### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C., *et al.*,** | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

### MOTION OF DEBTORS
### FOR ENTRY OF INTERIM AND FINAL
### ORDERS (I) AUTHORIZING THE DEBTORS
### TO PAY CERTAIN PREPETITION CLAIMS OF
### (A) CRITICAL VENDORS, (B) FOREIGN VENDORS,
### AND (C) LIEN CLAIMANTS; AND (II) GRANTING RELATED RELIEF

True Value Company, L.L.C. and certain of its affiliates, as the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), hereby move (this "Motion") this Court for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), granting the relief described below. In support of this Motion, the Debtors rely upon and incorporate by reference the contemporaneously filed *Declaration of Kunal S. Kamlani in Support of Chapter 11 Petitions and First Day Papers* (the "First Day Declaration")[2] and further represent as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

**RELIEF REQUESTED**

1. The Debtors respectfully request entry of an Interim Order and a Final Order (a) authorizing, but not directing, the Debtors to pay the claims of Critical Vendors, Foreign Vendors, and Lien Claimants (each as defined below) in an aggregate amount not to exceed (i) $18.5 million on an interim basis (the "Interim Cap Amount"), and (ii) $50.5 million on a final basis (the "Final Cap Amount"), to be allocated in the Debtors' sole discretion, without prejudice to the Debtors' right to seek additional relief on an emergency basis and (b) granting related relief.

2. The Debtors further request that the Interim Order and the Final Order (a) authorize all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorize the Banks to rely on the directions and representations of the Debtors as to which checks and fund transfers are subject to this Motion; *provided* that no such Bank shall have any liability to any party for relying on such directions and representations by the Debtors; (c) provide that the Banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims that had not been honored and paid as of the Petition Date; *provided* that sufficient funds are on deposit in the applicable accounts to cover such payments and that no such Bank shall have any liability to any party for relying on such direction by the Debtors; and (d) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts, and other forms of payment which may be inadvertently dishonored or rejected.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The legal predicates for the relief requested herein are sections 105(a), 363, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

5.      Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors confirm their consent to the entry of a final judgment or order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.      The Chapter 11 Cases

6.      On the date hereof (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that these voluntary cases (the "Chapter 11 Cases") be jointly administered.

7.      The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

9.      The Company is one of the world's leading hardlines wholesalers, serving approximately 4,500 stores worldwide.  A globally recognized retail brand, the Company provides customers in 55 countries an expansive product set across key categories such as Hardware Lumber & Building, Outdoor Living & Tools, and Plumbing & Heating.  The Company's business operations, corporate and capital structure, and the events leading up to the filing of the Chapter 11 Cases are described in greater detail in the First Day Declaration.

## II.      The Critical Vendors

10.     The Debtors' corporate headquarters, distribution business, and paint manufacturing business rely on an extensive network of critical vendors who provide goods and services that are necessary to the Debtors' continuing operations (the "Critical Vendors" and, the fixed, liquidated, and undisputed prepetition claims held by such parties, the "Critical Vendor Claims").  In order to minimize interruptions to the Debtors' business following the commencement of these Chapter 11 Cases, the Debtors seek authority, but not direction, to pay the Critical Vendor Claims.

11.     To identify the Critical Vendors, the Debtors, in consultation with their advisors, closely reviewed their accounts payable and prepetition vendor list.  In connection with these efforts, the Debtors also consulted with the employees most familiar with the Debtors' vendors to identify those vendors that are most critical to the Debtors' operations.  The criteria considered included:

(a)      whether a vendor is a sole- or limited-source supplier of certain goods, materials, or other services for use in the Debtors' business;

(b)     whether alternative vendors are available that can provide requisite volumes, specifications, customization, and expedited delivery of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operations without interruption while transitioning business thereto;

(c)     the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

(d)     whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

(e)     whether certain regulations, certifications, specifications, customization, location, or other relevant characteristics of ongoing operations prevent the Debtors from obtaining goods or services from alternative sources;

(f)     whether payment of an amount less than the full amount of a vendor's claim would induce such vendor to continue providing the applicable goods or services; and

(g)     the degree of risk that a vendor would move to a direct relationship with the Debtors' customers.

12.     Based on these criteria, the Debtors identified Critical Vendors that provide goods and services which are essential to the continuing operation of the Debtors' businesses, including: (i) suppliers of products and equipment for the Debtors' wholesale and distribution business; (ii) suppliers of equipment, raw materials, finished goods, and other products and supplies for the Debtors' paint manufacturing business; (iii) providers of hardware, software, and outsourced information technology services that maintain key applications of the Debtors; (iv) consultants and other professional services providers that assist the Debtors in connection with research and development and regulatory, legal, audit, quality control and compliance matters; and (v) providers of other critical business support and maintenance services (collectively, the "Critical Goods and Services").[3]

---

[3]     Upon request, the Debtors will provide a list of the Critical Vendors to the U.S. Trustee and any official committee appointed in these Chapter 11 Cases (the "Committee").  The Debtors expressly reserve the right to amend, modify, and/or supplement such list.

13.     Together, the Critical Goods and Services provided by Critical Vendors enable the Debtors to (i) source, store and sell tens of thousands of different hardware, tools, paint, outdoor living, bar-b-que, plumbing, electrical and cleaning products to customers across the United States and approximately 55 other countries and (ii) continue manufacturing paint and paint applicators for sale to customers.  Even a minor disruption to the Debtors' receipt of these Critical Goods and Services resulting from friction with vendors risks causing irreparable adverse consequences for the Debtors, the Debtors' customers, the Debtors' employees, downstream end consumers and all of the Debtors' stakeholders.  Any operational interruption also increases the likelihood that customers cease conducting business with the Debtors in the future. These harms could have lasting repercussions, impacting future cash flow and profitability and jeopardizing the Debtors' going concern prospects, the ongoing sale process, and the success of these Chapter 11 Cases, and far exceed the cost of paying prepetition Critical Vendor Claims.  Moreover, based on their books and records, the Debtors estimate that the total proposed payments on account of Critical Vendor Claims represent less than 10% of the Debtors' approximately $325.0 million total outstanding trade payables as of the Petition Date.

### III.     Proposed Terms and Conditions of Payment of the Critical Vendor Claims

14.     To preserve liquidity during the Chapter 11 Cases and ensure that the Debtors continue to receive Critical Goods and Services, the Debtors seek authority, but not direction, to condition any payment on account of Critical Vendor Claims on entry into an agreement, substantially in the form attached hereto as **Exhibit C** (the "Form of Trade Agreement"), between the Debtors and the applicable Critical Vendor.  The Debtors, however, reserve the right to negotiate different trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim, whether or not memorialized by a Trade Agreement (as defined herein), to the

extent the Debtors determine that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

15.     The Form of Trade Agreement, which the Debtors propose to send to Critical Vendors prior to making any payments, along with a copy of the Interim Order or Final Order, as applicable, includes, without limitation, the following terms:

(a)     The amount of such Critical Vendor's estimated claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for purposes of the order granting this Motion and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

(b)     The amount of payment toward the Critical Vendor's estimated claim;

(c)     The Critical Vendor's agreement to continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), representing the most favorable trade terms extended to the Debtors by the Critical Vendor within the 365-day period preceding the Petition Date (the "Customary Trade Terms"), or such other trade terms as mutually agreed to by the Debtors and the Critical Vendor, and the Debtors' agreement to pay the Critical Vendor postpetition in accordance with such terms;

(d)     The Critical Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates, or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary action to release such Lien;

(e)     The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the order granting this Motion and consents to be bound thereby;

(f)     The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claim (a "Reclamation Claim") or Bankruptcy Code section 503(b)(9) claim (a "503(b)(9) Claim"), other similar priority claim under the Bankruptcy Code or other statute (a "Priority Claim"), or other administrative expense claim under the Bankruptcy Code or other statute (an "Administrative Expense Claim") and that, to the extent that the Critical Vendor has previously

asserted a Reclamation Claim, a 503(b)(9) Claim, a Priority Claim, or an Administrative Expense Claim, such Critical Vendor shall immediately take all necessary action to withdraw such Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim; and

(g)     If a Critical Vendor who has received payment toward a Critical Vendor Claim subsequently refuses to supply goods or services to the Debtors on Customary Trade Terms, or on such other trade terms as mutually agreed to by the Debtors and such Critical Vendor, any payments received by the Critical Vendor on account of its Critical Vendor Claim may be deemed, in the sole discretion of the Debtors, to have been payment on account of any 503(b)(9) Claim, any Priority Claim, or any Administrative Expense Claim, and that such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim, to the extent that the aggregate amount of the Debtors' payments exceeds the Critical Vendor's obligations, without the right of setoff or reclamation.

16.     Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "Trade Agreement").[4]

17.     The Debtors hereby seek authority to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such agreements are necessary to their postpetition operations.  Maintaining normal trade-credit terms will improve the Debtors' chances of a robust and competitive auction and successful sale transaction, as purchasing goods on credit preserves working capital and liquidity, enabling the Debtors to maintain their competitiveness and to maximize the value of their businesses.  Absent the relief requested herein, many of the Debtors' vendors may attempt to place the Debtors on cash-in-advance or cash-on-delivery terms, which the Debtors estimate could drain their estates of resources that would otherwise be available

---

[4]     The Debtors' entry into a Trade Agreement shall not (a) effect a novation of any existing agreements between the Critical Vendor and the Debtors, (b) modify any of the conditions, covenants, representations and warranties, or other terms of any such existing agreements, other than as agreed between the Debtors and the Critical Vendor, (c) constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement, or (d) change the nature or priority of the underlying Critical Vendor Claims or entitle the Critical Vendor to treatment of its claim as an Administrative Expense Claim.

for other funding needs during the critical first weeks of the Debtors' bankruptcy cases. The Debtors are seeking to prevent the compression of trade terms early in the Chapter 11 Cases.

18.     If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor, following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority, in their discretion and without further order of the Court, but with notice to the affected Critical Vendor, to declare (a) such Trade Agreement immediately terminated (if applicable) and (b) any payments made to such Critical Vendor on account of the applicable Critical Vendor Claim to have been in payment of obligations owed to such Critical Vendor on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim.

19.     In the event that the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the amounts owed to such Critical Vendor on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, without giving effect to any rights of setoff or reclamation.

## IV.     Foreign Vendors

20.     In the ordinary course of business, the Debtors routinely transact with and rely on foreign vendors and service providers that are not U.S.-based, are not familiar with U.S. bankruptcy law or principles, and may not feel themselves bound by orders of a U.S. bankruptcy court (collectively, the "Foreign Vendors" and the fixed, liquidated, and undisputed prepetition claims held by such parties against the Debtors, the "Foreign Vendor Claims"). These include vendors from China and various other countries that supply thousands of products annually for the

Debtors' wholesale and distribution business as well as information technology providers that support key business functions.

21.    Based on the knowledge of the Debtors' personnel and advisors regarding the Foreign Vendors, the Debtors believe there is a material risk that the Foreign Vendors holding claims against the Debtors, particularly those who are unfamiliar with the chapter 11 process, may disregard the automatic stay and engage in conduct that disrupts the Debtors' operations. For example, Foreign Vendors may terminate their relationship with the Debtors or otherwise exercise self-help, which could result in shutting down the Debtors' access to essential goods and services. Foreign Vendors may also sue the Debtors in a foreign court to recover prepetition amounts owed to them. If they are successful in obtaining a judgment against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies, including seeking to withhold vital supplies and services from the Debtors. Because the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy these situations (absent payment of amounts sought) and are unable to efficiently replace the products and services supplied by Foreign Vendors, even temporary disputes over Foreign Vendor Claims could irreparably harm the Debtors' business to the detriment of the Debtors' estates and creditors. Accordingly, the Debtors need the ability to pay the Foreign Vendor Claims on an uninterrupted basis.

22.    For the 12 months prior to the Petition Date, the Debtors' average monthly payment to the Foreign Vendors was approximately $2.6 million. As of the Petition Date, the Debtors estimate that approximately $11.1 million in Foreign Vendor Claims are outstanding.

## V.    Lien Claimants

23.    In the ordinary course of operations, the Debtors' supply and distribution system depends upon the use of common carriers, freight forwarders, customs processors, and other shipping services operated by third parties, including intermodal shippers, ocean carriers, trucking

services, including full truckload and less-than-truckload, rail carriers, cross dock operators, third-party logistics providers, and a small parcel carrier, and storage and distribution facilities (the "Lien Claimants," and the fixed, liquidated, and undisputed prepetition claims held by such parties, the "Lien Claims"), to receive and store shipments of products and supplies from their vendors and deliver such products to their customers and to pass products and supplies through cross docks to minimize transportation costs.  As a result of the services they provide, the Lien Claimants regularly possess certain of the Debtors' goods in the ordinary course of the Debtors' operations.

24.     Under some state laws, the Lien Claimants may have a possessory lien on the goods in their possession, which secures payment of claims incurred in connection with the storage or transportation of goods.[5]  In addition, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants, as bailees, may be entitled to adequate protection for valid possessory liens.  If the Debtors fail to pay the Lien Claimants in a timely manner, the Lien Claimants may seek to assert liens against the Debtors' goods in the Lien Claimants' possession, which could potentially block the Debtors' access to the goods that are in transport.  While the Debtors reserve all rights to contest such actions, such actions would interrupt the flow of goods to customers, severely damaging the Debtors' ability to operate their businesses for the benefit of all stakeholders.

25.     As of the Petition Date, the Debtors estimate that the Lien Claims total approximately $9.1 million.

26.     Accordingly, the Debtors seek authority, in their business judgment, to make payments on account of Critical Vendor Claims, Foreign Vendor Claims and Lien Claims in an

---

[5]     For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  U.C.C. § 7-307(a) (2003).

aggregate amount not to exceed $50.5 million, of which $18.5 million shall be available upon entry of the Interim Order and the remaining $32.0 million available upon entry of the Final Order, which amounts represent the Debtors' best estimate as to what aggregate amounts must be paid to the Critical Vendors, Foreign Vendors and Lien Claimants to continue an uninterrupted supply of critical goods and services. The Debtors further request that the Court grant the Debtors the authority to allocate the foregoing amounts in their sole discretion, without prejudice to the right to seek additional relief.

27.     The Debtors expressly reserve the right to move to adjust the Interim Cap Amount or Final Cap Amount in the event that the Debtors determine that an adjustment is necessary to procure essential goods or services or is otherwise in the best interests of the Debtors' estates.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

**I.     Payment of the Critical Vendor Claims and Foreign Vendor Claims Is Authorized Under Section 363 of the Bankruptcy Code.**

28.     The Debtors should be authorized to pay the Critical Vendor Claims on the terms set forth in the Interim Order and Final Order, as it reflects a sound exercise of their business judgment.  Under section 363(b) of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  *See In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015) (citing *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153–54 (Bankr. D. Del. 1999)).

29.     Moreover, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, at *39–40 (Bankr. D. Del. Apr. 29, 2014) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)).  So long as a debtor's actions satisfy the business judgment rule, the

action "should be approved under section 363(b)(1)." *In re Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764, at *260 (Bankr. D. Del. Aug. 15, 2007); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

30.     The Debtors believe that if the Critical Vendors or the Foreign Vendors are not paid in the ordinary course, they may refuse to provide goods and services to the Debtors. Any disruption—however short—would adversely and severely impact the businesses of the Debtors, the businesses of the Debtors' customers, and the customers' willingness to conduct business with the Debtors in the future. Although the Debtors should be able to benefit from the protections of the universal automatic stay set forth in section 362 of the Bankruptcy Code, the Debtors do not believe that they have any practical or legal alternative to paying Foreign Vendor claims because of the expected challenges of enforcing this Court's orders on the Foreign Vendors and the Foreign Vendors' unfamiliarity with the Bankruptcy Code and the unique debtor-in-possession mechanisms central to chapter 11 proceedings. Accordingly, given the demonstrated benefits of paying (a) the Critical Vendor Claims in exchange for a postpetition trade relationship governed by the Trade Agreement or other mutually agreed terms and (b) the Foreign Vendor Claims, and the risks associated with non-payment in each case, the Debtors submit that paying such claims represents a sound exercise of their business judgment.

31.     The relief requested is commonly granted in this District. *See, e.g.*, *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 14, 2024) (authorizing payment of critical vendors' and foreign vendors' prepetition claims); *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. May 7, 2024) (same);  *In re Joann Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) (same); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15,

2023) (same); *In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 24, 2023) (same); *In re Armstong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. May 8, 2022) (same).[6]

## II.    The Court Should Authorize the Payment of Lienholder Claims.

32.    Certain Lien Claimants may be entitled under applicable nonbankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  *See* 11 U.S.C. § 362(b)(3); 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.").  As such, even absent a valid lien, to the extent that certain Lien Claimants have possession of the Debtors' inventory, mere possession or retention could disrupt the Debtors' operations.

33.    Moreover, to the extent that the Lien Claims are secured by a lien on certain of the Debtors' assets or a Lien Claimant is entitled to assert possessory liens securing their claims under applicable state law, the Lien Claimant is entitled to receive payment in full of its prepetition claim pursuant to any confirmed plan or plans in the Chapter 11 Cases, and may also be entitled to the postpetition interest accruing on such claim to the extent such claim is oversecured.  To the extent Lien Claimants remain unpaid, they may assert a lien on the goods in their possession, refuse to

---

[6]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available upon request.

deliver goods to the Debtors or their customers, or refuse to continue to do business with the Debtors in the future, which likely would cause irreparable harm to the Debtors' business. Even a short delay in the Debtors' supply chain could undermine the Debtors' ability to fulfill their customers' needs and adversely impact relationships with their customers. As a result, the Debtors' ability to effect a successful restructuring may be jeopardized. This risk is only heightened by the fact that the Debtors' customers may be tempted to source their business needs elsewhere due to the Debtors' commencement of the Chapter 11 Cases. Therefore, the Debtors respectfully request authority to pay, in their discretion, any of the Lien Claims.

34.     For these reasons, courts in this district have authorized the payment of prepetition lien claims in recent chapter 11 cases. *See, e.g.*, *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 14, 2024) (authorizing debtors to pay prepetition claims of potential statutory lienholders); *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. May 7, 2024) (same); *In re Joann Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) (same); *In re MVK FarmCo LLC,* No. 23-11721 (LSS) (Bankr. D. Del. Nov. 13, 2023) (same); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (same); *In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 24, 2023) (same).

## III.     Payment of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims Is Appropriate Under the Doctrine of Necessity.

35.     The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims whose payment is critical to the debtor's business is firmly established under the "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued

operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).[7]

Although the "doctrine of necessity" pre-dates the Bankruptcy Code, *see Miltenberger v. Logansport C. & S.W. R.Co.*, 106 U.S. 286 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a), and 1108. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value). Courts have located additional support for the pre-confirmation satisfaction of critical claims in section 363(b) of the Bankruptcy Code, under which a court may authorize the use of property outside the ordinary course of business where a debtor "articulate[s] some business justification, other than mere appeasement of major creditors" for such relief. *See Ionosphere*, 98 B.R. at 175.

36.    For the reasons set forth herein, satisfaction of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims in the ordinary course of business is critically important to the Debtors' ongoing business. Even if the Debtors could avoid payment of certain accrued Critical Vendor Claims, Foreign Vendor Claims, or Lien Claims, the collateral consequences on the Debtors' go-forward business would vastly exceed whatever modest short-run cost savings the Debtors might achieve.

---

[7]    *Accord In re Pers. Commc'ns Devices, LLC*, 588 B.R. 661, 666 (Bankr. E.D.N.Y. 2018); *see also In re Friedman's Inc.*, No. 09-10161 (CSS), 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("Normally, a debtor only pays prepetition, unsecured claims through a confirmed plan of reorganization . . . [h]owever, most courts will allow such payments under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business."); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996), *corrected* (Sept. 4, 1996); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit the pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

IV.     **The Proposed Payment-Processing Procedures Are Appropriate.**

37.     As set forth above, the Debtors request that all Banks be authorized and directed to honor and process payments on account of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims as directed by the Debtors.  The Debtors believe they will have sufficient liquidity to pay the amounts delineated in this Motion in the ordinary course of business, and have implemented controls to ensure that prepetition claims will not be paid except as authorized by this Court.  The Debtors therefore submit that the payment processing procedures described in this Motion are appropriate.

**IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY**

38.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate.  *See, e.g.*, *Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  The harm also must be actual and imminent, not speculative or unsubstantiated.  *See, e.g.*, *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

39.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

40.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

## NOTICE

41.     Notice of this Motion will be given to: (a) the U.S. Trustee, (b) counsel to the prepetition Lenders, (c) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (d) the Internal Revenue Service, (e) the Office of the United States Attorney for the District of Delaware, (f) any party that has requested notice pursuant to Bankruptcy Rule 2002, (g) the Banks, and (h) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m). The Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

42.     No previous request for the relief sought therein has been made to this Court or any other court.

## CONCLUSION

The Debtors respectfully request that this Court enter the Interim Order and the Final Order, each substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: October 14, 2024
     Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

Ron E. Meisler (*pro hac vice* admission pending)
Jennifer Madden (*pro hac vice* admission pending)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and –

Robert D. Drain (*pro hac vice* admission pending)
Evan A. Hill (*pro hac vice* admission pending)
Moshe S. Jacob (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Robert.Drain@skadden.com
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**EXHIBIT A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.**, *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| | Related Docket No[s]. __ |

## INTERIM ORDER (I) AUTHORIZING
## THE DEBTORS TO PAY CERTAIN PREPETITION
## CLAIMS OF (A) CRITICAL VENDORS, (B) FOREIGN VENDORS,
## AND (C) LIEN CLAIMANTS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for an interim order (this "Interim Order") and a final order (i) authorizing, but not directing, the Debtors to pay the fixed, liquidated, and undisputed prepetition claims of Critical Vendors, Foreign Vendors, and Lien Claimants and (ii) granting related relief; all as more fully described in the Motion; and upon consideration of the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under the particular circumstances;

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

and it appearing that no other or further notice is necessary; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby:

**ORDERED, ADJUDGED, AND DECREED that:**

1.　　The Motion is GRANTED on an interim basis as set forth herein.

2.　　The Debtors are hereby authorized, but not required, to pay, in their sole discretion, without further order of this Court, the Critical Vendor Claims, the Foreign Vendor Claims, and the Lien Claims in amounts not to exceed $18.5 million in the aggregate absent further order of the Court.

3.　　The form of Trade Agreement attached as <u>Exhibit C</u> to the Motion is hereby approved. The Debtors are authorized, but not directed, to enter into Trade Agreements. No Trade Agreement will (a) effect a novation of any existing agreements between the Critical Vendor and the Debtors, (b) modify any of the conditions, covenants, representations and warranties, or other terms of any such existing agreements, other than as agreed between the Debtors and the Critical Vendor, (c) constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement, or (d) change the nature or priority of the underlying Critical Vendor Claims or entitle the Critical Vendor to treatment of its claim as an Administrative Expense Claim.

4.　　Any Critical Vendor that accepts payment pursuant to the authority granted in this Order agrees to supply goods and/or services to the Debtors postpetition on Customary Trade Terms or on such other trade terms as mutually agreed to by the Debtors and such Critical Vendor; *provided, however*, that the Debtors' inability to agree on Customary Trade Terms shall not

preclude them from paying a Critical Vendor Claim if the Debtors determine, in the reasonable exercise of their business judgment, that such payment is necessary to the Debtors' operations.

5.      If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms, or on such other trade terms as mutually agreed to by the Debtors and such Critical Vendor, following receipt of any payment on account of its Critical Vendor Claim, then the Debtors may, in their sole discretion with notice to the affected Critical Vendor, declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, without giving effect to any rights of setoff or reclamation. Nothing herein shall constitute a waiver of the Debtors' rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

6.      All Banks are (a) authorized and directed to receive, process, honor and pay any and all prepetition and postpetition checks, drafts, electronic transfers and other forms of payment used by the Debtors to satisfy their Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims, whether presented before, on, or after the Petition Date; *provided* that sufficient funds are on deposit in the applicable accounts to cover such payments, and (b) prohibited from placing any holds on, or attempting to reverse, any automatic transfers on account of Critical Vendor Claims, Foreign Vendor Claims and Lien Claims. The Banks shall rely on the directions and representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Interim Order, and no such Bank shall have any liability to any party for relying on such directions and representations by the Debtors as provided for in this Interim Order.

7.      To the extent the Debtors have not yet sought to remit payment on account of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims, the Debtors are authorized, but

not directed, to issue checks or provide for other means of payment of the Critical Vendor Claims, Foreign Vendor Claims and Lien Claims.

8.      Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Interim Order.

9.      Nothing in the Motion or this Interim Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

10.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

11.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be effective and enforceable immediately upon entry hereof.

12.     All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

13.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.

14.     The final hearing on the Motion shall be held on _____ ___, 2024 at __:___ a.m./p.m., prevailing Eastern Time.  Any objections or responses to the entry of a final order on

the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____ ___,

2024, and shall be served on: (a) True Value Company, L.L.C., 8600 West Bryn Mawr Ave.,

Chicago, IL, 60631 (Attn: Susan Radde, Esq. (susan.radde@truevalue.com)); (b) proposed

counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago,

IL 60606 (Attn: Ron Meisler, Esq. (ron.meisler@skadden.com) and Jennifer Madden, Esq.

(jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001

(Attn: Evan Hill, Esq. (evan.hill@skadden.com) and Moshe Jacob, Esq.

(moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, Delaware 19801 (Attn:

Joe Larkin (joe.larkin@skadden.com)); (c) the United States Trustee for the District of Delaware,

844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Benjamin A. Hackman, Esq.

(Benjamin.A.Hackman@usdoj.gov)); (d) counsel to the prepetition Lenders (Attn: Daniel Fiorillo,

Esq. (dfiorillo@otterbourg.com)); and (e) counsel to any statutory committee appointed in the

Chapter 11 Cases.  If no objections or responses are filed and served, this Court may enter a final

order without further notice or hearing.

15.     This Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation, interpretation, or enforcement of this Interim Order.

**EXHIBIT B**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| | Related Docket No[s]. ___ |

## FINAL ORDER (I) AUTHORIZING
## THE DEBTORS TO PAY CERTAIN PREPETITION
## CLAIMS OF (A) CRITICAL VENDORS, (B) FOREIGN VENDORS,
## AND (C) LIEN CLAIMANTS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for an Interim Order and a final order (this "Final Order") (i) authorizing, but not directing, the Debtors to pay the fixed, liquidated, and undisputed prepetition claims of Critical Vendors, Foreign Vendors, and Lien Claimants and (ii) granting related relief, all as more fully described in the Motion; and upon consideration of the First Day Declaration and the Interim Order entered on [●]; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

given under the particular circumstances; and it appearing that no other or further notice is necessary; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby:

**ORDERED, ADJUDGED, AND DECREED that:**

1. The Motion is GRANTED on a final basis as set forth herein.

2. The Debtors are hereby authorized, but not required, to pay, in their sole discretion, without further order of this Court, the Critical Vendor Claims, the Foreign Vendor Claims, and the Lien Claims in amounts not to exceed $50.5 million in the aggregate absent further order of the Court.

3. The form of Trade Agreement attached as <u>Exhibit C</u> to the Motion is hereby approved. The Debtors are authorized, but not directed, to enter into Trade Agreements. No Trade Agreement will (a) effect a novation of any existing agreements between the Critical Vendor and the Debtors, (b) modify any of the conditions, covenants, representations and warranties, or other terms of any such existing agreements, other than as agreed between the Debtors and the Critical Vendor, (c) constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement, or (d) change the nature or priority of the underlying Critical Vendor Claims or entitle the Critical Vendor to treatment of its claim as an Administrative Expense Claim.

4. Any Critical Vendor that accepts payment pursuant to the authority granted in this Final Order agrees to supply goods and/or services to the Debtors postpetition on Customary Trade Terms or on such other trade terms as mutually agreed to by the Debtors and such Critical Vendor; *provided, however*, that the Debtors' inability to agree on Customary Trade Terms shall not

preclude them from paying a Critical Vendor Claim if the Debtors determine, in the reasonable exercise of their business judgment, that such payment is necessary to the Debtors' operations.

5.      If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms, or on such other terms as mutually agreed to by the Debtors and such Critical Vendor, following receipt of any payment on account of its Critical Vendor Claim, then the Debtors may, in their sole discretion with notice to the affected Critical Vendor, declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, without giving effect to any rights of setoff or reclamation.  Nothing herein shall constitute a waiver of the Debtors' rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

6.      All Banks are (a) authorized and directed to receive, process, honor and pay any and all prepetition and postpetition checks, drafts, electronic transfers and other forms of payment used by the Debtors to satisfy their Critical Vendor Claims, whether presented before, on, or after the Petition Date; *provided* that sufficient funds are on deposit in the applicable accounts to cover such payments, and (b) prohibited from placing any holds on, or attempting to reverse, any automatic transfers on account of Critical Vendor Claims.  The Banks shall rely on the directions and representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Final Order, and no such Bank shall have any liability to any party for relying on such directions and representations by the Debtors as provided for in this Final Order.

7.      To the extent the Debtors have not yet sought to remit payment on account of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims, the Debtors are authorized, but

not directed, to issue checks or provide for other means of payment of the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims.

8.      Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Final Order.

9.      Nothing in the Motion or this Final Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

10.     Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be effective and enforceable immediately upon entry hereof.

11.     All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

12.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Final Order.

13.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

**EXHIBIT C**

**Form of Trade Agreement**

_____, 20__

TO:    **[Critical Vendor/Service Provider]**
      **[Name]**
      **[Address]**

Dear Valued Supplier/Service Provider:

As you are aware, True Value Company, L.L.C. and certain of its affiliates (together, the "<u>Debtors</u>") filed voluntary petitions (the "<u>Chapter 11 Cases</u>") for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("<u>Bankruptcy Court</u>") on [_], 2024 (the "<u>Petition Date</u>").  On the Petition Date, in recognition of the importance of its relationship with vendors and suppliers and its desire that the Chapter 11 Cases have as little effect on such parties as possible, the Debtors requested the Bankruptcy Court's approval to pay the prepetition claims of certain critical vendors and suppliers.  On [_], 2024, the Bankruptcy Court entered an interim order (the "<u>Order</u>") authorizing the Debtors, under certain conditions, to pay the prepetition claims, in accordance with the terms of the Order, of certain trade creditors that agree to the terms set forth below and agree to be bound by the terms of the Order.  A copy of the Order is enclosed for your reference.  The Debtors have asked the Bankruptcy Court to schedule a final hearing and thereafter grant the relief provided in the Order on a final basis.

Under the Order, in order to receive payment of its prepetition claim, each selected trade creditor must agree to continue to supply goods and/or services to the Debtors based on "Customary Trade Terms."  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Debtors and in effect between such trade creditor and the Debtors on a historical basis for the period within 365 days of the Petition Date, or such other trade terms as mutually agreed to by the Debtors and such trade creditor.

For purposes of administering this trade program, as authorized by the Bankruptcy Court and in accordance with the terms of the Order, the Debtors and **[Name of Trade Vendor]** agree as follows (the "<u>Agreement</u>"):

      (a)    The estimated balance of the prepetition trade claim (net of any setoffs, credits or discounts) (the "<u>Trade Claim</u>") asserted against the Debtors by **[Name of Trade Vendor]** is $_____.  Your Trade Claim does not necessarily constitute a claim allowed by the Bankruptcy Court in the Chapter 11 Cases, and signing this Trade Agreement does not excuse you from any requirement of filing a proof of claim in the Chapter 11 Cases.

      (b)    The Debtors shall pay $_____ towards the Trade Claim (the "**Payment**").

(c) **[Name of Trade Vendor]** agrees to supply goods/services to the Debtors in accordance with the Customary Trade Terms, and the Debtors agree to pay **[Name of Trade Vendor]** in accordance with such Customary Trade Terms.  [For purposes of this Agreement, Customary Trade Terms consist of those terms provided for in the agreement attached hereto as **Exhibit A** and/or the following terms and conditions.]

(d) The open trade balance or credit line that **[Name of Trade Vendor]** will extend to the Debtors for shipment of postpetition goods/provision of postpetition services is $_____.

(e) In consideration for the Payment, you agree not to file or otherwise assert against the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien"), claim for reclamation ("Reclamation Claim"), claim under Bankruptcy Code section 503(b)(9) (a "503(b)(9) Claim"), any similar priority claim under the Bankruptcy Code or other statute (a "Priority Claim"), or other administrative expense claim under the Bankruptcy Code or other statute (an "Administrative Expense Claim") regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, you shall take (at your own expense) whatever actions are necessary to release such Lien or withdraw such Reclamation Claim, 503(b)(9) Claim, Priority Claim, or Administrative Claim unless your participation in the trade payment program authorized by the Order (the "Trade Payment Program") is terminated.

Your execution of this Agreement and return of the same to the Debtors constitutes an agreement by **[Name of Trade Vendor]** and the Debtors:

1. to be bound by the Customary Trade Terms (as modified herein) and, subject to the reservations set forth in the Order, to the amount of the Trade Claim set forth above;

2. that [**Name of Trade Vendor]** will continue to supply the Debtors with goods and/or services pursuant to the Customary Trade Terms (as modified herein) and that the Debtors will pay for such goods and/or services in accordance with the Customary Trade Terms (as modified herein);

3. that **[Name of Trade Vendor]** has reviewed the terms and provisions of the Order and that it consents to the bound by such terms;

4.      that **[Name of Trade Vendor]** will not separately seek payment for Liens, Reclamation Claims, 503(b)(9) Claims, Priority Claims, Administrative Expense Claims and similar claims outside of the terms of the Order unless its participation in the Trade Payment Program is terminated;

5.      that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Trade Claim may be deemed, in the sole discretion of the Debtors, to have been in payment on account of any 503(b)(9) Claim, Priority Claim, or Administrative Expense Claim, and you will immediately repay to the Debtors any payments made to you to the extent that the aggregate amount of such payments exceeds such obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense;

6.      that if the Debtors shall be in default under this Agreement, **[Name of Trade Vendor]** shall have no obligation to supply goods and/or services to the Debtors on Customary Trade Terms (as modified herein) until the Debtors cure such default and **[Name of Trade Vendor]** shall have the right to terminate this Agreement upon written notice to the Debtors detailing the Debtors' defaults hereunder (which the Debtors shall have the right to dispute) and the Debtors' failure to cure such default within five business days of such notice, in which event **[Name of Trade Vendor]** may retain all sums paid to it hereunder on account of its Trade Claim; and

7.      entry into this Trade Agreement shall not (a) effect a novation of any existing agreements between **[Name of Trade Vendor]** and the Debtors, (b) modify any of the conditions, covenants, representations and warranties, or other terms of any such existing agreements, other than as agreed between the Debtors and **[Name of Trade Vendor]**, (c) constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement, or (d) change the nature or priority of **[Name of Trade Vendor]**'s underlying claim(s) or entitle **[Name of Trade Vendor]** to treatment of its claim(s) as an Administrative Expense Claim(s).

      The Debtors and **[Name of Trade Vendor]** also hereby agree that any dispute with respect to this Agreement, the Order and/or **[Name of Trade Vendor]**'s participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

      If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call **[Contact Person]** at (___) ___-____:

                  Very truly yours,

                  True Value Company, L.L.C.

                  By:_____
                  Name: [●]
                  Title: [●]

Agreed and Accepted by:

**[Name of Trade Vendor]**

By:_____
        Name: **[Name]**
        Title: **[Title]**

Dated: _____, 2024