**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **TRUE VALUE COMPANY, L.L.C.**, *et al.*, | Case No. 24-12337 (___) |
| Debtors.[1] | (Joint Administration Pending) |

**MOTION OF DEBTORS FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE**
**DEBTORS TO HONOR CERTAIN PREPETITION OBLIGATIONS**
**TO CUSTOMERS AND CONTINUE CERTAIN CUSTOMER PROGRAMS IN**
**THE ORDINARY COURSE OF BUSINESS, AND (II) GRANTING RELATED RELIEF**

True Value Company, L.L.C. and certain of its affiliates, as the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), hereby move (this "Motion") this Court for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), granting the relief described below.  In support of the Motion, the Debtors rely upon and incorporate by reference the contemporaneously filed *Declaration of Kunal S. Kamlani in Support of Chapter 11 Petitions and First-Day Papers* (the "First Day Declaration")[2] and further represent as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

**RELIEF REQUESTED**

1.      By the Motion, the Debtors respectfully request entry of orders, (a) authorizing, but not directing, the Debtors to (i) honor certain prepetition obligations to customers and (ii) continue certain customer programs in the ordinary course of business; and (b) granting related relief.

2.      The Debtors further request that this Court (a) authorize financial institutions (collectively, the "Banks") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent directed by the Debtors in accordance with the Motion and to the extent the Debtors have sufficient funds on deposit in their accounts with such Banks, whether such checks were presented or electronic requests were submitted before or after the Petition Date; and (b) authorize all Banks to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to the Motion without any duty of further inquiry and without liability for following the Debtors' instructions, (c) provide that the Banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Customer Programs that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that no such Bank shall have any liability to any party for relying on such direction by the Debtors; and (d) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts, and other forms of payment which may be inadvertently dishonored or rejected.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C.

§ 157(b).  Venue of these Chapter 11 Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The legal predicates for the relief requested herein are sections 105(a), 363, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

5.      Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors confirm their consent to the entry of a final judgment or order by this Court in connection with the Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.      The Chapter 11 Cases

6.      On the date hereof (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that these cases (the "Chapter 11 Cases") be jointly administered.

7.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

9.      The Company is one of the world's leading hardlines wholesalers, serving approximately 4,500 stores worldwide.  A globally recognized retail brand, the Company provides customers in over 55 countries an expansive product set across key categories such as Hardware

Lumber & Building, Outdoor Living & Tools, and Plumbing & Heating.  The Company's business operations, corporate and capital structure, and the events leading up to the filing of the Chapter 11 Cases are described in greater detail in the First Day Declaration.

## II.    The Debtors' Customers

10.    The Debtors provide products and services to a wide variety of approximately 4,500 customers worldwide (the "Customers").  These Customers generally fall into one of the following six categories: (a) core accounts, consisting of the 2,200 independently-owned retail stores that bear the True Value name; (b) strategic accounts, consisting of the twelve multi-store chains that maintain a strategic merchandising relationship with the Debtors; (c) online retailers that sell the Debtors' product through e-commerce channels; (d) international True Value retailers located in Central America and the Caribbean Islands; (e) secondary customers who utilize True Value products when their primary supplier is unable or does not offer a product; and (f) specialty business customers, consisting of businesses that service the farm and ranch, nursery, and commercial industrial segments.

## III.    The Customer Programs

11.    The Debtors, in the ordinary course of business, maintained certain customer programs and related practices (collectively, the "Customer Programs") that are designed to (a) attract and retain Customers, (b) develop and sustain a positive reputation in the marketplace for the Debtors' products and the True Value brand, (c) ensure consistency of quality service and customer experience across the Company brand, (d) ensure customer satisfaction, (e) engender customer loyalty, and (f) meet competitive market pressures.  As set forth in more detail below, the Customer Programs are critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value.  The Customer Programs generate goodwill and ensure consistency across the Company brand, thereby allowing the Debtors to retain and incentivize

current Customers as well as attract new customers.  Through the Customer Programs, the Debtors are able to leverage the collective scale of their Customer base to provide Customers scalable solutions via programs that many Customers could not access individually. Therefore, the Debtors seek authority to continue to maintain and administer their Customer Programs in the ordinary course of business and to honor the cash and performance-based obligations arising thereunder (the "Customer Programs Obligations"), whether such Customer Programs Obligations arose prior to or after the Petition Date (except as otherwise set forth herein).  For the avoidance of doubt, the Debtors do not intend to make payments to or on behalf of Customers who have overdue balances with the Debtors.

12.    As described in greater detail below, the Debtors' Customer Programs can be divided into five categories: (a) the Direct Ship Program, (b) Rebate Programs and Warranty Claims Programs, (c) Loyalty and Promotional Programs, (d) Brand Consistency and Quality Programs, and (e) Vendor Relationship Programs.  The following are general descriptions and non-exhaustive examples of the Debtors' principal Customer Programs.

## A.    The Direct Ship Program

13.    Like their competitors, the Debtors, in the ordinary course of business, offer a direct ship program to their customers (the "Direct Ship Program"). Through the Direct Ship Program, Customers can access an extensive catalogue maintained by the Debtors that contains hundreds of thousands of products from thousands of different vendors. When a Customer wants to purchase merchandise from one of the third-party vendors listed in the Debtors' database, the Customer contacts the vendor directly, obtains a quote, negotiates a purchase order and places an order directly with the vendor (a "Direct Ship Order").  Once the purchase order is negotiated and the initial order is placed, but before any merchandise is shipped, the vendor notifies the Debtors, who perform a credit check on the Customer.  Assuming the credit check is approved by the Debtors,

the vendor proceeds with delivering the merchandise directly to the Customer. These credit approvals remain in effect for six months, during which the Customer can continue to place Direct Ship Orders with vendors on their negotiated terms.

14.     Although Customers participating in the Direct Ship Program place their orders directly with the third-party vendors who deliver the products directly to the Customer, payments for products purchased through the program are routed through the Debtors. When a Direct Ship Order is placed, the vendor submits an invoice to the Debtors (the "<u>Vendor Invoice</u>"), who, in turn, submit a separate invoice to the Customer (the "<u>Customer Invoice</u>"). The Customer then delivers payment to the Debtors on account of the Customer Invoice and the Debtors deliver payment to the vendor on account of the Vendor Invoice.  The Debtors retain the spread between the amount of the Vendor Invoice and the Customer Invoice.

15.     The Direct Ship Program, among other things, allows the Debtors to attract Customers by offering them access to thousands of vendors and hundreds of thousands of items that are not stored in the Debtors' warehouses through a centralized platform. The Debtors generate approximately $500 million in annual revenue on account of the Direct Ship Program.

16.     The Debtors seek authority, but not direction, to continue their Direct Ship Program in the ordinary course of business during the Chapter 11 Cases.

**B.      The Rebate and Warranty Claims Programs**

*(i)      The Rebate Programs*

17.     In the ordinary course of business, the Debtors offer annual volume-based rebates (the "<u>Rebate Programs</u>") to Customers to drive overall efficiency regarding the Company's inventory and reward those Customers with higher purchase volume.  The Debtors' primary Rebate Programs are the Assortment Volume Rebate and the Standard Volume Rebate (each as defined below).

6

18.     *Assortment Volume Rebate.*  Customers may receive an annual rebate based on the volume of sales of select items that are made by the Customer during a given year (the "Assortment Volume Rebate").  Customers must purchase $200,000 or more of select product to be eligible for the Assortment Volume Rebate.  The Customer is paid the Assortment Volume Rebate on a tiered basis as follows: (a) a 1.5% rebate for Customers whose purchases of select product total $200,000 to $350,000; (b) a 2.25% rebate for Customers whose purchases of select product total $350,000 to $550,000; (c) a 3% rebate for Customers whose purchases of select product total $550,000 to $750,000; and (d) a 3.5% rebate for Customers whose purchases of select product exceed $750,000.  New Customers who become Customers during the fiscal year are eligible for a pro-rated volume rebate based upon their average monthly purchases from the date of their first purchase.

19.     *Standard Volume Rebate.*  Customers may receive an annual rebate based on the volume of sales of all items at the recipient store (the "Standard Volume Rebate").  Customers must purchase $200,000 or more of select product to be eligible for the Assortment Volume Rebate.  The Customer is paid the Standard Volume Rebate on a tiered basis as follows: (a) a 1.25% rebate for Customers whose purchases of select product total $275,000 to $500,000; (b) a 2.25% rebate for Customers whose purchases of select product total $500,000 to $750,000; (c) a 3% rebate for Customers whose purchases of select product total $750,000 to $950,000; and (d) a 3.5% rebate for Customers whose purchases of select product exceed $950,000.  A Customer can only be eligible for either the Assortment Volume Rebate or the Standard Volume Rebate.

20.     *Growth Rebate.*  Customers that are eligible for the Assortment Volume Rebate are also eligible for a rebate based on the annual cumulative growth of accounts related to end-consumers (the "Consumers").  Specifically, Customers that achieve $10,000 or more in revenue

growth over a set baseline and in addition to their previous-year revenues receive a 10% rebate on all such growth revenue.

21.    *Other Rebates*.  Additionally, the Debtors offer (a) a volume-based rebate to select affiliates based on their sales and (b) a rebate based on the volume of lumber purchases in a given year.

22.    Rebates are typically paid in March of the year following the year of measurement. The Debtors paid approximately $19.4 million in rebates for sales that occurred during 2023.  As of the Petition Date, the Debtors estimate that, based on Customer sales to date, approximately $14,555,011 in rebates have accrued.

### (ii)    The Warranties Program

23.    In the ordinary course of business, the Debtors allow Customers to return products or file claims on products.  These claims fall into five different categories: (a) RFA Claims, (b) Policy A Claims, (c) Policy B Claims, (d) Direct Ship Claims, and (e) Pricing Claims (collectively, the "Warranty Claims").

24.    *RFA Claims*.  Requests for adjustment claims ("RFA Claims") may be made with respect to items that are (a) submitted for return within 30 days of the invoice date, with certain exceptions, (b) subjected to a shortage, an overage or a mis-ship situation, or (c) damaged upon a Consumer's receipt of the product.  If an RFA Claim is valid and timely submitted, a Customer is eligible to receive credit against future purchases.  In order to receive payment for RFA Claims, RFA Claims must be submitted within 30 days of the invoice date subject to certain exceptions. Claims submitted after the 15th day are subject to a 15% restocking fee.

25.    *Policy A and Policy B Claims*.  Customers may make claims related to defective or recalled items.  Whether claims must be made as Policy A Claims or Policy B Claims (each as defined herein) is generally within the discretion of the vendors who sell products to the Company.

8

Claims made under "Policy B" ("Policy B Claims") require the Customer to (a) submit proof to the vendor of the damage or defect or (b) to contact the vendor prior to the filing of the claim, whereas claims made under "Policy A" ("Policy A Claims") do not. Defect and recall claims on items that are not stocked in the Company's warehouses, such as large machinery, must be submitted as Policy B Claims. Customers who submit valid Policy A Claims and Policy B Claims generally receive credit against future purchases for such claims. The Debtors substantially simultaneously debit the vendor whose good gave rise to the claim for the amount of credit distributed to the Customers. As a result of the simultaneous crediting and debiting, the Company does not believe that they have any outstanding liabilities for Policy A Claims or Policy B Claims.

26.     *Direct Ship Claims*.  Customers may also submit claims for cases or shipment errors, recalls or defects, or damaged items related to products sent to Customers via the Company's Direct Ship Program ("Direct Ship Claims"). Direct Ship Claims include claims related to (a) pricing discrepancies, (b) overage or shortage of requested product, (c) damaged or concealed damaged products, (d) shipment of wrong merchandise, or (e) duplicate shipments of the requested product, among other claims. Customers who submit valid Direct Ship Claims generally receive credit against future purchases. As in the case of Policy A and Policy B Claims, the Debtors debit vendors for valid Direct Ship claims. As of the Petition Date, the Debtors do not believe that they have any outstanding liabilities on behalf of Direct Ship Claims.

27.     *Pricing Claims*.  Customers may also submit claims for pricing adjustment based on pricing discrepancies on stocked products. Customers generally receive credit against future purchases for these claims.

28.     As of the Petition Date, approximately $1,114,998.51 of unpaid Warranty Claims have been made by Customers.

###### C.    Loyalty and Promotional Programs

29.    The Debtors offer a number of promotional programs for the benefit of Customers and assist Customers in offering and administering certain promotional and loyalty rewards programs for the benefit of their Consumers.  These programs ensure Customer and Consumer satisfaction and engender loyalty to the True Value brand and the Customers.

###### (i)    True Value Rewards Program

30.    The Debtors help Customers operate the True Value Rewards Program (the "Rewards Program").  Under the Rewards Program, Consumers typically earn 10 points for every dollar they spend in-store and online at participating Customer retailers; however, Customers can tailor their individual Rewards Program at will.  When Consumers earn 2,500 points, they automatically receive a $5 reward certificate in redemption for those points, which certificates are valid for 30 days.  The Debtors support the Rewards Program by creating and distributing Rewards Program marketing materials, including the issuance of the reward certificates, as well as supplying the technology platforms which allow Customers to collect Consumer information when Consumers decide to enroll in the program.  Customers pay $150 monthly to participate in the Rewards Program and are also responsible for the total cost of the points redemption each month. There are currently approximately two million active loyalty Consumers and 750 participating Customers.

###### (ii)    The Gift Card Program

31.    The Debtors maintain a national gift card program for participating Customers who seek to offer True Value gift cards in their stores (the "Gift Card Program").  Under the Gift Card Program, Consumers purchase Company gift cards at Customer stores, and the proceeds of those sales go to the Company.  When a Consumer uses their gift card at a Customer's store, the Company will pay such Customer store an amount equal to the amount purchased with the gift

card.  Customers may receive funds directly to their checking account or as a credit on their statement with the Company on account of credited gift card funds.  As of the Petition Date, the Company estimates that it owes approximately $875,000 to Customer stores on account of gift card purchases.

*(iii)    Other Promotional Programs*

32.    The Debtors support certain other promotional and marketing programs by which Customers can offer products on promotion throughout the year.  The Debtors provide Customers the opportunity to buy certain products at a discount which Customers can then offer to Consumers at a discounted rate of their choosing.  Additionally, the Debtors offer Customers certain ready-made marketing content and promotion materials that Customers can utilize in their operations, such as coupon books and print and online sale advertisements, among others.

**IV.    Brand Consistency and Quality Programs**

33.    The Debtors offer numerous programs to support Customer operations that are designed to maintain quality of the Company's brand and ensure consistency across Customer operations.  These programs are numerous, comprehensive, and designed to ensure Customers are outfitted with the tools and services necessary to run efficient and successful stores and to meet Consumer expectations.  These programs include, among others:

- *The True Value Rental and Rent Center Programs*.  The Debtors assist Customers seeking to enter the rental business by suppling inventory of highly popular rental products.  Customers who operate rental businesses also have access to recommended rental software and marketing and signage materials.

- *Nursery, Lawn & Garden Programs*.  The Debtors also offer a program to support both Company-affiliated and independent garden retail Customers through merchandising, marketing, educational, and store development programs.  Under

the program, the Company provides these Customers with access and discounts to some of the country's top nursery suppliers, display guidance, and product maintenance information and direction, among other benefits.

- *True Value University Retail Educational Program.*   Customers and their employees can access educational materials and participate in programs such as in-person seminars, training, and certification courses, and web-based trainings for remote educational opportunities.  These educational courses allow Customers to stay apprised of competitive trends, new methods of operation, and innovative retail strategies to help ensure Consumers will receive the quality service and expert advice they expect from parties associated with the True Value brand.

- *Store Planning and Design Program.*  The Debtors offer support for potential Customers looking to open new stores and existing Customers seeking to remodel their current locations.  Through this store planning and design program (the "Store Planning and Design Program"), Customers have the opportunity to receive credits against future purchases as well as free or discounted items based on their performance in metrics such as revenue, Consumer-account growth, and total purchases. The terms of the Store Planning and Design Program vary on an individual-Customer basis. As of the Petition Date, the Debtors estimate that there are approximately $3.2 million in outstanding liabilities on account of the Store Planning and Design Program.

- *Marketing & Pricing Programs*.  The Debtors offer a number of marketing-based and price-related programs aimed at promoting price-competitive and effectively promoted Customers.  For example, Customers may participate in the "Brand" and

"Brand+" programs, which provide Customers access to the True Value brand, brand assets, branded programs, and locally-targeted campaigns for an annual fee. Under the Brand+ program, Customers pay for marketing materials and the relevant media placement. The Debtors in turn remit those funds to their media agency who procures the media placement with the Customer funding. The Debtors also offer a retail price optimization program, pursuant to which participating Customers receive access to dynamic-pricing solutions that are designed to improve profitability such as pricing analyst support, monthly and quarterly pricing reviews, and customized strategies for promotions and markdowns.

- **Operational Programs.** The Debtors also offer programs designed to ensure consistency across the quality of Customers' operations. These operational programs include (a) signage and marketing materials, in which Customers can create custom, True Value-branded materials for their own use and promotion and (b) inventory programs that provide Customers with the tools, software and systems needed to maintain a robust and efficient inventory process and warehouse.

34. The foregoing, non-exhaustive list of Customer Programs are illustrative of the various types of programming that the Debtors offer to the Customers. With the exception of the Store Planning and Design Program, the Debtors do not make payments to Customers under these programs but may incur costs in coordinating these Customer Programs. The Debtors seek to continue these Customer Programs in the ordinary course of business.

V.      **Vendor Relations Programs**

35.      To incentivize Customer retention and satisfaction, the Debtors offer a number of programs in partnership with third-party vendors for the Customers' convenience and benefit.  The Company connects Customers to third-party vendors who have familiarity with Customer needs and often offer favored rates for their services or products.   These relationships include partnerships with vendors related to freight shipping, accounting services, store fixture services and credit card processing, among other services.

36.      The Debtors also facilitate a vendor-sponsored incentive program, in which Customers and their select employees who hit target sale goals may participate in a sponsored trip (the "Momentum Incentive Program").  The Momentum Incentive Program is vendor-funded and results in no material cost to the Debtors.  Certain vendors provide the funding through the Debtors, who hold funds pending the payment of costs associated with the sponsored trip.  As of the Petition Date, the Debtors' books reflect a liability of approximately $255,000 in connection with the Momentum Incentive Program.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

VI.      **Continuation of the Customer Programs Is Appropriate Under the Doctrine of Necessity.**

37.      The Debtors submit that an order authorizing them to (a) continue their Customer Programs in the ordinary course of business as they determine, in their business judgment, to be appropriate; (b) renew, modify, terminate or replace such Customer Programs or agreements that, in their discretion, are necessary and in the best interests of the Debtors' estates, creditors, and other parties in interest; and (c) make payments owing on account of prepetition Customer Programs Obligations, regardless of when the obligations were incurred, is critical to the

preservation and successful reorganization of their business and should be authorized under sections 105(a) and 363 of the Bankruptcy Code and the "doctrine of necessity."

38.     The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims whose payment is critical to the debtor's business is firmly established under the "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).[3] Although the "doctrine of necessity" pre-dates the Bankruptcy Code, *see Miltenberger v. Logansport C. & S.W. R.Co.*, 106 U.S. 286 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a), and 1108.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value).  Courts have found additional support for the pre-confirmation satisfaction of critical claims in section 363(b) of the Bankruptcy Code, under which a court may authorize the use of property outside the ordinary course of business where a debtor "articulate[s] some business justification, other than mere appeasement of major creditors" for such relief.  *See Ionosphere*, 98 B.R. at 175.

---

[3]     *Accord In re Pers. Commc'ns Devices, LLC*, 588 B.R. 661, 666 (Bankr. E.D.N.Y. 2018); *see also In re Friedman's Inc.*, No. 09-10161 (CSS), 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("Normally, a debtor only pays pre-petition, unsecured claims through a confirmed plan of reorganization . . . [h]owever, most courts will allow such payments under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business."); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996), *corrected* (Sept. 4, 1996); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit the pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

39.    Maintaining the Customer Programs in the ordinary course of business is critically important to the Debtors' ongoing business.  If the Customers perceive that the Debtors are unable or unwilling to honor their Customer Programs Obligations, the Debtors believe that a significant number of their Customers would cease purchasing from the Debtors and instead purchase the same or similar products from competitors or directly from vendors.  Additionally, Customers rely on the Customer Programs in the operation of their own businesses and, in many instances, could not access the services offered by the Customer Programs without the support of the Debtors. If the Debtors are not able to maintain the Customer Programs, Customers and their retail businesses could suffer.

40.    As such, any delay in honoring the Debtors' Customer Programs Obligations could severely disrupt the Debtors' business and efforts to maximize value in the Chapter 11 Cases. Thus, even if the Debtors could avoid payment of or otherwise honoring certain accrued prepetition Customer Programs Obligations, the collateral consequences on the Debtors' go-forward business would exceed any modest short-run cost savings the Debtors might achieve.  Accordingly, the Debtors seek authorization, but not direction, to continue the Customer Programs in the ordinary course of business, including making payments with respect to the Customer Programs and Customer Program Obligations regardless of whether the claims arise prepetition or postpetition. The Debtors also seek authority, but not direction, to renew, modify, terminate, or replace the Customer Programs in their discretion.

41.    Courts in this district have granted similar relief in other chapter 11 cases.  *See, e.g.*, *In re Coach USA, Inc.*, No. 24-11258 (MFW) (Bankr. D. Del. June 13, 2024); *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. May 6, 2024); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Apr. 22, 2024); *In re Joann Inc.*, No. 24-10418 (CTG) (Bankr.

D. Del. Apr. 12, 2024) *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 13, 2023); *In re Yellow Corp*., No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. July 19, 2023); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 5, 2023); *In re Armstong Flooring, Inc.,* No. 22-10426 (MFW) (Bankr. D. Del. May 8, 2022).[4]

## VII.   The Proposed Payment-Processing Procedures Are Appropriate.

42.     As set forth above, the Debtors request that all Banks be authorized and directed to honor and process payments on account of certain prepetition obligations to Customers and Dealers in connection with the Customer Programs as directed by the Debtors.  The Debtors believe they have sufficient liquidity to pay the amounts delineated in the Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid except as authorized by this Court.  The Debtors therefore submit that the payment processing procedures described in the Motion are appropriate.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

43.     This Court may grant the relief requested in the Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate.  *See, e.g., Norfolk S. Ry. Co. v. City of*

---

[4]     Because of the voluminous nature of the orders cited herein, they are not attached to the Motion, but are available on request.

*Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  The harm also must be actual and imminent, not speculative or unsubstantiated.  *See, e.g.*, *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that, for the reasons already set forth herein, the relief requested in the Motion is necessary to avoid immediate and irreparable harm.

44.     The Debtors also request that this Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless this Court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that this Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

45.     Nothing in the Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.  Furthermore, the Debtors reserve the right to contest the amount claimed to be due by any person or entity, including the Customers. The Debtors also reserve the right, in their business judgment, to renew, replace, implement, modify, or terminate any Customer Program.

**NOTICE**

46.     Notice of the Motion will be given to: (a) the U.S. Trustee, (b) counsel to the prepetition Lenders, (c) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (d) the Internal Revenue Service, (e) the Office of the United States Attorney for the District of Delaware, (f) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (g) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m).  The Debtors submit that no other or further notice is required.

**NO PRIOR REQUEST**

47.     No previous request for the relief sought herein has been made to this Court or any other court.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**CONCLUSION**

The Debtors respectfully request that this Court enter the Interim and Final Order, each substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  October 14, 2024
       Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

Ron E. Meisler (*pro hac vice* admission pending)
Jennifer Madden (*pro hac vice* admission pending)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and –

Robert D. Drain (*pro hac vice* admission pending)
Evan A. Hill (*pro hac vice* admission pending)
Moshe S. Jacob (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Robert.Drain@skadden.com
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

*Proposed Counsel to Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |
| | Related Docket No[s]. __ |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS
AND CONTINUE CERTAIN CUSTOMER PROGRAMS IN THE
ORDINARY COURSE OF BUSINESS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for an interim order (this "Interim Order") and a Final Order under sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) continue to honor certain prepetition Customer Programs Obligations, and (b) otherwise continue their customer programs and practices in the ordinary course of business, and (ii) granting related relief; and upon consideration of the First-Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby;

### ORDERED, ADJUDGED, AND DECREED that:

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed, to continue the Customer Programs in the ordinary course of business and without further order of this Court, and to perform and honor all prepetition obligations thereunder in the ordinary course of businesses, and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date.

3.      All Banks are authorized and directed (a) when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Customer Programs, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) to rely on the representations of the Debtors as to which checks and fund transfers are subject to this Interim Order; provided that no such Bank shall have any liability to any party for relying on such direction and representations by the Debtors; (c) at the direction of the Debtors, to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Customer Programs that had not been honored and paid as of the Petition Date; provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that no such Bank shall have any liability to any party for relying on such direction by the Debtors; and (d) to issue new

postpetition checks or effect new postpetition fund transfers to replace any checks, drafts, and other forms of payment which may be inadvertently dishonored or rejected.

4.      To the extent the Debtors have not yet sought to remit payment on account of the Customer Programs, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment on account of the Customer Programs.

5.      The Debtors are authorized, but not directed, to continue, renew, replace, modify, or terminate such of their Customer Programs as they deem appropriate, in their discretion, and in the ordinary course of business, without further application to this Court.

6.      Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Interim Order.

7.      Nothing in the Motion or this Interim Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

8.      This Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

9.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be effective and enforceable immediately upon entry hereof.

10.     All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

11.     The Debtors are authorized to take all actions necessary to implement the relief granted in this Interim Order.

12.     The final hearing on the Motion shall be held on _____ ___, 2024 at __:___ a.m./p.m., prevailing Eastern Time.  Any objections or responses to the entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____ ___, 2024, and shall be served on: (a) True Value Company, L.L.C., 8600 West Bryn Mawr Ave., Chicago, IL, 60631 (Attn: Susan Radde, Esq. (susan.radde@truevalue.com)); (b) proposed counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606 (Attn: Ron Meisler, Esq. (ron.meisler@skadden.com) and Jennifer Madden, Esq. (jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001 (Attn:      Evan      Hill,      Esq.      (evan.hill@skadden.com)      and      Moshe      Jacob,      Esq. (moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph Larkin (joseph.larkin@skadden.com)); (c) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Benjamin A. Hackman, Esq. (benjamin.a.hackman@usdoj.gov)); (d) counsel to the prepetition Lenders (Attn: Daniel Fiorillo, Esq. (dfiorillo@otterbourg.com)); and (e) counsel to any statutory committee appointed in the Chapter 11 Cases.  If no objections or responses are filed and served, this Court may enter a final order without further notice or hearing.

13.    This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

**<u>EXHIBIT B</u>**

**Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C., *et al.*,** | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |
|  | Related Docket No[s]. ___ |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO HONOR
CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS
AND CONTINUE CERTAIN CUSTOMER PROGRAMS IN THE
ORDINARY COURSE OF BUSINESS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for an Interim Order and a final order (this "Final Order") under sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) continue to honor certain prepetition Customer Programs Obligations, and (b) otherwise continue their customer programs and practices in the ordinary course of business, and (ii) granting related relief; and upon consideration of the First-Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to

---

[1]   The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby;

**ORDERED, ADJUDGED, AND DECREED that:**

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to continue the Customer Programs in the ordinary course of business and without further order of this Court, and to perform and honor all prepetition obligations thereunder in the ordinary course of businesses, and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date.

3.      All Banks are authorized and directed (a) when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Customer Programs, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) to rely on the representations of the Debtors as to which checks and fund transfers are subject to this Final Order; provided that no such Bank shall have any liability to any party for relying on such direction and representations by the Debtors; (c) at the direction of the Debtors, to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Customer Programs that had not been honored and paid as of the Petition Date; provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that no such Bank shall have any liability to any party for relying on such direction by the Debtors; and (d) to issue new postpetition

checks or effect new postpetition fund transfers to replace any checks, drafts, and other forms of payment which may be inadvertently dishonored or rejected.

4.      To the extent the Debtors have not yet sought to remit payment on account of the Customer Programs, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Customer Programs.

5.      The Debtors are authorized, but not directed, to continue, renew, replace, modify, or terminate such of their Customer Programs as they deem appropriate, in their discretion, and in the ordinary course of business, without further application to this Court.

6.      Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Final Order.

7.      Nothing in the Motion or this Final Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

8.      Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be effective and enforceable immediately upon entry hereof.

9.      All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

10.     The Debtors are authorized to take all actions necessary to implement the relief granted in this Final Order.

11.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.