# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

## MOTION OF DEBTORS
## FOR ENTRY OF AN ORDER (I) ESTABLISHING
## BIDDING, NOTICING, AND ASSUMPTION AND ASSIGNMENT
## PROCEDURES, (II) APPROVING THE SALE OF SUBSTANTIALLY
## ALL OF THE DEBTORS' ASSETS, AND (III) GRANTING RELATED RELIEF

True Value Company, L.L.C. and certain of its affiliates, as the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), hereby move (the "Motion") this Court for, among other things, entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order" or "Order"), granting the relief described below. In addition, the Motion seeks the Court's approval, at a later date, of the underlying transaction after the process contemplated by the Bidding Procedures Order is completed. In support of the Motion, the Debtors rely upon and incorporate by reference the contemporaneously filed *Declaration of Kunal S. Kamlani in Support of Chapter 11 Petitions and First-Day Papers* (the "First-Day Declaration")[2] and *Declaration of William H. Hardie III in Support of Motion of Debtors for Entry of an Order (I)*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

*Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, And (III) Granting Related Relief* (the "Houlihan Declaration") and further represent as follows:

### PRELIMINARY STATEMENT

1.      After careful consideration of all potential restructuring alternatives, the Debtors commenced these chapter 11 cases to implement a value maximizing going concern sale of their business.  The Debtors filed these cases after a robust prepetition marking process with an extensively negotiated, executed agreement in hand with Do It Best Corp. (the "Stalking Horse Bidder") to serve as the stalking-horse bidder in connection with a Court-supervised marketing process.  A copy of that agreement is attached to the Bidding Procedures Order as **Exhibit 2** (the "Stalking Horse Agreement" or "APA" and the bid contemplated thereby, the "Stalking Horse Bid").  Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder has agreed to, among other things: (a) pay $153 million in cash consideration, (b) assume certain liabilities, including the assumption and cure of a meaningful number of contracts and the assumption of up to $45 million of trade payables that are administrative claims, and (c) offer employment to certain of the Debtors' employees.  The Debtors believe that the proposed transaction will maximize value for their stakeholders, preserving many jobs and a nearly century-old national brand.

2.      Through these chapter 11 cases, the Debtors seek to further market-test the Stalking Horse Bid with the goal of attracting a higher or otherwise better bid.  The Bidding Procedures proposed to govern the Debtors' post-petition marketing efforts are designed to facilitate an open, transparent and competitive process to determine the ultimate value of the Debtors' estates and will inure to the benefit of all the Debtors' creditors.

3.      As discussed in the Houlihan Declaration, time is of the essence.  The Debtors

believe it is critical that the sale process be consummated in an expeditious manner to minimize

disruption and potentially irreparable harm to their business and curtail professional fees and

administrative costs.  Under their proposed timeline, the Debtors intend to seek approval of the

sale within 45 days hereof (or the next business day thereafter).  If the Bidding Procedures are not

approved or there is any material delay to the proposed timeline, the Debtors' ability to maximize

value for the benefit of all stakeholders will be jeopardized.

4.      The Debtors believe that the Bidding Procedures and relief requested in the Motion

are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors

request that the Court grant the Bidding Procedures-related relief requested herein.

## RELIEF REQUESTED

5.      By the Motion, the Debtors request entry of an order:

(a)      authorizing and approving the proposed bidding procedures substantially in the form attached to the proposed Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code or other transformative transactions as described in the Bidding Procedures (the "Sale") including certain dates and deadlines thereunder for the Sale process;

(b)      authorizing and approving the Stalking Horse Agreement, namely that certain Asset Purchase Agreement, dated as of October 13, 2024, among the Debtors and the Stalking Horse Bidder attached to the Bidding Procedures Order as **Exhibit 2**, including the Bid Protections (as defined below) therein, for the purposes of the Bidding Procedures;

(c)      authorizing and approving the form of notice of the auction, if any, for the sale of the Assets (the "Auction"), the Sale, and the hearing to consider the Sale (the "Sale Hearing"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Sale Notice");

(d)      authorizing and scheduling the Sale Hearing and setting other related dates and deadlines;

(e)      authorizing and approving procedures (such procedures, the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption, assumption

3

and assignment, or rejection of certain executory contracts (the "Executory Contracts") or unexpired leases of the Debtors (the "Unexpired Leases"), and approving the form and manner of service of the notice regarding such assumption, assumption and assignment, or rejection of the Executory Contracts and Unexpired Leases to counterparties (such notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 4**, (the "Cure Notice") and the Notice of Successful Bidder (as defined herein);

(f)    authorizing and approving the Sale to the Successful Bidder(s) (as defined below), free and clear of all liens, claims, encumbrances, and other interests;

(g)    authorizing and approving the assumption and assignment of the Assigned Contracts (as defined below); and

(h)    granting related relief;

and, following entry of, and compliance with, the Bidding Procedures Order:

(a)    entry at or promptly after the Sale Hearing of a sale order, substantially in the form attached to the Motion as **Exhibit B** (the "Sale Order"); and

(b)    granting related relief.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

7.    The legal predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

8.     Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors confirm their consent to the entry of a final judgment or order by this Court in connection with the Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.    The Chapter 11 Cases

9.     On the date hereof (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under the Bankruptcy Code.  The Debtors have requested that these cases (the "Chapter 11 Cases") be jointly administered.

10.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.    To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

12.    The Company is one of the world's leading hardlines wholesalers, serving approximately 4,500 stores worldwide.  A globally recognized retail brand, the Company provides customers in over 50 countries an expansive product set across key categories such as Hardware Lumber & Building, Outdoor Living & Tools, and Plumbing & Heating.  The Company's business operations, corporate and capital structure, and the events leading up to the filing of the Chapter 11 Cases are described in greater detail in the First Day Declaration.

### II.    The Debtors' Prepetition Marketing Efforts

13.    As described in the First Day Declaration, in response to liquidity challenges, in May 2024, the Debtors engaged Houlihan Lokey Securities, Inc. ("Houlihan") to assist in exploring strategic options.  The Debtors believed that a robust marketing process for a going

concern sale transaction would maximize value by preserving the value of the business, preserving many jobs and capitalizing on a significant amount of synergy capabilities between the Debtors and potential partners. The Debtors Prepetition Lenders also bargained for the pursuit of such a transaction to occur within the timeframe that the Debtors have followed.

14.    In July 2024, Houlihan contacted 26 prospective strategic and financial buyers. Given the context, it was clear to prospective purchasers that the Debtors were open to consummating a transaction through a Chapter 11 case as well as the form of a potential transformative transaction. 17 of the potential buyers executed non-disclosure agreements and were granted access to a virtual data room. Seven received management presentations and other information as discussed in greater detail in the Houlihan Declaration. Ultimately, five potential buyers submitted indications of interest by August 30, 2024 (the "Indication of Interest Deadline").

15.    Following the Indication of Interest Deadline, the Debtors continued to solicit interest from potential buyers and worked with certain parties that submitted initial indications of interest in order to improve their proposed transaction terms. These efforts paid off, resulting in significantly improved proposals from two potential buyers, including Do It Best, a strategic and synergistic bidder who agreed to serve as the Stalking Horse Bidder in a court supervised process subject to higher or otherwise better bids. During the period leading to the filing of these Chapter 11 Cases, the Debtors responded to extensive diligence requests from Do It Best and negotiated the Stalking Horse Agreement.

**III.    The Stalking Horse Agreement**

16.    The Debtors believe that the transaction negotiated with the Stalking Horse Bidder is fair, reasonable, and represents the highest and best offer available to the Debtors at this time. The Stalking Horse Agreement was negotiated, proposed, and entered into by the Debtors and the

Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions.  The Debtors, the Stalking Horse Bidder, and all other relevant parties were represented by sophisticated and experienced advisors and attorneys, and engaged in substantial negotiations over the Stalking Horse Agreement's terms.

17.     A summary of the principal terms of the Stalking Horse Agreement is as follows[3]:

| Provision | Summary |
|---|---|
| **Parties**<br><br>*Preamble* | **Sellers:** True Value Company L.L.C., a Delaware limited liability company ("True Value Parent"), TV Holdco II, L.L.C., a Delaware limited liability company, TV TSLC, L.L.C., an Illinois limited liability company, TV GPMC, L.L.C., an Illinois limited liability company, True Value Retail, L.L.C., a Delaware limited liability company, TrueValue.com Company, L.L.C., a Delaware limited liability company, True Value Virginia, L.L.C., a Virginia limited liability company, and Distributors Hardware, L.L.C. a Delaware limited liability company (True Value Parent, together with the foregoing entities, each a "Seller" and collectively, "Sellers")<br><br>**Buyer:** Do It Best Corp., an Indiana corporation ("Buyer") |
| Transferred Assets<br><br>*Section 2.1(a)-(p)* | "Transferred Assets" shall mean all right, title and interest of Sellers as of immediately prior to the Closing in, to or under all properties and assets of Sellers, of every kind and description, wherever located (including, for the avoidance of doubt, any assets located at any Leased Real Property under a Transferred Lease or an Excluded Lease (subject to Section 2.2(f))), whether real, personal or mixed, tangible or intangible, including all right, title and interest of Sellers in, to or under the following (but excluding in each case any Excluded Assets):<br>      (a)     all rights, Claims or causes of action, other than Avoidance Actions (which are governed by Section 2.1(p)), of Sellers against any party arising out of events occurring prior to the Closing including, for the avoidance of doubt, arising out of events occurring prior to the commencement of the Chapter 11 Case, and including any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, in each case, relating to the Business and all such rights, Claims or causes of action relating to, arising from or pertaining to the Transferred Assets; |

---

[3]     The following summary and terms defined in this Part III are qualified in their entirety by reference to the provisions of the APA.  In the event of any inconsistencies between the provisions of the APA and the terms herein, the terms of the APA shall govern.  Capitalized terms used in this section of the Motion and not otherwise defined shall have the meanings ascribed thereto in the APA.

(b)     all Leased Real Property under Leases that are Transferred Contracts (the "Transferred Leases") and all associated tenant improvements, which Transferred Leases are set forth on Section 2.1(b) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e)), including such assets that are located at or associated with such Leased Real Property;

(c)     all Owned Real Property;

(d)     all owned tangible property, accounts, machinery, equipment, movable property and vehicles, and all Inventory, including all express or implied warranties with respect thereto;

(e)     all Transferred IT;

(f)     all Purchase Orders and all Contracts set forth on Section 2.1(f) of the Disclosure Letter, as may be amended from time to time pursuant to Section 2.5(e) (collectively with the Purchase Orders, the "Transferred Contracts"); provided that any applicable Cure Claims shall be paid by or on behalf of Buyer or its designee at Closing or as otherwise agreed by the applicable Contract counterparty;

(g)     all Transferred IP;

(h)     all goodwill associated with the Transferred Assets or the Business, including Seller's relationships with their customers and all rights of Sellers, in each case, under any Transferred Contracts with their customers;

(i)     subject to Section 2.2(e) and Section 2.12, all Prepaid Expenses;

(j)     all accounts receivable, instruments, and chattel paper of the Business and all cash receipts received from customers of the Business or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing (including any such accounts receivable related to "Destination True Value" store enhancements and improvements);

(k)     to the extent not prohibited by Law, all documents and other books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files related to the Transferred Assets and Transferred Contracts, suppliers lists, production data, quality control records and procedures, correspondence, the Transferred Employee Records, and all customer sales, marketing, advertising, packaging and promotional materials, drawings, engineering and manufacturing data, environmental studies, reports and analysis, sales records, strategic plans, research, and other technical information and data, and all other business and other records that are related to the Business or any Transferred Asset and in the possession of Seller, including any Tax Returns and Tax records to the extent related to any Taxes imposed on or with respect to a Transferred Asset or any Assumed Liability, and, except as set forth in Section 2.3, all privileged or confidential information and all attorney-client and other privileges pertaining to the Business or the Transferred Assets; provided,

<table>
<tr>
<td></td>
<td>

<u>however</u>, that in each case Seller have the right to retain copies at Sellers' expense pursuant to <u>Section 6.2</u>;

(l)    all telephone and facsimile numbers of the Business and all records of email addresses of customers and suppliers of the Business;

(m)    subject to obtaining the applicable consents set forth on <u>Section 3.3(a)</u> of the Disclosure Letter, all Permits and licenses held by Sellers, but only to the extent such Permits may be transferred under applicable Law;

(n)    any other assets and properties of Sellers that are not Excluded Assets;

(o)    all rights and obligations under or arising out of all insurance policies (except as set forth in <u>Section 2.2(g)</u>) for any of the Transferred Assets or Assumed Liabilities; and

(p)    all Claims or causes of action to avoid a transfer of property or an obligation incurred by the Sellers pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a), or any similar actions under any other applicable Law (collectively, "<u>Avoidance Actions</u>") against the following (collectively, the "<u>Designated Parties</u>"): (i) Sellers' or their vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Business or the Transferred Assets after the Closing, (ii) any of Sellers' counterparties under any licenses of Intellectual Property that are Transferred Contracts or counterparties under any other Transferred Contracts, (iii) any officer, manager or employee of Sellers that is a Transferred Employee, and (iv) any Affiliates of any of the Persons listed in clauses (i) through (iii); <u>provided</u>, <u>however</u>, that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense against any claim or cause of action raised by such Designated Party.

</td>
</tr>
<tr>
<td>

**Excluded Assets**

*Section 2.2(a)-(q)*

</td>
<td>

Notwithstanding anything contained in <u>Section 2.1</u> to the contrary, Sellers are not selling, and Buyer (and any Designated Buyer) is not purchasing, any right, title or interest in, to or under the following assets of Sellers, all of which shall be retained by Sellers (collectively, the "<u>Excluded Assets</u>"):

(a)    [RESERVED]

(b)    all documents, written files, papers, books, reports and records, including those prepared or received by Sellers or any of their Affiliates or Representatives: (i) in connection with any sale or potential sale of True Value Parent, Sellers, the Business, or any portion thereof including the Transferred Assets (including, but not limited to, the Stalking Horse Agreement and the transactions contemplated hereby), (ii) relating to the Chapter 11 Case, (iii) that are subject to any privilege in favor of Sellers or

</td>
</tr>
</table>

any of their Affiliates, or (iv) that Sellers are required by Law or other requirement to retain;

(c)     all rights, Claims and causes of action to the extent relating to any Excluded Asset (and not relating to the Business, any Transferred Assets, and Transferred Contracts, or any Assumed Liabilities), including any Avoidance Actions that are not against the Designated Parties;

(d)     shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(e)     all retainers or similar prepaid amounts paid to the Advisors of Sellers;

(f)     all Leased Real Property under Leases that are not Transferred Contracts (the "Excluded Leases") and all associated tenant improvements, which Excluded Leases are set forth on Section 2.2(f) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e));

(g)     all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, solely to the extent payable to or on behalf of, or in respect of amounts payable by Sellers to any individuals covered by such policies;

(h)     each Contract of any Seller that is not a Transferred Contract;

(i)     (i) all books and records to the extent primarily related to any of the Excluded Assets or Excluded Liabilities; (ii) all minute books, Organizational Documents, stock registers and such other books and records of such Seller, as pertaining to ownership, organization, qualification to do business, capitalization, or existence thereof, Tax Returns (and any related work papers) of any Seller (other than Tax Returns described in Section 2.1(k), provided that Sellers shall be entitled to retain copies thereof pursuant to Section 6.2), and the corporate seal of any Seller; and (iii) all books and records of Sellers that relate to the Transferred Employees, the disclosure of which would violate Law;

(j)     all Tax refunds and Tax attributes of Sellers that are not automatically transferred with the Transferred Assets by the operation of applicable Tax Law;

(k)     all Cash and Cash Equivalents (other than accounts receivable, instruments and chattel paper of the Business

|  |  |  |
|---|---|---|
|  |  | and all cash receipts received from customers or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing, in each case, as contemplated in <u>Section 2.1(j)</u>); |
|  | (l) | the Cash Consideration; |
|  | (m) | all Intellectual Property other than the Transferred IP, including all Excluded IP; |
|  | (n) | all information technology assets, and related systems and equipment other than the Transferred IT, including all Excluded IT; |
|  | (o) | all assets under each Employee Benefit Plan, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts); |
|  | (p) | all rights, Claims or causes of action of Sellers and their Affiliates under the Stalking Horse Agreement and the Ancillary Agreements; (ii) under any Contracts that are not Transferred Contracts and (iii) against third parties to the extent relating to any Excluded Asset or Excluded Liability; and |
|  | (q) | any other asset that, although included in the definition of Transferred Assets, Buyer notifies Seller in writing not later than one (1) Business Day prior to the Closing that Buyer does not wish to purchase pursuant to <u>Section 2.5(e)</u> |
| **Assumed Liabilities**<br><br>*Section 2.3(a)-(f)* |  | <u>Assumed Liabilities</u>. Subject to the terms and conditions set forth in the Stalking Horse Agreement, Buyer shall assume, pay, satisfy, perform and discharge when due only the following Liabilities (the "<u>Assumed Liabilities</u>"): |
|  | (a) | all Liabilities of Sellers under the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases) and the transferred Permits that arise under such Transferred Contracts or transferred Permits on or after the Closing; |
|  | (b) | all Liabilities relating to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the Closing; |
|  | (c) | all Liabilities under the Purchase Orders; |
|  | (d) | (i) timely filed or scheduled claims of Sellers' vendors for the value of goods received by the Sellers within twenty (20) days prior to the Petition Date which goods were sold to the Sellers in the Ordinary Course of Business but only to the extent such claims are entitled to priority in payment under Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Case as determined and allowed by the Bankruptcy Court or otherwise agreed to by Sellers and Buyer (the "<u>Section 503(b)(9) Claims</u>") and (ii) trade and vendor accounts payable incurred by Sellers in the Ordinary Course |

| | |
|---|---|
| | of Business after the Petition Date for goods received by Sellers that remain unpaid as of the Closing to the extent such payables are entitled to priority in payment in the Bankruptcy Case under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code as reasonably agreed by Sellers and Buyer based upon Sellers' books and records (or other appropriate form of validation) or as otherwise determined and allowed by the Bankruptcy Court (the "Trade Admin Claims," and together with the Section 503(b)(9) Claims, collectively, the "Assumed Payables"); *provided* that the aggregate face amount of such Assumed Payables that are Assumed Liabilities shall not exceed Forty Five Million dollars ($45,000,000) (the "Assumed Payables Cap") and if the aggregate face amount of such Assumed Payables exceeds the Assumed Payables Cap , Buyer shall be entitled to select which of the Section 503(b)(9) Claims and the Trade Admin Claims that Buyer will assume to equal such Assumed Payables Cap; |
| | (e)   all Cure Claims associated with the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases), other than to the extent waived by the applicable counterparty as contemplated by Section 2.5 of the Disclosure Letter; and |
| | (f)   Liabilities assumed by Buyer pursuant to Section 6.3. |
| **Excluded Liabilities**<br><br>*Section 2.4* | Other than the Assumed Liabilities, Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Transferred Assets or the Business, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing.  Notwithstanding anything in the Stalking Horse Agreement to the contrary, the Assumed Liabilities shall not include any Liabilities or obligations for any Taxes of any Seller or related to the operation of the Business prior to the Closing (or for the portion of any tax period ending on the Closing Date) (all such retained Liabilities, "Excluded Liabilities"). |
| **Consideration**<br><br>*Section 2.6(a)-(b)* | Consideration.   The aggregate consideration for the purchase, sale, assignment and conveyance of the Transferred Assets from Sellers to Buyer (the "Purchase Price") shall consist of:<br><br>(a)   the payment by Buyer and/or one or more Designated Buyers, by wire transfer of immediately available funds to one or more accounts designated in writing by True Value Parent in accordance with Section 2.8(c)(v) (the "Cash |

| | | |
|---|---|---|
| | (b) | Consideration"), of an aggregate amount equal to One Hundred Fifty-Three Million dollars ($153,000,000.00); and the assumption by Buyer, or a Designated Buyer, as applicable, of the Assumed Liabilities from Sellers. |
| **Bid Protections**<br><br>*Section 9.2(b)-(d)* | | The Stalking Horse Bidder is entitled to a Break-Up Fee and Expense Reimbursement as set forth in <u>Section 9.2</u> of the Stalking Horse Agreement: |
| | (b) | In consideration of Buyer having expended considerable time and expense in connection with the Stalking Horse Agreement and the negotiation thereof, and to compensate Buyer as a stalking-horse bidder, (i) if the Stalking Horse Agreement is terminated pursuant to Section 9.1(b)(<u>ii</u>), then True Value Parent shall pay to Buyer the Break-Up Fee and Expense Reimbursement Amount at the closing of such Alternative Transaction by wire transfer of immediately available funds; and (ii) if the Stalking Horse Agreement is terminated pursuant to <u>Section 9.1(c)(i)</u>, <u>Section 9.1(c)(iv)</u> or <u>Section 9.1(d)(ii)</u>, then True Value Parent shall pay to Buyer the Expense Reimbursement Amount by wire transfer of immediately available funds within three (3) Business Days following such termination.  The Bidding Procedures Order shall provide that the Expense Reimbursement Amount and Break-Up Fee shall constitute an allowed superpriority administrative expense claim against Sellers under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code. |
| | (c) | Notwithstanding anything to the contrary in the Stalking Horse Agreement, Buyer shall not be entitled to receive the Break-Up Fee or Expense Reimbursement Amount if Buyer shall have breached or violated any of its representations, warranties or covenants set forth in the Stalking Horse Agreement in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u>, as the case may be. |
| | (d) | Notwithstanding <u>Section 9.2(b)</u>, Buyer's right to receive the one-time payment of the Break-Up Fee and/or the Expense Reimbursement Amount from True Value Parent as provided in <u>Section 9.2(b)</u> shall be the sole and exclusive remedy available to Buyer against Sellers or any of its former, current or future equityholders, directors, officers, Affiliates, agents or Representatives with respect to the Stalking Horse Agreement and the transactions contemplated hereby in the |

| | |
|---|---|
| | event that the Stalking Horse Agreement is terminated pursuant to Section 9.1(b)(ii), Section 9.1(c)(i), Section 9.1(c)(iv) or Section 9.1(d)(ii) and upon such payment of the Break-Up Fee and/or the Expense Reimbursement Amount none of Sellers or any of their respective former, current or future equityholders, directors, officers, Affiliates, agents or Representatives shall have any further liability or obligation relating to or arising out of the Stalking Horse Agreement or the transactions contemplated hereby.  The parties acknowledge and agree that in no event shall True Value Parent be required to pay the Break-Up Fee and the Expense Reimbursement Amount on more than one occasion. |
| **Closing and Other Deadlines**<br><br>*Section 2.8(a)* | The purchase, sale, assignment and conveyance of the Transferred Assets contemplated by the Stalking Horse Agreement shall take place at a closing (the "Closing") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, located at One Manhattan West, New York, NY 10001) at 10:00 a.m. Eastern Time on the second (2nd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as Sellers and Buyer mutually may agree in writing.<br><br>The "Outside Date" for satisfaction of the conditions set forth in Sections 8.1 and 8.3 of the Stalking Horse Agreement is January 13, 2025. |
| **Good Faith Deposit**<br><br>*Section 2.7(a)* | On the date hereof, unless already deposited, Buyer shall deposit into escrow with an escrow agent reasonably acceptable to Sellers and Buyer (the "Escrow Agent") an amount equal to Fifteen Million Three Hundred Thousand dollars ($15,300,000,00) (such amount, together with all interest and other earnings accrued thereon and all reductions resulting from application thereof as contemplated by Section 2.7(a)(i) of the Stalking Horse Agreement, the "Deposit Funds"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.  The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) True Value Parent on behalf of Sellers, as follows:<br><br>(i)      prior to the occurrence of any of the events described in Section 2.7(a)(ii), (iii) or (iv) below, the use and availability of the Deposit Funds shall be subject solely to the terms and conditions set forth in the DIP Credit Agreement Term Sheet attached hereto |

| | |
|---|---|
| | as Exhibit B and, upon execution by the parties thereto, the DIP Credit Agreement; <br><br> (i) if the Closing shall occur, the Deposit Funds shall be applied towards the Purchase Price payable by Buyer pursuant to Section 2.6(a); <br><br> (ii) if the Stalking Horse Agreement is terminated by Sellers pursuant to Section 9.1(d)(i), the Deposit Funds shall be delivered to True Value Parent; or <br><br> (iii) if the Stalking Horse Agreement is terminated other than in a manner provided by Section 9.1(d)(i), the Deposit Funds shall be delivered to Buyer. |
| **Tax Exemption** <br><br> *Section 7.1* | The Sale Order shall provide that the transactions contemplated by the Stalking Horse Agreement and the Ancillary Agreements are and shall be exempt from any and all property transfer, stock transfer, real estate transfer, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable solely as a result of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities pursuant to the Stalking Horse Agreement ("Transfer Taxes") to the extent permitted pursuant to Section 1146(a) of the Bankruptcy Code. |
| **Record Retention** <br><br> *Section 6.2(c)* | From and after the Closing, until the closing of the Chapter 11 Case, Buyer will provide Sellers and their Representatives, at Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of Buyer or the Business, to the books and records (including Tax books and records), including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Chapter 11 Case and the wind down of Sellers' estate (including reconciliation of claims and preparation of Tax Returns or other Tax proceedings and the functions of any trusts established under a Chapter 11 plan of Sellers or any other successors of Sellers), (iii) complying with applicable Laws or (iv) other reasonable business purposes; provided that Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of Buyer, conflict with the Disclosure Limitations; provided, further that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Buyer after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information. Unless otherwise consented to in writing by True Value Parent, Buyer will not, for a period of three (3) years |

| | |
|---|---|
| | following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to True Value Parent such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of. |
| **Sale of Avoidance Actions**<br><br>*Section 2.1(p)* | The Transferred Assets include:<br><br>    (p)     all Claims or causes of action to avoid a transfer of property or an obligation incurred by the Sellers pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a), or any similar actions under any other applicable Law (collectively, "<u>Avoidance Actions</u>") against the following (collectively, the "<u>Designated Parties</u>"): (i) Sellers' or their vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Business or the Transferred Assets after the Closing, (ii) any of Sellers' counterparties under any licenses of Intellectual Property that are Transferred Contracts or counterparties under any other Transferred Contracts, (iii) any officer, manager or employee of Sellers that is a Transferred Employee, and (iv) any Affiliates of any of the Persons listed in clauses (i) through (iii); provided, however, that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense against any claim or cause of action raised by such Designated Party. |
| **Requested Findings as to Successor Liability**<br><br>*Form Sale Order Paragraph 12* | No Buyer Party shall be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale contemplated by the Asset Purchase Agreement, or the transfer, operation, or use of the Transferred Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Buyer, with respect to any Assumed Liabilities arising after the Closing), (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation. |

| | |
|---|---|
| **Sale Free and Clear of Unexpired Leases**<br><br>*Form Sale Order Paragraphs 8 -9* | At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the Buyer (or its designee) pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Transferred Assets. All persons or entities, presently, or at or after the Closing, in possession of some or all of the Transferred Assets, are directed to surrender possession of any and all portions of the Transferred Assets to the Buyer (or its designee) or its respective designees on the Closing or at such time thereafter as the Buyer (or its designee) may request.<br><br>The Sale Order (a) shall be effective as a determination that, as of the Closing, (i) the Transferred Assets shall have been transferred to the Buyer (or its designee) free and clear of all liens, claims, interests, and encumbrances, subject only to the Assumed Liabilities, (ii) holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Sale are deemed to have consented to the Sale being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code and holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Transferred Assets, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. The Transferred Assets are sold free and clear of any reclamation rights. All liens, claims, interests, and encumbrances on the Transferred Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, interests, and encumbrances applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such liens, claims, interests, and encumbrances applied prior to the Sale, subject |

| | to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein. |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)** | The Debtors have requested a waiver of the 14-day stay under Bankruptcy Rule 6004(h). |
| **Sale to Insider** | N/A |
| **Agreements with Management** | N/A |
| **Releases** | N/A |
| **Private Sale/No Competitive Bidding** | N/A |
| **Interim Arrangements with Proposed Buyer** | None.[4] |
| **Use of Proceeds** | None |
| **Credit Bidding** | N/A[5] |

## IV.  The Bidding Procedures

18.     Although the Debtors believe the proposed Stalking Horse Agreement is fair and reasonable, the Debtors are requesting authority, as the Stalking Horse Agreement contemplates, from this Court to conduct a value-maximizing public marketing process pursuant to Bankruptcy Code section 363 in an effort to generate higher or otherwise better bids for the Assets.

19.     The Bidding Procedures are designed to promote participation and active bidding and will allow the Debtors to conduct the Sale process in a controlled, fair, and open manner, maximizing value for stakeholders.

---

[4]     In connection with the APA, the Stalking Horse Bidder agreed to provide debtor-in-possession financing (the "Buyer DIP Financing") to the Debtors up to the amount of its Good Faith Deposit. The Debtors are not seeking court approval of the Buyer DIP Financing pursuant to this Motion. In the event that the Debtors determine to access the Buyer DIP Financing, the Debtors will seek appropriate relief from the Court at such time

[5]     Pursuant to Section 2.7(b) of the APA, in the event that the Debtors borrow funds from the Stalking Horse Buyer pursuant to the Buyer DIP Financing, the interest and fees associated with such Buyer DIP Financing would accrue in-kind and would be credit bid by the Stalking Horse Bidder in connection with its bid.

20.     In accordance with Local Bankruptcy Rule 6004-1, the below chart summarizes the

Bidding Procedures and the procedures for conducting the Auction[6]:

| Provision | Summary |
|---|---|
| **Qualification of Bidders** | To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a prospective bidder must submit to the Debtors (i) an executed confidentiality agreement in such form reasonably satisfactory to the Debtors, (ii) reasonable evidence demonstrating the party's financial capability to consummate a Sale as reasonably determined by the Debtors, and (iii) a statement that such party has a bona fide interest in submitting a bid.  A party who qualifies for access to Diligence Materials pursuant to the prior sentence shall be a "Potential Bidder." |
| **Qualified Bids** | The Debtors shall assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and shall accept Bids (as defined below) until **November 18, 2024 at 4:00 p.m. (prevailing Eastern Time**) (the "Bid Deadline").  The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, after consultation with the Consultation Parties, for all or certain bidders. |
| | To be eligible for consideration as a Qualified Bid and to participate in the Auction, each Potential Bidder (other than the Stalking Horse Bidder, which shall be deemed a Qualified Bidder) must deliver to the Debtors and their advisors a written, irrevocable offer (each, a "Bid") prior to the Bid Deadline that must be determined by the Debtors, in their business judgment and in consultation with the Consultation Parties, to satisfy each of the following conditions: |
| | Good Faith Offer; Partial Bids: Each Bid must constitute a good faith, bona fide offer to purchase all or a portion of the Assets (it being understood that partial bids may be permitted only if the combined consideration thereof satisfies the requirements of a Minimum Bid, as defined below). |
| | Good Faith Deposit: Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the cash consideration of the Purchase Price (as defined in the Alternative APA (as defined below)), before any |

---

[6]     The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms have the meaning ascribed to them in the Bidding Procedures.

reductions for assumed liabilities (the "<u>Good Faith Deposit</u>").  The Good Faith Deposit shall come in the form of a wire transfer, certified check or other form acceptable to the Debtors.  Each Good Faith Deposit will be deposited and held in one or more escrow accounts by the Debtors and shall not become property of the Debtors' estates absent further order of the Bankruptcy Court.  Requests for wire instructions should be directed to William Hardie (WHardie@HL.com), Jay Weinberger (JWeinberger@HL.com), John Hartigan (JHartigan@HL.com), and Christina Walters (Christina.Walters@HL.com).

<u>Same or Better Terms</u>: Each Bid must be on terms that in their totality (or in totality with other Partial Bids) are determined by the Debtors (in consultation with the Consultation Parties), in their business judgment, to be the same or better than the terms of the Stalking Horse Agreement in their totality.

<u>Executed Agreement</u>: Each Bid must include executed transaction documents, signed by an authorized representative of such Potential Bidder, pursuant to which the Potential Bidder proposes to effectuate a Sale or other transaction as contemplated by these Bidding Procedures (an "<u>Alternative APA</u>").  Each Bid must also include a copy of the Alternative APA marked against the Stalking Horse Agreement to show all changes requested by the Potential Bidder (including those related to the assumption and assignment of contracts and licenses, and other material terms such that the Debtors may determine how such Bid compares to the terms of the Stalking Horse Agreement and competing Bids).  Each Alternative APA must (i) specify the cash component of the Purchase Price in U.S. dollars; (ii) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by the Debtors); (iii) identify the proposed Assets to be included, including any proposed assumed contracts; (iv) provide a commitment to close within two (2) business days after all closing conditions are met and (v) include a representation that the Potential Bidder will make and submit all necessary filings under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), within five (5) calendar days following entry of an order approving the Sale.

<u>Employee and Labor Term:</u>  Each Bid must include a statement of proposed terms for employees, including whether the Potential Bidder intends to hire all employees who are primarily employed in connection with the Assets included in such Bid or any other employees, the terms and conditions of such employment offers, and whether the Potential Bidder intends to assume any collective bargaining agreements or employee related contracts, programs, or other employment-related liabilities or obligations (e.g., paid time off).  Each Bid must also include

a statement as to whether any employees who will not be offered employment by the Potential Bidder are needed to provide transitionary services.

<u>Transaction Structure:</u> Each Bid must clearly indicate whether it is structured as a going concern sale under section 363 of the Bankruptcy Code, a sponsorship of a plan of reorganization, or equity bids for a liquidation of the Debtors' assets.

<u>Pension Plan:</u> Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with the Debtors' pension plan.

<u>Other Post-Employment Benefits:</u> Each bid must state whether or not the Potential Bidder intends to assume the Debtors' obligations to provide other post-employment benefits, including (i) medical, dental, and vision coverage and out-of-pocket reimbursement of expenses available to certain former employees of certain Debtors, or such employees' beneficiaries; (ii) death benefits available to certain former employees of certain Debtors; and (iii) life insurance available to certain former employees of certain Debtors.

<u>Designation of Assigned Contracts and Leases</u>: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Potential Bidder wishes to be assumed pursuant to a Sale. A Bid must specify whether the Debtors or the Potential Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate shall be provided by the Debtors).

<u>Designation of Assumed Liabilities</u>: A Bid must identify all liabilities which the Potential Bidder proposes to assume.

<u>Corporate Authority</u>: A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Sale; <u>provided</u> that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the Sale, the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale by the equity holder(s) of such Potential Bidder.

<u>Disclosure of Identity of Potential Bidder</u>: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including the identity of any parent companies of such entity), and the complete terms of any such participation, including any connections, agreements, arrangements or understandings with the Debtors, the Stalking Horse

Bidder, or any other known, potential, prospective bidder, or Potential Bidder, or any officer, director, or equity holder of the Debtors.; provided that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the Sale, then the Potential Bidder must fully disclose the identity of each direct and indirect equity holder of such Potential Bidder.

<u>Proof of Financial Ability to Perform</u>: A Bid must include written evidence that the Debtors may reasonably conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Potential Bidder has the necessary financial ability to timely consummate a Sale and must further contain information that can be publicly filed and/or disseminated providing adequate assurance of future performance of all contracts and leases to be assumed and assigned in such Sale. Such information must include, *inter alia*, the following:

(1)    a statement that the Potential Bidder is financially capable of consummating the transaction contemplated by the Alternative APA;

(2)    contact names and numbers for verification of financing sources;

(3)    written evidence of the Potential Bidder's internal resources and proof of any debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Sale;

(4)    the Potential Bidder's most current audited (if any) and latest unaudited financial statements or, if the bidder is an entity formed for the purpose of making a bid, the current audited (if any) and latest unaudited financial statements of the equity holder(s) of the bidder or such other form of financial disclosure, and a guaranty from such equity holder(s);

(5)    a description of the Potential Bidder's pro forma capital structure; and

(6)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably

acceptable to the Debtors demonstrating that such Potential Bidder has the ability to promptly close the Sale.

Regulatory and Third-Party Approvals: A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale, and the time within which the Potential Bidder expects to receive such regulatory and third-party approvals, and the Debtors (in consultation with the Consultation Parties) may consider the timing of such approvals, and any actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible, when considering the other Bid Assessment Criteria (as defined below). Each Potential Bidder must further agree that its legal counsel will coordinate in good faith with the Debtors' legal counsel to provide pertinent information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable regulatory requirements and to discuss and explain the Potential Bidder's regulatory analysis, strategy, and timeline for securing all applicable approvals as soon as reasonably practicable.

Conditions/Contingencies: A Bid must not be subject, in the exercise of the Debtors' reasonable business judgment (in consultation with the Consultation Parties), to material conditions or contingencies to closing, including without limitation governmental approval, obtaining financing, internal approvals or further due diligence.

Bid Irrevocable: A Bid must provide that it is irrevocable until two (2) business days after the closing of the Sale. Each Potential Bidder further agrees that its Bid, if not chosen as the Successful Bidder, shall serve, without modification, as a Backup Bidder (as defined below) as may be designated by the Debtors at the hearing to approve the Sale, in the event the Successful Bidder fails to close as provided in the Successful Bidder Agreement, as modified, if at all, and the order approving the Sale.

As-Is, Where-Is: A Bid must include the following disclaimer: Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

Time Frame for Closing. A Bid by a Potential Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors (in consultation with the Consultation Parties).

Consent to Jurisdiction. Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the

| | |
|---|---|
| | Bidding Procedures, the Auction, any Alternative APA, or the construction and enforcement of documents relating to any Sale, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtors, the Bidding Procedures, the Auction, any Alternative APA, or the construction and enforcement of documents relating to any Sale, and (iii) agree to the entry of a final order or judgment in any way related to the Debtors, the Bidding Procedures, the Auction, any Alternative APA, or the construction and enforcement of documents relating to any Sale if it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection with the foregoing consistent with Article III of the United States Constitution.<br><br>No Bid Protections.  A Bid must not entitle the Potential Bidder to any break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of payment or reimbursement and, by submitting a Bid, the Potential Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.  Each Potential Bidder presenting a Bid will bear its own costs and expenses (including legal fees) in connection with any proposed Sale.  For the avoidance of doubt, the Stalking Horse Bidder shall not be considered a Potential Bidder for purposes of this paragraph. |
| **Bid Protections to Stalking Horse Bidder** | **Bid Protections.**  In the event the Stalking Horse Bidder is not the Successful Bidder, the Debtors shall pay in consideration of its being the Stalking Horse Bidder and to reimburse it for its reasonable and necessary out of pocket expenses, including the Breakup Fee and the Expense Reimbursement to be paid in accordance with the terms and conditions set forth in the Stalking Horse Agreement and as approved by the Bankruptcy Court in the Bidding Procedures Order.  No other bidder will be entitled to any expense reimbursement, break-up fee, termination or similar fee or payment.<br><br>**Bidding Increments**.<br><br>*Minimum Bid.*  A Bid must propose a minimum purchase price, including any assumption of liabilities, that in the Debtors' reasonable business judgment (in consultation with the Consultation Parties) has a value greater than the sum of (i) the Cash Consideration (as defined in the Stalking Horse Agreement), (ii) the Break-Up Fee, (iii) the Expense Reimbursement, (iv) the Assumed Liabilities (as defined in the Stalking Horse Agreement), and (v) a minimum Bid increment of $1,000,000 (the "<u>Overbid Amount</u>") (the sum of which shall be the "<u>Minimum Bid Amount</u>").  If the Potential Bidder believes that the Bid value relative to the Stalking Horse Bid should include additional non-cash components |

(such as fewer contingencies than are in the Stalking Horse Agreement), the Bid must include a detailed analysis of the value of any such additional non-cash components and any back-up documentation to support such value. To the extent the Debtors consider any Partial Bids, the combined consideration must be in the aggregate equal to or great than the Minimum Bid Amount.

*Relevant Terms of Overbids and Treatment of Break-Up and Topping Fees and Expense Reimbursement at Auction*

An "Overbid" is any bid made at the Auction after the Debtors' announcement of the respective Starting Bid. Any Overbid for purposes of this Auction must comply with the following conditions:

    (a)    *Minimum Overbid Increments*: Any Overbid after and above the respective Starting Bid or any subsequent Overbid shall be made in increments valued at not less than $1,000,000; provided, that in order to maximize value, the Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the minimum incremental Bids (or in valuing such Bids) at any time during the Auction. Additional consideration in excess of the amount set forth in the respective Starting Bid may include cash and/or noncash consideration, provided, however, that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties.

    (b)    *Stalking Horse Bidder Overbids*: If the Stalking Horse Bidder submits an Overbid, it will receive a credit equal to the Bid Protections when bidding during the Auction.

| | |
|---|---|
| **Modification of Bidding and Auction Procedures** | *Additional Procedures.* The Debtors may announce at the Auction additional or modified procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Stalking Horse Agreement.<br><br>*Reservation of Rights.* Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors (in consultation with the Consultation Parties) further reserve the right as they may reasonably determine to be in the best interest of their estates and in the exercise of their fiduciary duties to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the |

|  | requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein; (g) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (h) modify these Bidding Procedures and implement additional rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties. Nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder, other than the Stalking Horse Bidder subject to, and in accordance with the terms of, the Stalking Horse Agreement. |
|---|---|
| **Closing with Alternative Backup Bidders** | *Designation of Backup Bidder.* Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors (in consultation with the Consultation Parties), in the exercise of their business judgment, will be designated as the backup bidder (the "<u>Backup Bidder</u>"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "<u>Backup Bid</u>") open and irrevocable until two (2) business days after the Sale has closed (the "<u>Outside Backup Date</u>"). Each Qualified Bid that is not a Successful Bid or Backup Bid shall be deemed withdrawn and terminated at the conclusion of the Sale Hearing.<br>Following the hearing to approve the Sale, if the Successful Bidder fails to consummate an approved transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtors will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder. |
| **Date, Time, Place, and Notice of Auction** | The Auction, if necessary, shall take place on **November 22, at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606, or such other place (which may be via video conference) and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidder) and the Consultation Parties. The Auction may be postponed, adjourned or canceled as the Debtors (in consultation with the Consultation Parties) deem appropriate. Reasonable notice as is reasonably practicable under the circumstances of such postponement or adjournment and the time and place for the commencement or resumption of the Auction or cancellation shall be given to all Qualified Bidders. |
| **No Collusion** | Each Qualified Bidder (including the Stalking Horse Bidder) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets |

| | |
|---|---|
| | described herein and (b) has reviewed, understands and accepts the Bidding Procedures. |
| **Auction Participation** | Only the Debtors, the Consultation Parties, and any Qualified Bidder that has submitted a Qualified Bid (including the Stalking Horse Bidder), in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine shall attend the Auction and only such Qualified Bidders (including the Stalking Horse Bidder) will be entitled to make any Bids at the Auction.  The Debtors may, in their reasonable business judgment, establish a reasonable limit on the number of representatives and professional advisors that may appear on behalf of or accompany each Qualified Bidder and other parties in interest at the Auction. |
| **Transcription or Video Recording** | The Auction shall be transcribed. |

## V.     Key Dates and Deadlines

21.     The table below sets forth the proposed key dates and deadlines with respect to the

Sale process:

| Date/Time | Event |
|---|---|
| October 28, 2024 at 4:00 p.m. EST | Bidding Procedures Objection Deadline |
| October 31, 2024 at 4:00 p.m. EST | Bidding Procedures Objection Response Deadline |
| November 4, 2024 at [●] | Bidding Procedures Hearing |
| November 6, 2024 at 4:00 p.m. EST | Deadline for Cure Notice |
| November 6, 2024 at 4:00 p.m. EST | Deadline for Sale Notice |
| November 18, 2024 at 4:00 p.m. EST | Cure Objection Deadline |
| November 18, 2024 at 4:00 p.m. EST | Bid Deadline |
| November 20, 2024 at 4:00 p.m. EST | Sale Objection Deadline |
| November 20, 2024 at 10:00 a.m. EST | Auction to be held (if necessary) |
| *If Auction is not Held*: November 20, 2024 at 4:00 p.m. EST <br><br> *If Auction is Held*: November 20, 2024 at 11:59 p.m. EST | Notice of Successful Bidder |
| November 22, 2024 at 4:00 p.m. EST | Limited Objection Deadline |
| November 25, 2024 at 4:00 p.m. EST | Response Deadline |
| November 27, 2024 at [●] | Sale Hearing |

## VI.   Notice Procedures

22.    **Notice of Sale Hearing.**  Within two business days following the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors will cause the Sale Notice regarding the Sale of the Assets, the Auction (if any) and the Sale Hearing to be served on: (a) all entities reasonably known by the Debtors to have expressed a bona fide interest in acquiring the Assets during the year preceding the date hereof; (b) all entities known to have asserted any claims, liens, interests, or encumbrances in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the U.S. Trustee; (e) counsel to the Stalking Horse Bidder; (f) counsel to the Prepetition Lenders; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) counsel to any statutory committee

appointed in the Chapter 11 Cases; (j) the United States Attorney for the District of Delaware; (k) the Federal Trade Commission; (l) the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice; (m) all parties to Executory Contracts to be assumed, assumed and assigned or rejected as part of the Sale; (n) each governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder; and (o) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m).

23.     **Publication Notice.**  Additionally, on the Mailing Date or as soon as reasonably practicable thereafter, the Debtors shall publish a notice, substantially in the form of the Sale Notice (or a simplified version of the Sale Notice), on one occasion, in the national edition of *The New York Times*.  Such publication notice is reasonably calculated to provide sufficient and proper notice of the Sale to any interested parties whose identities or addresses are unknown to the Debtors.

24.     **Notice of Successful Bidder**.  As provided in the Bidding Procedures, promptly following the Debtors' selection of the Successful Bid or Successful Bids with respect to the Sale and the resulting conclusion of the Auction, the Debtors shall announce the Successful Bid or Successful Bids and Successful Bidder or Successful Bidders with respect to the Sale and shall file with this Court notice of such Successful Bid or Successful Bids and Successful Bidder or Successful Bidders.

25.     The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Motion and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets for sale; (v) instructions for promptly

obtaining a copy of the Stalking Horse Agreement; (vi) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; (vii) the commitment by the Stalking Horse Bidder to assume certain liabilities disclosed in the Stalking Horse Agreement (collectively, the "Assumed Liabilities"); and (viii) notice of the proposed assumption and assignment of the Assigned Contracts and the right, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

**VII.    Assumption and Assignment Procedures**

26.    The Debtors are also seeking approval of procedures to facilitate the assumption and assignment (the "Assumption and Assignment Procedures") of the Debtors' Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors, or that may be assumed by the Debtors, pursuant to Bankruptcy Code section 365(b) and assigned to a Successful Bidder(s) pursuant to Bankruptcy Code section 365(f) in connection with the Sale (each, an "Assigned Contract," and, collectively, the "Assigned Contracts"), subject to any payments necessary to cure any defaults arising under any Assigned Contract (the "Cure Amounts").

27.    The provisions of the Assumption and Assignment Procedures are:

(a)    **Cure Notice.**  No later than **November 6, 2024, at 11:59 p.m. (prevailing Eastern Time)** (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a Cure Notice via first-class mail on all counterparties to all Assigned Contracts and provide a copy of the same to the Stalking Horse Bidder and the Consultation Parties.  The Cure Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the Executory Contract or Unexpired Lease, as applicable, (ii) the name of the counterparty to the Executory Contract or Unexpired Lease, as applicable, (iii) Debtors' good faith estimates of the Cure Amounts (if any) required in connection with the Executory Contract or Unexpired Lease, as applicable, and (iv) the Cure Objection Deadline, Supplemental Cure Objection Deadline, and Limited Objection Deadline; *provided*, *however*, that service of a Cure Notice does not constitute an admission that any contract is an Executory Contract or that the

30

stated Cure Amount related to any Executory Contract or Unexpired Lease constitutes a claim against the Debtors or a right against the Stalking Horse Bidder (all rights with respect thereto being expressly reserved). Further, the inclusion of an Executory contract or Unexpired Lease, as applicable, on the Cure Notice is not a guarantee that such Executory contract or Unexpired Lease, as applicable, will ultimately be assumed and assigned.

(b)     **Cure Amounts and Adequate Assurance of Future Performance.** The payment of the applicable Cure Amounts shall (i) effect a cure of all defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

(c)     **Supplemental Cure Notice.** Although the Debtors intend to make a good faith effort to identify all Assigned Contracts that may be assumed and assigned in connection with a Sale, the Debtors may discover certain Executory Contracts inadvertently omitted from the Assigned Contracts list or the Stalking Horse Bidder or Successful Bidders may identify other Executory Contracts that they desire to assume and assign in connection with a Sale. Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Deadline and at least two days before the closing of a Sale, to (i) supplement the list of Assigned Contracts with previously omitted Executory Contracts (the "Additional Assigned Contracts"), (ii) remove Assigned Contracts from the list of Executory Contracts ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale (the "Eliminated Agreements"), and/or (iii) modify the previously stated Cure Amount associated with any Assigned Contracts. In the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption (a "Supplemental Cure Notice") on each of the counterparties to such Assigned Contracts or Eliminated Contracts, as applicable, and their counsel of record, if any, and the Consultation Parties; *provided*, *however*, the Debtors may not add an Executory Contract to the list of Assigned Contracts that has been previously rejected by the Debtors by order of the Court. Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice. If the Successful Bidder is not the Stalking Horse Bidder, the Debtors will file the Notice of Successful Bidder in accordance with paragraph 27(d)(3), which will among other things set the Limited Objection Deadline for parties to file Limited Objections (each as defined herein).

(d)     **Objections.** Objections, if any, to the proposed assumption and assignment or the Cure Amount proposed with respect thereto, *must* (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by, the Cure Objection Recipients (as defined below) by the applicable deadlines below.

(1)     *Cure Objection Deadline.*  Any objection to the Cure Amount, to assumption and assignment of an Assigned Contract, or to lack of adequate assurance of the performance of the Stalking Horse Bidder must be filed with the Bankruptcy Court on or before **November 18, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline") or such later date identified in the Supplemental Cure Notice in accordance with 26(d)(2) herein, and served on: (a) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606 (Attn: Ron Meisler, Esq. (ron.meisler@skadden.com) and Jennifer Madden, Esq. (jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001 (Attn: Evan Hill, Esq. (evan.hill@skadden.com) and Moshe Jacob, Esq. (moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph Larkin (joseph.larkin@skadden.com)); and (b) counsel to the Stalking Horse Bidder, Taft Stettinius & Hollister LLP, One Indiana Square, Suite 3500, Indianapolis, IN 46204 (Attn: Zachary E. Klutz (zklutz@taftlaw.com), W. Timothy Miller (miller@taftlaw.com)) (collectively, the "Cure Objection Recipients").

(2)     *Supplemental Cure Objection Deadline.*  Any objection to the to assumption and assignment of an Additional Assigned Contract and the corresponding Cure Amount, the removal of an Eliminated Agreement, or the modification of a Cure Amount in the Supplemental Cure Notice (a "Supplemental Cure Objection") must be filed with the Bankruptcy Court **within seven days of receipt of the Supplemental Cure Notice** (the "Supplemental Cure Objection Deadline"), and served on the Cure Objection Recipients.

(3)     *Auction Results Objection Deadline.*  If the Debtors hold an Auction and if a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, as soon as reasonably practicable after selecting such Successful Bidder(s), the Debtors will file (but not serve) and cause to be published on the Case Website a notice of results of the Auction (the "Notice of Successful Bidder").  Upon the filing of any Notice of Successful Bidder, objections *solely* to the identity of the Successful Bidder(s), changes to the Stalking Horse Agreement or adequate assurance of future performance (each, a "Limited Objection") may be made.  Any Limited Objection must be filed with the Bankruptcy Court and served on (A) counsel for the Debtors and (B) the Successful Bidder(s) and its counsel, if any and together with the Cure Objection Recipients, the "Objection Recipients"), so as to be received by **November 22, 2024, at**

**4:00 p.m. (prevailing Eastern Time)** (the "Limited Objection Deadline"); *provided, however,* that the Cure Objection Deadline will not be extended.

28.     Any party that fails to timely file an objection to the proposed Cure Amount, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on a Cure Notice or the Supplemental Cure Notice, or the Sale is deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract(s) (including the adequate assurance of future payment), (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to (i) the Cure Amounts, (ii) the assumption and assignment of the Assigned Contract or Additional Assigned Contract(s), (iii) adequate assurance of future performance, or (iv) any of the relief requested herein (whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or a Successful Bidder for purposes of Bankruptcy Code section 365(c)(1)).  Such party shall also be forever barred and estopped from asserting any additional cure or other amounts against the Debtors and the Stalking Horse Bidder or a Successful Bidder, with respect to such party's Assigned Contract or Additional Assigned Contract.

29.     If a Cure Objection, Supplemental Cure Objection, or Limited Objection, as applicable, filed by the Cure Objection Deadline, Supplemental Cure Objection Deadline, or Limited Objection Deadline, as applicable, cannot otherwise be resolved by the parties prior to the Sale Hearing, such objections and all issues regarding the Cure Amount to be paid, the assignability, or the adequate assurance of future performance, as applicable, will be determined by the Court at the Sale Hearing, or at a later hearing on a date to be scheduled by the Debtors in their discretion, and in consultation with the Successful Bidder(s).

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

**I.      The Sale and Bidding Procedures Are Fair and Are Designed To Maximize The Value Received for the Assets.**

30.      A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling estate assets.  *See, e.g., In re Culp,* 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999).

31.      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets").  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Dura Auto, Sys.,* No. 06-11202(KJC), 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (bidding procedures "enhanc[ing] competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

32.     Here, the Bidding Procedures are designed to promote competitive bidding and maximize value for the Debtors' estates.  Building on the Debtors' substantial prepetition marketing efforts, the Bidding Procedures contemplate a controlled, fair, and open process, supported by the Stalking Horse Bidder, that will encourage participation from interested parties and ensure that the Debtors' obtain the highest or otherwise best offer for their assets.  In particular, the Bidding Procedures contemplate an open auction process with minimal barriers to entry and provide prospective purchasers with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

33.     At the same time, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  In addition, the Stalking Horse Bid, which will be market-tested, establishes a minimum purchase price for the Debtors' assets, ensuring that the consideration obtained will be fair and reasonable.

34.     For these reasons, the Debtors submit that the proposed Bidding Procedures, including the Debtors' proposed Sale timeline, will encourage competitive bidding, are appropriate under section 363 of the Bankruptcy Code, and are consistent with other procedures previously approved by this Court.  *See, e.g., In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 25, 2023); *In re Lucira Health, Inc.*, No. 23-10242 (MFW) (Bankr. D. Del. Mar. 27, 2023); *In re Performance Powersports Group Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Jul. 16, 2021); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Bankr. D. Del. Jun. 3, 2020).

**II.        The Bid Protections Should Be Authorized.**

35.        As described above, the Debtors request approval of the Bid Protections for the Stalking Horse Bidder, which are customary for transactions of this type.  Subject to the terms of the Stalking Horse Agreement, the Bid Protections comprise a break-up fee of $4,590,000 (i.e., 3% of the cash purchase price under the Stalking Horse Agreement) (the "Break-Up Fee") and expense reimbursement up to $1,530,000 (i.e., 1% of the cash purchase price) (the "Expense Reimbursement").

36.        In the Third Circuit, bidding protections are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code.  *Energy Future*, 904 F.3d at 313 ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503."); *Women First Healthcare, Inc.*, 332 B.R. at 121–23 (holding that the general standard used for all administrative expenses applies to expense reimbursements). Thus, the allowability of the Bid Protections, "like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).  Courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of [bid protections] . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original).

37.        The Third Circuit has recognized several instances in which a break-up fee might confer a benefit on the estate.  *In re Energy Future Holdings,* 904 F.3d at 314.  For example, "such

a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited" or by "serv[ing] as a catalyst to higher bids." *In re O'Brien*, 181 F.3d at 537. Break-up fees may also benefit the estate by "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely," thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* Finally, a break-up fee may also benefit the estate if it induces a bidder to remain committed to its purchase after an auction is ordered. *In re Reliant Energy,* 594 F.3d at 207–08; *see also In re Energy Future Holdings,* 904 F.3d at 314.

38.     The Debtors believe that the Bid Protections, the product of hard-fought negotiations, provide each of the benefits articulated by the Third Circuit and are necessary to preserve the value of the Debtors' estates.  The Stalking Horse Bid will establish a floor value for the Sale of the Debtors' assets that other prospective bidders can rely upon and is anticipated to encourage competitive bidding with the goal of achieving higher or otherwise better bids.

39.     Without the Bid Protections, because of the risk that it would be outbid, the Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections given the substantial time and expense it has already incurred in connection with its efforts to conduct diligence on the Debtors' business and negotiate definitive documentation.  This, in turn, would cause the Debtors to lose the opportunity to obtain the highest or otherwise best offer for their assets and the downside protection afforded by the existence and commitment of the Stalking Horse Bidder.

40.     Finally, the Bid Protections only become payable in the event the Stalking Horse Bidder is not the Successful Bidder.  Accordingly, payment of the Bid Protections in the context

of a sale to another purchaser will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Break-Up Fee and Expense Reimbursement.

41.     Similar types of bid protections have been approved by this Court.  *See, e.g., In re Vyaire Medical, Inc.,* No, 24-11217 (BLS) (Bankr. D. Del. July 11, 2024) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $250,000); *In re Sientra, Inc.,* No. 24-10245 (JTD) (Bankr. D. Del. Mar. 5, 2024) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $500,000); *In re MVK FarmCo LLC,* No. 23-11721 (LSS) (Bankr. D. Del. Nov. 17, 2023) (authorizing stalking horse break-up fee of 3% inclusive of expense reimbursement); *In re Yellow Corp.,* No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (same); *In re PGX Holdings Inc.,* No. 23-10718 (CTG) (Bankr. D. Del. June. 4, 2023) (authorizing stalking horse break-up fee and expense reimbursement up to $1,000,000); *In re FTX Trading LTD.,* No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $1,250,000).

42.     Accordingly, for the reasons set forth above, the Debtors respectfully request that the Court grant the Debtors the authority, but not direction, to incur and pay the Break-Up Fee and/or Expense Reimbursement to the extent such Bid Protections are necessary to preserve the value of the Debtors' estates.

## III.    Approval of the Sale Is Warranted Under Bankruptcy Code Section 363(b) Because A Sound Business Justification Exists.

43.     Ample authority exists for approval of the Sale.   Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound

business purpose exists for the proposed transaction. *See, e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (same).

44.     "Under Delaware law, the business-judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *accord Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991).

### A.     A Sound Business Justification Exists for the Sale.

45.     The Debtors have articulated clear business justifications for the Sale.  After extensively exploring strategic alternatives prepetition and engaging in extensive negotiations with the Stalking Horse Bidder at arm's length, the Debtors believe that the Sale will preserve their business as a going concern and maximize the value of their assets.  It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'I Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) ("[I]t is worth noting that a [section] 363(b) sale transaction does not require an auction

procedure.   The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").   Consequently, the Debtors believe that the Stalking Horse Bid, after being market-tested in accordance with the Bidding Procedures through a competitive, arms' length process, or a higher or otherwise better successful bid, will provide a greater recovery for their estates than any known or practicably available alternative.   As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.   Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.[7]

## IV. The Proposed Sale Satisfies The Requirements Of Bankruptcy Code Section 363(f) For A Sale Free And Clear of All Encumbrances, Including Successor Liability Claims.

46.    Bankruptcy Code section 363(f) provides:

The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in *bona fide* dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

---

[7]    The Debtors intend to submit evidence at or prior the Sale Hearing to further support these conclusions.   The Debtors reserve the right to submit supplemental materials, including declarations, in connection with the Sale.

47.     Because section 363(f) of the Bankruptcy Code is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

48.     The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code.  The Debtors will send the Sale Notice to, among others, all parties who assert liens or claims against the Debtors' assets.  Any holder of a claim against or interest in the Debtors' assets who does not object to the Sale will be deemed to have consented to the sale of the Debtors' assets free and clear. 11 U.S.C. 363(f)(2); *see Hargrave v. Twp. of Pemberton,* 175 B.R. 855, 858 (Bankr. D.N.J. 1994). Moreover, the Debtors believe that any parties that do object on the basis that they hold liens or claims against the Assets will either (a) be holders of liens or claims that are subject to a *bona fide* dispute or (b) would be compelled to accept cash in satisfaction of their interests.  *Cf.* 11 U.S.C. §§ 363(f)(3) & 363(f)(5).

49.     Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the Sale, in the same order of priority, with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  *Cf. id.* § 363(f)(3).

50.     The Debtors also submit that it is appropriate to sell the Debtors' assets free and clear of successor liability relating to the Debtors' businesses.  Such a provision ensures that any Successful Bidder will be protected from any claims or lawsuits premised on the theory that such Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free

and clear from successor liability relating to the debtor's business. *See, e.g., In re Trans World Airlines, Inc.,* 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.),* 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

51.    The purpose of an order authorizing the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, the Stalking Horse Bidder required such assurances and without such assurances, the Debtors would run the risk that other prospective bidders may not enter the Auction or, if they did, would do so with reduced Bid amounts.  To that end, the Successful Bidder or Successful Bidders for the Debtors' Assets should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear.

52.    The Debtors accordingly request authority to convey the assets to the Successful Bidder free and clear of all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances, with any such liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances to attach to the proceeds of the Sale.

**V.      Any Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

53.      The Debtors request that the Court find the Stalking Horse Bidder and/or other Successful Bidder are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the assets.

54.      Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  11 U.S.C. § 363(m).

55.      Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

56.      As set forth above, the Debtors' marketing efforts and negotiations with the Stalking Horse Bidder and other Potential Bidders have been and will continue to be undertaken at arm's-length and without collusion, with all parties having the opportunity to be represented by

43

their own sophisticated counsel. Accordingly, the Debtors request that any Sale Order include a provision that any Successful Bidder for the Assets is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Successful Bidder or Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for their assets and that the closing of the Sale will occur promptly. Moreover, neither the Debtors nor  the Stalking Horse Bidder or any other Potential Bidder has engaged in any conduct that would cause or permit a Sale to be avoided under section 363(n) of the Bankruptcy Code and the Bidding Procedures are designed to prevent any conduct that could give rise to avoidance on that basis.

57.    Accordingly, the Debtors believe that the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

## VI.    Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized.

### A.    The Assumption and Assignment Procedures Reflect the Debtors' Reasonable Business Judgment.

58.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory

contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule").

59.    Here, the Court should approve the decision to assume and assign certain designated Executory Contracts and Unexpired Leases in connection with the Sale as a sound exercise of the Debtors' business judgment. Many of the Executory Contracts and Unexpired Leases are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. It is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Executory Contracts and Unexpired Leases needed to manage the Debtors' day-to-day operations were included in the transaction. In addition, the Assigned Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

60.    Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B.    Defaults Under the Assigned Contracts Will be Cured Through the Sale Transaction(s).**

61.    Upon finding that a debtor has exercised its business judgment in determining that assuming an Executory Contract or Unexpired Lease is in the best interest of its estate, courts must

then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the Executory Contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988). This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

62.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse Agreement and any marked copy thereof submitted by a Potential Bidder will require the cure of all defaults associated with, or that are required to properly assume, any Assigned Contracts. Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over Cure Amounts or other defaults, the Debtors maintain that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of contract counterparties.

### C.     Contract Counterparties Will Be Adequately Assured of Future Performance.

63.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance,' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re U.L. Radio Corp.*, 19

B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the degree of assurance necessary falls considerably short of an absolute guaranty."  *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (citing *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See Dura Auto.*, 2007 WL 7728109, at *97 (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding); *In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (same).

64.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.,* financial credibility, willingness, and ability of the interested party to perform under any Contracts to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform under any Contracts to be assumed and assigned to a Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed Cure Amounts.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the any Executory Contract and Unexpired Lease to be assumed and assigned to any Successful Bidder.

**VII.    The Forms of Notice and Notice Procedures for the Bidding Procedures, the Auction, and the Sale Hearing Are Reasonable and Appropriate.**

65.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, is reasonably calculated to provide all interested parties with timely and proper notice of a potential Transaction, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**VIII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

66.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).  The Debtors request that each of the Bidding Procedures Order and the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

67.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented.  *See* Fed R. Bankr. P. 6004(h), 6006(d) advisory committee's note to 1999 amendment.  The stay

pursuant to Bankruptcy Rule 6004(h) may be waived to allow a Sale to close immediately "where there has been no objection to the procedure." *See* 10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2016). Furthermore, if an objection is filed and overruled, and the objecting party informs this Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file an appeal. Id.

68.    Following the Sale Hearing, the Debtors seek to close the Sale as soon as possible following the Sale Hearing in order to maximize value received for the Assets. Accordingly, the Debtors hereby request that this Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**RESERVATION OF RIGHTS**

69.    Nothing in the Motion should be construed as (a) authority to assume or reject any Executory Contract or Unexpired Lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party. The inclusion of a contract, lease or other agreement on the Sale Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto shall be reserved. Nothing contained in the Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## NOTICE

70.     Notice of this Motion will be given to: (a) all entities reasonably known by the Debtors to have expressed a bona fide interest in acquiring the Assets during the year preceding the date hereof; (b) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the U.S. Trustee; (e) counsel to the Stalking Horse Bidder; (f) counsel to the Prepetition Lenders; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) counsel to any statutory committee appointed in the Chapter 11 Cases; (j) the United States Attorney for the District of Delaware; (k) the Federal Trade Commission; (l) the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice; (m) all parties to Executory Contracts to be assumed and assigned, or rejected as part of the Sale; (n) each governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder; and (p) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m).

## NO PRIOR REQUEST

71.     No previous request for the relief sought therein has been made to this Court or any other court.

### *[Remainder of Page Intentionally Left Blank]*

# CONCLUSION

The Debtors respectfully request that this Court enter the Bidding Procedures Order and, following the Sale Hearing, the Sale Order, granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  October 14, 2024
        Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

Ron E. Meisler (*pro hac vice* admission pending)
Jennifer Madden (*pro hac vice* admission pending)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and –

Robert D. Drain (*pro hac vice* admission pending)
Evan A. Hill (*pro hac vice* admission pending)
Moshe S. Jacob (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Robert.Drain@skadden.com
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

**<u>EXHIBIT A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Jointly Administered)** |
|  | **Related Docket No[s]. _____** |

## ORDER (I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND ASSIGNMENT PROCEDURES AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for an order (this "Order") (i) authorizing and approving the proposed bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") in connection with the sale (the "Sale") of substantially all of the assets of the Debtors (the "Assets") (ii) authorizing and approving that certain Asset Purchase Agreement, dated as of October 13, 2024, among the Debtors and the Stalking Horse Bidder attached hereto as **Exhibit 2** (the "Stalking Horse Agreement" or the "APA"), including the Bid Protections, (iii) authorizing and approving the form of notice of the auction, if any, for the sale of the Assets (the "Auction"), the Sale, and the hearing to consider the Sale (the "Sale Hearing"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Sale Notice"), (iv) authorizing and scheduling the Sale Hearing and setting other related dates and deadlines, (v) authorizing and approving the Assumption and Assignment Procedures, and (vi) granting related relief, all as more fully set forth in the Motion; and upon consideration of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures, as applicable.

Houlihan Declaration and the First-Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and this Court having held a hearing to consider the relief requested in the Motion; and upon the record of the hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby;

## FOUND, CONCLUDED, AND DETERMINED THAT:

A.    *Jurisdiction; Venue*. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are Bankruptcy Code Sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006.  Venue for these cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    *Notice*.  The Debtors' notice of the Motion, the proposed entry of the Bidding Procedures Order, the Bidding Procedures, the Assumption and Assignment Procedures, the Auction, the Sale, and the Sale Hearing is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002, 4001, 6004, and 6006, and no other or further notice of, or hearing on, the Motion or this Bidding Procedures Order is required.

C.    *Bidding Procedures*.  The Motion and the Bidding Procedures comply with the requirements set forth by Local Rule 6004-(1)(c).The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets.  The Bidding Procedures were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Debtors' Assets.

D.    *Stalking Horse Bid Protections*.  The Debtors have demonstrated compelling and sound business justifications for authorizing the payment of the break-up fee equal to $4,590,000 (the "Break-Up Fee") and the expense reimbursement of up to $1,530,000 (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections") to the Stalking Horse Bidder on the terms set forth in the Stalking Horse Agreement including:

(i)    the Bid Protections are the product of negotiations between the Debtors and the Stalking Horse Bidder conducted in good faith and at arm's length, and the Stalking Horse Agreement (including the Bid Protections) is the culmination of a process undertaken by the Debtors and their professionals to negotiate a transaction with a bidder who made the highest or otherwise best offer to date for the assets that are identified in the Stalking Horse Agreement to maximize the value of the Debtors' estates;

(ii)    the Bid Protections are an actual and necessary cost and expense of preserving the value of the respective Debtors' estates;

3

(iii)    the Bid Protections are fair, reasonable, and appropriate in light of, among other things, the size and nature of the proposed Sale under the Stalking Horse Agreement, the substantial efforts that have been and will be expended by the Stalking Horse Bidder, and, notwithstanding that the proposed Sale is subject to higher or better offers, the substantial benefits the Stalking Horse Bidder has provided to the Debtors, their estates, their creditors, and all parties-in-interest herein, including, among other things, by increasing the likelihood that the best possible price for the Assets will be received; and

(iv)    the protections afforded to the Stalking Horse Bidder by way of the Bid Protections were material inducements for, and express conditions of, the Stalking Horse Bidder's willingness to enter into the Stalking Horse Agreement, and were necessary to ensure that the Stalking Horse Bidder would continue to pursue the proposed acquisition on terms acceptable to the Debtors in their sound business judgment, subject to competitive bidding, and the Stalking Horse Bidder is unwilling to commit to purchase the Assets under the terms of the Stalking Horse Agreement unless the Stalking Horse Bidder is assured the Bid Protections if the Stalking Horse Bidder is not the purchaser of the Assets pursuant to the Stalking Horse Agreement.

E.    *Sale Notice*.    The Sale Notice, substantially in the form attached hereto as **Exhibit 3**, provided by the Debtors regarding the Sale of the Assets by Auction and Sale Hearing (the "Sale Notice") is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) notice of the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Motion and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets for sale; (v) instructions for promptly obtaining a copy of the Stalking Horse Agreement; (vi) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; (vii) the commitment by the Stalking Horse Bidder to assume certain liabilities disclosed in the Stalking Horse Agreement (collectively, the "Assumed Liabilities"); and (viii) notice of the proposed assumption and assignment of the Assigned Contracts and the right, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

F.      *Assumption and Assignment Procedures*.   The Motion and the Cure Notice (as defined herein) are reasonably calculated to provide counterparties to the Assigned Contracts with proper notice of the intended assumption and assignment of their Executory Contracts and Unexpired Leases, any Cure Amounts (as defined herein), and the Assumption and Assignment Procedures (as defined herein), and are appropriate.

G.      *Stalking Horse Bidder*.   The Stalking Horse Bid as reflected in the Stalking Horse Agreement represents the highest and best offer the Debtors have received to date.   The Stalking Horse Agreement provides the Debtors with the opportunity to sell the Assets in order to preserve and realize their going concern value and provide a floor for a further marketing and auction process.   The Stalking Horse Bid will enable the Debtors to continue their operations, preserve jobs, minimize disruption to the Debtors' business, and secure a fair and adequate baseline price for the Assets and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.   The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Debtors.

H.      *Other Findings*.   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the preceding findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the preceding conclusions of law constitute findings of fact, they are adopted as such.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED**

**THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

**I.      Key Dates and Deadlines**

2.      **Sale Hearing**.  The hearing to be conducted by the Bankruptcy Court to consider approval of the Sale will commence on [●]**, 2024 at** [●]**,** before the Honorable [●] of the United States Bankruptcy Court for the District of Delaware, 824 Market St. N., Wilmington, Delaware 19801. The Debtors may adjourn the Sale Hearing in open Court or on the Court's calendar without further notice.  Upon entry of this Order, the Debtors are authorized to perform any obligations set forth in the Stalking Horse Agreement that are intended to be performed prior to the Sale Hearing and/or entry of the order approving the Sale (the "Sale Order").

3.      **Sale Objection Deadline**.  Objections, if any, to the Sale of the Assets to a Successful Bidder or Successful Bidders ("Sale Objections"), *except* objections solely related to the identity of the Successful Bidder or Successful Bidders, any changes to the Stalking Horse Agreement, and adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder, must be made by [●]**, 2024 at** [●], **prevailing Eastern Time** (the "Sale Objection Deadline").  If a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, objections solely to the identity of such Successful Bidder, changes to the Stalking Horse Agreement, and adequate assurance of future performance by the Successful Bidder ("Limited Objections") must be made by  [●]**, 2024 at**  [●], **prevailing Eastern Time** (the "Limited Objections Deadline").  In each case, all objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court no later than the Sale Objection Deadline or the Limited

6

Objections Deadline, as applicable, and served on (i) the Debtors, (ii) proposed counsel to the Debtors, (iii) counsel to the Stalking Horse Bidder, (iv), counsel to the prepetition Lenders and (v) counsel to any statutory committee appointed in the Chapter 11 Cases.

4.     **Response Deadline**.  Responses or replies, if any, to Sale Objections and Limited Objections must be filed by [●], **2024 at  [●], prevailing Eastern Time** (or may be presented at the Sale Hearing); *provided* that such deadlines may be extended by agreement of the Debtors and the affected objecting party.

5.     **Competitive Bidding**.  The following dates and deadlines regarding competitive bidding are hereby established:

(a)     **Bid Deadline:  [●], 2024 at  [●], prevailing Eastern Time**, the deadline by which all Qualified Bids (as defined in the Bidding Procedures) must be actually received in writing in electronic format by the parties specified in the Bidding Procedures (the "Bid Deadline").  The Debtors may extend such deadline in accordance with the Bidding Procedures without any further motion in this Court; *provided* that the Debtors shall file a notice with the Court if the Debtors decide to extend the deadline by which Bids for a Sale must be submitted; and

(b)     **Auction: [●], 2024 at  [●], prevailing Eastern Time**, prevailing Eastern Time, is the date and time the Auction, if one is needed, will be held at the offices of [proposed] counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, 320 South Canal Street, Chicago, Illinois 60606-5707, or such other place (which in the Debtors' discretion may be virtual) and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidder) and the Consultation Parties.

**II.     Bidding Procedures and Related Relief**

6.     **Bidding Procedures.**  The Bidding Procedures are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed Sale, and any party desiring to submit a higher or better offer for the Debtors' Assets must comply with the terms of the Bidding Procedures and this Order.  The Bidding Procedures shall also govern the terms on which the Debtors will proceed with the Auction

or the Sale.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures.

7.      The failure to specifically include or reference any particular provision, section, or article of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision, section, or article, it being the intent of this Court that the Bidding Procedures are authorized in their entirety.

8.      **Bid Protections.**  The Bid Protections described in the Bidding Procedures and the Motion and set forth in the Stalking Horse Agreement are hereby approved as set forth in the Stalking Horse Agreement.

9.      If the Stalking Horse Bidder becomes entitled to receive the Bid Protections in accordance with the terms of the Stalking Horse Agreement: (a) the Debtors are authorized, and directed, to pay the Break-Up Fee and Expense Reimbursement, without further action or order by the Court, in accordance with the terms and conditions of the Stalking Horse Agreement, and (b) the Stalking Horse Bidder shall be and it is hereby granted a superpriority administrative expense claim against the Debtors under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the Debtors of the kind specified in section 503(b) in an amount equal to the Break-Up Fee and Expense Reimbursement.

10.     No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fee, "topping," or other similar fee or payment.

11.     **Good Faith Deposits.**  The Debtors may open one or more escrow accounts to hold the Good Faith Deposits of all Qualified Bidders.  The Debtors shall hold and return the Good Faith Deposits of Qualified Bidders in accordance with the Bidding Procedures.  If a Successful Bidder (or if the Sale is to be consummated with the applicable Back-Up Bidder, then such Back-

Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such Bidder, then the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if the Sale is to be consummated with a Back-Up Bidder, then such Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.  Any such forfeited Good Faith Deposit shall become property of the Debtors' estates; *provided, however*, that except as otherwise provided in the Stalking Horse Agreement, the Debtors' retainment of the Good Faith Deposit shall be without prejudice to any other remedies at law or at equity that the Debtors may have against such Bidder.

12.     The deposit provided by the Stalking Horse Bidder and all other Qualified Bidders shall be held in escrow by the Debtors or their agent, and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement or order of this Court (including the preceding paragraph).

13.     If the Stalking Horse Agreement is validly terminated under circumstances where the return of any deposit to the Stalking Horse Bidder is applicable and the Bid Protections are payable, the sole remedy of the Stalking Horse Bidder against the Debtors shall be the return of the applicable deposit and the Bid Protections.

## III.    Auction

14.     The Debtors are authorized, subject to the terms of this Order and the Bidding Procedures, to take actions reasonably necessary, in the discretion of the Debtors, to conduct and implement the Auction.

15.     The Debtors may (a) select, in their business judgment, pursuant to the Bidding Procedures, the overall highest or otherwise best Qualified Bid and the Successful Bidder or Successful Bidders with respect to any Sale, and (b) in accordance with the Bidding Procedures, reject any bid that, in the Debtors' business judgment, is (i) inadequate or insufficient, (ii) not in

9

conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the Bidding Procedures or (iii) contrary to the best interests of the Debtors and their estates, creditors, interest holders or parties-in-interest.

## IV.   Sale Hearing Notice and Related Relief

16.     The Sale Notice is hereby approved.  Within three business days following the entry of this Order or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors will cause the Sale Notice to be served on: (a) all entities reasonably known by the Debtors to have expressed a bona fide interest in acquiring the Assets during the year preceding the date hereof; (b) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the U.S. Trustee; (e) counsel to the Stalking Horse Bidder; (f) counsel to the Prepetition Lenders; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) counsel to any statutory committee appointed in the Chapter 11 Cases; (j) the United States Attorney for the District of Delaware; (k) the Federal Trade Commission; (l) the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice; (m) all parties to Executory Contracts to be assumed and assigned, or rejected as part of the Sale; (n) each governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder; and (o) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m).

17.     Additionally, on the Mailing Date or as soon as reasonably practicable thereafter, the Debtors shall publish a notice, substantially in the form of the Sale Notice (or a simplified version of the Sale Notice), on one occasion, in the national edition of *The New York Times*.  Such publication notice shall be deemed sufficient and proper notice of the Sale to any interested parties whose identities or addresses are unknown to the Debtors.

18.     Failure to file a Sale Objection or a Limited Objection on or before the Sale

Objection Deadline or the Limited Objection Deadline, as applicable, (a) shall forever bar the

assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to entry of the

Sale Order, and to the consummation and performance of the Sale contemplated by the Stalking

Horse Agreement or any alternative asset purchase agreement (an "Alternative APA") with a

Successful Bidder other than the Stalking Horse Bidder, and (b) for purposes of section 363(f)(2)

of the Bankruptcy Code, shall be deemed to be consent to entry of the Sale Order and

consummation of the Sale and all transactions related thereto.

**V.      Assumption and Assignment Procedures and Related Relief**

19.     The following Assumption and Assignment Procedures are hereby approved and

shall apply with respect to the Sale and assumption and assignment of Executory Contracts and

Unexpired Leases.

(a)     **Cure Notice.**  No later than  [●], **2024 at**  [●], **prevailing Eastern Time** (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a Cure Notice, substantially in the form attached hereto as **Exhibit 4**, via first-class mail on all counterparties to all Assigned Contracts and provide a copy of the same to the Stalking Horse Bidder and the Consultation Parties.  The Cure Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the Executory Contract or Unexpired Lease, as applicable, (ii) the name of the counterparty to the Executory Contract or Unexpired Lease, as applicable, (iii) Debtors' good faith estimates of the Cure Amounts (if any) required in connection with the Executory Contract or Unexpired Lease, as applicable, and (iv) the Cure Objection Deadline, Supplemental Cure Objection Deadline, and Limited Objection Deadline; *provided*, *however*, that service of a Cure Notice does not constitute an admission that any contract is an Executory Contract or that the stated Cure Amount related to any Executory Contract or Unexpired Lease constitutes a claim against the Debtors or a right against the Stalking Horse Bidder (all rights with respect thereto being expressly reserved).  Further, the inclusion of an Executory contract or Unexpired Lease, as applicable, on the Cure Notice is not a guarantee that such Executory contract or Unexpired Lease, as applicable, will ultimately be assumed and assigned.

(b)     **Cure Amounts and Adequate Assurance of Future Performance.** The payment of the applicable Cure Amounts shall (i) effect a cure of all defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

(c)     **Supplemental Cure Notice.** Although the Debtors intend to make a good faith effort to identify all Assigned Contracts that may be assumed and assigned in connection with a Sale, the Debtors may discover certain Executory Contracts inadvertently omitted from the Assigned Contracts list or the Stalking Horse Bidder or Successful Bidders may identify other Executory Contracts that they desire to assume and assign in connection with a Sale. Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Deadline and at least two days before the closing of a Sale, to (i) supplement the list of Assigned Contracts with previously omitted Executory Contracts (the "Additional Assigned Contracts"), (ii) remove Assigned Contracts from the list of Executory Contracts ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale (the "Eliminated Agreements"), and/or (iii) modify the previously stated Cure Amount associated with any Assigned Contracts. In the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption (a "Supplemental Cure Notice") on each of the counterparties to such Additional Assigned Contracts or Eliminated Agreements, as applicable, and their counsel of record, if any, and the Consultation Parties; *provided*, *however*, the Debtors may not add an Executory Contract to the list of Assigned Contracts that has been previously rejected by the Debtors by order of the Court. Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice. If the Successful Bidder is not the Stalking Horse Bidder, the Debtors will file the Notice of Successful Bidder in accordance with paragraph 19(d)(3), which will among other things set the Limited Objection Deadline for parties to file Limited Objections (each as defined herein).

(d)     **Objections.** Objections, if any, to the proposed assumption and assignment or the Cure Amount proposed with respect thereto, *must* (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by, the Cure Objection Recipients (as defined below) by the applicable deadlines below.

(1)     *Cure Objection Deadline.* Any objection to the Cure Amount, to assumption and assignment of an Assigned Contract, or to lack of adequate assurance of the performance of the Stalking Horse Bidder must be filed with the Bankruptcy Court on or before [●], **2024 at** [●], **prevailing Eastern Time** (the "Cure Objection

12

Deadline") or such later date identified in the Supplemental Cure Notice in accordance with 18(d)(2) herein, and served on: (a) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606 (Attn: Ron Meisler, Esq. (ron.meisler@skadden.com) and Jennifer Madden, Esq. (jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001 (Attn: Evan Hill, Esq. (evan.hill@skadden.com) and Moshe Jacob, Esq. (moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph Larkin (joseph.larkin@skadden.com)); and (b) counsel to the Stalking Horse Bidder, Taft Stettinius & Hollister LLP, One Indiana Square, Suite 3500, Indianapolis, IN 46204 (Attn: Zachary E. Klutz (zklutz@taftlaw.com) and W. Timothy Miller (miller@taftlaw.com)) (collectively, the "Cure Objection Recipients").

(2)     *Supplemental Cure Objection Deadline.*  Any objection to the to assumption and assignment of an Additional Assigned Contract and the corresponding Cure Amount, the removal of an Eliminated Agreement, or the modification of a Cure Amount in the Supplemental Cure Notice (a "Supplemental Cure Objection") must be filed with the Bankruptcy Court **within seven days of receipt of the Supplemental Cure Notice** (the "Supplemental Cure Objection Deadline"), and served on the Cure Objection Recipients.

(3)     *Auction Results Objection Deadline.*  If the Debtors hold an Auction and if a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, as soon as reasonably practicable after selecting such Successful Bidder(s), the Debtors will file (but not serve) and cause to be published on the Case Website a notice of results of the Auction (the "Notice of Successful Bidder").  Upon the filing of any Notice of Successful Bidder, objections *solely* to the identity of the Successful Bidder(s), changes to the Stalking Horse Agreement or adequate assurance of future performance (each, a "Limited Objection") may be made.  Any Limited Objection must be filed with the Bankruptcy Court and served on (A) counsel for the Debtors and (B) the Successful Bidder(s) and its counsel, if any and together with the Cure Objection Recipients, the "Objection Recipients"), so as to be received by  [●], 2024 at  [●], prevailing **Eastern Time** (the "Limited Objection Deadline"); *provided, however,* that the Cure Objection Deadline will not be extended.

20.     Any party that fails to timely file an objection to the proposed Cure Amount, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract

13

listed on a Cure Notice or the Supplemental Cure Notice, or the Sale is deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract(s) (including the adequate assurance of future payment), (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to (i) the Cure Amounts, (ii) the assumption and assignment of the Assigned Contract or Additional Assigned Contract(s), (iii) adequate assurance of future performance, or (iv) any of the relief requested herein (whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or a Successful Bidder for purposes of Bankruptcy Code section 365(c)(1)).  Such party shall also be forever barred and estopped from asserting any additional cure or other amounts against the Debtors and the Stalking Horse Bidder or a Successful Bidder, with respect to such party's Assigned Contract or Additional Assigned Contract.

21.     If a Cure Objection, Supplemental Cure Objection, or Limited Objection, as applicable, filed by the Cure Objection Deadline, Supplemental Cure Objection Deadline, or Limited Objection Deadline, as applicable, cannot otherwise be resolved by the parties prior to the Sale Hearing, such objections and all issues regarding the Cure Amount to be paid, the assignability, or the adequate assurance of future performance, as applicable, will be determined by the Court at the Sale Hearing, or at a later hearing on a date to be scheduled by the Debtors in their discretion, and in consultation with the Successful Bidder(s).

22.     The Debtors are authorized to take any and all actions necessary or appropriate to implement the Assumption and Assignment Procedures.

## VI.   Other Relief

23.     Any objections to the entry of this Order and the relief granted herein that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

24.     Nothing in the Bidding Procedures or this Order shall be determinative as to the allocation of value of the Assets and all parties' rights with respect thereto are expressly reserved.

25.     The Debtors are authorized to make non-substantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

26.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

27.     To the extent the provisions of this Order are inconsistent with the provisions of any exhibits referenced herein or with the Motion, the provisions of this Order shall control.

28.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

29.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

## <u>EXHIBIT 1</u>

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | Case No. 24-12337 (___) |
| **Debtors.**[1] | **(Jointly Administered)** |

## BIDDING PROCEDURES[2]

In the exercise of their good faith reasonable business judgment, True Value Company, L.L.C. and certain of its affiliates, as the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), have executed an Asset Purchase Agreement (collectively with all ancillary documents and agreements and as may be amended, modified or supplemented, the "Stalking Horse Agreement") with Do It Best Corp. (the "Stalking Horse Bidder"), dated as of October 13, 2024, subject to the approval of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), pursuant to which (i) the Stalking Horse Bidder proposes to (a) purchase the Transferred Assets (as defined in the Stalking Horse Agreement) for $153 million in aggregate cash consideration, (b) assume certain Assumed Liabilities (as defined in the Stalking Horse Agreement), and (c) pay cure costs with respect to assumed and assigned contracts designated by the Stalking Horse Bidder ((a) through (c) together, the "Purchase Price"), and (ii) the Debtors propose to, under certain circumstances in connection with the termination of the Stalking Horse Agreement, (a) pay the Stalking Horse Bidder an aggregate break-up fee in an amount equal to $4,590,000 in consideration of the Stalking Horse Bidder having expended considerable time and expense in connection with the Stalking Horse Agreement and the negotiation thereof (the "Break-Up Fee") and/or (b) reimburse the Stalking Horse Bidder for its out of pocket costs, expenses and fees in connection with evaluating, negotiating, documenting and performing the transactions contemplated by the Stalking Horse Agreement up to a maximum amount of $1,530,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections"), in each case, in accordance with the terms and subject to the conditions of the Stalking Horse Agreement.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion for approval of, among other things, the Bidding Procedures (the "Motion") or, if not defined therein, the Bidding Procedures Order.

On [__], 2024, the Bankruptcy Court entered an order [Docket No. __] (the "<u>Bidding Procedures Order</u>") approving, among other things, these bidding procedures (the "<u>Bidding Procedures</u>").

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct the marketing process and auction ("<u>Auction</u>") for the sale (the "<u>Sale</u>") of substantially all of their assets (the "<u>Assets</u>").  Subject to entry of a Bankruptcy Court order approving the Sale, the Sale may be implemented pursuant to the terms and subject to the conditions of the Stalking Horse Agreement, as the same may be amended pursuant to the terms thereof, subject to the receipt of higher or otherwise better Bids (as defined below) in accordance with these Bidding Procedures.

The Debtors intend to seek approval of the Sale under section 363 of the Bankruptcy Code and implement the Sale pursuant to the terms of the Stalking Horse Agreement or the applicable asset purchase agreement that reflects the highest or otherwise best bid.

## Bidding Process

The Debtors and their advisors, in consultation with the Consultation Parties, shall (i) determine whether any person is a Qualified Bidder (as defined below), (ii) coordinate the efforts of Potential Bidders (as defined below) in conducting their due diligence investigations, (iii) receive offers from Potential Bidders, (iv) negotiate any offers, and (v) conduct the Auction (as set forth herein).

## Key Dates For Potential Competing Bidders

The Debtors shall assist Potential Bidders in conducting their respective due diligence investigations and shall accept Bids (as defined below) until **November 18, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>").  The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, after consultation with the Consultation Parties, for all or certain bidders.

No later than the Bid Deadline, a Potential Bidder that desires to make a bid to consummate the Sale shall deliver written copies of its Bid in electronic format to: (1) the Debtors, True Value Company, L.L.C., 8600 West Bryn Mawr Ave., Chicago, IL, 60631 (Attn: Susan Radde (susan.radde@truevalue.com)); (2) proposed counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606 (Attn: Ron Meisler (ron.meisler@skadden.com) and Jennifer Madden (jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001 (Attn: Evan Hill (evan.hill@skadden.com) and Moshe Jacob (moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, Delaware 19801 (Attn: Steven Daniels (steven.daniels@skadden.com) and John Saathoff (john.saathoff@skadden.com)); (3) proposed investment banker for the Debtors, Houlihan Lokey Capital, Inc., 245 Park Ave, 20th Floor, New York, NY 10167, (Attn: William Hardie (WHardie@HL.com), Jay Weinberger (JWeinberger@HL.com), John Hartigan (JHartigan@HL.com), and Christina Walters (Christina.Walters@HL.com)); and (4) counsel to any statutory committee appointed in the Chapter 11 Cases.

The key dates for the sale process are as follows:

| Date/Time | Event |
|---|---|
| October 28, 2024 at 4:00 p.m. EST | Bidding Procedures Objection Deadline |
| October 31, 2024 at 4:00 p.m. EST | Bidding Procedures Objection Response Deadline |
| November 4, 2024 at [●]  EST | Bidding Procedures Hearing |
| November 6, 2024 at 4:00 p.m. EST | Deadline for Cure Notice |
| November 6, 2024 at 4:00 p.m. EST | Deadline for Sale Notice |
| November 18, 2024 at 4:00 p.m. EST | Cure Objection Deadline |
| November 18, 2024 at 4:00 p.m. EST | Bid Deadline |
| November 20, 2024 at 4:00 p.m. EST | Sale Objection Deadline |
| November 20, 2024 at 10:00 a.m. EST | Auction to be held (if necessary) |
| *If Auction is not Held*: November 20, 2024 at 4:00 p.m. EST<br>*If Auction is Held*: November 20, 2024 at 11:59 p.m. EST | Notice of Successful Bidder |
| November 22, 2024 at 4:00 p.m. EST | Limited Objection Deadline |
| November 25, 2024 at 4:00 p.m. EST | Response Deadline |
| November 27, 2024 at [●] EST | Sale Hearing |

The Debtors, after consultation with the Consultation Parties, may extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures, subject to the Court's availability.

## Due Diligence

***Access to Diligence Materials.***

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a prospective bidder must submit to the Debtors (i) an executed confidentiality agreement in such form reasonably satisfactory to the Debtors, (ii) reasonable evidence demonstrating the party's financial capability to consummate a Sale as reasonably determined by the Debtors, and (iii) a statement that such party has a bona fide interest in submitting a bid. A party who qualifies for access to Diligence Materials pursuant to the prior sentence shall be a "Potential Bidder." The Stalking Horse Bidder will be deemed a Potential Bidder at all times.

The Debtors will afford any Potential Bidder the time and opportunity to conduct reasonable due diligence, as determined by the Debtors, including reasonable access to management, access to the electronic data room and other information that a Potential Bidder may reasonably request, which information shall be substantially commensurate with that information given to the Stalking Horse Bidder; provided, however, that the Debtors shall not be obligated to furnish any due diligence information to Potential Bidders who the Debtors do not reasonably believe have established a good faith intent to, or lack the capacity to, consummate the Sale; provided, further, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below). The availability of additional due diligence to a Qualified Bidder (as defined below) will cease on the Auction date; provided, however, that the Successful Bidder shall be permitted to continue to

conduct due diligence until the closing of the Sale (subject to the terms of the Successful Bidder Agreement (as defined below)). The Debtors reserve the right to withhold any Diligence Materials that the Debtors determine are subject to attorney-client privilege, business-sensitive or otherwise not appropriate for disclosure to a Potential Bidder who is a competitor or customer of the Debtors or is affiliated with any competitor or customer of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder.

Each Potential Bidder will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct any and all due diligence regarding the Debtors' assets and liabilities that are the subject of the Auction to the extent of the assets and liabilities that are the subject of their Bid prior to making any such bids, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Debtors' assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or its bid. All due diligence requests must be directed to the Debtors' investment banker, Houlihan Lokey Capital, Inc., 245 Park Ave, 20th Floor, New York, NY 10167, William Hardie (WHardie@HL.com), Jay Weinberger (JWeinberger@HL.com), John Hartigan (JHartigan@HL.com), and Christina Walters (Christina.Walters@HL.com).

***Due Diligence from Potential Bidders.***

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction. Failure to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that such bidder (including any Qualified Bidder) is no longer a Potential Bidder or that the Bid made by such bidder will not be considered a Qualified Bid.

***Communications with Potential Bidders.***

There must be no communications between and among Potential Bidders, or between Potential Bidders and the Consultation Parties (as defined below), unless the Debtors have previously authorized such communication in writing or with the participation of a representative of the Debtors or their advisors, and each Potential Bidder shall be deemed to have so represented to the Court and the Debtors. Should any Potential Bidder attempt to communicate directly with a Consultation Party, such Consultation Party shall immediately direct the Potential Bidder to the Debtors' counsel and investment banker. The Debtors reserve the right, in their reasonable business judgment, to disqualify any Potential Bidder(s) that have communications between and among themselves or with a Consultation Party without the participation of the Debtors (or a representative of the Debtors) or the Debtors' prior written consent. The Debtors further reserve their right, in their reasonable business judgment, to strip any Consultation Party that violates this provision (except as otherwise provided in this paragraph) of its consultation rights hereunder with approval of the Court.

## Determination of Qualified Bid Status

To be eligible for consideration as a Qualified Bid and to participate in the Auction, each Potential Bidder (other than the Stalking Horse Bidder, which shall be deemed a Qualified Bidder) must deliver to the Debtors and their advisors a written, irrevocable offer (each, a "Bid") prior to the Bid Deadline that must be determined by the Debtors, in their business judgment and in consultation with the Consultation Parties, to satisfy each of the following conditions:

(a) Good Faith Offer; Partial Bids: Each Bid must constitute a good faith, bona fide offer to purchase all or a portion of the Assets (it being understood that partial bids may be permitted only if the combined consideration thereof satisfies the requirements of a Minimum Bid, as defined below).

(b) Good Faith Deposit: Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the cash consideration of the Purchase Price (as defined in the Alternative APA (as defined below)), before any reductions for assumed liabilities (the "Good Faith Deposit"). The Good Faith Deposit shall come in the form of a wire transfer, certified check or other form acceptable to the Debtors. Each Good Faith Deposit will be deposited and held in one or more escrow accounts by the Debtors and shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. Requests for wire instructions should be directed to William Hardie (WHardie@HL.com), Jay Weinberger (JWeinberger@HL.com), John Hartigan (JHartigan@HL.com), and Christina Walters (Christina.Walters@HL.com).

(c) Same or Better Terms: Each Bid must be on terms that in their totality (or in totality with other Partial Bids) are determined by the Debtors (in consultation with the Consultation Parties), in their business judgment, to be the same or better than the terms of the Stalking Horse Agreement in their totality.

(d) Executed Agreement: Each Bid must include executed transaction documents, signed by an authorized representative of such Potential Bidder, pursuant to which the Potential Bidder proposes to effectuate a Sale or other transaction as contemplated by these Bidding Procedures (an "Alternative APA"). Each Bid must also include a copy of the Alternative APA marked against the Stalking Horse Agreement to show all changes requested by the Potential Bidder (including those related to the assumption and assignment of contracts and licenses, and other material terms such that the Debtors may determine how such Bid compares to the terms of the Stalking Horse Agreement and competing Bids). Each Alternative APA must (i) specify the cash component of the Purchase Price in U.S. dollars; (ii) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by the Debtors); (iii) identify the proposed Assets to be included, including any proposed assumed contracts; (iv) provide a commitment to close within two (2) business days after all closing conditions are met and (v) include a representation that the Potential Bidder will make and submit all necessary filings under the Hart Scott Rodino Antitrust

5

Improvements Act of 1976, as amended (the "HSR Act"), within five (5) calendar days following entry of an order approving the Sale.

(e)  Minimum Bid: A Bid must propose a minimum purchase price, including any assumption of liabilities, that in the Debtors' reasonable business judgment (in consultation with the Consultation Parties) has a value greater than the sum of (i) the Cash Consideration (as defined in the Stalking Horse Agreement), (ii) the Break-Up Fee, (iii) the Expense Reimbursement, (iv) the Assumed Liabilities (as defined in the Stalking Horse Agreement), and (v) a minimum Bid increment of $1,000,000 (the "Overbid Amount") (the sum of which shall be the "Minimum Bid Amount").  If the Potential Bidder believes that the Bid value relative to the Stalking Horse Bid should include additional non-cash components (such as fewer contingencies than are in the Stalking Horse Agreement), the Bid must include a detailed analysis of the value of any such additional non-cash components and any back-up documentation to support such value.  To the extent the Debtors consider any Partial Bids, the combined consideration must be in the aggregate equal to or great than the Minimum Bid Amount.

(f)  Employee and Labor Terms.  Each Bid must include a statement of proposed terms for employees, including whether the Potential Bidder intends to hire all employees who are primarily employed in connection with the Assets included in such Bid or any other employees, the terms and conditions of such employment offers, and whether the Potential Bidder intends to assume any collective bargaining agreements or employee related contracts, programs, or other employment-related liabilities or obligations (e.g., paid time off).  Each Bid must also include a statement as to whether any employees who will not be offered employment by the Potential Bidder are needed to provide transitionary services.

(g)  Transaction Structure. Each Bid must clearly indicate whether it is structured as a going concern sale under section 363 of the Bankruptcy Code, a sponsorship of a plan of reorganization, or equity bids for a liquidation of the Debtors' assets.

(h)  Pension Plan.  Each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of or (ii) any of the potential liabilities associated with the Debtors' pension plan.

(i)  Other Post-Employment Benefits.  Each bid must state whether or not the Potential Bidder intends to assume the Debtors' obligations to provide other post-employment benefits, including (i) medical, dental, and vision coverage and out-of-pocket reimbursement of expenses available to certain former employees of certain Debtors, or such employees' beneficiaries; (ii) death benefits available to certain former employees of certain Debtors; and (iii) life insurance available to certain former employees of certain Debtors.

(j)  Designation of Assigned Contracts and Leases: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Potential Bidder wishes to be assumed pursuant to a Sale.  A Bid must specify whether the Debtors

or the Potential Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate shall be provided by the Debtors).

(k)     Designation of Assumed Liabilities: A Bid must identify all liabilities which the Potential Bidder proposes to assume.

(l)     Corporate Authority: A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Sale; provided that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the Sale, the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale by the equity holder(s) of such Potential Bidder.

(m)     Disclosure of Identity of Potential Bidder: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including the identity of any parent companies of such entity), and the complete terms of any such participation, including any connections, agreements, arrangements or understandings with the Debtors, the Stalking Horse Bidder, or any other known, potential, prospective bidder, or Potential Bidder, or any officer, director, or equity holder of the Debtors; provided that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the Sale, then the Potential Bidder must fully disclose the identity of each direct and indirect equity holder of such Potential Bidder.

(n)     Proof of Financial Ability to Perform: A Bid must include written evidence that the Debtors may reasonably conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Potential Bidder has the necessary financial ability to timely consummate a Sale and must further contain information that can be publicly filed and/or disseminated providing adequate assurance of future performance of all contracts and leases to be assumed and assigned in such Sale. Such information must include, *inter alia*, the following:

(1)     a statement that the Potential Bidder is financially capable of consummating the transaction contemplated by the Alternative APA;

(2)     contact names and numbers for verification of financing sources;

(3)     written evidence of the Potential Bidder's internal resources and proof of any debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Sale;

(4)     the Potential Bidder's most current audited (if any) and latest unaudited financial statements or, if the bidder is an entity formed for the purpose of making a bid, the current audited (if any) and latest unaudited financial

7

statements of the equity holder(s) of the bidder or such other form of financial disclosure, and a guaranty from such equity holder(s);

(5)     a description of the Potential Bidder's pro forma capital structure; and

(6)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to promptly close the Sale.

(o)     <u>Regulatory and Third-Party Approvals</u>: A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale, and the time within which the Potential Bidder expects to receive such regulatory and third-party approvals, and the Debtors (in consultation with the Consultation Parties) may consider the timing of such approvals, and any actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible, when considering the other Bid Assessment Criteria (as defined below).  Each Potential Bidder must further agree that its legal counsel will coordinate in good faith with the Debtors' legal counsel to provide pertinent information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable regulatory requirements and to discuss and explain the Potential Bidder's regulatory analysis, strategy, and timeline for securing all applicable approvals as soon as reasonably practicable.

(p)     <u>Conditions/Contingencies</u>: A Bid must not be subject, in the exercise of the Debtors' reasonable business judgment (in consultation with the Consultation Parties), to material conditions or contingencies to closing, including without limitation governmental approval, obtaining financing, internal approvals or further due diligence.

(q)     <u>Bid Irrevocable</u>: A Bid must provide that it is irrevocable until two (2) business days after the closing of the Sale.  Each Potential Bidder further agrees that its Bid, if not chosen as the Successful Bidder, shall serve, without modification, as a Backup Bidder (as defined below) as may be designated by the Debtors at the hearing to approve the Sale, in the event the Successful Bidder fails to close as provided in the Successful Bidder Agreement, as modified, if at all, and the order approving the Sale.

(r)     <u>As-Is, Where-Is</u>: A Bid must include the following disclaimer: Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

(s)     <u>Time Frame for Closing</u>.  A Bid by a Potential Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors (in consultation with the Consultation Parties).

(t)     <u>Consent to Jurisdiction</u>.  Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Bidding Procedures, the Auction, any Alternative APA, or the construction and enforcement of documents relating to any Sale, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtors, the Bidding Procedures, the Auction, any Alternative APA, or the construction and enforcement of documents relating to any Sale, and (iii) agree to the entry of a final order or judgment in any way related to the Debtors, the Bidding Procedures, the Auction, any Alternative APA, or the construction and enforcement of documents relating to any Sale if it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection with the foregoing consistent with Article III of the United States Constitution.

(u)     <u>No Bid Protections</u>.  A Bid must not entitle the Potential Bidder to any break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of payment or reimbursement and, by submitting a Bid, the Potential Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.  Each Potential Bidder presenting a Bid will bear its own costs and expenses (including legal fees) in connection with any proposed Sale.  For the avoidance of doubt, the Stalking Horse Bidder shall not be considered a Potential Bidder for purposes of this paragraph.

(v)     <u>Compliance with Bankruptcy Code and Non-Bankruptcy Law; Adherence to Bidding Procedures</u>.  By submitting a Bid, a Potential Bidder is agreeing to: (i) comply in all respects with the Bankruptcy Code and any applicable nonbankruptcy law; and (ii) abide by and honor the terms of these Bidding Procedures and the Bidding Procedures Order.

A Bid received from a Potential Bidder that meets the above requirements, as determined by the Debtors, shall constitute a "<u>Qualified Bid</u>" for such assets (and such Potential Bidder, a "<u>Qualified Bidder</u>"); <u>provided</u> that if the Debtors receive a Bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may in the exercise of their fiduciary duties provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction.  The Stalking Horse Bidder will be deemed a Qualified Bidder at all times.

All information disclosed by any Bidder in connection with all of the preceding requirements will be made available by the Debtors to the Consultation Parties promptly upon the Debtors' receipt thereof but in any event no later than twenty-four (24) hours following the Bid Deadline; <u>provided</u> that any confidential financing, equity commitment and/or other documents received from a Bidder shall only be shared with the Consultation Parties on a professional-eyes'-only basis.

Within one business day after the Bid Deadline, the Debtors with the assistance of their advisors (in consultation with the Consultation Parties) will determine which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute

Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any Bid that is not deemed a Qualified Bid will not be considered by the Debtors, unless any deficiencies are remedied prior to the Auction at the Debtors' discretion as provided herein. The Stalking Horse Agreement submitted by the Stalking Horse Bidder will be deemed a Qualified Bid, qualifying the Stalking Horse Bidder as a Qualified Bidder to participate in the Auction. To the extent there is any dispute regarding whether a bidder is a Qualified Bidder, such dispute may be raised with the Bankruptcy Court on an expedited basis prior to the commencement of the Auction.

Prior to the Auction, the Debtors with the assistance of their advisors will evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' reasonable business judgment and in consultation with the Consultation Parties, the highest or otherwise best bid (the "Starting Bid"). In making such determination, the Debtors will take into account, among other things, the execution risk attendant to any submitted bids. Within twenty-four (24) hours of such determination, but in no event later than twenty-four (24) hours before the start of the Auction, the Debtors will (i) notify the Stalking Horse Bidder and the Consultation Parties as to which Qualified Bid is the Starting Bid and (ii) distribute copies of the Starting Bid to each Qualified Bidder that has submitted a Qualified Bid and the Consultation Parties.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Potential Bidder's Good Faith Deposit on or within ten (10) business days after the Bid Deadline.

By submitting its Bid, each Potential Bidder is agreeing with each other Potential Bidder to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after the Auction.

## Auction

If one or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid. This determination shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes to the Stalking Horse Agreement requested by each Qualified Bidder; (c) the extent to which such modifications or provisions are likely to delay closing of the sale of the Debtors' assets and the cost to the Debtors of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the Debtors' estates, taking into account the Stalking Horse Bidder's right to any Break-Up Fee or Expense Reimbursement; (g) the contracts included in or excluded from the Bid; (h) the transaction structure, including whether a Bid is structured as a going concern sale under section 363 of the Bankruptcy Code, a sponsorship of a plan of reorganization, or equity bids for a liquidation of the Debtors' assets, and execution risk; (i) the impact on employees and employee claims against the Debtors and whether the Potential Bidder has reached an agreement with any affected unions; (j) the impact on trade creditors; and (k) any other qualitative or quantitative factor the Debtors deem reasonably appropriate under the circumstances (collectively, the "Bid Assessment Criteria").

If no Qualified Bids other than the Stalking Horse Bid are received prior to the Bid Deadline, the Auction will not occur, the Stalking Horse Agreement will be deemed the Successful Bid, and, subject to the termination rights under the Stalking Horse Agreement, the Debtors will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Agreement and authorizing the Sale to the Stalking Horse Bidder.

### Procedures for Auction

The Auction, if necessary, shall take place on **November 20, at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606, or such other place (which may be via video conference) and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidder) and the Consultation Parties. The Auction may be postponed, adjourned or canceled as the Debtors (in consultation with the Consultation Parties) deem appropriate. Reasonable notice as is reasonably practicable under the circumstances of such postponement or adjournment and the time and place for the commencement or resumption of the Auction or cancellation shall be given to all Qualified Bidders. The Auction shall be conducted according to the following procedures:

***Participation.***

Only the Debtors, the Consultation Parties, and any Qualified Bidder that has submitted a Qualified Bid (including the Stalking Horse Bidder), in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine shall attend the Auction and only such Qualified Bidders (including the Stalking Horse Bidder) will be entitled to make any Bids at the Auction. The Debtors may, in their reasonable business judgment, establish a reasonable limit on the number of representatives and professional advisors that may appear on behalf of or accompany each Qualified Bidder and other parties in interest at the Auction.

***The Debtors Shall Conduct the Auction.***

The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as expressly set forth herein, the Debtors may conduct the Auction in the manner they reasonably determine (in consultation with the Consultation Parties) will result in the highest or otherwise best Qualified Bid. The Debtors shall provide each participant in the Auction with a copy of the Alternative APA associated with the Starting Bid. In addition, at the start of the Auction, the Debtors shall describe the terms of the Starting Bid. Each Qualified Bidder (including the Stalking Horse Bidder) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein and (b) has reviewed, understands and accepts the Bidding Procedures.

All Qualified Bidders, including the Stalking Horse Bidder (each, a "Competing Bidder" and together, the "Competing Bidders"), if any, may submit further Bids, along with a markup or a further markup of the applicable purchase agreement. The Auction will be conducted in rounds. All Qualified Bidders are required to bid in each round or they forfeit their right to participate in subsequent rounds. At any time, a Qualified Bidder may request that the Debtors announce the then current highest and best bid. If requested, the Debtors shall use reasonable efforts to clarify

any and all questions any Qualified Bidder may have regarding the Debtors' announcement of the Starting Bid or the then current and highest bid.

The Auction will be conducted openly, and all Qualified Bidders shall have the right to submit additional bids and make modifications to their Alternative APA at the Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

***Terms of Overbids.***

An "Overbid" is any bid made at the Auction after the Debtors' announcement of the respective Starting Bid. Any Overbid for purposes of this Auction must comply with the following conditions:

(a)  Minimum Overbid Increments: Any Overbid after and above the respective Starting Bid or any subsequent Overbid shall be made in increments valued at not less than $1,000,000; provided, that in order to maximize value, the Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the minimum incremental Bids (or in valuing such Bids) at any time during the Auction. Additional consideration in excess of the amount set forth in the respective Starting Bid may include cash and/or noncash consideration, provided, however, that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties.

(b)  Stalking Horse Bidder Overbids: If the Stalking Horse Bidder submits an Overbid, it will receive a credit equal to the Bid Protections when bidding during the Auction.

(c)  Remaining Terms Are the Same as for Qualified Bids: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that (i) the Bid Deadline shall not apply and (ii) no additional Good Faith Deposit shall be required beyond the Good Faith Deposit previously submitted by a Qualified Bidder, provided that the Successful Bidder shall be required to make a representation at the end of the Auction that it will provide any additional deposit necessary so that its Good Faith Deposit is equal to the amount of ten percent (10%) of the cash purchase price contained in the Successful Bid. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes (if any) requested by the Qualified Bidder to the Stalking Horse Agreement or a previously submitted Alternative APA, in connection therewith (including any changes to the designated assigned contracts and leases and assumed liabilities). Any Overbid must remain open and binding on the Qualified Bidder until and unless the Debtors accept a higher or otherwise better Overbid from another Qualified Bidder (except, to the extent required hereby, to serve as the Backup Bid).

At the Debtors' discretion (in consultation with the Consultation Parties), to the extent not previously provided (which shall be determined by the Debtors), a

Qualified Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) reasonably demonstrating such Qualified Bidder's ability to close the Sale proposed by such Overbid.

***Announcement and Consideration of Overbids.***

     (a)    <u>Announcement of Overbids</u>: The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, the basis for calculating such total consideration and such other terms as the Debtors reasonably determine will facilitate the Auction.

     (b)    <u>Consideration of Overbids</u>: Subject to the deadlines set forth herein, the Debtors (in consultation with the Consultation Parties) reserve the right in their reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders or allow individual Qualified Bidders to consider how they wish to proceed.

***Closing the Auction.***

At the Auction, the Debtors may request best and final offers from the Qualified Bidders (including any Stalking Horse Bidders). The Auction shall continue until there is one Qualified Bid (in the case of Partial Bids, one or more Qualified Bids in the aggregate) that the Debtors determine in their reasonable business judgment (in consultation with the Consultation Parties) is the highest or otherwise best Qualified Bid at the Auction. Thereafter, the Debtors shall select such Qualified Bid as the overall highest or otherwise best Qualified Bid (such Bid, the "<u>Successful Bid</u>," the Qualified Bidder submitting such Successful Bid, the "<u>Successful Bidder</u>" and the Qualified Bidder's purchase agreement, the "<u>Successful Bidder Agreement</u>"). In making this decision, the Debtors shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

Unless otherwise required by their fiduciary duties, the Debtors shall not consider any Bids submitted after the conclusion of the Auction.

***Designation of Backup Bidder.***

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors (in consultation with the Consultation Parties), in the exercise of their business judgment, will be designated as the backup bidder (the "<u>Backup Bidder</u>"). The Backup

Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "Backup Bid") open and irrevocable until two (2) business days after the Sale has closed (the "Outside Backup Date"). Each Qualified Bid that is not a Successful Bid or Backup Bid shall be deemed withdrawn and terminated at the conclusion of the Sale Hearing.

Following the hearing to approve the Sale, if the Successful Bidder fails to consummate an approved transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtors will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder.

*Limited Objections*

If a Successful Bidder at the Auction is not the Stalking Horse Bidder, objections solely related to

(a)     the identity of the Successful Bidder(s),

(b)     changes to the Stalking Horse Agreement,

(c)     conduct of the Auction, and

(d)     adequate assurance of future performance

(each, objection a "Limited Objection") must be filed with the Court and served on the (i) the Debtors, (ii) proposed counsel to the Debtors, (iii) counsel to the Stalking Horse Bidder, (iv), counsel to the prepetition Lenders and (v) counsel to any statutory committee appointed in the Chapter 11 Cases so as to be received by **4:00 p.m. (Prevailing Eastern Time) on November 22, 2024**.  The Notice of Successful Bidder will set forth the specific deadline and procedures for filing any such objections.

**Additional Procedures**

The Debtors may announce at the Auction additional or modified procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Stalking Horse Agreement.

**Sale Is As Is/Where Is.**

Except as otherwise provided in the Successful Bidder Agreement or the Sale Order, the Assets of the Debtors sold pursuant to the Bidding Procedures shall be conveyed at the closing of a transaction with a Successful Bidder in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED**."  Except as may be set forth in the Successful Bidder Agreement or the Sale Order, the Assets are sold free and clear of any and all liens, claims, interests, restrictions, charges and encumbrances of any kind or nature to the fullest extent permissible under the Bankruptcy Code, with such liens, claims, interests, restrictions, charges, and encumbrances to attach to the net proceeds of sale with the same validity and enforceability and in the same order of priority.

***Sale Hearing.***

A hearing to consider approval of the Sale to the Stalking Horse Bidder or another Successful Bidder (the "Sale Hearing"), is presently scheduled to take place on **November 27, 2024, at [●], prevailing Eastern Time**, at the Bankruptcy Court.

Any objections to the Sale (other than a Limited Objection or a Supplemental Cure Objection) or to proposed cure payments in connection with the proposed assumption or assumption and assignment of any contract or lease must (a) be in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (c) state, with specificity, the legal and factual bases thereof; (d) if the objection pertains to the proposed cure costs, state the cure payment alleged to be owed to the objecting counterparty, together with the appropriate documentation including the cure payment the counterparty believes is required to cure defaults under the relevant contract or lease; (e) include any appropriate documentation in support thereof; and (f) be filed with the Court and served by **November 18, 2024 at 4:00 p.m. prevailing Eastern Time** for Cure Objections and **November 20, 2024 at 4:00 p.m. prevailing Eastern Time** for Sale Objections.

## Bid Protections

In the event the Stalking Horse Bidder is not the Successful Bidder, the Debtors shall pay the Breakup Fee and the Expense Reimbursement to the Stalking Horse Bidder in accordance with the terms and subject to the conditions set forth in the Stalking Horse Agreement and as approved by the Bankruptcy Court in the Bidding Procedures Order. No other bidder will be entitled to any expense reimbursement, break-up fee, termination or similar fee or payment.

## Return of Good Faith Deposits of Qualified Bidders

The Good Faith Deposits of all Qualified Bidders shall be held in one or more escrow accounts by the Debtors and shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the completion of the Sale Hearing. If the Backup Bidder is not designated the Successful Bidder, the Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder on the Outside Backup Date. If the Successful Bidder is not the Stalking Horse Bidder, the Good Faith Deposit of the Successful Bidder shall be held until the closing of the sale and applied in accordance with the Successful Bid. In the case of a breach or failure to perform on the part of the Successful Bidder (including any Backup Bidder designated as a Successful Bidder), the defaulting Successful Bidder's Good Faith Deposit shall be paid to the Debtors as liquidated damages, in addition to any and all rights, remedies and/or causes of action that may be available to the Debtors at law or in equity (except as otherwise provided in the Stalking Horse Agreement), and, the Debtors shall be free to consummate the proposed transaction at the next highest price bid at the Auction by a Qualified Bidder, without the need for an additional hearings or orders of the Courts. Except as otherwise provided in the Stalking Horse Agreement, the Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting

Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures. Notwithstanding any provision hereof, the terms pertaining to any Good Faith Deposit submitted by a Stalking Horse Bidder pursuant to the Stalking Horse Agreement (including, without limitation, the entitlements of the Stalking Horse Bidder and the Debtors to such Good Faith Deposit and the timing of return of any good faith deposit to a Stalking Horse Bidder) shall be governed by the terms of the Stalking Horse Agreement. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder (including any Backup Bidder designated as a Successful Bidder) timely closes the winning transaction, its Good Faith Deposit shall be credited towards the purchase price.

### The Consultation Parties

The Debtors shall consult with any official committee appointed by the Bankruptcy Court and the Prepetition Lenders, and each of their respective advisors (collectively, the "Consultation Parties" and each, a "Consultation Party") as explicitly provided for in the Bidding Procedures; provided, however, that the Debtors shall not be required to consult with any Consultation Party (and its advisors) that is a Qualified Bidder. For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment.

### Reservation of Rights of the Debtors

Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors (in consultation with the Consultation Parties) further reserve the right as they may reasonably determine to be in the best interest of their estates and in the exercise of their fiduciary duties to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein; (g) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (h) modify these Bidding Procedures and implement additional rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties. Nothing herein shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder, other than the Stalking Horse Bidder subject to, and in accordance with the terms of, the Stalking Horse Agreement.

## **EXHIBIT 2**

**Asset Purchase Agreement**

*Execution Version*

---

# ASSET PURCHASE AGREEMENT

by and among

## TRUE VALUE COMPANY L.L.C.,

## TV HOLDCO II, L.L.C.,

## TV TSLC, L.L.C.,

## TV GPMC, L.L.C.,

## TRUE VALUE RETAIL, L.L.C.,

## TRUEVALUE.COM COMPANY, L.L.C.,

## TRUE VALUE VIRGINIA, L.L.C.,

and

## DISTRIBUTORS HARDWARE, L.L.C.

## as Sellers,

and

## DO IT BEST CORP.

as Buyer,

Dated as of October 13, 2024

# TABLE OF CONTENTS

<u>Page</u>

Article I

DEFINITIONS

Section 1.1    Defined Terms ........................................................................................2

Article II

PURCHASE AND SALE

Section 2.1    Purchase and Sale ...................................................................................16
Section 2.2    Excluded Assets ......................................................................................18
Section 2.3    Assumed Liabilities.................................................................................20
Section 2.4    Excluded Liabilities ................................................................................21
Section 2.5    Assignment of Transferred Contracts ....................................................21
Section 2.6    Consideration...........................................................................................23
Section 2.7    Deposit Funds .........................................................................................23
Section 2.8    Closing ....................................................................................................24
Section 2.9    Purchase Price Allocation ......................................................................26
Section 2.10   Designated Buyer(s)................................................................................26
Section 2.11   Withholding.............................................................................................27
Section 2.12   Reimbursement of Prepaid Expenses.....................................................27
Section 2.13   Payment of Purchase Orders ..................................................................27

Article III

REPRESENTATIONS AND WARRANTIES
OF SELLERS

Section 3.1    Organization ............................................................................................28
Section 3.2    Authority .................................................................................................28
Section 3.3    No Conflict; Required Filings and Consents...........................................28
Section 3.4    Transferred Assets; Sufficiency of Assets..............................................29
Section 3.5    Financial Statements; No Undisclosed Liabilities ..................................29
Section 3.6    Absence of Certain Changes or Events...................................................30
Section 3.7    Compliance with Law; Permits ..............................................................30
Section 3.8    Litigation .................................................................................................31
Section 3.9    Employee Benefit Plans ..........................................................................31
Section 3.10   Labor and Employment Matters .............................................................32
Section 3.11   Real Property ...........................................................................................33
Section 3.12   Intellectual Property................................................................................34
Section 3.13   Tax Matters .............................................................................................36
Section 3.14   Environmental Matters............................................................................36

Section 3.15   Material Contracts ......................................................................37
Section 3.16   Certain Payments ........................................................................39
Section 3.17   Brokers .......................................................................................39
Section 3.18   Data Privacy; Information Security. ............................................39
Section 3.19   Exclusivity of Representations and Warranties ...........................40

Article IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.1    Organization ...............................................................................41
Section 4.2    Authority ....................................................................................41
Section 4.3    No Conflict; Required Filings and Consents ...............................41
Section 4.4    Absence of Litigation .................................................................42
Section 4.5    Qualification ...............................................................................42
Section 4.6    Legal Requirements and Approvals .............................................42
Section 4.7    Brokers .......................................................................................42
Section 4.8    Financing. ...................................................................................42
Section 4.9    Solvency .....................................................................................44
Section 4.10   Exclusivity of Representations and Warranties. ..........................44

Article V

BANKRUPTCY COURT MATTERS

Section 5.1    Debtors-in-Possession .................................................................45
Section 5.2    Sale Motion ................................................................................45
Section 5.3    Sale Order ...................................................................................45
Section 5.4    Cooperation with Respect to Bankruptcy Court Approvals ...............46
Section 5.5    Bankruptcy Court Filings ...........................................................46

Article VI

COVENANTS

Section 6.1    Conduct of Business Prior to the Closing ...................................46
Section 6.2    Covenants Regarding Information ...............................................50
Section 6.3    Employee Matters .......................................................................51
Section 6.4    Consents and Filings; Further Assurances ...................................53
Section 6.5    Wrong Pockets ............................................................................55
Section 6.6    Public Announcements .................................................................56
Section 6.7    Communications with Customers and Suppliers ..........................56
Section 6.8    Financing. ...................................................................................56
Section 6.9    Sellers' Cooperation with Buyer's Efforts under Debt Financing ......59
Section 6.10   Transition Services Agreement ...................................................62

ii

## Article VII

## TAX MATTERS

Section 7.1    Transfer Taxes ................................................................................................. 62
Section 7.2    Tax Cooperation .............................................................................................. 62

## Article VIII

## CONDITIONS TO CLOSING

Section 8.1    General Conditions .......................................................................................... 63
Section 8.2    Conditions to Obligations of Sellers ............................................................... 63
Section 8.3    Conditions to Obligations of Buyer ................................................................ 63

## Article IX

## TERMINATION

Section 9.1    Termination ..................................................................................................... 64
Section 9.2    Effect of Termination ...................................................................................... 66
Section 9.3    Alternative Transactions ................................................................................. 67

## Article X

## GENERAL PROVISIONS

Section 10.1    Nonsurvival of Representations, Warranties and Covenants ........................... 67
Section 10.2    Bulk Sales ..................................................................................................... 67
Section 10.3    Fees and Expenses ......................................................................................... 67
Section 10.4    Amendment and Modification ......................................................................... 67
Section 10.5    Waiver .......................................................................................................... 67
Section 10.6    Notices .......................................................................................................... 68
Section 10.7    Interpretation ................................................................................................. 69
Section 10.8    Entire Agreement ........................................................................................... 69
Section 10.9    Parties in Interest ........................................................................................... 69
Section 10.10  Governing Law ............................................................................................... 69
Section 10.11  Submission to Jurisdiction .............................................................................. 70
Section 10.12  Assignment; Successors .................................................................................. 70
Section 10.13  Specific Performance ...................................................................................... 71
Section 10.14  Currency ......................................................................................................... 71
Section 10.15  Severability ..................................................................................................... 71
Section 10.16  Waiver of Jury Trial ........................................................................................ 71
Section 10.17  Counterparts .................................................................................................... 72
Section 10.18  Jointly Drafted ................................................................................................ 72
Section 10.19  Limitation on Damages .................................................................................... 72
Section 10.20  No Recourse .................................................................................................... 72

Section 10.21  Time of Essence; Calculation of Dates ............................................................. 73
Section 10.22  Debt Financing.................................................................................................. 73

## INDEX OF EXHIBITS AND SCHEDULES

EXHIBIT A          FORM OF BIDDING PROCEDURES ORDER

EXHIBIT B          DIP CREDIT AGREEMENT TERM SHEET

EXHIBIT C          ESCROW AGREEMENT

EXHIBIT D          FORM OF SALE ORDER

EXHIBIT E          FORM OF BILL OF SALE AND ASSIGNMENT AND
                   ASSUMPTION AGREEMENT

EXHIBIT F          FORM OF LEASE ASSIGNMENT AND ASSUMPTION
                   AGREEMENT

EXHIBIT G          FORM OF IP ASSIGNMENT AGREEMENT

EXHIBIT H          TRANSITION SERVICES AGREEMENT TERM SHEET

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of October 13, 2024 (the "Execution Date"), by and between (i) True Value Company L.L.C., a Delaware limited liability company ("True Value Parent"), TV Holdco II, L.L.C., a Delaware limited liability company, TV TSLC, L.L.C., an Illinois limited liability company, TV GPMC, L.L.C., an Illinois limited liability company, True Value Retail, L.L.C., a Delaware limited liability company, TrueValue.com Company, L.L.C., a Delaware limited liability company, True Value Virginia, L.L.C., a Virginia limited liability company, and Distributors Hardware, L.L.C. a Delaware limited liability company (True Value Parent, together with the foregoing entities, each a "Seller" and collectively, "Sellers"), and (ii) Do It Best Corp., an Indiana corporation ("Buyer"). Capitalized terms have the definitions set forth in Article I below.

## RECITALS

A.     Sellers directly and indirectly are engaged in the Business;

B.     Sellers desire to sell to Buyer all of the Transferred Assets and Buyer desires to purchase from Sellers the Transferred Assets and assume the Assumed Liabilities in a sale transaction authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order by the Bankruptcy Court.

C.     In furtherance of the foregoing, Sellers intend to commence voluntary cases (collectively, the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), the date of commencement of the Chapter 11 Case in the Bankruptcy Court being the "Petition Date."

D.     As promptly as practicable following the Petition Date, Sellers intend to file with the Bankruptcy Court the Sale Motion seeking the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, which shall seek approval of the transactions contemplated by this Agreement subject to the marketing and auction process for the submission of competing bids for the Transferred Assets or an Alternative Transaction as described in the Bidding Procedures Order.

E.     Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, as further set forth herein. The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.1     Defined Terms.  For purposes of this Agreement:

"Action" means any action, complaint, Claim, suit, litigation, arbitration, mediation, hearing, public or otherwise known investigation, audit, or similar proceeding (in each case, whether civil, criminal, administrative, investigative, or informal), initiated, commenced, brought, conducted, heard or pending by or before any Governmental Authority, arbitrator or mediator, other than an Avoidance Action.

"Advisors" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers or other Representatives of such Person.

"Affiliate" means, with respect to any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Affordable Care Act" means the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, and the guidance and regulations issued thereunder.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 2.9.

"Allocation Methodology" has the meaning set forth in Section 2.9.

"Alternative Financing" has the meaning set forth in Section 6.8(c).

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, of a material portion of the Transferred Assets, in a transaction or series of transactions with one or more Persons other than Buyer.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment and Assumption Agreement, the IP Assignment Agreement, the Escrow Agreement and the Transition Services Agreement.

"Antitrust Authority" has the meaning set forth in Section 6.4(a).

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Governmental

2

Authority designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.8(b)(i)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Assumed Payables</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Auction</u>" has the meaning set forth in the Bidding Procedures Order.

"<u>Avoidance Actions</u>" has the meaning set forth in <u>Section 2.1(p)</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"<u>Bidding Procedures Order</u>" means the Order of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit A</u>, with such changes that may be reasonably acceptable to Buyer and True Value Parent, approving, among other things, the execution, delivery, and performance of this Agreement by Sellers (including payment of the Expense Reimbursement Amount and Break-Up Fee pursuant to and in accordance with <u>Section 9.2(b)</u>), other than the performance of those obligations to be performed at or after the Closing, Sellers' designation of Buyer as the stalking horse purchaser for the Business and the Transferred Assets, the bidding procedures for the submission of competing bids for the Transferred Assets or other Alternative Transaction proposals and the conduct of the Auction, the implementation of an initial overbid amount and subsequent bidding increments for the Auction reasonably acceptable to Buyer, and procedures for the assumption and assignment of executory Contracts and unexpired Leases. For the avoidance of doubt, references to the "Bidding Procedures Order" encompass the bidding procedures approved thereby.

"<u>Break-Up Fee</u>" means an amount equal to Four Million Five Hundred Ninety Thousand dollars ($4,590,000.00), which shall be payable as set forth in <u>Section 9.2(b)</u>.

"<u>Business</u>" means, collectively, the hardlines wholesale and related distribution business, direct retail business and paint manufacturing business, in each case, conducted by Sellers as of the date hereof.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Delaware, the State of Illinois or the State of New York.

3

"<u>Business Employees</u>" means, as of the relevant date, all individuals employed by Sellers. For the avoidance of doubt, the term "Business Employees" shall not include any Person who provides services to Sellers as an independent contractor or pursuant to any similar arrangement.

"<u>Business Privacy and Data Security Policies</u>" means all of Sellers' and any of their respective Subsidiaries' past or present, public-facing policies and notices concerning the privacy, security, or Processing of Personal Information, to the extent applicable to the conduct of the Business by Sellers and any of their Subsidiaries.

"<u>Buyer</u>" has the meaning set forth in the Preamble.

"<u>Buyer Credit Agreement</u>" means that certain Credit Agreement, dated as of October 11, 2024, by and among Buyer, as borrower, the lenders and issuing banks from time to time party thereto, and Wells Fargo Bank, National Association, as administrative agent, swingline lender and an issuing bank, as in effect on the date hereof.

"<u>Buyer Disclosure Letter</u>" has the meaning set forth in <u>Article IV</u>.

"<u>Buyer Non-Recourse Person</u>" has meaning set forth in <u>Section 10.20(a)</u>.

"<u>Buyer Plan</u>" has the meaning set forth in <u>Section 6.3(d)</u>.

"<u>Buyer 401(k) Plan</u>" has the meaning set forth in <u>Section 6.3(e)</u>.

"<u>Cash and Cash Equivalents</u>" means all of each Seller's cash (including petty cash and uncashed checks received on or before the Closing Date and checks that have been deposited on or before the Closing Date but have not yet cleared), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"<u>Cash Consideration</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Chapter 11</u>" means chapter 11 of the Bankruptcy Code.

"<u>Chapter 11 Case</u>" has the meaning set forth in the Recitals.

"<u>Claims</u>" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including (x) all "claims,"

4

within the meaning of Section 101(5) of the Bankruptcy Code and (y) all Avoidance Actions) or rights of set-off or recoupment.

"Closing" has the meaning set forth in Section 2.8(a).

"Closing Date" has the meaning set forth in Section 2.8(a).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and any rules or regulations promulgated thereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means each collective bargaining agreement or similar labor-related Contract with any Labor Organization covering a Business Employee.

"Compliance Date" means January 1, 2023.

"Confidentiality Agreement" means the Confidentiality Agreement, dated as of August 14, 2024, entered into between True Value Parent and Buyer with respect to the transactions contemplated hereby.

"Contract" means any written contract, agreement, understanding, insurance policy, lease, license, sublicense, option, undertaking, instrument or other commitment that is binding on any Person or any part of its assets or properties under applicable Law.

"Contagion Event" means any (a) outbreak or ongoing effects of any contagious disease, plague, epidemic, pandemic or other public health emergency (including COVID-19) or (b) escalation or worsening or subsequent waves or mutations of any of the foregoing.

"Contagion Measure" means any (a) applicable quarantine, "shelter in place," "stay at home," social distancing, shut-down, closure, sequester, declaration of martial law or similar Law, Order, directive or guidelines promulgated by any Governmental Authority, (b) action reasonably taken (or omitted to be taken) in response to any applicable quarantine, "shelter in place," "stay at home," social distancing, shut-down, closure, sequester, declaration of martial law or similar Law, directive or guidelines promulgated by any Governmental Authority, in each case, in response to any Contagion Event or (c) factory slowdown or shipping, freight, rail or other shipment interruptions or slowdowns, in each case, related to or resulting from a Contagion Event.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in order to effectuate the assumption and assignment to Buyer of the Transferred Contracts.

"Debt Commitment Letter" has the meaning set forth in Section 4.8(b).

"Debt Financing" has the meaning set forth in Section 4.8(b).

"Debt Financing Sources" has the meaning set forth in Section 4.8(b).

5

"<u>Deposit Funds</u>" has the meaning set forth in <u>Section 2.7(a)</u>.

"<u>Designated Buyer</u>" has the meaning set forth in <u>Section 2.10(a)</u>.

"<u>Designated Parties</u>" has the meaning set forth in <u>Section 2.1(p)</u>.

"<u>Designation Deadline</u>" has the meaning set forth in <u>Section 2.5(e)</u>.

"<u>DIP Credit Agreement</u>" means the credit facility to be entered into between Buyer and Sellers, substantially on the terms set forth in the DIP Credit Agreement Term Sheet attached hereto as <u>Exhibit B</u>, and otherwise in form and substance reasonably acceptable to Buyer and Sellers, as the same may be amended, restated, supplemented or refinanced from time to time in accordance with the DIP Order.

"<u>DIP Order</u>" means any interim or final Order entered by the Bankruptcy Court approving or authorizing Sellers' entry into and performance under the DIP Credit Agreement.

"<u>Disclosure Letter</u>" means the disclosure letter being delivered by Sellers to Buyer contemporaneously with the execution of this Agreement.  Notwithstanding anything to the contrary contained in the Disclosure Letter or in this Agreement, (a) the information and disclosures contained in any section of the Disclosure Letter shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Letter as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure, (b) the disclosure of any matter in the Disclosure Letter shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation or warranty to be true and correct, (c) the Disclosure Letter is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations and warranties by any Party except to the extent expressly set forth herein, (d) the inclusion of any item in the Disclosure Letter shall be deemed neither an admission that such item is material to the business, financial condition or results of operations of Sellers or the Business nor an admission of any liability to any third party, (e) matters reflected in the Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected therein and any additional matters are set forth therein for informational purposes and (f) headings are inserted in the Disclosure Letter for convenience of reference only and shall not have the effect of amending or changing the express description of the sections as set forth in this Agreement.

"<u>Disclosure Limitations</u>" has the meaning set forth in <u>Section 6.2(a)</u>.

"<u>Employee Benefit Plans</u>" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and

6

bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other individual employment, consulting or other individual service agreement or arrangement, in each case, (a) that is sponsored or maintained or contributed to by any Seller or any of its Affiliates in respect of any current or former employees, directors, independent contractors or consultants of any Seller or (b) with respect to which any Seller has any actual or contingent Liability (including any such plan or arrangement formerly maintained by any Seller or any Subsidiary of any Seller).

"Encumbrance" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, mortgage, lease, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, servitude, covenant, encroachment, option, right of use, first offer, or first refusal, setoff, recoupment, right of recovery, or final Order of any Governmental Authority, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.  Without limiting the foregoing, "Encumbrance" also includes, without limitation, (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or the Seller, to use any portion of the Transferred Assets.

"Enforceability Exceptions" has the meaning set forth in Section 3.2.

"Environmental Claim" means any Action, Order, lien, fine or penalty by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to, any Hazardous Materials, (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law or any Environmental Permit or (c) any other matters for which Liability is or may be imposed under Environmental Laws.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment or natural resources, or the protection of human health and safety (regarding exposure to Hazardous Materials), including Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal or handling of Hazardous Materials; (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials; or (d) including but not limited to the to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and the Superfund Amendments and Reauthorization Act (42 U.S.C. § 9601 et seq.); the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.); the Clean Air Act (42 U.S.C. § 7401 et seq.); the Toxic Substances Control Act of 1976 (15 U.S.C. § 2601 et seq.); the Safe Drinking Water Act (42 U.S.C. § 300f et seq.); to the extent relating to Hazardous Materials, the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.); and the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 et seq.).

"Environmental Permit" means all permits, certificates, licenses, approvals, authorizations, consents or registrations required by any applicable Environmental Law, or required for the storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"ERISA Affiliate" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"Escrow Agent" has the meaning set forth in Section 2.7(a).

"Escrow Agreement" means that certain Escrow Agreement, dated as of October 10, 2024, by and among Buyer, Sellers, and the Escrow Agent, a copy of which is attached hereto as Exhibit C.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded IP" means all Intellectual Property owned by any Seller and used or located exclusively at, or otherwise relating exclusively to, any Leased Real Property under any Excluded Lease.

"Excluded IT" means all information technology assets, and related systems and equipment, owned by any Seller and used or located exclusively at, or otherwise relating exclusively to, any Leased Real Property under any Excluded Lease.

"Excluded Leases" has the meaning set forth in Section 2.2(f).

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement Amount" means the dollar amount equal to the lesser of (i) One Million Five Hundred Thirty Thousand dollars ($1,530,000) and (ii) the aggregate amount of all reasonable and documented out of pocket costs, expenses and fees incurred by Buyer in connection with evaluating, negotiating, documenting and performing the transactions contemplated by this Agreement and the Ancillary Agreements, including fees, costs and expenses of outside legal counsel and other Advisors retained by or on behalf of Buyer in connection with or related to the evaluation, consideration, authorization, preparation, investigation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including the Chapter 11 Case and other judicial and regulatory proceedings related to such transactions, which shall be payable as set forth in Section 9.2(b).

"Fundamental Representations" means the representations and warranties set forth in Section 3.1 and Section 3.2.

8

"Funding Obligations" has the meaning set forth in Section 4.8(b).

"Funds" has the meaning set forth in Section 4.8(b).

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any United States or non-United States national, federal, state, local, municipal, provincial or other governmental, regulatory or administrative authority, agency, court, tribunal or commission (and each instrumentality, political subdivision thereof), self-regulated organization and other non-governmental regulatory authority or quasigovernmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law) or any other judicial or arbitral body, including the Bankruptcy Court.

"Hazardous Materials" means any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade (or combination thereof) whether in solid, semisolid, liquid or gaseous form that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum (including petroleum distillate and petroleum by-products) oil, asbestos, polychlorinated biphenyls, radioactive, lead-based paint, per- and polyfluoroalkyl substances or words of similar meaning or effect under any Law relating to pollution, hazardous or toxic waste, or protection of the environment, or (c) forms the basis of any Liability under any Law relating to pollution, hazardous or toxic waste, or protection of the environment.

"HSR Act" has the meaning set forth in Section 3.3(a).

"Intellectual Property" means all intellectual property rights throughout the world, including all U.S. and foreign rights in (a) trade names, trademarks and service marks, domain names, trade dress, logos, slogans, design rights and other similar designations of source or origin ("Trademarks"), together with the goodwill symbolized by any of the foregoing; (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof; (c) copyrights and copyrightable subject matter (whether registered or unregistered); (d) proprietary rights in computer programs (whether in source code, object code, or other form), firmware, software, algorithms, and databases; (e) confidential and proprietary information, trade secrets and know-how, and all other proprietary rights in inventions, proprietary processes, formulae, models, and methodologies; (f) all applications and registrations for any of the foregoing; and (g) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"Inventory" means all inventory, raw materials, works-in-progress, finished goods, supplies, parts, packaging materials and other inventories owned by Sellers.

"IP Assignment Agreement" has the meaning set forth in Section 2.8(b)(iii).

"IRS" means the Internal Revenue Service of the United States.

9

"Knowledge" means, with respect to Sellers, the knowledge of each of Chris Kempa, Bill McGann and Jennifer McNeill as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) after reasonable inquiry into the matters set forth in the representation that is so qualified.

"Labor Organization" means any labor union, labor organization, works council or other similar employee representative.

"Law" means any and all federal, state, local and foreign laws, constitutions, treaties, statutes, ordinances, rules, codes, regulations, policies, orders, judgments and decrees, in each case, enacted, adopted or promulgated by a Governmental Authority, including the common law.

"Lease" means any lease, sublease, license, or other use or occupancy agreement with respect to real property to which any Seller or any Subsidiary of any Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Leased Real Property" means any real property that is leased, subleased, licensed or otherwise occupied by any Seller or any Subsidiary of any Seller pursuant to a Lease.

"Legal Restraint" has the meaning set forth in Section 8.1(a).

"Liability" means any debt, loss, Claim, damage, demand, fine, judgment, penalty, Tax, liability, undertaking, commitment or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, determined or undeterminable or due or to become due).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that individually or in the aggregate (a) has had, or would reasonably be expected to have, a material adverse effect on the Business, the results or operations or the condition (financial or otherwise), assets, liabilities, or operations of the Business, taken as a whole, or (b) prevents or materially impedes, or would reasonably be expected to prevent or materially impede, the performance by Sellers of their obligations under this Agreement on a timely basis, other than, in each case of the preceding clauses (a) and (b), any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry or geographical areas in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts (including by cyberattack or otherwise), whether or not pursuant to the declaration of an emergency or war), (iii) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, earthquake, fire, flood, hurricane, tornado or other weather event, or the onset or continuation of any Contagion Event or Contagion Measure, (iv) changes in any applicable Laws or GAAP or interpretations thereof, (v) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby, (vi) the announcement or pendency of the Chapter 11 Case (and any limitations therein pursuant to the Bankruptcy Code, the Bankruptcy Rules, any Order of the Bankruptcy Court, or the DIP Credit Agreement (or limitations of funding

10

thereunder)) or any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby, (2) any chapter 11 plan of Sellers or any disclosure statement with respect thereto, (3) the Bidding Procedures Order, (4) the Sale Motion or the Sale Order, (5) the assumption of any Transferred Contract or (6) any action approved by the Bankruptcy Court, (vii) any action taken, or omitted to be taken, by any Seller or any of its Affiliates at the request or with the consent of Buyer or that is required by this Agreement or to comply with applicable Law, (viii) the identity of Buyer or any of its Affiliates, (ix) any failure to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement, (xi) any breach by Buyer of its obligations under this Agreement or any Ancillary Agreement, (xii) any matter disclosed on the Disclosure Letter or (xiii) any change in the cost or availability or other terms of any financing; provided, however, that changes or developments set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in determining whether there has been or is a Material Adverse Effect if such changes or developments have a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Material Contract" has the meaning set forth in Section 3.15(a).

"New Debt Commitment Letter" has the meaning set forth in Section 6.8(c).

"Offer Employee" has the meaning set forth in Section 6.3(a).

"Offering Materials" has the meaning set forth in Section 6.9(d).

"Open Source Materials" means any software that is distributed under a license meeting the Open Source Definition as promulgated by the Open Source Initiative or that is approved by the Open-Source Initiative and listed at http://www.opensource.org.

"Order" means any award, writ, injunction, judgment, stipulation, determination, order or decree entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice of Sellers, as such practice and custom is, or may have been, modified as a result of the Chapter 11 Case, in each case subject to (a) the filing of the Chapter 11 Case, (b) any Orders of the Bankruptcy Court, (c) the conduct of the process as contemplated by the Bidding Procedures Order, and (d) the transactions contemplated by this Agreement.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation, its bylaws, and any shareholder or stockholder agreement, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, any statement of partnership and its partnership agreement, (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, (e) with respect to any other form of entity,

11

any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and any agreement amongst its members, (f) any documents equivalent to any of the foregoing applicable to non-U.S. jurisdictions, and (g) any amendments, side letters, modifications or other arrangements with respect to any of the foregoing.

"Outside Date" has the meaning set forth in Section 9.1(c)(ii).

"Owned Real Property" means any real property owned by any Seller, including all of such Seller's right, title and interest in and to any buildings, improvements, fixtures and structures thereon and all easements, rights-of-way, and other rights and privileges appurtenant thereto.

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Permits" has the meaning set forth in Section 3.7(b).

"Permitted Post-Closing Encumbrance" means (a) Encumbrances of the types described in clauses (a), (c) through (g) and (j) of the definition of "Permitted Pre-Closing Encumbrance" and (b) other Encumbrances of which the Transferred Assets cannot be sold free and clear under Section 363(f) of the Bankruptcy Code.

"Permitted Pre-Closing Encumbrance" means (a) Encumbrances for Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers', suppliers', vendors' and other similar common law or statutory Encumbrances arising or incurred in the Ordinary Course of Business, (c) deposits securing the performance of bids, trade Contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (d) with respect to any Leased Real Property, any Encumbrance affecting the interest of the landlord, sublandlord or licensor of such real property or which constitutes a statutory landlord's lien under applicable Law and not in any way affecting or impairing Sellers' interest in such real property, (e) with respect to any Real Property, covenants, conditions, restrictions, easements, licenses, rights-of-way and other similar charges or encumbrances or defects or imperfections of title of any kind (i) that do not, individually or in the aggregate, materially interfere with the operation of the Business or the present use of such Real Property or materially impair the value of the Transferred Assets or the Real Property subject to such encumbrances or (ii) that would be revealed by an investigation of title to the extent and nature that a prudent buyer of property in the jurisdiction in which the applicable Real Property is located would carry out, (f) any licenses to or other rights to use Intellectual Property granted in the Ordinary Course of Business, (g) public roads, highways, zoning codes, building codes, entitlements, conservation restrictions or other land use or Environmental Laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over the Real Property, (h) Encumbrances arising under purchase money security interests, equipment leases or other similar arrangements entered into in the Ordinary Course of Business, (i) rights of setoff or banker's liens upon deposits of cash in favor of banks or other depositary institutions, (j) Encumbrances that are Assumed Liabilities and any Encumbrances that Buyer specifically approves in writing, and (k) any Encumbrances permitted by or that will be removed, extinguished, discharged or released at Closing by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Personal Information" means any information that identifies or, alone or in combination with any other information, could reasonably be used to identify or locate a natural Person, including name, street address, telephone number, email address, identification number issued by a Governmental Authority, credit card number, bank information, customer or account number, online identifier, device identifier, IP address, location data, biometric data, medical or health information, or any other information that is considered "personally identifiable information," "personal information," or "personal data" under, or is otherwise regulated by, applicable Law (including Privacy Laws).

"Petition Date" has the meaning set forth in the Recitals.

"Prepaid Expenses" means all deposits (including customer deposits, maintenance deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone bonds or other sureties or other expenses (including all prepaid rent and all prepaid charges, expenses and rent under any personal property leases)), advances, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), that have been prepaid by any Seller, in each case with respect to any of the Transferred Leases and Transferred Contracts, except that professional fee retainers and prepaid deposits related thereto shall not be included in the definition of "Prepaid Expenses."

"Prepaid Expenses Reimbursement Amount" has the meaning set forth in Section 2.12.

"Privacy Laws" means all applicable Laws, governmental orders, and guidance issued by any Governmental Authority concerning the privacy, security, or Processing of Personal Information (including Laws of jurisdictions where Personal Information was collected), including, as applicable, data breach notification Laws, consumer protection Laws, Laws concerning requirements for website and mobile application privacy policies and practices, data security Laws, and Laws concerning email, text message, or telephone communications. Without limiting the foregoing, to the extent relating to the Processing of Personal Information, Privacy Laws include: the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Children's Online Privacy Protection Act, the California Consumer Privacy Act of 2018, the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the Gramm-Leach-Bliley Act, the General Data Protection Regulation (Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016).

"Processing" means any operation performed on Personal Information, including the collection, receipt, access, use, handling, compilation, analysis, monitoring, maintenance, retention, storage, transmission, transfer, protection, disclosure, distribution, destruction, or disposal of Personal Information. The terms "Process" and "Processed" shall have correlative meanings.

13

"Purchase Orders" means any orders for the purchase and sale of goods issued by the Sellers in the Ordinary Course of Business for which the vendor has not received payment and Sellers have not received the goods as of the Closing.

"Purchase Price" has the meaning set forth in Section 2.6.

"Qualified Leave Recipient" means any Business Employee who is absent from active employment as of immediately prior to the Closing Date as a result of an approved leave of absence.

"Real Property" means the Leased Real Property and the Owned Real Property.

"Registered IP" has the meaning set forth in Section 3.12(a).

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, Advisors, bankers and other representatives of such Person (including counsel and accountants).

"Required Information" has the meaning set forth in Section 6.9(a).

"Sale Motion" has the meaning set forth in Section 5.2.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, in substantially the form attached hereto as Exhibit D, with such changes as may be reasonably acceptable to Buyer and Sellers.

"Section 503(b)(9) Claims" has the meaning set forth in Section 2.3(d).

"Seller 401(k) Plan" has the meaning set forth in Section 6.3(e).

"Seller Non-Recourse Person" has meaning set forth in Section 10.20(b).

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Tax Law" means any Law relating to Taxes.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means (a) any and all U.S. federal, state and local, non-U.S. and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other similar assessments imposed by any Governmental Authority, including all net income, gross income, gross receipts, license, lease, service, service use, payroll, employment, fringe, fringe benefits, excise, severance, stamp, occupation, premium, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, branch profits, profit share, withholding, social security, unemployment, pension plan, health, disability, real property, personal property, windfall profits, wealth, net wealth, net worth, export fees and charges, registration fees, deposits, sales, use, transfer, registration, alternative or add-on minimum or estimated tax, fee, assessment, custom, duty, levy, tariff, impost, toll or charge of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalty, inflationary adjustment, addition to tax, fine, or other addition thereto, (b) any and all liability for the payment of any item described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary or other similar group (or being included) in any Tax Return related to such group, and (c) any and all liability for the payment of any amount as a result of any successor or transferee liability, in respect of any item described in clause (a) or (b) above.

"Termination Pay" means any contractual or statutory severance, termination compensation, notice pay, paid vacation or annual leave, paid sick leave, paid time off, contractual or statutory bonuses, contractual or statutory gratuity or long service payments, or any other legally mandated termination payment or benefits obligations.

"Trade Admin Claims" has the meaning set forth in Section 2.3(d).

"Trademarks" has the meaning set forth in the definition of "Intellectual Property" in this Section 1.1.

"Transfer Taxes" has the meaning set forth in Section 7.1.

"Transferred Assets" has the meaning set forth in Section 2.1.

"Transferred Contracts" has the meaning set forth in Section 2.1(f).

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"Transferred Employee Records" means, to the extent permitted by Law, all records of Sellers that relate to the Transferred Employees, including records that pertain to (a) skill and development training, (b) seniority histories, (c) salary and benefit information, (d) Occupational, Safety and Health Administration reports and records and (e) active medical restriction forms, but excluding medical records.

15

"Transferred IP" means all Intellectual Property owned by any Seller, including the Intellectual Property listed on Section 3.12(a) and Section 3.12(f) of the Disclosure Letter, but excluding, for the avoidance of doubt, any Excluded IP.

"Transferred IT" means all information technology assets, and related systems and equipment, owned by any Seller, but excluding, for the avoidance of doubt, any Excluded IT.

"Transferred Leases" has the meaning set forth in Section 2.1(b).

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"True Value Parent" has the meaning set forth in the Preamble.

"Visa Employees" has the meaning set forth in Section 6.3(j).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar applicable state or local law requiring notice to employees in the event of a plant closing or mass layoff.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    Purchase and Sale.    Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement and subject to entry of the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or the applicable Designated Buyer(s)), and Buyer (or such applicable Designated Buyer(s)) shall purchase, all right, title and interest of Sellers, in, to or under the Transferred Assets, free and clear of any and all Encumbrances (other than Permitted Post-Closing Encumbrances).  "Transferred Assets" shall mean all right, title and interest of Sellers as of immediately prior to the Closing in, to or under all properties and assets of Sellers, of every kind and description, wherever located (including, for the avoidance of doubt, any assets located at any Leased Real Property under a Transferred Lease or an Excluded Lease (subject to Section 2.2(f)), whether real, personal or mixed, tangible or intangible, including all right, title and interest of Sellers in, to or under the following (but excluding in each case any Excluded Assets):

(a)    all rights, Claims or causes of action, other than Avoidance Actions (which are governed by Section 2.1(p)), of Sellers against any party arising out of events occurring prior to the Closing including, for the avoidance of doubt, arising out of events occurring prior to the commencement of the Chapter 11 Case, and including any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, in each case, relating to the Business and all such rights, Claims or causes of action relating to, arising from or pertaining to the Transferred Assets;

16

(b)      all Leased Real Property under Leases that are Transferred Contracts (the "Transferred Leases") and all associated tenant improvements, which Transferred Leases are set forth on Section 2.1(b) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e)), including such assets that are located at or associated with such Leased Real Property;

(c)      all Owned Real Property;

(d)      all owned tangible property, accounts, machinery, equipment, movable property and vehicles, and all Inventory, including all express or implied warranties with respect thereto;

(e)      all Transferred IT;

(f)      all Purchase Orders and all Contracts set forth on Section 2.1(f) of the Disclosure Letter, as may be amended from time to time pursuant to Section 2.5(e) (collectively with the Purchase Orders, the "Transferred Contracts"); provided that any applicable Cure Claims shall be paid by or on behalf of Buyer or its designee at Closing or as otherwise agreed by the applicable Contract counterparty;

(g)      all Transferred IP;

(h)      all goodwill associated with the Transferred Assets or the Business, including Seller's relationships with their customers and all rights of Sellers, in each case, under any Transferred Contracts with their customers;

(i)      subject to Section 2.2(e) and Section 2.12, all Prepaid Expenses;

(j)      all accounts receivable, instruments, and chattel paper of the Business and all cash receipts received from customers of the Business or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing (including any such accounts receivable related to "Destination True Value" store enhancements and improvements);

(k)      to the extent not prohibited by Law, all documents and other books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files related to the Transferred Assets and Transferred Contracts, suppliers lists, production data, quality control records and procedures, correspondence, the Transferred Employee Records, and all customer sales, marketing, advertising, packaging and promotional materials, drawings, engineering and manufacturing data, environmental studies, reports and analysis, sales records, strategic plans, research, and other technical information and data, and all other business and other records that are related to the Business or any Transferred Asset and in the possession of Seller, including any Tax Returns and Tax records to the extent related to any Taxes imposed on or with respect to a Transferred Asset or any Assumed Liability, and, except as set forth in Section 2.3, all privileged or confidential information and all attorney-client and other privileges pertaining to the Business or the Transferred Assets; provided, however, that in each case Seller have the right to retain copies at Sellers' expense pursuant to Section 6.2;

17

(l)      all telephone and facsimile numbers of the Business and all records of email addresses of customers and suppliers of the Business;

(m)      subject to obtaining the applicable consents set forth on Section 3.3(a) of the Disclosure Letter, all Permits and licenses held by Sellers, but only to the extent such Permits may be transferred under applicable Law;

(n)      any other assets and properties of Sellers that are not Excluded Assets;

(o)      all rights and obligations under or arising out of all insurance policies (except as set forth in Section 2.2(g)) for any of the Transferred Assets or Assumed Liabilities; and

(p)      all Claims or causes of action to avoid a transfer of property or an obligation incurred by the Sellers pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a), or any similar actions under any other applicable Law (collectively, "Avoidance Actions") against the following (collectively, the "Designated Parties"): (i) Sellers' or their vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Business or the Transferred Assets after the Closing, (ii) any of Sellers' counterparties under any licenses of Intellectual Property that are Transferred Contracts or counterparties under any other Transferred Contracts, (iii) any officer, manager or employee of Sellers that is a Transferred Employee, and (iv) any Affiliates of any of the Persons listed in clauses (i) through (iii); provided, however, that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense against any claim or cause of action raised by such Designated Party.

Section 2.2      Excluded Assets.  Notwithstanding anything contained in Section 2.1 to the contrary, Sellers are not selling, and Buyer (and any Designated Buyer) is not purchasing, any right, title or interest in, to or under the following assets of Sellers, all of which shall be retained by Sellers (collectively, the "Excluded Assets"):

(a)      [RESERVED]

(b)      all documents, written files, papers, books, reports and records, including those prepared or received by Sellers or any of their Affiliates or Representatives: (i) in connection with any sale or potential sale of True Value Parent, Sellers, the Business, or any portion thereof including the Transferred Assets (including, but not limited to, this Agreement and the transactions contemplated hereby), (ii) relating to the Chapter 11 Case, (iii) that are subject to any privilege in favor of Sellers or any of their Affiliates, or (iv) that Sellers are required by Law or other requirement to retain;

(c)      all rights, Claims and causes of action to the extent relating to any Excluded Asset (and not relating to the Business, any Transferred Assets, and Transferred Contracts, or any Assumed Liabilities), including any Avoidance Actions that are not against the Designated Parties;

18

(d)      shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(e)      all retainers or similar prepaid amounts paid to the Advisors of Sellers;

(f)      all Leased Real Property under Leases that are not Transferred Contracts (the "Excluded Leases") and all associated tenant improvements, which Excluded Leases are set forth on Section 2.2(f) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e));

(g)      all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, solely to the extent payable to or on behalf of, or in respect of amounts payable by Sellers to any individuals covered by such policies;

(h)      each Contract of any Seller that is not a Transferred Contract;

(i)      (i) all books and records to the extent primarily related to any of the Excluded Assets or Excluded Liabilities; (ii) all minute books, Organizational Documents, stock registers and such other books and records of such Seller, as pertaining to ownership, organization, qualification to do business, capitalization, or existence thereof, Tax Returns (and any related work papers) of any Seller (other than Tax Returns described in Section 2.1(k), provided that Sellers shall be entitled to retain copies thereof pursuant to Section 6.2), and the corporate seal of any Seller; and (iii) all books and records of Sellers that relate to the Transferred Employees, the disclosure of which would violate Law;

(j)      all Tax refunds and Tax attributes of Sellers that are not automatically transferred with the Transferred Assets by the operation of applicable Tax Law;

(k)      all Cash and Cash Equivalents (other than accounts receivable, instruments and chattel paper of the Business and all cash receipts received from customers or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing, in each case, as contemplated in Section 2.1(j));

(l)      the Cash Consideration;

(m)      all Intellectual Property other than the Transferred IP, including all Excluded IP;

(n)      all information technology assets, and related systems and equipment other than the Transferred IT, including all Excluded IT;

(o)      all assets under each Employee Benefit Plan, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts);

(p)    all rights, Claims or causes of action of Sellers and their Affiliates under this Agreement and the Ancillary Agreements; (ii) under any Contracts that are not Transferred Contracts and (iii) against third parties to the extent relating to any Excluded Asset or Excluded Liability; and

(q)    any other asset that, although included in the definition of Transferred Assets, Buyer notifies Seller in writing not later than one (1) Business Day prior to the Closing that Buyer does not wish to purchase pursuant to Section 2.5(e).

Section 2.3    Assumed Liabilities.  Subject to the terms and conditions set forth in this Agreement, Buyer shall assume, pay, satisfy, perform and discharge when due only the following Liabilities (the "Assumed Liabilities"):

(a)    all Liabilities of Sellers under the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases) and the transferred Permits that arise under such Transferred Contracts or transferred Permits on or after the Closing;

(b)    all Liabilities relating to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the Closing;

(c)    all Liabilities under the Purchase Orders;

(d)    (i) timely filed or scheduled claims of Sellers' vendors for the value of goods received by the Sellers within twenty (20) days prior to the Petition Date which goods were sold to the Sellers in the Ordinary Course of Business but only to the extent such claims are entitled to priority in payment under Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Case  as determined and allowed by the Bankruptcy Court or otherwise agreed to by Sellers and Buyer (the "Section 503(b)(9) Claims"), and (ii) trade and vendor accounts payable incurred by Sellers in the Ordinary Course of Business after the Petition Date for goods received by Sellers that remain unpaid as of the Closing to the extent such payables are entitled to priority in payment in the Bankruptcy Case under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code as reasonably agreed by Sellers and Buyer based upon Sellers' books and records (or other appropriate form of validation) or as otherwise determined and allowed by the Bankruptcy Court (the "Trade Admin Claims", and together with the Section 503(b)(9) Claims, collectively, the "Assumed Payables"); *provided* that the aggregate face amount of such Assumed Payables that are Assumed Liabilities shall not exceed Forty Five Million dollars ($45,000,000) (the "Assumed Payables Cap") and if the aggregate face amount of such Assumed Payables exceeds the Assumed Payables Cap, , Buyer shall be entitled to select which of the Section 503(b)(9) Claims and the Trade Admin Claims that Buyer will assume to equal such Assumed Payables Cap;

(e)    all Cure Claims associated with the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases), other than to the extent waived by the applicable counterparty as contemplated by Section 2.5 of the Disclosure Letter; and

(f)    Liabilities assumed by Buyer pursuant to Section 6.3.

Section 2.4    Excluded Liabilities.  Other than the Assumed Liabilities, Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Transferred Assets or the Business, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing.  Notwithstanding anything in this Agreement to the contrary, the Assumed Liabilities shall not include any Liabilities or obligations for any Taxes of any Seller or related to the operation of the Business prior to the Closing (or for the portion of any tax period ending on the Closing Date) (all such retained Liabilities, "Excluded Liabilities").

Section 2.5    Assignment of Transferred Contracts.

(a)    The Bidding Procedures Order shall implement a process to determine the Cure Claims with respect to any and all of Sellers' Contracts, including the right to negotiate in good faith and litigate, if necessary, with any Contract counterparty the Cure Claims needed to cure all monetary defaults under such Contract.  Notwithstanding the foregoing, prior to the Designation Deadline, Buyer may require Sellers to delete from Section 2.1(f) of the Disclosure Letter any Transferred Contract that Buyer no longer desires to have assigned to it in accordance with Section 2.5(e), and such Contract shall be an Excluded Asset.

(b)    To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, on the Closing Date, Sellers shall assign the Transferred Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by Buyer as may be required under Section 365 of the Bankruptcy Code and payment by Buyer of the Cure Claims in respect of the Transferred Contracts, and Buyer shall assume such Transferred Contracts.  All Cure Claims in respect of all of the Transferred Contracts shall be paid by Buyer.

(c)    To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, Sellers shall transfer and assign, all of the Transferred Assets to Buyer, and Buyer shall assume all of the Transferred Assets from Sellers, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code.

(d)    Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to Buyer of any asset that would be a Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any consent from any Governmental Authority or any other third party and such consents shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in the Purchase Price without the sale, transfer, assignment, conveyance or delivery of such asset.  In the event that any failed condition is waived and the Closing proceeds without the transfer or assignment of any such asset, then following the Closing, Sellers shall use their commercially reasonable efforts at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, and Buyer shall cooperate with Sellers (at Buyer's sole expense), to obtain such consent as promptly as

21

practicable following the Closing. Pending the receipt of such consent, the Parties shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other to provide Buyer with all of the benefits of use of such asset. Once consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, Sellers shall promptly (and, in any event, within two (2) Business Days or as soon as practicable thereafter) transfer, assign, convey and deliver such asset to Buyer. To the extent that any such asset cannot be transferred or the full benefits or use of any such asset cannot be provided to Buyer, then as promptly as practicable following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, Buyer and Sellers shall enter into such arrangements (including subleasing, sublicensing or subcontracting), and shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other, to provide Buyer with all of the benefits of use of such asset. Sellers shall hold in trust for, and pay to Buyer, promptly (and, in any event, within two (2) Business Days or as soon as practicable thereafter) upon receipt thereof, all income, proceeds and other monies received by Sellers derived from their use of any asset that would be a Transferred Asset in connection with the arrangements under this <u>Section 2.5(d)</u>. The Parties agree to treat any asset the benefits of which are transferred pursuant to this <u>Section 2.5(d)</u> as having been sold to Buyer for Tax purposes to the extent permitted by Law. Each of Sellers and Buyer agrees to notify the other Parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Buyer pursuant to this <u>Section 2.5(d)</u>) is not permitted for Tax purposes under applicable Law. Where such treatment is not so permitted, and subject to the terms of any relevant arrangement agreed to by Sellers and Buyer pursuant to this <u>Section 2.5(d)</u>, Buyer shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Transferred Asset after the Closing Date.

(e)    Notwithstanding anything in this Agreement to the contrary, Buyer may amend or revise <u>Section 2.1(f)</u> of the Disclosure Letter setting forth the Transferred Contracts, in order to add any Contract to, or eliminate any Contract from, such section at any time during the period commencing from the date hereof and ending immediately prior to the Auction (or if no Auction occurs, on the date that is two (2) Business Days before the Closing) (the "<u>Designation Deadline</u>"); provided that with respect to any Contract or Lease that is not listed as a Transferred Contract by the Designation Deadline but is included in the Transition Services Agreement, Buyer shall be entitled to designate such Contract or Lease as a Transferred Contract post-Closing in the manner contemplated in the Transition Services Agreement subject to Buyer's payment of all Cure Claims for such Contract or Lease; and provided further that if an Auction occurs and Buyer is the successful bidder at the Auction, Buyer may amend Section 2.1(f)(i) of the Disclosure Letter in order to add any Contract to the list of Transferred Contracts at any time on or before the date that is two (2) Business Days before the Closing. Automatically upon the addition of any Contract to <u>Section 2.1(f)</u> of the Disclosure Letter, such Contract shall be a Transferred Contract for all purposes of this Agreement. Automatically upon the removal of any Contract from <u>Section 2.1(f)</u> of the Disclosure Letter such Contract shall be an Excluded Asset for all purposes of this Agreement subject to the inclusion of such Contract in the Transition Services Agreement, and no liabilities arising thereunder shall be assumed or borne by Buyer except as otherwise provided in

the Transition Services Agreement (unless such liability is otherwise specifically assumed pursuant to Section 2.3).

Section 2.6    Consideration.    The aggregate consideration for the purchase, sale, assignment and conveyance of the Transferred Assets from Sellers to Buyer (the "Purchase Price") shall consist of:

(a)    the payment by Buyer and/or one or more Designated Buyers, by wire transfer of immediately available funds to one or more accounts designated in writing by True Value Parent in accordance with Section 2.8(c)(v) (the "Cash Consideration"), an aggregate amount equal to One Hundred Fifty-Three Million dollars ($153,000,000.00); and

(b)    the assumption by Buyer, or a Designated Buyer, as applicable, of the Assumed Liabilities from Sellers.

Section 2.7    Deposit Funds.

(a)    On the date hereof, unless already deposited, Buyer shall deposit into escrow with an escrow agent reasonably acceptable to Sellers and Buyer (the "Escrow Agent") an amount equal to Fifteen Million Three Hundred Thousand dollars ($15,300,000,00) (such amount, together with all interest and other earnings accrued thereon and all reductions resulting from application thereof as contemplated by Section 2.7(a)(i) below, the "Deposit Funds"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.  The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) True Value Parent on behalf of Sellers, as follows:

(i)    prior to the occurrence of any of the events described in Section 2.7(a)(ii), (iii) or (iv) below, the use and availability of the Deposit Funds shall be subject solely to the terms and conditions set forth in the DIP Credit Agreement Term Sheet attached hereto as Exhibit B and, upon execution by the parties thereto, the DIP Credit Agreement;

(ii)    if the Closing shall occur, the Deposit Funds shall be applied towards the Purchase Price payable by Buyer pursuant to Section 2.6(a);

(iii)    if this Agreement is terminated by Sellers pursuant to Section 9.1(d)(i), the Deposit Funds shall be delivered to True Value Parent; or

(iv)    if this Agreement is terminated other than in a manner provided by Section 9.1(d)(i), the Deposit Funds shall be delivered to Buyer.

(b)    For the avoidance of doubt, (i) the aggregate maximum value that shall be credited against the Cash Consideration by application of (x) the Deposit Funds and (y) any amounts outstanding under the DIP Term Sheet or the DIP Credit Agreement, if applicable, shall be Fifteen Million Three Hundred Thousand dollars ($15,300,000,00) plus any interest and other earnings solely to the extent accrued as part of the Deposit Funds while held by the Escrow Agent, and no value shall be ascribed for this purpose to any interest, fees or other amounts earned under

23

the DIP Term Sheet or the DIP Credit Agreement, if applicable; (ii) Buyer shall credit bid any interest, fees or other amounts earned under the DIP Term Sheet or the DIP Credit Agreement, if applicable, as additional consideration in addition to the Cash Consideration; and (iii) if the transactions contemplated by this Agreement are consummated at the Closing, no additional payment shall be made by Sellers to Buyer in respect of any such interest, fees or other amounts earned under the DIP Term Sheet or the DIP Credit Agreement, if applicable.  The Parties acknowledge that the agreements contained in this Section 2.7 are an integral part of the transactions contemplated in this Agreement, that the damages resulting from termination of this Agreement under circumstances where Sellers are entitled to the Deposit Funds are uncertain and incapable of accurate calculation and that the delivery of the Deposit Funds is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate Sellers in the circumstances where Sellers are entitled to the Deposit Funds for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, and that, without these agreements, Sellers would not enter into this Agreement.  As such, receipt of the Deposit Funds by True Value Parent, solely in the event of a termination of this Agreement pursuant to Section 9.1(d)(i) shall be Sellers' sole and exclusive remedy and Sellers shall have no further Claims or causes of action against Buyer arising from or relating to such termination of the Agreement; provided, however, that Sellers shall be entitled to seek specific performance of Buyer's obligations hereunder pursuant to Section 10.13 of this Agreement.  If Buyer fails to take any action necessary to cause the delivery of the Deposit Funds to Sellers pursuant to the Escrow Agreement under circumstances where Sellers are entitled to the Deposit Funds and, in order to obtain such Deposit Funds, Sellers commence an Action which results in a judgment in favor of Sellers, Buyer shall pay to Sellers an amount in cash equal to the costs and expenses (including attorney's fees) incurred by Sellers in connection with such Action.

Section 2.8    Closing.

(a)    The purchase, sale, assignment and conveyance of the Transferred Assets contemplated by this Agreement shall take place at a closing (the "Closing") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, located at One Manhattan West, New York, NY 10001) at 10:00 a.m. Eastern Time on the second (2nd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as Sellers and Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."

(b)    At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(i)    the bill of sale, assignment and assumption agreement substantially in the form of Exhibit E (the "Assignment and Assumption Agreement"), duly executed by Sellers;

24

(ii)    the assignment and assumption of leases, substantially in the form of Exhibit F (the "Lease Assignment and Assumption Agreement"), duly executed by Sellers with respect to each of the Transferred Leases;

(iii)    an intellectual property assignment agreement, substantially in the form of Exhibit G (the "IP Assignment Agreement"), duly executed by Sellers;

(iv)    a transition services agreement, if agreed to prior to the Closing in accordance with Section 6.10, substantially on the terms set forth in the Transition Services Term Sheet attached hereto as Exhibit H and otherwise in form and substance reasonably acceptable to Buyer and Sellers (the "Transition Services Agreement"), duly executed by Sellers;

(v)    possession of each Owned Real Property, together with, for each Owned Real Property recorded in the name of any Seller, a limited warranty deed (or its jurisdictional equivalent) in recordable form for all such Owned Real Property conveying such Owned Real Property subject only to Permitted Post-Closing Encumbrances, duly executed by the applicable Seller, and such ordinary and customary documents (including customary affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to obtain customary owner's title policies insuring Buyer's fee simple title to such Owned Real Property (without expanding or supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto);

(vi)    a copy of the Sale Order;

(vii)    an Internal Revenue Service Form W-9, duly executed by each Seller;

(viii)    RESERVED

(ix)    a duly executed certificate of a duly authorized officer of True Value Parent certifying the satisfaction of the conditions set forth in Section 8.3(a), Section 8.3(a)(i) and Section 8.3(c); and

(x)    evidence, in form and substance reasonably satisfactory to Buyer, that all notices, authorizations, approvals, Orders, permits, and consents set forth on Section 2.8(b)(x) of the Disclosure Letter have been obtained or delivered, as applicable.

(c)    At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(i)    the Assignment and Assumption Agreement, duly executed by Buyer;

(ii)    the Lease Assignment and Assumption Agreements, duly executed by Buyer;

(iii)    the IP Assignment Agreement, duly executed by Buyer;

25

(iv)     the Transition Services Agreement, if agreed to prior to the Closing in accordance with Section 6.10, duly executed by Buyer;

(v)     the Cash Consideration in cash by wire transfer of immediately available funds to an account or accounts designated by True Value Parent;

(vi)     the Prepaid Expenses Reimbursement Amount, in accordance with Section 2.12; and

(vii)     a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b).

Section 2.9     Purchase Price Allocation.  For U.S. federal and applicable state, local and foreign Tax purposes, Buyer, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any amounts treated as part of the Purchase Price for applicable Tax purposes) among the Transferred Assets in accordance with the methodology set forth in Section 2.9 of the Disclosure Letter (the "Allocation Methodology," and such allocation, the "Allocation").  After the Closing, Buyer shall prepare and deliver to Sellers the Allocation, and the Allocation as prepared by Buyer, including any reasonable comments sent to Buyer from Seller, shall be binding on the Parties and their respective Affiliates.  The Parties and their respective Affiliates shall (a) file all applicable Tax Returns in accordance with such Allocation and (b) not take any Tax-related action that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by a change in applicable Law occurring after the date hereof or pursuant to a "determination" within the meaning of Section 1313(a) of the Code or any similar provision of state, local or foreign Tax Law.

Section 2.10     Designated Buyer(s).

(a)     In connection with the Closing, without limitation by the terms of Section 10.12, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.10, one (1) or more Affiliates to purchase specified Transferred Assets and employ specified Transferred Employees on and after the Closing Date, (any such Affiliate of Buyer that shall be properly designated by Buyer in accordance with this Section 2.10, a "Designated Buyer"); provided that no such designation would impede or delay the Closing or materially and adversely affect the timely receipt of any regulatory approval, in each case, in any material respect; provided, further, that no such designation shall be permitted if any Taxes required to be withheld under applicable Law from any amounts otherwise payable hereunder would be higher than the amount of Taxes that would be required to be withheld absent such designation.  At and after the Closing, Buyer shall, or shall cause its Designated Buyer(s) to, honor Buyer's obligations at the Closing.  After the Closing, any reference to Buyer made in this Agreement in respect of any purchase, assumption or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any.Buyer shall be jointly and severally liable for all obligations of Buyer and its Designated Buyer(s) under this Agreement as to any particular Assumed Liability that a Designated Buyer is assuming at the Closing.

(b)     Without limitation of Section 6.4, the designation of a Designated Buyer in accordance with Section 2.10(a) shall be made by Buyer by way of a written notice to be delivered

26

to Sellers as soon as reasonably practicable following the date of this Agreement but in no event later than two (2) Business Days prior to the Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Assets and Transferred Employees Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.  Notwithstanding the foregoing, and for the avoidance of doubt, any designation pursuant to Section 2.10(a) shall not relieve Buyer of any of its obligations under this Agreement (or otherwise) and Buyer shall remain jointly and severally liable therefor.

Section 2.11    Withholding.  Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as are required to be deducted and withheld from such amount under the Code or any other applicable provision of U.S. or foreign Tax Law.  To the extent that Buyer intends to withhold any such amounts from the Purchase Price, it shall (a) notify Sellers of such intention as soon as reasonably possible after the date hereof and shall provide Sellers with an opportunity to provide forms or evidence that would exempt or reduce such amounts from withholding and (b) otherwise cooperate in good faith with Sellers and use commercially reasonable efforts to minimize or eliminate any such deductions or withholdings.  To the extent that any amounts are so deducted and withheld and paid to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 2.12    Reimbursement of Prepaid Expenses.  With respect to all Prepaid Expenses constituting deposits or otherwise attributable to the period following the Closing Date, (i) at least three (3) Business Days prior to the Closing, Sellers shall deliver to Buyer documentation, in form and substance reasonably satisfactory to Buyer, evidencing the amount of such Prepaid Expenses (the "Prepaid Expenses Reimbursement Amount") and (ii) at the Closing, Buyer shall pay to Sellers an amount equal to such Prepaid Expenses Reimbursement Amount in cash by wire transfer of immediately available funds to an account or accounts designated by True Value Parent, and all such Prepaid Expenses shall be assigned to Buyer in accordance with Section 2.1.

Section 2.13    Payment of Purchase Orders.  Pursuant to Section 2.1(f), Sellers shall assign to Buyer, and Buyer shall assume from Sellers, all Purchase Orders. For the avoidance of doubt, (i) all goods received pursuant to a Purchase Order after Closing at either a distribution center that is subject to a Transferred Lease or a distribution  center that is subject to an Excluded Lease, shall be owned by Buyer and (ii) Buyer shall pay when due all amounts owed under any such Purchase Order in accordance with the terms thereof directly to the party to whom such payment is owed.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Letter attached hereto, each Seller jointly and severally represents and warrants to Buyer as follows:

27

Section 3.1    Organization.  Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own, lease and operate all of its properties and assets (including the Transferred Assets) and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code and the Orders of the Bankruptcy Court, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which in which the nature of the Transferred Assets or the character or location of the Transferred Assets requires it to qualify, except where the failure to be so qualified would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.2    Authority.  Subject to required Bankruptcy Court approvals, (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

Section 3.3    No Conflict; Required Filings and Consents.

(a)    Except as set forth on Section 3.3(a) of the Disclosure Letter and assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.3(b) of the Disclosure Letter are made, given or obtained (as applicable), (y) the requirements of the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and any other applicable Antitrust Laws, are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Sellers of this Agreement and each of the Ancillary Agreements to which they will be a party and the consummation by Sellers of the transactions contemplated hereby and thereby, does not: (i) conflict with or violate any provision of any Organizational Document of any Seller; (ii) in any material respect conflict with or violate any Law or Order applicable to any Seller or by which any Transferred Asset is bound; or (iii) conflict with, result in any material breach of, constitute a material default (or an event that, with notice or lapse of time or both, would become a material default) under, create in any party thereto any right of termination, vesting, amendment, acceleration or cancellation of, require any consent under, or result in the creation or imposition of any material Encumbrance (other than a Permitted Pre-Closing Encumbrance) on any Transferred Asset or under any Transferred Contract; except, with respect to clauses (ii) and (iii),

28

for any such violations, breaches, defaults or other occurrences that, are not material to the Business, taken as a whole.

(b)       Except as set forth on <u>Section 3.3(b)</u> of the Disclosure Letter, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by any Seller of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby and thereby, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under the HSR Act and any other Antitrust Laws, (iii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, or (v) as may be necessary as a result of any facts or circumstances relating to Buyer or any of its Affiliates.

Section 3.4       <u>Transferred Assets; Sufficiency of Assets</u>.  Subject to requisite Bankruptcy Court approvals and except as a result of the commencement of the Chapter 11 Case:

(a)       Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Business, each Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

(b)       This Agreement, the Ancillary Agreements, and the other instruments and documents to be delivered by Sellers to Buyer at the Closing shall, subject to entry of the Sale Order and the receipt of each of the consents and approvals set forth on <u>Section 3.3(a)</u> and <u>Section 3.3(b)</u> of the Disclosure Letter, be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), claims and interests, other than Assumed Liabilities.

(c)       Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole, and except for any Business Employees who do not become Transferred Employees and for any Excluded Assets (including, for the avoidance of doubt, any Leased Real Property under any Excluded Lease), the Transferred Assets to be conveyed to Buyer hereunder at Closing (taking into account any rights granted or services to be provided under this Agreement or any Ancillary Agreement), constitute (i) all the properties, rights and other assets and personnel necessary, and are sufficient, to carry on the Business as it is currently conducted by Sellers and (ii) except for the Excluded Assets, all of the assets owned by Sellers and held for use by Sellers primarily in the conduct of the Business.

Section 3.5       <u>Financial Statements; No Undisclosed Liabilities</u>.

(a)       (i) The audited consolidated balance sheets of True Value Parent as of December 31, 2022 and 2023, together with the related consolidated statements of income, stockholders' equity and cash flows ended December 31, 2022 and 2023, and (ii) the unaudited

29

consolidated balance sheets of True Value Parent as of August 31, 2024, together with the related consolidated statements of income, stockholders' equity and cash flows for the eight months ended August 31, 2024 (collectively, the "Financial Statements") have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of True Value Parent and its Subsidiaries and the Business at the respective dates thereof and the results of their operations and cash flows for the periods indicated. None of the Financial Statements contains any material, non-recurring items of revenue or gain outside the Ordinary Course of Business, except as expressly set forth therein. No Seller is aware of any fraud or intentional misconduct relating to its Financial Statements or operations, or any allegations thereof.

(b)      Except for Liabilities (i) incurred in connection with or contemplated by this Agreement, (ii) reflected or reserved against in the audited consolidated balance sheet of True Value Parent as of December 31, 2023 or in the notes thereto, (iii) that have been incurred in the Ordinary Course of Business since December 31, 2023 or (iv) that have been discharged or paid in full in the Ordinary Course of Business, Sellers do not have any Liabilities of any nature (whether accrued, absolute, contingent or otherwise), which are required to be disclosed, recorded or reflected on a balance sheet, including the footnotes thereto, under GAAP.

Section 3.6      Absence of Certain Changes or Events.  Since December 31, 2023, through the date of this Agreement, there has not been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect. Except for (i) discussions, negotiations and activities related to this Agreement or other potential strategic transactions, (ii) the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets (or other strategic transaction), the negotiation and execution of this Agreement, (iii) for the preparation and commencement of the Chapter 11 Case, or (iv) as set forth on Section 3.6 of the Disclosure Letter or as expressly contemplated by this Agreement, from December 31, 2023 until the date hereof, no Seller has taken any action or failed to take any action, as applicable, that would be prohibited by Section 6.1(b)(i), Section 6.1(b)(ii), Section 6.1(b)(iii), Section 6.1(b)(iv), Section 6.1(b)(vii), Section 6.1(b)(viii), Section 6.1(b)(x) or Section 6.1(b)(xii) if taken, or failed to be taken, except for the execution and delivery of this Agreement.

Section 3.7      Compliance with Law; Permits.

(a)      As of the date hereof, the Business is being, and at all times since the Compliance Date has been, conducted in all material respects in compliance with, and Sellers are, and at all times since the Compliance Date have been, in compliance in all material respects with, all applicable Laws relating to the operation of the Business and the Transferred Assets and (ii) there are no pending or, to the Knowledge of Sellers, threatened, claims from any Governmental Authority relating to any non-compliance of the Business or the Transferred Assets.

(b)      Sellers are in possession of all material permits (including work permits and visas), licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate their assets and properties (including all the Transferred Assets), and to employ or engage officers, workers and employees who are not

citizens of the country where they are carrying out their duties or performing their services and to carry on the Business as currently conducted.  All material Permits held by Sellers are valid and in full force and effect and neither Sellers nor any of their applicable Subsidiaries are in default under, or in violation of, any such Permit,, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyer's ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending or, to the Knowledge of Sellers, threatened in writing.

Section 3.8    Litigation.  Except for the Chapter 11 Case, and any Order entered in the Chapter 11 Case, as of the date hereof, there is no material Action by or against Sellers in connection with the Business or the Transferred Assets pending, or to the Knowledge of Sellers, threatened in writing.

Section 3.9    Employee Benefit Plans.

(a)    (i) Each Employee Benefit Plan has been operated and administered in all material respects in accordance its terms and with applicable Law and with each applicable Collective Bargaining Agreement, and (ii) there are no pending or, to the Knowledge of Sellers, threatened actions, suits or claims by, on behalf of or against any Employee Benefit Plan or any administrator or fiduciary thereof (other than routine claims for benefits), in each case (i) and (ii), other than would not reasonably be expected to result in material Liability to the Business.

(b)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, (i) entitle any Business Employee to severance pay (other than from a Governmental Authority), (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation or benefits due to any Business Employee, (iii) cause any individual to receive any additional payment under any Employee Benefit Plan, or (iv) directly or indirectly cause any Seller or any Affiliate of a Seller to transfer or set aside any assets to fund or otherwise provide for benefits for any individual.

(c)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, result in any payment or benefit (whether in cash or property or the vesting of property) to any "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) that could, individually or in combination with any other such payment or benefit, constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) or subject any Person to Liability for Tax under Section 4999 of the Code or cause the loss of a deduction to any Seller under Section 280G of the Code.

(d)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination or opinion letter as to such qualification from the IRS, and, to the Knowledge of Sellers, no event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification.  No stock or other securities issued by any Seller or any Affiliate of a Seller forms or has formed any part of the assets of any Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code.

31

(e)     Except as set forth in <u>Section 3.9(e)</u> of the Disclosure Letter, none of Sellers or any of their ERISA Affiliates maintains, sponsors or contributes to or, within the last six (6) years, has maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to or in any way has any Liability (whether on account of an ERISA Affiliate or otherwise) to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA (whether or not subject thereto), (ii) a plan subject Title IV or Section 302 of ERISA or Section 412, 430 or 4971 of the Code or (iii)  a "multiemployer plan," as defined in Section 3(37) of ERISA. None of Sellers or any of their ERISA Affiliates has incurred any withdrawal liability (including any contingent or secondary withdrawal liability) within the meaning of Section 4201 or 4204 of ERISA that remains unsatisfied. Other than as would not reasonably be expected to result in material Liability to the Business, none of Sellers or any of their ERISA Affiliates maintains, sponsors or contributes to (x) any "voluntary employee beneficiary association" within the meaning of Section 501(c)(9) of the Code or any other "welfare benefit fund" as defined in Section 419 of the Code, (y) a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA, or (z) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

Section 3.10    <u>Labor and Employment Matters</u>.

(a)     <u>Section 3.10(a)</u> of the Disclosure Letter sets forth a complete and correct list of all Business Employees and for each such Business Employee, to the extent permitted by Law, the following: (i) name; (ii) title or position; (iii) whether full-time or part-time; (iv) classification as exempt or non-exempt; (v) hire date; and (vi) current annual base compensation rate.  As of the date of this Agreement, all compensation, including wages, commissions, bonuses, fees and other compensation, due and payable to each Business Employee for work performed on or prior to the date hereof has been paid in full, except for any such amounts that are accrued and unpaid in the Ordinary Course of Business.  As of the date of this Agreement, all compensation due and payable to each independent contractor who has been engaged by Sellers has been paid in full for services performed on or prior to the date hereof.

(b)     Except as set forth in <u>Section 3.10(b)</u> of the Disclosure Letter and except with respect to any such Contract at the national-, sector- or industry-level, Sellers are not a party to or bound by a Collective Bargaining Agreement.

(c)     As of the date hereof, solely with respect to the Business Employees, (i) there is no material unfair labor practice charge or complaint pending or, to the Knowledge of Sellers, threatened against Sellers before the National Labor Relations Board or any similar Governmental Authority, (ii) no Labor Organization or group of Business Employees has made a pending demand in writing for recognition or certification as the bargaining agent of the Business Employees, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or any similar Governmental Authority, (iii) to the Knowledge of Sellers, there are no pending or threatened union organizing or certification activities and (iv) there are no pending or, to the Knowledge of Sellers, threatened strikes, work stoppages, lockouts, slowdowns or other labor disputes, that, in each case of (i) through (iv), would reasonably be expected to be material to the Business, taken as a whole.  There are no material arbitrations, material grievances, or unfair labor practice charges or complaints

32

pending against Sellers or, to the Knowledge of Sellers, threatened as of the date of this Agreement by or on behalf of any Business Employee.

(d)　　　Sellers are and since the Compliance Date have been, in compliance in all material respects with all applicable Laws relating to labor, labor relations, employment and employment practices pertaining to the Business Employees and to Sellers' former employees of the Business, including but not limited to all Laws respecting collective bargaining, the terms and conditions of employment, wages, hours, overtime pay, equal employment opportunity, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay), immigration, work authorization, mandatory E-Verify obligations, occupational health and safety, working conditions, workers' compensation, vacation pay, plant closures and layoffs, affirmative action, labor relations, employee leave issues, and unemployment insurance.

(e)　　　Sellers have in their possession a U.S. Citizenship and Immigration Services Form I-9 that was, in all material respects, validly and properly completed and, if necessary, that has been properly updated, in all material respects, in accordance with applicable Law for each Business Employee.  To the Knowledge of Sellers, Sellers have not hired or continued to employ any worker who is not legally authorized to work in the United States.  To the Knowledge of Sellers, no Seller has used the services of any individual through a staffing agency, contract, or subcontract knowing that the individual was an unauthorized worker.

(f)　　　As of the date hereof, Sellers are in material compliance with the WARN Act as it relates to the current and former Business Employees.  During the 90-day period prior to the date of this Agreement, there has been no "mass layoff" or "plant closing" as defined by the WARN Act.

Section 3.11　　<u>Real Property</u>.

(a)　　　<u>Section 3.11(a)</u> of the Disclosure Letter sets forth an accurate and complete list of all Owned Real Property.  Each applicable Seller has good and valid fee simple title (or jurisdictional equivalent) to the Owned Real property it owns, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.  Seller has not leased, licensed, or granted any possessory interest in any Owned Real Property.

(b)　　　<u>Section 3.11(b)</u> of the Disclosure Letter sets forth an accurate and complete list of all Leased Real Property.  Each Seller has a valid leasehold, subleasehold or other similar interest in all Leased Real Property, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.  Sellers have made available to Buyer true, correct and complete copies of each Lease for Leased Real Property.  Seller has not subleased, licensed, or granted any possessory interest in any Leased Real Property.

(c)　　　Except as set forth on <u>Section 3.11(c)</u> of the Disclosure Letter, Sellers are not a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Real Property or any portion thereof or interest therein to any Person other than Buyer.

(d)    None of Sellers, or to the Knowledge of Sellers, any other party to such Lease is in material breach or default under such Lease, and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a material breach or default, or permit the termination, modification or acceleration of rent under such Lease. No security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease that has not been re-deposited in full.

(e)    Sellers have not received written notice from any Governmental Authority of, and there is not: (i) any pending or, to the Knowledge of Sellers, threatened, condemnation proceedings affecting the Leased Real Property or any part thereof; (ii) to the Knowledge of the Sellers, any violation of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Leased Real Property or any part thereof, which have not heretofore been cured; or (iii) any pending or, to the Knowledge of Sellers, threatened, injunction, decree, Order, writ or judgment outstanding, nor any claims, litigation, administrative actions or similar proceedings against Sellers or any Leased Real Property relating to the ownership, lease, use or occupancy of such Leased Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of any Leased Real Property or any part thereof or in any material respect prevent or limit the present operation of the improvements on the Leased Real Property or any part thereof.  There are no incomplete construction projects affecting the Leased Real Property and all completed construction projects have been fully paid for.  To the Knowledge of Sellers, there is no pending or contemplated special assessment or reassessment of any parcel included in the Leased Real Property that would result in a material increase in the real property Taxes or in the rent, additional rent or other sums and charges payable by a Seller under the Leases for Leased Real Property.  No brokerage or leasing commissions or other compensation are due or payable by a Seller to any Person, firm, corporation or other entity with respect to, or on account of, any Lease for Leased Real Property or any extensions or renewals thereof.  The improvements, systems, fixtures and equipment constituting or located on the Leased Real Property are in working order and repair sufficient for the conduct of the business of the Sellers as now conducted.

Section 3.12    Intellectual Property.

(a)    A true, correct and complete (in all material respects) list of all U.S. and foreign (i) issued patents and pending patent applications, (ii) registered trademarks and applications to register any trademarks, (iii) registered copyrights, in each case, owned by any Seller as of the date hereof, and (iv) all domain names owned or controlled by Sellers (foregoing subsections (i)-(iv), collectively, the "Registered IP") is set forth on Section 3.12(a) of the Disclosure Letter.  All material items of such Registered IP are subsisting and to the Knowledge of Sellers, are valid and enforceable.  Section 3.12(a) of the Disclosure Letter shall, with respect to each reference to Registered IP, include the title, mark, serial or application number, registration number, jurisdiction, registration or recordation date and next renewal deadline or expiry date, as applicable.

(b)    Sellers are the sole and exclusive owners of the Transferred IP, and the execution and performance of this Agreement will not result in the loss or impairment of any such ownership rights by any Sellers, or Sellers' ability to assign such Transferred IP to Buyer without loss of such rights.

34

(c)     As of the date hereof, (i) the conduct of the Business by Sellers, and the Transferred IP as currently used by Sellers in the conduct of the Business, do not infringe, misappropriate or otherwise violate any Person's Intellectual Property rights, and (ii) there is no such unresolved Action asserted or, to the Knowledge of Sellers, threatened in writing (including any "cease and desist" letters and invitations to license) against Sellers, except, in each case of (i) and (ii) as would not reasonably be expected to be material to the Business, taken as a whole.

(d)     To the Knowledge of Sellers, as of the date hereof, (i) no Person is infringing, misappropriating or otherwise violating any Transferred IP, and (ii) there is no such unresolved Action asserted or threatened in writing against any Person by Sellers, except, in each case of (i) and (ii) as would not reasonably be expected to be material to the Business, taken as a whole.

(e)     Sellers take commercially reasonable steps to safeguard and maintain the confidentiality of material trade secrets and other material confidential and proprietary information included in the Transferred IP. To the Knowledge of Sellers, as of the date hereof, no Person has asserted in writing, any right, title or interest, or the right to receive any royalties or other consideration with respect to, any of the Transferred IP nor contested or challenged the validity or enforceability of any of the Transferred IP, in any material respect.  To the Knowledge of Sellers, as of the date hereof, there has not been any unauthorized disclosure of material trade secrets that has resulted or is reasonably likely to result in the loss of trade secret or other rights in and to such information.

(f)     Section 3.12(f) of the Disclosure Letter sets forth a true, correct and complete list of material software applications or code owned by or developed by or for Sellers that are included in the Transferred IP.

(g)     To the Knowledge of Sellers, (i) Sellers are in material compliance with the terms and conditions pursuant to which Sellers have obtained or use any Open Source Materials in the Business and (ii) no Seller has (A) incorporated Open Source Materials into, or combined Open Source Materials with, any material technology or software in the Transferred IP; (B) distributed Open Source Material in conjunction with any such Transferred IP; or (C) used Open Source Material, in each case ((A)-(C)), in such a way that requires any such Transferred IP to be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works or (3) redistributed at no charge.

(h)     The Transferred IP developed, created, invented, or authored by individuals who were employed by Sellers at the time of such development, creation, invention, or authorship is the sole property of Sellers and no such employee has any rights, title, or interest in such Intellectual Property.  All employees of Sellers have executed and delivered to Sellers an agreement (i) transferring to Sellers any rights in the Transferred IP developed, created, invented, or authored by such employee or (ii) prohibiting disclosure of Sellers' confidential and proprietary information including non-public information regarding the Transferred IP; or such employees' rights, title and interest in such Intellectual Property has otherwise vested in Sellers by operation of Law.

35

(i)    All developers, creators, inventors, and authors of the Transferred IP (other than with respect to Intellectual Property licensed to Sellers), who were not employees of Sellers at the time of the development, creation, invention, or authorship of such Transferred IP have assigned in writing all of their rights, title, and interest to such Transferred IP to Sellers, or such rights, title and interest have otherwise vested in Sellers by operation of Law.

(j)    In connection with the use of all Transferred IP by Sellers, Sellers do not owe to any other Person any material fee, royalty, or other payment as a result of the use of such Transferred IP, other than any such payments in the Ordinary Course of Business.

(k)    No Transferred IP is subject to any outstanding Order or stipulation restricting the use or licensing thereof by Sellers in connection with the Business.

Section 3.13    Tax Matters.

(a)    All material Tax Returns required to be filed with respect to the Transferred Assets or the Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects.  Subject to any obligation of Sellers under the Bankruptcy Code, all material Taxes due and payable with respect to the Transferred Assets have been paid.  Since January 1, 2018, no claim has been made in writing by a Governmental Authority in a jurisdiction where a Seller does not file Tax Returns that the Seller or the Business is or may be subject to taxation by that jurisdiction.  All Taxes that any Seller is required by Law to withhold and collect have in all material respects been duly withheld, collected and paid over to the extent due and payable.

(b)    There is no Action, suit, claim, deficiency, assessment, or audit pending, proposed in writing, or, to the Knowledge of Sellers, threatened in writing with respect to any Taxes relating to the Transferred Assets or the Business.

(c)    There are no Encumbrances for Taxes upon any of the Transferred Assets other than Permitted Pre-Closing Encumbrances.

(d)    No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any material Taxes or Tax Returns of or with respect to the Transferred Assets or the Business is outstanding.

(e)    The representations and warranties set forth in Section 3.9 and this Section 3.13(e) are the sole and exclusive representations and warranties with respect to Taxes.

(f)    None of the Transferred Assets constitutes, stock, partnership interests or other equity interest in any Person for U.S. federal income tax purposes.

Section 3.14    Environmental Matters.

(a)    As of the date hereof, Sellers, the Transferred Assets and the Business are now and, except for matters which have been resolved, have been in compliance in all material respects with all applicable Environmental Laws, which compliance includes the possession of, and material compliance with the terms of, with all material Environmental Permits required in

36

connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets.  There are no Environmental Claims pending or, to the Knowledge of Sellers, threatened in writing, that seek the revocation, cancellation, suspension or adverse modification of any such Environmental Permit.  To the Knowledge of Sellers there are no facts, conditions or circumstances that would reasonably be expected to result in termination, revocation, cancellation, non-renewal or material adverse modification of any such Environmental Permits.

(b)    There is no material Environmental Claim pending or, to the Knowledge of Sellers, threatened against or affecting Sellers, the Transferred Asset or the Business.  To the Knowledge of Sellers, there are no environmental conditions, including the presence of any Hazardous Material at or migrating to or from the Real Property, which would form the basis of any material Liability of the Business or any Transferred Asset, or of any material Environmental Claim against or affecting any Transferred Asset or the Business.

(c)    To the Knowledge of Sellers, except as listed in Section 3.14(c) of the Disclosure Letter, (i) underground storage tanks have not been installed or otherwise placed on the Real Property under Sellers' ownership or possession thereof. To the Knowledge of Sellers, underground storage tanks were not located on the Real Property prior to Sellers' ownership or leasehold interest in the Real Property.

(d)    Hazardous Materials generated on the Real Property are treated, stored, generated, transported, handled, and disposed of in compliance in all material respects with all applicable Environmental Laws.

(e)    Sellers have made available to Buyer all material environmental audits, reports and site assessments regarding the Transferred Assets and the Business that are in possession of Seller and have been prepared in the last five (5) years prior to the date hereof.

Section 3.15    Material Contracts.

(a)    Section 3.15(a) of the Disclosure Letter sets forth each of the following Contracts entered into by any Seller (each, a "Material Contract"); provided, that the following Contracts shall not be set forth in Section 3.15(a) of the Disclosure Letter or be deemed a "Material Contract" for any purposes under this Agreement: (1) any Employee Benefit Plan; (2) any purchase orders or similar Contracts; and (3) any Lease for Leased Real Property:

(i)    Contracts with any current or former officer, director, or employee of any Seller;

(ii)    Contracts relating to the acquisition by any Seller of any operating business, real property, capital expenditures (including capital expenditures relating to information technology systems) or securities of any other Person (other than any Seller) (including investment in joint ventures and minority equity investments but excluding accounts receivable or other forms of trade credit) for aggregate consideration in excess of $500,000 pursuant to which there are remaining material liabilities or obligations;

(iii)    all Contracts relating to indebtedness for borrowed money;

37

(iv)    Contracts regarding a guaranty, undertaking to be liable for the debts of any Person other than any other Seller or provision of an indemnity in respect of liabilities, obligations or commitments of any Person other than any Seller, in each case in excess of $500,000;

(v)    any Contract (or group of related Contracts) the performance of which, in the twelve (12) months preceding the date hereof has resulted in, or in the twelve (12) months following the date of this Agreement would reasonably be expected to result in, consideration or payment in excess of $1,000,000 per annum to or from any Seller;

(vi)    any Contract pursuant to which any Seller (A) is granted or obtains any license or right to use any Intellectual Property material to the Business, (B) is restricted in its right to use or register any Intellectual Property material to the Business, or (C) permits any other Person to use, enforce or register any material Intellectual Property, including any license agreements, coexistence agreements and covenants not to sue, in each case other than: (X) "click-wrap," "shrink-wrap" and similar end-user licenses or other licenses to generally commercially available or "off-the-shelf" third-party software or technology, (Y) non-exclusive licenses granted in the Ordinary Course of Business, and (Z) any Contract that includes a license to use Intellectual Property that is incidental and not material to such Contract, including sales or marketing or similar Contracts for the purposes of promoting or using any products or services;

(vii)    any material Contract or consent decree with or from any Governmental Authority;

(viii)    Contracts that are capital leases as determined pursuant to GAAP and involve annual payments by any Seller in excess of $250,000;

(ix)    any Contract with a sole source supplier, pursuant to which such supplier provides to any Seller equipment, materials or services that are necessary for the sale, performance, manufacturing or support of the Business;

(x)    any material agreement relating to any strategic alliance, joint development, joint marketing, partnership, joint venture or similar arrangement; and

(xi)    all Contracts that limit or purport to limit in any respect the ability of the Business to solicit employees or customers of any other Person or compete in any line of business or with any Person or in any geographic area or during any period of time.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with the Bankruptcy Code and except as a result of the commencement of the Chapter 11 Case, each Material Contract and each of the Leases for Leased Real Property is in full force and effect and is a valid, binding and enforceable obligation of Sellers and, to the Knowledge of Sellers, each of the other parties thereto, except as may be limited by the Enforceability Exceptions.  Except as set forth on <u>Section 3.15(b)</u> of the Disclosure Letter, no Seller is in breach or default, or is alleged in writing by a counterparty thereto to have breached or to be in default, under any Material Contract or any Lease for Leased Real

38

Property, and, to the Knowledge of Sellers, each other party to each Material Contract and Lease for Leased Real Property is not in breach or default thereunder.

Section 3.16    <u>Certain Payments</u>.    Since the Compliance Date, no Seller (nor, to the Knowledge of Sellers, any of their respective Representatives) has (a) used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature for the purpose of obtaining or retaining business or favorable governmental action or to otherwise secure any improper advantage in violation of the Foreign Corrupt Practices Act.

Section 3.17    <u>Brokers</u>.    Other than Houlihan Lokey, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

Section 3.18    <u>Data Privacy; Information Security.</u>

(a)    Sellers comply and, since the Compliance Date, have complied, in all material respects with all of the following in the conduct of the Business of Sellers: (i) Privacy Laws; (ii) the PCI-DSS; (iii) generally accepted applicable cybersecurity and privacy industry standards and guidelines including the National Institute of Standards and Technology (NIST) Cybersecurity Framework; (iv) the Business Privacy and Data Security Policies; and (v) contractual requirements or terms of use concerning the Processing of Personal Information to which Sellers is or was a party or otherwise bound.

(b)    To the extent required by applicable Law, since the Compliance Date, Sellers have posted to each of its websites and mobile applications and provided or otherwise made available in connection with its products or services, an external privacy policy and terms of use, in each case, in connection with the Business.  Any external privacy policies or terms of use provided by Sellers in connection with the Business materially comply with all applicable Privacy Laws.  Sellers, and, to the Knowledge of Sellers, any vendor, processor, or other third-party Processing Personal Information for or on behalf of Sellers and any Subsidiary, in connection with the Business, are and since the Compliance Date, have been in compliance with the external privacy policies and terms of use in all material respects.  Sellers have made available to Buyer true, complete, and correct copies of all external privacy policies and terms of use that are currently in effect.

(c)    No Personal Information in the possession or control of Sellers, or held or Processed by any vendor, processor, or other third party for or on behalf of Sellers or any Subsidiary, in the conduct of the Business of Sellers or any Subsidiary have been subject to any data breach or other security incident that has resulted in or presents a material risk of unauthorized access, disclosure, use, denial of use, alteration, corruption, destruction, or loss of such Personal Information or that has caused or would reasonably be expected to cause a material disruption to the conduct of the Business of Sellers or any Subsidiary (a "<u>Security Incident</u>").  Since the

39

Compliance Date, Sellers or any Subsidiary have not notified and, to the Knowledge of Sellers, there have been no facts or circumstances that would require Sellers or any Subsidiary to notify, any Governmental Authority or other Person of any Security Incident.

(d)     No Seller nor any Subsidiary has received any material notice, request, claim, complaint, correspondence, or other communication in writing from any Governmental Authority or other Person, and to the Knowledge of Sellers, since the Compliance Date, there has not been any audit, investigation, enforcement action (including any fines or other sanctions), or other Action, relating to any actual or alleged material Security Incident or violation of any Privacy Law, any Business Privacy and Data Security Policy, or any Person's individual privacy rights involving Personal Information in the possession or control of Sellers or any Subsidiary in the conduct of the Business of Sellers or any Subsidiary.

Section 3.19   <u>Exclusivity of Representations and Warranties</u>.   Notwithstanding the delivery or disclosure to Buyer or any of its Affiliates or Representatives of any documentation or other information (including any financial projections or other supplemental data), except for the representations and warranties expressly set forth in this Agreement and the Ancillary Agreements, none of Sellers or their Affiliates or Representatives makes, or has made (and each Seller and their Affiliates and Representatives hereby disclaims) any express or implied representation or warranty with respect to Sellers, the Business or any Transferred Asset or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, and Buyer and its Affiliates and Representatives are not relying on any representation, warranty or other information of Sellers, its Affiliates or any Person except for those expressly set forth in this Agreement and the Ancillary Agreements.  None of Sellers or their respective Affiliates or Representatives makes (and Sellers, and their respective Affiliates and Representatives hereby disclaims) any express or implied representation or warranty (including as to completeness or accuracy), whether at Law or in equity, to Buyer with respect to, and none of Sellers, their respective Affiliates and Representatives or any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or its Representatives, or resulting from the omission of, any estimate, projection, prediction, data, budget, forecast, financial information, memorandum, prospect information, presentation or any other materials or information, including any oral, written, video, electronic or other materials or information presented to or made available to Buyer in connection with presentations by True Value Parent's management or information made available on any "data sites" or in the course of their due diligence investigation of the Business, the negotiation of this Agreement or the course of the transactions contemplated by this Agreement.  Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE IV

## <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Except as set forth in the disclosure schedule delivered to Sellers prior to the execution of this Agreement (the "<u>Buyer Disclosure Letter</u>"), Buyer represents and warrants to Sellers as follows:

Section 4.1    <u>Organization</u>.    Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement to which it is a party.

Section 4.2    <u>Authority</u>.    Buyer has the power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate (or equivalent) action.    This Agreement has been, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will have been, duly executed and delivered by Buyer, and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its respective terms, except as enforcement may be limited by the Enforceability Exceptions.

Section 4.3    <u>No Conflict; Required Filings and Consents</u>.

(a)    Assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Section 4.3(b)</u> of the Buyer Disclosure Letter are made, given or obtained (as applicable), (y) the requirements of the HSR Act, and any other applicable Antitrust Laws, are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, does not:

(i)    conflict with or violate any provision of any Organizational Document of Buyer;

(ii)    conflict with or violate any Law or Order applicable to Buyer; or

(iii)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract to which Buyer is a party (including the Buyer Credit Agreement), in each case, that would prevent or delay Buyer's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which Buyer will be a party.

(b)    Except as set forth on <u>Section 4.3(b)</u> of the Buyer Disclosure Letter, Buyer is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will

be a party or the consummation of the transactions contemplated hereby or thereby, except for any filings required to be made under the HSR Act or any other Antitrust Laws.

Section 4.4    <u>Absence of Litigation</u>.  There is no Action pending or, to the knowledge of Buyer, threatened in writing, against Buyer that, if adversely determined, (a) would prevent or materially restrict, impede or delay the performance by Buyer of its obligations under this Agreement or (b) would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

Section 4.5    <u>Qualification</u>.

(a)    To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(b)    Buyer is capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Transferred Contracts.

Section 4.6    <u>Legal Requirements and Approvals</u>.  Other than as may be required under the HSR Act or any other Antitrust Laws, Buyer has no knowledge of any consent of any Governmental Authority that will be required to consummate the transactions contemplated by this Agreement that it will not be able to obtain or make, or that it may obtain only after substantial delay, or any material requirement of any Governmental Authority that it will be unable to satisfy in connection with the transactions contemplated hereby.

Section 4.7    <u>Brokers</u>.  No broker, finder or investment banker is entitled to any fee, commission or expense from Buyer that would be payable by Sellers in connection with the transactions contemplated hereby.

Section 4.8    <u>Financing</u>.

(a)    Buyer affirms that it is not a condition to Closing or any of its obligations under this Agreement that Buyer or any other Persons obtain financing for the transactions contemplated by this Agreement.

(b)    Concurrently with the execution of this Agreement, Buyer has delivered to Sellers a true, correct and complete copy of an executed debt commitment letter and each executed fee letter, engagement letter and other agreement associated therewith (provided that provisions in the fee letter related solely to fees, pricing, "flex" provisions and other economic terms may be redacted in a customary manner, provided that none of such redacted provisions affects the availability, timing, conditionality, enforceability, termination or aggregate principal amount of the Debt Financing), dated as of the date of this Agreement (such commitment letter, fee letter, engagement letter and other agreements, including all exhibits, schedules, annexes, supplements, modifications and amendments thereto, collectively, the "<u>Debt Commitment Letter</u>"), from the lenders, arrangers, agents or other financing parties party thereto (collectively, together with any providers of alternative debt financing pursuant to <u>Section 6.8(b)</u>, the "<u>Debt Financing Sources</u>"), providing the terms and conditions upon which the Debt Financing Sources have committed to

42

provide an aggregate amount of debt financing set forth therein to Buyer for the purpose of funding the transactions contemplated by this Agreement (together with any alternative debt financing pursuant to <u>Section 6.8(b)</u>, the "<u>Debt Financing</u>").  The aggregate cash proceeds contemplated to be provided to Buyer at the Closing pursuant to the Debt Commitment Letter (after netting out applicable fees, expenses, original issue discount and similar premiums and charges after giving effect of the maximum amount of "flex" (including any original issue discount flex) provided for under the Debt Financing) when funded in accordance with the Debt Commitment Letter, will be in an amount sufficient and available, together with readily available funds to which Buyer has and will have access at all times through the Closing, for Buyer to fund all of the amounts required to be provided by Buyer for the consummation of the transactions contemplated hereby and the Debt Commitment Letter, including the payment of the Purchase Price and any associated expenses, including to pay all costs associated with Cure Claims and all other fees, costs and expenses to be incurred by Buyer in connection with the transactions contemplated hereby (the "<u>Funding Obligations</u>" and such sufficient proceeds, the "<u>Funds</u>").  As of the date hereof, (a) the Debt Commitment Letter in the form so delivered is in full force and effect and constitutes the legal, valid and binding obligation of Buyer, and, to Buyer's knowledge, the other parties thereto, enforceable against each of Buyer and such other parties in accordance with its respective terms, except as may be limited by the Enforceability Exceptions, (b) the obligations and commitments in the Debt Commitment Letter have not been withdrawn, reduced, rescinded, terminated or otherwise amended or modified in any respect, (c) no amendment or modification to, or withdrawal, reduction, termination or rescission of, the Debt Commitment Letter has occurred or is contemplated, (d) no event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach under any term or condition of the Debt Commitment Letter and (e) no event has occurred or circumstance exists which, with or without notice, lapse of time or both, would or would reasonably be expected to constitute or result in a failure by Buyer or any other party to the Debt Commitment Letter to satisfy, or any delay in satisfaction, of any condition or other contingency to the full funding of the Debt Financing under the Debt Commitment Letter. The Debt Commitment Letter (including the fee letter referred to therein) constitutes the entire and complete agreement between the parties thereto with respect to the financings contemplated thereby.  Except as expressly set forth in the Debt Commitment Letter as in effect on the date hereof, (a) there are no conditions precedent or other contingencies to the obligation of the Debt Financing Sources to fund the full amount of the Debt Financing to be funded on the Closing Date, in each case, on or prior to the Closing Date, and (b) there are no contractual contingencies or other provisions under any agreement or understanding relating to the transactions contemplated by this Agreement that would permit any Debt Financing Source to reduce the total amount of the Debt Financing or impose any additional conditions precedent to the availability of the Debt Financing. Buyer has fully paid or caused to be paid any and all commitment fees, if any, or other fees or deposits required by the Debt Commitment Letter to be paid as of the date of this Agreement and will pay in full any such amounts due on or prior to the Closing Date.  Buyer is unaware of any fact or occurrence existing on the date of this Agreement that would reasonably be expected to make any of the assumptions or any of the statements set forth in the Debt Commitment Letter inaccurate or that would reasonably be expected to cause the Debt Commitment Letter to be ineffective or the Debt Financing to be unavailable on or prior to the Closing Date.  Buyer has no reason to believe that any of the conditions to the availability to Buyer of the Debt Financing will not be satisfied on a timely basis or that the full amount of the Debt Financing will not be made

43

available to Buyer on a timely basis in order to consummate the transactions contemplated by this Agreement.

(c)    Buyer expressly acknowledges and agrees that (i) neither the availability, the terms nor the obtaining of the Debt Financing or any Alternative Financing, nor the completion of any issuance of securities contemplated by the Debt Financing or any Alternative Financing, is in any manner a condition to the Closing or the obligations of Buyer to consummate the transactions contemplated hereby, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Debt Financing or any Alternative Financing, or the completion of any such issuance and (ii) the failure, for any reason, of Buyer to have sufficient cash available at the Closing to satisfy its Funding Obligations in accordance with this Agreement or the failure to so pay its Funding Obligations in accordance with this Agreement, in each case, shall constitute a breach of this Agreement by Buyer.

Section 4.9    Solvency.  Immediately after giving effect to the transactions contemplated by this Agreement and the Ancillary Agreements (including the payment of the Purchase Price, and the payment of all related fees and expenses), (i) Buyer and its Affiliates will not have incurred debts beyond their ability to pay such debts as they mature or become due, (ii) the then present fair saleable value of the assets of Buyer and its Affiliates will exceed the amount that will be required to pay their existing debts (including the probable amount of all contingent liabilities) as such debts become absolute and matured, (iii) the assets of Buyer and its Affiliates at a fair valuation will exceed their debts (including the probable amount of all contingent liabilities) and (iv) Buyer and its Affiliates will not have unreasonably small capital to carry on their business as proposed to be conducted following the Closing.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby, in either case, with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Affiliates.

Section 4.10    Exclusivity of Representations and Warranties.

(a)    Except for the representations and warranties expressly set forth in this Article IV, neither Buyer nor any other Person on behalf of Buyer makes (and Buyer, on behalf of itself, its Subsidiaries, and their respective Affiliates and Representatives, hereby disclaims) any express or implied representation or warranty with respect to Buyer, its Subsidiaries or any of their respective businesses, operations, properties, assets, liabilities or otherwise in connection with this Agreement or the transactions contemplated hereby, including as to the accuracy or completeness of any information.

(b)    Except for the representations and warranties expressly set forth in Article III, Buyer acknowledges and agrees that (x) none of Sellers, their respective Affiliates and Representatives or any other Person on behalf of Sellers makes, or has made, any express or implied representation or warranty, at law or in equity, with respect to Sellers, the Business, any Transferred Asset or any Assumed Liability or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, including with respect to its business, operations, assets (including the Transferred Assets), liabilities (including the Assumed Liabilities), condition (financial or otherwise), prospects or otherwise in connection with this Agreement or the transactions contemplated by this Agreement,

44

including any representation or warranty as to value, merchantability, fitness for any particular purpose or for ordinary purposes, and Buyer and its Representatives are not relying on any written or oral statement, representation, warranty, guaranty or other information of Sellers or any Person except for those expressly set forth in <u>Article III</u> and (y) no person has been authorized by Sellers, their Affiliates or any other Person on behalf of Sellers to make any representation or warranty relating to the Business, any Transferred Asset or any Assumed Liability in connection with this Agreement, and if made, such representation or warranty shall not be relied upon by Buyer as having been authorized by such entity.  Without limiting the generality of the foregoing, Buyer acknowledges and agrees that neither Sellers, their Affiliates nor any other Person has made any representation or warranty (including as to completeness or accuracy) to Buyer with respect to, and neither Sellers, their Affiliates nor any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or their respective Representatives, or resulting from the omission of, any estimate, projection, prediction, data, financial information, memorandum, presentation or any other materials or information, including any materials or information made available to Buyer and/or its Representatives in connection with presentations by True Value Parent's management or information made available on any "data sites."  Buyer acknowledges that it has conducted, to its satisfaction, its own independent investigation of the condition (financial or otherwise), operations and business of Sellers and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and representations and warranties set forth in <u>Article III</u> and has not relied directly or indirectly on any materials or information made available to Buyer and/or its Representatives by or on behalf of Sellers.  Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

Section 5.1    <u>Debtors-in-Possession</u>.  No later than the date that is two (2) Business Days following the Execution Date, Sellers shall file a Chapter 11 petition with the Bankruptcy Court, thereby commencing the Chapter 11 Case.  From the Petition Date through the Closing, Sellers shall operate its business as debtor-in-possession pursuant to the Bankruptcy Code.

Section 5.2    <u>Sale Motion</u>.  Within two (2) Business Days of the Petition Date or as promptly as practicable thereafter, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order and the Sale Order (the "<u>Sale Motion</u>").  Sellers shall use their reasonable best efforts to obtain entry by the Bankruptcy Court of the (i) the Bidding Procedures Order within twenty-one (21) days after the date the Sale Motion is filed and (ii) the Sale Order within forty-five (45) days after the date the Sale Motion is filed (or, if such day is not a Business Day, the immediately succeeding Business Date).  In the event the entry of the Bidding Procedures Order shall be appealed, Sellers shall use reasonable best efforts to defend such appeal.

Section 5.3    <u>Sale Order</u>.  The Sale Order shall (a) be substantially in the form attached hereto as <u>Exhibit D</u>, with such changes as may be reasonably acceptable to Buyer and Sellers, and

(b) among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement and the Ancillary Agreements, (B) the sale of the Transferred Assets to Buyer on the terms and subject to the conditions set forth herein and free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), and (C) the performance by Sellers of their obligations under this Agreement and the Ancillary Agreements; (ii) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and the sale is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code; (iii) authorize Sellers to assume and assign to Buyer the Transferred Contracts, subject to Buyer's payment of the Cure Claims in accordance with <u>Section 2.5</u>; (iv) find that Buyer has provided adequate assurance of future performance (as that term is used in Section 365 of the Bankruptcy Code) in connection with the assumption and assignment of the Transferred Contracts; (v) find that Buyer shall not be deemed to assume or become responsible for any Liability that is not an Assumed Liability; and (vi) find that Buyer did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code.

Section 5.4    <u>Cooperation with Respect to Bankruptcy Court Approvals</u>.  Buyer shall take such actions as are reasonably requested by Sellers to assist in obtaining entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among other things: (a) demonstrating that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 5.5    <u>Bankruptcy Court Filings</u>.  Sellers shall consult with Buyer concerning the Sale Motion, the Bidding Procedures Order, the Sale Order and any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Buyer with proposed drafts of any material applications, pleadings, notices, proposed Orders and other documents to be filed by Sellers in the Chapter 11 Case that relate to this Agreement, the transactions contemplated hereby or Buyer no later than two (2) days prior (or as soon as practicable thereafter) to the making of any such filing or submission to the Bankruptcy Court.  If requested by Buyer, Sellers shall seek entry of appropriate orders from the Bankruptcy Court setting bar dates for the filing of Section 503(b)(9) Claims and Trade Admin Claims so that the amount of each such claim and the aggregate amount of all such claims can be promptly and accurately determined in the Bankruptcy Case.

## ARTICLE VI

## <u>COVENANTS</u>

Section 6.1    <u>Conduct of Business Prior to the Closing</u>.  From the date of this Agreement until the Closing Date or earlier termination of this Agreement:

(a)    except (1) as otherwise expressly permitted or required by this Agreement, (2) as expressly set forth in <u>Section 6.1</u> of the Disclosure Letter, (3) as required by the Bankruptcy Code or the Bankruptcy Rules as the result of Sellers being subject to the Chapter 11 Case, or otherwise required by Law or any Order, (4) for any limitations on operations or requirements

46

imposed by the Bankruptcy Court or the DIP Credit Agreement, or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing or earlier termination of this Agreement, Sellers shall conduct the Business in the Ordinary Course of Business in all material respects, shall use commercially reasonable efforts to maintain its current business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business, including (without limiting the generality of the foregoing) using commercially reasonable efforts to:

        (i)     preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Transferred Assets;

        (ii)    continue to collect accounts, notes and other receivables in a manner consistent with past practice, without discounting such receivables;

        (iii)   maintain the properties and assets included in the Transferred Assets in all material respects in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

        (iv)   continue in full force and effect without modification all insurance policies, except as required by applicable Law;

        (v)    preserve, maintain, defend and protect the Transferred Assets, including Sellers' customer relationships and Contracts between any Seller and its customers, from infringement, interference, or usurpation, which may include seeking entry of an order from the Bankruptcy Court on an expedited basis confirming the applicability of Sections 362(a), 365(e)(1), 365(f)(1), 365(f)(3) and 541(c) of the Bankruptcy Code to Sellers' contractual relationships with its customers and any attempt by Sellers' customers to terminate or breach those relationships, or any attempt by Sellers' competitors to cause Sellers' customers to terminate or breach those relationships;

        (vi)   maintain their books and records accurately and in accordance with past practice; and

        (vii)  comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Transferred Assets;

     (b)    except (1) as otherwise expressly permitted or required by this Agreement, (2) as expressly set forth in <u>Section 6.1</u> of the Disclosure Letter, (3) as required by the Bankruptcy Code or the Bankruptcy Rules as the result of Sellers being subject to the Chapter 11 Case, or otherwise required by Law or any Order, (4) for any limitations on operations or requirements imposed by the Bankruptcy Court or the DIP Credit Agreement, or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing or earlier termination of this Agreement, Sellers shall not:

(i)    sell, transfer, lease, sublease, encumber (other than pursuant to the DIP Order) or otherwise dispose of any Transferred Assets (other than Transferred IP, which is addressed in <u>Section 6.1(b)(ii)</u> hereof) other than immaterial dispositions thereof and Inventory sold or disposed of in the Ordinary Course of Business;

(ii)    sell, assign, exclusively license, dispose of, encumber (other than pursuant to the DIP Order), abandon or allow to lapse any material Transferred IP, other than (A) licenses granted in the Ordinary Course of Business, (B) expiration of Transferred IP in accordance with the applicable statutory term, or (C) abandoning or allowing to lapse Transferred IP that is no longer used or useful in any material respect in the Business, or is otherwise economically not practicable to maintain;

(iii)    acquire any corporation, partnership, limited liability company, other business organization or division thereof related to or affecting the Business or the Transferred Assets;

(iv)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence, except for any mergers or consolidations solely between or among Sellers and their Affiliates upon prior notice to Buyer;

(v)    declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities, other than (A) dividends and distributions by any Seller to any other Seller and (B) dividends or distributions made by any Subsidiary that is not wholly owned, directly or indirectly, by any Seller or by any joint venture of any Seller, in accordance with the requirements of the Organizational Documents of such Seller or such joint venture;

(vi)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business or the Transferred Assets;

(vii)    except with respect to any Employee Benefit Plan or arising out of, relating to or resulting from a Collective Bargaining Agreement, (1) reject, terminate (other than by expiration in accordance with its terms), or amend in any material respect any Transferred Contract or seek Bankruptcy Court approval to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Transferred Contract, including any Transferred Contracts with Sellers' customers;

(viii)    waive in any material respect any term of, or waive any material default under, or release, settle or compromise any material claim by or against or material liability or obligation owing to Sellers under, any Transferred Contract;

(ix)    fail to maintain in full force and effect existing insurance policies;

(x)    subject any of the Transferred Assets to any Encumbrance other than Permitted Pre-Closing Encumbrances;

48

(xi)    incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness, except for indebtedness under the DIP Credit Agreement;

(xii)    sell, lease, license, mortgage, sell and leaseback or otherwise subject to any Encumbrance, or otherwise dispose of, any material properties or assets or any material interests with respect to the Business other than (1) in all material respects in the Ordinary Course of Business; (2) pursuant to Contracts in existence on the date of this Agreement; (3) in an amount not to exceed $100,000 in the aggregate; (4) in transactions between or among Sellers and any of their respective Subsidiaries; (5) to secure indebtedness for borrowed money permitted to be incurred under this Section 6.1(b) or pursuant to any lease, sublease or other use or occupancy agreement or arrangement to which Seller or any of its Subsidiaries is party as lessor or sublessor; and (6) Transferred IP (which is addressed in this Section 6.1(b)).

(xiii)    in each case solely with respect to the Offer Employees and except as required by any Collective Bargaining Agreement or any Employee Benefit Plan, (1) make or grant any general or special wage or salary increase (other than standard increases in the Ordinary Course of Business), (2) increase in any material respect the level of benefits under any Employee Benefit Plan, (3) take any action with respect to the grant of any material severance or termination pay (other than pursuant to Employee Benefit Plans in effect on the date of this Agreement), (4) adopt, amend or terminate any material Employee Benefit Plan, other than in the Ordinary Course of Business or as required by Law, and (5) enter into any material employment, consulting or similar agreement or amend any existing material employment agreement; provided, that the foregoing shall not restrict any Seller from entering into or making available, to newly hired Business Employees or to Business Employees in the context of promotions based on job performance or workplace requirements, in each case, in the Ordinary Course of Business, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(xiv)    make (outside the Ordinary Course of Business), change or rescind any material election relating to material Taxes, change any method of Tax accounting in respect of material Taxes, file any materially amended Tax Return in respect of material Taxes, or settle or compromise any Action, investigation, audit or controversy relating to a material amount of Taxes;

(xv)    materially amend or terminate any Contract set forth on Section 2.1(f)(i) of the Disclosure Letter or any Transferred Lease set forth on Section 2.1(b) of the Disclosure Letter;

(xvi)    accelerate the collection of any accounts receivable or other payment (including by offering or promoting discounts or rebates outside of the Ordinary Course of Business); or

(xvii)    agree or commit to any of the foregoing.

49

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers or the Business prior to the Closing and (ii) prior to the Closing, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and its operations.

Section 6.2    <u>Covenants Regarding Information</u>.

(a)    Subject to the Bidding Procedures Order and applicable Law, from the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable request, Sellers shall afford Buyer and its Representatives reasonable access to the properties, offices, plants and other facilities, books and records (including Tax books and records) of Sellers and the Business, and shall furnish Buyer and its Representatives with such financial, operating and other data and information, and access to all the officers, employees, accountants and other Representatives of Sellers as Buyer may reasonably request in connection with the transactions contemplated by this Agreement.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to provide access to or disclose any information to Buyer or its Representatives if (i) such access or disclosure is prohibited pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) such access or disclosure would violate applicable Law, or (iii) such access or disclosure would adversely affect any attorney-client or other legal privilege or contravene any applicable Laws (the "<u>Disclosure Limitations</u>"); <u>provided</u> that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Sellers after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.

(b)    The information provided pursuant to this <u>Section 6.2</u> prior to Closing will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein.  Sellers do not make any representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Buyer may not rely on the accuracy of any such information.

(c)    From and after the Closing, until the closing of the Chapter 11 Case, Buyer will provide Sellers and their Representatives, at Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of Buyer or the Business, to the books and records (including Tax books and records), including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Chapter 11 Case and the wind down of Sellers' estate (including reconciliation of claims and preparation of Tax Returns or other Tax proceedings and the functions of any trusts established under a Chapter 11 plan of Sellers or any other successors of Sellers), (iii) complying with

applicable Laws or (iv) other reasonable business purposes; provided that Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of Buyer, conflict with the Disclosure Limitations; provided, further that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Buyer after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.  Unless otherwise consented to in writing by True Value Parent, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to True Value Parent such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.

Section 6.3    Employee Matters.

(a)    Prior to Closing, Buyer shall provide to Sellers a list of Business Employees (including each Qualified Leave Recipient to the extent applicable) to which Buyer, in its sole discretion, intends to extend a written offer of employment (each, an "Offer Employee") that, if accepted by a Business Employee, shall become effective immediately after the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment; provided that such Qualified Leave Recipient returns to active status within six (6) months following the Closing Date (or such later date as may be required by applicable Law).  Buyer shall make the written offer to Offer Employees at least ten (10) business days prior to the Closing.  The terms and conditions of such offers of employment shall comply with all applicable Laws and the terms of this Section 6.3.  Each Offer Employee who receives and accepts (or is deemed to have accepted) Buyer's (or an Affiliate of Buyer's) offer of employment and who commences employment with Buyer or an Affiliate thereof on or following the Closing shall be a "Transferred Employee."  Sellers shall terminate, or shall cause to be terminated, on or as soon as practicable prior to the Closing, the employment of all Transferred Employees.  Sellers shall reasonably cooperate with Buyer in effecting the Transferred Employees' transfer of employment from Sellers to Buyer or an Affiliate of Buyer as contemplated hereby.  Buyer shall notify Sellers in a reasonable timeframe with respect to whether each offer of employment to an Offer Employee has been accepted or rejected.  Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Offer Employees will accept an offer of employment or will continue in employment with Buyer following the Closing for any period of time.  Sellers and Buyer intend that Transferred Employees will have continuous and uninterrupted employment immediately before and immediately after the Closing.  In addition, Buyer shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits to any Business Employee on account of any termination of such Business Employee's employment prior to or at the Closing, and such payments, rights, and/or benefits (if any) shall remain obligations of Sellers.

(b)    Without limiting Section 6.3(i), Sellers shall be solely responsible for complying with the WARN Act and any and all obligations under applicable Laws requiring notice of plant closing, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to the Business Employees as a result of any action by Sellers on or prior to Closing, or following the Closing with respect to any Business Employee

who does not become a Transferred Employee. Following the Closing, Buyer shall be solely responsible for complying with the WARN Act and any and all obligations under applicable Laws requiring notice of plant closing, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Transferred Employees as a result of any action by Buyer following the Closing.

(c)    The Parties shall, and shall cause their respective Affiliates to, mutually cooperate with and provide reasonable assistance to the other in (i) undertaking all reasonably necessary or legally required provision of information to, or bargaining, consultations, discussions or negotiations with, any Business Employees or any Labor Organization that represents Business Employees affected by the transactions contemplated by this Agreement and (ii) maintaining the employment by Sellers or their Affiliates of those Business Employees who do not become Transferred Employees following the Closing Date and who the Parties agree will provide transition services for the benefit of Buyer or an Affiliate of Buyer pursuant to the Transition Services Agreement (such employees, the "TSA Employees"); provided, that Buyer timely compensates Sellers for any wages, compensation, fees, expenses and other employee Liabilities incurred in connection with the continued employment by Sellers or their Affiliates of the TSA Employees during the period in which such employees provide transition services for the benefit of the Buyer or its Affiliates.

(d)    Buyer shall, and shall cause its Affiliates to, provide each Transferred Employee with credit for such Transferred Employee's service with Sellers or their Affiliates or predecessors prior to the Closing for all purposes, including for purposes of eligibility and determination of level of benefits (including, for purposes of vacation and statutory benefits required by applicable Law but excluding for purposes of equity compensation and benefit accruals under any defined benefit pension plan, any defined contribution retirement plan, or retiree medical plan), under any benefit plan sponsored or maintained by Buyer or any of their Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "Buyer Plan") or as otherwise required by applicable Law or to prevent Termination Pay from becoming payable under applicable Law; provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits. With respect to each Buyer Plan that is a health or welfare plan, Buyer and its Affiliates shall use commercially reasonable efforts to (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health and (ii) credit each such Transferred Employee with all deductible payments, co-payments and co-insurance paid by such Transferred Employee under any Employee Benefit Plan prior to the Closing during the year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum for such year.

(e)    Effective as of the Closing Date, the Transferred Employees shall cease active participation in the True Value Company Savings & Compensation Deferral Plan (the "Seller 401(k) Plan"). Buyer shall, or shall cause one of its Affiliates to, designate a tax-qualified defined contribution retirement plan that will cover Transferred Employees as of the Closing that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the

52

Code (the "Buyer 401(k) Plan").  Buyer shall cause the Buyer 401(k) Plan to accept from each Seller 401(k) Plan the "direct rollover" of the account balance of each Transferred Employee who participated in the Seller 401(k) Plan prior to the Closing Date and who elects such direct rollover in accordance with the terms of the Seller 401(k) Plan and the Code.

(f)     For so long as the Sellers maintain a group health plan, Sellers shall be solely responsible for any and all obligations arising under COBRA for all (i) Business Employees and their respective spouses and dependents and (ii) all "M&A qualified beneficiaries" as defined in Treasury Regulation Section 54.4980B-9.

(g)     Without limitation of Section 10.9, nothing express or implied in this Section 6.3 or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Employee Benefit Plan, Buyer Plan or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by Buyer, Sellers or their respective Affiliates, as applicable, or (iii) obligate Buyer, Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

(h)     Prior to the Closing, any written or material oral communications proposed to be delivered by Buyer or an Affiliate of Buyer to any Business Employee regarding such employees' level of (or rights with respect to) continued employment or benefits or compensation at or after Closing shall be subject to the prior written approval of True Value Parent, which shall not be unreasonably withheld, conditioned or delayed; provided that in all cases, True Value Parent shall be given no less than three (3) Business Days to review and comment on any such communications.

(i)     The Parties agree to cooperate in good faith to comply in all material respects with preparing and delivering any notices required or potentially required pursuant to the WARN Act in connection with the transactions contemplated by this Agreement.

(j)     To the extent any Transferred Employees are foreign nationals working in the United States in non-immigrant status or for whom there are pending or approved I-140 immigrant petitions as of the Closing Date (collectively, the "Visa Employees"), Buyer and its Affiliates, as applicable, shall employ such Visa Employees under terms and conditions such that Buyer or its Affiliate, as applicable, qualify as a "successor employer" under applicable United States immigration laws effective as of the Closing Date, including, but not limited to, 8 U.S.C. section 1184(c)(10).  As of the Closing, Buyer or its Affiliate, as applicable, agrees to assume all immigration-related Liabilities and responsibilities under applicable United States immigration Laws with respect to such Visa Employees incurred after the Closing.

Section 6.4     Consents and Filings; Further Assurances.

(a)     Subject to the terms and conditions of this Agreement, each of the Parties shall, cooperate with each other Party to, promptly (i) take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law or

otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement and the Ancillary Agreements, including taking, or causing to be taken, all actions, and doing, or causing to be done, all things necessary to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from any third-party Person.  Without limiting the generality of the previous sentence, the Parties shall (i) cooperate with each other party hereto to take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, appropriate or desirable to obtain from Governmental Authorities all consents, approvals, clearances, expiration or termination of waiting periods, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) as promptly as practicable, make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act or any other applicable Law, including any other Antitrust Law; (iii) take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to comply at the earliest practicable date with any request under the HSR Act or any other applicable Law, including any other Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Authority in respect of such filings (collectively, an "Antitrust Authority"); (iv) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Antitrust Authorities under any Antitrust Law with respect to any such filing; and (v) take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable.  This Section 6.4(a) does not apply with respect to (x) Taxes or (y) Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(b)    In furtherance of the foregoing Section 6.4(a), each of the Parties shall promptly notify the other Parties of, and if in writing, furnish the other Parties with copies of (or, in the case of oral communications, advise the others of the contents of) any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority.  No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties and their respective counsel the opportunity to attend and participate at such meeting.  The Parties will coordinate and reasonably cooperate with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination or expiration of any applicable waiting periods, including under the HSR Act, subject to applicable Law.  Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.  This Section 6.4(b) does not

apply with respect to (x) Taxes or (y) Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(c)     From time to time, whether at or following the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide Buyer and Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.

(d)     Subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement, take, or cause to be taken, all commercially reasonable actions, and do, or cause to be done, all commercially reasonable things necessary, proper or advisable under applicable Laws to obtain the transfer or reissuance to Buyer of all Environmental Permits necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall take, or cause to be taken, all commercially reasonable actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to (i) respond promptly to any requests for additional information made by such agencies, and (ii) participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits.  Each Party will bear its costs of the preparation and review of any such filing.  Sellers and Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement in connection with any filings to transfer the Environmental Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.  This Section 6.4(d) does not apply with respect to Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(e)     Buyer agrees to use reasonable best efforts to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable.  Notwithstanding anything else in this Section 6.4, nothing in this Agreement requires Buyer to sell, divest, license, hold separate, or dispose of such assets or businesses of Buyer (or its Subsidiaries or other Affiliates) or the Business, or otherwise take or commit to take actions that limit Buyer's or its Subsidiaries' or Affiliates' freedom of action with respect to, or their ability to retain, any of the businesses, product lines, or assets of Buyer (or its Subsidiaries or other Affiliates) or the Business, or to defend any litigation or administrative proceeding initiated or made by a Governmental Authority under applicable Law.  This Section 6.4(e) does not apply with respect to Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

Section 6.5     Wrong Pockets.

(a)     After the Closing: (i) if Sellers or any of their Affiliates receive any amount that is a Transferred Asset or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount

to Buyer in accordance with this Agreement and (ii) if Buyer or any of its Affiliates receive any amount that is an Excluded Asset or is otherwise properly due and owing to Sellers or any of their Affiliates in accordance with the terms of this Agreement, Buyer promptly shall remit, or shall cause to be remitted, such amount to Sellers in accordance with this Agreement.

(b)     In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to Sellers or any of their Affiliates, Sellers shall, and shall cause their controlled Affiliates to, convey, assign or transfer promptly such Transferred Asset to Buyer or its designees in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Transferred Asset to Buyer or its designees in accordance with this Agreement or (ii) any Excluded Asset has been conveyed to or is received by Buyer, then, without any consideration payable to Buyer or any of its Affiliates, Buyer shall convey, assign or transfer promptly such Excluded Asset to Sellers in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Excluded Asset to Sellers or its designees in accordance with this Agreement.

Section 6.6     <u>Public Announcements</u>.  From the date hereof through the Closing Date, neither Buyer, on the one hand, nor Sellers, on the other hand, shall issue any public report, statement, press release or otherwise make any public statement regarding this Agreement or the transactions contemplated hereby, without the prior written consent of Buyer and True Value Parent, unless otherwise required by applicable Law, to obtain approval by the Bankruptcy Court of the transactions contemplated under this Agreement (including pursuant to the Bidding Procedures Order or the Sale Order), or by order of the Bankruptcy Court, in which case such Party shall coordinate and consult with the other Party to the extent not prohibited by applicable Law with respect to the timing, basis, scope and content before issuing any such report, statement or press release.

Section 6.7     <u>Communications with Customers and Suppliers</u>.  Prior to the Closing, Buyer shall not, and shall cause its Affiliates and instruct its Representatives not to, contact, or engage in any discussions or otherwise communicate with, Sellers or their employees, suppliers, vendors, licensors, licensees and other Persons with which Sellers have commercial dealings without obtaining the prior written consent of Sellers (other than any such communication in the ordinary course of business of Buyer or its Affiliates without reference to or any purpose relating to the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.

Section 6.8     <u>Financing</u>.

(a)     Buyer shall, and shall cause its Affiliates and instruct its Representatives to, use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate the Debt Financing, as the same may be amended in compliance with <u>Section 6.8(b)</u>, on the terms and subject only to the conditions set forth in the Debt Commitment Letter or any Alternative Financing (as defined below) (including any "flex" provisions applicable to the Debt Financing), including using (and causing its Affiliates to use), their respective reasonable best efforts to: (i) comply with and maintain in full force and

56

effect the Debt Commitment Letter in accordance with the terms and subject to the conditions thereof, (ii) negotiate, enter into and deliver (and cause its Affiliates to negotiate, enter into and deliver) definitive agreements with respect to the Debt Financing on the terms and conditions set forth in the Debt Commitment Letter (including any "flex" provisions applicable to the Debt Financing), which agreements shall be in effect as promptly as practicable after the date hereof, but in no event later than the Closing (and otherwise keep True Value Parent reasonably informed of the status of its efforts to arrange the Debt Financing), (iii) satisfy, on a timely basis, all conditions to the availability of the Debt Financing to the extent within Buyer's or its Affiliates' control and assist in the satisfaction of all other conditions to the Debt Financing and the definitive agreements entered into with respect to the Debt Commitment Letter, (iv) consummate and cause the Debt Financing Sources to fund the Debt Financing in an amount necessary to satisfy the Funding Obligations at or prior to the Closing and (v) enforce their rights under the Debt Commitment Letter and the definitive agreements related to the Debt Financing.

(b)      Neither Buyer nor its Affiliates shall agree to or permit any amendments, supplements, replacements or other modifications to, obtain any replacement of, or grant any waivers of, any condition, remedy or other provision under the Debt Financing (other than to effect any "flex" provisions set forth in the Debt Commitment Letter) without the prior written consent of True Value Parent if such amendments, supplements, replacements, waivers or modifications would or would reasonably be expected to (i) reduce the aggregate amount of the Debt Financing or the net cash proceeds available from the Debt Financing (including, in each case, by changing the amount of fees or other amounts to be paid (including original issue discount) with respect to the Debt Financing) below an amount necessary to satisfy the Funding Obligations, (ii) impose new or additional conditions or contingencies to the Debt Financing or otherwise expand, amend, waive or modify any of the conditions or contingencies to the Debt Financing or (iii) otherwise expand, amend, waive or modify any provisions of, or remedies under, the Debt Commitment Letter in a manner adverse to Sellers or that otherwise in any such case would or would reasonably be expected to (x) prevent, delay or make less likely the funding of the Debt Financing (or the satisfaction of the conditions to the Debt Financing) at the Closing or impair the ability of Buyer to consummate the transactions contemplated by this Agreement, (y) adversely impact the ability of the Buyer or any of its Affiliates to enforce their respective rights against the Debt Financing Sources or any other parties to the Debt Commitment Letter or the definitive agreements with respect thereto or (z) adversely affect the ability of Buyer to timely obtain the Debt Financing or consummate the transactions contemplated hereby; provided, that subject to compliance with the other provisions of this Section 6.8, Buyer may amend, supplement or otherwise modify the Debt Commitment Letter to add lenders, lead arrangers, syndication agents or other Debt Financing Sources that have not executed the Debt Commitment Letter as of the date hereof (which will not change or waive the terms thereof other than to alter the commitment percentages of the parties thereto in accordance with the parameters set forth in the Debt Commitment Letter as of the date hereof). Buyer shall not permit, release or consent to the withdrawal, termination, repudiation or rescission of the Debt Commitment Letter or any definitive agreement with respect to the Debt Financing and shall not release or consent to the termination of the obligations of any Debt Financing Source under the Debt Financing below an amount necessary to satisfy the Funding Obligations, in each case, without the prior written consent of True Value Parent. For purposes of this Agreement, references to "Debt Financing" shall include the financing contemplated by the Debt Commitment Letter, as hereafter amended, supplemented, replaced or modified, to the extent

such amendment, supplementation, replacement or modification is permitted by this <u>Section 6.8(b)</u>, and references to "Debt Commitment Letter," "Debt Financing Sources" or "Debt Financing" shall include such documents, as hereafter amended, modified, supplemented or replaced (or commitments or financing sources, as applicable), to the extent permitted by this <u>Section 6.8(b)</u>.  In the event Buyer enters into an amendment, supplement, replacement or modification permitted by this <u>Section 6.8(b)</u>, it shall, prior to the execution and delivery thereof, provide a copy of such amendment, supplement, replacement or modification to True Value Parent for its review and shall, simultaneously with the execution and delivery thereof, provide fully executed copies of such amendment, supplement, replacement or modification to True Value Parent (and, in the case of any amendment, supplement, replacement or modification to any fee letter(s), with such fee letter(s) permitted to be redacted in the same manner contemplated by <u>Section 4.8</u>).

(c)    In the event that (i) all or any portion of the Debt Financing becomes or could reasonably be expected to become unavailable in the manner or from the sources contemplated by the Debt Commitment Letter (including any "flex" provisions applicable thereto), (ii) Buyer becomes aware of any event or circumstance that could reasonably be expected to make the full amounts or any portion of the Debt Financing unavailable on the terms and conditions contemplated in the Debt Commitment Letter or (iii) the Debt Commitment Letter or any definitive agreement with respect to the Debt Financing shall expire or be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, Buyer shall, and shall cause its respective Affiliates to, within two (2) Business Days after the occurrence of such event, notify True Value Parent in writing thereof and promptly after the occurrence of such event, (A) use their respective reasonable best efforts to arrange and obtain alternative financing from the same or alternative financial institutions in an amount sufficient to enable Buyer to consummate the transactions contemplated by this Agreement in accordance with the terms of this Agreement, that does not impose any conditions or contingencies that would be reasonably expected to prevent or delay the Closing or contain any terms that would reasonably be expected to prevent, delay or impair the ability of Buyer to obtain the Debt Financing or consummate the transactions contemplated hereby, as compared to the conditions and other terms set forth in the Debt Commitment Letter as of the date hereof (as amended in accordance with <u>Section 6.8(b)</u>), taking into account any "flex" provisions thereof, as promptly as practicable following the occurrence of such event (the "<u>Alternative Financing</u>") and (B) obtain and deliver a debt commitment letter to Sellers with respect to such Alternative Financing, including true, correct and complete copies of any related executed fee letters, engagement letters and other agreements (provided that such fee letters may be redacted in the same manner as permitted by <u>Section 4.8</u>) (collectively, including all exhibits, schedules, amendments, supplements, modifications and annexes thereto, a "<u>New Debt Commitment Letter</u>").  For purposes of this Agreement, references to "Debt Financing" shall include the financing contemplated by any Alternative Financing and New Debt Commitment Letter to the extent permitted by this <u>Section 6.8(c)</u>, and references to "Debt Commitment Letter," "Debt Financing Sources," or "Debt Financing" shall include such documents (or commitments or financing sources, as applicable) in connection with any Alternative Financing and New Debt Commitment Letter to the extent permitted by this <u>Section 6.8(c)</u>.

(d)    Buyer expressly acknowledges and agrees that (i) neither the availability, the terms nor the obtaining of the Debt Financing or any Alternative Financing, nor the completion

of any issuance of securities contemplated by the Debt Financing or any Alternative Financing, is in any manner a condition to the Closing or the obligations of Buyer to consummate the transactions contemplated hereby, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Debt Financing or any Alternative Financing, or the completion of any such issuance and (ii) the failure, for any reason, of Buyer to have sufficient cash available at the Closing to satisfy its Funding Obligations in accordance with this Agreement or the failure to so pay its Funding Obligations in accordance with this Agreement, in each case, shall constitute a breach of this Agreement by Buyer.

(e)    Buyer shall (i) furnish True Value Parent with drafts (prior to execution) and complete, correct and executed copies of each amendment, supplement, replacement, waiver or other modification promptly upon their execution of the Debt Commitment Letter (but, in the case of any fee letter or amendment thereto, subject to the redaction of such fee letter in a manner consistent with <u>Section 4.8</u>), (ii) give Sellers prompt written notice of any (A) breach or default or any event that, with or without notice, lapse of time or both, would (or would reasonably be expected to) give rise to any default or breach by any party to the Debt Commitment Letter of which Buyer becomes aware, including the receipt of any written notice or other written communication from any Debt Financing Source with respect to any breach or default (or alleged breach or default) by any party to the Debt Commitment Letter, (B) material dispute or disagreement between or among any parties to the Debt Commitment Letter or the definitive documents relating to the Debt Financing, (C) withdrawal, repudiation or termination or threatened withdrawal, repudiation or termination thereof of which the Buyer becomes aware or (D) incurable event or circumstance that makes a condition precedent relating to the Debt Financing unable to be satisfied by any party or, in each case, any written notice or other communication with respect to any of the foregoing, (iii) notify Sellers promptly (and in any event within one (1) Business Day) if for any reason Buyer no longer believes in good faith that it will be able to obtain all or any portion of the Debt Financing contemplated by the Debt Commitment Letter on the terms and/or from the sources described therein and (iv) otherwise keep Sellers reasonably and promptly informed of the status of its efforts to arrange and consummate the Debt Financing (including any Alternative Financing).   As soon as reasonably practicable, but in any event within three (3) Business Days following the date True Value Parent delivers to Buyer a written request, Buyer shall provide any information reasonably requested by True Value Parent in writing relating to any circumstance referred to in the immediately preceding sentence.

Section 6.9    <u>Sellers' Cooperation with Buyer's Efforts under Debt Financing</u>.

(a)    Prior to the Closing Date, Sellers shall use commercially reasonable efforts to (and shall cause their respective Representatives to use commercially reasonable efforts to), at the sole cost and expense of Buyer, reasonably cooperate with and reasonably assist Buyer solely in connection with the arrangement, syndication and consummation of the Debt Financing, including using commercially reasonable efforts to: (i) cause appropriate senior officers of Sellers to participate in a reasonable number of meetings and presentations (or other sessions with the Debt Financing Sources) reasonably required in connection with the Debt Financing, in each case, at mutually agreed times, (ii) to the extent reasonably available to Sellers, provide Buyer with financial statements and historical financial information as it pertains to Sellers as reasonably

necessary for Buyer to prepare the pro forma financial statements, in each case solely as required by paragraph 5(a) of Annex B to the Debt Commitment Letter (all such statements and information referred to in this clause (ii), the "Required Information"); (iii) solely with respect to Sellers, facilitate the granting of a security interest (and perfection thereof) in collateral, guarantees or mortgages as may reasonably be requested by Buyer with the effectiveness thereof to be conditioned upon Closing; (iv) ensure that the appropriate officers of Sellers execute prior to the Closing a customary "authorization" letter in connection with bank information memoranda authorizing the distribution of information to prospective lenders; and (v) furnish no later than four (4) Business Days prior to the Closing Date all reasonably requested documentation and other information required by a Governmental Authority in order to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act of 2001, but in each case, solely as relating to Sellers and solely to the extent reasonably requested in writing by Buyer at least nine (9) Business Days prior to the Closing Date.

(b)     Sellers hereby consent to the reasonable use of their logos, names, and trademarks solely in connection with the arrangement and syndication of the Debt Financing; provided, however, that such logos, names and trademarks are used solely in a manner that is not intended to or reasonably likely to harm or disparage Sellers or their reputation or goodwill or any of their respective products, services, offerings or intellectual property rights.  Sellers shall use commercially reasonable efforts to promptly supplement the Required Information and all other information provided pursuant to Section 6.9(a) to the extent that any such Required Information or other information, to the Knowledge of Sellers, when taken as a whole, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements made in such Required Information or other information, in light of the circumstances under which they were made, not materially misleading.  Such cooperation and assistance contemplated by Section 6.9(a) will only be required during regular business hours, upon reasonable advance notice and in a manner as would not be unreasonably disruptive to the business or operations of Sellers, as applicable, and will only include such matters that would customarily be done in connection with the arrangement and syndication of credit facilities of the same nature as the Debt Financing.  Additionally, such cooperation and assistance contemplated by Section 6.9(a) shall not (A) require any action that would (or would reasonably be expected to): (i) cause any representation or warranty in this Agreement to be breached or (ii) cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement, (B) require Sellers or their respective Representatives to (i) other than with respect to the authorization letter contemplated by Section 6.9(a), execute, deliver, enter into, approve or perform any agreement, commitment, document or instrument, or modification of any agreement, commitment, document or instrument or incur any other actual or potential liability or obligation relating to the Debt Financing, (ii) deliver or cause the delivery of any legal opinions or reliance letters or any certificate as to solvency or any other certificate in connection with the Debt Financing (excluding the customary authorization letter contemplated by Section 6.9(a) (provided that such customary authorization letter (or the bank information memoranda in which such letter is included) shall include language that exculpates Sellers and their respective Representatives and Affiliates from any liability in connection with the unauthorized use by the recipients thereof of the information set forth in any such bank confidential information memoranda or similar memoranda or report distributed in connection therewith)), (iii) adopt any resolutions, execute any consents or otherwise take any corporate or similar action or deliver any certificate, in each case in connection to the Debt Financing or the incurrence of

indebtedness thereby or (iv) pay any commitment or other similar fee, incur or reimburse any costs or expenses or incur any liability or obligation of any kind or give any indemnities in connection with the Debt Financing, (C) require Sellers or their respective Affiliates and Representatives to deliver any certificate or take any action pursuant to <u>Section 6.9(a)</u> if doing so could reasonably be expected to result in liability to any Seller or any Affiliate or Representative of any Seller, (D) require Sellers to provide, or cause to be provided, any information the disclosure of which is prohibited or restricted under applicable Law or any binding agreement with a third party or is legally privileged or consists of attorney work product or could reasonably be expected to result in the loss of any attorney-client privilege, (E) require Sellers to take any action that will conflict with or violate its Organizational Documents or any Laws or result in a violation or breach of, or default under, any agreements to which any Seller is a party and/or any Laws, (F) unreasonably interfere with the ongoing operations of Sellers or (G) prepare or deliver any financial statements or other financial data other than the Required Information; it being understood that under no circumstances shall Sellers be required to provide pro forma financial information, projections or other pro forma adjustments.  Neither Sellers nor any of their respective Affiliates or Subsidiaries shall have any liability to Buyer in respect of any financial statements, other financial information or data or other information provided pursuant to this <u>Section 6.9</u>.  All non-public or other confidential information provided by Buyer pursuant to this <u>Section 6.9</u> shall be kept confidential in accordance with the Confidentiality Agreement.

(c)    Buyer shall be responsible for all fees and expenses related to the Debt Financing contemplated hereby.  Accordingly, notwithstanding anything to the contrary in <u>Section 10.3</u>, Buyer shall promptly reimburse Sellers for all reasonable and documented out-of-pocket costs and expenses (including attorneys' fees) incurred by Sellers in connection with their cooperation pursuant to this <u>Section 6.9</u> or otherwise in connection with the Debt Financing.  Buyer shall indemnify and hold harmless Sellers and each of their respective Representatives from and against any and all losses, damages, claims, penalties, costs and expenses suffered or incurred by any of them in connection with such cooperation and assistance with respect to the Debt Financing or the provision of any information utilized in connection therewith, except to the extent such liabilities, losses, damages, claims or obligations arose out of or resulted from the gross negligence, willful misconduct or fraud of Sellers, as determined in a final, non-appealable judgment of a court of competent jurisdiction.  Notwithstanding anything herein to the contrary, the condition set forth in <u>Section 8.3(a)(i)</u>, as it applies in respect of Sellers' obligations under this <u>Section 6.9</u>, shall be deemed satisfied unless Sellers have materially breached their obligations under this <u>Section 6.9</u> and such breach directly resulted in Buyer not being able to obtain the Debt Financing contemplated by the Debt Commitment Letter.

(d)    Buyer acknowledges and agrees that, except as set forth in <u>Section 6.9(a)</u> above, none of Sellers nor their respective Affiliates or Representatives will have any responsibility for any financing that Buyer may raise in connection with the transactions contemplated hereby.  Buyer shall ensure that any offering memorandum, bankers' book or other materials prepared by or on behalf of Buyer or its Affiliates or financing sources, in connection with Buyer's financing activities related to the transactions contemplated hereby (collectively, "<u>Offering Materials</u>"), which include any information provided by or on behalf of Sellers or their respective Affiliates or Representatives will include a conspicuous disclaimer to the effect that none of Sellers nor their respective Affiliates or Representatives will have any responsibility for

61

the content of such Offering Materials and disclaim all responsibility therefor and shall further include a disclaimer with respect to Sellers and their respective Affiliates and Representatives in any oral disclosure with respect to such financing, in each case, including any liability in connection with the unauthorized use by the recipients thereof of the information set forth in such document or oral disclosure.

Section 6.10    <u>Transition Services Agreement</u>.  As promptly as practicable following the date of this Agreement, the Parties shall in good faith cooperate, negotiate, prepare and finalize the Transition Services Agreement, substantially on the terms set forth in the Transition Services Agreement Term Sheet attached hereto as <u>Exhibit H</u> and otherwise in form and substance reasonably acceptable to Buyer and Sellers.  Without limiting the generality of the foregoing, such reasonable cooperation shall include Sellers, during normal business hours and upon at least twenty hour (24) hours' prior notice from Buyer to Sellers, (i) providing reasonable access to information and data in the possession of Sellers related to the transition services that Buyer has identified as needing and (ii) making appropriate, knowledgeable personnel of Sellers or their Affiliates reasonably available to participate in meetings and other discussions, in each case, to the extent any of the foregoing is reasonably requested by the Buyer.  Notwithstanding the foregoing, as part of the consideration of Buyer entering into this Agreement, if Sellers and Buyer do not agree to a Transition Services Agreement to be executed by Sellers and Buyer as of the Closing, the terms and conditions of the Transition Services Agreement Term Sheet shall be effective as of the Closing as if they were the Transition Services Agreement and shall be legally binding upon both Sellers and Buyer.  However, the Parties will continue in accordance with this <u>Section 6.10</u> to finalize and execute the Transition Services Agreement as promptly as possible following the Closing.

## ARTICLE VII

## TAX MATTERS

Section 7.1    <u>Transfer Taxes</u>.    The Sale Order shall provide that the transactions contemplated by this Agreement and the Ancillary Agreements are and shall be exempt from any and all property transfer, stock transfer, real estate transfer, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable solely as a result of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement ("<u>Transfer Taxes</u>") to the extent permitted pursuant to Section 1146(a) of the Bankruptcy Code.

Section 7.2    <u>Tax Cooperation</u>.    Buyer and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, the filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Any reasonable expenses incurred in furnishing such information or assistance pursuant to this <u>Section 7.2</u> shall be borne by the Party requesting it.

# ARTICLE VIII

# CONDITIONS TO CLOSING

Section 8.1    <u>General Conditions</u>.  The respective obligations of Buyer and Sellers to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (provided that such waiver shall only be effective as to the obligations of such Party):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "<u>Legal Restraint</u>").

(b)    Any waiting period (and any extension thereof) under the HSR Act or any other Antitrust Law applicable to the transactions contemplated by this Agreement shall have expired or shall have been terminated or the necessary clearance thereunder shall have been received.

(c)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed or modified in a manner materially adverse to Sellers absent consent of Sellers or to the Buyer absent consent of Buyer.

Section 8.2    <u>Conditions to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by True Value Parent in its sole discretion:

(a)    The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b)    Buyer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)    Sellers shall have received the documents listed in <u>Section 2.8(c)</u>.

Section 8.3    <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a)    Representations and Warranties.

(i)    The representations and warranties of Sellers contained in this Agreement, other than the Fundamental Representations of Sellers, shall be true and correct as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), except where the failure of such representations and warranties to be true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers set forth therein) would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(ii)    The Fundamental Representations of Sellers contained in this Agreement shall be true and correct in all but *de minimis* respects (other than those Fundamental Representations of Sellers that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b)    Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them at or prior to the Closing.

(c)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(d)    Buyer shall have received the documents listed in Section 2.8(b).

## ARTICLE IX

## TERMINATION

Section 9.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of Buyer and True Value Parent;

(b)    by either True Value Parent or Buyer, if:

(i)    a Legal Restraint is in effect that has become final and nonappealable; provided that no Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such Legal Restraint may terminate this Agreement pursuant to this Section 9.1(b)(i); or

(ii)    Sellers enter into a definitive agreement with respect to or consummate an Alternative Transaction, including if Buyer is not the successful bidder at

the Auction (unless such Alternative Transaction is a "back-up bid" in the event the Closing does not occur due to the breach by Buyer of any of its obligations under this Agreement).

(c)      by Buyer, if:

(i)      at any time, if Sellers shall have breached or violated any of their respective representations, warranties or covenants set forth in this Agreement or in any certificate delivered by Sellers in connection herewith in a manner that would prevent the satisfaction of the conditions to Closing set forth in Section 8.3(a) or Section 8.3(a)(i), and (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in Section 2.8, in which case such two (2) Business Day period shall apply) such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by Buyer to Sellers; provided that Buyer shall not be entitled to terminate the Agreement pursuant to this Section 9.1(c)(i) if the failure of the Closing to be consummated by such date is caused by Buyer's breach of any of its obligations under this Agreement;

(ii)      any of the conditions set forth in Section 8.1 or Section 8.3 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by January 13, 2025 (the "Outside Date"), unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; provided, however, that if the sole reason that the transactions contemplated hereby to occur at the Closing have not been consummated on or before the Outside Date is that the required approval from any Governmental Authority, the consent of which is required as a condition to the consummation of the transactions contemplated hereby, has not been obtained, then the Outside Date shall be extended to January 27, 2025;

(iii)      the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; or

(iv)      Sellers withdraw or seek authority to withdraw the Sale Motion.

(d)      by True Value Parent:

(i)      at any time, if (x) Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement or in any certificate delivered by Sellers in connection herewith in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in Section 8.2(a) or Section 8.2(b), or (y) Buyer shall have materially breached the Bidding Procedures Order or the Sale Order, and in each case (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in Section 2.8, in which case such two (2) Business Day period shall apply), such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by True Value Parent to Buyer, provided that True Value Parent shall not be entitled to terminate the Agreement pursuant to this Section 9.1(d)(i) if the failure of the Closing to

65

be consummated by such date is caused by any Seller's breach of any of its obligations under this Agreement; or

> (ii)    if the Board of Directors of True Value Parent determines in the exercise of its sole authority that proceeding with the transactions contemplated by this Agreement would be inconsistent with its fiduciary duties.

The Party seeking to terminate this Agreement pursuant to this <u>Section 9.1</u> (other than <u>Section 9.1(a)</u>) shall, if such Party is True Value Parent, give prompt written notice of such termination to Buyer, and if such Party is Buyer, give prompt written notice of such termination to True Value Parent.

Section 9.2    <u>Effect of Termination</u>.

(a)    In the event of termination of this Agreement as provided in <u>Section 9.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of <u>Section 6.6</u> (Public Announcements), <u>Section 10.3</u> (Fees and Expenses), <u>Section 10.6</u> (Notices), <u>Section 10.9</u> (Parties in Interest), <u>Section 10.10</u> (Governing Law), <u>Section 10.11</u> (Submission to Jurisdiction) and this <u>Article IX</u>, each of which shall survive such termination and remain enforceable in accordance with their respective terms, and (ii) that no such termination shall relieve any Party from liability for any willful breach of this Agreement arising prior to the date of termination.  Further, the Confidentiality Agreement shall survive the termination of this Agreement.

(b)    In consideration of Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and to compensate Buyer as a stalking-horse bidder, (i) if this Agreement is terminated pursuant to <u>Section 9.1(b)(ii)</u>, then True Value Parent shall pay to Buyer the Break-Up Fee and Expense Reimbursement Amount at the closing of such Alternative Transaction by wire transfer of immediately available funds; and (ii) if this Agreement is terminated pursuant to <u>Section 9.1(c)(i)</u>, <u>Section 9.1(c)(iv)</u> or Section 9.1(d)(ii)<u>Section 9.1(d)(ii)</u>, then True Value Parent shall pay to Buyer the Expense Reimbursement Amount by wire transfer of immediately available funds within three (3) Business Days following such termination.  The Bidding Procedures Order shall provide that the Expense Reimbursement Amount and Break-Up Fee shall constitute an allowed superpriority administrative expense claim against Sellers under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code.

(c)    Notwithstanding anything to the contrary in this Agreement, Buyer shall not be entitled to receive the Break-Up Fee or Expense Reimbursement Amount if Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u>, as the case may be.

(d)    Notwithstanding <u>Section 9.2(b)</u>, Buyer's right to receive the one-time payment of the Break-Up Fee and/or the Expense Reimbursement Amount from True Value Parent as provided in <u>Section 9.2(b)</u> shall be the sole and exclusive remedy available to Buyer against

Sellers or any of its former, current or future equityholders, directors, officers, Affiliates, agents or Representatives with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to <u>Section 9.1(b)(ii)</u>, <u>Section 9.1(c)(i)</u>, <u>Section 9.1(c)(iv)</u> or Section 9.1(d)(ii)<u>Section 9.1(d)(ii)</u> and upon such payment of the Break-Up Fee and/or the Expense Reimbursement Amount none of Sellers or any of their respective former, current or future equityholders, directors, officers, Affiliates, agents or Representatives shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. The parties acknowledge and agree that in no event shall True Value Parent be required to pay the Break-Up Fee and the Expense Reimbursement Amount on more than one occasion.

Section 9.3    <u>Alternative Transactions</u>. Notwithstanding anything in this Agreement to the contrary, Sellers may participate in discussions or negotiations with, or furnish information with respect to Sellers or the Business to, any Person. Upon receipt of any proposal for an Alternative Transaction, True Value Parent shall give prompt written notice to Buyer of such proposal, including a summary of the material terms thereof.

**ARTICLE X**

**GENERAL PROVISIONS**

Section 10.1    <u>Nonsurvival of Representations, Warranties and Covenants</u>. The respective representations, warranties and covenants of Sellers and Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; <u>provided</u> that this <u>Section 10.1</u> shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing.

Section 10.2    <u>Bulk Sales</u>. Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer.

Section 10.3    <u>Fees and Expenses</u>. All fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 10.4    <u>Amendment and Modification</u>. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.5    <u>Waiver</u>. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other

right or power.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.6    Notices.    All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a nationally recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i)    if to Sellers, to:

True Value Company
8600 West Bryn Mawr Avenue
Chicago, IL 60631
Attention:    Chris Kempa
Email:    Chris.Kempa@TrueValue.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attention:
            Steven J. Daniels
            Ron E. Meisler
Email:
            Steven.Daniels@skadden.com
            Ron.Meisler@skadden.com

(ii)    if to Buyer, to:

Do it Best Corp.
1626 Broadway, Suite 100
Fort Wayne, Indiana 46802
Attention:    Daniel B. Starr
Email:    dan.starr@doitbest.com

68

with copies (which shall not constitute notice) to:

> Taft Stettinius & Hollister LLP
> One Indiana Square, Suite 3500
> Indianapolis, IN 46204
> Attention: Zachary E. Klutz and W. Timothy Miller
> Email: zklutz@taftlaw.com; miller@taftlaw.com

Section 10.7    Interpretation.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  References to days mean calendar days unless otherwise specified.

Section 10.8    Entire Agreement.    This Agreement and the Ancillary Agreements, Confidentiality Agreement and Disclosure Letter (including the Exhibits and Schedules hereto and thereto) constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings among the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.9    Parties in Interest.  Except as specifically set forth in Section 10.12 and Section 10.20, this Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including Business Employees and other employees) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.10    Governing Law.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and

construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

Section 10.11  Submission to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Chapter 11 Case is closed or the Bankruptcy Court declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in the Court of Chancery of the State of Delaware, or if jurisdiction is not available in the Court of Chancery, then in the United States District Court for the District of Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts of the State of Delaware, and of the United States District Court for the District of Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 10.12  Assignment; Successors.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by Sellers without the prior written consent of Buyer, and by Buyer without the prior written consent of True Value Parent, and any such assignment without such prior written consent shall be null and void.  Notwithstanding the foregoing, subject to the terms of Section 2.10, Buyer may assign any of its rights under this Agreement to any Designated Buyer without obtaining the prior written consent of True Value Parent; provided that in connection with such assignment, such assignment shall not relieve Buyer of any of its obligations under this Agreement.  Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

70

Section 10.13 <u>Specific Performance</u>. Each Party acknowledges and agrees that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such Party and that any such breach would cause Buyer, on the one hand, and Sellers, on the other hand, irreparable harm. Accordingly, each Party also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such Party, Buyer, on the one hand, and Sellers, on the other hand, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance. Any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. Sellers, on the one hand, and Buyer, on the other hand, hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by Sellers or Buyer, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of Sellers or Buyer, as applicable, under this Agreement.

Section 10.14 <u>Currency</u>. All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 10.15 <u>Severability</u>. If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement, or the remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any such term or other provision, or any portion thereof, is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are consummated to the fullest extent possible.

Section 10.16 <u>Waiver of Jury Trial</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH SUCH

PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.16</u>.

Section 10.17 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, including by means of email in portable document format (.pdf) or other electronic means, each of which when executed shall be deemed to be an original copy of this Agreement and all of which taken together shall constitute one and the same agreement. Any electronic signatures shall have the same legal effect as physically delivered manual signatures.

Section 10.18 <u>Jointly Drafted</u>. This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party. The Parties acknowledge and agree that prior drafts of this Agreement and the other agreements and documents contemplated hereby will not be deemed to provide any evidence as to the meaning of any provision hereof or the intent of the Parties with respect hereto and that such drafts will be deemed to be the joint work product of the Parties.

Section 10.19 <u>Limitation on Damages</u>. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL BUYER, SELLERS OR ANY SELLER NON-RECOURSE PERSON BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE SPECIAL, OR EXEMPLARY DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES AS A RESULT OF SUCH PARTY'S BREACH OF THIS AGREEMENT, EXCEPT TO THE EXTENT ARISING FROM THE FRAUD OF SUCH PARTY.

Section 10.20 <u>No Recourse</u>.

(a) This Agreement may be enforced only by True Value Parent against, and any claim, action, suit, or other legal proceeding by Sellers in connection with this Agreement may be brought only against Buyer, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement. Neither any Seller nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, direct or indirect stockholder, Affiliate, agent, Advisor, Representative or investor of Buyer or of any Affiliate of Buyer or any of their successors or permitted assigns (each, a "<u>Buyer Non-Recourse Person</u>"), and no such Buyer Non-Recourse Person shall have any liability for any obligations or liabilities of Buyer under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

(b) This Agreement may be enforced only by Buyer against, and any claim, action, suit, or other legal proceeding by Buyer in connection with this Agreement may be brought only against Sellers, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement. None of Buyer, any Designated Buyer, nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, direct or indirect stockholder, Affiliate, agent, Advisor,

Representative or investor of Sellers or of any Affiliate of Sellers or any of their successors or permitted assigns (each, a "Seller Non-Recourse Person"), and no Seller Non-Recourse Person shall have any liability for any obligations or liabilities of Sellers under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

Section 10.21  Time of Essence; Calculation of Dates.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Section 10.22  Debt Financing.  Notwithstanding anything in this Agreement to the contrary, each party on behalf of itself, each its Subsidiaries, each of its Affiliates and each of their respective Representatives hereby: (a) agrees that any action, suit or proceeding of any kind or description, whether in contract or in tort or otherwise, involving any Debt Financing Source, arising out of or relating to this Agreement, the Debt Commitment Letter or the Debt Financing or any of the agreements entered into in connection with the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each party hereto irrevocably submits itself and its property with respect to any such action, suit or proceeding to the exclusive jurisdiction of such court; (b) agrees that any such action, suit or proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or other applicable definitive document agreement relating to the Debt Financing; (c) agrees not to bring or support or permit any of its Subsidiaries, Affiliates or Representatives to bring or support any action, suit or proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York; (d) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such action, suit or proceeding in any such court; (e) agrees that the waiver of rights to trial by jury set forth in Section 10.16 applies in any such action, suit or proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing Commitment, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder; (f) agrees that none of the Debt Financing Sources will have any liability to any Seller or any of their respective Subsidiaries, Affiliates or Representatives relating to or arising out of this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise (provided that nothing in this Section 10.22 shall limit the liability or obligations of the Debt Financing Sources to Buyer under the Debt Commitment Letter) (and, in

73

furtherance of the foregoing, agrees, subject to the immediately succeeding sentence, not to commence (and if commenced agrees to have dismissed or otherwise terminated) any action or proceeding against any Debt Financing Source in connection with this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder); (g) neither any Seller nor any of their respective Subsidiaries, Affiliates or Representatives shall be entitled to seek specific performance of any rights of Buyer to cause the Debt Financing to be funded; (h) agrees that Buyer may without the prior written consent of any Seller assign or transfer any or all of its rights and interests hereunder to any Debt Financing Source (so long as any such assignment does not relieve Buyer of its obligations hereunder) under terms of the Debt Financing solely for the purpose of creating a security interest herein or otherwise assigning with respect to the Debt Financing; (i) agrees that the Debt Financing Sources are express third-party beneficiaries of, and may enforce any of the provisions of, this Section 10.22; and (j) agrees that the provisions of this Section 10.22 and the definition of "Debt Financing Sources" shall not be directly or indirectly amended, modified or supplemented in any way adverse to the Debt Financing Sources without the prior written consent of the Debt Financing Sources party to the Debt Commitment Letter or definitive documentation related to the Debt Financing (such consent not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, nothing in this Section 10.22 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Commitment Letter or Buyer under the definitive agreements governing the Debt Financing. This Section 10.22 shall, with respect to the matters referenced herein, supersede any provision of this Agreement to the contrary. The provisions of this Section 10.22 will survive any termination of this Agreement. For purposes of this Section 10.22, "Debt Financing Sources" shall include the Debt Financing Sources, their respective Affiliates, and their and their Affiliates' respective Representatives and their respective successors and permitted assigns.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**SELLERS:**

**TRUE VALUE COMPANY L.L.C.**

By: _Chris Kempa_
Name: Chris Kempa
Title:   Chief Executive Officer

**TV HOLDCO II, L.L.C.**

By: _Chris Kempa_
Name: Chris Kempa
Title:   President

**TV TSLC, L.L.C.**

By: _William McGann_
Name: William McGann
Title:   President

**TV GPMC, L.L.C.**

By: _William McGann_
Name: William McGann
Title:   President

**TRUE VALUE RETAIL, L.L.C.**

By: _William McGann_
Name: William McGann
Title:   Vice President

**TRUEVALUE.COM COMPANY, L.L.C.**

By: _____

Name: William McGann
Title:  President


**TRUE VALUE VIRGINIA, L.L.C.**

By: _____

Name: William McGann
Title:  President


**DISTRIBUTORS HARDWARE, L.L.C.**

By: _____

Name: William McGann
Title:  Vice President

**BUYER:**

**DO IT BEST CORP.**

By: _____

Name: Daniel Starr

Title:   President and CEO

**EXHIBIT 3**

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION AND SALE HEARING

On October 13, 2024, the Debtors entered into a stalking horse asset purchase agreement (the "Stalking Horse Agreement") with Do It Best Corp. ("DIB").  Pursuant to the Stalking Horse Agreement, and subject to the terms and conditions thereof, DIB has agreed to acquire substantially of the Debtors' assets (the "Assets") and assume certain of the Debtors' liabilities (the "Assumed Liabilities").

On October 14, 2024, True Value Company, L.L.C. and certain of its affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a motion [Docket No.[__]] (the "Motion")[2] for the entry of orders: (I) approving (a) Bidding Procedures, (b) entry into the Stalking Horse Agreement (as defined herein), including bid protections, (c) form and manner of notice of Sale, Auction, and Sale Hearing, and (d) Assumption and Assignment Procedures, (II) scheduling Auction and Sale Hearing, and (III) granting related relief.

On [_], 2024, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. [_]] approving, among other things, the Bidding Procedures, which establishes the key dates and times related to the marketing process for the Sale of the Assets, Assumption and Assignment Procedures, Auction and Sale Hearing.  All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entireties.[3]

---

[1]   The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or Bidding Procedures, as applicable.

[3]   To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms in the Bidding Procedures shall control in all respects.

## IMPORTANT DATES AND DEADLINES

- **Bid Deadline**. Any person or entity interested in participating in the Auction for the sale of the Business must submit a Qualified Bid on or before [●], 2024 at [●], **prevailing Eastern Time** (the "Bid Deadline").

- **Auction**. If the Debtors receive more than one Qualified Bid, the Debtors will conduct the Auction, which has been scheduled for [●], 2024 at [●], **prevailing Eastern Time** either (i) at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 320 South Canal Street, Chicago, Illinois 60606-5707 or (ii) or such other place (which may be via video conference), date, time, and location as will be timely communicated to all entities entitled to attend the Auction.

- **Sale and Limited Objection Deadlines**. Objections to the sale (a "Sale Objection"), including any objection to the Assumed Liabilities and the sale of the Debtors' assets free and clear of all claims and interests pursuant to section 363(f) of the Bankruptcy Code, must be (i) filed with the Bankruptcy Court in accordance with the Bidding Procedures and (ii) served on the Objection Notice Parties (as defined herein) on or before [●], 2024 at [●], **prevailing Eastern Time. (prevailing Eastern Time)** (the "Sale Objection Deadline"). If a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, objections solely to the identity of such Successful Bidder, changes to the Stalking Horse Agreement and adequate assurance of future performance by the Successful Bidder ("Limited Objections") must be made by [●], **2024 at** [●], **prevailing Eastern Time** (the "Limited Objections Deadline").

- **Sale Hearing**. A hearing to approve and authorize the Sale to the Successful Bidder will be held before the Court on or before [●], 2024 at [●], **prevailing Eastern Time** or such other date as determined by the Court.

## FILING OBJECTIONS

Sale Objections, if any, must (i) be in writing, (ii) state, with specificity, the legal and factual bases thereof, (iii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iv) be filed with the Court by no later than the Sale Objection Deadline, and (v) be served on (i) the Debtors, True Value Company, L.L.C., 8600 West Bryn Mawr Ave., Chicago, IL, 60631 (Attn: Susan Radde, Esq. (susan.radde@truevalue.com)); (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606 (Attn: Ron Meisler, Esq. (ron.meisler@skadden.com) and Jennifer Madden, Esq. (jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001 (Attn: Evan Hill, Esq. (evan.hill@skadden.com) and Moshe Jacob, Esq. (moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph Larkin (joseph.larkin@skadden.com)); (iii) counsel to the Stalking Horse Bidder (Attn: Zachary E. Klutz, Esq. (zklutz@taftlaw.com), W. Timothy Miller, Esq. (miller@taftlaw.com)) ; (iv) counsel to the prepetition Lenders (Attn: Daniel Fiorillo, Esq. (dfiorillo@otterbourg.com)); and (v) counsel to any statutory committee appointed in the Chapter 11 Cases (collectively, the "Objection Notice Parties").

## ADDITIONAL INFORMATION

The Bidding Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid, and any party interested in making an offer to purchase the Assets must comply with the Bidding Procedures.  Only Qualified Bids will be considered by the Debtors, in accordance with the Bidding Procedures.

Any party interested in submitting a bid should contact the Debtors' investment banker, Houlihan Lokey, Inc., 245 Park Ave, 20th Floor, New York, NY 10167, William Hardie (WHardie@HL.com), Jay Weinberger (JWeinberger@HL.com), John Hartigan (JHartigan@HL.com), and Christina Walters (Christina.Walters@HL.com) as soon as possible.

Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, the Stalking Horse Agreement, and the Assumption and Assignment Procedures as well as all related exhibits and all other agreements filed with the Court, may be obtained free of charge at the website dedicated to the Debtors' Chapter 11 Cases maintained by their claims and noticing agent, Omni Agent Solutions, at https://omniagentsolutions.com/TrueValue.

## RESERVATION OF RIGHTS

Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors (in consultation with the Consultation Parties) further reserve the right as they may reasonably determine to be in the best interest of their estates and in the exercise of their fiduciary duties to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein; (g) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (h) modify the Bidding Procedures and implement additional rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties.  Nothing herein or in the Bidding Procedures shall obligate the Debtors to consummate or pursue any transaction with a Qualified Bidder, other than the Stalking Horse Bidder subject to, and in accordance with the terms of, the Stalking Horse Agreement.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER BY THE SALE OBJECTION DEADLINE OR LIMITED OBJECTION DEADLINE, AS APPLICABLE WILL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, THE SALE ORDER, THE PROPOSED SALE, OR**

**ANY OTHER AGREEMENT EXECUTED BY THE DEBTORS AND A SUCCESSFUL BIDDER AT THE AUCTION.**

Dated:  [●] [●], 2024
        Wilmington, Delaware

                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ DRAFT*            
Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

Ron E. Meisler (*pro hac vice* admission pending)
Jennifer Madden (*pro hac vice* admission pending)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and –

Robert D. Drain (*pro hac vice* admission pending)
Evan A. Hill (*pro hac vice* admission pending)
Moshe S. Jacob (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Robert.Drain@skadden.com
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

**<u>EXHIBIT 4</u>**

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF PROPOSED ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

---

**PLEASE TAKE NOTE OF THE FOLLOWING DEADLINES:**

**Cure Objection Deadline:** On or before  [●]**, 2024 at**  [●]**, prevailing Eastern Time**, or such deadline set forth in the applicable Supplemental Cure Notice.
Sale Hearing: [_]

---

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On October 14, 2024, True Value Company, L.L.C. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), filed with the United States Bankruptcy Court for the District of Delaware (the "Court") the *Motion of Debtors for Entry of An Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, and (III) Granting Related Relief*  [Docket No. []] (the "Bidding Procedures Motion"), seeking an order (the "Bidding Procedures Order"),[2] among other things, (a) approving certain bidding procedures (the "Bidding Procedures") in connection with the sale or sales of substantially all of the Debtors' assets (the "Sale") pursuant to section 363 of the Bankruptcy Code, including certain dates and deadlines thereunder for the Sale process; and (b) authorizing procedures (such procedures, the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption, assumption and assignment, and rejection of certain executory contracts (the "Executory Contracts") or unexpired leases (the "Unexpired Leases") of the Debtors.

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Bidding Procedures Motion or the Bidding Procedures Order.

2.      On [_], 2024, the Court, entered the Bidding Procedures Order [Docket No. [_]]. Pursuant to the Bidding Procedures Order, the Debtors hereby provide notice (this "Cure Notice") that they are seeking to assume and assign to Do It Best Corp. (the "Stalking Horse Bidder")[3], or, if the Stalking Horse Bidder is not the Successful Bidder at the Auction (if any), any other Successful Bidder(s), the Contracts or Leases listed on **Exhibit A** attached hereto (each, an "Assigned Contract").  **You are receiving this Cure Notice because you may be a counterparty to a Contract or Lease (a "Counterparty") that is proposed to be assumed and assigned to the Successful Bidder in connection with the Sale.**

3.      If the Debtors assume and assign to the Successful Bidder(s) an Assigned Contract to which you are a party, on the closing date of the Sale, or as soon thereafter as practicable, such Successful Bidder will pay you the amount the Debtors' records reflect is owing for **pre-chapter 11 filing arrearages, if any,** as set forth on **Exhibit A** (the "Cure Amount").

4.      The Debtors' inclusion of a Contract or Lease as an Assigned Contract on **Exhibit A** is not a guarantee that such Contract or Lease will ultimately be assumed and assigned to any Successful Bidder.  Should it be determined that an Assigned Contract will not be assumed and assigned, the Debtors will notify such party to the Assigned Contract in writing of such decision.

5.      Notwithstanding anything to the contrary herein, the proposed assumption and assignment of each of the Assigned Contracts listed on **Exhibit A** hereto (a) will not be an admission as to whether any such Assigned Contract was executory or unexpired as of the Petition Date or remains executory or unexpired postpetition within the meaning of Bankruptcy Code section 365; and (b) will be subject to the Debtors', the Stalking Horse Bidder's, or any Successful Bidder(s)'s right to conduct further confirmatory diligence with respect to the Cure Amount of each Assigned Contract and to modify such Cure Amount accordingly.  In the event that the Debtors or any Successful Bidder determine that your Cure Amount should be modified, you will receive a notice pursuant to the Assumption and Assignment Procedures below, which will provide for additional time for you to object to such modification.

## VII.    Assumption and Assignment Procedures

6.      The Assumption and Assignment Procedures set forth below regarding the assumption and assignment of the Assigned Contracts proposed to be assumed by the Debtors and assigned to the Successful Bidder(s) in connection with the Sale will govern the assumption and assignment of all of the Assigned Contracts, subject to the payment of any Cure Amounts:

(a)      **Cure Amounts and Adequate Assurance of Future Performance.**  The payment of the applicable Cure Amounts shall (i) effect a cure of all defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

---

[3]      [A copy of the purchase agreement between the Debtors and the Stalking Horse Bidder (the "Stalking Horse Agreement" or the "APA," and such bid memorialized therein, the "Stalking Horse Bid") is attached as Exhibit [_] to the Bidding Procedures Motion [Docket No. [_]].]

2

(b)     **Supplemental Cure Notice**.  Although the Debtors intend to make a good faith effort to identify all Assigned Contracts that may be assumed and assigned in connection with a Sale, the Debtors may discover certain Executory Contracts inadvertently omitted from the Assigned Contracts list or the Stalking Horse Bidder or Successful Bidders may identify other Executory Contracts that they desire to assume and assign in connection with a Sale.  Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Deadline and at least two days before the closing of a Sale, to (i) supplement the list of Assigned Contracts with previously omitted Executory Contracts (the "Additional Assigned Contracts"), (ii) remove Assigned Contracts from the list of Executory Contracts ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale (the "Eliminated Agreements"), and/or (iii) modify the previously stated Cure Amount associated with any Assigned Contracts.  In the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption (a "Supplemental Cure Notice") on each of the counterparties to such Additional Assigned Contracts or Eliminated Agreements, as applicable, and their counsel of record, if any, and the Consultation Parties; *provided*, *however*, the Debtors may not add an Executory Contract to the list of Assigned Contracts that has been previously rejected by the Debtors by order of the Court.  Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice.  If the Successful Bidder is not the Stalking Horse Bidder, the Debtors will file the Notice of Successful Bidder in accordance with paragraph 6(c)(3), which will among other things set the Limited Objection Deadline for parties to file Limited Objections (each as defined herein).

(c)     **Objections**.  Objections, if any, to the proposed assumption and assignment or the Cure Amount proposed with respect thereto, *must* (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by, the Cure Objection Recipients (as defined below) by the applicable deadlines below.

(1)     *Cure Objection Deadline*.  Any objection to the Cure Amount, to assumption and assignment of an Assigned Contract, or to lack of adequate assurance of the performance of the Stalking Horse Bidder must be filed with the Bankruptcy Court on or before [●]**, 2024 at** [●]**, prevailing Eastern Time** (the "Cure Objection Deadline") or such later date identified in the Supplemental Cure Notice in accordance with 6(c)(2) herein, and served on: (a) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606 (Attn: Ron Meisler, Esq. (ron.meisler@skadden.com) and Jennifer Madden, Esq.

(jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001 (Attn: Evan Hill, Esq. (evan.hill@skadden.com) and Moshe Jacob, Esq. (moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, Delaware 19801 (Attn: Joseph Larkin (joseph.larkin@skadden.com)); and (b) counsel to the Stalking Horse Bidder, Taft Stettinius & Hollister LLP, One Indiana Square, Suite 3500, Indianapolis, IN 46204 (Attn: Zachary E. Klutz (zklutz@taftlaw.com) and W. Timothy Miller (miller@taftlaw.com)) (collectively, the "Cure Objection Recipients").

(2)   *Supplemental Cure Objection Deadline.*  Any objection to the to assumption and assignment of an Additional Assigned Contract and the corresponding Cure Amount, the removal of an Eliminated Agreement, or the modification of a Cure Amount in the Supplemental Cure Notice (a "Supplemental Cure Objection") must be filed with the Bankruptcy Court **within seven days of receipt of the Supplemental Cure Notice** (the "Supplemental Cure Objection Deadline"), and served on the Cure Objection Recipients.

(3)   *Auction Results Objection Deadline.*  If the Debtors hold an Auction and if a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, as soon as reasonably practicable after selecting such Successful Bidder(s), the Debtors will file (but not serve) and cause to be published on the Case Website a notice of results of the Auction (the "Notice of Successful Bidder").  Upon the filing of any Notice of Successful Bidder, objections *solely* to the identity of the Successful Bidder(s), changes to the Stalking Horse Agreement or adequate assurance of future performance (each, a "Limited Objection") may be made.  Any Limited Objection must be filed with the Bankruptcy Court and served on (A) counsel for the Debtors and (B) the Successful Bidder(s) and its counsel, if any and together with the Cure Objection Recipients, the "Objection Recipients"), so as to be received by [●]**, 2024 at  [●], prevailing Eastern Time** (the "Limited Objection Deadline"); *provided, however,* that the Cure Objection Deadline will not be extended.

7.     Any party that fails to timely file an objection to the proposed Cure Amount, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on a Cure Notice or the Supplemental Cure Notice, or the Sale is deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract(s) (including the adequate assurance of future payment), (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to (i) the Cure Amounts, (ii) the assumption and assignment of the Assigned Contract or Additional Assigned Contract(s), (iii) adequate assurance of future performance, or (iv) any of the relief requested herein (whether applicable law excuses such

counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or a Successful Bidder for purposes of Bankruptcy Code section 365(c)(1)). Such party shall also be forever barred and estopped from asserting any additional cure or other amounts against the Debtors and the Stalking Horse Bidder or a Successful Bidder, with respect to such party's Assigned Contract or Additional Assigned Contract.

8.      If a Cure Objection, Supplemental Cure Objection, or Limited Objection, as applicable, filed by the Cure Objection Deadline, Supplemental Cure Objection Deadlines, or Limited Objection Deadline, as applicable, cannot otherwise be resolved by the parties prior to the Sale Hearing, such objections and all issues regarding the Cure Amount to be paid, the assignability, or the adequate assurance of future performance, as applicable, will be determined by the Court at the Sale Hearing, or at a later hearing on a date to be scheduled by the Debtors in their discretion, and in consultation with the Successful Bidder(s).

## VIII.   Additional Information

9.      Service of a Cure Notice or a Supplemental Cure Notice does not constitute an admission that any contract is an Executory Contract or that the stated Cure Amount related to any contract or Unexpired Lease constitutes a claim against the Debtors or a right against the Stalking Horse Bidder (all rights with respect thereto being expressly reserved). Further, the inclusion of a contract or Unexpired Lease, as applicable, on the Cure Notice is not a guarantee that such contract or Unexpired Lease, as applicable, will ultimately be assumed and assigned.

10.     Unless otherwise provided in the Sale Order, the Debtors will have no liability or obligation with respect to defaults relating to the Assigned Contracts arising, accruing, or relating to a period on or after the effective date of assignment.

11.     Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, and the Sale Notice may be obtained free of charge at the website dedicated to the Debtors' Chapter 11 Cases maintained by their claims and noticing agent and administrative advisor, Omni Agent Solutions, at https://omniagentsolutions.com/TrueValue.

*[Remainder of Page Intentionally Left Blank]*

Dated:  [●] [●], 2024
       Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ DRAFT*

Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -


Ron E. Meisler (*pro hac vice* admission pending)
Jennifer Madden (*pro hac vice* admission pending)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and –

Robert D. Drain (*pro hac vice* admission pending)
Evan A. Hill (*pro hac vice* admission pending)
Moshe S. Jacob (*pro hac vice* admission pending)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Robert.Drain@skadden.com
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

## **EXHIBIT B**

Sale Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C., *et al.*,** | **Case No. 24-_____ (___)** |
| **Debtors.**[1] | **(Jointly Administered)** |
|  | Related Docket No[s]. __ |

**ORDER (A) APPROVING
SALE OF SUBSTANTIALLY ALL
OF DEBTORS' ASSETS FREE AND CLEAR
OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS,
AND ENCUMBRANCES, (B) AUTHORIZING DEBTORS
TO ENTER INTO AND PERFORM UNDER ASSET PURCHASE
AGREEMENT, (C) APPROVING ASSUMPTION AND ASSIGNMENT OF
<u>CERTAIN EXECUTORY CONTRACTS, AND (D) GRANTING RELATED RELIEF</u>**

Upon the motion (the "<u>Motion</u>"),[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Bankruptcy Rules</u>"), for entry of an order (this "<u>Sale Order</u>" or "<u>Order</u>"): (a) authorizing and approving the entry into and performance under the terms and conditions of that certain Asset Purchase Agreement, substantially in the form attached hereto as

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]    Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Motion, the Bidding Procedures Order, or the Asset Purchase Agreement (each as defined herein), as applicable.

**Exhibit 1** (together with all schedules, exhibits, and ancillary documents related thereto, and as may be amended, supplemented or restated, the "Asset Purchase Agreement"), by and among the Debtors and Do It Best Corp., an Indiana corporation (the "Buyer"), (b) authorizing and approving the sale (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Asset Purchase Agreement, the "Sale") of those assets set forth in Section 2.1 of the Asset Purchase Agreement (the "Transferred Assets") free and clear of all liens, claims, encumbrances, and other interests, except to the extent set forth in the Asset Purchase Agreement, and the assumption of certain assumed liabilities set forth in Section 2.3 of the Asset Purchase Agreement (the "Assumed Liabilities") pursuant to the Asset Purchase Agreement upon the closing of the Sale (the "Closing"), (c) authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, an "Assigned Contract," and, collectively, the "Assigned Contracts") upon the Closing, subject to the payment by the Buyer of any payments to cure any defaults arising under any Assigned Contract (the "Cure Amounts"), and (d) granting related relief, all as more fully set forth in the Motion; and this Court having entered the *Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures and (II) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order");[3] and the Debtors having determined that the Buyer has submitted the highest or otherwise best bid for the Debtors' assets and determined that the Buyer is the Successful Bidder (as defined in the Bidding Procedures), each in accordance with the Bidding Procedures; and the Court having conducted a hearing on the Motion (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered

---

[3]   All references herein to the Bidding Procedures Order shall also be deemed to be references to the bidding procedures approved thereby, as subsequently modified from time to time (the "Bidding Procedures").

the Motion, the Asset Purchase Agreement, and any and all objections to the Sale, the Asset Purchase Agreement, and any other documents filed in accordance with the Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing and in the declaration[s] of [●]; and it appearing that due notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, and the Sale has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby:

**FOUND, CONCLUDED, AND DETERMINED THAT:**

## Jurisdiction, Venue, and Final Order

A.  This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157(a)–(b)(1) and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.  This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### Property of the Estate

D.      The Debtors are the sole and lawful owner of, and have clear and marketable title to, the Transferred Assets to be sold pursuant to the Asset Purchase Agreement. The Debtors' right, title and interest in and to the Transferred Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

### Notice of the Motion, Auction, Sale Hearing, Asset Purchase Agreement and Sale and the Cure Amounts

E.      As evidenced by the affidavits of service and publication previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, [the Auction,] the Sale Hearing, the Asset Purchase Agreement, and the Sale has been provided to each party entitled to such notice in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and Local Bankruptcy Rule 2002-1(b), and in compliance with the Bidding Procedures Order. No other or further notice of the foregoing is required. With respect to parties whose identities or addresses are not reasonably ascertained by the Debtors, publication of the Sale Notice (as defined in the Motion) in the *New York Times* on [●] and the posting of the Sale Notice on the website of the Debtors' claims and noticing agent, Omni Agent Solutions, at https://omniagentsolutions.com/TrueValue on [●] was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such parties.

F.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

G.      In accordance with the Bidding Procedures Order, the Debtors have served a notice of their intent to assume and assign the Assigned Contracts and of the Cure Amounts upon each counterparty to an Assigned Contract. The service and provision of such notice was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of the Assigned Contracts or establishing a Cure Amount for the respective Assigned Contracts. Counterparties to the Assigned Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assigned Contracts and the Cure Amounts set forth in the notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the counterparty from accepting performance by, or rendering performance to, the Buyer (or its designee) for purposes of section 365(c)(1) of the Bankruptcy Code). All objections, responses, or requests for adequate assurance, if any, have been resolved, overruled, or denied, as applicable.

**Business Judgment**

H.      The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and authorization to close, and compelling circumstances to promptly consummate, the Sale and the other transactions contemplated by the Asset Purchase Agreement, including, without limitation, the assumption, assignment, and/or transfer of the Assigned Contracts, pursuant to Sections 105, 363, 365, 1107, and 1108 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, their creditors, and other parties in interest. Such business reasons include, but are not limited to, the fact that: (i) there is substantial risk of depreciation of the value of the Debtors' assets if the Sale is not consummated

promptly; (ii) the Sale of the Transferred Assets and the assignment and assumption of the Assumed Liabilities pursuant to the Asset Purchase Agreement at the Closing present the best opportunity and represent the best method to maximize the value of the Debtors' estates for the benefit of the Debtors, their estates, their creditors, and other parties in interest; (iii) the purchase price and other terms set forth in the Asset Purchase Agreement constitute the highest or otherwise best offer received for the Debtors' assets; and (iv) unless the Sale is concluded expeditiously, as provided for in this Sale Order and pursuant to the Asset Purchase Agreement, the Debtors and their estates would receive significantly less value for all stakeholders.

**Marketing Process and Highest or Otherwise Best Offer**

I.      As demonstrated by the [●] Declaration[s], the evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the record at the Sale Hearing, the Debtors, consistent with their fiduciary duties, conducted a robust and extensive marketing process in accordance with, and have, along with the Buyer, complied in all respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Debtors' assets and assume the Debtors' liabilities.

J.      (i) The sale process, the Bidding Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any person or entity to make an offer to purchase the Debtors' assets, including, without limitation the Transferred Assets; (ii) the Debtors and the Buyer have negotiated and undertaken their roles leading to the entry into the Asset Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good-faith manner; and (iii) the sale process conducted by the Debtors both prior to the commencement of the Chapter 11 Cases and post-petition pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for

the Debtors' assets, was in the best interest of the Debtors, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

K.      Approval of the Motion and the Asset Purchase Agreement, and the consummation of the Sale contemplated thereby, is in the best interests of the Debtors, their respective creditors, estates, and other parties in interest.

### Single, Integrated Transaction

L.      Entry of this Order approving the Sale Order, the Asset Purchase Agreement, and all provisions thereof are a necessary condition precedent to the Buyer consummating the Sale. The provisions of this Order and the Asset Purchase Agreement and the transactions contemplated by this Order and the Asset Purchase Agreement and Sale to the Buyer are inextricably linked and technically and collectively constitute a single, integrated transaction.

### No *Sub Rosa* Plan

M.      The consummation of the Sale outside a plan of reorganization pursuant to the Asset Purchase Agreement and the transactions contemplated thereby, including the assumption and assignment of the Assigned Contracts, neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors. The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

### Good Faith of Buyer

N.      The consideration to be paid by the Buyer under the Asset Purchase Agreement was negotiated at arm's length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and is fair and reasonable under the circumstances. Specifically: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in purchasing the Transferred Assets; (ii) the Buyer complied with the provisions in the Bidding Procedures Order;

7

(iii) the Buyer agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made by the Buyer in connection with the Sale have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Buyer and the Debtors; (vi) the negotiation and execution of the Asset Purchase Agreement was at arm's length and in good faith, and at all times each of the Buyer and the Debtors were represented by competent counsel of their choosing; and (vii) the Buyer has not acted in a collusive manner with any person.

O.      The Debtors, the Buyer, their affiliates, and each of their respective management, boards of directors, officers, directors, members, partners, principals, shareholders (or equivalent), employees, agents, and representatives, have acted in good faith. Neither the Buyer nor any of its affiliates, officers, directors, members, partners, principals, shareholders (or equivalent), or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor. The Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

**<u>No Fraudulent Transfer</u>**

P.      The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under applicable law, and none of the parties to the Asset Purchase Agreement are consummating the Sale with any fraudulent or otherwise improper purpose. The consideration provided by the Buyer pursuant to the Asset Purchase Agreement for its purchase of the Transferred Assets and the assumption of the Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession,

8

or the District of Columbia. None of the Debtors, the Buyer, nor any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Sale or the other transactions contemplated by the Asset Purchase Agreement to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

### Buyer Not Successor

Q.      Neither the Buyer nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "Buyer Parties") is a continuation of the Debtors or their respective estates and no Buyer Party is holding itself out to the public as a continuation of the Debtors or their respective estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer (or any other Buyer Party) and the Debtors.

R.      The (i) transfer of the Transferred Assets to the Buyer and (ii) assignment to the Buyer of the Assigned Contracts, will not subject the Buyer or any of its affiliates or designees to any liability whatsoever that arises prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise.

**Validity of Transfer**

S.      Each Debtor's board of directors has authorized the execution and delivery of the Asset Purchase Agreement and the Sale of the Transferred Assets to the Buyer (or its designee). The Debtors and their affiliates (i) have full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Sale, and (iii) have taken all action necessary to authorize and approve the Asset Purchase Agreement and to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement. The Transferred Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

**Section 363(f) Is Satisfied**

T.      The Sale of the Transferred Assets to the Buyer (or its designee) and the assumption and assignment to the Buyer (or its designee) of the Assigned Contracts under the terms of the Asset Purchase Agreement meet the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Transferred Assets will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial rights, title, and interests in the Transferred Assets free and clear of any and all liens, claims, interests, and encumbrances, and will not subject any Buyer Party to any liability for any liens, claims, interests, and encumbrances whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Asset Purchase Agreement with respect to the Assumed Liabilities (as defined in the Asset Purchase Agreement). All holders of liens, claims, interests, and encumbrances who did not object, or withdrew their objections, to the Sale are deemed to have

10

consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, interests, and encumbrances are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their liens, claims, interests, and encumbrances, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, interests, and encumbrances, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable. [Those holders of claims who did object and that have an interest in the Transferred Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.]

U.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts (i) if the transfer of the Transferred Assets were not free and clear of all interests of any kind or nature whatsoever or (ii) if the Buyer or any of its affiliates or designees would, or in the future could, be liable for any interests, in each case, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities. Not transferring the Transferred Assets free and clear of all interests of any kind or nature whatsoever would adversely impact the Debtors' efforts to maximize the value of their estates.

**Assumption and Assignment of the Assigned Contracts**

V.      The assumption and assignment of the Assigned Contracts pursuant to the terms of this Sale Order are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their respective estates, creditors, and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors. Each and every provision of the

documents governing the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assigned Contracts, if any, has been or will be satisfied or are otherwise unenforceable under Section 365 of the Bankruptcy Code.

W.      The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts. The Buyer (or its designee) and/or the Debtor has (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assigned Contracts, and (iii) provided adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) and in accordance with the Bidding Procedures to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts.

X.      The Cure Amounts (as defined in the Cure Notices) listed on the Cure Notices are the sole amounts necessary to be paid upon assumption of the Assigned Contracts under Bankruptcy Code sections 365(b)(1)(A) and (B) and 365(f)(2)(A). All Cure Amounts, if any, shall be satisfied by the Buyer in accordance with the terms of the Asset Purchase Agreement. Upon the satisfaction of the Cure Amounts, if any, by the Buyer, the Assigned Contracts shall remain in full force and effect, and no default shall exist under the Assigned Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default. The Cure Amounts shall not be subject to further dispute or audit, including, without limitation, any dispute or audit based on performance prior to the Closing. After the payment of

the Cure Amounts by the Buyer, none of the Debtors or the Buyer shall have any further liabilities to the counterparties to the Assigned Contracts other than the Buyer's obligations under the Assigned Contracts that accrue and become due and payable on or after the Closing.

Y.      At any time prior to the rejection of an executory contract or unexpired lease, the Debtors shall have the right, in accordance with the Bidding Procedures Order, to serve a Supplemental Cure Notice upon any non-Debtor counterparty thereto indicating the Debtors' intent to assume and assign such executory contract or unexpired lease. The objection deadline for all Assigned Contracts, other than those subject to a Supplemental Cure Notice, lapsed on [●], 2024. The objection deadline for Assigned Contracts subject to a Supplemental Cure Notice shall be governed by the Bidding Procedures Order.

### Prompt Consummation

Z.      Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Transferred Assets must be approved and consummated promptly to preserve the value of the Transferred Assets. Time, therefore, is of the essence in effectuating the Asset Purchase Agreement. As such, the Debtors and the Buyer intend to close the sale of the Transferred Assets as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Asset Purchase Agreement and there is no legal or equitable reason to delay consummation of the Asset Purchase Agreement and the transactions contemplated therein. Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and 6006(d).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Motion is GRANTED to the extent set forth herein.

2.      All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled. All persons and entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**Approval of Asset Purchase Agreement**

3.      The Asset Purchase Agreement and all other ancillary documents, including the Transition Services Agreement and the term sheet associated therewith and any other documents contemplated by the Asset Purchase Agreement or that are necessary or appropriate to complete the transactions provided for in the Asset Purchase Agreement, and all of the terms and conditions thereof, and the Sale and related transactions contemplated therewith, are hereby approved in all respects. The failure specifically to include any particular terms of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement and the Sale be authorized and approved in their entireties.

4.      Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Debtors into the Asset Purchase Agreement is hereby authorized and approved as a valid exercise of the Debtors' business judgment. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors and their respective officers, employees, and agents are authorized, empowered, and directed to take any and all actions necessary or appropriate to (a) consummate the sale of the Transferred Assets to the Buyer pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (b) enter into all other agreements contemplated by the Asset

Purchase Agreement and consummate all other transactions contemplated by the Asset Purchase Agreement, (c) consummate the Sale as contemplated in the Asset Purchase Agreement and this Sale Order, (d) continue performance under and make all payments required by the Asset Purchase Agreement, (e) assume and assign any and all Assigned Contracts, (f) assign the Assumed Liabilities, and (g) execute and deliver, perform under, consummate, and implement the Asset Purchase Agreement, together with all additional instruments and ancillary documents that may be reasonably necessary or desirable to implement the Sale, or as may be reasonably necessary or appropriate to implement or perform any of the obligations contemplated by the Asset Purchase Agreement and any other documentation relating to the Sale, all without further order of the Court.

5.      The Debtors are authorized to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Units (as defined in section 101(27) of the Bankruptcy Code), any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements and this Order, including amended and restated certificates, articles of incorporation and by-laws, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Units or as any of the officers of the Debtors may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

**Transfer of the Transferred Assets as set forth in the Asset Purchase Agreement**

6.      Pursuant to Sections 105(a), 363(b), 363(f), 365(a), 365(b), and 365(f) of the Bankruptcy Code, and subject to the terms and conditions of the Asset Purchase Agreement, the Debtors are authorized and directed to transfer the Transferred Assets to the Buyer on the Closing

in accordance with the Asset Purchase Agreement. The Buyer is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities (as defined in the Asset Purchase Agreement).

7.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Transferred Assets to the Buyer (or its designee) in accordance with the Asset Purchase Agreement and this Sale Order.

8.      At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the Buyer (or its designee) pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Transferred Assets. All persons or entities, presently, or at or after the Closing, in possession of some or all of the Transferred Assets, are directed to surrender possession of any and all portions of the Transferred Assets to the Buyer (or its designee) or its respective designees on the Closing or at such time thereafter as the Buyer (or its designee) may request.

9.      This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) the Transferred Assets shall have been transferred to the Buyer (or its designee) free and clear of all liens, claims, interests, and encumbrances, subject only to the Assumed Liabilities, (ii) holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Sale are deemed to have consented to the Sale being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code and holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that

constitute interests in the Transferred Assets, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. The Transferred Assets are sold free and clear of any reclamation rights. All liens, claims, interests, and encumbrances on the Transferred Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, interests, and encumbrances applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such liens, claims, interests, and encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

10.     Except as otherwise provided in the Asset Purchase Agreement, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding

17

claims arising under or out of, in connection with, or in any way relating to, the Debtors, the

Transferred Assets, and the ownership, sale, or operation of the Transferred Assets prior to Closing

or the transfer of the Transferred Assets to the Buyer (or its designee), are hereby forever barred,

estopped, and permanently enjoined from asserting such claims against any Buyer Party and its

property (including, without limitation, the Transferred Assets). Following the Closing, no holder

of any claim or interest shall interfere with the Buyer's (or its designee's) title to or use and

enjoyment of the Transferred Assets based on or related to any such claim or interest, or based on

any action the Debtor may take in their Chapter 11 cases.

11.    If any person or entity that has filed financing statements, mortgages, mechanic's

claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or in

the Transferred Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in

proper form for filing and executed by the appropriate parties, termination statements, instruments

of satisfaction, and/or releases of all liens, claims, interests, and encumbrances that the person or

entity has with respect to the Debtors or the Transferred Assets or otherwise, then only with regard

to the Transferred Assets that are purchased by the Buyer (or its designee) pursuant to the Asset

Purchase Agreement and this Sale Order, (a) the Debtors are hereby authorized and directed to

execute and file such statements, instruments, releases, and other documents on behalf of the

person or entity with respect to the Transferred Assets, (b) the Buyer (or its designee) is hereby

authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once

filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all

liens, claims, interests, and encumbrances against the Buyer Parties and the Transferred Assets,

and (c) upon consummation of the Sale, the Buyer (or its designee) may seek in this Court or any

other court to compel appropriate parties to execute termination statements, instruments of

18

satisfaction, and releases of all liens, claims, interests, and encumbrances that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Transferred Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Transferred Assets free and clear of liens, claims, interests, and encumbrances shall be self-executing and neither the Debtors nor the Buyer (or its designee) shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

## No Successor or Transferee Liability

12.     No Buyer Party shall be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale contemplated by the Asset Purchase Agreement, or the transfer, operation, or use of the Transferred Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Buyer, with respect to any Assumed Liabilities arising after the Closing), (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("ERISA"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation.

13.     Immediately prior to the Closing, the Buyer was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or controlling stockholders existed between the Buyer and the Debtors.

14.     Other than as expressly set forth in the Asset Purchase Agreement, no Buyer Party shall have any responsibility for (a) any liability or other obligation of the Debtors or related to the Transferred Assets or (b) any claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the Asset Purchase Agreement, no Buyer Party shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Transferred Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation, or other employee benefits which is or has been sponsored, maintained, or contributed to by any Debtor or with respect to which any Debtor has any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which any Debtor has at any time contributed, or had any obligation to

20

contribute. Except to the extent expressly included in the Assumed Liabilities with respect to the Buyer or as otherwise expressly set forth in the Asset Purchase Agreement, no Buyer Party shall have any liability or obligation under any applicable law, including, without limitation, (a) the WARN Act, 29 U.S.C. §§ 2101 *et seq.*, (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Buyer's purchase of the Transferred Assets, assumption of the Assumed Liabilities, or hiring of certain employees of the Debtors pursuant to the terms of the Asset Purchase Agreement. Without limiting the foregoing, no Buyer Party shall have any liability or obligation with respect to any environmental liabilities of the Debtors or any environmental liabilities associated with the Transferred Assets except to the extent they are Assumed Liabilities set forth in the Asset Purchase Agreement.

15.     Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Buyer Party or their respective assets (including, without limitation, the Transferred Assets), with respect to any Successor or Transferee Liability including, without limitation, the following actions: (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this

Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Transferred Assets or conduct any of the businesses operated with respect to such assets.

## **Good Faith of Buyer**

16.    The Sale contemplated by the Asset Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of the Assigned Contracts), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

17.    Neither the Debtors nor the Buyer have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Transferred Assets under the Asset Purchase Agreement is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

## **Assumption and Assignment of Assigned Contracts**

18.    The Debtors are authorized and directed at the Closing to assume and assign each of the Assigned Contracts to the Buyer (or its designee) and to have such Assigned Contracts assumed by the Buyer (or its designee), pursuant to sections 105(a) and 365 of the Bankruptcy Code and to execute and deliver to the Buyer (or its designee) such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer (or its designee). The payment of the applicable Cure Amounts (if any) shall (a) effect a cure of all defaults existing

thereunder as of the Closing and (b) compensate for any actual pecuniary loss to such counterparty resulting from such default.

19.    Any non-Debtor counterparty to an Assigned Contract that has not filed with the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment.

20.    Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Amounts, the Assigned Contracts to be assumed and assigned under the Asset Purchase Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer (or its designee) notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer. Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract to the Buyer (or its designee) or allow the counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract to the Buyer (or its designee), constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer (or its designee) of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer (or its designee) shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assigned Contracts, and such Assigned Contracts shall remain in full force and effect for the benefit of the Buyer (or its designee). Each counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or any Buyer Party or their respective property any assignment fee, acceleration, default, breach, or claim or pecuniary

loss, or condition to assignment existing, arising, or accruing as of the Closing or arising by reason of the Closing, including, without limitation, any breach related to or arising out of change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts and (b) asserting against any Buyer Party (or its respective property, including, without limitation, the Transferred Assets) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable against, the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

21.     Upon the Closing and the payment of the relevant Cure Amounts, if any, the Buyer (or its designee) shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Buyer (or its designee) or the Debtors as a result of the assumption and assignment of the Assigned Contracts. The failure of the Debtors or the Buyer (or its designee) to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of the right of the Debtors or the Buyer (or its designee), as the case may be, to enforce every term and condition of such Assigned Contract. The validity of the assumption and assignment of any Assigned Contract to the Buyer (or its designee) shall not be affected by any existing dispute between the Debtors and any counterparty to such Assigned Contract. Any party that may have had the right to consent to the assignment of any Assigned Contract and did not timely object is deemed to have consented for the purposes of section 365(e)(2)(A) of the Bankruptcy Code.

22.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing after the deadline for parties to object to the Sale and prior to the Closing

(without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing, or as soon thereafter as reasonably practicable.

23.     Notwithstanding any term of any Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Assigned Contract that purport to be personal only to, or exercisable only by, the Debtors, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Buyer subject to the other applicable terms of the Assigned Contract. Any extension or renewal options in connection with all Assigned Contracts that the Debtors validly exercised prior to the entry of this Order, and all terms of the Assigned Contracts, are in full force and effect and have not been previously rejected, and the Debtors' time to assume or reject the Assigned Contracts has not otherwise expired.

24.     The assignments of each of the Assigned Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

25.     Nothing in this Sale Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors that any Assigned Contract is an executory contract or unexpired lease under Section 365 of the Bankruptcy Code.

26.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of their respective rights to enforce every term and condition of the Assigned Contracts.

## **Other Provisions**

27.     To the maximum extent permitted by applicable law, and in accordance with the Asset Purchase Agreement, the Buyer (or its designee) shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval

25

(collectively, the "Licenses") of the Debtors with respect to the Transferred Assets. To the extent the Buyer (or its designee) cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect while the Buyer (or its designee), with assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of Licenses to the Buyer (or its designee). The Debtors shall maintain the Licenses in good standing to the fullest extent allowed by applicable law for the Buyer's benefit until equivalent new Licenses are issued to the Buyer (or its designee).

28.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or License relating to the Transferred Assets sold, transferred, or conveyed to the Buyer (or its designee) on account of the filing or pendency of these Chapter 11 cases or the consummation of the Sale contemplated by the Asset Purchase Agreement.

29.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, *provided*, *however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

30.     Neither the Buyer nor the Debtors shall have an obligation to consummate the Sale until all conditions precedent in the Asset Purchase Agreement to each of their respective obligations to consummate the Sale have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

31.     The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of

26

(whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Transferred Assets, all counterparties to the Assigned Contracts, the Buyer, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' Chapter 11 cases or upon conversion to Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The Asset Purchase Agreement shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), or receiver(s).

32.     The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these Chapter 11 cases; (b) converting any of the Chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 cases. The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)–(d) above, shall continue in these Chapter 11 cases, or following dismissal of these Chapter 11 cases.

33.     Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

34.     The Asset Purchase Agreement and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

35.     The Asset Purchase Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not, based on the Debtors'

27

business judgment, and in consultation with the Consultation Parties, have a material adverse effect on the Debtors' estates or their creditors. The Debtors shall provide the Consultation Parties with prior notice of any such modification, amendment, or supplement of the Asset Purchase Agreement. For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

36.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

37.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Debtors and the Buyer are authorized to consummate the Sale immediately upon entry of this Sale Order.

38.     To the extent there is any conflict between the terms of this Sale Order and the Asset Purchase Agreement, the terms of this Sale Order shall control. Nothing contained in any chapter 11 plan hereinafter confirmed in these Chapter 11 cases or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

39.     The Court shall retain exclusive jurisdiction with respect to the terms and provisions of this Sale Order and the Asset Purchase Agreement.