### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, LLC,** *et al.*, | **Case No. 24-12337 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

### DECLARATION OF WILLIAM H. HARDIE III IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND (III) GRANTING RELATED RELIEF

I, William H. Hardie III, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.     I am a Managing Director in the Financial Restructuring Group of Houlihan Lokey Capital, Inc. ("Houlihan"), proposed investment banker to the above-captioned debtors and debtors-in-possession (the "Debtors"). I submit this declaration (the "Declaration") in support of the *Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures and (II) Granting Related Relief* (the "Order").

2.     Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, my discussions with other members of the Houlihan team working on this engagement, and my

---

[1]     The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); TV Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

personal knowledge and experience.  If I were called upon to testify, I could and would testify to each of the facts set forth below.

## QUALIFICATIONS

3.      Houlihan is an internationally recognized investment banking and financial advisory firm, with 22 offices worldwide and approximately 1,200 professionals.  The firm is one of the leading providers of M&A fairness opinions and has one of the largest worldwide financial restructuring practices of any investment bank.  Houlihan annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

4.      Houlihan's Financial Restructuring Group, which has approximately 225 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy.

5.      Houlihan has been, and is involved in some of the largest restructuring cases in the United States, including representing debtors in: *In re Coach USA, Inc.*, Case No. 24-11258 (MFW) (Bankr. D. Del. June 11, 2024); *In re JOANN Inc.,* Case No. 24-10481 (CTG) (Bankr. D. Del. March 18, 2024); *In re Town Sports International., LLC*, Case No. 20-12168 (CSS) (Bankr. D. Del. September 14, 2020); *In re Carestream Health, Inc.*, Case No. 22-10778 (JKS) (Bankr. D. Del. November 5, 2018); *In re Promise Healthcare Group, LLC*, Case No. 18-12491 (CSS) (Bankr. D. Del. November 5, 2018); *In re Heritage Home Grp., LLC*, Case No. 18-11736 (KG) (Bankr. D. Del. July 29, 2018); *In re Taler Inv. Mgmt. Corp.*, (JLG) (Bankr. S.D.N.Y. November 30, 2017); *In re Angelica Corp.*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); *In re Gawker Media LLC*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. June 10, 2016); *In*

*re Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. February 1, 2016); *In re Phoenix Brands, LLC*, Case No. 16-11242 (BLS) (Bankr. D. Del. July 5, 2016).

6.      I hold a B.S. in Economics from the University of Alabama and a J.D. from Vanderbilt University.

7.      Before joining Houlihan in January of 2000, I was Executive Vice President of Marvel Enterprises, Inc., where I led that company's efforts to acquire Marvel Entertainment Group out of Chapter 11, including arranging over $750 million in financings, managing the divestiture of several non-core businesses, managing the company's domestic and international licensing activities (motion picture, television, clothing, character statues, games, etc.), and serving as general counsel.

8.      Since joining Houlihan, I have managed numerous debtor- and creditor - side restructuring assignments involving businesses in various industries, including the energy, gaming, cable operators, and general industrial sectors.  During that time, I have been involved in numerous chapter 11 cases, including numerous cases involving the sale of substantially all of the debtors' assets in which I led or co-led the engagement.

**HOULIHAN RETENTION**

9.      As detailed in the *Declaration of Kunal Kamlani in Support of Chapter 11 Petitions and First-Day Papers* (the "First-Day Declaration"), the Company has faced significant liquidity challenges in the run-up to these Chapter 11 Cases.  As a result of these liquidity challenges, and in an attempt to proactively respond to them, the Company retained Houlihan in May 2024 to assist in exploring strategic options.  Among other options, Houlihan explored a potential going-concern sale of the Company.  The Company believed that a robust marketing process for a going-concern sale transaction would maximize value by preserving the value of the

business, including by preserving many jobs, and capitalizing on a significant amount of synergy capabilities between the Company and potential partners.  The Houlihan team has worked closely with the Debtors' management and other professionals in connection with these efforts.

### THE PREPETITION MARKETING EFFORTS AND SALE PROCESS AND PROPOSED BIDDING PROCEDURES

10.     The Company, with Houlihan's assistance, began its formal marketing process in July 2024.  The process was rigorous and designed to identify any potential buyers, including strategic or financial buyers, who may have an interest in a transaction with the Company. It was clear, given the context, that the Company would be open to consummating such a transaction in a bankruptcy case, and, further, that the Company would consider a wide range of possible transaction structures.  Houlihan worked with the Debtors to develop the initial list of potential interested parties.  Houlihan contacted 26 prospective strategic and financial buyers. 17 of the potential buyers executed non-disclosure agreements and were granted access to a virtual data room.  In the access room, the potential buyers had access to, among other diligence, confidential information memoranda (the "CIMs"), detailing the Company's business operations, financial projections, and growth opportunities.  The Debtors' management team conducted management presentation for seven of the potential buyers.

11.     At the same time, the Company was engaged in parallel negotiations with its lenders (the "Prepetition Lenders") under the Company's prepetition secured credit facility (the "Prepetition Secured Facility") regarding an amendment and waiver that would provide the Company with relief from certain asserted events of default and the ability to continue exploring a going-concern sale.  As part of these negotiations, I understand that the Prepetition Lenders required, among other things, that the Company require interested parties to submit non-binding indications of interest on or before August 30, 2024 (the "Indication of Interest Deadline").

12.     The Debtors remained actively engaged with interested parties, including responding to diligence requests and meeting with interested parties.  Ultimately, five potential buyers submitted non-binding indications of interest by the Indication of Interest Deadline.

13.     Following the Indication of Interest Deadline, the Houlihan continued to solicit interest from potential buyers and worked with certain parties that submitted initial non-binding indications of interest to improve their proposed transaction terms.  These efforts paid off, resulting in significantly improved proposals from two potential buyers, including Do it Best Corp. ("Do it Best" or the "Stalking Horse Bidder"), a strategic and synergistic bidder.

14.     The Debtors, with Houlihan's assistance, continued to negotiate with those two parties and respond to extensive diligence requests in an effort to further refine and improve the terms of both parties' bids.

15.     Ultimately, the Debtors determined that the transaction proposed by Do it Best would maximize value, allowing the Debtors' business to continue as a going-concern, including providing stability to the Debtors' vendors and customer base and preserving many jobs. The Debtors and Do it Best agreed to the terms of a going-concern sale, whereby Do it Best agreed to serve as the stalking horse bidder in a court supervised process, which would subject the Do it Best bid to higher or otherwise better bids.  During the period leading up to the filing of these chapter 11 cases (the "Chapter 11 Cases"), the Debtors and the Stalking Horse Bidder negotiated definitive documentation governing their bid (the "Stalking Horse Bid").  These terms are embodied in the Asset Purchase Agreement, dated as of October 13, 2024, among the Debtors and the Buyer (the "Stalking Horse Agreement or the "APA"), which is attached to the Order as Exhibit 2.  Certain key terms of the Stalking Horse Agreement include:

- A sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") to the Stalking Horse Bidder pursuant to Bankruptcy Code section 363;

- A $153 million cash purchase price (the "<u>Cash Consideration</u>");

- The assumption of certain liabilities, including cure costs associated with the assumption of contracts, and up to $45 million of trade payables entitled to administrative priority status (the "<u>Assumed Liabilities</u>");

- The assumption and assignment to the Stalking Horse Bidder of certain contracts designated by the Stalking Horse Bidder as material to the operation of the go-forward business (together with the Cash Consideration and the Assumed liabilities, the "<u>Purchase Price</u>");

- Employment offers to certain of the Debtors' existing employees at the closing of the Sale; and

- Bid Protections, as set forth in the APA.

16.    The Stalking Horse Agreement also contains customary representations and warranties of the parties and is subject to closing conditions, including, among others: (i) Bankruptcy Court approval of the Sale; (ii) the accuracy of representations and warranties of the parties in all materials respects; and (iii) material compliance with the obligations set forth in the Stalking Horse Agreement.

17.    The Company's board of directors (the "<u>Board</u>") met regularly throughout the Debtors' process of considering strategic alternatives and was kept apprised of the status of proposals and options available to the Debtors.  In addition to numerous other meetings that were regularly held throughout the strategic alternatives process, at a meeting of the Board held on October 13, 2024, the Board, after full deliberation, determined in its business judgment that entering into the Stalking Horse Agreement, filing these Chapter 11 Cases, and pursuing an in-court sale of the Company pursuant to Bankruptcy Code section 363 represents the highest or otherwise best offer available to the Debtors.

**THE PROPOSED BIDDING PROCEDURES**

18.    The transaction negotiated with the Stalking Horse Bidder builds on the Debtors' months-long prepetition process and will be supplemented during the postpetition marketing period contemplated by the Debtors' proposed bidding procedures (the "<u>Bidding</u>

Procedures"), thereby providing further opportunity for interested bidders to formally bid for the Assets and business operations.  Houlihan has been and is prepared to continue administering the marketing process postpetition consistent with the proposed Bidding Procedures.  I have reviewed and am familiar with the *Debtor's Motion for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, and (III) Granting Related Relief* (the "<u>Motion</u>") and the related Bidding Procedures, which include the above-mentioned timeline and history with the Stalking Horse Agreement.

19.     I believe the process engaged to date, and as further set forth in the Bidding Procedures establishes a fair, open, and competitive bidding and auction process.  Throughout their restructuring and sale process, the Debtors have expended significant effort to ensure that their key constituencies, in particular, the Prepetition Lenders, have remained apprised of the status of the process and have had access to information and diligence as needed to evaluate and advise in such process.

20.     To determine whether a going concern sale transaction would prove value maximizing, the Debtors retained Hilco Global ("<u>Hilco</u>") to prepare a report showing anticipated recoveries for the Debtors' stakeholders in an alternative liquidation scenario (the "<u>Liquidation Report</u>").  Over a period of several weeks during September 2024, the Debtors and their advisors provided Hilco with extensive diligence to complete the Liquidation Report.

21.     In evaluating potential alternatives prior to the Petition Date, the Company requested an equity liquidation bid from Hilco to accompany its report – that is, a bid under which Hilco would commit to any level of recovery in a liquidation.  However, Hilco was not willing to submit an equity liquidation bid.  As part of the postpetition process proposed in the Bidding

Procedures Motion, the Debtors and Houlihan nevertheless will consider and evaluate, among all proposed bids, equity liquidation bids submitted by any party based upon a proposed liquidation of the Debtors' assets.

22.      It is my opinion that as result of the Debtors' prepetition efforts, the Bidding Procedures and the Debtors' proposed sale timeline are fair and reasonable and will facilitate a sale process that will elicit the highest or otherwise best value for the Debtors' estate under the circumstances of the Chapter 11 Cases.  The Debtors intend to seek approval of the Bidding Procedures and the Sale within 21 and 45 days of the Petition Date, respectively.  I believe that maintaining the Sale timeline as currently proposed is particularly appropriate for several reasons. First, as indicated in the Motion, time plays a critical role in the Debtors' ability to maintain the business as a going-concern.  An expeditious process will help mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Debtors' business, and curtail professional fees and administrative costs for the benefit of all of their stakeholders and is warranted here given our prepetition work.

23.      Second, I believe that the existing timeline is adequate and provides all interested parties a reasonable opportunity to conduct diligence, assess the Company and its assets, and submit a potential bid.  Indeed, many of the likely participants are bidders who have already been contacted and are aware that the Debtors' assets are up for sale.  The robust prepetition process already undertaken as described in this Declaration supports the timeline proposed by the Debtors.

24.      I believe that the prepetition sale process has created a value maximizing procedure for the marketing of the Debtors' assets.  The postpetition period, in my view, will continue to build upon the work done to date under appropriate Bankruptcy Court supervision to

allow for (i) a market check and topping bid that would maximize value for the Debtors' estates or (ii) confirmation that the Stalking Horse Bid is the highest and best bid for the Assets as determined by the Debtors' thorough marketing process.

25.     Finally, I am familiar with the other terms and conditions of the proposed Bidding Procedures, including, without limitation, the procedures for designating a Stalking Horse Bidder and the Bid Protections.  I believe that these procedures and requirements are consistent with an orderly, value-maximizing sale process and are necessary to foster a competitive bidding environment.  In my experience, bidding incentives, such as break-up fees and expense reimbursements encourage potential purchasers to invest the requisite time, money and effort into diligence and entry into a binding agreement.  The inducements to the Salking Horse Bidder include a break-up fee of $4,590,000 (3% of the cash consideration) and expense reimbursement of up to $1,530,000 (1% of the cash consideration), in each case from the proceeds of a higher and better alternative transaction.  In my view, these aggregate amounts are reasonable compared to a $153 million base purchase price for the Stalking Horse Bid and within the range for transactions of this kind and size.

26.     I believe that, given the circumstances, the Sale process, Bidding Procedures, Bid Protections, and timeline proposed by the Debtors are fair to all parties involved and necessary to maximize the value of the Debtors' assets for the benefit of the Debtors' estates, creditors, and other parties-in-interest.

I declare under penalty of perjury that the Declaration is true and correct.

Dated:  October 14, 2024
       New York, New York

                              By:    */s/ William H. Hardie III*
                              Name:  William H. Hardie III
                              Title:   Managing Director – Houlihan Lokey