## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (●) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING
## THE DEBTORS TO ASSUME THE AGENCY AGREEMENT,
## (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE
## CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF
## ALL LIENS, CLAIMS, AND ENCUMBRANCES, (III) MODIFYING CUSTOMER
## PROGRAMS AT THE CLOSING STORES, AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):[2]

### Relief Requested

1.    The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"): (a) authorizing the Debtors to assume that certain Letter Agreement dated as of June 14, 2025, (as may be amended and supplemented from time to time), a copy of which is attached as Exhibit 1 to the Interim Order (the "Agency Agreement"), made by and between At Home Group, Inc. and Hilco Merchant Resources, LLC (the "Agent"); (b) authorizing and

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AtHome. The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

[2]    A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

approving the initiation of 26 store closings or similar themed sales at the stores listed on <u>Exhibit A</u> to the Agency Agreement (collectively, the "<u>Initial Closing Stores</u>"); (c) authorizing the Debtors to conduct store closings at additional stores at a later date or dates pursuant to the procedures set forth herein (the "<u>Additional Closing Stores</u>," if any, and, together with the Initial Closing Stores, the "<u>Closing Stores</u>"), with such sales of Store Closure Assets (as defined below) at the Closing Stores to be free and clear of all liens, claims, and encumbrances (the "<u>Sales</u>" or "<u>Store Closings</u>"), in accordance with the terms of the store closing sale guidelines (the "<u>Sale Guidelines</u>"), attached as <u>Exhibit 2</u> to the Interim Order; (d) approving certain modifications to customer programs solely with respect to the Closing Stores; and (e) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing approximately 21 days from the Petition Date.

**<u>Jurisdiction and Venue</u>**

2.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 363, 365, and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"),

rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rules 2002-1, 6004-1, and 9013-1.

<u>**Background**</u>

5.      At Home Group Inc. (together with its Debtor and non-Debtor affiliates, "<u>At Home</u>" or the "<u>Company</u>") is a national home décor and furnishings brand that offers its customers a broad assortment of everyday and seasonal products for any room in the home.  Headquartered in Coppell, Texas, the Debtors primarily derive their revenue from merchandise sold in their large format retail locations and through their e-commerce website.  The Debtors currently employ approximately 7,170 individuals and operate in 40 states with 260 retail locations and two distribution centers.  As described in the First Day Declaration, the Debtors commenced these chapter 11 cases with a restructuring support agreement in place with the support of holders of approximately 96% of the Debtors' first lien debt.

6.      On June 16, 2025 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**I.      The Store Closings.**

7.      As further described in the First Day Declaration, over the past few years, the Debtors have faced a challenging commercial environment brought on by both broader economic and retail-specific market pressures.  Macroeconomic issues, including a rapid and dramatic rise

in interest rates, persistent inflation, and concerns over unsustainable customs costs resulting from increased tariffs all placed significant pressure on the Debtors' revenue and cost structure. Retailers specifically contend with reduced foot traffic in stores, heightened competition from comparable and off-price retailers offering substantial discounts, and a disparity between inventory and customer demand.

8.      In the past 12 months, the Debtors have reduced their store footprint by six stores, leaving the Debtors with approximately 260 stores as of the Petition Date.  Given the expenses associated with brick-and-mortar operations, and the issues affecting the retail industry, a number of the Debtors' remaining stores are operating at sub-optimal performance levels.  Ultimately, the Debtors' management team and advisors determined that it is appropriate to commence closings of 26 underperforming brick-and-mortar stores, with the potential to close additional underperforming stores in the future.  The Debtors anticipate all Sales at the Initial Closing Stores to be completed, and the properties vacated, by September 30, 2025.  The date by which the Debtors anticipate Sales to conclude at Additional Closing Stores will be listed in any Additional Closing Store List (as defined below) filed with the Court.

9.      The Debtors entered these chapter 11 cases with an executed RSA that paves an efficient path through reorganization.  The relief requested in this Motion is integral to this path and maximizes the value of the Debtors' estates.  The Store Closings will permit the Debtors to commence the Sales in a timely manner and will establish fair and uniform store closing procedures that will maximize value for the Debtors' estates.

## II.    The Agent.

10.     In anticipation of these chapter 11 cases, the Debtors retained the Agent pursuant to the Agency Agreement to serve as the exclusive agent to the Debtors with respect to the Store Closings and Sales.  The Agent has significant expertise and experience in serving as a consultant

both in court and out of court for store closings and sales for businesses, merchandise, furniture fixtures and equipment, and store operations that are substantially similar to those of the Debtors. In light of the Agent's historic success in other store closings, the Debtors concluded in their business judgment that (a) the services of the Agent are necessary (i) for a seamless and efficient store closing process and (ii) to maximize the value of the saleable inventory located in the Closing Stores (as defined in the Agency Agreement, the "Merchandise"), and the associated furnishings, trade fixtures, and equipment (as defined in the Agency Agreement, the "FF&E" and, together with the Merchandise, the "Store Closure Assets"), and (b) the Agent is qualified and capable of performing the required tasks in a value-maximizing manner.

11.    By this Motion, the Debtors seek to assume the Agency Agreement, allow the Agent to commence its work at the Closing Stores as described herein uninterrupted, and to enter into additional agreements, if necessary.  The Store Closings are critical for the Debtors to efficiently administer their estates during the pendency of these chapter 11 cases, and assumption of the Agency Agreement will allow the Debtors to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

**III.    The Agency Agreement.**

12.    Pursuant to the Agency Agreement, the Agent will serve as agent to the Debtors in connection with the sale of the Store Closure Assets.  What follows is a summary of the material terms of the Agency Agreement.[3]

---

[3]    The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Agency Agreement, the Agency Agreement shall govern in all respects.  Capitalized terms used but not defined in the following summary shall have the meaning ascribed to them in the Agency Agreement.

| Term | Agency Agreement |
|---|---|
| **Services Provided by Agent** | During the Sale Term, Agent shall, in accordance with the Expense Budget approved by the Merchant: (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores and the Sale; (b) recommend appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) recommend appropriate discounts of Merchandise and staffing levels for the Stores, approved in advance by Merchant; (d) make recommendations to the Merchant in connection with appropriate allocation and replenishment of Merchandise, if applicable; (e) make recommendation to the Merchant concerning the display of Merchandise in the Stores; (f) assist the Merchant in connection with planning, execution and evaluation of marketing, customer retention and brand enhancement programs; (g) to the extent that information is available, evaluate sales and recovery performance of Merchandise by category and sales reporting and monitor expenses in accordance with an agreed upon forecast; (h) subject to Section C.(i) of the Agency Agreement, maintain the confidentiality of all proprietary or non-public information regarding Merchant; (i) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (j) to the extent requested, assist Merchant in obtaining any required permits and governmental approvals to conduct the Sale; and (k) following consultation with the ABL Agent, provide such other related services deemed necessary or appropriate as may be mutually agreed by Merchant and Agent.  Prior to the commencement of the Sale, the Agent will provide the Merchant with a proposed marketing plan as part of the Expense Budget. The Agent will also provide the Merchant with a weekly update on marketing performance in a format mutually agreed upon by the Parties.  The marketing plan and Expense Budget may be modified during the Sale Term to maximize sales and customer retention, if mutually agreed upon by the Merchant and the Agent. |
| **Term of Sale** | For the Initial Closing Stores, the Sale shall commence on or around June 19, 2025 (the "Sale Commencement Date") and conclude no later than September 30, 2025 (the "Sale Termination Date"). The Store Commencement Dates and Store Termination Dates for Additional Closing Stores will be mutually agreed in writing; *provided*, *however*, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the applicable Sale Termination Date. The period between the applicable Sale Commencement Date and the applicable Sale Termination Date shall be referred to as the "Sale Term." At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with the Interim Order or Final Order requirements, as applicable, for such premises; *provided*, *however*, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the Interim Order or Final Order, as applicable, according to a budget mutually agreed to in writing between the Agent and Merchant (in consultation with the Prepetition ABL Agent). At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store and provide such photographs to Merchant within five (5) days.  Photographs shall reference with specificity each Store by number, name and/or location. |
| **Expenses of Agent** | Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's other reasonable, documented out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established an aggregate budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs (including signage and the shipping, freight, and sales tax related thereto, where applicable).  The Expense Budget for the Sale is attached as Exhibit B to the Agency Agreement.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant (in consultation with the |

| TERM | AGENCY AGREEMENT |
|---|---|
| | Prepetition ABL Agent).  The costs of supervision set forth on <u>Exhibit B</u> of the Agency Agreement include, among other things, industry standard deferred compensation.<br><br>All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled on every Wednesday for the prior week and shall be paid on the next Friday after each such weekly reconciliation.  The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by the Agency Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty-five (45) days following the Sale Termination Date for the last Store.<br><br>Upon the execution of the Agency Agreement, and in any event no later than one (1) business day following entry of the Approval Order, the Merchant shall pay by wire transfer to the Agent an advance payment of costs and expenses delineated in the Expense Budget of $1,670,384 (the "<u>Sale Expense Advance</u>"), which shall be held by Agent and applied towards Expense Budget items as incurred.  Any portion of the Sale Expense Advance not so used shall be returned to Merchant within three days following the final reconciliation. |
| **Compensation for Agent** | In consideration of its services under the Agency Agreement, Agent shall earn a base retail fee equal to (2.0%) of the Gross Proceeds of Merchandise sold at the Stores (the "<u>Merchandise Fee</u>").  In the event the Merchant desires to have Agent facilitate a sale of Merchandise on a wholesale basis, Merchant shall do so only following obtaining the ABL Agent's consent.  Any such wholesales sales shall be subject to Merchant and Agent reaching a mutual agreement on a base wholesale fee.  In addition to the Merchandise Fee, and not in lieu thereof, the Merchant shall pay to the Agent from Gross Proceeds an additional fee based upon the Gross Recovery Percentages achieved as set forth in the table provided in the Agency Agreement (the "<u>Additional Incentive Compensation</u>").  The Additional Incentive Compensation shall be equal to the aggregate sum of the percentages set forth in the "Additional Incentive Compensation" column of the table (*e.g.*, calculated back to first dollar) for the corresponding Gross Recovery Percentage achieved; provided, however, no Additional Incentive Compensation shall be earned or payable where the Gross Recovery Percentage is less than 150.0%.<br><br>All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled on every Wednesday for the prior week and shall be paid on the next Friday after each such weekly reconciliation.  The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by the Agency Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty-five (45) days following the Sale Termination Date for the last Store.<br><br>Agent shall be entitled to a commission from the sale of the FF&E equal to seventeen and one-half percent (17.5%) of the Gross Proceeds of the sale of the FF&E.  Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in section E of the Agency Agreement, Agent's FF&E fee shall be calculated, and Agent's calculated FF&E fee and all FF&E costs and expenses then incurred shall be paid within twenty-one (21) days after each such weekly reconciliation. |
| **Conduct of Sale; Other Sale Matters** | During the Sale Term, Merchant shall:  (a) be the employer of the Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to |

| Term | Agency Agreement |
|------|------------------|
| | be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; (h) apply for and obtain, with Agent's assistance and support, all applicable permits and authorizations (including landlord approvals and consents) for the Sale; and (i) use reasonable efforts to ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under the Agency Agreement. |
| | Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent. |
| | All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, credit, debit card, credit card, or check and in accordance with the Approval Order (defined below) (where applicable) and Merchant's customary policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant. |
| | Agent shall assist Merchant in connection with the sale of the FF&E in the Stores from the Stores themselves.  Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.  Merchant shall consult with the Agent and Prepetition ABL Agent regarding the abandonment of any unsold FF&E at the Stores, in accordance with the Approval Order. |
| | If mutually agreed to by the Merchant and Agent, in consultation with the Prepetition ABL Agent, the Agent, at Agent's sole cost and expense, to supplement the Merchandise in the Sale at the Stores with additional goods procured by Agent, which are of like kind, in the Merchant's sole discretion, maintain the overall merchandising brand image of the Merchant, and are of no lesser quality to the Merchandise in the Sale at the Stores ("Additional Agent Goods"); provided, further, that the cost of Additional Agent Goods shall not exceed 20% of the aggregate Cost Value of Merchandise in the Sale.  The Additional Agent Goods shall be purchased by Agent as part of the Sale and delivered to the Stores at Agent's sole expense (including as to labor, freight and insurance relative to shipping such Additional Agent Goods to the Stores).  Sales of Additional Agent Goods shall be run through Merchant's cash register systems; provided however, that Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale. |
| | Agent shall pay to Merchant an amount equal to six percent (6%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "Additional Agent Goods Fee"), and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods.  Agent shall pay Merchant its Additional Agent Goods Fee in connection with each weekly sale reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time). |
| | Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects |

| TERM | AGENCY AGREEMENT |
|------|------------------|
| | and not a consignment for security purposes. Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their identifiable proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their identifiable proceeds. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.<br><br>Merchant shall, at Agent's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.<br><br>Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code. Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods identifiable proceeds less the Additional Agent Goods Fee, and which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods identifiable proceeds). Notwithstanding anything in this Agreement to the contrary, "Merchandise" shall not include "Additional Agent Goods."<br><br>Anything herein to the contrary notwithstanding, the Merchant, the ABL Agent, and the Agent shall work in good faith to reach an agreement with respect to the treatment of proceeds realized upon the sale or other disposition of Additional Agent Goods (and what is and is not "identifiable" (without regard to any reference to principles under the Code) and the respective rights with respect thereto / thereof) in the Approval Order, and, absent such agreement, the Agent has no obligation to provide Additional Agent Goods or pay any Additional Goods Fee. |
| **Insurance Obligations** | Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall, to the extent reasonably practicable, cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required in the Agency Agreement and, upon the reasonable request of Agent, that Agent is named as an additional insured thereunder during the Sale Term. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.<br><br>As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores. Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Agent shall maintain throughout |

| Term | Agency Agreement |
|---|---|
| | the Sale Term, workers compensation insurance in compliance with all statutory requirements. Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance. |
| **Indemnification by Agent** | Agent shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by Agent's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement, including, without limitation, the Supervisors. |
| **Indemnification by Merchant** | Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, affiliates, and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Agent Indemnified Parties) against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Agent's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law. |

## IV.    The Sale Guidelines.

13.    The Debtors seek approval of streamlined procedures to sell the Store Closure

Assets, in each case free and clear of liens, claims, and encumbrances.  As set forth below, the Sale

Guidelines are substantially similar to sale guidelines approved in retail bankruptcies around the

United States.  The Debtors seek interim approval of the Sale Guidelines to allow the commencement of the Sales at the Closing Stores.  The Sale Guidelines provide newspapers, other traditional advertising media, digital marketplaces, and other digital marketing and advertising platforms, in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Court's approval.  The Sale Guidelines anticipate that the Sales will be conducted at the Closing Stores during normal hours of operation, and that advertisements for the Sales will conform with the advertising requirements of any shopping center or retail venue in which the Closing Store may be located.  During the Sales, conspicuous signs indicating that "all sales are final" shall be posted in cash register areas of each Closing Store.  At the conclusion of each Store Closing, the Debtors shall vacate the applicable Closing Store while retaining the right to abandon any owned FF&E that is not sold in the Sales or otherwise transferred from the premises, with any such abandonment to be made in consultation with the Agent and Prepetition ABL Agent and in accordance with the Rejection Procedures.[4]  The landlord of the Closing Store will have reasonable access to the applicable Closing Store's premises as set forth in the applicable lease.  The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Sale Guidelines will provide the best and most efficient means of selling the Store Closure Assets to maximize their value to the estates.  The Debtors estimate that the currently contemplated Initial Store Closings will conclude no later than September 30, 2025.  The conclusion of Sales at Additional Closing Stores will depend on the start date.

---

[4]  "Rejection Procedures" shall have the meaning ascribed to such term in the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief*, filed contemporaneously herewith (the "Assumption and Rejection Procedures Motion").

**V.    Liquidation Sale Laws and Dispute Resolution Procedures.**

14.    Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws").  The Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, and augmentation limitations that would otherwise apply to the Store Closings.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Sale Guidelines, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Sale Guidelines shall control.

15.    For the purpose of orderly resolving any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), as set forth in the Interim Order and Final Order:

  i.    Provided that the Sales are conducted in accordance with the Interim Order, any Final Order, and the Sale Guidelines, the Debtors, the Agent, and the Debtors' landlords shall be presumed to be in compliance with any requirements of all county, parish, or municipal or other local government (hereinafter referred to as "Local") and state Liquidation Sale Laws establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets of any state or Local Governmental Unit (as defined in Bankruptcy Code section 101(27)); *provided* that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws of any state (collectively, the "Safety Laws"), and the Debtors and the Agent shall continue to be required to comply, as applicable, with such Safety Laws and General Laws (as defined in the Interim Order), subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in

the Interim Order or Final Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

ii.     Within five business days after entry of the Interim Order, the Debtors will serve by first-class mail, copies of the Interim Order, the proposed Final Order, the Agency Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; and (d) the landlords for the Closing Stores (collectively, the "Dispute Notice Parties").

iii.    With respect to any Additional Closing Stores, within five business days after filing any Additional Closing Store List (as defined below) with the Court, the Debtors will serve by first-class mail, copies of the Interim Order, or the Final Order, as applicable, the Agency Agreement, and the Sale Guidelines on the Dispute Notice Parties.

iv.     To the extent that there is a dispute arising from or relating to the Sales, the Interim Order or Final Order, as applicable, the Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Nicole L. Greenblatt, P.C., Matthew C. Fagen, P.C., and Elizabeth H. Jones; (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn.: Robert S. Brady, Edwin J. Harron, and Joseph A. Mulvihill; (c) the affected landlord, and their counsel, if any; (d) counsel to the Ad Hoc Group and the DIP Lenders, (i) Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036, Attn.: Stephen Zide (stephen.zide@dechert.com) and Eric Hilmo (eric.hilmo@dechert.com); and (ii) Potter Anderson & Corroon LLP, 1313 North Market Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary (bcleary@potteranderson.com) and Brett M. Haywood (bhaywood@potteranderson.com); (e) counsel to the Prepetition ABL Agent, (i) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn.: Kevin J. Simard (ksimard@choate.com) and Mark D. Silva (msilva@choate.com); and (ii) Reed Smith LLP, 1201 North Market Street, Suite 1500, Wilmington, DE 19801, Attn.: Kurt F. Gwynne (kgwynne@ReedSmith.com); (f) Counsel to the Agent, Riemer Braunstein LLP, Times Square Tower, Suite 2506, Seven Times Square, New York, NY 10036, Attn.: Steven Fox; (g) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Jon Lipshie (jon.lipshie@usdoj.gov) and Megan Seliber (megan.seliber@usdoj.gov); and (h) counsel to any statutory committee appointed

in these chapter 11 cases. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

v.　　In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, as applicable, absent further order of the Court. Upon the entry of the Interim or Final Order, the Debtors and the Agent shall be authorized to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, the Agency Agreement, and the Sale Guidelines (as may be modified by any Side Letters) and to take all actions reasonably related thereto or arising in connection therewith. Any Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

vi.　　If, at any time, a dispute arises among the Debtors or the Agent, on the one hand, and a Governmental Unit, on the other hand, as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

**VI.　Lease Restrictions.**

16.　　The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings and Sales. In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement

agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

17.     The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closings, the Sales or institute any action against the Debtors in any court (other than in the Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings, the Sales, or the advertising and promotion (including through the posting of signs) of the Sales.

18.     Given that the Debtors are seeking this relief on an interim basis, the Debtors seek to resolve the concerns of landlords as expeditiously as possible. In other similar cases, other debtors have proposed store closing procedures with materially similar lease restrictions. Other debtors in these situations have obtained store closing orders which included a provision allowing for "side letters" between a debtor and landlord to resolve landlord concerns. *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (approving store closing procedures which provide for side letters between the debtors and landlord); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023) (same); *In re Bed Bath &*

*Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[5]  The Debtors have included this

provision in the Interim Order and Final Order to expeditiously address landlord concerns.

## VII.  Abandonment.

19.    The Debtors respectfully request that the Court authorize the abandonment of

certain owned FF&E remaining in the Closing Stores.  The Debtors intend to sell any marketable

owned FF&E present in the Closing Stores or otherwise transfer valuable FF&E to the Debtors'

other store locations.   Any abandonment of unsold or non-transferred FF&E shall be determined

in the Debtors' business judgment in consultation with the Agent and Prepetition ABL Agent.  The

Debtors may determine that the cost associated with holding, transferring, or selling that property

exceeds the proceeds that will be realized from its sale, or such property may not be saleable at all.

In such cases, retaining the property would be burdensome to the estate and the property would be

of inconsequential value.   For the avoidance of doubt, the Debtors will not sell any personal

identifying information (which means information that alone or in conjunction with other

information identifies an individual, including, but not limited to, an individual's name, social

security number, date of birth, government-issued identification number, account number, and

credit or debit card number) as part of the Store Closings, and all personal identifying information

will be removed from any FF&E prior to abandonment of the same.  Any abandonment of such

FF&E will be in accordance with the Rejection Procedures.  Accordingly, the Debtors respectfully

submit that abandonment of such property is in the best interests of their estates and request that

the Court authorize them to do so where they determine in their business judgment that

abandonment is the appropriate course of action and in accordance with the Rejection Procedures.

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

**VIII.    Modifications to the Customer Programs Solely with Respect to the Closing Stores.**

20.    To properly effectuate the Store Closings, the Debtors need to modify the application of certain customer programs, including the form of tender for the Sales, Return Policy, Discounts, and Delivery Options, solely with respect to the Closing Stores (collectively, the "Closing Store Customer Policies").  For the avoidance of doubt, the proposed Closing Store Customer Policies will only apply to Closing Stores and all customer programs, including gift certificates, gift cards, and credit card rewards will continue to be accepted in the ordinary course at non-Closing Stores subject to approval of the relief sought in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs and (B) Honor Prepetition Obligations, and (II) Granting Related Relief*, filed contemporaneously herewith.

21.    Accordingly, the Debtors intend to implement the following Closing Store Customer Policies, which will be clearly posted for customers at cash registers and on the website of the Debtors' proposed claims and noticing agent's website at https://omniagentsolutions.com/AtHome:

22.    ***Form of Tender for the Sales.***  Fourteen days after entry of the Interim Order, the Debtors will no longer accept payment in the form of gift cards, gift certificates, or credit card rewards at the Closing Stores.

23.    ***Return Policy.***  The Debtors accept returns if a customer is not satisfied with their purchase for 60 or 90 days[6] after the date of purchase (the "Return Policy").  Fourteen days after the entry of the Interim Order, the Debtors shall no longer accept refunds or returns at any of the

---

[6]    The Debtors' Return Policy has historically provided for 60-day returns after the date of purchase for all customers and 90-day returns after the date of purchase for customers who are members of the Debtors' insider perks program.

Closing Stores.  Merchandise not purchased at a Store Closing may still be returned or exchanged at the Debtors' retail locations that are not Closing Stores, consistent with the terms of the Return Policy.  Upon entry of the Interim Order, Merchandise sold in the Sales shall be on a "final" basis and returns of such items shall not be accepted at any of the Debtors' retail locations or e-commerce platform.

24.    ***Discounts.***  The Debtors offer certain discounts, coupons, and other promotions for their customers in the ordinary course of business (collectively, "Discounts").  Upon entry of the Interim Order, Discounts shall no longer be applied to Merchandise purchased at a Sale.  The Debtors have also historically offered certain discounts for purchases made by the Debtors' employees with respect to the Merchandise (the "Employee Discount").  Upon entry of the Interim Order, employees shall be entitled to discounts on purchases of Merchandise at Closing Stores equal to the greater of:  (a) the Employee Discount; or (b) the discount offered to all customers in the Sale with respect to such Merchandise.

25.    ***Delivery Options.***  The Debtors offer certain local delivery, in-store pick-up services, and "Ship From Store (SFS)" delivery options (the "Delivery Options") in connection with orders placed on their e-commerce platform.  Upon entry of the Interim Order, such local delivery, in-store pick-up, and "Ship From Store (SFS)" options will no longer be offered at the Closing Stores.

### Basis for Relief

**I.    The Court Should Authorize the Assumption of the Agency Agreement as a Reasonable Exercise of the Debtors' Business Judgment.**

26.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *In re Trans World Airlines, Inc.*, 261 B.R. 103, 120 (Bankr. D. Del. 2001) ("A debtor's determination to reject an executory contract is governed by the business judgment standard." (citation omitted)); *see also In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("Courts have applied a 'business judgment' test in determining whether to approve a debtor's decision to assume an executory contract." (citation omitted)).

27.     To satisfy the business judgment test, the Debtors must demonstrate that assumption of the Agency Agreement would benefit the estate. *See In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule." (citation omitted)).  "A debtor's decision to reject [or assume] an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" *In re Trans Word*, 261 B.R. at 121.  Here, the Debtors have exercised their business judgment in determining to assume the Agency Agreement. By continuing the engagement of the Agent, the Debtors determined that they could capitalize on the knowledge of an agent already familiar with store liquidation and closing sales to ultimately deliver the best results for the Debtors.  Further, the Debtors believe that the terms set forth in the Agency Agreement are fair and reasonable and presently the best path for the Sales.  Moreover, the Agent has extensive expertise in conducting liquidation sales and will be able to effectively oversee and implement the Sales in an efficient and cost-effective manner.  Courts hearing chapter 11 cases filed by retailers have recently approved the assumption of similar agreements. *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (authorizing assumption of consulting agreement); *In re EXP OldCo Winddown, Inc.*,

No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (same); *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Jan. 29, 2024) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[7]

28.     The Debtors submit that they have exercised reasonable business judgment in engaging the Agent to conduct the Store Closings and Sales.  Given the number of stores and the Agent's in-depth knowledge and expertise, as discussed above, it is unlikely the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Agent.  If the Agency Agreement is not assumed on a final basis, the Sales would lose the benefit of the Agent's oversight and might be delayed or suspended entirely, leading to loss of additional liquidity and increased administrative expense.  Accordingly, the Debtors respectfully request that the Court authorize their assumption of the Agency Agreement.

**II.     The Debtors Have Shown a Valid Business Justification for the Sales.**

29.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also In re Culp*, 545 B.R. 827 (D. Del. 2016), *aff'd*, 681 F. App'x 140 (3d Cir. 2017) ("Transactions under Section 363 must be based upon the sound business judgment

---

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

of the trustee."); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

30.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (authorizing procedures for store closing sales); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[8]

31.     Sufficient business justification exists to approve the proposed Sales under section 363(b)(1).  Prior to the Petition Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their stores to:  (a) identify underperforming stores; (b) consider whether the store's performance can be improved by various initiatives, including through the negotiation of lease concessions with landlords; (c) determine which stores were candidates for downsizing; (d) assess the potential to consolidate certain stores within a reasonable proximity of one another; and (e) determine what stores should be closed promptly to eliminate their ongoing negative impact on the Debtors' financial performance and to improve the Debtors' liquidity.  This process has resulted in the Debtors' identification of the Initial Closing Stores and is ongoing with respect to Additional Closing Stores.  The Debtors, with the assistance of their advisors, have determined that the Sales represent the best alternative to maximize recoveries to

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

the Debtors' estates with respect to the Store Closure Assets and provide the Debtors with much-needed liquidity while optimizing their remaining fleet of stores.

32.     Further, delay in commencing the Sales would diminish the recovery tied to monetization of the Store Closure Assets.  Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity.  As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Stores.  Uninterrupted and orderly Sales will also allow the Debtors to timely reject leases associated with the Closing Stores, and therefore avoid the accrual of unnecessary administrative expenses for rent and related costs.  Suspension of the Sales until entry of the Final Order would delay the Sales process and may cause the Debtors to incur claims for additional rent at many of these stores, potentially costing the estate millions of dollars of administrative expense.

### III.    The Court Should Approve the Sale Guidelines.

33.     The Court may authorize the Debtors to consummate the Sales pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1). As discussed herein, pursuant to section 363(b) of the Bankruptcy Code, for the purpose of conducting the Store Closings, the Debtors need only show a legitimate business justification for the proposed action.  *See*, *e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted).

34.     Section 105(a) codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may authorize any action that is essential

to the continued operation of a debtor's businesses.  *See In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999) (authorizing the use of estate property when "necessary for the debtors' survival during chapter 11").

35.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.   Under the Sale Guidelines, the Sales will maximize value to the Debtors' estates by maintaining consistent operational efficiency across the Closing Stores while balancing the potentially competing concerns of landlords and other parties in interest.  Meaningful amounts of Merchandise, in the aggregate, will be monetized most efficiently and quickly through an orderly process in accordance with the Sale Guidelines.

36.     Further, any delay in consummating the Sales would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons, chief among them is that the Closing Stores are a drain on liquidity.  Thus, the Debtors will realize an immediate benefit in terms of liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Stores.  Further, the swift and orderly commencement of the Sales will allow the Debtors to timely reject the applicable store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment.  Delaying the Store Closings may cause the Debtors to pay postpetition rent at many of these stores and, given the Debtors' current section 365(d)(4) deadline, there is a finite number of days that the Sales can run without obtaining further extensions.

37.     Courts in this and other districts have routinely approved store closing sale guidelines in chapter 11 cases, and numerous courts have granted retail debtors authority to

implement such procedures. *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (authorizing the debtors, pursuant to sections 105(a) and 363(b), to conduct store closings in accordance with court-approved sale guidelines); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[9]   As such, the Court should authorize the Store Closings and approve the Sale Guidelines as a reasonable exercise of the Debtors' business judgment.

**IV.    The Court Should Approve the Sale of the Store Closure Assets Free and Clear of all Liens, Encumbrances, and Other Interests under Section 363(f) of the Bankruptcy Code.**

38.    The Debtors request approval to sell the Store Closure Assets on a final, "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003) ("[U]nder § 363(f), . . . a sale free and clear of any [interest in property] can occur if any one of

---

[9]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

five conditions has been satisfied."). The Debtors' "authority to sell free and clear is broad." *In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001)*, aff'd*, 322 F.3d 283 (3d Cir. 2003).

39.     The Debtors anticipate that, to the extent there are liens on the Store Closure Assets, all holders of such liens will consent to the Sales because the Sales provide the most effective, efficient, and time-sensitive approach to realizing proceeds for, among other things, the repayment of amounts due to such parties. Any and all liens on the Store Closure Assets sold under the Sales would attach to the remaining net proceeds of such sales with the same force, effect, and priority as such liens currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any party-in-interest with respect thereto. Moreover, all identified lienholders have received sufficient notice and have been given sufficient opportunity to object to the relief requested.

40.     Accordingly, the Debtors submit that the sale of the Store Closure Assets satisfies the statutory requirements of section 363(f) of the Bankruptcy Code and should, therefore, be free and clear of any liens, claims, encumbrances, and other interests.

## V.     The Court Should Waive Compliance with Liquidation Sale Laws and Approve the Dispute Resolution Procedures.

41.     The Debtors' ability to conduct the Sales in accordance with the Sale Guidelines and without complying with Liquidation Sale Laws is critical to the Sales' success. Although the Debtors intend to comply with state and Local Safety Laws and consumer protection laws in conducting the Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.

42.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Liquidation Sale Laws, the Debtors propose the Sale Guidelines as a way to streamline the administrative burdens on their estates while still adequately

protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Sale Guidelines mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings, and therefore, the below requested relief is consistent with any applicable Liquidation Sale Laws.

43. The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws, subject to the Sale Guidelines. *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, GA. CODE ANN. § 10-1-393(b)(24)(C)(iv) (exempting from the provisions of the chapter sales conducted pursuant to any court order); 815 ILL. COMP. STAT. 350/3 (same); LA. STAT. ANN. § 51:43(1) (same); N.Y. GEN. BUS. LAW § 584(a) (same); OR. REV. STAT. ANN. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); TEX. BUS. & COM. CODE ANN. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding any contrary Liquidation Sale Laws as it is essential to the continued operation of the Debtors' business and maximizing value from Sales. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). *Third*, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Bankruptcy Court.

44.     Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . .  [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).   Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).   Preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

45.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize the value of estate assets for the benefit of creditors.   Accordingly, authorizing the Sales without the delays and burdens associated with obtaining various state and Local licenses, observing state and Local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, sales, and similar items is necessary and appropriate.   The Debtors do not seek a general waiver of all state and Local law requirements, but only those that apply specifically to

retail liquidation sales.  Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Sales.  Moreover, the Debtors will comply with applicable state and Local Safety Laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.  Finally, the Dispute Resolution Procedures provide orderly means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws and should therefore be approved.

46.     Courts in this district, and in other districts, have recognized that the Bankruptcy Code preempts certain state laws and have granted similar relief from the Liquidation Sale Laws in other bankruptcy cases under similar circumstances.  *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (authorizing debtors to conduct store closing sales under the terms of the order and finding that "no further approval, license, or permit of any Governmental Unit shall be required."); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (same); *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[10]

## VI.   The Court Should Waive Compliance with Restrictions in the Debtors' Leases.

47.     Certain of the Debtors' leases governing the premises of the stores subject to the Store Closings may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be

---

[10]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its chapter 11 case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring [the debtor] to maximize estate assets. . ."); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where the debtor sought to conduct a liquidation sale).

48.    Courts in this district and others have authorized waivers of compliance with restrictive lease provisions affecting store liquidation sales in chapter 11 cases. *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[11]    Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors and the Agent to conduct any

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

## VII.   The Court Should Approve the Abandonment of Certain Property in Connection with the Sales.

49.      After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  Courts generally give a debtor in possession great deference to its decision to abandon property. *See In re Syntax-Brillian Corp.*, No. 08-11407 (KJC), 2018 WL 3491758, at *15 (Bankr. D. Del. July 18, 2018) ("The Trustee's power to abandon property is discretionary and the Court will generally defer to the Trustee's judgment in determining whether to abandon a property." (internal quotation omitted) (citation omitted)); *see also In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003), *aff'd*, 112 F. App'x 868 (3d Cir. 2004) ("The trustee's power to abandon property is discretionary.").  Unless certain property is harmful to the public, once a debtor has shown that it is burdensome or of inconsequential value to the estate, a court should approve the abandonment. *See In re Unidigital, Inc.*, 262 B.R. 283, 286 (Bankr. D. Del. 2001) (recognizing an exception to abandonment where there is a threat to the public health).

50.      The Debtors are seeking to sell all owned FF&E remaining in the Closing Stores. The Debtors may determine, however, that the costs associated with holding, transferring, or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.  To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any FF&E or other property located at any of the Closing Stores that is not sold or otherwise transferred to the Debtors' other stores, with any such abandonment to be in consultation

with the Agent and Prepetition ABL Agent and in accordance with the Rejection Procedures, without incurring liability to any person or entity. Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, cash registers, or similar equipment that are to be sold or abandoned.

**VIII.  The Bankruptcy Court Should Approve the Procedures Relating to the Additional Closing Stores.**

51.     The Debtors request that the Sale Guidelines and the Interim Order or the Final Order, as applicable, apply to any Additional Closing Stores. To provide landlords and other parties in interest with information regarding the ultimate disposition of the Closing Stores, to the extent that the Debtors seek to conduct the Sales at any Additional Closing Store the Debtors will file a list of such Additional Closing Stores (including the date by which the Debtors anticipate Sales to conclude at such Additional Closing Stores) with the Bankruptcy Court (the "Additional Closing Store List"), and serve a notice of their intent to conduct the Sales at the Additional Closing Stores on the applicable landlords (the "Additional Closing Store Landlords") and any other interested parties by email (to the extent available to the Debtors) or overnight mail. With respect to Additional Closing Store Landlords who do not have an email address on file in the Debtors' books and records, the Debtors will mail such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

52.     The Debtors propose that the Additional Closing Store Landlords (each of whom will have already been served with this Motion, the Interim Order, and the Final Order) and any

interested parties have five days after service of the applicable Additional Closing Store List to object to the application of the Interim Order or Final Order, as applicable, to their Additional Closing Store.  If no timely objections are filed with respect to the application of the Interim Order or the Final Order to an Additional Closing Store, then the Debtors should be authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional Closing Store in accordance with the Interim Order or the Final Order, the Sale Guidelines, and the Agency Agreement.

53.     If any objections are filed with respect to the application of the Interim Order or the Final Order, as applicable, to an Additional Closing Store, and such objections are not resolved, the objections and the application of the Interim Order or the Final Order, as applicable, to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary so that the Debtors can move promptly to maximize value and minimize expenses for the benefit of their creditors and stakeholders.  Similar relief has been granted in recent retail bankruptcy cases.  *See e.g.*, *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (approving similar procedures for additional stores); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (same); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019) (same); *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023) (same).[12]

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

**IX.    The Proposed Modifications to the Closing Store Customer Policies Are Appropriate.**

54.    The Court may authorize payment of prepetition claims, such as refund or exchange obligations, in appropriate circumstances, pursuant to section 105(a) of the Bankruptcy Code. As discussed above, section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  This "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow for modifications of customer programs not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 241 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of prepetition claims" under the doctrine of necessity).

55.    Accordingly, the Court has authority to authorize the Debtors to modify the Closing Store Customer Policies pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.  The Store Closings necessitate that the Closing Store Customer Policies must be modified to provide finality and support efficient Store Closings.  The grace period between entry of the Interim Order and the date after which certain Closing Store Customer Policies shall be modified affords customers ample opportunity to either (a) return any products purchased at Closing Stores prior to the Petition Date or (b) use any gift cards, gift certificates, or credit card rewards at the Closing Stores for the first 14 days following entry of the Interim Order.  Customers will not be prejudiced by discontinuing the Discounts, as the Sales will already provide for discounted Merchandise and customers may still apply Discounts at stores other than Closing Stores.  Modifying the Closing Store Customer Policies is therefore appropriate and a reasonable exercise of the Debtors' business

judgment. The Debtors submit that the notice provided through this Motion is adequate and proper under the circumstances. Similar relief has been granted in recent retail bankruptcy cases. *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (authorizing debtors to modify their exchange and return policies); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (authorizing debtors to modify their exchange, return, and certain discount policies).[13]

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

56. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of access to cash on hand and anticipated access to cash collateral and debtor-in-possession financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003(a) Are Satisfied

57. Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that "relief is needed to avoid immediate and

---

[13] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

irreparable harm." Fed. R. Bankr. P. 6003(a).  For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm.  The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

## Reservation of Rights

58.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the

Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

59.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

## Notice

60.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) counsel to the Ad Hoc Group and the DIP Lenders; (g) counsel to the Prepetition ABL Agent; (h) affected landlords; (i) any party known to assert an ownership interest in any Store Closure Assets or any other assets located at the stores that are the subject of the store closing procedures, including but not limited to lessors of FF&E or other personal property to the Debtors, (j) any party that has filed a UCC-1 statement against or is otherwise known to assert a lien on any personal property located at the applicable Closing Stores, (k) any other known affected counterparty at the applicable

proposed Closing Store, and (l) any party that is entitled to notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  June 16, 2025
Wilmington, Delaware

/s/ Joseph A. Mulvihill
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Edwin J. Harron (DE Bar No. 3396)
Joseph A. Mulvihill (DE Bar No. 6061)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 571-6600
Facsimile:    (302) 571-1253
Email:         rbrady@ycst.com
               eharron@ycst.com
               jmulvihill@ycst.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Matthew C. Fagen, P.C. (*pro hac vice* pending)
Elizabeth H. Jones (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900
Email:         nicole.greenblatt@kirkland.com
               matthew.fagen@kirkland.com
               elizabeth.jones@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (●) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | **Re: Docket No. _** |

## INTERIM ORDER (I) AUTHORIZING
## THE DEBTORS TO ASSUME THE AGENCY AGREEMENT,
## (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE
## CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF
## ALL LIENS, CLAIMS, AND ENCUMBRANCES, (III) MODIFYING CUSTOMER
## PROGRAMS AT THE CLOSING STORES, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession

(collectively, the "<u>Debtors</u>") for entry of an interim order (this "<u>Interim Order</u>"): (a) authorizing

the Debtors to assume the Agency Agreement; (b) authorizing and approving the initiation of the

Store Closings in accordance with the terms of the Agency Agreement and the Sale Guidelines,

with such sales to be free and clear of all liens, claims, and encumbrances; (c) authorizing the

Debtors to conduct Store Closings with respect to the Additional Closing Stores at a later date or

dates and the procedures associated therewith; (d) approving certain modifications to customer

programs solely with respect to the Closing Stores; (e) scheduling a final hearing to consider

approval of the Motion on a final basis; and (f) granting related relief, all as more fully set forth in

the Motion; and upon the First Day Declaration; and the United States District Court for the District

of Delaware having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://omniagentsolutions.com/AtHome.  The location of the Debtors'
service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

to the Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

A.      The Debtors have advanced sound business reasons for assuming the Agency Agreement and adopting the Sale Guidelines, on an interim basis subject to the Final Hearing, as set forth in the Motion and at the Hearing, and assuming the Agency Agreement is a reasonable exercise of the Debtors' business judgement and in the best interest of the Debtors and their estates.

B.      The Agency Agreement, a copy of which is attached to this Interim Order as **Exhibit 1**, was negotiated, proposed, and entered into by the Agent and the Debtors without collusion, in good faith, and from arm's-length bargaining positions.

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* Fed. R. Bankr. P. 7052.

C.      The assumption of the Agency Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

D.      The Sale Guidelines, which are attached hereto as **Exhibit 2**, are reasonable and appropriate, and the conduct of the Sales in accordance with the Sale Guidelines will provide an efficient means for the Debtors to dispose of the Store Closure Assets and are in the best interest of the Debtors' estates.

E.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

F.      The Store Closings and Sales are in the best interest of the Debtors' estates.

G.      The Dispute Resolution Procedures are fair and reasonable and comply with applicable law.

H.      The Debtors have represented that they intend to neither sell nor lease personally identifiable information pursuant to the relief requested in the Motion, although the Agent will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

I.      The entry of this Interim Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      Any objections to the entry of this Interim Order, to the extent not withdrawn or settled, are overruled.

3

3.      The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on _____, 2025, at__:__ _.m., (prevailing Eastern Time).  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2025 and shall be served on: (a) the Debtors, At Home Group Inc., 9000 Cypress Waters Blvd, Coppell, Texas 75019, Attn.: Meredith Hampton; (b) proposed counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Nicole L. Greenblatt, P.C. (nicole.greenblatt@kirkland.com); Matthew C. Fagen, P.C. (matthew.fagen@kirkland.com); and Elizabeth H. Jones (elizabeth.jones@kirkland.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn.: Robert S. Brady (rbrady@ycst.com); Edwin J. Harron (eharron@ycst.com); and Joseph A. Mulvihill (jmulvihill@ycst.com); (c) counsel to the Ad Hoc Group and the DIP Lenders, (i) Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036, Attn.:  Stephen Zide (stephen.zide@dechert.com) and Eric Hilmo (eric.hilmo@dechert.com); and (ii) Potter Anderson & Corroon LLP, 1313 North Market Street, Wilmington, Delaware 19801, Attn:  M. Blake Cleary (bcleary@potteranderson.com) and Brett M. Haywood (bhaywood@potteranderson.com); (d) counsel to the Prepetition ABL Agent, (i) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn.: Kevin J. Simard (ksimard@choate.com) and Mark D. Silva (msilva@choate.com); and (ii) Reed Smith LLP, 1201 North Market Street, Suite 1500, Wilmington, DE 19801, Attn.:  Kurt F. Gwynne (kgwynne@ReedSmith.com); (e) Counsel to the Agent, Riemer Braunstein LLP, Times Square Tower, Suite 2506, Seven Times Square, New York, NY 10036, Attn.:  Steven Fox; (f) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.:  Jon Lipshie (jon.lipshie@usdoj.gov) and Megan Seliber

4

(megan.seliber@usdoj.gov); and (g) counsel to any statutory committee appointed in these chapter 11 cases.

4.      To the extent any conflict between this Interim Order, the Sale Guidelines, and the Agency Agreement, the terms of this Interim Order shall control over all other documents and the Sale Guidelines shall control over the Agency Agreement.

**I.      Authority to Assume the Agency Agreement.**

5.      The Debtors are authorized to assume and perform under the Agency Agreement pursuant to sections 363 and 365 of the Bankruptcy Code, including:  (a) making payments required by the Agency Agreement to the Agent without the need for any application of the Agent or a further order of the Court and notwithstanding any budgets approved in connection with any interim and final orders, as applicable, approving any postpetition debtor-in-possession financing facility and/or the Debtors' use of cash collateral (in each case, the "DIP Order"); and (b) allowing the sale of Additional Agent Goods.

6.      Subject to the restrictions set forth in this Interim Order, the Sale Guidelines, and any Side Letters (each as defined below), the Debtors and the Agent are hereby authorized to take any and all actions as may be necessary or desirable to implement the Agency Agreement and the Sales, and each of the transactions contemplated by the Agency Agreement, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agency Agreement and/or the Sales prior to the date of this Interim Order, are hereby approved and ratified.

7.      The Agency Agreement and related documents may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, so long as any such modifications, amendments, or supplements are not materially adverse to the Debtors or their estates.  The Debtors are hereby authorized to enter into additional agreements with the Agent or, as provided for in paragraph 11 hereof, another agent or consultant

with respect to services to be provided in connection with any Additional Closing Stores that are not Permitted Store Closures (as defined in the DIP Order), or Sales related thereto.

8.      Notwithstanding anything to the contrary in the Agency Agreement, the Debtors and their estates shall not indemnify the Agent for any damages arising out of the Agent's fraud, willful misconduct, or gross negligence.

9.      The failure to include any provisions of the Agency Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that such provisions of the Agency Agreement be, and hereby are, authorized and approved.

**II.    Authority to Engage in Sales and Conduct Store Closings.**

10.     The Debtors are authorized, but not directed to, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately conduct the Sales at the Closing Stores in accordance with this Interim Order, the Sale Guidelines, and the Agency Agreement, as may be modified by any Side Letters (as defined below) between the Debtors or the Agent and the landlords at the Closing Stores.  Notwithstanding anything in this Interim Order to the contrary, and in consultation with the Prepetition ABL Agent, the Debtors may elect to discontinue the Sales at any Closing Stores and revert to normal operations without further notice or authorization from the Court.

11.     The Debtors may, in consultation with the Prepetition ABL Agent, enter into a consulting agreement with an additional or separate store closing consultant in place of the Agent, to assist with and oversee Additional Store Closings that do not constitute a Permitted Store Closure (as defined in the DIP Order).

12.     The Sale Guidelines are approved in their entirety on an interim basis.

13.     The Debtors are authorized, in consultation with the Prepetition ABL Agent, to discontinue operations at the Closing Stores in accordance with this Interim Order and the Sale Guidelines.

14.     All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Agency Agreement or this Interim Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent; *provided* that any such surrender shall be pursuant to an adversary proceeding to the extent that such an adversary proceeding is required under section 542 of the Bankruptcy Code.

15.     Neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) or landlord, to conduct the Sales and Store Closings and to take the related actions authorized herein.

III.    **Conduct of the Sales.**

16.     All newspapers and other digital and traditional advertising media in which the Sales and Store Closings may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sales and Store Closings pursuant to the Agency Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Agency Agreement.

17.     The Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Sales and Store Closings without necessity of further order of this Court as provided in the Agency Agreement and the Sale Guidelines (subject to any Side Letters, as defined below), including, but not limited to,

7

advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales as contemplated in the Sale Guidelines through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of sign-walkers, A-frames, and other street signage, as contemplated in the Sale Guidelines.

18.     Except as expressly provided in the Agency Agreement and the Sale Guidelines, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Agent.  Any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Sales (including the sale of the Merchandise and FF&E), the rejection of leases, abandonment of assets (including "going dark" provisions) shall not be enforceable in conjunction with the Store Closings or the Sales.  Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Sales are conducted in accordance with the terms of this Interim Order, any Side Letter (as defined below), and the Sale Guidelines.  The Debtors, the Agent, and the landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Debtors, the Agent, and any such landlords. In the event of any conflict between the Sale Guidelines, the Agency Agreement, any Side Letter, and this Interim Order, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the Sale Guidelines, no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, or creditors,

8

shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditors and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closings, or (b) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the closing locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the closing locations or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.    In accordance with and subject to the terms and conditions of the Agency Agreement, the Agent shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as modified by any Side Letters) and this Interim Order.

21.    All in-store sales of Store Closure Assets and the Additional Agent Goods shall be "as is" and final as of the Sale Commencement Date.  Conspicuous signs stating that "all sales are final" and "as is" will be posted at the point-of-sale areas at all Closing Stores.  As to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.     The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of such dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Agent shall collect, remit to the Debtors, and account for sales taxes as and to the extent provided in the Agency Agreement.  This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state, provincial or federal law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state, provincial or federal law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell the Store Closure Assets and all sales of Store Closure Assets, whether by the Agent or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, and other interests; *provided, however*, that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale of the Store Closure Assets with the same validity, in the same amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Agency Agreement).

24.     The Debtors or the Agent (as the case may be) are authorized and empowered to transfer Store Closure Assets among, and into, the Closing Stores in accordance with the Sale

10

Guidelines, as applicable.  The Debtors are authorized, with the assistance of the Agent, to sell the FF&E, transfer the FF&E to one of the Debtors' other store locations, or, in consultation with the Agent and Prepetition ABL Agent, abandon the same, as provided for and in accordance with the terms of the Agency Agreement and the Sale Guidelines.  Any abandonment of such FF&E or other property will be in accordance with the Rejection Procedures.  Notwithstanding anything to the contrary in this Order or the Agency Agreement, the Debtors shall not sell or abandon any property that the Debtors know is not owned by the Debtors; *provided* that the Debtors will either (a) provide for the return of such property to the Debtors' headquarters or (b) return such property to the applicable lessor, or other owner of the property; *provided*, *however*, that the Debtors may abandon property owned by the Landlord at the applicable Store.

25.    The Agent is authorized, if mutually agreed to by the Debtors and the Agent, in consultation with the Prepetition ABL Agent, and at the Agent's sole cost and expense, to supplement the Merchandise in the Sale at the Stores with additional goods procured by Agent, which are of like kind, in the Debtors' sole discretion, maintain the overall merchandising brand image of the Debtors, and are of no lesser quality to the Merchandise in the Sale; *provided* that the cost of Additional Agent Goods shall not exceed 20% of the aggregate Cost Value (as defined in the Agency Agreement) of the Merchandise in the Sale.  The Additional Agent Goods shall be purchased by the Agent as part of the Sales and delivered to the Closing Stores at the Agent's sole expense (including as to labor, freight, and insurance relative to shipping such Additional Agent Goods to the Closing Stores).  Sales of Additional Agent Goods shall be run through the Debtors' cash register systems; provided, however, that the Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  The Agent and Debtors shall

cooperate to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods from the Merchandise. The Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

26.     The Agent shall pay the Debtors an amount equal to 6% of the gross proceeds (excluding Sale Taxes) from the Sale of the Additional Agent Goods (the "Additional Agent Goods Fee"). The Agent shall retain all remaining amounts from the sale of the Additional Agent Goods. The Agent shall pay the Debtors the Additional Agent Goods Fee in connection with each weekly reconciliation with respect to the sales of Additional Agent Goods sold by the Agent during each then prior week (or at such other mutually agreed upon time).

27.     All transactions relating to the Additional Agent Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from the Agent to the Debtors under Article 9 of the Uniform Commercial Code (the "UCC") and not a consignment for security purposes. Subject solely to Agent's obligations to pay to the Debtors the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their identifiable proceeds shall be the exclusive property of the Agent, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Agent Goods or the identifiable proceeds thereof. Notwithstanding anything to the contrary herein, the Debtors, the Prepetition ABL Agent, and the Agent shall work in good faith to reach an agreement with respect to the treatment of proceeds realized upon the sale or other disposition of Additional Agent Goods (and what is and is not "identifiable" (without regard to any reference to principles under the UCC) and the respective rights with respect thereto / thereof) in this Interim

Order, and, absent such agreement, the Agent has no obligation to provide Additional Agent Goods or pay any Additional Goods Fee.  The Additional Agent Goods shall at all times remain subject to the exclusive control of the Agent.  The Debtors shall, at Agent's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard thereto. The Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

28.     Notwithstanding anything to the contrary contained herein, in the Agency Agreement, or otherwise, the sale of the Additional Agent Goods shall not extend the Sale Term with respect to any Closing Store, unless otherwise agreed in writing by the Debtors and the Prepetition ABL Agent.

29.     The Agent is hereby granted a first-priority security interest in and lien upon (a) the Additional Agent Goods and (b) the Additional Agent Goods identifiable proceeds (less the Additional Agent Goods Fee), which security interest shall be deemed perfected without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that the Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying the Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Debtors as the consignee therefor, and the Agent's security interest in and lien upon such Additional Agent Goods and the Additional Agent Goods identifiable proceeds).  The term "Merchandise" shall not include "Additional Agent Goods."  Notwithstanding anything to the contrary contained herein, in the Agency Agreement, or otherwise, the Agent shall have no claim or lien on, or security interest in, any assets in the ABL True Up Account (as defined in the DIP Order, the "True Up Assets"),

13

and the Agent is prohibited from asserting any interest in such True Up Assets on account of fees and expenses owed to the Agent on account of Additional Agent Goods or otherwise.

30.     Neither the Sale Guidelines, Agency Agreement, nor this Interim Order authorize the Debtors to transfer or sell to Agent or any other party the personal identifying information (which means information that alone or in conjunction with other information identifies an individual, including but not limited to an individual's first name (or initial) and last name, physical address, electronic address, telephone number, social security number, date of birth, government-issued identification number, account number and credit or debit card number) ("PII") of any customers unless such sale or transfer is permitted by the Debtors' privacy policy and state, provincial or federal privacy and/or identity theft prevention laws and rules (collectively, the "Applicable Privacy Laws").  The foregoing shall not limit the Agent's use of the Debtors' customer lists and mailing lists in accordance with the Agency Agreement solely for purposes of advertising and promoting the Sales.

31.     The Debtors shall remove or cause to be removed any confidential information and/or PII in any of the Debtors hardware, software, computers or cash registers or similar equipment which are to be sold or abandoned so as to render the PII unreadable or undecipherable. At the conclusion of the Sales, the Agent shall provide the Debtors with written verification that the Agent has not removed, copied, or transferred any customer PII and that any records containing PII were shredded, erased, or otherwise modified to render the PII unreadable or undecipherable.

32.     Nothing herein shall limit the Debtors' right, in consultation with the Prepetition ABL Agent, to pause or discontinue a Sale at a Closing Store on notice to affected parties.

33.     Nothing herein is intended to affect any rights of any applicable Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) to enforce any law affecting the Debtors' conduct of any store closing sale that occurred before the Petition Date.

34.     At the conclusion of each Sale, Agent shall surrender the premises for each Store to the Debtors in broom clean condition and in accordance with this Interim Order; *provided*, *however*, the Debtors shall bear all costs and expenses associated with surrendering the premises in accordance with this Interim Order, according to a budget mutually agreed to in writing between the Agent and the Debtors (in consultation with the Prepetition ABL Agent).

**IV.     Procedures Relating to Additional Closing Stores.**

35.     To the extent that the Debtors seek to conduct Sales at any Additional Closing Store, the Sale Guidelines and this Interim Order shall apply to the Additional Closing Stores.

36.     Prior to conducting the Sales at any Additional Closing Store (and solely to the extent such Additional Closing Store does not constitute a Permitted Store Closure, with the prior written consent of the Prepetition ABL Agent), the Debtors will file a list including such Additional Closing Stores (as well as the date by which the Debtors anticipate Sales to conclude at such Additional Closing Store) with this Court (each, an "Additional Closing Store List"), and serve a notice of their intent to conduct the Sales at the Additional Closing Store on the applicable landlords (collectively, the "Additional Closing Store Landlords"), Additional Closing Store Landlords' counsel of record (if known), and other interested parties by email (to the extent available to the Debtors) or overnight mail. With respect to Additional Closing Store Landlords who do not have an email address on file in the Debtors' books and records, the Debtors will mail, if applicable, such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors). After the occurrence of an ABL Cash Collateral Termination Event (as defined in the DIP Order), the Prepetition ABL Agent

15

shall have the right to direct the Debtors via notice to the Debtors, with a copy to the Debtors'

counsel, to designate Additional Closing Stores. Within five business days of notice thereof, the

Debtors shall designate Additional Closing Stores consistent with the procedures set forth herein

and direct the Agent to begin the store closing process with respect to such Additional Closing

Stores.

37.     The Additional Closing Store Landlords and any interested parties shall have five

calendar days after service of the applicable Additional Closing Store List to object to the

application of this Interim Order to the Additional Closing Store(s) listed in such Additional

Closing Store List. If no timely objections are filed with respect to the application of this Interim

Order to an Additional Closing Store, the Debtors are authorized, pursuant to sections 105(a), and

363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional

Closing Stores in accordance with this Interim Order, the Sale Guidelines, the Agency Agreement,

and any Side Letter, if applicable. If any objections are timely filed with respect to the application

of this Interim Order or the Final Order to an Additional Closing Store, and such objections are

not resolved, the objections and the application of this Interim order or the Final Order to the

Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus

hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice,

to the extent necessary. Any objections as to particular Additional Closing Stores will not affect

the Debtors' and Agent's rights to begin Sales at non-objected-to Additional Closing Stores.

Notwithstanding anything in this Interim Order to the contrary, and in consultation with the

Prepetition ABL Agent, the Debtors may elect to discontinue the Sales at any Additional Closing

Stores and revert to normal operations without further notice or authorization from the Court.

## V.        Closing Store Customer Policies.

38.    Fourteen calendar days following the entry of this Interim Order, the Debtors will no longer accept payment in the form of gift cards, gift certificates, or credit card rewards at the Closing Stores.

39.    Fourteen calendar days following the entry of this Interim Order, the Debtors will no longer accept refunds or returns at any of the Closing Stores.

40.    Upon entry of the Interim Order, Merchandise sold in the Sales shall be on a "final" basis and returns of such items shall not be accepted at any of the Debtors' retail locations or ecommerce platform.  The Debtors shall post notice of changes to the Customer Policies for customers at cash registers and on the website of the Debtors' proposed claims and noticing agent's website at https://omniagentsolutions.com/AtHome.

41.    Upon entry of the Interim Order, Discounts shall no longer be applied to Merchandise purchased at a Sale.   The Debtors shall post notice of changes to the Customer Policies for customers at cash registers and on the website of the Debtors' proposed claims and noticing agent's website at https://omniagentsolutions.com/AtHome.

42.    Upon entry of the Interim Order, the Debtors shall no longer offer local delivery, in-store pick-up services, or "Ship From Store (SFS)" delivery options, solely for the Closing Stores.

## VI.       Dispute Resolution Procedures with Governmental Units.

43.    Nothing in this Interim Order, the Agency Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this

Interim Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, Safety Laws, criminal, tax (including, but not limited to, the collection of sales taxes), labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising, consumer protection, the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring (collectively, "General Laws"). Nothing in this Interim Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall alter or affect obligations to comply with all applicable federal Safety Laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court, that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Interim Order. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

44.    To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state, or Local statute, ordinance, rule, or licensing requirement directed at regulating "going out of business," "store closing," or similar inventory liquidation

sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, signage, and use of sign-walkers solely in connection with the sale of the Store Closing Assets, including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets, the dispute resolution procedures in this section shall apply and the Dispute Resolution Procedures shall control over any Side Letters:

(A)     Provided that the Sales are conducted in accordance with this Interim Order, any Final Order, and the Sale Guidelines, the Debtors, the Agent, and the Debtors' landlords shall be presumed to be in compliance with any requirements of all county, parish, or municipal or other local government (hereinafter referred to as "Local") and State requirements governing the conduct of the Sales of the Store Closure Assets, including but not limited to Local statutes, regulation and ordinances establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets (collectively, the "Liquidation Sale Laws") of any state or Local Governmental Unit (as defined in Bankruptcy Code section 101(27)); *provided* that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws of any state (collectively, "Safety Laws"), and the Debtors and the Agent shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Interim Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

(B)     Within five business days after entry of this Interim Order, the Debtors will serve by first-class mail, copies of this Interim Order, the proposed Final Order, the Agency Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; and (d) the landlords for the Closing Stores (collectively, the "Dispute Notice Parties").

(C)     With respect to any Additional Closing Stores, within five business days after filing any Additional Closing Store List with the Court, the Debtors will serve by first-class mail, copies of the Interim Order or the Final Order, as applicable, the Agency Agreement, and the Sale Guidelines on the Dispute Notice Parties.

(D)     To the extent that there is a dispute arising from or relating to the Sales, this Interim Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive

jurisdiction to resolve the Reserved Dispute. Within ten days following entry of this Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Nicole L. Greenblatt, P.C., Matthew C. Fagen, P.C., and Elizabeth H. Jones; (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn.: Robert S. Brady, Edwin J. Harron, and Joseph A. Mulvihill; (c) the affected landlord, and their counsel, if any; (d) counsel to the Ad Hoc Group and the DIP Lenders, (i) Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036, Attn.: Stephen Zide (stephen.zide@dechert.com) and Eric Hilmo (eric.hilmo@dechert.com); and (ii) Potter Anderson & Corroon LLP, 1313 North Market Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary (bcleary@potteranderson.com) and Brett M. Haywood (bhaywood@potteranderson.com); (e) counsel to the Prepetition ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn.: Kevin J. Simard (ksimard@choate.com) and Mark D. Silva (msilva@choate.com); and (ii) Reed Smith LLP, 1201 North Market Street, Suite 1500, Wilmington, DE 19801, Attn.: Kurt F. Gwynne (kgwynne@ReedSmith.com); (f) Counsel to the Agent, Riemer Braunstein LLP, Times Square Tower, Suite 2506, Seven Times Square, New York, NY 10036, Attn.: Steven Fox; (g) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Jon Lipshie (jon.lipshie@usdoj.gov) and Megan Seliber (megan.seliber@usdoj.gov); and (h) counsel to any statutory committee appointed in these chapter 11 cases. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(E)     In the event that a Dispute Resolution Motion is filed, nothing in this Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of this Interim Order or the Final Order nor the conduct of the Debtors pursuant to this Interim Order or the Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Interim Order or the Final Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Sales pursuant to this Interim Order or the Final Order, as applicable, absent further order of the Court. Upon the entry of this Interim Order or the Final Order, the Court grants authority for the Debtors and the Agent to conduct the Sales pursuant to the terms of this Interim Order or the Final Order, the Agency Agreement, and the Sale Guidelines (as may be modified by any Side Letters) and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any

preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in this Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(F)     If, at any time, a dispute arises among the Debtors or the Agent, on the one hand, and a Governmental Unit, on the other hand, as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (D) and (E) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

45.     Subject to paragraphs 38 and 39 above, each and every federal, state, or Local agency, departmental, or Governmental Unit with regulatory authority over the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors or the Agent be required to post any bond, to conduct the Sales.

46.     Provided that the Sales are conducted in accordance with the terms of this Interim Order, the Agency Agreement, and the Sale Guidelines (as may be modified by Side Letters) and in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors and Agent shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Interim Order and the Sale Guidelines (as may be modified by Side Letters) without the necessity of further showing compliance with any such Liquidation Sale Laws.

47.     Nothing in this Interim Order, the Agency Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or

21

operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.

48.     Notwithstanding anything to the contrary herein, in view of the importance of the use of sign-walkers, banners, and other advertising to the Sales and the Store Closings, to the extent that disputes arise during the course of the Sales regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors and the Agent are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court.  Such hearing will, to the extent practicable and subject to the Court's availability, be scheduled initially no later than the earlier of (a) the Final Hearing or (b) within three business days of such request. This scheduling procedure shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

**VII.     Other Provisions.**

49.     Neither the Agent nor any of its respective affiliates (whether individually, as part of a joint venture, or otherwise), shall be precluded from, following consultation with the ABL Agent, providing additional services to the Debtors or bidding on the Debtors' assets in connection with any other future process that may or may not be undertaken by the Debtors to close stores.

50.     Not later than seven calendar days prior to the objection deadline related to entry of an order approving the Motion on a final basis, the Agent shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these chapter 11 cases, and all parties who have filed requests for service under Bankruptcy Rule 2002, by email, or if the email address is not available to the Debtors, then by first class mail.

51.     Agent shall act solely as agent to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Agency Agreement (including the Agent's indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of gross negligence or willful misconduct and, for greater certainty, the Agent shall not be deemed to be an employer, or a joint or successor employer or a related or common employer or payor within the meaning of any legislation governing employment or labor standards or pension benefits, Safety Laws, or other statute, regulation or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.

52.     Subject to the provisions of paragraphs 30–31 hereof, the Debtors are authorized and permitted to transfer to the Agent PII in the Debtors' custody and control solely for the purposes of assisting with and conducting the Sales and only to the extent necessary for such purposes; *provided* that the Debtors, with the assistance of the Agent, remove such PII from FF&E prior to any abandonment of the same.

53.     Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief (including any payment made in accordance with this Interim Order), nothing in this Interim Order is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Interim Order or the Motion or any order granting the relief requested by the Motion; (e) a request or authorization to assume, adopt, or reject any agreement,

contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim, other than with respect to payments made to the Agent, which are governed by the terms of the this Interim Order and the reconciliation procedures in the Agency Agreement.

54.    The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

55.     The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

56.     The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a) and the contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(a).

57.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and such notice satisfies the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

58.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

59.     The Debtors are authorized, but not directed, to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

60.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order or the Agency Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Agent for protection from interference with the Store Closings or Sales, (c) any other disputes related to the Store Closings or Sales, and (d) protect the Debtors and/or the Agent against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action

against the Debtors, the Agent, the landlords, the Store Closings, or the Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

[*Remainder of page intentionally left blank*]

## Exhibit 1

**Agency Agreement**



June 14, 2025

<u>**VIA EMAIL**</u>
At Home Group, Inc.
Attn: Jeremy Aguilar
9000 Cypress Waters Blvd.
Coppell, TX 75019

Re:     **Letter Agreement Governing Inventory Disposition**

Dear (authorized Company signatory):

By executing below, this letter shall serve as an agreement ("<u>Agreement</u>") between Hilco Merchant Resources, LLC, on the one hand ( "<u>Agent</u>" or a "<u>Party</u>"), and At Home Group, Inc., on the other hand ("<u>Merchant</u>" or a "<u>Party</u>" and together with the Agent, the "<u>Parties</u>"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) at (i) the Merchant's stores set forth on <u>Exhibit A</u> and (ii) any other stores, or distribution centers as may be designated for disposition by Merchant (with the consent of the ABL Agent[1]) from time to time subsequent to the date of this Agreement (each a "<u>Store</u>" and collectively, the "<u>Stores</u>") through a "Store Closing", "Everything Must Go", "Everything on Sale" or similar themed sale (the "<u>Sale</u>"). Notwithstanding the foregoing or any other term of this Agreement, the Merchant shall not be obligated to exclusively retain the Agent for purposes of conducting a sale of Merchandise at all or substantially all of Merchant's remaining stores should Merchant elect to pursue equity or guarantee proposals in connection with such a liquidation.

A.     <u>Merchandise</u>

For purposes hereof, "<u>Merchandise</u>" shall mean all goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below).  "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant or are leased or licensed from third-parties by Merchant; (2) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores (collectively, "<u>FF&E</u>") or any FF&E that is leased by Merchant located in the Stores; or (3) damaged or defective merchandise that cannot be sold.

B.     <u>Sale Term</u>

For each Store on Exhibit A (the "<u>Initial Closing Stores</u>"), the Sale shall commence on or around June 19, 2025 (the "<u>Sale Commencement Date</u>") and conclude no later than September 30, 2025 (the "<u>Sale Termination Date</u>"). The Parties agree that there may be additional store closures, which stores can be added by Merchant. Store Commencement Dates and Store Termination Dates

---

[1] As used herein, the "ABL Agent" shall mean Bank of America, N.A. in its capacity as administrative agent and collateral agent under that certain Asset-Based Revolving Credit Agreement, dated as of July 23, 2021 (as amended and otherwise modified from time to time), by and among, among others, the Merchant, the ABL Agent and the lenders party thereto.

for additional store closure will be mutually agreed in writing; <u>provided</u>, <u>however</u>, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the applicable Sale Termination Date. The period between the applicable Sale Commencement Date and the applicable Sale Termination Date shall be referred to as the "<u>Sale Term</u>."  At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with the Store Closing Sale Order requirements for such premises; <u>provided</u>, <u>however</u>, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the Store Closing Sale Order according to a budget mutually agreed to in writing between the Agent and Merchant (in consultation with the ABL Agent).  At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store and provide such photographs to Merchant within five (5) days.  Photographs shall reference with specificity each Store by number, name and/or location.

## C.    **Project Management**

(i)     <u>Agent's Undertakings</u>

During the Sale Term, Agent shall, in accordance with the Expense Budget (defined below) approved by the Merchant, (a) provide qualified supervisors (the "<u>Supervisors</u>") engaged by Agent to oversee the management of the Stores and the Sale; (b) recommend appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) recommend appropriate discounts of Merchandise and staffing levels for the Stores, approved in advance by Merchant; (d) make recommendations to the Merchant in connection with appropriate allocation and replenishment of Merchandise, if applicable; (e) make recommendation to the Merchant concerning the display of Merchandise in the Stores; (f) assist the Merchant in connection with planning, execution and evaluation of marketing, customer retention and brand enhancement programs; (g) to the extent that information is available, evaluate sales and recovery performance of Merchandise by category and sales reporting and monitor expenses in accordance with an agreed upon forecast; (h) subject to this Section C.(i), maintain the confidentiality of all proprietary or non-public information regarding Merchant; (i) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (j) to the extent requested, assist Merchant in obtaining any required permits and governmental approvals to conduct the Sale; and (k) following consultation with the ABL Agent, provide such other related services deemed necessary or appropriate as may be mutually agreed by Merchant and Agent.  Prior to the commencement of the Sale, the Agent will provide the Merchant with a proposed marketing plan as part of the Expense Budget.  The Agent will also provide the Merchant with a weekly update on marketing performance in a format mutually agreed upon by the Parties.  The marketing plan and Expense Budget may be modified during the Sale Term to maximize sales and customer retention, if mutually agreed upon by the Merchant and the Agent.

Without limiting the generality of the foregoing, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities, or other business affairs of Merchant, its customers, employees, parent, subsidiary, or other affiliated entities (for purposes of this paragraph, all such entities are included within each reference to "Merchant"), including the terms and existence of this Agreement, is Merchant's confidential, trade secret information ("<u>Merchant Confidential Information</u>"), which is and shall remain the exclusive intellectual property of Merchant. Except as may be required for Agent to perform its obligations under this Agreement in respect of the Sale, Agent shall not divulge, furnish, make available, or in any other manner disclose such

information to any third party other than Agent's officers, employees, representatives, and agents. Agent shall take and shall cause its officers, employees, representatives, and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Merchant Confidential Information. Agent agrees to maintain strict confidentiality and agrees that it may use Merchant Confidential Information agrees to maintain strict confidentiality and agrees that it may use Merchant Confidential Information only as reasonably necessary to the performance of its obligations related to the Sale.  If and to the extent the use or other handling of any Personal Information (defined below) is necessary for Agent to perform its obligations hereunder, Agent shall comply with all Data Security Requirements (defined below) and such other reasonable restrictions requested by Merchant. For purposes of this Agreement, "<u>Personal Information</u>" means any natural person's name, street address, telephone number, e-mail address, social security number, driver's license number, passport number, credit card number, or user or account number, or any other piece of information that, individually or when combined with other information, allows the identification of a natural person or is otherwise considered personally identifiable information or personal data protected under any applicable Data Security Requirement.   For purposes of this Agreement, "<u>Data Security Requirements</u>" means, collectively, all of the following to the extent relating to privacy, security, or security breach notification requirements: (a) Merchant's own rules, policies, and procedures; (b) all applicable statutes and regulations; (c) industry standards applicable to the industry in which the Merchant's business is conducted (including, as applicable, the Payment Card Industry Data Security Standard (PCI DSS)); and (d) contracts into which Merchant has entered or by which it is otherwise bound, provided such contracts (or the requirements of such contracts) are provided to Agent prior to the Sale Commencement Date.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    <u>Merchant's Undertakings</u>

During the Sale Term, Merchant shall (a) be the employer of the Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; (h) apply for and obtain, with Agent's assistance and support, all applicable permits and authorizations (including landlord approvals and consents) for the Sale; and (via ACM) use reasonable efforts to ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.**    **The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, credit, debit card, credit card, or check and in accordance with the Approval Order (defined below) (where applicable) and Merchant's customary policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.**    **Agent Fee and Expenses in Connection with the Sale**

In consideration of its services hereunder, Agent shall earn a base retail fee equal to 2.0% of the Gross Proceeds of Merchandise sold at the Stores (the "Merchandise Fee").  For purposes of this Agreement, "Gross Proceeds" means gross receipts calculated using the "gross rings" method, net of applicable sales taxes.

In the event the Merchant desires to have Agent facilitate a sale of Merchandise on a wholesale basis, Merchant shall do so only following obtaining the ABL Agent's consent. Any such wholesale sales shall be subject to Merchant and Agent reaching a mutual agreement on a base wholesale fee.

In addition to the Merchandise Fee, and not in lieu thereof, the Merchant shall pay to the Agent from Gross Proceeds an additional fee based upon the Gross Recovery Percentages achieved as set forth in the following table (the "Additional Incentive Compensation"). The Additional Incentive Compensation shall be equal to the aggregate sum of the percentages set forth in the "Additional Incentive Compensation" column of the table (e.g., calculated back to first dollar) for the corresponding Gross Recovery Percentage achieved; provided, however, no Additional Incentive Compensation shall be earned or payable where the Gross Recovery Percentage is less than 150.0%:

| Gross Recovery Percentage | Additional Incentive Compensation |
|---|---|
| Between 150% and 154.9% | An additional 0.25% of Gross Proceeds (total fee equal to 2.25% of Gross Proceeds) |
| Above 155.0% | An additional 0.25% of Gross Proceeds (total fee equal to 2.50% of Gross Proceeds) |

For purposes of the Additional Incentive Compensation:

"**Cost Value**" with respect to each item of Merchandise sold shall mean the lower of (i) the lowest per unit vendor cost in the File or in the Merchant's books and records, maintained in the ordinary course consistent with historic practices; or (ii) the Retail Price.

"**File**" shall mean shall mean Merchant's files titled "13_SKU Inventory Units and AUR 5.15.25.xlsx", "14_SKU Inventory 05.15.25 - AUC.xlsx" and all other and subsequent files received by Agent.

"**Gross Recovery Percentage**" shall mean the Gross Proceeds divided by the sum of the aggregate Cost Value of all of the Merchandise.

"**Retail Price**" shall mean with respect to each item of Merchandise sold, the retail price reflected at the register for such item, excluding the discount granted in connection with such sale.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's other reasonable, documented out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established an aggregate budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs (including signage and the shipping, freight, and sales tax related thereto, where applicable).  The Expense Budget for the Sale is attached hereto as Exhibit B.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant (in consultation with the ABL Agent).  The costs of supervision set forth on Exhibit B include, among other things, industry standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled on every Wednesday for the prior week and shall be paid on the next Friday after each such weekly reconciliation.  The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty-five (45) days following the Sale Termination Date for the last Store.

Upon the execution of this Agreement, and in any event no later than one (1) business day following entry of the Approval Order, the Merchant shall pay by wire transfer to the Agent an advance payment of costs and expenses delineated in the Expense Budget of $1,670,384 (the "Sale Expense Advance"), which shall be held by Agent and applied towards Expense Budget items as incurred.  Any portion of the Sale Expense Advance not so used shall be returned to Merchant within three days following the final reconciliation.

**F.**     **Indemnification**

(i)     Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective

bargaining agreement or otherwise), or any other person (excluding Agent Indemnified Parties) against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Agent's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

      (ii)      <u>Agent's Indemnification</u>

      Agent shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by Agent's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement, including, without limitation, the Supervisors.

## G.    <u>Insurance</u>

      (i)      <u>Merchant's Insurance Obligations</u>

      Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall, to the extent reasonably practicable, cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and, upon the reasonable request of Agent, that Agent is named as an additional insured thereunder during the Sale term. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

      (ii)      <u>Agent's Insurance Obligations</u>

      As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores. Agent shall name Merchant as an additional insured and loss payee under such

policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance in compliance with all statutory requirements. Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

## H.    Representations, Warranties, Covenants and Agreements

(i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein, (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with Merchant's customary practices, and (e) the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)    Agent warrants, represents, covenants and agrees that (a) Agent is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable federal, state and, local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, and (e) Agent will not take any disciplinary action against any employee of Merchant.

## I.    Furniture, Fixtures and Equipment

Agent shall assist Merchant in connection with the sale of the FF&E in the Stores from the Stores themselves. Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties. Merchant shall consult with the Agent and ABL Agent regarding the abandonment of any unsold FF&E at the Stores, in accordance with the Approval Order.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to seventeen and one-half percent (17.5%) of the Gross Proceeds of the sale of the FF&E ("FF&E Fee").

All Gross Proceeds from the sale of FF&E shall be remitted to Merchant. During each weekly reconciliation described in Section E above, Agent's FF&E Fee shall be calculated, and Agent's calculated FF&E Fee and all FF&E costs and expenses then incurred shall be paid as part of each such weekly reconciliation.

## J.    <u>Additional Agent Goods</u>

If mutually agreed to by the Merchant and Agent, in consultation with the ABL Agent, the Agent may, at Agent's sole cost and expense, supplement the Merchandise in the Sale at the Stores with additional goods procured by Agent, which are of like kind, in the Merchants sole discretion, maintain the overall merchandising brand image of the Merchant and are of  no lesser quality to the Merchandise in the Sale at the Stores ("<u>Additional Agent Goods</u>"); provided, further, that the cost of Additional Agent Goods shall not exceed 20% of the aggregate Cost Value of Merchandise in the Sale. The Additional Agent Goods shall be purchased by Agent as part of the Sale and delivered to the Stores at Agent's sole expense (including as to labor, freight and insurance relative to shipping such Additional Agent Goods to the Stores). Sales of Additional Agent Goods shall be run through Merchant's cash register systems; provided however, that Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods. Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

Agent shall pay to Merchant an amount equal to six percent (6.0%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "<u>Additional Agent Goods Fee</u>"), and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods. Agent shall pay Merchant its Additional Agent Goods Fee in connection with each weekly sale reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time).

Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their identifiable proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their identifiable proceeds. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

Merchant shall, at Agent's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code. Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and

(ii) the Additional Agent Goods identifiable proceeds less the Additional Agent Goods Fee, and which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods identifiable proceeds).

Notwithstanding anything in this Agreement to the contrary, "Merchandise" shall not include "Additional Agent Goods."

Anything herein to the contrary notwithstanding, the Merchant, the ABL Agent, and the Agent shall work in good faith to reach an agreement with respect to the treatment of proceeds realized upon the sale or other disposition of Additional Agent Goods (and what is and is not "identifiable" (without regard to any reference to principles under the Code) and the respective rights with respect thereto / thereof) in the Approval Order, and, absent such agreement, the Agent has no obligation to provide Additional Agent Goods or pay any Additional Goods Fee.

## K.    Termination

The following shall constitute "Termination Events" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting Party; provided; however, anything herein to the contrary notwithstanding, in the event Merchant fails to pay or reimburse any Merchandise Fee, Additional Incentive Compensation, any FF&E, any amount reimbursable in accordance with the Expense Budget, or any proceeds of the sale of Additional Agent Goods (net of any Additional Agent Goods Fee) when due and payable in accordance with the terms of this Agreement, Agent may, in its sole discretion, terminate this Agreement upon two (2) days' written notice to Merchant;

(b)    Any representation or warranty made by Merchant or Agent is untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)    the Sale is terminated or materially interrupted or impaired for any reason other than an event of default by Agent or Merchant.

If a Termination Event occurs, the non-defaulting Party (in the case of an event of default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing seven (7) days' written notice thereof to the other Party and, in the case of an event of default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default.  If this Agreement is terminated, Merchant shall be obligated to pay Agent all amounts due and owing by Merchant to Agent under this Agreement through and including the termination date.

**L.**      **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by electronic mail or by recognized overnight delivery service as follows:  (a) to Merchant: at the address listed above; (b) to Agent: (i) c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax:  847- 849-0859, Attn: T. Kellan Grant; and (ii) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox, Esq.; Email – sfox@riemerlaw.com; or (c) such other address as may be designated in writing by Merchant or Agent.

**M.**     **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect.   No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement.  Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**N.**      **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided, however, that Agent may syndicate this transaction with one or more third parties upon notice to, but not the consent of Merchant.   No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors, and permitted assigns.  The ABL Agent is an express third party beneficiary of this Agreement and shall be entitled to enforce the provisions of this Agreement as if the ABL Agent were a signatory hereto.

**O.**      **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**P.**      **Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Delaware (without reference to the conflicts of laws provisions therein).  Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing

brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

**Q.    Bankruptcy**

If the Merchant commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), with a bankruptcy court (the "Bankruptcy Court"), the Merchant shall promptly file a motion to assume sections of this Agreement under section 365 and/or 363 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by an order that approves, among other things (the "Approval Order"):  (i) the payment of all fees and reimbursement of expenses under this Agreement is approved without further order of the Bankruptcy Court; (ii) all such payments of fees and reimbursement of expenses related to such Approval Order shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) the conduct of the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (iv) the conduct of the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; (v) the Sale through the conduct of "Going out of Business" or similar themed sales, in addition to the Sale themes set forth in the Agreement; (vi) the sale of Additional Agent Goods in accordance with the terms and conditions hereof; and (vii) Merchant in taking all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement. The Bankruptcy Court shall have exclusive jurisdiction to resolve any issues arising under this Agreement.  In such event, any legal action, suit, or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over the Merchant, and each Party waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. From and after entry of the Approval Order, Agent shall conduct the Sale in accordance with the terms of the Approval Order in all material respects.  If any objections are received prior to entry of the Approval Order, Agent will use commercially reasonable efforts to assist Merchant in negotiating a consensual resolution of such objection with the objecting party.

**R.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**S.    Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent

signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*   *   *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

_____

By:  T. Kellan Grant
Its:  EVP Commercial Counsel

**AGREED AND ACCEPTED as of the ___ day
of June, 2025:**

AT HOME GROUP, INC.

_____

By:
Its:

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC


_____
By:  T. Kellan Grant
Its:  EVP Commercial Counsel


**AGREED AND ACCEPTED as of the 14th**
**day of June, 2025:**

AT HOME GROUP, INC.

Signed by:

*Jeremy Aguilar*
1C88ADC45EA54D1...
_____          _____
By:  Jeremy Aguilar
Its:  Chief Financial Officer

## EXHIBIT A

**Initial Closing Stores**

| Count | Store # | Store Address | City | State | Zip | Landlord |
|---|---|---|---|---|---|---|
| 1 | 276 | 6135 Junction Blvd | Rego Park | NY | 11374 | Kohl's Department Stores, Inc. |
| 2 | 295 | 300 Baychester Ave | Bronx | NY | 10475 | Transform Operating Stores LLC |
| 3 | 296 | 750 Newhall Dr | San Jose | CA | 95110-1106 | Lowe's Home Centers, LLC |
| 4 | 318 | 2505 El Camino Real | Tustin | CA | 92782 | Transform Leaseco LLC |
| 5 | 274 | 14585 Biscayne Blvd | North Miami | FL | 33181-1209 | Oleta Partners Biscayne Parcel LLC |
| 6 | 265 | 2200 Harbor Blvd | Costa Mesa | CA | 92627 | Transform Operating Stores LLC |
| 7 | 330 | 3795 E Foothills Blvd | Pasadena | CA | 91107 | Transform Lease OPCO LLC |
| 8 | 338 | 1982 E 20Th St | Chico | CA | 95928 | ECP / TPB1, LLC |
| 9 | 324 | 2820 Hwy 63 South | Rochester | MN | 55904-5571 | Pergola LLC and Abraham Properties LLC |
| 10 | 223 | 26532 Towne Center Drive Suites A-B | Foothill Ranch | CA | 92610 | Che Chen Liu & Shu Fen Liu Revocable Trust |
| 11 | 234 | 1001 E Sunset Drive | Bellingham | WA | 98226 | BLI Sunset Square LLC |
| 12 | 257 | 8320 Delta Shores Circle S. | Sacramento | CA | 95832 | Spirit Realty LP |
| 13 | 342 | 1361 NJ-35 | Middletown Township | NJ | 7748 | Brixmor Middletown Plaza Owner, LLC |
| 14 | 229 | 2900 N Bellflower Blvd | Long Beach | CA | 90815 | Transform Lease OPCO LLC |
| 15 | 331 | 720 Clairton Blvd | Pittsburgh | PA | 15236 | BT Pleasant Hills LP |
| 16 | 290 | 2530 Rudkin Road | Yakima | WA | 98903 | YAKIMA THEATRES, INC. |
| 17 | 325 | 571 Boston Turnpike | Shrewsbury | MA | 1545 | Shrewsbury Crossing II, LLC |
| 18 | 370 | 5203 W War Memorial Dr | Peoria | IL | 61615 | Peoria New Mall LLC |

| 19 | 127 | 8300 Sudley Rd. | Manassas | VA | 20109 | Manassas Real Estate Ventures, LLC |
| 20 | 322 | 461 Route 10 East | Ledgewood | NJ | 07852 | UE Ledgewood LLC |
| 21 | 280 | 301 Nassau Park Blvd. | Princeton | NJ | 08540 | SCC Nassau Park Pavilion LLC |
| 22 | 190 | 300 Providence Highway | Dedham | MA | 02026 | Dedham R2G Owner LLC |
| 23 | 281 | 905 S 24Th Street W | Billings | MT | 59102 | 905 South 24th Street West Owner LLC |
| 24 | 250 | 19460 Compass Creek Pkwy | Leesburg | VA | 20175 | Mervis - CCP Leesburg, LLC |
| 25 | 124 | 3201 North Mayfair Road | Wauwatosa | WI | 53222 | Fundamentals Company, Kinpark Associates, Laurie Industries, Inc. |
| 26 | 266 | 13180 S Cicero Avenue | Crestwood | IL | 60445 | Brixmor SPE 3 LLC |

**<u>EXHIBIT B</u>**

**Expense Budget**

# At Home
## Exhibit B

| Expense Budget (1) |
|---|

**Advertising**

| | |
|---|---:|
| Digital & Media | 144,600 |
| Signs (2) | 417,576 |
| Sign Walkers | 218,175 |
| Subtotal Advertising | 780,351 |

**Supervision**

| | |
|---|---:|
| Fees / Wages / Expenses (3) | 1,886,154 |
| Subtotal Supervision | 1,886,154 |

**Miscellaneous**

| | |
|---|---:|
| Miscellaneous /Legal (4) | 25,000 |
| Subtotal Miscellaneous | 25,000 |
| Total Expenses | 2,691,505 |

Notes:

1. This Expense Budget contemplates a sale term of June, 19, 2025 through September 25, 2025.  The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.

2. Includes Sales Tax.

3. Includes Deferred Compensation and Insurance.

4. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.

## Exhibit 2

**Sale Guidelines**

## Sale Guidelines[1]

1.    The Sales shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Closing Stores.

2.    The Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sale shall be conducted on Sunday unless the Debtors had been operating such Closing Store on a Sunday prior to the commencement of the Sales.

3.    On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; *provided* that the Agent may solicit customers in the Closing Stores themselves.  On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.    The Debtors and the Agent shall have the right to use and sell the Store Closure Assets and the Additional Agent Goods.  The Debtors and the Agent may advertise the sale of the Store Closure Assets and the Additional Agent Goods in a manner consistent with these Sale Guidelines.  The purchasers of any of the Store Closure Assets and the Additional Agent Goods sold during the Sales shall be permitted to remove the Store Closure Assets and the Additional Agent Goods either through the back or alternative shipping areas at any time, or through other areas after store business hours; provided, however, that the foregoing shall not apply to the sale of de minimis Store Closure Assets and Additional Agent Goods, whereby the item(s) can be carried out of the store in a shopping bag.

5.    At the conclusion of the Sale, the Agent shall vacate the Closing Stores; *provided* that Agent may leave any owned furniture, fixtures, and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) ("FF&E") not sold in the Sales or otherwise transferred from the premises at the conclusion of the Sales (the "Termination Date") on the Closing Stores' premises, without cost or liability of any kind to the Agent.  The Agent shall notify the Debtors of its intention to leave any FF&E at the Closing Stores' premises at least two (2) days prior to the Termination Date.  The Debtors will have the option to either remove the FF&E, at its own cost prior to the Termination Date, or, in consultation with the Agent and Prepetition ABL Agent, abandon the FF&E.  Any abandoned FF&E left in a Closing Store after a lease is rejected pursuant to the Rejection Procedures shall be deemed abandoned to the

---

[1]   Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief.*

applicable landlord.  For the avoidance of doubt, as of the Termination Date, the Agent may leave in place, and without further responsibility or liability of any kind, any FF&E.

6.      The Agent may advertise the Sales as "store closing," "sale on everything," "everything must go," "everything on sale," or similar-themed sales.  The Agent may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.  All signs, banners, ads and other advertising material, promotions, and campaigns will be approved by the Debtors, prior to purchase, in accordance with the Agency Agreement and these Sale Guidelines.

7.      The Agent shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Debtors and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, *however*, that such banners shall be located or hung so as to make clear that the Sales are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Debtors and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Closing Stores, except as authorized by the applicable lease.

10.     The Agent shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease.  No property of the landlord of a Closing Store shall be removed or sold during the Sales.  The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Closing Store.

11.     The Agent shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

12.     The Agent, at the direction of the Debtors, and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

13.     Subject to the provisions of the Agency Agreement, the Agent shall have the right to use and sell all FF&E owned by the Debtors (the "Owned FF&E"), approved by the Debtors. The Agent may advertise the sale of the Owned FF&E in a manner consistent with these

guidelines and the Agency Agreement.  The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however*, that the foregoing shall not apply to *de minimis* FF&E sales made whereby the item can be carried out of the Closing Store in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Agent may leave in place, and without further responsibility, any FF&E.

14.     At the conclusion of the Sales at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors, Agent and their agents and representatives shall continue to have access to the Closing Stores, pending assumption or rejection of applicable leases, as provided for in the Agency Agreement.

15.     The rights of landlords against Debtors for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease; *provided* that to the extent certain leases of Closing Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

16.     If and to the extent that the landlord of any Closing Store affected hereby contends that the Debtors or Agent are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Debtors and Agent as follows:

<u>If to Agent:</u>

Hilco Merchant Resources, LLC
One Northbrook Place
5 Revere Drive, Suite 206
Northbrook, Illinois 60062
Facsimile: (847) 849-0859
Attention: T. Kellan Grant

with copies (which shall not constitute notice) to:

Riemer & Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, New York 10036
Attention: Steven E. Fox, Esq.
Email: sfox@riemerlaw.com

3

<u>If to the Debtors</u>:

At Home Group Inc.
9000 Cypress Waters Blvd
Coppell, Texas 75019
Attention: Meredith Hampton

with copies (which shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP,
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attention:  Robert S. Brady, Edwin J. Harron, and Joseph A. Mulvihill
Email:  rbrady@ycst.com
            eharron@ycst.com
            jmulvihill@ycst.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Nicole L. Greenblatt, P.C., Matthew C. Fagen, P.C., and Elizabeth H. Jones
Email:  nicole.greenblatt@kirkland.com
            matthew.fagen@kirkland.com
            elizabeth.jones@kirkland.com

17.    If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than three business days' written notice to the other party, served by email or overnight delivery.

4

**<u>Exhibit B</u>**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (●) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re:  Docket No. _** |

**FINAL ORDER (I) AUTHORIZING
THE DEBTORS TO ASSUME THE AGENCY AGREEMENT,
(II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE
CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF
ALL LIENS, CLAIMS, AND ENCUMBRANCES, (III) MODIFYING CUSTOMER
PROGRAMS AT THE CLOSING STORES, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession

(collectively, the "<u>Debtors</u>") for entry of a final order (this "<u>Final Order</u>"): (a) authorizing the

Debtors to assume the Agency Agreement; (b) authorizing and approving the initiation of the Store

Closings in accordance with the terms of the Agency Agreement and the Sale Guidelines, with

such sales to be free and clear of all liens, claims, and encumbrances; (c) authorizing the Debtors

to conduct Store Closings with respect to the Additional Closing Stores at a later date or dates and

the procedures associated therewith; (d) approving certain modifications to the customer programs

solely with respect to the Closing Stores; and (e) granting related relief, all as more fully set forth

in the Motion; and upon the First Day Declaration; and the United States District Court for the

District of Delaware having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was

referred to the Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AtHome.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

A.      The Debtors have advanced sound business reasons for assuming the Agency Agreement and adopting the Sale Guidelines, as set forth in the Motion and at the Hearing, and assuming the Agency Agreement is a reasonable exercise of the Debtors' business judgement and in the best interest of the Debtors and their estates.

B.      The Agency Agreement, a copy of which is attached to this Final Order as **Exhibit 1**, was negotiated, proposed, and entered into by the Agent and the Debtors without collusion, in good faith and from arm's-length bargaining positions.

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* Fed. R. Bankr. P. 7052.

C.      The assumption of the Agency Agreement is a sound exercise of the Debtors' business judgment.

D.      The Sale Guidelines, which are attached hereto as **Exhibit 2**, are reasonable and appropriate, and the conduct of the Sales in accordance with the Sale Guidelines will provide an efficient means for the Debtors to dispose of the Store Closure Assets and are in the best interest of the Debtors' estates.

E.      The Store Closings and Sales are in the best interest of the Debtors' estates.

F.      The Dispute Resolution Procedures are fair and reasonable and comply with applicable law.

G.      The Debtors have represented that they intend to neither sell nor lease personally identifiable information pursuant to the relief requested in the Motion, although the Agent will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

H.      The entry of this Final Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      Any objections to the entry of this Final Order, to the extent not withdrawn or settled, are overruled.

3.      The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Final Order.

4.      To the extent any conflict between this Final Order, the Sale Guidelines, and the Agency Agreement, the terms of this Final Order shall control over all other documents and the Sale Guidelines shall control over the Agency Agreement.

**I.      Authority to Assume the Agency Agreement.**

5.      The Debtors are authorized to assume and perform under the Agency Agreement pursuant to sections 363 and 365 of the Bankruptcy Code, including:   (a) making payments required by the Agency Agreement to the Agent without the need for any application of the Agent or a further order of the Court and notwithstanding any budgets approved in connection with any interim and final orders, as applicable, approving any postpetition debtor-in-possession financing facility and/or the Debtors' use of cash collateral (in each case, the "DIP Order"); and (b) allowing the sale of Additional Agent Goods.

6.      Subject to the restrictions set forth in this Final Order, the Sale Guidelines, the applicable provisions of the DIP Order, and any Side Letters (each as defined below), the Debtors and the Agent are hereby authorized to take any and all actions as may be necessary or desirable to implement the Agency Agreement and the Sales, and each of the transactions contemplated by the Agency Agreement, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agency Agreement and/or the Sales prior to the date of this Final Order, are hereby approved and ratified.

7.      The Agency Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, so long as any such modifications, amendments, or supplements are not materially adverse to the Debtors or their estates.  The Debtors are hereby authorized to enter into additional agreements with the Agent or, as provided for in paragraph 11 hereof, another agent or consultant

with respect to services to be provided in connection with any Additional Closing Stores that are not Permitted Store Closures (as defined in the DIP Order), or Sales related thereto.

8.      Notwithstanding anything to the contrary in the Agency Agreement, the Debtors and their estates shall not indemnify the Agent for any damages arising out of the Agent's fraud, willful misconduct, or gross negligence.

9.      The failure to include any provisions of the Agency Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that such provisions of the Agency Agreement be, and hereby are, authorized and approved.

**II.    Authority to Engage in Sales and Conduct Store Closings.**

10.     The Debtors are authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sales at the Closing Stores in accordance with this Final Order, the Sale Guidelines, and the Agency Agreement, as may be modified by any Side Letters (as defined below) between the Debtors or the Agent and the landlords at the Closing Stores. Notwithstanding anything in this Final Order to the contrary, and in consultation with the Prepetition ABL Agent, the Debtors may elect to discontinue the Sales at any Closing Stores and revert to normal operations without further notice or authorization from the Court.

11.     The Debtors may, in consultation with the Prepetition ABL Agent, enter into a consulting agreement with an additional or separate store closing consultant in place of the Agent, to assist with and oversee Additional Store Closings that do not constitute a Permitted Store Closure (as defined in the DIP Order).

12.     The Sale Guidelines are approved in their entirety on a final basis.

13.     The Debtors are authorized, in consultation with the Prepetition ABL Agent, to discontinue operations at the Closing Stores in accordance with this Final Order and the Sale Guidelines.

5

14.     All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Agency Agreement or this Final Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent; *provided* that any such surrender shall be pursuant to an adversary proceeding to the extent that such an adversary proceeding is required under section 542 of the Bankruptcy Code.

15.     Neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) or landlord, to conduct the Sales and Store Closings and to take the related actions authorized herein.

**III.    Conduct of the Sales.**

16.     All newspapers and other advertising media in which the Sales and Store Closings may be advertised and all landlords are directed to accept this Final Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sales and Store Closings pursuant to the Agency Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Final Order, the Sale Guidelines, and the Agency Agreement.

17.     The Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Sales and Store Closings without necessity of further order of this Court as provided in the Agency Agreement and the Sale Guidelines (subject to any Side Letters, as defined below), including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales as contemplated in the Sale Guidelines through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing

6

locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, A-frames, and other street signage, as contemplated in the Sale Guidelines.

18.     Except as expressly provided in the Agency Agreement and the Sale Guidelines, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Agent.  Any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Sales (including the sale of the Merchandise and FF&E), the rejection of leases, abandonment of assets (including "going dark" provisions) shall not be enforceable in conjunction with the Store Closings or the Sales.  Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Sales are conducted in accordance with the terms of this Final Order, any Side Letter (as defined below) and the Sale Guidelines.  The Debtors, the Agent, and the landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Debtors, the Agent, and any such landlords.  In the event of any conflict between the Sale Guidelines, the Agency Agreement, any Side Letter, and this Final Order, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the Sale Guidelines, no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, or creditors, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and

all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditors and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closings, or (b) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the closing locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the closing locations or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.    In accordance with and subject to the terms and conditions of the Agency Agreement, the Agent shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as modified by any Side Letters) and this Final Order.

21.    All in-store sales of Store Closure Assets and the Additional Agent Goods shall be "as is" and final as of the Sale Commencement Date.  Conspicuous signs that "all sales are final" and "as is" will be posted at the point-of-sale areas at all Closing Stores.  As to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.    The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental

Units as and when due; provided that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of such dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. The Agent shall collect, remit to the Debtors, and account for sales taxes as and to the extent provided in the Agency Agreement. This Final Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state, provincial or federal law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state, provincial or federal law.

23. Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell the Store Closure Assets and all sales of Store Closure Assets, whether by the Agent or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, and other interests; *provided, however*, that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale of the Store Closure Assets with the same validity, in the same amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Agency Agreement).

24. The Debtors or the Agent (as the case may be) are authorized and empowered to transfer Store Closure Assets among, and into, the Closing Stores in accordance with the Sale Guidelines, as applicable. The Debtors are authorized, with the assistance of the Agent, to sell the FF&E, transfer the FF&E to one of the Debtors' other store locations, or, in consultation with the Agent and Prepetition ABL Agent, abandon the same, as provided for and in accordance with the

9

terms of the Agency Agreement and the Sale Guidelines.  Any abandonment of such FF&E or other property will be in accordance with the Rejection Procedures.  Notwithstanding anything to the contrary in this Order or the Agency Agreement, the Debtors shall not sell or abandon any property that the Debtors know is not owned by the Debtors; *provided* that the Debtors will either (a) provide for the return of such property to the Debtors' headquarters or (b) return such property to the applicable lessor, or other owner of the property; *provided*, *however*, that the Debtors may abandon property owned by the Landlord at the applicable Store.

25.    The Agent is authorized, if mutually agreed to by the Debtors and the Agent, in consultation with the Prepetition ABL Agent, and at the Agent's sole cost and expense, to supplement the Merchandise in the Sale at the Stores with additional goods procured by Agent, which are of like kind, in the Debtors' sole discretion, maintain the overall merchandising brand image of the Debtors and are of no lesser quality to the Merchandise in the Sale; *provided* that the cost of Additional Agent Goods shall not exceed 20% of the aggregate Cost Value (as defined in the Agency Agreement) of the Merchandise in the Sale.  The Additional Agent Goods shall be purchased by the Agent as part of the Sales and delivered to the Closing Stores at the Agent's sole expense (including as to labor, freight, and insurance relative to shipping such Additional Agent Goods to the Closing Stores).  Sales of Additional Agent Goods shall be run through the Debtors' cash register systems; provided, however, that the Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  The Agent and Debtors shall cooperate to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods from the Merchandise.  The Agent shall

provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

26.     The Agent shall pay the Debtors an amount equal to 6% of the gross proceeds (excluding Sale Taxes)] from the Sale of the Additional Agent Goods (the "Additional Agent Goods Fee").  The Agent shall retain all remaining amounts from the sale of the Additional Agent Goods.  The Agent shall pay the Debtors the Additional Agent Goods Fee in connection with each weekly reconciliation with respect to the sales of Additional Agent Goods sold by the Agent during each then prior week (or at such other mutually agreed upon time).

27.     All transactions relating to the Additional Agent Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from the Agent to the Debtors under Article 9 of the Uniform Commercial Code (the "UCC") and not a consignment for security purposes.  Subject solely to Agent's obligations to pay to the Debtors the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their identifiable proceeds shall be the exclusive property of the Agent, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Agent Goods or the identifiable proceeds thereof.  Notwithstanding anything to the contrary herein, the Debtors, the Prepetition ABL Agent, and the Agent shall work in good faith to reach an agreement with respect to the treatment of proceeds realized upon the sale or other disposition of Additional Agent Goods (and what is and is not "identifiable" (without regard to any reference to principles under the UCC) and the respective rights with respect thereto / thereof) in this Final Order, and, absent such agreement, the Agent has no obligation to provide Additional Agent Goods or pay any Additional Goods Fee.  The Additional Agent Goods shall at all times remain subject

11

to the exclusive control of the Agent.  The Debtors shall, at Agent's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard thereto. The Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

28.     Notwithstanding anything to the contrary contained herein, in the Agency Agreement, or otherwise, the sale of the Additional Agent Goods shall not extend the Sale Term with respect to any Closing Store, unless otherwise agreed in writing by the Debtors and the Prepetition ABL Agent.

29.     The Agent is hereby granted a first-priority security interest in and lien upon (a) the Additional Agent Goods and (b) the Additional Agent Goods identifiable proceeds (less the Additional Agent Goods Fee), which security interest shall be deemed perfected without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that the Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying the Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Debtors as the consignee therefor, and the Agent's security interest in and lien upon such Additional Agent Goods and the Additional Agent Goods identifiable proceeds).  The term "Merchandise" shall not include "Additional Agent Goods."  Notwithstanding anything to the contrary contained herein, in the Agency Agreement, or otherwise, the Agent shall have no claim or lien on, or security interest in, any assets in the ABL True Up Account (as defined in the DIP Order, the "True Up Assets"), and the Agent is prohibited from asserting any interest in such True Up Assets on account of fees and expenses owed to the Agent on account of Additional Agent Goods or otherwise.

30.     Neither the Sale Guidelines, Agency Agreement, nor this Final Order authorize the Debtors to transfer or sell to Agent or any other party the personal identifying information (which means information that alone or in conjunction with other information identifies an individual, including but not limited to an individual's first name (or initial) and last name, physical address, electronic address, telephone number, social security number, date of birth, government-issued identification number, account number and credit or debit card number) ("PII") of any customers unless such sale or transfer is permitted by the Debtors' privacy policy and state, provincial or federal privacy and/or identity theft prevention laws and rules (collectively, the "Applicable Privacy Laws").  The foregoing shall not limit the Agent's use of the Debtors' customer lists and mailing lists in accordance with the Agency Agreement solely for purposes of advertising and promoting the Sales.

31.     The Debtors shall remove or cause to be removed any confidential information and/or PII in any of the Debtors hardware, software, computers or cash registers or similar equipment which are to be sold or abandoned so as to render the PII unreadable or undecipherable. At the conclusion of the Sales, the Agent shall provide the Debtors with written verification that the Agent has not removed, copied, or transferred any customer PII and that any records containing PII were shredded, erased, or otherwise modified to render the PII unreadable or undecipherable.

32.     Nothing herein shall limit the Debtors' right, in consultation with the Prepetition ABL Agent, to pause or discontinue a Sale at a Closing Store on notice to affected parties.

33.     Nothing herein is intended to affect any rights of any applicable Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) to enforce any law affecting the Debtors' conduct of any store closing sale that occurred before the Petition Date.

34.     At the conclusion of each Sale, Agent shall surrender the premises for each Store

to the Debtors in broom clean condition and in accordance with this Interim Order; *provided*,

*however*, the Debtors shall bear all costs and expenses associated with surrendering the premises

in accordance with this Interim Order, according to a budget mutually agreed to in writing between

the Agent and the Debtors (in consultation with the Prepetition ABL Agent).

**IV.     Procedures Relating to Additional Closing Stores.**

35.     To the extent that the Debtors seek to conduct Sales at any Additional Closing

Store, the Sale Guidelines and this Final Order shall apply to the Additional Closing Stores.

36.     Prior to conducting the Sales at any Additional Closing Store (and solely to the

extent such Additional Closing Store does not constitute a Permitted Store Closure, with the prior

written consent of the Prepetition ABL Agent), the Debtors will file a list including such Additional

Closing Store (including the date by which the Debtors anticipate Sales will conclude at such

Additional Closing Store) with this Court (each, an "<u>Additional Closing Store List</u>"), and serve a

notice of their intent to conduct the Sales at the Additional Closing Store on the applicable landlord

(collectively, the "<u>Additional Closing Store Landlords</u>"), the Additional Closing Store Landlords'

counsel of record (if known), and other interested parties by email (to the extent available to the

Debtors) or overnight mail.  With respect to Additional Closing Store Landlords who do not have

an email address on file in the Debtors' books and records, the Debtors will mail, if applicable,

such notice to the notice address set forth in the lease for such Additional Closing Store (or, if

none, at the last known address available to the Debtors).  After the occurrence of an ABL Cash

Collateral Termination Event (as defined in the DIP Order), the Prepetition ABL Agent shall have

the right to direct the Debtors via notice to the Debtors, with a copy to the Debtors' counsel, to

designate Additional Closing Stores.  Within five business days of notice thereof, the Debtors shall

designate Additional Closing Stores consistent with the procedures set forth herein and direct the Agent to begin the store closing process with respect to such Additional Closing Stores.

37.    The Additional Closing Store Landlords and any interested parties shall have five days after service of the applicable Additional Closing Store List to object to the application of this Final Order to the Additional Closing Store(s) listed in such Additional Closing Store List. If no timely objections are filed with respect to the application of this Final Order to an Additional Closing Store, the Debtors are authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional Closing Stores in accordance with this Final Order, the Sale Guidelines, the Agency Agreement, and any Side Letter, if applicable.  If any objections are timely filed with respect to the application of this Final Order, to an Additional Closing Store, and such objections are not resolved, the objections and the application of this Final Order to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary.  Any objections as to particular Additional Closing Stores will not affect the Debtors' and Agent's right to begin Closing Sales at non-objected-to Additional Closing Stores.  Notwithstanding anything in this Final Order to the contrary, and in consultation with the Prepetition ABL Agent, the Debtors may elect to discontinue the Sales at any Additional Closing Stores and revert to normal operations without further notice or authorization from the Court.

**V.    Closing Store Customer Polices.**

38.    The Debtors are authorized to no longer accept refunds or returns of Merchandise sold in the Debtors' retail stores or on the Debtors' e-commerce platform at the Closing Stores.

39.    Merchandise sold in the Sales shall be on a "final" basis and returns of such items shall not be accepted at any of the Debtors' retail locations or e-commerce platform.

15

40. Discounts shall no longer be applied to Merchandise purchased at a Sale.

41. The Debtors are authorized to no longer accept payment in the form of gift cards, gift certificates, or credit card rewards at the Closing Stores.

42. The Debtors' shall no longer offer local delivery, in-store pick-up services, or "Ship From Store (SFS)" delivery options, solely for the Closing Stores.

## VI. Dispute Resolution Procedures with Governmental Units.

43. Nothing in this Final Order, the Agency Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order. Nothing contained in this Final Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, Safety Laws, criminal, tax (including, but not limited to, the collection of sales taxes), labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising, consumer protection, the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring (collectively, "General Laws"). Nothing in this Final Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall alter or affect obligations to comply with all applicable federal Safety Laws and regulations. Nothing in this Final Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the

applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court, that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order.  Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

44.     To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state, or Local statute, ordinance, rule, or licensing requirement directed at regulating "going out of business," "store closing," or similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, signage, and use of sign-walkers solely in connection with the sale of the Store Closing Assets, including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets, the dispute resolution procedures in this section shall apply and the Dispute Resolution Procedures shall control over any Side Letters:

    (A)    Provided that the Sales are conducted in accordance with this Interim Order, any Final Order, and the Sale Guidelines, the Debtors, the Agent, and the Debtors' landlords, shall be presumed to be in compliance with any requirements of all county, parish, or municipal or other local government (hereinafter referred to as "Local") and State requirements governing the conduct of the Sales of the Store Closure Assets, including but not limited to Local statutes, regulation and ordinances establishing licensing or permitting requirements, waiting periods or time limits, or bulk sale restrictions that would otherwise apply to the Sales and sales of the Store Closure Assets (collectively, the "Liquidation Sale Laws") of any state or Local Governmental Unit (as defined in Bankruptcy Code section 101(27)); *provided* that the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws of any state (collectively, the "Safety Laws"), and the Debtors and the Agent shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the

Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

(B)     Within five business days after entry of this Final Order, the Debtors will serve by first-class mail, copies of this Final Order, the Agency Agreement, and the Sale Guidelines on the following:  (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; and (d) the landlords for the Closing Stores (collectively, the "Dispute Notice Parties").

(C)     With respect to any Additional Closing Stores, within five business days after filing any Additional Closing Store List with the Court, the Debtors will serve by first-class mail, copies of this Final Order, the Agency Agreement, and the Sale Guidelines on the Dispute Notice Parties.

(D)     To the extent that there is a dispute arising from or relating to the Sales, this Final Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Within ten days following entry of this Final Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Nicole L. Greenblatt, P.C., Matthew C. Fagen, P.C., and Elizabeth H. Jones; (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn.:  Robert S. Brady, Edwin J. Harron, and Joseph A. Mulvihill; (c) the affected landlord, and their counsel, if any; (d) counsel to the Ad Hoc Group and the DIP Lenders, (i) Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036, Attn.:  Stephen Zide (stephen.zide@dechert.com) and Eric Hilmo (eric.hilmo@dechert.com); and (ii) Potter Anderson & Corroon LLP, 1313 North Market Street, Wilmington, Delaware 19801, Attn:  M. Blake Cleary (bcleary@potteranderson.com) and Brett M. Haywood (bhaywood@potteranderson.com); (e) counsel to the Prepetition ABL Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn.: Kevin J. Simard (ksimard@choate.com) and Mark D. Silva (msilva@choate.com); and (ii) Reed Smith LLP, 1201 North Market Street, Suite 1500, Wilmington, DE 19801, Attn.:  Kurt F. Gwynne (kgwynne@ReedSmith.com); (f) Counsel to the Agent, Riemer Braunstein LLP, Times Square Tower, Suite 2506, Seven Times Square, New York, NY 10036, Attn.:  Steven Fox; (g) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.:  Jon Lipshie (jon.lipshie@usdoj.gov) and Megan Seliber (megan.seliber@usdoj.gov); and (h) any statutory committee appointed in these chapter 11 cases.  If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental

Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(E)     In the event that a Dispute Resolution Motion is filed, nothing in this Final Order shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of this Final Order nor the conduct of the Debtors pursuant to this Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Final Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Sales pursuant to this Final Order, absent further order of the Court. Upon the entry of this Final Order, the Court grants authority for the Debtors and the Agent to conduct the Sales pursuant to the terms of this Final Order, the Agency Agreement, and the Sale Guidelines (as may be modified by any Side Letters) and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in this Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(F)     If, at any time, a dispute arises among the Debtors or the Agent, on the one hand, and a Governmental Unit, on the other hand, as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (D) and (E) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

45.     Subject to paragraphs 38 and 39 above, each and every federal, state, or Local agency, departmental, or Governmental Unit with regulatory authority over the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Final Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors or the Agent be required to post any bond, to conduct the Sales.

46.     Provided that the Sales are conducted in accordance with the terms of this Final Order, the Agency Agreement, and the Sale Guidelines (as may be modified by Side Letters), and

in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors and Agent shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Final Order and the Sale Guidelines (as may be modified by Side Letters) without the necessity of further showing compliance with any such Liquidation Sale Laws.

47.      Nothing in this Final Order, the Agency Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.

**VII.    Other Provisions.**

48.      Neither the Agent nor any of its respective affiliates (whether individually, as part of a joint venture, or otherwise), shall be precluded from providing additional services to the Debtors or bidding on the Debtors' assets in connection with any other future process that may or may not be undertaken by the Debtors to close stores.

49.      Not later than seven calendar days prior to the objection deadline related to entry of an order approving the Motion on a final basis, the Agent shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these chapter 11 cases, and all parties who have filed requests for service under Bankruptcy Rule 2002, by email, or if the email address is not available to the Debtors, then by first class mail.

50.     Agent shall act solely as agent to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Agency Agreement (including the Agent's indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of gross negligence or willful misconduct and, for greater certainty, the Agent shall not be deemed to be an employer, or a joint or successor employer or a related or common employer or payor within the meaning of any legislation governing employment or labor standards or pension benefits, Safety Laws, or other statute, regulation or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.

51.     Subject to the provisions of paragraphs 30–31 hereof, the Debtors are authorized and permitted to transfer to the Agent PII in the Debtors' custody and control solely for the purposes of assisting with and conducting the Sales and only to the extent necessary for such purposes; *provided* that the Debtors, with assistance of the Agent, remove such PII from FF&E prior to any abandonment of the same.

52.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

53.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief (including any payment made in accordance with this Final Order), nothing in this Final Order is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors'

or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Final Order or the Motion or any order granting the relief requested by the Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim, other than with respect to payments made to the Agent, which are governed by the terms of this Interim Order and the reconciliation procedures in the Agency Agreement.

54.     The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests

that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

55.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and such notice satisfies the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

56.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

57.     The Debtors are authorized, but not directed, to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

58.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order or the Agency Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Agent for protection from interference with the Store Closings or Sales, (c) any other disputes related to the Store Closings or Sales, and (d) protect the Debtors and/or the Agent against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the Agent, the landlords, the Store Closings, or the Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

*[Remainder of page intentionally left blank]*

23

# <u>Exhibit 1</u>

**Agency Agreement**

## **EXHIBIT A**

**Initial Closing Stores**

| Count | Store # | Store Address | City | State | Zip | Landlord |
|---|---|---|---|---|---|---|
| 1 | 276 | 6135 Junction Blvd | Rego Park | NY | 11374 | Kohl's Department Stores, Inc. |
| 2 | 295 | 300 Baychester Ave | Bronx | NY | 10475 | Transform Operating Stores LLC |
| 3 | 296 | 750 Newhall Dr | San Jose | CA | 95110-1106 | Lowe's Home Centers, LLC |
| 4 | 318 | 2505 El Camino Real | Tustin | CA | 92782 | Transform Leaseco LLC |
| 5 | 274 | 14585 Biscayne Blvd | North Miami | FL | 33181-1209 | Oleta Partners Biscayne Parcel LLC |
| 6 | 265 | 2200 Harbor Blvd | Costa Mesa | CA | 92627 | Transform Operating Stores LLC |
| 7 | 330 | 3795 E Foothills Blvd | Pasadena | CA | 91107 | Transform Lease OPCO LLC |
| 8 | 338 | 1982 E 20Th St | Chico | CA | 95928 | ECP / TPB1, LLC |
| 9 | 324 | 2820 Hwy 63 South | Rochester | MN | 55904-5571 | Pergola LLC and Abraham Properties LLC |
| 10 | 223 | 26532 Towne Center Drive Suites A-B | Foothill Ranch | CA | 92610 | Che Chen Liu & Shu Fen Liu Revocable Trust |
| 11 | 234 | 1001 E Sunset Drive | Bellingham | WA | 98226 | BLI Sunset Square LLC |
| 12 | 257 | 8320 Delta Shores Circle S. | Sacramento | CA | 95832 | Spirit Realty LP |
| 13 | 342 | 1361 NJ-35 | Middletown Township | NJ | 7748 | Brixmor Middletown Plaza Owner, LLC |
| 14 | 229 | 2900 N Bellflower Blvd | Long Beach | CA | 90815 | Transform Lease OPCO LLC |
| 15 | 331 | 720 Clairton Blvd | Pittsburgh | PA | 15236 | BT Pleasant Hills LP |
| 16 | 290 | 2530 Rudkin Road | Yakima | WA | 98903 | YAKIMA THEATRES, INC. |
| 17 | 325 | 571 Boston Turnpike | Shrewsbury | MA | 1545 | Shrewsbury Crossing II, LLC |

| 18 | 370 | 5203 W War Memorial Dr | Peoria | IL | 61615 | Peoria New Mall LLC |
| 19 | 127 | 8300 Sudley Rd. | Manassas | VA | 20109 | Manassas Real Estate Ventures, LLC |
| 20 | 322 | 461 Route 10 East | Ledgewood | NJ | 07852 | UE Ledgewood LLC |
| 21 | 280 | 301 Nassau Park Blvd. | Princeton | NJ | 08540 | SCC Nassau Park Pavilion LLC |
| 22 | 190 | 300 Providence Highway | Dedham | MA | 02026 | Dedham R2G Owner LLC |
| 23 | 281 | 905 S 24th Street W | Billings | MT | 59102 | 905 South 24th Street West Owner LLC |
| 24 | 250 | 19460 Compass Creek Pkwy | Leesburg | VA | 20175 | Mervis - CCP Leesburg, LLC |
| 25 | 124 | 3201 North Mayfair Road | Wauwatosa | WI | 53222 | Fundamentals Company, Kinpark Associates, Laurie Industries, Inc. |
| 26 | 266 | 13180 S Cicero Avenue | Crestwood | IL | 60445 | Brixmor SPE 3 LLC |

**<u>Exhibit B</u>**

**Expense Budget**

**<u>Exhibit 2</u>**

**Sale Guidelines**