## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.,** *et al.*, | **Case No. 24-12337 (KBO)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

## DECLARATION OF KUNAL S. KAMLANI IN
## SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PAPERS

I, Kunal S. Kamlani, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Transformation Officer for True Value Company, L.L.C. ("TVC") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "True Value" and, together with their non-Debtor affiliates, the "Company").  I also am a Senior Managing Director of M3 Advisory Partners, LP ("M3"), the Debtors' proposed restructuring advisor in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2.      I have more than 25 years of operating and advisory experience across a number of industries including retail, financial services, logistics, real-estate, healthcare, and global leisure and hospitality.

3.      Prior to joining M3, I served as the President of ESL Investments, Inc. and the President and Chief Operating Officer of Prestige Cruise Holdings, the parent company of the Oceania Cruises and Regent Seven Seas Cruise lines.  Prior to that I served as the Chief Operating

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

Officer of Citi Smith Barney and served in the Corporate Development departments of Starwood Hotels & Resorts and ITT Corporation.  I started my career as an investment banking analyst at Bear Stearns.  In each of these roles I have been intimately involved in developing operating plans and cashflow forecasts, as well as reviewing capital structuring alternatives in the context of organic growth initiatives and M&A transactions.  In addition, I served as a member of the Board of Directors of Staples Inc. and Sears Holdings Corporation.  As a Board Member, I also served on Audit, Compensation, Finance, and Related Party Transaction Committees.

4.      M3 was retained as financial advisor as of July 29, 2024 and I was formally appointed as Chief Transformation Officer of the Debtors on October 13, 2024.  In such capacity, I have, in consultation and coordination with the Company's board of directors (the "Board"), led and directed the efforts of the Company and its advisors to manage liquidity to allow the Company adequate time to maximize its enterprise value, and served as the Company's principal advisor to its creditor constituencies and other stakeholders with respect to the Company's financial and operational matters.

5.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case (these "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors intend to continue in the possession of their respective properties and the management of their business as debtors in possession.  To minimize any business disruption caused by the commencement of the Chapter 11 Cases, the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith (collectively, the "First Day Papers").

6.      I submit this declaration (this "Declaration") in support of the Debtors' (i) voluntary petitions for relief under chapter 11 of the Bankruptcy Code and (ii) First Day

Papers. I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors. In my capacity as Chief Transformation Officer of the Debtors and as a result of my time with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management team (the "Management Team"), I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, the circumstances leading to the commencement of these Chapter 11 Cases, and the information in the First Day Papers.

7.      The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge of the Debtors' operations and finances based on information provided by the Debtors; (b) my review of relevant documents, including information provided by other parties; (c) information provided to me by, or discussions with, the members of the Management Team or their advisors; or (d) my opinion based upon my experience. If called upon to testify, I would testify competently to the facts as set forth in this Declaration.

8.      This Declaration is divided into three parts: **Part I** provides background information about the Debtors, their business operations, and their corporate and capital structures; **Part II** describes the circumstances surrounding the commencement of the Chapter 11 Cases and the Debtors' prepetition sale efforts; and **Part III** sets forth the relevant facts in support of each of the First Day Papers.

## PRELIMINARY STATEMENT

9.      True Value, one of the world's leading hardlines (*i.e.*, hard goods) wholesalers, filed these Chapter 11 Cases to consummate a value maximizing going concern sale of its business. Do It Best Corp. ("Do It Best", the "Stalking Horse Bidder", or the "Buyer") submitted a binding bid for True Value's assets as a going concern following a robust and competitive prepetition sale process, which the Debtors propose to continue to market-test under the Court's supervision. The

proposed sale transaction, designed to preserve the nearly century-old True Value business and position it for long-term success, offers True Value and its constituents a clear and viable path forward in the face of macroeconomic headwinds and liquidity constraints.

10.     The Debtors' business and their customers are spread across the United States.  The Debtors operate twelve distribution centers, servicing approximately 4,500 retail storefronts.  As a measure of the Company's national reach, 98% of the United States' population resides within the trade area of one or more True Value retail stores.

11.     True Value-branded retailers account for 76% of the Debtors' sales, while the Debtors' other customers (approximately 3,000) account for the remaining 24%.  The Debtors offer their customers approximately 75,000 different products across categories such as "Hardware Lumber & Building," "Electrical & Light," and "Farm, Ranch & Automotive," making True Value a one-stop-shop for its customers' needs.

12.     End consumer demand for hard goods spiked during the COVID-19 pandemic, as many Americans' discretionary spending shifted to home improvement projects.  The increase in demand coincided with severe disruptions to the domestic and global supply chain, which made it more difficult and more expensive for the Debtors to source products.  Because of the Debtors' decreased fill rate (*i.e.*, the percentage of orders they could ship from available stock), certain of their customers began using other wholesalers in whole or in part.

13.     Unfortunately, the COVID-19-induced spike in demand was only temporary—an example of demand that had been "pulled forward."  The period of increased demand was followed by a period of lower-than-anticipated demand where sales fell beneath the level they were at prior to the spike.

14.     The Debtors continue to experience the repercussions of the COVID-19 demand "pull forward," with sales staying below pre-pandemic levels.  In 2019, the Debtors' revenue totaled $1.336 billion.  In 2020, that number jumped to $1.557 billion; in 2021, $1.559 billion, and 2022, $1.588 billion.  In 2023, revenue dropped 8% year over year to $1.455 billion, and 2024 revenue through the end of August was $868 million, down 14% year over year.  The COVID-19 pull-forward is not solely responsible for the decline in revenue: an unfavorably warm winter and wetter than usual spring combined with the pull-forward to drive conservative buying behavior by retailers—the rate of inventory turn reached its lowest point since 2015.  Additionally, during COVID-19, certain of the Company's customers added competitive wholesalers as back-up suppliers, decreasing the Debtors' post-COVID-19 market share.

15.     In addition to these macroeconomic headwinds, over the past several months, the Debtors have faced significant challenges under their credit facility.  The Debtors' Prepetition Lenders (as defined below) imposed changes to the Debtors' "borrowing base," or the formula used to determine the amount of revolver loans the Debtors can borrow at a given point in time, which led to a material reduction in available liquidity.  This reduction in liquidity, along with other actions taken and remedies exercised by the Prepetition Lenders, including their exercise of cash dominion—sweeping the Debtors' cash on a daily basis—severely reduced the Company's access to working capital.  In cash dominion, the Prepetition Lenders control the Debtors' access to cash, including cash received from operations, and must consent to all disbursements.  These changes put the Debtors in a profoundly difficult situation.

16.     In May 2024, prior to the imposition of any changes to the borrowing base or other remedies under the credit facility, the Company retained Houlihan Lokey Capital, Inc. ("Houlihan") to explore liquidity solutions and other strategic alternatives.  In July 2024, the

Company formally launched a marketing process to sell its business as a going concern.  Five parties submitted indications of interest.  Following extensive negotiations, the Debtors have reached an agreement with Do It Best to serve as the stalking horse bidder in connection with a Bankruptcy Court-supervised sale process to be effectuated through a sale under Bankruptcy Code section 363.  Do It Best's stalking horse bid for substantially all of the Debtors' assets, which is subject to higher or otherwise better offers, contemplates, among other things, a $153 million cash purchase price and the assumption and cure of certain contracts and leases and the assumption of up to $45 million of trade payables that are administrative claims (the "Stalking Horse Bid").  These terms are embodied in the Asset Purchase Agreement, dated as of October 13, 2024, among the Debtors and the Buyer (the "Stalking Horse Agreement or the "APA").

17.    Informed by the difficult challenges they currently face and after careful deliberations by the Debtors' board, management team, and advisors, the Debtors believe that the going concern sale supported by Do It Best as Stalking Horse Bidder, represents the best available option.  It will preserve True Value's business as a going concern and will maximize value for all stakeholders.

18.    Building on their significant prepetition efforts and their need to secure long term funding for their business, the Debtors are committed to an efficient chapter 11 process and a quick exit from bankruptcy.  Under their proposed timeline, the Debtors intend to seek approval of bidding procedures and the sale within 21 and 45 days of the Petition Date, respectively.  An expeditious process will help mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Debtors' business, and curtail professional fees and administrative costs for the benefit of all of their stakeholders.

## PART I: BACKGROUND

### I.    The Debtors' Business

#### A.    Business Overview

19.    True Value is one of the world's leading hardware wholesalers, with a globally recognized retail brand.  Founded in 1855 as Hibbard Spencer Bartlett & Company, the True Value brand dates to 1932, when it was introduced as a line of hand tools.  Cotter & Company acquired Hibbard, along with the True Value brand, in 1963.  Decades later, in 1997, Cotter & Company merged with ServiStar Coast to Coast Corporation to form TruServ Corporation, which was renamed True Value Company in 2005.  Historically, True Value was fully owned by a cooperative of its retailers, but in 2018, an outside investor acquired approximately 70% of the Company's equity.  The 2018 transaction brought an influx of cash and allowed True Value to partially de-lever its balance sheet.  Through the cooperative, certain of True Value's retailers continue to own approximately 30% of the Company.

20.    True Value offers approximately 75,000 different products, making it a one-stop-shop for its retail store customers.  In 2023, True Value eclipsed $130 million in total handled and direct sales in each of nine different product categories: (1) Hardware Lumber & Building ($319.8 million); (2) Outdoor Living & Tools ($235.1 million); (3) Paint ($221.3 million); (4) Plumbing & Heating ($217.6 million); (5) Lawn & Garden ($187.6 million); (6) Home ($168.6 million); (7) Farm, Ranch & Automotive ($137.2 million); (8) Hand & Power Tools ($135.4 million); and (9) Electrical & Light ($135.0 million).  Miscellaneous products accounted for an additional $78.1 million in handled and direct sales.

21.    In addition to sourcing and selling national branded products (*e.g.*, Stanley Black & Decker, Scotts, Proctor & Gamble, Weber Grills, General Electric Lighting, and many others), True Value also offers a portfolio of 11 private label brands.  Because True Value pays less to

source its private label products, it can offer them to retailers at lower price points, allowing the retailers to achieve higher margins when selling to end consumers.  These private label brands include GreenThumb®, covering 18 categories of Lawn & Garden and Outdoor Tools; EasyCare® premium paints, manufactured at the Debtors' facility in Cary, Illinois; and Master Mechanic®, including high-quality tools, accessories, plumbing supplies and repair items, electrical supplies, and farm and ranch products to provide the backbone of the independent hardware store.

22.    True Value's approximately 4,500 customers, located across the United States and in upwards of 55 other countries, can be divided into six general categories:

(i)    ***Core Accounts***:  This is True Value's long-tenured base. These core accounts include approximately 2,200 retail stores nationwide, with the majority bearing the True Value name.  The average core account customer has been a retail partner of True Value for 24 years.  In 2023, core accounts accounted for $1.119 billion in gross billings on $858 million in handled sales, yielding a wholesale margin of $220 million.

(ii)    ***Strategic Accounts***:  The Debtors have strategic merchandising relationships with 12 multi-store chains that sell True Value products across 475 store fronts.  In 2023, strategic accounts produced $200 million in gross billings on $158 million in handled sales, yielding a wholesale margin of $35 million, and True Value believes there is substantial room for expansion in this category.

(iii)    ***E-commerce***:  True Value is currently partnering with Amazon to sell through its e-commerce channel.  In 2023, 56 Amazon e-commerce store fronts/accounts accounted for $54 million in gross billings on $49 million in handled sales, for a wholesale margin of $8 million in the e-commerce marketplace.  The Debtors view e-commerce as providing a massive opportunity for growth, with market potential in excess of one billion dollars.

(iv)    ***International***:  True Value customers have a significant presence in Central America and the Caribbean Islands.  In 2023, 220 international store fronts produced $138 million in gross billings on $41 million in handled sales. True Value's wholesale margin was $11 million.

(v)    ***Secondary***:  Secondary customers utilize True Value when their primary supplier is out of stock or doesn't offer a product.  In 2023, 475 store fronts accounted for $83 million in gross billings on $62 million of handled sales

to True Value's secondary customers.  True Value's wholesale margin was $14 million.

(vi)  ***Specialty Business*:** True Value supplies certain specialty businesses that service the farm and ranch, nursery, and commercial industrial segments. In 2023, 1,460 store fronts accounted for $169 million in gross billings and $73 million in handled sales in this business line.  True Value's wholesale margin was $16 million.

## B.    Supply Chain and Distribution

23.    The Company sources approximately 75,000 products from an expansive network of more than 2,000 suppliers.  In 2023, approximately 93% of products were purchased from domestic suppliers; 5% were purchased from suppliers in China; and the remaining 2% were purchased from suppliers in other countries.  The supplier network is highly diversified—in 2023, no one supplier accounted for more than 2.9% of total products purchased, and the top ten suppliers accounted for 16.2% of products purchased (those products spread across nine product categories). True Value's relationships with suppliers have increased its ability to achieve favorable pricing, inventory recoveries, and competitive discounts and rebates, allowing it to boost its own margins.

24.    True Value's supply chain has relied on 12 leased distribution centers:

|    | Location | Facility Sq. Ft. | Lease Exp. Date | Employees | 2023 Sales |
|----|----------|------------------|-----------------|-----------|------------|
| 1  | Wilkes-Barre, PA | 1,025,000 | Sept. 2040 | 314 | $215 million |
| 2  | Corsicana, TX | 754,000 | Dec. 2036 | 125 | $156 million |
| 3  | Harvard, IL | 1,346,000 | Feb. 2030 | 286 | $128 million |
| 4  | Springfield, OR | 523,000 | Dec. 2036 | 112 | $118 million |
| 5  | Atlanta, GA | 619,000 | Dec. 2036 | 173 | $116 million |
| 6  | Cleveland, OH | 393,000 | Aug. 2042 | 100 | $107 million |
| 7  | Kingman, AZ | 354,000 | Dec. 2036 | 59 | $81 million |
| 8  | Kansas City, MO | 398,000 | Dec. 2036 | 64 | $67 million |
| 9  | Mankato, MN | 310,000 | Nov. 2041 | 56 | $64 million |
| 10 | Woodland, CA | 341,000 | Dec. 2036 | 57 | $55 million |
| 11 | Manchester, NH | 439,000 | Jul. 2033 | 93 | *Phasing Out* |

| | Location | Facility Sq. Ft. | Lease Exp. Date | Employees | 2023 Sales |
|---|---|---|---|---|---|
| 12 | Denver, CO | 355,000 | Jan. 2027 | 76 | *Inventory Holding– Phasing Out* |



*The Company's distribution center in Wilkes-Barre, Pennsylvania*

25.     Additionally, the Debtors own and operate their paint manufacturing plant in Cary, Illinois, one of the ten largest paint manufacturing facilities in the world and the only facility in the United States capable of manufacturing latex, oil-based, and aerosol paints under one roof.

**C.     Employees**

26.     As of the Petition Date, the Debtors employ approximately 1,950 employees (the "<u>Employees</u>"), with approximately 115 sales Employees (the "<u>Sales Employees</u>"), 1,370 Employees in warehouse, distribution, and manufacturing roles, 15 Employees at the Debtors' corporate store in Palatine, Illinois (the "<u>Retail Store</u>"), and the remaining Employees in corporate and other support positions.  All of the Debtors' Employees are located in the United States.

Approximately 98% of the Debtors' Employees work full-time, and the remaining Employees work part-time.

27.    Approximately 270 of the Debtors' Employees are represented (the "Represented Employees") by three unions affiliated with the International Brotherhood of Teamsters (the "Unions").  All of the Represented Employees work in warehouse and distribution roles.  The Debtors' relationships with the unions are reflected in three separate collective bargaining agreements (the "CBAs").  Prior to the Petition Date, the Debtors decided to cease operations at their Manchester, NH distribution center (the "Manchester Distribution Center") by the end of the 2024 calendar year and have negotiated the terms of the closure with the union representing Employees at that location (the "Manchester Closure Effects Agreement").

28.    To supplement its workforce, separate and apart from the Employees, the Debtors utilize individuals who provide a range of services to the Debtors on a contractual basis.  The Debtors are currently working with approximately three part-time independent contractors who work directly for the Debtors (the "Independent Contractors") and provide human resources, risk management, and benefits administration support and consulting services.  Independent Contractors are paid directly by the Debtors, in arrears.  The Debtors also enlist the services of temporary workers (the "Temporary Workers"), each of whom is employed by and paid through third-party service providers.

**D.    Market and Competition**

29.    The Debtors operate in a large, relatively fragmented wholesale hardware distribution market in the United States.  Based on internal estimates, the Company estimates the total market size, excluding big box retailers such as Home Depot and Lowe's, at $38 billion in 2023.  Fifty-one percent of this market is captured by regional distributors, followed by Ace Hardware (22%), Do it Best Co-op (12%), Orgill (10%), and the Company (5%).  Wholesalers

provide value through a bulk-purchasing and low-margins strategy, which delivers lower costs to hardware retailers and end customers.

## II.      The Debtors' Corporate and Capital Structure

30.      The Company operates in a holding company structure, with non-Debtor TV Holdco I, L.L.C. at the top, then Debtor TV Holdco II, L.L.C. acting as a direct and indirect holding company for each of the Debtor subsidiaries, including TVC, that conducts operations.   An organizational chart showing the Company's corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

### A.      Funded Indebtedness

31.      As of the Petition Date, the Debtors have approximately $238.2 million in total funded indebtedness under their Credit Facility (as defined below).  In addition, the Debtors have obligations under certain issued and outstanding Letters of Credit and the PNC Commercial Card Program (each as defined below).

#### *(i)      The Credit Facility*

32.      On April 20, 2018, TVC entered into that certain Credit Agreement (as amended by Amendment No. 1 to Credit Agreement, dated as of September 16, 2021, as further amended by Amendment No. 2 to Credit Agreement, dated as of November 2, 2022, as further amended by Amendment No. 3 to Credit Agreement, dated as of January 24, 2023, as further amended by Amendment No. 4 (as defined below), dated as of August 26, 2024, and as further amended by Amendment No. 5 (as defined below), dated as of September 9, 2024, the "Credit Agreement") by and among TVC, as a borrower, and each of Distributors Hardware, L.L.C., TV GPMC, L.L.C., True Value Retail, L.L.C., TrueValue.com Company, L.L.C., TV TSLC, L.L.C., and True Value Virginia L.L.C., as additional borrowers (together with TVC, the "Borrowers"), TV Holdco II L.L.C., as guarantor (the "Guarantor" and, together with the Borrowers, the "Loan Parties"), PNC

Bank, National Association, as administrative agent (in such capacity, the "Administrative Agent"), and the lenders and issuing banks party thereto (the "Prepetition Lenders" and, together with the Administrative Agent, the "Prepetition Secured Parties"), pursuant to which the Prepetition Lenders provided term loans, revolving loan commitments, and other financial accommodations to the Loan Parties (the "Credit Facility").

33.     The Credit Facility consists of (i) a term loan with $18.75 million outstanding after amortization as of the Petition Date and (ii) an up to $300 million asset-based revolving credit facility, subject to a borrowing base, and is secured by a first-priority security interest in and lien on substantially all of the Loan Parties' assets, subject to certain exclusions (the "Prepetition Collateral"). The Prepetition Collateral includes, among other things, inventory, accounts receivable, certain fee-owned real property and subsidiary equity interests. The borrowing base, as of October 5, 2024, was $260.6 million.

34.     The Credit Facility matures on September 16, 2026, and bears interest at a rate per annum equal to the Alternate Base Rate (as defined in the Credit Agreement), *plus* an applicable margin of 3.50%. Interest on the Credit Facility is payable on the first calendar date of each calendar quarter. Term loan amortization payments in the amount of $1,250,000 are payable on the first day of each calendar quarter. The Borrowers pay an unused line fee of 0.25% per annum based on the outstanding unused commitment during the most recently completed calendar quarter. Additionally, the Borrowers pay a fee of 0.10% per annum based on the amount by which the Borrowers elect to reduce the commitments by up to $50,000,000 during the period from November 1 of any year to January 31 of the following year. The Credit Agreement grants the Administrative Agent discretion to reduce the availability of funds that can be borrowed under the Credit Facility by increasing the Borrowers' required reserves.

35.     On August 26, 2024, the Loan Parties entered into a Temporary Waiver and Amendment No. 4 to the Credit Agreement ("Amendment No. 4" or the "First Waiver") which, among other things, temporarily waived certain Events of Default, reduced the aggregate revolving credit commitments to $350,000,000 from $450,000,000, and pursuant to which the Loan Parties agreed that on and after August 27, 2024, all obligations under the Credit Agreement have, or shall be deemed to have, borne, and shall continue to bear, interest at a rate per annum equal to the Alternate Base Rate plus 3.50% (the "Amended Applicable Rate").

36.     On September 9, 2024, the Loan Parties entered into the Second Temporary Waiver and Amendment No. 5 to the Credit Agreement ("Amendment No. 5" or the "Second Waiver") which, among other things, temporarily waived certain Events of Default and further reduced the aggregate revolving credit commitments to $300,000,000 from $350,000,000.

### (ii)    *Letters of Credit*

37.     The Debtors are required to provide security to secure their obligations under certain Insurance Policies (as defined below), historical insurance policies, and the Customs Bond (as defined below).  To satisfy these obligations, the Debtors have obtained a letter of credit facility pursuant to that certain Amended and Restated Substitute Insurance Collateral Facility Agreement (the "LC Facility Agreement"), dated as of September 25, 2024, by and between 1970 Group, Inc. ("1970 Group") and the Debtors (the "LC Facility").  Under the LC Facility, in exchange for a fee, 1970 Group arranges for the issuance and renewal of six letters of credit (the "Letters of Credit") for the benefit of the insurers and the Customs Bond issuer.  As of the Petition Date, the total amount outstanding on the Letters of Credit is approximately $11.31 million.  None of the Letters of Credit have been drawn upon.

38.     Generally, the Letters of Credit are issued for one-year terms.  The Debtors paid 1970 Group a fee of approximately $1.48 million for the renewal of the six outstanding Letters of

Credit in accordance with their anticipated maturity dates.  Under the LC Facility Agreement, the Debtors are required to fund an escrow account (the "LC Facility Escrow Account") over a period of three months with approximately $1.78 million to serve as security for 1970 Group (the "LC Facility Reserve Amount").  It is my understanding that, in accordance with the terms of the LC Facility Agreement, prior to the Petition Date, the Debtors funded the first half of the LC Facility Reserve Amount (approximately $877,000) on October 3, 2024.  The next funding installment of approximately $296,000 is due on November 4, 2024.  Upon an event of default under the LC Facility Agreement, 1970 Group is entitled to the LC Facility Reserve Amount and to demand that the LC Escrow Account be replenished.  The LC Facility Agreement requires that the Debtors maintain their Insurance Policies in full force and effect and generally pay their obligations under the insurance policies as they become due.

### (iii)    *PNC Commercial Card Program*

39.    On December 21, 2018, TVC entered into that certain PNC Commercial Card Program Authorization and Agreement (as amended by the Amendment to PNC Commercial Card Program Authorization and Agreement, dated as of May 6, 2022, and as supplemented by the PNC Commercial Card Program Term and Conditions (version May 2018), the "PNC Card Agreement") with PNC Bank, National Association ("PNC"), one of the lenders under the Credit Facility.  Pursuant to the PNC Card Agreement, PNC extended credit to TVC by establishing one or more commercial card programs with an aggregate maximum limit of $25 million (the "PNC Commercial Card Program").  The Debtors maintain corporate cards under the PNC Commercial Card Program in the ordinary course of business to pay vendors and for certain work-related expenses, including "in the field" and employee travel expenses.  Because of PNC's participation as a lender in the Credit Facility, the credit extended under the PNC Commercial Card Program is secured by a first-priority security interest in and lien on the Prepetition Collateral.  On July 31,

2024, September 5, 2024, September 30, 2024, and October 11, 2024, PNC unilaterally reduced the aggregate maximum limit under the PNC Commercial Card Program to $4.5 million, $3.0 million (with a further contemplated reduction to $2.5 million effective shortly thereafter), $500,000, and $100,000, respectively.  The Company maintains a small credit balance under the PNC Commercial Card Program.

**PART II: CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES
AND THE DEBTORS' PATH FORWARD**

I.      **Events Precipitating These Chapter 11 Cases.**

      A.      **Consequences of the COVID-19 Pandemic**

40.     When the world shut down in the early months of the COVID-19 pandemic, demand for hardware products increased.  As a point of reference, approximately 1,350 of True Value's retail customers provide True Value with point of sale data.  At those 1,350 stores, there were approximately 44.6 million total retail transactions in 2019; in 2020, there were approximately 50.8 million.  At the same time, the entire industry experienced major supply chain disruptions.  The Company's fill rate dropped from over 95% in January 2020 to below 75% in July 2020.  Increased transaction volumes and product scarcity exacerbated the Company's challenges, with freight, labor, product, and financing costs escalating significantly.  Raw material constraints led to price increases of 25-30%.  Despite the Company's best efforts, some of its customers added a secondary supplier to maximize their ability to quickly meet end consumer demand.

41.     Management swiftly took action to improve fill rates by removing redundancies, making internal changes to the Company's inventory team to refocus on key product areas, implementing an offline planning process for highly seasonal products and imports, and building

out an optimized ordering module for True Value customers.  However, the Company continues to struggle in winning back the business of those customers who added secondary suppliers.

42.     Following the initial COVID spike in demand, transaction volume began to normalize.  In 2021, retail transactions at reporting stores fell to 48.3 million; in 2022, to 44.4 million; in 2023, to 41.6 million; and in 2024, based on year-to-date sales and go-forward projections, to 39.7 million.  The Company anticipates that it is at the nadir of the COVID-impacted, "pulled forward" demand curve, and that retail transactions—and, as a consequence, wholesale transactions—will soon rise to pre-COVID levels.  In addition, its customers built up high inventory positions in the latter half of the pandemic, which resulted in further reductions in purchasing (even beyond reductions resulting from the drop in demand).  The Company believes that as much as 80% of the decline in sales from 2023 to 2024 can be attributed to slower retail traffic, fewer retail transactions, and a milder winter, which affected the broader industry.

### B.     Recent Liquidity Challenges

#### (i)     Decreased Sales

43.     Beginning in 2023, the Company began implementing difficult decisions to right-size its cost structure and responsibly manage the business in light of the numerous economic challenges it faced that were depressing its sales, including the impact of COVID described above, supply chain disruptions, and inflation.  The Company negotiated with vendors to achieve favorable pricing and worked to optimize delivery routes by minimizing miles driven and providing fixed order and delivery days.  Additionally, the Company anticipates phasing out two of its twelve distribution centers by consolidating less profitable centers with the ten driving the vast majority of profits.  Certain Employees have been impacted by reductions in force.

44.     Also in 2023, the Company approached its lenders in hopes of negotiating a credit agreement amendment to provide additional cushion based on the projected drop in sales and short-

term liquidity challenges it anticipated that it would face as a result. Ultimately, despite the Debtors' good faith efforts, no such agreement was reached at the time.

### (ii) *Borrowing Base Reduction and Prefunding Requirements*

45.     The Company's borrowing capacity under the Credit Agreement is tied to a formula called the "borrowing base." The borrowing base calculation takes into account the value of certain collateral pledged under the Credit Agreement. One component of this calculation is the value of the Company's inventory, which value is determined via an annual appraisal. In May 2024, the Prepetition Lenders had the Debtors' inventory appraised by Hilco Valuation Services. The appraisal valued the Debtors' inventory more conservatively, leading to a $13.6 million reduction in True Value's borrowing base under the Credit Agreement.

46.     Additionally, in June 2024, the Prepetition Lenders imposed a pre-funding requirement for ACH payments, a departure from the Debtors' historical practices upon which they had relied for budgeting and disbursement purposes. The pre-funding requirement and reduced borrowing base left the Debtors without sufficient liquidity to operate their business on ordinary terms.

### (iii) *Cash Dominion*

47.     In July 2024, the Prepetition Lenders implemented cash dominion (which the Company disputed), sweeping the Debtors' cash on a daily basis and applying it to the outstanding principal amount of the revolving loans. These measures froze the Debtors' liquidity, making the Debtors dependent on the Prepetition Lenders for daily funding to maintain basic operations. As a result, during the past several months, the Debtors were required to engage in nearly daily and, at times, contentious negotiations with the Prepetition Lenders over planned disbursements. Over that period, approximately $105.1 million has been applied to reduce the outstanding balance under the Credit Facility to $238.2 million.

C.      **Waiver Negotiations**

48.      In July 2024, facing material reductions in its borrowing capacity, cash dominion, and associated liquidity issues, the Debtors began negotiating the First Waiver with the Administrative Agent to (i) avoid or (ii) limit the operational consequences of any potential default under the Credit Agreement.  The goal of the First Waiver was to provide the Company with the runway to complete a going concern restructuring transaction.

49.      On August 26, 2024, following more than a month of negotiations, the Debtors and the Prepetition Lenders entered into the First Waiver.  The First Waiver waived certain specified events of default by the Debtors through August 30, 2024, subject to an optional extension by the Prepetition Lenders.  It also obligated the Prepetition Lenders to fund the Debtors' operations during the First Waiver period, which lasted approximately five days from signing to expiration. In exchange, the Debtors incurred a $1.85 million amendment fee, released claims against the Prepetition Lenders and agreed to various milestones relating to the ongoing sale process, including an August 30, 2024 deadline for potential buyers to submit indications of interest regarding a potential acquisition of the Debtors or their assets (as extended, the "Indication of Interest Deadline").  In addition, the First Waiver incorporated several amendments to the Credit Agreement as described above.

50.      On September 9, 2024, the parties executed the Second Waiver.  The Second Waiver waived certain specified events of default by the Debtors through September 16, 2024. Similar to the First Waiver, the Second Waiver obligated the Prepetition Lenders to fund the Debtors' operations during the Second Waiver period, which lasted approximately seven days from signing to expiration.  In exchange, the Debtors released certain claims against the Prepetition Lenders and agreed to various milestones relating to the ongoing sale and valuation processes, including a September 6, 2024 deadline for certain updates on the economic benefits of the

indications of interest received and a September 16, 2024 deadline for a valuation report of a hypothetical liquidation. In addition, the Second Waiver incorporated several amendments to the Credit Agreement as described above.

51.     On September 17, 2024, after the expiration of the Second Waiver period, the banks declined to enter into further waivers, and the parties began a process whereby the Prepetition Lenders and Debtors negotiated limited disbursements on an almost-daily basis (with no funding provided on certain days) while the Debtors negotiated with a competing bidder and worked to finalize the Stalking Horse Agreement with Do It Best.

### D.     Restructuring Efforts

#### (i)     Sale Process and Stalking Horse Bidder

52.     In May 2024, the Company retained Houlihan to explore liquidity solutions and other strategic alternatives. The Company believed that a robust marketing process for a going concern sale transaction would maximize value by preserving the value of the business, preserving many jobs and capitalizing on a significant amount of synergy potential between the Company and potential partners.

53.     In July 2024, around the time that the Company began negotiating the First Waiver, Houlihan launched a formal sale process. In connection with this process, Houlihan contacted 25 prospective strategic and financial buyers. 15 of the potential buyers executed non-disclosure agreements and were granted access to a virtual data room. Seven received management presentations. It was clear to prospective bidders that the Company was open to concluding a transaction as part of a chapter 11 case. Ultimately, five potential buyers submitted indications of interest by the Indication of Interest Deadline.

54.     Following the Indication of Interest Deadline, the Debtors continued to solicit interest from potential buyers and worked with certain parties that submitted initial indications of

interest in order to improve their proposed transaction terms.  These efforts paid off, resulting in significantly improved proposals from two potential buyers, including Do It Best, a strategic and synergistic bidder who agreed to serve as the Stalking Horse Bidder in a court supervised process subject to higher or otherwise better bids.  During the period leading up to the filing of these Chapter 11 Cases, the Debtors and Do It Best negotiated the Stalking Horse Agreement.  Certain key terms of the Stalking Horse Agreement include:

- A sale of substantially all of the Debtors' assets to the Stalking Horse Bidder pursuant to Bankruptcy Code section 363;

- $153 million in cash consideration (the "Cash Consideration");

- The assumption of certain liabilities, including the assumption and cure of a meaningful number of contracts and the assumption of up to $45 million of trade payables that are administrative claims (the "Assumed Liabilities" and together with the Cash Consideration, the "Purchase Price");

- The assumption and assignment to the Stalking Horse Bidder of certain contracts and leases material to the operation of the business; and

- Employment offers to certain of the Debtors' existing Employees at the closing of the Sale.

55.     The Stalking Horse Agreement also contains customary representations and warranties of the parties and is subject to a number of closing conditions, including, among others: (i) Bankruptcy Court approval of the Sale; (ii) the accuracy of representations and warranties of the parties in all materials respects; and (iii) material compliance with the obligations set forth in the Stalking Horse Agreement.

56.     The transaction negotiated with the Stalking Horse Bidder builds on the Debtors' months-long prepetition process and will be supplemented during the postpetition marketing period contemplated by the bidding procedures, thereby providing further opportunity for interested bidders to formally bid for the Debtors' assets and business operations.  Consummation of the Stalking Horse Bid (or a higher or otherwise better bid) would ensure that the Debtors'

business continues as a going concern, providing stability to the Debtors' vendors and customer base and preserving many jobs.

57.     TVC's board of directors (the "<u>Board</u>") met regularly throughout the Debtors' consideration of strategic alternatives and was kept apprised of the status of proposals and options available to the Debtors.   In addition to numerous other meetings that were regularly held throughout the strategic alternatives process, at a meeting of the Board held on October 13, 2024, the Board, after full deliberation, determined that entering into the Stalking Horse Agreement, filing these Chapter 11 Cases, and pursuing an in-court sale of the Company pursuant to Bankruptcy Code section 363 represents the highest and best offer currently available to the Debtors.

58.     The Company, with the assistance of its advisors, carefully considered liquidation alternatives, including via an analysis prepared by Hilco Consumer-Retail.  The Company agreed with the Prepetition Lenders to engage Hilco Consumer-Retail to conduct the analysis as part of negotiations regarding the Second Waiver and the commitment for stable funding during the waiver period and with the expectation that the Debtors and Prepetition Lenders would enter into a subsequent waiver.   Ultimately, the Company determined that the Stalking Horse Bid and proposed bankruptcy sale process provided the most value-maximizing alternative.

## II.     The Chapter 11 Cases

59.     Building on their prepetition restructuring efforts, the Debtors filed for chapter 11 to complete a robust and orderly sale process supported by the Stalking Horse Bidder under the supervision of the Court, as described in greater detail in the sale motion filed with the Court on the Petition Date [Docket No. 12] (the "<u>Sale Motion</u>").   Based on the indications of interest received during the prepetition marketing process, the Debtors have already narrowed in on a list of prospective buyers that have expressed interest in submitting viable bids and have developed a

timeline to pursue a value maximizing going concern sale transaction.  The alternative, a fire sale liquidation, would leave all stakeholders worse off and subject Prepetition Lenders' recovery and that of other stakeholders to material risk and diminution.

## PART III: THE DEBTORS' FIRST-DAY PAPERS

60.     To facilitate their restructuring efforts, to minimize any adverse effects of commencing the Chapter 11 Cases, and to promote a smooth transition into chapter 11, the Debtors have filed the First Day Papers, concurrently with this Declaration and respectfully request that this Court enter the proposed orders granting such First Day Papers.  I have reviewed each of the First Day Papers and proposed orders and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  I believe that the relief sought in each First Day Paper (i) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value; and (ii) constitutes a critical element in maximizing value during the Chapter 11 Cases.

## III.     Administrative Papers

61.     The Debtors have filed four (4) "administrative" papers that seek to (i) jointly administer the Chapter 11 Cases for procedural purposes only; (ii) authorize the Debtors to waive certain creditor list requirements and redact personally identifiable information, among other things; (iii) authorize the Debtors to retain Omni Agent Solutions, Inc. ("Omni") as claims and noticing agent; and (iv) extend the time period by which the Debtors must file their schedules and statements.

### A.     Joint Administration Motion

62.     The Debtors have requested that these Chapter 11 Cases be jointly administered for procedural purposes only.  As set forth above, the Debtors are affiliated with each other.  Joint administration of these cases will avoid the unnecessary time and expense of duplicative motions,

applications, orders, and other papers and related notices that otherwise would need to be filed in all of the cases absent joint administration. Accordingly, joint administration will save considerable time and expense.

**B.    Consolidated List of Creditors Motion**

63.    The Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to redact certain personally identifiable information of natural persons in any document made publicly available on the Debtors' case website or filed with this Court, including the consolidated list of the Debtors' creditors (the "Consolidated Creditor Matrix"), the Debtors' schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements"), affidavits of service, and the official claims register for each Debtor (collectively, the "Redaction Documents"); and (ii) granting related relief.

64.    I further believe that it is appropriate to authorize the Debtors to redact personally identifiable information of individuals included in the Redaction Documents.  This redaction will prevent unnecessary disclosure of personal information and protect against identity theft.  Further, the Debtors plan to provide unredacted versions of applicable documents to the Court, the U.S. Trustee, any official committee appointed in these Chapter 11 Cases, and will further provide unredacted versions of applicable documents upon reasonable request of any party in interest.

**C.    Application to Retain Omni as Claims and Noticing Agent**

65.    The Debtors seek authority to retain Omni as claims and noticing agent in the Chapter 11 Cases.  I understand that requesting such appointment is required by the local rules of this Court, given that the Debtors anticipate that there will be more than 200 creditors and/or parties in interest listed on their creditor matrix.  I believe that Omni's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases.  Further, prior to the selection of Omni as

24

the claims and noticing agent, the Debtors reviewed and compared engagement proposals from four (4) court-approved claims and noticing agents, including Omni, to ensure selection through a competitive process.  Based on all engagement proposals obtained and reviewed, I believe that Omni's rates, as set forth in the engagement agreement between Omni and the Debtors, are competitive and reasonable given Omni's quality of services and expertise.  In addition, Omni will transmit, receive, docket, and maintain proofs of claim filed in connection with the Chapter 11 Cases.  Accordingly, I believe that retention of Omni, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of the Debtors and their estates and their creditors.

## IV.     Operational Pleadings

### A.     Cash Management Motion

66.     the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, (i) maintain and continue using their existing Cash Management System, Bank Accounts, and Business Forms (each as defined below) and (ii) implement changes to their Cash Management System in the ordinary course of business; (b) modifying certain requirements under section 345(b) of the Bankruptcy Code and operating guidelines relating to bank accounts set forth in the U.S. Department of Justice, Office of the United States Trustee: Operating Guidelines for Chapter 11 Cases (the "U.S. Trustee Guidelines"); (c) authorizing, but not directing, the Debtors to continue to perform Intercompany Transactions through the Cash Management System, and the accordance of administrative expense priority status to all Intercompany Claims arising postpetition in the ordinary course of business as a result of an Intercompany Transaction (capitalized terms used in this clause (c), as defined below); (d) authorizing, but not directing, the payment of related prepetition obligations; and (e) granting related relief.

67.     *Summary of Cash Management System.*  Prior to the Petition Date, and in the ordinary course of business, the Debtors operated a centralized cash management system (the "Cash Management System") to ensure the efficient operation of the business.  The Debtors' Cash Management System collects, transfers, and disburses funds and facilitates reporting, monitoring, forecasting, and implementation controls for accepting, processing, and releasing funds.  In the ordinary course of business, it is my understanding that the Debtors may close existing accounts or open new accounts to facilitate their cash management needs.

68.     *Summary of the Bank Accounts.*  In the ordinary course of business, the Debtors maintain approximately 22 bank accounts (the "Bank Accounts"), including, but not limited to, various lockbox deposit accounts (the "Lockbox Accounts"), a merchant bankcard account (the "Merchant Account"); a receivables account (the "Receivables Account" and, together with the Lockbox Accounts and Merchant Account, the "Deposit Accounts"), two primary operating accounts (the "Master Operating Accounts"), certain other operating accounts (the "Other Operating Accounts"), Bank Accounts to pay Employees (the "Employee Accounts"), and a variety of disbursement accounts (the "Disbursement Accounts").  As of the Petition Date, the Bank Accounts had an aggregate combined balance of approximately $3.1 million.

69.     The Bank Accounts consist of the: (a) nine Bank Accounts maintained at Bank of America, N.A. ("Bank of America"); five Bank Accounts maintained at PNC Bank, National Association ("PNC"); three Bank Accounts maintained at Bank of Montreal ("BMO"); and one Bank Account maintained at each of U.S. Bank National Association ("US Bank"), Citibank, N.A. ("Citibank"), City National Bank ("City National") the Bank of Houston ("BOH"), and the Industrial and Commercial Bank of China ("ICBC").  Except for the BOH and ICBC Bank Accounts, all of the Bank Accounts are held at federally insured banking institutions that are

recognized as authorized depositories under the U.S. Trustee Guidelines ("Authorized Depositories").

70.     Substantially all of the funds held in the Deposit Accounts are subject to properly perfected security interests in favor of the Administrative Agent.  Further, the Deposit Accounts are subject to that certain Deposit Account Control Agreement, by and among certain Debtors, the Administrative Agent, and Bank of America, dated as of May 3, 2018 (such agreement, as may be amended, the "DACA").  As discussed above, certain conditions under the Credit Agreement resulted in the Administrative Agent exercising cash dominion, which altered the flow of funds within the Cash Management System.

71.     *Deposit Accounts.*  The Debtors maintain five Deposit Accounts with Bank of America, including three Lockbox Accounts, the Merchant Account, and the Receivables Account. All five Deposit Accounts are zero balance accounts (each, a "ZBA").  The Lockbox Accounts and Merchant Account receive cash and non-cash receipts from customers via credit card, check, automated clearinghouse ("ACH") transfer, or wire transfer.  The Receivables Account includes two designated lockboxes and a main account.  The two lockboxes within the Receivables Account receive funds from merchant rebate programs and Company-hosted events, respectively.  The main account within the Receivables Account also receives payments directly from customers via electronic fund transfers.  Historically, upon receipt of funds deposited into the Lockbox Accounts and Merchant Account, funds were swept automatically into the Receivables Account.  The Receivables Account would in turn be swept daily to the BoA Master Operating Account (as defined below).  Since the Administrative Agent exercised cash dominion, funds in the Deposit Accounts are swept by Bank of America and transferred to the Administrative Agent to pay down

obligations arising under the Credit Agreement.  As of the Petition Date, the Deposit Accounts had no balance.

72.     As described in the motion, Bank of America has recently implemented a practice of imposing ACH holds on funds remitted to the Deposit Accounts prior to the sweeping of such funds to the Administrative Agent pursuant to the cash dominion process.  This practice has adversely impacted the Debtors' ability to make ordinary-course payments necessary to run their business.  As part of the motion, the Debtors are seeking relief from these ACH holds to be able to efficiently conduct ordinary-course operations as they had prior to the ACH hold policy.

73.     *Master Operating Accounts.*  The Debtors maintain two Master Operating Accounts, consisting of one account at Bank of America (the "BoA Master Operating Account") and one account at PNC (the "PNC Master Operating Account").  Historically, the BoA Master Operating Account would receive funds from the Receivables Account.  Upon receipt of such funds, the BoA Master Operating Account would historically (directly or indirectly) fund the Disbursement Accounts, Employee Accounts, and certain Other Operating Accounts, either automatically or manually by wire or ACH transfer.  The PNC Master Operating Account (a) historically acted as a pass through account for the BoA Master Operating Account and (b) receives funds requested by the Company under the Credit Facility.  Since the Administrative Agent exercised cash dominion, when the Company requests funding, the Administrative Agent, in its discretion, funds the Company's draw requests to the PNC Master Operating Account.  The Company then manually transfers funds from the PNC Master Operating Account to the BoA Master Operating Account.  Further, the PNC Master Operating Account will, on occasion, fund the Pass Through BMO Account (as defined below) directly.  As of the Petition Date, the Master Operating Accounts held $2.6 million in the aggregate.

74.     *Other Operating Accounts.*   The Debtors maintain six Other Operating Accounts funded from the Master Operating Accounts.   Three of the Other Operating Accounts are maintained at PNC.   One of these Other Operating Accounts is the main operating account for the Retail Store.   The other two Other Operating Accounts maintained at PNC (the "Gift Card Accounts") generally relate to the gift card program, which process receipts and payments from the Debtors' gift card program, among other items.   In addition, the Debtors maintain three Other Operating Accounts that are not in active use, one with Bank of America, one with BOH, and one with City National.   As of the Petition Date, the Other Operating Accounts held $84,000 in the aggregate.

75.     *Employee Accounts.*   The Debtors maintain three Employee Accounts, all of which are funded from the BoA Master Operating Account.   The Debtors maintain two Employee Accounts at Bank of America.   One of these Employee Accounts is the Debtors' primary "payroll" account, used exclusively to fund the Debtors' payroll obligations to Employees by check and direct deposit.   The second Employee Account is used as a payroll account for special items such as, among other things, issuing a final paycheck on an Employee's date of termination.   The Debtors also maintain one Employee Account at US Bank to pay certain Employees via a prepaid debit card.   As of the Petition Date, the Employee Accounts held $21,000 in the aggregate.

76.     *Disbursement Accounts.*   The Debtors maintain three Disbursement Accounts at BMO.   Both Master Operating Accounts transfer funds to one of these Disbursement Accounts.   This BMO Disbursement Account funds the other two Disbursement Accounts maintained at BMO, which, in turn, fund general corporate disbursements, such as payments to vendors and contract counterparties via ACH transfer or check.   The Debtors also maintain one Disbursement Account at ICBC that receives funds from the BoA Master Operating Account.   The funds in this

Disbursement Account are used to pay certain local expenses and third-party contractors in Shanghai, China who source supplies and ensure product and shipping requirements are met. Third, the Debtors maintain one Disbursement Account at Citibank that receives funding as needed from the BoA Master Operating Account to pay certain workers compensation claims. Finally, the Debtors maintain one Disbursement Account at PNC that receives funds from the PNC Master Operating Account. The funds in this Disbursement Account are used to pay rebates to the Company's members by check. As of the Petition Date, the Disbursement Accounts held $404,000 in the aggregate.

77.     *Business Forms.*  The Debtors use various checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms"), in the ordinary course of business. Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Nonetheless, it is my understanding that most parties doing business with the Debtors will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement served on parties in interest.

78.     It is my belief that requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates. Thus, the Debtors request that they be authorized to use their existing Business Forms without placing a "Debtor in Possession" legend on each. Any subsequently printed checks that are generated electronically, to the extent reasonably practicable, will bear the designation "Debtor In Possession."

79.     *Bank Fees.*  The Debtors incur periodic service charges and other fees related to the Cash Management System (collectively, the "Bank Fees"). On average, the Debtors incur between

$25,000 and $30,000 in aggregate monthly fees owed to the Banks. As of the Petition Date, it is my understanding that the Debtors owe approximately $30,000 in prepetition Bank Fees. The Debtors request authority, but not direction, to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course on a postpetition basis.

80.    *Corporate Card Program.*  As part of the Cash Management System, in the ordinary course of business, the Debtors maintain certain corporate cards (the "Corporate Cards") issued by PNC that are used to pay for certain work-related expenses and to pay vendors (collectively, the "Corporate Card Program"), including (a) approximately 466 cards issued to certain Employees for travel and related expenses (the "T&E Cards") and (b) approximately 43 purchase cards (the "P-Cards").  Employees eligible for the Corporate Cards include Employees with frequent business travel, designated procurement personnel, office managers (to purchase office supplies and related charges), and certain sales and marketing personnel as required.  It is my understanding that the Debtors pay the Corporate Cards through the BoA Master Operating Account.

(a)    *T&E Cards.*  The T&E Cards are used as the Debtors' principal payment method for reimbursable expenses incurred by Employees, including expenses related to air, lodging, car rental, meals, entertainment, and other miscellaneous expenses.  T&E Cards are issued directly in an individual Employee's name.  After incurring a reimbursable expense, the Employee must submit an expense request through the Debtors' expense system with SAP Concur ("Concur").  Managers then review and approve expense requests.

(b)    *P-Cards.*  The P-Cards are used primarily for "in the field" expenses, including administrative costs, training, maintenance, procurement, and IT needs.  The P-Cards are intended to streamline and simplify the purchasing and accounts payable functions by reducing transaction costs, facilitating timely acquisition of materials and supplies, and automating data flow for accounting purposes.  After incurring a "qualifying" expense under the Debtors' P-Card policy, the Employee must upload the associated receipt or invoice to Concur.

81.    Historically, the Corporate Cards were subject to a credit limit of $25 million, but prior to the Petition Date, the issuing bank reduced the Debtors' credit limit. As of September 13, 2024, PNC reduced the credit limit to $2.5 million under the Corporate Cards, which was further reduced to $500,000 on September 30, 2024, and $100,000 on October 11, 2024. As of the Petition Date, the Company maintains a small credit balance under the Corporate Cards.

82.    The Debtors seek authority, but not direction, to continue the Corporate Card Program in the ordinary course of business, including making ordinary-course modifications thereto, and to pay outstanding amounts, regardless of whether such amounts arose before or after the Petition Date. As per the Company's historical practices, each use of the credit card and request for reimbursement will be carefully reviewed to ensure it relates to a proper business expense.

83.    *Intercompany Transactions.* I understand that, in the ordinary course of business, the Debtors and certain non-Debtor affiliates have historically engaged in routine business relationships with each other (collectively, the "Intercompany Transactions") resulting in intercompany receivables and payables. The majority of receipts and disbursements are managed through the Bank Accounts maintained by Debtor True Value Company, L.L.C., and because the Debtors operate on a consolidated basis, and each of the Debtors (except TV Holdco II, L.L.C.) are a disregarded entity for tax purposes, the Debtors maintain their accounting books and records on a consolidated basis. Nevertheless, it is my understanding that the Debtors otherwise maintain accounting and other records to account for the Intercompany Transactions and any claims that may arise as a result of the Intercompany Transactions (collectively, the "Intercompany Claims"). Recorded Intercompany Transactions include those in connection with (a) the gift card program; (b) the franchise business; (c) and the Retail Store.

84.     The Debtors seek authority to continue the Intercompany Transactions postpetition. I understand that, because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course, as contemplated by section 363(c)(1) of the Bankruptcy Code, without court approval.  Nonetheless, out of an abundance of caution, the Debtors seek express authority, but not direction, to continue engaging in the Intercompany Transactions.  Consistent with their prepetition practice, it is my understanding that the Debtors will maintain records of all transfers and can ascertain, trace, and account for all post-Petition Intercompany Transactions.  In addition, the Debtors request that the Intercompany Claims be granted administrative expense priority status, which will facilitate the orderly and efficient operation of the Debtors' enterprise.

85.     Because of the nature and operational scale of the Debtors' business, I believe that any disruption to the Cash Management System could have an immediate and significant adverse effect on the Debtors' business and operations to the detriment of their estates and stakeholders that permitting the Debtors to continue the cash Management System and maintenance of their Bank Accounts will avoid delays in payments to administrative creditors, create a smoother transition into chapter 11, and maximize the value of their estates.

### B.     Employee Compensation and Benefits Programs Motion

86.     The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay all prepetition wages, salaries, other compensation, and certain reimbursable expenses on account of the Compensation and Benefits Programs (as defined below), and (b) continue to administer the Compensation and Benefits Programs in the ordinary course of business; and (ii) granting related relief.

87.     The Employees perform a wide variety of critical functions, including sales, manufacturing, distribution, information technology, administrative, compliance, legal, finance, and management-related tasks.  The Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, who possess unique skills and experience related to the core business segments of the Debtors, and/or who have developed relationships with key counterparties that are essential to the Debtors' business.  I believe the skills and expertise of the Debtors' Employees, as well as their relationships with the Debtors' customers and vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' ongoing operations and ability to operate their business effectively during these Chapter 11 Cases.  The below provides an overview of some of the Employee Benefits, which the motion describes in further detail.

88.     *Employee Wages*.  The Debtors' average monthly payroll for the Debtors' Employees is approximately $11 million, inclusive of payroll taxes.  Generally, the Debtors pay Employee wages and salaries by direct deposit through electronic transfer of funds to the Employees' bank accounts or other electronic means.  In certain instances, the Debtors issue payroll funds to their Employees on a prepaid debit card or check.  Payroll for the Retail Store is processed through Midwest Hardware Association, a third-party payroll and accounting service provider.  The Debtors generally administer their own payroll system for Employees.  In addition, the Debtors use Dayforce, Inc. ("Dayforce") for tax and garnishment services.  On an interim basis, the Debtors request authorization, but not direction, to pay wages, salaries, and overtime owed to Employees (all such claims for unpaid salaries or wages, the "Employee Wage Claims") up to the $15,150 priority cap provided for under section 507(a)(4) of the Bankruptcy Code (the "Wage Cap").  On a final basis, the Debtors request the authorization to pay such claims in the ordinary course of business, including any amounts in excess of the Wage Cap.

89.    *Employee Incentive Plans.*  To encourage Employees to maximize their efforts and performance, the Debtors have historically maintained various incentive programs to bring value to the Debtors' estates by encouraging Employees to achieve company-side, business segment, or individual goals and targets, including (a) a discretionary sales incentive plan for a majority of eligible Sales Employees (the "General Sales Incentive Plan,"); (b) a discretionary sales incentive plan for Sales Employees employed in the TVM business (the "TVM Sales Incentive Plan" and, together with the General Sales Incentive Plan, the "Sales Incentive Plans"); and (c) a discretionary annual incentive plan for salaried and select non-exempt hourly Employees (the "Annual Incentive Plan" and, together with the Sales Incentive Plans, the "Employee Incentive Plans"). Approximately 650 Employees participate in the Employee Incentive Plans.  Employees are generally eligible to participate in only one incentive program at a time.  It is my understanding that there are no outstanding amounts that will become due and unpaid on account of the Employee Incentive Plans between entry of the interim and final orders as proposed.  However, out of an abundance of caution, under the proposed interim order, the Debtors request authority to continue administering the Employee Incentive Plans in the ordinary course of business.  Further, it is my understanding that the Debtors do not expect any payments to come due under the Employee Incentive Plans during the Chapter 11 Cases.  However, out of an abundance of caution, under the proposed final order, the Debtors seek authority, in their discretion, to pay any amounts that may become due under the Employee Incentive Plans to eligible non-insider Employees in the ordinary course of business, irrespective of whether such amounts are prepetition liabilities or exceed the Wage Cap.  It is my understanding that the Debtors are not seeking at this time to make payments to any insiders who participate in the Employee Incentive Plans.

90.     *Paid Time Off.*  The Debtors offer their Employees other forms of compensation, including paid time off for vacations, holidays, personal holidays, sick days, and parental leave (collectively, the "Paid Time Off").  This form of compensation is usual, customary, and necessary if the Debtors are to retain qualified employees during the reorganization process.  It is my understanding that Paid Time Off is paid out in accordance with the Company's policies, applicable laws, and the CBAs.  The Debtors seek to continue their Paid Time Off policies in the ordinary course and honor obligations with respect to the Paid Time Off when an Employee elects to use their Paid Time Off, with the exception that, at this time, the Debtors seek authority to pay prepetition obligations related to Paid Time Off only to Represented Employees and to non-Represented Employees in states where state law requires payment of unused Paid Time Off.

91.     *Retention Payments.*  It is my understanding that Debtors from time to time provide retention payments for certain Employees (the "Retention Payments") in order to maintain sufficient productivity to achieve certain financial or operational goals in critical periods.  It is my understanding that the Debtors determined prior to the Petition Date that, to best address their current business circumstances, a reorganized workforce is required at their Denver regional distribution center (the "Denver Distribution Center") and the Manchester Distribution Center should be permanently closed, with both occurring by the end of 2024.  In connection with these developments, the Debtors began terminating certain Employees at these facilities at various dates and times through the fall of 2024 and offered Retention Payments to Employees who work productively through their termination date (the "Distribution Retention Payments").  On a final basis, the Debtors seek authority, but not direction, to pay all outstanding Distribution Retention Payments to the applicable non-insider Employees on a postpetition basis in the ordinary course

of business, irrespective of whether such amounts are prepetition liabilities or exceed the Wage

Cap, and to provide Retention Payments to non-insiders in the ordinary course of business.

92.    *Contractor Claims and Temporary Workforce Obligations.*  The Debtors make

payments directly to their Independent Contractors and pay the Temporary Workforce

Administrators in respect of the Temporary Workers for the performance of certain services critical

to the Debtors' operations.  It is my understanding that the Debtors rely on the Independent

Contractors and Temporary Workers to complete discrete projects in furtherance of the Debtors'

business and to provide support to the Debtors' operations on a short-term basis where it is not

economically feasible to employ personnel on a full- or part-time basis.  Accordingly, the Debtors

seek authority to satisfy any accrued but unpaid prepetition Contractor Claims owed to the

Independent Contractors and to continue paying the Independent Contractors and using and paying

for the services provided by Temporary Workers going forward as requested on a postpetition

basis in the ordinary course of business and consistent with prepetition practices.

93.    *Employee Benefits.*  The Debtors offer various standard employee benefits to

eligible Employees, including (a) medical, dental, vision, and prescription drug benefits, (b) life

and accidental death and dismemberment insurance, and (c) miscellaneous other voluntary

benefits provided to eligible Employees in the ordinary course of business (collectively,

the "Employee Benefits").  Such Employee Benefits are administered pursuant to Debtor-provided

health and wellness insurance plans, programs, and policies (amounts owed in connection with

such policies, the "Employee Benefit Obligations").  Under the motion, the Debtors seek

authorization to continue to provide these benefits by making any payments or remittances for

amounts attributable to the prepetition period and relating to the Employee Benefits and to

otherwise continue their practices related to these programs on a postpetition basis in the ordinary course of business and in the Debtors' sole discretion.

94.     *Reimbursable Expenses.*     The Debtors reimburse Employees for approved Reimbursable Expenses incurred in the scope of their employment on behalf of the Debtors, including, among other things, travel, transportation, lodging, meals, entertainment, and other business expenses.  Further, the Debtors reimburse members of the governing bodies for the Debtors and certain non-Debtor affiliates for Reimbursable Expenses incurred related to travel costs associated with certain Company-related matters, including attendance of in-person board meetings and the Debtors' bi-annual trade show.  The Debtors believe that payment of the Reimbursable Expenses is critically important to the morale of the Debtors' workforce, which, in turn, is essential to maximizing the value of the estates.  Failing to honor the Reimbursable Expenses would cause disruption to the Debtors' businesses and would be inequitable to the Employees that would personally bear any approved business-related expenses they incurred in furtherance of their responsibilities to the Debtors.  The Reimbursable Expenses may represent a significant cost to the Employees who incurred them, but represent a relatively minimal cost to the Debtors' estates in light of the overall benefits achieved.  It is my understanding that certain prepetition Reimbursable Expenses may not have been paid as of the Petition Date because, among other reasons, amounts charged to the T&E Cards have not yet become due or Employees have not yet submitted a request for reimbursement.  I understand there is a lag time between the time expenses are incurred and the time expenses are reimbursed and paid.  Thus, I believe it is difficult to determine with precision the actual amount of incurred but not reported Reimbursable Expenses as of any particular time.  I believe that the average aggregate monthly amount expended by the Debtors for Reimbursable Expenses varies and can be up to $550,000.  The Debtors seek authority

to continue to offer the Reimbursable Expenses programs, pay any outstanding prepetition Reimbursable Expenses directly to Employees, and to continue to pay and honor obligations in respect of the Reimbursable Expenses on a postpetition basis in the ordinary course of business.

95.    *Tax and Withholding Obligations*.   Applicable statutory authority requires the Debtors to match and pay additional amounts for Social Security, Medicare taxes, and federal and state unemployment insurance (the "<u>Company Payroll Taxes</u>").   In addition, during each applicable payroll period, the Debtors routinely deduct certain amounts from Employee compensation that the Debtors are required to transmit to third parties, including, without limitation, (a) the Employee portion of payroll taxes (the "<u>Employee Payroll Taxes</u>"); (b) other pre- and post-tax deductions payable pursuant to certain of the Employee Benefit Obligations discussed above (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, and other miscellaneous deductions); (c) Union dues and assessments (for Represented Employees); and (d) garnishments, child support, service charges, and similar deductions (collectively, the "<u>Employee Withholding Obligations</u>"). The Debtors request authority to remit unpaid Company Payroll Taxes and remit the Employee Withholding Obligations in the ordinary course of business and consistent with past practice and to continue collecting and remitting the Employee Withholding Obligations in the ordinary course of business on a postpetition basis.

96.    *Non-Executive Employee Severance Plan*.  The Debtors provide severance pay to eligible non-insider, non-union Employees in accordance with the terms of a formal severance plan (the "<u>Corporate Severance Plan</u>").  Pursuant to the Corporate Severance Plan, Employees may receive a base severance benefit of between two weeks and eight weeks of pay depending on the Employee's salary grade.   In addition, in connection with the reorganization at the Denver

Distribution Center and closure of the Manchester Distribution Center, the Debtors have terminated or intend to terminate certain Employees at these facilities and have offered severance pay to terminated Employees (the "<u>Distribution Center Severance Obligations</u>" and together with the Severance Plan, the "<u>Non-Executive Employee Severance Plans</u>").    Distribution Center Severance Obligations for non-Represented Employees at the Denver Distribution Center and Manchester Distribution Center are made in accordance with the terms of the Corporate Severance Plan, whereby Employees may receive an additional week of pay per complete year of service with the Company, with the total amount of severance not to exceed 26 weeks of pay.  The Distribution Center Severance Obligations for Represented Employees at the Manchester Distribution Center was separately negotiated under the Manchester Closure Effects Agreement.  Upon entering the final order, the Debtors seek authority, but not direction, to continue the Corporate Severance Plan and otherwise honor Non-Executive Severance Obligations in their sole discretion and in the ordinary course of business.  It is my understanding that the Non-Executive Employee Severance Plans do not make severance payments to insiders (as defined in section 101(31) of the Bankruptcy Code.  While the Debtors maintained severance arrangements for their Senior Leadership Team before the Petition Date, the Debtors are not seeking authority at this time to pay any obligations arising thereunder at this time.

### C.    Critical Vendors Motion

97.    The Debtors seek authority to pay certain prepetition claims of critical vendors, foreign vendors, and lien claimants.

98.    *Critical Vendors*.  The Debtors' corporate headquarters, distribution business and paint manufacturing business rely on an extensive network of critical vendors who provide goods and services that are necessary to the Debtors' continuing operations (the "<u>Critical Vendors</u>").  My team at M3 worked with the Debtors and their other advisors to identify the Critical Vendors,

closely reviewing the Debtors' accounts payable and prepetition vendor list and consulting with the Debtors' Employees most familiar with the Debtors' vendors.

99.     Based upon our analysis, which took into consideration the criteria described in the motion, we identified Critical Vendors that provide goods and services which are essential to the continuing operation of the Debtors' businesses, including: (i) suppliers of products and equipment for the Debtors' wholesale and distribution business; (ii) suppliers of equipment, raw materials, finished goods, and other products and supplies for the Debtors' paint manufacturing business; (iii) providers of hardware, software, and outsourced information technology services that maintain key applications of the Debtors; (iv) consultants and other professional services providers that assist the Debtors in connection with research and development and regulatory, legal, audit, quality control and compliance matters; and (v) providers of other critical business support and maintenance services (collectively, the "Critical Goods and Services").

100.     Together, the Critical Goods and Services provided by Critical Vendors enable the Debtors to (i) source, store and sell tens of thousands of different hardware, tools, paint, outdoor living, bar-b-que, plumbing, electrical and cleaning products to customers across the United States and approximately 55 other countries and (ii) continue manufacturing paint and paint applicators for sale to customers.  I believe that even a minor disruption to the Debtors' receipt of these Critical Goods and Services resulting from friction with vendors risks causing irreparable adverse consequences for the Debtors, the Debtors' customers, the Debtors' Employees, downstream end consumers and all of the Debtors' stakeholders.  Any operational interruption also increases the likelihood that customers cease conducting business with the Debtors in the future.  These harms could have lasting repercussions, impacting future cash flow and profitability and jeopardizing the Debtors' going concern prospects, the ongoing sale process, and the success of these Chapter 11

Cases, and, in my opinion, far exceed the cost of paying prepetition Critical Vendor Claims. Based on the Debtors' books and records, I estimate that the total proposed payments on account of Critical Vendor Claims represent less than 10% of the Debtors' approximately $325.0 million total outstanding trade payables as of the Petition Date.

101.    *Foreign Vendors*.  In the ordinary course of business, the Debtors routinely transact with and rely on foreign vendors and service providers that are not U.S.-based, including vendors from China and various other countries that supply thousands of products annually for the Debtors' wholesale and distribution business as well as information technology providers that support key business functions (collectively, the "Foreign Vendors").  I am informed that the Foreign Vendors may not be familiar with U.S. bankruptcy law or principles and may not be feel themselves bound by orders of a U.S. bankruptcy court.

102.    Based on my discussions with the Debtors' personnel and other advisors regarding the Foreign Vendors, I believe there is a material risk that the Foreign Vendors holding claims against the Debtors, particularly those who are unfamiliar with the chapter 11 process, may engage in conduct that disrupts the Debtors' operations such as terminating their relationship with the Debtors, exercising self-help or suing the Debtors in a foreign court to recover prepetition amounts owed to them.  I understand that the Debtors would have limited, if any, effective and timely recourse against Foreign Vendors and no practical ability to remedy these situations (absent payment of amounts sought) and are unable to efficiently replace the products and services supplied by Foreign Vendors.  For these reasons, I believe that the Debtors need the ability to pay the Foreign Vendor Claims on an uninterrupted basis to avoid even temporary disputes over Foreign Vendor Claims which could irreparably harm the Debtors' business to the detriment of the Debtors' estates and creditors.

103.    *Lien Claimants*.  In the ordinary course of operations, the Debtors' supply and distribution system depends upon the use of common carriers, freight forwarders, customs processors, and other shipping services operated by third parties, including intermodal shippers, ocean carriers, trucking services including full truckload and less-than-truckload, rail carriers, cross dock operators, third-party logistics providers, and a small parcel carrier, and storage and distribution facilities (the "Lien Claimants," and the fixed, liquidated, and undisputed prepetition claims held by such parties, the "Lien Claims"), to receive and store shipments of products and supplies from their vendors and deliver such products to their customers and to pass products and supplies through cross docks to minimize transportation costs.  As a result of the services they provide, the Lien Claimants regularly possess certain of the Debtors' goods in the ordinary course of the Debtors' operations.

104.    I understand from the Debtors' legal counsel that if the Debtors fail to pay the Lien Claimants in a timely manner, the Lien Claimants may seek to assert liens against the Debtors' goods in the Lien Claimants' possession, which could potentially block the Debtors' access to the goods that are in transport.  Such actions would interrupt the flow of goods to customers, severely damaging the Debtors' ability to operate their businesses for the benefit of all stakeholders.

105.    Accordingly, I believe that the relief requested in the Critical Vendors motion is in the best interests of the Debtors, their creditors, and all other parties-in-interest.

**D.    Utilities Motion**

106.    The Debtors seek entry of interim and final orders (a) approving the Debtors' proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to their "utilities" (the "Utility Companies"), as that term is used in section 366 of the Bankruptcy Code; (b) approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance (the "Adequate Assurance Procedures"); and

(c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these Chapter 11 Cases, a debt owed by the Debtors for services rendered prior to the Petition Date, or any perceived inadequacy of the Debtors' Proposed Adequate Assurance.

107.    In the ordinary course of business, the Debtors receive electricity, internet, telephone, water, waste disposal, and similar utility products and services (the "Utility Services" giving rise to the "Utility Obligations") from the Utility Companies.  A list of the Debtors' Utility Services and the respective Utility Companies providing such services is attached as **Schedule 1** to each of the interim and final orders (the "Utility Company List"), although the relief requested in the motion is not limited to those Utilities Companies identified on the Utility Company List. Over the six-month period ending on June 30,[2] 2024, the Debtors paid an average of approximately $542,214 each month on account of the Utility Services.   Based on my discussions with the Debtors, I understand that, prior to the commencement of the Chapter 11 Cases, the Debtors generally were current with respect to the Debtors' undisputed invoices for Utility Services.

108.    I understand that within 20 days after the Petition Date, the Debtors intend to timely pay all undisputed postpetition obligations owed to the Utility Companies.  The Debtors propose (a) to designate or establish a segregated account (the "Utility Deposit Account"), and (b) for each Utility Company on the Utility Company List to place a deposit into the Utility Deposit Account equal to approximately two weeks' worth of Utility Services, calculated based on the historical average monthly cost of the Utility Services over the past six months.

---

[2]    As the Retail Store was acquired by the Company in May 2024, the average utilities cost for that location was calculated over the three-month period ending on August 31, 2024.

109.    I believe that the creation of the Utility Deposit Account and the additional procedures set forth in the Utilities Motion adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which Debtors' operations depend.    The Debtors estimate that the Utility Deposits will total approximately $255,349.17.

### E.    Insurance Motion

110.    The Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) maintain existing Insurance Policies, Letters of Credit, and the Customs Bond (collectively, the "Insurance Programs"); (ii) pay, on uninterrupted basis, all premiums under the Insurance Programs (plus any unforeseen deductible payment amounts), Taxes and Fees, administration costs (including, but not limited, to the Broker Fees), and other fees arising thereunder or in connection therewith that are paid for by the Debtors in the ordinary course of business (the "Insurance Obligations"), including any Insurance Obligations for prepetition periods, (ii) continue to honor obligations related to the PFA (the "Premium Financing Obligations") and the LC Facility Agreement (the "LC Facility Obligations" and, together with the Insurance Obligations and the Premium Financing Obligations, the "Insurance Program Obligations"); (iii) renew, revise, extend, supplement, change, or enter into new insurance coverage, surety coverage, letters of credit, premium finance agreements, and/or letter of credit facilities as needed in their business judgment without further order of this Court; (b) authorizing the Debtors' to modify the automatic stay under section 362 of the Bankruptcy Code with respect to claims under the Workers' Compensation Program to allow claims under the Workers' Compensation Program to proceed under the applicable Insurance Policies; and (c) granting

related relief (each capitalized term used in this paragraph not otherwise defined, as defined below).

111.    *Overview of Insurance Policies*.    In connection with the operation of their businesses, the Debtors maintain insurance policies for, among other things, automobile liability, ocean cargo liability, cyber liability, crime, kidnap and ransom liability, directors' and officers' liability, workers' compensation claims, employment practices liability, environmental liability, general liability, business travel accident liability, property liability, and foreign difference in conditions liability (collectively, the "Insurance Policies").  The Insurance Policies, which the Debtors have obtained through third-party insurance carriers (collectively, the "Insurance Carriers"), and their corresponding policy periods and annual premiums, including any applicable Broker Fees, but excluding any applicable Taxes and Fees.  I believe that the coverage types, levels, and premiums for these Insurance Policies are typical for comparably sized companies in the Debtors' industry.

112.    I believe that continuation and renewal of the Insurance Policies and entry into new Insurance Policies is essential to protecting the value of the Debtors' businesses, properties, and assets.  I am informed that the Insurance Policies are required by various regulations, laws, and contracts that govern the Debtors' commercial activities, and ensure compliance with the Bankruptcy Code and the Operating Guidelines for Chapter 11 Cases issued by the Office of United States Trustee for Region 3.  Further, I am informed that failure to maintain workers' compensation insurance could have a detrimental effect on the financial well-being and morale of their Employees and/or could result in administrative or legal proceedings against the Debtors and their officers and directors.

113.    *The Debtors' Annual Premiums*.  The current annual premiums and commission-based Broker Fees under the Insurance Policies total approximately $4.26 million.  The premiums for all of the Debtors' Insurance Policies are generally due on an annual basis, however, the Debtors finance the premium relating to the Debtors' property insurance under the PFA.  With certain exceptions, the Insurance Policies generally are one year in length and renew annually at various times throughout the year.  It is my understanding that all of the Insurance Policies have already been renewed for 2024–2025 (which includes certain policies that have been renewed the paid through a PFA) or are anticipated to be renewed before the expiration of their terms.

114.    Except for the installment payments provided for under the PFA, the Debtors do not believe that they owe any prepetition amounts on account of the Insurance Policies.  However, I understand that certain of the Debtors' Insurance Policies provide for potential premium adjustments, which could either increase or decrease the Debtors' Insurance Obligations.  Out of an abundance of caution, the Debtors seek authority, but not direction, to make payments of Insurance Obligations attributable to the prepetition period (plus any unforeseen deductible payment amounts for prepetition claims), including any premium adjustments that might come due after the Petition Date.

115.    I believe that if the Debtors are unable to make any payments that may be owed on account of the Insurance Policies, including on account of any potential premium adjustments, the unpaid Insurance Carriers may seek relief from the automatic stay to terminate such Insurance Policies.  The Debtors would then be required to obtain replacement insurance on an expedited basis and at a significant cost.  Even if these Insurance Carriers were not permitted to terminate the agreements, I believe that any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

116.    *Workers' Compensation Policies.*   In the ordinary course of business, as required by applicable law, the Debtors maintain the workers' compensation insurance coverage for claims arising from, or related to, employment with the Debtors (the "Workers' Compensation Program"). The Debtors maintain coverage for the Workers' Compensation Program through the four Insurance Policies.  As of the Petition Date, the Debtors estimate that approximately $2.25 million is outstanding on account of prepetition obligations associated with the Workers' Compensation Program.  To maintain the Workers' Compensation Program in the ordinary course, the Debtors request authority, in their sole discretion, to agree to the modification of the automatic stay of section 362 of the Bankruptcy Code to allow claims under the Workers' Compensation Program to proceed under the applicable Insurance Policies.

117.    *Premium Financing Agreement*.   Generally, the Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period.  Because it is not always economically advantageous for the Debtors to pay the premiums on a lump-sum basis, the Debtors finance a portion of the property insurance's premiums pursuant to the PFA, which is entered with third-party lender AFCO Premium Credit LLC ("AFCO").  Under the PFA, the Debtors make monthly payments towards the Insurance Policy premiums.

118.    Generally, the Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period.  Because it is not always economically advantageous for the Debtors to pay the premiums on a lump-sum basis, the Debtors finance a portion of the property insurance's premiums pursuant to a commercial premium financing agreement (the "PFA") with third-party lender AFCO Premium Credit LLC ("AFCO") under which the Debtors make monthly payments towards the Insurance Policy premiums.  For the policy term of June 1, 2024 through June 1, 2025, the PFA required the Debtors to make an initial down payment of

$139,460.14, followed by 11 monthly, equal installment payments in the same amount (subject to late payment fees).  As of the Petition Date, I believe that the Debtors have made the initial down payment and all installment payments required to date under the PFA, totaling approximately $697,300.  The next installment payment is due November 1, 2024.  Out of an abundance of caution, the Debtors seek authority, but not direction, to honor any amounts owed under the PFA to ensure continuous insurance coverage.  Additionally, the Debtors seek authority, but not direction, to continue performing under the PFA in the ordinary course of business and to enter into new premium financing agreements as necessary or appropriate, without further Court approval.

119.    I am informed that the PFA purports to grant AFCO a security interest in the named Debtor's respective interests in all sums payable to the Debtor on account of the property insurance policies covered under the PFA, including gross return premiums and any payment on account of loss which results in reduction of unearned premiums in accordance with the applicable policy.  In addition, if the Debtors are unable to continue making payments on the PFA, the PFA permits AFCO to terminate the property insurance policy financed through the PFA.  The Debtors would then be required to obtain replacement insurance on an expedited basis and at significant cost to the estates if they were able to obtain such replacement insurance at all.  Moreover, if the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such insurance policy in advance, I believe this payment would likely be greater than what the Debtors currently pay.  Even if AFCO were not permitted to terminate the PFA, I believe any interruption of payment could have an adverse effect on the Debtors' ability to finance premiums for future policies.

120.    *Customs Bond.*  In the ordinary course of business, the Debtors import about 7% of their merchandise from non-United States jurisdictions and remit related duty and excise taxes to

the U.S. Customs and Border Protection Agency.  In connection with these duty and excise taxes, the Debtors post collateral in the form of a surety bond (the "Customs Bond").  The Debtors' outstanding Customs Bond was issued by Hudson Insurance Group (the "Customs Bond Issuer") and the premium is determined annually upon renewal (the "Customs Bond Premium").  For the bond period of March 14, 2024 through March 14, 2025, the Customs Bond Premium was $7,175. As of the Petition Date, I believe that all Customs Bond Premium payments due and owing have been paid in full and I am not aware of any pending requests for payment by the Customs Bond Issuer.  Nevertheless, the Debtors request that they be authorized to pay any Customs Bond premiums that may become due and owing and renew or potentially acquire additional bonding capacity as needed in the ordinary course of business because failing to provide, maintain, back, or timely replace the Customs Bond will prevent the Debtors from being able to import certain goods essential to the business.

121.    *LC Facility Agreement*.  In addition, the Debtors seek authority, but not direction, to honor their obligations under the LC Facility Agreement (including, for the avoidance of doubt, remitting the remaining LC Facility Reserve Amount to the LC Facility Escrow Account) to maintain and renew the LC Facility Agreement, and to acquire additional letters of credit under the LC Facility Agreement as needed in the ordinary course of business.  I believe that failing to provide, maintain, back, or timely replace the Letters of Credit or the LC Facility Agreement will prevent the Debtors from, among other things, complying with their obligations under the associated Insurance Policies and the Customs Bond.  If the Debtors fail to provide the requisite security under the Insurance Policies, I believe that the Insurance Carriers may terminate the policies.  It is my understanding that failure to maintain the Insurance Policies would prevent the Debtors from undertaking essential functions related to their operations, and a failure to maintain

and honor employee claims under the Workers' Compensation Program may require the Debtors to shut down their operations.

122.     *Brokers*.  The Debtors obtained their existing Insurance Policies through their three insurance brokers: USI Insurance Services ("USI"), Aon plc ("Aon") and Willis Towers Watson plc ("Willis" and, collectively with USI and Aon, the "Insurance Brokers") and their Customs Bond through Alliant Insurance Services (the "Customs Bond Broker" and, together with the Insurance Brokers, the "Brokers").  The Brokers assists the Debtors with the procurement and negotiation of the Insurance Policies and Customs Bond, as applicable, enabling the Debtors to obtain Insurance Policies and the Customs Bond at competitive rates and in a cost-effective manner.  In exchange for the receipt of these services, the Debtors are obligated to pay certain fees payable at the inception of the applicable term (the "Broker Fees").  In 2024, USI earns an annual flat Broker Fee of approximately $110,000 and the Customs Bond Broker earns an annual flat Broker Fee of approximately $300, while Willis and AON earn Broker Fees on a commission basis.  Broker Fees earned on a commission basis are built into the annual premiums under the Insurance Policies.

123.     I am not aware of any outstanding prepetition amounts owed to any Brokers on account of the Broker Fees.  However, out of an abundance of caution, to the extent that any Broker Fees may be attributed to the prepetition period, the Debtors request authority, but not direction, to pay any outstanding amounts, regardless of whether such obligations arose pre- or postpetition. The Debtors also request authority, but not direction, to continue utilizing the Brokers' services and pay any Broker Fees that may become due and payable in the ordinary course of the Debtors' business.

124.     For the above reasons, I believe that the Debtors' failure to maintain the Insurance Policies, Letters of Credit, Customs Bond, or continue to honor relevant related obligations, could have an adverse impact on their ability to operate in the ordinary course of business.  I therefore believe that the relief requested in the insurance motion is in the best interests of the Debtors, their creditors, and all other parties-in-interest.

### F.     Customer Programs Motion

125.     The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) honor certain prepetition obligations to customers, and (b) continue certain customer programs in the ordinary course of business; and (ii) granting related relief.

126.     I understand that the Debtors, prior to the Petition Date and in the ordinary course of their business, maintained certain customer programs and related practices (collectively, the "Customer Programs") that are designed to (i) attract and retain Customers, (ii) develop and sustain a positive reputation in the marketplace for the Debtors' products and the True Value brand, (iii) ensure consistency of quality service and customer experience across the Company brand, (iv) ensure customer satisfaction, (v) engender customer loyalty, and (vi) meet competitive market pressures.

127.     The Customer Programs can be divided into five categories: (a) the Direct Ship Program, (b) Rebate Programs and Warranty Claims Programs, (c) Loyalty and Promotional Programs, (d) Brand Consistency and Quality Programs, and (e) Vendor Relationship Programs (each as defined below).

128.     *Direct Ship Program.* Like their competitors, in the ordinary course of business, the Debtors offer a direct ship program to their customers (the "Direct Ship Program"). Through the Direct Ship Program, Customers can access an extensive catalogue maintained by the Debtors that contains hundreds of thousands of products from thousands of different vendors. When a

Customer wants to purchase merchandise from one of the third party vendors listed in the Debtors' database, the Customer contacts the vendor directly, obtains a quote, negotiates a purchase order and places an order directly with the vendor (a "Direct Ship Order"). The vendor then ships the item directly to the Customer, circumventing the Debtors' warehouses. The Direct Ship Program, among other things, allows the Debtors to attract Customers by offering them access to thousands of vendors and hundreds of thousands of items that are not stored in the Debtors' warehouses through a centralized platform. The Debtors generate approximately $500 million in annual revenue on account of the Direct Ship Program. The Debtors seek authority, but not direction, to continue their Direct Ship Program in the ordinary course of business during the Chapter 11 Cases.

129. *Rebate and Warranties Claims Programs*. In the ordinary course of business, the Debtors offer annual volume-based rebates (the "Rebate Programs") to Customers to drive overall efficiency regarding the Company's inventory and reward those Customers with higher purchase volume. The Debtors paid approximately $19.4 million in rebates for sales that occurred during 2023. As of the Petition Date, the Debtors estimate that, based on Customer sales to date, approximately $14,555,011 in rebates have accrued.

130. The Debtors allow Customers to return products or file claims on products (the "Warranty Claims Program" and, together with the Rebate Program, the Rebate and Warranty Claims Programs"). These claims fall into five different categories: (i) RFA claims, (ii) policy A claims, (iii) policy B claims, (iv) direct ship claims, and (v) pricing claims (together with the RFA claims, policy A claims, policy B claims, and the direct ship claims, the "Warranty Claims"). As of the Petition Date, approximately $1,114,998.51 of unpaid Warranty Claims have been made by Customers.

131.     *Loyalty and Promotional Programs.*  The Debtors offer a number of promotional programs for the benefit of Customers and assist Customers in offering and administering certain promotional and loyalty rewards programs for the benefit of their consumers (the "Loyalty and Promotional Programs"), such as the rewards program (the "True Value Rewards Program") and gift card program (the "Gift Card Program").  These programs ensure Customer and consumer satisfaction and engender loyalty to the True Value brand and the Customers.  As of the Petition Date, the Company estimates that it owes approximately $875,000 to Customer stores on account of gift card purchases under the Gift Card Program.  It is my understanding that there are no other outstanding liabilities on account of the Loyalty and Promotional Programs as of the Petition Date.

132.     *Brand Consistency and Quality Programs.*  The Debtors offer numerous programs to support Customer operations that are designed to maintain quality of the Company's brand and ensure consistency across Customer operations (the "Brand Consistency and Quality Programs"). These programs are numerous, comprehensive and designed to ensure Customers are outfitted with the tools and services necessary to run efficient and successful stores and to meet consumer expectations. As of the Petition Date, the Debtors estimate that there are approximately $3.2 million in outstanding liabilities on account of the Brand Consistency and Quality Programs.  The Debtors seek to continue these programs in the ordinary course of business.

133.     *Vendor Relations Programs.*  To incentivize Customer retention and satisfaction, the Debtors offer a number of programs in partnership with third-party vendors for Customers' convenience and benefit (the "Vendor Relations Programs").  The Company connects Customers to third-party vendors who have familiarity with Customer needs and often offer favored rates for their services or products.  These relationships include partnerships with vendors related to freight

shipping, accounting services, store fixture services and credit card processing, among other services.

134.    The Debtors also facilitate a vendor-sponsored incentive program in which Customers and their select Employees who hit target sale goals may participate in a sponsored trip (the "<u>Momentum Incentive Program</u>").  The Momentum Incentive Program is vendor-funded and results in no material cost to the Debtors.  Certain vendors provide the funding through the Debtors, who hold funds pending the payment of costs associated with the sponsored trip.  As of the Petition Date, the Debtors' books reflect a liability of approximately $255,000 in connection with Momentum Incentive Program.  It is my understanding that there are no other outstanding liabilities on account of the Vendor Relations Programs as of the Petition Date.

135.    The Customer Programs are critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value.  Therefore, the Debtors seek authority to continue to maintain and administer their Customer Programs in the ordinary course of business and to honor the cash and performance-based obligations arising thereunder (the "<u>Customer Programs Obligations</u>"), whether such Customer Programs Obligations arose prior to or after the Petition Date.

136.    I believe that the relief requested in the customer programs motion is in the best interests of the Debtors, their creditors, and all other parties-in-interest.

**G.    Taxes Motion**

137.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to negotiate, remit and pay (or use tax credits or other attributes to offset or otherwise satisfy) (a) income taxes, (b) property taxes, (c) sales and use taxes, (d) franchise taxes and regulatory and licensing fees taxes, (e) foreign taxes, (f) custom imports and duties and other related obligations, and (g) Regulatory and Other Taxes and Fees (collectively, the "<u>Taxes and</u>

Assessments") as the Debtors, in their discretion, deem necessary to various federal, state, county, city, and foreign taxing, licensing, and regulatory authorities (collectively, the "Applicable Authorities").

138.    The Debtors pay or remit, as the case may be, the Taxes and Assessments on a monthly, quarterly, semiannual, or annual basis to the Applicable Authorities, as required by applicable laws and regulations.

139.    I understand that the Debtors were substantially current in the payment of assessed and undisputed Taxes and Assessments that came due and payable prior to the Petition Date. However, the Debtors estimate that approximately $5,160,000 of Taxes and Assessments relating to prepetition liabilities will become due and payable to the Applicable Authorities in the ordinary course, approximately $1,692,000 of which will become due and payable between entry of the interim order and the final order (the "Interim Period").

140.    *Income Taxes*.  The Debtors are subject to income taxation by the federal government and certain state governments (collectively, "Income Taxes").  Nonetheless, because the Debtors are operating at a net loss for the fiscal year prior to the Petition Date, I believe that the Debtors have little or no Income Tax liability as of the Petition Date.  Out of an abundance of caution, however, the Debtors seek authority to pay any Income Taxes that come due during the Chapter 11 Cases, whether or not arising prior to the Petition Date, in their sole discretion.

141.    *Property Taxes*.  Various state and local governments in U.S. jurisdictions where the Debtors operate have the authority to levy property taxes against the Debtors' owned and leased real and personal property (the "Property Taxes").  I understand that the Debtors typically pay Property Taxes in the ordinary course as such taxes are invoiced.  Payment of Property Taxes is critical, as I am informed that failure to pay certain Property Taxes may give rise to liens in favor

of the Applicable Authority on the Debtor's relevant property to secure payment of those taxes. Nonpayment of Property Taxes could also result in additional fees and penalties. On an annual basis, the Debtors remit approximately $3,100,000 on account of Property Taxes. The Debtors estimate the prepetition liability for Property Taxes to be approximately $2,775,000, approximately $210,000 of which will become due and payable during the Interim Period.

142. *Sales and Use Taxes*. In the ordinary course of business, the Debtors collect and remit sales taxes to the Applicable Authorities in connection with the operation of their businesses and the sale and distribution of products (the "Sales Taxes"). The Debtors also incur use taxes when they purchase materials and services from a vendor that is not registered to collect sales taxes for the state where the product is delivered or the services are provided (the "Use Taxes"). In these circumstances, vendors are not obligated to charge or remit sales taxes. As purchasers, however, the Debtors must self-assess and pay the Use Taxes to the Applicable Authority. The Debtors estimate the prepetition liability for Sales and Use Taxes to be approximately $216,000, of which $144,000 will become due and payable during the Interim Period.

143. *Franchise and Regulatory Taxes*. Certain states require the Debtors to pay state franchise taxes in order to conduct business within those states. In addition, laws and regulations in jurisdictions in which the Debtors operate require the Debtors to pay regulatory and licensing fees to obtain a range of licenses and permits from a number of different Applicable Authorities (together with the state franchise taxes, the "Franchise and Regulatory Taxes"). I understand that the methods for calculating amounts due for such taxes, licenses, and permits, and the deadlines for paying such amounts, vary by jurisdiction. As of the Petition Date, the Debtors estimate prepetition liability for Franchise and Regulatory Taxes to be approximately $250,000, of which approximately $50,000 of which will become due and payable during the Interim Period.

144.    *Customs and Import Duties*.  The Debtors incur certain duty and excise taxes related to the purchase and sale of goods from or in foreign jurisdictions (the "Customs and Import Duties").  In the ordinary course of business, the Debtors import merchandise from non-United States jurisdictions into the United States and remit Customs and Import Duties with respect thereto to the U.S. Customs and Border Protection Agency (the "U.S. Customs Service").  As of the Petition Date, the Debtors estimate that approximately $1,800,000 is due and payable on account of Customs and Import Duties, approximately $1,200,000 of which will be come due and payable during the Interim Period.  I believe that it is essential for the Debtors to have authority to pay any Customs and Import Duties that may become due and owing in the ordinary course of business during the Chapter 11 Cases, whether or not arising prior to the Petition Date.  If the Debtors do not timely pay the Customs and Import Duties, I understand that the U.S. Customs Service may demand liquidated damages, assess interest, or impose other sanctions, and/or assert liens against the imported goods.

145.    *Regulatory and Other Taxes and Fees*.  Certain states require the Debtors to pay various business taxes, annual reporting fees, certain escheat and unclaimed property, regulatory assessments, permitting licensing and other operational taxes and fees, including fees relating to certain regulations, and other miscellaneous taxes and fees to remain in good standing and/or to conduct business within the state (collectively, "Regulatory and Other Taxes and Fees").  The manner in which such fees and taxes are computed varies according to the law of the applicable jurisdiction.  I have been informed that as the Regulatory and Other Taxes and Fees become due, the Applicable Authorities to whom they are owed may be entitled to a priority claim.

146.    I have been informed by counsel that a portion of the Taxes and Assessments constitute so-called "trust fund" obligations that are required to be collected from third parties and

held in trust for payment to taxing and regulatory authorities.  I understand that the funds that would be used to pay the trust fund Taxes and Assessments are not property of the Debtors' estates.

147.    I have also been advised that the nonpayment of certain trust fund obligations may result in personal liability for the Debtors' officers and directors.  Efforts by the Applicable Authorities to collect such trust fund amounts would unnecessarily divert the Debtors' officers and directors from tasks relating to the restructuring and ongoing management of the Debtors' business.

148.    Additionally, the Applicable Authorities may take disruptive actions, including audits, asserting tax liens, moving for relief from the automatic stay, and other administrative procedures, as well as bringing enforcement efforts against the Debtors' directors and officers if the Taxes and Assessments are not paid immediately.  Such actions would consume valuable time and resources and divert the Debtors' attention from their business operations and sale efforts.

149.    Moreover, payment of certain of the prepetition Taxes and Assessments is necessary for the Debtors to maintain their good standing to operate in the jurisdictions in which they do business.  Any dispute with an Applicable Authority over the payment of these Taxes and Assessments could impair the Debtors' ability to conduct business in a particular jurisdiction and could negatively affect the Debtors' businesses as a whole by creating a risk that the regulatory authorities will cancel or fail to renew necessary permits or authorizations

150.    For these reasons, I believe that the Debtors' failure to pay Taxes and Assessments could have an adverse impact on their ability to operate in the ordinary course of business.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 14, 2024
       Miami, Florida

*/s/ Kunal S. Kamlani*
Name:  Kunal S. Kamlani
Title:   Chief Transformation Officer

## EXHIBIT A

**Organizational Chart**

