IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> **TRUE VALUE COMPANY, L.L.C. *et al.*,** <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 24-12337 (KBO) <br><br> (Joint Administration Pending) |

**DECLARATION OF KUNAL S. KAMLANI IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I)(A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (B) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS; (C) MODIFYING THE AUTOMATIC STAY; AND (D) SCHEDULING A FINAL HEARING AND (II) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C § 1746, I, Kunal S. Kamlani, declare as follows:

1. My name is Kunal S. Kamlani. I am over the age of 18 and have personal knowledge of the matters discussed in this declaration (this "Declaration").

2. I am the Chief Transformation Officer for True Value Company, L.L.C. ("TVC") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "True Value" and, together with their non-Debtor affiliates, the "Company"). I also am a Senior Managing Director of M3 Advisory Partners, LP ("M3"), the Debtors' proposed restructuring advisor in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3. I make this Declaration in support of the *Motion of Debtors for Entry of Interim and Final Orders (I)(A) Authorizing Debtors to Use Cash Collateral; (B) Granting Adequate*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco, L.L.C. (1833); TV Holdco I, L.L.C. (2219); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); Distributors Hardware, L.L.C. (8106); and True Value Specialty Company, LLC (5611). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

*Protection to Prepetition Lenders; (C) Modifying the Automatic Stay; and (D) Scheduling a Final Hearing and (II) Granting Related Relief* (the "<u>Motion</u>").[2]

4. I have more than 25 years of operating and advisory experience across a number of industries including retail, financial services, logistics, real-estate, healthcare, and global leisure and hospitality.

5. Prior to joining M3, I served as the President of ESL Investments, Inc. and the President and Chief Operating Officer of Prestige Cruise Holdings, the parent company of the Oceania Cruises and Regent Seven Seas Cruise lines. Prior to that I served as the Chief Operating Officer of Citi Smith Barney and served in the Corporate Development departments of Starwood Hotels & Resorts and ITT Corporation. I started my career as an investment banking analyst at Bear Stearns. In each of these roles I have been intimately involved in developing operating plans and cashflow forecasts, as well as reviewing capital structuring alternatives in the context of organic growth initiatives and M&A transactions. In addition, I served as a member of the Board of Directors of Staples Inc. and Sears Holdings Corporation. As a Board Member, I also served on Audit, Compensation, Finance, and Related Party Transaction Committees.

## Background

6. Prior to the Petition Date, on July 29, 2024, the Company retained M3 as financial advisor at the request of the Debtors' Prepetition Lenders. I was formally appointed as Chief Transformation Officer of the Debtors on October 13, 2024. In such capacity, I have, in consultation and coordination with the Company's board of directors (the "<u>Board</u>"), led and directed the efforts of the Company and its advisors to manage liquidity to allow the Company adequate time to maximize its enterprise value, and served as the Company's principal advisor to

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

its creditor constituencies and other stakeholders with respect to the Company's financial and operational matters.

7. After facing major supply chain disruptions during the early months of the COVID-19 pandemic, the Company's industry-leading fill rate (i.e., the percentage of orders they could ship from available stock) dropped and a number of customers added secondary suppliers to maximize their ability to meet end-consumer demand. Although the Company has made significant progress in winning back its customers' business from secondary suppliers, a number of its customers still rely on multiple suppliers. The Company implemented difficult decisions to right-size its cost structure, including closing one of its distribution centers.

8. In July 2024, the Debtors were placed in "cash dominion," which the Company disputed. On account of the implementation of cash dominion, any amounts received from operations have been swept into an account under lender control. The effect of this cash dominion has been devastating to the Company's liquidity. During this time, the Prepetition Secured Parties limited draws on the Credit Facility thereby reducing cash available to pay vendors and employees in the ordinary course, which caused the Debtors to make most payments late or not at all, and severely compromising the Debtors' ability to operate their businesses in the ordinary course. Since cash dominion started in July 2024, approximately $105.1 million has been applied to reduce the outstanding balance under the Credit Facility to $238.2 million.

9. Prior to the imposition of any changes to the borrowing base or other remedies under the Credit Facility, the Company retained Houlihan Lokey Capital, Inc. ("Houlihan") in May 2024 to explore liquidity solutions and other strategic alternatives. In July 2024, the Company formally launched a marketing process to sell its business as a going concern. The Company believed that a robust marketing process for a going concern sale transaction would maximize

value by preserving the value of the business, preserving numerous jobs and capitalizing on a significant amount of synergy potential between the Company and potential partners. The culmination of these efforts is the proposed sale to Do it Best Corp., a strategic buyer who agreed to serve as the stalking horse bidder in a court-supervised process subject to higher or otherwise better bids.

### The Chapter 11 Cases

10. The Debtors commenced these Chapter 11 Cases to complete a value-maximizing sale (or sales) of all or substantially all of their assets following a Court-approved and monitored accelerated bidding process (the "Sale Process"). The Debtors' proposed Sale Process is backstopped by a stalking horse offer from competitor Do it Best Corp. ("Do it Best" or the "Stalking Horse Bidder," and such bid, the "Stalking Horse Bid"). To bridge to that value-maximizing sale, the Debtors will need to use cash on hand and cash from operations to pay suppliers, fund payroll obligations, and satisfy other critical obligations.

11. As part of M3's strategic review prior to the commencement of these Chapter 11 Cases, M3, with the assistance of the Debtors and their other advisors, engaged in substantial analysis of the Debtors' anticipated cash receipts, operating disbursements, and other material factors impacting the Debtors' go-forward cash position. The result of these efforts is the net cash flow projections and budget annexed to the Interim Order as **Exhibit 1**, illustrating the sources and uses of funds during the Chapter 11 Cases.

### Cash Collateral Motion

12. With respect to the relief requested in the Motion, and as set forth therein and described herein, the Debtors require immediate access to Cash Collateral for expenses such as vendor payments, payroll, tax payments, insurance and other routine disbursements. To bridge

the gap exacerbated by the consequences of cash dominion and other factors and to get to that value-maximizing sale, the Debtors will need to use cash on hand and future cash flows to pay suppliers, fund payroll obligations, and satisfy other critical obligations. Without access to this Cash Collateral, the Debtors will be forced into a value-destructive liquidation, immediately eliminating nearly 2,000 jobs and forgoing the value inherent to the Company as a going concern. In the unique hardware co-op market, such a result would be disastrous for the Debtors' businesses and materially harm the Debtors' efforts to preserve the value of their estates for their constituents. Interim authority to use Cash Collateral on a non-consensual basis should give the Debtors breathing room to stabilize the Company's operations.

13.  The Debtors have historically used cash on hand and cash flow from operations for working capital and general corporate purposes. Using Cash Collateral to fund the continued operation of the Debtors' businesses will facilitate the preservation of the Prepetition Secured Parties' collateral while maximizing the value of the Debtors' enterprise for the benefit of all stakeholders. Assuming no meaningful change in customer practices, I anticipate that cash on hand and revenue earned from post-petition operations will be sufficient to fund all payments contemplated by the Debtors' first-day motions and the Debtors' post-petition operating and Sale Process-related expenses.

14.  Without prompt access to Cash Collateral, the Debtors would be unable to, among other things, satisfy payroll, pay vendor expenses incurred in the ordinary course of business, including certain payments that are essential for the ongoing operations of the Debtors' business, and fund the administration of these Chapter 11 Cases. The Debtors would be forced into a near-term value-destructive liquidation and winddown of their businesses, which would cause

5

immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders, including the Prepetition Secured Parties.

15. Absent entry of the interim and final orders authorizing the Debtors' use of Cash Collateral and granting related relief, the Debtors would be unable to generate revenue, operate their businesses, or pay the thousands of individuals who report to work each day. Indeed, without access to sufficient cash, the Debtors would potentially have to suspend operations, materially damaging the Debtors' business reputation and relationships with their customers who are the primary source of income for the business and are already under strain. Further, there can be no guarantee that, if the Debtors were to temporarily suspend operations, such operations could be resumed once the Debtors' access to cash was restored.

16. My team at M3 and I have assisted and advised the Debtors in estimating the amount of liquidity the Debtors will require during these Chapter 11 Cases and, particularly, during the interim period of the first several weeks following the Petition Date. Based on these discussions, my team and the Debtors developed an eight-week cash flow forecast and budget, attached to the Interim Order as **Exhibit 1**. The cash flow forecast projection assumes a closing date of the Do it Best sale on December 6, 2024, completing the Sale Process eight weeks after the Petition Date. Assuming no meaningful change in customer behavior, I believe the Interim Budget represents a reasonable estimate of the Debtors' cash sources and needs, during the first eight weeks of these Chapter 11 Cases.

17. As of the filing of these Chapter 11 Cases, the Prepetition Secured Parties have not consented to the use of their Cash Collateral (although the Debtors are working assiduously to obtain that consent). Authority to use Cash Collateral on an Interim basis would provide the

Company the necessary breathing room and runway to prepare for an orderly sale of all of its assets.

18. The Debtors believe that the going concern value of their business is significantly greater than their liquidation value. Based on our most recent forecasts, the Do it Best bid would result in a paydown such that the ending balance of the secured debt is approximately $103 million; whereas, the ending balance of the secured debt under each of the "Low Case," "Mid Case" and "High Case" scenarios in a desk-top liquidation analysis prepared by Hilco Consumer-Retail would be approximately $171 million, $128 million and $84 million, respectively.

19. In the exercise of the Debtors' sound business judgment, and in consultation with their advisors, the Debtors determined that the Adequate Protection is appropriate and reasonable under these circumstances as the going concern value of the Debtors will be preserved by the Debtors' continuing operations and use of Cash Collateral. The Debtors' continued operations likely present the best opportunity for the Prepetition Secured Parties to receive the greatest recovery on account of their claims.

20. I believe that the Prepetition Secured Parties will be adequately protected as a result of the continuation of the Debtors' business operations as these cash expenditures are necessary to bridge to a value-maximizing sale to Do it Best (or a higher and better bidder). Without the use of Cash Collateral, the Debtors' operations would be irreparably harmed and create a diminution of value for the estates. Indeed, absent use of Cash Collateral, the Debtors will be unable to continue to pay their ordinary business expenses, including rent and employee wages. Failure to make such payments would significantly jeopardize the Debtors' ability to maintain their business and continue their operations.

21. I also believe that the Prepetition Secured Parties are adequately protected by the Sale Process contemplated by the Chapter 11 Cases. Use of Cash Collateral will preserve and enhance the value of the Debtors' estates, all of which are the Prepetition Secured Parties' collateral; whereas, if the Chapter 11 Cases are converted immediately to cases under chapter 7 or dismissed for an out-of-court liquidation, that value would be lost. Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern, necessitating the cessation of the Debtors' operations.

22. The Debtors propose to provide Prepetition Secured Parties with several forms of Adequate Protection to the extent of any diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including Cash Collateral) resulting from these Chapter 11 Cases. The Adequate Protection includes Adequate Protection Superpriority Claims and Adequate Protection Liens, subject in each case to a carve-out of certain statutory fees and allowed professional fees of the Debtors and any statutory committee appointed in these Chapter 11 Cases. The Debtors will also provide additional Adequate Protection to the Prepetition Secured Parties in the form of (a) payment of the Prepetition Secured Parties' reasonable and documented fees and expenses; (b) the provision of certain financial and other reporting; and (c) compliance with certain milestones applicable to the Debtors' Chapter 11 Cases (unless extended or waived by the Prepetition Secured Parties), all as set forth in the Interim Order.

## Conclusion

23. For these reasons, entry of an Interim Order is in the best interests of the Debtors, their creditors, and all other parties in interest. The Debtors continue to negotiate with the Prepetition Lenders regarding the consensual use of cash collateral, but absent their agreement, the

Court should approve its non-consensual use on an interim basis to avoid a value-destructive outcome to the Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 15, 2024　　　　　　　　　　　　　　　*/s/ Kunal S. Kamlani*
　　　　Miami, Florida　　　　　　　　　　　　　　　　Kunal S. Kamlani
　　　　　　　　　　　　　　　　　　　　　　　　　　　Chief Transformation Officer
　　　　　　　　　　　　　　　　　　　　　　　　　　　True Value Company LLC