## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **TRUE VALUE COMPANY, L.L.C.** *et al.*, | Case No. 24-12337 (KBO) |
| Debtors.[1] | (Joint Administration Pending) |

## DECLARATION OF MEGAN MENZER IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I)(A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (B) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS; (C) MODIFYING THE AUTOMATIC STAY; AND (D) SCHEDULING A FINAL HEARING AND (II) GRANTING RELATED RELIEF

I, Megan Menzer, submit this declaration (this "Declaration") under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am a fourth-generation owner and operator of Newton's True Value Hardware ("Newton's") in Cherryvale, Kansas, an independently owned and operated retail store that is a member store serviced by True Value Company, L.L.C. and certain of its affiliates (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"). I am and have been a member of the Board of Directors of the Company's cooperative, TV Cooperative Company (the "Co-op"), since 2021 and served as its Chairperson from 2023 until March 2024. In March 2024, I became and remain a member of the Board of Directors of non-Debtor affiliate TV Holdco, L.L.C. ("TV Holdco").

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

2.      I submit this Declaration in support of the *Motion of Debtors for Entry of Interim and Final Orders (I)(A) Authorizing Debtors to Use Cash Collateral; (B) Granting Adequate Protection to Prepetition Lenders; (C) Modifying the Automatic Stay; and (D) Scheduling a Final Hearing and (II) Granting Related Relief* (the "Motion"),[2] filed contemporaneously herewith.

3.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge and experience, my review of relevant documents, and my discussions with the Debtors and their professionals.  If I were called upon to testify, I could and would testify to each of the facts set forth below.

## BACKGROUND

### A.      My Background

4.      My family has owned and operated Newton's since it was established by my great grandparents in 1924.  I have participated in the operation of Newton's in some capacity for my entire life.  Upon graduating from college in 1998, I became involved in operating Newton's on a full-time basis.  In 2005, I took over management of all store operations.  In 2015, I began purchasing equity in the Company.  Today, I own 90% of Newton's.  By January 2025, I will own Newton's in its entirety.  As the owner and operator of Newton's, I am responsible for the store's day-to-day operations, including managing our staff and employees, our vendor relationships, and our product selection and purchases.  I am also responsible for Newton's overall financial management.

5.      As a member of the Board of Directors of Co-op, then Chairperson of the Board of Directors of Co-op, and now a member of the Board of Directors of TV Holdco, I have worked closely with other Co-op Members and the Company's management.

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

6.      In addition to my involvement with Newton's and the Company, I also have been heavily involved in the retail hardware industry in general.  For example, at thirty years old, I was named "Young Retailer of the Year."  In 2012, I was featured on the cover of Hardware Retailing magazine for my work designing and implementing QR codes in the hardware industry.  From 2011 to 2019, I was a member of the Board of Directors of the North American Retail Hardware Association in Indianapolis and served as its Chairperson in 2017 to 2018.  Last year, I was named as one of the "Top Women in Hardware & Business Supply" by HBS Dealer.  I have also been a member of the Board of Directors of the Cherryvale Main Street, Cherryvale Chamber of Commerce, and the ECI Computer Council of Texas.  Throughout my career, I have attended and spoken at numerous vendor summits and Company conferences.  I have also had numerous opportunities to work closely with representatives of key players in the industry, including Ace Hardware, Orgill, Blisch Mize and the proposed buyer of the Debtors' assets, Do It Best.

7.      This experience, among others, has enabled me to build close working relationships with other Co-op Members, local and nationwide vendors, dealers and distributors, hardware store owners, and others in the industry across the country.

**B.      The Company's Business Model**

8.      I assume that the reader is generally familiar with the Company's business model, which is described in further detail in the First Day Declaration.  For context, I will briefly summarize certain aspects of the Company's business model that are relevant to my statements in this Declaration.

9.      As part of the supply chain network between the Company and the retail storefronts, Newton's and other Co-op Members order products from the Company's warehouses and distribution centers to be sent to their storefronts.  The products include nationally branded products, as well as the Company's private label products.

10.     Newton's and other Co-op Members also purchase a significant portion of their products via "drop-shipment."  In this sales channel, a Co-op Member orders a product directly from a vendor, and the vendor delivers the product directly to the storefront.  However, the Company functions as a middleman for the purposes of invoicing and payment.  Specifically, the Company invoices the Co-op Members, the Co-op Members pay the Company, and the Company pays the vendor.  This is a critical, value-added services to the Co-op Members because it dramatically simplifies the process by which they order and manage inventory.

11.     The Company also offers several programs that are critical to maintaining Co-op Members' incentives, satisfaction, and investment in the Company's overall success.  For example, the Company offers a volume-based rebate program under which the Company refunds a percentage of the total amount that a Co-op Member spends on product in a given fiscal year.  The Company also offers a warranty program that allows Co-op Members to return defective products or file claims for reimbursement.

C.     **The Current Soft Demand Environment**

12.     During the COVID-19 pandemic, demand for hardware products increased dramatically.  Americans were working from home and doing home improvement projects at an unprecedented rate.  Due to nationwide supply shortages, Newton's and many other Co-op Members struggled to meet the unprecedented demand.  When supply constraints eased, Newton's and other Co-op Members stocked up on inventory to mitigate any potential future supply shortages.  Unfortunately, demand tapered off and then decreased to levels materially below pre-pandemic levels.  As a result, Newton's and many other Co-op Members are currently overstocked, sitting on more inventory than they can reasonably expect to sell in a reasonable timeframe.  Exacerbating the downward pressure on demand, 2024 is a presidential election year, which historically has been a period where product demand from customers of Newton's and other Co-

4

op Members has softened.   Newton's and other Co-op Members, in turn, have been more conservative in purchasing inventory in recent months.   In short, the current demand for inventory is exceptionally low.   With respect to seasonality, demand tends to be highest in the spring and summer, and slower in the fall and winter months.

### THE HILCO REPORT

13.     As a member of the Board of Directors of TV Holdco, I became aware that Hilco Consumer-Retail ("Hilco") had prepared a report, dated September 27, 2024 (the "Hilco Report"), which purports to provide a point-in-time liquidation analysis of the Company's paint business and its known tangible and intangible assets.   On or about October 1, 2024, I requested and received a copy of the Hilco Report, a true and correct copy of which is attached hereto as **Exhibit A**.[3]   Based on my personal experiences and observations, I believe the Hilco Report is premised on multiple assumptions that are unreliable and unrealistic for the reasons outlined below.

14.     As an initial matter, I understand the Hilco Report is a "desktop" report prepared without the benefit of interviews with the Company's management, board members, or employees or conducting other "hands-on" due diligence.   By submitting this Declaration, I aim to provide important context that may not be apparent to someone merely looking at documents in a data room.   In particular, the Company's cooperative business model is firmly rooted in local communities, where stores are run by independent owners with longstanding relationships with real people.   We pride ourselves in connecting with our customers and our vendors on a personal level.   My family has built and maintained such relationships over four generations, which we

---

[3]    The Hilco Report contains highly confidential and commercial sensitive information concerning the Debtors' business; accordingly, it is being filed under seal.

consider to be invaluable and will protect accordingly.  As discussed below, this fundamental ethos

is critical to understanding the likely behavior of individual store owners and assessing the impact

of that behavior in the context of a bankruptcy proceeding.

A.    <u>**INVENTORY ASSUMPTIONS**</u>

15.    The Hilco Report states that the liquidation it contemplates reflects that "[a]ll

Physical Assets would be sold on an "as is, where is" basis with NO warranties."  Ex. A. at 14.

The Hilco Report further states in the "High Case" that █████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████.  Ex. A. at 33.

16.    Hilco assumes that this discount would be enticing enough for the store owners to

buy additional inventory in bulk.  I strenuously disagree.  Based on my experience, such a discount

is unlikely to incentivize the vast majority of the store owners for multiple reasons.  First, most

store owners (including my store) lack the storage space to buy additional inventory in bulk at this

minimal discount.  Simply put, the discount is not worth the time, effort or storage cost.  Second,

many of store owners operate with limited working capital and may not have the resources to

purchase significant quantities of inventory, even if discounted.  This is especially true in the

absence of rebates that are normally available for bulk purchases.  Third, owners are unlikely to

be interested in inventory that would be sold without warranties or returns.  The store owners are

local establishments that, as described herein, care deeply about their relationships with their

customers.  If a product is faulty, we rely on the Company's warranties and return policies to

satisfy our customers' needs and right our wrongs.  Fourth, even in more robust market climates

not present now, sales to existing customers decrease during the fall and winter months, which is

the anticipated liquidation period, causing store owners' appetite to purchase inventory to decrease even further.  Fifth, competitors are likely to poach customers in a liquidation scenario, even further depressing inventory demand.  For these reasons, among others, even if the discount were significantly higher, only a small fraction of store owners are likely to be interested in such bulk sales.

17.     In sum, I believe that the inventory sales in a liquidation would have to be at discounts far below even Hilco's low case because the discount is simply not worth it for the Co-2op Members because of the lack of warranties, the inability to use rebates, the cost of warehousing merchandise, and soft consumer demand.

## B.    **ACCOUNTS RECEIVABLE RECOVERIES**

18.     **Dispersed Customers:**  The Hilco Report states that "Gross Orderly Liquidation Value" or "GOLV" is ████ in the "High Case."  Ex. A. at 23.  This figure fails to account for customer dispersion and associated costs with recovering accounts receivable.  The Company's accounts receivable span approximately 3,000 customers, many of whom are stand-alone retailers and are not centralized.  In a going-out-of-business scenario, efforts to recover payments from such dispersed customers would be impractical and unlikely to yield substantial value when the average receivable is just approximately ████.  Indeed, I am aware that the Company is already having trouble collecting receivables, with many customers beginning to slow pay invoices.

19.     **Drop-Ship Suppliers:**  The Hilco Report states that "████████████████ ████████████████████████████."  Ex. A at 23.  The Hilco Report acknowledges that a "████████████████████████ ████████████████████."  *Id*.  The Hilco Report also acknowledges that the Company believes Hilco "████████████████████████ ████████████████."  *Id*. at 20.  I strongly agree with the Company.

20.    In my assessment, the Hilco Report incorrectly assumes that drop-ship collections would mirror ordinary receivable recoveries.  That assumption is fundamentally flawed.  The Company has not been paying drop-ship suppliers in recent months, and the store owners value our relationships with our vendors too much to allow them to be left unpaid.  In a liquidation scenario, the store owners will continue to have relationships with our suppliers long after our relationship with the Company has ended.  Consequently, if the Company is not paying our drop-ship suppliers in accordance with our drop-ship policy, then most of the store owners are likely to stop paying the Company for drop shipments altogether, and will instead pay their suppliers directly, in order to preserve their relationships with them.

21.    **Rebate Offsets:**  The Hilco Report states that, "████████████████████████ ████████████████████████████████████████████."  Ex. A. at 23. Historically, the amount of a store owner's rebate was offset against accounts receivable; however, the Hilco Report fails to account for this offset and underestimates the incremental risk to receivable collection.   To the extent store owners continue to pay the Company at all in a liquidation scenario, they are likely to deduct the rebates they would receive in the ordinary course of business.  As far as most store owners are concerned, they have earned those rebates.

22.    **Store Owners' Relationships:**  The Hilco Report fundamentally misapprehends the importance of the store owners' relationships with customers and vendors.  The Hilco Report overlooks the likelihood that, in the case of a liquidation, we store owners will focus on maintaining these relationships so that our stores can survive after the liquidation.  Store owners are very skeptical of liquidation efforts and are protecting their own interests at this time, since our interests would not be aligned with those of the Company in a liquidation.  In a liquidation, we will redirect our capital and efforts toward replacing the Company with alternative suppliers and

deal with any disputes concerning accounts receivable after we have assured the viability of our stores.  The Hilco Report assumes store owners' cooperation and additional investment in the Company in a liquidation scenario, which is simply unrealistic and an incorrect assumption.  Hilco fails to consider the risk of store owners' disinclination to investing additional capital in the form of payables into a liquidating company with whom we will have no go-forward relationship nor equity interest.

*** 

23.    I can say with confidence that other store owners and I would be invested and cooperative in a going concern sale process, rather than a liquidation, and many of the risks I have outlined herein would be drastically reduced or eliminated through a sale instead of a liquidation. We have been loyally serving the Company and would continue to do so to aid in the process of selling the Company, maintaining our vendor and customer relationships, and forming a strong foundation with the buyer to continue the hard work, time and money we have invested in the success of the Company and each of our stores.  The Company is not just an investment for us owners; it's our livelihood.  This is not just what we do for work; it defines who we are, day in and day out.  We will do whatever it takes for this business and our stores to survive these liquidity challenges because we believe in, and care deeply about, the business and the people it serves.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 16, 2024                    /s/ Megan Menzer
      New York, New York              Megan Menzer
                                     Member of the Boards of Directors of
                                     TV Cooperative Company and TV Holdco, L.L.C.

## EXHIBIT A

**Hilco Report**

**REDACTED**