IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> **TRUE VALUE COMPANY, L.L.C.,** *et al.*, <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 24-12337 (KBO) <br><br> (Joint Administration Pending) |

**PRELIMINARY OBJECTION OF PNC BANK, NATIONAL ASSOCIATION TO (A) DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) SCHEDULING A FINAL HEARING; AND (B) TO ALL OTHER FIRST DAY MOTIONS TO THE EXTENT THEY REQUIRE USE OF CASH COLLATERAL**

PNC Bank, National Association ("**PNC**") as administrative agent for the Lenders (defined below) (PNC, in such capacity, "**Administrative Agent**"), by and through its attorneys, Otterbourg P.C. and Blank Rome LLP, respectfully submits this Objection to (a) the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Doc. No. 19] (the "**Motion**"); and (b) to all other First Day Motions to the extend they require the use of the Lenders' cash collateral, and states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

**PRELIMINARY STATEMENT**

1. The circumstances of this chapter 11 filing in general, and the relief requested in the Motion specifically, are extraordinary. The Debtors have filed chapter 11 cases, and now seek to run a sale process to sell their business as a going concern to Do It Best Corporation (the "**DIB Sale**"), financed with the nonconsensual use of the Lenders' cash collateral, where *the only* creditors who *possibly* could benefit from the outcome of the sale are the Lenders themselves. That is because, by the Debtors' own admission, the Lenders are now, and at all times will remain (even under the Debtors' rosiest scenario), under-secured by tens of millions of dollars. In other words, in this case, unsecured creditors will receive no recoveries, and will never receive any recoveries, *even if* the sale process were a complete "success."

2. And, yet, while the *result* of the process would seemingly benefit only the Lenders, who do not want that result, the *process itself* would benefit only stakeholders *other than* the Lenders. According to the Debtors' proposed budget attached to the Motion, if the sale process were to run with the use of the Lenders' cash collateral: professionals would be paid tens of millions of dollars and unsecured vendors would be paid tens of millions of dollars in respect of prepetition unsecured claims -- all in just the span of two months; and the Debtors' officers, directors and equity sponsor, ACON Investments ("**ACON**") are absolved of substantially all of Debtors' obligations for which they have direct liability. And yet, during this time, the Lenders would receive *nothing*, except proceeds of collateral to which the Lenders already are entitled. The Debtors' proposed course of action would turn both the absolute priority rule and the adequate protection requirement on their heads. There is no legal authority in this Circuit or elsewhere for such an outcome, and, not surprisingly, the Debtors cite to none.

3.  Instead, the Debtors seek to stretch flexible legal standards governing the use of cash collateral to invent a new form of adequate protection. If such a new standard is adopted, the protections afforded to secured lenders under the Bankruptcy Code would be eviscerated in a manner that would have broader economic implications to the ability of financial institutions to extend credit. According to the Debtors, the indisputably, perpetually under-secured Lenders are adequately protected because, according to the Debtors, the Lenders would *lose* less money in a proposed going concern sale process than the Lenders would *lose* in a hypothetical liquidation scenario. Even if the Debtors could prove that the Lenders would take less of a loss from a sale than in a liquidation (and they do not and cannot prove that), the Debtors point to *no* case holding that an under-secured lender is adequately protected because it would lose less money from a sale process than it would lose from a liquidation.

4.  In any event, the Debtors cannot prove the facts to support their theory. Rather, the theory is entirely premised on the Debtors discrediting, ignoring and/or misrepresenting the liquidation value analysis performed by the Debtors' own (highly reputable and well-known) liquidation expert, Hilco Global ("**Hilco**"). The Debtors' attempt to impeach its own consultant does not, and cannot, satisfy its burden to demonstrate that the Lenders are adequately protected.

5.  The Debtors are in this predicament by their own doing by failing to adjust to their economic realities of falling sales months ago, and concealing the true financial condition of the company from the Lenders and other stakeholders. Indeed, when ACON was asked to fund the Debtors to support its turnaround or sale efforts, ACON refused. While ACON refused to step up, prior to commencement of these cases, the Administrative Agent continually engaged in an effort to confer with the Debtors in an attempt to come to terms on an appropriate path forward to maximize values and even made over $220 million in advances to the Debtors since late July.

Unfortunately, as a result of the lack of information and transparency from the Debtors in the weeks leading to the Chapter 11 filings, those discussions were unsuccessful leading to the Debtors' proposal of highly risky DIB Sale that does not benefit the one stakeholder with skin in the game – the Lenders.

6. The Lenders believe that discovery taken of ACON, various officers and directors as well as other parties, including Hilco, will reveal that this sham sale process has been promulgated by ACON in a desperate effort to save face with its constituents and reduce its exposure by achieving a going concern sale, albeit at a price tens of millions below what may be achieved through an orderly liquidation that any reasonable fiduciary would have chosen over a lowball going concern bid. Indeed, the proposed distribution to the Lenders through this sale approximates only have of the value ascribed to those assets in the borrowing base calculations submitted by the Debtors to the Lenders over these past several months, which is an absurd result that fails on its face to maximize values.

7. For these, and the other reasons discussed below, the Motion should be denied, and the Debtors' request to use the Lenders' collateral to run a sale process that solely would benefit professionals, unsecured creditors, ACON and their officers and directors at the direct expense of the Lenders, should be rejected out of hand. Moreover, to the extent the Court authorizes the use of any cash collateral on an emergency basis (and it should not), the Court should limit such use to fund solely those expenses that are needed to pay truly critical expenses in the immediate term. For the avoidance of doubt, the Lenders do not consent to any carve-out for professional fees and expenses on an interim basis and does not consent to the use of its cash collateral to pay the Debtors' projected $22 million in professional fees.

**PERTINENT FACTS**

A.    **The Loan Documents**

8.    The Debtors, Administrative Agent, and the financial institutions, from time to time, party thereto (with the Administrative Agent, each a "**Lender**" and collectively, the "**Lenders**"), are parties to that certain Credit Agreement, dated as of April 20, 2018 (as amended, restated, supplemented or otherwise modified from time to time) (the "**Credit Agreement**" and "**Credit Facility**").  *See* Declaration of Kunal S. Kamlani in Support of Chapter 11 Petitions and First Day Papers dated October 14, 2024 ("**First Day Dec**.") at ¶¶ 32-36.  Under the Credit Agreement, the Administrative Agent and the Lenders agreed to provide, and have provided, certain secured loans, letters of credit and other extensions of credit to the Borrowers on the terms and subject to the conditions set forth therein and in accordance with the other loan documents executed in connection therewith (collectively, the "**Loan Documents**"). [*Id.* at ¶¶ 31-37]

9.    The Credit Facility consists of (i) a term loan with approximately $19 million Outstanding, after amortization, as of the Petition Date and (ii) an up to $300 million asset-based revolving credit facility, subject to a borrowing base, all of which are secured by a first-priority security interest in and lien on substantially all of the Debtors' assets, subject to certain exclusions (the "**Prepetition Collateral**") including in all or substantially all of the assets subject to the DIB Sale. [*Id*. at ¶ 33]

10.    As of the Petition Date, the Debtors are indebted to the Lenders in an amount not less than $238 million (the "**Indebtedness**"). [*Id*. at ¶ 31]  The Debtors concede that the Lenders are undersecured. [Motion at ¶ 33]

11.    On August 26, 2024, the Loan Parties entered into a Temporary Waiver and Amendment No. 4 to the Credit Agreement ("**Amendment No. 4**" or the "**First Waiver**")

which, among other things, temporarily waived certain Events of Default. In the First Waiver, as a condition of continuing financing, the Debtors agreed to retain a valuation firm to prepare an analysis reflecting estimated realizable value associated with a hypothetical liquidation of the Debtors' businesses. A copy of the First Waiver is attached hereto as Exhibit A.

12. On September 9, 2024, the Loan Parties entered into the Second Temporary Waiver and Amendment No. 5 to the Credit Agreement ("**Amendment No. 5**" or the "**Second Waiver**") which, among other things, temporarily waived certain Events of Default and further reduced the aggregate revolving credit commitments to $300,000,000 from $350,000,000. A copy of the Second Waiver is attached hereto as Exhibit B.

13. In each of the First and Second Waivers, the Debtors released any claims against the Lenders, including any claims the Debtors now imply exist from the Lenders' (appropriate) placement of the Debtors into cash dominion.

**B.  A Decline in Sales Lead the Debtors to Retention of Houlihan Lokey to Explore a Sales Process and Retention of Hilco to Undertake Liquidation Analysis**

14. As set forth in the First Day Declaration and the Declaration of Kunal S. Kamlani ("**Kamlani Dec**."), Chief Transformation Officer for the Debtors and senior managing director of M3 Advisory Partners, LP ("**M3**"), submitted in support of the Motion, the Debtors' financial troubles have been clear for some time now. After facing major supply chain disruptions during the early months of the COVID-19 pandemic, the Debtors' fill rate (*i.e.*, the percentage of orders they were able to ship from available stock) dropped, and a number of customers added secondary suppliers to maximize their ability to meet end-consumer demand. Many of those customers continue to rely on multiple suppliers, leading to a decline in the Debtors' sales. [Kamlani Dec. at ¶ 7; First Day Dec. at ¶¶ 40 - 42].

15. Among other things, to obtain additional liquidity to ramp up inventory purchases during the pandemic, in late 2021 through early and middle 2022, the Debtors sought to monetize the Lenders' real estate collateral located in Minnesota and Ohio to generate approximately $89.4 million in proceeds used to generate liquidity to purchase inventory.

16. In order to address their ongoing financial difficulties, the Debtors retained Houlihan Lokey Capital, Inc. ("**Houlihan**") in May 2024 to explore liquidity solutions and other strategic alternatives. [Kamlani Dec. at ¶ 8].

17. Notwithstanding the efforts of Houlihan, as of October 9, 2024, the Debtors reported to the Lenders nothing beyond non-definitive indications of interest from DIB and another potential purchaser, both of which resulted in loan recovery shortfalls at or exceeding $100 million. [See, Exs. D and E attached hereto, October 4 email and October 11 letter from Lenders' counsel to Debtors' counsel].

18. Further, as set forth above, pursuant to § 6.8 of the First Waiver, as a condition of continued financing, the Debtors agreed to engage a nationally known valuation firm to furnish an analysis reflecting estimated realizable value, in each case associated with a hypothetical liquidation of the Debtors' businesses. The liquidation analysis was undertaken to enable the Lenders to understand the liquidation values, in view of the expected limited recovery values obtained from sale of the business as a going concern. [Exs. A and E]

19. The Debtors chose to engage Hilco, a firm of national scope and reputation and which the Debtors previously had employed for purposes of undertaking appraisals, which were used to determine loan availability under the Credit Facility, to undertake the liquidation analysis. The Debtors delivered Hilco's analysis to the Lenders weeks later, on September 28, 2024. With Hilco's analysis, the Debtors' counsel enclosed a 12-page letter, obviously prepared between the

time of the Debtors' receipt of Hilco's analysis and their deliver to the Lenders, discrediting their own expert's work product. [Ex. D]

20. The figures reported by the Debtors as to Hilco's "High Case," "Mid Case" and "Low Case" recoveries appear nowhere in Hilco's report, which, due to confidentiality considerations, is not being provided at this time.

21. Rather, the Debtors have embedded in Hilco's figures expenses of an orderly liquidation in Chapter 11 that the Debtors' financial advisor, M3, calculated and which the Debtors believe (without disclosing so to the Court) require Hilco's figures to be adjusted. The Debtors' self-serving adjustments, made without disclosure to or input from Hilco, materially change the numbers and distort the analysis. [Ex. D]

22. On October 2, 2024, M3 delivered its response to Hilco's analysis to the Lenders. The M3 analysis indicated a low-end liquidation recovery loss to the Lenders of $157 million. M3 did not seek to adjust the high-end and mid-range Hilco valuations, because the Debtors simply disregarded them. *Id*.

23. In addition to the estimated low-end liquidation recovery loss, M3 evaluated two then purportedly active going concern bids for the Debtors, including the DIB bid, which, according to the Debtors, would result in a loss to the Debtor of $100 million. [Ex. D].

24. Following delivery of the M3 analysis, two days later, on Friday, October 4, 2024, the Debtors, through counsel, issued an ultimatum to the Lenders to respond by the following Monday, October 7, 2024, whether the Lenders would support the DIB Sale or an alternative transaction (which has since been withdrawn). A copy of the October 4 letter is attached hereto as Exhibit C.

25. The same day, the Lenders, through counsel, rejected the Debtors' ultimatum on grounds, among others, that the ultimatum inappropriately was designed to force the Lenders to decide on which path the Debtors should pursue without adequate information. Given the Debtors' deteriorating financial condition, the incomplete and non-definitive indications of interest from the two then potential going concern buyers, the late arriving and incomplete analysis associated with the liquidation analysis, the Lenders responded that the demands in the October 4 letter were unreasonable. A copy of the Lenders' October 4 response is attached hereto as Exhibit D.

26. By letter dated October 11, 2024, the Lenders through counsel, reiterated that the Debtors' demands were unreasonable, including the Debtors' request for a decision on the DIB Sale, since the Lenders only had received the DIB Sale asset purchase agreement for the first time on October 10, 2024 at 5:01 p.m. A copy of the October 11 letter is attached hereto as Exhibit E.

27. In the letter, the Lenders also made clear that, as of the date thereof, the Lenders did not support or consent to the DIB Sale, and did not consent to the use of their cash collateral in connection with the Debtors' preferred path toward such a sale. Notably, as of the date of that letter, the Debtors had not provided the Lenders with a proposed cash collateral budget; hence, the Lenders could not even ascertain what their "net" recovery would be upon the closing of the DIB Sale. *Id*.

28. The Lenders' October 11 letter also advised the Debtors that, while the Lenders remained willing to work with the Debtors and their advisors to determine the best path forward to maximizing the value of the Lenders' collateral, the Administrative Agent intends to exercise all of its rights and remedies to oppose any efforts by the Debtors to disregard their obligations under the Credit Agreement. The Lenders warned the Debtors against irresponsibly choosing to file a Chapter 11 proceeding, without the consent and support of the Lenders. *Id*.

29.     In fact, the Lenders continually sought to support the Debtors even after the Debtors delivered a borrowing base certificate to the Lenders on the last day of a five-day grace period that they were granted in July 2024 which showed a $40 million overadvance.  Notwithstanding the massive overadvance, the Lenders still advanced over $215 million after the Debtors in order to preserve value and allow the Debtors' professionals to propose a path forward that would maximize collateral recoveries.

C.     **Debtors Chapter 11 Filing and Motion**

30.     On October 13, 2024 (the "**Petition Date**"), Debtors, without the support of the Lenders, filed for relief under Chapter 11 of the Bankruptcy Code.

31.     In addition, on the Petition Date, the Debtors filed a motion seeking approval to sell their business as a going concern to DIB for $198 million.  Pursuant to the proposed sale that - after payment of all expenses in what on its face is a bloated and unvetted budget - only $135 million would remain towards payment of the Lenders secured debt thus locking in projected losses to the Lenders of at least $100 million.

32.     Further, the Debtors seek approval of the DIB Sale even though Hilco undertook a liquidation analysis showing that the Lenders would achieve better recoveries in a chapter 11 liquidation.  According to M3, the Debtors' own financial advisor, taking Hilco's analysis and once certain expenses are factored in the losses to the Lenders would range between $84 million to $171 million.  [Kamlani Dec. at ¶18]  Notably, Mr. Kamlani does not affirmatively state whether he or M3 believe that the Debtors' going concern value is greater than their liquidation value.  *Id*.

33.     Two days after the bankruptcy filing, in the wee hours of the night, the Debtors filed the Motion seeking the use of Cash Collateral during the interim period of the eight weeks following the Petition Date (the "**Interim Period**").  In support thereof, the Debtors attached an

eight-week cash flow forecast and budget annexed to the Interim Order as Exhibit 1 (the "**Interim Budget**"). [Motion at Ex. 1]

34. The Debtors contend that the Debtors will have adequate liquidity to pay all administrative expenses due or arising during the Interim Period as required by Local Rule 4001-2(a)(iii). However, as set forth in the Kamlani Declaration, the Debtors' contention that it will have adequate liquidity relies on the unfounded assumption that there is "no meaningful changes in customer practices" to ensure that "cash on hand and revenue earned from post-petition operation will be sufficient to fund all payments contemplated by the Debtors' first-day motions and the Debtors' post-petition operating and Sale Process-related expenses." [Kamlani Dec. at ¶13.]

35. Notably, the Debtors' critique of Hilco's liquidation analysis, asserted through counsel, that collections due from over 4,000 independent store owners would cause massive dilution and collectability issues with the accounts receivable in an orderly wind down. However, the Debtors now pivot and contend that those same receivables will collect consistently throughout the Chapter 11.

36. Per the Motion, the Debtors propose to provide the Prepetition Secured Parties with several forms of purported "adequate protection" (collectively, the "**Adequate Protection**") to the extent of any diminution in value of the Lenders' interests in the collateral resulting therefrom (the "**Diminution in Value**"). [Motion at ¶13]. The Adequate Protection purportedly includes "adequate protection" superpriority claims and "adequate protection" liens, subject in each case to a carve-out (not agreed to) of certain statutory fees and allowed professional fees of the Debtors and any statutory committee appointed in these Chapter 11 Cases (the "**Carve-Out**"). *Id*.

11

37. Moreover, the Debtors contend that entry of the Interim Order will provide Adequate Protection to the Lenders by allowing the Debtors to close a "value maximizing" sale that allegedly will generate tens of millions of dollars in greater recovery to the Lenders than in a liquidation. (No recoveries, even under the rosiest forecast, is expected for unsecured creditors.) The Debtors make this bald assertion with no evidentiary back-up whatsoever. The Debtors have submitted no evidence, just untested speculation, that the Lenders would achieve greater recoveries under the DIB Sale rather than a liquidation.

38. Further, as stated, that budget is full of facially inflated numbers and unnecessary expenses, including projected professional fees of $22 million, millions for payment to certain vendors and millions in pre-petition taxes on what is supposed to be a quick sale process which is projected to close in November 2024. The budget also includes millions for the purchase of new inventory – inventory which, if not sold by closing, the Debtors will turnover to DIB for a fraction of the cost for which it is purchased such inventory (*i.e.* no more than 30% of cost) – all to the detriment of the Lenders.

39. Moreover, if the Debtors' projections are off, and cash on hand and revenue are not enough to get the Debtors through closing, the terms and conditions of the DIB asset purchase agreement include a financing component providing for the $13.5 million deposit made by DIB to convert to a DIP loan which would prime the Lenders in contravention of the Bankruptcy Code further eroding the Lenders' collateral position.

40. For the reasons set forth herein, the Lenders object. Absent the Lenders' consent, there is no authority, and the Debtors cite none, permitting the Debtors to use the Lenders' cash collateral under the showing made here.

**ARGUMENT**

**I.    There Is No Factual or Legal Basis for Approving
the Nonconsensual Use of the Lenders' Cash Collateral**

41.    The Cash Collateral Motion should be denied because the Administrative Agent, on behalf of the Lenders, does not consent to the use of cash collateral, and the Lenders will not be adequately protected. Indeed, according to the Debtors' proposed budget, if the sale process were to be run to a successful completion with the use of the Lenders' cash collateral, professionals would be paid tens of millions of dollars; unsecured vendors would be paid tens of millions of dollars; and employees collectively would be paid collectively tens of millions of dollars, ACON and the officers and directors will be relieved from millions of dollars of Debtors' obligations for which they have direct responsibility all in just the span of two months. And yet, during this same time, the Lenders would receive nothing, except proceeds of collateral to which the Lenders already are entitled, and would *lose* tens of millions of dollars. Thus, the Debtors cannot meet their burden of proving show adequate protection, and the relief sought by Debtors should not be granted.

**A.    Relevant Standards**

42.    Section 363(c)(2) of the Bankruptcy Code unequivocally prohibits a debtor-in-possession from using cash collateral unless (i) the secured creditor consents to the use of such funds or (ii) the court authorizes the use of cash collateral in accordance with the other provisions of 11 U.S.C. § 363. *See* § 363(c)(2). Thus, in the absence of the secured creditor's consent, cash collateral may only be accessed "with the approval of the court, which requires adequate protection of the adverse interest." 3 COLLIERS ON BANKRUPTCY ¶ 363.03[4] (16th ed. 2024); *see also Matter of Gilda Gradenigo, Inc.*, 80 B.R. 666, 669 (Bankr. D. Del. 1987) ("[C]ash collateral . . . cannot be used absent consent of each entity having an interest in it.").

43. If, as here, the secured creditor does not consent, the debtor bears the burden of establishing, prior to the use of the collateral, that a secured creditor's interest is adequately protected. *See* 11 U.S.C. § 363(e) ("on request of an entity that has an interest in property … proposed to be used … by the trustee, the court, with or without a hearing, shall prohibit or condition such use … as is necessary to provide adequate protection of such interest ...."); *see also In re Grant Broad. of Phila., Inc.*, 75 B.R. 819, 822 (E.D. Pa. 1987) ("[I]n a § 363(c)(2) hearing, the Debtor has the burden of proof on all issues except the validity, priority, and extent of the alleged secured party's security interest, including all other component elements relevant to the 'issue of adequate protection'").

44. A secured creditor is entitled to adequate protection—as a matter of right, not merely a matter of discretion—when the estate proposes to use the creditor's collateral and when the creditor is stayed from enforcing its interests. *See* 11 U.S.C. §§ 361, 362(d), 363(e); 3 COLLIERS ON BANKRUPTCY ¶ 361.02 (16th ed. 2024) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339, at 343-44 (1977)). Protection of a secured creditor's interest in collateral is rooted in the Fifth Amendment of the United States Constitution and is recognized as a property right afforded the highest protection under the law. *See* H.R. Rep. No. 595, at 339 (1977) ("The concept is derived from the fifth amendment protection of property interests"); *In re Keystone Camera Prods. Corp.*, 126 B.R. 177, 183 (Bankr. D.N.J. 1991) ("A secured creditor has a constitutional right to have the value of its secured claim on the petition date preserved.").

45. Indeed, for over eighty years, the United States Supreme Court has recognized that the security interests possessed by a secured lender constitute "property", and are thus accorded protection by the Takings Clause of the Fifth Amendment. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S. Ct. 196, 85 L. Ed. 184 (1940); *see also United States v. Security Indus.*

14

*Bank*, 459 U.S. 70, 103 S. Ct. 407 (1982) (categorizing the right of a secured "creditor in the collateral" as a "traditional property right"); *In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019 (11th Cir. 1984) ("[S]ecurity interests are 'property rights' protected by the Fifth Amendment from public taking without just compensation"); *In re DeSardi,* 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) (holding that in order to honor the federal constitution's protection of property rights set forth in the Fifth Amendment, where cash collateral usage is to be compelled, secured creditor must be provided with the benefit of its original bargain); *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment.") (citing *In re Johnson*, 63 B.R. 550, 551 (Bankr. D. Colo. 1986)).

46. Given these Constitutional underpinnings, the statutory requirement of adequate protection is a weighty one. "A finding of adequate protection should be premised on facts, or projections grounded on a firm evidentiary basis." *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) Thus, adequate protection does not exist "where '[a]n examination of the assumptions relied on by the Debtor which form[] the basis for the proposition that the [lender] is adequately protected reveals that the assumptions are mere expectations, many of which are highly speculative and unrealistic.'" *Id.* (quoting *Matter of St. Petersburg Hotel Associates Ltd.*, 44 B.R. 944, 946 (Bankr. M.D.Fla.1984)).

47. Thus, the adequate protection offered to the pre-petition creditor should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition use of its collateral. *Id.*; *In re Windsor Hotel L.L.C.*, 295 B.R. 307 (Bankr. C.D. Ill. 2003) ("Adequate protection is designed to preserve the secured creditor's position as it existed at the time of the bankruptcy filing"). This is true even where the pre-petition lender is

undersecured. *Baybank-Middlesex v. Ralar Distribs., Inc. (In re Ralar Distribs., Inc.),* 182 B.R. 81, 85 (D. Mass, 1995), *aff'd* 69 F.3d 1200 (1st Cir. 1995).

48. Merely providing replacement liens in the Collateral to which the Lenders are already entitled to does not adequately protect the value of the Lenders' liens. *See, e.g., In re LTAP US, LLLP,* No. 10-14125 (KG), 2011 WL 671761 (Bankr. D. Del. Feb. 18, 2011) at *3. To establish adequate protection the debtor must prove "that there is sufficient value in the secured assets to protect the secured lender." *Id.* at *2-3 ("[P]roviding [a secured creditor] with a replacement lien on assets against which it already has a lien is illusory. Debtor must provide [secured creditor] with additional collateral, and there is none."). The Debtors do not come close to meeting their burden of demonstrating adequate protection.

**B.     The Debtors Have Not Met Their Burden of Establishing Adequate Protection**

49. Here, the Debtors admit there can be no adequate protection in the form of an equity cushion. Just the opposite, the Motion is premised on there never being, at any point time, collateral values in excess of the Debtors' outstanding debt.

50. Further, even if replacement liens could provide value to the Lenders (and they cannot), any such value would not be sufficient to cover the diminution caused by the use of the cash collateral. No replacement liens can protect the Lenders based on the projected diminution in values if the Debtors are permitted to proceed with the DIB Sale under a process where, even if the Debtors hit all the numbers in the budget, (i) there is a negative cash over the first week, (ii) the Debtors are required to purchase millions in inventory which, if not sold, will only be turned over to DIB at closing for a fraction of the cost that the inventory was purchased, and (iii) the projected losses to the Lenders are in the range of $100 million.

51. Moreover, as stated by Mr. Kamlani, the Debtors' proposal relies on the assumption that there is "no meaningful changes in customer practices" -- and unfounded assumption that casts doubt on whether the Debtors will hit their numbers and have sufficient cash on hand to fund all payments contemplated in the Debtors' budget. If cash on hand and revenue were not enough, the terms and conditions of the DIB asset purchase agreement includes a financing component that provides for the $13.5 million deposit made by DIB to convert to a DIP loan which, if approved, would prime the Lenders in contravention of the Bankruptcy Code and further erode the Lenders' collateral position. In short, the Debtors' proposed process would only benefit the Debtors' professionals, unsecured creditors, employees and landlords, all to the detriment of the Lenders.

52. While the Debtors argue that its efforts are all in the name of "maximizing value," the only beneficiary of such "maximized value," as the Debtors admit, would be the Lenders, and the Lenders do not want their assets "maximized" at a cost to them of tens of millions of dollars. In all events, the Debtors have not come close to proving that, proceeding with the costly sale process that the Debtors seek to undertake, would maximize values other than to the professionals and other stakeholders who would receive the proceeds of the Lenders' collateral during the process. Indeed, this entire proposed process is undertaken for the benefit of these Debtors, its sponsor, ACON, its directors and officers who have directed the efforts of the Debtors to pursue a path that substantially eliminates much of the Debtors' obligation for which they bear direct liability and will presumably seek to have derivative claims against them discharged and the Debtors' professionals, all to the detriment of the Lenders.

53. Moreover, allowing the Debtors' business to operate pending a sale, in and of itself, is not a form of adequate protection at all, and merely asserting that funding is necessary to maintain operations of the Debtors' business cannot form the basis of an adequate protection

finding. *See In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 751-54 (S.D. Fla. 2010) (holding that the fact that post-petition financing was necessary to prevent liquidation does not provide adequate protection, and that any preservation or enhancement of "the value of collateral must be viewed side-by-side with the decrease in value of a creditor's interest."); 3 COLLIER ON BANKRUPTCY ¶ 361.03[5][b] (16th ed. 2024) ("[I]n those situations in which the collateral is to be consumed in the business or is otherwise expected to decline in value over time, preservation of the *status quo* by passive means is impossible.")

54. The Debtors cannot be permitted to further erode the Lenders' interest in the cash collateral to proceed with the DIB Sale and run a marketing process that will harm the collateral and leave the Lenders with significantly diminished returns. *See In re LTAP US, LLLP*, 2011 WL 671761, at *2 (denying the use of cash collateral where "the value of Debtor's assets do not provide [the creditor bank] with the required protection against the use of its cash collateral."); *In re LightStyles, Ltd.*, No. 12-03711 (MDF), 2012 WL 3115902, at *3 (Bankr. M.D. Pa. July 27, 2012) (denying use of cash collateral because "the Bank's interest in Debtor's collateral is undersecured and any diminution in the value of the collateral will result in a loss to the Bank").

55. Here, especially given the uncertainties surrounding the proposed sale and asset values, the Debtors are merely gambling and hoping that their efforts will be successful, where the measure of success, in all events, is how many tens of millions of dollars the Lenders would lose in a comparison of a hypothetical going concern sale to a hypothetical liquidation. And the Debtors are not gambling with house money, but rather the Lenders' cash collateral and without the Lenders consent. This should not be countenanced. The Motion should be denied.

## II. At Most, Only Payments Necessary to Prevent Immediate and Irreparable Harm In the Very Near Term Should Be Authorized

56. Bankruptcy Rule 4001(b)(2)[2] provides that a Court is permitted to approve the use only of only such amounts that the debtor demonstrates is needed to pay emergency expenses that are necessary to avoid immediate and irreparable harm, while providing the secured parties with adequate protection for same.

57. As such, and as mandated by Bankruptcy Rule 4001(b)(2), to the extent that the Court is inclined to grant any interim relief to the Debtors (which, under the circumstances, it should not), the Court is permitted to approve the use *only* of such amount that the Debtors demonstrate is needed to pay emergency expenses that are necessary to avoid immediate and irreparable harm, while providing the Administrative Agent with adequate protection for same.[3] The Debtors' proposed budget does not come close to satisfying that burden.

## III. Reservation of Rights

58. The Administrative Agent expressly reserves the right to amend or supplement this Objection, to file additional objections, and to introduce evidence supporting this Objection and any other objections at any hearing on the Motion. Further, any order granting adequate protection

---

[2] Bankruptcy Rule 4001(b)(2) is clear that if a request is made for an interim use of cash collateral, "the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

[3] The Lenders do not consent to any carve-out for professional fees and expenses on an interim basis and does not consent to the use of its cash collateral to pay the Debtors' professionals. *See e.g. In re Addison Properties Ltd. P'ship*, 185 B.R. 766, 769 (Bankr. N.D. Ill. 1995) (unless the secured parties consent, or the court finds that the interest secured by the collateral is adequately protected, cash collateral may not properly be used to pay administrative expenses); *In re 680 Fifth Avenue Assocs.*, 154 B.R. 38, 41 (Bankr. S.D.N.Y. 1993) (denying use of rents to pay administrative expenses where debtors failed to prove that the secured creditor's interest would be adequately protected).

to the Lenders should state that such order is without prejudice to the request of the Administrative Agent for any modification of, or further or different, adequate protection.

### IV. Conclusion

59. For all the foregoing reasons, the Motion should be denied.

Dated: October 16, 2024
Wilmington, Delaware

**BLANK ROME LLP**

*/s/ Regina Stango Kelbon*
Regina Stango Kelbon (DE No. 5444)
Stanley B. Tarr (DE No. 5535)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:     (302) 425-6400
Facsimile:     (302) 425-6464
Email:         regina.kelbon@blankrome.com
               stanley.tarr@blankrome.com

-and-

**BLANK ROME LLP**
John E. Lucian (*pro hac vice* forthcoming)
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-5500
Facsimile:     (215) 569-5555
Email:         john.lucian@blankrome.com

-and-

**OTTERBOURG P.C.**
Daniel F. Fiorillo (*pro hac vice* forthcoming)
Adam C. Silverstein (*pro hac vice* forthcoming)
Chad B. Simon (*pro hac vice* forthcoming)
Pauline McTernan (*pro hac vice* forthcoming)
230 Park Avenue
New York, New York 10169
Telephone:     (212) 661-9100
Facsimile:     (212) 682-6104
Email:         dfiorillo@otterbourg.com
               asilverstein@otterbourg.com
               csimon@otterbourg.com
               pmcternan@otterbourg.com

*Counsel to PNC Bank, National Association*