IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*<br><br>**TRUE VALUE COMPANY, L.L.C.,** *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-12337 (KBO)<br><br>(Joint Administration) |

**SUPPLEMENTAL OBJECTION OF PNC BANK, NATIONAL ASSOCIATION TO (A) DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTON TO PREPETITION LENDERS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) SCHEDULING A FINAL HEARING; AND (B) TO ALL OTHER FIRST DAY MOTIONS TO THE EXTENT THEY REQUIRE USE OF CASH COLLATERAL**

PNC Bank, National Association ("**PNC**") as administrative agent for the Lenders (defined below) (PNC, in such capacity, "**Administrative Agent**"), by and through its attorneys, Otterbourg P.C. and Blank Rome LLP, respectfully submits this Supplemental Objection (the "**Supplemental Objection**") to (a) the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Doc. No. 19] (the "**Motion**"); and (b) to all other First Day Motions to the extend they require the use of the Lenders' cash collateral, and states as follows:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2] On October 16, 2024, the Lenders filed their Preliminary Objection to the Motion [Doc. No. 68] which is incorporated herein in its entirety ("**Preliminary Objection**").

1

## **PRELIMINARY STATEMENT**

1.      As the Lenders set forth in the Preliminary Objection, they object to the Debtors' use of their cash collateral, because the relief requested in the Motion pushes the limits of the Bankruptcy Code beyond recognition. The Debtors seek to run a sale process to sell their business as a going concern (the "**DIB Sale**") to Do It Best Corporation ("**DIB**"), financed with the non-consensual use of the Lenders' cash collateral, where, from the start through the finish of the sale process, the Lenders are, and would remain, undersecured. By the Debtors' own admission, even under their rosiest scenario (where the Debtors hit all of their budget numbers and the DIB Sale closes without a hitch), the Lenders' projected losses still would be in the range of $100 million. Moreover, the only adequate protection that the Debtors purport to offer in the Motion for the use of the Lenders' cash collateral was the Debtors' unsubstantiated belief that the DIB Sale would maximize the value of the Lenders' collateral based on a comparison of a hypothetical closing of the DIB Sale with a hypothetical liquidation of the collateral. As the Court observed during argument on DIB's motion to quash a subpoena served on it, any such theory of "adequate protection" is without legal support.

2.      No matter how the Debtors attempt to reframe their argument, however, the indisputable fact remains that every single dollar used to operate the Debtors' business over the next eight weeks will be a dollar of the Lenders' cash collateral that has been diminished, and the Debtors cannot come forward with any credible evidence to demonstrate under accepted law that the Lenders will be adequately protected for such diminution. That is because the Debtors admit that no equity cushion now exists, or ever will be created, that would leave the Lenders adequately protected notwithstanding the burn of their cash to run the DIB Sale process. And, further, there

is insufficient new (post-petition) collateral being generated to equal the dollars of cash collateral that, under the Debtors' budget, will be needed to run the DIB Sale process.

3. Indeed, even under the Debtors' own projections, the Lenders' collateral values will be declining. During the projected eight-week period per the Motion, gross accounts receivable are projected to decline from $173 million to $161 million, and gross inventory is projected to go from $318 million to $299 million. More to the point, to run the sale process (assuming no hitches and the Debtors hit all of their budget numbers), the Debtors project incurring $87 million of restructuring and other "Chapter 11 Items," including payments for professionals of $22 million, $5.2 million of prepetition taxes, and $62.6 million for payment of certain vendors and Section 503(b)(9) claims in a truncated eight-week sale process. The budget also includes millions for the purchase of new inventory—inventory which, if not sold by closing, the Debtors will turn over to DIB, presumably for a fraction of the cost for which the Debtors purchased such inventory (*i.e.*, at an expected 30% or less of cost).

4. Every single one of the hundreds of millions of dollars (all cash collateral of the Lenders) projected to be spent on the DIB Sale process is not, and cannot be, adequately protected with replacement liens on collateral of equal or greater value. In fact, to suggest otherwise would mean that, after operating at a loss *before* bankruptcy, the Debtors suddenly have figured out, *after* bankruptcy, how to operate at a profit, such that every dollar they spend in expenses is more than compensated with the generation of new assets of equal or greater value to the expenses incurred. That is not the case, and, even if it were credible (it is not), under the Debtors' plan, it is *DIB* and the Debtors' *vendors* who would receive such value, *not* the Lenders. Hence, *any* adequate protection theory upon which the Debtors might rely fails as a matter of law.

5.      Beyond all of that, a DIB Sale process against the Lenders' wishes is a bridge to nowhere. The process being imposed upon the Lenders contemplates the payment of tens of millions in expenses from the Lenders' cash collateral in a manner both detrimental to the Lenders and inconsistent with the Bankruptcy Code's priority scheme. The Lenders cannot, under those terms, offer their consent. *See* 11 U.S.C. § 363(f). Thus, the DIB Sale process is doomed to fail. And it will not even get to a closing, because the Lenders do not consent to any carve-out for professional fees and expenses (which cannot be imposed on the Lenders over their objection). With professionals having no carve-out, their only ability to be compensated for running the sale process would be by surcharging the bank's collateral under Section 506(c). But no such surcharge could ever be imposed, because the Debtors cannot demonstrate that the incurrence of all of these administrative expenses was "necessary" to preserve the Lenders' collateral.

6.      For these, and the other reasons discussed below, the Motion should be denied. The Debtors' request to use the Lenders' collateral to run a sale process that solely would benefit professionals, unsecured creditors, and their officers and directors at the direct expense of the Lenders, should be rejected.

## ARGUMENT

### I. Because the Lenders Are Undersecured and Collateral Values Are Declining, There is No Basis for Using the Proceeds of the Lenders' Collateral

7.      Before a Bankruptcy Court may approve a debtor's request to use cash collateral under Section 363(c)(2) of the Bankruptcy Code, the Court must conclude that the creditor with an interest in the cash collateral is being adequately protected by the debtor. Whether there is adequate protection is determined on a case by cases basis. *see Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994). As this Court stated at the hearing, the debtor has the burden of affirmatively proving that the

creditor is adequately protected. 11 U.S.C. § 363(p). Indeed, "[t]he debtor's standard in cash collateral cases is a high one." *First Bank of Miller v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985).

8. The fundamental purpose of an offer of adequate protection is to ensure "that the creditor receives the value for which he bargained pre-bankruptcy." *Swedeland*, 16 F.3d at 564 (citation omitted); *see also Sharon Steel Corp. v. Citibank, N.A.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 338-40 (1977) ("Secured creditors should not be deprived of the benefit of their bargain."). Ensuring the secured party's receipt of such pre-petition value, in turn, requires that any offer of adequate protection must protect "against any decrease in the value of its collateral which may result from depreciation, destruction, or the debtor's use of the collateral" during the course of the bankruptcy. *In re Adirondack Timber Enter., Inc.*, No. 08-12553, 2010 WL 1741378, at *5 (Bankr. N.D.N.Y. Apr. 28, 2010) (quoting *Volvo Commercial Fin. LLC the Ams. v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*, 326 B.R. 683, 691–92 (B.A.P. 6th Cir. 2005)); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the focus of adequate protection is the protection of a secured creditor from "diminution in the value of its collateral during the reorganization process").

9. Here, the Debtors' primary proposal for adequately protecting the Lenders' interest in their cash collateral is by using that very cash collateral to maintain the Debtors as a going concern in service of a sale to DIB.[3] But the outcome of that potential sale is, at best, months away, and, at worst (as discussed below), something that may never occur. It is not sufficient

---

[3] Debtors previously argued that the Lenders were adequately protected because the value of this potential sale would exceed the hypothetical liquidation value. They now assert that the value of the sale is the correct baseline from which to measure diminution, and because it is likely that the sale will close at that price, there will be no diminution. But both arguments fail for the same basic reason—there is nothing offered to protect the Lenders in the interim while their cash collateral is being spent, and the sale has not occurred.

5

adequate protection that some value *might* eventually be returned to the Lenders, if there is nothing covering the Lenders' losses in the interim. *See, e,g.*, *In re Pacific Lifestyle Homes, Inc.*, No. 08-45328, 2009 WL 688908, at *12 (Bankr. W.D. Wash. March 16, 2009) ("Through its proposed adequate protection, the Debtor has offered little, if anything, of additional value to the Lenders in exchange for the use of their Cash Collateral.").

10. Instead, the Debtors rely on their hopes and projections of future profitability, and do not compensate the Lenders for the present value of the use of their Cash Collateral. *Id.* at *12 ("hopes and projections of future profitability . . . . do[] not compensate the Lenders for the *present value use of their Cash Collateral*" (emphasis added)). Within the Third Circuit, "adequate protection requires more than an opportunity to recoup a creditor's loss of collateral through the potential success of a speculative business venture." *LightStyles, Ltd. v. Susquehanna Bank (In re LightStyles, Ltd.)*, No. 1:12-BK-03711 MDF, 2012 WL 3115902, at *4 (Bankr. M.D. Pa. July 27, 2012); *see also Sharon Steel*, 159 B.R. at 172-73 (rejection of the use of cash collateral where debtor's proposed business plan "stretches everything to the limit and beyond," and would result in "significant losses"). That is especially so here, where, unlike the typical case in which a debtor seeks to use a secured party's cash collateral without consent, the debtor does not even offer the hope of a sale or refinancing where the secured party recovers in full.

11. Nor, for that matter, is there any protection in the mere fact that the Debtors will maintain their business as a going concern through the proposed date of the sale. Allowing the Debtors' business to operate pending a sale, in and of itself, is not a form of adequate protection at all, and merely asserting that funding is necessary to maintain operations of the Debtors' business cannot form the basis of an adequate protection finding. *See Desert Fire Protection v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434

B.R. 716, 751-54 (S.D. Fla. 2010) (holding that the fact that post-petition financing was necessary to prevent liquidation does not provide adequate protection, and that any preservation or enhancement of "the value of collateral must be viewed side-by-side with the decrease in value of a creditor's interest"); 3 COLLIER ON BANKRUPTCY ¶ 361.03[5][b] (16th ed. 2024) ("[I]n those situations in which the collateral is to be consumed in the business or is otherwise expected to decline in value over time, preservation of the *status quo* by passive means is impossible.").

12. What is necessary is not the fact of continued operation alone, but that any continued operation generates additional collateral permitting the creditor to recoup their losses in real time. *See, e.g.*, *LightStyles*, 2012 WL 3115902, at *3 (noting that payments to a lender coming from pre-petition accounts receivable, rather than newly generated collateral, would not constitute adequate protection); *Mt. Olive Hospitality, LLC*, Civil No. 13–3395 (RBK), 2014 WL 1309953, at *4 (D.N.J. March 31, 2014) ("[B]ankruptcy courts have looked favorably upon the use of cash collateral where its use served to enhance the secured creditor's position *through the generation of additional value*." (emphasis added)). In other words, essentially every dollar of the Lenders' cash collateral spent on the sale process needs to be protected—either through a dollar of equity or a dollar of replacement lien on new collateral. *See Swedeland*, 16 F.3d at 564 ("[T]he proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been . . . [erosion of the interest]."); *Fontainebleau*, 434 B.R. at 749, 752 (noting that adequate protection should be "completely compensatory," and concluding that adequate protection for an unsecured lender in the face of a $51 million priming lien required ensuring that the dollar-for-dollar resulting decrease in the lender's interests was protected).

13. Here, while the Debtors offer replacement liens, the property to which these liens would attach *are already encumbered* under existing agreements. As noted in the Lenders' prior

7

objection, merely providing replacement liens in the Collateral to which the Lenders are already entitled to does not adequately protect the value of the Lenders' liens here where asset values are declining.  *See, e.g., In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761 (Bankr. D. Del. Feb. 18, 2011) at *3 ("Providing Wells Fargo with a replacement lien on assets against which it already has a lien is illusory.  Debtor must provide Wells Fargo with additional collateral, and there is none.").

14. Further, based on the Debtors' own projections, the Lenders' collateral values will be diminished and *not* be adequately replaced.  There are no projections of future profitably, but rather locked in losses to the Lenders of over $100 million.  It is therefore without doubt that the requested use of cash collateral, if granted by this Court, will irrevocably harm the Lenders' interest in the collateral, and will permanently reduce the secured portion of the Lenders' claim against the Debtor—an untenable result.  *See Swedeland*, 16 F.3d at 567 ("Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects.").  And any projections showing that, now, *after* the bankruptcy, the Debtors suddenly will operate so profitably as to generate enough assets both to replace sold off inventory *and* the cash burn on overhead and administrative expenses simply is not credible.

### II. The Debtors' Insistence on Pursuing the DIB Sale Process Without the Lenders Consent is a Bridge to Nowhere

15. The success of the sale is not only speculative, failing to afford the Lenders concrete, contemporaneous protection of their collateral, but is also not positioned to occur in the future.  The only available avenue for the Debtors to effectuate a sale in this case is the Lenders' consent.  But the Lenders do not, and cannot, consent to a sale to DIB that has been foisted upon

them, with unfavorable terms and contrary to the Bankruptcy Code's priority scheme. Under those circumstances, cash collateral cannot be used to fund an ultimately a futile process.

16. Section 363(f) permits a sale free and clear only if one of five criteria are met:

   (1) "applicable nonbankruptcy law permits sale of such property free and clear of such interest;

   (2) such entity consents;

   (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

   (4) such interest is in bona fide dispute; or

   (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. § 363(f); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288 (3d Cir. 2003).

17. Here, there is no potential available ground to approve a sale except consent under Section 363(f)(2). There is no dispute over the validity of the Lenders' interest or the fact that the Lenders are undersecured. This eliminates two of five potential bases for a sale. *See, e.g. See In re Revel AC, Inc.,* 802 F.3d 558, 573 (3d Cir. 2015) (discussing circumstances giving rise to a bona fide dispute)*; In re WDH Howell, LLC*, 298 B.R. 527, 533-34 (D.N.J. 2003) (reversing bankruptcy court order allowing debtors in possession to sell environmentally contaminated property for less than aggregate amount due on account of mortgage claim as Section 363(f)(3) requires that the sale price must exceed the face amount of claims secured by liens on the property).

18. Nor have the Debtors raised any basis to conclude—and, indeed, none exists—that non-bankruptcy law would either permit a sale free and clear of Lenders' interests or could compel Lenders to accept money in satisfaction of their interest. *See In re PW, LLC*, 391 B.R. 25, 41 (B.A.P. 9th Cir. 2008) (explaining that, under Section 363(f)(5), the Debtors must meet three elements: (1) a proceeding exits, or could be brought, in which (2) the creditor could be compelled

to accept money satisfaction of (3) its interest). This leaves the Lenders' consent under Section 363(f)(2), and, as stated, the Lenders do not support or consent to a sale to DIB.

19. In this regard, it cannot be the case that the Lenders are adequately protected by the proposed stalking horse bid from, and potential sale to, DIB. The success of the sale is not only speculative, failing to afford the Lenders concrete, contemporaneous protection of their collateral, but is also *not positioned to occur in the future*. Any use of cash collateral to get to this sale, then, will be collateral wasted without any return to the Lenders. *LightStyles*, 2012 WL 3115902, at *3 ("In addition to reviewing the debtor's adequate protection proposal, the court should consider whether there is any reasonable chance of reorganization. If a debtor is engaged in an obviously futile attempt to reorganize, it should not be permitted to jeopardize a creditor's cash collateral."). *LightStyles*, 2012 WL 3115902, at *3 .

### III. The Lenders Do Not Consent to Any Carve-Out for Professional Fees and Expenses, and Any 506(c) Surcharge Would Be Limited to Expenses Necessary to Preserve the Lenders' Collateral

20. The Lenders further do not consent to any carve-out for professional fees and expenses, and do not consent to the use of its cash collateral to pay the Debtors' professionals. Accordingly, no carve-out for professional fees can be imposed on the Lenders. *See e.g. In re: Exide Holdings, Inc.*, Case No. 20-11157 (LSS) (Transcript of May 21, 2020 Hearing, Dkt. No. 287 at 123-25) ("But in connection with the nonconsenting ABL lenders, I don't think you can impose the carveout on them absent their consent in this situation. So, I do think you need to take the ABL lenders in effect out of the carveout or make them senior to the carveout at the very least"); *In re California Webbing Industries, Inc*. 370 B.R. 480, 486 (Bankr. D.R.I. 2007) (denying carve-out for professional fees holding "[a] carve out may not exist unless ordered, or approved by the Court with the consent of the affected secured creditor"); *In re White Glove, Inc*., No. 98–12493DWS, 98–12494DWS, 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998) ("It is it is

essential to note that the carve out is a product of agreement between the secured party and the beneficiary of the carve out."); *In re 680 Fifth Avenue Assocs.*, 154 B.R. 38, 41 (Bankr. S.D.N.Y. 1993) (denying use of rents to pay professional fees of debtors' counsel and official unsecured creditors committee's counsel where debtors failed to prove that the secured creditor's interest would be adequately protected); *In re Trim-X Inc.*, 695 F.2d 296, 301 (7th Cir. 1982) (noting that consent is the exception to the general rule that the estate, and not the secured creditor, bears the cost of the estate's administrative expenses).

21. Moreover, Section 506(c) of the Bankruptcy Code is not available to fund the current budget, including its proposed professional fees. As this Court has previously recognized, Section 506(c) does not authorize shifting the burden of "ordinary administrative expenses"—that is, those associated with "general operation and dissolution of an estate"—to a debtor's secured creditor. *In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 408 (Bankr. D. Del. 2022) (quoting *United Jersey Bank v. Miller (In re C.S. Assocs.)*, 29 F.3d 903, 906 (3d Cir. 1994)). Rather, Section 506(c)'s application has been "sharply limited" to circumstances where an expenditure is shown to (i) be both reasonable and necessary and (ii) provide a direct benefit to the impacted secured creditor. *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus. Inc.)*, 57 F.3d 321, 325-26 (3d Cir. 1995). It is the movant's burden, here the Debtor, to establish both elements. Neither has been, or can be, shown here.

22. As an initial matter, it cannot be that the whole of the Debtor's proposed budget is "reasonable and necessary" to preserve the Lenders' collateral. *See Margolis Law Firm L.L.C. v. BMW Fin. Servs. LLC (In re Towne, Inc.)*, Civ. No. 11–5435 (KSH), 2012 WL 2401981, at *7 (D.N.J. June 25, 2012). Among other inflated values—including millions in purchases for new inventory—the disbursements in the Debtors' proposed budget include almost $100 million in

chapter 11 costs, including $22 million in professional fees alone. At this point, the Debtor cannot demonstrate that all of these administrative expenses, encompassing the totality of administering the estate over the next eight weeks, will be "necessary" to preserve the Lenders' collateral. Rather, these are precisely the ordinary administrative expenses associated with running this case to which Section 506(c) does not apply.

23. But even if expenses such as these could somehow be deemed reasonable and necessary to preserve the Lenders' collateral—they are not—they still do not provide the type of *direct* benefit required for Section 506(c) surcharge. *C.S. Assocs.*, 29 F.3d at 906 ("[T]o warrant [§] 506(c) recovery . . . [the claimant] must show that . . . funds were expended primarily for the benefit of the creditor and that the creditor directly benefitted from the expenditure.")(quoting *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985)). To the extent that the expenses contained in the budget are those of the Debtor's ordinary operation, any benefit conferred to PNC from those expenses would be incidental at best. An incidental benefit, however, cannot support a Section 506(c) surcharge. *C.S. Assocs.*, 29 F.3d at 906. To the contrary, the expense must be "specifically incurred for the express purpose" of preserving a secured creditor's collateral. *Bayou Steel*, 642 B.R. at 408. Consistent with this principle, the Third Circuit has expressly rejected Section 506(c) recovery for general preservation of a debtor's "going concern" value, *Visual Indus.*, 57 F.3d at 326, as well as for expenses, like taxes, that a debtor would have been otherwise required to satisfy, *C.S. Assocs.*, 29 F.3d at 907 ("Simply because UJB benefitted from the sale of the property does not automatically mean that payment of real estate taxes and water/sewer rents which accrued pending the sale of the property provided any direct benefit to the property in question."). Ultimately, the Debtor cannot show that its specific proposed expenditures will

provide a direct, quantifiable benefit to PNC's collateral. *See id.* at 906 (quoting *In re Glasply Marine Indus.*, 971 F.2d 391, 394 (9th Cir. 1992)).

24. Without a professional fee carve-out and/or any plausible Section 506(c) argument, the DIB Sale process is doomed to fail and cannot constitute "adequate protection" to the Lenders—period.

## Conclusion

25. For all the foregoing reasons and the reasons stated in the Lenders' Preliminary Objection, the Motion should be denied.

Dated: October 29, 2024
      Wilmington, Delaware

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Regina Stango Kelbon*
Regina Stango Kelbon (DE No. 5444)
Stanley B. Tarr (DE No. 5535)
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel:    (302) 425-6424
Fax:    (302) 428-5133
Email:  regina.kelbon@blankrome.com
           stanley.tarr@blankrome.com

**BLANK ROME LLP**
John E. Lucian (*pro hac vice*)
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 569-5500
Facsimile:   (215) 569-5555
Email:  john.lucian@blankrome.com

**OTTERBOURG P.C.**
Daniel F. Fiorillo (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Pauline McTernan (*pro hac* vice)
230 Park Avenue
New York, NY 10169
Tel:    (212) 661-9100
Fax:    (212) 682-6104

Email: dfiorillo@otterbourg.com
asilverstein@otterbourg.com
pmcternan@otterbourg.com

*Counsel for PNC Bank, National Association, Administrative Agent*