## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.** *et al.*, | **Case No. 24-12337 (KBO)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| | **Re: Dkt. Nos. 19, 68 & 106** |

### DEBTORS' REPLY (I) IN SUPPORT OF DEBTORS' CASH COLLATERAL MOTION AND (II) IN RESPONSE TO RELATED OBJECTION OF PNC BANK, NATIONAL ASSOCIATION

True Value Company, L.L.C. and certain of its affiliates (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") hereby files this reply (this "Reply") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I)(A) Authorizing Debtors to Use Cash Collateral; (B) Granting Adequate Protection to Prepetition Lenders; (C) Modifying the Automatic Stay; and (D) Scheduling a Final Hearing and (II) Granting Related Relief* [Dkt. No. 19] (the "Motion")[2] and in response to the *Preliminary Objection of PNC Bank, National Association to (A) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Lenders; (III) Modifying the Automatic Stay; and (IV) Scheduling a Final Hearing; and (B) To All Other First Day Motions to the Extent they Require Use of Cash Collateral* [Dkt. No. 68] (the "PNC Objection") and certain statements made

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

on the record at the October 16, 2024 hearing.  In further support of the Motion and in response to the PNC Objection, the Debtors state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors should be authorized to use Cash Collateral because the Prepetition Lenders will not suffer any diminution in the value of their collateral pending the sale of the Debtors' assets to Do it Best.  That is the test, and the evidence at trial will show that the Debtors have satisfied it.

2.      The Debtors have analyzed diminution in value in two different ways.  First, comparing liquidation values on an NOLV (as defined herein) basis as of the Petition Date and as of the expected closing date of the Do it Best sale (the "Closing Date"), while adjusting for the interim incremental net costs (if any) on account of running a sale process in these Chapter 11 Cases.  Second, the Debtors compared the value of the Prepetition Lenders' collateral between the same dates on a going concern basis.  The Debtors intend to call Kunal Kamlani, their Chief Transformation Officer, and Jay Weinberger, their investment banker, to testify and demonstrate that the Prepetition Lenders' collateral will not decline in value from the Petition Date through the expected Closing Date notwithstanding the use of Cash Collateral to run these cases in the intervening period.

3.      During the status conference held on October 23, 2024, the Court observed that whether a going concern sale exceeds liquidation value is not necessarily relevant for the purposes of demonstrating adequate protection under Section 361 of the Bankruptcy Code.  The Debtors are mindful of the Court's view.  Instead, the Debtors will present evidence that the Prepetition Lenders will suffer no diminution in value and, therefore, use of Cash Collateral should be permitted, even on a non-consensual basis.

4.      Nevertheless, the Debtors' arguments are also informed by, and responsive to, the Prepetition Lenders' position.  PNC, as Administrative Agent, has confirmed that ███████████ ████████████████████████████████████████████████████████████████████████████ ████████████████. Instead, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████. Thus, the Motion and its supporting documents sought to refute the Prepetition Lenders' assertions about ████████████████████████████████████████ ████████████. That is the crux of the dispute between the parties, regardless of which measure of adequate protection this Court determines is most appropriate to apply.

5.      The Prepetition Lenders' position is intractably tethered to their pursuit of a liquidation – an outcome they have been driving at since early September.  Expedited document and deposition discovery has revealed, and the evidence at the October 29th hearing will show, that ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████. This liquidation analysis was delivered by Hilco Consumer-Retail ("Hilco") on September 27, 2024 (the "Hilco Report").  But the Hilco Report is tainted. ██████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

6.      Tellingly, the Prepetition Lenders have not articulated any reason to object to the use of Cash Collateral other than the tainted Hilco Report purportedly ████████████████

██████████████████████████████████████████

████████████████. The Debtors have asked PNC for its valuation analysis of the Prepetition Lenders' collateral, but apparently it has none.  The Debtors have asked PNC for its projection of the collateral's diminution in value based on the Debtors' proposed eight-week budget.  PNC declined to provide a number.  The Debtors asked PNC to articulate how much Do it Best had to increase its bid to provide recoveries exceeding PNC's unrealistic liquidation value.  PNC's deponent had no definitive answer.

7.      Nonetheless, the Debtors have continued to try to obtain the Prepetition Lenders' consent to a settlement that would provide them with additional value, and will do so until the hearing on the Motion on October 29.  To be clear, though, the Bankruptcy Code, by protecting the value of the Prepetition Lenders' collateral from diminution, no more as well as no less, does not give them a veto over the proposed use of that collateral untethered from its value, including the costs necessary to preserve and enhance it.  Diminution of collateral value, against which adequate protection is required, is not measured by the sum spent to preserve and enhance the collateral, which is inherent in the calculation of its value, or the "use cost" to the creditor, but, rather, by the difference, if any, between the collateral's value on the determination date (including the costs of realizing on such value) and the collateral's realistically projected value on the date through which the Debtors propose to use it.  The Court should not allow the Prepetition Lenders to force the Debtors to default into a value-destructive liquidation, particularly given the troubling

details that have emerged in just the last 72 hours of expedited discovery.  Instead, if consent is not obtained, the Debtors intend to provide the Court with clear and unrebutted evidence that there will be no diminution of the Prepetition Lenders' collateral value in either a going concern sale or a Chapter 11 liquidation scenario based on the Debtors' projected use.

8.      The Debtors therefore respectfully request that the Court allow the Debtors to use Cash Collateral in accordance with the Budget and find that the Prepetition Lenders are adequately protected while the Debtors close a value-maximizing transaction—a transaction that will save many jobs, provide substantial value to unsecured creditors (through, for example, the payment of cure costs and the assumption by Do it Best of certain liabilities), and result in superior recoveries to the Prepetition Lenders as compared to any available alternative.

## SUPPLEMENTAL FACTS

9.      The Prepetition Lenders' view on liquidation value is based entirely on the Hilco Report.  The Hilco Report assumes and requires a liquidation to be implemented in a Chapter 11 process, but does not include the bankruptcy-related costs inherent in Hilco's assumption that such liquidation occur in Chapter 11.[3]  At the Prepetition Lenders' request, the Debtors delivered an analysis of such costs, based on their actual postpetition circumstances, without otherwise altering Hilco's assumptions (although, as elsewhere noted, the Debtors take issue with many of those assumptions). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[3]     Neither the Prepetition Lenders nor the Debtors propose either an out-of-court or a Chapter 7 liquidation as a tenable basis for valuation of the collateral, as neither is a remotely realistic measure of the collateral's value.

██████████████████████████ However, the Prepetition Lenders disregard the Debtors' analysis while failing to provide any alternative.

10.     As the Motion explains, the Debtors seek authorization to use Cash Collateral to fund a value-maximizing going-concern sale to a buyer that is ready, willing, able and contractually obligated to close.  Unlike in recent cash collateral disputes before this Court and others, the Debtors are not seeking to use Cash Collateral to fund a freefall Chapter 11 case with no concrete monetization event for the secured lenders.  The Do it Best asset purchase agreement is financed and has very few conditions, chiefly a material adverse change condition and a standard ordinary course operating condition.  In other words, the Debtors are not gambling with the Prepetition Lenders' collateral.  Instead, the Debtors have a creditworthy buyer that has posted a $15.3 million good faith security deposit and is eager to close on an expedited basis, a reasonable budget, and a plan in place not only to maximize the recovery of the Prepetition Lenders but also of many of the Debtors' other stakeholders.  But the Debtors cannot execute this transaction without the use of Cash Collateral to sustain their business operations and fund critical and necessary payments as part of these Chapter 11 Cases.  This is the most realistic, highest and best use of the collateral.  Congress understood this very concern with respect to the disposition of collateral without the full cooperation of a secured lender and therefore legislated the Debtors' ability to surcharge collateral to the extent of any benefit to the holder of such claim.  *See* 11. U.S.C. § 506(c).  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[4]     The ultimate economic benefit to the Prepetition Lenders through the Do it Best sale remains under negotiation as of the time of this filing.

███████████████████████████████████. But most importantly, for purposes of the Motion, it does not diminish, and indeed ensures, the value of the Prepetition Lenders' collateral.

11.     In the weeks leading to the Petition Date and thereafter, the Debtors have worked with the Prepetition Lenders, Do it Best, the newly-appointed Committee, the U.S. Trustee and other parties in interest to consensually resolve the use of Cash Collateral.  While the extensive negotiations and expedited discovery conducted this week have not yet culminated in the outcome the Debtors hoped, they have confirmed the Debtors' position that every interested party in these Chapter 11 Cases, including the Prepetition Lenders, will benefit from the Debtors' continued operations through use of Cash Collateral, operations which, notably, are producing significantly higher than budgeted cash receipts despite the bankruptcy filing.  They also have confirmed that this realistic proposal is superior to the Prepetition Lenders' stated preferred alternative.

12.     The Prepetition Lenders' position that the Debtors liquidate pre-dates the Motion, and their reliance on the Hilco Report to support that position requires context.  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.[5]  Recent discovery has shown,

---

[5]     The Debtors' belief that the Prepetition Lenders supported the sale process was especially reasonable given that there was excess availability under their borrowing base formula, which enabled the Debtors to continue drawing loans to support their working capital needs.  In addition, even on a post-petition basis, the borrowing base is projected to remain constant or increase during the period for the Debtors' requested use of Cash Collateral.  Thus, even though the Prepetition Lenders are objecting to use of their cash collateral, they would be otherwise contractually obligated to extend credit to the Debtors based on the terms they negotiated.

however, ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ [6]

13.     The Prepetition Lenders expressed a strong preference for Hilco, and the Debtors complied in an effort to work collaboratively with the lenders.  At the Prepetition Lenders' request, the Debtors arranged weekly update calls between the Prepetition Lenders and Hilco, so that they could hear about Hilco's progress on the report.  ███████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

14.     Specifically, Hilco's preliminary conclusions indicated that the liquidation recovery rates would be ██████  ██████ on inventory than Hilco had delivered in a report issued in May 2024, and ████████████████████████████████████████████████

██████████████████████████████████████████████████. On the September 19th call, a number of the lenders expressed their outrage with Hilco's opinions.  Then, that night,

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████  Ultimately, ████████████████████████████████████████████████

████████████████████████████████████████████████████████.

---

[6]     Specifically, pursuant to section 6.8 of the August 28, 2024 waiver, "████████████████████████

████████████████████████████"

15.  After lobbying Hilco for a materially higher liquidation value, the Prepetition Lenders now insist that this largely self-engineered estimate is somehow the watermark for their recovery. The unwitting and innocent victims of this approach, were it to be adopted and Cash Collateral access denied, are approximately 1,950 employees (who will lose their jobs), trade creditors (with $45 million in invoices that will not be paid and millions more of cure costs that will go unsatisfied), and thousands of customers who will lose access to their primary supplier.

## ARGUMENT

16.     Secured lenders have no inherent right to dictate the outcome of a Chapter 11 case. Instead, they are entitled only to the protection of the value of their collateral on a fair basis in the light of the operative facts, including deduction of the costs associated therewith. "The most important message of the Code with respect to the treatment of an entity with an interest in property of the estate or in the possession of the estate is that its remedies may be suspended, even abrogated, and its right of recourse to collateral may be terminated as it is consumed in the business, as long as the *value* of its secured position is adequately protected, when required by

section 362, 363, or 364."   3 COLLIER ON BANKR. ¶ 361.02[3] (emphasis in original).   The appropriate analysis entails comparing the value of the collateral at the bankruptcy petition date with the value of the collateral on the date through which the debtor proposes to use it, not by simply pointing out that some portion of the collateral is used between those times.   As provided herein, such an analysis demonstrates that there will be no diminution in the value of the Prepetition Lenders' collateral, including Cash Collateral through the Debtors' pursuit of the Do it Best bid.   The Court therefore should find that the Debtors have carried their burden of proof with respect to adequate protection.

I.   **The Debtors Have Satisfied Their Burden to Provide Adequate Protection to the Prepetition Lenders.**

17.   Unlike in other recent cases before this Court, the Debtors are not seeking to use Cash Collateral for a freefall Chapter 11 case, such that there is no concrete answer on how the lenders' collateral will be treated at exit, or even for a standalone reorganization, with all of its uncertainties.   The Debtors have entered Chapter 11 with an eager, willing and able stalking horse bidder that is prepared to close and is backstopping the Debtors' sale process.   That proposed use is the best measure of the collateral's value.   Moreover, the requirements of Section 361 of the Bankruptcy Code are satisfied by the adequate protection the Debtors propose to provide the Prepetition Lenders.   Thus the Debtors do not propose a use like the proposed priming DIP loan under the "inherently risky characteristics" of the proposed Chapter 11 process in *Resolution Trust Corp. v. Swedeland Development Group (In re Swedeland Development Group)*, 16 F.3d 552, 565 (3d Cir. 1994), where the Court found that the debtor had not shown that the proposed use would maintain the collateral's value (which would require an increase in value given the lender's release-price rights).   *Id.* at 566.

18.     Moreover, the Prepetition Lenders have objected primarily to the professional fees needed to be incurred to bridge through the Do it Best sale.  While the Debtors believe there is no diminution from the incurrence of such fees based on the proposed budget, Sections 361 and 363(b) of Bankruptcy Code must be read holistically with Section 506(c).  Congress understood the concern that a secured lender may object to such expenses in connection with the disposition of collateral without the full cooperation of a secured lender and therefore legislated the Debtors' ability to surcharge collateral to the extent of any benefit to the holder of such claim.  *See* 11 U.S.C. § 506(c).  Instead, the Debtors will show that their proposed use realistically maintains the collateral's value and indeed enhances it over the Prepetition Lenders' proposed alternative.  *See VWI Props., LLC v. Mt. Olive Hospitality, LLC* (*In re Mt. Olive Hospitality, LLC*), 2014 U.S. Dist. LEXIS 42886, at *16–18 (D. N.J. March 31, 2014), and the cases cited below.

A.     **Applicable Standards for Nonconsensual Use of Cash Collateral.**

19.     A debtor may not use, sell, or lease cash collateral even in the ordinary course of business without first obtaining either (1) the consent of any other parties with an interest in the cash collateral or (2) bankruptcy court approval.  11 U.S.C. § 363(c)(2).  A bankruptcy court can allow a debtor to use its cash collateral over a lienholder's objection only upon a showing that the party with a lien on the cash is adequately protected notwithstanding its use.

20.     The Bankruptcy Code does not expressly define "adequate protection" or proscribe a particular form that it must take; what constitutes adequate protection must be decided on a case-by-case basis.  The purpose of adequate protection, however, is to "protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay."  *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012).  Section 361 of the Bankruptcy Code provides the following three examples of adequate protection if there is projected diminution in value of the collateral: (1) periodic cash

payments to the secured creditor, (2) a replacement lien or substitute lien in property of the debtor's estate, and (3) other relief that will constitute the indubitable equivalent of the secured party's interest, 11 U.S.C. § 361.  The last possibility is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party.  *In re Swedeland Development Group*, 16 F.3d at 664.

21.     Adequate protection is meant to compensate a secured creditor for diminution in the value of its collateral during the bankruptcy case.  *See, e.g.*, *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital)*, 501 B.R. 549, 589 (Bankr. S.D.N.Y. 2013).  To satisfy its burden for use of cash collateral, a debtor must demonstrate that the lender's valuation position will not deteriorate based on the intended use; the debtor must show that either adequate protection is unnecessary to prevent this deterioration or the proposed adequate protection will preserve the lender's collateral value.  If the debtor can demonstrate that the collateral's value is adequately protected, the court may authorize the use of cash collateral over the creditor's objection.  *See* 3 COLLIER ON BANKR. ¶ 361.02[3] (a secured lender's "right of recourse to collateral may be terminated as it is consumed in the business, as long as the *value* of its secured position is adequately protected" (emphasis in original)).

22.     Courts have used different methods to value collateral to determine whether it may diminish in value.  *See In re M.D. Moody & Sons, Inc.*, 2010 Bankr. LEXIS 220, at *25–26 (Bankr. M.D. Fla. Mar. 5, 2010) (collecting cases supporting fair market value and forced liquidation valuation methods).  Section 506(a) of the Bankruptcy Code mandates that the value of collateral "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property."  *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 961–62 (1997) (noting the proposed disposition or use of the collateral was the debtors' continued retention and use of

the vehicle to generate an income stream, and thus the vehicle's replacement value was appropriate rather than the value in a foreclosure sale).  Although *Rash* was decided in the context of a Chapter 13 plan, the Supreme Court's emphasis on the actual disposition of the property, rather than a hypothetical outcome is applicable for purposes of valuation of collateral under other chapters of the Bankruptcy Code.  In *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012), the U.S. Court of Appeals for the Third Circuit reasoned that if the "proposed disposition or use" language in § 506(a) is to be afforded any significance, "the appropriate standard for valuing collateral must depend upon what is to be done with the property—whether it is to be liquidated, surrendered, or retained by the debtor."  *Id.*

23.    The choice of value should be tied to a realistic proposed use of the collateral, however.  Thus, if the likely choices in a particular context are a going concern sale and an orderly liquidation, as opposed to retail value or a forced liquidation, the key inquiry involves consideration of those choices.  *See ESL Invs., L.P. v. Sears Holdings Corp. Debtor-Appellee (In re Sears Holdings Corp.)*, 51 F.4th 53, 61 (2d Cir. 2022) (holding that secured creditors had not experienced any diminution in value where the debtors pursued a going concern sale, as such valuation was compared favorably to what would have been obtained in a net orderly liquidation, the realistic alternative on the petition date).  Here, the appropriate test for determining adequate protection similarly requires a valuation based on the realistic valuation scenarios at two critical junctures—the Petition Date and the expected Closing Date of the Debtors' proposed going-concern sale—to determine whether that process will reasonably result in a diminution of the collateral's value from its fair value on the Petition Date.  If appropriate, that going concern valuation can then be stress tested against the other possible alternative raised by the Prepetition

Lenders: a net orderly liquidation under Chapter 11. As described herein, the Debtors have satisfied both tests.

24. The evidence will show that the Debtors' use of cash collateral to close the Do it Best sale, or a higher and better transaction, is critical to preserve, and avoid diminution of, the value to the Prepetition Secured Parties' collateral as it existed on the Petition Date. *See In re Tusa-Expo Hldgs., Inc.*, 811 F.3d 786, 792–94, 798–99 (5th Cir. 2016). The Debtors have historically used cash on hand and cash flow from operations for working capital. Absent entry of the interim and final orders authorizing the Debtors' use of Cash Collateral and granting related relief, the Debtors will be unable to generate revenue, operate their businesses, or pay the thousands of individuals who report to work each day. Without access to sufficient cash, the Debtors will have to suspend operations, which will materially damage the Debtors' business reputation and relationships with their customers who are the primary source of income for the business and are already under strain. Further, there can be no guarantee that even if the Debtors' suspension of operations were temporary that such operations could be resumed once the Debtors' access to cash was restored. More importantly for purposes of the Motion, though, if authorized to use the Prepetition Lenders' collateral, the facts show that (a) the alternative—the Do it Best sale—is likely to occur and (b) even in the highly unlikely event it were not to occur, the Prepetition Lenders' collateral value would not be impaired by a pivot to a liquidation.

25. The PNC Objection mischaracterizes the Debtors' proposed adequate protection as a simple unproven assertion that "the Lenders would lose less" in a proposed going concern sale than Prepetition Lenders would lose in a hypothetical liquidation. PNC Objection ¶ 3. First, this implies, without showing and contrary to logic, that merely because the Prepetition Lenders were undersecured on the Petition Date, the collateral's value was somehow greater on that date than

14

either its going concern value as established by the Do it Best transaction or its net orderly liquidation value. Second, the PNC Objection relies on PNC's belief that a going concern sale to Do it Best will yield less value than an orderly liquidation of the collateral and that the Stalking Horse Bidder's deposit (if converted to a priming DIP) could only serve to erode the Prepetition Lenders' collateral position. PNC Objection ¶¶ 6, 51. PNC further argues that maintaining the Debtors' business to enable the closing of the Stalking Horse Bid cannot form the basis of an adequate protection finding. PNC Objection ¶¶ 48, 53. Finally, PNC wrongly alleges, citing no legal authority, that the Debtors' proposed course of action would turn the absolute priority rule on its head, PNC Objection ¶ 2, when, in fact, requiring adequate protection for the unsecured portion of their claim would provide the Prepetition Lenders with a windfall. 3 COLLIER ON BANKR. ¶ 363.03[4] ("Although the secured party is entitled to protection of its interest in the cash collateral, it is not entitled to improve its position with respect to any unsecured claim it holds.").

26.     The PNC Objection focuses solely on the lack of equity cushion and the limited nature of the proposed adequate protection liens and fails to take into consideration the additional proposed adequate protection of (a) the provision of certain financial and other reporting, (b) compliance with certain milestones applicable to the Debtors' Chapter 11 Cases (unless extended or waived by the Prepetition Lenders) and (c) adequate protection payments (including payment of professional fees), all as set forth in the First Interim Order.

27.     More importantly, the PNC Objection ignores applicable law, which requires proof only that the value of the collateral is not subject to a reasonable risk of diminution postpetition. If the PNC Objection were correct, Congress would have given undersecured creditors a veto over the proposed use of their collateral, but Congress instead ensured only adequate protection of the realistic value of the collateral during the applicable period. The Debtors' proposed use of Cash

Collateral aligns with the principles set forth by the Supreme Court in *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997)—as well as other case law applying *Rash*—that the value of the creditors' interest in the estate's interest in property should reflect the "proposed disposition or use" of the Collateral in determining its value."

28.     "[T]he valuation methodology varies on a case-by-case basis, and . . . courts should take into consideration the facts and competing interest of each case." *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 199 (Bankr. S.D.N.Y. 2016).  This depends on "what is to be done with the property—whether it is to be liquidated, surrendered, or retained by the debtor." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012).  Case law of similar facts supports a net orderly liquidation value and has rejected book value.  *See, e.g.*, *In re Sears Holdings Corp.*, 51 F.4th 53, 64 (2d Cir. 2022) (rejecting secured creditor's request to use book value as a method of calculating the value of collateral as of the petition date, instead holding that net orderly liquidation value was a reasonable valuation where the collateral was realistically going to be sold in a going-concern sale or a forced liquidation as of the petition date); *In re Residential Cap.*, 501 B.R. at 595 (finding that the proper value "entered into a cash collateral stipulation to allow the sale of assets as a going concern" and "[a] going concern valuation is consistent with the [d]ebtors' stated purpose in [the] case as of the [p]etition [d]ate," the proper method for valuing the collateral on the petition date for diminution purposes was the "fair market value in the hands of the [d]ebtors").

29.     Courts assess the value of collateral by evaluating the "spectrum" of potential outcomes of the debtor's Chapter 11 case at the petition date—ranging between a true going-concern business and a forced liquidation.  *See, e.g.*, *In re Aerogroup Int'l, Inc.*, 601 B.R. 571, 596 (Bankr. D. Del. 2019), *aff'd*, 620 B.R. 517 (D. Del. 2020); *Official Committee of Unsecured Creditors v. U.M.B. Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 592 (Bankr.

S.D.N.Y. 2013); *In re Sears Holdings Corp.*, 51 F.4th 53, 59 (2d Cir. 2022), *cert. denied sub nom. Cyrus Capital Partners, L.P. v. Sears Holdings Corp.*, 143 S. Ct. 1024, 215 L. Ed. 2d 190 (2023).

30.     In *Sears*, affirming the bankruptcy court's decision, the district court held that valuation of the debtor's interest for the purpose of determining adequate protection must "account for the range of outcomes as of the [p]etition [d]ate which was a continuum of going-concern sale or liquidation, or worst-case scenario, a forced liquidation." *In re Sears Holdings Corp.,* 621 B.R. 563, 573 (S.D.N.Y. 2020), *aff'd,* 51 F.4th 53 (2d Cir. 2022).   The district court affirmed the bankruptcy court's decision that net orderly liquidating value ("<u>NOLV</u>")—a valuation "somewhere between a forced liquidation and its full retail price"—was suitable given that there was a "distinct possibility of veering or pivoting to a liquidation."

31.     The Second Circuit affirmed the district court's decision.  The Second Circuit held that the critical juncture in determining the value of the collateral for the purpose of adequate protection is the petition date based on a realistic assessment of such likely value.  *In re Sears Holdings Corp.*, 51 F.4th 53, 63 (2d Cir. 2022), *cert. denied sub nom. Cyrus Capital Partners, L.P. v. Sears Holdings Corp*., 143 S. Ct. 1024, 215 L. Ed. 2d 190 (2023) ("[T]he valuation process in this case turned on the value of the collateral on the Petition Date, without inquiring into how the collateral was *ultimately* used).  Considering the "realistic scenarios" as of the petition date, the Second Circuit agreed with the district court that NOLV was the appropriate baseline for evaluating adequate protection when "a company-side liquidation was possible" at the time of filing and likewise found the valuation method that "reflected the likelihood that existed on the [p]etition [d]ate of an eventual distressed-asset sale" to be proper.  *Id*. at 64.

32.     This Court conducted a similar analysis in *In re Aerogroup Int'l, Inc.*, 2019 WL 1407007 (Bankr. D. Del. Mar. 26, 2019), *aff'd*, 620 B.R. 517 (D. Del. 2020).  The Court agreed

that the question of going concern versus liquidation is not a "binary" situation; instead, a company's status as of the petition date "appears on a spectrum" a true "going concern business" and a "forced liquidation" with "an orderly liquidation somewhere in between," *id.* at *16, and should be determined based on a realistic assessment of outcomes likely at the time.

33.     Consistent with this precedent, the starting value for an adequate protection analysis with a stalking horse bid should be based on the value of such bid, or, in the worst case scenario, the NOLV of the collateral at the Petition Date, which represents the liquidation value that would be realized if the Debtors commenced a liquidation immediately in lieu of conducting a sale process.  Even if that remote possibility occurred here (and this Court should discount it as a result), the evidence will show that the Prepetition Lenders are adequately protected.

### i.       The Debtors' Proposed Use of Cash Collateral Is Readily Distinguishable from Recent Precedent.

34.     As noted, the Debtors are likely to close a value-maximizing going concern transaction, with the Stalking Horse Bid as a floor, in the near future.  This likely outcome is easily distinguishable from other recent cases where use of cash collateral was contested on the basis of inadequate protection.  *See, e.g.*, *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. 2024), Dkt. No. 48.  In *Tupperware*, there was no stalking horse bidder in place, no concrete floor for the secured lenders' recovery to be measured against their alternative, and the debtors merely alleged that the operation of their business and prosecution of their competitive bidding process—"[v]alue-focused operation of a distressed business"—was sufficient adequate protection under the Bankruptcy Code.  *See In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. 2024), Dkt. No. 153.  Similarly, in *Swedeland*, the debtor was unable to show that its proposed standalone reorganization was concrete enough to warrant a finding that its value exceeded the agreed value of the lender's collateral.  *Swedeland Dev. Grp.*, 16 F.3d at 564–68.

The Debtors here, however, do not seek to fund a freefall Chapter 11 case. Rather, the proposed rapid sale process is backed by a viable stalking horse bid. The proposed use of Cash Collateral is therefore not speculative but essential to preserving collateral value and achieving a recovery that can be valued against the Lenders' alternative.

### ii.    The Use of Cash Collateral in Furtherance of the Do it Best Sale Preserves the Value of the Cash Collateral.

35.    In the context of a debtor selling its assets, courts have found prepetition lenders are adequately protected, even without an equity cushion, where, as here, access to cash collateral or financing would provide the debtor with additional liquidity to pursue a value-maximizing sale process and thereby preserve the debtor's going-concern value and satisfy the claims of prepetition lenders. Hr'g Tr. 15–18, *In re Aeropostale, Inc.*, No. 16-11275 (CSS) (Bankr. S.D.N.Y. May 5, 2016), Dkt. No. 113 (finding that secured lenders were adequately protected where liquidity was anticipated to increase slightly, allowing the debtors to pursue a sale of their assets, as opposed to forcing an immediate liquidation); *see also In re Yellowstone Mtn. Club, LLC*, No. 08-61570, 2008 WL 5875547 at *9, *17 (Bankr. D. Mont. Dec. 17, 2008) (considering adequate protection in terms of "maintain[ing] the debtors' going concern value" and finding that a postpetition financing would provide a "net economic benefit" because it would be used to finance operation of the debtor's business rather than allowing it to "go dark" while it pursued a sale).

36.    The Do it Best bid sets the proverbial bar for going concern value, as measured by the market, and the expenditures in the Budget are necessary expenditures in furtherance of closing the sale. The Debtors cannot sell their assets today to Do it Best and achieve the going concern value from that sale now; that is a practical impossibility. Instead, the sale requires the typical bankruptcy process milestones and timeframe, and the sale of the business as a going concern, ordinary course operation through a court-administered process with its associated expenses.

There is no way to implement the Do it Best transaction "gross" of those expenses.  Simply put, the only way to achieve going concern value is through the use of Cash Collateral to preserve such value.  *See Sears Holdings Corp.*, 51 F.4th at 61 (holding that the appropriate inquiry for diminution in value in a going concern sale is to compare it to the value of the collateral in a liquidation).

37.    Moreover, if the Debtors were to commence wind-down procedures immediately, they would incur substantial shut-down costs and impairment to accounts receivable, all of which are avoided by pursuing the Debtors' going concern sale process.  These avoided costs would, on a net basis and considering realistic asset values, be substantially greater than the funds disbursed under the Budget in connection with the sale process.

38.    Even without the adequate protection package offered by the Debtors, the Prepetition Lenders' interests are already adequately protected because the use of Cash Collateral is necessary to preserve the Debtors' going concern and maximize value of such lenders' collateral to bridge to closing the Do it Best sale, while the alternative would be a value-destructive liquidation, which precedent has established also serves as adequate protection.[7]

39.    Courts have consistently held that preservation of a debtor's going-concern value serves as adequate protection to nonconsenting lenders when a lack of access to financing and cash collateral would cause substantial loss, "not only to the going concern value of the debtors, but to the collateral of all the secured creditors."  *See* Hr'g Tr. 131–32, *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 3, 2015), Dkt. No. 245; *see also*, *e.g.*, *In re Borden Dairy Company*, 20-10010-CSS (Bankr. D. Del. Jan. 10, 2020), Dkt. No. 73 (over the objections of

---

[7]    Nonetheless, the Debtors have offered an appropriate adequate protection package that includes adequate protection payments (including payment of professional fees), adequate protection liens and claims, financial and other reporting, and compliance with agreed upon milestones for the Chapter 11 Cases.

secured lenders, court granting debtors' use of cash collateral in order to continue operating as a going concern and, if production stopped, irreparable harm would inure to the entire company; however, court conditioned relief on lenders being provided with adequate protection in the form of a replacement lien); *In re Hubbard Power & Light*, 202 B.R. 680, 684–85 (Bankr. E.D.N.Y. 1996) (holding that secured creditor were adequately protected for priming loan by anticipated increase in value of the debtor's property due to use of loan proceeds, by comparing value of debtor's primary asset prior to use of loan proceeds for clean up versus value following clean up and resumption of debtor's business operations); *In re 495 Cent. Park Ave.*, 136 B.R. at 631–32 ("[t]o determine whether [a secured creditor] is adequately protected, the court must consider whether the value of the debtor's property will increase as a result of the renovations funded by the proposed financing."); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used for reasonable and necessary operating expenses of the collateral); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) ("[creditors'] secured position can only be enhanced by the continued operation of the [debtors.]"); *In re Aqua Assocs.*, 123 B.R. at 192, 198-99 (Bankr. E.D. Pa. 1982) (holding secured creditor adequately protected for priming loan based on small equity cushion and increase in going concern value versus liquidation value).[8]

---

[8]  To the extent that the Prepetition Lenders object to payment of wind-down costs, under Section 506(c) of the Bankruptcy Code, these costs could be surcharged against the Prepetition Lenders as "reasonable, necessary costs and expenses of preserving, or disposing of" their collateral. *See* 11 U.S.C. § 506(c); *see also Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 701 (5th Cir. 2015) (affirming a decision of the bankruptcy court surcharging a secured creditor for the cost of preserving the creditor's collateral before the property was abandoned). This is because the wind-down costs are needed for transition services to support the sale. Accordingly, the Prepetition Lenders are not entitled to adequate protection because their collateral will not suffer any diminution in value. Indeed, if the Debtors were forced to liquidate, the Prepetition Lenders likely would foot the bill for disposing of their collateral. Alternatively, such costs should be viewed as inherently a part of determining the value of the collateral: value is not determined on a gross basis, but, rather, on a net basis. Livestock, for example, is valued at the likely sale price minus the cost of bringing it to sale.

40.     The Debtors' use of Cash Collateral is the best option available to the Debtors to fund these Chapter 11 Cases and preserve the Debtors' going concern value for the benefit of all stakeholders, including the Prepetition Lenders.  Without the necessary expenditures contemplated by the Budget, the Company will be forced to liquidate and realize significantly less value than the Do it Best sale offers.  Accordingly, the Debtors' use of Cash Collateral is reasonable, appropriate, and permissible under the Bankruptcy Code.

## CONCLUSION

41.     The Bankruptcy Code entitles prepetition secured lenders to adequate protection, only to the extent of actual diminution of their collateral value.  It does not, however, give lenders the right to dictate the way their collateral is adequately protected; it allows the Debtors to surcharge collateral to the extent of the benefit to the estates.

42.     The Prepetition Lenders will not suffer any diminution, or are otherwise adequately protected in these Chapter 11 Cases.  The Bankruptcy Code does not require a *guarantee* that the sale will close; rather, the Debtors need only show a *reasonable likelihood* of closing—a showing that is easily satisfied by the executed Asset Purchase Agreement with Do it Best.  The appropriate test entails comparing the value of the Collateral on the Petition Date with the value of the Collateral on the date the proposed sale would close, *i.e.*, December 6, 2024.  Accordingly, the Debtors respectfully request that this Court grant the relief requested in the Motion and such other and further relief as may be just and proper.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated: October 29, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Edmon L. Morton*
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Kristin L. McElroy (Del. Bar No. 6871)
Timothy R. Powell (Del. Bar No. 6894)
One Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: emorton@ycst.com
        kenos@ycst.com
        kmcelroy@ycst.com
        tpowell@ycst.com

- and -

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
Michelle C. Perez (admitted *pro hac vice*)
Esther Hong (admitted *pro hac vice*)
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
        twelch@glennagre.com
        mdoss@glennagre.com
        mperez@glennagre.com
        ehong@glennagre.com

*Proposed Conflicts Counsel to the Debtors and Debtors in Possession*