**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.**, *et al.*, | **Case No. 24-12337 (KBO)** |
| **Debtors.**[1] | **(Jointly Administered)** |
|  | Related Docket Nos. 12, 268, 297, 362 |

<u>**NOTICE OF AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**</u>

**PLEASE TAKE NOTICE** that on October 14, 2024 (the "<u>Petition Date</u>"), the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the U.S. Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

**PLEASE TAKE FURTHER NOTICE** that on the Petition Date, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, and (III) Granting Related Relief* [Docket No. 12] (the "<u>Motion</u>").[2]

**PLEASE TAKE FURTHER NOTICE** that on November 2, 2024, the Debtors filed the *Notice of Filing of Cash Collateral Resolution Documents* [Docket No. 268]. Attached thereto as <u>Exhibit C</u> is that certain amended asset purchase agreement, dated as of October 31, 2024, among the Debtors and Do it Best Corp. ("<u>Do it Best</u>") (the "<u>October 31 APA</u>").

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**PLEASE TAKE FURTHER NOTICE** that on November 4, 2024, the Court entered the *Order (I) Approving the Bid Protections; (II) Approving the Assumption and Assignment Procedures; (III) Authorizing and Approving the Form of Notice of the Sale of Substantially All of the Assets of the Debtors; (IV) Authorizing and Scheduling the Sale Hearing and Setting Other Related Dates and Deadlines; and (V) Granting Related Relief* [Docket No. 297] (the "Bid Protections Order"), by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale (the "Sale") of substantially all of the Debtors' assets.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Protections Order, on November 9, 2024, having received no Qualified Bids other than the Stalking Horse Bid by the Bid Deadline, the Debtors designated Do it Best as the Successful Bidder and filed the *Notice of Cancellation of Auction and Designation of the Stalking Horse Bidder as the Successful Bidder* [Docket No. 362].

**PLEASE TAKE FURTHER NOTICE** that attached as **Exhibit A** is that certain amended and restated asset purchase agreement (the "Amended and Restated APA"), dated as of November 10, 2024, among the Debtors and Do it Best.  Attached to the Amended and Restated APA as Exhibit H is the transition services agreement term sheet (the "TSA Term Sheet").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit B** is a redline comparing the Amended and Restated APA to the October 31 APA.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale to Do it Best pursuant to the terms of the Amended and Restated APA at a hearing to be held on November 12, 2024 at 10:00 a.m. (prevailing Eastern Time) (the "Sale Hearing") before the

Honorable Karen B. Owens, United States Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.

Dated:  November 10, 2024
      Wilmington, Delaware

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

Ron E. Meisler (admitted *pro hac vice*)
Jennifer Madden (admitted *pro hac vice*)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and –

Robert D. Drain (admitted *pro hac vice*)
Evan A. Hill (admitted *pro hac vice*)
Moshe S. Jacob (admitted *pro hac vice*)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Robert.Drain@skadden.com
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

## EXHIBIT A

**Amended and Restated APA**

*__Execution Version__*

---

# AMENDED AND RESTATED

# ASSET PURCHASE AGREEMENT

by and among

# TRUE VALUE COMPANY L.L.C.,

# TV HOLDCO II, L.L.C.,

# TV TSLC, L.L.C.,

# TV GPMC, L.L.C.,

# TRUE VALUE RETAIL, L.L.C.,

# TRUEVALUE.COM COMPANY, L.L.C.,

# TRUE VALUE VIRGINIA, L.L.C.,

and

# DISTRIBUTORS HARDWARE, L.L.C.

# as Sellers,

and

# DO IT BEST CORP.

as Buyer,

Dated as of November 10, 2024

# TABLE OF CONTENTS

<u>Page</u>

### Article I
### DEFINITIONS

Section 1.1    Defined Terms ................................................................................2

### Article II

### PURCHASE AND SALE

Section 2.1    Purchase and Sale ..........................................................................18
Section 2.2    Excluded Assets .............................................................................20
Section 2.3    Assumed Liabilities ........................................................................22
Section 2.4    Excluded Liabilities ........................................................................23
Section 2.5    Assignment of Transferred Contracts ............................................23
Section 2.6    Consideration .................................................................................25
Section 2.7    Deposit Funds .................................................................................25
Section 2.8    Closing ...........................................................................................26
Section 2.9    Purchase Price Allocation ..............................................................28
Section 2.10   Designated Buyer(s) .......................................................................28
Section 2.11   Withholding ...................................................................................29
Section 2.12   Reimbursement of Prepaid Expenses .............................................29
Section 2.13   Payment of Purchase Orders ..........................................................29
Section 2.14   LC Reimbursement Amount ...........................................................30

### Article III

### REPRESENTATIONS AND WARRANTIES
### OF SELLERS

Section 3.1    Organization ...................................................................................30
Section 3.2    Authority ........................................................................................30
Section 3.3    No Conflict; Required Filings and Consents ..................................31
Section 3.4    Transferred Assets; Sufficiency of Assets .....................................31
Section 3.5    Financial Statements; No Undisclosed Liabilities ..........................32
Section 3.6    Absence of Certain Changes or Events ..........................................33
Section 3.7    Compliance with Law; Permits ......................................................33
Section 3.8    Litigation ........................................................................................33
Section 3.9    Employee Benefit Plans .................................................................34
Section 3.10   Labor and Employment Matters ....................................................35
Section 3.11   Real Property ..................................................................................36
Section 3.12   Intellectual Property .......................................................................37
Section 3.13   Tax Matters ....................................................................................39

Section 3.14   Environmental Matters.................................................................39
Section 3.15   Material Contracts.....................................................................40
Section 3.16   Certain Payments......................................................................42
Section 3.17   Brokers.................................................................................42
Section 3.18   Data Privacy; Information Security.................................................42
Section 3.19   Exclusivity of Representations and Warranties ...................................43

Article IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.1    Organization...........................................................................44
Section 4.2    Authority..............................................................................44
Section 4.3    No Conflict; Required Filings and Consents .......................................44
Section 4.4    Absence of Litigation.................................................................45
Section 4.5    Qualification..........................................................................45
Section 4.6    Legal Requirements and Approvals..................................................45
Section 4.7    Brokers................................................................................45
Section 4.8    Financing..............................................................................45
Section 4.9    Solvency...............................................................................47
Section 4.10   Exclusivity of Representations and Warranties. ...................................47

Article V

BANKRUPTCY COURT MATTERS

Section 5.1    Debtors-in-Possession................................................................48
Section 5.2    Sale Motion; Bidding Procedures Order............................................48
Section 5.3    Sale Order.............................................................................49
Section 5.4    Cooperation with Respect to Bankruptcy Court Approvals ......................49
Section 5.5    Bankruptcy Court Filings............................................................49

Article VI

COVENANTS

Section 6.1    Conduct of Business Prior to the Closing .........................................50
Section 6.2    Covenants Regarding Information...................................................53
Section 6.3    Employee Matters.....................................................................55
Section 6.4    Consents and Filings; Further Assurances .........................................57
Section 6.5    Wrong Pockets.........................................................................59
Section 6.6    Public Announcements................................................................60
Section 6.7    Communications with Customers and Suppliers ..................................60
Section 6.8    Financing..............................................................................61
Section 6.9    Sellers' Cooperation with Buyer's Efforts under Debt Financing.................64
Section 6.10   Transition Services Agreement......................................................66
Section 6.11   Certain Acknowledgements .........................................................66

ii

Section 6.12  Lender Recovery Shortfall Calculation ...........................................................67
Section 6.13  Assumed Payables Reconciliation ..................................................................67

## Article VII

## TAX MATTERS

Section 7.1  Transfer Taxes ...............................................................................................68
Section 7.2  Tax Cooperation.............................................................................................68

## Article VIII

## CONDITIONS TO CLOSING

Section 8.1  General Conditions ........................................................................................68
Section 8.2  Conditions to Obligations of Sellers ..............................................................69
Section 8.3  Conditions to Obligations of Buyer ...............................................................69

## Article IX

## TERMINATION

Section 9.1  Termination.....................................................................................................70
Section 9.2  Effect of Termination......................................................................................72
Section 9.3  Alternative Transactions .................................................................................73

## Article X

## GENERAL PROVISIONS

Section 10.1   Nonsurvival of Representations, Warranties and Covenants................................73
Section 10.2   Bulk Sales ......................................................................................................73
Section 10.3   Fees and Expenses .........................................................................................74
Section 10.4   Amendment and Modification ........................................................................74
Section 10.5   Waiver............................................................................................................74
Section 10.6   Notices ...........................................................................................................74
Section 10.7   Interpretation..................................................................................................75
Section 10.8   Entire Agreement ...........................................................................................75
Section 10.9   Parties in Interest ...........................................................................................76
Section 10.10  Governing Law ..............................................................................................76
Section 10.11  Submission to Jurisdiction .............................................................................76
Section 10.12  Assignment; Successors .................................................................................77
Section 10.13  Specific Performance .....................................................................................77
Section 10.14  Currency.........................................................................................................77
Section 10.15  Severability ....................................................................................................77
Section 10.16  Waiver of Jury Trial.......................................................................................78
Section 10.17  Counterparts...................................................................................................78

Section 10.18  Jointly Drafted ................................................................................................78
Section 10.19  Limitation on Damages....................................................................................78
Section 10.20  No Recourse.....................................................................................................79
Section 10.21  Time of Essence; Calculation of Dates...........................................................79
Section 10.22  Debt Financing.................................................................................................79

## INDEX OF EXHIBITS AND SCHEDULES

EXHIBIT A          [RESERVED]

EXHIBIT B          [RESERVED]

EXHIBIT C          ESCROW AGREEMENT

EXHIBIT D          FORM OF SALE ORDER

EXHIBIT E          FORM OF BILL OF SALE AND ASSIGNMENT AND
                   ASSUMPTION AGREEMENT

EXHIBIT F          FORM OF LEASE ASSIGNMENT AND ASSUMPTION
                   AGREEMENT

EXHIBIT G          FORM OF IP ASSIGNMENT AGREEMENT

EXHIBIT H          AMENDED AND RESTATED TRANSITION SERVICES
AGREEMENT TERM SHEET

iv

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of November 10, 2024 (the "Execution Date"), by and between (i) True Value Company L.L.C., a Delaware limited liability company ("True Value Parent"), TV Holdco II, L.L.C., a Delaware limited liability company, TV TSLC, L.L.C., an Illinois limited liability company, TV GPMC, L.L.C., an Illinois limited liability company, True Value Retail, L.L.C., a Delaware limited liability company, TrueValue.com Company, L.L.C., a Delaware limited liability company, True Value Virginia, L.L.C., a Virginia limited liability company, and Distributors Hardware, L.L.C. a Delaware limited liability company (True Value Parent, together with the foregoing entities, each a "Seller" and collectively, "Sellers"), and (ii) Do it Best Corp., an Indiana corporation ("Buyer").  Capitalized terms have the definitions set forth in Article I below.

**RECITALS**

A.      Sellers directly and indirectly are engaged in the Business.

B.      On October 13, 2024, Sellers and Buyer entered into that certain Asset Purchase Agreement (the "Original APA") pursuant to which, among other things, Sellers agreed to sell to Buyer all of the Transferred Assets and Buyer agreed to purchase from Sellers the Transferred Assets and assume the Assumed Liabilities in a sale transaction authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, all on the terms and subject to the conditions set forth in the Original APA and subject to entry of the Sale Order by the Bankruptcy Court.

C.      In furtherance of the foregoing, Sellers commenced voluntary cases (collectively, the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101– 1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), on October 14, 2024 (the "Petition Date")."

D.      On the Petition Date, Sellers filed with the Bankruptcy Court the Sale Motion seeking the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, which seek approval of the transactions contemplated by this Agreement.

E.      Following the execution of the Original APA and the commencement of the Chapter 11 Case, Sellers have continued to engage in negotiations with the Prepetition Secured Parties under the Prepetition Credit Agreement and the Official Committee of Unsecured Creditors with respect to the Chapter 11 Case (the "Creditors' Committee") in order to reach a settlement with respect to, among other things, (i) Sellers' use of "cash collateral" (as such term is defined in the Bankruptcy Code) during the period prior to the Closing, (ii) Sellers' operations and conduct of the Business prior to the Closing, (iii) the timing of the consummation of the Closing and (iv) the net recovery to be received by the Prepetition Secured Parties' as a result of the consummation of the transactions contemplated hereby (collectively, the "Settlement").

F.      Sellers, the Prepetition Secured Parties, and the Creditors' Committee have memorialized the terms of the Settlement pursuant to that certain Cash Collateral Resolution Term Sheet (the "Cash Collateral Resolution Term Sheet") attached as an exhibit to that certain *Final Order (I)(A) Authorizing Debtors to Use Cash Collateral; (B) Granting Adequate Protection to Prepetition Lenders; (C) Modifying the Automatic Stay; and (II) Granting Related Relief*, entered by the Bankruptcy Court on November 4, 2024 at docket number 296 (the "Final Cash Collateral Order").

G.      The Final Cash Collateral Order has attached as an exhibit a revised budget with respect to the operations and conduct of the Business of Sellers during the period prior to the Closing (the "Revised Budget") and (ii) contemplates, among other things, that Sellers and Buyer will amend the Purchase Agreement, the Bidding Procedures Order, the Sale Order and the proposed timeline for the sale of the Transferred Assets as necessary to reflect the terms of the Settlement.

H.      Buyer is supportive of the Settlement and has (i) approved and agreed to the operation by Sellers of the Business in accordance with the Revised Budget in satisfaction of the Settlement and (ii) agreed to amend the Original APA in furtherance of the Settlement, all upon the terms and subject to the conditions set forth herein.

I.      Pursuant to Section 10.4 of the Original APA, the Original APA may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment thereto, signed on behalf of each of Sellers and Buyer, and in accordance therewith each of Sellers and Buyer hereby agree to amend and restate the Original APA in its entirety in the form of this Agreement.

J.      Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, as further set forth herein.  The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1      Defined Terms.  For purposes of this Agreement:

"1970 Group Agreements" means, collectively, (i) that certain Amended and Restated Substitute Insurance Collateral Facility Agreement, dated as of September 25, 2024, by and between 1970 Group, Inc. and Sellers, and (ii) that certain Master Escrow Agreement, dated as of August 1, 2024, entered into by and among 1970 Group, Inc., Wilmington Trust, National Association, as escrow agent, and True Value Parent, as supplemented by that certain Joinder Agreement, dated as of September 25, 2024.

"Action" means any action, complaint, Claim, suit, litigation, arbitration, mediation, hearing, public or otherwise known investigation, audit, or similar proceeding (in each case, whether civil, criminal, administrative, investigative, or informal), initiated, commenced, brought, conducted, heard or pending by or before any Governmental Authority, arbitrator or mediator, other than an Avoidance Action.

"Administrative Agent" means PNC Bank, National Association, as administrative agent under the Prepetition Credit Agreement.

"Administrative Claims Bar Date" means the deadline for filing proofs of claim for payment of any and all Claims for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, which deadline shall be established by the Bankruptcy Court.

"Advisors" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers or other Representatives of such Person.

"Affiliate" means, with respect to any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Affordable Care Act" means the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, and the guidance and regulations issued thereunder.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 2.9.

"Allocation Methodology" has the meaning set forth in Section 2.9.

"Alternative Financing" has the meaning set forth in Section 6.8(c).

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, of a material portion of the Transferred Assets, in a transaction or series of transactions with one or more Persons other than Buyer.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment and Assumption Agreement, the IP Assignment Agreement, the Escrow Agreement and the Transition Services Agreement.

"Antitrust Authority" has the meaning set forth in Section 6.4(a).

3

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Governmental Authority designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(b)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Payables" has the meaning set forth in Section 2.3.

"Assumed Payables Reconciliation Period" has the meaning set forth in Section 6.13.

"Avoidance Actions" has the meaning set forth in Section 2.1(p).

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"Bid Deadline" means November 8, 2024.

"Bidding Procedures Hearing" has the meaning set for in Section 5.2.

"Bidding Procedures Order" means the Order of the Bankruptcy Court approving, among other things, the execution, delivery, and performance of this Agreement by Sellers (including payment of the Expense Reimbursement Amount and Break-Up Fee pursuant to and in accordance with Section 9.2(b) of this Agreement), other than the performance of those obligations to be performed at or after the Closing, Sellers' designation of Buyer as the purchaser for the Business and the Transferred Assets (subject to the receipt of higher or otherwise better bids to be submitted by no later than the Bid Deadline), and procedures for the assumption and assignment of executory Contracts and unexpired Leases.

"Break-Up Fee" means an amount equal to Four Million Five Hundred Ninety Thousand dollars ($4,590,000.00), which shall be payable as set forth in Section 9.2(b).

"Business" means, collectively, the hardlines wholesale and related distribution business, direct retail business and paint manufacturing business, in each case, conducted by Sellers as of the date hereof.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Delaware, the State of Illinois or the State of New York.

4

"<u>Business Employees</u>" means, as of the relevant date, all individuals employed by Sellers.  For the avoidance of doubt, the term "Business Employees" shall not include any Person who provides services to Sellers as an independent contractor or pursuant to any similar arrangement.

"<u>Business Privacy and Data Security Policies</u>" means all of Sellers' and any of their respective Subsidiaries' past or present, public-facing policies and notices concerning the privacy, security, or Processing of Personal Information, to the extent applicable to the conduct of the Business by Sellers and any of their Subsidiaries.

"<u>Buyer</u>" has the meaning set forth in the Preamble.

"<u>Buyer Credit Agreement</u>" means that certain Credit Agreement, dated as of October 11, 2024, by and among Buyer, as borrower, the lenders and issuing banks from time to time party thereto, and Wells Fargo Bank, National Association, as administrative agent, swingline lender and an issuing bank, as in effect on the date hereof.

"<u>Buyer Disclosure Letter</u>" has the meaning set forth in <u>Article IV</u>.

"<u>Buyer Non-Recourse Person</u>" has meaning set forth in <u>Section 10.20(a)</u>.

"<u>Buyer Plan</u>" has the meaning set forth in <u>Section 6.3(d)</u>.

"<u>Buyer 401(k) Plan</u>" has the meaning set forth in <u>Section 6.3(e)</u>.

"<u>Cash and Cash Equivalents</u>" means all of each Seller's cash (including petty cash and uncashed checks received on or before the Closing Date and checks that have been deposited on or before the Closing Date but have not yet cleared), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"<u>Cash Consideration</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Chapter 11</u>" means chapter 11 of the Bankruptcy Code.

"<u>Chapter 11 Case</u>" has the meaning set forth in the Recitals.

"<u>Claims</u>" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature,

5

known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including (x) all "claims," within the meaning of Section 101(5) of the Bankruptcy Code and (y) all Avoidance Actions) or rights of set-off or recoupment.

"Closing" has the meaning set forth in Section 2.8(a).

"Closing Date" has the meaning set forth in Section 2.8(a).

"Closing Target Date" means November 22, 2024, as such period may be extended by mutual agreement of Buyer and Sellers.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and any rules or regulations promulgated thereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means each collective bargaining agreement or similar labor-related Contract with any Labor Organization covering a Business Employee.

"Compliance Date" means January 1, 2023.

"Confidentiality Agreement" means the Confidentiality Agreement, dated as of August 14, 2024, entered into between True Value Parent and Buyer with respect to the transactions contemplated hereby.

"Contract" means any written contract, agreement, understanding, insurance policy, lease, license, sublicense, option, undertaking, instrument or other commitment that is binding on any Person or any part of its assets or properties under applicable Law.

"Contagion Event" means any (a) outbreak or ongoing effects of any contagious disease, plague, epidemic, pandemic or other public health emergency (including COVID-19) or (b) escalation or worsening or subsequent waves or mutations of any of the foregoing.

"Contagion Measure" means any (a) applicable quarantine, "shelter in place," "stay at home," social distancing, shut-down, closure, sequester, declaration of martial law or similar Law, Order, directive or guidelines promulgated by any Governmental Authority, (b) action reasonably taken (or omitted to be taken) in response to any applicable quarantine, "shelter in place," "stay at home," social distancing, shut-down, closure, sequester, declaration of martial law or similar Law, directive or guidelines promulgated by any Governmental Authority, in each case, in response to any Contagion Event or (c) factory slowdown or shipping, freight, rail or other shipment interruptions or slowdowns, in each case, related to or resulting from a Contagion Event.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in order to effectuate the assumption and assignment to Buyer of the Transferred Contracts.

"Cure Notice" has the meaning set forth in the Sale Motion.

"<u>Cure Objection Deadline</u>" has the meaning set forth in the Sale Motion.

"<u>Debt Commitment Letter</u>" has the meaning set forth in <u>Section 4.8(b)</u>.

"<u>Debt Financing</u>" has the meaning set forth in <u>Section 4.8(b)</u>.

"<u>Debt Financing Sources</u>" has the meaning set forth in <u>Section 4.8(b)</u>.

"<u>Deposit Funds</u>" has the meaning set forth in <u>Section 2.7(a)</u>.

"<u>Designated Buyer</u>" has the meaning set forth in <u>Section 2.10(a)</u>.

"<u>Designated Parties</u>" has the meaning set forth in <u>Section 2.1(p)</u>.

"<u>Designation Deadline</u>" has the meaning set forth in <u>Section 2.5(e)</u>.

"<u>Disclosure Letter</u>" means the disclosure letter being delivered by Sellers to Buyer contemporaneously with the execution of this Agreement.  Notwithstanding anything to the contrary contained in the Disclosure Letter or in this Agreement, (a) the information and disclosures contained in any section of the Disclosure Letter shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Letter as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure, (b) the disclosure of any matter in the Disclosure Letter shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation or warranty to be true and correct, (c) the Disclosure Letter is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations and warranties by any Party except to the extent expressly set forth herein, (d) the inclusion of any item in the Disclosure Letter shall be deemed neither an admission that such item is material to the business, financial condition or results of operations of Sellers or the Business nor an admission of any liability to any third party, (e) matters reflected in the Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected therein and any additional matters are set forth therein for informational purposes and (f) headings are inserted in the Disclosure Letter for convenience of reference only and shall not have the effect of amending or changing the express description of the sections as set forth in this Agreement.

"<u>Disclosure Limitations</u>" has the meaning set forth in <u>Section 6.2(a)</u>.

"<u>Employee Benefit Plans</u>" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other individual employment, consulting or other individual service

7

agreement or arrangement, in each case, (a) that is sponsored or maintained or contributed to by any Seller or any of its Affiliates in respect of any current or former employees, directors, independent contractors or consultants of any Seller or (b) with respect to which any Seller has any actual or contingent Liability (including any such plan or arrangement formerly maintained by any Seller or any Subsidiary of any Seller).

"Encumbrance" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, mortgage, lease, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, servitude, covenant, encroachment, option, right of use, first offer, or first refusal, setoff, recoupment, right of recovery, or final Order of any Governmental Authority, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown. Without limiting the foregoing, "Encumbrance" also includes, without limitation, (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or the Seller, to use any portion of the Transferred Assets.

"Enforceability Exceptions" has the meaning set forth in Section 3.2.

"Environmental Claim" means any Action, Order, lien, fine or penalty by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to, any Hazardous Materials, (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law or any Environmental Permit or (c) any other matters for which Liability is or may be imposed under Environmental Laws.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment or natural resources, or the protection of human health and safety (regarding exposure to Hazardous Materials), including Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal or handling of Hazardous Materials; (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials; or (d) including but not limited to the to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and the Superfund Amendments and Reauthorization Act (42 U.S.C. § 9601 et seq.); the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.); the Clean Air Act (42 U.S.C. § 7401 et seq.); the Toxic Substances Control Act of 1976 (15 U.S.C. § 2601 et seq.); the Safe Drinking Water Act (42 U.S.C. § 300f et seq.); to the extent relating to Hazardous Materials, the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.); and the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 et seq.).

8

"Environmental Permit" means all permits, certificates, licenses, approvals, authorizations, consents or registrations required by any applicable Environmental Law, or required for the storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"ERISA Affiliate" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"Escrow Agent" has the meaning set forth in Section 2.7(a).

"Escrow Agreement" means that certain Escrow Agreement, dated as of October 10, 2024, by and among Buyer, Sellers, and the Escrow Agent, a copy of which is attached hereto as Exhibit C.

"Estimated Assumed Payables Statement" has the meaning set forth in Section 6.13.

"Estimated Lender Recovery Statement" has the meaning set forth in Section 6.12.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded IP" means all Intellectual Property owned by any Seller and used or located exclusively at, or otherwise relating exclusively to, any Leased Real Property under any Excluded Lease.

"Excluded IT" means all information technology assets, and related systems and equipment, owned by any Seller and used or located exclusively at, or otherwise relating exclusively to, any Leased Real Property under any Excluded Lease.

"Excluded Leases" has the meaning set forth in Section 2.2(f).

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement Amount" means the dollar amount equal to the lesser of (i) One Million Five Hundred Thirty Thousand dollars ($1,530,000) and (ii) the aggregate amount of all reasonable and documented out of pocket costs, expenses and fees incurred by Buyer in connection with evaluating, negotiating, documenting and performing the transactions contemplated by this Agreement and the Ancillary Agreements, including fees, costs and expenses of outside legal counsel and other Advisors retained by or on behalf of Buyer in connection with or related to the evaluation, consideration, authorization, preparation, investigation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including the Chapter 11 Case and other judicial and regulatory proceedings related to such transactions, which shall be payable as set forth in Section 9.2(b).

9

"Final Cash Collateral Order" has the meaning set forth in the Recitals.

"Finished Goods Inventory" means all Inventory of Sellers other than Inventory maintained, utilized and held for use in the Sellers' paint manufacturing business.

"Fundamental Representations" means the representations and warranties set forth in Section 3.1 and Section 3.2.

"Funding Obligations" has the meaning set forth in Section 4.8(b).

"Funds" has the meaning set forth in Section 4.8(b).

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any United States or non-United States national, federal, state, local, municipal, provincial or other governmental, regulatory or administrative authority, agency, court, tribunal or commission (and each instrumentality, political subdivision thereof), self-regulated organization and other non-governmental regulatory authority or quasigovernmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law) or any other judicial or arbitral body, including the Bankruptcy Court.

"Hazardous Materials" means any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade (or combination thereof) whether in solid, semisolid, liquid or gaseous form that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum (including petroleum distillate and petroleum by-products) oil, asbestos, polychlorinated biphenyls, radioactive, lead-based paint, per- and polyfluoroalkyl substances or words of similar meaning or effect under any Law relating to pollution, hazardous or toxic waste, or protection of the environment, or (c) forms the basis of any Liability under any Law relating to pollution, hazardous or toxic waste, or protection of the environment.

"HSR Act" has the meaning set forth in Section 3.3(a).

"Intellectual Property" means all intellectual property rights throughout the world, including all U.S. and foreign rights in (a) trade names, trademarks and service marks, domain names, trade dress, logos, slogans, design rights and other similar designations of source or origin ("Trademarks"), together with the goodwill symbolized by any of the foregoing; (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof; (c) copyrights and copyrightable subject matter (whether registered or unregistered); (d) proprietary rights in computer programs (whether in source code, object code, or other form), firmware, software, algorithms, and databases; (e) confidential and proprietary information, trade secrets and know-how, and all other proprietary rights in inventions, proprietary processes, formulae, models, and methodologies; (f) all applications and registrations for any of the foregoing; and (g) all rights

10

and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"Inventory" means all inventory, raw materials, works-in-progress, finished goods, supplies, parts, packaging materials and other inventories owned by Sellers.

"Inventory Value" means, as of any date of determination, the value of Sellers' Finished Goods Inventory, as reported on Sellers' books and records in accordance with GAAP, consistently applied.

"IP Assignment Agreement" has the meaning set forth in Section 2.8(b)(iii).

"IRS" means the Internal Revenue Service of the United States.

"Knowledge" means, with respect to Sellers, the knowledge of each of Chris Kempa, Bill McGann and Jennifer McNeill as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) after reasonable inquiry into the matters set forth in the representation that is so qualified.

"Labor Organization" means any labor union, labor organization, works council or other similar employee representative.

"Law" means any and all federal, state, local and foreign laws, constitutions, treaties, statutes, ordinances, rules, codes, regulations, policies, orders, judgments and decrees, in each case, enacted, adopted or promulgated by a Governmental Authority, including the common law.

"LC Reimbursement Amount" has the meaning set forth in Section 2.14.

"Lease" means any lease, sublease, license, or other use or occupancy agreement with respect to real property to which any Seller or any Subsidiary of any Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Leased Real Property" means any real property that is leased, subleased, licensed or otherwise occupied by any Seller or any Subsidiary of any Seller pursuant to a Lease.

"Legal Restraint" has the meaning set forth in Section 8.1(a).

"Lender Recovery" means an amount equal to (i)(a) the Cash Consideration *plus* (b) net pro-rations and reimbursements required to be paid by Buyer at the Closing pursuant to the terms of this Agreement, including the Prepaid Expenses Reimbursement Amount and the LC Reimbursement Amount *plus* (c) any Cash and Cash Equivalents on hand of Sellers as of the Closing (excluding, for the avoidance of doubt, any amounts prefunded by Buyer at the Closing pursuant to the Transition Services Agreement and any amounts held in trust for the benefit of the True Value Foundation) *minus* (ii) the amounts required to be reserved as of the Closing to satisfy the reserves and accruals provided for in the budget set forth on Section 8.2(d) of the Disclosure Letter after taking into account, among other things, the assumption of the Assumed Liabilities by Buyer at the Closing, including, as and to the extent applicable, the Section 503(b)(9) Claims and the Vendor Admin Claims.

11

"<u>Lender Recovery Floor Amount</u>" means One Hundred Sixty Three Million dollars ($163,000,000).

"<u>Lender Recovery Shortfall</u>" has the meaning set forth in <u>Section 6.12</u>.

"<u>Lender Recovery Shortfall Backstop</u>" means Ten Million dollars ($10,000,000).

"<u>Liability</u>" means any debt, loss, Claim, damage, demand, fine, judgment, penalty, Tax, liability, undertaking, commitment or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, determined or undeterminable or due or to become due).

"<u>Material Adverse Effect</u>" means any event, change, condition, occurrence or effect that individually or in the aggregate (a) has had, or would reasonably be expected to have, a material adverse effect on the Business, the results or operations or the condition (financial or otherwise), assets, liabilities, or operations of the Business, taken as a whole, or (b) prevents or materially impedes, or would reasonably be expected to prevent or materially impede, the performance by Sellers of their obligations under this Agreement on a timely basis, other than, in each case of the preceding clauses (a) and (b), any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry or geographical areas in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts (including by cyberattack or otherwise), whether or not pursuant to the declaration of an emergency or war), (iii) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, earthquake, fire, flood, hurricane, tornado or other weather event, or the onset or continuation of any Contagion Event or Contagion Measure, (iv) changes in any applicable Laws or GAAP or interpretations thereof, (v) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby, (vi) the announcement or pendency of the Chapter 11 Case (and any limitations therein pursuant to the Bankruptcy Code, the Bankruptcy Rules, any Order of the Bankruptcy Court or the Revised Budget) or any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby, (2) any chapter 11 plan of Sellers or any disclosure statement with respect thereto, (3) the Bidding Procedures Order, (4) the Sale Motion or the Sale Order, (5) the assumption of any Transferred Contract or (6) any action approved by the Bankruptcy Court, (vii) any action taken, or omitted to be taken, by any Seller or any of its Affiliates at the request or with the consent of Buyer or that is required by this Agreement or to comply with applicable Law, (viii) the identity of Buyer or any of its Affiliates, (ix) any failure to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement, (xi) any breach by Buyer of its obligations under this Agreement or any Ancillary Agreement, (xii) any matter disclosed on the Disclosure Letter or

(xiii) any change in the cost or availability or other terms of any financing; provided, however, that changes or developments set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in determining whether there has been or is a Material Adverse Effect if such changes or developments have a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Material Contract" has the meaning set forth in Section 3.15(a).

"New Debt Commitment Letter" has the meaning set forth in Section 6.8(c).

"Offer Employee" has the meaning set forth in Section 6.3(a).

"Offering Materials" has the meaning set forth in Section 6.9(d).

"Open Source Materials" means any software that is distributed under a license meeting the Open Source Definition as promulgated by the Open Source Initiative or that is approved by the Open-Source Initiative and listed at http://www.opensource.org.

"Order" means any award, writ, injunction, judgment, stipulation, determination, order or decree entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice of Sellers, as such practice and custom is, or may have been, modified as a result of the Chapter 11 Case, in each case subject to (a) the filing of the Chapter 11 Case, (b) any Orders of the Bankruptcy Court, (c) the Revised Budget and (d) the transactions contemplated by this Agreement.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation, its bylaws, and any shareholder or stockholder agreement, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, any statement of partnership and its partnership agreement, (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, (e) with respect to any other form of entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and any agreement amongst its members, (f) any documents equivalent to any of the foregoing applicable to non-U.S. jurisdictions, and (g) any amendments, side letters, modifications or other arrangements with respect to any of the foregoing.

"Outside Date" has the meaning set forth in Section 9.1(c)(ii).

"Owned Real Property" means any real property owned by any Seller, including all of such Seller's right, title, interest in and to any buildings, improvements, fixtures and structures thereon and all easements, rights-of-way, and other rights and privileges appurtenant thereto.

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Permits" has the meaning set forth in Section 3.7(b).

"Permitted Post-Closing Encumbrance" means (a) Encumbrances of the types described in clauses (a), (c) through (g) and (j) of the definition of "Permitted Pre-Closing Encumbrance" and (b) other Encumbrances of which the Transferred Assets cannot be sold free and clear under Section 363(f) of the Bankruptcy Code.

"Permitted Pre-Closing Encumbrance" means (a) Encumbrances for Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers', suppliers', vendors' and other similar common law or statutory Encumbrances arising or incurred in the Ordinary Course of Business, (c) deposits securing the performance of bids, trade Contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (d) with respect to any Leased Real Property, any Encumbrance affecting the interest of the landlord, sublandlord or licensor of such real property or which constitutes a statutory landlord's lien under applicable Law and not in any way affecting or impairing Sellers' interest in such real property, (e) with respect to any Real Property, covenants, conditions, restrictions, easements, licenses, rights-of-way and other similar charges or encumbrances or defects or imperfections of title of any kind (i) that do not, individually or in the aggregate, materially interfere with the operation of the Business or the present use of such Real Property or materially impair the value of the Transferred Assets or the Real Property subject to such encumbrances or (ii) that would be revealed by an investigation of title to the extent and nature that a prudent buyer of property in the jurisdiction in which the applicable Real Property is located would carry out, (f) any licenses to or other rights to use Intellectual Property granted in the Ordinary Course of Business, (g) public roads, highways, zoning codes, building codes, entitlements, conservation restrictions or other land use or Environmental Laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over the Real Property, (h) Encumbrances arising under purchase money security interests, equipment leases or other similar arrangements entered into in the Ordinary Course of Business, (i) rights of setoff or banker's liens upon deposits of cash in favor of banks or other depositary institutions, (j) Encumbrances that are Assumed Liabilities and any Encumbrances that Buyer specifically approves in writing, and (k) any Encumbrances permitted by or that will be removed, extinguished, discharged or released at Closing by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Personal Information" means any information that identifies or, alone or in combination with any other information, could reasonably be used to identify or locate a natural Person, including name, street address, telephone number, email address, identification number issued by a Governmental Authority, credit card number, bank information, customer or account number, online identifier, device identifier, IP address, location data, biometric data, medical or health information, or any other information that is considered "personally identifiable information," "personal information," or "personal data" under, or is otherwise regulated by, applicable Law (including Privacy Laws).

14

"Petition Date" has the meaning set forth in the Recitals.

"Prepaid Expenses" means all deposits (including customer deposits, maintenance deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone bonds or other sureties or other expenses (including all prepaid rent and all prepaid charges, expenses and rent under any personal property leases)), advances, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), that have been prepaid by any Seller, in each case with respect to any of the Transferred Leases and Transferred Contracts, except that professional fee retainers and prepaid deposits related thereto shall not be included in the definition of "Prepaid Expenses."

"Prepaid Expenses Reimbursement Amount" has the meaning set forth in Section 2.12.

"Prepetition Credit Agreement" means that certain Credit Agreement, dated as of April 20, 2018, by and among Sellers, the Prepetition Secured Parties and the Administrative Agent, as amended.

"Prepetition Secured Parties" means the lenders and financial institutions party to the Prepetition Credit Agreement.

"Privacy Laws" means all applicable Laws, governmental orders, and guidance issued by any Governmental Authority concerning the privacy, security, or Processing of Personal Information (including Laws of jurisdictions where Personal Information was collected), including, as applicable, data breach notification Laws, consumer protection Laws, Laws concerning requirements for website and mobile application privacy policies and practices, data security Laws, and Laws concerning email, text message, or telephone communications. Without limiting the foregoing, to the extent relating to the Processing of Personal Information, Privacy Laws include: the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Children's Online Privacy Protection Act, the California Consumer Privacy Act of 2018, the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the Gramm-Leach-Bliley Act, the General Data Protection Regulation (Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016).

"Processing" means any operation performed on Personal Information, including the collection, receipt, access, use, handling, compilation, analysis, monitoring, maintenance, retention, storage, transmission, transfer, protection, disclosure, distribution, destruction, or disposal of Personal Information.  The terms "Process" and "Processed" shall have correlative meanings.

"Purchase Orders" means any orders for the purchase and sale of goods issued by the Sellers in the Ordinary Course of Business for which the vendor has not received payment and Sellers have not received the goods as of the Closing.

"Purchase Price" has the meaning set forth in Section 2.6.

"Qualified Leave Recipient" means any Business Employee who is absent from active employment as of immediately prior to the Closing Date as a result of an approved leave of absence.

"Real Property" means the Leased Real Property and the Owned Real Property.

"Registered IP" has the meaning set forth in Section 3.12(a).

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, Advisors, bankers and other representatives of such Person (including counsel and accountants).

"Required Information" has the meaning set forth in Section 6.9(a).

"Sale Motion" means that certain *Motion of Debtors for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, and (III) Granting Related Relief*, filed by the Sellers in the Chapter 11 Case on the Petition Date at docket number 12.

"Sale Objection Deadline" has the meaning set for in the Sale Motion.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, in substantially the form attached hereto as Exhibit D, with such changes as may be reasonably acceptable to Buyer and Sellers.

"Section 503(b)(9) Claims" has the meaning set forth in Section 2.3(d).

"Section 503(b)(9) Claims Bar Date" means the deadline for filing proofs of claim for payment of any and all Claims for costs and expenses of administration of the Bankruptcy Case pursuant to Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code, which deadline shall be November 27, 2024, unless otherwise ordered by the Bankruptcy Court.

"Seller 401(k) Plan" has the meaning set forth in Section 6.3(e).

"Seller Non-Recourse Person" has meaning set forth in Section 10.20(b).

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its

16

Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Tax Law" means any Law relating to Taxes.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means (a) any and all U.S. federal, state and local, non-U.S. and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other similar assessments imposed by any Governmental Authority, including all net income, gross income, gross receipts, license, lease, service, service use, payroll, employment, fringe, fringe benefits, excise, severance, stamp, occupation, premium, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, branch profits, profit share, withholding, social security, unemployment, pension plan, health, disability, real property, personal property, windfall profits, wealth, net wealth, net worth, export fees and charges, registration fees, deposits, sales, use, transfer, registration, alternative or add-on minimum or estimated tax, fee, assessment, custom, duty, levy, tariff, impost, toll or charge of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalty, inflationary adjustment, addition to tax, fine, or other addition thereto, (b) any and all liability for the payment of any item described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary or other similar group (or being included) in any Tax Return related to such group, and (c) any and all liability for the payment of any amount as a result of any successor or transferee liability, in respect of any item described in clause (a) or (b) above.

"Termination Pay" means any contractual or statutory severance, termination compensation, notice pay, paid vacation or annual leave, paid sick leave, paid time off, contractual or statutory bonuses, contractual or statutory gratuity or long service payments, or any other legally mandated termination payment or benefits obligations.

"Trade Admin Claims" has the meaning set forth in Section 2.3(d).

"Trademarks" has the meaning set forth in the definition of "Intellectual Property" in this Section 1.1.

"Transfer Taxes" has the meaning set forth in Section 7.1.

"Transferred Assets" has the meaning set forth in Section 2.1.

"Transferred Contracts" has the meaning set forth in Section 2.1(f).

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"Transferred Employee Records" means, to the extent permitted by Law, all records of Sellers that relate to the Transferred Employees, including records that pertain to (a) skill and

17

development training, (b) seniority histories, (c) salary and benefit information, (d) Occupational, Safety and Health Administration reports and records and (e) active medical restriction forms, but excluding medical records.

"Transferred IP" means all Intellectual Property owned by any Seller, including the Intellectual Property listed on Section 3.12(a) and Section 3.12(f) of the Disclosure Letter, but excluding, for the avoidance of doubt, any Excluded IP.

"Transferred IT" means all information technology assets, and related systems and equipment, owned by any Seller, but excluding, for the avoidance of doubt, any Excluded IT.

"Transferred Leases" has the meaning set forth in Section 2.1(b).

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"True Value Parent" has the meaning set forth in the Preamble.

"Visa Employees" has the meaning set forth in Section 6.3(j).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar applicable state or local law requiring notice to employees in the event of a plant closing or mass layoff.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    Purchase and Sale.    Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement and subject to entry of the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or the applicable Designated Buyer(s)), and Buyer (or such applicable Designated Buyer(s)) shall purchase, all right, title and interest of Sellers, in, to or under the Transferred Assets, free and clear of any and all Encumbrances (other than Permitted Post-Closing Encumbrances).    "Transferred Assets" shall mean all right, title and interest of Sellers as of immediately prior to the Closing in, to or under all properties and assets of Sellers, of every kind and description, wherever located (including, for the avoidance of doubt, any assets located at any Leased Real Property under a Transferred Lease or an Excluded Lease (subject to Section 2.2(f)), whether real, personal or mixed, tangible or intangible, including all right, title and interest of Sellers in, to or under the following (but excluding in each case any Excluded Assets):

(a)    all rights, Claims or causes of action, other than Avoidance Actions (which are governed by Section 2.1(p)), of Sellers against any party arising out of events occurring prior to the Closing including, for the avoidance of doubt, arising out of events occurring prior to the commencement of the Chapter 11 Case, and including any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers,

18

manufacturers and contractors relating to products sold, or services provided, to Sellers, in each case, relating to the Business and all such rights, Claims or causes of action relating to, arising from or pertaining to the Transferred Assets;

(b)    all Leased Real Property under Leases that are Transferred Contracts (the "Transferred Leases") and all associated tenant improvements, which Transferred Leases are set forth on Section 2.1(b) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e)), including such assets that are located at or associated with such Leased Real Property;

(c)    all Owned Real Property;

(d)    all owned tangible property, accounts, machinery, equipment, movable property and vehicles, and all Inventory, including all express or implied warranties with respect thereto;

(e)    all Transferred IT;

(f)    all Purchase Orders and all Contracts set forth on Section 2.1(f) of the Disclosure Letter, as may be amended from time to time pursuant to Section 2.5(e) (collectively with the Purchase Orders, the "Transferred Contracts"); provided that any applicable Cure Claims shall be paid by or on behalf of Buyer or its designee at Closing or as otherwise agreed by the applicable Contract counterparty;

(g)    all Transferred IP;

(h)    all goodwill associated with the Transferred Assets or the Business, including Seller's relationships with their customers and all rights of Sellers, in each case, under any Transferred Contracts with their customers;

(i)    subject to Section 2.2(e) and Section 2.12, all Prepaid Expenses;

(j)    all accounts receivable, instruments, and chattel paper of the Business and all cash receipts received from customers of the Business or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing (including any such accounts receivable related to "Destination True Value" store enhancements and improvements);

(k)    to the extent not prohibited by Law, all documents and other books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files related to the Transferred Assets and Transferred Contracts, suppliers lists, production data, quality control records and procedures, correspondence, the Transferred Employee Records, and all customer sales, marketing, advertising, packaging and promotional materials, drawings, engineering and manufacturing data, environmental studies, reports and analysis, sales records, strategic plans, research, and other technical information and data, and all other business and other records that are related to the Business or any Transferred Asset and in the possession of Seller, including any Tax Returns and Tax records to the extent related to any Taxes imposed on or with respect to a Transferred Asset or any Assumed Liability, and, except as set forth in Section 2.3, all privileged or

19

confidential information and all attorney-client and other privileges pertaining to the Business or the Transferred Assets; provided, however, that in each case Seller have the right to retain copies at Sellers' expense pursuant to Section 6.2;

(l)    all telephone and facsimile numbers of the Business and all records of email addresses of customers and suppliers of the Business;

(m)    subject to obtaining the applicable consents set forth on Section 3.3(a) of the Disclosure Letter, all Permits and licenses held by Sellers, but only to the extent such Permits may be transferred under applicable Law;

(n)    any other assets and properties of Sellers that are not Excluded Assets, including, upon payment to Sellers of the LC Reimbursement Amount, all right, title and interest of Sellers and True Value Parent in and to the cash collateral posted by Sellers under the 1970 Group Agreements, including the right to direct the party or parties holding such cash collateral to transfer it to Buyer (and not to Sellers) when permitted under the 1970 Group Agreements;

(o)    all rights and obligations under or arising out of all insurance policies (except as set forth in Section 2.2(g)) for any of the Transferred Assets or Assumed Liabilities; and

(p)    all Claims or causes of action to avoid a transfer of property or an obligation incurred by the Sellers pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a), or any similar actions under any other applicable Law (collectively, "Avoidance Actions") against the following (collectively, the "Designated Parties"): (i) Sellers' or their vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Business or the Transferred Assets after the Closing, (ii) any of Sellers' counterparties under any licenses of Intellectual Property that are Transferred Contracts or counterparties under any other Transferred Contracts, (iii) any officer, manager or employee of Sellers that is a Transferred Employee, and (iv) any Affiliates of any of the Persons listed in clauses (i) through (iii); provided, however, that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense against any claim or cause of action raised by such Designated Party; provided further that Buyer shall not use any of the Avoidance Actions acquired pursuant to this Agreement for purposes or as a means of failing to honor its obligations under Section 2.3(d) of this Agreement.

Section 2.2    Excluded Assets.  Notwithstanding anything contained in Section 2.1 to the contrary, Sellers are not selling, and Buyer (and any Designated Buyer) is not purchasing, any right, title or interest in, to or under the following assets of Sellers, all of which shall be retained by Sellers (collectively, the "Excluded Assets"):

(a)    [RESERVED]

(b)    all documents, written files, papers, books, reports and records, including those prepared or received by Sellers or any of their Affiliates or Representatives: (i) in connection with any sale or potential sale of True Value Parent, Sellers, the Business, or any

20

portion thereof including the Transferred Assets (including, but not limited to, this Agreement and the transactions contemplated hereby), (ii) relating to the Chapter 11 Case, (iii) that are subject to any privilege in favor of Sellers or any of their Affiliates, or (iv) that Sellers are required by Law or other requirement to retain;

(c)    all rights, Claims and causes of action to the extent relating to any Excluded Asset (and not relating to the Business, any Transferred Assets, and Transferred Contracts, or any Assumed Liabilities), including any Avoidance Actions that are not against the Designated Parties;

(d)    shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(e)    all retainers or similar prepaid amounts paid to the Advisors of Sellers;

(f)    all Leased Real Property under Leases that are not Transferred Contracts (the "Excluded Leases") and all associated tenant improvements, which Excluded Leases are set forth on Section 2.2(f) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e));

(g)    all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, solely to the extent payable to or on behalf of, or in respect of amounts payable by Sellers to any individuals covered by such policies;

(h)    each Contract of any Seller that is not a Transferred Contract;

(i)    (i) all books and records to the extent primarily related to any of the Excluded Assets or Excluded Liabilities; (ii) all minute books, Organizational Documents, stock registers and such other books and records of such Seller, as pertaining to ownership, organization, qualification to do business, capitalization, or existence thereof, Tax Returns (and any related work papers) of any Seller (other than Tax Returns described in Section 2.1(k), provided that Sellers shall be entitled to retain copies thereof pursuant to Section 6.2), and the corporate seal of any Seller; and (iii) all books and records of Sellers that relate to the Transferred Employees, the disclosure of which would violate Law;

(j)    all Tax refunds and Tax attributes of Sellers that are not automatically transferred with the Transferred Assets by the operation of applicable Tax Law;

(k)    all Cash and Cash Equivalents (other than accounts receivable, instruments and chattel paper of the Business and all cash receipts received from customers or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing, in each case, as contemplated in Section 2.1(j));

(l)    the Cash Consideration;

21

(m)     all Intellectual Property other than the Transferred IP, including all Excluded IP;

(n)     all information technology assets, and related systems and equipment other than the Transferred IT, including all Excluded IT;

(o)     all assets under each Employee Benefit Plan, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts);

(p)     all rights, Claims or causes of action of Sellers and their Affiliates under this Agreement and the Ancillary Agreements; (ii) under any Contracts that are not Transferred Contracts and (iii) against third parties to the extent relating to any Excluded Asset or Excluded Liability; and

(q)     any other asset that, although included in the definition of Transferred Assets, Buyer notifies Seller in writing not later than one (1) Business Day prior to the Closing that Buyer does not wish to purchase pursuant to Section 2.5(e).

Section 2.3    Assumed Liabilities.  Subject to the terms and conditions set forth in this Agreement, Buyer shall assume, pay, satisfy, perform and discharge when due only the following Liabilities (the "Assumed Liabilities"):

(a)     all Liabilities of Sellers under the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases) and the transferred Permits that arise under such Transferred Contracts or transferred Permits on or after the Closing;

(b)     all Liabilities relating to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the Closing;

(c)     all Liabilities under the Purchase Orders;

(d)     (i) timely filed or scheduled claims of Sellers' vendors for the value of goods received by Sellers within twenty (20) days prior to the Petition Date which goods were sold to Sellers in the Ordinary Course of Business but only to the extent such claims are entitled to priority in payment under Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Case as determined and allowed by the Bankruptcy Court or otherwise agreed to by Sellers and Buyer (the "Section 503(b)(9) Claims"), and (ii) trade and vendor accounts payable incurred by Sellers in the Ordinary Course of Business after the Petition Date for goods received by Sellers that remain unpaid as of the Closing to the extent such payables are entitled to priority in payment in the Bankruptcy Case under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code as reasonably agreed by Sellers and Buyer based upon Sellers' books and records (or other appropriate form of validation) or as otherwise determined and allowed by the Bankruptcy Court (the "Trade Admin Claims", and together with the Section 503(b)(9) Claims, collectively, the "Assumed Payables"); provided, however, that (x) the aggregate face amount of Assumed Payables that are Assumed Liabilities pursuant to this Section 2.3(d) shall not exceed Forty Five Million dollars ($45,000,000) (such amount, as may be decreased pursuant to subclause (y) immediately below, the "Assumed Payables Cap"); (y) in the event of a Lender Recovery

22

Shortfall pursuant to <u>Section 6.12</u>, the Assumed Payables Cap shall be decreased by an amount equal to the lesser of (i) the amount of such Lender Recovery Shortfall and (ii) the Lender Recovery Shortfall Backstop; and (z) the face amount of the Section 503(b)(9) Claims and Trade Admin Claims to be assumed, satisfied and paid by Buyer pursuant to this <u>Section 2.3(d)</u> shall be subject to the reconciliation procedures and other terms set forth in <u>Section 6.13</u>;

      (e)     all Cure Claims associated with the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases), other than to the extent waived by the applicable counterparty as contemplated by <u>Section 2.5</u> of the Disclosure Letter; and

      (f)     Liabilities assumed by Buyer pursuant to <u>Section 6.3</u>.

Section 2.4    <u>Excluded Liabilities</u>.  Other than the Assumed Liabilities, Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Transferred Assets or the Business, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing.  Notwithstanding anything in this Agreement to the contrary, the Assumed Liabilities shall not include any Liabilities or obligations for any Taxes of any Seller or related to the operation of the Business prior to the Closing (or for the portion of any tax period ending on the Closing Date) (all such retained Liabilities, "<u>Excluded Liabilities</u>").

Section 2.5    <u>Assignment of Transferred Contracts</u>.

      (a)     The Bidding Procedures Order shall implement a process to determine the Cure Claims with respect to any and all of Sellers' Contracts, including the right to negotiate in good faith and litigate, if necessary, with any Contract counterparty the Cure Claims needed to cure all monetary defaults under such Contract.  Notwithstanding the foregoing, prior to the Designation Deadline, Buyer may require Sellers to delete from <u>Section 2.1(f)</u> of the Disclosure Letter any Transferred Contract that Buyer no longer desires to have assigned to it in accordance with <u>Section 2.5(e)</u>, and such Contract shall be an Excluded Asset.

      (b)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this <u>Section 2.5</u>, on the Closing Date, Sellers shall assign the Transferred Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by Buyer as may be required under Section 365 of the Bankruptcy Code and payment by Buyer of the Cure Claims in respect of the Transferred Contracts, and Buyer shall assume such Transferred Contracts.  All Cure Claims in respect of all of the Transferred Contracts shall be paid by Buyer.

      (c)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this <u>Section 2.5</u>, Sellers shall transfer and assign, all of the Transferred Assets to Buyer, and Buyer shall assume all of the Transferred Assets from Sellers, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code.

(d)    Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to Buyer of any asset that would be a Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any consent from any Governmental Authority or any other third party and such consents shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in the Purchase Price without the sale, transfer, assignment, conveyance or delivery of such asset.  In the event that any failed condition is waived and the Closing proceeds without the transfer or assignment of any such asset, then following the Closing, Sellers shall use their commercially reasonable efforts at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, and Buyer shall cooperate with Sellers (at Buyer's sole expense), to obtain such consent as promptly as practicable following the Closing.  Pending the receipt of such consent, the Parties shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other to provide Buyer with all of the benefits of use of such asset.  Once consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, Sellers shall promptly (and, in any event, within two (2) Business Days or as soon as practicable thereafter) transfer, assign, convey and deliver such asset to Buyer.  To the extent that any such asset cannot be transferred or the full benefits or use of any such asset cannot be provided to Buyer, then as promptly as practicable following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, Buyer and Sellers shall enter into such arrangements (including subleasing, sublicensing or subcontracting), and shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other, to provide Buyer with all of the benefits of use of such asset.  Sellers shall hold in trust for, and pay to Buyer, promptly (and, in any event, within two (2) Business Days or as soon as practicable thereafter) upon receipt thereof, all income, proceeds and other monies received by Sellers derived from their use of any asset that would be a Transferred Asset in connection with the arrangements under this <u>Section 2.5(d)</u>.  The Parties agree to treat any asset the benefits of which are transferred pursuant to this <u>Section 2.5(d)</u> as having been sold to Buyer for Tax purposes to the extent permitted by Law.  Each of Sellers and Buyer agrees to notify the other Parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Buyer pursuant to this <u>Section 2.5(d)</u>) is not permitted for Tax purposes under applicable Law.  Where such treatment is not so permitted, and subject to the terms of any relevant arrangement agreed to by Sellers and Buyer pursuant to this <u>Section 2.5(d)</u>, Buyer shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Transferred Asset after the Closing Date.

(e)    Notwithstanding anything in this Agreement to the contrary, Buyer may amend or revise <u>Section 2.1(f)</u> of the Disclosure Letter setting forth the Transferred Contracts, in order to add any Contract to, or eliminate any Contract from, such section of the Disclosure Letter at any time during the period commencing from the date hereof and ending on the date that is two (2) Business Days before the Closing (the "<u>Designation Deadline</u>"); provided that with respect to any Contract or Lease that is not listed as a Transferred Contract by the Designation Deadline but is necessary for Sellers to satisfy their obligations under the Transition Services Agreement, Buyer shall be entitled to designate such Contract or Lease as a Transferred

24

Contract post-Closing in the manner contemplated in the Transition Services Agreement subject to Buyer's payment of all Cure Claims for such Contract or Lease. Automatically upon the addition of any Contract to Section 2.1(f) of the Disclosure Letter, such Contract shall be a Transferred Contract for all purposes of this Agreement. Automatically upon the removal of any Contract from Section 2.1(f) of the Disclosure Letter such Contract shall be an Excluded Asset for all purposes of this Agreement subject to the inclusion of such Contract in the Transition Services Agreement, and no liabilities arising thereunder shall be assumed or borne by Buyer except as otherwise provided in the Transition Services Agreement (unless such liability is otherwise specifically assumed pursuant to Section 2.3).

Section 2.6    Consideration.    The aggregate consideration for the purchase, sale, assignment and conveyance of the Transferred Assets from Sellers to Buyer (the "Purchase Price") shall consist of:

(a)    the payment by Buyer and/or one or more Designated Buyers, by wire transfer of immediately available funds to one or more accounts designated in writing by True Value Parent in accordance with Section 2.8(c)(v), an aggregate amount equal to One Hundred Fifty-Three Million dollars ($153,000,000.00) (the "Cash Consideration"); provided, that in the event of a Lender Recovery Shortfall pursuant to Section 6.12, the Cash Consideration shall be increased by an amount equal to the lesser of (i) the amount of such Lender Recovery Shortfall and (ii) the Lender Recovery Shortfall Backstop;

(b)    the assumption by Buyer, or a Designated Buyer, as applicable, of the Assumed Liabilities from Sellers.

Section 2.7    Deposit Funds.

(a)    On the date hereof, unless already deposited, Buyer shall deposit into escrow with an escrow agent reasonably acceptable to Sellers and Buyer (the "Escrow Agent") an amount equal to Fifteen Million Three Hundred Thousand dollars ($15,300,000,00) (such amount, together with all interest and other earnings accrued thereon, the "Deposit Funds"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement. The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) True Value Parent on behalf of Sellers, as follows:

(i)    if the Closing shall occur, the Deposit Funds shall be applied towards the Purchase Price payable by Buyer pursuant to Section 2.6(a);

(ii)    if this Agreement is terminated by Sellers pursuant to Section 9.1(d)(i), the Deposit Funds shall be delivered to True Value Parent; or

(iii)    if this Agreement is terminated other than in a manner provided by Section 9.1(d)(i), the Deposit Funds shall be delivered to Buyer.

(b)    For the avoidance of doubt, the aggregate maximum value that shall be credited against the Cash Consideration by application of the Deposit Funds shall be Fifteen Million Three Hundred Thousand dollars ($15,300,000.00) plus any interest and other earnings solely to the extent accrued as part of the Deposit Funds while held by the Escrow Agent. The

Parties acknowledge that the agreements contained in this <u>Section 2.7</u> are an integral part of the transactions contemplated in this Agreement, that the damages resulting from termination of this Agreement under circumstances where Sellers are entitled to the Deposit Funds are uncertain and incapable of accurate calculation and that the delivery of the Deposit Funds is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate Sellers in the circumstances where Sellers are entitled to the Deposit Funds for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, and that, without these agreements, Sellers would not enter into this Agreement.  As such, receipt of the Deposit Funds by True Value Parent, solely in the event of a termination of this Agreement pursuant to <u>Section 9.1(d)(i)</u> shall be Sellers' sole and exclusive remedy and Sellers shall have no further Claims or causes of action against Buyer arising from or relating to such termination of the Agreement; <u>provided</u>, <u>however</u>, that Sellers shall be entitled to seek specific performance of Buyer's obligations hereunder pursuant to <u>Section 10.13</u> of this Agreement.  If Buyer fails to take any action necessary to cause the delivery of the Deposit Funds to Sellers pursuant to the Escrow Agreement under circumstances where Sellers are entitled to the Deposit Funds and, in order to obtain such Deposit Funds, Sellers commence an Action which results in a judgment in favor of Sellers, Buyer shall pay to Sellers an amount in cash equal to the costs and expenses (including attorney's fees) incurred by Sellers in connection with such Action.

Section 2.8    <u>Closing</u>.

(a)    The purchase, sale, assignment and conveyance of the Transferred Assets contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, located at One Manhattan West, New York, NY 10001) at 10:00 a.m. Eastern Time on the Closing Target Date or at such other place or at such other time or on such other date as Sellers and Buyer mutually may agree in writing, it being understood that if the Closing cannot occur on the Closing Target Date then Sellers and Buyer shall confer in good faith to determine whether to consummate the Closing at such other time or on such other date as Sellers and Buyer mutually may agree in writing, in each case, following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in <u>Article VII</u> (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions).  The day on which the Closing takes place is referred to as the "<u>Closing Date</u>."

(b)    At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(i)    the bill of sale, assignment and assumption agreement substantially in the form of <u>Exhibit E</u> (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Sellers;

(ii)    the assignment and assumption of leases, substantially in the form of <u>Exhibit F</u> (the "<u>Lease Assignment and Assumption Agreement</u>"), duly executed by Sellers with respect to each of the Transferred Leases;

26

(iii)    an intellectual property assignment agreement, substantially in the form of <u>Exhibit G</u> (the "<u>IP Assignment Agreement</u>"), duly executed by Sellers;

(iv)    a transition services agreement, if agreed to prior to the Closing in accordance with <u>Section 6.10</u>, substantially on the terms set forth in the Amended and Restated Transition Services Term Sheet attached hereto as <u>Exhibit H</u> and otherwise in form and substance reasonably acceptable to Buyer and Sellers (the "<u>Transition Services Agreement</u>"), duly executed by Sellers;

(v)    possession of each Owned Real Property, together with, for each Owned Real Property recorded in the name of any Seller, a limited warranty deed (or its jurisdictional equivalent) in recordable form for all such Owned Real Property conveying such Owned Real Property subject only to Permitted Post-Closing Encumbrances, duly executed by the applicable Seller, and such ordinary and customary documents (including customary affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to obtain customary owner's title policies insuring Buyer's fee simple title to such Owned Real Property (without expanding or supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto);

(vi)    a copy of the Sale Order;

(vii)    an Internal Revenue Service Form W-9, duly executed by each Seller;

(viii)    RESERVED

(ix)    a duly executed certificate of a duly authorized officer of True Value Parent certifying the satisfaction of the conditions set forth in <u>Section 8.3(a)</u>, <u>Section 8.3(a)(i)</u> and <u>Section 8.3(c)</u>; and

(x)    evidence, in form and substance reasonably satisfactory to Buyer, that all notices, authorizations, approvals, Orders, permits, and consents set forth on <u>Section 2.8(b)(x)</u> of the Disclosure Letter have been obtained or delivered, as applicable.

(c)    At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(i)    the Assignment and Assumption Agreement, duly executed by Buyer;

(ii)    the Lease Assignment and Assumption Agreements, duly executed by Buyer;

(iii)    the IP Assignment Agreement, duly executed by Buyer;

(iv)    the Transition Services Agreement, if agreed to prior to the Closing in accordance with <u>Section 6.10</u>, duly executed by Buyer;

27

(v)     the Cash Consideration in cash by wire transfer of immediately available funds to an account or accounts designated by True Value Parent;

(vi)     the Prepaid Expenses Reimbursement Amount, in accordance with Section 2.12;

(vii)     the LC Reimbursement Amount in accordance with Section 2.14; and

(viii)     a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b).

Section 2.9    Purchase Price Allocation.  For U.S. federal and applicable state, local and foreign Tax purposes, Buyer, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any amounts treated as part of the Purchase Price for applicable Tax purposes) among the Transferred Assets in accordance with the methodology set forth in Section 2.9 of the Disclosure Letter (the "Allocation Methodology," and such allocation, the "Allocation").  After the Closing, Buyer shall prepare and deliver to Sellers the Allocation, and the Allocation as prepared by Buyer, including any reasonable comments sent to Buyer from Seller, shall be binding on the Parties and their respective Affiliates.  The Parties and their respective Affiliates shall (a) file all applicable Tax Returns in accordance with such Allocation and (b) not take any Tax-related action that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by a change in applicable Law occurring after the date hereof or pursuant to a "determination" within the meaning of Section 1313(a) of the Code or any similar provision of state, local or foreign Tax Law.

Section 2.10    Designated Buyer(s).

(a)     In connection with the Closing, without limitation by the terms of Section 10.12, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.10, one (1) or more Affiliates to purchase specified Transferred Assets and employ specified Transferred Employees on and after the Closing Date, (any such Affiliate of Buyer that shall be properly designated by Buyer in accordance with this Section 2.10, a "Designated Buyer"); provided that no such designation would impede or delay the Closing or materially and adversely affect the timely receipt of any regulatory approval, in each case, in any material respect; provided, further, that no such designation shall be permitted if any Taxes required to be withheld under applicable Law from any amounts otherwise payable hereunder would be higher than the amount of Taxes that would be required to be withheld absent such designation.  At and after the Closing, Buyer shall, or shall cause its Designated Buyer(s) to, honor Buyer's obligations at the Closing.  After the Closing, any reference to Buyer made in this Agreement in respect of any purchase, assumption or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any.  Buyer shall be jointly and severally liable for all obligations of Buyer and its Designated Buyer(s) under this Agreement as to any particular Assumed Liability that a Designated Buyer is assuming at the Closing.

(b)      Without limitation of <u>Section 6.4</u>, the designation of a Designated Buyer in accordance with <u>Section 2.10(a)</u> shall be made by Buyer by way of a written notice to be delivered to Sellers as soon as reasonably practicable following the date of this Agreement but in no event later than two (2) Business Days prior to the Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Assets and Transferred Employees Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.      Notwithstanding the foregoing, and for the avoidance of doubt, any designation pursuant to <u>Section 2.10(a)</u> shall not relieve Buyer of any of its obligations under this Agreement (or otherwise) and Buyer shall remain jointly and severally liable therefor.

Section 2.11      <u>Withholding</u>.  Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as are required to be deducted and withheld from such amount under the Code or any other applicable provision of U.S. or foreign Tax Law.  To the extent that Buyer intends to withhold any such amounts from the Purchase Price, it shall (a) notify Sellers of such intention as soon as reasonably possible after the date hereof and shall provide Sellers with an opportunity to provide forms or evidence that would exempt or reduce such amounts from withholding and (b) otherwise cooperate in good faith with Sellers and use commercially reasonable efforts to minimize or eliminate any such deductions or withholdings.  To the extent that any amounts are so deducted and withheld and paid to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 2.12      <u>Reimbursement of Prepaid Expenses</u>.   With respect to all Prepaid Expenses (x) constituting deposits or (y) attributable to the period following the Closing Date, (i) at least three (3) Business Days prior to the Closing, Sellers shall deliver to Buyer documentation, in form and substance reasonably satisfactory to Buyer, evidencing the amount of such Prepaid Expenses (the "<u>Prepaid Expenses Reimbursement Amount</u>") and (ii) at the Closing, Buyer shall pay to Sellers an amount equal to such Prepaid Expenses Reimbursement Amount in cash by wire transfer of immediately available funds to an account or accounts designated by True Value Parent, and all such Prepaid Expenses shall be assigned to Buyer in accordance with <u>Section 2.1</u>. For the avoidance of doubt, if any Prepaid Expenses that otherwise would be reimbursable by Buyer under this <u>Section 2.12</u> are not known to Sellers as of the Closing, then Sellers shall, following their becoming aware of such Prepaid Expenses, deliver to Buyer documentation, in form and substance reasonably satisfactory to Buyer, evidencing the amount of such Prepaid Expenses and Buyer shall, as soon as practicable after receipt of such notice, reimburse Sellers in the amount provided in this <u>Section 2.12</u>.

Section 2.13      <u>Payment of Purchase Orders</u>.   Pursuant to <u>Section 2.1(f)</u>, Sellers shall assign to Buyer, and Buyer shall assume from Sellers, all Purchase Orders. For the avoidance of doubt, (i) all goods received pursuant to a Purchase Order after Closing at either a distribution center that is subject to a Transferred Lease or a distribution  center that is subject to an Excluded

Lease, shall be owned by Buyer and (ii) Buyer shall pay when due all amounts owed under any such Purchase Order in accordance with the terms thereof directly to the party to whom such payment is owed.

Section 2.14   LC Reimbursement Amount.  At the Closing, Buyer shall pay to Sellers in accordance with Section 2.8(c)(vii), an amount equal to One Million Seven Hundred Seventy Four Thousand Six Hundred Twenty Two Dollars and Fifty Cents ($1,774,622.50) (the "LC Reimbursement Amount") in respect of the cash collateral posted by Sellers under the 1970 Group Agreements.  Sellers shall use reasonable best efforts to cause the transfer to Buyer in accordance with Section 2.1(n) of all of their rights, title and interest in and to such cash collateral, and shall direct the party or parties holding such cash collateral to deliver and pay such cash collateral to Buyer (and not to Sellers) when permitted to do so under the 1970 Group Agreements; provided, that if the counter-parties to the 1970 Group Agreements are unwilling to deliver and pay such cash collateral directly to Buyer, then Sellers covenant and agree that, promptly upon receipt of such cash collateral by Sellers in accordance with the terms of the 1970 Group Agreements, Sellers shall deliver and pay over to Buyer such cash collateral.  In each case, any such payments shall be made by wire transfer of immediately available funds to an account or accounts designated by Buyer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF SELLERS

Except as set forth in the Disclosure Letter attached hereto, each Seller jointly and severally represents and warrants to Buyer as follows (and for all purposes of this Article III, references to the "date hereof" shall mean October 13, 2024):

Section 3.1   Organization.  Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own, lease and operate all of its properties and assets (including the Transferred Assets) and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code and the Orders of the Bankruptcy Court, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which in which the nature of the Transferred Assets or the character or location of the Transferred Assets requires it to qualify, except where the failure to be so qualified would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.2   Authority.  Subject to required Bankruptcy Court approvals, (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been,

duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

Section 3.3    No Conflict; Required Filings and Consents.

(a)    Except as set forth on Section 3.3(a) of the Disclosure Letter and assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.3(b) of the Disclosure Letter are made, given or obtained (as applicable), (y) the requirements of the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and any other applicable Antitrust Laws, are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Sellers of this Agreement and each of the Ancillary Agreements to which they will be a party and the consummation by Sellers of the transactions contemplated hereby and thereby, does not: (i) conflict with or violate any provision of any Organizational Document of any Seller; (ii) in any material respect conflict with or violate any Law or Order applicable to any Seller or by which any Transferred Asset is bound; or (iii) conflict with, result in any material breach of, constitute a material default (or an event that, with notice or lapse of time or both, would become a material default) under, create in any party thereto any right of termination, vesting, amendment, acceleration or cancellation of, require any consent under, or result in the creation or imposition of any material Encumbrance (other than a Permitted Pre-Closing Encumbrance) on any Transferred Asset or under any Transferred Contract; except, with respect to clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences that, are not material to the Business, taken as a whole.

(b)    Except as set forth on Section 3.3(b) of the Disclosure Letter, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by any Seller of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby and thereby, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under the HSR Act and any other Antitrust Laws, (iii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, or (v) as may be necessary as a result of any facts or circumstances relating to Buyer or any of its Affiliates.

Section 3.4    Transferred Assets; Sufficiency of Assets.  Subject to requisite Bankruptcy Court approvals and except as a result of the commencement of the Chapter 11 Case:

31

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Business, each Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

(b)    This Agreement, the Ancillary Agreements, and the other instruments and documents to be delivered by Sellers to Buyer at the Closing shall, subject to entry of the Sale Order and the receipt of each of the consents and approvals set forth on Section 3.3(a) and Section 3.3(b) of the Disclosure Letter, be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), claims and interests, other than Assumed Liabilities.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole, and except for any Business Employees who do not become Transferred Employees and for any Excluded Assets (including, for the avoidance of doubt, any Leased Real Property under any Excluded Lease), the Transferred Assets to be conveyed to Buyer hereunder at Closing (taking into account any rights granted or services to be provided under this Agreement or any Ancillary Agreement), constitute (i) all the properties, rights and other assets and personnel necessary, and are sufficient, to carry on the Business as it is currently conducted by Sellers and (ii) except for the Excluded Assets, all of the assets owned by Sellers and held for use by Sellers primarily in the conduct of the Business.

Section 3.5    Financial Statements; No Undisclosed Liabilities.

(a)    (i) The audited consolidated balance sheets of True Value Parent as of December 31, 2022 and 2023, together with the related consolidated statements of income, stockholders' equity and cash flows ended December 31, 2022 and 2023, and (ii) the unaudited consolidated balance sheets of True Value Parent as of August 31, 2024, together with the related consolidated statements of income, stockholders' equity and cash flows for the eight months ended August 31, 2024 (collectively, the "Financial Statements") have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of True Value Parent and its Subsidiaries and the Business at the respective dates thereof and the results of their operations and cash flows for the periods indicated.  None of the Financial Statements contains any material, non-recurring items of revenue or gain outside the Ordinary Course of Business, except as expressly set forth therein.  No Seller is aware of any fraud or intentional misconduct relating to its Financial Statements or operations, or any allegations thereof.

(b)    Except for Liabilities (i) incurred in connection with or contemplated by this Agreement, (ii) reflected or reserved against in the audited consolidated balance sheet of True Value Parent as of December 31, 2023 or in the notes thereto, (iii) that have been incurred in the Ordinary Course of Business since December 31, 2023 or (iv) that have been discharged or paid in full in the Ordinary Course of Business, Sellers do not have any Liabilities of any nature

(whether accrued, absolute, contingent or otherwise), which are required to be disclosed, recorded or reflected on a balance sheet, including the footnotes thereto, under GAAP.

Section 3.6    Absence of Certain Changes or Events.    Since December 31, 2023, through the date of this Agreement, there has not been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect.  Except for (i) discussions, negotiations and activities related to this Agreement or other potential strategic transactions, (ii) the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets (or other strategic transaction), the negotiation and execution of this Agreement, (iii) for the preparation and commencement of the Chapter 11 Case, or (iv) as set forth on Section 3.6 of the Disclosure Letter or as expressly contemplated by this Agreement, from December 31, 2023 until the date hereof, no Seller has taken any action or failed to take any action, as applicable, that would be prohibited by Section 6.1(b)(i), Section 6.1(b)(ii), Section 6.1(b)(iii), Section 6.1(b)(iv), Section 6.1(b)(vii), Section 6.1(b)(viii), Section 6.1(b)(x) or Section 6.1(b)(xii) if taken, or failed to be taken, except for the execution and delivery of this Agreement.

Section 3.7    Compliance with Law; Permits.

(a)    As of the date hereof, the Business is being, and at all times since the Compliance Date has been, conducted in all material respects in compliance with, and Sellers are, and at all times since the Compliance Date have been, in compliance in all material respects with, all applicable Laws relating to the operation of the Business and the Transferred Assets and (ii) there are no pending or, to the Knowledge of Sellers, threatened, claims from any Governmental Authority relating to any non-compliance of the Business or the Transferred Assets.

(b)    Sellers are in possession of all material permits (including work permits and visas), licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate their assets and properties (including all the Transferred Assets), and to employ or engage officers, workers and employees who are not citizens of the country where they are carrying out their duties or performing their services and to carry on the Business as currently conducted.  All material Permits held by Sellers are valid and in full force and effect and neither Sellers nor any of their applicable Subsidiaries are in default under, or in violation of, any such Permit,, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyer's ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending or, to the Knowledge of Sellers, threatened in writing.

Section 3.8    Litigation.  Except for the Chapter 11 Case, and any Order entered in the Chapter 11 Case, as of the date hereof, there is no material Action by or against Sellers in connection with the Business or the Transferred Assets pending, or to the Knowledge of Sellers, threatened in writing.

33

Section 3.9    <u>Employee Benefit Plans</u>.

(a)    (i) Each Employee Benefit Plan has been operated and administered in all material respects in accordance its terms and with applicable Law and with each applicable Collective Bargaining Agreement, and (ii) there are no pending or, to the Knowledge of Sellers, threatened actions, suits or claims by, on behalf of or against any Employee Benefit Plan or any administrator or fiduciary thereof (other than routine claims for benefits), in each case (i) and (ii), other than would not reasonably be expected to result in material Liability to the Business.

(b)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, (i) entitle any Business Employee to severance pay (other than from a Governmental Authority), (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation or benefits due to any Business Employee, (iii) cause any individual to receive any additional payment under any Employee Benefit Plan, or (iv) directly or indirectly cause any Seller or any Affiliate of a Seller to transfer or set aside any assets to fund or otherwise provide for benefits for any individual.

(c)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, result in any payment or benefit (whether in cash or property or the vesting of property) to any "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) that could, individually or in combination with any other such payment or benefit, constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) or subject any Person to Liability for Tax under Section 4999 of the Code or cause the loss of a deduction to any Seller under Section 280G of the Code.

(d)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination or opinion letter as to such qualification from the IRS, and, to the Knowledge of Sellers, no event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification.  No stock or other securities issued by any Seller or any Affiliate of a Seller forms or has formed any part of the assets of any Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code.

(e)    Except as set forth in <u>Section 3.9(e)</u> of the Disclosure Letter, none of Sellers or any of their ERISA Affiliates maintains, sponsors or contributes to or, within the last six (6) years, has maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to or in any way has any Liability (whether on account of an ERISA Affiliate or otherwise) to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA (whether or not subject thereto), (ii) a plan subject Title IV or Section 302 of ERISA or Section 412, 430 or 4971 of the Code or (iii)  a "multiemployer plan," as defined in Section 3(37) of ERISA. None of Sellers or any of their ERISA Affiliates has incurred any withdrawal liability (including any contingent or secondary withdrawal liability) within the meaning of Section 4201 or 4204 of ERISA that remains unsatisfied. Other than as would not reasonably be expected to result in material Liability to the Business, none of Sellers or any of their ERISA Affiliates maintains, sponsors or contributes to (x) any "voluntary employee beneficiary association"

34

within the meaning of Section 501(c)(9) of the Code or any other "welfare benefit fund" as defined in Section 419 of the Code, (y) a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA, or (z) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

Section 3.10    Labor and Employment Matters.

(a)    Section 3.10(a) of the Disclosure Letter sets forth a complete and correct list of all Business Employees and for each such Business Employee, to the extent permitted by Law, the following: (i) name; (ii) title or position; (iii) whether full-time or part-time; (iv) classification as exempt or non-exempt; (v) hire date; and (vi) current annual base compensation rate.  As of the date of this Agreement, all compensation, including wages, commissions, bonuses, fees and other compensation, due and payable to each Business Employee for work performed on or prior to the date hereof has been paid in full, except for any such amounts that are accrued and unpaid in the Ordinary Course of Business.  As of the date of this Agreement, all compensation due and payable to each independent contractor who has been engaged by Sellers has been paid in full for services performed on or prior to the date hereof.

(b)    Except as set forth in Section 3.10(b) of the Disclosure Letter and except with respect to any such Contract at the national-, sector- or industry-level, Sellers are not a party to or bound by a Collective Bargaining Agreement.

(c)    As of the date hereof, solely with respect to the Business Employees, (i) there is no material unfair labor practice charge or complaint pending or, to the Knowledge of Sellers, threatened against Sellers before the National Labor Relations Board or any similar Governmental Authority, (ii) no Labor Organization or group of Business Employees has made a pending demand in writing for recognition or certification as the bargaining agent of the Business Employees, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or any similar Governmental Authority, (iii) to the Knowledge of Sellers, there are no pending or threatened union organizing or certification activities and (iv) there are no pending or, to the Knowledge of Sellers, threatened strikes, work stoppages, lockouts, slowdowns or other labor disputes, that, in each case of (i) through (iv), would reasonably be expected to be material to the Business, taken as a whole.  There are no material arbitrations, material grievances, or unfair labor practice charges or complaints pending against Sellers or, to the Knowledge of Sellers, threatened as of the date of this Agreement by or on behalf of any Business Employee.

(d)    Sellers are and since the Compliance Date have been, in compliance in all material respects with all applicable Laws relating to labor, labor relations, employment and employment practices pertaining to the Business Employees and to Sellers' former employees of the Business, including but not limited to all Laws respecting collective bargaining, the terms and conditions of employment, wages, hours, overtime pay, equal employment opportunity, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay),

35

immigration, work authorization, mandatory E-Verify obligations, occupational health and safety, working conditions, workers' compensation, vacation pay, plant closures and layoffs, affirmative action, labor relations, employee leave issues, and unemployment insurance.

(e)     Sellers have in their possession a U.S. Citizenship and Immigration Services Form I-9 that was, in all material respects, validly and properly completed and, if necessary, that has been properly updated, in all material respects, in accordance with applicable Law for each Business Employee.  To the Knowledge of Sellers, Sellers have not hired or continued to employ any worker who is not legally authorized to work in the United States.  To the Knowledge of Sellers, no Seller has used the services of any individual through a staffing agency, contract, or subcontract knowing that the individual was an unauthorized worker.

(f)     As of the date hereof, Sellers are in material compliance with the WARN Act as it relates to the current and former Business Employees.  During the 90-day period prior to the date of this Agreement, there has been no "mass layoff" or "plant closing" as defined by the WARN Act.

Section 3.11     Real Property.

(a)     Section 3.11(a) of the Disclosure Letter sets forth an accurate and complete list of all Owned Real Property.  Each applicable Seller has good and valid fee simple title (or jurisdictional equivalent) to the Owned Real property it owns, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.  Seller has not leased, licensed, or granted any possessory interest in any Owned Real Property.

(b)     Section 3.11(b) of the Disclosure Letter sets forth an accurate and complete list of all Leased Real Property.  Each Seller has a valid leasehold, subleasehold or other similar interest in all Leased Real Property, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.  Sellers have made available to Buyer true, correct and complete copies of each Lease for Leased Real Property.  Seller has not subleased, licensed, or granted any possessory interest in any Leased Real Property.

(c)     Except as set forth on Section 3.11(c) of the Disclosure Letter, Sellers are not a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Real Property or any portion thereof or interest therein to any Person other than Buyer.

(d)     None of Sellers, or to the Knowledge of Sellers, any other party to such Lease is in material breach or default under such Lease, and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a material breach or default, or permit the termination, modification or acceleration of rent under such Lease.  No security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease that has not been re-deposited in full.

(e)     Sellers have not received written notice from any Governmental Authority of, and there is not: (i) any pending or, to the Knowledge of Sellers, threatened, condemnation

proceedings affecting the Leased Real Property or any part thereof; (ii) to the Knowledge of the Sellers, any violation of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Leased Real Property or any part thereof, which have not heretofore been cured; or (iii) any pending or, to the Knowledge of Sellers, threatened, injunction, decree, Order, writ or judgment outstanding, nor any claims, litigation, administrative actions or similar proceedings against Sellers or any Leased Real Property relating to the ownership, lease, use or occupancy of such Leased Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of any Leased Real Property or any part thereof or in any material respect prevent or limit the present operation of the improvements on the Leased Real Property or any part thereof. There are no incomplete construction projects affecting the Leased Real Property and all completed construction projects have been fully paid for. To the Knowledge of Sellers, there is no pending or contemplated special assessment or reassessment of any parcel included in the Leased Real Property that would result in a material increase in the real property Taxes or in the rent, additional rent or other sums and charges payable by a Seller under the Leases for Leased Real Property. No brokerage or leasing commissions or other compensation are due or payable by a Seller to any Person, firm, corporation or other entity with respect to, or on account of, any Lease for Leased Real Property or any extensions or renewals thereof. The improvements, systems, fixtures and equipment constituting or located on the Leased Real Property are in working order and repair sufficient for the conduct of the business of the Sellers as now conducted.

Section 3.12    Intellectual Property.

(a)    A true, correct and complete (in all material respects) list of all U.S. and foreign (i) issued patents and pending patent applications, (ii) registered trademarks and applications to register any trademarks, (iii) registered copyrights, in each case, owned by any Seller as of the date hereof, and (iv) all domain names owned or controlled by Sellers (foregoing subsections (i)-(iv), collectively, the "Registered IP") is set forth on Section 3.12(a) of the Disclosure Letter. All material items of such Registered IP are subsisting and to the Knowledge of Sellers, are valid and enforceable. Section 3.12(a) of the Disclosure Letter shall, with respect to each reference to Registered IP, include the title, mark, serial or application number, registration number, jurisdiction, registration or recordation date and next renewal deadline or expiry date, as applicable.

(b)    Sellers are the sole and exclusive owners of the Transferred IP, and the execution and performance of this Agreement will not result in the loss or impairment of any such ownership rights by any Sellers, or Sellers' ability to assign such Transferred IP to Buyer without loss of such rights.

(c)    As of the date hereof, (i) the conduct of the Business by Sellers, and the Transferred IP as currently used by Sellers in the conduct of the Business, do not infringe, misappropriate or otherwise violate any Person's Intellectual Property rights, and (ii) there is no such unresolved Action asserted or, to the Knowledge of Sellers, threatened in writing (including any "cease and desist" letters and invitations to license) against Sellers, except, in each case of (i) and (ii) as would not reasonably be expected to be material to the Business, taken as a whole.

(d)     To the Knowledge of Sellers, as of the date hereof, (i) no Person is infringing, misappropriating or otherwise violating any Transferred IP, and (ii) there is no such unresolved Action asserted or threatened in writing against any Person by Sellers, except, in each case of (i) and (ii) as would not reasonably be expected to be material to the Business, taken as a whole.

(e)     Sellers take commercially reasonable steps to safeguard and maintain the confidentiality of material trade secrets and other material confidential and proprietary information included in the Transferred IP. To the Knowledge of Sellers, as of the date hereof, no Person has asserted in writing, any right, title or interest, or the right to receive any royalties or other consideration with respect to, any of the Transferred IP nor contested or challenged the validity or enforceability of any of the Transferred IP, in any material respect.   To the Knowledge of Sellers, as of the date hereof, there has not been any unauthorized disclosure of material trade secrets that has resulted or is reasonably likely to result in the loss of trade secret or other rights in and to such information.

(f)     Section 3.12(f) of the Disclosure Letter sets forth a true, correct and complete list of material software applications or code owned by or developed by or for Sellers that are included in the Transferred IP.

(g)     To the Knowledge of Sellers, (i) Sellers are in material compliance with the terms and conditions pursuant to which Sellers have obtained or use any Open Source Materials in the Business and (ii) no Seller has (A) incorporated Open Source Materials into, or combined Open Source Materials with, any material technology or software in the Transferred IP; (B) distributed Open Source Material in conjunction with any such Transferred IP; or (C) used Open Source Material, in each case ((A)-(C)), in such a way that requires any such Transferred IP to be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works or (3) redistributed at no charge.

(h)     The Transferred IP developed, created, invented, or authored by individuals who were employed by Sellers at the time of such development, creation, invention, or authorship is the sole property of Sellers and no such employee has any rights, title, or interest in such Intellectual Property.  All employees of Sellers have executed and delivered to Sellers an agreement (i) transferring to Sellers any rights in the Transferred IP developed, created, invented, or authored by such employee or (ii) prohibiting disclosure of Sellers' confidential and proprietary information including non-public information regarding the Transferred IP; or such employees' rights, title and interest in such Intellectual Property has otherwise vested in Sellers by operation of Law.

(i)     All developers, creators, inventors, and authors of the Transferred IP (other than with respect to Intellectual Property licensed to Sellers), who were not employees of Sellers at the time of the development, creation, invention, or authorship of such Transferred IP have assigned in writing all of their rights, title, and interest to such Transferred IP to Sellers, or such rights, title and interest have otherwise vested in Sellers by operation of Law.

38

(j)      In connection with the use of all Transferred IP by Sellers, Sellers do not owe to any other Person any material fee, royalty, or other payment as a result of the use of such Transferred IP, other than any such payments in the Ordinary Course of Business.

(k)      No Transferred IP is subject to any outstanding Order or stipulation restricting the use or licensing thereof by Sellers in connection with the Business.

Section 3.13    Tax Matters.

(a)      All material Tax Returns required to be filed with respect to the Transferred Assets or the Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects.   Subject to any obligation of Sellers under the Bankruptcy Code, all material Taxes due and payable with respect to the Transferred Assets have been paid.   Since January 1, 2018, no claim has been made in writing by a Governmental Authority in a jurisdiction where a Seller does not file Tax Returns that the Seller or the Business is or may be subject to taxation by that jurisdiction.  All Taxes that any Seller is required by Law to withhold and collect have in all material respects been duly withheld, collected and paid over to the extent due and payable.

(b)      There is no Action, suit, claim, deficiency, assessment, or audit pending, proposed in writing, or, to the Knowledge of Sellers, threatened in writing with respect to any Taxes relating to the Transferred Assets or the Business.

(c)      There are no Encumbrances for Taxes upon any of the Transferred Assets other than Permitted Pre-Closing Encumbrances.

(d)      No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any material Taxes or Tax Returns of or with respect to the Transferred Assets or the Business is outstanding.

(e)      The representations and warranties set forth in Section 3.9 and this Section 3.13(e) are the sole and exclusive representations and warranties with respect to Taxes.

(f)      None of the Transferred Assets constitutes, stock, partnership interests or other equity interest in any Person for U.S. federal income tax purposes.

Section 3.14    Environmental Matters.

(a)      As of the date hereof, Sellers, the Transferred Assets and the Business are now and, except for matters which have been resolved, have been in compliance in all material respects with all applicable Environmental Laws, which compliance includes the possession of, and material compliance with the terms of, with all material Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets.   There are no Environmental Claims pending or, to the Knowledge of Sellers, threatened in writing, that seek the revocation, cancellation, suspension or adverse modification of any such Environmental Permit.   To the Knowledge of Sellers there are no facts, conditions or circumstances that would reasonably be expected to result in termination,

39

revocation, cancellation, non-renewal or material adverse modification of any such Environmental Permits.

(b)     There is no material Environmental Claim pending or, to the Knowledge of Sellers, threatened against or affecting Sellers, the Transferred Asset or the Business.  To the Knowledge of Sellers, there are no environmental conditions, including the presence of any Hazardous Material at or migrating to or from the Real Property, which would form the basis of any material Liability of the Business or any Transferred Asset, or of any material Environmental Claim against or affecting any Transferred Asset or the Business.

(c)     To the Knowledge of Sellers, except as listed in Section 3.14(c) of the Disclosure Letter, (i) underground storage tanks have not been installed or otherwise placed on the Real Property under Sellers' ownership or possession thereof. To the Knowledge of Sellers, underground storage tanks were not located on the Real Property prior to Sellers' ownership or leasehold interest in the Real Property.

(d)     Hazardous Materials generated on the Real Property are treated, stored, generated, transported, handled, and disposed of in compliance in all material respects with all applicable Environmental Laws.

(e)     Sellers have made available to Buyer all material environmental audits, reports and site assessments regarding the Transferred Assets and the Business that are in possession of Seller and have been prepared in the last five (5) years prior to the date hereof.

Section 3.15    Material Contracts.

(a)     Section 3.15(a) of the Disclosure Letter sets forth each of the following Contracts entered into by any Seller (each, a "Material Contract"); provided, that the following Contracts shall not be set forth in Section 3.15(a) of the Disclosure Letter or be deemed a "Material Contract" for any purposes under this Agreement: (1) any Employee Benefit Plan; (2) any purchase orders or similar Contracts; and (3) any Lease for Leased Real Property:

(i)     Contracts with any current or former officer, director, or employee of any Seller;

(ii)     Contracts relating to the acquisition by any Seller of any operating business, real property, capital expenditures (including capital expenditures relating to information technology systems) or securities of any other Person (other than any Seller) (including investment in joint ventures and minority equity investments but excluding accounts receivable or other forms of trade credit) for aggregate consideration in excess of $500,000 pursuant to which there are remaining material liabilities or obligations;

(iii)     all Contracts relating to indebtedness for borrowed money;

(iv)     Contracts regarding a guaranty, undertaking to be liable for the debts of any Person other than any other Seller or provision of an indemnity in respect of liabilities, obligations or commitments of any Person other than any Seller, in each case in excess of $500,000;

40

(v)    any Contract (or group of related Contracts) the performance of which, in the twelve (12) months preceding the date hereof has resulted in, or in the twelve (12) months following the date of this Agreement would reasonably be expected to result in, consideration or payment in excess of $1,000,000 per annum to or from any Seller;

(vi)    any Contract pursuant to which any Seller (A) is granted or obtains any license or right to use any Intellectual Property material to the Business, (B) is restricted in its right to use or register any Intellectual Property material to the Business, or (C) permits any other Person to use, enforce or register any material Intellectual Property, including any license agreements, coexistence agreements and covenants not to sue, in each case other than: (X) "click-wrap," "shrink-wrap" and similar end-user licenses or other licenses to generally commercially available or "off-the-shelf" third-party software or technology, (Y) non-exclusive licenses granted in the Ordinary Course of Business, and (Z) any Contract that includes a license to use Intellectual Property that is incidental and not material to such Contract, including sales or marketing or similar Contracts for the purposes of promoting or using any products or services;

(vii)    any material Contract or consent decree with or from any Governmental Authority;

(viii)    Contracts that are capital leases as determined pursuant to GAAP and involve annual payments by any Seller in excess of $250,000;

(ix)    any Contract with a sole source supplier, pursuant to which such supplier provides to any Seller equipment, materials or services that are necessary for the sale, performance, manufacturing or support of the Business;

(x)    any material agreement relating to any strategic alliance, joint development, joint marketing, partnership, joint venture or similar arrangement; and

(xi)    all Contracts that limit or purport to limit in any respect the ability of the Business to solicit employees or customers of any other Person or compete in any line of business or with any Person or in any geographic area or during any period of time.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with the Bankruptcy Code and except as a result of the commencement of the Chapter 11 Case, each Material Contract and each of the Leases for Leased Real Property is in full force and effect and is a valid, binding and enforceable obligation of Sellers and, to the Knowledge of Sellers, each of the other parties thereto, except as may be limited by the Enforceability Exceptions.  Except as set forth on Section 3.15(b) of the Disclosure Letter, no Seller is in breach or default, or is alleged in writing by a counterparty thereto to have breached or to be in default, under any Material Contract or any Lease for Leased Real Property, and, to the Knowledge of Sellers, each other party to each Material Contract and Lease for Leased Real Property is not in breach or default thereunder.

41

Section 3.16  <u>Certain Payments</u>.  Since the Compliance Date, no Seller (nor, to the Knowledge of Sellers, any of their respective Representatives) has (a) used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature for the purpose of obtaining or retaining business or favorable governmental action or to otherwise secure any improper advantage in violation of the Foreign Corrupt Practices Act.

Section 3.17  <u>Brokers</u>.  Other than Houlihan Lokey, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

Section 3.18  <u>Data Privacy; Information Security.</u>

(a)    Sellers comply and, since the Compliance Date, have complied, in all material respects with all of the following in the conduct of the Business of Sellers: (i) Privacy Laws; (ii) the PCI-DSS; (iii) generally accepted applicable cybersecurity and privacy industry standards and guidelines including the National Institute of Standards and Technology (NIST) Cybersecurity Framework; (iv) the Business Privacy and Data Security Policies; and (v) contractual requirements or terms of use concerning the Processing of Personal Information to which Sellers is or was a party or otherwise bound.

(b)    To the extent required by applicable Law, since the Compliance Date, Sellers have posted to each of its websites and mobile applications and provided or otherwise made available in connection with its products or services, an external privacy policy and terms of use, in each case, in connection with the Business.  Any external privacy policies or terms of use provided by Sellers in connection with the Business materially comply with all applicable Privacy Laws.  Sellers, and, to the Knowledge of Sellers, any vendor, processor, or other third-party Processing Personal Information for or on behalf of Sellers and any Subsidiary, in connection with the Business, are and since the Compliance Date, have been in compliance with the external privacy policies and terms of use in all material respects.  Sellers have made available to Buyer true, complete, and correct copies of all external privacy policies and terms of use that are currently in effect.

(c)    No Personal Information in the possession or control of Sellers, or held or Processed by any vendor, processor, or other third party for or on behalf of Sellers or any Subsidiary, in the conduct of the Business of Sellers or any Subsidiary have been subject to any data breach or other security incident that has resulted in or presents a material risk of unauthorized access, disclosure, use, denial of use, alteration, corruption, destruction, or loss of such Personal Information or that has caused or would reasonably be expected to cause a material disruption to the conduct of the Business of Sellers or any Subsidiary (a "<u>Security Incident</u>").  Since the Compliance Date, Sellers or any Subsidiary have not notified and, to the Knowledge of Sellers, there have been no facts or circumstances that would require Sellers or any Subsidiary to notify, any Governmental Authority or other Person of any Security Incident.

(d)     No Seller nor any Subsidiary has received any material notice, request, claim, complaint, correspondence, or other communication in writing from any Governmental Authority or other Person, and to the Knowledge of Sellers, since the Compliance Date, there has not been any audit, investigation, enforcement action (including any fines or other sanctions), or other Action, relating to any actual or alleged material Security Incident or violation of any Privacy Law, any Business Privacy and Data Security Policy, or any Person's individual privacy rights involving Personal Information in the possession or control of Sellers or any Subsidiary in the conduct of the Business of Sellers or any Subsidiary.

Section 3.19   Exclusivity of Representations and Warranties.   Notwithstanding the delivery or disclosure to Buyer or any of its Affiliates or Representatives of any documentation or other information (including any financial projections or other supplemental data), except for the representations and warranties expressly set forth in this Agreement and the Ancillary Agreements, none of Sellers or their Affiliates or Representatives makes, or has made (and each Seller and their Affiliates and Representatives hereby disclaims) any express or implied representation or warranty with respect to Sellers, the Business or any Transferred Asset or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, and Buyer and its Affiliates and Representatives are not relying on any representation, warranty or other information of Sellers, its Affiliates or any Person except for those expressly set forth in this Agreement and the Ancillary Agreements. None of Sellers or their respective Affiliates or Representatives makes (and Sellers, and their respective Affiliates and Representatives hereby disclaims) any express or implied representation or warranty (including as to completeness or accuracy), whether at Law or in equity, to Buyer with respect to, and none of Sellers, their respective Affiliates and Representatives or any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or its Representatives, or resulting from the omission of, any estimate, projection, prediction, data, budget, forecast, financial information, memorandum, prospect information, presentation or any other materials or information, including any oral, written, video, electronic or other materials or information presented to or made available to Buyer in connection with presentations by True Value Parent's management or information made available on any "data sites" or in the course of their due diligence investigation of the Business, the negotiation of this Agreement or the course of the transactions contemplated by this Agreement.   Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

Except as set forth in the disclosure schedule delivered to Sellers prior to the execution of this Agreement (the "Buyer Disclosure Letter"), Buyer represents and warrants to Sellers as follows (and for all purposes of this Article IV, references to the "date hereof" shall mean October 13, 2024):

43

Section 4.1    <u>Organization</u>.    Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement to which it is a party.

Section 4.2    <u>Authority</u>.    Buyer has the power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate (or equivalent) action.    This Agreement has been, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will have been, duly executed and delivered by Buyer, and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its respective terms, except as enforcement may be limited by the Enforceability Exceptions.

Section 4.3    <u>No Conflict; Required Filings and Consents</u>.

(a)    Assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Section 4.3(b)</u> of the Buyer Disclosure Letter are made, given or obtained (as applicable), (y) the requirements of the HSR Act, and any other applicable Antitrust Laws, are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, does not:

(i)    conflict with or violate any provision of any Organizational Document of Buyer;

(ii)    conflict with or violate any Law or Order applicable to Buyer; or

(iii)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract to which Buyer is a party (including the Buyer Credit Agreement), in each case, that would prevent or delay Buyer's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which Buyer will be a party.

(b)    Except as set forth on <u>Section 4.3(b)</u> of the Buyer Disclosure Letter, Buyer is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will

44

be a party or the consummation of the transactions contemplated hereby or thereby, except for any filings required to be made under the HSR Act or any other Antitrust Laws.

Section 4.4    <u>Absence of Litigation</u>.  There is no Action pending or, to the knowledge of Buyer, threatened in writing, against Buyer that, if adversely determined, (a) would prevent or materially restrict, impede or delay the performance by Buyer of its obligations under this Agreement or (b) would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

Section 4.5    <u>Qualification</u>.

(a)    To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(b)    Buyer is capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Transferred Contracts.

Section 4.6    <u>Legal Requirements and Approvals</u>.  Other than as may be required under the HSR Act or any other Antitrust Laws, Buyer has no knowledge of any consent of any Governmental Authority that will be required to consummate the transactions contemplated by this Agreement that it will not be able to obtain or make, or that it may obtain only after substantial delay, or any material requirement of any Governmental Authority that it will be unable to satisfy in connection with the transactions contemplated hereby.

Section 4.7    <u>Brokers</u>.  No broker, finder or investment banker is entitled to any fee, commission or expense from Buyer that would be payable by Sellers in connection with the transactions contemplated hereby.

Section 4.8    <u>Financing</u>.

(a)    Buyer affirms that it is not a condition to Closing or any of its obligations under this Agreement that Buyer or any other Persons obtain financing for the transactions contemplated by this Agreement.

(b)    Concurrently with the execution of this Agreement, Buyer has delivered to Sellers a true, correct and complete copy of an executed debt commitment letter and each executed fee letter, engagement letter and other agreement associated therewith (provided that provisions in the fee letter related solely to fees, pricing, "flex" provisions and other economic terms may be redacted in a customary manner, provided that none of such redacted provisions affects the availability, timing, conditionality, enforceability, termination or aggregate principal amount of the Debt Financing), dated as of the date of this Agreement (such commitment letter, fee letter, engagement letter and other agreements, including all exhibits, schedules, annexes, supplements, modifications and amendments thereto, collectively, the "<u>Debt Commitment Letter</u>"), from the lenders, arrangers, agents or other financing parties party thereto (collectively, together with any providers of alternative debt financing pursuant to <u>Section 6.8(b)</u>, the "<u>Debt Financing Sources</u>"), providing the terms and conditions upon which the Debt Financing Sources have committed to provide an aggregate amount of debt financing set forth therein to Buyer for

45

the purpose of funding the transactions contemplated by this Agreement (together with any alternative debt financing pursuant to <u>Section 6.8(b)</u>, the "<u>Debt Financing</u>"). The aggregate cash proceeds contemplated to be provided to Buyer at the Closing pursuant to the Debt Commitment Letter (after netting out applicable fees, expenses, original issue discount and similar premiums and charges after giving effect of the maximum amount of "flex" (including any original issue discount flex) provided for under the Debt Financing) when funded in accordance with the Debt Commitment Letter, will be in an amount sufficient and available, together with readily available funds to which Buyer has and will have access at all times through the Closing, for Buyer to fund all of the amounts required to be provided by Buyer for the consummation of the transactions contemplated hereby and the Debt Commitment Letter, including the payment of the Purchase Price and any associated expenses, including to pay all costs associated with Cure Claims and all other fees, costs and expenses to be incurred by Buyer in connection with the transactions contemplated hereby (the "<u>Funding Obligations</u>" and such sufficient proceeds, the "<u>Funds</u>"). As of the date hereof, (a) the Debt Commitment Letter in the form so delivered is in full force and effect and constitutes the legal, valid and binding obligation of Buyer, and, to Buyer's knowledge, the other parties thereto, enforceable against each of Buyer and such other parties in accordance with its respective terms, except as may be limited by the Enforceability Exceptions, (b) the obligations and commitments in the Debt Commitment Letter have not been withdrawn, reduced, rescinded, terminated or otherwise amended or modified in any respect, (c) no amendment or modification to, or withdrawal, reduction, termination or rescission of, the Debt Commitment Letter has occurred or is contemplated, (d) no event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach under any term or condition of the Debt Commitment Letter and (e) no event has occurred or circumstance exists which, with or without notice, lapse of time or both, would or would reasonably be expected to constitute or result in a failure by Buyer or any other party to the Debt Commitment Letter to satisfy, or any delay in satisfaction, of any condition or other contingency to the full funding of the Debt Financing under the Debt Commitment Letter. The Debt Commitment Letter (including the fee letter referred to therein) constitutes the entire and complete agreement between the parties thereto with respect to the financings contemplated thereby. Except as expressly set forth in the Debt Commitment Letter as in effect on the date hereof, (a) there are no conditions precedent or other contingencies to the obligation of the Debt Financing Sources to fund the full amount of the Debt Financing to be funded on the Closing Date, in each case, on or prior to the Closing Date, and (b) there are no contractual contingencies or other provisions under any agreement or understanding relating to the transactions contemplated by this Agreement that would permit any Debt Financing Source to reduce the total amount of the Debt Financing or impose any additional conditions precedent to the availability of the Debt Financing. Buyer has fully paid or caused to be paid any and all commitment fees, if any, or other fees or deposits required by the Debt Commitment Letter to be paid as of the date of this Agreement and will pay in full any such amounts due on or prior to the Closing Date. Buyer is unaware of any fact or occurrence existing on the date of this Agreement that would reasonably be expected to make any of the assumptions or any of the statements set forth in the Debt Commitment Letter inaccurate or that would reasonably be expected to cause the Debt Commitment Letter to be ineffective or the Debt Financing to be unavailable on or prior to the Closing Date. Buyer has no reason to believe that any of the conditions to the availability to Buyer of the Debt Financing will not be satisfied on a timely basis or that the full amount of the

Debt Financing will not be made available to Buyer on a timely basis in order to consummate the transactions contemplated by this Agreement.

(c)     Buyer expressly acknowledges and agrees that (i) neither the availability, the terms nor the obtaining of the Debt Financing or any Alternative Financing, nor the completion of any issuance of securities contemplated by the Debt Financing or any Alternative Financing, is in any manner a condition to the Closing or the obligations of Buyer to consummate the transactions contemplated hereby, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Debt Financing or any Alternative Financing, or the completion of any such issuance and (ii) the failure, for any reason, of Buyer to have sufficient cash available at the Closing to satisfy its Funding Obligations in accordance with this Agreement or the failure to so pay its Funding Obligations in accordance with this Agreement, in each case, shall constitute a breach of this Agreement by Buyer.

Section 4.9    Solvency.    Immediately after giving effect to the transactions contemplated by this Agreement and the Ancillary Agreements (including the payment of the Purchase Price, and the payment of all related fees and expenses), (i) Buyer and its Affiliates will not have incurred debts beyond their ability to pay such debts as they mature or become due, (ii) the then present fair saleable value of the assets of Buyer and its Affiliates will exceed the amount that will be required to pay their existing debts (including the probable amount of all contingent liabilities) as such debts become absolute and matured, (iii) the assets of Buyer and its Affiliates at a fair valuation will exceed their debts (including the probable amount of all contingent liabilities) and (iv) Buyer and its Affiliates will not have unreasonably small capital to carry on their business as proposed to be conducted following the Closing.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby, in either case, with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Affiliates.

Section 4.10    Exclusivity of Representations and Warranties.

(a)     Except for the representations and warranties expressly set forth in this Article IV, neither Buyer nor any other Person on behalf of Buyer makes (and Buyer, on behalf of itself, its Subsidiaries, and their respective Affiliates and Representatives, hereby disclaims) any express or implied representation or warranty with respect to Buyer, its Subsidiaries or any of their respective businesses, operations, properties, assets, liabilities or otherwise in connection with this Agreement or the transactions contemplated hereby, including as to the accuracy or completeness of any information.

(b)     Except for the representations and warranties expressly set forth in Article III, Buyer acknowledges and agrees that (x) none of Sellers, their respective Affiliates and Representatives or any other Person on behalf of Sellers makes, or has made, any express or implied representation or warranty, at law or in equity, with respect to Sellers, the Business, any Transferred Asset or any Assumed Liability or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, including with respect to its business, operations, assets (including the Transferred Assets), liabilities (including the Assumed Liabilities), condition (financial or otherwise), prospects or

47

otherwise in connection with this Agreement or the transactions contemplated by this Agreement, including any representation or warranty as to value, merchantability, fitness for any particular purpose or for ordinary purposes, and Buyer and its Representatives are not relying on any written or oral statement, representation, warranty, guaranty or other information of Sellers or any Person except for those expressly set forth in Article III and (y) no person has been authorized by Sellers, their Affiliates or any other Person on behalf of Sellers to make any representation or warranty relating to the Business, any Transferred Asset or any Assumed Liability in connection with this Agreement, and if made, such representation or warranty shall not be relied upon by Buyer as having been authorized by such entity.  Without limiting the generality of the foregoing, Buyer acknowledges and agrees that neither Sellers, their Affiliates nor any other Person has made any representation or warranty (including as to completeness or accuracy) to Buyer with respect to, and neither Sellers, their Affiliates nor any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or their respective Representatives, or resulting from the omission of, any estimate, projection, prediction, data, financial information, memorandum, presentation or any other materials or information, including any materials or information made available to Buyer and/or its Representatives in connection with presentations by True Value Parent's management or information made available on any "data sites."  Buyer acknowledges that it has conducted, to its satisfaction, its own independent investigation of the condition (financial or otherwise), operations and business of Sellers and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and representations and warranties set forth in Article III and has not relied directly or indirectly on any materials or information made available to Buyer and/or its Representatives by or on behalf of Sellers.  Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

Section 5.1    Debtors-in-Possession.  From the Petition Date through the Closing, Sellers shall operate the Business in accordance with the Revised Budget as debtors-in-possession pursuant to the Bankruptcy Code.

Section 5.2    Sale Motion; Bidding Procedures Order.  Sellers shall use their respective reasonable best efforts to obtain entry by the Bankruptcy Court of (i) the Bidding Procedures Order at the 10:00 am, November 4, 2024 hearing scheduled for that purpose (the "Bidding Procedures Hearing") and (ii) the Sale Order no later than November 12, 2024.  In advance of the Bidding Procedures Hearing, Sellers shall use their respective reasonable best efforts in the Chapter 11 Case to cause the Bidding Procedures Order entered by the Bankruptcy Court at the Bidding Procedures Hearing to require that (i) the Cure Notice be properly served on counterparties to Contracts no later than November 6, 2024, (ii) the Bid Deadline be set for no later than November 8, 2024; (iii) the Sale Objection Deadline be set for no later than November 8, 2024, (iv) the Sale Hearing be set for no later than November 12, 2024; and (v) the Cure Objection Deadline be set for no later than November 18, 2024.  Sellers shall otherwise cause the

48

Bidding Procedures Order entered by the Bankruptcy Court to conform to this Agreement in a manner reasonably satisfactory to Buyer. In the event the entry of the Bidding Procedures Order shall be appealed, Sellers shall use reasonable best efforts to defend such appeal.

Section 5.3    Sale Order.  The Sale Order shall (a) be substantially in the form attached hereto as Exhibit D, with such changes as may be reasonably acceptable to Buyer and Sellers, and (b) among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement and the Ancillary Agreements, (B) the sale of the Transferred Assets to Buyer on the terms and subject to the conditions set forth herein and free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), and (C) the performance by Sellers of their obligations under this Agreement and the Ancillary Agreements; (ii) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and the sale is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code; (iii) authorize Sellers to assume and assign to Buyer the Transferred Contracts, subject to Buyer's payment of the Cure Claims in accordance with Section 2.5; (iv) find that Buyer has provided adequate assurance of future performance (as that term is used in Section 365 of the Bankruptcy Code) in connection with the assumption and assignment of the Transferred Contracts; (v) find that Buyer shall not be deemed to assume or become responsible for any Liability that is not an Assumed Liability; and (vi) find that Buyer did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code.

Section 5.4    Cooperation with Respect to Bankruptcy Court Approvals.  Buyer shall take such actions as are reasonably requested by Sellers to assist in obtaining entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among other things: (a) demonstrating that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 5.5    Bankruptcy Court Filings.  Sellers shall consult with Buyer concerning the Sale Motion, the Bidding Procedures Order, the Sale Order and any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Buyer with proposed drafts of any material applications, pleadings, notices, proposed Orders and other documents to be filed by Sellers in the Chapter 11 Case that relate to this Agreement, the transactions contemplated hereby or Buyer no later than two (2) days prior (or as soon as practicable thereafter) to the making of any such filing or submission to the Bankruptcy Court.  If requested by Buyer, Sellers shall seek entry of appropriate orders from the Bankruptcy Court setting bar dates for the filing of Section 503(b)(9) Claims and Trade Admin Claims, including the Section 503(b)(9) Claims Bar Date, so that the amount of each such claim and the aggregate amount of all such claims can be promptly and accurately determined in the Bankruptcy Case.

**ARTICLE VI**

**COVENANTS**

Section 6.1    Conduct of Business Prior to the Closing.    From the date of this Agreement until the Closing Date or earlier termination of this Agreement:

(a)    except (1) as otherwise expressly permitted or required by this Agreement, (2) as expressly set forth in Section 6.1 of the Disclosure Letter, (3) as required by the Bankruptcy Code or the Bankruptcy Rules as the result of Sellers being subject to the Chapter 11 Case, or otherwise required by Law or any Order, (4) for any limitations on operations or requirements imposed by the Bankruptcy Court, or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing or earlier termination of this Agreement, Sellers shall conduct the Business in the Ordinary Course of Business in all material respects, shall use commercially reasonable efforts to maintain its current business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business, including (without limiting the generality of the foregoing) using commercially reasonable efforts to:

(i)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Transferred Assets;

(ii)    continue to collect accounts, notes and other receivables in a manner consistent with past practice, without discounting such receivables;

(iii)    maintain the properties and assets included in the Transferred Assets in all material respects in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(iv)    continue in full force and effect without modification all insurance policies, except as required by applicable Law;

(v)    preserve, maintain, defend and protect the Transferred Assets, including Sellers' customer relationships and Contracts between any Seller and its customers, from infringement, interference, or usurpation, which may include seeking entry of an order from the Bankruptcy Court on an expedited basis confirming the applicability of Sections 362(a), 365(e)(1), 365(f)(1), 365(f)(3) and 541(c) of the Bankruptcy Code to Sellers' contractual relationships with its customers and any attempt by Sellers' customers to terminate or breach those relationships, or any attempt by Sellers' competitors to cause Sellers' customers to terminate or breach those relationships;

(vi)    maintain their books and records accurately, in all material respects and in accordance with past practice, including of its Inventory and the value thereof; and

(vii)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Transferred Assets;

50

(b)     except (1) as otherwise expressly permitted or required by this Agreement, (2) as expressly set forth in <u>Section 6.1</u> of the Disclosure Letter, (3) as required by the Bankruptcy Code or the Bankruptcy Rules as the result of Sellers being subject to the Chapter 11 Case, or otherwise required by Law or any Order, (4) for any limitations on operations or requirements imposed by the Bankruptcy Court, or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing or earlier termination of this Agreement, Sellers shall not:

(i)     sell, transfer, lease, sublease, encumber or otherwise dispose of any Transferred Assets (other than Transferred IP, which is addressed in <u>Section 6.1(b)(ii)</u> hereof) other than immaterial dispositions thereof and Inventory sold or disposed of in the Ordinary Course of Business;

(ii)     sell, assign, exclusively license, dispose of, encumber, abandon or allow to lapse any material Transferred IP, other than (A) licenses granted in the Ordinary Course of Business, (B) expiration of Transferred IP in accordance with the applicable statutory term, or (C) abandoning or allowing to lapse Transferred IP that is no longer used or useful in any material respect in the Business, or is otherwise economically not practicable to maintain;

(iii)     acquire any corporation, partnership, limited liability company, other business organization or division thereof related to or affecting the Business or the Transferred Assets;

(iv)     merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence, except for any mergers or consolidations solely between or among Sellers and their Affiliates upon prior notice to Buyer;

(v)     declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities, other than (A) dividends and distributions by any Seller to any other Seller and (B) dividends or distributions made by any Subsidiary that is not wholly owned, directly or indirectly, by any Seller or by any joint venture of any Seller, in accordance with the requirements of the Organizational Documents of such Seller or such joint venture;

(vi)     enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business or the Transferred Assets;

(vii)     except with respect to any Employee Benefit Plan or arising out of, relating to or resulting from a Collective Bargaining Agreement, (1) reject, terminate (other than by expiration in accordance with its terms), or amend in any material respect any Transferred Contract or seek Bankruptcy Court approval to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Transferred Contract, including any Transferred Contracts with Sellers' customers;

51

(viii)   waive in any material respect any term of, or waive any material default under, or release, settle or compromise any material claim by or against or material liability or obligation owing to Sellers under, any Transferred Contract;

(ix)   fail to maintain in full force and effect existing insurance policies;

(x)   subject any of the Transferred Assets to any Encumbrance other than Permitted Pre-Closing Encumbrances;

(xi)   incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness;

(xii)   sell, lease, license, mortgage, sell and leaseback or otherwise subject to any Encumbrance, or otherwise dispose of, any material properties or assets or any material interests with respect to the Business other than (1) in all material respects in the Ordinary Course of Business; (2) pursuant to Contracts in existence on the date of this Agreement; (3) in an amount not to exceed $100,000 in the aggregate; (4) in transactions between or among Sellers and any of their respective Subsidiaries; (5) to secure indebtedness for borrowed money permitted to be incurred under this Section 6.1(b) or pursuant to any lease, sublease or other use or occupancy agreement or arrangement to which Seller or any of its Subsidiaries is party as lessor or sublessor; and (6) Transferred IP (which is addressed in this Section 6.1(b)).

(xiii)   in each case solely with respect to the Offer Employees and except as required by any Collective Bargaining Agreement or any Employee Benefit Plan, (1) make or grant any general or special wage or salary increase (other than standard increases in the Ordinary Course of Business), (2) increase in any material respect the level of benefits under any Employee Benefit Plan, (3) take any action with respect to the grant of any material severance or termination pay (other than pursuant to Employee Benefit Plans in effect on the date of this Agreement), (4) adopt, amend or terminate any material Employee Benefit Plan, other than in the Ordinary Course of Business or as required by Law, and (5) enter into any material employment, consulting or similar agreement or amend any existing material employment agreement; provided, that the foregoing shall not restrict any Seller from entering into or making available, to newly hired Business Employees or to Business Employees in the context of promotions based on job performance or workplace requirements, in each case, in the Ordinary Course of Business, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(xiv)   make (outside the Ordinary Course of Business), change or rescind any material election relating to material Taxes, change any method of Tax accounting in respect of material Taxes, file any materially amended Tax Return in respect of material Taxes, or settle or compromise any Action, investigation, audit or controversy relating to a material amount of Taxes;

(xv)    materially amend or terminate any Contract set forth on Section 2.1(f)(i) of the Disclosure Letter or any Transferred Lease set forth on Section 2.1(b) of the Disclosure Letter;

(xvi)    accelerate the collection of any accounts receivable or other payment (including by offering or promoting discounts or rebates outside of the Ordinary Course of Business); or

(xvii)    agree or commit to any of the foregoing.

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers or the Business prior to the Closing and (ii) prior to the Closing, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and its operations.

Section 6.2    Covenants Regarding Information.

(a)    Subject to the Bidding Procedures Order and applicable Law, from the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable request, Sellers shall afford Buyer and its Representatives reasonable access to the properties, offices, plants and other facilities, books and records (including Tax books and records) of Sellers and the Business, and shall furnish Buyer and its Representatives with such financial, operating and other data and information, and access to all the officers, employees, accountants and other Representatives of Sellers as Buyer may reasonably request in connection with the transactions contemplated by this Agreement.  Sellers shall provide Buyer with copies of all financial and other information that Sellers are required to provide to the Prepetition Secured Parties under Section 7 of the Final Cash Collateral Order at the same time that such information is provided to the Prepetition Secured Lenders.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to provide access to or disclose any information to Buyer or its Representatives if (i) such access or disclosure is prohibited pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) such access or disclosure would violate applicable Law, or (iii) such access or disclosure would adversely affect any attorney-client or other legal privilege or contravene any applicable Laws (the "Disclosure Limitations"); provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Sellers after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.

(b)    From the date hereof until the Closing Date or earlier termination of this Agreement, within two (2) Business Days of request, Sellers shall provide Buyer and its Representatives copies of the books and records of Sellers and the Business setting forth the current Inventory, other than Inventory maintained, utilized and held for use in the Sellers' paint manufacturing business, and Inventory Value thereof, and shall furnish Buyer and its

Representatives with such other work papers, spreadsheets, schedules, memoranda, and other documents, data and Inventory information as Buyer may reasonably request.

(c)    The information provided pursuant to this Section 6.2 prior to Closing will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein.  Sellers do not make any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Buyer may not rely on the accuracy of any such information.

(d)    From and after the Closing, until the closing of the Chapter 11 Case, Buyer will provide Sellers and their Representatives, at Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of Buyer or the Business, to the books and records (including Tax books and records), including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Chapter 11 Case and the wind down of Sellers' estate (including reconciliation of claims and preparation of Tax Returns or other Tax proceedings and the functions of any trusts established under a Chapter 11 plan of Sellers or any other successors of Sellers), (iii) complying with applicable Laws or (iv) other reasonable business purposes; provided that Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of Buyer, conflict with the Disclosure Limitations; provided, further that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Buyer after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.  Unless otherwise consented to in writing by True Value Parent, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to True Value Parent such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.

Section 6.3     Employee Matters.

(a)     Prior to the Closing, Buyer shall provide to Sellers a list of Business Employees (including each Qualified Leave Recipient to the extent applicable) to which Buyer, in its sole discretion, intends to extend a written offer of employment (each, an "Offer Employee") that, if accepted by a Business Employee, shall become effective immediately after the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment; provided that such Qualified Leave Recipient returns to active status within six (6) months following the Closing Date (or such later date as may be required by applicable Law). Buyer's list of Offer Employees shall include a sufficient number of employees at each Leased Real Property under a Transferred Lease to avoid triggering the WARN Act. Buyer shall make the written offer to Offer Employees at least five (5) Business Days prior to the Closing. The terms and conditions of such offers of employment shall comply with all applicable Laws and the terms of this Section 6.3, and shall be sufficient to avoid triggering an "employment loss" under the WARN Act. Each Offer Employee who receives and accepts (or is deemed to have accepted) Buyer's (or an Affiliate of Buyer's) offer of employment and who commences employment with Buyer or an Affiliate thereof on or following the Closing shall be a "Transferred Employee." Sellers shall terminate, or shall cause to be terminated, on or as soon as practicable prior to the Closing, the employment of all Transferred Employees. Sellers shall reasonably cooperate with Buyer in effecting the Transferred Employees' transfer of employment from Sellers to Buyer or an Affiliate of Buyer as contemplated hereby. Buyer shall notify Sellers in a reasonable timeframe with respect to whether each offer of employment to an Offer Employee has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Offer Employees will accept an offer of employment or will continue in employment with Buyer following the Closing for any period of time. Sellers and Buyer intend that the Transferred Employees will have continuous and uninterrupted employment immediately before and immediately after the Closing. In addition, Buyer shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits to any Business Employee on account of any termination of such Business Employee's employment prior to or at the Closing, and such payments, rights, and/or benefits (if any) shall remain obligations of Sellers.

(b)     Without limiting Section 6.3(i), Sellers shall be solely responsible for complying with the WARN Act and any and all obligations under applicable Laws requiring notice of plant closing, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to the Business Employees as a result of any action by Sellers on or prior to Closing, or following the Closing with respect to any Business Employee who does not become a Transferred Employee. Following the Closing, Buyer shall be solely responsible for complying with the WARN Act and any and all obligations under applicable Laws requiring notice of plant closing, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Transferred Employees as a result of any action by Buyer following the Closing.

(c)     The Parties shall, and shall cause their respective Affiliates to, mutually cooperate with and provide reasonable assistance to the other in (i) undertaking all reasonably necessary or legally required provision of information to, or bargaining, consultations, discussions or negotiations with, any Business Employees or any Labor Organization that

55

represents Business Employees affected by the transactions contemplated by this Agreement and (ii) maintaining the employment by Sellers or their Affiliates of those Business Employees who do not become Transferred Employees following the Closing Date and who the Parties agree will provide transition services for the benefit of Buyer or an Affiliate of Buyer pursuant to the Transition Services Agreement (such employees, the "TSA Employees"); provided, that Buyer timely compensates Sellers for any wages, compensation, fees, expenses and other employee Liabilities incurred in connection with the continued employment by Sellers or their Affiliates of the TSA Employees during the period in which such employees provide transition services for the benefit of the Buyer or its Affiliates.

(d)     Buyer shall, and shall cause its Affiliates to, provide each Transferred Employee with credit for such Transferred Employee's service with Sellers or their Affiliates or predecessors prior to the Closing for all purposes, including for purposes of eligibility and determination of level of benefits (including, for purposes of vacation and statutory benefits required by applicable Law but excluding for purposes of equity compensation and benefit accruals under any defined benefit pension plan, any defined contribution retirement plan, or retiree medical plan), under any benefit plan sponsored or maintained by Buyer or any of their Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "Buyer Plan") or as otherwise required by applicable Law or to prevent Termination Pay from becoming payable under applicable Law; provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits.  With respect to each Buyer Plan that is a health or welfare plan, Buyer and its Affiliates shall use commercially reasonable efforts to (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health and (ii) credit each such Transferred Employee with all deductible payments, co-payments and co-insurance paid by such Transferred Employee under any Employee Benefit Plan prior to the Closing during the year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum for such year.

(e)     Effective as of the Closing Date, the Transferred Employees shall cease active participation in the True Value Company Savings & Compensation Deferral Plan (the "Seller 401(k) Plan").  Buyer shall, or shall cause one of its Affiliates to, designate a tax-qualified defined contribution retirement plan that will cover Transferred Employees as of the Closing that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (the "Buyer 401(k) Plan").  Buyer shall cause the Buyer 401(k) Plan to accept from each Seller 401(k) Plan the "direct rollover" of the account balance of each Transferred Employee who participated in the Seller 401(k) Plan prior to the Closing Date and who elects such direct rollover in accordance with the terms of the Seller 401(k) Plan and the Code.

(f)     For so long as the Sellers maintain a group health plan, Sellers shall be solely responsible for any and all obligations arising under COBRA for all (i) Business Employees and their respective spouses and dependents and (ii) all "M&A qualified beneficiaries" as defined in Treasury Regulation Section 54.4980B-9.

(g)    Without limitation of <u>Section 10.9</u>, nothing express or implied in this <u>Section 6.3</u> or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Employee Benefit Plan, Buyer Plan or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by Buyer, Sellers or their respective Affiliates, as applicable, or (iii) obligate Buyer, Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

(h)    Prior to the Closing, any written or material oral communications proposed to be delivered by Buyer or an Affiliate of Buyer to any Business Employee regarding such employees' level of (or rights with respect to) continued employment or benefits or compensation at or after Closing shall be subject to the prior written approval of True Value Parent, which shall not be unreasonably withheld, conditioned or delayed; <u>provided</u> that in all cases, True Value Parent shall be given no less than three (3) Business Days to review and comment on any such communications.

(i)    The Parties agree to cooperate in good faith to comply in all material respects with preparing and delivering any notices required or potentially required pursuant to the WARN Act in connection with the transactions contemplated by this Agreement. For a period of ninety (90) days after the Closing Date, Buyer shall not, and shall cause its Affiliates not to, engage in any conduct that would result in an employment loss or layoff for a sufficient number of employees of Buyer or an Affiliate of Buyer (including any Transferred Employees) which, if aggregated with any such conduct on the part of Sellers on or prior to the Closing Date, would trigger the WARN Act.

(j)    To the extent any Transferred Employees are foreign nationals working in the United States in non-immigrant status or for whom there are pending or approved I-140 immigrant petitions as of the Closing Date (collectively, the "<u>Visa Employees</u>"), Buyer and its Affiliates, as applicable, shall employ such Visa Employees under terms and conditions such that Buyer or its Affiliate, as applicable, qualify as a "successor employer" under applicable United States immigration laws effective as of the Closing Date, including, but not limited to, 8 U.S.C. section 1184(c)(10). As of the Closing, Buyer or its Affiliate, as applicable, agrees to assume all immigration-related Liabilities and responsibilities under applicable United States immigration Laws with respect to such Visa Employees incurred after the Closing.

Section 6.4    <u>Consents and Filings; Further Assurances</u>.

(a)    Subject to the terms and conditions of this Agreement, each of the Parties shall, cooperate with each other Party to, promptly (i) take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement and the Ancillary Agreements, including taking, or causing to be taken, all actions, and doing, or causing to be done, all things necessary to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from any third-

party Person.  Without limiting the generality of the previous sentence, the Parties shall (i) cooperate with each other party hereto to take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, appropriate or desirable to obtain from Governmental Authorities all consents, approvals, clearances, expiration or termination of waiting periods, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) as promptly as practicable, make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act or any other applicable Law, including any other Antitrust Law; (iii) take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to comply at the earliest practicable date with any request under the HSR Act or any other applicable Law, including any other Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Authority in respect of such filings (collectively, an "Antitrust Authority"); (iv) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Antitrust Authorities under any Antitrust Law with respect to any such filing; and (v) take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable.  This Section 6.4(a) does not apply with respect to (x) Taxes or (y) Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(b)     In furtherance of the foregoing Section 6.4(a), each of the Parties shall promptly notify the other Parties of, and if in writing, furnish the other Parties with copies of (or, in the case of oral communications, advise the others of the contents of) any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority.  No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties and their respective counsel the opportunity to attend and participate at such meeting.  The Parties will coordinate and reasonably cooperate with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination or expiration of any applicable waiting periods, including under the HSR Act, subject to applicable Law.  Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.  This Section 6.4(b) does not apply with respect to (x) Taxes or (y) Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(c)     From time to time, whether at or following the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and

releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide Buyer and Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.

(d)     Subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement, take, or cause to be taken, all commercially reasonable actions, and do, or cause to be done, all commercially reasonable things necessary, proper or advisable under applicable Laws to obtain the transfer or reissuance to Buyer of all Environmental Permits necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall take, or cause to be taken, all commercially reasonable actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to (i) respond promptly to any requests for additional information made by such agencies, and (ii) participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits.  Each Party will bear its costs of the preparation and review of any such filing.   Sellers and Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement in connection with any filings to transfer the Environmental Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.  This Section 6.4(d) does not apply with respect to Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(e)     Buyer agrees to use reasonable best efforts to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable.  Notwithstanding anything else in this Section 6.4, nothing in this Agreement requires Buyer to sell, divest, license, hold separate, or dispose of such assets or businesses of Buyer (or its Subsidiaries or other Affiliates) or the Business, or otherwise take or commit to take actions that limit Buyer's or its Subsidiaries' or Affiliates' freedom of action with respect to, or their ability to retain, any of the businesses, product lines, or assets of Buyer (or its Subsidiaries or other Affiliates) or the Business, or to defend any litigation or administrative proceeding initiated or made by a Governmental Authority under applicable Law.   This Section 6.4(e) does not apply with respect to Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

Section 6.5     Wrong Pockets.

(a)     After the Closing: (i) if Sellers or any of their Affiliates receive any amount that is a Transferred Asset or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer in accordance with this Agreement and (ii) if Buyer or any of its Affiliates receive any amount that is an Excluded Asset or is otherwise properly due and owing to Sellers or any of their Affiliates in accordance with the terms of this Agreement, Buyer

59

promptly shall remit, or shall cause to be remitted, such amount to Sellers in accordance with this Agreement.

(b)    In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to Sellers or any of their Affiliates, Sellers shall, and shall cause their controlled Affiliates to, convey, assign or transfer promptly such Transferred Asset to Buyer or its designees in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Transferred Asset to Buyer or its designees in accordance with this Agreement or (ii) any Excluded Asset has been conveyed to or is received by Buyer, then, without any consideration payable to Buyer or any of its Affiliates, Buyer shall convey, assign or transfer promptly such Excluded Asset to Sellers in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Excluded Asset to Sellers or its designees in accordance with this Agreement.

Section 6.6    Public Announcements.  From the date hereof through the Closing Date, neither Buyer, on the one hand, nor Sellers, on the other hand, shall issue any public report, statement, press release or otherwise make any public statement regarding this Agreement or the transactions contemplated hereby, without the prior written consent of Buyer and True Value Parent, unless otherwise required by applicable Law, to obtain approval by the Bankruptcy Court of the transactions contemplated under this Agreement (including pursuant to the Bidding Procedures Order or the Sale Order), or by order of the Bankruptcy Court, in which case such Party shall coordinate and consult with the other Party to the extent not prohibited by applicable Law with respect to the timing, basis, scope and content before issuing any such report, statement or press release.

Section 6.7    Communications with Customers and Suppliers.  Prior to the Closing, Buyer shall not, and shall cause its Affiliates and instruct its Representatives not to, contact, or engage in any discussions or otherwise communicate with, Sellers or their employees, suppliers, vendors, licensors, licensees and other Persons with which Sellers have commercial dealings without obtaining the prior written consent of Sellers (other than any such communication in the ordinary course of business of Buyer or its Affiliates without reference to or any purpose relating to the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.

Section 6.8     Financing.

(a)     Buyer shall, and shall cause its Affiliates and instruct its Representatives to, use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate the Debt Financing, as the same may be amended in compliance with Section 6.8(b), on the terms and subject only to the conditions set forth in the Debt Commitment Letter or any Alternative Financing (as defined below) (including any "flex" provisions applicable to the Debt Financing), including using (and causing its Affiliates to use), their respective reasonable best efforts to: (i) comply with and maintain in full force and effect the Debt Commitment Letter in accordance with the terms and subject to the conditions thereof, (ii) negotiate, enter into and deliver (and cause its Affiliates to negotiate, enter into and deliver) definitive agreements with respect to the Debt Financing on the terms and conditions set forth in the Debt Commitment Letter (including any "flex" provisions applicable to the Debt Financing), which agreements shall be in effect as promptly as practicable after the date hereof, but in no event later than the Closing (and otherwise keep True Value Parent reasonably informed of the status of its efforts to arrange the Debt Financing), (iii) satisfy, on a timely basis, all conditions to the availability of the Debt Financing to the extent within Buyer's or its Affiliates' control and assist in the satisfaction of all other conditions to the Debt Financing and the definitive agreements entered into with respect to the Debt Commitment Letter, (iv) consummate and cause the Debt Financing Sources to fund the Debt Financing in an amount necessary to satisfy the Funding Obligations at or prior to the Closing and (v) enforce their rights under the Debt Commitment Letter and the definitive agreements related to the Debt Financing.

(b)     Neither Buyer nor its Affiliates shall agree to or permit any amendments, supplements, replacements or other modifications to, obtain any replacement of, or grant any waivers of, any condition, remedy or other provision under the Debt Financing (other than to effect any "flex" provisions set forth in the Debt Commitment Letter) without the prior written consent of True Value Parent if such amendments, supplements, replacements, waivers or modifications would or would reasonably be expected to (i) reduce the aggregate amount of the Debt Financing or the net cash proceeds available from the Debt Financing (including, in each case, by changing the amount of fees or other amounts to be paid (including original issue discount) with respect to the Debt Financing) below an amount necessary to satisfy the Funding Obligations, (ii) impose new or additional conditions or contingencies to the Debt Financing or otherwise expand, amend, waive or modify any of the conditions or contingencies to the Debt Financing or (iii) otherwise expand, amend, waive or modify any provisions of, or remedies under, the Debt Commitment Letter in a manner adverse to Sellers or that otherwise in any such case would or would reasonably be expected to (x) prevent, delay or make less likely the funding of the Debt Financing (or the satisfaction of the conditions to the Debt Financing) at the Closing or impair the ability of Buyer to consummate the transactions contemplated by this Agreement, (y) adversely impact the ability of the Buyer or any of its Affiliates to enforce their respective rights against the Debt Financing Sources or any other parties to the Debt Commitment Letter or the definitive agreements with respect thereto or (z) adversely affect the ability of Buyer to timely obtain the Debt Financing or consummate the transactions contemplated hereby; provided, that subject to compliance with the other provisions of this Section 6.8, Buyer may amend, supplement or otherwise modify the Debt Commitment Letter to add lenders, lead arrangers, syndication agents or other Debt Financing Sources that have not executed the Debt

61

Commitment Letter as of the date hereof (which will not change or waive the terms thereof other than to alter the commitment percentages of the parties thereto in accordance with the parameters set forth in the Debt Commitment Letter as of the date hereof). Buyer shall not permit, release or consent to the withdrawal, termination, repudiation or rescission of the Debt Commitment Letter or any definitive agreement with respect to the Debt Financing and shall not release or consent to the termination of the obligations of any Debt Financing Source under the Debt Financing below an amount necessary to satisfy the Funding Obligations, in each case, without the prior written consent of True Value Parent. For purposes of this Agreement, references to "Debt Financing" shall include the financing contemplated by the Debt Commitment Letter, as hereafter amended, supplemented, replaced or modified, to the extent such amendment, supplementation, replacement or modification is permitted by this Section 6.8(b), and references to "Debt Commitment Letter," "Debt Financing Sources" or "Debt Financing" shall include such documents, as hereafter amended, modified, supplemented or replaced (or commitments or financing sources, as applicable), to the extent permitted by this Section 6.8(b). In the event Buyer enters into an amendment, supplement, replacement or modification permitted by this Section 6.8(b), it shall, prior to the execution and delivery thereof, provide a copy of such amendment, supplement, replacement or modification to True Value Parent for its review and shall, simultaneously with the execution and delivery thereof, provide fully executed copies of such amendment, supplement, replacement or modification to True Value Parent (and, in the case of any amendment, supplement, replacement or modification to any fee letter(s), with such fee letter(s) permitted to be redacted in the same manner contemplated by Section 4.8).

(c)    In the event that (i) all or any portion of the Debt Financing becomes or could reasonably be expected to become unavailable in the manner or from the sources contemplated by the Debt Commitment Letter (including any "flex" provisions applicable thereto), (ii) Buyer becomes aware of any event or circumstance that could reasonably be expected to make the full amounts or any portion of the Debt Financing unavailable on the terms and conditions contemplated in the Debt Commitment Letter or (iii) the Debt Commitment Letter or any definitive agreement with respect to the Debt Financing shall expire or be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, Buyer shall, and shall cause its respective Affiliates to, within two (2) Business Days after the occurrence of such event, notify True Value Parent in writing thereof and promptly after the occurrence of such event, (A) use their respective reasonable best efforts to arrange and obtain alternative financing from the same or alternative financial institutions in an amount sufficient to enable Buyer to consummate the transactions contemplated by this Agreement in accordance with the terms of this Agreement, that does not impose any conditions or contingencies that would be reasonably expected to prevent or delay the Closing or contain any terms that would reasonably be expected to prevent, delay or impair the ability of Buyer to obtain the Debt Financing or consummate the transactions contemplated hereby, as compared to the conditions and other terms set forth in the Debt Commitment Letter as of the date hereof (as amended in accordance with Section 6.8(b)), taking into account any "flex" provisions thereof, as promptly as practicable following the occurrence of such event (the "Alternative Financing") and (B) obtain and deliver a debt commitment letter to Sellers with respect to such Alternative Financing, including true, correct and complete copies of any related executed fee letters, engagement letters and other agreements (provided that such fee letters may be redacted in the same manner as permitted by Section 4.8) (collectively, including all exhibits, schedules, amendments, supplements, modifications and annexes thereto, a "New Debt Commitment Letter"). For purposes of this Agreement, references

to "Debt Financing" shall include the financing contemplated by any Alternative Financing and New Debt Commitment Letter to the extent permitted by this Section 6.8(c), and references to "Debt Commitment Letter," "Debt Financing Sources," or "Debt Financing" shall include such documents (or commitments or financing sources, as applicable) in connection with any Alternative Financing and New Debt Commitment Letter to the extent permitted by this Section 6.8(c).

(d)      Buyer expressly acknowledges and agrees that (i) neither the availability, the terms nor the obtaining of the Debt Financing or any Alternative Financing, nor the completion of any issuance of securities contemplated by the Debt Financing or any Alternative Financing, is in any manner a condition to the Closing or the obligations of Buyer to consummate the transactions contemplated hereby, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Debt Financing or any Alternative Financing, or the completion of any such issuance and (ii) the failure, for any reason, of Buyer to have sufficient cash available at the Closing to satisfy its Funding Obligations in accordance with this Agreement or the failure to so pay its Funding Obligations in accordance with this Agreement, in each case, shall constitute a breach of this Agreement by Buyer.

(e)      Buyer shall (i) furnish True Value Parent with drafts (prior to execution) and complete, correct and executed copies of each amendment, supplement, replacement, waiver or other modification promptly upon their execution of the Debt Commitment Letter (but, in the case of any fee letter or amendment thereto, subject to the redaction of such fee letter in a manner consistent with Section 4.8), (ii) give Sellers prompt written notice of any (A) breach or default or any event that, with or without notice, lapse of time or both, would (or would reasonably be expected to) give rise to any default or breach by any party to the Debt Commitment Letter of which Buyer becomes aware, including the receipt of any written notice or other written communication from any Debt Financing Source with respect to any breach or default (or alleged breach or default) by any party to the Debt Commitment Letter, (B) material dispute or disagreement between or among any parties to the Debt Commitment Letter or the definitive documents relating to the Debt Financing, (C) withdrawal, repudiation or termination or threatened withdrawal, repudiation or termination thereof of which the Buyer becomes aware or (D) incurable event or circumstance that makes a condition precedent relating to the Debt Financing unable to be satisfied by any party or, in each case, any written notice or other communication with respect to any of the foregoing, (iii) notify Sellers promptly (and in any event within one (1) Business Day) if for any reason Buyer no longer believes in good faith that it will be able to obtain all or any portion of the Debt Financing contemplated by the Debt Commitment Letter on the terms and/or from the sources described therein and (iv) otherwise keep Sellers reasonably and promptly informed of the status of its efforts to arrange and consummate the Debt Financing (including any Alternative Financing).  As soon as reasonably practicable, but in any event within three (3) Business Days following the date True Value Parent delivers to Buyer a written request, Buyer shall provide any information reasonably requested by True Value Parent in writing relating to any circumstance referred to in the immediately preceding sentence.

63

Section 6.9    <u>Sellers' Cooperation with Buyer's Efforts under Debt Financing</u>.

(a)    Prior to the Closing Date, Sellers shall use commercially reasonable efforts to (and shall cause their respective Representatives to use commercially reasonable efforts to), at the sole cost and expense of Buyer, reasonably cooperate with and reasonably assist Buyer solely in connection with the arrangement, syndication and consummation of the Debt Financing, including using commercially reasonable efforts to: (i) cause appropriate senior officers of Sellers to participate in a reasonable number of meetings and presentations (or other sessions with the Debt Financing Sources) reasonably required in connection with the Debt Financing, in each case, at mutually agreed times, (ii) to the extent reasonably available to Sellers, provide Buyer with financial statements and historical financial information as it pertains to Sellers as reasonably necessary for Buyer to prepare the pro forma financial statements, in each case solely as required by paragraph 5(a) of Annex B to the Debt Commitment Letter (all such statements and information referred to in this clause (ii), the "<u>Required Information</u>"); (iii) solely with respect to Sellers, facilitate the granting of a security interest (and perfection thereof) in collateral, guarantees or mortgages as may reasonably be requested by Buyer with the effectiveness thereof to be conditioned upon Closing; (iv) ensure that the appropriate officers of Sellers execute prior to the Closing a customary "authorization" letter in connection with bank information memoranda authorizing the distribution of information to prospective lenders; and (v) furnish no later than four (4) Business Days prior to the Closing Date all reasonably requested documentation and other information required by a Governmental Authority in order to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act of 2001, but in each case, solely as relating to Sellers and solely to the extent reasonably requested in writing by Buyer at least nine (9) Business Days prior to the Closing Date.

(b)    Sellers hereby consent to the reasonable use of their logos, names, and trademarks solely in connection with the arrangement and syndication of the Debt Financing; <u>provided</u>, <u>however</u>, that such logos, names and trademarks are used solely in a manner that is not intended to or reasonably likely to harm or disparage Sellers or their reputation or goodwill or any of their respective products, services, offerings or intellectual property rights. Sellers shall use commercially reasonable efforts to promptly supplement the Required Information and all other information provided pursuant to <u>Section 6.9(a)</u> to the extent that any such Required Information or other information, to the Knowledge of Sellers, when taken as a whole, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements made in such Required Information or other information, in light of the circumstances under which they were made, not materially misleading. Such cooperation and assistance contemplated by <u>Section 6.9(a)</u> will only be required during regular business hours, upon reasonable advance notice and in a manner as would not be unreasonably disruptive to the business or operations of Sellers, as applicable, and will only include such matters that would customarily be done in connection with the arrangement and syndication of credit facilities of the same nature as the Debt Financing. Additionally, such cooperation and assistance contemplated by <u>Section 6.9(a)</u> shall not (A) require any action that would (or would reasonably be expected to): (i) cause any representation or warranty in this Agreement to be breached or (ii) cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement, (B) require Sellers or their respective Representatives to (i) other than with respect to the authorization letter contemplated by <u>Section 6.9(a)</u>, execute, deliver, enter into, approve or

64

perform any agreement, commitment, document or instrument, or modification of any agreement, commitment, document or instrument or incur any other actual or potential liability or obligation relating to the Debt Financing, (ii) deliver or cause the delivery of any legal opinions or reliance letters or any certificate as to solvency or any other certificate in connection with the Debt Financing (excluding the customary authorization letter contemplated by Section 6.9(a) (provided that such customary authorization letter (or the bank information memoranda in which such letter is included) shall include language that exculpates Sellers and their respective Representatives and Affiliates from any liability in connection with the unauthorized use by the recipients thereof of the information set forth in any such bank confidential information memoranda or similar memoranda or report distributed in connection therewith)), (iii) adopt any resolutions, execute any consents or otherwise take any corporate or similar action or deliver any certificate, in each case in connection to the Debt Financing or the incurrence of indebtedness thereby or (iv) pay any commitment or other similar fee, incur or reimburse any costs or expenses or incur any liability or obligation of any kind or give any indemnities in connection with the Debt Financing, (C) require Sellers or their respective Affiliates and Representatives to deliver any certificate or take any action pursuant to Section 6.9(a) if doing so could reasonably be expected to result in liability to any Seller or any Affiliate or Representative of any Seller, (D) require Sellers to provide, or cause to be provided, any information the disclosure of which is prohibited or restricted under applicable Law or any binding agreement with a third party or is legally privileged or consists of attorney work product or could reasonably be expected to result in the loss of any attorney-client privilege, (E) require Sellers to take any action that will conflict with or violate its Organizational Documents or any Laws or result in a violation or breach of, or default under, any agreements to which any Seller is a party and/or any Laws, (F) unreasonably interfere with the ongoing operations of Sellers or (G) prepare or deliver any financial statements or other financial data other than the Required Information; it being understood that under no circumstances shall Sellers be required to provide pro forma financial information, projections or other pro forma adjustments. Neither Sellers nor any of their respective Affiliates or Subsidiaries shall have any liability to Buyer in respect of any financial statements, other financial information or data or other information provided pursuant to this Section 6.9. All non-public or other confidential information provided by Buyer pursuant to this Section 6.9 shall be kept confidential in accordance with the Confidentiality Agreement.

(c)    Buyer shall be responsible for all fees and expenses related to the Debt Financing contemplated hereby. Accordingly, notwithstanding anything to the contrary in Section 10.3, Buyer shall promptly reimburse Sellers for all reasonable and documented out-of-pocket costs and expenses (including attorneys' fees) incurred by Sellers in connection with their cooperation pursuant to this Section 6.9 or otherwise in connection with the Debt Financing. Buyer shall indemnify and hold harmless Sellers and each of their respective Representatives from and against any and all losses, damages, claims, penalties, costs and expenses suffered or incurred by any of them in connection with such cooperation and assistance with respect to the Debt Financing or the provision of any information utilized in connection therewith, except to the extent such liabilities, losses, damages, claims or obligations arose out of or resulted from the gross negligence, willful misconduct or fraud of Sellers, as determined in a final, non-appealable judgment of a court of competent jurisdiction. Notwithstanding anything herein to the contrary, the condition set forth in Section 8.3(a)(i), as it applies in respect of Sellers' obligations under this Section 6.9, shall be deemed satisfied unless Sellers have materially breached their

obligations under this <u>Section 6.9</u> and such breach directly resulted in Buyer not being able to obtain the Debt Financing contemplated by the Debt Commitment Letter.

(d)    Buyer acknowledges and agrees that, except as set forth in <u>Section 6.9(a)</u> above, none of Sellers nor their respective Affiliates or Representatives will have any responsibility for any financing that Buyer may raise in connection with the transactions contemplated hereby.  Buyer shall ensure that any offering memorandum, bankers' book or other materials prepared by or on behalf of Buyer or its Affiliates or financing sources, in connection with Buyer's financing activities related to the transactions contemplated hereby (collectively, "<u>Offering Materials</u>"), which include any information provided by or on behalf of Sellers or their respective Affiliates or Representatives will include a conspicuous disclaimer to the effect that none of Sellers nor their respective Affiliates or Representatives will have any responsibility for the content of such Offering Materials and disclaim all responsibility therefor and shall further include a disclaimer with respect to Sellers and their respective Affiliates and Representatives in any oral disclosure with respect to such financing, in each case, including any liability in connection with the unauthorized use by the recipients thereof of the information set forth in such document or oral disclosure.

Section 6.10    <u>Transition Services Agreement</u>.  As promptly as practicable following the date of this Agreement, the Parties shall in good faith cooperate, negotiate, prepare and finalize the Transition Services Agreement, substantially on the terms set forth in the Amended and Restated Transition Services Agreement Term Sheet attached hereto as <u>Exhibit H</u> and otherwise in form and substance reasonably acceptable to Buyer and Sellers.  Without limiting the generality of the foregoing, such reasonable cooperation shall include Sellers, during normal business hours and upon at least twenty hour (24) hours' prior notice from Buyer to Sellers, (i) providing reasonable access to information and data in the possession of Sellers related to the transition services that Buyer has identified as needing and (ii) making appropriate, knowledgeable personnel of Sellers or their Affiliates reasonably available to participate in meetings and other discussions, in each case, to the extent any of the foregoing is reasonably requested by the Buyer.  Notwithstanding the foregoing, as part of the consideration of Buyer entering into this Agreement, if Sellers and Buyer do not agree to a Transition Services Agreement to be executed by Sellers and Buyer as of the Closing, the terms and conditions of the Amended and Restated Transition Services Agreement Term Sheet shall be effective as of the Closing as if they were the Transition Services Agreement and shall be legally binding upon both Sellers and Buyer.  However, the Parties will continue in accordance with this <u>Section 6.10</u> to finalize and execute the Transition Services Agreement as promptly as possible following the Closing.

Section 6.11    <u>Certain Acknowledgements</u>.  Buyer hereby (i) acknowledges and agrees that Sellers entered into the Settlement with the support and agreement of Buyer and pursuant thereto Sellers will be operating the Business prior to the Closing in accordance with the terms of such Settlement, including the Revised Budget, and (ii) consents to the taking by Sellers of such actions that Sellers determine to be reasonably necessary or desirable in order to operate prior to the Closing in compliance with the terms of such Settlement, including the Revised Budget.  In furtherance of the foregoing, Sellers agree to use their respective reasonable best efforts to implement, as promptly as practicable after November 4, 2024, the actions set forth on <u>Section 6.11</u> of the Disclosure Letter.

Section 6.12    Lender Recovery Shortfall Calculation.  Four (4) Business Days prior to the Closing Target Date, Sellers shall deliver to Buyer and the Administrative Agent (on behalf of the Prepetition Secured Parties) a statement (the "Estimated Lender Recovery Statement") setting forth Sellers' good faith estimate of the projected Lender Recovery as of the Closing Target Date and based thereon the amount, if any, by which the estimated Lender Recovery as of the Closing Target Date is projected to be less than the Lender Recovery Floor Amount (a "Lender Recovery Shortfall"). Such Estimated Lender Recovery Statement shall be prepared in accordance with GAAP, consistently applied, and shall be calculated based upon the books and records of Sellers and the Business and such other work papers, spreadsheets, schedules, memoranda, documents, data and information as Sellers reasonably deem relevant and appropriate.  In the event of a Lender Recovery Shortfall as of the Closing equal to or less than the Lender Recovery Shortfall Backstop, (i) the Cash Consideration pursuant to Section 2.6(a) shall be increased by an amount equal to such Lender Recovery Shortfall and (ii) the Assumed Payables Cap pursuant to Section 2.3(d) shall be decreased by an amount equal to such Lender Recovery Shortfall.  In the event of a Lender Recovery Shortfall as of the Closing in excess of the Lender Recovery Shortfall Backstop, Buyer and Sellers shall cooperate in good faith and use their respective reasonable best efforts to reach a mutually agreeable amendment to this Agreement or other resolution to their mutual satisfaction and to the satisfaction of the Administrative Agent (on behalf of the Prepetition Secured Parties) as a result of such Lender Recovery Shortfall on or before the Closing Target Date. For the avoidance of doubt, Buyer and Sellers shall continue to collaborate in the preparation of the Estimated Lender Recovery Statement until the Closing Target Date and shall continue to update such Estimated Lender Recovery Statement based on current information through the Closing.

Section 6.13    Assumed Payables Reconciliation. Four (4) Business Days prior to the Closing Target Date, Sellers shall deliver to Buyer a statement (the "Estimated Assumed Payables Statement") setting forth Sellers' good faith estimate of (i) the face amount of Section 503(b)(9) Claims outstanding as of the Petition Date and (ii) the face amount of Trade Admin Claims projected to be outstanding as of the Closing Target Date.  Following the Closing, and during the 45-day period following the later of the Section 503(b)(9) Claims Bar Date and the Administrative Claims Bar Date (such period, the "Assumed Payables Reconciliation Period"), (x) Sellers shall, in consultation with Buyer, use commercially reasonable efforts to review, analyze and reconcile against the Debtors' books and records, including the Estimated Assumed Payables Statement, each Section 503(b)(9) Claim properly scheduled or submitted on or prior to the Section 503(b)(9) Bar Date and each Trade Admin Claim properly scheduled or submitted on or before the Administrative Claims Bar Date; and (y) Buyer shall, in consultation with Sellers, accept or negotiate with the applicable counterparty with respect to each reconciled Section 503(b)(9) Claim and Trade Admin Claim.  Sellers and Buyer shall work collaboratively and in good faith to complete the claim reconciliation, negotiation and acceptance process during the Assumed Payables Reconciliation Period.  For the avoidance of doubt, Sellers and Buyer shall not be required to pay or otherwise discharge any such Assumed Payables during the Assumed Payables Reconciliation Period. Following the Assumed Payables Reconciliation Period, in furtherance of Section 2.3(d) hereof, Buyer shall assume and pay the Assumed Payables as follows:

(a)      subject to subsection (c) below, Buyer shall assume all reconciled Section 503(b)(9) Claims, subject to the Assumed Payables Cap, as may be reduced in accordance with Section 2.3(d);

(b)      if the aggregate face amount of reconciled Section 503(b)(9) Claims is less than the Assumed Payables Cap, then Buyer shall assume Trade Admin Claims in an aggregate face amount equal to the lesser of (i)(x) the Assumed Payables Cap *minus* (y) the total amount of reconciled Section 503(b)(9) Claims assumed by Buyer and (ii) the total face amount of reconciled Trade Admin Claims; and

(c)      if the aggregate face amount of reconciled Section 503(b)(9) Claims and Trade Admin Claims is greater than the Assumed Payables Cap, then Buyer shall be entitled to select which of the Section 503(b)(9) Claims and Trade Admin Claims Buyer will assume and pay to equal the Assumed Payables Cap.

## ARTICLE VII

## TAX MATTERS

Section 7.1    Transfer Taxes.    The Sale Order shall provide that the transactions contemplated by this Agreement and the Ancillary Agreements are and shall be exempt from any and all property transfer, stock transfer, real estate transfer, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable solely as a result of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") to the extent permitted pursuant to Section 1146(a) of the Bankruptcy Code.

Section 7.2    Tax Cooperation.    Buyer and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, the filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 7.2 shall be borne by the Party requesting it.

## ARTICLE VIII

## CONDITIONS TO CLOSING

Section 8.1    General Conditions.    The respective obligations of Buyer and Sellers to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (provided that such waiver shall only be effective as to the obligations of such Party):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "Legal Restraint").

(b)    Any waiting period (and any extension thereof) under the HSR Act or any other Antitrust Law applicable to the transactions contemplated by this Agreement shall have expired or shall have been terminated or the necessary clearance thereunder shall have been received.

(c)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed or modified in a manner materially adverse to Sellers absent consent of Sellers or to the Buyer absent consent of Buyer.

Section 8.2    Conditions to Obligations of Sellers.    The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by True Value Parent in its sole discretion:

(a)    The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b)    Buyer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)    Sellers shall have received the documents listed in Section 2.8(c).

(d)    No Lender Recovery Shortfall in excess of the Lender Recovery Shortfall Backstop shall exist, it being understood that this condition shall be deemed satisfied if the Parties reach a mutually agreeable amendment to this Agreement or other resolution to their mutual satisfaction and with the approval of the Administrative Agent (on behalf of the Prepetition Secured Parties). Notwithstanding anything to the contrary set forth in this Agreement, this Section 8.2(d) may be waived only by a written instrument executed and delivered by a duly authorized officer of each of Buyer, Sellers and the Administrative Agent (on behalf of the Prepetition Secured Parties).

Section 8.3    Conditions to Obligations of Buyer.    The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a)     <u>Representations and Warranties</u>.

(i)     The representations and warranties of Sellers contained in this Agreement, other than the Fundamental Representations of Sellers, shall be true and correct as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), except where the failure of such representations and warranties to be true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers set forth therein) would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(ii)    The Fundamental Representations of Sellers contained in this Agreement shall be true and correct in all but *de minimis* respects (other than those Fundamental Representations of Sellers that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b)     Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them at or prior to the Closing.

(c)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(d)     Buyer shall have received the documents listed in <u>Section 2.8(b)</u>.

## **ARTICLE IX**

## **TERMINATION**

Section 9.1     <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written consent of Buyer and True Value Parent;

(b)     by either True Value Parent or Buyer, if:

(i)     a Legal Restraint is in effect that has become final and nonappealable; <u>provided</u> that no Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such Legal Restraint may terminate this Agreement pursuant to this <u>Section 9.1(b)(i)</u>;

(ii)    Sellers enter into a definitive agreement with respect to or consummate an Alternative Transaction; or

70

(iii)    In the event that on the Closing Target Date a Lender Recovery Shortfall in excess of the Lender Recovery Shortfall Backstop exists and Buyer and Sellers and the Administrative Agent (on behalf of the Prepetition Secured Parties) fail to reach a mutually agreeable amendment to this Agreement or other resolution to their mutual satisfaction as the result of such Lender Recovery Shortfall, if any, on or prior to the Closing Target Date; provided, that no Party shall be entitled to terminate the Agreement pursuant to this Section 9.1(b)(iii) if the failure to reach a mutually agreeable amendment to this Agreement or other resolution is caused by such Party's breach of its obligations under Section 6.12.  For the avoidance of doubt, if the termination right pursuant to this Section 9.1(b)(iii) becomes exercisable, Sellers shall exercise such termination right only if requested to do so in writing by the Administrative Agent (on behalf of the Prepetition Secured Parties).

(c)    by Buyer, if:

(i)    at any time, if Sellers shall have breached or violated any of their respective representations, warranties or covenants set forth in this Agreement or in any certificate delivered by Sellers in connection herewith in a manner that would prevent the satisfaction of the conditions to Closing set forth in Section 8.3(a) or Section 8.3(a)(i), and (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in Section 2.8, in which case such two (2) Business Day period shall apply) such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by Buyer to Sellers; provided that Buyer shall not be entitled to terminate the Agreement pursuant to this Section 9.1(c)(i) if the failure of the Closing to be consummated by such date is caused by Buyer's breach of any of its obligations under this Agreement;

(ii)    any of the conditions set forth in Section 8.1 or Section 8.3 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by December 16, 2024 (the "Outside Date"), unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; provided, however, that if the sole reason that the transactions contemplated hereby to occur at the Closing have not been consummated on or before the Outside Date is that the required approval from any Governmental Authority, the consent of which is required as a condition to the consummation of the transactions contemplated hereby, has not been obtained, then the Outside Date shall be extended to December 31, 2024;

(iii)    the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; or

(iv)    Sellers withdraw or seek authority to withdraw the Sale Motion.

(d)    by True Value Parent:

71

(i)      at any time, if (x) Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement or in any certificate delivered by Sellers in connection herewith in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in Section 8.2(a) or Section 8.2(b), or (y) Buyer shall have materially breached the Bidding Procedures Order or the Sale Order, and in each case (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in Section 2.8, in which case such two (2) Business Day period shall apply), such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by True Value Parent to Buyer, provided that True Value Parent shall not be entitled to terminate the Agreement pursuant to this Section 9.1(d)(i) if the failure of the Closing to be consummated by such date is caused by any Seller's breach of any of its obligations under this Agreement; or

(ii)      if the Board of Directors of True Value Parent determines in the exercise of its sole authority that proceeding with the transactions contemplated by this Agreement would be inconsistent with its fiduciary duties.

The Party seeking to terminate this Agreement pursuant to this Section 9.1 (other than Section 9.1(a)) shall, if such Party is True Value Parent, give prompt written notice of such termination to Buyer, and if such Party is Buyer, give prompt written notice of such termination to True Value Parent.

Section 9.2      Effect of Termination.

(a)      In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of Section 6.6 (Public Announcements), Section 10.3 (Fees and Expenses), Section 10.6 (Notices), Section 10.9 (Parties in Interest), Section 10.10 (Governing Law), Section 10.11 (Submission to Jurisdiction) and this Article IX, each of which shall survive such termination and remain enforceable in accordance with their respective terms, and (ii) that no such termination shall relieve any Party from liability for any willful breach of this Agreement arising prior to the date of termination.  Further, the Confidentiality Agreement shall survive the termination of this Agreement.

(b)      In consideration of Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and to compensate Buyer as a stalking-horse bidder, (i) if this Agreement is terminated pursuant to Section 9.1(b)(ii), then True Value Parent shall pay to Buyer the Break-Up Fee and Expense Reimbursement Amount at the closing of such Alternative Transaction by wire transfer of immediately available funds; and (ii) if this Agreement is terminated pursuant to Section 9.1(c)(i), Section 9.1(c)(iv) or Section 9.1(d)(ii), then True Value Parent shall pay to Buyer the Expense Reimbursement Amount by wire transfer of immediately available funds within three (3) Business Days following such termination.  The Bidding Procedures Order shall provide that the Expense Reimbursement Amount and Break-Up Fee shall constitute an allowed administrative expense claim against Sellers under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with

priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code.

(c)     Notwithstanding anything to the contrary in this Agreement, Buyer shall not be entitled to receive the Break-Up Fee or Expense Reimbursement Amount if Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in Section 8.2(a) or Section 8.2(b), as the case may be.

(d)     Notwithstanding Section 9.2(b), Buyer's right to receive the one-time payment of the Break-Up Fee and/or the Expense Reimbursement Amount from True Value Parent as provided in Section 9.2(b) shall be the sole and exclusive remedy available to Buyer against Sellers or any of its former, current or future equityholders, directors, officers, Affiliates, agents or Representatives with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to Section 9.1(b)(ii), Section 9.1(c)(i), Section 9.1(c)(iv) or Section 9.1(d)(ii) and upon such payment of the Break-Up Fee and/or the Expense Reimbursement Amount none of Sellers or any of their respective former, current or future equityholders, directors, officers, Affiliates, agents or Representatives shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.  The parties acknowledge and agree that in no event shall True Value Parent be required to pay the Break-Up Fee and the Expense Reimbursement Amount on more than one occasion.

Section 9.3     Alternative Transactions.  Notwithstanding anything in this Agreement to the contrary, Sellers may participate in discussions or negotiations with, or furnish information with respect to Sellers or the Business to, any Person.  Upon receipt of any proposal for an Alternative Transaction, True Value Parent shall give prompt written notice to Buyer of such proposal, including a summary of the material terms thereof.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.1     Nonsurvival of Representations, Warranties and Covenants.     The respective representations, warranties and covenants of Sellers and Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing.

Section 10.2     Bulk Sales.  Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer.

Section 10.3    Fees and Expenses.  All fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 10.4    Amendment and Modification.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.5    Waiver.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.6    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a nationally recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

        (i)     if to Sellers, to:

        True Value Company
        8600 West Bryn Mawr Avenue
        Chicago, IL 60631
        Attention:    Chris Kempa
        Email:        Chris.Kempa@TrueValue.com

with a copy (which shall not constitute notice) to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> One Manhattan West
> New York, NY 10001
> Attention:
> > Steven J. Daniels
> > Ron E. Meisler
>
> Email:
> > Steven.Daniels@skadden.com
> > Ron.Meisler@skadden.com

(ii)      if to Buyer, to:

> Do it Best Corp.
> 1626 Broadway, Suite 100
> Fort Wayne, Indiana 46802
> Attention:    Daniel B. Starr
> Email:         dan.starr@doitbest.com

with copies (which shall not constitute notice) to:

> Taft Stettinius & Hollister LLP
> One Indiana Square, Suite 3500
> Indianapolis, IN 46204
> Attention: Zachary E. Klutz and W. Timothy Miller
> Email: zklutz@taftlaw.com; miller@taftlaw.com

Section 10.7    <u>Interpretation</u>.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  References to days mean calendar days unless otherwise specified.

Section 10.8    <u>Entire Agreement</u>.    This Agreement and the Ancillary Agreements, Confidentiality Agreement and Disclosure Letter (including the Exhibits and Schedules hereto

and thereto) constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings among the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.9   Parties in Interest.  Except as specifically set forth in Section 10.12 and Section 10.20, this Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including Business Employees and other employees) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.10   Governing Law.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

Section 10.11   Submission to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Chapter 11 Case is closed or the Bankruptcy Court declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in the Court of Chancery of the State of Delaware, or if jurisdiction is not available in the Court of Chancery, then in the United States District Court for the District of Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts of the State of Delaware, and of the United

States District Court for the District of Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 10.12 <u>Assignment; Successors</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by Sellers without the prior written consent of Buyer, and by Buyer without the prior written consent of True Value Parent, and any such assignment without such prior written consent shall be null and void.  Notwithstanding the foregoing, subject to the terms of <u>Section 2.10</u>, Buyer may assign any of its rights under this Agreement to any Designated Buyer without obtaining the prior written consent of True Value Parent; <u>provided</u> that in connection with such assignment, such assignment shall not relieve Buyer of any of its obligations under this Agreement.  Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.13 <u>Specific Performance</u>.  Each Party acknowledges and agrees that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such Party and that any such breach would cause Buyer, on the one hand, and Sellers, on the other hand, irreparable harm.  Accordingly, each Party also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such Party, Buyer, on the one hand, and Sellers, on the other hand, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.  Any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.  Sellers, on the one hand, and Buyer, on the other hand, hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by Sellers or Buyer, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of Sellers or Buyer, as applicable, under this Agreement.

Section 10.14 <u>Currency</u>.  All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 10.15 <u>Severability</u>.  If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement, or the remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any such term or other provision, or any portion thereof, is invalid,

illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are consummated to the fullest extent possible.

Section 10.16 <u>Waiver of Jury Trial</u>.    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.16</u>.

Section 10.17 <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, including by means of email in portable document format (.pdf) or other electronic means, each of which when executed shall be deemed to be an original copy of this Agreement and all of which taken together shall constitute one and the same agreement.    Any electronic signatures shall have the same legal effect as physically delivered manual signatures.

Section 10.18 <u>Jointly Drafted</u>.  This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.  The Parties acknowledge and agree that prior drafts of this Agreement and the other agreements and documents contemplated hereby will not be deemed to provide any evidence as to the meaning of any provision hereof or the intent of the Parties with respect hereto and that such drafts will be deemed to be the joint work product of the Parties.

Section 10.19 <u>Limitation on Damages</u>.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL BUYER, SELLERS OR ANY SELLER NON-RECOURSE PERSON BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE SPECIAL, OR EXEMPLARY DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES AS A RESULT OF SUCH PARTY'S BREACH OF THIS

AGREEMENT, EXCEPT TO THE EXTENT ARISING FROM THE FRAUD OF SUCH PARTY.

Section 10.20 <u>No Recourse</u>.

(a)    This Agreement may be enforced only by True Value Parent against, and any claim, action, suit, or other legal proceeding by Sellers in connection with this Agreement may be brought only against Buyer, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  Neither any Seller nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, direct or indirect stockholder, Affiliate, agent, Advisor, Representative or investor of Buyer or of any Affiliate of Buyer or any of their successors or permitted assigns (each, a "<u>Buyer Non-Recourse Person</u>"), and no such Buyer Non-Recourse Person shall have any liability for any obligations or liabilities of Buyer under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

(b)    This Agreement may be enforced only by Buyer against, and any claim, action, suit, or other legal proceeding by Buyer in connection with this Agreement may be brought only against, Sellers, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  None of Buyer, any Designated Buyer, nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, direct or indirect stockholder, Affiliate, agent, Advisor, Representative or investor of Sellers or of any Affiliate of Sellers or any of their successors or permitted assigns (each, a "<u>Seller Non-Recourse Person</u>"), and no Seller Non-Recourse Person shall have any liability for any obligations or liabilities of Sellers under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

Section 10.21 <u>Time of Essence; Calculation of Dates</u>.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Section 10.22 <u>Debt Financing</u>.  Notwithstanding anything in this Agreement to the contrary, each party on behalf of itself, each its Subsidiaries, each of its Affiliates and each of their respective Representatives hereby: (a) agrees that any action, suit or proceeding of any kind or description, whether in contract or in tort or otherwise, involving any Debt Financing Source, arising out of or relating to this Agreement, the Debt Commitment Letter or the Debt Financing or any of the agreements entered into in connection with the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each party hereto irrevocably submits itself and its property with respect to any such action, suit or proceeding to the exclusive jurisdiction of such

79

court; (b) agrees that any such action, suit or proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or other applicable definitive document agreement relating to the Debt Financing; (c) agrees not to bring or support or permit any of its Subsidiaries, Affiliates or Representatives to bring or support any action, suit or proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York; (d) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such action, suit or proceeding in any such court; (e) agrees that the waiver of rights to trial by jury set forth in Section 10.16 applies in any such action, suit or proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing Commitment, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder; (f) agrees that none of the Debt Financing Sources will have any liability to any Seller or any of their respective Subsidiaries, Affiliates or Representatives relating to or arising out of this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise (provided that nothing in this Section 10.22 shall limit the liability or obligations of the Debt Financing Sources to Buyer under the Debt Commitment Letter) (and, in furtherance of the foregoing, agrees, subject to the immediately succeeding sentence, not to commence (and if commenced agrees to have dismissed or otherwise terminated) any action or proceeding against any Debt Financing Source in connection with this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder); (g) neither any Seller nor any of their respective Subsidiaries, Affiliates or Representatives shall be entitled to seek specific performance of any rights of Buyer to cause the Debt Financing to be funded; (h) agrees that Buyer may without the prior written consent of any Seller assign or transfer any or all of its rights and interests hereunder to any Debt Financing Source (so long as any such assignment does not relieve Buyer of its obligations hereunder) under terms of the Debt Financing solely for the purpose of creating a security interest herein or otherwise assigning with respect to the Debt Financing; (i) agrees that the Debt Financing Sources are express third-party beneficiaries of, and may enforce any of the provisions of, this Section 10.22; and (j) agrees that the provisions of this Section 10.22 and the definition of "Debt Financing Sources" shall not be directly or indirectly amended, modified or supplemented in any way adverse to the Debt Financing Sources without the prior written consent of the Debt Financing Sources party to the Debt Commitment Letter or definitive documentation related to the Debt Financing (such consent not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, nothing in this Section 10.22 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Commitment Letter or Buyer under the definitive agreements governing the Debt Financing. This Section 10.22 shall, with respect to the matters referenced herein, supersede any provision of this Agreement to the contrary.  The provisions of this Section 10.22 will survive any termination of this Agreement.  For purposes of this Section

10.22, "Debt Financing Sources" shall include the Debt Financing Sources, their respective Affiliates, and their and their Affiliates' respective Representatives and their respective successors and permitted assigns.

*[The remainder of this page is intentionally left blank.]*

81

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**SELLERS:**

**TRUE VALUE COMPANY L.L.C.**

By: _Christopher Kempa_

Name: Chris Kempa

Title:   Chief Executive Officer

**TV HOLDCO II, L.L.C.**

By: _Christopher Kempa_

Name: Chris Kempa

Title:   President

**TV TSLC, L.L.C.**

By: _____

Name: William McGann

Title:   President

**TV GPMC, L.L.C.**

By: _____

Name: William McGann

Title:   President

**TRUE VALUE RETAIL, L.L.C.**

By: _____

Name: William McGann

Title:   Vice President

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**SELLERS:**

**TRUE VALUE COMPANY L.L.C.**

By: _____
    Name: Chris Kempa
    Title:   Chief Executive Officer

**TV HOLDCO II, L.L.C.**

By: _____
    Name: Chris Kempa
    Title:   President

**TV TSLC, L.L.C.**

By: _____
    Name:  William McGann
    Title:   President

**TV GPMC, L.L.C.**

By: _____
    Name:  William McGann
    Title:   President

**TRUE VALUE RETAIL, L.L.C.**

By: _____
    Name:  William McGann
    Title:   Vice President

**TRUEVALUE.COM COMPANY, L.L.C.**

By: _William McGann_

Name: William McGann
Title: President


**TRUE VALUE VIRGINIA, L.L.C.**

By: _William McGann_

Name: William McGann
Title: President


**DISTRIBUTORS HARDWARE, L.L.C.**

By: _William McGann_

Name: William McGann
Title: Vice President

**BUYER:**

**DO IT BEST CORP.**

By: _Daniel B. Starr_____
    Name:  Daniel B. Starr
    Title:   President & CEO

**Exhibit A**

**[RESERVED]**

**Exhibit B**

**[RESERVED]**

**Exhibit C**

**Escrow Agreement**

**Exhibit D**

**<u>Form of Sale Order</u>**

**Exhibit E**

**Form of Bill of Sale and Assignment and Assumption Agreement**

**Exhibit F**

**Form of Lease Assignment and Assumption Agreement**

**Exhibit G**

**Form of IP Assignment Agreement**

**Exhibit H**

**Amended and Restated Transition Services Agreement Term Sheet**

CONFIDENTIAL

**EXHIBIT H**

**TRANSITION SERVICES AGREEMENT**

**AMENDED AND RESTATED TERM SHEET**

The following sections are intended to summarize the material terms and conditions of the Transition Services Agreement to be entered into by and among the Parties, and which will be negotiated by the Parties in accordance with the Amended and Restated Asset Purchase Agreement, dated as of November 10, 2024, by and among the Parties (as amended from time to time, the "Asset Purchase Agreement").  This amended and restated term sheet (as amended from time to time in accordance with the amendment provisions set forth in the Asset Purchase Agreement, the "Transition Services Agreement Term Sheet") is not intended to be a statement of all terms and conditions of the Transition Services Agreement.  This Transition Services Agreement Term Sheet amends and restates in its entirety the Transition Services Agreement Term Sheet appended to the Asset Purchase Agreement, dated as of October 13, 2024, by and among the Parties (the "Original Asset Purchase Agreement").

I.    **Definitions**

For purposes of this Transition Services Agreement Term Sheet and the Transition Services Agreement, the terms set forth below shall have the following meanings:

"Chicago Headquarters" means Sellers' corporate headquarters located in Chicago, Illinois.

"Contracts" means those contracts and agreements with third parties reasonably required by Sellers to provide the Transition Services including, without limitation, lease agreements, vendor agreements, services agreements and agreements with customers and members of Sellers.

"Distribution Business" means the operation of Sellers' distribution business at the Distribution Centers, substantially in the same manner as such business is operated by Sellers immediately prior to the Closing.

"Distribution Centers" means the distribution centers located in (i) Springfield, OR; (ii) Kingman, AZ; (iii) Atlanta, GA; (iv) Denver; CO; (v) Cleveland (Westlake); OH; (vi) Kansas City, MO; (vii) Mankato, MN; (viii) Wilkes Barre, PA; (ix) Harvard, IL; (x) Corsicana, TX; (xi) Woodland, TX; and (xii) Manchester, NH.

"Paint Business" means the operation of Sellers' paint manufacturing and warehousing business at the Paint Manufacturing and Warehousing Facilities, substantially in the same manner as such paint business is operated by Sellers immediately prior to the Closing.

"<u>Paint Manufacturing and Warehousing Facilities</u>" means, collectively, Sellers' paint manufacturing facility located in Cary, IL, together with Sellers' paint warehousing center located in Freeport, IL.

"<u>Transferred Employee</u>" means any Transition Employee who, during the term of the Transition Services Agreement, receives and accepts (or is deemed to have accepted) Buyer's (or an Affiliate of Buyer's) offer of employment and who commences employment with Buyer or an Affiliate thereof.

"<u>Transition Employees</u>" means all employees employed by Sellers (i) to provide services at, or with a base of operations in, a Distribution Center or the Paint Manufacturing and Warehousing Facilities, and (ii) at other locations, including at the Chicago Headquarters, to the extent such employees are not Transferred Employees and the services of such employees are reasonably required to provide the Transition Services to Buyer.

"<u>Transition Equipment</u>" means all leased equipment and trailers reasonably required by Sellers to operate the Distribution Centers and the Paint Manufacturing and Warehousing Facilities and to otherwise conduct the Distribution Business and the Paint Business and provide the Transition Services, in each case, to the extent that such equipment and trailers are leased under a lease or other Contract that is not a Transferred Contract at the relevant time.

"<u>Transition Locations</u>" means, collectively, the Chicago Headquarters, the Distribution Centers and the Paint Manufacturing and Warehousing Facilities.

"<u>Transition Period</u>" means a period of up to twelve (12) months following the Closing Date; <u>provided</u>, <u>however</u>, with respect to the Distribution Centers, the Paint Manufacturing and Warehousing Facilities and the Chicago Headquarters, the Transition Period will start on the Closing Date and is anticipated to end within seven (7) months following the Petition Date; <u>provided</u>, <u>however</u>, that the Transition Period (x) may be extended beyond the period of twelve (12) months following the Closing Date by mutual agreement of the Parties and (b) shall be extended as necessary solely for purposes of the resolution of Costs and reconciliation of payments hereunder or under the Transition Services Agreement (it being understood that if the Transition Period is extended pursuant to this subclause (y) beyond the twelve (12) month anniversary of the Closing, then the Transition Period (but not the provision of any Transition Services) shall be extended solely for purposes of such resolution of Costs and reconciliation of payments hereunder or under the Transition Services Agreement unless otherwise agreed by the Parties).

"<u>Transition Services</u>" means all services and systems reasonably required to operate the Distribution Business and the Paint Business substantially in the same manner as such businesses are operated by Sellers immediately prior to the Closing, including, without limitation, all warehousing, paint manufacturing, logistics (including

2

shipping and receiving), sales, e-commerce, ordering, finance, IT, software, security, and payroll services or systems, whether provided internally by Sellers or pursuant to Contracts or other arrangements with third parties.

Other capitalized terms used but not defined in this Transition Services Agreement Term Sheet shall have the respective meanings given to such terms in the Asset Purchase Agreement.

## II.    Provision of Transition Services

Subject to the terms and conditions of the Transition Services Agreement (if and when entered into), during the Transition Period, Sellers shall use commercially reasonable efforts to provide or cause to be provided to Buyer and/or its designees (solely for use in the conduct of the Distribution Business and the Paint Business by Buyer) with (a) reasonable access to and use of the Transition Locations and all assets, including fixed assets, located at the Transition Locations which are not Transferred Assets at the relevant time, (b) the utilities and other services provided at the Transition Locations, (c) use of the Transition Equipment, (d) the Transition Employees, and (e) the Transition Services, together with those services associated with maintaining any Contracts reasonably required for providing the Transition Services and maintaining the insurance policies required for purposes of providing the Transition Services (and adding Buyer as an additional insured under such insurance policies); provided that, for the avoidance of doubt,  the matters set forth in this sentence shall all be considered part of the Transition Services. As and to the extent that Buyer shall have acquired at the Closing pursuant to the Asset Purchase Agreement any of the equipment, rights or assets (including Contracts, intellectual property and IT systems) needed by Sellers to provide the Transition Services, Buyer shall make such equipment, rights and other assets available to Sellers, by license, sublicense or otherwise, at no cost to Sellers.

## III.    Termination of Transition Services

Buyer may terminate all or any portion of the Transition Services prior to the end of the Transition Period.  If Buyer desires to terminate any Transition Services, Buyer shall provide prior written notice thereof to Sellers and the Parties shall collaborate in good faith to determine the most commercially practicable manner and timing for such termination.  Sellers shall then use reasonable best efforts to terminate such Transition Services as soon as practicable after the Parties agree on the approach with respect thereto.  For the avoidance of any doubt, all Costs incurred by Sellers pending termination of any such Transition Service, as well as any Costs incurred as a result of such termination, shall be borne by Buyer.  The termination of any Transition Service by Buyer hereunder shall not alter, amend, modify, waive or otherwise affect the designation rights of Buyer under the Asset Purchase Agreement (subject to the Bankruptcy Code or any Bankruptcy Court Order and

949168.01E-WILSR01A - MSW

135814783v6

provided, in each case, that Buyer pays the applicable Cure Claims in connection therewith).

If Buyer desires to vacate any Transition Location, Buyer shall provide at least 30 days prior written notice thereof to Sellers (a "Vacate Notice") and the Parties shall collaborate in good faith to determine the most commercially practicable manner and timing for the Parties to vacate such Transition Location.  Sellers shall then use reasonable best efforts to vacate such Transition Location as soon as reasonably practicable after the Parties agree on the approach with respect thereto (the effective date on which Sellers vacate such Transition Location as provided herein, the "Vacate Date").  For the avoidance of doubt, Buyer's obligations to pay Costs related to the occupancy shall continue until the applicable Vacate Date for each Transition Location, which, for the avoidance of doubt, shall include the full monthly rent for each Transition Location that becomes due and payable through the Vacate Date (unless the applicable lessor for such Transition Location agrees to prorate the monthly rent through such Vacate Date without any liability to Sellers) and shall include any Costs that accrued during the Transition Period but become payable at and after the applicable Vacate Date pursuant to the terms of the Lease for the applicable Transition Location. At the conclusion of the Transition Period with respect to each Transition Location, Buyer agrees to leave such Transition Location in "broom clean" condition, ordinary wear and tear excepted and otherwise in accordance with the terms of the applicable Lease therefor. Buyer shall be responsible for any and all Costs and Liabilities arising from or in connection with Buyer's or its designees' access to and use of the Transition Locations during the Transition Period and/or Sellers' provision of Transition Services at such Transition Location during the Transition Period; provided, that upon vacating each Transition Location, and subject to the terms of the Lease for such Transition Location, Buyer shall have the right to abandon any inventory, machinery and equipment and other property in each Transition Location to Sellers without liability to Buyer (it being understood that the removal and disposal of any such inventory, machinery and equipment shall be at Buyer's sole cost and expense).

949168.01E-WILSR01A - MSW

135814783v6

IV.    **Compensation for Transition Services**

Buyer shall pay, or cause to be paid, to Sellers, in advance, (a) all out of pocket fees, costs and expenses incurred by Sellers to provide each of the Transition Services, including all fees, costs and expenses paid to third parties in connection with the provision by Sellers of the Transition Services, and any payments under Contracts or other arrangements with respect thereto, and (b) all Transition Employee Costs (as defined below) (such costs and fees, collectively, the "Costs"). All such Costs shall be requested by Sellers and paid by Buyer sufficiently in advance of when needed by Sellers. At least three (3) business days prior to Buyer's advance of any Costs to Sellers (each, an "Advance Cost Payment"), Sellers shall provide Buyer a calculation of the Advance Cost Payment together with supporting spreadsheets, schedules, documents, data and other information used and relied upon by Sellers for the calculation of such Advance Cost Payment request. All Advance Cost Payments and Costs paid by Buyer to Sellers shall be subject to a continuing reconciliation process by and among Buyer and Sellers during the Transition Period and for a reasonable period after the termination or expiration of the Transition Services Agreement.  Any excess contributed or paid by Buyer in respect of any Costs that is outstanding at the end of the Transition Period shall be remitted to Buyer by Seller within ninety (90) days after the end of the Transition Period.

V.    **Transition Employees and Insurance**

At the direction of Buyer, Sellers shall employ, pay, supervise and direct and discharge all Transition Employees. Sellers shall be solely responsible for providing employee benefits to all Transition Employees and administering the payment of all wages and other compensation during the Transition Period for all Transition Employees (collectively, the "Transition Employee Costs"). Buyer shall, on a monthly basis on or before the 15th day of each month during the Transition Period, prepay to Sellers the Transition Employee Costs that (a) are expected to be incurred in connection with Sellers performing the Transition Services for the following month or (b) are expected to arise from or relate to events, acts or omissions expected to occur during the following month in connection with the winding down and termination of any Transition Services.  If any payment made by Buyer to Sellers in respect of Transition Employee Costs exceeds the amount of actually incurred Transition Employee Costs for the applicable month during the Transition Period, the excess will be rolled over and credited towards the subsequent month; provided, that any excess contributed by Buyer in respect of Transition Employee Costs that is outstanding at the end of the Transition Period shall be remitted to Buyer by Seller within ninety (90) days after the end of the Transition Period. Except for the Transition Employee Costs, Buyer shall have no obligation in respect of any liability associated with a Transition Employee. For the avoidance of doubt, all Transition Employees shall remain employees of Sellers. Buyer shall not be deemed to control any of Sellers' employees.

949168.01E-WILSR01A - MSW

135814783v6

Sellers shall, during the period from the Closing until the expiration of the Transition Period maintain, at Buyer's sole cost and expense, the insurance policies that (i) are required for purposes of providing the Transition Employees and the Transition Services; provided that Sellers may allow such policies to lapse at such time as the services of all Transition Employees have been terminated, (ii) are required pursuant to the terms of the Lease for each Transition Location, (iii) have historically been procured by Sellers and (iv) are otherwise customary and required (collectively, the "Insurance Policies") (other than such Insurance Policies that will automatically convert to run-off policies in accordance with the terms thereof), including Insurance Policies in respect of statutory workers' compensation, employers' liability insurance, and comprehensive general liability insurance, each with a limit for each incident not less than the limits in effect as of immediately prior to the Closing. If Buyer makes, or instructs Sellers to make, a claim under any such Insurance Policies, Sellers shall be responsible for the resulting payment of all deductibles, retentions or self-insured amounts thereunder, which costs shall be treated as Costs hereunder, and Buyer shall be entitled to all recoveries thereunder to the extent related to the provision of the Transition Services after the Closing. Sellers shall name Buyer as an additional insured, with waiver of subrogation, under the Insurance Policies that are required for purposes of providing the Transition Employees.

During the period from the Closing until such time as the services of all Transition Employees have been terminated, Sellers shall be responsible for adhering to any reporting requirements associated with all applicable employment taxes and other taxes and contributions applicable to the Transition Employees (i.e., wage withholding, social security, unemployment insurance, disability insurance and workers' compensation insurance), the costs of which, to the extent incurred in connection with providing the Transition Services and arising from or relating to events, acts or omissions occurring after the Closing, shall be a Transition Employee Cost.

Sellers will not terminate any Transition Employee during the Transition Period, other than for cause as determined by Sellers, without the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed).  Sellers shall provide written notice to Buyer of their desire and intent to terminate any Transition Employee at least seven (7) days prior to any termination by Sellers, unless a shorter period is warranted under the circumstances, and, the failure of Buyer to deliver an objection to such termination shall constitute Buyer's consent as contemplated in the immediately preceding sentence.  If Buyer (in its sole discretion) desires for Sellers to terminate the employment of any Transition Employee, Buyer shall provide notice of such desire and Sellers shall terminate the employment of such Transition Employee within fourteen (14) days, unless a shorter period is warranted under the circumstances; provided, however, that Buyer shall consult with Sellers on any such proposed employment terminations that are reasonably expected to trigger the notice requirements under the WARN Act or any state analog.  If

949168.01E-WILSR01A - MSW

135814783v6

requested by Buyer (in its sole discretion), Sellers shall use commercially reasonable efforts to provide replacement employees with substantially the same skill set and experience as any terminated employees, and any such costs relating to the replacement of any Transition Employee shall be a Transition Employee Cost. As Buyer completes the hiring of each Transferred Employee as contemplated by the Transition Services Agreement, Sellers shall assist in such hiring process as part of the Transition Services.

**VI.    Miscellaneous**

The provisions of Sections 10.4 through 10.21 of the Asset Purchase Agreement shall apply to this Transition Services Agreement Term Sheet and the Transition Services Agreement, *mutatis mutandis*, as if set forth herein.

949168.01E-WILSR01A - MSW

135814783v6

# EXHIBIT B

**Redline of Amended and Restated APA**

~~CONFIDENTIAL~~*Execution Version*

# AMENDED AND RESTATED
# ASSET PURCHASE AGREEMENT

by and among

## TRUE VALUE COMPANY L.L.C.,

## TV HOLDCO II, L.L.C.,

## TV TSLC, L.L.C.,

## TV GPMC, L.L.C.,

## TRUE VALUE RETAIL, L.L.C.,

## TRUEVALUE.COM COMPANY, L.L.C.,

## TRUE VALUE VIRGINIA, L.L.C.,

and

## DISTRIBUTORS HARDWARE, L.L.C.

**as Sellers,**

and

## DO IT BEST CORP.

as Buyer,

Dated as of ~~October 31~~November 10, 2024

# TABLE OF CONTENTS

Page

Article I
DEFINITIONS

Section 1.1    Defined Terms ........................................................................................ 2

Article II

PURCHASE AND SALE

Section 2.1    Purchase and Sale ................................................................................. 18
Section 2.2    Excluded Assets .................................................................................... 20
Section 2.3    Assumed Liabilities .............................................................................. 22
Section 2.4    Excluded Liabilities .............................................................................. 23
Section 2.5    Assignment of Transferred Contracts .................................................... 23
Section 2.6    Consideration ........................................................................................ 25
Section 2.7    Deposit Funds ....................................................................................... 25
Section 2.8    Closing .................................................................................................. 26
Section 2.9    Purchase Price Allocation ..................................................................... 28
Section 2.10   Designated Buyer(s) .............................................................................. 28
Section 2.11   Withholding ........................................................................................... 29
Section 2.12   Reimbursement of Prepaid Expenses ..................................................... 29
Section 2.13   Payment of Purchase Orders .................................................................. 29
Section 2.14   LC Reimbursement Amount ................................................................... ~~29~~30

Article III

REPRESENTATIONS AND WARRANTIES
OF SELLERS

Section 3.1    Organization ......................................................................................... 30
Section 3.2    Authority ............................................................................................... 30
Section 3.3    No Conflict; Required Filings and Consents ........................................... ~~30~~31
Section 3.4    Transferred Assets; Sufficiency of Assets .............................................. 31
Section 3.5    Financial Statements; No Undisclosed Liabilities ................................... 32
Section 3.6    Absence of Certain Changes or Events ................................................... ~~32~~33
Section 3.7    Compliance with Law; Permits ............................................................... 33
Section 3.8    Litigation .............................................................................................. 33
Section 3.9    Employee Benefit Plans ......................................................................... ~~33~~34
Section 3.10   Labor and Employment Matters .............................................................. ~~34~~35
Section 3.11   Real Property ........................................................................................ ~~35~~36
Section 3.12   Intellectual Property ............................................................................. 37

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase
Agreement 950067v6A 11/10/2024 8:43:03 PM

Section 3.13    Tax Matters ........................................................... 3839
Section 3.14    Environmental Matters ............................................. 39
Section 3.15    Material Contracts .................................................. 40
Section 3.16    Certain Payments .................................................... 4142
Section 3.17    Brokers ................................................................ 4142
Section 3.18    Data Privacy; Information Security. ........................... 4142
Section 3.19    Exclusivity of Representations and Warranties ............ 4243

Article IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.1    Organization ........................................................... 4344
Section 4.2    Authority ................................................................ 4344
Section 4.3    No Conflict; Required Filings and Consents .................. 4344
Section 4.4    Absence of Litigation ............................................... 4445
Section 4.5    Qualification ........................................................... 4445
Section 4.6    Legal Requirements and Approvals .............................. 4445
Section 4.7    Brokers .................................................................. 45
Section 4.8    Financing. ............................................................... 45
Section 4.9    Solvency ................................................................ 4647
Section 4.10    Exclusivity of Representations and Warranties. ........... 47

Article V

BANKRUPTCY COURT MATTERS

Section 5.1    Debtors-in-Possession ............................................. 48
Section 5.2    Sale Motion; Bidding Procedures Order ...................... 48
Section 5.3    Sale Order .............................................................. 4849
Section 5.4    Cooperation with Respect to Bankruptcy Court Approvals ... 4849
Section 5.5    Bankruptcy Court Filings .......................................... 49

Article VI

COVENANTS

Section 6.1    Conduct of Business Prior to the Closing ..................... 4950
Section 6.2    Covenants Regarding Information ............................... 5253
Section 6.3    Employee Matters ................................................... 5455
Section 6.4    Consents and Filings; Further Assurances .................... 5657
Section 6.5    Wrong Pockets ....................................................... 5859
Section 6.6    Public Announcements .............................................. 5960
Section 6.7    Communications with Customers and Suppliers ............. 5960
Section 6.8    Financing. ............................................................... 6061

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Section 6.9    Sellers' Cooperation with Buyer's Efforts under Debt Financing.......................6364
Section 6.10   Transition Services Agreement.......................6566
Section 6.11   Certain Acknowledgements.......................6566
Section 6.12   Lender Recovery Shortfall Calculation.......................6667
Section 6.13   Assumed Payables Reconciliation.......................67

Article VII

TAX MATTERS

Section 7.1    Transfer Taxes.......................6668
Section 7.2    Tax Cooperation.......................6668

Article VIII

CONDITIONS TO CLOSING

Section 8.1    General Conditions.......................6768
Section 8.2    Conditions to Obligations of Sellers.......................6769
Section 8.3    Conditions to Obligations of Buyer.......................6869

Article IX

TERMINATION

Section 9.1    Termination.......................6870
Section 9.2    Effect of Termination.......................7072
Section 9.3    Alternative Transactions.......................7173

Article X

GENERAL PROVISIONS

Section 10.1   Nonsurvival of Representations, Warranties and Covenants.......................7173
Section 10.2   Bulk Sales.......................7273
Section 10.3   Fees and Expenses.......................7274
Section 10.4   Amendment and Modification.......................7274
Section 10.5   Waiver.......................7274
Section 10.6   Notices.......................7274
Section 10.7   Interpretation.......................7375
Section 10.8   Entire Agreement.......................7375
Section 10.9   Parties in Interest.......................7476
Section 10.10  Governing Law.......................7476
Section 10.11  Submission to Jurisdiction.......................7476
Section 10.12  Assignment; Successors.......................7577
Section 10.13  Specific Performance.......................7577

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase
Agreement 950067v6A 11/10/2024 8:43:03 PM

Section 10.14  Currency .................................................................................. ~~75~~77
Section 10.15  Severability ............................................................................. ~~75~~77
Section 10.16  Waiver of Jury Trial ............................................................... ~~76~~78
Section 10.17  Counterparts ........................................................................... ~~76~~78
Section 10.18  Jointly Drafted ........................................................................ ~~76~~78
Section 10.19  Limitation on Damages ........................................................... ~~76~~78
Section 10.20  No Recourse ............................................................................ ~~77~~79
Section 10.21  Time of Essence; Calculation of Dates .................................... ~~77~~79
Section 10.22  Debt Financing ........................................................................ ~~77~~79

## INDEX OF EXHIBITS AND SCHEDULES

EXHIBIT A             [RESERVED]

EXHIBIT B             [RESERVED]

EXHIBIT C             ESCROW AGREEMENT

EXHIBIT D             FORM OF SALE ORDER

EXHIBIT E             FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT F             FORM OF LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT G             FORM OF IP ASSIGNMENT AGREEMENT

EXHIBIT H             AMENDED AND RESTATED TRANSITION SERVICES AGREEMENT TERM SHEET

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

iv

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of ~~October 31~~November 10, 2024 (the "Execution Date"), by and between (i) True Value Company L.L.C., a Delaware limited liability company ("True Value Parent"), TV Holdco II, L.L.C., a Delaware limited liability company, TV TSLC, L.L.C., an Illinois limited liability company, TV GPMC, L.L.C., an Illinois limited liability company, True Value Retail, L.L.C., a Delaware limited liability company, TrueValue.com Company, L.L.C., a Delaware limited liability company, True Value Virginia, L.L.C., a Virginia limited liability company, and Distributors Hardware, L.L.C. a Delaware limited liability company (True Value Parent, together with the foregoing entities, each a "Seller" and collectively, "Sellers"), and (ii) Do it Best Corp., an Indiana corporation ("Buyer"). Capitalized terms have the definitions set forth in Article I below.

**RECITALS**

A.    Sellers directly and indirectly are engaged in the Business.

B.    On October 13, 2024, Sellers and Buyer entered into that certain Asset Purchase Agreement (the "Original APA") pursuant to which, among other things, Sellers agreed to sell to Buyer all of the Transferred Assets and Buyer agreed to purchase from Sellers the Transferred Assets and assume the Assumed Liabilities in a sale transaction authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, all on the terms and subject to the conditions set forth in the Original APA and subject to entry of the Sale Order by the Bankruptcy Court.

C.    In furtherance of the foregoing, Sellers commenced voluntary cases (collectively, the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), on October 14, 2024 (the "Petition Date")."

D.    On the Petition Date, Sellers filed with the Bankruptcy Court the Sale Motion seeking the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, which seek approval of the transactions contemplated by this Agreement.

E.    Following the execution of the Original APA and the commencement of the Chapter 11 Case, Sellers have continued to engage in negotiations with the Prepetition Secured Parties under the Prepetition Credit Agreement and the Official Committee of Unsecured Creditors with respect to the Chapter 11 Case (the "Creditors' Committee") in order to reach a settlement with respect to, among other things, (i) Sellers' use of "cash collateral" (as such term is defined in the Bankruptcy Code) during the period prior to the Closing, (ii) Sellers' operations and conduct of the Business prior to the Closing, (iii) the timing of the consummation of the Closing and (iv) the net recovery to be received by the Prepetition Secured Parties' as a result of the consummation of the transactions contemplated hereby (collectively, the "Settlement").

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

F.      Sellers, the Prepetition Secured Parties, and the Creditors' Committee have memorialized the terms of the Settlement pursuant to that certain Cash Collateral Resolution Term Sheet (the "Cash Collateral Resolution Term Sheet") attached as an exhibit to that certain ~~Second Interim~~Final Order (I)(A) Authorizing Debtors to Use Cash Collateral; (B) Granting Adequate Protection to Prepetition Lenders; (C) Modifying the Automatic Stay; and ~~(D) Scheduling a Final Hearing and (~~II) Granting Related Relief, ~~filed with~~entered by the Bankruptcy Court on ~~October 31~~November 4, 2024 at docket number 296 (the "Final Cash Collateral Order").

G.      The Final Cash Collateral ~~Resolution Term Sheet (i) includes~~Order has attached as an exhibit a revised budget with respect to the operations and conduct of the Business of Sellers during the period prior to the Closing (the "Revised Budget") and (ii) contemplates, among other things, that Sellers and Buyer will amend the Purchase Agreement, the Bidding Procedures Order, the Sale Order and the proposed timeline for the sale of the Transferred Assets as necessary to reflect the terms of the Settlement.

H.      Buyer is supportive of the Settlement and has (i) approved and agreed to the operation by Sellers of the Business in accordance with the Revised Budget in satisfaction of the Settlement and (ii) agreed to amend the Original APA in furtherance of the Settlement, all upon the terms and subject to the conditions set forth herein.

I.      Pursuant to Section 10.4 of the Original APA, the Original APA may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment thereto, signed on behalf of each of Sellers and Buyer, and in accordance therewith each of Sellers and Buyer hereby agree to amend and restate the Original APA in its entirety in the form of this Agreement.

J.      Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, as further set forth herein. The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1     Defined Terms.  For purposes of this Agreement:

"1970 Group Agreements" means, collectively, (i) that certain Amended and Restated Substitute Insurance Collateral Facility Agreement, dated as of September 25, 2024, by and between 1970 Group, Inc. and Sellers, and (ii) that certain Master Escrow Agreement, dated as

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

2

of August 1, 2024, entered into by and among 1970 Group, Inc., Wilmington Trust, National Association, as escrow agent, and True Value Parent, as supplemented by that certain Joinder Agreement, dated as of September 25, 2024.

"<u>Action</u>" means any action, complaint, Claim, suit, litigation, arbitration, mediation, hearing, public or otherwise known investigation, audit, or similar proceeding (in each case, whether civil, criminal, administrative, investigative, or informal), initiated, commenced, brought, conducted, heard or pending by or before any Governmental Authority, arbitrator or mediator, other than an Avoidance Action.

"<u>Administrative Agent</u>" means PNC Bank, National Association, as administrative agent under the Prepetition Credit Agreement.

"<u>Administrative Claims Bar Date</u>" means the deadline for filing proofs of claim for payment of any and all Claims for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, which deadline shall be established by the Bankruptcy Court.

"<u>Advisors</u>" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers or other Representatives of such Person.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"<u>Affordable Care Act</u>" means the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, and the guidance and regulations issued thereunder.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation</u>" has the meaning set forth in <u>Section 2.9.</u>

"<u>Allocation Methodology</u>" has the meaning set forth in <u>Section 2.9.</u>

"<u>Alternative Financing</u>" has the meaning set forth in <u>Section 6.8(c).</u>

"<u>Alternative Transaction</u>" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, of a material portion of the Transferred Assets, in a transaction or series of transactions with one or more Persons other than Buyer.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment and Assumption Agreement, the IP Assignment Agreement, the Escrow Agreement and the Transition Services Agreement.

"Antitrust Authority" has the meaning set forth in Section 6.4(a).

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Governmental Authority designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(b)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Payables" has the meaning set forth in Section 2.3.

"Assumed Payables Reconciliation Period" has the meaning set forth in Section 6.13.

"Avoidance Actions" has the meaning set forth in Section 2.1(p).

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"Bid Deadline" means November 8, 2024.

"Bidding Procedures Hearing" has the meaning set for in Section 5.2.

"Bidding Procedures Order" means the Order of the Bankruptcy Court approving, among other things, the execution, delivery, and performance of this Agreement by Sellers (including payment of the Expense Reimbursement Amount and Break-Up Fee pursuant to and in accordance with Section 9.2(b) of this Agreement), other than the performance of those obligations to be performed at or after the Closing, Sellers' designation of Buyer as the purchaser for the Business and the Transferred Assets (subject to the receipt of higher or otherwise better bids to be submitted by no later than the Bid Deadline), and procedures for the assumption and assignment of executory Contracts and unexpired Leases.

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

4

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

"Break-Up Fee" means an amount equal to Four Million Five Hundred Ninety Thousand dollars ($4,590,000.00), which shall be payable as set forth in Section 9.2(b).

"Business" means, collectively, the hardlines wholesale and related distribution business, direct retail business and paint manufacturing business, in each case, conducted by Sellers as of the date hereof.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Delaware, the State of Illinois or the State of New York.

"Business Employees" means, as of the relevant date, all individuals employed by Sellers.  For the avoidance of doubt, the term "Business Employees" shall not include any Person who provides services to Sellers as an independent contractor or pursuant to any similar arrangement.

"Business Privacy and Data Security Policies" means all of Sellers' and any of their respective Subsidiaries' past or present, public-facing policies and notices concerning the privacy, security, or Processing of Personal Information, to the extent applicable to the conduct of the Business by Sellers and any of their Subsidiaries.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Credit Agreement" means that certain Credit Agreement, dated as of October 11, 2024, by and among Buyer, as borrower, the lenders and issuing banks from time to time party thereto, and Wells Fargo Bank, National Association, as administrative agent, swingline lender and an issuing bank, as in effect on the date hereof.

"Buyer Disclosure Letter" has the meaning set forth in Article IV.

"Buyer Non-Recourse Person" has meaning set forth in Section 10.20(a).

"Buyer Plan" has the meaning set forth in Section 6.3(d).

"Buyer 401(k) Plan" has the meaning set forth in Section 6.3(e).

"Cash and Cash Equivalents" means all of each Seller's cash (including petty cash and uncashed checks received on or before the Closing Date and checks that have been deposited on or before the Closing Date but have not yet cleared), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Cash Consideration" has the meaning set forth in Section 2.6(a).

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

"Chapter 11" means chapter 11 of the Bankruptcy Code.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Claims" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including (x) all "claims," within the meaning of Section 101(5) of the Bankruptcy Code and (y) all Avoidance Actions) or rights of set-off or recoupment.

"Closing" has the meaning set forth in Section 2.8(a).

"Closing Date" has the meaning set forth in Section 2.8(a).

"Closing Target Date" means November 22, 2024, as such period may be extended by mutual agreement of Buyer and Sellers.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and any rules or regulations promulgated thereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means each collective bargaining agreement or similar labor-related Contract with any Labor Organization covering a Business Employee.

"Compliance Date" means January 1, 2023.

"Confidentiality Agreement" means the Confidentiality Agreement, dated as of August 14, 2024, entered into between True Value Parent and Buyer with respect to the transactions contemplated hereby.

"Contract" means any written contract, agreement, understanding, insurance policy, lease, license, sublicense, option, undertaking, instrument or other commitment that is binding on any Person or any part of its assets or properties under applicable Law.

"Contagion Event" means any (a) outbreak or ongoing effects of any contagious disease, plague, epidemic, pandemic or other public health emergency (including COVID-19) or (b) escalation or worsening or subsequent waves or mutations of any of the foregoing.

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

6

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

"Contagion Measure" means any (a) applicable quarantine, "shelter in place," "stay at home," social distancing, shut-down, closure, sequester, declaration of martial law or similar Law, Order, directive or guidelines promulgated by any Governmental Authority, (b) action reasonably taken (or omitted to be taken) in response to any applicable quarantine, "shelter in place," "stay at home," social distancing, shut-down, closure, sequester, declaration of martial law or similar Law, directive or guidelines promulgated by any Governmental Authority, in each case, in response to any Contagion Event or (c) factory slowdown or shipping, freight, rail or other shipment interruptions or slowdowns, in each case, related to or resulting from a Contagion Event.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in order to effectuate the assumption and assignment to Buyer of the Transferred Contracts.

"Cure Notice" has the meaning set forth in the Sale Motion.

"Cure Objection Deadline" has the meaning set forth in the Sale Motion.

"Debt Commitment Letter" has the meaning set forth in Section 4.8(b).

"Debt Financing" has the meaning set forth in Section 4.8(b).

"Debt Financing Sources" has the meaning set forth in Section 4.8(b).

"Deposit Funds" has the meaning set forth in Section 2.7(a).

"Designated Buyer" has the meaning set forth in Section 2.10(a).

"Designated Parties" has the meaning set forth in Section 2.1(p).

"Designation Deadline" has the meaning set forth in Section 2.5(e).

"Disclosure Letter" means the disclosure letter being delivered by Sellers to Buyer contemporaneously with the execution of this Agreement.  Notwithstanding anything to the contrary contained in the Disclosure Letter or in this Agreement, (a) the information and disclosures contained in any section of the Disclosure Letter shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Letter as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure, (b) the disclosure of any matter in the Disclosure Letter shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation or warranty to be true and correct, (c) the Disclosure Letter is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations and warranties by any Party except to the extent expressly set forth herein, (d) the inclusion of any item in the Disclosure Letter shall be deemed neither an admission that such item is material to the business, financial condition or

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

7

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

results of operations of Sellers or the Business nor an admission of any liability to any third party, (e) matters reflected in the Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected therein and any additional matters are set forth therein for informational purposes and (f) headings are inserted in the Disclosure Letter for convenience of reference only and shall not have the effect of amending or changing the express description of the sections as set forth in this Agreement.

"Disclosure Limitations" has the meaning set forth in Section 6.2(a).

"Employee Benefit Plans" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other individual employment, consulting or other individual service agreement or arrangement, in each case, (a) that is sponsored or maintained or contributed to by any Seller or any of its Affiliates in respect of any current or former employees, directors, independent contractors or consultants of any Seller or (b) with respect to which any Seller has any actual or contingent Liability (including any such plan or arrangement formerly maintained by any Seller or any Subsidiary of any Seller).

"Encumbrance" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, mortgage, lease, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, servitude, covenant, encroachment, option, right of use, first offer, or first refusal, setoff, recoupment, right of recovery, or final Order of any Governmental Authority, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown. Without limiting the foregoing, "Encumbrance" also includes, without limitation, (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or the Seller, to use any portion of the Transferred Assets.

"Enforceability Exceptions" has the meaning set forth in Section 3.2.

"Environmental Claim" means any Action, Order, lien, fine or penalty by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to, any Hazardous Materials, (b)

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

8

circumstances forming the basis of any violation, or alleged violation, of any Environmental Law or any Environmental Permit or (c) any other matters for which Liability is or may be imposed under Environmental Laws.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment or natural resources, or the protection of human health and safety (regarding exposure to Hazardous Materials), including Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal or handling of Hazardous Materials; (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials; or (d) including but not limited to the to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and the Superfund Amendments and Reauthorization Act (42 U.S.C. § 9601 et seq.); the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.); the Clean Air Act (42 U.S.C. § 7401 et seq.); the Toxic Substances Control Act of 1976 (15 U.S.C. § 2601 et seq.); the Safe Drinking Water Act (42 U.S.C. § 300f et seq.); to the extent relating to Hazardous Materials, the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.); and the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 et seq.).

"Environmental Permit" means all permits, certificates, licenses, approvals, authorizations, consents or registrations required by any applicable Environmental Law, or required for the storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"ERISA Affiliate" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"Escrow Agent" has the meaning set forth in Section 2.7(a).

"Escrow Agreement" means that certain Escrow Agreement, dated as of October 10, 2024, by and among Buyer, Sellers, and the Escrow Agent, a copy of which is attached hereto as Exhibit C.

"Estimated Assumed Payables Statement" has the meaning set forth in Section 6.13.

"Estimated Lender Recovery Statement" has the meaning set forth in Section 6.12.

"Excluded Assets" has the meaning set forth in Section 2.2.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

9

"Excluded IP" means all Intellectual Property owned by any Seller and used or located exclusively at, or otherwise relating exclusively to, any Leased Real Property under any Excluded Lease.

"Excluded IT" means all information technology assets, and related systems and equipment, owned by any Seller and used or located exclusively at, or otherwise relating exclusively to, any Leased Real Property under any Excluded Lease.

"Excluded Leases" has the meaning set forth in Section 2.2(f).

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement Amount" means the dollar amount equal to the lesser of (i) One Million Five Hundred Thirty Thousand dollars ($1,530,000) and (ii) the aggregate amount of all reasonable and documented out of pocket costs, expenses and fees incurred by Buyer in connection with evaluating, negotiating, documenting and performing the transactions contemplated by this Agreement and the Ancillary Agreements, including fees, costs and expenses of outside legal counsel and other Advisors retained by or on behalf of Buyer in connection with or related to the evaluation, consideration, authorization, preparation, investigation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including the Chapter 11 Case and other judicial and regulatory proceedings related to such transactions, which shall be payable as set forth in Section 9.2(b).

"Final Cash Collateral Order" has the meaning set forth in the Recitals.

"Finished Goods Inventory" means all Inventory of Sellers >other than Inventory maintained, utilized and held for use in the Sellers' paint manufacturing business<.

"Fundamental Representations" means the representations and warranties set forth in Section 3.1 and Section 3.2.

"Funding Obligations" has the meaning set forth in Section 4.8(b).

"Funds" has the meaning set forth in Section 4.8(b).

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any United States or non-United States national, federal, state, local, municipal, provincial or other governmental, regulatory or administrative authority, agency, court, tribunal or commission (and each instrumentality, political subdivision thereof), self-regulated organization and other non-governmental regulatory authority or quasigovernmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law) or any other judicial or arbitral body, including the Bankruptcy Court.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

10

"Hazardous Materials" means any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade (or combination thereof) whether in solid, semisolid, liquid or gaseous form that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum (including petroleum distillate and petroleum by-products) oil, asbestos, polychlorinated biphenyls, radioactive, lead-based paint, per- and polyfluoroalkyl substances or words of similar meaning or effect under any Law relating to pollution, hazardous or toxic waste, or protection of the environment, or (c) forms the basis of any Liability under any Law relating to pollution, hazardous or toxic waste, or protection of the environment.

"HSR Act" has the meaning set forth in Section 3.3(a).

"Intellectual Property" means all intellectual property rights throughout the world, including all U.S. and foreign rights in (a) trade names, trademarks and service marks, domain names, trade dress, logos, slogans, design rights and other similar designations of source or origin ("Trademarks"), together with the goodwill symbolized by any of the foregoing; (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof; (c) copyrights and copyrightable subject matter (whether registered or unregistered); (d) proprietary rights in computer programs (whether in source code, object code, or other form), firmware, software, algorithms, and databases; (e) confidential and proprietary information, trade secrets and know-how, and all other proprietary rights in inventions, proprietary processes, formulae, models, and methodologies; (f) all applications and registrations for any of the foregoing; and (g) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"Inventory" means all inventory, raw materials, works-in-progress, finished goods, supplies, parts, packaging materials and other inventories owned by Sellers.

"Inventory Value" means, as of any date of determination, the value of Sellers' Finished Goods Inventory, <other than Inventory maintained, utilized and held for use in the Sellers' paint manufacturing business>, as reported on the Sellers' books and records in accordance with GAAP, consistently applied.

"IP Assignment Agreement" has the meaning set forth in Section 2.8(b)(iii).

"IRS" means the Internal Revenue Service of the United States.

"Knowledge" means, with respect to Sellers, the knowledge of each of Chris Kempa, Bill McGann and Jennifer McNeill as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) after reasonable inquiry into the matters set forth in the representation that is so qualified.

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

11

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

"<u>Labor Organization</u>" means any labor union, labor organization, works council or other similar employee representative.

"<u>Law</u>" means any and all federal, state, local and foreign laws, constitutions, treaties, statutes, ordinances, rules, codes, regulations, policies, orders, judgments and decrees, in each case, enacted, adopted or promulgated by a Governmental Authority, including the common law.

"<u>LC Reimbursement Amount</u>" has the meaning set forth in <u>Section 2.14</u>.

"<u>Lease</u>" means any lease, sublease, license, or other use or occupancy agreement with respect to real property to which any Seller or any Subsidiary of any Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"<u>Leased Real Property</u>" means any real property that is leased, subleased, licensed or otherwise occupied by any Seller or any Subsidiary of any Seller pursuant to a Lease.

"<u>Legal Restraint</u>" has the meaning set forth in <u>Section 8.1(a)</u>.

"<u>Lender Recovery</u>" means an amount equal to (i)(a) the Cash Consideration *plus* (b) net pro-rations and reimbursements required to be paid by Buyer at the Closing pursuant to the terms of this Agreement, including the Prepaid Expenses Reimbursement Amount and the LC Reimbursement Amount *plus* (c) any Cash and Cash Equivalents on hand of Sellers as of the Closing *plus (d) the LC Reimbursement Amount*(excluding, for the avoidance of doubt, any amounts prefunded by Buyer at the Closing pursuant to the Transition Services Agreement and any amounts held in trust for the benefit of the True Value Foundation) *minus* (ii) the amounts actually required to be reserved as of the Closing to satisfy the reserves and accruals provided for in the budget set forth on <u>Section 8.2(d)</u> of the Disclosure Letter after taking into account, among other things, the assumption of the Assumed Liabilities by Buyer at the Closing, including, as and to the extent applicable, the Section 503(b)(9) Claims and the Vendor Admin Claims.

"<u>Lender Recovery Floor Amount</u>" means One Hundred Sixty Three Million dollars ($163,000,000).

"<u>Lender Recovery Shortfall</u>" has the meaning set forth in <u>Section 6.12</u>.

"<u>Lender Recovery Shortfall Backstop</u>" means Ten Million dollars ($10,000,000).

"<u>Liability</u>" means any debt, loss, Claim, damage, demand, fine, judgment, penalty, Tax, liability, undertaking, commitment or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, determined or undeterminable or due or to become due).

"<u>Material Adverse Effect</u>" means any event, change, condition, occurrence or effect that individually or in the aggregate (a) has had, or would reasonably be expected to have, a material adverse effect on the Business, the results or operations or the condition (financial or otherwise),

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

12

assets, liabilities, or operations of the Business, taken as a whole, or (b) prevents or materially impedes, or would reasonably be expected to prevent or materially impede, the performance by Sellers of their obligations under this Agreement on a timely basis, other than, in each case of the preceding clauses (a) and (b), any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry or geographical areas in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts (including by cyberattack or otherwise), whether or not pursuant to the declaration of an emergency or war), (iii) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, earthquake, fire, flood, hurricane, tornado or other weather event, or the onset or continuation of any Contagion Event or Contagion Measure, (iv) changes in any applicable Laws or GAAP or interpretations thereof, (v) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby, (vi) the announcement or pendency of the Chapter 11 Case (and any limitations therein pursuant to the Bankruptcy Code, the Bankruptcy Rules, any Order of the Bankruptcy Court or the Revised Budget) or any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby, (2) any chapter 11 plan of Sellers or any disclosure statement with respect thereto, (3) the Bidding Procedures Order, (4) the Sale Motion or the Sale Order, (5) the assumption of any Transferred Contract or (6) any action approved by the Bankruptcy Court, (vii) any action taken, or omitted to be taken, by any Seller or any of its Affiliates at the request or with the consent of Buyer or that is required by this Agreement or to comply with applicable Law, (viii) the identity of Buyer or any of its Affiliates, (ix) any failure to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement, (xi) any breach by Buyer of its obligations under this Agreement or any Ancillary Agreement, (xii) any matter disclosed on the Disclosure Letter or (xiii) any change in the cost or availability or other terms of any financing; provided, however, that changes or developments set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in determining whether there has been or is a Material Adverse Effect if such changes or developments have a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Material Contract" has the meaning set forth in Section 3.15(a).

"New Debt Commitment Letter" has the meaning set forth in Section 6.8(c).

"Offer Employee" has the meaning set forth in Section 6.3(a).

"Offering Materials" has the meaning set forth in Section 6.9(d).

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

13

"<u>Open Source Materials</u>" means any software that is distributed under a license meeting the Open Source Definition as promulgated by the Open Source Initiative or that is approved by the Open-Source Initiative and listed at http://www.opensource.org.

"<u>Order</u>" means any award, writ, injunction, judgment, stipulation, determination, order or decree entered, issued, made or rendered by any Governmental Authority.

"<u>Ordinary Course of Business</u>" means the operation of the Business in the ordinary and usual course consistent with past practice of Sellers, as such practice and custom is, or may have been, modified as a result of the Chapter 11 Case, in each case subject to (a) the filing of the Chapter 11 Case, (b) any Orders of the Bankruptcy Court, (c) the Revised Budget and (d) the transactions contemplated by this Agreement.

"<u>Organizational Documents</u>" means (a) with respect to any corporation, its certificate or articles of incorporation, its bylaws, and any shareholder or stockholder agreement, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, any statement of partnership and its partnership agreement, (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, (e) with respect to any other form of entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and any agreement amongst its members, (f) any documents equivalent to any of the foregoing applicable to non-U.S. jurisdictions, and (g) any amendments, side letters, modifications or other arrangements with respect to any of the foregoing.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 9.1(c)(ii)</u>.

"<u>Owned Real Property</u>" means any real property owned by any Seller, including all of such Seller's right, title and interest in and to any buildings, improvements, fixtures and structures thereon and all easements, rights-of-way, and other rights and privileges appurtenant thereto.

"<u>Party</u>" or "<u>Parties</u>" means, individually or collectively, Buyer and Sellers.

"<u>Permits</u>" has the meaning set forth in <u>Section 3.7(b)</u>.

"<u>Permitted Post-Closing Encumbrance</u>" means (a) Encumbrances of the types described in clauses (a), (c) through (g) and (j) of the definition of "Permitted Pre-Closing Encumbrance" and (b) other Encumbrances of which the Transferred Assets cannot be sold free and clear under Section 363(f) of the Bankruptcy Code.

"<u>Permitted Pre-Closing Encumbrance</u>" means (a) Encumbrances for Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers', suppliers', vendors' and other similar common law or statutory Encumbrances arising or incurred in the Ordinary Course of Business,

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

14

(c) deposits securing the performance of bids, trade Contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (d) with respect to any Leased Real Property, any Encumbrance affecting the interest of the landlord, sublandlord or licensor of such real property or which constitutes a statutory landlord's lien under applicable Law and not in any way affecting or impairing Sellers' interest in such real property, (e) with respect to any Real Property, covenants, conditions, restrictions, easements, licenses, rights-of-way and other similar charges or encumbrances or defects or imperfections of title of any kind (i) that do not, individually or in the aggregate, materially interfere with the operation of the Business or the present use of such Real Property or materially impair the value of the Transferred Assets or the Real Property subject to such encumbrances or (ii) that would be revealed by an investigation of title to the extent and nature that a prudent buyer of property in the jurisdiction in which the applicable Real Property is located would carry out, (f) any licenses to or other rights to use Intellectual Property granted in the Ordinary Course of Business, (g) public roads, highways, zoning codes, building codes, entitlements, conservation restrictions or other land use or Environmental Laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over the Real Property, (h) Encumbrances arising under purchase money security interests, equipment leases or other similar arrangements entered into in the Ordinary Course of Business, (i) rights of setoff or banker's liens upon deposits of cash in favor of banks or other depositary institutions, (j) Encumbrances that are Assumed Liabilities and any Encumbrances that Buyer specifically approves in writing, and (k) any Encumbrances permitted by or that will be removed, extinguished, discharged or released at Closing by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Personal Information" means any information that identifies or, alone or in combination with any other information, could reasonably be used to identify or locate a natural Person, including name, street address, telephone number, email address, identification number issued by a Governmental Authority, credit card number, bank information, customer or account number, online identifier, device identifier, IP address, location data, biometric data, medical or health information, or any other information that is considered "personally identifiable information," "personal information," or "personal data" under, or is otherwise regulated by, applicable Law (including Privacy Laws).

"Petition Date" has the meaning set forth in the Recitals.

"Prepaid Expenses" means all deposits (including customer deposits, maintenance deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone bonds or other sureties or other expenses (including all prepaid rent and all prepaid charges, expenses and rent under any personal property leases)), advances, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), that have

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

15

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

been prepaid by any Seller, in each case with respect to any of the Transferred Leases and Transferred Contracts, except that professional fee retainers and prepaid deposits related thereto shall not be included in the definition of "Prepaid Expenses."

"Prepaid Expenses Reimbursement Amount" has the meaning set forth in Section 2.12.

"Prepetition Credit Agreement" means that certain Credit Agreement, dated as of April 20, 2018, by and among Sellers, the Prepetition Secured Parties and the Administrative Agent, as amended.

"Prepetition Secured Parties" means the lenders and financial institutions party to the Prepetition Credit Agreement.

"Privacy Laws" means all applicable Laws, governmental orders, and guidance issued by any Governmental Authority concerning the privacy, security, or Processing of Personal Information (including Laws of jurisdictions where Personal Information was collected), including, as applicable, data breach notification Laws, consumer protection Laws, Laws concerning requirements for website and mobile application privacy policies and practices, data security Laws, and Laws concerning email, text message, or telephone communications. Without limiting the foregoing, to the extent relating to the Processing of Personal Information, Privacy Laws include: the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Children's Online Privacy Protection Act, the California Consumer Privacy Act of 2018, the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the Gramm-Leach-Bliley Act, the General Data Protection Regulation (Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016).

"Processing" means any operation performed on Personal Information, including the collection, receipt, access, use, handling, compilation, analysis, monitoring, maintenance, retention, storage, transmission, transfer, protection, disclosure, distribution, destruction, or disposal of Personal Information.  The terms "Process" and "Processed" shall have correlative meanings.

"Purchase Orders" means any orders for the purchase and sale of goods issued by the Sellers in the Ordinary Course of Business for which the vendor has not received payment and Sellers have not received the goods as of the Closing.

"Purchase Price" has the meaning set forth in Section 2.6.

"Qualified Leave Recipient" means any Business Employee who is absent from active employment as of immediately prior to the Closing Date as a result of an approved leave of absence.

"Real Property" means the Leased Real Property and the Owned Real Property.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

16

"Registered IP" has the meaning set forth in Section 3.12(a).

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, Advisors, bankers and other representatives of such Person (including counsel and accountants).

"Required Information" has the meaning set forth in Section 6.9(a).

"Sale Motion" means that certain *Motion of Debtors for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, and (III) Granting Related Relief*, filed by the Sellers in the Chapter 11 Case on the Petition Date at docket number 12.

"Sale Objection Deadline" has the meaning set for in the Sale Motion.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, in substantially the form attached hereto as Exhibit D, with such changes as may be reasonably acceptable to Buyer and Sellers.

"Section 503(b)(9) Claims" has the meaning set forth in Section 2.3(d).

"Section 503(b)(9) Claims Bar Date" means the deadline for filing proofs of claim for payment of any and all Claims for costs and expenses of administration of the Bankruptcy Case pursuant to Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code, which deadline shall be November 27, 2024, unless otherwise ordered by the Bankruptcy Court.

"Seller 401(k) Plan" has the meaning set forth in Section 6.3(e).

"Seller Non-Recourse Person" has meaning set forth in Section 10.20(b).

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

17

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

"Tax Law" means any Law relating to Taxes.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means (a) any and all U.S. federal, state and local, non-U.S. and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other similar assessments imposed by any Governmental Authority, including all net income, gross income, gross receipts, license, lease, service, service use, payroll, employment, fringe, fringe benefits, excise, severance, stamp, occupation, premium, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, branch profits, profit share, withholding, social security, unemployment, pension plan, health, disability, real property, personal property, windfall profits, wealth, net wealth, net worth, export fees and charges, registration fees, deposits, sales, use, transfer, registration, alternative or add-on minimum or estimated tax, fee, assessment, custom, duty, levy, tariff, impost, toll or charge of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalty, inflationary adjustment, addition to tax, fine, or other addition thereto, (b) any and all liability for the payment of any item described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary or other similar group (or being included) in any Tax Return related to such group, and (c) any and all liability for the payment of any amount as a result of any successor or transferee liability, in respect of any item described in clause (a) or (b) above.

"Termination Pay" means any contractual or statutory severance, termination compensation, notice pay, paid vacation or annual leave, paid sick leave, paid time off, contractual or statutory bonuses, contractual or statutory gratuity or long service payments, or any other legally mandated termination payment or benefits obligations.

"Trade Admin Claims" has the meaning set forth in Section 2.3(d).

"Trademarks" has the meaning set forth in the definition of "Intellectual Property" in this Section 1.1.

"Transfer Taxes" has the meaning set forth in Section 7.1.

"Transferred Assets" has the meaning set forth in Section 2.1.

"Transferred Contracts" has the meaning set forth in Section 2.1(f).

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"Transferred Employee Records" means, to the extent permitted by Law, all records of Sellers that relate to the Transferred Employees, including records that pertain to (a) skill and

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

18

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

development training, (b) seniority histories, (c) salary and benefit information, (d) Occupational, Safety and Health Administration reports and records and (e) active medical restriction forms, but excluding medical records.

"Transferred IP" means all Intellectual Property owned by any Seller, including the Intellectual Property listed on Section 3.12(a) and Section 3.12(f) of the Disclosure Letter, but excluding, for the avoidance of doubt, any Excluded IP.

"Transferred IT" means all information technology assets, and related systems and equipment, owned by any Seller, but excluding, for the avoidance of doubt, any Excluded IT.

"Transferred Leases" has the meaning set forth in Section 2.1(b).

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"True Value Parent" has the meaning set forth in the Preamble.

"Visa Employees" has the meaning set forth in Section 6.3(j).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar applicable state or local law requiring notice to employees in the event of a plant closing or mass layoff.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    Purchase and Sale.    Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement and subject to entry of the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or the applicable Designated Buyer(s)), and Buyer (or such applicable Designated Buyer(s)) shall purchase, all right, title and interest of Sellers, in, to or under the Transferred Assets, free and clear of any and all Encumbrances (other than Permitted Post-Closing Encumbrances).    "Transferred Assets" shall mean all right, title and interest of Sellers as of immediately prior to the Closing in, to or under all properties and assets of Sellers, of every kind and description, wherever located (including, for the avoidance of doubt, any assets located at any Leased Real Property under a Transferred Lease or an Excluded Lease (subject to Section 2.2(f)), whether real, personal or mixed, tangible or intangible, including all right, title and interest of Sellers in, to or under the following (but excluding in each case any Excluded Assets):

(a)    all rights, Claims or causes of action, other than Avoidance Actions (which are governed by Section 2.1(p)), of Sellers against any party arising out of events occurring prior to the Closing including, for the avoidance of doubt, arising out of events

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

19

occurring prior to the commencement of the Chapter 11 Case, and including any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, in each case, relating to the Business and all such rights, Claims or causes of action relating to, arising from or pertaining to the Transferred Assets;

(b)    all Leased Real Property under Leases that are Transferred Contracts (the "Transferred Leases") and all associated tenant improvements, which Transferred Leases are set forth on Section 2.1(b) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e)), including such assets that are located at or associated with such Leased Real Property;

(c)    all Owned Real Property;

(d)    all owned tangible property, accounts, machinery, equipment, movable property and vehicles, and all Inventory, including all express or implied warranties with respect thereto;

(e)    all Transferred IT;

(f)    all Purchase Orders and all Contracts set forth on Section 2.1(f) of the Disclosure Letter, as may be amended from time to time pursuant to Section 2.5(e) (collectively with the Purchase Orders, the "Transferred Contracts"); provided that any applicable Cure Claims shall be paid by or on behalf of Buyer or its designee at Closing or as otherwise agreed by the applicable Contract counterparty;

(g)    all Transferred IP;

(h)    all goodwill associated with the Transferred Assets or the Business, including Seller's relationships with their customers and all rights of Sellers, in each case, under any Transferred Contracts with their customers;

(i)    subject to Section 2.2(e) and Section 2.12, all Prepaid Expenses;

(j)    all accounts receivable, instruments, and chattel paper of the Business and all cash receipts received from customers of the Business or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing (including any such accounts receivable related to "Destination True Value" store enhancements and improvements);

(k)    to the extent not prohibited by Law, all documents and other books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files related to the Transferred Assets and Transferred Contracts, suppliers lists, production data, quality control records and procedures, correspondence, the Transferred Employee Records, and all customer sales, marketing, advertising, packaging and promotional materials, drawings, engineering and manufacturing data, environmental studies, reports and analysis, sales records, strategic plans, research, and

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

20

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

other technical information and data, and all other business and other records that are related to the Business or any Transferred Asset and in the possession of Seller, including any Tax Returns and Tax records to the extent related to any Taxes imposed on or with respect to a Transferred Asset or any Assumed Liability, and, except as set forth in <u>Section 2.3</u>, all privileged or confidential information and all attorney-client and other privileges pertaining to the Business or the Transferred Assets; <u>provided</u>, <u>however</u>, that in each case Seller have the right to retain copies at Sellers' expense pursuant to <u>Section 6.2</u>;

       (l)    all telephone and facsimile numbers of the Business and all records of email addresses of customers and suppliers of the Business;

       (m)    subject to obtaining the applicable consents set forth on <u>Section 3.3(a)</u> of the Disclosure Letter, all Permits and licenses held by Sellers, but only to the extent such Permits may be transferred under applicable Law;

       (n)    any other assets and properties of Sellers that are not Excluded Assets, including, upon payment to Sellers of the LC Reimbursement Amount, all right, title and interest of Sellers and True Value Parent in and to the cash collateral posted by Sellers under the 1970 Group Agreements, including the right to direct the party or parties holding such cash collateral to transfer it to Buyer (and not to Sellers) when permitted under the 1970 Group Agreements;

       (o)    all rights and obligations under or arising out of all insurance policies (except as set forth in <u>Section 2.2(g)</u>) for any of the Transferred Assets or Assumed Liabilities; and

       (p)    all Claims or causes of action to avoid a transfer of property or an obligation incurred by the Sellers pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a), or any similar actions under any other applicable Law (collectively, "<u>Avoidance Actions</u>") against the following (collectively, the "<u>Designated Parties</u>"): (i) Sellers' or their vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Business or the Transferred Assets after the Closing, (ii) any of Sellers' counterparties under any licenses of Intellectual Property that are Transferred Contracts or counterparties under any other Transferred Contracts, (iii) any officer, manager or employee of Sellers that is a Transferred Employee, and (iv) any Affiliates of any of the Persons listed in clauses (i) through (iii); <u>provided</u>, <u>however</u>, that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense against any claim or cause of action raised by such Designated Party; <u>provided</u> <u>further</u> that Buyer shall not use any of the Avoidance Actions acquired pursuant to this Agreement for purposes or as a means of failing to honor its obligations under <u>Section 2.3(d)</u> of this Agreement.

      <u>Section 2.2</u>    <u>Excluded Assets</u>.  Notwithstanding anything contained in <u>Section 2.1</u> to the contrary, Sellers are not selling, and Buyer (and any Designated Buyer) is not purchasing, any right, title or interest in, to or under the following assets of Sellers, all of which shall be retained by Sellers (collectively, the "<u>Excluded Assets</u>"):

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

(a)     [RESERVED]

(b)     all documents, written files, papers, books, reports and records, including those prepared or received by Sellers or any of their Affiliates or Representatives: (i) in connection with any sale or potential sale of True Value Parent, Sellers, the Business, or any portion thereof including the Transferred Assets (including, but not limited to, this Agreement and the transactions contemplated hereby), (ii) relating to the Chapter 11 Case, (iii) that are subject to any privilege in favor of Sellers or any of their Affiliates, or (iv) that Sellers are required by Law or other requirement to retain;

(c)     all rights, Claims and causes of action to the extent relating to any Excluded Asset (and not relating to the Business, any Transferred Assets, and Transferred Contracts, or any Assumed Liabilities), including any Avoidance Actions that are not against the Designated Parties;

(d)     shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(e)     all retainers or similar prepaid amounts paid to the Advisors of Sellers;

(f)     all Leased Real Property under Leases that are not Transferred Contracts (the "Excluded Leases") and all associated tenant improvements, which Excluded Leases are set forth on Section 2.2(f) of the Disclosure Letter (as may be amended from time to time pursuant to Section 2.5(e));

(g)     all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, solely to the extent payable to or on behalf of, or in respect of amounts payable by Sellers to any individuals covered by such policies;

(h)     each Contract of any Seller that is not a Transferred Contract;

(i)     (i) all books and records to the extent primarily related to any of the Excluded Assets or Excluded Liabilities; (ii) all minute books, Organizational Documents, stock registers and such other books and records of such Seller, as pertaining to ownership, organization, qualification to do business, capitalization, or existence thereof, Tax Returns (and any related work papers) of any Seller (other than Tax Returns described in Section 2.1(k), provided that Sellers shall be entitled to retain copies thereof pursuant to Section 6.2), and the corporate seal of any Seller; and (iii) all books and records of Sellers that relate to the Transferred Employees, the disclosure of which would violate Law;

(j)     all Tax refunds and Tax attributes of Sellers that are not automatically transferred with the Transferred Assets by the operation of applicable Tax Law;

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

22

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

(k)     all Cash and Cash Equivalents (other than accounts receivable, instruments and chattel paper of the Business and all cash receipts received from customers or otherwise in respect of such accounts receivable, instruments or chattel paper after the Closing, in each case, as contemplated in Section 2.1(j));

(l)     the Cash Consideration;

(m)     all Intellectual Property other than the Transferred IP, including all Excluded IP;

(n)     all information technology assets, and related systems and equipment other than the Transferred IT, including all Excluded IT;

(o)     all assets under each Employee Benefit Plan, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts);

(p)     all rights, Claims or causes of action of Sellers and their Affiliates under this Agreement and the Ancillary Agreements; (ii) under any Contracts that are not Transferred Contracts and (iii) against third parties to the extent relating to any Excluded Asset or Excluded Liability; and

(q)     any other asset that, although included in the definition of Transferred Assets, Buyer notifies Seller in writing not later than one (1) Business Day prior to the Closing that Buyer does not wish to purchase pursuant to Section 2.5(e).

Section 2.3     Assumed Liabilities.  Subject to the terms and conditions set forth in this Agreement, Buyer shall assume, pay, satisfy, perform and discharge when due only the following Liabilities (the "Assumed Liabilities"):

(a)     all Liabilities of Sellers under the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases) and the transferred Permits that arise under such Transferred Contracts or transferred Permits on or after the Closing;

(b)     all Liabilities relating to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the Closing;

(c)     all Liabilities under the Purchase Orders;

(d)     (i) timely filed or scheduled claims of Sellers' vendors for the value of goods received by ~~the~~ Sellers within twenty (20) days prior to the Petition Date which goods were sold to ~~the~~ Sellers in the Ordinary Course of Business but only to the extent such claims are entitled to priority in payment under Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Case as determined and allowed by the Bankruptcy Court or otherwise agreed to by Sellers and Buyer (the "Section 503(b)(9) Claims"), and (ii) trade and vendor accounts

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

23

950067.04A - WILSR01A950067.06A - WILSR01A - MSW

payable incurred by Sellers in the Ordinary Course of Business after the Petition Date for goods received by Sellers that remain unpaid as of the Closing to the extent such payables are entitled to priority in payment in the Bankruptcy Case under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code as reasonably agreed by Sellers and Buyer based upon Sellers' books and records (or other appropriate form of validation) or as otherwise determined and allowed by the Bankruptcy Court  (the "Trade Admin Claims", and together with the Section 503(b)(9) Claims, collectively, the "Assumed Payables"); *provided, however,* that (x) the aggregate face amount of such Assumed Payables that are Assumed Liabilities pursuant to this Section 2.3(d) shall not exceed Forty Five Million dollars ($45,000,000) (such amount, as may be decreased pursuant to subclause (y) immediately below, the "Assumed Payables Cap") and <if the aggregate face amount of >such Assumed Payables exceeds the Assumed Payables Cap, <Buyer shall be entitled to select which of the Section 503(b)(9) Claims and >the Trade Admin Claims that Buyer will assume to equal such Assumed Payables Cap; *provided, further,* that; (y) in the event of a Lender Recovery Shortfall pursuant to Section 6.12, the Assumed Payables Cap shall be decreased by an amount equal to the lesser of (i) the amount of such Lender Recovery Shortfall and (ii) the Lender Recovery Shortfall Backstop; and (z) the face amount of the Section 503(b)(9) Claims and Trade Admin Claims to be assumed, satisfied and paid by Buyer pursuant to this Section 2.3(d) shall be subject to the reconciliation procedures and other terms set forth in Section 6.13;

(e)     all Cure Claims associated with the Transferred Contracts (including, for the avoidance of doubt, the Transferred Leases), other than to the extent waived by the applicable counterparty as contemplated by Section 2.5 of the Disclosure Letter; and

(f)     Liabilities assumed by Buyer pursuant to Section 6.3.

Section 2.4     Excluded Liabilities.  Other than the Assumed Liabilities, Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Transferred Assets or the Business, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing.  Notwithstanding anything in this Agreement to the contrary, the Assumed Liabilities shall not include any Liabilities or obligations for any Taxes of any Seller or related to the operation of the Business prior to the Closing (or for the portion of any tax period ending on the Closing Date) (all such retained Liabilities, "Excluded Liabilities").

Section 2.5     Assignment of Transferred Contracts.

(a)     The Bidding Procedures Order shall implement a process to determine the Cure Claims with respect to any and all of Sellers' Contracts, including the right to negotiate in good faith and litigate, if necessary, with any Contract counterparty the Cure Claims needed to cure all monetary defaults under such Contract.  Notwithstanding the foregoing, prior to the

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Designation Deadline, Buyer may require Sellers to delete from Section 2.1(f) of the Disclosure Letter any Transferred Contract that Buyer no longer desires to have assigned to it in accordance with Section 2.5(e), and such Contract shall be an Excluded Asset.

(b)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, on the Closing Date, Sellers shall assign the Transferred Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by Buyer as may be required under Section 365 of the Bankruptcy Code and payment by Buyer of the Cure Claims in respect of the Transferred Contracts, and Buyer shall assume such Transferred Contracts.  All Cure Claims in respect of all of the Transferred Contracts shall be paid by Buyer.

(c)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, Sellers shall transfer and assign, all of the Transferred Assets to Buyer, and Buyer shall assume all of the Transferred Assets from Sellers, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code.

(d)     Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to Buyer of any asset that would be a Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any consent from any Governmental Authority or any other third party and such consents shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in the Purchase Price without the sale, transfer, assignment, conveyance or delivery of such asset.  In the event that any failed condition is waived and the Closing proceeds without the transfer or assignment of any such asset, then following the Closing, Sellers shall use their commercially reasonable efforts at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, and Buyer shall cooperate with Sellers (at Buyer's sole expense), to obtain such consent as promptly as practicable following the Closing.  Pending the receipt of such consent, the Parties shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other to provide Buyer with all of the benefits of use of such asset.  Once consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, Sellers shall promptly (and, in any event, within two (2) Business Days or as soon as practicable thereafter) transfer, assign, convey and deliver such asset to Buyer.  To the extent that any such asset cannot be transferred or the full benefits or use of any such asset cannot be provided to Buyer, then as promptly as practicable following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, Buyer and Sellers shall enter into such arrangements (including subleasing, sublicensing or subcontracting), and shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other, to provide Buyer with all of the benefits of use of such asset.  Sellers shall hold in trust for, and pay to Buyer, promptly (and, in any event, within two (2) Business Days or as soon as practicable thereafter) upon receipt thereof, all income, proceeds and other monies received by Sellers derived from their use of any

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

25

950067.04A WILSR01A950067.06A-WILSR01A - MSW

asset that would be a Transferred Asset in connection with the arrangements under this Section 2.5(d). The Parties agree to treat any asset the benefits of which are transferred pursuant to this Section 2.5(d) as having been sold to Buyer for Tax purposes to the extent permitted by Law. Each of Sellers and Buyer agrees to notify the other Parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Buyer pursuant to this Section 2.5(d)) is not permitted for Tax purposes under applicable Law. Where such treatment is not so permitted, and subject to the terms of any relevant arrangement agreed to by Sellers and Buyer pursuant to this Section 2.5(d), Buyer shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Transferred Asset after the Closing Date.

(e)     Notwithstanding anything in this Agreement to the contrary, Buyer may amend or revise Section 2.1(f) of the Disclosure Letter setting forth the Transferred Contracts, in order to add any Contract to, or eliminate any Contract from, such section of the Disclosure Letter at any time during the period commencing from the date hereof and ending on the date that is two (2) Business Days before the Closing (the "Designation Deadline"); provided that with respect to any Contract or Lease that is not listed as a Transferred Contract by the Designation Deadline but is necessary for Sellers to satisfy their obligations under the Transition Services Agreement, Buyer shall be entitled to designate such Contract or Lease as a Transferred Contract post-Closing in the manner contemplated in the Transition Services Agreement subject to Buyer's payment of all Cure Claims for such Contract or Lease. Automatically upon the addition of any Contract to Section 2.1(f) of the Disclosure Letter, such Contract shall be a Transferred Contract for all purposes of this Agreement. Automatically upon the removal of any Contract from Section 2.1(f) of the Disclosure Letter such Contract shall be an Excluded Asset for all purposes of this Agreement subject to the inclusion of such Contract in the Transition Services Agreement, and no liabilities arising thereunder shall be assumed or borne by Buyer except as otherwise provided in the Transition Services Agreement (unless such liability is otherwise specifically assumed pursuant to Section 2.3).

Section 2.6     Consideration.   The aggregate consideration for the purchase, sale, assignment and conveyance of the Transferred Assets from Sellers to Buyer (the "Purchase Price") shall consist of:

(a)     the payment by Buyer and/or one or more Designated Buyers, by wire transfer of immediately available funds to one or more accounts designated in writing by True Value Parent in accordance with Section 2.8(c)(v), an aggregate amount equal to One Hundred Fifty-Three Million dollars ($153,000,000.00) (the "Cash Consideration"); provided, that in the event of a Lender Recovery Shortfall pursuant to Section 6.12, the Cash Consideration shall be increased by an amount equal to the lesser of (i) the amount of such Lender Recovery Shortfall and (ii) the Lender Recovery Shortfall Backstop;

(b)     the assumption by Buyer, or a Designated Buyer, as applicable, of the Assumed Liabilities from Sellers.

Section 2.7     Deposit Funds.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

26

(a)    On the date hereof, unless already deposited, Buyer shall deposit into escrow with an escrow agent reasonably acceptable to Sellers and Buyer (the "Escrow Agent") an amount equal to Fifteen  Million Three Hundred Thousand dollars ($15,300,000,00) (such amount, together with all interest and other earnings accrued thereon, the "Deposit Funds"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement. The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) True Value Parent on behalf of Sellers, as follows:

(i)    if the Closing shall occur, the Deposit Funds shall be applied towards the Purchase Price payable by Buyer pursuant to Section 2.6(a);

(ii)    if this Agreement is terminated by Sellers pursuant to Section 9.1(d)(i), the Deposit Funds shall be delivered to True Value Parent; or

(iii)    if this Agreement is terminated other than in a manner provided by Section 9.1(d)(i), the Deposit Funds shall be delivered to Buyer.

(b)    For the avoidance of doubt, the aggregate maximum value that shall be credited against the Cash Consideration by application of the Deposit Funds shall be Fifteen Million Three Hundred Thousand dollars ($15,300,000,0015,300,000.00) plus any interest and other earnings solely to the extent accrued as part of the Deposit Funds while held by the Escrow Agent.  The Parties acknowledge that the agreements contained in this Section 2.7 are an integral part of the transactions contemplated in this Agreement, that the damages resulting from termination of this Agreement under circumstances where Sellers are entitled to the Deposit Funds are uncertain and incapable of accurate calculation and that the delivery of the Deposit Funds is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate Sellers in the circumstances where Sellers are entitled to the Deposit Funds for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, and that, without these agreements, Sellers would not enter into this Agreement.  As such, receipt of the Deposit Funds by True Value Parent, solely in the event of a termination of this Agreement pursuant to Section 9.1(d)(i) shall be Sellers' sole and exclusive remedy and Sellers shall have no further Claims or causes of action against Buyer arising from or relating to such termination of the Agreement; provided, however, that Sellers shall be entitled to seek specific performance of Buyer's obligations hereunder pursuant to Section 10.13 of this Agreement.  If Buyer fails to take any action necessary to cause the delivery of the Deposit Funds to Sellers pursuant to the Escrow Agreement under circumstances where Sellers are entitled to the Deposit Funds and, in order to obtain such Deposit Funds, Sellers commence an Action which results in a judgment in favor of Sellers, Buyer shall pay to Sellers an amount in cash equal to the costs and expenses (including attorney's fees) incurred by Sellers in connection with such Action.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

27

Section 2.8    Closing.

(a)    The purchase, sale, assignment and conveyance of the Transferred Assets contemplated by this Agreement shall take place at a closing (the "Closing") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, located at One Manhattan West, New York, NY 10001) at 10:00 a.m. Eastern Time on the Closing Target Date or at such other place or at such other time or on such other date as Sellers and Buyer mutually may agree in writing, it being understood that if the Closing cannot occur on the Closing Target Date then Sellers and Buyer shall confer in good faith to determine whether to consummate the Closing at such other time or on such other date as Sellers and Buyer mutually may agree in writing, in each case, following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions).  The day on which the Closing takes place is referred to as the "Closing Date."

(b)    At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(i)    the bill of sale, assignment and assumption agreement substantially in the form of Exhibit E (the "Assignment and Assumption Agreement"), duly executed by Sellers;

(ii)    the assignment and assumption of leases, substantially in the form of Exhibit F (the "Lease Assignment and Assumption Agreement"), duly executed by Sellers with respect to each of the Transferred Leases;

(iii)    an intellectual property assignment agreement, substantially in the form of Exhibit G (the "IP Assignment Agreement"), duly executed by Sellers;

(iv)    a transition services agreement, if agreed to prior to the Closing in accordance with Section 6.10, substantially on the terms set forth in the Amended and Restated Transition Services Term Sheet attached hereto as Exhibit H and otherwise in form and substance reasonably acceptable to Buyer and Sellers (the "Transition Services Agreement"), duly executed by Sellers;

(v)    possession of each Owned Real Property, together with, for each Owned Real Property recorded in the name of any Seller, a limited warranty deed (or its jurisdictional equivalent) in recordable form for all such Owned Real Property conveying such Owned Real Property subject only to Permitted Post-Closing Encumbrances, duly executed by the applicable Seller, and such ordinary and customary documents (including customary affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to obtain customary owner's title policies insuring Buyer's fee simple title to such Owned Real Property (without expanding or

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

28

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto);

(vi)     a copy of the Sale Order;

(vii)    an Internal Revenue Service Form W-9, duly executed by each Seller;

(viii)   RESERVED

(ix)     a duly executed certificate of a duly authorized officer of True Value Parent certifying the satisfaction of the conditions set forth in <u>Section 8.3(a)</u>, <u>Section 8.3(a)(i)</u> and <u>Section 8.3(c)</u>; and

(x)      evidence, in form and substance reasonably satisfactory to Buyer, that all notices, authorizations, approvals, Orders, permits, and consents set forth on <u>Section 2.8(b)(x)</u> of the Disclosure Letter have been obtained or delivered, as applicable.

(c)      At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(i)      the Assignment and Assumption Agreement, duly executed by Buyer;

(ii)     the Lease Assignment and Assumption Agreements, duly executed by Buyer;

(iii)    the IP Assignment Agreement, duly executed by Buyer;

(iv)     the Transition Services Agreement, if agreed to prior to the Closing in accordance with <u>Section 6.10</u>, duly executed by Buyer;

(v)      the Cash Consideration in cash by wire transfer of immediately available funds to an account or accounts designated by True Value Parent;

(vi)     the Prepaid Expenses Reimbursement Amount, in accordance with <u>Section 2.12</u>;

(vii)    the LC Reimbursement Amount in accordance with <u>Section 2.14;</u> and

(viii)   a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>.

<u>Section 2.9</u>     <u>Purchase Price Allocation</u>.  For U.S. federal and applicable state, local and foreign Tax purposes, Buyer, Sellers, and their respective Affiliates shall allocate the Purchase

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

29

950067.04A  WILSR01A950067.06A-WILSR01A - MSW

Price (and any amounts treated as part of the Purchase Price for applicable Tax purposes) among the Transferred Assets in accordance with the methodology set forth in Section 2.9 of the Disclosure Letter (the "Allocation Methodology," and such allocation, the "Allocation").  After the Closing, Buyer shall prepare and deliver to Sellers the Allocation, and the Allocation as prepared by Buyer, including any reasonable comments sent to Buyer from Seller, shall be binding on the Parties and their respective Affiliates.  The Parties and their respective Affiliates shall (a) file all applicable Tax Returns in accordance with such Allocation and (b) not take any Tax-related action that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by a change in applicable Law occurring after the date hereof or pursuant to a "determination" within the meaning of Section 1313(a) of the Code or any similar provision of state, local or foreign Tax Law.

> Section 2.10    Designated Buyer(s).

(a)    In connection with the Closing, without limitation by the terms of Section 10.12, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.10, one (1) or more Affiliates to purchase specified Transferred Assets and employ specified Transferred Employees on and after the Closing Date, (any such Affiliate of Buyer that shall be properly designated by Buyer in accordance with this Section 2.10, a "Designated Buyer"); provided that no such designation would impede or delay the Closing or materially and adversely affect the timely receipt of any regulatory approval, in each case, in any material respect; provided, further, that no such designation shall be permitted if any Taxes required to be withheld under applicable Law from any amounts otherwise payable hereunder would be higher than the amount of Taxes that would be required to be withheld absent such designation.  At and after the Closing, Buyer shall, or shall cause its Designated Buyer(s) to, honor Buyer's obligations at the Closing.  After the Closing, any reference to Buyer made in this Agreement in respect of any purchase, assumption or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any.  Buyer shall be jointly and severally liable for all obligations of Buyer and its Designated Buyer(s) under this Agreement as to any particular Assumed Liability that a Designated Buyer is assuming at the Closing.

(b)    Without limitation of Section 6.4, the designation of a Designated Buyer in accordance with Section 2.10(a) shall be made by Buyer by way of a written notice to be delivered to Sellers as soon as reasonably practicable following the date of this Agreement but in no event later than two (2) Business Days prior to the Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Assets and Transferred Employees Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.   Notwithstanding the foregoing, and for the avoidance of doubt, any designation pursuant to Section 2.10(a) shall not relieve Buyer of any of

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

30

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

its obligations under this Agreement (or otherwise) and Buyer shall remain jointly and severally liable therefor.

Section 2.11   Withholding.  Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as are required to be deducted and withheld from such amount under the Code or any other applicable provision of U.S. or foreign Tax Law.  To the extent that Buyer intends to withhold any such amounts from the Purchase Price, it shall (a) notify Sellers of such intention as soon as reasonably possible after the date hereof and shall provide Sellers with an opportunity to provide forms or evidence that would exempt or reduce such amounts from withholding and (b) otherwise cooperate in good faith with Sellers and use commercially reasonable efforts to minimize or eliminate any such deductions or withholdings.  To the extent that any amounts are so deducted and withheld and paid to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 2.12   Reimbursement of Prepaid Expenses.    With respect to all Prepaid Expenses (x) constituting deposits or ~~otherwise~~(y) attributable to the period following the Closing Date, (i) at least three (3) Business Days prior to the Closing, Sellers shall deliver to Buyer documentation, in form and substance reasonably satisfactory to Buyer, evidencing the amount of such Prepaid Expenses (the "Prepaid Expenses Reimbursement Amount") and (ii) at the Closing, Buyer shall pay to Sellers an amount equal to such Prepaid Expenses Reimbursement Amount in cash by wire transfer of immediately available funds to an account or accounts designated by True Value Parent, and all such Prepaid Expenses shall be assigned to Buyer in accordance with Section 2.1. For the avoidance of doubt, if any Prepaid Expenses that otherwise would be reimbursable by Buyer under this Section 2.12 are not known to Sellers as of the Closing, then Sellers shall, following their becoming aware of such Prepaid Expenses, deliver to Buyer documentation, in form and substance reasonably satisfactory to Buyer, evidencing the amount of such Prepaid Expenses and Buyer shall, as soon as practicable after receipt of such notice, reimburse Sellers in the amount provided in this Section 2.12.

Section 2.13   Payment of Purchase Orders.  Pursuant to Section 2.1(f), Sellers shall assign to Buyer, and Buyer shall assume from Sellers, all Purchase Orders. For the avoidance of doubt, (i) all goods received pursuant to a Purchase Order after Closing at either a distribution center that is subject to a Transferred Lease or a distribution  center that is subject to an Excluded Lease, shall be owned by Buyer and (ii) Buyer shall pay when due all amounts owed under any such Purchase Order in accordance with the terms thereof directly to the party to whom such payment is owed.

Section 2.14   LC Reimbursement Amount.  At the Closing, Buyer shall pay to Sellers in accordance with Section 2.8(c)(vii), an amount equal to One Million Seven Hundred Seventy Four Thousand Six Hundred Twenty Two Dollars and Fifty Cents ($1,774,622.50) (the "LC Reimbursement Amount") in respect of the cash collateral posted by Sellers under the 1970 Group Agreements.  Sellers shall use reasonable best efforts to cause the transfer to Buyer in

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

accordance with Section 2.1(n) of all of their rights, title and interest in and to such cash collateral, and shall direct the party or parties holding such cash collateral to deliver and pay such cash collateral to Buyer (and not to Sellers) when permitted to do so under the 1970 Group Agreements; provided, that if the counter-parties to the 1970 Group Agreements are unwilling to deliver and pay such cash collateral directly to Buyer, then Sellers covenant and agree that, promptly upon receipt of such cash collateral by Sellers in accordance with the terms of the 1970 Group Agreements, Sellers shall deliver and pay over to Buyer such cash collateral.  In each case, any such payments shall be made by wire transfer of immediately available funds to an account or accounts designated by Buyer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF SELLERS

Except as set forth in the Disclosure Letter attached hereto, each Seller jointly and severally represents and warrants to Buyer as follows (and for all purposes of this Article III, references to the "date hereof" shall mean October 13, 2024):

Section 3.1    Organization.  Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own, lease and operate all of its properties and assets (including the Transferred Assets) and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code and the Orders of the Bankruptcy Court, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which the nature of the Transferred Assets or the character or location of the Transferred Assets requires it to qualify, except where the failure to be so qualified would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.2    Authority.  Subject to required Bankruptcy Court approvals, (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

32

950067.04A  WILSR01A950067.06A-WILSR01A - MSW

principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

Section 3.3    No Conflict; Required Filings and Consents.

(a)    Except as set forth on Section 3.3(a) of the Disclosure Letter and assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.3(b) of the Disclosure Letter are made, given or obtained (as applicable), (y) the requirements of the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and any other applicable Antitrust Laws, are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Sellers of this Agreement and each of the Ancillary Agreements to which they will be a party and the consummation by Sellers of the transactions contemplated hereby and thereby, does not: (i) conflict with or violate any provision of any Organizational Document of any Seller; (ii) in any material respect conflict with or violate any Law or Order applicable to any Seller or by which any Transferred Asset is bound; or (iii) conflict with, result in any material breach of, constitute a material default (or an event that, with notice or lapse of time or both, would become a material default) under, create in any party thereto any right of termination, vesting, amendment, acceleration or cancellation of, require any consent under, or result in the creation or imposition of any material Encumbrance (other than a Permitted Pre-Closing Encumbrance) on any Transferred Asset or under any Transferred Contract; except, with respect to clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences that, are not material to the Business, taken as a whole.

(b)    Except as set forth on Section 3.3(b) of the Disclosure Letter, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by any Seller of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby and thereby, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under the HSR Act and any other Antitrust Laws, (iii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, or (v) as may be necessary as a result of any facts or circumstances relating to Buyer or any of its Affiliates.

Section 3.4    Transferred Assets; Sufficiency of Assets.  Subject to requisite Bankruptcy Court approvals and except as a result of the commencement of the Chapter 11 Case:

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Business, each Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

(b)        This Agreement, the Ancillary Agreements, and the other instruments and documents to be delivered by Sellers to Buyer at the Closing shall, subject to entry of the Sale Order and the receipt of each of the consents and approvals set forth on Section 3.3(a) and Section 3.3(b) of the Disclosure Letter, be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), claims and interests, other than Assumed Liabilities.

(c)        Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole, and except for any Business Employees who do not become Transferred Employees and for any Excluded Assets (including, for the avoidance of doubt, any Leased Real Property under any Excluded Lease), the Transferred Assets to be conveyed to Buyer hereunder at Closing (taking into account any rights granted or services to be provided under this Agreement or any Ancillary Agreement), constitute (i) all the properties, rights and other assets and personnel necessary, and are sufficient, to carry on the Business as it is currently conducted by Sellers and (ii) except for the Excluded Assets, all of the assets owned by Sellers and held for use by Sellers primarily in the conduct of the Business.

Section 3.5        Financial Statements; No Undisclosed Liabilities.

(a)        (i) The audited consolidated balance sheets of True Value Parent as of December 31, 2022 and 2023, together with the related consolidated statements of income, stockholders' equity and cash flows ended December 31, 2022 and 2023, and (ii) the unaudited consolidated balance sheets of True Value Parent as of August 31, 2024, together with the related consolidated statements of income, stockholders' equity and cash flows for the eight months ended August 31, 2024 (collectively, the "Financial Statements") have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of True Value Parent and its Subsidiaries and the Business at the respective dates thereof and the results of their operations and cash flows for the periods indicated.  None of the Financial Statements contains any material, non-recurring items of revenue or gain outside the Ordinary Course of Business, except as expressly set forth therein.  No Seller is aware of any fraud or intentional misconduct relating to its Financial Statements or operations, or any allegations thereof.

(b)        Except for Liabilities (i) incurred in connection with or contemplated by this Agreement, (ii) reflected or reserved against in the audited consolidated balance sheet of True Value Parent as of December 31, 2023 or in the notes thereto, (iii) that have been incurred in the Ordinary Course of Business since December 31, 2023 or (iv) that have been discharged or paid in full in the Ordinary Course of Business, Sellers do not have any Liabilities of any nature (whether accrued, absolute, contingent or otherwise), which are required to be disclosed, recorded or reflected on a balance sheet, including the footnotes thereto, under GAAP.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

34

Section 3.6    Absence of Certain Changes or Events.    Since December 31, 2023, through the date of this Agreement, there has not been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect.  Except for (i) discussions, negotiations and activities related to this Agreement or other potential strategic transactions, (ii) the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets (or other strategic transaction), the negotiation and execution of this Agreement, (iii) for the preparation and commencement of the Chapter 11 Case, or (iv) as set forth on Section 3.6 of the Disclosure Letter or as expressly contemplated by this Agreement, from December 31, 2023 until the date hereof, no Seller has taken any action or failed to take any action, as applicable, that would be prohibited by Section 6.1(b)(i), Section 6.1(b)(ii), Section 6.1(b)(iii), Section 6.1(b)(iv), Section 6.1(b)(vii), Section 6.1(b)(viii), Section 6.1(b)(x) or Section 6.1(b)(xii) if taken, or failed to be taken, except for the execution and delivery of this Agreement.

Section 3.7    Compliance with Law; Permits.

(a)    As of the date hereof, the Business is being, and at all times since the Compliance Date has been, conducted in all material respects in compliance with, and Sellers are, and at all times since the Compliance Date have been, in compliance in all material respects with, all applicable Laws relating to the operation of the Business and the Transferred Assets and (ii) there are no pending or, to the Knowledge of Sellers, threatened, claims from any Governmental Authority relating to any non-compliance of the Business or the Transferred Assets.

(b)    Sellers are in possession of all material permits (including work permits and visas), licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate their assets and properties (including all the Transferred Assets), and to employ or engage officers, workers and employees who are not citizens of the country where they are carrying out their duties or performing their services and to carry on the Business as currently conducted.  All material Permits held by Sellers are valid and in full force and effect and neither Sellers nor any of their applicable Subsidiaries are in default under, or in violation of, any such Permit,, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyer's ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending or, to the Knowledge of Sellers, threatened in writing.

Section 3.8    Litigation.  Except for the Chapter 11 Case, and any Order entered in the Chapter 11 Case, as of the date hereof, there is no material Action by or against Sellers in connection with the Business or the Transferred Assets pending, or to the Knowledge of Sellers, threatened in writing.

Section 3.9    Employee Benefit Plans.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

35

(a)    (i) Each Employee Benefit Plan has been operated and administered in all material respects in accordance its terms and with applicable Law and with each applicable Collective Bargaining Agreement, and (ii) there are no pending or, to the Knowledge of Sellers, threatened actions, suits or claims by, on behalf of or against any Employee Benefit Plan or any administrator or fiduciary thereof (other than routine claims for benefits), in each case (i) and (ii), other than would not reasonably be expected to result in material Liability to the Business.

(b)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, (i) entitle any Business Employee to severance pay (other than from a Governmental Authority), (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation or benefits due to any Business Employee, (iii) cause any individual to receive any additional payment under any Employee Benefit Plan, or (iv) directly or indirectly cause any Seller or any Affiliate of a Seller to transfer or set aside any assets to fund or otherwise provide for benefits for any individual.

(c)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, result in any payment or benefit (whether in cash or property or the vesting of property) to any "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) that could, individually or in combination with any other such payment or benefit, constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) or subject any Person to Liability for Tax under Section 4999 of the Code or cause the loss of a deduction to any Seller under Section 280G of the Code.

(d)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination or opinion letter as to such qualification from the IRS, and, to the Knowledge of Sellers, no event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification.  No stock or other securities issued by any Seller or any Affiliate of a Seller forms or has formed any part of the assets of any Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code.

(e)    Except as set forth in Section 3.9(e) of the Disclosure Letter, none of Sellers or any of their ERISA Affiliates maintains, sponsors or contributes to or, within the last six (6) years, has maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to or in any way has any Liability (whether on account of an ERISA Affiliate or otherwise) to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA (whether or not subject thereto), (ii) a plan subject Title IV or Section 302 of ERISA or Section 412, 430 or 4971 of the Code or (iii)  a "multiemployer plan," as defined in Section 3(37) of ERISA. None of Sellers or any of their ERISA Affiliates has incurred any withdrawal liability (including any contingent or secondary withdrawal liability) within the meaning of Section 4201 or 4204 of ERISA that remains unsatisfied. Other than as would not reasonably be expected to result in material Liability to the Business, none of Sellers or any of their ERISA Affiliates

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

36

950067.04A WILSR01A950067.06A-WILSR01A - MSW

maintains, sponsors or contributes to (x) any "voluntary employee beneficiary association" within the meaning of Section 501(c)(9) of the Code or any other "welfare benefit fund" as defined in Section 419 of the Code, (y) a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA, or (z) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

Section 3.10    Labor and Employment Matters.

(a)    Section 3.10(a) of the Disclosure Letter sets forth a complete and correct list of all Business Employees and for each such Business Employee, to the extent permitted by Law, the following: (i) name; (ii) title or position; (iii) whether full-time or part-time; (iv) classification as exempt or non-exempt; (v) hire date; and (vi) current annual base compensation rate.  As of the date of this Agreement, all compensation, including wages, commissions, bonuses, fees and other compensation, due and payable to each Business Employee for work performed on or prior to the date hereof has been paid in full, except for any such amounts that are accrued and unpaid in the Ordinary Course of Business.  As of the date of this Agreement, all compensation due and payable to each independent contractor who has been engaged by Sellers has been paid in full for services performed on or prior to the date hereof.

(b)    Except as set forth in Section 3.10(b) of the Disclosure Letter and except with respect to any such Contract at the national-, sector- or industry-level, Sellers are not a party to or bound by a Collective Bargaining Agreement.

(c)    As of the date hereof, solely with respect to the Business Employees, (i) there is no material unfair labor practice charge or complaint pending or, to the Knowledge of Sellers, threatened against Sellers before the National Labor Relations Board or any similar Governmental Authority, (ii) no Labor Organization or group of Business Employees has made a pending demand in writing for recognition or certification as the bargaining agent of the Business Employees, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or any similar Governmental Authority, (iii) to the Knowledge of Sellers, there are no pending or threatened union organizing or certification activities and (iv) there are no pending or, to the Knowledge of Sellers, threatened strikes, work stoppages, lockouts, slowdowns or other labor disputes, that, in each case of (i) through (iv), would reasonably be expected to be material to the Business, taken as a whole.  There are no material arbitrations, material grievances, or unfair labor practice charges or complaints pending against Sellers or, to the Knowledge of Sellers, threatened as of the date of this Agreement by or on behalf of any Business Employee.

(d)    Sellers are and since the Compliance Date have been, in compliance in all material respects with all applicable Laws relating to labor, labor relations, employment and employment practices pertaining to the Business Employees and to Sellers' former employees of the Business, including but not limited to all Laws respecting collective bargaining, the terms and conditions of employment, wages, hours, overtime pay, equal employment opportunity,

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay), immigration, work authorization, mandatory E-Verify obligations, occupational health and safety, working conditions, workers' compensation, vacation pay, plant closures and layoffs, affirmative action, labor relations, employee leave issues, and unemployment insurance.

(e)     Sellers have in their possession a U.S. Citizenship and Immigration Services Form I-9 that was, in all material respects, validly and properly completed and, if necessary, that has been properly updated, in all material respects, in accordance with applicable Law for each Business Employee.  To the Knowledge of Sellers, Sellers have not hired or continued to employ any worker who is not legally authorized to work in the United States.  To the Knowledge of Sellers, no Seller has used the services of any individual through a staffing agency, contract, or subcontract knowing that the individual was an unauthorized worker.

(f)     As of the date hereof, Sellers are in material compliance with the WARN Act as it relates to the current and former Business Employees.  During the 90-day period prior to the date of this Agreement, there has been no "mass layoff" or "plant closing" as defined by the WARN Act.

Section 3.11   Real Property.

(a)     Section 3.11(a) of the Disclosure Letter sets forth an accurate and complete list of all Owned Real Property.  Each applicable Seller has good and valid fee simple title (or jurisdictional equivalent) to the Owned Real property it owns, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.  Seller has not leased, licensed, or granted any possessory interest in any Owned Real Property.

(b)     Section 3.11(b) of the Disclosure Letter sets forth an accurate and complete list of all Leased Real Property.  Each Seller has a valid leasehold, subleasehold or other similar interest in all Leased Real Property, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.  Sellers have made available to Buyer true, correct and complete copies of each Lease for Leased Real Property.  Seller has not subleased, licensed, or granted any possessory interest in any Leased Real Property.

(c)     Except as set forth on Section 3.11(c) of the Disclosure Letter, Sellers are not a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Real Property or any portion thereof or interest therein to any Person other than Buyer.

(d)     None of Sellers, or to the Knowledge of Sellers, any other party to such Lease is in material breach or default under such Lease, and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a material breach or default, or permit the termination, modification or acceleration of rent under such Lease.  No security deposit or portion thereof deposited with

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

38

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

respect to such Lease has been applied in respect of a breach or default under such Lease that has not been re-deposited in full.

(e)    Sellers have not received written notice from any Governmental Authority of, and there is not: (i) any pending or, to the Knowledge of Sellers, threatened, condemnation proceedings affecting the Leased Real Property or any part thereof; (ii) to the Knowledge of the Sellers, any violation of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Leased Real Property or any part thereof, which have not heretofore been cured; or (iii) any pending or, to the Knowledge of Sellers, threatened, injunction, decree, Order, writ or judgment outstanding, nor any claims, litigation, administrative actions or similar proceedings against Sellers or any Leased Real Property relating to the ownership, lease, use or occupancy of such Leased Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of any Leased Real Property or any part thereof or in any material respect prevent or limit the present operation of the improvements on the Leased Real Property or any part thereof.  There are no incomplete construction projects affecting the Leased Real Property and all completed construction projects have been fully paid for.  To the Knowledge of Sellers, there is no pending or contemplated special assessment or reassessment of any parcel included in the Leased Real Property that would result in a material increase in the real property Taxes or in the rent, additional rent or other sums and charges payable by a Seller under the Leases for Leased Real Property.  No brokerage or leasing commissions or other compensation are due or payable by a Seller to any Person, firm, corporation or other entity with respect to, or on account of, any Lease for Leased Real Property or any extensions or renewals thereof.  The improvements, systems, fixtures and equipment constituting or located on the Leased Real Property are in working order and repair sufficient for the conduct of the business of the Sellers as now conducted.

Section 3.12    Intellectual Property.

(a)    A true, correct and complete (in all material respects) list of all U.S. and foreign (i) issued patents and pending patent applications, (ii) registered trademarks and applications to register any trademarks, (iii) registered copyrights, in each case, owned by any Seller as of the date hereof, and (iv) all domain names owned or controlled by Sellers (foregoing subsections (i)-(iv), collectively, the "Registered IP") is set forth on Section 3.12(a) of the Disclosure Letter.  All material items of such Registered IP are subsisting and to the Knowledge of Sellers, are valid and enforceable.  Section 3.12(a) of the Disclosure Letter shall, with respect to each reference to Registered IP, include the title, mark, serial or application number, registration number, jurisdiction, registration or recordation date and next renewal deadline or expiry date, as applicable.

(b)    Sellers are the sole and exclusive owners of the Transferred IP, and the execution and performance of this Agreement will not result in the loss or impairment of any such ownership rights by any Sellers, or Sellers' ability to assign such Transferred IP to Buyer without loss of such rights.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

(c)     As of the date hereof, (i) the conduct of the Business by Sellers, and the Transferred IP as currently used by Sellers in the conduct of the Business, do not infringe, misappropriate or otherwise violate any Person's Intellectual Property rights, and (ii) there is no such unresolved Action asserted or, to the Knowledge of Sellers, threatened in writing (including any "cease and desist" letters and invitations to license) against Sellers, except, in each case of (i) and (ii) as would not reasonably be expected to be material to the Business, taken as a whole.

(d)     To the Knowledge of Sellers, as of the date hereof, (i) no Person is infringing, misappropriating or otherwise violating any Transferred IP, and (ii) there is no such unresolved Action asserted or threatened in writing against any Person by Sellers, except, in each case of (i) and (ii) as would not reasonably be expected to be material to the Business, taken as a whole.

(e)     Sellers take commercially reasonable steps to safeguard and maintain the confidentiality of material trade secrets and other material confidential and proprietary information included in the Transferred IP. To the Knowledge of Sellers, as of the date hereof, no Person has asserted in writing, any right, title or interest, or the right to receive any royalties or other consideration with respect to, any of the Transferred IP nor contested or challenged the validity or enforceability of any of the Transferred IP, in any material respect.  To the Knowledge of Sellers, as of the date hereof, there has not been any unauthorized disclosure of material trade secrets that has resulted or is reasonably likely to result in the loss of trade secret or other rights in and to such information.

(f)     Section 3.12(f) of the Disclosure Letter sets forth a true, correct and complete list of material software applications or code owned by or developed by or for Sellers that are included in the Transferred IP.

(g)     To the Knowledge of Sellers, (i) Sellers are in material compliance with the terms and conditions pursuant to which Sellers have obtained or use any Open Source Materials in the Business and (ii) no Seller has (A) incorporated Open Source Materials into, or combined Open Source Materials with, any material technology or software in the Transferred IP; (B) distributed Open Source Material in conjunction with any such Transferred IP; or (C) used Open Source Material, in each case ((A)-(C)), in such a way that requires any such Transferred IP to be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works or (3) redistributed at no charge.

(h)     The Transferred IP developed, created, invented, or authored by individuals who were employed by Sellers at the time of such development, creation, invention, or authorship is the sole property of Sellers and no such employee has any rights, title, or interest in such Intellectual Property.  All employees of Sellers have executed and delivered to Sellers an agreement (i) transferring to Sellers any rights in the Transferred IP developed, created, invented, or authored by such employee or (ii) prohibiting disclosure of Sellers' confidential and proprietary information including non-public information regarding the Transferred IP; or such

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

40

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

employees' rights, title and interest in such Intellectual Property has otherwise vested in Sellers by operation of Law.

(i)     All developers, creators, inventors, and authors of the Transferred IP (other than with respect to Intellectual Property licensed to Sellers), who were not employees of Sellers at the time of the development, creation, invention, or authorship of such Transferred IP have assigned in writing all of their rights, title, and interest to such Transferred IP to Sellers, or such rights, title and interest have otherwise vested in Sellers by operation of Law.

(j)     In connection with the use of all Transferred IP by Sellers, Sellers do not owe to any other Person any material fee, royalty, or other payment as a result of the use of such Transferred IP, other than any such payments in the Ordinary Course of Business.

(k)     No Transferred IP is subject to any outstanding Order or stipulation restricting the use or licensing thereof by Sellers in connection with the Business.

Section 3.13   Tax Matters.

(a)     All material Tax Returns required to be filed with respect to the Transferred Assets or the Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects.  Subject to any obligation of Sellers under the Bankruptcy Code, all material Taxes due and payable with respect to the Transferred Assets have been paid.  Since January 1, 2018, no claim has been made in writing by a Governmental Authority in a jurisdiction where a Seller does not file Tax Returns that the Seller or the Business is or may be subject to taxation by that jurisdiction.  All Taxes that any Seller is required by Law to withhold and collect have in all material respects been duly withheld, collected and paid over to the extent due and payable.

(b)     There is no Action, suit, claim, deficiency, assessment, or audit pending, proposed in writing, or, to the Knowledge of Sellers, threatened in writing with respect to any Taxes relating to the Transferred Assets or the Business.

(c)     There are no Encumbrances for Taxes upon any of the Transferred Assets other than Permitted Pre-Closing Encumbrances.

(d)     No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any material Taxes or Tax Returns of or with respect to the Transferred Assets or the Business is outstanding.

(e)     The representations and warranties set forth in Section 3.9 and this Section 3.13(e) are the sole and exclusive representations and warranties with respect to Taxes.

(f)     None of the Transferred Assets constitutes, stock, partnership interests or other equity interest in any Person for U.S. federal income tax purposes.

Section 3.14   Environmental Matters.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

41

(a)    As of the date hereof, Sellers, the Transferred Assets and the Business are now and, except for matters which have been resolved, have been in compliance in all material respects with all applicable Environmental Laws, which compliance includes the possession of, and material compliance with the terms of, with all material Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets.    There are no Environmental Claims pending or, to the Knowledge of Sellers, threatened in writing, that seek the revocation, cancellation, suspension or adverse modification of any such Environmental Permit.    To the Knowledge of Sellers there are no facts, conditions or circumstances that would reasonably be expected to result in termination, revocation, cancellation, non-renewal or material adverse modification of any such Environmental Permits.

(b)    There is no material Environmental Claim pending or, to the Knowledge of Sellers, threatened against or affecting Sellers, the Transferred Asset or the Business.    To the Knowledge of Sellers, there are no environmental conditions, including the presence of any Hazardous Material at or migrating to or from the Real Property, which would form the basis of any material Liability of the Business or any Transferred Asset, or of any material Environmental Claim against or affecting any Transferred Asset or the Business.

(c)    To the Knowledge of Sellers, except as listed in Section 3.14(c) of the Disclosure Letter, (i) underground storage tanks have not been installed or otherwise placed on the Real Property under Sellers' ownership or possession thereof. To the Knowledge of Sellers, underground storage tanks were not located on the Real Property prior to Sellers' ownership or leasehold interest in the Real Property.

(d)    Hazardous Materials generated on the Real Property are treated, stored, generated, transported, handled, and disposed of in compliance in all material respects with all applicable Environmental Laws.

(e)    Sellers have made available to Buyer all material environmental audits, reports and site assessments regarding the Transferred Assets and the Business that are in possession of Seller and have been prepared in the last five (5) years prior to the date hereof.

Section 3.15    Material Contracts.

(a)    Section 3.15(a) of the Disclosure Letter sets forth each of the following Contracts entered into by any Seller (each, a "Material Contract"); provided, that the following Contracts shall not be set forth in Section 3.15(a) of the Disclosure Letter or be deemed a "Material Contract" for any purposes under this Agreement: (1) any Employee Benefit Plan; (2) any purchase orders or similar Contracts; and (3) any Lease for Leased Real Property:

(i)    Contracts with any current or former officer, director, or employee of any Seller;

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

42

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

(ii)     Contracts relating to the acquisition by any Seller of any operating business, real property, capital expenditures (including capital expenditures relating to information technology systems) or securities of any other Person (other than any Seller) (including investment in joint ventures and minority equity investments but excluding accounts receivable or other forms of trade credit) for aggregate consideration in excess of $500,000 pursuant to which there are remaining material liabilities or obligations;

(iii)     all Contracts relating to indebtedness for borrowed money;

(iv)     Contracts regarding a guaranty, undertaking to be liable for the debts of any Person other than any other Seller or provision of an indemnity in respect of liabilities, obligations or commitments of any Person other than any Seller, in each case in excess of $500,000;

(v)     any Contract (or group of related Contracts) the performance of which, in the twelve (12) months preceding the date hereof has resulted in, or in the twelve (12) months following the date of this Agreement would reasonably be expected to result in, consideration or payment in excess of $1,000,000 per annum to or from any Seller;

(vi)     any Contract pursuant to which any Seller (A) is granted or obtains any license or right to use any Intellectual Property material to the Business, (B) is restricted in its right to use or register any Intellectual Property material to the Business, or (C) permits any other Person to use, enforce or register any material Intellectual Property, including any license agreements, coexistence agreements and covenants not to sue, in each case other than: (X) "click-wrap," "shrink-wrap" and similar end-user licenses or other licenses to generally commercially available or "off-the-shelf" third-party software or technology, (Y) non-exclusive licenses granted in the Ordinary Course of Business, and (Z) any Contract that includes a license to use Intellectual Property that is incidental and not material to such Contract, including sales or marketing or similar Contracts for the purposes of promoting or using any products or services;

(vii)     any material Contract or consent decree with or from any Governmental Authority;

(viii)     Contracts that are capital leases as determined pursuant to GAAP and involve annual payments by any Seller in excess of $250,000;

(ix)     any Contract with a sole source supplier, pursuant to which such supplier provides to any Seller equipment, materials or services that are necessary for the sale, performance, manufacturing or support of the Business;

(x)     any material agreement relating to any strategic alliance, joint development, joint marketing, partnership, joint venture or similar arrangement; and

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

43

(xi)   all Contracts that limit or purport to limit in any respect the ability of the Business to solicit employees or customers of any other Person or compete in any line of business or with any Person or in any geographic area or during any period of time.

(b)   Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with the Bankruptcy Code and except as a result of the commencement of the Chapter 11 Case, each Material Contract and each of the Leases for Leased Real Property is in full force and effect and is a valid, binding and enforceable obligation of Sellers and, to the Knowledge of Sellers, each of the other parties thereto, except as may be limited by the Enforceability Exceptions.  Except as set forth on Section 3.15(b) of the Disclosure Letter, no Seller is in breach or default, or is alleged in writing by a counterparty thereto to have breached or to be in default, under any Material Contract or any Lease for Leased Real Property, and, to the Knowledge of Sellers, each other party to each Material Contract and Lease for Leased Real Property is not in breach or default thereunder.

Section 3.16   Certain Payments.   Since the Compliance Date, no Seller (nor, to the Knowledge of Sellers, any of their respective Representatives) has (a) used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature for the purpose of obtaining or retaining business or favorable governmental action or to otherwise secure any improper advantage in violation of the Foreign Corrupt Practices Act.

Section 3.17   Brokers.  Other than Houlihan Lokey, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

Section 3.18   Data Privacy; Information Security.

(a)   Sellers comply and, since the Compliance Date, have complied, in all material respects with all of the following in the conduct of the Business of Sellers: (i) Privacy Laws; (ii) the PCI-DSS; (iii) generally accepted applicable cybersecurity and privacy industry standards and guidelines including the National Institute of Standards and Technology (NIST) Cybersecurity Framework; (iv) the Business Privacy and Data Security Policies; and (v) contractual requirements or terms of use concerning the Processing of Personal Information to which Sellers is or was a party or otherwise bound.

(b)   To the extent required by applicable Law, since the Compliance Date, Sellers have posted to each of its websites and mobile applications and provided or otherwise made available in connection with its products or services, an external privacy policy and terms

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

44

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

of use, in each case, in connection with the Business.  Any external privacy policies or terms of use provided by Sellers in connection with the Business materially comply with all applicable Privacy Laws.  Sellers, and, to the Knowledge of Sellers, any vendor, processor, or other third-party Processing Personal Information for or on behalf of Sellers and any Subsidiary, in connection with the Business, are and since the Compliance Date, have been in compliance with the external privacy policies and terms of use in all material respects.  Sellers have made available to Buyer true, complete, and correct copies of all external privacy policies and terms of use that are currently in effect.

(c)    No Personal Information in the possession or control of Sellers, or held or Processed by any vendor, processor, or other third party for or on behalf of Sellers or any Subsidiary, in the conduct of the Business of Sellers or any Subsidiary have been subject to any data breach or other security incident that has resulted in or presents a material risk of unauthorized access, disclosure, use, denial of use, alteration, corruption, destruction, or loss of such Personal Information or that has caused or would reasonably be expected to cause a material disruption to the conduct of the Business of Sellers or any Subsidiary (a "Security Incident").  Since the Compliance Date, Sellers or any Subsidiary have not notified and, to the Knowledge of Sellers, there have been no facts or circumstances that would require Sellers or any Subsidiary to notify, any Governmental Authority or other Person of any Security Incident.

(d)    No Seller nor any Subsidiary has received any material notice, request, claim, complaint, correspondence, or other communication in writing from any Governmental Authority or other Person, and to the Knowledge of Sellers, since the Compliance Date, there has not been any audit, investigation, enforcement action (including any fines or other sanctions), or other Action, relating to any actual or alleged material Security Incident or violation of any Privacy Law, any Business Privacy and Data Security Policy, or any Person's individual privacy rights involving Personal Information in the possession or control of Sellers or any Subsidiary in the conduct of the Business of Sellers or any Subsidiary.

Section 3.19  Exclusivity of Representations and Warranties.  Notwithstanding the delivery or disclosure to Buyer or any of its Affiliates or Representatives of any documentation or other information (including any financial projections or other supplemental data), except for the representations and warranties expressly set forth in this Agreement and the Ancillary Agreements, none of Sellers or their Affiliates or Representatives makes, or has made (and each Seller and their Affiliates and Representatives hereby disclaims) any express or implied representation or warranty with respect to Sellers, the Business or any Transferred Asset or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, and Buyer and its Affiliates and Representatives are not relying on any representation, warranty or other information of Sellers, its Affiliates or any Person except for those expressly set forth in this Agreement and the Ancillary Agreements. None of Sellers or their respective Affiliates or Representatives makes (and Sellers, and their respective Affiliates and Representatives hereby disclaims) any express or implied representation or warranty (including as to completeness or accuracy), whether at Law or in equity, to Buyer with respect to, and none of Sellers, their respective Affiliates and Representatives or any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

45

950067.04A - WILSR01A950067.06A - WILSR01A - MSW

their respective Representatives providing, or making available, to Buyer or any of its Affiliates or its Representatives, or resulting from the omission of, any estimate, projection, prediction, data, budget, forecast, financial information, memorandum, prospect information, presentation or any other materials or information, including any oral, written, video, electronic or other materials or information presented to or made available to Buyer in connection with presentations by True Value Parent's management or information made available on any "data sites" or in the course of their due diligence investigation of the Business, the negotiation of this Agreement or the course of the transactions contemplated by this Agreement. Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the disclosure schedule delivered to Sellers prior to the execution of this Agreement (the "Buyer Disclosure Letter"), Buyer represents and warrants to Sellers as follows (and for all purposes of this Article IV, references to the "date hereof" shall mean October 13, 2024):

Section 4.1    Organization.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement to which it is a party.

Section 4.2    Authority.  Buyer has the power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate (or equivalent) action.  This Agreement has been, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will have been, duly executed and delivered by Buyer, and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its respective terms, except as enforcement may be limited by the Enforceability Exceptions.

Section 4.3    No Conflict; Required Filings and Consents.

(a)    Assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 4.3(b) of the Buyer Disclosure Letter are made, given or obtained (as applicable), (y) the requirements of

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

the HSR Act, and any other applicable Antitrust Laws, are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, does not:

> (i)    conflict with or violate any provision of any Organizational Document of Buyer;

> (ii)    conflict with or violate any Law or Order applicable to Buyer; or

> (iii)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract to which Buyer is a party (including the Buyer Credit Agreement), in each case, that would prevent or delay Buyer's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which Buyer will be a party.

(b)    Except as set forth on Section 4.3(b) of the Buyer Disclosure Letter, Buyer is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby or thereby, except for any filings required to be made under the HSR Act or any other Antitrust Laws.

Section 4.4    Absence of Litigation.  There is no Action pending or, to the knowledge of Buyer, threatened in writing, against Buyer that, if adversely determined, (a) would prevent or materially restrict, impede or delay the performance by Buyer of its obligations under this Agreement or (b) would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

Section 4.5    Qualification.

(a)    To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(b)    Buyer is capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Transferred Contracts.

Section 4.6    Legal Requirements and Approvals.  Other than as may be required under the HSR Act or any other Antitrust Laws, Buyer has no knowledge of any consent of any Governmental Authority that will be required to consummate the transactions contemplated by this Agreement that it will not be able to obtain or make, or that it may obtain only after

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

47

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

substantial delay, or any material requirement of any Governmental Authority that it will be unable to satisfy in connection with the transactions contemplated hereby.

Section 4.7    Brokers.  No broker, finder or investment banker is entitled to any fee, commission or expense from Buyer that would be payable by Sellers in connection with the transactions contemplated hereby.

Section 4.8    Financing.

(a)    Buyer affirms that it is not a condition to Closing or any of its obligations under this Agreement that Buyer or any other Persons obtain financing for the transactions contemplated by this Agreement.

(b)    Concurrently with the execution of this Agreement, Buyer has delivered to Sellers a true, correct and complete copy of an executed debt commitment letter and each executed fee letter, engagement letter and other agreement associated therewith (provided that provisions in the fee letter related solely to fees, pricing, "flex" provisions and other economic terms may be redacted in a customary manner, provided that none of such redacted provisions affects the availability, timing, conditionality, enforceability, termination or aggregate principal amount of the Debt Financing), dated as of the date of this Agreement (such commitment letter, fee letter, engagement letter and other agreements, including all exhibits, schedules, annexes, supplements, modifications and amendments thereto, collectively, the "Debt Commitment Letter"), from the lenders, arrangers, agents or other financing parties party thereto (collectively, together with any providers of alternative debt financing pursuant to Section 6.8(b), the "Debt Financing Sources"), providing the terms and conditions upon which the Debt Financing Sources have committed to provide an aggregate amount of debt financing set forth therein to Buyer for the purpose of funding the transactions contemplated by this Agreement (together with any alternative debt financing pursuant to Section 6.8(b), the "Debt Financing").  The aggregate cash proceeds contemplated to be provided to Buyer at the Closing pursuant to the Debt Commitment Letter (after netting out applicable fees, expenses, original issue discount and similar premiums and charges after giving effect of the maximum amount of "flex" (including any original issue discount flex) provided for under the Debt Financing) when funded in accordance with the Debt Commitment Letter, will be in an amount sufficient and available, together with readily available funds to which Buyer has and will have access at all times through the Closing, for Buyer to fund all of the amounts required to be provided by Buyer for the consummation of the transactions contemplated hereby and the Debt Commitment Letter, including the payment of the Purchase Price and any associated expenses, including to pay all costs associated with Cure Claims and all other fees, costs and expenses to be incurred by Buyer in connection with the transactions contemplated hereby (the "Funding Obligations" and such sufficient proceeds, the "Funds").  As of the date hereof, (a) the Debt Commitment Letter in the form so delivered is in full force and effect and constitutes the legal, valid and binding obligation of Buyer, and, to Buyer's knowledge, the other parties thereto, enforceable against each of Buyer and such other parties in accordance with its respective terms, except as may be limited by the Enforceability Exceptions, (b) the obligations and commitments in the Debt Commitment Letter have not been withdrawn, reduced, rescinded, terminated or otherwise amended or modified in any respect, (c) no

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

amendment or modification to, or withdrawal, reduction, termination or rescission of, the Debt Commitment Letter has occurred or is contemplated, (d) no event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach under any term or condition of the Debt Commitment Letter and (e) no event has occurred or circumstance exists which, with or without notice, lapse of time or both, would or would reasonably be expected to constitute or result in a failure by Buyer or any other party to the Debt Commitment Letter to satisfy, or any delay in satisfaction, of any condition or other contingency to the full funding of the Debt Financing under the Debt Commitment Letter.  The Debt Commitment Letter (including the fee letter referred to therein) constitutes the entire and complete agreement between the parties thereto with respect to the financings contemplated thereby.  Except as expressly set forth in the Debt Commitment Letter as in effect on the date hereof, (a) there are no conditions precedent or other contingencies to the obligation of the Debt Financing Sources to fund the full amount of the Debt Financing to be funded on the Closing Date, in each case, on or prior to the Closing Date, and (b) there are no contractual contingencies or other provisions under any agreement or understanding relating to the transactions contemplated by this Agreement that would permit any Debt Financing Source to reduce the total amount of the Debt Financing or impose any additional conditions precedent to the availability of the Debt Financing.  Buyer has fully paid or caused to be paid any and all commitment fees, if any, or other fees or deposits required by the Debt Commitment Letter to be paid as of the date of this Agreement and will pay in full any such amounts due on or prior to the Closing Date.  Buyer is unaware of any fact or occurrence existing on the date of this Agreement that would reasonably be expected to make any of the assumptions or any of the statements set forth in the Debt Commitment Letter inaccurate or that would reasonably be expected to cause the Debt Commitment Letter to be ineffective or the Debt Financing to be unavailable on or prior to the Closing Date.  Buyer has no reason to believe that any of the conditions to the availability to Buyer of the Debt Financing will not be satisfied on a timely basis or that the full amount of the Debt Financing will not be made available to Buyer on a timely basis in order to consummate the transactions contemplated by this Agreement.

(c)    Buyer expressly acknowledges and agrees that (i) neither the availability, the terms nor the obtaining of the Debt Financing or any Alternative Financing, nor the completion of any issuance of securities contemplated by the Debt Financing or any Alternative Financing, is in any manner a condition to the Closing or the obligations of Buyer to consummate the transactions contemplated hereby, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Debt Financing or any Alternative Financing, or the completion of any such issuance and (ii) the failure, for any reason, of Buyer to have sufficient cash available at the Closing to satisfy its Funding Obligations in accordance with this Agreement or the failure to so pay its Funding Obligations in accordance with this Agreement, in each case, shall constitute a breach of this Agreement by Buyer.

Section 4.9    Solvency.    Immediately after giving effect to the transactions contemplated by this Agreement and the Ancillary Agreements (including the payment of the Purchase Price, and the payment of all related fees and expenses), (i) Buyer and its Affiliates will not have incurred debts beyond their ability to pay such debts as they mature or become due, (ii)

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

the then present fair saleable value of the assets of Buyer and its Affiliates will exceed the amount that will be required to pay their existing debts (including the probable amount of all contingent liabilities) as such debts become absolute and matured, (iii) the assets of Buyer and its Affiliates at a fair valuation will exceed their debts (including the probable amount of all contingent liabilities) and (iv) Buyer and its Affiliates will not have unreasonably small capital to carry on their business as proposed to be conducted following the Closing.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby, in either case, with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Affiliates.

Section 4.10   Exclusivity of Representations and Warranties.

(a)    Except for the representations and warranties expressly set forth in this Article IV, neither Buyer nor any other Person on behalf of Buyer makes (and Buyer, on behalf of itself, its Subsidiaries, and their respective Affiliates and Representatives, hereby disclaims) any express or implied representation or warranty with respect to Buyer, its Subsidiaries or any of their respective businesses, operations, properties, assets, liabilities or otherwise in connection with this Agreement or the transactions contemplated hereby, including as to the accuracy or completeness of any information.

(b)    Except for the representations and warranties expressly set forth in Article III, Buyer acknowledges and agrees that (x) none of Sellers, their respective Affiliates and Representatives or any other Person on behalf of Sellers makes, or has made, any express or implied representation or warranty, at law or in equity, with respect to Sellers, the Business, any Transferred Asset or any Assumed Liability or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, including with respect to its business, operations, assets (including the Transferred Assets), liabilities (including the Assumed Liabilities), condition (financial or otherwise), prospects or otherwise in connection with this Agreement or the transactions contemplated by this Agreement, including any representation or warranty as to value, merchantability, fitness for any particular purpose or for ordinary purposes, and Buyer and its Representatives are not relying on any written or oral statement, representation, warranty, guaranty or other information of Sellers or any Person except for those expressly set forth in Article III and (y) no person has been authorized by Sellers, their Affiliates or any other Person on behalf of Sellers to make any representation or warranty relating to the Business, any Transferred Asset or any Assumed Liability in connection with this Agreement, and if made, such representation or warranty shall not be relied upon by Buyer as having been authorized by such entity.  Without limiting the generality of the foregoing, Buyer acknowledges and agrees that neither Sellers, their Affiliates nor any other Person has made any representation or warranty (including as to completeness or accuracy) to Buyer with respect to, and neither Sellers, their Affiliates nor any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or their respective Representatives, or resulting from the omission of, any estimate, projection, prediction, data, financial information, memorandum, presentation or any other materials or information, including any materials or information made available to Buyer and/or its

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

50

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

Representatives in connection with presentations by True Value Parent's management or information made available on any "data sites." Buyer acknowledges that it has conducted, to its satisfaction, its own independent investigation of the condition (financial or otherwise), operations and business of Sellers and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and representations and warranties set forth in <u>Article III</u> and has not relied directly or indirectly on any materials or information made available to Buyer and/or its Representatives by or on behalf of Sellers.  Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## <u>ARTICLE V</u>

## <u>BANKRUPTCY COURT MATTERS</u>

<u>Section 5.1    Debtors-in-Possession</u>.   From the Petition Date through the Closing, Sellers shall operate the Business in accordance with the Revised Budget as debtors-in-possession pursuant to the Bankruptcy Code.

<u>Section 5.2    Sale Motion; Bidding Procedures Order</u>.  Sellers shall use their respective reasonable best efforts to obtain entry by the Bankruptcy Court of (i) the Bidding Procedures Order at the 10:00 am, November 4, 2024 hearing scheduled for that purpose (the "Bidding Procedures Hearing") and (ii) the Sale Order no later than November 12, 2024.  In advance of the Bidding Procedures Hearing, Sellers shall use their respective reasonable best efforts in the Chapter 11 Case to cause the Bidding Procedures Order entered by the Bankruptcy Court at the Bidding Procedures Hearing to require that (i) the Cure Notice be properly served on counterparties to Contracts no later than November 6, 2024, (ii) the Bid Deadline be set for no later than November 8, 2024; (iii) the Sale Objection Deadline be set for no later than November 8, 2024, (iv) the Sale Hearing be set for no later than November 12, 2024; and (v) the Cure Objection Deadline be set for no later than November 18, 2024.  Sellers shall otherwise cause the Bidding Procedures Order entered by the Bankruptcy Court to conform to this Agreement in a manner reasonably satisfactory to Buyer. In the event the entry of the Bidding Procedures Order shall be appealed, Sellers shall use reasonable best efforts to defend such appeal.

<u>Section 5.3    Sale Order</u>.  The Sale Order shall (a) be substantially in the form attached hereto as <u>Exhibit D</u>, with such changes as may be reasonably acceptable to Buyer and Sellers, and (b) among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement and the Ancillary Agreements, (B) the sale of the Transferred Assets to Buyer on the terms and subject to the conditions set forth herein and free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), and (C) the performance by Sellers of their obligations under this Agreement and the Ancillary Agreements; (ii) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and the sale is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code; (iii) authorize Sellers to assume and

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

assign to Buyer the Transferred Contracts, subject to Buyer's payment of the Cure Claims in accordance with <u>Section 2.5</u>; (iv) find that Buyer has provided adequate assurance of future performance (as that term is used in Section 365 of the Bankruptcy Code) in connection with the assumption and assignment of the Transferred Contracts; (v) find that Buyer shall not be deemed to assume or become responsible for any Liability that is not an Assumed Liability; and (vi) find that Buyer did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code.

<u>Section 5.4    Cooperation with Respect to Bankruptcy Court Approvals</u>.  Buyer shall take such actions as are reasonably requested by Sellers to assist in obtaining entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among other things: (a) demonstrating that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

<u>Section 5.5    Bankruptcy Court Filings</u>.  Sellers shall consult with Buyer concerning the Sale Motion, the Bidding Procedures Order, the Sale Order and any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Buyer with proposed drafts of any material applications, pleadings, notices, proposed Orders and other documents to be filed by Sellers in the Chapter 11 Case that relate to this Agreement, the transactions contemplated hereby or Buyer no later than two (2) days prior (or as soon as practicable thereafter) to the making of any such filing or submission to the Bankruptcy Court.  If requested by Buyer, Sellers shall seek entry of appropriate orders from the Bankruptcy Court setting bar dates for the filing of Section 503(b)(9) Claims and Trade Admin Claims, including the Section 503(b)(9) Claims Bar Date, so that the amount of each such claim and the aggregate amount of all such claims can be promptly and accurately determined in the Bankruptcy Case.

## ARTICLE VI

## COVENANTS

<u>Section 6.1    Conduct of Business Prior to the Closing</u>.   From the date of this Agreement until the Closing Date or earlier termination of this Agreement:

(a)    except (1) as otherwise expressly permitted or required by this Agreement, (2) as expressly set forth in <u>Section 6.1</u> of the Disclosure Letter, (3) as required by the Bankruptcy Code or the Bankruptcy Rules as the result of Sellers being subject to the Chapter 11 Case, or otherwise required by Law or any Order, (4) for any limitations on operations or requirements imposed by the Bankruptcy Court, or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing or earlier termination of this Agreement, Sellers shall conduct the Business in the Ordinary Course of Business in all material respects, shall use commercially reasonable efforts to maintain its current business organization, operations and franchise and to

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

52

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business, including (without limiting the generality of the foregoing) using commercially reasonable efforts to:

(i)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Transferred Assets;

(ii)    continue to collect accounts, notes and other receivables in a manner consistent with past practice, without discounting such receivables;

(iii)    maintain the properties and assets included in the Transferred Assets in all material respects in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(iv)    continue in full force and effect without modification all insurance policies, except as required by applicable Law;

(v)    preserve, maintain, defend and protect the Transferred Assets, including Sellers' customer relationships and Contracts between any Seller and its customers, from infringement, interference, or usurpation, which may include seeking entry of an order from the Bankruptcy Court on an expedited basis confirming the applicability of Sections 362(a), 365(e)(1), 365(f)(1), 365(f)(3) and 541(c) of the Bankruptcy Code to Sellers' contractual relationships with its customers and any attempt by Sellers' customers to terminate or breach those relationships, or any attempt by Sellers' competitors to cause Sellers' customers to terminate or breach those relationships;

(vi)    maintain their books and records accurately, in all material respects and in accordance with past practice, including of its Inventory and the value thereof; and

(vii)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Transferred Assets;

(b)    except (1) as otherwise expressly permitted or required by this Agreement, (2) as expressly set forth in Section 6.1 of the Disclosure Letter, (3) as required by the Bankruptcy Code or the Bankruptcy Rules as the result of Sellers being subject to the Chapter 11 Case, or otherwise required by Law or any Order, (4) for any limitations on operations or requirements imposed by the Bankruptcy Court, or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing or earlier termination of this Agreement, Sellers shall not:

(i)    sell, transfer, lease, sublease, encumber or otherwise dispose of any Transferred Assets (other than Transferred IP, which is addressed in Section 6.1(b)(ii) hereof) other than immaterial dispositions thereof and Inventory sold or disposed of in the Ordinary Course of Business;

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

53

(ii)     sell, assign, exclusively license, dispose of, encumber, abandon or allow to lapse any material Transferred IP, other than (A) licenses granted in the Ordinary Course of Business, (B) expiration of Transferred IP in accordance with the applicable statutory term, or (C) abandoning or allowing to lapse Transferred IP that is no longer used or useful in any material respect in the Business, or is otherwise economically not practicable to maintain;

(iii)    acquire any corporation, partnership, limited liability company, other business organization or division thereof related to or affecting the Business or the Transferred Assets;

(iv)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence, except for any mergers or consolidations solely between or among Sellers and their Affiliates upon prior notice to Buyer;

(v)     declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities, other than (A) dividends and distributions by any Seller to any other Seller and (B) dividends or distributions made by any Subsidiary that is not wholly owned, directly or indirectly, by any Seller or by any joint venture of any Seller, in accordance with the requirements of the Organizational Documents of such Seller or such joint venture;

(vi)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business or the Transferred Assets;

(vii)   except with respect to any Employee Benefit Plan or arising out of, relating to or resulting from a Collective Bargaining Agreement, (1) reject, terminate (other than by expiration in accordance with its terms), or amend in any material respect any Transferred Contract or seek Bankruptcy Court approval to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Transferred Contract, including any Transferred Contracts with Sellers' customers;

(viii)  waive in any material respect any term of, or waive any material default under, or release, settle or compromise any material claim by or against or material liability or obligation owing to Sellers under, any Transferred Contract;

(ix)    fail to maintain in full force and effect existing insurance policies;

(x)     subject any of the Transferred Assets to any Encumbrance other than Permitted Pre-Closing Encumbrances;

(xi)    incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness;

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

54

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

(xii)    sell, lease, license, mortgage, sell and leaseback or otherwise subject to any Encumbrance, or otherwise dispose of, any material properties or assets or any material interests with respect to the Business other than (1) in all material respects in the Ordinary Course of Business; (2) pursuant to Contracts in existence on the date of this Agreement; (3) in an amount not to exceed $100,000 in the aggregate; (4) in transactions between or among Sellers and any of their respective Subsidiaries; (5) to secure indebtedness for borrowed money permitted to be incurred under this Section 6.1(b) or pursuant to any lease, sublease or other use or occupancy agreement or arrangement to which Seller or any of its Subsidiaries is party as lessor or sublessor; and (6) Transferred IP (which is addressed in this Section 6.1(b)).

(xiii)    in each case solely with respect to the Offer Employees and except as required by any Collective Bargaining Agreement or any Employee Benefit Plan, (1) make or grant any general or special wage or salary increase (other than standard increases in the Ordinary Course of Business), (2) increase in any material respect the level of benefits under any Employee Benefit Plan, (3) take any action with respect to the grant of any material severance or termination pay (other than pursuant to Employee Benefit Plans in effect on the date of this Agreement), (4) adopt, amend or terminate any material Employee Benefit Plan, other than in the Ordinary Course of Business or as required by Law, and (5) enter into any material employment, consulting or similar agreement or amend any existing material employment agreement; provided, that the foregoing shall not restrict any Seller from entering into or making available, to newly hired Business Employees or to Business Employees in the context of promotions based on job performance or workplace requirements, in each case, in the Ordinary Course of Business, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(xiv)    make (outside the Ordinary Course of Business), change or rescind any material election relating to material Taxes, change any method of Tax accounting in respect of material Taxes, file any materially amended Tax Return in respect of material Taxes, or settle or compromise any Action, investigation, audit or controversy relating to a material amount of Taxes;

(xv)    materially amend or terminate any Contract set forth on Section 2.1(f)(i) of the Disclosure Letter or any Transferred Lease set forth on Section 2.1(b) of the Disclosure Letter;

(xvi)    accelerate the collection of any accounts receivable or other payment (including by offering or promoting discounts or rebates outside of the Ordinary Course of Business); or

(xvii)    agree or commit to any of the foregoing.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

55

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers or the Business prior to the Closing and (ii) prior to the Closing, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and its operations.

Section 6.2    Covenants Regarding Information.

(a)    Subject to the Bidding Procedures Order and applicable Law, from the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable request, Sellers shall afford Buyer and its Representatives reasonable access to the properties, offices, plants and other facilities, books and records (including Tax books and records) of Sellers and the Business, and shall furnish Buyer and its Representatives with such financial, operating and other data and information, and access to all the officers, employees, accountants and other Representatives of Sellers as Buyer may reasonably request in connection with the transactions contemplated by this Agreement. Sellers shall provide Buyer with copies of all financial and other information that Sellers are required to provide to the Prepetition Secured Parties under Section 7 of the Final Cash Collateral Order at the same time that such information is provided to the Prepetition Secured Lenders. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to provide access to or disclose any information to Buyer or its Representatives if (i) such access or disclosure is prohibited pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) such access or disclosure would violate applicable Law, or (iii) such access or disclosure would adversely affect any attorney-client or other legal privilege or contravene any applicable Laws (the "Disclosure Limitations"); provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Sellers after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.

(b)    From the date hereof until the Closing Date or earlier termination of this Agreement, within two (2) Business Days of request, Sellers shall provide Buyer and its Representatives copies of the books and records of Sellers and the Business setting forth the current Inventory, other than Inventory maintained, utilized and held for use in the Sellers' paint manufacturing business, and Inventory Value thereof, and shall furnish Buyer and its Representatives with such other work papers, spreadsheets, schedules, memoranda, and other documents, data and Inventory information as Buyer may reasonably request.

(c)    The information provided pursuant to this Section 6.2 prior to Closing will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Sellers do not make any representation or warranty as to the accuracy of

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

56

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

any information, if any, provided pursuant to this <u>Section 6.2</u>, and Buyer may not rely on the accuracy of any such information.

(d)     From and after the Closing, until the closing of the Chapter 11 Case, Buyer will provide Sellers and their Representatives, at Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of Buyer or the Business, to the books and records (including Tax books and records), including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Chapter 11 Case and the wind down of Sellers' estate (including reconciliation of claims and preparation of Tax Returns or other Tax proceedings and the functions of any trusts established under a Chapter 11 plan of Sellers or any other successors of Sellers), (iii) complying with applicable Laws or (iv) other reasonable business purposes; provided that Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of Buyer, conflict with the Disclosure Limitations; provided, further that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Buyer after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.  Unless otherwise consented to in writing by True Value Parent, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to True Value Parent such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

57

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

Section 6.3    Employee Matters.

(a)    Prior to the Closing, Buyer shall provide to Sellers a list of Business Employees (including each Qualified Leave Recipient to the extent applicable) to which Buyer, in its sole discretion, intends to extend a written offer of employment (each, an "Offer Employee") that, if accepted by a Business Employee, shall become effective immediately after the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment; provided that such Qualified Leave Recipient returns to active status within six (6) months following the Closing Date (or such later date as may be required by applicable Law). Buyer's list of Offer Employees shall include a sufficient number of employees at each Leased Real Property under a Transferred Lease to avoid triggering the WARN Act. Buyer shall make the written offer to Offer Employees at least five (5) Business Days prior to the Closing.  The terms and conditions of such offers of employment shall comply with all applicable Laws and the terms of this Section 6.3, and shall be sufficient to avoid triggering an "employment loss" under the WARN Act.  Each Offer Employee who receives and accepts (or is deemed to have accepted) Buyer's (or an Affiliate of Buyer's) offer of employment and who commences employment with Buyer or an Affiliate thereof on or following the Closing shall be a "Transferred Employee."  Sellers shall terminate, or shall cause to be terminated, on or as soon as practicable prior to the Closing, the employment of all Transferred Employees.  Sellers shall reasonably cooperate with Buyer in effecting the Transferred Employees' transfer of employment from Sellers to Buyer or an Affiliate of Buyer as contemplated hereby.  Buyer shall notify Sellers in a reasonable timeframe with respect to whether each offer of employment to an Offer Employee has been accepted or rejected.  Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Offer Employees will accept an offer of employment or will continue in employment with Buyer following the Closing for any period of time.  Sellers and Buyer intend that the Transferred Employees will have continuous and uninterrupted employment immediately before and immediately after the Closing.  In addition, Buyer shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits to any Business Employee on account of any termination of such Business Employee's employment prior to or at the Closing, and such payments, rights, and/or benefits (if any) shall remain obligations of Sellers.

(b)    Without limiting Section 6.3(i), Sellers shall be solely responsible for complying with the WARN Act and any and all obligations under applicable Laws requiring notice of plant closing, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to the Business Employees as a result of any action by Sellers on or prior to Closing, or following the Closing with respect to any Business Employee who does not become a Transferred Employee.  Following the Closing, Buyer shall be solely responsible for complying with the WARN Act and any and all obligations under applicable Laws requiring notice of plant closing, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Transferred Employees as a result of any action by Buyer following the Closing.

(c)    The Parties shall, and shall cause their respective Affiliates to, mutually cooperate with and provide reasonable assistance to the other in (i) undertaking all reasonably

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

58

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

necessary or legally required provision of information to, or bargaining, consultations, discussions or negotiations with, any Business Employees or any Labor Organization that represents Business Employees affected by the transactions contemplated by this Agreement and (ii) maintaining the employment by Sellers or their Affiliates of those Business Employees who do not become Transferred Employees following the Closing Date and who the Parties agree will provide transition services for the benefit of Buyer or an Affiliate of Buyer pursuant to the Transition Services Agreement (such employees, the "TSA Employees"); provided, that Buyer timely compensates Sellers for any wages, compensation, fees, expenses and other employee Liabilities incurred in connection with the continued employment by Sellers or their Affiliates of the TSA Employees during the period in which such employees provide transition services for the benefit of the Buyer or its Affiliates.

(d)    Buyer shall, and shall cause its Affiliates to, provide each Transferred Employee with credit for such Transferred Employee's service with Sellers or their Affiliates or predecessors prior to the Closing for all purposes, including for purposes of eligibility and determination of level of benefits (including, for purposes of vacation and statutory benefits required by applicable Law but excluding for purposes of equity compensation and benefit accruals under any defined benefit pension plan, any defined contribution retirement plan, or retiree medical plan), under any benefit plan sponsored or maintained by Buyer or any of their Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "Buyer Plan") or as otherwise required by applicable Law or to prevent Termination Pay from becoming payable under applicable Law; provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits.  With respect to each Buyer Plan that is a health or welfare plan, Buyer and its Affiliates shall use commercially reasonable efforts to (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health and (ii) credit each such Transferred Employee with all deductible payments, co-payments and co-insurance paid by such Transferred Employee under any Employee Benefit Plan prior to the Closing during the year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum for such year.

(e)    Effective as of the Closing Date, the Transferred Employees shall cease active participation in the True Value Company Savings & Compensation Deferral Plan (the "Seller 401(k) Plan").  Buyer shall, or shall cause one of its Affiliates to, designate a tax-qualified defined contribution retirement plan that will cover Transferred Employees as of the Closing that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (the "Buyer 401(k) Plan").  Buyer shall cause the Buyer 401(k) Plan to accept from each Seller 401(k) Plan the "direct rollover" of the account balance of each Transferred Employee who participated in the Seller 401(k) Plan prior to the Closing Date and who elects such direct rollover in accordance with the terms of the Seller 401(k) Plan and the Code.

(f)    For so long as the Sellers maintain a group health plan, Sellers shall be solely responsible for any and all obligations arising under COBRA for all (i) Business

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

59

950067.04A -WILSR01A950067.06A-WILSR01A - MSW

Employees and their respective spouses and dependents and (ii) all "M&A qualified beneficiaries" as defined in Treasury Regulation Section 54.4980B-9.

(g)    Without limitation of <u>Section 10.9</u>, nothing express or implied in this <u>Section 6.3</u> or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Employee Benefit Plan, Buyer Plan or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by Buyer, Sellers or their respective Affiliates, as applicable, or (iii) obligate Buyer, Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

(h)    Prior to the Closing, any written or material oral communications proposed to be delivered by Buyer or an Affiliate of Buyer to any Business Employee regarding such employees' level of (or rights with respect to) continued employment or benefits or compensation at or after Closing shall be subject to the prior written approval of True Value Parent, which shall not be unreasonably withheld, conditioned or delayed; <u>provided</u> that in all cases, True Value Parent shall be given no less than three (3) Business Days to review and comment on any such communications.

(i)    The Parties agree to cooperate in good faith to comply in all material respects with preparing and delivering any notices required or potentially required pursuant to the WARN Act in connection with the transactions contemplated by this Agreement. For a period of ninety (90) days after the Closing Date, Buyer shall not, and shall cause its Affiliates not to, engage in any conduct that would result in an employment loss or layoff for a sufficient number of employees of Buyer or an Affiliate of Buyer (including any Transferred Employees) which, if aggregated with any such conduct on the part of Sellers on or prior to the Closing Date, would trigger the WARN Act.

(j)    To the extent any Transferred Employees are foreign nationals working in the United States in non-immigrant status or for whom there are pending or approved I-140 immigrant petitions as of the Closing Date (collectively, the "<u>Visa Employees</u>"), Buyer and its Affiliates, as applicable, shall employ such Visa Employees under terms and conditions such that Buyer or its Affiliate, as applicable, qualify as a "successor employer" under applicable United States immigration laws effective as of the Closing Date, including, but not limited to, 8 U.S.C. section 1184(c)(10).  As of the Closing, Buyer or its Affiliate, as applicable, agrees to assume all immigration-related Liabilities and responsibilities under applicable United States immigration Laws with respect to such Visa Employees incurred after the Closing.

<u>Section 6.4    Consents and Filings; Further Assurances</u>.

(a)    Subject to the terms and conditions of this Agreement, each of the Parties shall, cooperate with each other Party to, promptly (i) take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

60

<span style="color:red">950067.04A-WILSR01A</span>950067.06A-WILSR01A - MSW

Law or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement and the Ancillary Agreements, including taking, or causing to be taken, all actions, and doing, or causing to be done, all things necessary to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from any third-party Person.  Without limiting the generality of the previous sentence, the Parties shall (i) cooperate with each other party hereto to take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, appropriate or desirable to obtain from Governmental Authorities all consents, approvals, clearances, expiration or termination of waiting periods, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) as promptly as practicable, make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act or any other applicable Law, including any other Antitrust Law; (iii) take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to comply at the earliest practicable date with any request under the HSR Act or any other applicable Law, including any other Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Authority in respect of such filings (collectively, an "<u>Antitrust Authority</u>"); (iv) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Antitrust Authorities under any Antitrust Law with respect to any such filing; and (v) take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable.  This <u>Section 6.4(a)</u> does not apply with respect to (x) Taxes or (y) Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by <u>Article V</u>).

(b)        In furtherance of the foregoing <u>Section 6.4(a)</u>, each of the Parties shall promptly notify the other Parties of, and if in writing, furnish the other Parties with copies of (or, in the case of oral communications, advise the others of the contents of) any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority.  No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties and their respective counsel the opportunity to attend and participate at such meeting.  The Parties will coordinate and reasonably cooperate with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination or expiration of any applicable waiting periods, including under the HSR Act, subject to applicable Law.  Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

61

950067.04A WILSR01A950067.06A-WILSR01A - MSW

Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby. This Section 6.4(b) does not apply with respect to (x) Taxes or (y) Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(c)     From time to time, whether at or following the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide Buyer and Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.

(d)     Subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement, take, or cause to be taken, all commercially reasonable actions, and do, or cause to be done, all commercially reasonable things necessary, proper or advisable under applicable Laws to obtain the transfer or reissuance to Buyer of all Environmental Permits necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall take, or cause to be taken, all commercially reasonable actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to (i) respond promptly to any requests for additional information made by such agencies, and (ii) participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits.  Each Party will bear its costs of the preparation and review of any such filing.  Sellers and Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement in connection with any filings to transfer the Environmental Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.  This Section 6.4(d) does not apply with respect to Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

(e)     Buyer agrees to use reasonable best efforts to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable.  Notwithstanding anything else in this Section 6.4, nothing in this Agreement requires Buyer to sell, divest, license, hold separate, or dispose of such assets or businesses of Buyer (or its Subsidiaries or other Affiliates) or the Business, or otherwise take or commit to take actions that limit Buyer's or its Subsidiaries' or Affiliates' freedom of action with respect to, or their ability to retain, any of the businesses, product lines, or assets of Buyer (or its Subsidiaries or other Affiliates) or the Business, or to defend any litigation or administrative proceeding initiated or made by a Governmental Authority under applicable Law.  This Section 6.4(e) does not apply with respect to Bankruptcy Court proceedings (which Bankruptcy Court proceedings are governed by Article V).

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Section 6.5    Wrong Pockets.

(a)    After the Closing: (i) if Sellers or any of their Affiliates receive any amount that is a Transferred Asset or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer in accordance with this Agreement and (ii) if Buyer or any of its Affiliates receive any amount that is an Excluded Asset or is otherwise properly due and owing to Sellers or any of their Affiliates in accordance with the terms of this Agreement, Buyer promptly shall remit, or shall cause to be remitted, such amount to Sellers in accordance with this Agreement.

(b)    In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to Sellers or any of their Affiliates, Sellers shall, and shall cause their controlled Affiliates to, convey, assign or transfer promptly such Transferred Asset to Buyer or its designees in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Transferred Asset to Buyer or its designees in accordance with this Agreement or (ii) any Excluded Asset has been conveyed to or is received by Buyer, then, without any consideration payable to Buyer or any of its Affiliates, Buyer shall convey, assign or transfer promptly such Excluded Asset to Sellers in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Excluded Asset to Sellers or its designees in accordance with this Agreement.

Section 6.6    Public Announcements.  From the date hereof through the Closing Date, neither Buyer, on the one hand, nor Sellers, on the other hand, shall issue any public report, statement, press release or otherwise make any public statement regarding this Agreement or the transactions contemplated hereby, without the prior written consent of Buyer and True Value Parent, unless otherwise required by applicable Law, to obtain approval by the Bankruptcy Court of the transactions contemplated under this Agreement (including pursuant to the Bidding Procedures Order or the Sale Order), or by order of the Bankruptcy Court, in which case such Party shall coordinate and consult with the other Party to the extent not prohibited by applicable Law with respect to the timing, basis, scope and content before issuing any such report, statement or press release.

Section 6.7    Communications with Customers and Suppliers.  Prior to the Closing, Buyer shall not, and shall cause its Affiliates and instruct its Representatives not to, contact, or engage in any discussions or otherwise communicate with, Sellers or their employees, suppliers, vendors, licensors, licensees and other Persons with which Sellers have commercial dealings without obtaining the prior written consent of Sellers (other than any such communication in the ordinary course of business of Buyer or its Affiliates without reference to or any purpose relating to the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Section 6.8    Financing.

(a)    Buyer shall, and shall cause its Affiliates and instruct its Representatives to, use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate the Debt Financing, as the same may be amended in compliance with Section 6.8(b), on the terms and subject only to the conditions set forth in the Debt Commitment Letter or any Alternative Financing (as defined below) (including any "flex" provisions applicable to the Debt Financing), including using (and causing its Affiliates to use), their respective reasonable best efforts to: (i) comply with and maintain in full force and effect the Debt Commitment Letter in accordance with the terms and subject to the conditions thereof, (ii) negotiate, enter into and deliver (and cause its Affiliates to negotiate, enter into and deliver) definitive agreements with respect to the Debt Financing on the terms and conditions set forth in the Debt Commitment Letter (including any "flex" provisions applicable to the Debt Financing), which agreements shall be in effect as promptly as practicable after the date hereof, but in no event later than the Closing (and otherwise keep True Value Parent reasonably informed of the status of its efforts to arrange the Debt Financing), (iii) satisfy, on a timely basis, all conditions to the availability of the Debt Financing to the extent within Buyer's or its Affiliates' control and assist in the satisfaction of all other conditions to the Debt Financing and the definitive agreements entered into with respect to the Debt Commitment Letter, (iv) consummate and cause the Debt Financing Sources to fund the Debt Financing in an amount necessary to satisfy the Funding Obligations at or prior to the Closing and (v) enforce their rights under the Debt Commitment Letter and the definitive agreements related to the Debt Financing.

(b)    Neither Buyer nor its Affiliates shall agree to or permit any amendments, supplements, replacements or other modifications to, obtain any replacement of, or grant any waivers of, any condition, remedy or other provision under the Debt Financing (other than to effect any "flex" provisions set forth in the Debt Commitment Letter) without the prior written consent of True Value Parent if such amendments, supplements, replacements, waivers or modifications would or would reasonably be expected to (i) reduce the aggregate amount of the Debt Financing or the net cash proceeds available from the Debt Financing (including, in each case, by changing the amount of fees or other amounts to be paid (including original issue discount) with respect to the Debt Financing) below an amount necessary to satisfy the Funding Obligations, (ii) impose new or additional conditions or contingencies to the Debt Financing or otherwise expand, amend, waive or modify any of the conditions or contingencies to the Debt Financing or (iii) otherwise expand, amend, waive or modify any provisions of, or remedies under, the Debt Commitment Letter in a manner adverse to Sellers or that otherwise in any such case would or would reasonably be expected to (x) prevent, delay or make less likely the funding of the Debt Financing (or the satisfaction of the conditions to the Debt Financing) at the Closing or impair the ability of Buyer to consummate the transactions contemplated by this Agreement, (y) adversely impact the ability of the Buyer or any of its Affiliates to enforce their respective rights against the Debt Financing Sources or any other parties to the Debt Commitment Letter or the definitive agreements with respect thereto or (z) adversely affect the ability of Buyer to timely obtain the Debt Financing or consummate the transactions contemplated hereby;

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

provided, that subject to compliance with the other provisions of this <u>Section 6.8</u>, Buyer may amend, supplement or otherwise modify the Debt Commitment Letter to add lenders, lead arrangers, syndication agents or other Debt Financing Sources that have not executed the Debt Commitment Letter as of the date hereof (which will not change or waive the terms thereof other than to alter the commitment percentages of the parties thereto in accordance with the parameters set forth in the Debt Commitment Letter as of the date hereof). Buyer shall not permit, release or consent to the withdrawal, termination, repudiation or rescission of the Debt Commitment Letter or any definitive agreement with respect to the Debt Financing and shall not release or consent to the termination of the obligations of any Debt Financing Source under the Debt Financing below an amount necessary to satisfy the Funding Obligations, in each case, without the prior written consent of True Value Parent. For purposes of this Agreement, references to "Debt Financing" shall include the financing contemplated by the Debt Commitment Letter, as hereafter amended, supplemented, replaced or modified, to the extent such amendment, supplementation, replacement or modification is permitted by this <u>Section 6.8(b)</u>, and references to "Debt Commitment Letter," "Debt Financing Sources" or "Debt Financing" shall include such documents, as hereafter amended, modified, supplemented or replaced (or commitments or financing sources, as applicable), to the extent permitted by this <u>Section 6.8(b)</u>. In the event Buyer enters into an amendment, supplement, replacement or modification permitted by this <u>Section 6.8(b)</u>, it shall, prior to the execution and delivery thereof, provide a copy of such amendment, supplement, replacement or modification to True Value Parent for its review and shall, simultaneously with the execution and delivery thereof, provide fully executed copies of such amendment, supplement, replacement or modification to True Value Parent (and, in the case of any amendment, supplement, replacement or modification to any fee letter(s), with such fee letter(s) permitted to be redacted in the same manner contemplated by <u>Section 4.8</u>).

(c)    In the event that (i) all or any portion of the Debt Financing becomes or could reasonably be expected to become unavailable in the manner or from the sources contemplated by the Debt Commitment Letter (including any "flex" provisions applicable thereto), (ii) Buyer becomes aware of any event or circumstance that could reasonably be expected to make the full amounts or any portion of the Debt Financing unavailable on the terms and conditions contemplated in the Debt Commitment Letter or (iii) the Debt Commitment Letter or any definitive agreement with respect to the Debt Financing shall expire or be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, Buyer shall, and shall cause its respective Affiliates to, within two (2) Business Days after the occurrence of such event, notify True Value Parent in writing thereof and promptly after the occurrence of such event, (A) use their respective reasonable best efforts to arrange and obtain alternative financing from the same or alternative financial institutions in an amount sufficient to enable Buyer to consummate the transactions contemplated by this Agreement in accordance with the terms of this Agreement, that does not impose any conditions or contingencies that would be reasonably expected to prevent or delay the Closing or contain any terms that would reasonably be expected to prevent, delay or impair the ability of Buyer to obtain the Debt Financing or consummate the transactions contemplated hereby, as compared to the conditions and other terms set forth in the Debt Commitment Letter as of the date hereof (as amended in accordance with <u>Section 6.8(b)</u>), taking into account any "flex" provisions thereof, as promptly as practicable following the occurrence of such event (the "<u>Alternative Financing</u>") and (B) obtain and deliver a debt

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

commitment letter to Sellers with respect to such Alternative Financing, including true, correct and complete copies of any related executed fee letters, engagement letters and other agreements (provided that such fee letters may be redacted in the same manner as permitted by <u>Section 4.8</u>) (collectively, including all exhibits, schedules, amendments, supplements, modifications and annexes thereto, a "<u>New Debt Commitment Letter</u>").  For purposes of this Agreement, references to "Debt Financing" shall include the financing contemplated by any Alternative Financing and New Debt Commitment Letter to the extent permitted by this <u>Section 6.8(c)</u>, and references to "Debt Commitment Letter," "Debt Financing Sources," or "Debt Financing" shall include such documents (or commitments or financing sources, as applicable) in connection with any Alternative Financing and New Debt Commitment Letter to the extent permitted by this <u>Section 6.8(c)</u>.

(d)    Buyer expressly acknowledges and agrees that (i) neither the availability, the terms nor the obtaining of the Debt Financing or any Alternative Financing, nor the completion of any issuance of securities contemplated by the Debt Financing or any Alternative Financing, is in any manner a condition to the Closing or the obligations of Buyer to consummate the transactions contemplated hereby, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Debt Financing or any Alternative Financing, or the completion of any such issuance and (ii) the failure, for any reason, of Buyer to have sufficient cash available at the Closing to satisfy its Funding Obligations in accordance with this Agreement or the failure to so pay its Funding Obligations in accordance with this Agreement, in each case, shall constitute a breach of this Agreement by Buyer.

(e)    Buyer shall (i) furnish True Value Parent with drafts (prior to execution) and complete, correct and executed copies of each amendment, supplement, replacement, waiver or other modification promptly upon their execution of the Debt Commitment Letter (but, in the case of any fee letter or amendment thereto, subject to the redaction of such fee letter in a manner consistent with <u>Section 4.8</u>), (ii) give Sellers prompt written notice of any (A) breach or default or any event that, with or without notice, lapse of time or both, would (or would reasonably be expected to) give rise to any default or breach by any party to the Debt Commitment Letter of which Buyer becomes aware, including the receipt of any written notice or other written communication from any Debt Financing Source with respect to any breach or default (or alleged breach or default) by any party to the Debt Commitment Letter, (B) material dispute or disagreement between or among any parties to the Debt Commitment Letter or the definitive documents relating to the Debt Financing, (C) withdrawal, repudiation or termination or threatened withdrawal, repudiation or termination thereof of which the Buyer becomes aware or (D) incurable event or circumstance that makes a condition precedent relating to the Debt Financing unable to be satisfied by any party or, in each case, any written notice or other communication with respect to any of the foregoing, (iii) notify Sellers promptly (and in any event within one (1) Business Day) if for any reason Buyer no longer believes in good faith that it will be able to obtain all or any portion of the Debt Financing contemplated by the Debt Commitment Letter on the terms and/or from the sources described therein and (iv) otherwise keep Sellers reasonably and promptly informed of the status of its efforts to arrange and consummate the Debt Financing (including any Alternative Financing).  As soon as reasonably

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

66

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

practicable, but in any event within three (3) Business Days following the date True Value Parent delivers to Buyer a written request, Buyer shall provide any information reasonably requested by True Value Parent in writing relating to any circumstance referred to in the immediately preceding sentence.

Section 6.9    Sellers' Cooperation with Buyer's Efforts under Debt Financing.

(a)    Prior to the Closing Date, Sellers shall use commercially reasonable efforts to (and shall cause their respective Representatives to use commercially reasonable efforts to), at the sole cost and expense of Buyer, reasonably cooperate with and reasonably assist Buyer solely in connection with the arrangement, syndication and consummation of the Debt Financing, including using commercially reasonable efforts to: (i) cause appropriate senior officers of Sellers to participate in a reasonable number of meetings and presentations (or other sessions with the Debt Financing Sources) reasonably required in connection with the Debt Financing, in each case, at mutually agreed times, (ii) to the extent reasonably available to Sellers, provide Buyer with financial statements and historical financial information as it pertains to Sellers as reasonably necessary for Buyer to prepare the pro forma financial statements, in each case solely as required by paragraph 5(a) of Annex B to the Debt Commitment Letter (all such statements and information referred to in this clause (ii), the "Required Information"); (iii) solely with respect to Sellers, facilitate the granting of a security interest (and perfection thereof) in collateral, guarantees or mortgages as may reasonably be requested by Buyer with the effectiveness thereof to be conditioned upon Closing; (iv) ensure that the appropriate officers of Sellers execute prior to the Closing a customary "authorization" letter in connection with bank information memoranda authorizing the distribution of information to prospective lenders; and (v) furnish no later than four (4) Business Days prior to the Closing Date all reasonably requested documentation and other information required by a Governmental Authority in order to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act of 2001, but in each case, solely as relating to Sellers and solely to the extent reasonably requested in writing by Buyer at least nine (9) Business Days prior to the Closing Date.

(b)    Sellers hereby consent to the reasonable use of their logos, names, and trademarks solely in connection with the arrangement and syndication of the Debt Financing; provided, however, that such logos, names and trademarks are used solely in a manner that is not intended to or reasonably likely to harm or disparage Sellers or their reputation or goodwill or any of their respective products, services, offerings or intellectual property rights. Sellers shall use commercially reasonable efforts to promptly supplement the Required Information and all other information provided pursuant to Section 6.9(a) to the extent that any such Required Information or other information, to the Knowledge of Sellers, when taken as a whole, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements made in such Required Information or other information, in light of the circumstances under which they were made, not materially misleading. Such cooperation and assistance contemplated by Section 6.9(a) will only be required during regular business hours, upon reasonable advance notice and in a manner as would not be unreasonably disruptive to the business or operations of Sellers, as applicable, and will only include such matters that would

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

67

950067.04A WILSR01A950067.06A-WILSR01A - MSW

customarily be done in connection with the arrangement and syndication of credit facilities of the same nature as the Debt Financing.  Additionally, such cooperation and assistance contemplated by Section 6.9(a) shall not (A) require any action that would (or would reasonably be expected to): (i) cause any representation or warranty in this Agreement to be breached or (ii) cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement, (B) require Sellers or their respective Representatives to (i) other than with respect to the authorization letter contemplated by Section 6.9(a), execute, deliver, enter into, approve or perform any agreement, commitment, document or instrument, or modification of any agreement, commitment, document or instrument or incur any other actual or potential liability or obligation relating to the Debt Financing, (ii) deliver or cause the delivery of any legal opinions or reliance letters or any certificate as to solvency or any other certificate in connection with the Debt Financing (excluding the customary authorization letter contemplated by Section 6.9(a) (provided that such customary authorization letter (or the bank information memoranda in which such letter is included) shall include language that exculpates Sellers and their respective Representatives and Affiliates from any liability in connection with the unauthorized use by the recipients thereof of the information set forth in any such bank confidential information memoranda or similar memoranda or report distributed in connection therewith)), (iii) adopt any resolutions, execute any consents or otherwise take any corporate or similar action or deliver any certificate, in each case in connection to the Debt Financing or the incurrence of indebtedness thereby or (iv) pay any commitment or other similar fee, incur or reimburse any costs or expenses or incur any liability or obligation of any kind or give any indemnities in connection with the Debt Financing, (C) require Sellers or their respective Affiliates and Representatives to deliver any certificate or take any action pursuant to Section 6.9(a) if doing so could reasonably be expected to result in liability to any Seller or any Affiliate or Representative of any Seller, (D) require Sellers to provide, or cause to be provided, any information the disclosure of which is prohibited or restricted under applicable Law or any binding agreement with a third party or is legally privileged or consists of attorney work product or could reasonably be expected to result in the loss of any attorney-client privilege, (E) require Sellers to take any action that will conflict with or violate its Organizational Documents or any Laws or result in a violation or breach of, or default under, any agreements to which any Seller is a party and/or any Laws, (F) unreasonably interfere with the ongoing operations of Sellers or (G) prepare or deliver any financial statements or other financial data other than the Required Information; it being understood that under no circumstances shall Sellers be required to provide pro forma financial information, projections or other pro forma adjustments.  Neither Sellers nor any of their respective Affiliates or Subsidiaries shall have any liability to Buyer in respect of any financial statements, other financial information or data or other information provided pursuant to this Section 6.9.  All non-public or other confidential information provided by Buyer pursuant to this Section 6.9 shall be kept confidential in accordance with the Confidentiality Agreement.

(c)     Buyer shall be responsible for all fees and expenses related to the Debt Financing contemplated hereby.  Accordingly, notwithstanding anything to the contrary in Section 10.3, Buyer shall promptly reimburse Sellers for all reasonable and documented out-of-pocket costs and expenses (including attorneys' fees) incurred by Sellers in connection with their cooperation pursuant to this Section 6.9 or otherwise in connection with the Debt Financing.  Buyer shall indemnify and hold harmless Sellers and each of their respective Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Representatives from and against any and all losses, damages, claims, penalties, costs and expenses suffered or incurred by any of them in connection with such cooperation and assistance with respect to the Debt Financing or the provision of any information utilized in connection therewith, except to the extent such liabilities, losses, damages, claims or obligations arose out of or resulted from the gross negligence, willful misconduct or fraud of Sellers, as determined in a final, non-appealable judgment of a court of competent jurisdiction. Notwithstanding anything herein to the contrary, the condition set forth in Section 8.3(a)(i), as it applies in respect of Sellers' obligations under this Section 6.9, shall be deemed satisfied unless Sellers have materially breached their obligations under this Section 6.9 and such breach directly resulted in Buyer not being able to obtain the Debt Financing contemplated by the Debt Commitment Letter.

(d)     Buyer acknowledges and agrees that, except as set forth in Section 6.9(a) above, none of Sellers nor their respective Affiliates or Representatives will have any responsibility for any financing that Buyer may raise in connection with the transactions contemplated hereby. Buyer shall ensure that any offering memorandum, bankers' book or other materials prepared by or on behalf of Buyer or its Affiliates or financing sources, in connection with Buyer's financing activities related to the transactions contemplated hereby (collectively, "Offering Materials"), which include any information provided by or on behalf of Sellers or their respective Affiliates or Representatives will include a conspicuous disclaimer to the effect that none of Sellers nor their respective Affiliates or Representatives will have any responsibility for the content of such Offering Materials and disclaim all responsibility therefor and shall further include a disclaimer with respect to Sellers and their respective Affiliates and Representatives in any oral disclosure with respect to such financing, in each case, including any liability in connection with the unauthorized use by the recipients thereof of the information set forth in such document or oral disclosure.

Section 6.10   Transition Services Agreement.  As promptly as practicable following the date of this Agreement, the Parties shall in good faith cooperate, negotiate, prepare and finalize the Transition Services Agreement, substantially on the terms set forth in the Amended and Restated Transition Services Agreement Term Sheet attached hereto as Exhibit H and otherwise in form and substance reasonably acceptable to Buyer and Sellers.  Without limiting the generality of the foregoing, such reasonable cooperation shall include Sellers, during normal business hours and upon at least twenty hour (24) hours' prior notice from Buyer to Sellers, (i) providing reasonable access to information and data in the possession of Sellers related to the transition services that Buyer has identified as needing and (ii) making appropriate, knowledgeable personnel of Sellers or their Affiliates reasonably available to participate in meetings and other discussions, in each case, to the extent any of the foregoing is reasonably requested by the Buyer.  Notwithstanding the foregoing, as part of the consideration of Buyer entering into this Agreement, if Sellers and Buyer do not agree to a Transition Services Agreement to be executed by Sellers and Buyer as of the Closing, the terms and conditions of the Amended and Restated Transition Services Agreement Term Sheet shall be effective as of the Closing as if they were the Transition Services Agreement and shall be legally binding upon both Sellers and Buyer.  However, the Parties will continue in accordance with this Section 6.10 to

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

69

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

finalize and execute the Transition Services Agreement as promptly as possible following the Closing.

Section 6.11   Certain Acknowledgements.  Buyer hereby (i) acknowledges and agrees that Sellers entered into the Settlement with the support and agreement of Buyer and pursuant thereto Sellers will be operating the Business prior to the Closing in accordance with the terms of such Settlement, including the Revised Budget, and (ii) consents to the taking by Sellers of such actions that Sellers determine to be reasonably necessary or desirable in order to operate prior to the Closing in compliance with the terms of such Settlement, including the Revised Budget.  In furtherance of the foregoing, Sellers agree to use their respective reasonable best efforts to implement, as promptly as practicable after ~~October 31~~November 4, 2024, the actions set forth on Section 6.11 of the Disclosure Letter.

Section 6.12   Lender Recovery Shortfall Calculation.  Four (4) Business Days prior to the Closing Target Date, Sellers shall deliver to Buyer and the Administrative Agent (on behalf of the Prepetition Secured Parties) a statement (the "Estimated Lender Recovery Statement") setting forth Sellers' good faith estimate of the projected Lender Recovery as of the Closing Target Date and based thereon the amount, if any, by which the estimated Lender Recovery as of the Closing Target Date is projected to be less than the Lender Recovery Floor Amount (a "Lender Recovery Shortfall"). Such Estimated Lender Recovery Statement shall be prepared in accordance with GAAP, consistently applied, and shall be calculated based upon the books and records of Sellers and the Business and such other work papers, spreadsheets, schedules, memoranda, documents, data and information as Sellers reasonably deem relevant and appropriate.  In the event of a Lender Recovery Shortfall as of the Closing equal to or less than the Lender Recovery Shortfall Backstop, (i) the Cash Consideration pursuant to Section 2.6(a) shall be increased by an amount equal to such Lender Recovery Shortfall and (ii) the Assumed Payables Cap pursuant to Section 2.3(d) shall be decreased by an amount equal to such Lender Recovery Shortfall.  In the event of a Lender Recovery Shortfall as of the Closing in excess of the Lender Recovery Shortfall Backstop, Buyer and Sellers shall cooperate in good faith and use their respective reasonable best efforts to reach a mutually agreeable amendment to this Agreement or other resolution to their mutual satisfaction and to the satisfaction of the Administrative Agent (on behalf of the Prepetition Secured Parties) as a result of such Lender Recovery Shortfall on or before the Closing Target Date. For the avoidance of doubt, Buyer and Sellers shall continue to collaborate in the preparation of the Estimated Lender Recovery Statement until the Closing Target Date and shall continue to update such Estimated Lender Recovery Statement based on current information through the Closing.

Section 6.13   Assumed Payables Reconciliation. Four (4) Business Days prior to the Closing Target Date, Sellers shall deliver to Buyer a statement (the "Estimated Assumed Payables Statement") setting forth Sellers' good faith estimate of (i) the face amount of Section 503(b)(9) Claims outstanding as of the Petition Date and (ii) the face amount of Trade Admin Claims projected to be outstanding as of the Closing Target Date.  Following the Closing, and during the 45-day period following the later of the Section 503(b)(9) Claims Bar Date and the Administrative Claims Bar Date (such period, the "Assumed Payables Reconciliation Period"), (x) Sellers shall, in consultation with Buyer, use commercially reasonable efforts to review,

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

analyze and reconcile against the Debtors' books and records, including the Estimated Assumed Payables Statement, each Section 503(b)(9) Claim properly scheduled or submitted on or prior to the Section 503(b)(9) Bar Date and each Trade Admin Claim properly scheduled or submitted on or before the Administrative Claims Bar Date; and (y) Buyer shall, in consultation with Sellers, accept or negotiate with the applicable counterparty with respect to each reconciled Section 503(b)(9) Claim and Trade Admin Claim.  Sellers and Buyer shall work collaboratively and in good faith to complete the claim reconciliation, negotiation and acceptance process during the Assumed Payables Reconciliation Period.  For the avoidance of doubt, Sellers and Buyer shall not be required to pay or otherwise discharge any such Assumed Payables during the Assumed Payables Reconciliation Period. Following the Assumed Payables Reconciliation Period, in furtherance of Section 2.3(d) hereof, Buyer shall assume and pay the Assumed Payables as follows:

(a)    subject to subsection (c) below, Buyer shall assume all reconciled Section 503(b)(9) Claims, subject to the Assumed Payables Cap, as may be reduced in accordance with Section 2.3(d);

(b)    if the aggregate face amount of reconciled Section 503(b)(9) Claims is less than the Assumed Payables Cap, then Buyer shall assume Trade Admin Claims in an aggregate face amount equal to the lesser of (i)(x) the Assumed Payables Cap *minus* (y) the total amount of reconciled Section 503(b)(9) Claims assumed by Buyer and (ii) the total face amount of reconciled Trade Admin Claims; and

(c)    >if the aggregate face amount of <reconciled Section 503(b)(9) Claims and Trade Admin Claims is greater than the Assumed Payables Cap, then >Buyer shall be entitled to select which of the Section 503(b)(9) Claims and <Trade Admin Claims Buyer will assume and pay to equal the Assumed Payables Cap.

## ARTICLE VII

## TAX MATTERS

Section 7.1    Transfer Taxes.   The Sale Order shall provide that the transactions contemplated by this Agreement and the Ancillary Agreements are and shall be exempt from any and all property transfer, stock transfer, real estate transfer, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable solely as a result of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") to the extent permitted pursuant to Section 1146(a) of the Bankruptcy Code.

Section 7.2    Tax Cooperation.   Buyer and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, the filing of any Tax Return, the making of any election relating to

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

71

Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this <u>Section 7.2</u> shall be borne by the Party requesting it.

## <u>ARTICLE VIII</u>

## <u>CONDITIONS TO CLOSING</u>

Section 8.1    <u>General Conditions</u>.  The respective obligations of Buyer and Sellers to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (provided that such waiver shall only be effective as to the obligations of such Party):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "<u>Legal Restraint</u>").

(b)    Any waiting period (and any extension thereof) under the HSR Act or any other Antitrust Law applicable to the transactions contemplated by this Agreement shall have expired or shall have been terminated or the necessary clearance thereunder shall have been received.

(c)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed or modified in a manner materially adverse to Sellers absent consent of Sellers or to the Buyer absent consent of Buyer.

Section 8.2    <u>Conditions to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by True Value Parent in its sole discretion:

(a)    The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b)    Buyer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

72

(c)       Sellers shall have received the documents listed in <u>Section 2.8(c)</u>.

(d)       No Lender Recovery Shortfall in excess of the Lender Recovery Shortfall Backstop shall exist, it being understood that this condition shall be deemed satisfied if the Parties reach a mutually agreeable amendment to this Agreement or other resolution to their mutual satisfaction and with the approval of the Administrative Agent (on behalf of the Prepetition Secured Parties). Notwithstanding anything to the contrary set forth in this Agreement, this <u>Section 8.2(d)</u> may be waived only by a written instrument executed and delivered by a duly authorized officer of each of Buyer, Sellers and the Administrative Agent (on behalf of the Prepetition Secured Parties).

<u>Section 8.3</u>      <u>Conditions to Obligations of Buyer</u>.    The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a)       <u>Representations and Warranties</u>.

(i)       The representations and warranties of Sellers contained in this Agreement, other than the Fundamental Representations of Sellers, shall be true and correct as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), except where the failure of such representations and warranties to be true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers set forth therein) would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(ii)       The Fundamental Representations of Sellers contained in this Agreement shall be true and correct in all but *de minimis* respects (other than those Fundamental Representations of Sellers that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b)       Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them at or prior to the Closing.

(c)       From the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(d)       Buyer shall have received the documents listed in <u>Section 2.8(b)</u>.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

73

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

## **ARTICLE IX**

## **TERMINATION**

Section 9.1     Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written consent of Buyer and True Value Parent;

(b)     by either True Value Parent or Buyer, if:

(i)     a Legal Restraint is in effect that has become final and nonappealable; provided that no Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such Legal Restraint may terminate this Agreement pursuant to this Section 9.1(b)(i);

(ii)     Sellers enter into a definitive agreement with respect to or consummate an Alternative Transaction; or

(iii)     In the event that on the Closing Target Date a Lender Recovery Shortfall in excess of the Lender Recovery Shortfall Backstop exists and Buyer and Sellers and the Administrative Agent (on behalf of the Prepetition Secured Parties) fail to reach a mutually agreeable amendment to this Agreement or other resolution to their mutual satisfaction as the result of such Lender Recovery Shortfall, if any, on or prior to the Closing Target Date; provided, that no Party shall be entitled to terminate the Agreement pursuant to this Section 9.1(b)(iii) if the failure to reach a mutually agreeable amendment to this Agreement or other resolution is caused by such Party's breach of its obligations under Section 6.12.  For the avoidance of doubt, if the termination right pursuant to this Section 9.1(b)(iii) becomes exercisable, Sellers shall exercise such termination right only if requested to do so in writing by the Administrative Agent (on behalf of the Prepetition Secured Parties).

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

74

950067.04A WILSR01A950067.06A-WILSR01A - MSW

(c)     by Buyer, if:

(i)     at any time, if Sellers shall have breached or violated any of their respective representations, warranties or covenants set forth in this Agreement or in any certificate delivered by Sellers in connection herewith in a manner that would prevent the satisfaction of the conditions to Closing set forth in <u>Section 8.3(a)</u> or <u>Section 8.3(a)(i)</u>, and (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in <u>Section 2.8</u>, in which case such two (2) Business Day period shall apply) such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by Buyer to Sellers; <u>provided</u> that Buyer shall not be entitled to terminate the Agreement pursuant to this <u>Section 9.1(c)(i)</u> if the failure of the Closing to be consummated by such date is caused by Buyer's breach of any of its obligations under this Agreement;

(ii)     any of the conditions set forth in <u>Section 8.1</u> or <u>Section 8.3</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by December 16, 2024 (the "<u>Outside Date</u>"), unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; <u>provided</u>, however, <u>that if</u> the sole reason that the transactions contemplated hereby to occur at the Closing have not been consummated on or before the Outside Date is that the required approval from any Governmental Authority, the consent of which is required as a condition to the consummation of the transactions contemplated hereby, has not been obtained, then the Outside Date shall be extended to December 31, 2024;

(iii)     the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; or

(iv)     Sellers withdraw or seek authority to withdraw the Sale Motion.

(d)     by True Value Parent:

(i)     at any time, if (x) Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement or in any certificate delivered by Sellers in connection herewith in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u>, or (y) Buyer shall have materially breached the Bidding Procedures Order or the Sale Order, and in each case (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in <u>Section 2.8</u>, in which case such two (2) Business Day period shall apply), such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by True Value Parent to Buyer, provided that True Value Parent shall not be entitled to terminate the Agreement pursuant to this <u>Section 9.1(d)(i)</u> if the failure of the

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Closing to be consummated by such date is caused by any Seller's breach of any of its obligations under this Agreement; or

(ii)     if the Board of Directors of True Value Parent determines in the exercise of its sole authority that proceeding with the transactions contemplated by this Agreement would be inconsistent with its fiduciary duties.

The Party seeking to terminate this Agreement pursuant to this Section 9.1 (other than Section 9.1(a)) shall, if such Party is True Value Parent, give prompt written notice of such termination to Buyer, and if such Party is Buyer, give prompt written notice of such termination to True Value Parent.

Section 9.2     Effect of Termination.

(a)     In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of Section 6.6 (Public Announcements), Section 10.3 (Fees and Expenses), Section 10.6 (Notices), Section 10.9 (Parties in Interest), Section 10.10 (Governing Law), Section 10.11 (Submission to Jurisdiction) and this Article IX, each of which shall survive such termination and remain enforceable in accordance with their respective terms, and (ii) that no such termination shall relieve any Party from liability for any willful breach of this Agreement arising prior to the date of termination.  Further, the Confidentiality Agreement shall survive the termination of this Agreement.

(b)     In consideration of Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and to compensate Buyer as a stalking-horse bidder, (i) if this Agreement is terminated pursuant to Section 9.1(b)(ii), then True Value Parent shall pay to Buyer the Break-Up Fee and Expense Reimbursement Amount at the closing of such Alternative Transaction by wire transfer of immediately available funds; and (ii) if this Agreement is terminated pursuant to Section 9.1(c)(i), Section 9.1(c)(iv) or Section 9.1(d)(ii)~~Section 9.1(d)(ii)~~, then True Value Parent shall pay to Buyer the Expense Reimbursement Amount by wire transfer of immediately available funds within three (3) Business Days following such termination.  The Bidding Procedures Order shall provide that the Expense Reimbursement Amount and Break-Up Fee shall constitute an allowed administrative expense claim against Sellers under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code.

(c)     Notwithstanding anything to the contrary in this Agreement, Buyer shall not be entitled to receive the Break-Up Fee or Expense Reimbursement Amount if Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in Section 8.2(a) or Section 8.2(b), as the case may be.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

(d)    Notwithstanding Section 9.2(b), Buyer's right to receive the one-time payment of the Break-Up Fee and/or the Expense Reimbursement Amount from True Value Parent as provided in Section 9.2(b) shall be the sole and exclusive remedy available to Buyer against Sellers or any of its former, current or future equityholders, directors, officers, Affiliates, agents or Representatives with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to Section 9.1(b)(ii), Section 9.1(c)(i), Section 9.1(c)(iv) or Section 9.1(d)(ii)Section 9.1(d)(ii)  and upon such payment of the Break-Up Fee and/or the Expense Reimbursement Amount none of Sellers or any of their respective former, current or future equityholders, directors, officers, Affiliates, agents or Representatives shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.  The parties acknowledge and agree that in no event shall True Value Parent be required to pay the Break-Up Fee and the Expense Reimbursement Amount on more than one occasion.

Section 9.3    Alternative Transactions.  Notwithstanding anything in this Agreement to the contrary, Sellers may participate in discussions or negotiations with, or furnish information with respect to Sellers or the Business to, any Person. Upon receipt of any proposal for an Alternative Transaction, True Value Parent shall give prompt written notice to Buyer of such proposal, including a summary of the material terms thereof.

**ARTICLE X**

**GENERAL PROVISIONS**

Section 10.1    Nonsurvival of Representations, Warranties and Covenants.  The respective representations, warranties and covenants of Sellers and Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing.

Section 10.2    Bulk Sales.  Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer.

Section 10.3    Fees and Expenses.  All fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 10.4    Amendment and Modification.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

77

950067.04A - WILSR01A950067.06A-WILSR01A - MSW

an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.5  Waiver.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.6  Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a nationally recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i)      if to Sellers, to:

True Value Company
8600 West Bryn Mawr Avenue
Chicago, IL 60631
Attention: Chris Kempa
Email: Chris.Kempa@TrueValue.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attention:
        Steven J. Daniels
        Ron E. Meisler
Email:
        Steven.Daniels@skadden.com
        Ron.Meisler@skadden.com

(ii)     if to Buyer, to:

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Do it Best Corp.
1626 Broadway, Suite 100
Fort Wayne, Indiana 46802
Attention: Daniel B. Starr
Email: dan.starr@doitbest.com

with copies (which shall not constitute notice) to:

Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Attention: Zachary E. Klutz and W. Timothy Miller
Email: zklutz@taftlaw.com; miller@taftlaw.com

Section 10.7   Interpretation.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  References to days mean calendar days unless otherwise specified.

Section 10.8   Entire Agreement.  This Agreement and the Ancillary Agreements, Confidentiality Agreement and Disclosure Letter (including the Exhibits and Schedules hereto and thereto) constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings among the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

79

Section 10.9   Parties in Interest.  Except as specifically set forth in Section 10.12 and Section 10.20, this Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including Business Employees and other employees) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.10  Governing Law.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

Section 10.11  Submission to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Chapter 11 Case is closed or the Bankruptcy Court declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in the Court of Chancery of the State of Delaware, or if jurisdiction is not available in the Court of Chancery, then in the United States District Court for the District of Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts of the State of Delaware, and of the United States District Court for the District of Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

80

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

Section 10.12  Assignment; Successors.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by Sellers without the prior written consent of Buyer, and by Buyer without the prior written consent of True Value Parent, and any such assignment without such prior written consent shall be null and void.  Notwithstanding the foregoing, subject to the terms of Section 2.10, Buyer may assign any of its rights under this Agreement to any Designated Buyer without obtaining the prior written consent of True Value Parent; provided that in connection with such assignment, such assignment shall not relieve Buyer of any of its obligations under this Agreement.  Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.13  Specific Performance.  Each Party acknowledges and agrees that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such Party and that any such breach would cause Buyer, on the one hand, and Sellers, on the other hand, irreparable harm.  Accordingly, each Party also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such Party, Buyer, on the one hand, and Sellers, on the other hand, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.  Any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.  Sellers, on the one hand, and Buyer, on the other hand, hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by Sellers or Buyer, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of Sellers or Buyer, as applicable, under this Agreement.

Section 10.14  Currency.  All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 10.15  Severability.  If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement, or the remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any such term or other provision, or any portion thereof, is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are consummated to the fullest extent possible.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

81

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

Section 10.16 Waiver of Jury Trial.    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.16.

Section 10.17 Counterparts.    This Agreement may be executed in any number of counterparts, including by means of email in portable document format (.pdf) or other electronic means, each of which when executed shall be deemed to be an original copy of this Agreement and all of which taken together shall constitute one and the same agreement. Any electronic signatures shall have the same legal effect as physically delivered manual signatures.

Section 10.18  Jointly Drafted.  This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.  The Parties acknowledge and agree that prior drafts of this Agreement and the other agreements and documents contemplated hereby will not be deemed to provide any evidence as to the meaning of any provision hereof or the intent of the Parties with respect hereto and that such drafts will be deemed to be the joint work product of the Parties.

Section 10.19 Limitation on Damages.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL BUYER, SELLERS OR ANY SELLER NON-RECOURSE PERSON BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE SPECIAL, OR EXEMPLARY DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES AS A RESULT OF SUCH PARTY'S BREACH OF THIS AGREEMENT, EXCEPT TO THE EXTENT ARISING FROM THE FRAUD OF SUCH PARTY.

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

Section 10.20  No Recourse.

(a)     This Agreement may be enforced only by True Value Parent against, and any claim, action, suit, or other legal proceeding by Sellers in connection with this Agreement may be brought only against Buyer, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  Neither any Seller nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, direct or indirect stockholder, Affiliate, agent, Advisor, Representative or investor of Buyer or of any Affiliate of Buyer or any of their successors or permitted assigns (each, a "Buyer Non-Recourse Person"), and no such Buyer Non-Recourse Person shall have any liability for any obligations or liabilities of Buyer under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

(b)     This Agreement may be enforced only by Buyer against, and any claim, action, suit, or other legal proceeding by Buyer in connection with this Agreement may be brought only against, Sellers, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  None of Buyer, any Designated Buyer, nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, direct or indirect stockholder, Affiliate, agent, Advisor, Representative or investor of Sellers or of any Affiliate of Sellers or any of their successors or permitted assigns (each, a "Seller Non-Recourse Person"), and no Seller Non-Recourse Person shall have any liability for any obligations or liabilities of Sellers under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

Section 10.21  Time of Essence; Calculation of Dates.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Section 10.22  Debt Financing.   Notwithstanding anything in this Agreement to the contrary, each party on behalf of itself, each its Subsidiaries, each of its Affiliates and each of their respective Representatives hereby: (a) agrees that any action, suit or proceeding of any kind or description, whether in contract or in tort or otherwise, involving any Debt Financing Source, arising out of or relating to this Agreement, the Debt Commitment Letter or the Debt Financing or any of the agreements entered into in connection with the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each party hereto irrevocably submits itself and its property with respect to any such action, suit or proceeding to the exclusive jurisdiction of such

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

court; (b) agrees that any such action, suit or proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in the Debt Commitment Letter or other applicable definitive document agreement relating to the Debt Financing; (c) agrees not to bring or support or permit any of its Subsidiaries, Affiliates or Representatives to bring or support any action, suit or proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York; (d) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such action, suit or proceeding in any such court; (e) agrees that the waiver of rights to trial by jury set forth in Section 10.16 applies in any such action, suit or proceeding brought against any Debt Financing Source in any way arising out of or relating to this Agreement, the Debt Financing Commitment, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder; (f) agrees that none of the Debt Financing Sources will have any liability to any Seller or any of their respective Subsidiaries, Affiliates or Representatives relating to or arising out of this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise (provided that nothing in this Section 10.22 shall limit the liability or obligations of the Debt Financing Sources to Buyer under the Debt Commitment Letter) (and, in furtherance of the foregoing, agrees, subject to the immediately succeeding sentence, not to commence (and if commenced agrees to have dismissed or otherwise terminated) any action or proceeding against any Debt Financing Source in connection with this Agreement, the Debt Commitment Letter, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder); (g) neither any Seller nor any of their respective Subsidiaries, Affiliates or Representatives shall be entitled to seek specific performance of any rights of Buyer to cause the Debt Financing to be funded; (h) agrees that Buyer may without the prior written consent of any Seller assign or transfer any or all of its rights and interests hereunder to any Debt Financing Source (so long as any such assignment does not relieve Buyer of its obligations hereunder) under terms of the Debt Financing solely for the purpose of creating a security interest herein or otherwise assigning with respect to the Debt Financing; (i) agrees that the Debt Financing Sources are express third-party beneficiaries of, and may enforce any of the provisions of, this Section 10.22; and (j) agrees that the provisions of this Section 10.22 and the definition of "Debt Financing Sources" shall not be directly or indirectly amended, modified or supplemented in any way adverse to the Debt Financing Sources without the prior written consent of the Debt Financing Sources party to the Debt Commitment Letter or definitive documentation related to the Debt Financing (such consent not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, nothing in this Section 10.22 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Commitment Letter or Buyer under the definitive agreements governing the Debt Financing. This Section 10.22 shall, with respect to the matters referenced herein,

Redline Project Stud - A&R Asset Purchase Agreement and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

supersede any provision of this Agreement to the contrary.  The provisions of this Section 10.22 will survive any termination of this Agreement.  For purposes of this Section 10.22, "Debt Financing Sources" shall include the Debt Financing Sources, their respective Affiliates, and their and their Affiliates' respective Representatives and their respective successors and permitted assigns.

[*The remainder of this page is intentionally left blank.*]

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

85

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**SELLERS:**

**TRUE VALUE COMPANY L.L.C.**

By: _____
    Name: Chris             Kempa
    Title:  Chief Executive Officer

**TV HOLDCO II, L.L.C.**

By: _____
    Name: Chris             Kempa
    Title:  President

**TV TSLC, L.L.C.**

By: _____
    Name: William        McGann
    Title:  President

**TV GPMC, L.L.C.**

By: _____
    Name: William        McGann
    Title:  President

**TRUE VALUE RETAIL, L.L.C.**

By: _____
    Name: William        McGann
    Title:  Vice President

**TRUEVALUE.COM COMPANY, L.L.C.**

By: _____
     Name:  William             McGann
     Title:   President

**TRUE VALUE VIRGINIA, L.L.C.**

By: _____
     Name:  William             McGann
     Title:   President

**DISTRIBUTORS HARDWARE, L.L.C.**

By: _____
     Name:  William             McGann
     Title:   Vice President

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

**BUYER:**

**DO IT BEST CORP.**

By: _____
    Name: Daniel      B.     Starr
    Title:  President & CEO

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

**Exhibit A**

**[RESERVED]**

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

**Exhibit B**

**[RESERVED]**

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

**Exhibit C**

**Escrow Agreement**

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

**Exhibit D**

**Form of Sale Order**

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

**Exhibit E**

**Form of Bill of Sale and Assignment and Assumption Agreement**

**Exhibit F**

**Form of Lease Assignment and Assumption Agreement**

**Exhibit G**

**Form of IP Assignment Agreement**

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

**Exhibit H**

**<u>Amended and Restated </u>Transition Services Agreement Term Sheet</u>**

Redline Project Stud - A&R Asset Purchase Agreement  and Project Stud - A&R Asset Purchase Agreement 950067v6A 11/10/2024 8:43:03 PM

950067.04A-WILSR01A950067.06A-WILSR01A - MSW

| Summary report: Litera Compare for Word 11.7.0.54 Document comparison done on 11/10/2024 8:43:03 PM | |
|---|---|
| **Style name:** JSaathof | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Project Stud - A&R Asset Purchase Agreement.DOC | |
| **Description:** 6A | |
| **Modified DMS:** dm://WILSR01A/950067/6A | |
| **Changes:** | |
| Add | 121 |
| Delete | 97 |
| Move From | 3 |
| Move To | 3 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 9 |
| **Total Changes:** | 233 |