# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*<br><br>**TRUE VALUE COMPANY, L.L.C.** *et al.,*<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 24-12337 (KBO)**<br><br>**(Jointly Administered)**<br><br>Related Docket Nos. 12, 297, 299 |

## DECLARATION OF NICK WEBER
## IN SUPPORT OF ENTRY OF THE SALE ORDER

Pursuant to 28 U.S.C § 1746, I, Nick Weber, declare as follows:

1.    My name is Nick Weber. I am over the age of 18 and have personal knowledge of the matters discussed in this declaration (this "Declaration").

2.    I am a Director of M3 Advisory Partners, LP ("M3"), proposed restructuring advisor to True Value Company, L.L.C. ("TVC") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "True Value" and, together with their non-Debtor affiliates, the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I have worked directly alongside Kunal Kamlani, the Debtors' Chief Transformation Officer, advising the Debtors since M3 was retained on July 29, 2024.

3.    I make this Declaration in support of the *Motion of Debtors for Entry of an Order (i) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (ii) Approving the Sale of Substantially All of the Debtors' Assets, and (iii) Granting Related Relief* [Docket No. 12] (the "Motion") and the proposed *Order (a) Approving Sale of Substantially All of Debtors'*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

*Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (b) Authorizing Debtors to Enter Into and Perform Under Asset Purchase Agreement, (c) Approving Assumption and Assignment of Certain Executory Contracts, and (d) Granting Related Relief* to be filed in advance of the Sale Hearing (the "Sale Order").[2]

4.     I have more than eight years of experience advising clients on restructurings and performance improvement engagements across a number of industries in my current role at M3 and in my prior role working in BDO USA LLP's Business Restructuring Services group.

5.     I have served as an advisor to companies and creditors in numerous restructuring transactions, including Sears, Barneys, Tailored Brands, Neiman Marcus, JC Penney, Guitar Center, Paper Source, and Express.

6.     I earned a bachelor's degree from Franklin & Marshall College.

## Background

7.     On October 14, 2024, following an extensive pre-petition marketing process, the Debtors commenced the Chapter 11 Cases to implement a value-maximizing going concern sale of their business to Do it Best Corp. ("Do it Best") pursuant to the asset purchase agreement between the Debtors and Do it Best (as amended from time to time, the "APA"), or to another buyer who submits a higher or otherwise better offer.

8.     Pursuant to the APA, Do it Best agreed to, among other things, pay $153 million in cash consideration and assume up to $45 million of the face amount of Bankruptcy Code section 503(b)(9) administrative expense claims and merchandise payables entitled to administrative priority status, in addition to other assumed liabilities, including cure and certain

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Cash Collateral Resolution Term Sheet attached as Exhibit 1 to the *Final Order (i)(a) Authorizing Debtors to Use Cash Collateral; (b) Granting Adequate Protection to Prepetition Lenders; and (c) Modifying the Automatic Stay; and (ii) Granting Related Relief* [Docket No. 296] (the "Cash Collateral Resolution Term Sheet").

employee obligations. Do it Best has also agreed to reimburse the Debtors at the closing of the Sale for certain deposits and prepaid expenses that will benefit Do it Best or otherwise relate to periods following the closing.

9.      The Debtors and Do it Best have entered into a binding Transition Services Agreement Term Sheet (as amended, the "TSA Term Sheet"), which, among other things, addresses post-closing administrative expenses to be covered by Do it Best. Pursuant to the APA, the Debtors and Do it Best have agreed to work in good faith to enter into a definitive transition services agreement substantially on the terms set forth in the TSA Term Sheet. As used in this Declaration, "Transition Services Agreement" refers to the TSA Term Sheet or, once executed and binding, the definitive executed transition services agreement.[3]

10.      In connection with the Debtors' negotiations with their lenders regarding the consensual use of cash collateral, the Debtors, the Prepetition Secured Parties and the Creditors' Committee agreed to the terms of the Cash Collateral Resolution Term Sheet, including the Budget contemplated thereby. In connection with the resolution, I understand that the parties agreed that as a condition to the closing of the Sale, the Prepetition Secured Parties would receive a $163 million Required Paydown Amount. Do it Best also agreed to backstop an up to $10 million shortfall of the Required Paydown Amount at the closing of the Sale.

### The Budget

11.      My team at M3 and I developed the Budget in close collaboration with the Debtors' finance team. The Budget takes into account historical financial data, recent business trends and the anticipated performance of the Debtors' business. It assumes the sale to Do it Best

---

[3]      To the extent that a definitive transition services agreement is not entered into between the Debtors and Do it Best as of the closing of the Sale, the TSA Term Sheet will be effective as of the closing of the Sale as if it were the definitive transition services agreement and will be legally binding on the Debtors and Do it Best.

contemplated by the APA will close on November 22, 2024. Based on my knowledge of the Debtors' business and my experience with operational budgets, I believe that the Budget relies on reasonable methodologies and represents a good faith estimate of the Debtors' funding sources as well as expenses, including administrative expense claims incurred before (and, in certain instances, after) the closing of the Sale. In addition, I believe that the Budget demonstrates that the Debtors or their successors are reasonably expected to have sufficient cash following the closing of the Sale to satisfy outstanding administrative expense claims that are not otherwise expected to be paid or assumed by Do it Best, including pursuant to the Transition Services Agreement.

**I.      Sources**

12.     The Budget assumes and reflects that administrative expense claims will be satisfied through four key funding sources: (i) operating cash receipts, (ii) the $153 million cash purchase price for the Debtors' assets under the APA, (iii) the assumption by Do it Best of various liabilities, including up to $45 million of administrative expense liabilities arising from 503(b)(9) claims and merchandise payables entitled to administrative priority status, as required under the APA and (iv) the agreement of Do it Best to pay the expenses associated with the Debtors' provision of transition services under the TSA Term Sheet and, if applicable, the Transition Services Agreement.

13.     In developing the Budget, M3 relied on estimates of operating cash receipts. My team worked closely with the Debtors' treasury team to determine anticipated timing of collections of existing customer accounts receivable—the primary driver of operating cash receipts. As part of this process, we analyzed historical customer payment schedules, comparing the timing of customer payments relative to invoice due dates to develop a formula that could be applied to existing customer accounts receivable to derive the numbers reflected in the Budget. I believe using this methodology to project cash receipts is reasonable under the circumstances and has

proven to be accurate. In the 15 weeks since M3 was initially hired, our forecasts of receipts have been in line with actual results. And, as noted below, to date, actual cash receipts have exceeded our projections.

**II.      Uses**

14.      The Budget contemplates the payment of operating expenses and certain chapter 11 costs and the funding of various reserves to satisfy administrative expense claims, some of which may require a multi-month reconciliation period.

(a)      <u>Operating Expenses</u>

15.      Operating expenses are separated into two groups: merchandise operating disbursements and non-merchandise operating disbursements. Merchandise operating disbursements generally include payments made to vendors for the purchase of inventory. The payments are tied to the expected delivery date of goods ordered by the Debtors and the terms governing the purchase. My team and the Debtors' merchandising team worked closely together to determine upcoming merchandise operating disbursements. Non-merchandise operating disbursements cover, among other things, taxes, real estate costs, logistics expense and payments to information technology providers. In determining these amounts, we referenced historical spending data and applied certain adjustments to reflect anticipated deviations from historical trends, as reasonably necessary. Our non-merchandise operating disbursement forecast methodology was reviewed by the applicable members of the Debtors' senior leadership team responsible for each function.

(b)      <u>Chapter 11 Costs</u>

16.      The Budget also contemplates the payment of (or assumption of, as applicable) various chapter 11 related costs, including payment of (or Do it Best's assumption of) Bankruptcy Code section 503(b)(9) administrative expense claims, payments made under the Debtors' "first-

day" motions and payment of U.S. Trustee fees. To estimate 503(b)(9) claims, M3 relied on the Debtors' books and records showing goods delivered to the Debtors in the 20 days leading to the chapter 11 filing. For payments anticipated to be made under the Debtors' first-day motions, M3 worked closely with the Debtors and the Debtors' other advisors to determine amounts expected to be paid in connection with the first-day relief authorized by the Court. Professional fees were estimated based on input from the respective professionals. Accordingly, I believe that the Budget adequately accounts for chapter 11 costs described above that will be assumed, paid or reserved for in connection with the closing of the Sale.

      (c)    <u>Employee Claims</u>

      17.    The Budget also takes into account employee-related payments that will be reconciled and paid following the closing of the Sale. These include employee benefit obligations and other employee claims such as incurred but not reported medical claims, paid time off and certain severance amounts. As described below, the Cash Collateral Resolution Term Sheet contemplates the establishment of reserves to be funded within two business days following the closing of the Sale to satisfy these claims. We worked in close collaboration with the Debtors' human resources team and the Debtors' legal counsel to estimate the amount of post-close employee related payments reflected in the Budget and I believe the reserved amounts will be sufficient to satisfy the Debtors' obligations.

**III.  Performance Under Budget to Date**

      18.    As noted above, the Budget reflects both known and estimated payables. As of the date hereof, based on current trends, I believe that the Debtors are on track to meet or exceed the Budget with respect to available cash as of the closing. My expectation that the Debtors will meet or exceed budgeted performance is driven by ████████████████████████████████

████████████████████████████████████████████████████████████████

████████ Accordingly, I believe that the Debtors have sufficient capacity in their Budget to provide comfort that enough cash will be available at the closing to pay the Required Paydown Amount and other payments contemplated to be made at closing and reserve for the administrative expense claims to be paid by the Debtors' estates post-closing.

## IV.    Compliance with Budget to Date

19.    To date, the Debtors have complied with the budget that was agreed to by the Prepetition Secured Parties during the Chapter 11 Cases. In fact, as noted above, operating cash receipts have been higher than reflected in the Budget. Accordingly, it is reasonable to believe that the actual results at the closing of the Sale will meet or exceed the budgeted amount required to satisfy administrative expense claims.

### Administrative Expense Claim Reserves and Reconciliation

20.    Effectuating an orderly wind-down of the Debtors' estates and facilitating the satisfaction of allowed administrative claims after the closing of the Sale to Do it Best were critical components of the Debtors' restructuring negotiations. Indeed, the Debtors made great efforts to structure the transaction to satisfy both the Required Paydown Amount, and incurred and to be incurred allowed administrative expense claims, which the Debtors knew, in some cases, would require several months following the closing to reconcile. As described below, a substantial portion of anticipated administrative expense claims are addressed by the APA, which requires Do it Best to assume up to $45 million of the face amount of 503(b)(9) claims and merchandise payables entitled to administrative priority status. Actual and forecasted administrative expense claims in excess of the $45 million, to the extent not assumed or funded under the APA or funded under the Transition Services Agreement, have been carefully projected and budgeted for in the Budget and the Cash Collateral Resolution Term Sheet.

I.      **APA (assumption of liabilities)**

21.    Since before the filing of the Chapter 11 Cases, the Debtors were focused on addressing administrative expense liabilities in the context of a sale transaction under section 363 of the Bankruptcy Code. Following extensive negotiations with Do it Best, the APA provides that Do it Best will assume up to $45 million of administrative expense liabilities, including 503(b)(9) claims and merchandise payables entitled to administrative priority status. Pursuant to the APA, Do it Best will also assume certain employee obligations. In addition, cure claims associated with contracts assigned under the APA will also be satisfied by Do it Best. The assumption of these obligations substantially reduces the estates' projected administrative expense liabilities.

II.     **Cash Collateral Resolution Term Sheet (funding and cash reserves)**

22.    As part of the cash collateral resolution discussions, the Debtors negotiated extensively with the Prepetition Secured Parties so that administrative claims not funded or assumed by Do it Best pursuant to the APA or funded by Do it Best pursuant to the Transition Services Agreement would be satisfied at or following the closing of the Sale. To achieve this goal, the Cash Collateral Resolution Term Sheet breaks administrative expense claims into three categories, described in detail below: (1) claims to be paid at closing, (2) claims to be paid within 90 days of closing, and (3) claims that will continue to be paid following 90 days after closing.

23.    The Cash Collateral Resolution Term Sheet requires the Debtors to satisfy certain administrative expense claims at the closing of the Sale and to fund certain reserves shortly following the closing to satisfy administrative expense claims that will be reconciled and paid post-closing. Each of the reserves will be funded up to the amounts set forth in an agreed-upon Budget. These reserves were carefully sized to ensure satisfaction of the estates' administrative claims. The Prepetition Secured Parties are entitled to incremental recovery above their $163 million required paydown amount only if sale proceeds together with cash on hand exceed the amounts required to

fund each of the administrative expense claims reserves. The Cash Collateral Resolution Term Sheet also sets forth a mechanism by which the Debtors or their successors must administer the reconciliation of claims. The mechanism was designed to provide the Debtors with time to ascertain, test and pay allowed administrative claims of their estates to the extent not covered by the Transition Services Agreement before remitting any excess reserved or retained funds to the Prepetition Secured Parties.

24.    The three categories of administrative expense claims and their respective payment schedules and reconciliation periods are described in detail below and summarized in the following chart.

| Category | Description of Administrative Expenses | Reconciliation Period / Deadline to Satisfy Claims |
|---|---|---|
| Category 1 | 1. Payroll & Benefits<br>2. Rent<br>3. Insurance<br>4. Prepetition Taxes<br>5. Utility Deposits<br>6. Critical Vendor Payments<br>7. Shippers<br>8. Bank and Letter of Credit Fees | At closing |
| Category 2 | 1. Employee Benefit<br>2. Vendor Payments<br>3. Taxes<br>4. Critical Foreign Vendors | Within 90 days post-closing |
| Category 3 | 1. Professional Fees<br>2. UST Fees<br>3. Employee Benefit Claims | Earlier of (i) chapter 11 plan effective date and (ii) 90 days post TSA termination |
| | 4. Wind Down | 90 days post-TSA termination |

(a)    <u>Category 1 Administrative Expense Claims (paid at closing)</u>

25.    The first category of administrative expenses ("<u>Category 1 Claims</u>") comprises certain claims that were incurred but not paid before the closing of the Sale, subject to limited enumerated exclusions. Payroll and benefits, prepetition taxes, rent, insurance obligations and critical vendor payments, among other things, all fall under this category. Administrative expenses otherwise assumed by Do it Best or addressed by separate cash reserves and professional fees are excluded from Category 1. Given the nature of these types of administrative expenses, I believe that the Debtors will be able to reasonably ascertain the fixed universe of Category 1 Claims in advance of the closing of the Sale. Accordingly, as described in the Cash Collateral Resolution Term Sheet, Category 1 Claims will be reconciled and satisfied at the closing of the Sale.

(b)    <u>Category 2 Administrative Expense Claims (paid within 90 days of closing)</u>

26.    The second category of administrative claims ("<u>Category 2 Claims</u>") consists of expenses whose precise quantum will not be fixed on the closing date of the Sale but will be reconciled and settled within 90 days from closing. Category 2 Claims include employee benefits, post-petition taxes, payments owing to vendors, and payments owing to foreign critical vendors. As described in the Cash Collateral Resolution Term Sheet, within two business days following the closing of the Sale, the Debtors will establish and fund reserves to satisfy all Category 2 Claims. In sizing the Category 2 Claim reserves, I worked closely with the Debtors to analyze and estimate potential Category 2 Claims. I believe that the budgeted amounts for Category 2 Claims are reasonably likely to ensure satisfaction of such claims following closing of the Sale.

(c)    <u>Category 3 Administrative Expense Claims (tied to chapter 11 plan and/or Transition Services Agreement)</u>

27.    Administrative expense claims in the third category ("<u>Category 3 Claims</u>") will require a longer period to reconcile, with payment tied to a chapter 11 plan and/or the conclusion

of the transition services period. Included in this category are professional fees, wind-down costs, US Trustee fees and certain employee claims. For all Category 3 Claims, with the exception of wind-down expenses, the Debtors will have until the earlier of (i) the effective date of a chapter 11 plan and (ii) 90 days following termination of the Transition Services Agreement with Do it Best to reconcile and satisfy such claims. In the case of wind-down expenses, the Debtors will have until 90 days following termination of the Transition Services Agreement to reconcile and pay such costs. I, together with the Debtors, carefully considered and sized the scope of potential Category 3 Claims. I believe the reserves contemplated by the Budget are reasonably likely to satisfy all Category 3 Claims following the closing of the Sale.

(d)    Fungibility Among Reserve Amounts

28.    A key feature of the administrative expense claim reserves that the Debtors negotiated extensively is cross-reserve fungibility. As described in the Cash Collateral Resolution Term Sheet, excess funds in any of the reserves established to satisfy Category 2 Claims and Category 3 Claims could be used to fund shortfalls in reserves within the same category of reserves with (two) limited exceptions: no excess funds from the reserves may be used to cover shortfalls in the professional fees and wind-down reserves. Only if there are excess funds on a cumulative basis (qualified by the preceding sentence) across a category of reserves will any remainder be remitted to Prepetition Secured Parties. Although I believe that the amounts budgeted for each Category 2 Claims and Category 3 Claims reserve are reasonably likely to satisfy all claims in each such reserve, I believe that the fungibility feature provides a meaningful additional level of certainty that administrative expense claims will be satisfied following the closing of the Sale.

(e)    Excess Funds

29.    In addition to the assumption of liabilities under the APA, payment of administrative claims at closing and the cash reserves with cross-reserve fungibility—which I

11

believe are reasonably likely to be sufficient to satisfy administrative expense claims—the Debtors negotiated for an additional mechanism to satisfy potential administrative claims, through the shared use of "excess funds" with the Prepetition Secured Parties in the event that proceeds from the sale together with cash on hand provide sufficient cash to pay the lenders $163 million, pay all Category 1 Claims at closing and fund each of the reserves on account of the Category 2 Claims and Category 3 Claims. In such case, the excess cash would be split such that the Debtors would remit 75% of the excess cash to the Prepetition Secured Parties and would retain the remaining 25% for a period of 90 days (subject to extension) to reconcile and satisfy administrative claims. Based on the Debtors' performance under the Budget to date, I believe that the Debtors will have excess funds following the closing.

(f)     Unanticipated Claims

30.     While I believe that the disbursements contemplated by the Budget and the reserves to be funded under the Cash Collateral Resolution Term Sheet will be sufficient to satisfy potential administrative claims, both anticipated and unanticipated, the Debtors also have in place other resources, including insurance policies, that I expect would mitigate potential unanticipated claims based on the volume of historical claims. With the authority of this Court, the Debtors have paid all insurance related obligations to ensure that the policies remain in effect. For the these reasons, I believe that the Budget and other measures in place provide sufficient flexibility in the event of unanticipated administrative expenses that may arise post-Sale.

## Administrative Expense Claims Arising Post-Closing

31.     Finally, to the extent obligations are incurred post-closing as a result of the Debtors' requirement to provide Do it Best with transition services, such administrative expense claims are obligations of Do it Best under the Transition Services Agreement. The Debtors anticipate that any administrative obligations arising post-closing will be related to transition services or will be

covered by the reserves. Accordingly, I believe that it is reasonably likely that all administrative expense claims will be satisfied.

### Conclusion

32.     For all of the reasons described above, I believe that the Budget, the APA and the Transition Services Agreement provide for the payment of all of the administrative expense claims of the Debtors' estates. Accordingly, I believe that the Debtors will be administratively solvent post closing of the Sale.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated: November 11, 2024                              By: */s/ Nick Weber*
     New York, New York                              Nick Weber
                                           Director
                                           M3 Advisory Partners, LP