## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C., *et al.*,** | **Case No. 24-12337 (KBO)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DISCLOSURE STATEMENT FOR THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF TRUE VALUE COMPANY, L.L.C. AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

Ron E. Meisler (admitted *pro hac vice*)
Jennifer Madden (admitted *pro hac vice*)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and -

Evan A. Hill (admitted *pro hac vice*)
Moshe S. Jacob (admitted *pro hac vice*)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Kristin L. McElroy (Del. Bar No. 6871)
Timothy R. Powell (Del. Bar No. 6894)
One Rodney Square
1000 North King Street
Wilmington, Delaware 1801
Telephone: (302) 571-6600
emorton@ycst.com
kenos@ycst.com
kmcelroy@ycst.com
tpowell@ycst.com

GLENN AGRE BERGMAN & FUENTES LLP
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
Michelle C. Perez (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
aglenn@glennagre.com
twelch@glennagre.com
mdoss@glennagre.com
mperez@glennagre.com

*Counsel to Debtors and Debtors-in-Possession*

Dated:   February 12, 2025
        Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO THE DATE OF SUCH HEARING.**

<u>**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**</u>

**SOLICITATION OF VOTES ON THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF TRUE VALUE COMPANY, L.L.C. AND ITS DEBTOR AFFILIATES* FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER PLAN |
|---|---|
| Class 3 | Prepetition Lender Claims |
| Class 4 | General Unsecured Claims |

**IF YOU ARE IN CLASS 3 OR CLASS 4, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

<u>**VOTING DEADLINE**</u>

**THE VOTING DEADLINE IS 4:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 14, 2025 (UNLESS EXTENDED BY THE DEBTORS).**

**FOR YOUR VOTE TO BE COUNTED, YOU MUST RETURN YOUR PROPERLY COMPLETED BALLOT TO THE SOLICITATION AGENT, OMNI AGENT SOLUTIONS, INC., SO THAT YOUR BALLOT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT BEFORE THE VOTING DEADLINE.**

**THE BALLOTS CONTAIN DETAILED VOTING INSTRUCTIONS AND SET FORTH THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN, AND THE APPLICABLE STANDARDS FOR TABULATING BALLOTS. PLEASE READ YOUR BALLOT CLOSELY.**

**IF YOU HAVE ANY QUESTIONS REGARDING YOUR BALLOT OR THE PROCEDURES FOR VOTING ON THE PLAN, YOU CAN CONTACT THE SOLICITATION AGENT BY E-MAIL AT: TRUEVALUEINQUIRIES@OMNIAGNT.COM (REFERENCING "TRUE VALUE" IN THE SUBJECT LINE) OR BY PHONE TOLL-FREE AT (866) 771-0561 (U.S. & CANADA) OR +1 (818) 356-8633 (INTERNATIONAL).**

---

**RECOMMENDATION BY THE DEBTORS**

**THE DEBTORS BELIEVE THE PLAN IS IN THE BEST INTERESTS OF THEIR CREDITORS AND OTHER STAKEHOLDERS.  ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.**

---

**IMPORTANT NOTICE REGARDING THIRD-PARTY
RELEASE BY HOLDERS OF CLAIMS**

**Pursuant to Article VIII of the Plan, each Holder of a Claim is deemed to grant the third-party releases described therein (the "Third-Party Releases"), to the maximum extent otherwise permitted by law, if such Holder votes to accept the Plan or "opts in" to the Third-Party Releases.  The Third-Party Releases are discussed further in Articles I and IV of this Disclosure Statement.  Instructions for "opting in" to the Third-Party Releases are set forth in the solicitation materials distributed in connection with this Disclosure Statement.**

# DISCLAIMER[2]

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY PROVIDE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN, AND ANY PLAN SUPPLEMENT(S).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

---

[2] Terms used in this Disclaimer that are not otherwise defined will have the meanings ascribed to such terms elsewhere in the Disclosure Statement.

# TABLE OF CONTENTS

ARTICLE I INTRODUCTION ...................................................................................1
    A.    Purpose of the Disclosure Statement ...............................................1
    B.    Preliminary Statement .......................................................................1
    C.    Confirmation of the Plan ...................................................................3
        1.    Plan ........................................................................................3
        2.    Plan Supplement ...................................................................3
        3.    Combined Hearing .................................................................4
        4.    Objection Deadline ................................................................4
        5.    Effect of Confirmation ..........................................................5
    D.    Voting Rights, Treatment and Classification of Claims and Interests Under the Plan................................................................5
    E.    Releases and Exculpation ..................................................................7
    F.    Voting Deadline .................................................................................9
ARTICLE II GENERAL INFORMATION REGARDING THE DEBTORS..........................9
    A.    Overview.............................................................................................9
    B.    The Debtors' Business and Employees .............................................10
        1.    Business Overview...............................................................10
        2.    Supply Chain and Distribution ............................................11
        3.    The Debtors' Employees......................................................12
        4.    Market and Competition ......................................................12
    C.    The Debtors' Prepetition Corporate and Capital Structure..................13
        1.    The Debtors' Corporate Structure and Headquarters................13
        2.    The Debtors' Capital Structure ............................................13
    D.    Summary of Events Leading to the Chapter 11 Filings ......................15
        1.    Consequences of the COVID-19 Pandemic .........................15
        2.    Liquidity Challenges ...........................................................16
        3.    Waiver Negotiations ............................................................16
        4.    Restructuring Efforts............................................................17
ARTICLE III THE CHAPTER 11 CASES .................................................................19
    A.    First Day Relief.................................................................................19
    B.    Second Day Relief ............................................................................21
        1.    Retention of Professionals ...................................................21
        2.    Bar Dates .............................................................................21
    C.    Appointment of Committees..............................................................22
    D.    Sale Process .....................................................................................22
        1.    The Stalking Horse Bidder and Bidding Procedures ...........22
        2.    The Transition Services Agreement .....................................23
ARTICLE IV SUMMARY OF PLAN .......................................................................25
    A.    Plan Overview...................................................................................25
    B.    Administrative Expenses and Priority Claims (Article II)....................26
    C.    Classification, Treatment, and Voting of Claims and Interests (Articles III & IV)..............................................................................27
    D.    Voting on the Plan (Article III)..........................................................28
    E.    Means for Implementation of the Plan (Article IV)............................29

|   |   |   |   |
|---|---|---|---|
| | 1. | Corporate Action | 29 |
| | 2. | Effectuating Documents; Further Transactions | 29 |
| | 3. | Corporate Existence Post-Effective Date | 29 |
| | 4. | Settlement of Claims and Interests | 30 |
| | 5. | Plan Funding | 30 |
| | 6. | Cancellation of Old Securities and Agreements | 30 |
| | 7. | Vesting of Assets | 31 |
| | 8. | Plan Administrator | 31 |
| | 9. | Litigation Trust | 34 |
| | 10. | Sale Order | 36 |
| | 11. | Asbestos Litigation | 36 |
| | 12. | Exemption from Certain Transfer Taxes | 36 |
| | 13. | Preservation of Causes of Action | 37 |
| F. | | Unexpired Leases and Executory Contracts (Article V) | 37 |
| | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 37 |
| | 2. | Rejection Damages Claim Procedures | 38 |
| | 3. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 39 |
| | 4. | Modifications, Amendments, Restatements, Supplements, Restatements, and Other Agreements | 40 |
| | 5. | Reservation of Rights | 41 |
| | 6. | Employee Compensation and Benefit Programs | 41 |
| | 7. | Insurance Policies | 42 |
| | 8. | D&O Policies | 42 |
| | 9. | Indemnification Obligations | 42 |
| | 10. | Nonoccurrence of the Effective Date | 43 |
| G. | | Procedures for Resolving Disputed Claims and Interests (Article VI) | 43 |
| | 1. | Determination of Claims and Interests | 43 |
| | 2. | Claims Administration Responsibility | 43 |
| | 3. | Objections to Claims | 44 |
| | 4. | Disallowance of Claims | 44 |
| | 5. | Estimation of Claims | 44 |
| | 6. | No Interest on Claims | 45 |
| | 7. | Amendments to Claims | 45 |
| H. | | Provisions Governing Distributions (Article VII) | 45 |
| | 1. | Distributions Allowed as of the Effective Date | 45 |
| | 2. | Distribution on Account of Claims and Interests Allowed After the Effective Date | 46 |
| | 3. | Timing and Calculation of Amounts to Be Distributed | 46 |
| | 4. | Delivery of Distributions | 46 |
| | 5. | Currency | 47 |
| | 6. | Distribution Agent (if any) | 48 |
| | 7. | Undeliverable Distributions | 48 |
| | 8. | De Minimis Distributions | 48 |
| | 9. | Surrender of Securities or Instruments | 49 |

|  |  | 10. | Compliance Matters | 49 |
|  |  | 11. | Claims Paid or Payable by Third Parties | 49 |
|  |  | 12. | Setoffs | 49 |
|  |  | 13. | Allocation of Plan Distributions Between Principal and Interest | 50 |
|  | I. | Effect of Plan on Claims and Interests (Article VIII) | | 50 |
|  |  | 1. | Compromise and Settlement | 50 |
|  |  | 2. | Releases by the Debtors | 50 |
|  |  | 3. | Releases by Releasing Parties | 51 |
|  |  | 4. | Exculpation and Limitation of Liability | 52 |
|  |  | 5. | Injunction | 53 |
|  |  | 6. | Subordinated Claims | 54 |
|  |  | 7. | Protection Against Discriminatory Treatment | 55 |
|  |  | 8. | Release of Liens | 55 |
|  |  | 9. | Reimbursement or Contribution | 55 |
|  | J. | Conditions Precedent to the Effective Date (Article IX) | | 55 |
|  |  | 1. | Conditions Precedent to the Effective Date of the Plan | 55 |
|  |  | 2. | Waiver of Conditions Precedent | 56 |
|  |  | 3. | Notice of Effective Date | 56 |
|  |  | 4. | Effect of Non-Occurrence of Conditions to Consummation | 56 |
|  | K. | Bankruptcy Court Jurisdiction (Article X) | | 57 |
|  |  | 1. | Retention of Jurisdiction | 57 |
|  | L. | Miscellaneous Provisions (Article XI) | | 59 |
|  |  | 1. | Binding Effect | 59 |
|  |  | 2. | Payment of Statutory Fees | 59 |
|  |  | 3. | Statutory Committee Dissolution | 59 |
|  |  | 4. | Modification and Amendment | 60 |
|  |  | 5. | Confirmation of Plan | 60 |
|  |  | 6. | Additional Document | 60 |
|  |  | 7. | Revocation, Withdrawal, Non-Consummation | 60 |
|  |  | 8. | Notices | 61 |
|  |  | 9. | Term of Injunctions or Stays | 62 |
|  |  | 10. | Governing Law | 62 |
|  |  | 11. | Entire Agreement | 62 |
|  |  | 12. | Severability | 63 |
|  |  | 13. | No Waiver or Estoppel | 63 |
| **ARTICLE V VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN** | | | | 63 |
|  | A. | General | | 63 |
|  | B. | Parties in Interest Entitled to Vote | | 64 |
|  | C. | Classes Impaired and Entitled to Vote Under the Plan | | 64 |
|  | D. | The Solicitation Package | | 64 |
|  | E. | Voting Procedures and Requirements | | 64 |
|  |  | 1. | Ballots | 64 |
|  |  | 2. | Returning Ballots | 65 |
|  |  | 3. | Ballots Not Counted | 65 |
|  |  | 4. | Waivers of Defects, Irregularities, etc. | 66 |

5. Voting Amount ...................................................................66
F. Acceptance of Plan ...........................................................................66
G. Confirmation Without Necessary Acceptances; Cramdown ..............67
1. No Unfair Discrimination ...........................................................67
2. Fair and Equitable Test ...............................................................67
ARTICLE VI FEASIBILITY AND BEST INTERESTS OF CREDITORS ..............68
A. Best Interests Test and Liquidation Analysis....................................68
B. Feasibility..........................................................................................69
ARTICLE VII EFFECT OF CONFIRMATION ....................................................69
A. Binding Effect of Confirmation ........................................................69
B. Good Faith .........................................................................................69
ARTICLE VIII CERTAIN RISK FACTORS TO BE CONSIDERED....................69
A. Certain Bankruptcy Considerations ...................................................70
1. Risk of Non-Approval of the Disclosure Statement As Containing Adequate Information ...............................................70
2. Risk of Failing to Satisfy the Vote Requirement .......................70
3. Risk of Non-Confirmation of Plan..............................................70
4. Risks Related to Possible Objections to the Plan........................70
5. Risk of Non-Consensual Confirmation........................................70
6. Distributions to Holders of Allowed Claims Under the Plan ......71
7. Classification and Treatment of Claims and Interests .................71
8. Conditions Precedent to Consummation of the Plan ...................71
9. Risk of Non-Occurrence of the Effective Date............................72
10. Releases, Injunction, and/or Exculpation Provisions May Not Be Approved............................................................................72
11. The Debtors May Be Unable to Confirm the Plan and Exit from Chapter 11 ...........................................................................72
12. Conversion into Chapter 7 Cases ................................................72
13. Risk of Non-Dischargeability of Claims.....................................72
14. Amendment of Plan Prior to Confirmation by Debtors ..............73
15. Litigation Risk ............................................................................73
16. Landlord Claims and Lease-Related Risks ..................................73
B. Forward Looking Statements .............................................................73
1. Forward Looking Statements.......................................................73
2. Books and Records ......................................................................73
3. Projections and Estimates ...........................................................74
C. Certain Other Risks ...........................................................................74
1. Tax Considerations ......................................................................74
D. Disclosure Statement Disclaimer ......................................................74
1. This Disclosure Statement Was Not Approved by the Securities and Exchange Commission .........................................74
2. No Legal or Tax Advice Is Provided to You by This Disclosure Statement...................................................................74
3. No Admissions Made...................................................................75
4. Failure to Identify Litigation Claims or Projected Objections...................75

5.      No Waiver of Right to Object or Right to Recover Transfers and Assets ...........................................................................................75

6.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ..........................................................75

7.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update ....................................................................................75

8.      No Representations Outside this Disclosure Statement Are Authorized .............................................................................................75

E.      Liquidation Under Chapter 7 ...............................................................76

ARTICLE IX CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN 76

A.      Consequences to the Debtors ...............................................................77

B.      Consequences to Claimholders .............................................................78

        1.      Gain or Loss .............................................................................78

        2.      Market Discount........................................................................79

        3.      Allocation of Plan Distributions Between Principal and Interest ..............79

C.      Information Reporting and Backup Withholding ...................................79

D.      Importance of Obtaining Professional Tax Assistance ..........................80

ARTICLE X ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .........................................................................................................80

A.      Alternative Plans ..................................................................................80

B.      Liquidation Under Chapter 7 of the Bankruptcy Code .........................80

ARTICLE XI RECOMMENDATION AND CONCLUSION....................................80

**TABLE OF EXHIBITS**

| Exhibit | Title |
| --- | --- |
| A | Second Amended Joint Chapter 11 Plan of True Value Company, L.L.C. and Its Debtor Affiliates |
| B | Liquidation Analysis |

# ARTICLE I
# INTRODUCTION

## A.    Purpose of the Disclosure Statement

True Value Company, L.L.C. ("TVC") and certain of its affiliates, as the debtors and debtors in possession (collectively, "True Value" or the "Debtors" and, together with their non-debtor affiliates, the "Company") in the chapter 11 cases commenced in the United States Bankruptcy Court for the District of Delaware (the "Court" or the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), submit this disclosure statement (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "Disclosure Statement"), pursuant to Section 1125 of the Bankruptcy Code, in connection with the solicitation of votes on the *Second Amended Joint Chapter 11 Plan of True Value Company, L.L.C. and Its Debtor Affiliates* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "Plan").[3]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under Section 1125 of the Bankruptcy Code, to creditors who have the right to vote on the Plan so they can make informed decisions in doing so.  Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined below) together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Debtors' chapter 11 cases (the "Chapter 11 Cases").  In addition, the Disclosure Statement provides an overview of the Plan, sets forth certain terms and provisions of the Plan, describes the effects of confirmation of the Plan, and includes certain risk factors associated with the Plan and the Chapter 11 Cases.  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the creditors entitled to vote under the Plan for their votes to be counted.

## B.    Preliminary Statement

True Value, one of the world's leading hardlines (*i.e.*, hard goods) wholesalers, commenced the Chapter 11 Cases to consummate the sale of substantially all of their operating assets and a restructuring contemplated by the Plan.  A nearly century-old brand, True Value struggled to weather the long-term impacts of COVID-19 and the macroeconomic challenges that resulted therefrom—including supply chain disruptions and cost inflation.  In addition, unanticipated reductions to the Debtors' borrowing capacity under their credit facility and the

---

[3]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, *however*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

exercise of remedies by the Debtors' lenders all but eliminated the Company's access to working capital, triggering a liquidity crisis. As discussed more fully below, following a fulsome prepetition sale process and postpetition Court-supervised process, the Debtors' efforts culminated in a value-maximizing sale of substantially all of the Debtors' assets to Do it Best Corp. ("Do it Best," the "Stalking Horse Bidder," or the "Purchaser").

Prior to the Petition Date, the Debtors' business and their customers were spread across the United States. The Debtors operated twelve distribution centers, servicing approximately 5,000 retail storefronts, including over 2,000 independently owned and operated True Value retail stores across the country. As a measure of the Company's national reach, 98% of the United States' population resided within the trade area of one or more True Value retail stores.

True Value-branded retailers accounted for 76% of the Debtors' sales, while the Debtors' other customers (approximately 3,000) accounted for the remaining 24%. The Debtors offered their customers approximately 75,000 different products across categories such as "Hardware Lumber & Building," "Electrical & Light," and "Farm, Ranch & Automotive," making True Value a one-stop-shop for its customers' needs.

Retailer demand for the Debtors' products was ultimately driven by end consumer demand: when retail transactions increased, so did wholesale transactions; when retail transactions decreased, so did wholesale transactions. End consumer demand for hard goods spiked during the COVID-19 pandemic, as many Americans worked from home and had increased time to focus on home improvement projects. The increase in demand coincided with severe disruptions to the domestic and global supply chain, which made it more difficult and more expensive for the Debtors to source products. Because of the Debtors' decreased fill rate (*i.e.*, the percentage of orders they could ship from available stock without any lost sales, backorders, or other inventory shortages), certain of their customers began using other wholesalers in whole or in part.

Unfortunately, the COVID-19-induced spike in demand was only temporary—an example of demand that had been "pulled forward." The period of increased demand was followed by a period of lower-than-anticipated demand where sales fell beneath the level they were at prior to the spike.

The Debtors continued to experience the repercussions of the COVID-19 demand "pull forward," with sales staying below pre-pandemic levels. In 2019, the Debtors' revenue totaled $1.336 billion. In 2020, that number jumped to $1.557 billion; in 2021, $1.559 billion, and 2022, $1.588 billion. In 2023, revenue dropped 8% year over year to $1.455 billion, and 2024 revenue through the end of August was $868 million, a decrease of 14% year over year. An unfavorably warm winter and spring in 2024, conservative inventory management by retailers, and the Debtors' post-COVID-19 reduced market share (as a result of retailers adding additional wholesalers during the pandemic) had further contributed to the Company's declining revenue.

In addition to these macroeconomic headwinds, over the past several months, the Debtors faced significant challenges under their credit facility. The Debtors' Prepetition Lenders (as defined below) imposed changes to the Debtors' "borrowing base," or the formula used to determine the amount of revolver loans the Debtors can borrow at a given point in time, which led to a material reduction in available liquidity. This reduction in liquidity, along with other actions

taken and remedies exercised by the Prepetition Lenders, including their exercise of cash dominion—sweeping the Debtors' cash on a daily basis—severely reduced the Company's access to working capital. In cash dominion, the Prepetition Lenders control the Debtors' access to cash, including cash received from operations, and must consent to all disbursements. These changes put the Debtors in a profoundly difficult situation.

In response, the Debtors explored numerous liquidity solutions and other strategic alternatives while negotiating with the Prepetition Lenders. In July 2024, the Company formally launched a marketing process to sell its business as a going concern. Five parties submitted indications of interest. Following extensive negotiations, the Debtors reached an agreement with Do it Best to serve as the stalking horse bidder in connection with a Bankruptcy Court-supervised sale process to be effectuated through a sale under Section 363 of the Bankruptcy Code. Do it Best's stalking horse bid for substantially all of the Debtors' assets, which was subject to higher or otherwise better offers, contemplated a $153 million purchase price and the assumption and cure of certain contracts and leases and the assumption of up to $45 million of trade payables that are administrative claims (the "Stalking Horse Bid"). The sale to Do it Best was approved by the Court on November 13, 2024 [Docket No. 411] and closed on November 22, 2024.

## C.    Confirmation of the Plan

### 1.    Plan

The Plan provides for the distribution of the Distributable Proceeds in accordance with the priorities and requirements of the Bankruptcy Code. As described in more detail below, the Plan provides for, among other things, the treatment of approximately $238.2 million of the Prepetition Lenders' Claims and approximately $1.45 billion of General Unsecured Claims, maximizing creditor recoveries.

The Plan provides for the appointment of a Plan Administrator to be the sole director, officer, and manager of the Debtors to implement the Plan and ultimately wind-down the Debtors' business affairs. The Plan Administrator, who shall also serve as Litigation Trustee, shall be empowered to, among other things, administer and liquidate all Assets, object to and settle Claims, and prosecute Retained Causes of Action in accordance with the Plan.

### 2.    Plan Supplement

The Debtors propose to file the Plan Supplement (which may be further amended, modified, or supplemented) at least seven (7) days before the deadline to object to confirmation of the Plan. The Debtors will transmit a copy of the Plan Supplement to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the prepetition Lenders, (c) counsel to the Committee (as defined below), (d) the Internal Revenue Service, (e) the Office of the United States Attorney for the District of Delaware, (f) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (g) all parties entitled to notice pursuant to Rules 2002-1(b) and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"). The Plan Supplement will include all exhibits and Plan schedules that were not already filed or sent to parties entitled to vote

on the Plan in connection with solicitation. The Plan Supplement will be incorporated by reference into, and an integral part of, the Plan.

3.      **Combined Hearing**Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Bankruptcy Court entered the Disclosure Statement Order, which, among other things, scheduled a Combined Hearing to consider confirmation of the Plan and final approval of the adequacy of the disclosures contained in this Disclosure Statement. The Combined Hearing will commence on March 27, 2025 at 10:30 a.m. (prevailing Eastern Time), before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market St, Sixth Floor, Courtroom 3, Wilmington, Delaware 19801. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Combined Hearing or at any subsequent continued Combined Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

4.      **Objection Deadline**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. The Disclosure Statement Order established March 14, 2025 at 4:00 p.m. (prevailing Eastern Time) as the deadline for parties to object to the Plan or the adequacy of the disclosures contained in the Disclosure Statement (the "Plan Objection Deadline"). Any objection to confirmation of the Plan or the Disclosure Statement must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of the Claims and/or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of Bankruptcy Judge Karen B. Owens, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order (the "Notice Parties"): (a) True Value Company, L.L.C., 8600 West Bryn Mawr Ave., Chicago, IL, 60631 (Attn: Susan Radde, Esq. (susan.radde@truevalue.com)); (b) counsel for the Debtors, (i) Skadden, Arps, Slate, Meagher & Flom LLP, 320 S. Canal St., Chicago, IL 60606 (Attn: Ron Meisler, Esq. (ron.meisler@skadden.com) and Jennifer Madden, Esq. (jennifer.madden@skadden.com)), One Manhattan West, 395 9th Ave., New York, NY 10001 (Attn: Evan Hill, Esq. (evan.hill@skadden.com) and Moshe Jacob, Esq. (moshe.jacob@skadden.com)), and 920 North King Street, Wilmington, DE 19801 (Attn: Joseph O. Larkin, Esq. (joseph.larkin@skadden.com)), (ii) Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, NY 10036 (Attn: Andrew K. Glenn, Esq. (aglenn@glennagre.com) and Malak S. Doss, Esq. (mdoss@glennagre.com)) and (iii) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801 (Attn: Edmon L. Morton, Esq. (emorton@ycst.com) and Timothy R. Powell, Esq. (tpowell@ycst.com)); (c) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn: Benjaman A. Hackman, Esq. (benjamin.a.hackman@usdoj.gov)); (d) counsel to the Prepetition Lenders, (i) Otterbourg P.C., 230 Park Avenue, New York, NY 10169 (Attn: Daniel Fiorillo, Esq. (dfiorillo@otterbourg.com)); (ii) Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801 (Attn: Regina S.

Kelbon (regina.kelbon@blankrome.com) and Stanley B. Tarr (Stanley.tarr@blankrome.com)), and 130 North 18th Street, Philadelphia, PA 19103 (Attn: John E. Lucian (john.lucian@blankrome.com)); (e) counsel to the Purchaser, Taft Stettinius & Hollister LLP, 425 Walnut Street, Suite 1800, Cincinnati, OH 45202 (Attn: W. Timothy Miller, Esq. (miller@taftlaw.com)); (f) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899 (Attn: Bradford J. Sandler (bsandler@pszjlaw.com)); and (g) counsel to any other statutory committee appointed in the Chapter 11 Cases. **CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### 5. Effect of Confirmation

The Bankruptcy Court's confirmation of the Plan will bind the Debtors, any entity acquiring property under the Plan, any Holder of a Claim or Interest in the Debtors, and all other entities as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed Plan, whether or not such entity votes on the Plan or affirmatively votes to reject the Plan.

### D. Voting Rights, Treatment and Classification of Claims and Interests Under the Plan

As described in Article IV of this Disclosure Statement (Summary of Plan) and in accordance with Sections 1122 and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan (i) designates Classes of Claims and Interests and (ii) specifies the treatment (including whether each class is impaired or unimpaired) and the voting rights of each Class. The table below summarizes these terms as well as the estimated percentage recoveries of classified Claims and Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE VII BELOW. THIS TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY. FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| CLASS | CLAIM OR INTEREST | STATUS | VOTING RIGHTS | PROPOSED TREATMENT |
|---|---|---|---|---|
| 1 | *Other Priority Claims* Estimated Recovery (%): 100% | Unimpaired | Presumed to Accept | Holders of Allowed Other Priority Claims will be paid in full in cash or paid in the ordinary course of business. |
| 2 | *Other Secured Claims* Estimated Recovery (%): 100% | Unimpaired | Presumed to Accept | Holders of Allowed Other Secured Claims will be paid in full in cash or receive such other treatment so that their Claims are unimpaired. |

| 3 | *Prepetition Lender Claims*<br><br>Estimated Recovery (%): [84.4]% (includes payments made prior to the Effective Date)<br><br>Estimated Recovery ($): [$201.0] million (includes payments made prior to the Effective Date) | Impaired | Entitled to Vote | Holders of Prepetition Lender Claims shall receive:<br><br>(i) Subject to the terms and conditions of the Cash Collateral Order:<br><br>(A) upon the conclusion of the Administrative Claims Reconciliation Period (as defined in the Cash Collateral Order), i.e., February 20, 2025, any Retained Funds that were not used, or identified for use on account of incurred or accrued Administrative Claims that have been reconciled, by the Debtors' Estates to pay Allowed Administrative Claims up to the full amount of the Indebtedness (as defined in the Cash Collateral Order);<br><br>(B) no later than 90 days following the closing of the Sale (i.e., February 20, 2025), any excess funds in any of the 90 Day Buckets that are not required to address or pay the Allowed Administrative Claims or priority Claims for which such 90 Day Buckets were established to address, or to cover shortfalls in other 90 Day Buckets in accordance with the Fungibility Mechanisms up to the full amount of the Indebtedness;<br><br>(C) no later than the earlier of (1) the Effective Date and (2) 90 days following the termination of the Transition Services Agreement, any excess funds in any of the 90+ Day Buckets other than the Wind Down Budget Reserve that are not required to address or pay the Allowed Administrative Claims or priority Claims for which such 90+ Day Buckets were established to address, or to cover shortfalls in other reserves in accordance with the Fungibility Mechanisms up to the full amount of the Indebtedness; and<br><br>(D) no later than 90 days following the termination of the Transition Services Agreement, any excess funds in the Wind Down Budget Reserve that are not required to address or pay the Allowed Administrative Claims or priority Claims for which the Wind Down Budget Reserve was established to address up to the full amount of the Indebtedness.<br><br>(ii) As and when received, in accordance with the Cash Collateral Order, promptly upon receipt, any Cash the Debtors have on hand, including, for the avoidance of doubt, such funds received by the Debtors after the Closing other than funds received pursuant to the Transition Services Agreement.<br><br>(iii) On the Effective Date, the Litigation Trust Prepetition Lender Interests. |

| | | | | |
|---|---|---|---|---|
| 4 | *General Unsecured Claims*<br>Estimated Recovery (%): Unknown, contingent on Litigation Trust recoveries | Impaired | Entitled to Vote | General Unsecured Claims shall receive its Pro Rata share of the Litigation Trust GUC Interests. |
| 5 | *Intercompany Claims*<br>Estimated Recovery (%): N/A | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject | Intercompany Claims will either be reinstated or canceled, extinguished, and discharged in the discretion of the Debtors. |
| 6 | *Intercompany Interests*<br>Estimated Recovery (%): N/A | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject | Intercompany Interests will be (i) transferred, directly or indirectly, to the Purchaser, (ii) reinstated, or (iii) canceled, extinguished, and discharged in the discretion of the Debtors. |
| 7 | *Subordinated Claims*<br>Estimated Recovery (%): 0.0% | Impaired | Deemed to Reject | Subordinated Claims shall be released, waived, and discharged for no consideration. |
| 8 | *Existing Interests*<br>Estimated Recovery (%): 0.0% | Impaired | Deemed to Reject | Existing Interests shall be deemed automatically canceled, released, and extinguished for no consideration. |

AS DEMONSTRATED IN THE TABLE ABOVE, ONLY HOLDERS OF PREPETITION LENDER CLAIMS IN CLASS 3 AND HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASS 4 ARE ENTITLED TO VOTE ON THE PLAN. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF PREPETITION LENDER CLAIMS IN CLASS 3 AND HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASS 4.

## E.    Releases and Exculpation

Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The releases by the Debtors, the Third-Party Releases, and the exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the Plan.

All of the Released Parties are being consensually released by the Debtors. All of the Released Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan and the Sale, which will maximize and preserve value for the benefit of all parties in interest.

Moreover, the Debtors are not aware of any viable claims that their estates may have against Insiders and believe that a release of potential estate claims against the Insiders is warranted under the circumstances. In particular, the Debtors considered, as discussed below, whether preserving possible claims related to prepetition retention payments to certain management employees is warranted. On July 10, 2024, more than three months before commencing the Chapter 11 Cases, True Value Company, LLC's board approved retention payments totaling approximately $1.765 million for eight key employees, including the CEO, CFO, CMO, and

several senior vice presidents and vice presidents.[4] These payments, ranging from $76,000 to $568,000, were designed to retain employees who were vital to the company's restructuring efforts. In addition, on October 11, 2024, the Debtors made a retention payment to the Chief Human Resources Officer of True Value Company, LLC in the amount of $125,000. The board recognized the significant risk of attrition among these employees during a period of financial distress and uncertainty, including the possibility of losing their jobs after a change in control. Additionally, these employees were expected to face increased workloads and pressures, which heightened concerns about their compensation and attrition.

Recipients were required to remain with the company until March 30, 2025 or 30 days following a change-in-control transaction. If they resigned or were terminated for cause before this date, they would have been obligated to repay the payments within 10 days. The payments matched the employees' target annual cash bonus for 2024, which was agreed would no longer be available to them.

Ultimately, all the recipients of the retention payments were instrumental in maintaining business operations pre- and postpetition, preparing for the bankruptcy cases, and facilitating the value-maximizing sale to Do it Best as a going concern. Notably, none of these key employees resigned or were terminated for cause during the retention period.

The Debtors evaluated potential estate claims related to these retention payments both before they were made and in connection with deciding whether a release of the estates' possible claims related thereto is warranted. After an inquiry led by the Debtors' independent director with the assistance of Glenn Agre—both retained after the payments were made—the board has determined that any potential claims against the recipients of the payments or the board for approving the payments are weak and that the costs of pursuing them would outweigh the benefits. Preference claims, for example, would be undermined because the payments were for future services, not antecedent debt. Moreover, the payments were in exchange for significant value by the recipients, who maintained business operations and facilitated the value-maximizing going concern sale of the Debtors' business. This would provide a robust defense against constructive fraudulent transfer claims. In addition, the Debtors believe that litigation defense costs would be covered by their insurer, reducing any non-merits-based incentives for a quick settlement.

Only Holders of Claims that vote to accept the Plan, and Holders of Claims who are deemed to reject, but "opt in" to the Third-Party Releases will be bound by the Third-Party Releases. Accordingly, each of the Released Parties and the Exculpated Parties is entitled to the benefit of the release and exculpation provisions. Moreover, the release and exculpation provisions contain carve-outs for gross negligence, willful misconduct, and fraud.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and comply with applicable bankruptcy law. Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, injunction, and related provisions

---

[4]    In addition to the payments made to senior-level employees, approximately $450,000 in aggregate retention payments were made to fifteen key lower-level employees.

that are contained in the Plan are copied in Article IV of this Disclosure Statement, under the section titled "Effect of the Plan on Claims and Interests" (Article VIII).

**F.     Voting Deadline**

Detailed voting instructions will be provided with each Ballot.  Additional detail is also included in Article V of this Disclosure Statement.  Please carefully review that section.

---

**IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, A BALLOT IS ENCLOSED FOR THE PURPOSE OF VOTING ON THE PLAN.  PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SO THAT YOUR VOTE MAY BE COUNTED.**

---

TO BE COUNTED, YOUR BALLOT WITH YOUR SIGNATURE INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN **4:00 P.M. (EASTERN TIME) ON MARCH 14, 2025** (THE "VOTING DEADLINE").

YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR SUBMIT THROUGH THE E-BALLOTING PORTAL THE BALLOT ENCLOSED WITH THE NOTICE.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY, AND IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT OMNI AGENT SOLUTIONS, INC. ("OMNI" OR THE "SOLICITATION AGENT") VIA EMAIL TO TRUEVALUEINQUIRIES@OMNIAGNT.COM OR BY CALLING (866) 771-0561 (U.S. & CANADA) OR +1 (818) 356-8633 (INTERNATIONAL).  THE SOLICITATION AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

**ARTICLE II**
**GENERAL INFORMATION REGARDING THE DEBTORS**

**A.     Overview**

As described in further detail herein, prior to the filing of the Chapter 11 Cases, the Debtors negotiated and entered into the Stalking Horse Agreement (as defined herein) with the Stalking Horse Bidder.  Through the Chapter 11 Cases, the Debtors conducted a competitive public marketing process, supported by the Stalking Horse Bidder, to sell all or substantially all of the Debtors' assets as a going concern pursuant to Section 363 of the Bankruptcy Code (the "Sale") and distribute the proceeds of the Sale to creditors.  The Sale closed on November 22, 2024.

B.     **The Debtors' Business and Employees**

1.     **Business Overview**

True Value was one of the world's leading hardware wholesalers, with a globally recognized retail brand.  Founded in 1855 as Hibbard Spencer Bartlett & Company, the True Value brand dates to 1932, when it was introduced as a line of hand tools.  Cotter & Company acquired Hibbard, along with the True Value brand, in 1963.  Decades later, in 1997, Cotter & Company merged with ServiStar Coast to Coast Corporation to form TruServ Corporation, which was renamed True Value Company in 2005.  Historically, True Value was fully owned by a cooperative of its retailers, but in 2018, an outside investor acquired approximately 70% of the Company's equity.  The 2018 transaction brought an influx of cash and allowed True Value to partially de-lever its balance sheet.  Through the cooperative, certain of True Value's retailers continue to own approximately 30% of the Company.

True Value offered approximately 75,000 different products, making it a one-stop-shop for its retail store customers.  In 2023, nine different product categories eclipsed $130 million in total handled and direct sales: (1) Hardware Lumber & Building ($319.8 million); (2) Outdoor Living & Tools ($235.1 million); (3) Paint ($221.3 million); (4) Plumbing & Heating ($217.6 million); (5) Lawn & Garden ($187.6 million); (6) Home ($168.6 million); (7) Farm, Ranch & Automotive ($137.2 million); (8) Hand & Power Tools ($135.4 million); and (9) Electrical & Light ($135.0 million).  Miscellaneous products accounted for an additional $78.1 million in handled and direct sales.

In addition to sourcing and selling national branded products (*e.g.*, Stanley Black & Decker, Scotts, Proctor & Gamble, Weber Grills, General Electric Lighting, and many others), True Value also offered a portfolio of 11 private label brands.  Because True Value paid less to source its private label products, it could offer them to retailers at lower price points, allowing the retailers to achieve higher margins when selling to end consumers.  These private label brands included GreenThumb®, covering 18 categories of Lawn & Garden and Outdoor Tools; EasyCare® premium paints, manufactured at the Debtors' facility in Cary, Illinois; and Master Mechanic®, including high-quality tools, accessories, plumbing supplies and repair items, electrical supplies, and farm and ranch products to provide the backbone of the independent hardware store.

True Value's approximately 4,500 customers, located across the United States and in upwards of sixty (60) other countries, were divided into six (6) general categories:

- *Core Accounts*: This was True Value's long-tenured base.  Prior to the Petition Date, approximately 2,200 retail stores nationwide bore the True Value name.  The average core account customer had been a retail partner of True Value for twenty-four (24) years.  In 2023, core accounts accounted for $1.119 billion in gross billings on $858 million in handled sales, yielding a wholesale margin of $220 million.

- *Strategic Accounts*: The Debtors had strategic merchandising relationships with 12 multi-store chains that sold True Value products across 475 store fronts.  In 2023, strategic accounts produced $200 million in gross billings on $158 million in handled sales, yielding a wholesale margin of $35 million.

- **E-commerce**: True Value had partnered with Amazon to sell through its e-commerce channel. In 2023, fifty-six (56) Amazon e-commerce store fronts/accounts accounted for $54 million in gross billings on $49 million in handled sales, for a wholesale margin of $8 million in the e-commerce marketplace.

- **International**: True Value customers had a significant presence in Central America and the Caribbean Islands. In 2023, 220 international store fronts produced $138 million in gross billings on $41 million in handled sales. True Value's wholesale margin was $11 million.

- **Secondary**: Secondary customers utilized True Value when their primary supplier was out of stock or didn't offer a product. In 2023, 475 store fronts accounted for $83 million in gross billings on $62 million of handled sales to True Value's secondary customers. True Value's wholesale margin was $14 million.

- **Specialty Business**: True Value supplied certain specialty businesses that service the farm and ranch, nursery, and commercial industrial segments. In 2023, 1,460 store fronts accounted for $169 million in gross billings and $73 million in handled sales in this business line. True Value's wholesale margin was $16 million.

### 2. Supply Chain and Distribution

The Company sourced approximately 75,000 products from an expansive network of more than 2,000 suppliers. In 2023, approximately 93% of products were purchased from domestic suppliers; 5% were purchased from suppliers in China; and the remaining 2% were purchased from suppliers in other countries. The supplier network was highly diversified—in 2023, no one supplier accounted for more than 2.9% of total products purchased, and the top ten suppliers accounted for 16.2% of products purchased (those products spread across nine product categories). True Value's strong relationships with suppliers increased its ability to achieve favorable price reductions, inventory recoveries, and competitive discounts and rebates, allowing it to boost its own margins.

True Value's supply chain relied on twelve (12) leased distribution centers:

|  | Location | Facility Sq. Ft. | Lease Exp. Date | Employees | 2023 Sales |
|---|---|---|---|---|---|
| 1 | Wilkes-Barre, PA | 1,025,000 | Sept. 2040 | 314 | $215 million |
| 2 | Corsicana, TX | 754,000 | Dec. 2036 | 125 | $156 million |
| 3 | Harvard, IL | 1,346,000 | Feb. 2030 | 286 | $128 million |
| 4 | Springfield, OR | 523,000 | Dec. 2036 | 112 | $118 million |
| 5 | Atlanta, GA | 619,000 | Dec. 2036 | 173 | $116 million |
| 6 | Cleveland, OH | 393,000 | Aug. 2042 | 100 | $107 million |
| 7 | Kingman, AZ | 354,000 | Dec. 2036 | 59 | $81 million |
| 8 | Kansas City, MO | 398,000 | Dec. 2036 | 64 | $67 million |
| 9 | Mankato, MN | 310,000 | Nov. 2041 | 56 | $64 million |

| | Location | Facility Sq. Ft. | Lease Exp. Date | Employees | 2023 Sales |
|---|---|---|---|---|---|
| 10 | Woodland, CA | 341,000 | Dec. 2036 | 57 | $55 million |
| 11 | Manchester, NH | 439,000 | Jul. 2033 | 93 | *Phasing Out* |
| 12 | Denver, CO | 355,000 | Jan. 2027 | 76 | *Inventory Holding – Phasing Out* |

Additionally, the Debtors owned and operated their paint manufacturing plant in Cary, Illinois, one of the ten largest paint manufacturing facilities in the world and the only facility in the United States capable of manufacturing latex, oil-based, and aerosol paints under one roof. The paint manufacturing plant was sold to the Purchaser.

### 3.    The Debtors' Employees

As of the Petition Date, the Debtors employed approximately 1,950 employees (the "Employees"), with approximately 115 sales Employees (the "Sale Employees"), 1,370 Employees in warehouse, distribution, and manufacturing roles, and the remaining Employees in corporate and other support positions. All of the Debtors' Employees were located in the United States. More than 98% of the Debtors' Employees worked full-time, and the remaining employees worked part-time.

Approximately 270 of the Debtors' Employees were represented (the "Represented Employees") by three unions affiliated with the International Brotherhood of Teamsters (the "Unions"). All of the Represented Employees worked in warehouse and distribution roles. The Debtors' relationships with the Unions are reflected in three separate collective bargaining agreements. Prior to the Petition Date, the Debtors decided to cease operations at their Manchester, NH distribution center by the end of the 2024 calendar year and had negotiated the terms of the closure with the Union representing Employees at that location.

To supplement its workforce, separate and apart from the Employees, the Debtors utilized individuals who provide a range of services to the Debtors on a contractual basis. The Debtors worked with approximately three part-time independent contractors who work directly for the Debtors (the "Independent Contractors") and provide human resources, risk management, and benefits administration support and consulting services. Independent Contractors were paid directly by the Debtors, in arrears. The Debtors also enlisted the services of temporary workers, each of whom was employed by and paid through third-party service providers.

### 4.    Market and Competition

The Debtors operated in a large, relatively fragmented wholesale hardware distribution market in the United States. Based on internal estimates, the Company estimated the total market size, excluding big box retailers such as Home Depot and Lowe's, at $38 billion in 2023. Fifty-one percent of this market was captured by regional distributors, followed by Ace Hardware (22%), Do it Best Co-op (12%), Orgill (10%), and the Company (5%). Wholesalers provide value through a bulk-purchasing and low-margins strategy, which delivers lower costs to hardware retailers and end customers.

C.      **The Debtors' Prepetition Corporate and Capital Structure**

1.      **The Debtors' Corporate Structure and Headquarters**

The Company operated in a holding company structure, with non-Debtors TV Holdco, L.L.C. and TV Holdco I, L.L.C. at the top, then Debtor TV Holdco II, L.L.C. acting as a direct and indirect holding company for each of the Debtor subsidiaries, including TVC, that conduct operations.

The Company's corporate headquarters is currently located at 8600 W. Bryn Mawr Ave., Chicago, IL 60631.

2.      **The Debtors' Capital Structure**

As of the Petition Date, the Debtors had approximately $238.2 million in total funded indebtedness under their Credit Facility (as defined below).  In addition, the Debtors had obligations under certain issued and outstanding Letters of Credit and the PNC Commercial Card Program (each as defined below).

*(i)      The Credit Facility*

On April 20, 2018, TVC entered into that certain Credit Agreement (as amended by Amendment No. 1  to Credit Agreement, dated as of September 16, 2021, as further amended by Amendment No. 2 to Credit Agreement, dated as of November 2, 2022, as further amended by Amendment No. 3 to Credit Agreement, dated as of January 24, 2023, as further amended by Amendment No. 4 (as defined below), dated as of August 26, 2024, and as further amended by Amendment No. 5 (as defined below), dated as of September 9, 2024, the "Credit Agreement") by and among TVC, as a borrower, and each of Distributors Hardware, L.L.C., TV GPMC, L.L.C., True Value Retail, L.L.C., TrueValue.com Company, L.L.C., TV TSLC, L.L.C., and True Value Virginia L.L.C., as additional borrowers (together with TVC, the "Borrowers"), TV Holdco II L.L.C., as guarantor (the "Guarantor" and, together with the Borrowers, the "Loan Parties"), PNC Bank, National Association, as administrative agent (in such capacity, the "Administrative Agent"), and the lenders and issuing banks party thereto (the "Prepetition Lenders" and, together with the Administrative Agent, the "Prepetition Secured Parties"), pursuant to which the Prepetition Lenders provided term loans, revolving loan commitments, and other financial accommodations to the Loan Parties (the "Credit Facility").

The Credit Facility consisted of (i) a term loan with $18.75 million outstanding after amortization as of the Petition Date and (ii) an up to $300 million asset-based revolving credit facility, subject to a borrowing base, and was secured by a first-priority security interest in and lien on substantially all of the Loan Parties' assets, subject to certain exclusions (the "Prepetition Collateral").  The Prepetition Collateral included, among other things, inventory, accounts receivable, certain fee-owned real property and subsidiary equity interests.  The borrowing base, as of October 5, 2024, was $260.6 million.

On August 26, 2024, the Loan Parties entered into a Temporary Waiver and Amendment No. 4 to the Credit Agreement ("Amendment No. 4" or the "First Waiver") which, among other things, temporarily waived certain Events of Default, reduced the aggregate revolving credit

commitments to $350,000,000 from $450,000,000, and pursuant to which the Loan Parties agreed that on and after August 27, 2024, all obligations under the Credit Agreement have, or shall be deemed to have, borne, and shall continue to bear, interest at a rate per annum equal to the Alternate Base Rate plus 3.50% (the "Amended Applicable Rate"), irrespective of whether the rate of such interest on or after such date was previously calculated using a rate other than the Amended Applicable Rate.

On September 9, 2024, the Loan Parties entered into the Second Temporary Waiver and Amendment No. 5 to the Credit Agreement ("Amendment No. 5" or the "Second Waiver") which, among other things, temporarily waived certain Events of Default and further reduced the aggregate revolving credit commitments to $300,000,000 from $350,000,000.

### (ii)    Letters of Credit

The Debtors were required to provide security to secure their obligations under certain Insurance Policies (as defined below), historical insurance policies, and the Customs Bond (as defined below).  To satisfy these obligations, the Debtors obtained a letter of credit facility pursuant to that certain Amended and Restated Substitute Insurance Collateral Facility Agreement (the "LC Facility Agreement"), dated as of September 25, 2024, by and between 1970 Group, Inc. ("1970 Group") and the Debtors (the "LC Facility").  Under the LC Facility, in exchange for a fee, 1970 Group arranged for the issuance and renewal of six letters of credit (the "Letters of Credit") for the benefit of the insurers and the Customs Bond issuer.  As of the Petition Date, the total amount outstanding on the Letters of Credit was approximately $11.31 million.  None of the Letters of Credit were drawn upon.  The LC Facility Agreement requires that the Debtors maintain their Insurance Policies in full force and effect and generally pay their obligations under the insurance policies as they become due.

### (iii)    PNC Commercial Card Program

On December 21, 2018, TVC entered into that certain PNC Commercial Card Program Authorization and Agreement (as amended by the Amendment to PNC Commercial Card Program Authorization and Agreement, dated as of May 6, 2022, and as supplemented by the PNC Commercial Card Program Term and Conditions (version May 2018), the "PNC Card Agreement") with PNC Bank, National Association ("PNC"), one of the lenders under the Credit Facility. Pursuant to the PNC Card Agreement, PNC extended credit to TVC by establishing one or more commercial card programs with an aggregate maximum limit of $25 million (the "PNC Commercial Card Program").  The Debtors maintain corporate cards under the PNC Commercial Card Program in the ordinary course of business to pay vendors and for certain work-related expenses, including "in the field" and employee travel expenses.  Because of PNC's participation as a lender in the Credit Facility, the credit extended under the PNC Commercial Card Program is secured by a first-priority security interest in and lien on the Prepetition Collateral.  On July 31, 2024, September 5, 2024, September 30, 2024, and October 11, 2024, PNC unilaterally reduced the aggregate maximum limit under the PNC Commercial Card Program to $4.5 million, $3.0 million (with a further contemplated reduction to $2.5 million effective shortly thereafter), $500,000, and $100,000, respectively.  As of the Petition Date, the Company maintained a small credit balance under the PNC Commercial Card Program.

### (iv) *Common Equity Interests*

Non-Debtor Acon owns approximately 99% of Class A units outstanding and issued in TV Holdco, L.L.C. Non-Debtor TV Cooperative Company owns 100% of Class B units outstanding and issued in TV Holdco, L.L.C. Non-debtor individuals collectively own 100% of Class E units outstanding and issued in TV Holdco, L.L.C. Non-Debtor TV Holdco, L.L.C. owns 100% of the equity interests in non-Debtor TV Holdco I, L.L.C. Non-Debtor TV Holdco I, L.L.C. owns 100% of the equity interests in Debtor TV Holdco II, L.L.C. Debtor TV Holdco II, L.L.C. owns 100% of the equity interests in True Value Company, L.L.C. True Value Company, L.L.C. owns 100% of the equity interests in each of the remaining Debtor subsidiaries.

## D. Summary of Events Leading to the Chapter 11 Filings

### 1. Consequences of the COVID-19 Pandemic

When the world shut down in the early months of the COVID-19 pandemic, demand for hardware products increased. As a point of reference, approximately 1,350 of True Value's retail customers provide True Value with point of sale data. At those 1,350 stores, there were approximately 44.6 million total retail transactions in 2019; in 2020, there were approximately 50.8 million. At the same time, the entire industry experienced major supply chain disruptions. The Company's fill rate (*i.e.*, the percentage of orders it could ship from available stock without any lost sales, backorders, or other inventory shortages) dropped from over 95% in January 2020 to below 75% in July 2020. Increased transaction volumes and product scarcity exacerbated the Company's challenges, with freight, labor, product, and financing costs escalating significantly. Raw material constraints led to price increases of 25-30%. Despite the Company's best efforts, some of their customers added a secondary supplier to maximize their ability to quickly meet end consumer demand.

Management swiftly took action to improve fill rates by removing redundancies, making internal changes to the Company's inventory team to refocus on key product areas, implementing an offline planning process for highly seasonal products and imports, and building out an optimized ordering module for True Value customers. However, the Company continued to struggle in winning back the business of those customers who added secondary suppliers.

Following the initial COVID spike in demand, transaction volume began to normalize. In 2021, retail transactions at reporting stores fell to 48.3 million; in 2022, to 44.4 million; in 2023, to 41.6 million; and in 2024, based on year-to-date sales and go-forward projections, to 39.7 million. In addition, its customers built up high inventory positions in the latter half of the pandemic, which resulted in further reductions in purchasing (even beyond reductions resulting from the drop in demand). The Company believed that as much as 80% of the decline in sales from 2023 to 2024 can be attributed to slower retail traffic, fewer retail transactions, and a milder winter, which affected the broader industry.

### 2.    Liquidity Challenges

#### (i)    Decreased Sales

Beginning in 2023, the Company began implementing difficult decisions to right-size its cost structure and responsibly manage the business in light of the numerous economic challenges it faced that were depressing its sales, including the impact of COVID described above, supply chain disruptions, and inflation.  The Company negotiated with vendors to achieve favorable pricing and worked to optimize delivery routes by minimizing miles driven and providing fixed order and delivery days.  Additionally, the Company anticipated phasing out two of its twelve distribution centers by consolidating less profitable centers with the ten driving the vast majority of profits.  Certain Employees were impacted by reductions in force.

Also in 2023, the Company approached its lenders in hopes of negotiating a credit agreement amendment to provide additional cushion based on the projected drop in sales and short-term liquidity challenges it anticipated that it would face as a result.  Ultimately, despite the Debtors' good faith efforts, no such agreement was reached.

#### (ii)    Borrowing Base Reduction and Prefunding Requirements

The Company's borrowing capacity under the Credit Agreement was tied to a formula called the "borrowing base."  The borrowing base calculation took into account the value of certain collateral pledged under the Credit Agreement.  One component of this calculation is the value of the Company's inventory, which value is determined via an annual appraisal.  In May 2024, the Prepetition Lenders had the Debtors' inventory appraised by Hilco Valuation Services.  The appraisal valued the Debtors' inventory more conservatively than the Debtors believe was warranted, leading to a $13.6 million reduction in True Value's borrowing base under the Credit Agreement.

Additionally, in June 2024, the Prepetition Lenders imposed a pre-funding requirement for ACH payments, a departure from the Debtors' historical practices upon which they had relied for budgeting and disbursement purposes.  The pre-funding requirement and reduced borrowing base left the Debtors without sufficient liquidity to operate their business on customary terms.

#### (iii)    Cash Dominion

In July 2024, the Prepetition Lenders implemented cash dominion (which the Company disputed), sweeping the Debtors' cash on a daily basis and applying it to the outstanding principal amount of the revolving loans.  These measures froze the Debtors' liquidity, making the Debtors dependent on the Prepetition Lenders for daily funding to maintain basic operations.  As a result, the Debtors were required to engage in nearly daily and, at times, contentious negotiations with the Prepetition Lenders over planned disbursements.  Over that period, approximately $105.1 million was applied to reduce the outstanding balance under the Credit Facility to $238.2 million.

### 3.    Waiver Negotiations

In July 2024, facing material reductions in its borrowing capacity, cash dominion, and associated liquidity issues, the Debtors began negotiating the First Waiver with the Administrative

Agent to (i) avoid or (ii) limit the operational consequences of any potential default under the Credit Agreement. The goal of the First Waiver was to provide the Company with the runway to complete a going concern restructuring transaction.

On August 26, 2024, following more than a month of negotiations, the Debtors and the Prepetition Lenders entered into the First Waiver. The First Waiver waived certain specified events of default by the Debtors through August 30, 2024, subject to an optional extension by the Prepetition Lenders. It also obligated the Prepetition Lenders to fund the Debtors' operations during the First Waiver period, which lasted approximately five days from signing to expiration. The Debtors continued to receive funding from the Prepetition Lenders following the expiration of the First Waiver period on a discretionary basis.

In exchange, the Debtors incurred a $1.85 million amendment fee, released claims against the Prepetition Lenders and agreed to various milestones relating to the ongoing sale process, including an August 30, 2024 deadline for potential buyers to submit indications of interest regarding a potential acquisition of the Debtors or their assets (as extended, the "Indication of Interest Deadline"). In addition, the First Waiver incorporated several amendments to the Credit Agreement as described above.

On September 9, 2024, the parties executed the Second Waiver. The Second Waiver waived certain specified events of default by the Debtors through September 16, 2024. Similar to the First Waiver, the Second Waiver obligated the Prepetition Lenders to fund the Debtors' operations during the Second Waiver period, which lasted approximately seven days from signing to expiration. In exchange, the Debtors released claims against the Prepetition Lenders and agreed to various milestones relating to the ongoing sale and valuation processes, including a September 6, 2024 deadline for certain updates on the economic benefits of the indications of interest received and a September 16, 2024 deadline for a valuation report of a hypothetical liquidation. In addition, the Second Waiver incorporated several amendments to the Credit Agreement as described above.

On September 17, 2024, after the expiration of the Second Waiver period, the banks declined to enter into further waivers, and the parties began a process whereby the Prepetition Lenders and Debtors negotiated funding amounts for certain, agreed upon, disbursements on an almost-daily basis while the Debtors negotiated with a competing bidder and worked to finalize the Stalking Horse Agreement with Do it Best.

### 4.      Restructuring Efforts

#### (i)      Sale Process

In May 2024, the Company retained Houlihan Lokey Capital, Inc. ("Houlihan") to explore liquidity solutions and other strategic alternatives. The Company believed that a robust marketing process for a going concern sale transaction would maximize value by preserving the going concern value of the business, preserving many jobs and capitalizing on a significant amount of synergy potential between the Company and potential partners.

In July 2024, around the time that the Company began negotiating the First Waiver, Houlihan launched a formal sale process. In connection with this process, Houlihan contacted twenty-five (25) prospective strategic and financial buyers. Fifteen (15) of the potential buyers

executed non-disclosure agreements and were granted access to a virtual data room.  Seven received management presentations.  It was clear to prospective bidders that the Company was open to concluding a transaction as part of a chapter 11 case.  Ultimately, five (5) potential buyers submitted indications of interest by the deadline to do so.

Following the submission of these indications of interest, the Debtors continued to solicit interest from potential buyers and worked with certain parties that submitted initial indications of interest in order to improve their proposed transaction terms.  These efforts paid off, resulting in significantly improved proposals from two potential buyers, including Do it Best, a strategic and synergistic bidder who agreed to serve as the Stalking Horse Bidder in a court supervised process subject to higher or otherwise better bids.   During the period leading up to the filing of these Chapter 11 Cases, the Debtors and Do it Best negotiated definitive documentation governing the Stalking Horse Bid.   These terms are embodied in the Asset Purchase Agreement, dated as of October 13, 2024, among the Debtors and the Purchaser (the "Stalking Horse Agreement"), which is attached as Exhibit 2 to the proposed order attached to the *Motion of Debtors for Entry of an Order (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, and (III) Granting Related Relief* [Docket No. 12] (the "Bidding Procedures Motion"), as amended by the *Notice of Amended and Restated Asset Purchase Agreement* [Docket No. 363].   Certain key terms of the Stalking Horse Agreement included:

- A sale of substantially all of the Debtors' assets to the Stalking Horse Bidder pursuant to Section 363 of the Bankruptcy Code;

- A $153 million cash consideration (the "Cash Consideration");

- The assumption of certain liabilities, including the assumption and cure of a meaningful number of contracts and the assumption of up to $45 million of trade payables that are administrative claims (the "Assumed Liabilities" and together with the Cash Consideration, the "Purchase Price");

- The assumption and assignment to the Stalking Horse Bidder of certain contracts and leases material to the operation of the business; and

- Employment offers to certain of the Debtors' existing Employees at the closing of the Sale.

The Stalking Horse Agreement also contained customary representations and warranties of the parties and is subject to a number of closing conditions, including, among others: (i) Bankruptcy Court approval of the Sale; (ii) the accuracy of representations and warranties of the parties in all materials respects; and (iii) material compliance with the obligations set forth in the Stalking Horse Agreement.

The transaction negotiated with the Stalking Horse Bidder built on the Debtors' months-long prepetition process and was supplemented during the postpetition marketing period contemplated by the bidding procedures, thereby providing further opportunity for interested bidders to formally bid for the Debtors' assets and business operations.  The consummation of the Stalking Horse Bid ensured that the Debtors' business continued as a going concern, providing stability to the Debtors' vendors and customer base and preserving many jobs.

TVC's board of directors (the "Board") met regularly throughout the Debtors' process of considering strategic alternatives and was kept apprised of the status of proposals and options available to the Debtors. In addition to numerous other meetings that were regularly held throughout the strategic alternatives process, at a meeting of the Board held on October 13, 2024, the Board, after full deliberation, determined that entering into the Stalking Horse Agreement, filing these Chapter 11 Cases, and pursuing an in-court sale of the Company pursuant to either the Plan or Section 363 of the Bankruptcy Code represented the highest and best offer available to the Debtors.

The Company, with the assistance of its advisors, carefully considered liquidation alternatives, including via an analysis prepared by Hilco Consumer-Retail. The Company agreed with the Prepetition Lenders to engage Hilco Consumer-Retail to conduct the analysis as part of negotiations regarding the Second Waiver and the commitment for stable funding during the waiver period and with the expectation that the Debtors and Prepetition Lenders would enter into a subsequent waiver. Ultimately, the Company determined that the Stalking Horse Bid and proposed bankruptcy sale process provided the most value-maximizing alternative.

### (ii)    Hilco Liquidation Report

At the insistence of the Prepetition Secured Lenders, the Debtors retained Hilco Consumer-Retail ("Hilco") to prepare a report showing anticipated recoveries for the Debtors' stakeholders in a liquidation. On September 27, 2024, Hilco issued an Asset Liquidation Analysis (the "Hilco Report") projecting recoveries in high case, mid case and low case liquidation scenarios with estimated recoveries ranging between approximately $185-271 million. The Hilco Report assumed a chapter 11 liquidation process that would take place over a 13-16 week period.

However, following a close review of the Hilco Report and discussions with Hilco and the Debtors' advisors, the Debtors determined that the Hilco Report was unreliable. Specifically, the Debtors believe that they identified numerous fundamental flaws in the methodologies relied upon by Hilco in preparing the Hilco Report, in particular, as it relates to the projected high-case scenario (and mid-case scenario, which simply averaged the low and high cases). The Debtors believe that the problematic assumptions, among other things, led to materially inflated projected inventory recoveries and accounts receivable collections. Accordingly, the Board determined that the Stalking Horse Bid presented the value maximizing alternative.

### ARTICLE III
### THE CHAPTER 11 CASES

#### A.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge upon written or other request to the Solicitation Agent by: (a) emailing the Solicitation

Agent at TrueValueInquiries@OmniAgnt.com with a reference to "True Value" in the subject line; (b) visiting the Debtors' restructuring website at https://omniagentsolutions.com/TrueValue; or (c) calling the Solicitation Agent toll-free at (866) 771-0561 (U.S. & Canada) or +1 (818) 356-8633 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at https://www.deb.uscourts.gov or the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours 8:00 a.m. to 4:00 p.m. (prevailing Eastern Time).  The following table provides a brief overview of the First Day Motions.

| MOTION | RELIEF REQUESTED |
|---|---|
| **Administrative Motions** | |
| Joint Administration | Authority to jointly administer the Debtors' cases for procedural purposes only |
| Redact Personally Identifiable Information | Authority to redact personally identifiable information of individuals |
| Claims and Noticing Agent | Authority to retain Omni as claims and noticing agent |
| **Operational Motions** | |
| Employee Compensation and Benefits Programs | Authority to pay prepetition wages, compensation and employee benefits and continue certain employee benefit programs |
| Critical Vendors | Authority to pay certain prepetition critical vendors, foreign vendors and lien claimants |
| Utilities | Establishment of procedures for determining adequate assurance of payment for future utility services |
| Insurance | Authority to pay prepetition insurance obligations and maintain and renew insurance policies in the ordinary course |
| Customer Programs | Authority to honor certain prepetition obligations to customers and continue customer programs |
| Taxes | Authority to pay prepetition sales, use, franchise, income, property, and other taxes and related fees, charges, and assessments |
| Cash Collateral | Authority to use cash collateral and granting adequate protection to the Prepetition Lenders |

On October 16, 2024, the Bankruptcy Court held a hearing (the "First Day Hearing") at which it considered the First Day Motions.  Following the First Day Hearing, the Bankruptcy Court entered certain orders granting the relief requested by the Debtors (the "First Day Orders").  Certain of the First Day Orders were entered on an interim basis and later approved on a final basis in the subsequent weeks.

The First Day Motions included the Debtors' motion requesting authority to use cash collateral and granting adequate protection to the Prepetition Lenders [Docket No. 19] (the "Cash Collateral Motion").  On October 16, 2024, PNC filed a preliminary objection to the Cash Collateral Motion [Docket No. 67].  Following the First Day Hearing, the Debtors reached agreement with PNC on the Debtors' interim use of Cash Collateral (as defined in the Cash Collateral Motion) to facilitate the Debtors' urgent need for cash to protect the business and the value-maximizing going concern sale that could not be accomplished outside of these Chapter 11 Cases.  This agreement was reflected in the interim Cash Collateral order entered on October 18, 2024 [Docket No. 106].

Over the following two weeks, the Debtors worked tirelessly to reach consensual agreement with PNC on the use of Cash Collateral on a final basis, while also preparing to proceed with the request on a contested basis in the event a consensual agreement could not be reached. A second agreed interim Cash Collateral order was entered on October 28, 2024 [Docket No. 175] to allow more time for the parties to reach agreement. On October 29, 2024, the Debtors filed a reply in support of the Cash Collateral Motion and in response to PNC's objection [Docket No. 199] and PNC filed a supplemental objection [Docket No. 203]. A third agreed interim Cash Collateral order was entered on October 30, 2024 [Docket No. 224] in advance of a contested hearing on Cash Collateral held later that day.

Following numerous depositions, expedited discovery, and intensive negotiations among the parties, the Debtors announced on the record at a continued hearing on October 31, 2024 that an agreement had been reached with respect to the Debtors' consensual use of Cash Collateral, which agreement was supported by the Committee (as defined below) and the Prepetition Lenders. The final Cash Collateral order was entered on November 4, 2024 [Docket No. 296].

### B.     Second Day Relief

In addition to the First Day Motions, the Debtors filed various motions seeking additional relief following the Petition Date, which were subsequently granted by the Bankruptcy Court (collectively, the "Second Day Orders"). In addition to the relief described below, the Second Day Orders included orders (i) establishing procedures for interim compensation and reimbursement of expenses for professionals [Docket No. 346] and (ii) authorizing the retention and compensation of professionals utilized in the ordinary course of business [Docket No. 390].

#### 1.     Retention of Professionals

The Second Day Orders also included orders authorizing the Debtors to retain, effective as of the Petition Date, the following professionals and advisors to assist the Debtors during the Chapter 11 Cases: (i) Skadden, Arps, Meagher & Flom LLP as counsel [Docket No. 435], (ii) Glenn Agre Bergman & Fuentes LLP as conflicts and efficiency counsel [Docket No. 424], (iii) Young Conaway Stargatt & Taylor, LLP as co-counsel [Docket No. 421], (iv) M3 Advisory Partners, LP to provide a Chief Transformation Officer and supporting personnel [Docket No. 419], (v) Houlihan as financial advisor and investment banker [Docket No. 418], and (vi) Omni as administrative agent.

#### 2.     Bar Dates

The Second Day Orders also included an order [Docket No. 262] (the "Bar Date Order"), establishing November 27, 2024 at 11:59 p.m. (prevailing Eastern Time) as the 503(b)(9) Bar Date, December 5, 2024 at 11:59 p.m. (prevailing Eastern Time) as the General Bar Date, April 14, 2024 at 11:59 p.m. (prevailing Eastern Time) as the Governmental Bar Date, and separate bar dates for Claims arising from the Debtors' rejection of executory contracts and unexpired leases and for Claims that the Debtors have amended in their Schedules. In addition, the Bankruptcy Court entered an order [Docket No. 577] (the "Administrative Expense Bar Date Order" and, together with the Bar Date Order, the "Bar Date Orders") establishing December 23, 2024 at 11:59 p.m.

(prevailing Eastern Time) as the deadline for filing requests for allowance of administrative expense claims (collectively, the "Bar Dates").

Pursuant to the Bar Date Orders, the Debtors' claims and noticing agent, Omni, served notice of the Bar Dates on November 5, 2024 and November 22, 2024.

## C.    Appointment of Committees

On October 23, 2024, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "Committee").  As of the date of this filing, the Committee comprised (i) STIHL Inc., (ii) The Hillman Group, Inc., (iii) Black & Decker (US), Inc., (iv) Ryder Integrated Logistics, (v) Carhartt, Inc., (vi) The Sherwin-Williams Co. d/b/a Minwax, (vii) Pension Benefit Guaranty Corp., and (viii) W.P. Carey Inc.

The Committee retained Pachulski Stang Ziehl & Jones, LLP as counsel and Province, LLC as financial advisor.  The Bankruptcy Court subsequently entered orders authorizing the employment and retention of these advisors by the Committee [Docket Nos. 694, 695].

On December 3, 2024, the Bankruptcy Court entered an order authorizing and directing the U.S. Trustee to appoint an Official Committee of Retired Employees [Docket No. 655].  On January 2, 2025, the U.S. Trustee filed a statement that a committee of retired employees was not appointed due to a lack of response [Docket No. 746].

## D.    Sale Process

### 1.    The Stalking Horse Bidder and Bidding Procedures

As described above, on October 13, 2024, the Debtors entered into the Stalking Horse Agreement with the Stalking Horse Bidder.  The Stalking Horse Agreement contemplated the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder for a total of $153 million in cash paid to the Debtors at Closing and the assumption by the Purchaser of the Assumed Liabilities, among other key terms.   The transactions contemplated by the Stalking Horse Agreement were subject to a Court-supervised sale process pursuant to the Debtors' proposed bidding procedures, higher or better offers, and an auction.

In connection with the Sale, the Debtors filed the Bidding Procedures Motion on the Petition Date requesting entry of an order, among other things: (i) authorizing and approving bidding procedures (the "Bidding Procedures") for soliciting other bids for the Debtors' business, (ii) establishing notice procedures and approving the form of notice and manner of all procedures, protections, schedules, and agreements in connection with the proposed sale, (iii) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases, (iv) scheduling the Sale hearing and related dates and deadlines, (v) approving the form and manner of the notice of the Sale hearing, and (vi) granting related relief, including authorizing and approving the Debtors' entry into the Stalking Horse Agreement.

As set forth in the Bidding Procedures Motion, the Debtors, in consultation with their professional advisors, worked extensively to implement a robust and expeditious Sale process.  On

November 4, 2024, the Bankruptcy Court entered an order [Docket No. 297] (the "Bidding Procedures Order") approving the Bidding Procedures and establishing, among other things, November 8, 2024 as the bid deadline and Sale objection deadline, November 11, 2024 as the auction date (if one were to be conducted), and November 12, 2024 as the hearing to approve the Sale. The description of the Stalking Horse Agreement and the Bidding Procedures contained herein does not purport to be complete and is qualified in its entirety by reference to the Plan, the Stalking Horse Agreement and the Bidding Procedures, as applicable.

The Stalking Horse Agreement served as the baseline for all prospective bidders to negotiate from, and was subject to higher or otherwise better bids for the Assets pursuant to the Bidding Procedures. To this end, Houlihan continued to market the Debtors' Assets and contacted all third parties contacted as part of the prepetition sale process to inform them of the Chapter 11 Cases, the Stalking Horse Agreement and the proposed Bidding Procedures, and to gauge their interest in participating in the postpetition Sale process.

The Debtors ultimately received no other qualifying bids for any of the Debtors' Assets by the bid deadline. In accordance with the Bidding Procedures Order, the Debtors filed a notice [Docket No. 362] of cancellation of the auction and designation of the Stalking Horse Bidder as the Successful Bidder (as defined in the Bidding Procedures Order) and, ultimately, the Purchaser of the Assets.

The Bankruptcy Court held a hearing and approved the Sale on November 12, 2024, and entered an order [Docket No. 411] memorializing approval of the Sale on November 13, 2024. The Sale closed on November 22, 2024.

In accordance with the Cash Collateral Order and the Sale Order, all proceeds of the Sale and cash collateral of the Prepetition Lenders not otherwise designated pursuant to and as set forth in the Cash Collateral Order, are to be remitted to the Prepetition Lenders for permanent application toward the indefeasible payment of all Indebtedness (as defined in the Cash Collateral Order) owing by the Debtors to the Prepetition Lenders. The remaining proceeds of the Sale received from the Purchaser at the Closing and cash collateral of the Prepetition Lenders not otherwise designated pursuant to and as set forth in the Cash Collateral Order, which, in the aggregate, is projected to be approximately $[6.2] million as of the Effective Date, represent the majority of the Assets being used to fund the Plan.

## 2. The Transition Services Agreement

To effectuate a smooth transition of the Debtors' assets and business operations to the Purchaser as part of the Sale, the Purchaser and the Debtors entered into a transition services agreement (the "Transition Services Agreement") on terms consistent with those set forth in the TSA Term Sheet (as defined in the Sale Order) attached as Exhibit H to the Asset Purchase Agreement filed at Docket No. 363. The Transition Services Agreement provides for a transition period of up to twelve (12) months following the Sale Closing date, which period may be extended by mutual agreement of the Purchaser and the Debtors or the Post-Effective Date Debtors, as applicable (the "Transition Period"). Pursuant to the Transition Services Agreement, the Debtors or the Post-Effective Date Debtors, as applicable, have been providing and shall continue to provide through the Transition Period certain transition services, including but not limited to:

(i) providing reasonable access to and use of information, data and assets in the possession of the Debtors or the Post-Effective Date Debtors, as applicable, needed by the Purchaser to effectuate a smooth transition of the Debtors' assets and business operations; and (ii) services required for maintaining the Debtors' assets, contracts and insurance policies. The remaining obligations of the Debtors or the Post-Effective Date Debtors, as applicable, under the Transition Services Agreement are minimal and the costs of such services provided by the Debtors or the Post-Effective Date Debtors, as applicable, are to be reimbursed by the Purchaser in accordance with the Transition Services Agreement.

**E.      Retiree Benefits**

The Debtors provide certain self-funded postemployment medical, dental, and vision benefits, life insurance benefits, and death benefits to approximately 300 former employees in one or more plans (collectively, the "Retiree Plans" or "OPEB"). After review of the plans and related information, the Debtors believe that most of the Retiree Plans are unvested and therefore unilaterally terminable in their discretion after the Effective Date of the Plan. *See In re Visteon Corp.*, 612 F.3d 210, 236 (3d Cir. 2010). They intend in connection with Confirmation to establish, for purposes of setting post-Effective Date reserves, that they may in fact terminate such Retiree Plans after the Effective Date, as they do not have the means to continue to maintain them.

The Debtors have also determined that certain of the Retiree Plans are or may be vested, and as such, are not unilaterally terminable after the Effective Date. The arguably vested plans are for (a) postemployment medical, dental, and vision benefits (affecting approximately four retirees in the aggregate) and (b) benefits under one death benefit plan (the so-called "Servistar Plan," affecting approximately 264 retirees in the aggregate) (together, the "Ongoing Retiree Plans").

Accordingly, on October 21, 2024, the Debtors filed a motion [Docket No. 116] seeking the appointment of an official committee of retired employees (a "retiree committee") to negotiate the go-forward treatment of such Retiree Plans and resolution of claims thereunder. Although on December 3, 2024, the Court entered an order authorizing and directing the U.S. Trustee to appoint a retiree committee [Docket No. 655], on January 1, 2025, the U.S. Trustee filed a statement, however, that no retiree committee would be appointed as no retirees had responded to its inquiry inviting service on the committee [Docket No. 746].

Because no retiree committee has been appointed, the Debtors now will seek the appointment of a disinterested, third-party fiduciary pursuant to Section 1114 or Section 105(a) of the Bankruptcy Code to represent the interests of the beneficiaries under the Ongoing Retiree Plans, including to negotiate modifications thereof, as well as to assist the Plan Administrator in making any OPEB distributions to retirees or their beneficiaries (the "Fiduciary"). *See In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Jan. 2, 2019), ECF No. 943.

If the Court appoints the Fiduciary, the Debtors will, before Confirmation, seek to negotiate a settlement in respect of the Ongoing Retiree Plans under which they would reserve for and pay the net present cash value of the future entitlements under such plans. Subject to the Fiduciary's evaluation of the proposal and Court approval, the Debtors would then fund a reserve with the amount of the settlement. The Fiduciary would also be authorized to engage in a notice and claims resolution process to facilitate paying each bona fide claimant their share of the settlement, which

process would be incorporated into the Plan, approved pursuant to the Confirmation Order, and administered following the Effective Date.

If any of the foregoing does not occur, the Debtors intend to fund a reserve, in trust, with (a) cash equal to the net present value of future entitlements under the Ongoing Retiree Plans and to obtain beneficiaries' approval of the payment thereof, and (b) the amount of any Allowed Administrative Claims, if any, in respect of benefits due for the period prior to the Effective Date under the to-be-terminated unvested plans, in each case, for further distribution to beneficiaries. The Fiduciary would be responsible for managing the foregoing process.

## ARTICLE IV
## SUMMARY OF PLAN

THIS SECTION PROVIDES A SUMMARY OF THE PLAN.  THE STATEMENTS CONTAINED IN THIS SECTION DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN AND ARE QUALIFIED IN THEIR ENTIRETY BY AND ARE SUBJECT TO THE PLAN, THE EXHIBITS TO THE PLAN, AND THE DEFINITIONS CONTAINED IN THE PLAN.  REFERENCE IS MADE TO THE PLAN, ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT A**, FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN.  UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**THE PLAN CONTAINS CERTAIN IMPORTANT SETTLEMENT, RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.  THOSE PROVISIONS ARE RESTATED BELOW FOR YOUR CONVENIENCE.**

In this section, the Debtors provide a summary of certain key provisions of the Plan relating to, among other things, the: (i) payment of administrative expenses and priority claims, (ii) classification, treatment, and voting rights of creditors and equity holders, (iii) sources of funding for Distributions contemplated by the Plan, (iv) the orderly wind-down of the Debtors, and (v) releases, injunctions, and exculpations.

## A.    Plan Overview

The following chart provides an overview of certain important provisions in the Plan:

| Category | Description | Location in Plan |
|---|---|---|
| Treatment of Administrative Expenses and other Priority Claims | Sets forth detailed information relating to the treatment of Administrative Claims, Professional Claims and Priority Tax Claims. | Article II |
| Classification and Treatment of Claims and Interests and Acceptance of the Plan | Provides information relating to the classification and treatment of Claims and Interests, including proposed distributions under the Plan to creditors and equity holders as well as the terms for voting on and acceptance of the Plan. | Article III |
| Means for Implementation | Describes the means for implementing the Plan, including details regarding the funding for distributions under the Plan, the Post-Effective Date Debtors, the Plan Administrator, the Litigation Trust and the Transition Services Agreement. | Article IV |
| Treatment of Executory Contracts and Unexpired Leases | Sets forth details regarding the assumption and rejection of executory contracts and unexpired leases, including with respect to claims arising from rejections, assumption cure determinations, employee compensation and benefit programs, insurance policies and organizational documents. | Article V |
| Procedures for Resolving Claims | Provides procedures for resolving contingent, unliquidated, and disputed claims. | Article VI |
| Distributions | Describes distributions under the Plan including, among other things, the record date for distributions, timing and calculation of amounts to be distributed, and rights and powers of the Distribution Agent. | Article VII |
| Settlement, Release, and Injunction Provisions | Sets forth settlements, releases, and injunctions under the Plan. | Article VIII |
| Conditions Precedent | Sets forth the conditions precedent to confirmation of the Plan and the Effective Date, including various required Bankruptcy Court approvals. | Article IX |
| Retention of Jurisdiction | Describes the matters over which the Bankruptcy Court will retain exclusive jurisdiction following confirmation of the Plan. | Article X |
| Miscellaneous | Covers miscellaneous relief, including, among other things, the binding effect of the Plan, the dissolution of any statutory committees appointed in the Chapter 11 Cases, the Debtors' rights to modify or amend the Plan, and governing law. | Article XI |

## B.    Administrative Expenses and Priority Claims (Article II)

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims of the kinds specified in Sections 507(a)(1) and 507(a)(8) of the

Bankruptcy Code have not been classified.  As summarized in the chart below, Article II of the Plan describes the treatment of such claims.

| Claim | Plan Treatment | Section |
|---|---|---|
| Administrative Claims | Paid in full in cash (i) on the Effective Date, (ii) when the claim becomes due, (iii) in the ordinary course or (iv) on such other agreed date. | §2.1 |
| Professional Claims | Paid in full in cash in accordance with the procedures set forth in the Plan. | §2.2 |
| Priority Tax Claims | Paid in full in cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. | §2.5 |

## C.    Classification, Treatment, and Voting of Claims and Interests (Articles III & IV)

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  The Debtors are also required, under Section 1122 of the Bankruptcy Code, to classify Claims against and Interests in, the Debtors (except for certain claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

IN ACCORDANCE WITH SECTION 1123 OF THE BANKRUPTCY CODE, ARTICLES III AND IV OF THE PLAN (I) DESIGNATE CLASSES OF CLAIMS AND INTERESTS AND (II) SPECIFY THE TREATMENT, INCLUDING WHETHER EACH CLASS IS IMPAIRED OR UNIMPAIRED, AND VOTING RIGHTS OF EACH CLASS.  PLEASE REVIEW THESE ARTICLES OF THE PLAN CLOSELY.  **FOR A SUMMARY OF THESE TERMS AS WELL AS THE ESTIMATED PERCENTAGE RECOVERIES OF THE CLAIMS AND INTERESTS UNDER THE PLAN, PLEASE REFER TO THE TABLE INCLUDED IN THE INTRODUCTION TO THIS DISCLOSURE STATEMENT UNDER THE SECTION TITLED "VOTING RIGHTS, TREATMENT AND CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN."**

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that they have complied with such standard. If the Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors and does not constitute a substantive consolidation of the Debtors' Estates.  The Plan provides for consolidation of the Debtors solely for voting, confirmation and distribution, but not for any other purpose.  Therefore, all Claims against and Interests in a particular Debtor are placed in the Classes with respect to such Debtor.  Classes that are not applicable as to a particular Debtor shall be eliminated as set forth more fully in Section 3.3(d) of the Plan.

A Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under the Plan and under Sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of voting on the Plan and, to the extent applicable, receiving distributions pursuant to

the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  **UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained in the Plan with respect to the aggregate Claims in any Impaired Class.  Thus, the value of property that ultimately will be received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.

The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Court.

### D.    Voting on the Plan (Article III)

As described in Article V of this Disclosure Statement, only classes of claims or interests that are "impaired" under a plan and receive or retain some property under the plan on account of their claims or interests may vote to accept or reject such plan.  Accordingly, only Holders of Prepetition Lender Claims in Class 3 and Holders of General Unsecured Claims in Class 4 are entitled to vote on the Plan.

**E.**    **Means for Implementation of the Plan (Article IV)**

**1.**    **Corporate Action**

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator or the Litigation Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Post-Effective Date Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

**2.**    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Debtors, the Plan Administrator (on behalf of the Post-Effective Date Debtors) and the Litigation Trustee (on behalf of the Post-Effective Date Debtors), as applicable, is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**3.**    **Corporate Existence Post-Effective Date**

*(i)*    *Directors and Officers*

Immediately following the occurrence of the Effective Date, (i) the respective boards of directors or managers, as applicable, and the current officers, of each of the Debtors, shall be terminated without cause and such members of the boards of directors or managers, as applicable, and the current officers of the Debtors shall be deemed to have resigned; and (ii) the Plan Administrator shall: (1) be appointed as the sole member of the board of directors or board of managers, as applicable, and the sole officer; (2) succeed as the sole Holder of Interests in each Post-Effective Date Debtor; (3) have the rights and powers of a debtor in possession under Section 1107 of the Bankruptcy Code; (4) be a "representative of the estate" pursuant to Section 1123(b)(3) of the Bankruptcy Code; (5) be vested with the rights, powers, and benefits afforded to a "trustee" under Sections 704 and 1106 of the Bankruptcy Code; and (6) have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary.

*(ii)*    *Organizational and Governance Documents*

Immediately following the occurrence of the Effective Date, the Post-Effective Date Debtors shall continue to exist in accordance with the laws of their respective states of formation and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with

the Plan.  The Post-Effective Date Debtors shall exist for the limited purposes of completing the Debtors' obligations under the Transition Services Agreement and fully administering the Estates. Promptly after performing all duties and functions that are consistent with the implementation of the Plan, the Confirmation Order, the Asset Purchase Agreement, and the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all actions to wind down, dissolve, or liquidate the Post-Effective Date Debtors.  without the necessity for any other or further actions to be taken by or on behalf of such dissolving Post-Effective Date Debtors or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

The certificate and articles of in-corporation and by-laws of each Post-Effective Date Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under Section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Post-Effective Date Debtors to matters authorized under the Plan.

### 4.    Settlement of Claims and Interests

Pursuant to Section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests or Causes of Action that (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released pursuant to Section 8.2 of the Plan; (c) have been released pursuant to Section 8.3 of the Plan; (d) are subject to the exculpation pursuant to Section 8.4 of the Plan; or (e) are otherwise stayed or terminated pursuant to the terms of the Plan.

### 5.    Plan Funding

All Cash necessary for the Debtors to fund distributions, make payments or otherwise satisfy any obligations under the Plan shall be funded in accordance with the Cash Collateral Order; *provided that*, to the extent the Transition Services Agreement requires the Debtors to make any payments or take any other actions associated therewith, the amount of any such payments or distributions or the cost of taking such actions shall be funded solely by the Purchaser.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

### 6.    Cancellation of Old Securities and Agreements

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including, without limitation, Prepetition Lender Claims and Existing Interests, shall be deemed canceled and surrendered without any need for further action or approval of the Bankruptcy Court or any Holder or other Entity and the obligations of the Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and satisfied with the distributions, if any, provided hereunder, and the Administrative Agent

shall be released from all duties thereunder; *provided* that notwithstanding entry of the Confirmation Order or consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (a) allowing Holders to receive distributions under the Plan; (b) allowing the Administrative Agent to enforce its rights, claims, and interests vis-à-vis any parties other than the Debtors or the Post-Effective Date Debtors; (c) allowing the Administrative Agent to make the distributions on account of Prepetition Lender Claims in accordance with the Plan (if any), as applicable; (d) preserving any rights of the Administrative Agent to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders under the Credit Agreement, including any rights to priority of payment and/or to exercise charging liens; (e) allowing the Administrative Agent to exercise rights and obligations relating to the interests of Holders of Prepetition Lender Claims; (f) allowing the Administrative Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan; and (g) permitting the Administrative Agent to perform any functions that are necessary to effectuate the foregoing; *provided, further,* that except as provided herein, the preceding proviso shall not affect the settlement and release of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtors.

## 7.  Vesting of Assets

Except as otherwise provided in the Plan, the Asset Purchase Agreement, the Plan Supplement, or in any agreement, instrument, or other document incorporated herein or therein, on the Effective Date all property in each Debtor's Estate, and all Causes of Action held by the Debtors or their Estates (except those released pursuant to the Plan or an order of the Bankruptcy Court) shall either be transferred to the Purchaser in accordance with the Asset Purchase Agreement or re-vest with the Post-Effective Date Debtors, as applicable, free and clear of all Liens, Claims, charges, and other encumbrances to the fullest extent possible under the Bankruptcy Code, and neither the Purchaser nor the Post-Effective Date Debtors shall have any liability for such Liens, Claims, charges, or other encumbrances whatsoever (other than to the extent provided in the Asset Purchase Agreement). On and after the Effective Date, except as provided in this Plan, the Purchaser (and, to the extent acting on behalf of the Post-Effective Date Debtors pursuant to this Plan, the Plan Administrator Agreement, or the Asset Purchase Agreement, the Plan Administrator) may operate their business and may (a) use, acquire, and dispose of property; (b) compromise or settle Claims, Interests, and Causes of Action; and (c) take any other action contemplated by the Plan, the Asset Purchase Agreement, the Plan Supplement, or the Confirmation Order, in each case, without Bankruptcy Court supervision or approval, and free of any Bankruptcy Code or Bankruptcy Rule restrictions, provided, however, that any derivative actions may be settled, voluntarily dismissed, or compromised only with court approval, to the extent that such court approval is required by Bankruptcy Rule 7023.1(c).

## 8.  Plan Administrator

### (i)  Appointment of the Plan Administrator

From and after the Effective Date, a Person or Persons to be designated by the Debtors in consultation with the Committee shall serve as the Plan Administrator pursuant to the Plan

Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan. The Debtors shall include, in the Plan Supplement, the information set forth in Sections 1129(a)(4) and (5) of the Bankruptcy Code and the identity of Person or Entity who the Debtors have selected as the Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. The Plan Administrator shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the Plan Administrator Agreement.

### (ii)      The Plan Administrator Agreement

Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan.

### (iii)     Rights, Powers, and Duties of the Debtors and the Plan Administrator

On and after the Effective Date, the Plan Administrator will act for the Post-Effective Date Debtors in the same capacity as applicable to a board of managers or directors, or to officers, subject to the provisions of the Plan. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Post-Effective Date Debtors. Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all corporate actions consistent with the Plan, the Confirmation Order, the Asset Purchase Agreement, all other applicable orders of the Bankruptcy Court, and the Plan Administrator Agreement, in each case, that are necessary and/or desirable to effectuate the terms of the Plan on behalf of the Post-Effective Date Debtors and use its reasonable best efforts to assist with or effectuate the transition of the Debtors' business, wind down, dissolution, or liquidation of the Post-Effective Date Debtors and any non-Debtor Affiliates. In taking such actions, the Plan Administrator may control and exercise authority over any Assets, vested in the Post-Effective Date Debtors pursuant to the Plan, over the acquisition, management, and disposition thereof and over the management and conduct of the affairs of the Post-Effective Date Debtors. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Post-Effective Date Debtors pursuant to the Plan and the Plan Administrator Agreement, shall include, among others, (a) making distributions to Holders of Allowed Claims and Interests as provided for in the Plan, (b) administering, reconciling and resolving Administrative Claims, Professional Claims, Restructuring Expenses, Priority Tax Claims and Other Priority Claims, (c) filing tax returns and paying taxes, (d) performing all obligations required of the Post-Effective Date Debtors under the Transition Services Agreement, (e) paying any Statutory Fees, (f) maintaining the books and records and accounts of the Debtors, (g) defending the Debtors in any pending or future litigation (except with respect to any counterclaims filed against the Litigation Trust), (h) selling,

abandoning, or otherwise fully administering the Estates, (i) closing the Chapter 11 Cases, (j) dissolving the Post-Effective Date Debtors, and (xi) performing other duties and functions that are consistent with the implementation of the Plan.

### (iv)    Transition Services

On the Effective Date, and continuing until the end of the Transition Period, the Plan Administrator shall serve as an appointed agent of the designated operator or as the operator of the Debtors in accordance with the Plan for the purpose of fulfilling any obligations thereunder.

### (v)    Compensation of the Plan Administrator and Plan Administrator Professionals

The Plan Administrator shall be compensated from the Plan Administration Reserve, in accordance with the Plan Administration Budget, and pursuant to the terms of the Plan Administrator Agreement. For the avoidance of doubt, any costs of the Plan Administrator associated with fulfilling the obligations under the Transition Services Agreement shall be funded directly by the Purchaser and will not be paid out of the Plan Administrative Reserve or calculated for purposes of the Plan Administration Budget.

The Plan Administrator Professionals shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Plan Administration Reserve. Payment of the fees and expenses of the Plan Administrator and the Plan Administrator Professionals shall be made in the ordinary course of business; *provided*, *however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

### (vi)    Indemnification of the Plan Administration Indemnified Parties

The Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administration Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administration Indemnified Party's willful misconduct or gross negligence, with respect to the Debtors or the implementation or administration of the Plan or the Plan Administrator Agreement. To the extent any Plan Administration Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Plan Administration Indemnified Party (and such Plan Administration Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Plan Administration Indemnified Party is not entitled to be indemnified therefore) out of the Plan Administration Reserve or any insurance purchased using the Plan Administration Reserve. The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent of the Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

### (vii)     Exculpation of the Plan Administrator

As of the Effective Date, to the extent not already included, the organizational documents of the Debtors shall be modified to provide for the exculpation of the Plan Administrator to the fullest extent permitted by applicable law.

### (viii)     Insurance for the Plan Administrator

The Plan Administrator shall be authorized to obtain and pay for out of the Plan Administration Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Post-Effective Date Debtors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator after the termination of the Plan Administrator Agreement.

### 9.     Litigation Trust

### (i)     Establishment of the Litigation Trust

On or prior to the Effective Date, the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement in form and substance consistent with the terms set forth herein and otherwise reasonably acceptable to the Debtors and the Committee.

On the Effective Date, the Debtors shall (x) automatically be deemed to have transferred and assigned to the Litigation Trust all of their right, title, and interest in and to all the Retained Causes of Action, and, in accordance with Section 1141 of the Bankruptcy Code, all such Retained Causes of Action shall automatically vest in the Litigation Trust free and clear of all Liens, Claims, charges, encumbrances and interests, for the benefit of Holders of Allowed General Unsecured Claims and (y) transfer the Initial Litigation Trust Funded Amount to an account established by the Litigation Trust to fund the administration of such trust.

Immediately following the occurrence of the Effective Date, the Litigation Trustee shall be deemed appointed to serve as the trustee and administrator of the Litigation Trust. The Litigation Trust shall have standing to pursue, assert, litigate, and fully resolve the Litigation Trust Causes of Action, and neither the Debtors nor the Post-Effective Date Debtors shall have any interest in or with respect to the Retained Causes of Action or any Cash or assets contained in the Litigation Trust.

As set forth in the Plan, the Debtors anticipate transferring the Retained Causes of Action to the Litigation Trust on the Effective Date. The Litigation Trustee shall investigate any Retained Causes of Action and determine if any can be brought for the benefit of Holders of General Unsecured Claims and the Prepetition Lenders as and to the extent set forth in the Cash Collateral Order, who will be the beneficiaries of the Litigation Trust. There are a number of significant variables associated with projecting likely distributions to unsecured creditors, both with respect

to the value, if any, of the Retained Causes of Action, and the costs and expenses of pursuing such Retained Causes of Action, as well as administering the Litigation Trust.

### (ii)    Purpose of the Litigation Trust

The Litigation Trust shall be established for the purpose of (i) investigating, commencing, litigating, and settling the Retained Causes of Action, (ii) liquidation of the Litigation Trust's assets, (iii) distribution of the Litigation Trust Distributable Proceeds, if any, to the Litigation Trust Beneficiaries, and (iv) performing such other duties as set forth in the Litigation Trust Agreement, in each case in accordance with Section 301.7701-4(d) of the Treasury Regulations, with no objective to continue or engage in the conduct of a trade or business.

### (iii)    The Litigation Trust Agreement

The Litigation Trust shall be administered by the Litigation Trustee in accordance with the Litigation Trust Agreement.  The Litigation Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Litigation Trust as a liquidating trust for United States federal income tax purposes as discussed below.  Upon execution of the Litigation Trust Agreement, the Litigation Trustee shall be authorized to take all steps necessary to complete the formation of the Litigation Trust.  The Litigation Trustee shall serve as representative of the Estates under Section 1123(b) of the Bankruptcy Code for the purpose of (i) enforcing the Litigation Trust Causes of Action and (ii) administering the Litigation Trust and distributing its assets to the Litigation Trust Beneficiaries.

### (iv)    Powers and Duties of the Litigation Trustee

On and after the Effective Date, the powers and duties of the Litigation Trustee shall include, *inter alia*, (i) analyzing Retained Causes of Action and determining whether to abandon, pursue, litigate, or settle such claims; (ii) retaining and compensating professionals, employees, and consultants to assist with the administration of the Litigation Trust; (iii) making distributions to the Litigation Trust Beneficiaries in accordance with the Plan and Litigation Trust Agreement; (iv) administering, reconciling, and resolving General Unsecured Claims; and (v) performing other duties and functions that are consistent with the purpose of the Litigation Trust.

In pursuing any Litigation Trust Causes of Action, the Litigation Trustee shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Litigation Trust Causes of Action may be brought under Section 546 of the Bankruptcy Code.

### (v)    Litigation Trust Treatment

In furtherance of the Plan, (i) the terms of the Litigation Trust shall be set forth in the Litigation Trust Agreement, (ii) the Litigation Trust shall be structured to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code to Holders of Allowed General Unsecured Claims,

consistent with the terms of the Plan, (iii) all parties (including the Debtors, the Post-Effective Date Debtors, the Litigation Trust Beneficiaries, and the Litigation Trustee) shall report consistently with such treatment, (iv) all parties shall report consistently with the valuation of the assets transferred to the Litigation Trust as determined by the Litigation Trustee (or its designee), (v) the Litigation Trustee shall be responsible for filing returns for the trust as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations, and (vi) the Litigation Trustee shall annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the trust as relevant for federal income tax purposes.

### (vi)    *Litigation Trust Distributions*

Distributions from the Litigation Trust shall be made from the Litigation Trust Distributable Proceeds, in accordance with the Plan and the Litigation Trust Agreement.

### (vii)    *Litigation Trust Expenses*

The Litigation Trust Expenses shall be paid from (i) the Initial Litigation Trust Funded Amount and (ii) the Cash proceeds, whether by settlement, adjudication or otherwise, of any Retained Causes of Action.

### 10.    Sale Order

Notwithstanding anything to the contrary herein, nothing in the Plan shall affect, impair or supersede the Sale Order, which remains in full force and effect and governs in the event of any inconsistency with the Plan.

### 11.    Asbestos Litigation

As of the Petition Date, the Debtors were defendants in approximately 20 lawsuits alleging asbestos exposure from products purchased at the Debtors' retail stores and seeking unliquidated damages amounts.  Claims arising from these lawsuits are classified as General Unsecured Claims under the Plan, provided that nothing in the Plan will affect the rights of any plaintiff in any lawsuit from seeking a recovery from applicable insurance.

### 12.    Exemption from Certain Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by Section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall be directed to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

13.     **Preservation of Causes of Action**

In accordance with Section 1123(b)(3) of the Bankruptcy Code, the Debtors and their Estates shall retain all of the Retained Causes of Action, which shall be vested in the Post-Effective Date Debtors on the Effective Date.  The Litigation Trustee, on behalf of the Post-Effective Date Debtors, may enforce all rights to commence and pursue any and all Retained Causes of Action, whether arising before or after the Petition Date (including, without limitation, any actions or categories of actions specifically enumerated in a list of retained Causes of Action contained in the Plan Supplement), and all Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against it as any indication that the Litigation Trustee will not pursue any and all available Retained Causes of Action against it.  The Litigation Trustee expressly reserves all rights to prosecute any and all** Retained **Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

The Litigation Trustee, in its sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any Retained Causes of Action (or decline to do any of the foregoing) in accordance with the best interests of the Litigation Trust, and shall not be required to seek further approval of the Bankruptcy Court for such action; provided, however, the Litigation Trustee may settle, voluntarily dismiss, or compromise any derivative actions as such term is used in Bankruptcy Rule 7023.1(c) only with court approval, to the extent such court approval is required by Bankruptcy Rule 7023.1(c).

Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, or acquired by the Purchaser or otherwise released pursuant to the Asset Purchase Agreement, the Plan expressly reserves all of the Debtors' Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

F.     **Executory Contracts (Article V)**

1.     **Assumption and Rejection of Executory Contracts**

On the Effective Date, each Executory Contract shall be deemed rejected in accordance with, and subject to, Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract: (a) is designated as a Transferred Contract under the Asset Purchase Agreement; (b) is designated as an Assumed Contract on the Schedule of Assumed Executory Contracts or a Transferred Contract on a TSA Contract Notice or a Supplemental TSA Contract Notice (each as defined in the TSA Assumption Order); (c) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court, including the Bidding Procedures Order, Sale Order and TSA Assumption Order, or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (d) is the subject of a motion to assume pending as of the Effective Date; or (e) is otherwise assumed

pursuant to the terms herein.  The Rejection Damages Claims of counterparties to Executory Contracts that are deemed rejected as of the Effective Date shall be classified as General Unsecured Claims and shall be treated in accordance with **Section 3.2(d)** of the Plan.

As of the Effective Date, each Executory Contract that is designated as an Assumed Contract on the Schedule of Assumed Executory Contracts shall revest in and be fully enforceable by the Plan Administrator on behalf of the Post-Effective Date Debtors, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court, or applicable law.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption, assumption and assignment, or rejection, as the case may be, of such Executory Contracts, pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  To the extent any provision in any Executory Contract assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtors' assumption of or the assumption and assignment of such Executory Contract then such provision shall be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto.

Rejection of any Executory Contract pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts pursuant to the Plan are effective as of the Effective Date.  Notwithstanding anything to the contrary in the Plan, Asset Purchase Agreement, or Plan Supplement, the Debtors reserve the right to, with the consent of the Purchaser, as required, alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and any TSA Contract Notice or Supplemental TSA Contract Notice at any time prior to the Effective Date, in accordance with the Assumption and Assignment Procedures, the Asset Purchase Agreement and the TSA Assumption Order, as applicable.

2.    **Rejection Damages Claim Procedures**

Unless otherwise provided by a Bankruptcy Court order, any Rejection Damages Claim must be filed with the Claims and Solicitation Agent and served on the Plan Administrator and the Litigation Trustee no later than thirty (30) days after the filing of the notice of the occurrence of the Effective Date.  Any Rejection Damages Claims that are not timely filed shall be Disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Post-Effective Date Debtors without the need for any objection by the Debtors or the Litigation Trustee or any further notice to or action, order, or approval of the Bankruptcy Court, and all Rejection Damages Claims shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or any Proofs of Claim to the

contrary.  All Allowed Rejection Damages Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Section 3.2(d) of the Plan.

3.      **Cure of Defaults for Assumed Executory Contracts**

*(i)      Proofs of Claim Based on Assumed Contracts or Transferred Contracts*

Any and all Proofs of Claim based on Executory Contracts that have been designated as Transferred Contracts or Assumed Contracts, except Proofs of Claim asserting Cure Amount, pursuant to the order approving such assumption or assumption and assignment, including the Confirmation Order, shall be deemed Disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

*(ii)      Cure Proceedings and Payments*

With respect to each of the Transferred Contracts and Assumed Contracts, the Debtors have designated or shall designate a proposed Cure Amount in the Cure Notice and the determination of the Cure Amount shall be governed by the Bankruptcy Court's order related thereto.  Except with respect to Executory Contracts for which the Cure Amount is zero dollars, or for which the Cure Amount is in dispute, (i) with respect to Transferred Contacts, the Cure Amount shall be satisfied by the Purchaser; and (ii) with respect to Assumed Contracts, the Cure Amount shall be satisfied by the Plan Administrator on behalf of the Post-Effective Date Debtors, in each case, in accordance with the terms of the TSA Assumption Order, Bidding Procedures, Sale Order, Asset Purchase Agreement (including the Transition Services Agreement), or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract without any further notice to or action, order, or approval of the Bankruptcy Court.

Any provisions or terms of a Transferred Contract or Assumed Contract that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Amount, or by an agreed-upon waiver of the Cure Amount.  If there is a dispute regarding such Cure Amount, the ability of the Purchaser or Plan Administrator, as applicable, to provide "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assignment, then payment of the Cure Amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption, or as may be agreed upon by the Purchaser or the Plan Administrator, as applicable, and the counterparty to the Executory Contract; *provided, however*, that the Purchaser or the Plan Administrator (on behalf of the Post-Effective Date Debtors), as applicable, shall have the right either to reject or nullify the assumption of any Executory Contract after entry of a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption or assumption and assignment of any Executory Contract pursuant to the Plan, the Sale Order, the Asset Purchase Agreement, the TSA Assumption Order, or otherwise, shall result in the full release and satisfaction of any Cure Amount, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption, as applicable.

### (iii) *Cure Notice*

The Debtors shall serve the Cure Notice on counterparties to any Assumed Contracts or Transferred Contracts in accordance with the terms of the applicable orders of the Bankruptcy Court, including in the case of Transferred Contracts, the TSA Assumption Order.  If no Cure Objection is timely received, (a) the non-Debtor party to the assumed Executory Contract shall be deemed to have consented to the assumption or assumption and assignment of the applicable Executory Contract and shall be forever barred from asserting any objection with regard to such assumption, and (b) the proposed Cure Amount shall be controlling, notwithstanding anything to the contrary in any applicable Executory Contract or other document as of the date of the filing of the Plan, and the non-Debtor party to an applicable Executory Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors, the Post-Effective Date Debtors, the Purchaser, or the property of any of the foregoing.

### (iv) *Cure Objections*

If a proper and timely Cure Objection is filed by the applicable Cure Objection Deadline, including in the case of Transferred Contracts, in accordance with the TSA Assumption Order, the Cure Amount shall be equal to (a) the amount agreed to between the Debtors, Plan Administrator (on behalf of the Post-Effective Date Debtors), or Purchaser, as applicable, and the applicable counterparty or (b) to the extent the Plan Administrator (on behalf of the Post-Effective Date Debtors), or Purchaser, as applicable, and counterparty do not reach an agreement regarding any Cure Amount or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure Amount and any related issues.  Objections, if any, to the proposed assumption and/or Cure Amount must be in writing, filed with the Bankruptcy Court, and served in hard-copy form on the parties identified in the Cure Notice so that they are actually received by the Cure Objection Deadline.

If a Cure Objection is timely filed and received in accordance with the applicable procedures, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court.  Cure Objections will not be treated as objections to Confirmation of the Plan.

### 4.    Modifications, Amendments, Restatements, Supplements, Restatements, and Other Agreements

Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated pursuant to the Plan.  Modifications, amendments, supplements, and re-statements to prepetition Executory Contracts that have been executed by the Debtors during

the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 5.      Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on the Schedule of Assumed Executory Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that the Debtors, the Plan Administrator, or any of their Affiliates, has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## 6.      Employee Compensation and Benefit Programs

Except as otherwise provided in the Plan, the Asset Purchase Agreement or the Plan Supplement, on and after the Effective Date, the Post-Effective Date Debtors may, but are not required to, honor in the ordinary course of business, any employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974) and any other contracts, agreements, policies, programs, and plans for, among other things, employment, compensation, health care, disability and other welfare benefits, deferred compensation benefits, severance policies and benefits, retirement benefits, workers' compensation insurance and accidental death and dismemberment insurance that, as of immediately prior to the Petition Date are, and as of immediately prior to the Effective Date continue to be, sponsored, maintained, or contributed to by any of the Debtors for the directors, officers, employees and other service providers of any of the Debtors who served in such capacity at any time.

Nothing contained herein shall entitle any Person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such expired benefit plan or alleged entitlement under any such expired benefit plan.  Nothing herein shall limit, diminish, or otherwise alter the Post-Effective Date Debtors' defenses, Claims, Causes of Action, or other rights with respect to any benefit plan, whether expired or unexpired.

Except as otherwise provided in the Plan, the Asset Purchase Agreement, or the Plan Supplement, none of (a) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by the Plan or (b) the consummation of the transactions provided in the Plan (or otherwise contemplated by the Sale and the Plan to occur prior to or on or about the Effective Date), in each case alone or together with any other event, shall (i) entitle any current or former director, officer, employee or other service provider of any of the Debtors to any payment or benefit, (ii) accelerate the time of payment or vesting or trigger any payment or funding of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any benefit plan or expired benefit plan or (iii) limit or restrict the right of the Debtors or Post-Effective Date Debtors to merge, amend or terminate any benefit plan, in each case including as a result of a "change in control" or similar provision or as a result of giving rise to any Person

to terminate his or her service with the Debtors or Post-Effective Date Debtors for "good reason" or similar provision.

### 7.    Insurance Policies

Except as otherwise provided in the Plan, the Asset Purchase Agreement, or the Plan Supplement, all insurance policies pursuant to which any Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to the Plan and, unless such insurance policy is assumed or assumed and assigned in accordance with **Section 5.1** of the Plan, such insurance policy shall be deemed to be rejected in accordance with, and subject to, Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### 8.    D&O Policies

The Debtors or the Plan Administrator on behalf of the Post-Effective Date Debtors, as applicable, shall maintain D&O Policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six (6) years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors. Nothing in the Plan shall be deemed to impair any Entity's claim, if any, to proceeds of the D&O Policies or the priority of payment on such claim, if any, under the D&O Policies. Notwithstanding any other provision in the Plan, all D&O Policies shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the Post-Effective Date Debtors, shall remain in full force and effect thereafter and shall continue as obligations of the Post-Effective Date Debtors in accordance with their respective terms, and all such D&O Policies shall vest in the Post-Effective Date Debtors.

### 9.    Indemnification Obligations

Except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, any and all obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents or agreements to indemnify officers, directors or employees, in each case solely in their capacity as such, employed by the Debtors (i) on and/or after the Petition Date or (ii) prior to the Petition Date (but only to the extent necessary to preserve the D&O Policies) with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; *provided,* that, the Debtors or the Plan Administrator on behalf of the Post-Effective Date Debtors, as applicable, shall not indemnify any such officers, directors or employees of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' indemnification obligations. The Plan Administrator on behalf of the Post-Effective Date Debtors shall not indemnify any Entities for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence or willful misconduct. Except as otherwise

provided in the Plan, all such indemnification obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan.

### 10.    Nonoccurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## G.    Procedures for Resolving Disputed Claims and Interests (Article VI)

### 1.    Determination of Claims and Interests

After the Effective Date, the Plan Administrator or the Litigation Trustee, as the case may be, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Section 4.12 of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan.  Nothing contained in Section 6.1 of the Plan shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Post-Effective Date Debtors may have against any Entity in connection with or arising out of any Claim, including any rights under Section 157(b) of title 28 of the United States Code.

### 2.    Claims Administration Responsibility

Notwithstanding anything to the contrary herein, after the Effective Date: (a) the Plan Administrator shall have responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims, except for General Unsecured Claims and Prepetition Lender Claims; (b) the Litigation Trustee shall have responsibility for administering, disputing, objecting to, compromising, or otherwise resolving General Unsecured Claims; and (c) the Administrative Agent shall have responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Prepetition Lender Claims.  Nothing herein is intended to limit the right of any party in interest from objecting to any Claims, except to the extent such Claims, including the Prepetition Lender Claims, have already been Allowed, and, subject, however, to any limitation in any prior order of the Bankruptcy Court, including the Cash Collateral Order.

3.      **Objections to Claims**

Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Litigation Trustee without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Litigation Trustee effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address); or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

4.      **Disallowance of Claims**

Except as otherwise agreed, any and all Proofs of Claim filed after the applicable deadline for filing such Proofs of Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims, unless any such late proof of Claim is deemed timely filed by a Final Order of the Bankruptcy Court.  Nothing herein shall in any way alter, impair, or abridge the rights of the Debtors, the Litigation Trustee, or other parties-in-interest to object to Claims on the grounds that they are time-barred or otherwise subject to disallowance or modification.  Except as set forth in section 6.7, nothing in the Plan shall preclude amendments to timely filed Proofs of Claim to the extent permitted by applicable law. All Claims of any Person or Entity from which property is sought by the Debtors under Section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Litigation Trustee allege is a transferee of a transfer that is avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed if (a) the Person or Entity, on the one hand, and the Debtors or the Litigation Trustee, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned Sections of the Bankruptcy Code and (b) such Person or Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

5.      **Estimation of Claims**

Before the Effective Date, the Debtors, and after the Effective Date, the Litigation Trustee (on behalf of the Post-Effective Date Debtors), may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that

estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan, without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Plan Administrator or Litigation Trustee, as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. All estimation procedures set forth in the Plan shall be applied in accordance with Section 502(c) of the Bankruptcy Code. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

### 6.    No Interest on Claims

Unless otherwise specifically provided for in the Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

### 7.    Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Post-Effective Date Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## H.    Provisions Governing Distributions (Article VII)

### 1.    Distributions Allowed as of the Effective Date

Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; *provided that* (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) in accordance with Article II of the Plan, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

## 2.      Distribution on Account of Claims Allowed After the Effective Date

### (i)      *No Distributions Pending Allowance*

No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

### (ii)      *Payments and Distributions on Disputed Claims*

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the first day that is thirty (30) Business Days after the Disputed Claims become Allowed Claims; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with the Plan and paid.

### (iii)      *Special Rules for Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

## 3.      Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## 4.      Delivery of Distributions

### (i)      *Record Date for Distributions*

On the Distribution Record Date, any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the register for Claims as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim is transferred twenty (20) or fewer days before the Distribution Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the

relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Administrative Agent shall have no obligation to recognize any transfer of any applicable Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record on their respective lender registers as of the close of business on the Distribution Record Date.

### (ii)    Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Post-Effective Date Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### (iii)    Delivery of Distributions in General

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder; *provided* that the manner of such distributions shall be determined at the discretion of the Post-Effective Date Debtors. The Distribution Agent shall not incur any liability whatsoever on account of any distributions under the Plan.

### (iv)    Delivery of Distributions on Account of Prepetition Lender Claims

In the case of Holders of Prepetition Lender Claims, the Administrative Agent shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder. The Distribution Agent shall make all distributions on account of such Claims to the Administrative Agent or as directed by the Administrative Agent, in the Administrative Agent' sole discretion. The Administrative Agent shall, at its option, hold or direct such distributions for the beneficial Holders of such Allowed Claims, as applicable; *provided*, *however*, that the Administrative Agent shall retain all rights under its respective agreement in connection with delivery of distributions to the beneficial Holders of such Allowed Claims, including rights on account of its charging lien; *provided*, *further*, *however*, that the Debtors' obligations to make distributions pursuant to the Plan shall be deemed satisfied upon delivery of distributions to the Administrative Agent or the Entity or Entities designated by the Administrative Agent. The Administrative Agent shall not be required to give any bond, surety, or other security for the performance of their duties with respect to such distributions.

### 5.    Currency

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of the Effective Date at 4:00 p.m. (prevailing Eastern Time), mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal* following the Effective Date.

6.        **Distribution Agent (if any)**

The Distribution Agent shall make all distributions required under the Plan, subject to the terms and provisions of the Plan.  If the Distribution Agent is an independent third party designated to serve in such capacity, such Distribution Agent shall receive, without further Court approval, reasonable compensation from the Plan Administration Reserve for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties.  The Distribution Agent shall be authorized and directed to rely upon the Debtors' books and records and, as applicable, the Plan Administrator's representatives and professionals in determining Allowed Claims not entitled to distributions under the Plan in accordance with the terms and conditions of the Plan.  The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

7.        **Undeliverable Distributions**

(i)        *Holders of Undeliverable Distributions*

If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or Administrative Agent is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest on the next Periodic Distribution Date.  Amounts in respect of undeliverable distributions shall be returned (1) if prior to the Dissolution Date, to the Debtors, and (2) if after the Dissolution Date, to the Administrative Agent to be redistributed, in each case, until such distributions are claimed.

(ii)        *Reversion*

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Post-Effective Date Debtors.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be canceled and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the applicable trustee, agent, servicer, or other authorized representative to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

8.        **De Minimis Distributions**

Notwithstanding any other provision of the Plan to the contrary, the Distribution Agent and Administrative Agent shall not be required to make a distribution on account of an Allowed Claim or Interest if the aggregate amount of distributions to be made is less than $50 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

9.    **Surrender of Securities or Instruments**

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim or Interest shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be canceled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

10.    **Compliance Matters**

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Debtors and Plan Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

11.    **Claims Paid or Payable by Third Parties**

The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Distribution Agent without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Distribution Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Distribution Agent, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

12.    **Setoffs**

Except as otherwise expressly provided for in the Plan, the Debtors, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights,

and Causes of Action of any nature that the Debtors or the Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors of any such Claims, rights, and Causes of Action that the Debtors may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date or has otherwise indicated in a timely filed proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 of the Bankruptcy Code or otherwise.

### 13.     Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## I.     Effect of Plan on Claims and Interests (Article VIII)

### 1.     Compromise and Settlement

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Persons or Entities up to the Effective Date.  After the Effective Date, any such right shall pass to the Litigation Trustee to the extent provided in the Plan without the need for further approval of the Bankruptcy Court; provided, however, the Litigation Trustee may settle derivative claims/causes of action as such term is used in Bankruptcy Rule 7023.1(c), if any, only with court approval, to the extent that such court approval is required by Bankruptcy Rule 7023.1(c).

### 2.     Releases by the Debtors

**Pursuant to Section 1123(b) of the Bankruptcy Code, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and their Estates, as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtors or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or**

collectively) or on behalf of the Holder of any Claim or Interest or any other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' prepetition and postpetition, in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, preparation, entry, and execution of the Cash Collateral Order, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Asset Purchase Agreement, the Sale Order or related agreements, instruments, or other documents, the pursuit of the Sale, the pursuit of consummation of the Sale, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan; *provided* that, nothing in this Section 8.2 shall be construed to release the Released Parties from their gross negligence, willful misconduct, or fraud as determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligation or liability of any Person or Entity under the Plan, the Asset Purchase Agreement, the Sale Order, the Cash Collateral Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, (b) a good-faith settlement and compromise of the claims released by the Debtor Release; (c) given and made after due notice and opportunity for hearing; and (d) a bar to any of the Debtors or the Estates or any other Entities from asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

3.    **Releases by Releasing Parties**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party and each other Releasing Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the

Debtors, the Debtors' prepetition and postpetition, in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, preparation, entry, and execution of the Cash Collateral Order, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Asset Purchase Agreement, the Sale Order, or related agreements, instruments, or other documents, the pursuit of the Sale, the pursuit of consummation of the Sale, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan related to the Debtors and the Chapter 11 Cases; provided that, nothing in this Section 8.3 shall be construed to release the Released Parties or Releasing Parties from their gross negligence, willful misconduct, or fraud as determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligation or liability of any Entity under the Plan, the Asset Purchase Agreement, the Sale Order, the Cash Collateral Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (b) any asbestos claims or any personal injury claims, in each case that have been or may be asserted against insurance or non-debtor third parties, unless such non-debtor third parties are Released Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Releasing Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is: (a) consensual, (b) in exchange for the good and valuable consideration provided by the Released Parties, (c) a good-faith settlement and compromise of claims released by the Releasing Party Release; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or Releasing Parties or their property, released pursuant to the Releasing Party Release.

4.     **Exculpation and Limitation of Liability**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Releasing Party Release, and notwithstanding anything herein to the contrary, each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any action taken or omitted to be taken during the period commencing on the Petition Date through and including the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Cash Collateral Order, the Asset Purchase Agreement, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection

**with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided* that, nothing in Section 8.4 of the Plan shall be construed to release the Exculpated Parties from their gross negligence, willful misconduct, or fraud as determined by a Final Order.  Each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release any post-Effective Date obligation or liability of any Entity under the Plan, Asset Purchase Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

### 5.      Injunction

In accordance with Bankruptcy Code Section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code Section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and interests against the Debtors, and Bankruptcy Code Section 1141(a) provides that the Plan, as confirmed, will be binding to the extent provided therein. As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Interests, Causes of Action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan; (3) were purchased and released by the Purchaser in connection with the Sale; (4) are subject to exculpation pursuant to the Plan; or (5) are otherwise satisfied, stayed, released, or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding, including on account of any claims, interests, Causes of Action, or liabilities that have been compromised or settled against the Debtors or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of, or in connection with or with respect to, any discharged, released, settled, compromised, or exculpated claims, interests, Causes of Action, or liabilities, including being permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Litigation Trust, the Released Parties, or Exculpated Parties (as applicable): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means

any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estate of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff (*i.e.*, a Proof of Claim or motion asserting such rights), and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtors, the Post-Effective Date Debtors, the Litigation Trust, and their respective affiliates, employees, advisors, officers and directors, or agents.

6.      **Subordinated Claims**

Except as otherwise provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Section 510(b) of the Bankruptcy Code, or otherwise. All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan

Except as otherwise provided in the Plan, the right of the Debtors or the Litigation Trustee on behalf of the Post-Effective Date Debtors to seek subordination of any Claim or Interest pursuant to Section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a Subordinated Claim at any time shall be modified to reflect such subordination. Unless the Plan or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to Section 8.6 of the Plan unless ordered by the Bankruptcy Court.

7. **Protection Against Discriminatory Treatment**

Consistent with Section 525 of the Bankruptcy Code, no Governmental Unit shall discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Effective Date Debtors, or another Entity with whom the Post-Effective Date Debtors have been associated, solely because the Post-Effective Date Debtors have been debtors under chapter 11, have been insolvent before the commencement of the Chapter 11 Cases, or have not paid a debt that is settled and released in the Chapter 11 Cases.

8. **Release of Liens**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns.

9. **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding Section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has filed a contingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**J.    Conditions Precedent to the Effective Date (Article IX)**

1. **Conditions Precedent to the Effective Date of the Plan**

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 9.2 of the Plan:

(a)    the Plan and Confirmation Order shall be in form reasonably acceptable to the Debtors and, solely with respect to any provision that may adversely affect the Purchaser, as applicable, which consent or waiver shall not be unreasonably withheld, conditioned, or delayed;

(b)    the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order and, each shall be a Final Order;

(c)    the Professional Claims Reserve shall have been funded in Cash in full and the Plan Administration Reserve shall have been funded with the amount provided in the Plan Administration Budget;

(d)     All Restructuring Expenses incurred or estimated to be incurred as of the Effective Date shall have been paid in full;

(e)     all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents, or actions necessary to implement the Plan shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

(f)     the Plan Administrator shall have been appointed and shall have assumed all rights and responsibilities under the Plan and the Plan Administrator Agreement;

(g)     the Litigation Trust Agreement shall have been executed, and the Litigation Trustee shall have been appointed and shall have assumed all rights and responsibilities under the Plan and the Litigation Trust Agreement; and

(h)     all Statutory Fees then due and payable to the U.S. Trustee shall have been paid and satisfied in full.

## 2.     Waiver of Conditions Precedent

The conditions set forth in Section 9.1 of the Plan may be waived, in whole or in part, the Debtors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; provided that, solely with respect to any condition that may adversely affect the Purchaser or the Prepetition Secured Parties, subject to such party's consent (which in each instance shall not be unreasonably withheld).

## 3.     Notice of Effective Date

The Plan Administrator shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 9.1 of the Plan have been satisfied or waived pursuant to Section 9.2 of the Plan.

## 4.     Effect of Non-Occurrence of Conditions to Consummation

If, prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then. except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

**K.      Bankruptcy Court Jurisdiction (Article X)**

**1.      Retention of Jurisdiction**

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan (without prejudice to the rights, if any, of any party in interest to seek to withdraw the bankruptcy reference pursuant to 28 U.S.C. § 157(d) and related law with respect to any issue or proceeding subject to mandatory or discretionary withdrawal), including jurisdiction to:

(a)      resolve any matters related to Executory Contracts, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine, and, if necessary, liquidate any Claims arising therefrom including Cure Amount pursuant to Section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract that is assumed (or assumed and assigned); (iii) the Post-Effective Date Debtors' amendment, modification, or supplement after the Effective Date, pursuant to **Article V** of the Plan, of the lists of Executory Contracts to be assumed (or assumed and assigned) or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

(b)      adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)      ensure that distributions to Holders of Allowed Claims and Interests are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)      allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after Confirmation of the Plan, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(f)      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or, subject to any applicable forum selection clause, any contract, instrument, release, or other document created in connection with the Plan or the Disclosure Statement;

(g)      enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(h)　　enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan or the Asset Purchase Agreement and all contracts, instruments, releases, and other agreements and documents created in connection with the Plan, the Plan Supplement, and the Disclosure Statement;

(i)　　enter and enforce any order for the sale of property pursuant to Sections 363, 1123 or 1146(a) of the Bankruptcy Code;

(j)　　consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(k)　　hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(l)　　determine requests for the payment of Claims entitled to priority under Section 507(a)(1) of the Bankruptcy Code;

(m)　　adjudicate, decide, or resolve any and all matters related to Section 1141 of the Bankruptcy Code;

(n)　　hear and determine all disputes involving the existence, nature, scope, or enforcement of the exculpations, injunctions and releases granted in connection with and under the Plan, including under **Article VIII** of the Plan;

(o)　　enforce the injunction, release and exculpation provisions set forth in **Article VIII** of the Plan;

(p)　　resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with consummation of the Plan, including the interpretation, implementation, or enforcement of the Plan and the Confirmation Order, as applicable, including disputes arising under agreements, documents, or instruments executed in connection with the Plan or any disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(q)　　hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(r)　　hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(s)　　grant any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to Section 365(d)(4) of the Bankruptcy Code;

(t)　　enter a Final Decree closing the Chapter 11 Cases;

(u)　　hear any other matter not inconsistent with the Bankruptcy Code; and

(v)      enforce all orders previously entered by the Bankruptcy Court.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date.  Nothing contained herein shall be construed to increase, decrease, or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## L.      Miscellaneous Provisions (Article XI)

### 1.      Binding Effect

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns, and resolve any matters related to Executory Contracts, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Amount, pursuant to Section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract that is assumed (or assumed and assigned); (iii) the Post-Effective Date Debtors' amendment, modification, or supplement after the Effective Date.

### 2.      Payment of Statutory Fees

All Statutory Fees payable on or before the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Post-Effective Date Debtors, the Plan Administrator, and the Litigation Trust shall be jointly and severally liable for paying any and all Statutory Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.  The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Post-Effective Date Debtors, the Plan Administrator, and the Litigation Trust shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR.  Notwithstanding anything to the contrary in the Plan, (i) Statutory Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Statutory Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.

### 3.      Statutory Committee Dissolution

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve, and members thereof shall be released from all rights and duties from or related to the Chapter 11 Cases; *provided, however*, that the Committee will stay in existence solely for the limited purpose of filing and prosecuting final fee applications.

4.      **Modification and Amendment**

Except as otherwise specifically provided in the Plan, subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, the Debtors reserve the right to modify the Plan, subject to any applicable consent rights set forth herein, whether such modification is material or immaterial prior to Confirmation, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan) and any consent rights as set forth herein, the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan after Confirmation, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided* that any modifications or amendments, whether before or after Confirmation, that impact the treatment of the Prepetition Lender Claims shall require the consent of the Administrative Agent (whose consent may not be unreasonably withheld).

5.      **Confirmation of Plan**

The Debtors request Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

6.      **Additional Document**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Plan Administrator, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

7.      **Revocation, Withdrawal, Non-Consummation**

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain Claims or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any

Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

8.    **Notices**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered on the parties below shall be served as follows:

If to the Debtors:

> True Value Company, L.L.C.
> 8600 West Bryn Mawr Ave.
> Chicago, IL, 60631

*With copies (which shall not constitute notice) to:*

> Skadden, Arps, Slate, Meagher & Flom LLP
> 320 S. Canal St.
> Chicago, IL 60606
> Attention:  Ron E. Meisler (Ron.Meisler@skadden.com)
>                    Jennifer Madden (Jennifer.Madden@skadden.com)

> One Manhattan West
> 395 9th Ave.
> New York, NY 10001
> Attention:  Evan A. Hill (Evan.Hill@skadden.com)
>                    Moshe S. Jacob (Moshe.Jacob@skadden.com)

> 920 North King Street
> Wilmington, Delaware 19801
> Attention:  Joseph O. Larkin (Joseph.Larkin@skadden.com)

> - and -

> Glenn Agre Bergman & Fuentes LLP
> 1185 Avenue of the Americas, 22nd Floor
> New York, New York 10036
> Attention:  Andrew K. Glenn (aglenn@glennagre.com)
>                    Malak S. Doss (mdoss@glennagre.com)

> - and -

> Young Conaway Stargatt & Taylor, LLP
> One Rodney Square
> 1000 North King Street

Wilmington, Delaware 19801
Attention:  Edmon L. Morton (emorton@ycst.com)
            Timothy R. Powell (tpowell@ycst.com)

If to the Office of the United States Trustee:

Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Attention: Benjamin A. Hackman (Benjamin.A.Hackman@usdoj.gov)

If to the Prepetition Lenders:

Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Attention:  Regina S. Kelbon (regina.kelbon@blankrome.com)
            Stanley B. Tarr (Stanley.tarr@blankrome.com)

One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Attention:  John E. Lucian (john.lucian@blankrome.com)

## 9.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 10.    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to the Plan, provides otherwise, the Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.  Corporate governance matters shall be governed by the laws of the state of incorporation, formation, or functional equivalent thereof, as applicable, of the applicable Post-Effective Date Debtor.

## 11.    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

32866420.1

12.    **Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, and (c) non-severable and mutually dependent.

13.    **No Waiver or Estoppel**

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court; provided however, that this provision is without prejudice to any Government Unit whose claims are subject to the Governmental Bar Date.

### ARTICLE V
### VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

A.    **General**

The Bankruptcy Code requires that, in order to confirm the Plan, the Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by Section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code); (vi) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

**B.     Parties in Interest Entitled to Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in Section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

**C.     Classes Impaired and Entitled to Vote Under the Plan**

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Prepetition Lender Claims in Class 3 and Holders of General Unsecured Claims in Class 4, which Holders are impaired under the Plan and entitled to vote on the Plan.

Holders of Claims and Interests in Classes 7 and 8 are deemed to reject the Plan and are not entitled to vote.  Holders of Claims in Classes 1 and 2 are presumed to accept the Plan and are not entitled to vote.  Holders of Claims and Interests in Classes 5 and 6 (i) will either be deemed to reject the Plan or presumed to accept the Plan and (ii) are not entitled to vote.  The Debtors are ***not*** soliciting votes on the Plan from Holders of Claims or Interests in these Classes.

Please refer to the table above in the Introduction to this Disclosure Statement under "Voting Rights, Treatment and Classification of Claims and Interests Under the Plan" for more information.

**D.     The Solicitation Package**

Only the Holders of Claims in Classes 3 and 4 as of the Voting Record Date (defined below) are entitled to vote on the Plan.  Each Holder of a Claim in Classes 3 and 4 will receive a solicitation package consisting of the following materials:

- This Disclosure Statement (including the Plan, and other exhibits hereto and thereto); and

- A ballot (the "Ballot"), including the voting instructions.

**E.     Voting Procedures and Requirements**

The discussion of the procedures below is a summary of the solicitation and voting process. Detailed voting instructions will be provided with each Ballot.

**1.     Ballots**

February 10, 2025 is the record date for voting on the Plan (the "Voting Record Date"). Accordingly, only Holders of record as of the Voting Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement.  If you are a Holder of a Claim in Classes 3 and 4 and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Solicitation Agent via email to TrueValueInquiries@OmniAgnt.com or by calling (866) 771-0561 (U.S. & Canada) or +1 (818) 356-8633 (international).

The Ballot also contains an election to "opt in" to the release provisions contained in Section 8.3 of the Plan.  All persons who vote to accept the Plan and do not "opt out" of the releases contained in Section 8.3 of the Plan, or, who vote to reject the Plan and elect to "opt in" to the releases contained in Section 8.3 of the Plan, shall be deemed to have consented to and provided the releases contained in the Plan.

## 2.    Returning Ballots

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, sign and return your Ballot, with your original signature, in the enclosed envelope or via Omni's E-Balloting Portal.

TO BE COUNTED, YOUR BALLOT WITH YOUR SIGNATURE INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE VOTING DEADLINE OF **4:00 P.M. (EASTERN TIME) ON MARCH 14, 2025**.

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

## 3.    Ballots Not Counted

**No Ballot will be counted toward confirmation of the Plan if, among other things:** (1) it is received after the Voting Deadline (as may be extended by the Debtors); (2) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (3) it was transmitted by means other than as specifically set forth in the Ballots, including facsimile, email, or by any means of electronic submission other than Omni's E-Ballot platform; (4) it was cast by an entity that is not entitled to vote on the Plan; (5) it was sent to any person or entity other than the Solicitation Agent; (6) it does not contain an original signature if submitted by mail, courier, or hand delivery or an electronic signature if submitted through Omni's E-Ballot platform; (7) the Solicitation Agent cannot match it to an existing database record; (8) it is submitted on a form other than the official form sent by Omni; (9) any Ballot (other than a master Ballot) that casts part of its vote in the same Class to accept the Plan and part to reject the Plan or (10) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE V OF THE DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL NOT BE COUNTED WITH RESPECT TO VOTING ON THE PLAN WITHOUT THE CONSENT OF THE COMPANY.**

4.      **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by Omni and/or the Debtors, as applicable, in their sole discretion.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.   The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  Unless waived, any defects or irregularities in Ballots returned to the Solicitation Agent or the Debtors must be cured within such time as the Debtors determine, unless otherwise ordered by the Bankruptcy Court.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will the Debtors or any other person incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

5.      **Voting Amount**

The amount of Prepetition Lender Claims for voting purposes only will be established based on the amounts of the applicable loan positions held by each Holder of such Claim(s) as of the Voting Record Date, as evidenced by the applicable books and records maintained by the Administrative Agent, which was provided to the Debtors or the Solicitation Agent in electronic Microsoft Excel format promptly following the Voting Record Date.

F.      **Acceptance of Plan**

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept the Plan, except under certain circumstances.  *See* "Confirmation Without Necessary Acceptances; Cramdown" below.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of those that vote in such class vote to accept the plan.  Only those holders of claims who actually vote count in these tabulations.  Holders of claims who fail to vote are not counted as either accepting or rejecting the Plan.  At least one voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

In addition to this voting requirement, Section 1129 of the Bankruptcy Code requires that the Plan be accepted by each Holder of a Claim or Interest in an impaired class or that the Plan otherwise be found by the Court to be in the best interests of each Holder of a Claim or Interest in such class.  *See* "Best Interests Test" below.  Moreover, each impaired class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in Section 1129(b) of the Bankruptcy Code discussed below.  *See* "Confirmation Without Necessary Acceptances; Cramdown" below.

### G.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of Claims or Interests does not accept the Plan, the Debtors nevertheless may move for confirmation of the Plan.  The Plan may be confirmed, even if it is not accepted by all impaired classes, if the Plan has been accepted by at least one impaired class of Claims, and the Plan meets the "cramdown" requirements set forth in Section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that the Court find that the Plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Here, because Classes 7 and 8 are (or may be) deemed to reject the Plan, and certain Holders of Claims or Interests under Class 5 and 6 are deemed (or may be) deemed to reject the Plan and Classes 3 and 4 are entitled to vote on the Plan, the Debtors will seek confirmation of the Plan from the Court by satisfying the "cramdown" requirements set forth in Section 1129(b) of the Bankruptcy Code.  The Debtors believe that such requirements are satisfied as no Claim or Interest Holder junior to those in Classes 5, 6, 7 and 8 will receive any property under the Plan.

#### 1.    No Unfair Discrimination

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that under the Plan all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, or the Debtors have a legitimate business reason for such treatment, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

#### 2.    Fair and Equitable Test

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class received everything to which they are legally entitled or that classes junior in priority to the class receive nothing.  The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests, which may be summarized as follows:

a.    *Secured Claims.*  Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

b.      *Unsecured Claims.*  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

c.      *Interests.*  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule.

## ARTICLE VI
## FEASIBILITY AND BEST INTERESTS OF CREDITORS

### A.      Best Interests Test and Liquidation Analysis

As noted above, even if the Plan is accepted by the Holders of each class of Claims and Interests, the Bankruptcy Code requires a bankruptcy court to determine that the Plan is in the best interests of all Holders of Claims or Interests that are impaired by that Plan and that have not accepted the Plan.  The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of Claims or Interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

As described in the hypothetical liquidation analysis attached to this Disclosure Statement as **Exhibit B**, the Debtors submit that because of, among other things, (1) discounts to asset values caused in part by the forced nature of a sale of the Debtors' assets in a chapter 7 liquidation scenario, (2) loss of value from sales caused by, among other things, business discontinuity and loss of employee knowledge, (3) the illiquid nature of certain of the assets and dis-synergies associated with a piecemeal liquidation, (4) associated delays in connection with a chapter 7 liquidation and (5) the incurrence of additional priority claims such as, among other things, the costs of payment of a statutorily allowed commission to the chapter 7 trustee and the costs of counsel and other professionals retained by the trustee, Holders of Impaired Claims and Interests will receive at least as great of a recovery under the proposed Plan as in a chapter 7 liquidation.  The Debtors therefore believe that the Plan satisfies the Best Interests Test under Section 1129(a)(7) of the Bankruptcy Code.  The Debtors caution that the assumptions used in the Liquidation Analysis may ultimately vary and actual recoveries in a chapter 7 liquidation could be substantially less than recoveries set forth in the Liquidation Analysis.

B.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. Payments under the Plan are to be made from the Distributable Proceeds stemming primarily from the Sale and do not depend on future earnings of the Debtors. Accordingly, the Debtors believe that they will have sufficient resources to make all payments required pursuant to the Plan and that the Plan is feasible and meets the requirements of Section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE VII
## EFFECT OF CONFIRMATION

A.      **Binding Effect of Confirmation**

Confirmation will bind the Debtors and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan. Confirmation will have the effect of converting all claims into rights to receive the treatment specified in **Article III** of the Plan and cancelling all Interests in Debtor TV Holdco II, LLC.

B.      **Good Faith**

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII
## CERTAIN RISK FACTORS TO BE CONSIDERED

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT TOGETHER WITH ANY ATTACHMENTS, EXHIBITS, OR DOCUMENTS INCORPORATED BY REFERENCE HERETO AND THE PLAN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan or its implementation. No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Court or the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are not contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. New factors, risks and uncertainties emerge from time to time and it is not possible to predict all such factors, risks and uncertainties.

A.      **Certain Bankruptcy Considerations**

1.      **Risk of Non-Approval of the Disclosure Statement As Containing Adequate Information**

This Disclosure Statement has not, as of the date hereof, been approved by the Bankruptcy Court as containing "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code.  While the Debtors believe that this Disclosure Statement provides "adequate information" within the meaning of Section 1125(a), there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **Risk of Failing to Satisfy the Vote Requirement**

The Plan is subject to a vote of Holders of Impaired Claims in voting classes and to Confirmation by the Bankruptcy Court.  There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Thus, while the Debtors believe the Plan is confirmable under the standards set forth in Section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.  If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

3.      **Risk of Non-Confirmation of Plan**

Even if the Holders of Claims who are entitled to vote accept the Plan, the Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  For example, Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting Holders of Claims or Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors believe the Plan meets such requirement, there can be no assurance the Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  In the event that the Debtors are unable to get sufficient votes from the Holders of Claims who are entitled to vote to accept the Plan, the Debtors may seek to accomplish an alternative chapter 11 plan or seek to cram down the Plan on non-accepting classes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests in an alternative plan.

4.      **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

5.      **Risk of Non-Consensual Confirmation.**

If any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Court may nevertheless confirm the Plan at the Debtors' request if at least one impaired class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable". The Debtors believe that the Plan satisfies these requirements.

6.     **Distributions to Holders of Allowed Claims Under the Plan**

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

7.     **Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to modify the Plan to provide for whatever classification might be required for confirmation.  Any such reclassification of creditors would be subject to the notice and hearing requirements of the Bankruptcy Code and there can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation of the Plan could increase the risk that the Plan will not be consummated.

8.     **Conditions Precedent to Consummation of the Plan**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date of the of the Plan and consummation of the transactions contemplated by the Plan. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### 9.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur in short order after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 10.      Releases, Injunction, and/or Exculpation Provisions May Not Be Approved

**Article VIII** of the Plan provides for certain releases, injunctions, and exculpations for Claims and Causes of Action that may otherwise be asserted against the Debtors, the other Released Parties, and their respective Affiliates and Affiliates' Representatives, as applicable.  The release, injunction, and exculpation provisions included in the Plan may be subject to objection by parties in interest and may not be approved.  If the release and/or exculpation provisions are not approved, certain parties may withdraw their support for the Plan.

### 11.      The Debtors May Be Unable to Confirm the Plan and Exit from Chapter 11

As of the date hereof, the Debtors contemplate that the use of Cash Collateral will provide the Debtors with ample liquidity to fund administrative expenses during these Chapter 11 Cases. If confirmation does not occur expeditiously, the Chapter 11 Cases could result in, among other things, the Debtors' inability to confirm the Plan.

### 12.      Conversion into Chapter 7 Cases

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the order of priorities established by the Bankruptcy Code.  *See* Article X hereof, as well as the Liquidation Analysis. However, as reflected in the Liquidation Analysis, the Debtors believe that recoveries in a converted chapter 7 case will be greatly reduced from the recoveries contemplated under the Plan.

### 13.      Risk of Non-Dischargeability of Claims

During the Chapter 11 Cases, certain creditors may take the position their claims are non-dischargeable under the Bankruptcy Code.  Such creditors may make such allegations at any time, notwithstanding the existence of deadlines established by the Bankruptcy Rules or applicable Court order, entry of the Confirmation Order, or the occurrence of the Effective Date.  Such assertions of non-dischargeability could result in the denial of Confirmation, changes to the Plan, withdrawal of the Plan.

14.     **Amendment of Plan Prior to Confirmation by Debtors**

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive conditions thereto if and to the extent necessary or desirable for confirmation or approval of the Plan. The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

15.     **Litigation Risk**

The Debtors are involved in various litigation, which so long as it remains unresolved represents a legal issue and potential Claim for monetary damages. Additionally, there is a risk of future litigation. Pending litigation or future litigation could result in a material judgment against the Debtors or the Purchaser. Such litigation, and any judgment in connection therewith, could have a material adverse effect on the Debtors.

16.     **Landlord Claims and Lease-Related Risks**

The Debtors lease twelve (12) distribution centers, some which were included in the Sale and assigned to Do it Best in accordance with the Stalking Horse Agreement. Any remaining leases not assigned to Do it Best will be rejected, and claims arising from lease rejections will be treated as general unsecured claims. If disputes with landlords regarding rejection damages or other lease-related liabilities arise, the administration of the Debtors' estate may incur additional costs, which could impact creditor recoveries.

B.     **Forward Looking Statements**

1.     **Forward Looking Statements**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

2.     **Books and Records**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used

their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained in the Plan and attached hereto is without inaccuracies.

### 3. Projections and Estimates

There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or amount of Claims in the various Classes that might be allowed.  The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in this "Risk Factors" section in this Article of the Disclosure Statement.  Such factors have, in some instances, affected and in the future could affect the ability of the Company to achieve its projected results and may cause actual results to differ materially from those expressed in the Plan.  The Company undertakes no obligation to update any forward-looking statements in this Disclosure Statement.

## C. Certain Other Risks

### 1. Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan and the Sale.  Holders of Claims and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth below.

## D. Disclosure Statement Disclaimer

### 1. This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 2. No Legal or Tax Advice Is Provided to You by This Disclosure Statement

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

3.     **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Post-Effective Date Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4.     **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.

5.     **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

6.     **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

7.     **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

8.     **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement or other materials included in the Solicitation Package. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as

contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel for the Debtors, the counsel for the Committee and the United States Trustee.

## E.    Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee (or trustees) would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit B**.

**ARTICLE IX**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Claims that are impaired under the Plan and that are entitled to vote to accept or reject the Plan. This discussion is provided for information purposes only and is based on the Tax Code, Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change or differing interpretations, possibly with retroactive effect.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to a particular Claimholder in light of its particular facts and circumstances, or to certain types of Claimholders subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, governmental entities and entities exercising governmental authority, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction or other integrated transaction, Claimholders that are, or hold their Claims through, a partnership or other pass-through entity, persons that have a functional currency other than the U.S. dollar, dealers in securities or foreign currencies, employees of the Debtors, and persons who received their claims pursuant to the exercise of an employee stock option or otherwise as compensation). This discussion does not address any aspects of state, local, non-U.S. taxation or U.S. federal taxation other than income taxation. Furthermore, this discussion does not address the U.S. federal income tax consequences to Claimholders that are unimpaired under the Plan or Claimholders or Interest Holders that are not entitled to receive or retain any property under the Plan.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds Claims, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

The tax treatment of Claimholders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Claimholder in exchange for the Claim and whether the Claimholder receives distributions under the Plan in more than one taxable year; (iii) whether the Claimholder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Claimholder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Claimholder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Claimholder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Claimholder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Claimholder. Therefore, each Claimholder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Claimholder of the transactions contemplated by the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the Internal Revenue Code (the "IRS") with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Claimholder. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein. Accordingly, each Claimholder is strongly urged to consult its tax advisor regarding the U.S. federal, state, local, and non-U.S. tax consequences of the Plan to such Claimholder.

The following discussion is intended only as a summary of certain U.S. federal tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The following discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Claimholder's particular circumstances. Accordingly, each Claimholder is strongly urged to consult its tax advisor regarding the U.S. federal, state, local, and applicable non-U.S. income and other tax consequences of the Plan.

## A.    Consequences to the Debtors

As a result of the consummation of the transactions contemplated by the Plan, the Debtors may realize substantial cancellation of indebtedness income ("CODI"). In general, absent an exception, a taxpayer will realize and recognize CODI upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. CODI is taxable as ordinary income. The amount of CODI, in general, is the excess of (i) the adjusted issue price

of the indebtedness discharged, over (ii) the sum of (x) the issue price of any new indebtedness of the taxpayer issued, (y) the amount of cash paid, and (z) the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange.  There are exceptions to the recognition of CODI.  For example, a taxpayer is not required to include CODI in gross income if either the taxpayer is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or the taxpayer is insolvent, as specifically defined for U.S. federal income tax purposes, at the time the CODI is triggered.

**B.**     **Consequences to Claimholders**

**1.**     **Gain or Loss**

A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim.  *See* Article IX.B.3—"Allocation of Plan Distributions between Principal and Interest."  A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest.  The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).  The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder of the Claim, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim.  Subject to the "market discount" rules described above, if the Claim in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss.  Such gain or loss will generally constitute long-term capital gain or loss if the Holder of the Claim held such Claim for longer than one year or short-term capital gain or loss if the Holder of the Claim held such Claim for less than one year.  Long-term capital gains of non-corporate holders are taxed at preferential rates, and capital losses are subject to limitations on deductibility.

A Holder of an Allowed Claim who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business.  A Holder that has previously recognized a loss or deduction in respect of its Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim.  Holders of Claims who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest.  Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.  Whether such losses qualify as ordinary losses under the Tax Code is unclear.

## 2.       Market Discount

The market discount provisions of the Tax Code may apply to Holders of Claims. Generally, if a Holder of a Claim purchased the Claim at a price less than such Claim's principal amount, the difference would constitute "market discount" for federal income tax purposes.  In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having OID, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.  Any gain recognized by such Holder on the receipt of Cash in respect of its Claim would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

## 3.       Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position that, for income tax purposes, such distribution shall be allocated to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.  No assurances can be made in this regard.  If, contrary to the Debtors' intended position, such a distribution were treated as being allocated first to accrued but unpaid interest, a Holder of such an Allowed Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder otherwise realized a loss as a result of the Plan.  Conversely, a Holder generally would recognize a deductible loss to the extent that any accrued interest was previously included in its gross income and was not paid in full.  To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

## C.       Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims or Interests pursuant to the Plan, may be subject to information reporting to the IRS.  Moreover, under certain circumstances, Claimholders may be subject to "backup withholding" at the applicable rate. Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Claimholder's U.S. federal income tax liability, and a Claimholder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  Each Claimholder is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Claimholder's tax returns.

**D.      Importance of Obtaining Professional Tax Assistance**

The foregoing discussion is intended only as a summary of certain tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.  The above discussion is for informational purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Claimholder's particular circumstances.  Accordingly, claimholders are urged to consult their tax advisors about the federal, state and local, and applicable foreign income and other tax consequences of the Plan.

## ARTICLE X
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, alternatives include: (A) continuation of the Chapter 11 Cases; or (B) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**A.      Alternative Plans**

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases (if the Debtors' exclusive period in which to file a chapter 11 plan has expired) could propose a different plan or plans.

**B.      Liquidation Under Chapter 7 of the Bankruptcy Code**

If the Plan or any other chapter 11 plan of the Debtors cannot be confirmed under Section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee (or trustees) would be elected or appointed to liquidate the Debtors' assets for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code.  A liquidation under chapter 7 likely would result in smaller distributions made to creditors than that provided for in the Plan because of a number of factors.  Please refer to the discussion regarding the Liquidation Analysis contained in Article VI of this Disclosure Statement (Feasibility and Best Interests of Creditors - Best Interests Test and Liquidation Analysis) for a description of these factors and other chapter 7 liquidation considerations.

## ARTICLE XI
## RECOMMENDATION AND CONCLUSION

The Debtors believe that confirmation and consummation of the Plan is in the best interests of the Debtors, their Estates and their creditors.  The Plan provides for an equitable distribution to creditors.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes. Consequently, the Debtors urge all eligible Holders of Impaired Claims to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Solicitation Agent on or before the Voting Deadline.

Dated: Wilmington, Delaware
       February 12, 2025

TRUE VALUE COMPANY, L.L.C., on behalf of itself
and its Debtor affiliates

*/s/ Kunal S. Kamlani*
Name: Kunal S. Kamlani
Title:   Chief Transformation Officer

**Exhibit A**

**Second Amended Joint Chapter 11 Plan of True Value Company, L.L.C. and Its Debtor Affiliates**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C., *et al.*,** | **Case No. 24-12337 (KBO)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF TRUE VALUE COMPANY, L.L.C. AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Joseph O. Larkin
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

Ron E. Meisler (admitted *pro hac vice*)
Jennifer Madden (admitted *pro hac vice*)
320 South Canal Street
Chicago, Illinois 60606-5707
Telephone: (312) 407-0705
Ron.Meisler@skadden.com
Jennifer.Madden@skadden.com

- and -

Evan A. Hill (admitted *pro hac vice*)
Moshe S. Jacob (admitted *pro hac vice*)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Evan.Hill@skadden.com
Moshe.Jacob@skadden.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Kristin L. McElroy (Del. Bar No. 6871)
Timothy R. Powell (Del. Bar No. 6894)
One Rodney Square
1000 North King Street
Wilmington, Delaware 1801
Telephone: (302) 571-6600
emorton@ycst.com
kenos@ycst.com
kmcelroy@ycst.com
tpowell@ycst.com

GLENN AGRE BERGMAN & FUENTES LLP
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
Michelle C. Perez (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
aglenn@glennagre.com
twelch@glennagre.com
mdoss@glennagre.com
mperez@glennagre.com

*Counsel to Debtors and Debtors-in-Possession*

Dated:  February 12, 2025
        Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1
ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF
TIME        ..................................................................................................1
    Section 1.1      Defined Terms .................................................1
    Section 1.2      Rules of Interpretation ......................................15
    Section 1.3      Computation of Time .......................................16
    Section 1.4      Exhibits .........................................................16
    Section 1.5      Reference to the Debtors or the Post-Effective Date Debtors ..............16
    Section 1.6      References to the Asset Purchase Agreement and any Ancillary
                       Agreements ....................................................16
    Section 1.7      Controlling Document ......................................16
ARTICLE II ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS .......................16
    Section 2.1      Administrative Claims .....................................16
    Section 2.2      Professional Claims .........................................18
    Section 2.3      Restructuring Expenses ....................................19
    Section 2.4      Plan Administration Reserve .............................19
    Section 2.5      Priority Tax Claims .........................................20
ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
INTERESTS        ..................................................................................................20
    Section 3.1      Classification of Claims and Interests .................20
    Section 3.2      Treatment and Voting of Claims and Interests .......21
    Section 3.3      Voting, Presumptions, and Solicitation. ...............25
ARTICLE IV MEANS OF IMPLEMENTATION OF THE PLAN ...................................26
    Section 4.1      Corporate Action.............................................26
    Section 4.2      Effectuating Documents; Further Transactions .......26
    Section 4.3      Corporate Existence Post-Effective Date................26
    Section 4.4      Settlement of Claims and Interests .....................27
    Section 4.5      Plan Funding ..................................................27
    Section 4.6      Cancellation of Old Securities and Agreements .......28
    Section 4.7      Vesting of Assets ............................................28
    Section 4.8      Plan Administrator. .........................................29
    Section 4.9      Litigation Trust ..............................................31
    Section 4.10     Sale Order .....................................................33
    Section 4.11     Exemption from Certain Transfer Taxes ...............33
    Section 4.12     Preservation of Causes of Action........................33
ARTICLE V EXECUTORY CONTRACTS............................................................34
    Section 5.1      Assumption and Rejection of Executory Contracts ...34
    Section 5.2      Rejection Damages Claim Procedures....................35
    Section 5.3      Cure of Defaults for Assumed Executory Contracts .............36
    Section 5.4      Modifications, Amendments, Restatements, Supplements,
                       Restatements, and Other Agreements....................37
    Section 5.5      Reservation of Rights.......................................38
    Section 5.6      Employee Compensation and Benefit Programs .......38
    Section 5.7      Insurance Policies ...........................................39

i

Section 5.8     D&O Policies ........................................................................39
Section 5.9     Indemnification Obligations ..............................................39
Section 5.10    Nonoccurrence of the Effective Date ...............................40
ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS ..40
Section 6.1     Determination of Claims and Interests ............................40
Section 6.2     Claims Administration Responsibility ..............................40
Section 6.3     Objections to Claims ...........................................................41
Section 6.4     Disallowance of Claims .......................................................41
Section 6.5     Estimation of Claims ...........................................................41
Section 6.6     No Interest on Claims ..........................................................42
Section 6.7     Amendments to Claims .......................................................42
ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ..........................................42
Section 7.1     Distributions Allowed as of the Effective Date ......................42
Section 7.2     Distribution on Account of Claims and Equity Interests Allowed
                After the Effective Date ......................................................43
Section 7.3     Timing and Calculation of Amounts to Be Distributed .........43
Section 7.4     Delivery of Distributions ....................................................43
Section 7.5     Currency ...............................................................................44
Section 7.6     Distribution Agent (if any) ................................................45
Section 7.7     Undeliverable Distributions ..............................................45
Section 7.8     De Minimis Distributions ...................................................46
Section 7.9     Surrender of Securities or Instruments ...........................46
Section 7.10    Compliance Matters ............................................................46
Section 7.11    Claims Paid or Payable by Third Parties .........................46
Section 7.12    Setoffs ..................................................................................46
Section 7.13    Allocation of Plan Distributions Between Principal and Interest ..........47
ARTICLE VIII EFFECT OF PLAN ON CLAIMS AND INTERESTS ..................................47
Section 8.1     Compromise and Settlement .............................................47
Section 8.2     Releases by the Debtors .....................................................47
Section 8.3     Releases by Releasing Parties ..........................................48
Section 8.4     Exculpation and Limitation of Liability ...........................49
Section 8.5     Injunction ............................................................................50
Section 8.6     Subordinated Claims ..........................................................51
Section 8.7     Protection Against Discriminatory Treatment .................52
Section 8.8     Release of Liens ...................................................................52
Section 8.9     Reimbursement or Contribution .......................................52
ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..........................52
Section 9.1     Conditions Precedent to the Effective Date of the Plan .........52
Section 9.2     Waiver of Conditions Precedent .......................................53
Section 9.3     Notice of Effective Date .....................................................53
Section 9.4     Effect of Non-Occurrence of Conditions to Consummation .................53
ARTICLE X BANKRUPTCY COURT JURISDICTION .....................................................54
Section 10.1    Retention of Jurisdiction ...................................................54
ARTICLE XI MISCELLANEOUS PROVISIONS ................................................................56
Section 11.1    Binding Effect ......................................................................56
Section 11.2    Payment of Statutory Fees ................................................56

Section 11.3      Statutory Committee Dissolution..............................................................56
Section 11.4      Modification and Amendment ...................................................................57
Section 11.5      Confirmation of Plan.................................................................................57
Section 11.6      Additional Document.................................................................................57
Section 11.7      Revocation, Withdrawal, Non-Consummation.........................................57
Section 11.8      Notices ......................................................................................................58
Section 11.9      Term of Injunctions or Stays....................................................................59
Section 11.10     Governing Law .........................................................................................59
Section 11.11     Entire Agreement .....................................................................................59
Section 11.12     Severability ..............................................................................................59
Section 11.13     No Waiver or Estoppel..............................................................................60

iii

## INTRODUCTION

True Value Company, L.L.C. and its debtor affiliates in the above-captioned chapter 11 cases propose this joint chapter 11 plan (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in **Section 1.1** hereof or the Bankruptcy Code or Bankruptcy Rules.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Each Debtor is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth herein shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  The Plan does not contemplate substantive consolidation of any of the Debtors.  Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, and operations, as well as a summary and description of the Plan and certain related matters.

> **ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS THERETO) IN THEIR ENTIRETIES BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### Section 1.1    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

**1.1.1**    "**90 Day Buckets**" means collectively the following items in the Cash Collateral Budget: "Employee Benefit Reserve", "Vendor Payments", "Tax Payments", and "Critical Foreign Vendors."

**1.1.2**    "**90+ Day Buckets**" means collectively the following items in the Cash Collateral Budget: "Total Professional Fees", "UST Fees", "Employee Benefit Claims Reserve", and "Wind Down Budget Reserve."

**1.1.3**    "**Administrative Agent**" means PNC Bank, National Association, as administrative agent under the Credit Agreement.

**1.1.4**    "**Administrative Claim**" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to Sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries or commissions for services and

payments for goods and other services and leased premises); (b) Professional Claims; (c) Restructuring Expenses and (d) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code.

1.1.5    "**Administrative Claim Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be (a) December 23, 2024, at 11:59 p.m. (prevailing Eastern Time) with respect to Administrative Claims incurred from the Petition Date through November 22, 2024; and (b) 30 days after the Effective Date with respect to Administrative Claims incurred from November 22, 2024 through the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to (i) Professional Claims, (ii) Restructuring Expenses, (iii) Administrative Claims Allowed by a Final Order of the Bankruptcy Court on or before the Effective Date, (iv) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, or (v) Administrative Claims arising under chapter 123 of title 28 of the United States Code.

1.1.6    "**Affiliate**" has the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.1.7    "**Allowed**" means (a) any Claim against the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or included in a timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with the Plan or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective Holder, (c) any Claim expressly allowed by the Plan, or (d) any Claim expressly allowed by a Final Order.

1.1.8    "**Ancillary Agreements**" means, collectively, the agreements to be executed in connection with the transactions contemplated by the Asset Purchase Agreement, including, but not limited to, the Transition Services Agreement.

1.1.9    "**Asset Purchase Agreement**" means the asset purchase agreement entered into by and between the Purchaser and the Debtors, dated as of November 10, 2024, which is attached as Exhibit 1 to the Sale Order, including all schedules and exhibits thereto, and as may be amended or modified from time to time.

1.1.10    "**Assets**" means all of the rights, title, and interests of the Debtors, of any nature in property of any kind, wherever located, as specified in Section 541 of the Bankruptcy Code.

1.1.11    "**Assumed Contracts**" means all Executory Contracts that are not Transferred Contracts but are designated as being assumed on the Schedule of Assumed Executory Contracts.

**1.1.12**     "**Assumption and Assignment Procedures**" has the meaning set forth in the Bidding Procedures Order.

**1.1.13**     "**Avoidance Actions**" means any and all actual or potential Claims or Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including Sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

**1.1.14**     "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time and in effect during the pendency of these Chapter 11 Cases.

**1.1.15**     "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under Section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under Section 151 of title 28 of the United States Code.

**1.1.16**     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**1.1.17**     "**Bar Date**" means, as applicable, the date of the General Bar Date, Administrative Claims Bar Date, Governmental Bar Date, and any other deadline set by the Bankruptcy Court for filing proofs of claim or requests for allowance of Administrative Claims in the Chapter 11 Cases.

**1.1.18**     "**Bidding Procedures**" means the competitive marketing and bidding process conducted by the Debtors for the Sale pursuant to the Bidding Procedures Order.

**1.1.19**     "**Bidding Procedures Order**" means the *Order (I) Approving the Bid Protections; (II) Approving the Assumption and Assignment Procedures; (III) Authorizing and Approving the Form of Notice of the Sale of Substantially All of the Assets of the Debtors; (IV) Authorizing and Scheduling the Sale Hearing and Setting Other Related Dates and Deadlines; and (V) Granting Related Relief* [Docket No. 297].

**1.1.20**     "**Budget Reserve Buckets**" means collectively the 90 Day Buckets and the 90+ Day Buckets.

**1.1.21**     "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)).

**1.1.22**     "**Cash**" means legal tender of the United States of America.

**1.1.23**     "**Cash Collateral Budget**" means the budget attached to the Cash Collateral Order as Exhibit 2 (together with the detailed version of such budget in which, among

other things, each of the Budget Reserve Buckets is set forth), as the same may be modified from time to time as permitted by the Cash Collateral Order.

**1.1.24** "**Cash Collateral Order**" means the *Final Order (I)(A) Authorizing Debtors to Use Cash Collateral; (B) Granting Adequate Protection to Prepetition Lenders; and (C) Modifying the Automatic Stay; and (II) Granting Related Relief* [Docket No. 296], including all exhibits thereto. Notwithstanding anything to the contrary herein, nothing in this Plan shall affect, impair or supersede the Cash Collateral Order, which remains in full force and effect and governs in the event of any inconsistency with the Plan.

**1.1.25** "**Causes of Action**" means any action, claim, cause of action, controversy, third-party claim, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to Section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defense set forth in Section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

**1.1.26** "**Certificate**" means any instrument evidencing a Claim or an Interest.

**1.1.27** "**Chapter 11 Cases**" means the chapter 11 cases of the Debtors pending in the Bankruptcy Court and being jointly administered under Case No. 24-12337.

**1.1.28** "**Claim**" means a "claim" against one or more of the Debtors, as defined in Section 101(5) of the Bankruptcy Code.

**1.1.29** "**Claims and Solicitation Agent**" means Omni Agent Solutions, in its capacity as "claims and noticing agent" for the Debtors, or any successor thereto.

**1.1.30** "**Claims Objection Deadline**" means the deadline to object to a Claim, which shall be the date that is the later of (a) one-hundred and eighty (180) days after the Effective Date and (b) such other deadline as may be fixed by an order of the Bankruptcy Court for objecting to such Claims.

**1.1.31** "**Class**" means a category of Claims or Interests classified together under the Plan pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.1.32** "**Closing**" means the closing of the Sale, which occurred on November 22, 2024.

**1.1.33** "**Combined Hearing**" means the hearing(s) conducted by the Bankruptcy Court pursuant to Section 1128(a) of the Bankruptcy Code (a) to consider confirmation of the

Plan under Section 1129 of the Bankruptcy Code and (b) final approval of the adequacy of the disclosures contained in the Disclosure Statement under Section 1125 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

      **1.1.34**      "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, on the docket of the Chapter 11 Cases.

      **1.1.35**      "**Confirmation Date**" means the date on which Confirmation occurs.

      **1.1.36**      "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under Section 1129 of the Bankruptcy Code.

      **1.1.37**      "**Credit Agreement**" means that certain Credit Agreement dated as of April 20, 2018, by and among the Debtors, the Prepetition Lenders, and the Administrative Agent, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, as amended, supplemented, restated or otherwise modified prior to the Petition Date.

      **1.1.38**      "**Credit Facility**" means all term loans, revolving loan commitments, and other financial accommodations provided to the Debtors by the Prepetition Secured Parties under the Credit Agreement.

      **1.1.39**      "**Creditors' Committee**" means the statutory committee of unsecured creditors appointed by the U.S. Trustee on October 23, 2024 pursuant to Section 1102(a)(1) of the Bankruptcy Code.

      **1.1.40**      "**Cure Amount**" means the amount to be paid in Cash or by the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract and (ii) permit the Debtors to assume such Executory Contract under Section 365(a) of the Bankruptcy Code.

      **1.1.41**      "**Cure Notice**" means any notice that informs each counterparty to an Executory Contract of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or unexpired lease, as applicable, (iii) Debtors' good faith estimate of the Cure Amount (if any) required in connection with the executory contract or unexpired lease, as applicable, (iv) with respect to Assumed Contracts to be assumed or Transferred Contracts to be assumed and assigned in connection with the Asset Purchase Agreement.

      **1.1.42**      "**Cure Objection**" means an objection by a counterparty to an Executory Contract that is timely filed by the applicable Cure Objection Deadline.

      **1.1.43**      "**Cure Objection Deadline**" means the applicable deadline for filing objections to a Cure Notice or proposed Cure Amount.

1.1.44    "**Cure Payment**" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract and (ii) permit the Debtors to assume such Executory Contract under Section 365(a) of the Bankruptcy Code.

1.1.45    "**D&O Policies**" means all directors' and officers' liability insurance policies (including any tail policy) issued or providing coverage to any of the Debtors covering potential liability of current or former directors, officers and/or employees of the Debtors.

1.1.46    "**Debtor Release**" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in **Section 8.2** of the Plan.

1.1.47    "**Debtors**" means True Value Company, L.L.C. and all of its affiliates that are debtors in the Chapter 11 Cases.

1.1.48    "**Disallowed**" means, with respect to any Claim, or any portion thereof, that such Claim, or such portion thereof, is not Allowed.

1.1.49    "**Disclosure Statement**" means the disclosure statement for the Plan, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, which is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

1.1.50    "**Disclosure Statement Order**" means the Final Order entered by the Bankruptcy Court approving the Disclosure Statement.

1.1.51    "**Disputed**" means any Claim, or any portion thereof, that is not yet Allowed or Disallowed.

1.1.52    "**Dissolution Date**" means the date that the Debtors dissolve in accordance with applicable state law.

1.1.53

1.1.54    "**Distribution**" means a distribution under the Plan of property to a Holder of a Claim on account of such Claim.

1.1.55    "**Distribution Agent**" means (a) prior to the Effective Date, the Debtors and (b) on and after the Effective Date, the Plan Administrator, or, in each case, any Person designated by the Debtors or the Plan Administrator, as applicable, in the capacity of distribution agent under the Plan; *provided* that, distributions on account of Class 3 Claims shall be made to, or at the direction of the Administrative Agent in accordance with the Plan.

1.1.56    "**Distribution Date**" means the date(s) on which Holders of Allowed Claims are eligible to receive distributions under the Plan.

1.1.57    "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) the Confirmation Date, or (b) such other date as designated by an order of the Bankruptcy Court.

1.1.58    "**Do it Best**" means Do it Best Corp., an Indiana corporation.

1.1.59    "**Effective Date**" means the first Business Day on which (a) all conditions precedent to the effectiveness of the Plan set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan and (b) no stay of the Confirmation Order is in effect. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.1.60    "**Entity**" has the meaning set forth in Section 101(15) of the Bankruptcy Code.

1.1.61    "**Estates**" means the bankruptcy estates of the Debtors created under Section 541 of the Bankruptcy Code.

1.1.62    "**Exculpated Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors; (b) the Estates; (c) the Creditors' Committee and each of its current and former members (provided, for the avoidance of doubt, that former members of the Creditors' Committee shall not be exculpated for any act or omission occurring after their tenure on the Creditors' Committee); and (d) each of the preceding parties' respective Related Parties, in each case, who served as a fiduciary of the Estates or on behalf of holders of General Unsecured Claims at any time between the Petition Date and the Effective Date of this Plan.

1.1.63    "**Executory Contract**" means any contract or unexpired lease of non-residential property to which any of the Debtors is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

1.1.64    "**Existing Interests**" means any and all Interests in any of the Debtors that are not Intercompany Interests.

1.1.65    "**Final Decree**" means a final decree entered by the Bankruptcy Court closing the Chapter 11 Cases pursuant to Bankruptcy Rule 3022.

1.1.66    "**Final Order**" means an order, the operation or effect of which has not been stayed, reversed, or amended and as to which order the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by all Entities possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which reargument or rehearing was sought or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous

rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

**1.1.67** "**Fungibility Mechanisms**" means the rights, pursuant to the Cash Collateral Order, of the Debtors, the Post-Effective Date Debtors and the Plan Administrator to (i) use excess amounts within any of the 90 Day Buckets to fund any shortfall in any other 90 Day Bucket, and (ii) use excess amounts within any 90+ Day Bucket to fund any shortfall in any other 90+ Day Bucket; provided, however, that no funds in any Budget Reserve Bucket may be moved to, or used to fund, any shortfalls in the 90+ Day Buckets established for "Total Professional Fees," and the "Wind Down Budget Reserve," as such terms are used in the Cash Collateral Budget.

**1.1.68** "**General Bar Date**" means December 5, 2024 at 11:59 p.m. (prevailing Eastern Time).

**1.1.69** "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Prepetition Lender Claim, or Intercompany Claims. For the avoidance of doubt, General Unsecured Claims include, without limitation, any Prepetition Lender Deficiency Claims.

**1.1.70** "**Governmental Bar Date**" means April 14, 2025 at 11:59 p.m. (prevailing Eastern Time).

**1.1.71** "**Governmental Unit**" has the meaning set forth in Section 101(27) of the Bankruptcy Code.

**1.1.72** "**Holder**" means a holder of a Claim against, or Interest in, the Debtors.

**1.1.73** "**Impaired**" has the meaning as defined in Section 1124 of the Bankruptcy Code.

**1.1.74** "**Initial Litigation Trust Funded Amount**" means $150,000, to be funded by the Debtors, out of the "Wind Down Budget Reserve," as such term is used in the Cash Collateral Budget, to the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

**1.1.75** "**Intercompany Claim**" means a Claim held by a Debtor against another Debtor.

**1.1.76** "**Intercompany Interest**" means any and all Interests in a Debtor held by another Debtor.

**1.1.77** "**Interest**" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership or limited liability company interests (whether certificated or uncertificated), any "equity security" (as defined in the Bankruptcy Code), or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire

such equity interests at any time and all rights arising with respect thereto that existed immediately before the Petition Date..

**1.1.78**      "**Lien**" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

**1.1.79**      "**Litigation Trust**" means the trust to be established on the Effective Date for the benefit of Holders of Allowed General Unsecured Claims and the Prepetition Lenders in accordance with the Plan and the Litigation Trust Agreement.

**1.1.80**      "**Litigation Trust Agreement**" means the agreement establishing and governing the Litigation Trust, a form of which shall be filed with the Plan Supplement.

**1.1.81**      "**Litigation Trust Assets**" means (i) the Initial Litigation Trust Funded Amount and (ii) the Retained Causes of Action.

**1.1.82**      "**Litigation Trust Beneficiaries**" means all Holders entitled to Litigation Trust Distributable Proceeds.

**1.1.83**      "**Litigation Trust Distributable Proceeds**" means the Cash proceeds, whether by settlement, adjudication or otherwise, of any Retained Causes of Action net of any Litigation Trust Expenses.

**1.1.84**      "**Litigation Trust Expenses**" means any fees and expenses incurred by the Litigation Trustee (including, but not limited to, the compensation of the Litigation Trustee and the reasonable fees and expenses of professionals or other persons retained by the Litigation Trustee) in connection with the administration of the Litigation Trust.

**1.1.85**      "**Litigation Trust GUC Interests**" means all of the interests in the Litigation Trust other than the Litigation Trust Prepetition Lender Interests, which shall be distributed to the Holders of Allowed General Unsecured Claims, in accordance with the Plan and the Litigation Trust Agreement.

**1.1.86**      "**Litigation Trust Prepetition Lender Interests**" means the interests in (i) 50% of the proceeds from commercial tort claims pursued by the Litigation Trust and (ii) the proceeds from any other claims or causes of action pursued by the Litigation Trust.  The Litigation Trust Prepetition Lender Interests shall be distributed to the Prepetition Lenders on account of their Prepetition Lender Claims in accordance with the Plan and the Litigation Trust Agreement and subject to the Cash Collateral Order.

**1.1.87**      "**Litigation Trustee**" means the Person or Persons appointed by the Debtors in consultation with the Creditors' Committee as the Plan Administrator acting in the capacity as trustee of, and to administer, the Litigation Trust, and take such other actions as may be authorized under the Litigation Trust Agreement, along with any successor thereto.

**1.1.88**      "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority of payment as set forth in Section 507(a) of the Bankruptcy Code.

**1.1.89** "**Other Secured Claim**" means a Secured Claim, other than any Prepetition Lender Claim.

**1.1.90** "**Person**" has the meaning set forth in Section 101(41) of the Bankruptcy Code.

**1.1.91** "**Petition Date**" means the date on which the Debtors filed their voluntary petitions for relief commencing the Chapter 11 Cases.

**1.1.92** "**Plan**" has the meaning set forth in the Introduction.

**1.1.93** "**Plan Administration Budget**" means a budget to be prepared by the Debtors, which shall be consistent with the Cash Collateral Order and filed with the Bankruptcy Court as part of the Plan Supplement, and which may be amended from time to time by the Debtors or the Plan Administrator (including in the capacity as Litigation Trustee), as applicable, and which shall estimate the funds necessary to administer the Plan and wind down the Debtors' affairs, including the costs of holding and liquidating any Assets that are not Transferred Assets, reconciling, objecting to, and resolving Claims and Interests, making the distributions required by the Plan, prosecuting Causes of Action and Avoidance Actions, paying taxes, filing tax returns, paying the fees and expenses of the Plan Administrator and the Plan Administrator Professionals, providing for the purchase of errors and omissions insurance and/or other forms of indemnification for the Plan Administrator, satisfying any post-Closing obligations under Asset Purchase Agreement, and all such items and other costs of implementing the terms of the Plan and the Asset Purchase Agreement, and upon fulfilling all such obligations, any costs associated with dissolving the Post-Effective Date Debtors and their Affiliates; *provided that*, for the avoidance of doubt, any costs associated with fulfilling the obligations under the Transition Services Agreement shall be funded directly by the Purchaser and will not be calculated for purposes of the Plan Administration Budget.

**1.1.94** "**Plan Administration Indemnified Parties**" means (a) the Plan Administrator (in its capacity as such and as the Litigation Trustee and as officer and director of the Debtors as of and following the Effective Date), (b) such individuals that may serve as officers and directors of the Post-Effective Date Debtors, if any, and (c) the Plan Administrator Professionals.

**1.1.95** "**Plan Administration Reserve**" means a Cash reserve to be funded out of the "Wind Down Budget Reserve," as such term is used in the Cash Collateral Budget, in the amount of the Plan Administration Budget, which, for the avoidance of doubt, is separate from the funds that will be provided by the Purchaser to fund any costs associated with the Post-Effective Date Debtors' obligations under the Transition Services Agreement, which shall be covered directly by the Purchaser. A portion of the Plan Administration Reserve shall comprise the Initial Litigation Trust Funded Amounts.

**1.1.96** "**Plan Administrator**" means the Person or Persons identified in the Plan Supplement (as determined by the Debtors in consultation with the Creditors' Committee) and appointed on the Effective Date, who will serve as the trustee and administrator for the Post-

Effective Date Debtors, including as the Litigation Trustee, on and after the Effective Date in accordance with the Plan.

**1.1.97** "**Plan Administrator Agreement**" means the agreement between the Debtors and the Plan Administrator specifying the rights, duties and responsibilities of the Plan Administrator under the Plan and providing for the Plan Administrator's retention of the Plan Administrator Professionals, a form of which shall be filed with the Plan Supplement.

**1.1.98** "**Plan Administrator Professionals**" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives and other professionals of the Plan Administrator and the Post-Effective Date Debtors, in their capacities as such.

**1.1.99** "**Plan Supplement**" means a supplemental appendix to the Plan containing, among other things, substantially final forms of documents, schedules, and exhibits relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, including, among other things, the following: the Plan Administrator Agreement, the Plan Administration Budget, the Litigation Trust Agreement, the Schedule of Assumed Executory Contracts, and the Schedule of Retained Causes of Action. The Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date; *provided that,* through the Effective Date, the Debtors shall have the right to amend and supplement the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Litigation Trust Agreement.

**1.1.100** "**Plan Supplement Filing Date**" means March 7, 2025 (prevailing Eastern Time).

**1.1.101** "**Post-Effective Date Debtors**" means the Debtors as of and following the Effective Date.

**1.1.102** "**Prepetition Lenders**" means the lenders and issuing banks party to the Credit Agreement.

**1.1.103** "**Prepetition Lender Claims**" means a Claim arising under, derived from, or based on the Credit Agreement, other than any Prepetition Lender Deficiency Claims.

**1.1.104** "**Prepetition Lender Deficiency Claim**s" means, subject in all respects to the agreements set forth under the "Releases" section of the Cash Collateral Order, any unsecured Claim of a Holder of Prepetition Lender Claims arising under, derived from, or based on the Credit Agreement.

**1.1.105** "**Prepetition Lender Subordinated Liens**" means the Prepetition Lenders' Liens on the cash collateral used to fund the Retained Funds and the Budget Reserve Buckets which Liens are subordinated pursuant to the Cash Collateral Order to the payment of the Allowed Administrative Claims and/or other Claims for which the Retained Funds and the Budget Reserve Buckets were established to address, and which lien subordination shall remain in effect notwithstanding a conversion of the Debtors' Chapter 11 Cases to cases under chapter 7.

**1.1.106** "**Prepetition Secured Parties**" means, collectively, the Administrative Agent and the Prepetition Lenders.

**1.1.107** "**Priority Tax Claim**" means any Claim of a Governmental Unit entitled to priority of payment under Section 507(a)(8) of the Bankruptcy Code.

**1.1.108** "**Pro Rata**" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claims or Allowed Interests under the Plan.

**1.1.109** "**Professional**" means any Entity retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code; *provided*, *however*, that Professional does not include any Entity retained pursuant to an order of the Bankruptcy Court authorizing the retention of "ordinary-course professionals" or the Plan Administrator Professionals.

**1.1.110** "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date.

**1.1.111** "**Professional Claim Estimate**" means the sum of (a) the billed but unpaid fees and expenses of Professionals as of the Effective Date, and (b) the unbilled fees and expenses of Professionals estimated pursuant **Section 2.2(b)** of the Plan attributable to fees and expenses to be incurred as of the Effective Date; *provided*, *however*, that if a Professional does not provide an estimate pursuant to **Section 2.2(b)** of the Plan, the Debtors may estimate the unbilled fees and expenses of such Professional incurred as of the Effective Date.

**1.1.112** "**Professional Claims Reserve**" means the interest-bearing escrow account, maintained by the Plan Administrator, on behalf of the Debtors, into which, subject to and in accordance with the Cash Collateral Order, Cash equal to the Professional Claim Estimate has been deposited under the Cash Collateral Order or shall be deposited on or before the Effective Date to fund all Professional Claims of Professionals.

**1.1.113** "**Purchaser**" means Do it Best and, to the extent applicable, any Affiliates thereof.

**1.1.114** "**Rejection Damages Claim**" means any Claim on account of the rejection of an Executory Contract pursuant to Section 365 of the Bankruptcy Code.

**1.1.115** "**Related Party**" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or

managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

1.1.116    "**Released Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors' and the Estates' Related Parties; (b) the Prepetition Secured Parties; (c) the Creditors' Committee and each of its current and former members; and (d) the Related Parties of each of the Entities in clauses (b) and (c).

1.1.117    "**Releasing Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Released Parties; (b) all Holders of Claims or Interests that (i) vote to reject or abstain from voting on the Plan and (ii) check the box on the applicable ballot indicating that they "opt in" to granting the Releasing Party Releases; (c) all Holders of Claims or Interests that vote to accept the Plan and do not affirmatively "opt out" of granting the Releasing Party Releases; (d) all Holders of Claims or Interests that (i) are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code, and (ii) after receiving notice, affirmatively "opt in" to the Releasing Party Releases; (e) all Holders of Claims or Interests that (i) are deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code and, (ii) after receiving notice, affirmatively "opt in" to the Releasing Party Releases; and (f) each Related Party of each Entity in the foregoing clauses (a) through (e), solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (e).

1.1.118    "**Releasing Party Release**" means the release given by each of the Releasing Parties to the Released Parties as set forth in **Section 8.3** of the Plan.

1.1.119    "**Representatives**" means, with respect to any Person or Entity, such Person's or Entity's current and former principals, members, equity holders, managers, partners, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, experts, and other professionals acting in such capacity for such Person or Entity.

1.1.120    "**Restructuring Expenses**" means the reasonable and documented professional fees and expenses incurred pursuant to the Asset Purchase Agreement, the Cash Collateral Order, or other applicable agreement pursuant to which the Debtors have agreed to reimburse the reasonable professional fees and expenses of the respective party, to the extent such fees and expenses are not paid or contemplated to be paid from other sources.

1.1.121    "**Retained Causes of Action**" means all Causes of Action owned by the Debtors, other than any Causes of Action that are Transferred Assets under the Asset Purchase Agreement or released pursuant to the terms of the Plan or an order of the Bankruptcy Court.

1.1.122    "**Retained Funds**" shall have the meaning ascribed to such term in the Cash Collateral Order.

1.1.123     "**Sale Order**" means the *Order (A) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing Debtors to Enter Into and Perform Under Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts, and (D) Granting Related Relief* [Docket No. 411].

1.1.124     "**Sale**" means the sale of substantially all of the Debtors' Assets to the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

1.1.125     "**Schedule of Assumed Executory Contracts**" means the schedule of Executory Contracts to be assumed by the Debtors pursuant to the Plan, along with the proposed Cure Amount, if any, with respect to each such Executory Contract, in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

1.1.126     "**Schedule of Retained Causes of Action**" means the schedule of Retained Causes of Action, in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time. For the avoidance of doubt, exclusion of a Person or Entity on the schedule of Retained Causes of Action does not, and should not be interpreted to, mean that Causes of Action against such Person or Entity are released or waived under the Plan.

1.1.127     "**Schedules**" means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

1.1.128     "**Secured Claim**" means a Claim to the extent it is (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (i) as set forth in the Plan, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with Section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any rights of setoff of the Holder thereof under Section 553 of the Bankruptcy Code.

1.1.129     "**Statutory Fees**" means all fees and charges assessed against the Estates under Section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-4001, plus any interest thereon pursuant to 31 U.S.C. § 3717.

1.1.130     "**Subordinated Claim**" means any Claim arising from rescission of a purchase or sale of an equity security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such an equity security, for reimbursement or contribution allowed under Section 502 of the Bankruptcy Code on account of such a Claim or otherwise subordinated under Section 510 of the Bankruptcy Code.

1.1.131     "**Transferred Assets**" means all assets transferred to the Purchaser pursuant to the Asset Purchase Agreement.

**1.1.132** "**Transferred Contracts**" means collectively, all Executory Contracts that are assumed and assigned by the Debtors to the Purchaser under the Asset Purchase Agreement.

**1.1.133** "**Transition Services Agreement**" means the Amended and Restated Transition Services Agreement Term Sheet among the Purchaser and Debtors, which is attached as Exhibit H to the Asset Purchase Agreement as the same may be modified or amended by the parties thereto as provided therein.

**1.1.134** "**TSA Assumption Order**" means the *Order Approving TSA Contract Assumption and Assignment Procedures* [Docket No. 688].

**1.1.135** "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated and/or cashed such check; (b) given notice to the Debtors or the Plan Administrator, as applicable, of an intent to accept a particular distribution; (c) responded to the Debtors' or the Plan Administrator's, as applicable, request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

**1.1.136** "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

**1.1.137** "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

### Section 1.2    *Rules of Interpretation*

For purposes of the Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter shall include the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereto," and the like refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; (i) references to "shares," "shareholders," "directors," and/or "officers" shall also include "membership units," "members," "managers," or other functional equivalents, as applicable, as such terms are defined under the applicable state limited liability company or alternative comparable laws, as applicable; and (j) any immaterial effectuating provision may be interpreted by the Post-Effective Date Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further order of the Bankruptcy Court.

### Section 1.3    Computation of Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

### Section 1.4    Exhibits

All Exhibits hereto are incorporated into and are part of the Plan as if set forth in full herein and such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the Plan Supplement is filed, copies of Exhibits may be obtained upon email request to the Claims and Solicitation Agent at TrueValueInquiries@OmniAgnt.com.

### Section 1.5    Reference to the Debtors or the Post-Effective Date Debtors

Except as otherwise specifically provided to the contrary, references in the Plan to the Debtors or the Post-Effective Date Debtors shall mean the Debtors and the Post-Effective Date Debtors, as applicable, to the extent the context requires.

### Section 1.6    References to the Asset Purchase Agreement and any Ancillary Agreements

Except as otherwise specifically provided to the contrary, references in the Plan to the Asset Purchase Agreement shall also include any Ancillary Agreements entered in connection with the *Asset Purchase Agreement.*

### Section 1.7    Controlling Document

In the event that there is any inconsistency between the Plan, the Plan Supplement or any other instrument or document created or executed pursuant to the Plan, the Disclosure Statement, and the Litigation Trust Agreement, the terms of the Plan shall govern. In the event that the provisions of the Plan, the Confirmation Order, the Disclosure Statement, the Plan Supplement, and the Litigation Trust Agreement conflict, the terms of the Confirmation Order shall govern.

## ARTICLE II
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

### Section 2.1    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Plan Administrator (on behalf of the Post-Effective Date Debtors), as applicable, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases and except as otherwise provided in this Article II, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction and settlement of and in exchange for of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then

due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

All requests for payment of an Administrative Claim (other than Professional Claims or Administrative Claims that are not disputed and arose in the ordinary course of business) that accrued on or before the Effective Date must be filed with the Bankruptcy Court and served on the Debtors or the Plan Administrator (on behalf of the Post-Effective Date Debtors) no later than the Administrative Claims Bar Date or be forever barred. Holders of Administrative Claims (other than Professional Claims or Administrative Claims that are not disputed and arose in the ordinary course of business) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, or their Estates, and such Administrative Claims shall be deemed discharged, compromised, settled, and released as of the Effective Date.

The Debtors or the Plan Administrator (on behalf of the Post-Effective Date Debtors), as applicable, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors or the Litigation Trustee may also choose to object to any Administrative Claim no later than forty-five (45) days after the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Litigation Trustee (or other party with standing) object to a timely filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or the Litigation Trustee object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

### Section 2.2    Professional Claims

(a)    *Final Fee Applications*

All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date. Objections to Professional Claims must be filed and served no later than twenty-one (21) days after the Filing of the Professional Claim. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims of Professionals after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. Unless otherwise agreed to by the Debtors and the Professional, the Plan Administrator shall pay

Professional Claims that are Allowed by Final Order following the Effective Date in Cash within five (5) Business Days of the entry of such Final Order.

    (b)    *Professional Claim Estimate*

The Professionals shall reasonably estimate in good faith their respective Professional Claim prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than five (5) Business Days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. If a Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional; *provided that* such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. The total amount estimated as of the Effective Date shall consist of the Professional Claim Estimate.

    (c)    *Professional Claims Reserve*

On or before the Effective Date, the Debtors or the Plan Administrator (on behalf of the Post-Effective Date Debtors) shall establish and fund, in a manner consistent with the Cash Collateral Order, the Professional Claims Reserve with Cash equal to the Professional Claim Estimate. The Professional Claims Reserve shall be maintained in trust solely for the benefit of the Professionals to pay Professional Claims. Other than the Prepetition Lender Subordinated Liens, no Liens, Claims, or Interests shall encumber the Professional Claims Reserve in any way. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Claims Reserve shall be remitted to the Prepetition Lenders in accordance with the Cash Collateral Order.

    (d)    *Post-Effective Date Retention*

Upon the Effective Date, any requirement that Professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate, and the Plan Administrator shall be permitted to employ and pay Professionals and Plan Administrator Professionals in its discretion (including the fees and expenses incurred by professionals in preparing, reviewing, prosecuting, defending, or addressing any issues with respect to final fee applications). The Debtors or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Court. For the avoidance of doubt, professional persons employed or compensated by the Litigation Trust shall be employed and compensated by the Litigation Trust and not by the Debtors, their Estates or the Post-Effective Date Debtors.

**Section 2.3    Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, but not paid, shall be paid in full in Cash on or as soon as practicable after the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to the Plan and the Cash Collateral Order, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and

without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided* that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay, subject to the Cash Collateral Budget, pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses whether incurred before, on, or after the Effective Date.

### Section 2.4    Plan Administration Reserve

Before the Effective Date, the Debtors shall establish and fund the Plan Administration Reserve with Cash equal to the Plan Administration Budget. The Plan Administration Reserve shall be maintained in trust solely for the benefit of the Plan Administrator to satisfy all obligations under the Plan Administrator Agreement, the Plan, the Asset Purchase Agreement, and any Ancillary Agreements. Such funds shall not be considered property of the Estates of the Debtors. Other than the Prepetition Lender Subordinated Liens, no Liens, Claims, or Interests shall encumber the Plan Administration Reserve in any way. For the avoidance of doubt, any costs incurred in connection with the obligations owed by the Post-Effective Date Debtors under the Transition Services Agreement shall be separately funded by the Purchaser to a separate bank account managed by the Plan Administrator on behalf of the Post-Effective Date Debtors.

### Section 2.5    Priority Tax Claims

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction and settlement of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or when such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law, or in the ordinary course of business. In the event an Allowed Priority Tax Claim is also a Secured Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

## ARTICLE III
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### Section 3.1    Classification of Claims and Interests

The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors and does not constitute a substantive consolidation of the Debtors' Estates. The Plan provides for consolidation of the Debtors solely for voting, confirmation and distribution, but not for any other purpose. Therefore, all Claims against and Interests in a particular Debtor are placed in the Classes set forth below with respect to such Debtor. Classes that are not applicable as to a particular Debtor

shall be eliminated as set forth more fully in **Section 3.3(d)** of the Plan.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims of the kinds specified in Sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in **Article II** of the Plan.

A Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under the Plan and under Sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

Claims and Interests are divided into the numbered Classes set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Prepetition Lender Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired/ Impaired | Presumed to Accept or Deemed to Reject |
| 6 | Intercompany Interests | Unimpaired/ Impaired | Presumed to Accept or Deemed to Reject |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Existing Interests | Impaired | Deemed to Reject |

### Section 3.2    *Treatment and Voting of Claims and Interests*

(a)    <u>*Class 1 – Other Priority Claims*</u>

(i)    *Classification*: Class 1 consists of all Other Priority Claims.

(ii)    *Treatment*: Except as otherwise provided in the Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash  as soon as reasonably practicable after the latest of (1) the Effective Date; (2) thirty (30) days after the date when an Other Priority Claim becomes an Allowed Other Priority Claim, or (3) such other date as agreed upon by the Debtors or the Plan Administrator (on behalf of the Post-Effective Date Debtors) and the Holder of such Other Priority Claim; *provided*, *however*, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    *Impairment and Voting.*  Class 1 is Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan.

(b)    <u>*Class 2 – Other Secured Claims*</u>

(i)    *Classification.*  Class 2 consists of all Other Secured Claims.

(ii)    *Treatment.*  Except as otherwise provided in the Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the sole option of the Debtors or the Plan Administrator (on behalf of the Post-Effective Date Debtors), as applicable, (1) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim required to be paid pursuant to Section 506 of the Bankruptcy Code, as soon as reasonably practicable after the latest of (A) the Effective Date or (B) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (C) such other date as agreed upon by the Debtors or the Plan Administrator (on behalf of the Post-Effective Date Debtors) and the Holder of such Other Secured Claim; (2) delivery of collateral securing any such Claim; or (3) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired under the Bankruptcy Code; *provided*, that Other Secured Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof; *provided further*, that nothing in this **Section 3.2(b)** or elsewhere in the Plan shall preclude the Debtors or the Litigation Trustee (on behalf of the Post-Effective Date Debtors), as applicable, from challenging the validity of any alleged Lien on any asset of the Debtors or the value of the property that secures any alleged Lien.

(iii)    *Impairment and Voting.*  Class 2 is Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan.

(c)    <u>*Class 3 – Prepetition Lender Claims*</u>

(i)    *Classification*.  Class 3 consists of all Prepetition Lender Claims.

(ii)    *Allowance*.  The Prepetition Lender Claims shall be Allowed in the aggregate principal amount of $238.2 million *plus* accrued unpaid interest on the Allowed amount of the Prepetition Lender Claims under the Credit Agreement.  For the avoidance of doubt, any Restructuring Expenses incurred by the Prepetition Secured Parties in connection with their participation in these Chapter 11 Cases shall be paid in accordance with **Section 2.3** of the Plan.

(iii)    *Treatment.*  Except to the extent that a Holder of an Allowed Prepetition Lender Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Prepetition Lender Claim, each Holder of an Allowed Prepetition Lender Claim shall receive:

(1)    Subject to the terms and conditions of the Cash Collateral Order:

(A)    upon the conclusion of the Administrative Claims Reconciliation Period (as defined in the Cash Collateral Order), i.e., February 20, 2025, any Retained Funds that were not used, or identified for use on account of incurred or accrued Administrative Claims that have been reconciled, by the Debtors' Estates to pay Allowed Administrative Claims up to the full amount of the Indebtedness (as defined in the Cash Collateral Order);

(B)    no later than 90 days following the closing of the Sale (i.e., February 20, 2025), any excess funds in any of the 90 Day Buckets that are not required to address or pay the Allowed Administrative Claims or priority Claims for which such 90 Day Buckets were established to address, or to cover shortfalls in other 90 Day Buckets in accordance with the Fungibility Mechanisms up to the full amount of the Indebtedness;

(C)    no later than the earlier of (1) the Effective Date and (2) 90 days following the termination of the Transition Services Agreement, any excess funds in any of the 90+ Day Buckets other than the Wind Down Budget Reserve that are not required to address or pay the Allowed Administrative Claims or priority Claims for which such 90+ Day Buckets were established to address, or to cover shortfalls in other reserves in accordance with the Fungibility Mechanisms up to the full amount of the Indebtedness; and

(D)    no later than 90 days following the termination of the Transition Services Agreement, any excess funds in the Wind Down Budget Reserve that are not required to address or pay the Allowed Administrative Claims or priority Claims for which the Wind Down Budget Reserve was established to address up to the full amount of the Indebtedness.

(2)    As and when received, in accordance with the Cash Collateral Order, promptly upon receipt, any Cash the Debtors have on hand, including, for the avoidance of doubt, such funds received by the Debtors after the Closing other than funds received pursuant to the Transition Services Agreement.

(3)    On the Effective Date, the Litigation Trust Prepetition Lender Interests.

(iv)    On the Effective Date, the Prepetition Lenders' liens, including the Prepetition Lender Subordinated Liens, shall be subject to and consistent with the Cash Collateral Order.

(v)     *Impairment and Voting*.  Class 3 is Impaired, and Holders of Allowed Prepetition Lender Claims are entitled to vote to accept or reject the Plan.

(d)     *Class 4 – General Unsecured Claims*

(i)     *Classification*.  Class 4 consists of all General Unsecured Claims.

(ii)     *Treatment*.  On the Effective Date, each Holder of a General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust GUC Interests.

(iii)     *Impairment and Voting*.  Class 4 is Impaired, and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

(e)     *Class 5 – Intercompany Claims*

(i)     *Classification*.  Class 5 consists of all Intercompany Claims.

(ii)     *Treatment*.  On the Effective Date, all Intercompany Claims shall be: (1) reinstated; (2) canceled, released, waived, and discharged; or (3) otherwise settled in the Debtors' or the Post-Effective Date Debtors' sole discretion.

(iii)     *Impairment and Voting*.  Holders of Intercompany Claims that are reinstated are conclusively presumed to accept the Plan pursuant to Section 1126(f) and Holders of Intercompany Claims that are canceled, released and discharged under the Plan without any distribution are deemed to reject pursuant to Section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Claims.

(f)     *Class 6 – Intercompany Interests*

(i)     *Classification*.  Class 6 consists of all Intercompany Interests.

(ii)     *Treatment*.  On the Effective Date, all Intercompany Interests shall be: (1) reinstated; (2) canceled, released, waived, and discharged; or (3) otherwise settled in the Debtors' or the Post-Effective Date Debtors' sole discretion.

(iii)     *Impairment and Voting*.  Holders of Intercompany Interests that are reinstated are conclusively presumed to accept the Plan pursuant to Section 1126(f) and Holders of Intercompany Interests that are canceled, released and discharged under the Plan without any distribution are deemed to reject pursuant to Section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Interest.

(g)     *Class 7 – Subordinated Claims*

(i)     *Classification*.  Class 7 consists of all Subordinated Claims, if any.

(ii)     *Treatment*.  On the Effective Date, all Subordinated Claims shall be canceled, released, extinguished and discharged, and Holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.

(iii)     *Impairment and Voting*.  Class 7 is Impaired, and Holders of Subordinated Claims are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(h)     *Class 8 – Existing Interests*

(i)     *Classification*.  Class 8 consists of all Existing Interests.

(ii)     *Treatment*.  On the Effective Date, all Existing Interests shall be canceled without any distribution on account of such Existing Interest

(iii)     *Impairment and Voting*.  Class 8 is Impaired and Holders of Existing Interests are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Interests.

### Section 3.3     Voting, Presumptions, and Solicitation.

(a)     *Classes Entitled to Vote; Acceptance*

Classes 3 and 4 are Impaired and are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (a) Holders of at least 2/3 in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) Holders of more than 1/2 in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

(b)     *Conclusively Presumed Acceptance by Unimpaired Classes*

Pursuant to Section 1126(f) of the Bankruptcy Code, Classes 1 and 2, and certain Holders of Claims or Interests under Class 5 or Class 6 are Unimpaired and are conclusively presumed to have accepted the Plan.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

(c)     *Deemed to Reject by Certain Impaired Classes*

Pursuant to Section 1126(g) of the Bankruptcy Code, Classes 7 and 8, and certain Holders of Claims or Interests under Class 5 or Class 6 are fully Impaired and are deemed to have rejected the Plan.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

(d)    _Elimination of Classes_

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims or Interests temporarily Allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Combined Hearing for all Debtors or with respect to any particular Debtor shall be deemed to have been deleted from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under Section 1129(a)(8) of the Bankruptcy Code.

(e)    _Deemed Acceptance If No Votes Cast_

If no Holders of Claims or Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by Holders of such Claims or Interests in such Class.

(f)    _Cramdown_

To the extent necessary with respect to Classes 4, 7 and 8, the Debtors shall request Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify, amend, or withdraw the Plan, with respect to all Debtors or any individual Debtor, to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

(g)    _Controversy Concerning Impairment_

If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV
## MEANS OF IMPLEMENTATION OF THE PLAN

### Section 4.1    _Corporate Action_

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator or the Litigation Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, Post-Effective Date Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

### Section 4.2    _Effectuating Documents; Further Transactions_

On and after the Effective Date, the Debtors, the Plan Administrator (on behalf of the Post-Effective Date Debtors) and the Litigation Trustee (on behalf of the Post-Effective Date Debtors), as applicable, is authorized to and may issue, execute, deliver, file or record such contracts,

securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### Section 4.3    Corporate Existence Post-Effective Date

(a)    _Directors and Officers_

Immediately following the occurrence of the Effective Date, (i) the respective boards of directors or managers, as applicable, and the current officers, of each of the Debtors, shall be terminated without cause and such members of the boards of directors or managers, as applicable, and the current officers of the Debtors shall be deemed to have resigned; and (ii) the Plan Administrator shall: (1) be appointed as the sole member of the board of directors or board of managers, as applicable, and the sole officer; (2) succeed as the sole Holder of Interests in each Post-Effective Date Debtor; (3) have the rights and powers of a debtor in possession under Section 1107 of the Bankruptcy Code; (4) be a "representative of the estate" pursuant to Section 1123(b)(3) of the Bankruptcy Code; (5) be vested with the rights, powers, and benefits afforded to a "trustee" under Sections 704 and 1106 of the Bankruptcy Code; and (6) have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary.

(b)    _Organizational and Governance Documents_

Immediately following the occurrence of the Effective Date, the Post-Effective Date Debtors shall continue to exist in accordance with the laws of their respective states of formation and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with the Plan.  The Post-Effective Date Debtors shall exist for the limited purposes of completing the Debtors' obligations under the Transition Services Agreement and fully administering the Estates. Promptly after performing all duties and functions that are consistent with the implementation of the Plan, the Confirmation Order, the Asset Purchase Agreement, and the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all actions to wind down, dissolve, or liquidate the Post-Effective Date Debtors without the necessity for any other or further actions to be taken by or on behalf of such dissolving Post-Effective Date Debtors or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

The certificate and articles of in-corporation and by-laws of each Post-Effective Date Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under Section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Post-Effective Date Debtors to matters authorized under the Plan.

### Section 4.4     Settlement of Claims and Interests

Pursuant to Section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests or Causes of Action that (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released pursuant to **Section 8.2** of the Plan; (c) have been released pursuant to **Section 8.3** of the Plan; (d) are subject to the exculpation pursuant to **Section 8.4** of the Plan; or (e) are otherwise stayed or terminated pursuant to the terms of the Plan.

### Section 4.5     Plan Funding

All Cash necessary for the Debtors to fund distributions, make payments or otherwise satisfy any obligations under the Plan shall be funded in accordance with the Cash Collateral Order; *provided that*, to the extent the Transition Services Agreement requires the Debtors to make any payments or take any other actions associated therewith, the amount of any such payments or distributions or the cost of taking such actions shall be funded solely by the Purchaser.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

### Section 4.6     Cancellation of Old Securities and Agreements

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including, without limitation, Prepetition Lender Claims and Existing Interests, shall be deemed canceled and surrendered without any need for further action or approval of the Bankruptcy Court or any Holder or other Entity and the obligations of the Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and satisfied with the distributions, if any, provided hereunder, and the Administrative Agent shall be released from all duties thereunder; *provided* that notwithstanding entry of the Confirmation Order or consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (a) allowing Holders to receive distributions under the Plan; (b) allowing the Administrative Agent to enforce its rights, claims, and interests vis-à-vis any parties other than the Debtors or the Post-Effective Date Debtors; (c) allowing the Administrative Agent to make the distributions on account of Prepetition Lender Claims in accordance with the Plan (if any), as applicable; (d) preserving any rights of the Administrative Agent to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders under the Credit Agreement, including any rights to priority of payment and/or to exercise charging liens; (e) allowing the Administrative Agent to exercise rights and obligations relating to the interests of Holders of Prepetition Lender Claims; (f) allowing the Administrative Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan; and (g) permitting the Administrative Agent to perform any functions that are necessary to effectuate the foregoing; *provided, further,* that except as provided herein, the preceding proviso shall not affect the

settlement and release of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtors.

### Section 4.7    *Vesting of Assets*

Except as otherwise provided in the Plan, the Asset Purchase Agreement, the Plan Supplement, or in any agreement, instrument, or other document incorporated herein or therein, on the Effective Date all property in each Debtor's Estate, and all Causes of Action held by the Debtors or their Estates (except those released pursuant to the Plan or an order of the Bankruptcy Court) shall either be transferred to the Purchaser in accordance with the Asset Purchase Agreement or re-vest with the Post-Effective Date Debtors, as applicable, free and clear of all Liens, Claims, charges, and other encumbrances to the fullest extent possible under the Bankruptcy Code, and neither the Purchaser nor the Post-Effective Date Debtors shall have any liability for such Liens, Claims, charges, or other encumbrances whatsoever (other than to the extent provided in the Asset Purchase Agreement). On and after the Effective Date, except as provided in this Plan, the Purchaser (and, to the extent acting on behalf of the Post-Effective Date Debtors pursuant to this Plan, the Plan Administrator Agreement, or the Asset Purchase Agreement, the Plan Administrator) may operate their business and may (a) use, acquire, and dispose of property; (b) compromise or settle Claims, Interests, and Causes of Action; and (c) take any other action contemplated by the Plan, the Asset Purchase Agreement, the Plan Supplement, or the Confirmation Order, in each case, without Bankruptcy Court supervision or approval, and free of any Bankruptcy Code or Bankruptcy Rule restrictions, provided, however, that any derivative actions may be settled, voluntarily dismissed, or compromised only with court approval, to the extent that such court approval is required by Bankruptcy Rule 7023.1(c).

### Section 4.8    *Plan Administrator.*

(a)    *Appointment of the Plan Administrator*

From and after the Effective Date, a Person or Persons to be designated by the Debtors in consultation with the Creditors' Committee shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan. The Debtors shall include, in the Plan Supplement, the information set forth in Sections 1129(a)(4) and (5) of the Bankruptcy Code and the identity of Person or Entity who the Debtors have selected as the Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. The Plan Administrator shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the Plan Administrator Agreement.

(b)    *The Plan Administrator Agreement*

Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or

modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan.

(c)    *Rights, Powers, and Duties of the Debtors and the Plan Administrator*

On and after the Effective Date, the Plan Administrator will act for the Post-Effective Date Debtors in the same capacity as applicable to a board of managers or directors, or to officers, subject to the provisions of the Plan. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Post-Effective Date Debtors. Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all corporate actions consistent with the Plan, the Confirmation Order, the Asset Purchase Agreement, all other applicable orders of the Bankruptcy Court, and the Plan Administrator Agreement, in each case, that are necessary and/or desirable to effectuate the terms of the Plan on behalf of the Post-Effective Date Debtors and use its reasonable best efforts to assist with or effectuate the transition of the Debtors' business, wind down, dissolution, or liquidation of the Post-Effective Date Debtors and any non-Debtor Affiliates. In taking such actions, the Plan Administrator may control and exercise authority over any Assets, vested in the Post-Effective Date Debtors pursuant to the Plan, over the acquisition, management, and disposition thereof and over the management and conduct of the affairs of the Post-Effective Date Debtors. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Post-Effective Date Debtors pursuant to the Plan and the Plan Administrator Agreement, shall include, among others, (a) making distributions to Holders of Allowed Claims and Interests as provided for in the Plan, (b) administering, reconciling and resolving Administrative Claims, Professional Claims, Restructuring Expenses, Priority Tax Claims and Other Priority Claims, (c) filing tax returns and paying taxes, (d) performing all obligations required of the Post-Effective Date Debtors under the Transition Services Agreement, (e) paying any Statutory Fees, (f) maintaining the books and records and accounts of the Debtors, (g) defending the Debtors in any pending or future litigation (except with respect to any counterclaims filed against the Litigation Trust), (h) selling, abandoning, or otherwise fully administering the Estates, (i) closing the Chapter 11 Cases, (j) dissolving the Post-Effective Date Debtors, and (xi) performing other duties and functions that are consistent with the implementation of the Plan.

(d)    *Transition Services*

On the Effective Date, and continuing until the end of the term under the Transition Services Agreement, the Plan Administrator shall serve as an appointed agent of the designated operator or as the operator of the Debtors in accordance with the Plan for the purpose of fulfilling any obligations thereunder.

(e)    *Compensation of the Plan Administrator and Plan Administrator Professionals*

(i)    The Plan Administrator shall be compensated from the Plan Administration Reserve, in accordance with the Plan Administration Budget, and pursuant to the terms of the Plan Administrator Agreement. For the avoidance of doubt, any costs

of the Plan Administrator associated with fulfilling the obligations under the Transition Services Agreement shall be funded directly by the Purchaser and will not be paid out of the Plan Administrative Reserve or calculated for purposes of the Plan Administration Budget.

(ii)    The Plan Administrator Professionals shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Plan Administration Reserve.  Payment of the fees and expenses of the Plan Administrator and the Plan Administrator Professionals shall be made in the ordinary course of business; *provided*, *however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(f)    *Indemnification of the Plan Administration Indemnified Parties*

The Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administration Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administration Indemnified Party's willful misconduct or gross negligence, with respect to the Debtors or the implementation or administration of the Plan or the Plan Administrator Agreement.  To the extent any Plan Administration Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Plan Administration Indemnified Party (and such Plan Administration Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Plan Administration Indemnified Party is not entitled to be indemnified therefore) out of the Plan Administration Reserve or any insurance purchased using the Plan Administration Reserve.  The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent of the Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(g)    *Exculpation of the Plan Administrator*

As of the Effective Date, to the extent not already included, the organizational documents of the Debtors shall be modified to provide for the exculpation of the Plan Administrator to the fullest extent permitted by applicable law.

(h)    *Insurance for the Plan Administrator*

The Plan Administrator shall be authorized to obtain and pay for out of the Plan Administration Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Post-Effective Date Debtors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise),

the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator after the termination of the Plan Administrator Agreement.

### Section 4.9    Litigation Trust

(a)    *Establishment of the Litigation Trust*

On or prior to the Effective Date, the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement in form and substance consistent with the terms set forth herein and otherwise reasonably acceptable to the Debtors and the Creditors' Committee.

On the Effective Date, the Debtors shall (x) automatically be deemed to have transferred and assigned to the Litigation Trust all of their right, title, and interest in and to all the Retained Causes of Action, and, in accordance with Section 1141 of the Bankruptcy Code, all such Retained Causes of Action shall automatically vest in the Litigation Trust free and clear of all Liens, Claims, charges, encumbrances and interests, for the benefit of Holders of Allowed General Unsecured Claims and (y) transfer the Initial Litigation Trust Funded Amount to an account established by the Litigation Trust to fund the administration of such trust.

Immediately following the occurrence of the Effective Date, the Litigation Trustee shall be deemed appointed to serve as the trustee and administrator of the Litigation Trust. The Litigation Trust shall have standing to pursue, assert, litigate, and fully resolve the Litigation Trust Causes of Action, and neither the Debtors nor the Post-Effective Date Debtors shall have any interest in or with respect to the Retained Causes of Action or any Cash or assets contained in the Litigation Trust.

(b)    *Purpose of the Litigation Trust*

The Litigation Trust shall be established for the purpose of (i) investigating, commencing, litigating, and settling the Retained Causes of Action, (ii) liquidation of the Litigation Trust's assets, (iii) distribution of the Litigation Trust Distributable Proceeds, if any, to the Litigation Trust Beneficiaries, and (iv) performing such other duties as set forth in the Litigation Trust Agreement, in each case in accordance with Section 301.7701-4(d) of the Treasury Regulations, with no objective to continue or engage in the conduct of a trade or business.

(c)    *The Litigation Trust Agreement*

The Litigation Trust shall be administered by the Litigation Trustee in accordance with the Litigation Trust Agreement. The Litigation Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Litigation Trust as a liquidating trust for United States federal income tax purposes as discussed below. Upon execution of the Litigation Trust Agreement, the Litigation Trustee shall be authorized to take all steps necessary to complete the formation of the Litigation Trust. The Litigation Trustee shall serve as representative of the Estates under Section 1123(b) of the Bankruptcy Code for the purpose of (i) enforcing the Litigation Trust Causes of Action and (ii) administering the Litigation Trust and distributing its assets to the Litigation Trust Beneficiaries.

(d)    *Powers and Duties of the Litigation Trustee*

On and after the Effective Date, the powers and duties of the Litigation Trustee shall include, *inter alia*, (i) analyzing Retained Causes of Action and determining whether to abandon, pursue, litigate, or settle such claims; (ii) retaining and compensating professionals, employees, and consultants to assist with the administration of the Litigation Trust; (iii) making distributions to the Litigation Trust Beneficiaries in accordance with the Plan and Litigation Trust Agreement; (iv) administering, reconciling and resolving General Unsecured Claims; and (v) performing other duties and functions that are consistent with the purpose of the Litigation Trust.

In pursuing any Litigation Trust Causes of Action, the Litigation Trustee shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Litigation Trust Causes of Action may be brought under Section 546 of the Bankruptcy Code.

(e)    *Litigation Trust Treatment*

In furtherance of the Plan, (i) the terms of the Litigation Trust shall be set forth in the Litigation Trust Agreement, (ii) the Litigation Trust shall be structured to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code to Holders of Allowed General Unsecured Claims, consistent with the terms of the Plan, (iii) all parties (including the Debtors, the Post-Effective Date Debtors, the Litigation Trust Beneficiaries, and the Litigation Trustee) shall report consistently with such treatment, (iv) all parties shall report consistently with the valuation of the assets transferred to the Litigation Trust as determined by the Litigation Trustee (or its designee), (v) the Litigation Trustee shall be responsible for filing returns for the trust as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations, and (vi) the Litigation Trustee shall annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the trust as relevant for federal income tax purposes.

(f)    *Litigation Trust Distributions*

Distributions from the Litigation Trust shall be made from the Litigation Trust Distributable Proceeds, in accordance with the Plan and the Litigation Trust Agreement.

(g)    *Litigation Trust Expenses*

The Litigation Trust Expenses shall be paid from (i) the Initial Litigation Trust Funded Amount and (ii) the Cash proceeds, whether by settlement, adjudication or otherwise, of any Retained Causes of Action.

**Section 4.10   Sale Order**

Notwithstanding anything to the contrary herein, nothing in this Plan shall affect, impair or supersede the Sale Order, which remains in full force and effect and governs in the event of any inconsistency with the Plan.

### Section 4.11    Exemption from Certain Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by Section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall be directed to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### Section 4.12    Preservation of Causes of Action

In accordance with Section 1123(b)(3) of the Bankruptcy Code, the Debtors and their Estates shall retain all of the Retained Causes of Action, which shall be vested in the Post-Effective Date Debtors on the Effective Date.  The Litigation Trustee, on behalf of the Post-Effective Date Debtors, may enforce all rights to commence and pursue any and all Retained Causes of Action, whether arising before or after the Petition Date (including, without limitation, any actions or categories of actions specifically enumerated in a list of retained Causes of Action contained in the Plan Supplement), and all Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against it as any indication that the Litigation Trustee will not pursue any and all available Retained Causes of Action against it.  The Litigation Trustee expressly reserves all rights to prosecute any and all** Retained **Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

The Litigation Trustee, in its sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any Retained Causes of Action (or decline to do any of the foregoing) in accordance with the best interests of the Litigation Trust, and shall not be required to seek further approval of the Bankruptcy Court for such action; provided, however, the Litigation Trustee may settle, voluntarily dismiss, or compromise any derivative actions as such term is used in Bankruptcy Rule 7023.1(c) only with court approval, to the extent such court approval is required by Bankruptcy Rule 7023.1(c).

Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, or acquired by the Purchaser or otherwise released pursuant to the Asset Purchase Agreement, the Plan expressly reserves all of the Debtors' Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

# ARTICLE V
# EXECUTORY CONTRACTS

***Section 5.1     Assumption and Rejection of Executory Contracts*** On the Effective Date, each Executory Contract shall be deemed rejected in accordance with, and subject to, Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract: (a) is designated as a Transferred Contract under the Asset Purchase Agreement; (b) is designated as an Assumed Contract on the Schedule of Assumed Executory Contracts or a Transferred Contract on a TSA Contract Notice or a Supplemental TSA Contract Notice (each as defined in the TSA Assumption Order); (c) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court, including the Bidding Procedures Order, Sale Order and TSA Assumption Order, or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (d) is the subject of a motion to assume pending as of the Effective Date; or (e) is otherwise assumed pursuant to the terms herein. The Rejection Damages Claims of counterparties to Executory Contracts that are deemed rejected as of the Effective Date shall be classified as General Unsecured Claims and shall be treated in accordance with **Section 3.2(d)** of the Plan.

As of the Effective Date, each Executory Contract that is designated as an Assumed Contract on the Schedule of Assumed Executory Contracts shall revest in and be fully enforceable by the Plan Administrator on behalf of the Post-Effective Date Debtors, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court, or applicable law.   The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption, assumption and assignment, or rejection, as the case may be, of such Executory Contracts, pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.   To the extent any provision in any Executory Contract assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtors' assumption of or the assumption and assignment of such Executory Contract then such provision shall be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto.

Rejection of any Executory Contract pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.   In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts pursuant to the Plan are effective as of the Effective Date.   Notwithstanding anything to the contrary in the Plan, Asset Purchase Agreement, or Plan Supplement, the Debtors reserve the right to, with the consent of the Purchaser, as required, alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and any TSA Contract Notice or Supplemental TSA Contract Notice at any time prior to the Effective Date, in accordance with the

Assumption and Assignment Procedures, the Asset Purchase Agreement and the TSA Assumption Order, as applicable.

### Section 5.2    Rejection Damages Claim Procedures

Unless otherwise provided by a Bankruptcy Court order, <u>any Rejection Damages Claim must be filed with the Claims and Solicitation Agent and served on the Plan Administrator and the Litigation Trustee no later than thirty (30) days after the filing of the notice of the occurrence of the Effective Date</u>.  Any Rejection Damages Claims that are not timely filed shall be Disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Post-Effective Date Debtors without the need for any objection by the Debtors or the Litigation Trustee or any further notice to or action, order, or approval of the Bankruptcy Court, and all Rejection Damages Claims shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or any Proofs of Claim to the contrary.  All Allowed Rejection Damages Claims shall be classified as General Unsecured Claims and shall be treated in accordance with **Section 3.2(d)** of the Plan.

### Section 5.3    Cure of Defaults for Assumed Executory Contracts

(a)    <u>*Proofs of Claim Based on Assumed Contracts or Transferred Contracts*</u>

Any and all Proofs of Claim based on Executory Contracts that have been designated as Transferred Contracts or Assumed Contracts, except Proofs of Claim asserting Cure Amount, pursuant to the order approving such assumption or assumption and assignment, including the Confirmation Order, shall be deemed Disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)    <u>*Cure Proceedings and Payments*</u>

With respect to each of the Transferred Contracts and Assumed Contracts, the Debtors have designated or shall designate a proposed Cure Amount in the Cure Notice and the determination of the Cure Amount shall be governed by the Bankruptcy Court's order related thereto.  Except with respect to Executory Contracts for which the Cure Amount is zero dollars, or for which the Cure Amount is in dispute, (i) with respect to Transferred Contacts, the Cure Amount shall be satisfied by the Purchaser; and (ii) with respect to Assumed Contracts, the Cure Amount shall be satisfied by the Plan Administrator on behalf of the Post-Effective Date Debtors, in each case, in accordance with the terms of the TSA Assumption Order, Bidding Procedures, Sale Order, Asset Purchase Agreement (including the Transition Services Agreement), or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract without any further notice to or action, order, or approval of the Bankruptcy Court.

Any provisions or terms of a Transferred Contract or Assumed Contract that are, or may be, alleged to be in default, shall be satisfied solely by payment of the Cure Amount, or by an agreed-upon waiver of the Cure Amount.  If there is a dispute regarding such Cure Amount, the ability of the Purchaser or Plan Administrator, as applicable, to provide "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assignment, then payment of the Cure Amount shall occur as

soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption, or as may be agreed upon by the Purchaser or the Plan Administrator, as applicable, and the counterparty to the Executory Contract; *provided, however*, that the Purchaser or the Plan Administrator (on behalf of the Post-Effective Date Debtors), as applicable, shall have the right either to reject or nullify the assumption of any Executory Contract after entry of a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption or assumption and assignment of any Executory Contract pursuant to the Plan, the Sale Order, the Asset Purchase Agreement, the TSA Assumption Order, or otherwise, shall result in the full release and satisfaction of any Cure Amount, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption, as applicable.

(c)     *Cure Notice*

The Debtors shall serve the Cure Notice on counterparties to any Assumed Contracts or Transferred Contracts in accordance with the terms of the applicable orders of the Bankruptcy Court, including in the case of Transferred Contracts, the TSA Assumption Order.  If no Cure Objection is timely received, (a) the non-Debtor party to the assumed Executory Contract shall be deemed to have consented to the assumption or assumption and assignment of the applicable Executory Contract and shall be forever barred from asserting any objection with regard to such assumption, and (b) the proposed Cure Amount shall be controlling, notwithstanding anything to the contrary in any applicable Executory Contract or other document, and the non-Debtor party to an applicable Executory Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors, the Post-Effective Date Debtors, the Purchaser, or the property of any of the foregoing.

(d)     *Cure Objections*

If a proper and timely Cure Objection is filed by the applicable Cure Objection Deadline, including in the case of Transferred Contracts, in accordance with the TSA Assumption Order, the Cure Amount shall be equal to (a) the amount agreed to between the Debtors, Plan Administrator (on behalf of the Post-Effective Date Debtors), or Purchaser, as applicable, and the applicable counterparty or (b) to the extent the Plan Administrator (on behalf of the Post-Effective Date Debtors), or Purchaser, as applicable, and counterparty do not reach an agreement regarding any Cure Amount or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure Amount and any related issues.  Objections, if any, to the proposed assumption and/or Cure Amount must be in writing, filed with the Bankruptcy Court, and served in hard-copy form on the parties identified in the Cure Notice so that they are actually received by the Cure Objection Deadline.

If a Cure Objection is timely filed and received in accordance with the applicable procedures, and the parties do not reach a consensual resolution of such objection, a hearing with

respect to such objection shall be held at such time scheduled by the Bankruptcy Court. Cure Objections will not be treated as objections to Confirmation of the Plan.

### Section 5.4    Modifications, Amendments, Restatements, Supplements, Restatements, and Other Agreements

Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated pursuant to the Plan. Modifications, amendments, supplements, and re-statements to prepetition Executory Contracts that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### Section 5.5    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on the Schedule of Assumed Executory Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that the Debtors, the Plan Administrator, or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### Section 5.6    Employee Compensation and Benefit Programs

Except as otherwise provided in the Plan, the Asset Purchase Agreement or the Plan Supplement, on and after the Effective Date, the Post-Effective Date Debtors may, but are not required to, honor in the ordinary course of business, any employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974) and any other contracts, agreements, policies, programs, and plans for, among other things, employment, compensation, health care, disability and other welfare benefits, deferred compensation benefits, severance policies and benefits, retirement benefits, workers' compensation insurance and accidental death and dismemberment insurance that, as of immediately prior to the Petition Date are, and as of immediately prior to the Effective Date continue to be, sponsored, maintained, or contributed to by any of the Debtors for the directors, officers, employees and other service providers of any of the Debtors who served in such capacity at any time.

Nothing contained herein shall entitle any Person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such expired benefit plan or alleged entitlement under any such expired benefit plan. Nothing herein shall limit, diminish, or otherwise alter the Post-Effective Date Debtors' defenses, Claims, Causes of Action, or other rights with respect to any benefit plan, whether expired or unexpired.

Except as otherwise provided in the Plan, the Asset Purchase Agreement, or the Plan Supplement, none of (a) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by the Plan or (b) the consummation of the transactions provided in the Plan (or otherwise contemplated by the Sale and the Plan to occur prior to or on or about the Effective Date), in each case alone or together with any other event, shall (i) entitle any current or former director, officer, employee or other service provider of any of the Debtors to any payment or benefit, (ii) accelerate the time of payment or vesting or trigger any payment or funding of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any benefit plan or expired benefit plan or (iii) limit or restrict the right of the Debtors or Post-Effective Date Debtors to merge, amend or terminate any benefit plan, in each case including as a result of a "change in control" or similar provision or as a result of giving rise to any Person to terminate his or her service with the Debtors or Post-Effective Date Debtors for "good reason" or similar provision.

### Section 5.7     *Insurance Policies*

Except as otherwise provided in the Plan, the Asset Purchase Agreement, or the Plan Supplement, all insurance policies pursuant to which any Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to the Plan and, unless such insurance policy is assumed or assumed and assigned in accordance with **Section 5.1** of the Plan, such insurance policy shall be deemed to be rejected in accordance with, and subject to, Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### Section 5.8     *D&O Policies*

The Debtors or the Plan Administrator on behalf of the Post-Effective Date Debtors, as applicable, shall maintain D&O Policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors. Nothing in the Plan shall be deemed to impair any Entity's claim, if any, to proceeds of the D&O Policies or the priority of payment on such claim, if any, under the D&O Policies. Notwithstanding any other provision in the Plan, all D&O Policies shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the Post-Effective Date Debtors, shall remain in full force and effect thereafter and shall continue as obligations of the Post-Effective Date Debtors in accordance with their respective terms, and all such D&O Policies shall vest in the Post-Effective Date Debtors.

### Section 5.9     *Indemnification Obligations*

Except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, any and all obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents or agreements to indemnify officers, directors or employees, in each case solely in their capacity as such, employed by the Debtors (i) on and/or after the Petition Date or (ii) prior to the Petition Date (but only to the extent necessary to preserve the D&O Policies)

with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; *provided,* that, the Debtors or the Plan Administrator on behalf of the Post-Effective Date Debtors, as applicable, shall not indemnify any such officers, directors or employees of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' indemnification obligations. The Plan Administrator on behalf of the Post-Effective Date Debtors shall not indemnify any Entities for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence or willful misconduct. Except as otherwise provided in the Plan, all such indemnification obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan.

### Section 5.10   Nonoccurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to Section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## ARTICLE VI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

### Section 6.1   Determination of Claims and Interests

After the Effective Date, the Plan Administrator or the Litigation Trustee, as the case may be, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to **Section 4.12** of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties. For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan. Nothing contained in this **Section 6.1** shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Post-Effective Date Debtors may have against any Entity in connection with or arising out of any Claim, including any rights under Section 157(b) of title 28 of the United States Code.

### Section 6.2    Claims Administration Responsibility

Notwithstanding anything to the contrary herein, after the Effective Date: (a) the Plan Administrator shall have responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims, except for General Unsecured Claims and Prepetition Lender Claims; (b) the Litigation Trustee shall have responsibility for administering, disputing, objecting to, compromising, or otherwise resolving General Unsecured Claims; and (c) the Administrative Agent shall have responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Prepetition Lender Claims.  Nothing herein is intended to limit the right of any party in interest from objecting to any Claims, except to the extent such Claims, including the Prepetition Lender Claims, have already been Allowed, and, subject, however, to any limitation in any prior order of the Bankruptcy Court, including the Cash Collateral Order.

### Section 6.3    Objections to Claims

Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Litigation Trustee without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Litigation Trustee effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address); or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

### Section 6.4    Disallowance of Claims

Except as otherwise agreed, any and all Proofs of Claim filed after the applicable deadline for filing such Proofs of Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims, unless any such late proof of Claim is deemed timely filed by a Final Order of the Bankruptcy Court.  Nothing herein shall in any way alter, impair, or abridge the rights of the Debtors, the Litigation Trustee, or other parties-in-interest to object to Claims on the grounds that they are time-barred or otherwise subject to disallowance or modification.  Except as set forth in section 6.7, nothing in the Plan shall preclude amendments to timely filed Proofs of Claim to the extent permitted by applicable law. All Claims of any Person or Entity from which property is sought by the Debtors under Section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Litigation Trustee allege is a transferee of a transfer that is avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed if (a) the Person or Entity, on the one hand, and the Debtors or the Litigation Trustee, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned Sections of the Bankruptcy Code and (b) such Person or

Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### Section 6.5    Estimation of Claims

Before the Effective Date, the Debtors, and after the Effective Date, the Litigation Trustee (on behalf of the Post-Effective Date Debtors), may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan, without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Plan Administrator or Litigation Trustee, as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. All estimation procedures set forth in the Plan shall be applied in accordance with Section 502(c) of the Bankruptcy Code. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

### Section 6.6    No Interest on Claims

Unless otherwise specifically provided for in the Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

### Section 6.7    Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Post-Effective Date Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE VII**
**PROVISIONS GOVERNING DISTRIBUTIONS**

*Section 7.1*    *Distributions Allowed as of the Effective Date*

Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; *provided that* (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) in accordance with Article II of the Plan, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

*Section 7.2*    *Distribution on Account of Claims Allowed After the Effective Date*

(a)    *No Distributions Pending Allowance*

No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

(b)    *Payments and Distributions on Disputed Claims*

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be  made on the first day that is thirty (30) Business Days after the Disputed Claims become Allowed Claims; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with the Plan and paid.

(c)    *Special Rules for Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

### Section 7.3    *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### Section 7.4    *Delivery of Distributions*

(a)    *Record Date for Distributions*

On the Distribution Record Date, any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the register for Claims as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim is transferred twenty (20) or fewer days before the Distribution Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.  The Administrative Agent shall have no obligation to recognize any transfer of any applicable Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record on their respective lender registers as of the close of business on the Distribution Record Date.

(b)    *Cash Distributions*

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Post-Effective Date Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(c)    *Delivery of Distributions in General*

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder; *provided* that the manner of such distributions shall be determined at the discretion of the Post-Effective Date Debtors.  The Distribution Agent shall not incur any liability whatsoever on account of any distributions under the Plan.

(d)    *Delivery of Distributions on Account of Prepetition Lender Claims*

In the case of Holders of Prepetition Lender Claims, the Administrative Agent shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder.  The Distribution Agent shall make all distributions on account of such Claims to the Administrative Agent or as directed by the Administrative Agent, in the Administrative Agent' sole discretion. The Administrative Agent shall, at its option, hold or direct such distributions for the beneficial

Holders of such Allowed Claims, as applicable; *provided*, *however*, that the Administrative Agent shall retain all rights under its respective agreement in connection with delivery of distributions to the beneficial Holders of such Allowed Claims, including rights on account of its charging lien; *provided*, *further*, *however*, that the Debtors' obligations to make distributions pursuant to the Plan shall be deemed satisfied upon delivery of distributions to the Administrative Agent or the Entity or Entities designated by the Administrative Agent.  The Administrative Agent shall not be required to give any bond, surety, or other security for the performance of their duties with respect to such distributions.

### Section 7.5     Currency

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of the Effective Date at 4:00 p.m. (prevailing Eastern Time), mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal* following the Effective Date.

### Section 7.6     Distribution Agent (if any)

The Distribution Agent shall make all distributions required under the Plan, subject to the terms and provisions of the Plan.  If the Distribution Agent is an independent third party designated to serve in such capacity, such Distribution Agent shall receive, without further Court approval, reasonable compensation from the Plan Administration Reserve for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties.  The Distribution Agent shall be authorized and directed to rely upon the Debtors' books and records and, as applicable, the Plan Administrator's representatives and professionals in determining Allowed Claims not entitled to distributions under the Plan in accordance with the terms and conditions of the Plan.  The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

### Section 7.7     Undeliverable Distributions

(a)     <u>Holders of Undeliverable Distributions</u>

If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or Administrative Agent is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest on the next Periodic Distribution Date.  Amounts in respect of undeliverable distributions shall be returned (1) if prior to the Dissolution Date, to the Debtors, and (2) if after the Dissolution Date, to the Administrative Agent to be redistributed, in each case, until such distributions are claimed.

(b)    *Reversion*

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Post-Effective Date Debtors. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be canceled and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the applicable trustee, agent, servicer, or other authorized representative to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

### Section 7.8    De Minimis Distributions

Notwithstanding any other provision of the Plan to the contrary, the Distribution Agent and Administrative Agent shall not be required to make a distribution on account of an Allowed Claim or Interest if the aggregate amount of distributions to be made is less than $50 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### Section 7.9    Surrender of Securities or Instruments

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim or Interest shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

### Section 7.10    Compliance Matters

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate.  The Debtors and Plan Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### Section 7.11   Claims Paid or Payable by Third Parties

The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Distribution Agent without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Distribution Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Distribution Agent, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### Section 7.12   Setoffs

Except as otherwise expressly provided for in the Plan, the Debtors, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtors or the Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors of any such Claims, rights, and Causes of Action that the Debtors may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date or has otherwise indicated in a timely filed proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 of the Bankruptcy Code or otherwise.

### Section 7.13   Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE VIII
## EFFECT OF PLAN ON CLAIMS AND INTERESTS

### Section 8.1   Compromise and Settlement

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Persons or Entities up to the Effective Date.  After the Effective Date, any such right shall pass to the Litigation Trustee to the extent provided in the Plan without the need for further approval of the

Bankruptcy Court; provided, however, the Litigation Trustee may settle derivative claims/causes of action as such term is used in Bankruptcy Rule 7023.1(c), if any, only with court approval, to the extent that such court approval is required by Bankruptcy Rule 7023.1(c).

### Section 8.2    Releases by the Debtors

**Pursuant to Section 1123(b) of the Bankruptcy Code, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and their Estates, as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of the Debtors or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' prepetition and postpetition, in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, preparation, entry, and execution of the Cash Collateral Order, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Asset Purchase Agreement, the Sale Order or related agreements, instruments, or other documents, the pursuit of the Sale, the pursuit of consummation of the Sale, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan; *provided* that, nothing in this Section 8.2 shall be construed to release the Released Parties from their gross negligence, willful misconduct, or fraud as determined by a Final Order. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligation or liability of any Person or Entity under the Plan, the Asset Purchase Agreement, the Sale Order, the Cash Collateral Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, (b) a good-faith settlement and compromise of the claims released by the Debtor Release; (c) given and made after due notice and opportunity for**

hearing; and (d) a bar to any of the Debtors or the Estates or any other Entities from asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

### Section 8.3    Releases by Releasing Parties

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party and each other Releasing Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' prepetition and postpetition, in- or out-of-court restructuring and sale efforts, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, preparation, entry, and execution of the Cash Collateral Order, the negotiation, formulation, preparation, dissemination and filing of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the Asset Purchase Agreement, the Sale Order, or related agreements, instruments, or other documents, the pursuit of the Sale, the pursuit of consummation of the Sale, the pursuit of Confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan related to the Debtors and the Chapter 11 Cases; *provided* that, nothing in this Section 8.3 shall be construed to release the Released Parties or Releasing Parties from their gross negligence, willful misconduct, or fraud as determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligation or liability of any Entity under the Plan, the Asset Purchase Agreement, the Sale Order, the Cash Collateral Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (b) any asbestos claims or any personal injury claims, in each case that have been or may be asserted against insurance or non-debtor third parties, unless such non-debtor third parties are Released Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Releasing Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is: (a) consensual, (b) in exchange for the good and valuable consideration provided by the Released Parties, (c) a good-faith settlement and

compromise of claims released by the Releasing Party Release; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or Releasing Parties or their property, released pursuant to the Releasing Party Release.

### Section 8.4    *Exculpation and Limitation of Liability*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Releasing Party Release, and notwithstanding anything herein to the contrary, each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any action taken or omitted to be taken during the period commencing on the Petition Date through and including the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Cash Collateral Order, the Asset Purchase Agreement, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided* that, nothing in this Section 8.4 shall be construed to release the Exculpated Parties from their gross negligence, willful misconduct, or fraud as determined by a Final Order. Each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release any post-Effective Date obligation or liability of any Entity under the Plan, Asset Purchase Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### Section 8.5    *Injunction*

In accordance with Bankruptcy Code Section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code Section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and interests against the Debtors, and Bankruptcy Code Section 1141(a) provides that the Plan, as confirmed, will be binding to the extent provided therein. As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Interests, Causes of Action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan; (3) were purchased and released by the Purchaser in connection with the Sale; (4) are subject to exculpation pursuant to the Plan; or (5) are otherwise satisfied, stayed, released, or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding, including on account of any claims, interests, Causes of Action, or liabilities that have been compromised or settled against the Debtors or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of, or in connection with or with respect to, any discharged, released, settled, compromised, or exculpated claims, interests, Causes of Action, or liabilities, including being permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Litigation Trust, the Released Parties, or Exculpated Parties (as applicable): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estate of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff (*i.e.*, a Proof of Claim or motion asserting such rights), and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtors, the Post-Effective Date Debtors, the Litigation Trust, and their respective affiliates, employees, advisors, officers and directors, or agents.

### Section 8.6    *Subordinated Claims*

Except as otherwise provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Section 510(b) of the Bankruptcy Code, or otherwise. All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed

subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan

Except as otherwise provided in the Plan, the right of the Debtors or the Litigation Trustee on behalf of the Post-Effective Date Debtors to seek subordination of any Claim or Interest pursuant to Section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a Subordinated Claim at any time shall be modified to reflect such subordination. Unless the Plan or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this **Section 8.6** unless ordered by the Bankruptcy Court.

### Section 8.7    *Protection Against Discriminatory Treatment*

Consistent with Section 525 of the Bankruptcy Code, no Governmental Unit shall discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Effective Date Debtors, or another Entity with whom the Post-Effective Date Debtors have been associated, solely because the Post-Effective Date Debtors have been debtors under chapter 11, have been insolvent before the commencement of the Chapter 11 Cases, or have not paid a debt that is settled and released in the Chapter 11 Cases.

### Section 8.8    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns.

### Section 8.9    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding Section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has filed a contingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### Section 9.1    Conditions Precedent to the Effective Date of the Plan

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with **Section 9.2** of the Plan:

(a)    the Plan and Confirmation Order shall be in form reasonably acceptable to the Debtors and, solely with respect to any provision that may adversely affect the Purchaser, as applicable, which consent or waiver shall not be unreasonably withheld, conditioned, or delayed;

(b)    the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order and, each shall be a Final Order;

(c)    the Professional Claims Reserve shall have been funded in Cash in full and the Plan Administration Reserve shall have been funded with the amount provided in the Plan Administration Budget;

(d)    All Restructuring Expenses incurred or estimated to be incurred as of the Effective Date shall have been paid in full;

(e)    all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents, or actions necessary to implement the Plan shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

(f)    the Plan Administrator shall have been appointed and shall have assumed all rights and responsibilities under the Plan and the Plan Administrator Agreement;

(g)    the Litigation Trust Agreement shall have been executed, and the Litigation Trustee shall have been appointed and shall have assumed all rights and responsibilities under the Plan and the Litigation Trust Agreement; and

(h)    all Statutory Fees then due and payable to the U.S. Trustee shall have been paid and satisfied in full.

### Section 9.2    Waiver of Conditions Precedent

The conditions set forth in **Section 9.1** of the Plan may be waived, in whole or in part, the Debtors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided that*, solely with respect to any condition that may adversely affect the Purchaser or the Prepetition Secured Parties, subject to such party's consent (which in each instance shall not be unreasonably withheld).

### Section 9.3    Notice of Effective Date

The Plan Administrator shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in **Section 9.1** of the Plan have been satisfied or waived pursuant to **Section 9.2** of the Plan.

### Section 9.4    Effect of Non-Occurrence of Conditions to Consummation

If, prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

### ARTICLE X
### BANKRUPTCY COURT JURISDICTION

### Section 10.1    Retention of Jurisdiction

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan (without prejudice to the rights, if any, of any party in interest to seek to withdraw the bankruptcy reference pursuant to 28 U.S.C. § 157(d) and related law with respect to any issue or proceeding subject to mandatory or discretionary withdrawal), including jurisdiction to:

(a)    resolve any matters related to Executory Contracts, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine, and, if necessary, liquidate any Claims arising therefrom including Cure Amount pursuant to Section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract that is assumed (or assumed and assigned); (iii) the Post-Effective Date Debtors' amendment, modification, or supplement after the Effective Date, pursuant to **Article V** of the Plan, of the lists of Executory Contracts to be assumed (or assumed and assigned) or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

(b)    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)    ensure that distributions to Holders of Allowed Claims and Interests are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)    allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest,

including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after Confirmation of the Plan, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(f)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or, subject to any applicable forum selection clause, any contract, instrument, release, or other document created in connection with the Plan or the Disclosure Statement;

(g)     enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(h)     enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan or the Asset Purchase Agreement and all contracts, instruments, releases, and other agreements and documents created in connection with the Plan, the Plan Supplement, and the Disclosure Statement;

(i)     enter and enforce any order for the sale of property pursuant to Sections 363, 1123 or 1146(a) of the Bankruptcy Code;

(j)     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(k)     hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(l)     determine requests for the payment of Claims entitled to priority under Section 507(a)(1) of the Bankruptcy Code;

(m)     adjudicate, decide, or resolve any and all matters related to Section 1141 of the Bankruptcy Code;

(n)     hear and determine all disputes involving the existence, nature, scope, or enforcement of the exculpations, injunctions and releases granted in connection with and under the Plan, including under **Article VIII** of the Plan;

(o)     enforce the injunction, release and exculpation provisions set forth in **Article VIII** of the Plan;

(p)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with consummation of the Plan, including the interpretation, implementation, or

enforcement of the Plan and the Confirmation Order, as applicable, including disputes arising under agreements, documents, or instruments executed in connection with the Plan or any disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(q)     hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(r)     hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(s)     grant any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to Section 365(d)(4) of the Bankruptcy Code;

(t)     enter a Final Decree closing the Chapter 11 Cases;

(u)     hear any other matter not inconsistent with the Bankruptcy Code; and

(v)     enforce all orders previously entered by the Bankruptcy Court.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date.  Nothing contained herein shall be construed to increase, decrease, or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

### Section 11.1    Binding Effect

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns, and resolve any matters related to Executory Contracts, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Amount, pursuant to Section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract that is assumed (or assumed and assigned); (iii) the Post-Effective Date Debtors' amendment, modification, or supplement after the Effective Date.

### Section 11.2    Payment of Statutory Fees

All Statutory Fees payable on or before the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Post-Effective Date Debtors, the Plan Administrator, and the Litigation Trust shall be jointly and severally liable for paying any and all Statutory Fees in full in Cash when due in each Chapter 11 Case for each quarter (including

any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code. The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Post-Effective Date Debtors, the Plan Administrator, and the Litigation Trust shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) Statutory Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Statutory Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.

### Section 11.3    *Statutory Committee Dissolution*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve, and members thereof shall be released from all rights and duties from or related to the Chapter 11 Cases; *provided, however*, that the Creditors' Committee will stay in existence solely for the limited purpose of filing and prosecuting final fee applications.

### Section 11.4    *Modification and Amendment*

Except as otherwise specifically provided in the Plan, subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, the Debtors reserve the right to modify the Plan, subject to any applicable consent rights set forth herein, whether such modification is material or immaterial prior to Confirmation, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan) and any consent rights as set forth herein, the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan after Confirmation, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided* that any modifications or amendments, whether before or after Confirmation, that impact the treatment of the Prepetition Lender Claims shall require the consent of the Administrative Agent (whose consent may not be unreasonably withheld).

### Section 11.5    *Confirmation of Plan*

The Debtors request Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

### Section 11.6    Additional Document

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Plan Administrator, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

### Section 11.7    Revocation, Withdrawal, Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain Claims or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

### Section 11.8    Notices

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered on the parties below shall be served as follows:

If to the Debtors:

> True Value Company, L.L.C.
> 8600 West Bryn Mawr Ave.
> Chicago, IL, 60631

> *With copies (which shall not constitute notice) to:*

> Skadden, Arps, Slate, Meagher & Flom LLP
> 320 S. Canal St.
> Chicago, IL 60606
> Attention:  Ron E. Meisler (Ron.Meisler@skadden.com)
>               Jennifer Madden (Jennifer.Madden@skadden.com)

> One Manhattan West
> 395 9th Ave.
> New York, NY 10001

Attention:  Evan A. Hill (Evan.Hill@skadden.com)
                 Moshe S. Jacob (Moshe.Jacob@skadden.com)

920 North King Street
Wilmington, DE 19801
Attention:  Joseph O. Larkin (Joseph.Larkin@skadden.com)

- and -

Glenn Agre Bergman & Fuentes LLP
1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
Attention:  Andrew K. Glenn (aglenn@glennagre.com)
                 Malak S. Doss (mdoss@glennagre.com)

- and -

Young Conaway Stargatt & Taylor, LLP
One Rodney Square
1000 North King Street
Wilmington, DE 19801
Attention:  Edmon L. Morton (emorton@ycst.com)
                 Timothy R. Powell (tpowell@ycst.com)

If to the Office of the United States Trustee:

Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Attention: Benjamin A. Hackman (Benjamin.A.Hackman@usdoj.gov)

If to the Prepetition Lenders:

Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Attention:  Regina S. Kelbon (regina.kelbon@blankrome.com)
                 Stanley B. Tarr (Stanley.tarr@blankrome.com)

One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Attention:  John E. Lucian (john.lucian@blankrome.com)

### Section 11.9    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### Section 11.10  Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to the Plan, provides otherwise, the Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.  Corporate governance matters shall be governed by the laws of the state of incorporation, formation, or functional equivalent thereof, as applicable, of the applicable Post-Effective Date Debtor.

### Section 11.11  Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### Section 11.12  Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, and (c) non-severable and mutually dependent.

### Section 11.13  No Waiver or Estoppel

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court; provided however, that this provision is

without prejudice to any Governmental Unit whose claims are subject to the Governmental Bar Date.

Dated: Wilmington, Delaware
       February 12, 2025

Respectfully submitted,

TRUE VALUE COMPANY, L.L.C., on behalf of itself
and its Debtor affiliates

*/s/ Kunal S. Kamlani*
Name:  Kunal S. Kamlani
Title:   Chief Transformation Officer

**<u>Exhibit B</u>**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS FOR TRUE VALUE COMPANY, L.L.C.,** *et al.*[1]

## I.    INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the Conversion Date (defined below) of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates.  As illustrated by this Liquidation Analysis, Holders of First Lean Secured Claims would receive a lower recovery in a hypothetical liquidation than they would under the Plan.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  This Liquidation Analysis is not intended, and should not be used, for any other purpose.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based, are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Disclosure Statement for the Joint Chapter 11 Plan of True Value Company, L.L.C. and Its Debtor Affiliates* [Docket No. 797] (the "Disclosure Statement").

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN CONVERSION DATE.  THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.  NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about March 28, 2025 (the "Conversion Date").  Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash, and certain receipts and expenses have been projected forward or estimated as of the Conversion Date.  As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon the claims register prepared by Omni Agent Solutions and the First, Second, and Third Omnibus Claim Objections. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.  There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.  The Liquidation Analysis is an estimate and is subject to material change and revision in all respects, and takes a conservative approach to analyzing the value to Holders of Claims in a chapter 7 liquidation.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1.  Unaudited Financial Statements.  This Liquidation Analysis contains numerous estimates.  Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2.  <u>Chapter 7 Liquidation Costs</u>.  The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately twelve (12) months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates.  In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries.  Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3.  <u>Distribution of Net Proceeds</u>.  Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims.  The estimates used in this Liquidation Analysis for these expenses include estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee.  Any remaining net Cash would then be distributed to creditors in accordance with applicable law.

    Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full.  The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4.  <u>Certain Exclusions and Assumptions</u>.  This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis.  Such tax consequences may be material.

## II.    <u>CONCLUSIONS</u>

> **THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

**True Value Company, L.L.C.**
**Illustrative Liquidation Analysis**

*($ in millions)*

| Ref # | | Chapter 11 Plan | Chapter 7 Liquidation |
|---|---|---|---|
| 1 | **Pro Forma Cash Balance** | $6.2 | $6.2 |
| 2 | Tax Receivable | 0.2 | 0.1 |
| 3 | Tenant Improvements | – | – |
| 4 | Utility Deposits | 0.2 | 0.2 |
| 5 | Causes of Action | TBD | TBD |
| | **Total Estimated Distributable Value** | **$6.6** | **$6.5** |
| | | | |
| 6 | Post-Effective Date Wind Down Budget | ($1.1) | ($1.1) |
| 7 | Chapter 7 Trustee Fee | – | (0.2) |
| 8 | Chapter 7 Professional Fees | – | (2.8) |
| | **Total Fees** | **($1.1)** | **($4.1)** |
| | | | |
| | **Proceeds Available for the Benefit of Creditors** | **$5.5** | **$2.3** |
| | | | |
| | **Administrative Claims** | | |
| 9 | 503(b)(9) Claims | – | – |
| 10 | Post-Petition Vendor and Other Claims | – | – |
| | **Total Administrative Recovery** | **–** | **–** |
| | | | |
| | **Priority Unsecured Claims** | | |
| 11 | Priority Tax Claims | ($3.0) | ($1.4) |
| 12 | Employee Claims | (0.6) | (0.3) |
| 13 | UST Fees | (0.5) | (0.2) |
| 14 | OPEB Claims | (0.7) | (0.3) |
| 15 | IBNR Claims | (0.4) | (0.2) |
| | **Total Priority Unsecured Recovery** | **($5.2)** | **($2.3)** |
| | | | |
| | **First Lien Secured Claims** | | |
| 16 | ABL Facility | ($0.3) | – |
| 17 | Term Loan | – | – |
| | **Total First Lien Secured Recovery** | **($0.3)** | **–** |
| | | | |
| | **General Unsecured Claims** | | |
| 18 | Estimated GUC Pool | – | – |
| | **Total General Unsecured Claim Recovery** | **–** | **–** |
| | | | |
| | **Proceeds Available for the Benefit of Subordinated Claims and Equity Interests** | **–** | **–** |
| | | | |
| | **Estimated Recoveries to Creditors** | | |
| | *Administrative Claims* | – | – |
| | *Priority Unsecured Claims* | *100.0%* | *45.3%* |
| | *Secured Claims* | *0.7%* | – |
| | *General Unsecured Claims* | – | – |

**True Value Company, L.L.C.**
**Illustrative Liquidation Analysis**

### Notes

| | |
|---|---|
| 1 | The pro forma cash balance assumes an Effective Date of March 28, 2025, in the Chapter 11 Plan case. The Chapter 7 Liquidation case assumes the cases convert on March 28, 2025. The pro forma cash balance is compromised of the forecast ending cash balance as of January 28, 2025, which is then reduced for operating disbursements through March 28, 2025. The pro forma cash balances exclude bank accounts being operated on behalf of the buyer for the Transition Services Agreement. The funds in those bank accounts are assets of the buyer, but the bank accounts themselves represent Estate property. |
| 2 | Tax Receivables represent tax refunds owed to the Estate. The Chapter 11 Plan case assumes a full recovery during the Post-Effective Date period; the Chapter 7 Liquidation case assumes a partial recovery due to the expedited wind down of the Estate. |
| 3 | Tenant Improvements represent potential refunds owed to the Estate for certain leases associated with the Company's distribution centers. Both the Chapter 11 Plan case and Chapter 7 Liquidation case assume no recovery during the Post-Effective Date period. |
| 4 | Utility Deposits represent funds the Estate has placed in escrow for potential disbursements to utility providers. The deposits are assumed to be returned to the Estate in the Post-Effective Date period. |
| 5 | For purposes of the illustrative Liquidation Analysis, no values have been ascribed to any potential litigation and causes of action. The Cash Collateral Order requires any proceeds related to commercial tort claims and insider avoidance actions to be distributed equally between the First Lien Secured Claims and General Unsecured Claims. |
| 6 | The Post-Effective Date Wind Down Budget in the Chapter 11 Plan case includes funds for the wind-down period, professional fees, and other disbursements based on the Cash Collateral Order. Both the Chapter 11 Plan and Chapter 7 Liquidation cases assume the Wind Down Budget is used in the Post-Effective Date period. |
| 7 | Trustee fees include all fees paid to the Trustee by the Debtors, consistent with the fee structure set forth in the Bankruptcy Code. The Trustee fee is estimated at 3% of all distributions to creditors from gross asset proceeds (including cash), inclusive of payments of Chapter 7 and Chapter 11 administrative claims and all prepetition claims. See 11 U.S.C. § 326(a) |
| 8 | Trustee professional fees include all fees paid to professionals hired by the Trustee to assist with effectuating the liquidation and wind down of the Estate. The illustrative analysis assumes elevated professional fees (compared to the Chapter 11 Plan case) due to the lack of knowledge and relationships held by the Chapter 7 Trustee (and other professionals) with key counterparties that will be required to effectuate the wind-down of the Estate. |
| 9 | Administrative expense claims for the value of any goods received by the debtor within 20 days before the commencement of the bankruptcy case, sold to the debtor in the ordinary course of business. See 11 U.S.C. § 503(b)(9). This represents the forecast of the remaining 503(b)(9) Administrative Claims that have not been assumed by the buyer, are the Estate's obligation, and are unpaid as of March 28, 2025. All 503(b)(9) Administrative Claims that are the Estate's obligation are forecast to be paid before the Effective Date. |
| 10 | Post-Petition Vendor and Other Claims represent the forecast outstanding payables for vendor and other administrative claims to be assumed by the Estate. This represents the forecast of the remaining administrative claims that have not been assumed by the buyer, are the Estate's obligation, and are unpaid as of March 28, 2025. All Post-Petition Vendor and Other Claims that are the Estate's obligation are forecast to be paid before the Effective Date. |
| 11 | Estimated remaining claims, based on those filed through January 23, 2025, for certain taxes owed to governmental units given priority status, including income, property, and sales taxes, before the Effective Date for the Debtor's Chapter 11 plan or conversion to Chapter 7 Liquidation. See 11 U.S.C. § 507(a)(8). |
| 12 | Estimated remaining claims for employee benefits, including accrued and unpaid benefits and severance pay, as of the transaction close. See 11 U.S.C. § 507(a)(4) and (a)(5). |
| 13 | UST Fees represent the forecast fees for the US Trustee based on the Debtor's estimated disbursements through March 28, 2025. The timing of the disbursement of the UST fees is assumed to be after the Chapter 11 Plan Effective Date. |
| 14 | OPEB Claims represent Other Post-Employment Benefit obligations of the Estate, which are assumed to be disbursed after the Chapter 11 Plan Effective Date. |
| 15 | IBNR Claims represent incurred but not reported claims by Estate employees for medical, dental, and other coverage. The IBNR Claims represent the forecast remaining claims for Estate Employees that are assumed to occur after the Chapter 11 Plan Effective Date. |

**True Value Company, L.L.C.**
**Illustrative Liquidation Analysis**

| 16 | Claims secured by a first-priority lien on the debtor's assets. See 11 U.S.C. § 506. The First Lien Secured Claim ABL projected distribution does not include a forecast distribution to the Secured Claimants following a 90-day reconciliation period of reserve accounts after the sale closing, and prior to the Effective Date, as provided for in the Cash Collateral Order. |
|---|---|
| 17 | Claims secured by a first-priority lien on the debtor's assets. See 11 U.S.C. § 506. The First Lien Secured Claim Term Loan projected distribution does not include a forecast distribution to the Secured Claimants following a 90-day reconciliation period of reserve accounts after the sale closing, and prior to the Effective Date, as provided for in the Cash Collateral Order. |
| 18 | Represents any Claim, other than a Secured Claim, that is not an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), a Tax Priority Claim, a Priority Unsecured Claim, or a Prepetition Credit Agreement Claim. |