**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| **TRUE VALUE COMPANY, L.L.C.** *et al.*, | Case No. 24-12337 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | Re: D.I. Nos. 796, 878 & 905 |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF
FIFTH THIRD BANK, N.A. AND BANK OF MONTREAL TO
THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
TRUE VALUE COMPANY, L.L.C. AND ITS DEBTOR AFFILIATES**

Fifth Third Bank, N.A. ("Fifth Third") and Bank of Montreal ("BMO" together with Fifth Third the "Objectors"), through undersigned counsel, file this limited objection and reservation of rights (the "Objection") to the Debtors' *Second Amended Joint Chapter 11 Plan of True Value Company, L.L.C. and its Debtor Affiliates* [D.I. 796] (as modified, amended, or supplemented, the "Plan")[2] and respectfully state as follows:

**PRELIMINARY STATEMENT**

1. On the eve of confirmation, the Debtors have reversed course on the Objectors' rights under the Cash Collateral Order, Sale Order, and Plan. After months of treating the Objectors' equipment lease schedules as "true leases," Debtors now contend that (i) eight (8) of those equipment lease schedules are financing agreements; (ii) the equipment leased under those schedules were part of the "Transferred Assets" sold to Do it Best in November 2024; and (iii) the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106). The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Cash Collateral Order, Sale Order, APA, or Plan, as the context requires.

Objectors' Prepetition Permitted Liens in such equipment will not attach to the Sale proceeds until the Prepetition Lenders are paid in full. This belated shift deprives the Objectors of their rights under section 365 of the Bankruptcy Code, retroactively forcing them to consent to both the Sale of their equipment and the non-consensual priming of their Prepetition Permitted Liens.[3] Such revisionist history violates due process and sandbags the Objectors at the eleventh hour.

2.  The Court should not permit the Cash Collateral Order and Sale Order to be misinterpreted in a way that effects an *ex post facto* forfeiture of the Objectors' rights. Allowing the Debtors to divert the proceeds of the Objectors' equipment collateral to the Prepetition Lenders would be both improper and fundamentally unfair. Accordingly, the Court should enforce its prior orders consistent with due process and direct the Debtors to (i) allocate the Sale proceeds in accordance with the Objectors' Prepetition Permitted Liens and (ii) distribute those proceeds to the Objectors on account of heir Other Secured Claims under the Plan.

3.  In the spirit of providing solutions, the Objectors note that this Objection likely could have been avoided had Do it Best simply agreed to pay for the equipment it purportedly purchased under the Sale. Unfortunately, because no such offer has been made, the Objectors are constrained to expend resources filing this Objection.

## BACKGROUND

### A.  The Fifth Third Equipment Leases

4.  Fifth Third, as successor to MB Equipment Finance, LLC ("MBEF") as lessor, and Debtor True Value Company, L.L.C. ("TVC"), as lessee, are parties to *Equipment Schedule*

---

[3] Based on available information, the Objectors hold Prepetition Permitted Liens on its Collateral, making its interests in such Collateral and its proceeds superior to that of any other party. The Objectors acknowledge that accepting the Debtors' reclassification of certain equipment lease schedules as financing agreements would require it to establish an interest in its Collateral superior to the Administrative Agent's interest therein, if any. Given the late-stage shift in the Debtors' position, the Objectors' analysis remains ongoing. The Objectors will supplement this Objection as needed.

*No. 005* dated May 16, 2023 ("Fifth Third Schedule 5") to that certain *Master Lease Agreement No. 100537* dated January 27, 2017 (the "2017 MLA" and together with Fifth Third Schedule 5, the "Fifth Third Schedule 5 Lease (2017)") between Fifth Third and TVC.

5.   Fifth Third, as successor to MBEF, as lessor, and TVC, as lessee, are parties to *Equipment Schedule No. 007* dated June 28, 2023 ("Fifth Third Schedule 7") to that certain *Master Equipment Lease Agreement* dated June 15, 2023 (the "2023 MLA" and together with Fifth Third Schedule 7, the "Fifth Third Schedule 7 Lease (2023)").

6.   Fifth Third, as successor to MBEF, as lessor, and TVC, as lessee, are parties to *Equipment Schedule No. 008* dated September 21, 2023 ("Fifth Third Schedule 8") to the 2023 MLA, which together with Fifth Third Schedule 8 is referred to herein as the "Fifth Third Schedule 8 Lease (2023)." The Fifth Third Schedule 5 Lease (2017), the Fifth Third Schedule 7 Lease (2023), and the Fifth Third Schedule 8 Lease (2023) are referred to collectively as the "Fifth Third Equipment Leases."[4]

7.   Pursuant to the Fifth Third Equipment Leases, Fifth Third leased various trailers and certain other equipment (collectively, the "Fifth Third Equipment") to the Debtors.

8.   In accordance with the terms and conditions of the Fifth Third MLA (which are expressly incorporated into each of the Fifth Third Schedules), Fifth Third, as lessor, retains legal title for all Fifth Third Equipment.

9.   As is common in leasing agreements like the Fifth Third MLA, out of an abundance of caution, Fifth Third also holds a prepetition security interest in and lien on and to the Fifth Third Equipment should any of the Fifth Third Equipment Leases be determined to be a financing

---

[4] The Debtors concede that *Equipment Schedule No. 001* (April 3, 2017) under the Fifth Third MLA is a true lease and is therefore being addressed separately.

- 3 -

arrangement rather than true lease. Fifth Third duly perfected its security interests in and liens on and to the Fifth Third Equipment by filing two (2) UCC-1 financing statements with the Delaware Secretary of State. Specifically, Fifth Third is perfected in the equipment financed under the Fifth Third Schedule 5 Lease (2017) pursuant to a UCC-1 financing statement filed on May 16, 2023, at File No. 20233652087. Fifth Third is perfected in the equipment financed under the Fifth Third Schedule 7 Lease (2023) and the Fifth Third Schedule 8 Lease (2023) pursuant to a UCC-1 financing statement filed on June 22, 2023, at Filing No. 20232832461.

10. TVC is currently in default of its monthly payment obligations under the Fifth Third Equipment Leases. As of the filing of this Objection, and subject to further reconciliation, the outstanding and overdue aggregate balance owed to Fifth Third was at least $1,096,079.39 (exclusive of any late charges, interest, liquidated damages, and attorneys' fees).

**B. The BMO Equipment Leases**

11. BMO, as assignee of Harris Equipment Finance Company, as lessor, and TVC, as lessee, are parties to that certain *Master Lease of Personal Property* dated July 22, 2015 (as the same has been amended, restated, amended and restated, supplemented, revised, and otherwise modified from time to time, the "BMO MLA" and together with the Fifth Third MLA the "MLAs"); together with eight (8) corresponding lease schedules, pursuant to which BMO leased various trailers and certain other equipment (collectively, the "BMO Equipment") to the Debtors. Of the eight (8) schedules, only five (5) of the schedules are at issue for purposes of this Objection: (i) *Lease Schedule No. 32186* dated November 7, 2017 ("BMO Schedule 32186"); (ii) *Lease Schedule No. 32188* dated November 10, 2017 ("BMO Schedule 32188"); (iii) *Lease Schedule No. 32568* dated May 29, 2018 ("BMO Schedule 32568"); (iv) *Lease Schedule No. 32693* dated July 17, 2018 ("BMO Schedule 32693"); (v) *Lease Schedule No. 32869* dated September 14, 2018

("BMO Schedule 32869," and together with items (i) – (v), the "BMO Schedules" and collectively with the BMO MLA, the "BMO Equipment Leases").[4]

12. Under the BMO MLA, BMO has a right to "any and all proceeds (including insurance proceeds) of the" BMO Equipment "and all rights and remedies of a first priority secured party under the Uniform Commercial Code. *See* BMO MLA, ¶ 30. In accordance with the terms and conditions of the BMO MLA (which are expressly incorporated into each of the BMO Schedules), BMO, as lessor, retains legal title for all BMO Equipment.

13. BMO also holds a prepetition security interest in and lien on and to the BMO Equipment should the BMO Equipment Lease be determined to be a financing arrangement rather than true lease. BMO duly perfected its security interests in and liens on and to the BMO Equipment by filing UCC-1 financing statements with the Delaware Secretary of State.

14. TVC is currently in default of its monthly payment obligations under the BMO Equipment Lease. As of the filing of this Objection, and subject to further reconciliation, the outstanding and overdue aggregate balance owed to BMO was at least $210,248.08 (exclusive of any late charges, interest, liquidated damages, and attorneys' fees).

**C.    The Chapter 11 Cases**

15. On October 14, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, thereby commencing their Chapter 11 Cases. Upon information and belief, the Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[4] The Debtors concede that two (2) of the schedules executed pursuant to the BMO MLA, *Lease Schedule No. 30825* dated December 29, 2015 and *Lease Schedule No. 33728* dated October 3, 2019, are true leases and are being addressed separately. In addition, *Lease Schedule No. 34022* dated September 16, 2019 has been satisfied in full.

### (i) *The Cash Collateral Order*

16. On November 4, 2024, the Court entered the Cash Collateral Order [D.I. 296], which expressly incorporates the Cash Collateral Resolution Term Sheet attached as Exhibit 1 thereto, specifically provides that the Prepetition Lenders' Prepetition Liens on Prepetition Collateral are subject to all Prepetition Permitted Liens.[5] *See* Cash Collateral Order ¶G(3).

17. The language in the Cash Collateral Order regarding Prepetition Permitted Liens was added *after* entry of the initial interim order regarding the Debtors' use of Cash Collateral (which necessarily implies that the Prepetition Lenders agreed to the inclusion of such language). *Compare* D.I. 216 ¶ G(i)(c) *with* Cash Collateral Order ¶ G(3).

18. Regardless, the Prepetition Lenders agree that the Cash Collateral Order "approves the Debtors' representations, admissions, stipulations and agreements in Paragraph G therein" and that the same "are now binding on all parties given the expiry of the challenge period." *See Administrative Agent's Reservation of Rights* [D.I. 890] ¶ 5.

19. The Adequate Protection Liens granted to the Prepetition Lenders under the Cash Collateral Order are similarly subject and subordinate to the Prepetition Permitted Liens. Cash Collateral Order ¶ 4(a).

### (ii) *The Sale Order*

20. On November 13, 2024, the Court entered the Sale Order [D.I. 411], thereby authorizing the Debtors to enter into the Asset Purchase Agreement (the "APA") with Do it Best Corp. ("Do it Best") for the sale of the Transferred Assets. The terms and conditions of the Cash

---

[5] The Cash Collateral Order defines a "Prepetition Permitted Lien" as a "valid, perfected, and unavoidable lien or security interest otherwise existing as of the Petition Date that is senior to the security interest of the Prepetition Lenders, to the extent such liens or security interests are valid, perfected and unavoidable liens or security interests existing as of the Petition Date and otherwise senior to the Prepetition Liens as of the Petition Date." Cash Collateral Order ¶G(3).

Collateral Order (including the Cash Collateral Term Sheet) are "fully incorporated into" the Sale Order.  *See* Sale Order ¶ T.

21. Under the Sale Order, all liens, claims, interests, and encumbrances on any Transferred Assets attach to the proceeds of the Sale in the same order of priority and with the same validity, force, and effect that such they applied prior to the Sale "only after such proceeds are first applied to the Prepetition Lenders' *repayment rights* as set forth in the Cash Collateral Order and Cash Collateral Term Sheet which payments shall be for the indefeasible and permanent application of the Prepetition Secured Obligations until such obligations are indefeasibly paid in full."  *See* Sale Order ¶ T (emphasis added).  Neither the Sale Order nor the Cash Collateral Order defines the "repayment rights" of the Prepetition Lenders.

22. Under the APA, Do it Best purchased "all right, title and interest of [Debtors], in, to or under the Transferred Assets," including "all right, title and interest of [Debtors] as of immediately prior to the Closing in, to or under all properties and assets of [Debtors], of every kind and description, wherever located" including "all owned tangible property, accounts, machinery, equipment, movable property and vehicles, and all Inventory, including all express or implied warranties with respect thereto."  *See* APA § 2.1(f).  The Transferred Assets were not sold to Do it Best free and clear of "Permitted Post-Closing Encumbrances," which include "Encumbrances arising under purchase money security interests, *equipment leases or other similar arrangements* entered into in the Ordinary Course of Business."  *Id.* § 2.1; *see also id.* Art. I (Definition of Permitted Post-Closing Encumbrances).

23. Debtors also expressly represented and warranted under the APA that, as of November 10, 2024, they had "indefeasible title to, and own[ed] and possesses[d] all rights and

- 7 -

interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in" such Transferred Assets. *See* APA § 3.4(a).

**(iii)** *Debtors' Changing Positions Regarding the Objectors' Equipment Leases*

24. The Court entered a separate order on November 4, 2024, approving, *inter alia*, the Debtors' proposed Assumption and Assignment Procedures [D.I. 297]. Debtors filed the (i) *Notice of Proposed Assumption and Assignment of Certain Executory Contracts* [D.I. 339] on November 6, 2024, and (ii) *Second Supplemental Notice of Proposed Assumption and Assignment of Certain Executory Contracts* [D.I. 822] on January 24, 2025, wherein they designated the following unexpired leases for assumption or assumption and assignment to Do it Best:

- **Fifth Third (Cure Amount: $47,795.56)**[6]
  - Equipment Lease Agreement (Fifth Third Bank MLA);
  - Lease Agreement (Equipment Lease);
  - Lease Agreement (IT Equipment Lease); and
  - Lease Agreement (Trailer Equipment Lease).

- **BMO (Cure Amount: $352,865.66)**
  - Equipment Lease Agreement (Material Handling Equipment from Associated (CER 2017-50-001));
  - Equipment Lease Agreement (MHE equipment (part of CER 2017-50-004));
  - Equipment Lease Agreement (Material Handling Equipment (CER 2017-50-001));
  - Equipment Lease Agreement (Various Material Handling Equipment (Part 2 of CER 2018-50-004));

---

[6] Fifth Third filed a (i) *Limited Objection and Reservation of Rights to the First Assumption Notice* [D.I. 580] on November 22, 2024; and (ii) *Limited Objection and Reservation of Rights to the First Assumption Notice* [D.I. 846] on February 4, 2025, to correct the Debtors' proposed cure amounts and provide prospective amounts to come due. Fifth Third also reserved all rights to further object to the proposed assumption assignment of the Fifth Third Lease Agreement and any Fifth Third Schedules to Do It Best.

- o Lease Agreement (Equipment Lease); and
- o Lease Agreement (Trailer Equipment Lease).

25. On February 27, 2025, for the *first time*, the Debtors communicated their (and Do it Best's) position that: (i) certain of BMO Equipment Leases and Fifth Third Equipment Leases are "financing agreements" (collectively, the "<u>Alleged Financing Agreements</u>")[7] rather than "true leases"; (ii) the BMO Equipment and Fifth Third Equipment subject to the Alleged Financing Agreements ("<u>Allegedly Transferred Equipment</u>") were "Transferred Assets" sold to Do it Best as part of the Sale; and (iii) the Objectors had perfected liens in the Allegedly Transferred Equipment and, in turn, were entitled to an allocation of the Sale proceeds in the amount of the value of such equipment. Debtors' counsel then advised that they would prepare a proposal concerning the appropriate allocation of the Sale proceeds on account of the Allegedly Transferred Equipment.

26. The Objectors initially agreed with Debtors' assessment regarding the Alleged Financing Agreements given Debtors' contemporaneous admission that the Objectors were entitled to an allocation of the Sale proceeds.

27. On March 7, 2025, Debtors filed the Plan Supplement, including the Schedule of Assumed Executory Contracts. *See* D.I. 996, Exh. D. Consistent with the assertions regarding the Alleged Financing Agreements and the proposed rejection of any remaining "true leases," neither the Fifth Third MLA, BMO MLA, any Fifth Third Equipment Leases, nor any BMO Schedules were listed on the Schedule of Assumed Executory Contracts.

---

[7] According to Debtors' counsel, the following comprise the Alleged Financing Agreements: (i) BMO Schedule Nos. 32186, 32188, 32568, 32693, 32869 and 34022 and (ii) Fifth Third Schedule Nos. 5, 7 and 8.

**(iv)** *The Chapter 11 Plan*

28. On February 12, 2025, the Debtors filed the Plan, which provides that all Cash used to "fund distributions, make payments or otherwise satisfy any obligations" thereunder "shall be funded in accordance with the Cash Collateral Order." *See* Plan Art. IV, § 4.5. The Plan also makes clear that nothing in the Plan "shall affect, impair or supersede the Cash Collateral Order, which remains in full force and effect and governs in the event of any inconsistency with the Plan." *Id*., Art. I, § 1.1.24 (definition of "Cash Collateral Order").

29. The Plan classifies Other Secured Claims (defined as a Secured Claim[7] other than any Prepetition Lender Claim) in Class 2 (Other Secured Claims). *See* Plan, Art. 1, §1.189; Art. III, 3.2(b). Holders of Allowed Other Secured Claims are Unimpaired and therefore are entitled to (i) payment "in full in Cash in an amount equal to such Allowed Other Secured Claim required to be paid pursuant to Section 506 of the Bankruptcy Code," (ii) delivery of the collateral securing the Holder's Allowed Other Secured Claim, or (iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired under the Bankruptcy Code. *Id*., Art. III, 3.2(b).

30. On March 13, 2025, the Debtors advised the Objectors (through counsel) of the Administrative Agent's position (with which the Debtors agreed) regarding allocation and distribution of the Sale proceeds under the Plan. Specifically, the Debtors and Administrative Agent now assert that, even if a counterparty (*i.e.*, Fifth Third and BMO) to a secured financing agreement (*i.e.*, the Alleged Financing Agreements) is properly perfected in the equipment collateral provided under such agreement and is or may be entitled to an allocation of the Sale

---

[7] "Secured Claim" is defined as "a Claim to the extent it is (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (i) as set forth in the Plan, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with Section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any rights of setoff of the Holder thereof under Section 553 of the Bankruptcy Code." Plan, Art. I § 1.128.

- 10 -

proceeds on account of such perfected security interested, such counterparty is entitled to an allocation of the Sale proceeds only *after* such proceeds are first applied toward full repayment of the Prepetition Lenders' Indebtedness.  In other words, after threatening to recharacterize the Alleged Financing Agreements four (4) months after entry of the Cash Collateral Order and Sale Order, the Debtors are now—ten (10) days before the Confirmation Hearing—asserting that the Objectors are "out of the money" until the Administrative Agent is paid in full.

### **LIMITED OBJECTION**

31. The Objectors hereby object to the Plan to the extent the Debtors attempt to distribute any Sale proceeds attributable to any Allegedly Transferred Equipment in a manner inconsistent with the Cash Collateral Order and Sale Order and in violation of the Objectors' interests therein.

32. After months of treating the Fifth Third Equipment Leases and BMO Equipment Leases as true leases (including listing them on assumption and assignment notices, designating them as "equipment leases" on TVC's Schedules, and countless discussions among counsel regarding cure amounts and post-petition rent payments),[8] the Debtors (at Do it Best's behest) did a last minute about-face.  To avoid a recharacterization fight that would distract from the confirmation process—and in reliance on the treatment of their "Other Secured Claims" related to the Alleged Financing Agreements under the Plan—the Objectors initially agreed with the Debtors that the Alleged Financing Agreements were loans rather than true leases.[9]

---

[8] Debtors likely will point to various reservations of rights regarding their ability to seek recharacterization of agreements previously listed as equipment leases.  Respectfully, such boilerplate reservations cannot be used as both a sword and shield to allow Debtors to recharacterize equipment leases *after* the Sale Closing, thereby retroactively designating leased equipment as Transferred Assets sold to Do it Best.

[9] The Objectors have not executed any agreement or stipulation consenting to the recharacterization of any Fifth Third Equipment Lease or BMO Equipment Lease, respectively.  For the avoidance of doubt, the Objectors assert that the Alleged Financing Agreements are "true leases" until this Court enters an order recharacterizing them as financing agreements.  Coincidentally, this presents another potential issue for the Debtors:  under the express language of the applicable lease documents, title to the Allegedly Transferred Equipment remains with the Objectors—which conflicts

33. Then, just *four (4) days* before the confirmation objection deadline, the Debtors adopted the position that (i) the Objectors' Prepetition Permitted Liens attach to the Sale proceeds only *after* such proceeds are first applied to the Prepetition Lenders' "repayment rights" under the Cash Collateral Order until the Prepetition Lenders' Indebtedness is indefeasibly paid in full and (ii) as a result, the Objectors are not entitled to an allocation of the Sale proceeds or distribution of same under the Plan until the Prepetition Lender is paid in full from the Sale proceeds.

34. The result of this backpedaling is that three (3) Fifth Third Equipment Leases and six (6) BMO Schedules are no longer entitled to treatment as unexpired leases under section 365 of the Bankruptcy Code, but rather are entitled to treatment under section 506(a) as prepetition security agreements. That alone is not a bad outcome for the Objectors—the Alleged Financing Agreements likely would have been rejected, with the Objectors' rejection damages treated as General Unsecured Claims under the Plan. Indeed, unlike General Unsecured Claims, Other Secured Claims in Class 2 are Unimpaired under the Plan.

35. But the Debtors' eleventh-hour change of heart regarding the Objectors' entitlement to an allocation of Sale proceeds is an unfair surprise that amounts to "heads I win, tails you lose." Had the Debtors taken the same position about the Alleged Financing Agreements from the start of these Chapter 11 Cases, the situation would (arguably) be different. But to now assert that the Alleged Financing Agreements are not true leases entitled to treatment under 11 U.S.C. § 365 *and* that the Sale Order effectively subordinates the Objectors' Prepetition Permitted Liens to those of the Administrative Agent until the Prepetition Lenders are paid in full raises serious due process concerns. Had the Objectors been on notice that the Alleged Financing

---

with Debtors' representations and warranties in the APA that they held legal title to the Allegedly Transferred Equipment at Closing.

Agreements were being treated as loans rather than true leases, they most certainly would have objected to any language in the Sale Order purporting to place the Administrative Agent's interests over those of the Objectors. Had the Objectors been on notice that their equipment was in fact being sold to Do it Best under the APA, they would have ensured their right to payment on account of such equipment.

36. More fundamentally, however, the Cash Collateral Order expressly provides that the Objectors' Prepetition Permitted Liens in the Allegedly Transferred Equipment are *senior* to the Administrative Agent's liens (whether prepetition or otherwise). The Debtors' nascent position effectively rewrites the Cash Collateral Order by misrepresenting the Sale Order and, in turn, re-routing the proceeds in which the Objectors have a first-priority secured interest. That cannot be the result under these circumstances.

37. The Objectors are confident that the Cash Collateral Order and the Sale Order cannot be used by the Debtors to argue (after the fact) that (i) Do it Best purchased the Allegedly Transferred Equipment and (ii) the Prepetition Lenders are entitled to payment in full before the Objectors receive a penny. The Court should require the Debtors to make distributions under the Plan on account of the Objectors' Other Secured Claims to the Objectors (not the Administrative Agent).

38. To do anything else would turn notions of due process on its head and create an unworkable precedent allowing parties to adopt new positions—months after an order becomes final and non-appealable—that eviscerate secured parties' property rights. The Court should decline the Debtors' invitation to adopt this impracticable outcome.

39. Finally, the Objectors objects to the scope of the Plan's exculpation provision to the extent that the Debtors and any of their Related Parties assert that they are exculpated from any

liability related to the transfer of the Allegedly Transferred Equipment to Do it Best. *See* Plan, Art. VIII § 8.4 (*Exculpation and Limitation of Liability*).

## **RESERVATION OF RIGHTS**

40. The Objectors expressly reserve all rights to amend, supplement, modify, or withdraw this Objection in whole or in part at any time. The Objectors further reserve the right to file a motion requesting reconsideration of the Sale Order and the language therein that permits the non-consensual priming of the Objectors' Prepetition Permitted Liens.

41. Nothing in this Objection is intended to be, or should be construed as, a waiver by the Objectors of any of their rights under the MLAs, the Bankruptcy Code, or applicable law, including, without limitation, all rights to assert any additional amounts due and owing under the MLAs and/or any further objections related to the Plan as the Objectors deem necessary or appropriate and as the evidence may allow at any hearing thereon.

[*Remainder of Page Intentionally Left Blank*]

**CONCLUSION**

WHEREFORE, the Objectors respectfully request that the Court (i) sustain this Objection; (ii) direct the Debtors to distribute the Sale proceeds to the Objectors in accordance with the Plan on account of their Prepetition Permitted Liens; (iii) to the extent necessary, enforce the Cash Collateral Order and Sale Order; and (iv) grant the Objectors such other relief as is appropriate.

Dated: March 17, 2025
       Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

By: */s/ Jason D. Angelo*
Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778.7500
Facsimile: (302) 778.7575
Email: jangelo@reedsmith.com

*Counsel to Fifth Third Bank, N.A. and Bank of Montreal*