# EXHIBIT 1

**Stipulation**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C. *et al.*,** | **Case No. 24-12337 (KBO)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**STIPULATION REGARDING**
**ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASE**
**OF NONRESIDENTIAL REAL PROPERTY WITH STNL II OPERATING CORP.**

True Value Company, L.L.C. and certain of its affiliates (collectively, the "Debtors"), Do it Best Corp. ("DIB") and its designee, TV Hardware Distribution, LLC (the "Assignee" and together with DIB, the "Buyer"), and STNL II Operating Corp. (the "Landlord" and together with the Debtors, the Buyer, the "Parties") through their undersigned counsel, hereby enter into this stipulation (this "Stipulation") as follows:

WHEREAS, on October 14, 2024 (the "Petition Date"), the Debtors filed voluntary bankruptcy petitions ("Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court");

WHEREAS, as of the Petition Date, the Debtors and STNL II Operating Corp. (the "Landlord") were (and as of the date of this Stipulation, remain) parties to that certain Amended and Restated Lease Agreement, dated February 28, 2018, as amended by that certain First Amendment to Amended and Restated Lease Agreement dated November 19, 2018, and that

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

certain Second Amendment to Amended and Restated Lease Agreement, dated April 22, 2019 (collectively, the "Lease"), which pertains to certain real property located at 308 South Division Street, Harvard, Illinois and as more particularly described in the Lease (the "Premises"). A true and correct copy of the Lease is attached to the Stipulation (defined below) as Exhibit A;

WHEREAS, on November 13, 2024, the Court entered the *Order (A) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing Debtors to Enter Into and Perform Under Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts, and (D) Granting Related Relief* [Docket No. 411] (the "Sale Order") approving the sale of substantially all of the Debtors' assets to the Buyer (collectively, the "Sale Transaction"), including those executory contracts and unexpired non-residential real property leases of the Debtors that the Buyer designated for assumption by the Debtors and assignment to the Buyer under Section 365 of the Bankruptcy Code;

WHEREAS, on December 11, 2024, the Court entered an order implementing procedures for the assumption and assignment of TSA Contracts (as defined in the Sale Order) [Docket No. 688] (the "TSA Contract Procedures Order") pursuant to which the Assignee was authorized to direct the Debtors to assume and assign TSA Contracts to the Assignee upon prior notice to the contract counterparties. TSA Contracts assumed and assigned to the Assignee in compliance with the TSA Contract Procedures Order are "Transferred Assets" for all purposes under the Sale Order and the APA, subject to performance of all outstanding non-monetary obligations and payment of any and all amounts necessary to cure defaults under such TSA Contract as required by Sections 365(b)(1)(a) and (b) of the Bankruptcy Code (the "Cure Amount");

WHEREAS, the Lease was listed by the Debtors among the executory contracts and unexpired leases that the Debtors might assume and assign to the Buyer (or the Assignee) in connection with the Sale Transaction in: (i) their *Notice of Proposed Assumption and Assignment of Certain Executory Contracts*, filed on November 6, 2024 [D.I. 339]; and (ii) their *Second Supplemental Notice of Proposed Assumption and Assignment of Certain Executory Contracts*, filed on January 24, 2025 [D.I. 822];

WHEREAS, the Landlord filed its *Objection of STNL II (Harvard), LLC to Notice of Proposed Assumption and Assignment of Certain Executory Contracts* on November 14, 2024 [D.I. 425] (the "Landlord Objection");

WHEREAS, the Sale Transaction closed as of November 22, 2024 (the "Closing");

WHEREAS, since the Closing, the Debtors have provided the Buyer access to the Premises under the Amended and Restated Transition Services Agreement Term Sheet attached as an exhibit to the Sale Order (the "TSA"), such that the Lease is a TSA Contract.

WHEREAS, the Buyer and the Landlord have entered into that certain Third Amendment to Amended and Restated Lease Agreement, dated March 27, 2025, a copy of which is attached hereto as Exhibit B (the "Lease Amendment"), that provides for, among other things, the assumption of the Lease by the Debtors and the assignment of the Lease to the Assignee pursuant to the Sale Order and the TSA Contract Procedures Order, subject to the Lease Amendment, upon entry of an Order of the Court approving the assumption and assignment of the Lease, as amended by the Lease Amendment and payment by the Buyer of the Cure Amounts set forth in the Lease Amendment (the "Cure Claim");

WHEREAS, there are no Cure Amounts owing in respect of the Lease other than the Cure Claim expressly set forth in and waived pursuant to the Lease Amendment; and

WHEREAS, through their undersigned counsel, the Parties have conferred and engaged in negotiations with respect to the Landlord Objection and have resolved, as provided for herein, the issues raised by such objection without the need for motion practice.

**NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING PREMISES, THE MUTUAL COVENANTS HEREIN CONTAINED, AND FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS ACKNOWLEDGED BY ALL PARTIES, THE PARTIES HERETO AGREE TO THE FOLLOWING TERMS, SUBJECT TO THE ENTRY OF AN ORDER BY THE COURT APPROVING THIS STIPULATION (THE "ORDER"):**

1.      The Recitals stated above constitute and form an integral part of this Stipulation and are incorporated by this reference as if set forth herein in full.

2.      Effective upon entry of the Order and satisfaction of Buyer's obligation to pay the Cure Claim, the Lease shall be deemed assumed by the Debtors pursuant to Section 365(a) of the Bankruptcy Code and assigned to the Assignee pursuant to Section 365(f) of the Bankruptcy Code, subject to the terms and conditions of the Lease Amendment, whereupon the Lease as amended by the Lease Amendment shall constitute an "Assigned Contract" and a "Transferred Asset" for all purposes under the Sale Order.

3.      This Stipulation is being entered into by the Parties pursuant to, and subject to the terms and conditions, of the APA.  Notwithstanding anything to the contrary herein, in no manner shall this assignment supersede, amend, modify, alter or waive any term of the APA as between the Buyer and Debtors, and all rights of the parties to the APA thereunder are expressly preserved. For the avoidance of doubt, nothing herein shall limit, affect, or prejudice the Debtors' rights or the Buyer's (or any of its affiliates') rights under the terms of the Sale Order or APA. Further,

notwithstanding anything to the contrary set forth in this Stipulation or the APA, the Assignee acknowledges that in connection with taking an assignment of the Lease (as amended by the Lease Amendment), the Assignee is assuming the Assumed Lease Liabilities (as defined in the Lease Amendment) and such assumption shall be unaffected by any provision of this Stipulation or the APA.

4.      This Stipulation fully resolves the Landlord Objection and such objection is deemed fully resolved upon entry of the Order.  Upon entry of the Order, the Parties are authorized and empowered to take all actions necessary to implement the relief requested in this Stipulation and the Order.

5.      Except as expressly provided for in this Stipulation (and all exhibits attached thereto), nothing contained herein shall be an admission or waiver of the substantive or procedural rights, remedies, claims, or defenses of the Parties in the Debtors' Chapter 11 Cases or at law or equity, and the Parties reserve all of their respective rights, claims, and defenses under the Bankruptcy Code and other applicable law.

6.      This Stipulation shall not become effective unless and until it is approved by the Court.

7.      This Stipulation shall be binding on and inure to the benefit of the Parties hereto and their respective successors and assigns.

8.      This Stipulation shall not be modified, altered, amended, or vacated without written consent of all Parties hereto. Any such modification, alteration, amendment, or vacation in whole or in part, shall be subject to the approval of the Court.

9.      Each of the undersigned counsel represents that she or he is authorized to execute this Stipulation on behalf of her or his respective client.

10.　　This Stipulation may be executed in multiple counterparts, any of which may be transmitted by facsimile or electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

11.　　Upon entry of the Order, the Parties and their undersigned counsel are authorized to take all actions necessary to effectuate the relief provided by this Stipulation without further order from the Court.

12.　　The terms and conditions of this Stipulation shall be immediately effective and enforceable upon entry of the Order.

13.　　The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation and the Order.

*[Remainder of Page Intentionally Left Blank]*

STIPULATED and AGREED to this 3rd day of April, 2025.

*/s/ David Weitman*

**K&L GATES LLP**

Matthew B. Goeller (No. 6283)
600 N. King St., Suite 901
Wilmington, Delaware 19801
Phone: (302) 416-7082
Email: matthew.goeller@klgates.com

-and-

David Weitman, Esq.
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, TX  75201
Phone: (214) 939-5500
Email:  david.weitman@klgates.com

*ATTORNEYS FOR LANDLORD, STNL II OPERATING CORP,*
*assignee of STNL II (HARVARD), LLC*

*/s/ Katherine L. Hemming*

**CAMPBELL & LEVINE, LLC**

Katherine L. Hemming (No. 5496)
222 Delaware Avenue, Suite 1620
Wilmington, DE 19801
Telephone:(302) 426-1900
khemming@camlev.com

Paul J. Cordaro, Esq. (PA No. 85828)
310 Grant Street, Suite 1700
Pittsburgh, PA 15219
Telephone: (302) 426-1900
pcordaro@camlev.com

-and-

**TAFT STETTINIUS & HOLLISTER LLP**
W. Timothy Miller, Esq. (OH No. 0059952)
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Telephone:(317) 713-3500
miller@taftlaw.com

*Counsel for Do it Best Corp. and TV Hardware Distribution, LLC*

*/s/ Carol E. Thompson*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Kristin L. McElroy (Del. Bar No. 6871)
Timothy R. Powell (Del. Bar No. 6894)
Carol E. Thompson (Del. Bar No. 6936)
One Rodney Square
1000 North King Street
Wilmington, Delaware 1801
Telephone: (302) 571-6600
emorton@ycst.com
kenos@ycst.com
kmcelroy@ycst.com
tpowell@ycst.com
cthompson@ycst.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
Michelle C. Perez (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
aglenn@glennagre.com
twelch@glennagre.com
mdoss@glennagre.com
mperez@glennagre.com

*Conflict and Efficiency Counsel to Debtors and
Debtors in Possession*

## EXHIBIT A

**Lease**

**AMENDED AND RESTATED LEASE AGREEMENT**

**by and between**

**Harvard Division, LLC,**
**a Delaware limited liability company**

**and**

**True Value Company,**
**a Delaware corporation**

## TABLE OF CONTENTS

| Title | | Page |
|---|---|---|

LEASE SUMMARY ................................................................................................................ i

| | | |
|---|---|---|
| 1. | PREMISES................................................................................................ | 3 |
| 2. | TERM....................................................................................................... | 6 |
| 3. | RENT........................................................................................................ | 6 |
| 4. | SECURITY DEPOSIT ............................................................................... | 17 |
| 5. | ADDITIONAL RENT ............................................................................... | 17 |
| 6. | PARKING ................................................................................................ | 30 |
| 7. | PERMITTED USES .................................................................................. | 31 |
| 8. | ENVIRONMENTAL COMPLIANCE/HAZARDOUS MATERIALS......... | 33 |
| 9. | UTILITIES............................................................................................... | 48 |
| 10. | REPAIRS BY LANDLORD ....................................................................... | 50 |
| 11. | REPAIRS BY TENANT ............................................................................ | 51 |
| 12. | TENANT'S TAXES AND ASSESSMENTS.................................................. | 54 |
| 13. | ALTERATION OF PREMISES .................................................................. | 55 |
| 14. | INSURANCE ............................................................................................ | 55 |
| 15. | WAIVER, EXCULPATION AND INDEMNITY .......................................... | 67 |
| 16. | CONSTRUCTION LIENS ......................................................................... | 72 |
| 17. | QUIET ENJOYMENT .............................................................................. | 75 |
| 18. | LANDLORD'S RIGHT OF ENTRY ........................................................... | 75 |
| 19. | DESTRUCTION OF BUILDINGS............................................................. | 77 |
| 20. | EMINENT DOMAIN ................................................................................ | 80 |
| 21. | BANKRUPTCY ........................................................................................ | 83 |
| 22. | DEFAULT................................................................................................. | 84 |
| 23. | SURRENDER OF PREMISES ................................................................... | 88 |
| 24. | HOLDING OVER ..................................................................................... | 89 |
| 25. | SURRENDER OF LEASE ......................................................................... | 90 |
| 26. | INTENTIONALLY DELETED .................................................................. | 90 |
| 27. | RULES AND REGULATIONS .................................................................. | 91 |
| 28. | NOTICE ................................................................................................... | 92 |
| 29. | ASSIGNMENT AND SUBLETTING ......................................................... | 97 |
| 30. | ATTORNEY'S FEES................................................................................. | 99 |
| 31. | JUDGMENT COSTS ................................................................................ | 100 |
| 32. | BROKERS ............................................................................................... | 101 |
| 33. | SUBORDINATION OF LEASE.................................................................. | 102 |
| 34. | INTENTIONALLY DELETED .................................................................. | 105 |
| 35. | ESTOPPEL CERTIFICATES AND FINANCIAL STATEMENTS .............. | 105 |
| 36. | SHORT FORM OF LEASE ....................................................................... | 107 |
| 37. | SIGNS ..................................................................................................... | 107 |
| 38. | INTENTIONALLY DELETED .................................................................. | 109 |
| 39. | FORCE MAJEURE ................................................................................... | 109 |
| 40. | GENERAL PROVISIONS ......................................................................... | 110 |

Exhibits

| | |
|---|---|
| Exhibit "A" | Premises |
| Exhibit "B" | Tenant Improvements |

## LEASE SUMMARY

Set forth below is a summary of certain terms and conditions of the Amended and Restated Lease Agreement between Harvard Division, LLC, a Delaware limited liability company, as Landlord, and True Value Company, a Delaware corporation, as Tenant, solely for the convenience of the parties. In the event there is a conflict between this Lease Summary and the terms and conditions of the Lease Agreement, the terms and conditions of the Lease Agreement shall prevail.

A.    **Building(s)** mean one or more of those certain buildings containing approximately 1,331,727 total rentable square feet and having the street address of 308 South Division Street, Harvard, IL  60033.  See Paragraph 1.

B.    **Premises** means approximately 1,331,727 rentable square feet of the Buildings, as outlined on the site plan attached as **Exhibit "A"**.  See Paragraph 1.

C.    **Term** means eleven (11) years from the Commencement Date, unless extended or terminated earlier by law or any provision of the Lease.  See Paragraph 2.1.

D.    **Commencement Date** means March 1, 2018.  See Paragraph 2.2.

E.    **Security Deposit**.  Tenant shall pay no security deposit to Landlord for Tenant's obligations under this Lease. See Paragraph 4.

F.    **Base Rent** initially means $201,099.42 per month for the Premises beginning on the Commencement Date.  All rent is due on the first day of each month and shall be paid to Landlord at One West Avenue, Larchmont, New York 10538.  See Paragraph 3.

G.    **Additional Rent** means Tenant's Share of the Project Expenses, payable monthly in advance together with Base Rent.  See Paragraph 5.1.A.

H.    **Project Expenses** means the sum of Taxes and Common Expenses, related to the Property.  See Paragraph 5.1.E.

I.    **Tenant's Share** for the Premises initially means 89.71% computed by dividing the Rentable Area of the Premises (i.e., initially 1,194,650 rentable square feet) by the Rentable Area of the Buildings.  Tenant's Share shall increase to 100% on March 1, 2019.  See Paragraph 5.1.J.

J.    **Permitted Use** means warehouse storage purposes and uses customarily associated therewith.  See Paragraph 7.

K.    **Utilities**.  Tenant shall pay the cost of its Utilities.  See Paragraph 9.

L.    **Taxpayer Identification Number** for Tenant is 36-2099896.

i

## AMENDED AND RESTATED LEASE AGREEMENT

THIS AMENDED AND RESTATED LEASE AGREEMENT ("**Lease**"), dated as of February 28, 2018, is made by and between Harvard Division, LLC, a Delaware limited liability company ("**Landlord**"), and True Value Company, a Delaware corporation ("**Tenant**").

### RECITALS:

**A.**     Landlord and Tenant are parties to that certain Lease dated as of November 24, 1998 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Original Lease**"), commencing on August 23, 1998 ("**Occupancy Date**").

**B.**     As of the Commencement Date, Landlord and Tenant wish to replace the Original Lease in its entirety with this Lease upon the terms and conditions as more fully set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, herby agree as follows:

### 1.     PREMISES

**1.1.     Property**.  Landlord owns that certain real property improved with one or more multi-tenant buildings ("**Buildings**") located at 308 South Division Street, Harvard, IL  60033 ("**Land**").  The Buildings and the Land are collectively referred to as the "**Property**".

**1.2.     Premises**.  Landlord, for and in consideration of the rents, covenants, agreements, and stipulations contained herein, to be paid, kept and performed by Tenant, leases and rents to Tenant, and Tenant hereby leases and takes from Landlord upon the terms and conditions contained herein, approximately 1,331,727 square feet of office/warehouse/industrial space located within the Property, as outlined in the site plan attached as **Exhibit "A"** ("**Premises**").

**1.3.     Common Areas**.  In addition to the Premises, Tenant shall have the use of those certain common areas to be designated by Landlord from time to time on the Property; such areas shall include, but not be limited to, parking areas, access roads and facilities, interior corridors, sidewalks, driveways and landscaped and open areas (collectively, "**Common Areas**").  The use of the Common Areas shall be for the non exclusive use of Tenant and Tenant's employees, agents, suppliers, customers and patrons, in common with Landlord and all other tenants of the Property and all such other persons to whom Landlord has previously granted, or may hereinafter grant, rights of usage; provided that such nonexclusive use shall be expressly subject to such reasonable rules and regulations which may be adopted by Landlord from time to time.  Tenant shall not be entitled to use the common areas for storage of goods, vehicles, refuse or any other items.  Landlord reserves the right to alter, modify, enlarge, diminish, reduce or eliminate the Common Areas from time to time in its sole discretion; provided, however, it does not unreasonably and materially interfere with Tenant's use and occupancy of the Premises.  Landlord shall have the right to modify common areas, and if necessary, parts of the Premises, in order to implement new, necessary security measures and Landlord shall endeavor to minimize any adverse effect on Tenant's use of the Premises.  If Tenant shall use any of the Common Areas for storage of any items, Tenant shall pay all fines imposed upon either Landlord or Tenant by any fire, building or other regulatory body, and Tenant shall pay all costs incurred by Landlord to clear and clean the Common Areas and dispose of such items, including but not limited to, a disposal fee of twenty-five dollars ($25.00) for each pallet or other container and fifty dollars ($50.00) for each drum, together with any additional costs for testing and special disposal, if required.

### 2.     TERM

**2.1.     Term**.  The term of the Lease shall be for eleven (11) years beginning on the Commencement Date ("**Term**"), unless extended or sooner terminated pursuant to the terms of this Lease.   The term "**Lease Year**" as used herein shall mean any 365-consecutive-day period beginning on the Commencement Date, or any anniversary thereafter.

1

**2.2.**    **Commencement Date**.  The term "**Commencement Date**" as used herein shall mean March 1, 2018.

**3.**    **RENT**

**3.1.**    **Rent**.  Rent shall be due and payable in lawful money of the United States in advance on the first day of each month after the Commencement Date.  Tenant shall pay to Landlord as base rent ("**Base Rent**") for the Premises, without notice or demand and without abatement, deduction, offset or set off, the following sums:

A.    $201,099.42 per month (based upon $2.02 per square foot per year for 1,194,650 square feet only) beginning on the Commencement Date and continuing through February 28, 2019;

B.    $228,657.53 per month (based upon approximately $2.06 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2019 and continuing through February 29, 2020;

C.    $233,230.68 per month (based upon approximately $2.10 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2020 and continuing through February 28, 2021;

D.    $237,895.29 per month (based upon approximately $2.14 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2021 and continuing through February 28, 2022;

E.    $242,653.20 per month (based upon approximately $2.19 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2022 and continuing through February 28, 2023;

F.    $247,506.26 per month (based upon approximately $2.23 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2023 and continuing through February 29, 2024;

G.    $252,456.38 per month (based upon approximately $2.27 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2024 and continuing through February 28, 2025;

H.    $257,505.51 per month (based upon approximately $2.32 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2025 and continuing through February 28, 2026;

I.    $262,655.62 per month (based upon approximately $2.37 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2026 and continuing through February 28, 2027;

J.    $267,908.74 per month (based upon approximately $2.41 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2027 and continuing through February 29, 2028; and

K.    $273,266.91 per month (based upon approximately $2.46 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2028 and continuing through February 28, 2029.

Rent for any period during the Term hereof which is for less than one (1) full calendar month shall be prorated based upon the actual number of days of the calendar month involved.  Tenant shall pay the first full month's Base Rent and any other charges upon execution of this Lease.

**3.2.**    **Reduced Rent Due To Abatement.**  Notwithstanding Paragraph 3.1 above, in the event Landlord has not elected to terminate the Lease due to a default of the Lease by Tenant which remains uncured after all applicable notice and cure periods, Tenant's obligation to pay Base Rent shall be partially abated and forgiven to the following amounts ("**Rent Abatement**"):

A.    $201,099.42 per month (based upon $2.02 per square foot per year for 1,194,650 square feet only) beginning on the Commencement Date and continuing through February 28, 2019;

2

B.    $205,121.41 per month (based upon approximately $2.06 per square foot per year for 1,194,650 square feet) beginning on the March 1, 2019 and continuing through February 29, 2020, provided, however, that Landlord shall apply a one-time $125,000.00 credit towards Base Rent for the month of October 2019 ("**October 2019 Base Rent Credit**");

C.    $209,223.83 per month (based upon approximately $2.10 per square foot per year for 1,194,650 square feet) beginning on the March 1, 2020 and continuing through February 28, 2021;

D.    $213,408.31 per month (based upon approximately $2.14 per square foot per year for 1,194,650  square feet) beginning on the March 1, 2021 and continuing through February 28, 2022;

E.    $217,676.48 per month (based upon approximately $2.19 per square foot per year for 1,194,650 square feet) beginning on the March 1, 2022 and continuing through February 28, 2023;

F.    $222,030.01 per month (based upon approximately $2.23 per square foot per year for 1,194,650 square feet) beginning on the March 1, 2023 and continuing through February 29, 2024;

G.    $252,456.38 per month (based upon approximately $2.27 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2024 and continuing through February 28, 2025;

H.    $257,505.51 per month (based upon approximately $2.32 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2025 and continuing through February 28, 2026;

I.    $262,655.62 per month (based upon approximately $2.37 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2026 and continuing through February 28, 2027;

J.    $267,908.74 per month (based upon approximately $2.41 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2027 and continuing through February 29, 2028; and

K.    $273,266.91 per month (based upon approximately $2.46 per square foot per year for 1,331,727 square feet) beginning on the March 1, 2028 and continuing through February 28, 2029.

Notwithstanding the foregoing, in the event Landlord elects to terminate the Lease due to a default of the Lease by Tenant which remains uncured after all applicable notice and cure periods, then such Base Rent shall not be deemed to have been partially forgiven or abated and Tenant shall be liable for the Base Rent that would have otherwise been partially abated and forgiven if Tenant had not defaulted, and such Base Rent (as set forth in Paragraph 3.1) shall become immediately due and payable as unpaid rent which shall be deemed earned at the date of Lease termination**.**

3.3.    **Place of Payment**.  All payments under this Lease to be made by Tenant to Landlord shall be made payable to, and mailed or personally delivered to Landlord at the following address or such other address(es) which Landlord may notify Tenant from time to time: c/o IRG Realty Advisors, LLC, One West Avenue, Larchmont, New York 10538.

3.4.    **Late Payment**.  Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent (as defined in Paragraph 5.1.F. herein) pursuant to this Lease will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Accordingly, if any installment of Rent or other payment under this Lease is not received by Landlord, on or before the fifth (5th) day of the month in which such Rent or other payment is due, Tenant shall pay a late charge equal to two and one half percent (2.5%) of such overdue amounts. Tenant shall also be responsible for a service fee equal to fifty dollars ($50.00) for any check returned for insufficient funds together with such other costs and expenses as may be imposed by Landlord's bank.  The payment to and acceptance by Landlord of such late charge shall in no event constitute a waiver by Landlord of Tenant's default with respect to such overdue amounts, nor prevent Landlord from exercising any of the other rights and remedies granted at law or equity or pursuant to this Lease.

**3.5.     Payment on Account**.  No payment by Tenant or receipt by Landlord of a lesser amount than the Rent actually due hereunder shall be deemed to be other than a payment on account.  No restrictive endorsement or statement on any check or any letter accompanying any check or payment shall be deemed to effect an accord and satisfaction or have any effect whatsoever.  Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law or in equity provided.

**4.     SECURITY DEPOSIT**

Tenant shall pay no security deposit to Landlord for Tenant's obligations under this Lease ("**Security Deposit**").

**5.     ADDITIONAL RENT**

**5.1.     Definitions**.

A.     "**Additional Rent**" shall mean Tenant's Share of the Project Expenses.

B.     "**Common Expenses**" shall mean the aggregate amount of the total costs and expenses paid or incurred by Landlord in any way connected with or related to (i) the operation, repair and maintenance of the Common Areas, the Buildings and the Property, including, without limitation, electricity, gas, water, sewer and other utilities, trash removal, security, snow plowing, sanding, salting and shoveling snow, landscaping, mowing and weed removal, sweeping and janitorial services, on-site manager and employees and related expenses, office expenses, electrical, plumbing, sprinkler and HVAC repair and maintenance, alarm and sprinkler system testing, maintenance and repair (including Landlord Repairs), paving, repair, resurfacing, and restriping of all parking areas, loading and unloading areas, trash areas, roadways, driveways, walkways, common signage, painting of the Buildings and Property, fence and gate repair and maintenance, repair and replacement of all lighting facilities, and any and all other repairs and maintenance, (ii) the furnishing of or contracting for any service generally provided to the tenants of the Property by Landlord, including, without limitation, professional fees, and (iii) an administrative accounting and billing fee of two thousand five hundred dollars ($2,500.00) per month. Common Expenses shall also include the amortized portion of any (x) full or partial roof replacements ("**Roof Replacements**") except those set forth in **Exhibit B** for the Nissan Bldg. roof replacement (Area E), Ryder garage roof replacement (Area Q), and Remaining roof replacement (Areas C,D,F,R) and (y) Capitalized Excess Underground Plumbing. For purposes hereof, "**Capitalized Excess Underground Plumbing**" shall mean any capital improvements or replacements portion of the Excess Underground Plumbing Repairs (as defined in <u>Paragraph 10</u>). The costs of any Roof Replacements and Capitalized Excess Underground Plumbing shall be amortized over the Useful Life of such Roof Replacements and Capitalized Excess Underground Plumbing, respectively, and only the amortized amount of such Roof Replacements and Capitalized Excess Underground Plumbing attributable to any particular Computation Year, at an interest rate of eight percent (8%), shall be includable as part of the Common Expenses for such Computation Year.  Landlord may make any appropriate adjustment in occupancy-related Common Expenses for such year by determining, on a commercially reasonably basis, the Common Expenses that would have been paid or incurred by Landlord had the Buildings been fully rented and occupied, and the amount so determined shall be deemed to have been Common Expenses for such year.

C.     "**Computation Year**" shall mean each twelve (12) consecutive month period commencing January 1 of each year during the Term, provided that Landlord, upon notice to Tenant, may change the Computation Year from time to time to any other twelve (12) consecutive month period and, in the event of any such change, Tenant's Share of Project Expenses shall be equitably adjusted for the Computation Years involved in any such change.

D.     **Intentionally Deleted**.

E.     "**Project Expenses**" shall mean and include Taxes and Common Expenses.

4

F.    "**Rent**" or "**rent**" shall mean the total of all sums due to Landlord from Tenant hereunder, including but not limited to Base Rent, Additional Rent, Utilities, and all other fees and charges owed to Landlord as well as all damages, costs, expenses, and sums that Landlord may suffer or incur, or that may become due, by reason of any default of Tenant or failure by Tenant to comply with the terms and conditions of this Lease.

G.    "**Rentable Area of the Buildings**" shall mean 1,331,727 agreed square feet.

H.    "**Rentable Area of the Premises**" shall initially mean 1,194,650 agreed square feet and shall increase to 1,331,727 agreed square feet on March 1, 2019.

I.    "**Taxes**" shall mean all taxes, assessments and charges levied upon or with respect to the Property or any personal property of Landlord used in the operation thereof, or Landlord's interest in the Property or such personal property. Taxes shall include, without limitation, all general real property taxes and general and special assessments, occupancy taxes, commercial rental taxes, charges, fees or assessments for transit, housing, police, fire or other governmental services or purported benefits to the Property, service payments in lieu of taxes, and any tax, fee or excise on the act of entering into any lease for space in the Property, or on the use or occupancy of the Property or any part thereof, or on the rent payable under any lease or in connection with the business of renting space in the Property that are now or hereafter levied or assessed against Landlord by the United States of America, the state in which the Property is located, or any political subdivision, public corporation, district or other political or public entity, whether due to increased rate and/or valuation, additional improvements, change of ownership, or any other events or circumstances, and shall also include any other tax, fee or other excise, however described, that may be levied or assessed as a substitute for or as an addition to, as a whole or in part, any other Taxes whether or not now customary or in the contemplation of the parties on the date of this Lease. Taxes shall not include franchise, transfer, inheritance or capital stock taxes or income taxes measured by the net income of Landlord from all sources unless, due to a change in the method of taxation, any of such taxes is levied or assessed against Landlord as a substitute for or as an addition to, as a whole or in part, any other tax that would otherwise constitute a Tax. If any Taxes are specially assessed by reason of the occupancy or activities of one or more tenants and not the occupancy or activities of the tenants as a whole, such Taxes shall be allocated by Landlord to the tenant or tenants whose occupancy or activities brought about such assessment. Taxes shall also include reasonable legal fees, costs and disbursements incurred in connection with proceedings to contest, determine or reduce Taxes. Either Landlord or Tenant shall have the right to contest the Taxes with respect to the Property, or seek a reduction in the assessed valuation of the same, in Tenant's name or Landlord's name, as applicable, and the non-contesting party shall reasonably cooperate with the contesting party with respect to the same, including execution of any documents or pleadings reasonably required for such purposes, and reasonably acceptable to the executing party, provided that such cooperation and execution shall be at no cost or liability to the non-contesting party. Such contest may include appeals from any judgment, decrees or order until a final determination is made by a court or governmental department or authority having final jurisdiction over the matter. Any refund or reduction received as a result of such contest shall be applied first against the reasonable costs and fees incurred in obtaining such refund or reduction, and the remainder applied to Taxes.

J.    "**Tenant's Share**" shall initially mean 89.71% computed by dividing initially Rentable Area of the Premises by the Rentable Area of the Buildings. Tenant's Share shall increase to 100% on March 1, 2019. In the event that either the Rentable Area of the Premises or the Rentable Area of the Buildings is changed, Tenant's Share will be appropriately adjusted by Landlord. For purposes of the Computation Year in which such change occurs, Tenant's Share shall be determined on the basis of the number of days during such Computation Year at each such percentage.

K.    "**Useful Life**" shall mean the estimated useful life of any capital improvement or replacement repair, as determined in accordance with generally acceptable accounting principles or tax accounting principles consistently applied, in Landlord's sole discretion.

**5.2.**     **Payments**.  In addition to Base Rent, and beginning on the Commencement Date, Tenant shall pay to Landlord, monthly, in advance, one-twelfth (1/12) of the Additional Rent due for each Computation Year, in an amount estimated by Landlord and billed by Landlord to Tenant ("**Estimated Expenses**").  Landlord shall have the right to reasonably revise such estimates from time to time and to adjust Tenant's monthly payments accordingly.  If either the Commencement Date or the expiration of the Term shall occur on a date other than the first or last day of a Computation Year respectively, the Additional Rent for such Computation Year shall be in the proportion that the number of days the Lease was in effect during such Computation Year bears to 365.  With reasonable promptness after the expiration of each Computation Year, Landlord shall furnish Tenant with a statement of the actual expenses ("**Actual Expenses**"), setting forth in reasonable detail the Project Expenses for such Computation Year, and Tenant's Share of such Project Expenses.  If the actual Project Expenses for such Computation Year exceed the estimated Project Expenses paid by Tenant for such Computation Year, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual Project Expenses within thirty (30) days after the receipt of Landlord's Expense Statement.  If the total amount paid by Tenant for any such Computation Year shall exceed the actual Project Expenses for such Computation Year, such excess shall be credited against the next installments of Additional Rent due from Tenant to Landlord hereunder.  Neither Landlord's failure to deliver, nor late delivery of, the Estimated or Actual Expenses shall constitute a default by Landlord hereunder or a waiver of Landlord's right to collect any payment provided for herein.

**5.3.**     **Intentionally Deleted**.

**5.4.**     **Disputes**.  If there is any dispute as to any Additional Rent due under this Paragraph 5 for any particular Computation Year, Tenant shall have the right during the six (6) month period following Tenants receipt of the Actual Expenses for such disputed Computation Year ("**Audit Period**"), upon reasonable notice and at reasonable times, to inspect Landlord's accounting records at Landlord's accounting office.  Tenant's failure to provide Landlord with notice of any dispute as to Additional Rent during the Audit Period, shall constitute a waiver by Tenant to dispute or audit the Additional Rent, or any component thereof, for such Computation Year.  If after such inspection Tenant still disputes such Additional Rent, upon Tenant's written request therefore, a certification as to the proper amount of Project Expenses and the amount due to or payable by Tenant shall be made by an independent accounting firm selected by Landlord and Tenant.  If Landlord and Tenant are unable to agree upon an accounting firm, Landlord and Tenant shall each select an accounting firm and the two (2) firms so selected shall select a third firm which shall make the certification requested hereunder.  Such certification shall be final and conclusive as to all parties.  Notwithstanding the foregoing, in no event shall Tenant be entitled to withhold payment of Additional Rent during the certification process and Tenant shall remain obligated to pay all Additional Rent due as otherwise set forth in this Lease.  In the event Tenant shall prevail in the certification process, Landlord, at its election, shall either promptly refund any excess Additional Rent payments to Tenant or shall apply such excess as a credit against future Additional Rent due from Tenant.  Should the parties obtain a certification, or otherwise agree to compromise the amount in dispute, they shall each pay their proportionate amount of the cost of obtaining the certification in the same percentage as the final certification or compromise amount relates to each parties initial assertion.  For example, if Landlord claims Tenant owes $20.00 and Tenant asserts that only $10.00 is due, and the parties ultimately agree on $15.00, each party shall be responsible for paying 50% of the costs of obtaining the certification, if the parties ultimately agree on $18.00, Landlord shall be responsible for 20% and Tenant shall be responsible for 80% of the costs of obtaining the certification.]  Tenant shall notify Landlord of any disputes with respect to Additional Rent within ninety (90) days from Tenant's receipt of such Actual Expenses as set forth herein; thereafter any Actual Expenses which have not been timely disputed shall be deemed approved by Tenant.

**6.**     **PARKING**

So long as Tenant complies with the terms, provisions and conditions of this Lease, Landlord shall maintain and operate, or cause to be maintained and operated automobile parking facilities ("**Parking Facilities**") adjacent to or within a reasonable distance from the Buildings.  Landlord shall have the right to temporarily relocate such Parking Facilities to another location in Landlord's reasonable discretion to facilitate development of the Property.  All vehicles located on or about the Premises shall be licensed and insured at all times and shall be in operable condition. NOTWITHSTANDING ANYTHING CONTAINED IN THIS LEASE TO THE CONTRARY, TENANT ACKNOWLEDGES AND AGREES THAT IT SHALL USE ANY PARKING FACILITIES AT ITS SOLE RISK AND THAT LANDLORD SHALL HAVE NO RESPONSIBILITY TO PREVENT, AND SHALL NOT BE LIABLE TO TENANT OR ANY TENANT

6

REPRESENTATIVES FOR, DAMAGES OR INJURIES TO PERSONS OR PROPERTY PARKED OR OTHERWISE LOCATED ON OR ABOUT THE PREMISES.

**7.    PERMITTED USES**

Tenant shall use and occupy the Premises throughout the term of the Lease for light manufacturing and warehousing and uses customarily associated therewith and for no other purpose; in particular no use shall be made or permitted to be made of the Premises, nor acts done which will increase the existing rate of insurance upon the Buildings, or cause a cancellation of any insurance policy covering the Buildings, or any part thereof, nor shall Tenant sell, or permit to be kept, used, or sold, in or about the Premises, any article which may be prohibited by the standard form of fire insurance policies. Tenant shall comply with all laws, ordinances, rules, regulations and codes of all municipal, county, state and federal authorities pertaining to Tenant's use and occupation of the Premises. Tenant shall not commit, or suffer to be committed, any waste upon the Premises or any public or private nuisance, or other act or thing which disturbs the quiet enjoyment of any other tenant in the Buildings. Tenant shall also specifically not permit the storage of tires, flammable products, batteries, fertilizer, charcoal or any other similar items that cause objectionable odors to escape or be emitted from the Premises. Tenant shall use commercially reasonable efforts to insure sanitation and freedom from odor, smell and infestation from rodents or insects. Tenant, at its expense, shall provide (and enclose if required by codes or Landlord) a dumpster or dumpsters for Tenant's trash in a location and manner approved by Landlord, and shall use commercially reasonable efforts to cause its trash to be removed at intervals reasonably satisfactory to Landlord. In connection therewith, Tenant shall use commercially reasonable efforts to keep the dumpster(s) clean and insect, rodent and odor free.

**8.    ENVIRONMENTAL COMPLIANCE/HAZARDOUS MATERIALS**

**8.1.    Definitions**. **"Hazardous Materials"** shall mean any (i) material, substance or waste that is or has the characteristic of being hazardous, toxic, ignitable, reactive, flammable, explosive, radioactive, mutagenic or corrosive, including, without limitation, petroleum, or any petroleum derivative, solvents, heavy metals, acids, pesticides, paints, printing ink, PCBs, asbestos, materials commonly known to cause cancer or reproductive problems and those materials, substances and/or wastes, including wastes which are or later become regulated by any local governmental authority, the state in which the Premises are located or the United States Government, including, but not limited to, substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "hazardous wastes" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §1801, et seq.; the Resource Conservation and Recovery Act; all environmental laws of the state where the Property is located, and any other environmental law, regulation or ordinance now existing or hereinafter enacted, (ii) any other substance or matter which results in liability to any person or entity from exposure to such substance or matter under any statutory or common law theory, and (iii) any substance or matter which is in excess of relevant and appropriate levels set forth in any applicable federal, state or local law or regulation pertaining to any hazardous or toxic substance, material or waste, or for which any applicable federal, state or local agency orders or otherwise requires removal, remediation or treatment. **"Hazardous Materials Laws"** shall mean all present and future federal, state and local laws, ordinances and regulations, prudent industry practices, requirements of governmental entities and manufacturer's instructions relating to industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, presence, disposal or transportation of any Hazardous Materials, including without limitation the laws, regulations and ordinances referred to in the preceding sentence.

**8.2.    Use of Premises by Tenant**. Tenant hereby agrees that Tenant and Tenant's officers, employees, representatives, agents, consultants, contractors, subcontractors, successors, assigns, subtenants, concessionaires, invitees and any other occupants of the Premises (collectively, **"Tenant Representatives"**) shall not cause or permit any Hazardous Materials to be used, generated, manufactured, refined, produced, processed, stored or disposed of, on, under or about the Premises or the Property or transport to or from the Premises or the Property without the express prior written consent of Landlord. Landlord may, in its sole discretion, place such conditions as Landlord deems appropriate with respect to such Hazardous Materials, including without limitation, rules, regulations and safeguards as may be required by any insurance carrier, environmental consultant or lender of Landlord, or environmental consultant retained by any lender of Landlord, and may further require that Tenant demonstrates to Landlord that such Hazardous Materials are necessary or useful to Tenant's business and will be generated, stored, used and disposed of in a manner that complies

7

with all Hazardous Materials Laws regulating such Hazardous Materials and with good business practices. Tenant understands that Landlord may utilize an environmental consultant to assist in determining conditions of approval and monitoring in connection with the presence, storage, generation or use of Hazardous Materials on or about the Premises by Tenant, and Tenant agrees that any costs reasonably incurred by Landlord in connection with any such environmental consultant's services shall be reimbursed by Tenant to Landlord as Additional Rent upon demand. Unless approved in writing by Landlord, Tenant shall not be entitled to utilize any Hazardous Materials in the Premises. In connection therewith, Tenant shall at its own expense procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for the storage or use by Tenant or any of Tenant's Representatives of Hazardous Materials on the Premises or the Property, including without limitation, discharge of (appropriately treated) materials or wastes into or through any sanitary sewer serving the Premises or the Property with all required permits. Notwithstanding the foregoing Tenant shall be entitled to use and store in the Premises Hazardous Materials used or stored by Tenant in its ordinary operations, so long as the same are stored in appropriate containers, and in appropriate areas, in compliance with all Hazardous Materials Laws.

**8.3.    Remediation**. If at any time after the Occupancy Date any contamination of the Premises or the Property by Hazardous Materials shall occur where such contamination is caused by the act or omission of Tenant or Tenant's Representatives ("**Tenant's Contamination**"), then Tenant, at Tenant's sole cost and expense, shall promptly and diligently remove such Hazardous Materials from the Premises, the Property or the groundwater underlying the Premises or the Property to the extent required to comply with applicable Hazardous Materials Laws to restore the Premises or the Property to the same or better condition which existed before Tenant's Contamination. Tenant shall not take any required remedial action in response to any Tenant's Contamination in or about the Premises or the Property, or enter into any settlement agreement, consent, decree or other compromise in respect to any claims relating to any Tenant's Contamination without first obtaining the prior written consent of Landlord, which may be subject to conditions imposed by Landlord as determined in Landlord's sole discretion, provided, however, Landlord's prior written consent shall not be necessary in the event that the presence of Hazardous Materials on, under or about the Premises or the Property (i) poses an immediate threat to the health, safety or welfare of any individual or (ii) is of such a nature that an immediate remedial response is necessary and it is not possible to obtain Landlord's consent before taking such action. Tenant and Landlord shall jointly prepare a remediation plan in compliance with all Hazardous Materials Laws and the provisions of this Lease. In addition to all other rights and remedies of Landlord hereunder, if Tenant does not promptly and diligently take all steps to prepare and obtain all necessary approvals of a remediation plan for any Tenant's Contamination, and thereafter commence the required remediation of any Hazardous Materials released or discharged in connection with Tenant's Contamination within thirty (30) days after all necessary approvals and consents have been obtained and thereafter continue to prosecute such remediation to completion in accordance with an approved remediation plan, then Landlord, at its sole discretion, shall have the right, but not the obligation, to cause such remediation to be accomplished, and Tenant shall reimburse Landlord within fifteen (15) business days of Landlord's demand for reimbursement of all amounts reasonably paid by Landlord (together with interest on such amounts at the highest lawful rate until paid), when such demand is accompanied by reasonable proof of payment by Landlord of the amounts demanded. Tenant shall promptly deliver to Landlord, legible copies of hazardous waste manifests reflecting the legal and proper disposal of all Hazardous Materials removed from the Premises or the Property as part of Tenant's remediation of any Tenant's Contamination.

**8.4.    Disposition of Hazardous Materials**. Except as discharged into the sanitary sewer in strict accordance and conformity with Paragraph 8.2 herein and all applicable Hazardous Materials Laws, Tenant shall cause any and all Hazardous Materials removed from the Premises and the Property (including without limitation all Hazardous Materials removed from the Premises as part of the required remediation of Tenant's Contamination) to be removed and transported solely by duly licensed haulers to duly licensed facilities for recycling or final disposal of such materials and wastes. Tenant is and shall be deemed to be the "operator" "in charge" of Tenant's "facility" and the "owner," as such terms are used in the Hazardous Materials Laws, of all Hazardous Materials and any wastes generated or resulting therefrom. Tenant shall be designated as the "generator," as such terms are used in the Hazardous Materials Laws, on all manifests relating to such Hazardous Materials or wastes.

**8.5.    Notice of Hazardous Materials Matters**. Tenant shall immediately notify Landlord in writing of: (i) any enforcement, clean up, removal or other governmental or regulatory action instituted, contemplated or threatened concerning the Premises pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant or the Premises relating to damage contribution, cost recovery, compensation, loss or injury resulting from

8

or claimed to result from any Hazardous Materials on or about the Premises; (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials in or removed from the Premises including any complaints, notices, warnings or asserted violations in connection therewith, all upon receipt by Tenant of actual knowledge of any of the foregoing matters; and (iv) any spill, release, discharge or disposal of any Hazardous Materials in, on or under the Premises, the Property, or any portion thereof.  Tenant shall also supply to Landlord as promptly as possible, and in any event within five (5) business days after Tenant first receives or sends the same, with copies of all claims, reports, complaints, notices, warnings or asserted violations relating in any way to the Premises or Tenant's use thereof.

      8.6.    **Indemnification by Tenant**.  Tenant shall indemnify, defend (by counsel reasonably acceptable to Landlord), protect, and hold Landlord, and each of Landlord's employees, representatives, agents, attorneys, successors and assigns, and its directors, officers, partners, representatives, any lender having a lien on or covering the Premises or any part thereof, and any entity or person named or required to be named as an additional insured in Paragraph 14.2 of this Lease free and harmless from and against any and all claims, actions (including, without limitation, the cost of investigation and testing, consultant's and attorney's fees, remedial and enforcement actions of any kind, administrative (informal or otherwise) or judicial proceedings and orders or judgments arising therefrom), causes of action, liabilities, penalties, forfeitures, damages (including, but not limited to, damages for the loss or restriction or use of rentable space or any amenity of the Premises or the Property, or damages arising from any adverse impact on marketing of space in the Premises or the Property), diminution in the value of the Premises or the Property, fines, injunctive relief, losses or expenses (including, without limitation, reasonable attorneys' fees and costs) or death of or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly by (i) any Tenant's Contamination, (ii) Tenant's or Tenant's Representatives' failure to comply with any Hazardous Materials Laws with respect to the Premises, or (iii) offsite disposal or transportation of Hazardous Materials on, from, under or about the Premises or the Property by Tenant or Tenant's Representatives.  Tenant's obligations hereunder shall include without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, clean up or detoxification or decontamination of the Premises, and the preparation and implementation of any closure, remedial action or other required plans in connection therewith.  For purposes of the indemnity provisions hereof, any acts or omissions of Tenant, or by employees, agents, assignees, contractors or subcontractors of Tenant or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful), shall be strictly attributable to Tenant.

      8.7.    **Indemnification by Landlord**.  Landlord shall indemnify, defend (by counsel reasonably acceptable to Tenant), protect, and hold Tenant, and each of Tenant's employees, representatives, agents, attorneys, successors and assigns, free and harmless from and against any and all claims, actions, causes of action (including, without limitation, remedial and enforcement actions of any kind, administrative or judicial proceedings, and orders or judgments arising therefrom), liabilities, penalties, forfeitures, losses or expenses (including, without limitation, reasonable attorneys' fees and costs) or death of or injury to any person or damage to any property whatsoever, to the extent arising from or caused in whole or in part, directly or indirectly by any contamination caused by Landlord in violation of a Hazardous Material Law.  Landlord's obligations hereunder shall include without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, clean up or detoxification or decontamination of the Premises, and the preparation and implementation of any closure, remedial action or other required plans in connection therewith.  This indemnity shall be specifically limited to affirmative acts of Landlord, and shall not include the acts or omissions of any other tenants of the Property or other persons.

      8.8.    **Tenant Certifications**.  Within ninety (90) days prior to the expiration of the Term, Tenant shall certify to Landlord in writing that, to the best of its knowledge, (i) the Premises is free from all Hazardous Materials caused by Tenant or Tenant's Representatives, and (ii) no such Hazardous Materials exist on, under or about the Premises other than as specifically identified to Landlord by Tenant in writing.  If Landlord reasonably believes that such certification is inaccurate, or if an environmental report is required by law, Landlord shall give notice to Tenant within thirty (30) days after receipt of Tenant's certification that Tenant shall have the Premises thoroughly inspected by an environmental consultant acceptable to Landlord for purposes of determining whether the Premises is free from all Hazardous Materials.  If Landlord fails to timely give such notice, the requirement for an environmental inspection report is not required of Tenant unless such report is otherwise required by Tenant under this Paragraph 8.  Landlord's failure to request an environmental inspection report shall in no way alter, abridge or limit Tenant's indemnity obligation hereunder.  Tenant shall deliver to Landlord a copy of the environmental consultant's report forty-five (45) days prior to

the expiration of the Lease.  In the event the report discloses the existence of any Hazardous Materials, requires any clean up or any other form of response (collectively "**Clean up**"), Tenant shall perform such immediately and deliver the Premises with the conditions specified in the report "cleaned up", to the full satisfaction of Landlord.  In the event the conditions specified in the report require Clean up which cannot be completed prior to the expiration of the Term, Tenant shall be obligated to pay Landlord the greater of (i) the fair market rental value of the Premises, or (ii) the rent hereunder, as adjusted, for each day delivery of the Premises in the required condition to Landlord is delayed beyond the expiration of the Term in addition to the Clean up costs.

        **8.9.**     **Exclusivity**.  The allocations of responsibility between, obligations and liabilities undertaken by, and indemnifications given by Landlord and Tenant under this Paragraph 8, shall be the exclusive provisions under this Lease, applicable, on and after the Occupancy Date, to the subject matter treated in this Paragraph 8, and any other conflicting or inconsistent provisions contained in this Lease or Original Lease shall not apply with respect to the subject matter.

        **8.10.**     **Compliance with Environmental Laws**.  Tenant shall at all times and in all respects comply with all Hazardous Materials Laws.  All reporting obligations imposed by Hazardous Materials Laws are strictly the responsibility of Tenant.  Tenant and Landlord have been informed that certain judicial decisions have held that, notwithstanding the specific language of a lease, courts may impose the responsibility for complying with legal requirements and for performing improvements, maintenance and repairs on a landlord or tenant based on the court's assessment of the parties' intent in light of certain equitable factors.  Tenant and Landlord have each been advised by their respective legal counsel about the provisions of this Lease allocating responsibility for compliance with laws and for performing improvements, maintenance and repairs between Tenant and Landlord.  Tenant and Landlord expressly agree that the allocation of responsibility for compliance with laws and for performing improvements, maintenance and repairs set forth in this Lease represents Tenant's and Landlord's intent with respect to this issue.

        **8.11.**     **Survival and Duration of Obligations**.  All covenants, representations, warranties, obligations and indemnities made or given under this Paragraph 8 shall survive the expiration or earlier termination of this Lease.

**9.**     **UTILITIES**

        Tenant shall pay all service charges and utility deposits and fees, for water, electricity, sewage, janitorial, trash removal, gas, telephone, pest control and any other utility services furnished to the Premises and the improvements on the Premises during the entire term of this Lease ("**Utilities**").  Tenant shall pay for all Utilities in addition to Rent.  Landlord shall not be liable for any reason for any loss or damage resulting from an interruption of any of the Utility services.  Except as may be set forth in **Exhibit "B"** for Tenant Improvements, or as otherwise determined by Landlord, Landlord may elect to separately meter each of the Utilities at Landlord's expense.  If any Utilities are not separately metered or billed to Tenant for the Premises but rather are billed to and paid by Landlord, Tenant shall pay to Landlord, as Additional Rent, its share of the cost of such services, as reasonably determined by Landlord.  If any Utilities are not separately metered, Landlord shall have the right to determine Tenant's consumption by submetering, survey or other methods designed to measure consumption with reasonable accuracy.

**10.**     **REPAIRS BY LANDLORD**

        Landlord shall maintain only the roof, foundations and structural soundness of the exterior walls of the Buildings (exclusive of all glass and exclusive of all exterior doors) and paving in good repair, except repairs rendered necessary by the misuse, negligence or intentional acts of Tenant, its employees, invitees or representatives which shall be repaired by Tenant (collectively, "**Landlord Repairs**").  Landlord shall also repair any underground sprinkler, sewer and water systems; provided, however, that for the first two (2) years of this Lease only, the costs of any such repairs (i) up to $50,000.00 per year shall be the sole responsibility of Landlord, and (ii) in excess of $50,000.00 per year shall be considered "**Excess Underground Plumbing Repairs**" and shall be the sole responsibility of Tenant.  In the event any Excess Underground Plumbing Repairs is classified as capital, then Landlord shall pass through the amortized costs of such Excess Underground Plumbing Repair to Tenant pursuant to Paragraph 5.1.B.  Tenant shall promptly report in writing to Landlord any condition known to Tenant to be defective which Landlord is required to repair and failure to so report such conditions shall make Tenant responsible to Landlord for any liability incurred by Landlord by reason of such

conditions.  Landlord shall be required to commence such repairs within a reasonable period of time from receipt of Tenant's notice.

## 11.    REPAIRS BY TENANT

Tenant accepts the Premises in its present "As-Is" condition (except for the "**Tenant Improvements**" which are the responsibility of Landlord set forth in **Exhibit "B"**) and specifically acknowledges that the Premises is suited for the uses intended by Tenant.  Tenant acknowledges and agrees that as of the date hereof, Landlord is not in default or violation of any covenant, provision, obligation, agreement or condition contained in the Original Lease.  Tenant shall at its own cost and expense keep and maintain the Premises (including, the Tenant Improvements set forth in **Exhibit "B"**) in good order and repair, promptly making all necessary repairs and replacements, including, but not limited to, all equipment and facilities and components thereof within the Premises, fixtures, walls (interior), finish work, ceilings, floors, lighting fixtures, bulbs and ballasts, utility connections and facilities within the Premises, windows, glass, doors, and plate glass, downspouts, gutters, air conditioning and heating systems, truck doors, dock levelers, bumpers, seals and enclosures, cranes, rail systems (if any), plumbing, electrical, termite and pest extermination, and damage to common areas caused by Tenant, excluding only those repairs expressly required to be made by Landlord hereunder.  Tenant, at its sole expense, shall also maintain the grounds surrounding the Buildings, including the mowing of grass, care of shrubs and general landscaping, snow removal, salting, trash removal, janitorial services, and fire system testing and maintenance; provided, however, that in the event that Landlord provides any of the foregoing services, the costs of such Landlord provided services shall be deemed a part of Common Expenses.  Tenant, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices.  Tenant shall maintain, and shall provide Landlord with proof thereof, an annual service maintenance contract for the HVAC system in a form and with a contractor reasonably satisfactory to Landlord.  Tenant's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.  Tenant shall be permitted to implement its own reasonable security measures in the Premises, subject to prior approval by Landlord.  Any security implemented by Tenant shall not interfere with the Building's security. Notwithstanding anything to the contrary herein, Tenant acknowledges and agrees that it shall be solely responsible for providing adequate security for its premises, trucks and containers, and its use of the Property and Premises thereof. Landlord shall have no responsibility to prevent, and shall not be liable to tenant, its agents, employees, contractors, visitors or invitees, for losses due to theft, burglary or other criminal activity, or for damages or injuries to persons or property resulting from Tenant's storage of trucks and containers on the Premises, from persons gaining access to the Premises or any part of the Property, and Tenant hereby releases Landlord and its agents and employees from all liabilities for such losses, damages or injury, regardless of the cause thereof.

## 12.    TENANT'S TAXES AND ASSESSMENTS

Tenant covenants and agrees to pay promptly, when due, all personal property taxes or other taxes and assessments levied and assessed by any governmental authority upon the removable property of Tenant in, upon or about the Premises.

## 13.    ALTERATION OF PREMISES

Tenant shall not alter, repair or change the Premises at a cost in excess of $5,000.00 ("**Tenant Repairs**") without the prior written consent of Landlord which shall not be unreasonably withheld.  All alterations, improvements or changes shall remain a part of and be surrendered with the Premises, unless Landlord directs its removal under Paragraph 23 of this Lease.

## 14.    INSURANCE

**14.1.    Landlord's Insurance**.  Landlord may maintain in full force and effect throughout the entire term of this Lease general comprehensive liability or other insurance under such policies and amounts as determined by Landlord.  Copies of all such insurance policies or certificates thereof endorsed to show payment of the premium shall be available for inspection by Tenant and such policies and certificates shall show Landlord and the beneficiary of any mortgage or deed of trust on the Premises to be additional insureds as their interests may exist (or a mortgagee loss

11

payable endorsement). Such insurance may be provided by a blanket insurance policy covering the Premises, so long as the coverage on the Premises is at all times at least as great as required by this <u>Paragraph 14.1</u>. Notwithstanding anything to the contrary herein, Landlord shall only be responsible for the reimbursement of the Tenant Deductible in the event of a claim for the Buildings structure only, but specifically excluding (without limitation) Tenant's improvements, betterments, alterations, floor and wall coverings, office furniture, business and personal trade fixtures, equipment, furniture system and other personal property from time to time situated in the Premises.

14.2.    **Tenant's Insurance**.  Tenant agrees to take out and keep in force during the term hereof, without expense to Landlord, with an insurance company with general policy holder's rating of not less than A-VII, as rated in the most current Best's Insurance Reports, or other company acceptable to Landlord, the policies of insurance as set forth below or as reasonably required by Landlord or the beneficiary of any mortgage or deed of trust on the Premises. Tenant shall be permitted to obtain the insurance required under this <u>Paragraph 14</u> by providing a blanket policy of insurance only if such blanket policies expressly provide coverage to the Premises and Landlord as required by this Lease without regard to claims made under such policies with respect to other persons or properties and in such form and content reasonably acceptable to Landlord.  Commercial general liability insurance, employer's liability insurance and business automobile liability insurance required limits hereunder can be satisfied by an umbrella/excess liability insurance policy if the applicable insurance coverages are included under the umbrella/excess liability insurance policy.  All such insurance policies shall be on an occurrence basis and not a claims-made basis, contain a standard separation of insureds provision, and shall name Landlord, its property manager IRG Realty Advisors, LLC (or such other property manager selected by Landlord), and their respective agents and employees as additional insureds on a primary and non-contributory basis.  Notwithstanding the foregoing, Landlord and the beneficiary of any mortgage or deed of trust on the Premises shall be listed as "loss payee" under the Special Form property insurance covering the Buildings and common areas.

A.    Causes of Loss – Special Form property insurance, with a maximum deductible of $25,000.00 ("**Tenant Deductible**") in an amount not less than one hundred percent (100%) of replacement cost covering the Buildings and all common areas (including vandalism and special form or such other or broader coverage as may from time to be customary on the Buildings and the common areas and other areas of land within which the Buildings are located in such amounts determined by Landlord), tenant improvements, betterments, and alterations permitted under this Lease, floor and wall coverings, and Tenant's office furniture, business and personal trade fixtures, equipment, furniture system and other personal property from time to time situated in the Premises.  Such property insurance shall include a replacement cost endorsement, providing protection against any peril included within the classification fire and extended coverage, sprinkler damage, vandalism, malicious mischief, and such other additional perils as covered in a cause of loss (special form) insurance policy required by Landlord or Landlord's lender.  The proceeds of such insurance shall be used for the repair and replacement of the property so insured, except that if not so applied or if this Lease is terminated following a casualty, the proceeds applicable to the leasehold improvements shall first be paid to Landlord and the proceeds applicable to Tenant's personal property shall then be paid to Tenant;

B.    Commercial general liability insurance, in the name of Tenant, insuring against any liability from the use and occupancy of the Premises and the business operated by Tenant.  All such policies shall be written to apply to all bodily injury or death, property damage and personal injury losses, and shall include blanket contractual liability (including Tenant's indemnity obligations under this Lease), broad form property damage liability, premise-operations and products-completed operations and shall contain an exception to any pollution exclusion which insures damage or injury arising out of heat, smoke or fumes from hostile fire, a contractual liability endorsement, and provide primary coverage to Landlord (any insurance policy issued to Landlord providing duplicate or similar coverage shall be deemed to be excess over Tenant's policies), in such amounts as may from time to time be customary with respect to similar properties in the same area, but in any event not less than $3,000,000.00 per occurrence (or such other amounts as may be required by Landlord).  The amounts of such insurance required hereunder shall be adjusted from time to time as requested by Landlord based upon Landlord's determination as to the amounts of such insurance generally required at such time for comparable premises and buildings in the general geographical area of the Premises.  In addition, such policy of insurance shall include coverage for any potential liability arising out of or because of any construction, work of repair, maintenance, restoration, replacement, alteration, or other work done on or about the Premises by or under the control or direction of Tenant;

12

C.    Workers Compensation insurance as required by the state law applicable in the state in which the Premises is located with Employers Liability insurance with limits of not less than $1,000,000.00; and

D.    Business automobile liability insurance covering owned, hired and non-owned vehicles with limits of not less than $1,000,000.00 combined single limit (bodily injury and property damage) per occurrence.

**14.3.    Certificates of Insurance**.  All policies of insurance set forth in Paragraph 14.2 above, shall provide that copies of the policies or certificates thereof showing the premium thereon to have been paid, shall be delivered to Landlord and to IRG Realty Advisors, LLC, One West Avenue, Larchmont, New York 10538 (or such other property manager designated by Landlord), prior to the Commencement Date and thereafter fifteen (15) days prior to each renewal date.  All such policies shall provide that they shall not be canceled nor coverage reduced by the insurer without first giving at least thirty (30) days prior written notice to Landlord.  Copies of all such insurance policies shall be provided to Landlord, promptly upon request by Landlord.  If Tenant fails to procure and keep in force such insurance, Landlord may procure it, and the cost thereof with interest at the maximum lawful rate shall be payable immediately by Tenant to Landlord as additional rent.  Such insurance may be provided by a blanket insurance policy covering the Premises, so long as the coverage on the Premises is at all times at least as great as required by this Paragraph 14.

**14.4.    Contractors' Insurance**.  If Tenant permits or causes any construction, work of repair, maintenance, restoration, replacement, alteration, or other work to be done on or about the Premises by any independent contractor or other person, then Tenant shall cause such independent contractor or other person ("**Contractor**") to take out and keep in force, throughout the period during which such Contractor performs any work on the Premises and for a period of two years after completion of such work, without expense to Landlord, the policies of insurance as set forth below.  All such policies shall be provided by an insurance company with general policy holder's rating of not less than A-VII, as rated in the most current Best's Insurance Reports, or other company acceptable to Landlord.  All such insurance policies shall be on an occurrence basis, and shall name Landlord, its property manager IRG Realty Advisors, LLC (or such other property manager selected by Landlord), Tenant, and their respective agents and employees as additional insureds on a primary and non-contributory basis.  Commercial general liability insurance, employer's liability insurance and business automobile liability insurance required limits hereunder can be satisfied by an umbrella/excess liability insurance policy if the applicable insurance coverages are included under the umbrella/excess liability insurance policy.  All policies of insurance set forth in this Paragraph 14.4 shall provide that copies of the policies or certificates thereof showing the premium thereon to have been paid, shall be delivered to Landlord and to IRG Realty Advisors, LLC, One West Avenue, Larchmont, New York 10538 (or such other property manager designated by Landlord), prior to the date on which such Contractor commences work on the Premises and thereafter fifteen (15) days prior to each renewal date.  All such policies shall provide that they shall not be canceled nor coverage reduced by the insurer without first giving at least thirty (30) days prior written notice to Landlord.  If Tenant fails to cause such any Contractor performing work on the Premises to procure and keep in force such insurance, Landlord may procure it, and the cost thereof with interest at the maximum lawful rate shall be payable immediately by Tenant to Landlord as additional rent.

A.    Commercial general liability insurance, in the name of Contractor, insuring against any liability from the use and occupancy of the Premises and the business operated by Contractor.  All such policies shall be written to apply to all bodily injury or death, property damage and personal injury losses, and shall include blanket contractual liability (including Tenant's indemnity obligations under this Lease), broad form property damage liability, premise-operations and products-completed operations and shall contain an exception to any pollution exclusion which insures damage or injury arising out of heat, smoke or fumes from hostile fire, a contractual liability endorsement, and provide primary coverage to Landlord (any insurance policy issued to Landlord providing duplicate or similar coverage shall be deemed to be excess over Tenant's and Contractor's policies), in such amounts as may from time to time be customary with respect to similar properties in the same area, but in any event not less than $3,000,000.00 per occurrence (or such other amounts as may be required by Landlord).  The amounts of such insurance required hereunder shall be adjusted from time to time as requested by Landlord based upon Landlord's determination as to the amounts of such insurance generally required at such time for comparable premises and buildings in the general geographical area of the Premises.  In addition, such policy of insurance shall include coverage for any potential liability arising out of or because of any construction, work of repair, maintenance, restoration, replacement, alteration, or other work done on or about the Premises by or under the control or direction of Tenant;

13

B.      Workers compensation insurance as required by the state law applicable in the state in which the Premises is located with employer liability insurance with limits of not less than $1,000,000.00; and

C.      Business automobile liability insurance covering owned, hired and non-owned vehicles with limits of not less than $1,000,000.00 combined single limit (bodily injury and property damage) per occurrence.

## 15.    WAIVER, EXCULPATION AND INDEMNITY

15.1.    **Definitions**.  For purposes of this Paragraph 15, (i) "**Tenant Parties**" shall mean, singularly and collectively, Tenant and Tenant's officers, directors, shareholders, partners, members, trustees, agents, employees, independent contractors, consultants, licensees, concessionaires, customers, guests, invitees or visitors as well as to all persons and entities claiming through any of the foregoing persons or entities, and (ii) "**Landlord Parties**" shall mean singularly and collectively, Landlord and Landlord's, mortgagees, officers, directors, shareholders, partners, members, trustees, agents, employees, independent contractors, and consultants, as well as to all persons and entities claiming through any of the foregoing persons or entities, but expressly excluding any other tenant or occupant of the Property.

15.2.    **Exculpation**.  Tenant, on behalf of itself and of all Tenant Parties, and as a material part of the consideration to be rendered to Landlord under this Lease, hereby waives, to the fullest extent permitted by law, all claims against Landlord for loss, theft or damage to goods, wares, merchandise or other property (whether tangible or intangible) in and about the Premises, for loss or damage to Tenant's business or other economic loss (whether direct, indirect or consequential), and for the injury or death to any persons in, on or about the Premises, except for damage or loss directly caused by Landlord's willful misconduct.

15.3.    **Landlord's Indemnity**.  Landlord shall indemnify, defend (by an attorney of Landlord's choice, reasonably acceptable to Tenant), reimburse, protect and hold harmless Tenant and all Tenant Parties from and against all third party claims, liability and/or damages arising from or related to the acts or omissions of Landlord or Landlord Parties, relating to their use, possession, or occupancy of the Property or, its obligations under this Lease, or to any work done, permitted or contracted for by any of them on or about the Premises, to the extent that such liability or damage is covered by Landlord's insurance (or would have been covered had Landlord carried the insurance as required under this Lease).  It is specifically understood and agreed that Landlord shall not be liable or responsible for the acts or omissions of any of the other tenants of the Property or of any agents, independent contractors, consultants, licensees, concessionaires, customers, guests, invitees or visitors of persons other than Landlord.

15.4.    **Tenant's Indemnity**.  Tenant shall indemnify, defend (by an attorney of Tenant's choice, reasonably acceptable to Landlord), reimburse, protect and hold harmless Landlord and all Landlord Parties from and against all third party claims, liability and/or damages arising from or related to the negligence, acts or omissions of Tenant or any Tenant Parties relating to their use, possession, or occupancy of the Property or, Tenant's obligations under this Lease, or to any work done, permitted or contracted for by any of them on or about the Premises, to the extent that such liability or damage is covered by Tenant's insurance (or would have been covered had Tenant carried the insurance as required under this Lease).  Tenant shall cause any independent contractor or other person who performs any construction, work of repair, maintenance, restoration, replacement, alteration, or other work on or about the Premises by or under the control or direction of Tenant to execute and deliver to IRG Realty Advisors, LLC, One West Avenue, Larchmont, New York 10538 (or such other property manager designated by Landlord) an agreement whereby such independent contractor or other person agrees to indemnify, defend (by an attorney of Landlord's choice, reasonably acceptable to such independent contractor or other person) , reimburse, protect and hold harmless Landlord, all Landlord Parties, and Tenant from and against the matters described in this Paragraph 15.4.

15.5.    **Waiver of Subrogation**.  To the extent of any and all insurance maintained, or required to be maintained, by either Landlord or Tenant in any way connected with the Premises, Landlord and Tenant hereby waive on behalf of their respective insurance carriers any right of subrogation that may exist or arise as against the other party to this Lease.  Landlord and Tenant shall cause the insurance companies issuing their insurance policies with respect to the Premises to waive any subrogation rights that the companies may have against Tenant and Landlord, respectively, which waivers shall be specifically stated in the respective policies.

14

**15. 6.     Survival and Duration of Obligations**.  All representations, warranties, obligations and indemnities made or given under this <u>Paragraph 15</u> shall survive the expiration or earlier termination of this Lease.

**16.     CONSTRUCTION LIENS**

**16.1.**     Tenant shall not suffer or permit any construction liens, mechanic's liens or materialman's liens to be filed against Landlord's interest in the real property of which the Premises form a part nor against Tenant's leasehold interest in the Premises ("**Tenant Lien**").  Landlord shall have the right at all reasonable times to post and keep posted on the Premises, any notices which it deems necessary for protection from such liens, or take such other action as applicable law may require to protect from such liens.  In connection therewith, Tenant shall cooperate with Landlord and shall sign any notice or other documents reasonably required by Landlord to comply with such applicable law.  Tenant shall have the right to contest by proper proceedings any Tenant Lien, provided that Tenant shall prosecute such contest diligently and in good faith and such contest shall not expose Landlord to any civil or criminal penalty or liability in connection therewith.  In such case, within five (5) days after Landlord's demand, Tenant shall furnish Landlord a surety bond or other adequate security satisfactory to Landlord in an amount equal to one hundred fifty percent (150%) of the amount of such claim or such higher amount as may be reasonably required to both to indemnify Landlord against liability and hold the Property free from adverse effect in the event the contest is not successful ("**Lien Bond**").  The Lien Bond may be retained by Landlord until the Tenant Lien has been removed of record or until judgment has been rendered on such claim and such judgment has become final, at which time Landlord shall have the right to apply such Lien Bond in discharge of the judgment on the Tenant Lien and to any actual costs, including reasonable attorneys' fees incurred by Landlord, and shall remit the balance thereof to Tenant.  In the event that a Tenant Lien is filed and Tenant does not properly contest such lien or timely post the Lien Bond, Landlord, at its election, and upon not less than five (5) days prior written notice to Tenant, may pay and satisfy the Tenant Lien and, in such event the sums so paid by Landlord, including all actual and other expenses, including reasonable attorney's fees, so paid by Landlord, shall be deemed to be Additional Rent due and shall be payable by Tenant at once without notice or demand together with interest thereon from the date of payment at the rate of eighteen percent (18%) per annum, provided such interest rate shall not exceed the maximum interest rate permitted by law.  Notwithstanding the foregoing, Tenant shall have no responsibility for discharge of any mechanics' liens filed by a contractor, subcontractor, materialman, or laborer of Landlord.

**16.2.**     Tenant agrees to give Landlord written notice not less than ten (10) days in advance of the commencement of any Tenant Repairs in order that Landlord may post appropriate notices of Landlord's non-responsibility.  Promptly after the Tenant Repairs are completed, Tenant shall file a Notice of Completion.

**17.     QUIET ENJOYMENT**

Landlord covenants and agrees that Tenant, upon making all of Tenant's payments of Rent as and when due under the Lease, and upon performing, observing and keeping the covenants, agreements and conditions of this Lease on its part to be kept, shall peaceably and quietly hold, occupy and enjoy the Premises during the term of this Lease as extended by the options described herein, if any, subject to the terms and provisions of this Lease.

**18.     LANDLORD'S RIGHT OF ENTRY**

Landlord or his agents shall have the right to enter the Premises at reasonable times upon reasonable notice in order to examine it or to show it to prospective tenants or buyers, to place "For Rent" or "For Sale" signs on or about the Premises, and to make modifications or other changes to the Property as are necessary in Landlord's sole discretion to facilitate development of the Property, provided, however, Landlord shall use its best efforts to minimize the effect of any such entry or any interference with Tenant's use of the Premises.  Upon receipt of reasonable advance notice from Landlord, Tenant may arrange to have a designated representative accompany Landlord in entering the Premises.  Landlord's right of reentry shall not be deemed to impose upon Landlord any obligation, responsibility, or liability for the care, supervision or repair of the Premises other than as herein provided; except that Landlord shall use reasonable care to prevent loss or damage to Tenant's property resulting from Landlord's entry.  Landlord shall have the right at any time, without effecting an actual or constructive eviction and without incurring any liability to Tenant therefore, to change the arrangement or location of entrances or passageways, doors and doorways, corridors, elevators, stairs, toilets or other public parts of the Buildings and to change the name, number or designation by which the Buildings are commonly

15

known, provided that such action does not result in any unreasonable interference with Tenant's access to or use of the Premises. Notwithstanding the foregoing, Landlord shall have the right to enter the Premises without first giving notice to Tenant in the event of an emergency where the nature of the emergency will not reasonably permit the giving of notice.

## 19.    DESTRUCTION OF BUILDINGS

**19.1.    Partial Destruction**.  In the event of a partial destruction of the building containing the Premises during the term of this Lease from any cause, Landlord shall forthwith repair the same, provided such repair can reasonably be made within ninety (90) days from the happening of such destruction under applicable laws and regulations (but only to the extent of insurance proceeds made available to Landlord by any mortgagee of the Premises). During such period, Tenant shall be entitled to a proportionate reduction of rent to the extent such repairs unreasonably interfere with the business carried on by Tenant in the Premises.  If Tenant fails to remove its goods, wares or equipment within a reasonable time and as a result the repair or restoration is delayed, or if such damage or destruction is caused primarily by the negligence or willful act of Tenant, or its employees, invitees or agents, there shall be no reduction in rent during such delay.  In the event that such repair cannot reasonably be made within ninety (90) days from the happening of such destruction under applicable laws and regulations, Landlord shall have the right to terminate this Lease by notifying Tenant in writing within sixty (60) days from the happening of such destruction of Landlord's decision not to repair such building in which event this Lease shall be deemed terminated.  If Landlord fails to give such written notice of Landlord's decision not to repair such building within such sixty (60) days, then Landlord shall be required to commence the repair of the building promptly and thereafter diligently complete the repairs.  In addition to the above, in the event that such building is partially destroyed and (i) the cost of repairing such building exceeds thirty-three and one-third percent (33-1/3%) of the replacement cost thereof, or (ii) the damage caused by the partial destruction of such building cannot reasonably be repaired within a period of ninety (90) days from the happening of such damage, Landlord may elect to terminate this Lease, whether or not such building is insured, by written notice to Tenant given within sixty (60) days from the happening of such destruction.  If Landlord fails to give such written notice of Landlord's decision not to repair such building within such sixty (60) days, then Landlord shall be required to repair such building within ninety (90) days from the happening of such destruction, if it can be reasonably repaired in such time, or as soon thereafter as reasonably practical if it cannot reasonably be repaired in such earlier period of time.

**19.2.    Total Destruction**.  A total destruction of the building containing the Premises shall terminate this Lease.  A total destruction of such building means the cost of repairing such building exceeds seventy-five percent (75%) of the replacement cost of such building.

## 20.    EMINENT DOMAIN

**20.1.    Definitions**.  For purposes of this Lease, the word "**condemned**" is co-extensive with the phrase "**right of eminent domain**", that is, the right of the government to take property for public use, and shall include the intention to condemn expressed in writing as well as the filing of any action or proceeding for condemnation.

**20.2.    Exercise of Condemnation**.  If any action or proceeding is commenced for the condemnation of the Premises or any portion thereof, or if Landlord is advised in writing by any government (federal, state or local) agency or department or bureau thereof, or any entity or body having the right or power of condemnation, of its intention to condemn all or any portion of the Premises at the time thereof, or if the Premises or any part or portion thereof be condemned through such action, then and in any of such events Landlord may, without any obligation or liability to Tenant, and without affecting the validity and existence of this Lease other than as hereafter expressly provided, agree to sell and/or convey to the condemnor, without first requiring that any action or proceeding be instituted, or if such action or proceeding shall have been instituted, without requiring any trial or hearing thereof, and Landlord is expressly empowered to stipulate to judgment therein, the part and portion of the Premises sought by the condemnor, free from this Lease and the rights of Tenant hereunder.  Tenant shall have no claim against Landlord nor be entitled to any part or portion of the amount that may be paid or awarded as a result of the sale, for the reasons as aforesaid, or condemnation of the Premises or any part or portion thereof, except that Tenant shall be entitled to recover from the condemnor and Landlord shall have no claim therefore or thereto for Tenant's relocation costs, loss of goodwill, for Tenant's trade fixtures, any removable structures and improvements erected and made by Tenant to or upon the Premises which Tenant is or may be entitled to remove at the expiration of this Lease and Tenant's leasehold estate hereunder.

16

**20.3.    Effect on Lease**.  If the entire Premises is condemned, this Lease shall terminate as of the earlier of such taking or loss of possession.  If only a part of the Premises is condemned and taken and the remaining portion thereof is in Tenant's reasonable discretion not suitable for purposes for which Tenant has leased the Premises, either Landlord or Tenant shall have the option to terminate this Lease effective as of the earlier of such taking or loss of possession.  If by such condemnation and taking only a part of the Premises is taken, and the remaining part thereof is in Tenant's reasonable discretion suitable for the purposes for which Tenant has leased the Premises, this Lease shall continue, but the rental shall be reduced in an amount proportionate to the percentage that the floor area of that portion of the Premises physically taken by eminent domain bears to the floor area of the entire Premises.

## 21.    BANKRUPTCY

If a general assignment is made by Tenant for the benefit of creditors, or any action is taken by Tenant under any insolvency or bankruptcy act, or if a receiver is appointed to take possession of all or substantially all of the assets of Tenant (and Tenant fails to terminate such receivership within sixty (60) days after such appointment), or if any action is taken by a creditor of Tenant under any insolvency or bankruptcy act, and such action is not dismissed or vacated within thirty (30) days after the date of such filing, then this Lease shall terminate at the option of Landlord upon the occurrence of any such contingency and shall expire as fully and completely as if the day of the occurrence of such contingency was the date specified in this Lease for the expiration thereof.  In such event, Tenant shall then quit and surrender the Premises to Landlord.

## 22.    DEFAULT

If Tenant fails to pay any rent or other sum due hereunder, or in the event Tenant fails to perform any other covenant to be performed by Tenant under this Lease and continues to fail to perform the same for a period of five (5) days after receipt of written notice from Landlord pertaining thereto (or a reasonable period of time, using due diligence, if any non-monetary default cannot be cured within such five (5) day period, but not to exceed thirty (30) days), then Tenant shall be deemed to have breached this Lease and Landlord, in addition to other rights or remedies it may have, may:

A.    Continue this Lease in effect by not terminating Tenant's right to possession of the Premises, and thereby be entitled to enforce all Landlord's rights and remedies under this Lease, including the right to recover the Rent specified in this Lease as it becomes due under this Lease; or

B.    Terminate Tenant's right to possession of the Premises, thereby terminating this Lease, and recover from Tenant:

(i.)    The worth at the time of award of the unpaid Rent which had been earned at the time of termination of the Lease;

(ii.)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination of the Lease until the time of award exceeds the amount of rental loss that Tenant proves could have been reasonably avoided;

(iii.)    The worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of rental loss that Tenant proves could be reasonably avoided; and

(iv.)    Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease; or

C.    In lieu of, or in addition to, bringing an action for any or all of the recoveries described in subparagraph B above, bring an action to recover and regain possession of the Premises in the manner provided by the laws of unlawful detainer then in effect in the state where the Property is located.  If Landlord makes any expenditure required of Tenant hereunder, or if Tenant fails to make any payment or expenditure required of

17

Tenant hereunder, such amount shall be payable by Tenant to Landlord as Rent together with interest from the date due at the rate of twelve percent (12%) per annum, provided such interest rate shall not exceed the maximum interest rate permitted by law, and Landlord shall have the same remedies as on the default in payment of Rent. The payment of interest required hereunder shall be in addition to the late charge set forth in Paragraph 3.3. Notwithstanding any other provisions of this Lease, under no circumstances shall Landlord or Tenant be liable to the other for any consequential damages arising out of the acts or omissions of Landlord or Tenant or a breach of this Lease by either party.

23. **SURRENDER OF PREMISES**

On or before the expiration of the Term, Tenant shall vacate the Premises in broom clean condition and otherwise in the same condition as existed on the Commencement Date, ordinary wear and tear and fire and casualty loss excepted, except that any improvements made within and on the Premises by Tenant shall remain, in the same condition and repair as when constructed or installed, reasonable wear and tear and fire and casualty loss excepted, unless Landlord gives Tenant at least thirty (30) days prior written notice, which, if any, of such improvements in the Premises are to be removed. Landlord's failure to timely give notice to Tenant to remove any such improvements shall not relieve Tenant of its obligation to remove any such improvements requested to be removed by Landlord. In addition, Tenant shall remove from the Premises all of Tenant's personal property and trade fixtures in order that Landlord can repossess the Premises on the day this Lease or any extension hereof expires or is sooner terminated. Any removal of Tenant's improvements, Tenant's property and/or trade fixtures by Tenant shall be accomplished in a manner which will minimize any damage or injury to the Premises, and any such damage or injury shall be repaired by Tenant at its sole cost and expense with thirty (30) days after Tenant vacates.

24. **HOLDING OVER**

Should Tenant hold over and remain in possession of the Premises after the expiration of this Lease, without the written consent of Landlord, such possession shall be as a month-to-month tenant. Unless Landlord agrees otherwise in writing, Base Rent during the hold-over period shall be payable in an amount equal to one hundred fifty percent (150%) of the Base Rent paid for the last month of the term hereof until Tenant vacates the Premises. All other terms and conditions of this Lease shall continue in full force and effect during such hold-over tenancy, which hold-over tenancy shall be terminable by either party delivering at least one (1) month's written notice, before the end of any monthly period. Such hold-over tenancy shall terminate effective as of the last day of the month following the month in which the termination notice is given.

25. **SURRENDER OF LEASE**

The voluntary or other surrender of this Lease by Tenant, or mutual cancellation thereof, shall not work a merger and may, at the option of Landlord, terminate all or any existing subleases or subtenancies or may operate as an assignment of any or all such subleases or subtenancies to Landlord.

26. **INTENTIONALLY DELETED**

27. **RULES AND REGULATIONS**

Tenant shall comply with all reasonable and nondiscriminatory rules and regulations now or hereinafter adopted by Landlord during the existence of this Lease, both in regard to the Property, the Buildings as a whole and to the Premises herein leased. In the event of any inconsistency between the provisions of this Lease and the provisions of any such rules and regulations, the provisions of this Lease shall control.

28. **NOTICE**

Any notice, request, demand, instruction or other document or communication required or permitted to be given hereunder shall be in writing addressed to the respective party as set forth below and may be personally served, sent by facsimile, email, or sent by a nationally recognized overnight courier or by U.S. Mail, first class, addressed as follows:

18

| | |
|---|---|
| **TO LANDLORD:** | c/o Industrial Realty Group, LLC<br>11100 Santa Monica Boulevard, Suite 850<br>Los Angeles, California  90025<br>Attention:  John A. Mase<br>Telephone:  (310) 806-4434<br>FAX:  (310) 473-8702 |
| **with a copy to:** | Fainsbert Mase Brown & Sussman, LLP<br>11100 Santa Monica Boulevard, Suite 870<br>Los Angeles, California  90025<br>Attention:  Jerry A. Brown, Jr., Esq.<br>Email:  jbrown@fms-law.com<br>Telephone:  (310) 473-6400<br>FAX:  (310) 473-8702 |
| **TO TENANT:** | True Value Company<br>8600 W. Bryn Mawr Avenue<br>Chicago, IL  60631<br>Attention: Abhinav Shukla, S.V.P. / C.O.O.<br>Email:  abhinav.shukla@truevalue.com<br>Telephone:  (773) 695-5430<br>FAX:  (773) 695-5127 |
| **with a copy to:** | True Value Company<br>8600 W. Bryn Mawr Avenue<br>Chicago, IL  60631<br>Attention: Susan Radde, Asst. General Counsel<br>Email:  susan.radde@truevalue.com<br>Telephone:  (773) 695-5430<br>FAX:  (773) 695-5127 |

Any party may change their notice or email address and/or facsimile number by giving written notice thereof in accordance with this Paragraph.  All notices hereunder shall be deemed given: (1) if served in person, when served; (2) if sent by facsimile or email, on the date of transmission if before 6:00 p.m. P.S.T.; provided that a hard copy of such notice is also sent by either a nationally recognized overnight courier or by U.S. Mail, first class; (3) if by overnight courier, by a nationally recognized courier which has a system of providing evidence of delivery, on the first business day after delivery to the courier; or (4) if by U.S. Mail, on the third day after deposit in the mail, postage prepaid, certified mail, return receipt requested.

## 29.    ASSIGNMENT AND SUBLETTING

29.1.    **No Assignment**.  Tenant shall not directly or indirectly, voluntarily or by operation of law, sell, assign, encumber, pledge or otherwise transfer or hypothecate all or any part of the Premises or Tenant's leasehold estate hereunder (collectively, "**Assignment**"), or permit the Premises to be occupied by anyone other than Tenant or sublet the Premises (collectively, "**Sublease**") or any portion thereof  without Landlord's prior written consent in each instance, which consent may not be unreasonably withheld by Landlord.  Notwithstanding the foregoing, Tenant may assign this Lease to any parent, subsidiary or affiliate of Tenant without Landlord's prior consent, provided, however, that Tenant shall be required to provide Landlord prompt written notice of such assignment.  In addition, Tenant shall provide financial statements for Tenant and any proposed assignee or sublessee of this Lease, in form and substance reasonably acceptable to Landlord, with any request for Landlord's approval (or other notice) of any assignment or sublease and prior to the effectiveness of any such assignment or sublease.  For purposes of this paragraph, an "**affiliate**" means any person that controls, is controlled by, or is under common control with Tenant, or any person who acquires all or substantially all of the assets of Tenant as a going concern of the business that is being conducted on the Premises.

19

**29.2.    No Relief of Obligations**.  No consent by Landlord to any Assignment or Sublease by Tenant shall relieve Tenant of any obligation to be performed by Tenant under this Lease, whether arising before or after the Assignment or Sublease.  The consent by Landlord to any Assignment or Sublease shall not relieve Tenant of the obligation to obtain Landlord's express written consent to any other Assignment or Sublease.  Any Assignment or Sublease that is not in compliance with this Paragraph 28 shall be void and, at the option of Landlord, shall constitute a material default by Tenant under this Lease.  The acceptance of Rent by Landlord from a proposed assignee or sublessee shall not constitute the consent by Landlord to such Assignment or Sublease.

## 30.    ATTORNEY'S FEES

In the event of any legal or equitable action arising out of this Lease, the prevailing party shall be entitled to recover all reasonable fees, costs and expenses, together with reasonable attorney's fees incurred in connection with such action.  The fees, costs and expenses so recovered shall include those incurred in prosecuting or defending any appeal. The prevailing party shall also be entitled to reasonable attorney's fees incurred to collect or enforce the judgment.

## 31.    JUDGMENT COSTS

**31.1.    Landlord**.  Should Landlord, without fault on Landlord's part, be made a party to any litigation instituted by or against Tenant, or by or against any person holding the Premises by license of Tenant, or for foreclosure of any lien for labor or material furnished to or for Tenant, or any such person, or otherwise arising out of or resulting from any act or transaction of Tenant, or of any such person, Tenant covenants to pay to Landlord, the amount of any judgment rendered against Landlord or the Premises or any part thereof, and all costs and expenses, including reasonable attorney's fees incurred by Landlord in connection with such litigation.

**31.2.    Tenant**.  Should Tenant, without fault on Tenant's part, be made a party to any litigation instituted by or against Landlord, or by or against any person holding the Premises by license of Landlord, or for foreclosure of any lien for labor or material furnished to or for Landlord, or any such person, or otherwise arising out of or resulting from any act or transaction of Landlord, or of any such person, Landlord covenants to pay to Tenant, the amount of any judgment rendered against Tenant or the Premises or any part thereof, and all costs and expenses, including reasonable attorney's fees incurred by Tenant in connection with such litigation.

## 32.    BROKERS

Landlord and Tenant each represent and warrant to each other that it has had no dealings with any real estate broker or agent in connection with the Premises and this Lease, and that it knows of no real estate broker or agent who is or might be entitled to a commission in connection with this Lease.  Landlord shall only pay the real estate brokerage commission due to any real estate broker or agent entitled to a commission in connection with this Lease if claimed through the actions of Landlord.  Tenant shall pay any other commission or finder's fee due if claimed through the actions of Tenant.  Each of Tenant and Landlord shall indemnify and hold the other harmless from and against any such commission or finder's fee which may be claimed by any person or broker with respect to this transaction as a result of its breach of the foregoing representation.

## 33.    SUBORDINATION OF LEASE

This Lease is subject and subordinate to any mortgages which may now or hereafter be placed upon or affect the property or Buildings of which the Premises are a part, and to all renewals, modifications, consolidations, replacements and extensions hereof, provided that the holder(s) of such mortgage(s) shall agree in writing not to disturb the possession of the Premises by Tenant or the rights of Tenant under this Lease so long as Tenant is not in material default (subject to applicable notice and cure rights in favor of Tenant as contained in this Lease) in the performance of its obligations thereunder and, in the event of foreclosure, Tenant agrees to look solely to the mortgagee's interest in the Property for the payment and discharge of any obligations imposed upon the mortgagee or Landlord under this Lease.  In the event that a Successor Landlord, as hereinafter defined, takes title to the Property, (i) Successor Landlord shall be bound to Tenant under all of the terms and conditions of this Lease, (ii) Tenant shall recognize and attorn to Successor Landlord as Tenant's direct landlord under this Lease, and (iii) this Lease shall continue in full force and effect, in accordance with its

terms, as a direct lease between Successor Landlord and Tenant.  This clause shall be self-operative, and no further instrument or subordination shall be necessary unless requested by a mortgagee or the insuring title company, in which event Tenant shall sign, within five (5) business days after requested, such instruments and/or documents as the mortgagee and/or insuring title company reasonably request be signed ("**SNDA**").  In the event Tenant fails to execute a SNDA or an estoppel certificate as provided herein, Tenant hereby constitutes and appoints Landlord as its attorney-in-fact, with full power of substitution, to sign, execute, certify, acknowledge, deliver or record, where required or appropriate, in the name, place and stead of Tenant, all such SNDAs and estoppel certificates for and on behalf of Tenant as may be required.  For purposes of this Paragraph 33, "**Successor Landlord**" shall mean any party that becomes owner of the Property as the result of a (i) foreclosure under any mortgage or deed of trust; (ii) any other exercise by a lender of rights and remedies (whether under any security instrument or under applicable law, including bankruptcy law) as a result of which such lender becomes owner of the Property; or (iii) delivery by Landlord to any lender (or its designee or nominee) of a deed or other conveyance of Landlord's interest in the Property in lieu of any of the foregoing.

34.    **INTENTIONALLY DELETED**

35.    **ESTOPPEL CERTIFICATES AND FINANCIAL STATEMENTS**

    35.1.    **Estoppel Certificate**.  Tenant shall, at any time and from time to time, upon not less than ten (10) days' prior request by Landlord, execute, acknowledge and deliver to such other persons who may be designated in such request, a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and, if so, the dates to which the rent and any other charges have been paid in advance, and such other items requested by Landlord, including without limitation, the lease commencement date and expiration date, rent amounts, and that no offsets or counterclaims are present.  It is intended that any such statement delivered pursuant to this Paragraph may be relied upon by any prospective purchaser or encumbrancer (including assignee) of the Premises.

    35.2.    **Financial Statements**.  If Landlord desires to finance, refinance, or sell the Buildings, or the Property, or any part thereof, Tenant shall deliver to Landlord, or to such potential lender or purchaser designated by Landlord, such financial information regarding Tenant, as may reasonably be required to establish Tenants' creditworthiness.  In addition, Tenant shall provide such financial information in any request for Landlord's approval of any assignment or sublease, prior to the effectiveness of such assignment or sublease.  All financial information provided by Tenant to Landlord or any lender or potential purchaser shall be held by the recipient in strict confidence and may not be used or disclosed by the recipient except for the purpose of determining Tenants' creditworthiness in connection with Tenants' obligations under this Lease.

36.    **SHORT FORM OF LEASE**

    Tenant agrees to execute, deliver and acknowledge, at the request of Landlord, a short form of this Lease satisfactory to counsel for Landlord, and Landlord may in its sole discretion record this Lease or such short form in the County where the Premises are located.  Tenant shall not record this Lease, or a short form of this Lease, without Landlord's prior written consent which may be withheld in Landlord's reasonable discretion.

37.    **SIGNS**

    Tenant shall not place any sign upon the Premises, except that Tenant may, with Landlord's prior written consent which shall not be unreasonably withheld, install such signs on the exterior of the Premises and at the entrance to the Property as are reasonably required to advertise Tenant's own business.  The installation of any sign on the Premises by or for Tenant shall be subject to the provisions of Paragraph 23.  Tenant shall maintain any such signs installed on the Property.  Unless otherwise expressly agreed herein, Landlord reserves the right to install, and all revenues from the installation of, such advertising signs on the Premises, including the roof, as do not unreasonably interfere with the conduct of Tenant's business.

38.  **INTENTIONALLY DELETED**

39.  **FORCE MAJEURE**

In discharging its duty to complete the tenant improvements and to operate, maintain and repair those systems as set forth in this Lease, Landlord shall be held to a standard of reasonableness and shall not be liable to Tenant for matters outside its control, including, but not limited to, acts of God, civil riot, war, strikes, labor unrest, or shortage of material, and in no event shall Landlord be liable to Tenant for incidental damages, including, but not limited to, loss of business or business interruption.

40.  **GENERAL PROVISIONS**

40.1.  **Waiver of Jury Trial; Governing Law; Venue**.  **EACH PARTY TO THIS LEASE HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS LEASE OR THE TRANSACTIONS CONTEMPLATED HEREBY.  THIS LEASE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS.  THE PARTIES HERETO AGREE THAT VENUE SHALL BE PROPER IN ANY STATE OR FEDERAL COURT LOCATED WITHIN, OR HAVING JURISDICTION OVER, MCHENRY COUNTY, ILLINOIS.**

40.2.  **Waiver**.  The waiver by Landlord or Tenant of any breach of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition contained herein.  The acceptance of rent hereunder shall not be construed to be a waiver of any breach by Tenant of any term, condition or covenant of this Lease.

40.3.  **Remedies Cumulative**.  It is understood and agreed that the remedies herein given to Landlord or Tenant shall be cumulative, and the exercise of any one remedy of Landlord or Tenant shall not be to the exclusion of any other remedy.

40. 4.  **Successors and Assigns**.  The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; if Landlord or Tenant is comprised of multiple parties, each of such parties hereto shall be jointly and severally liable hereunder.

40. 5.  **No Personal Liability**.  No individual member, manager, manager of a member, partner, shareholder, director, officer, employee, trustee, investment advisor, consultant or agent of Landlord, or individual member of a joint venture, tenancy in common, firm, limited liability company or partnership (general or limited), which constitutes Landlord, or any successor interest thereof, shall be subject to personal liability with respect to any of the covenants or conditions of this Lease.  Tenant shall look solely to the equity of Landlord in the Property and to no other assets of Landlord for the satisfaction of any remedies of Tenant in the event of any breach by Landlord.  It is mutually agreed by Tenant and Landlord that this paragraph is and shall be deemed to be a material and integral part of this Lease.  All obligations of Landlord shall be binding upon Landlord only during the period of Landlord's ownership of the Property and not thereafter.

40. 6.  **Entire Agreement**.  This Lease, the exhibits referred to herein, and any addendum executed concurrently herewith, are the final, complete and exclusive agreement between the parties and cover in full each and every agreement of every kind or nature, whatsoever, concerning the Premises and all preliminary negotiations and agreements of whatsoever kind or nature, are merged herein.  Landlord and Tenant have made no representations or promises whatsoever with respect to the Premises, except those contained herein, and no other person, firm or corporation has at any time had any authority from Landlord or Tenant to make any representations or promises on behalf of such party, and Landlord and Tenant expressly agree that if any such representations or promises have been made by others, such party hereby waives all right to rely thereon.  No verbal agreement or implied covenant shall be held to vary the provisions hereof, any statute, law or custom to the contrary notwithstanding.  Unless otherwise provided herein, no supplement, modification, or amendment of this Lease shall be binding unless executed in writing by the parties.

40.7.    **Captions**.  The captions of paragraphs of this Lease are for convenience only, and do not in any way limit or amplify the terms and provisions of this Lease.

40.8.    **Partial Invalidity**.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

40.9.    **Authority**.  The person(s) executing this Lease warrants that he or she has the authority to execute this Lease and has obtained or has the requisite corporate or other authority to do the same.

40.10.    **Approvals**.  Any consent or approval required hereunder shall not be unreasonably withheld, conditioned or delayed by the party from whom such consent or approval is requested unless this Lease expressly provides otherwise.

40.11.    **Counterparts and Electronic Signatures**.  This Lease may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, and such counterparts shall together constitute but one and the same Lease. The parties shall be entitled to sign and transmit an electronic signature of this Lease (whether by facsimile, PDF or other email transmission), which signature shall be binding on the party whose name is contained therein.  Any party providing an electronic signature agrees to promptly execute and deliver to the other parties an original signed Lease upon request.

40.12.    **Intentionally Deleted**.

40.13.    **OFAC Certification**.  Tenant represents and warrants to Landlord that neither Tenant nor any person or entity that owns or controls, is owned or controlled by or is under common ownership or control with Tenant, and Landlord represents and warrants to Tenant that neither Landlord nor any person or entity that owns or controls, is owned or controlled by or is under common ownership or control with Landlord: (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury pursuant to Executive Order No. 13224, 66 Federal Register 49079 (September 25, 2001) or (b) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

[*Signatures contained on the following page*]

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement in duplicate as of the day and year first above written.

**LANDLORD:**

**Harvard Division, LLC,**
a Delaware limited liability company

By:    Holdings SPE Manager, LLC
        a Delaware limited liability company,
        its Manager

        By:   _____
              John ▮
              Chie ▮

Dated:   _____3/6/18_____

**TENANT:**

**True Value Company,**
a Delaware corporation

By:   ▮▮▮▮▮▮▮▮
       Abhinav Shukla
       S.V.P. / Chief Operating Officer

Dated:   03/06/18

EXHIBIT "A"

PREMISES



Exhibit "A"

**EXHIBIT "B"**

**TENANT IMPROVEMENTS**

**Schedule of Improvements**
**(see following pages for further detail)**

| # | Improvement | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| | | | | |
| 1 | Nissan building roof replacement (Area E) | X | | |
| 2 | Ryder garage roof replacement (Area Q) | X | | |
| 3 | Floor repairs throughout Building | X | | |
| 4 | Provide two (2) openings in Section K wall | X | | |
| 5 | Rooftop units – HVAC main office | X | | |
| 6 | Pave cross dock trailer staging | X | | |
| 7 | Water & sewage pipes, subject to Paragraph 10 | X | | |
| 8 | National Transportation office remodel | X | | |
| 9 | Initial $1,000,000 Building improvement allowance* | X | | |
| 10 | Remaining roof replacement (Areas C, D, F, and R) | | X | |
| 11 | Repair & insulate outside walls | | X | |
| 12 | I-Beams to be repaired | | X | |
| 13 | Repair rain gutters (north side) | | X | |
| 14 | Repair exterior fence line - sections | | X | |
| 15 | Red room remodel – VCT (Upstairs Office/Lunch Room) | | X | |
| 16 | Main office remodel | | X | |
| 17 | Move phone room | | | X |
| 18 | Maintenance of exterior fire tank | | | X |
| 19 | Exterior skin blasting & repair expansion (vacant area) | | | X |
| 20 | Additional $500,000 Building improvement allowance* | | | X |
| | Central ship plumbing | | | |
| | Continuous parking repairs (as part of Common Area Expenses) | | | |

* The initial $1,000,000 and additional $500,000 in Building improvement allowances shall be mutually agreed upon by Landlord and Tenant and shall consist solely of improvements to the Buildings on the Property to repair, replace or improve such Buildings for the continued benefit of any user of the Buildings rather than uses specific or limited to Tenant.

Exhibit "B"

## <u>YEAR 1</u>

1. **Nissan building roof replacement (Area E) – see attached Korellis proposal/scope PK170803B**

2. **Ryder garage roof replacement (Area Q) – see attached Korellis proposal/scope PK170803C**

3. **Floor repairs throughout Building**

   *Work scope to be further reasonably determined by Tenant and Landlord.*

4. **Provide two (2) openings in Section K wall**

   - Preparation for wall
     - Drape both sides of the concrete block wall with plastic sheeting for dust and debris protection
     - Construct a temporary plywood wall to protect merchandise and plastic sheeting during wall removal
     - Remove roll up door
     - Remove and relocate electrical
     - Remove existing small office area
     - Haul all debris off site
     - Using aerial equipment, breakers, and concrete saws we will provide two (2) finished wall openings of 14' in width by 18' in height and finish.
     - Supply all equipment and machinery necessary for completion

   NOTE: Tenant shall relocate racking where/if required (at Tenant's cost).

5. **Rooftop units – HVAC main office**

   - RTU replacement Unit #1
     - Pull existing RTU with pro lifts to remove adapter curb to check measurements of original curb, reset curb and RTU
     - Supply crane lift
     - Remove and dispose of existing RTU
     - Supply and install new Heil 12.5 Ton RTU (M-RGH150LFCA0AAB)
     - Supply and install new curb adapter
     - Transitional low/line voltage wiring, gas piping and condensate drain
     - Start up and calibration of new RTU

   - Economizer for RTU
     - Supply and install new Heil economizer (M-DNECOMZR062A00)
     - Start up and calibration of economizer

   - Mini split replacement Unit #2
     - Remove and dispose of existing mini split system
     - Supply and install new Samsung Whisper 18K BTU indoor unit (M-AR18KSWSJWKNCV)
     - Supply and install new Samsung Whisper 18K BTU outdoor unit (M-AR18KSWSJWKXCV)
     - Supply and install new side and rear wind baffle
     - Supply and install new outdoor pad unit
     - Supply and install new ¼"x ½" lineset and condensate pump
     - Transitional low/line voltage wiring
     - Transition condensate piping and rework of existing line to get proper pitch
     - Start up and calibration of new mini split system

Exhibit "B"

6. **Pave cross dock trailer staging (39,292 sq. ft.)**

- Remove and replace defective asphalt in areas indicated with 5" of compacted lifts using specifications below:
  - Repair area to be saw cut in right angles
  - Defective asphalt removed and hauled away
  - Base to be repaired and reinforced with CA-6 stone where needed, regarded and recompacted
  - Surface repair area with 3-3/8" of binder bituminous mix and roll to a compacted depth of 3"
  - Surface first lift of asphalt with 2-5/8" of surface bituminous mix and roll to a compacted depth of 2" matching existing grades

- Concrete dolly pads (Approximately 4,180 sq. ft. – 10 ft. wide x 225 ft. long)
  - Remove and replace damaged/ deteriorated concrete in areas indicated
  - Haul off all broken concrete
  - Reinforce base with CA-6 as needed
  - New concrete will be poured using six (6) bags of concrete mix complete with expansion joints and/or tooled joints as necessary
  - Pour to a depth of 8"
  - Install wire mesh throughout

7. **Water & Sewage Pipes**

Nissan building only
  - Vacuum out forty five (45) storm basins
  - Jet all lines in and out of each basin
  - Camera any line with known issues
  - Removal of all spoils to off-site location
  - Visually inspect all storm basins for necessary repairs or replacement
  - No repairs or replacement of any storm basins or exterior storm lines are included. A separate quote will be provided if necessary
  - camera, locate, map, and diagnose storm line problems SW corner of warehouse
  - floor scan, saw cut, and patch seven (7) locations 4'x 4' square

8. **National Transportation Office Remodel**

Scope of Work: *Demo and Updates*
Carpet (upstairs office / stairs / three downstairs offices)

- Metal stairnose

- Mercer strip

- Stair carpet with 32oz. felt pad

- Carpet tile

- Take up and haul away two layers and tack strip

- Remove and replace with new cove base 4"

- Basic floor prep

- Moving all heavy office furniture

Exhibit "B"

- Downstairs office walls
  - Move all furniture away from walls that need to be painted
  - Patch and repair walls as needed with Duro-Bond patching compound
  - Prime areas of repair
  - Paint walls in colors to match existing
  - Paint cafeteria support beams
  - Paint hollow metal window frames within suite
  - Paint hollow metal door frames
  - Remove and replace ceiling tiles

- Upstairs office including stairwell walls
  - Move all furniture away from walls that need to be painted
  - Patch and repair walls as needed with Duro-Bond patching compound
  - Prime areas of repair
  - Paint wall in color to match existing
  - Paint hollow metal window frames within suite
  - Paint hollow metal door frames

- Remove and replace ceiling tiles

9. **Initial $1,000,000 Building improvement allowance**

   *To be mutually agreed upon by Landlord and Tenant and shall consist solely of improvements to the Buildings on the Property to repair, replace or improve such Buildings for the continued benefit of any user of the Buildings rather than uses specific or limited to Tenant*

\\END

<u>YEAR 2</u>

10. **Remaining roof replacement (Areas C, D, F, and R) – see attached Korellis proposal/scope PK170803A & D**

11. **Repair & insulate walls**

- Remove and replace up to 200' of interior wall insulation

12. **I-Beams to be repaired**

- Remove and replace up to ten (10) I-beams

13. **Repair rain gutters (north side)**
- Break out two (2) existing 50'x 5' troughs and basins

  - Supply and install new basins
  - Hook up to sewer
  - Place 12" of ¾" stone
  - Pin in rebar
  - Supply and install new troughs
  - Pour new 4,000 PSI concrete

- Break out three (3) existing 20'x 5' troughs and basins

  - Supply and install new basins
  - Hook up sewer line
  - Place 12" of ¾" stone
  - Pin in rebar
  - Supply and install new troughs
  - Pour new 4,000 PSI concrete

14. **Repair exterior fence line**
  - Contractor will replace/repair all perimeter fencing as required as exists around larger site.

15. **Red Room remodel – VCT (Upstairs Office/Lunch Room)**
- Upstairs office

  - All colors and styles TBD
  - Supply and install all materials
  - Underlayment – tile - cove base
  - Move all heavy office furniture

- Lunch room

  - All colors and styles TBD
  - Supply and install all materials
  - Underlayment and repair plywood- tile- cove base
  - Move all heavy office furniture

- Large cafeteria walls

Exhibit "B"

- o  If applicable, inject paste into bubbled areas and lay wall paper flat again.  If not applicable, cut open and patch
- o  Patch and repair walls as needed with Duro-Bond patching compound
- o  Paint over wallpaper with paint color of choice
- Remove and replace ceiling tiles in the lunch room area

16. **Main office remodel**

*Work scope to be further reasonably determined by Tenant and Landlord (NOTE: limited to $100,000 in cost)*

\\END

Exhibit "B"

## YEAR 3

**17. Move Phone Room**

- Landlord will relocate phone room to an area of Tenant's choosing subject to reasonable costs associated with such relocation and cooperation from utility, where and if applicable.

**18. Maintenance of exterior fire tank**

*Work scope to be further reasonably determined by Tenant and Landlord.*

**19. Exterior skin blasting and repair expansion (vacant area)**

- Two exterior L-shaped walls facing Division Street
  - Supply aerial equipment
  - Spot tuckpoint to make water tight
  - Mask and protect surrounding areas
  - Power wash entire scope to rid of loose paint and other contaminants that interfere with coating adhesion
  - Prime walls with Sherwin Williams exterior Loxon primer
  - Paint walls with exterior paint in a "brown" colored shade of paint
  - Paint exterior side of hollow metal doors and frames
  - Paint exterior side of overhead doors and frame

**20. Additional $500,000 Building improvement allowance**

*To be mutually agreed upon by Landlord and Tenant and shall consist solely of improvements to the Buildings on the Property to repair, replace or improve such Buildings for the continued benefit of any user of the Buildings rather than uses specific or limited to Tenant*

\\END

Exhibit "B"

# FIRST AMENDMENT TO
# AMENDED AND RESTATED LEASE AGREEMENT

This First Amendment to Amended and Restated Lease Agreement ("**First Amendment**"), is entered into as of the 19th day of November, 2018, by and between Harvard Division, LLC, a Delaware limited partnership ("**Landlord**") and True Value Company, a Delaware corporation ("**Tenant**").

## RECITALS:

A.      Landlord and Tenant entered into that certain Amended and Restated Lease Agreement dated as of February 28, 2018 (the "**Lease Agreement**") for those certain buildings commonly known as 308 South Division Street, Harvard, Illinois 60033 (the "**Premises**").

B.      Pursuant to Paragraph 14.2.A of the Lease Agreement, the Tenant Deductible for the Causes of Loss – Special Form property insurance required to be maintained by Tenant is $25,000.00 (the "**Original Tenant Deductible**").  Tenant wishes to raise the Tenant Deductible to $250,000.00.

C.      Landlord is willing to allow Tenant to raise the Tenant Deductible to $250,000.00 strictly upon the terms and conditions as more fully set forth herein.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Recitals/Definitions.  The foregoing recitals are hereby incorporated into and made a part of this First Amendment by this reference.  All capitalized terms in this First Amendment shall have the same meaning ascribed thereto in the Lease Agreement, unless otherwise provided herein. The Lease Agreement and this First Amendment are collectively referred to as the "**Lease**".

2.      Effective Date of First Amendment.  This First Amendment shall be effective commencing effective as of July 1, 2018 (the "**Effective Date**").

3.      Insurance Deductible Requirements.  Subject to Landlord receiving Lender Approval as set forth below, the Tenant Deductible as set forth in Paragraph 14.2.A of the Lease Agreement, shall be increased from $25,000.00 to $250,000.00 (the "**Increased Tenant Deductible**"); provided, however, that Tenant shall be deemed to be self-insuring the difference between the Original Tenant Deductible and the Increased Tenant Deductible of $225,000.00 (the "**Self-Insured Amount**"), such that Tenant shall be solely responsible for contributing up to the Self-Insured Amount towards any insured repairs required to be made by either Landlord or Tenant, including, without limitation,

1

pursuant to Paragraphs 10 and 11 of the Lease Agreement, respectively, or in the event of a partial or total destruction pursuant to Paragraph 19 of the Lease Agreement. In addition, in the event that any present or future lender of Landlord (each, a "**Lender**") does not consent to, or otherwise approve, the Increased Tenant Deducible, Tenant shall cause the Tenant Deductible to be lowered to an amount acceptable to such Lender, but in no event to less than the Original Tenant Deductible. In connection therewith, Tenant recognizes that Landlord is required to obtain the consent from its current Lender before the Increased Tenant Deductible can become effective (the "**Lender Consent**"). Accordingly, Tenant hereby agrees to reimburse Landlord for its actual out of pocket costs, including attorney's fees, required to obtain the Lender Consent and to prepare this First Amendment.

4.      Landlord's Insurance.   Landlord's obligation to reimburse the Tenant Deductible pursuant to Paragraph 14.1 of the Lease Agreement shall be limited in all events to $25,000.00 regardless of whether the Tenant Deductible has been increased over that amount, including, without limitation, pursuant to Paragraph 3 above.

5.      Intentionally Deleted.

6.      Effect of First Amendment.  Except as specifically amended in this First Amendment, all of the terms and conditions of the Lease Agreement continue in full force and effect. In the event of any conflict between the terms of this First Amendment and the terms of the Lease Agreement, the terms of this First Amendment shall prevail.

7.      Counterparts and Electronic Signatures.  This First Amendment may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, and such counterparts shall together constitute but one and the same First Amendment. The parties shall be entitled to sign and transmit an electronic signature of this First Amendment (whether by facsimile, PDF or other email transmission), which signature shall be binding on the party whose name is contained therein.  Any party providing an electronic signature agrees to promptly execute and deliver to the other parties an original signed First Amendment.

8.      Entire Agreement.  This First Amendment contains the entire understanding and agreement between the parties relating to the matters covered hereby and supersedes all prior or contemporaneous negotiations, arrangements, agreements, understandings, representations, and statements, whether oral or written, with respect to the matters covered hereby, all of which are merged herein and shall be of no further force or effect.

*[**Signatures appear on the following page**]*

2

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Amended and Restated Lease Agreement as of the date first written above.

**LANDLORD**:

**Harvard Division, LLC**,
a Delaware limited liability company

By:     Holdings SPE Manager, LLC
        a Delaware limited liability company,
        its Manager

        By:     _____
                John A. Mase
                Chief Executive Officer

Dated: _11/20/18_____

**TENANT**:

**True Value Company**,
a Delaware corporation

By:     _____
        Abhinav Shukla
        S.V.P. / Chief Operating Officer

Dated: _11/16/18_____

S-1

## SECOND AMENDMENT TO
## AMENDED AND RESTATED LEASE AGREEMENT

This Second Amendment to Amended and Restated Lease Agreement (this "Amendment") is made and entered into as of April 2-2 2019 by and between Harvard Division, LLC, a Delaware limited liability company ("Landlord") and True Value Company, L.L.C. a Delaware corporation ("Tenant").

## RECITALS

A.    Landlord, as landlord, and Tenant, as tenant, are parties to that certain Amended and Restated Lease Agreement dated as of February 28, 2018 (the "Original Lease"), as amended by that certain First Amendment to Amended and Restated Lease Agreement dated November 19, 2018 (the "First Amendment") and that certain Memorandum of Understanding dated March 12, 2018 (the "Memo", the Memo, the First Amendment and the Original Lease are hereinafter referred to, collectively, as the "Lease"), whereby Landlord leased to Tenant certain premises commonly known as 308 South Division Street, Harvard, Illinois.

B.    Landlord and Tenant desire to clarify the responsibility for the maintenance of and payment of expenses for the Paving Areas (defined below).

## AGREEMENTS

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Recitals.**  The recitals set forth above are incorporated herein and made a part of this Amendment to the same extent as if set forth herein in full.

2.    **Parking Areas**.  Landlord shall maintain in good repair, the parking areas, loading and unloading areas, trash areas, roadways and driveways located on the Property (the "Paving Areas").  Common Expenses shall include the repair, maintenance and replacement of the Paving Areas.  Tenant shall be responsible for the payment of Common Expenses relating to the Paving Areas, which, at Landlord's election, shall be paid either (a) as part of Project Expenses pursuant to Paragraph 5.2 of the Original Lease; or (b) within ten (10) days following Landlord's invoice therefor.  Notwithstanding the foregoing, if a contractor engaged by Landlord shall require payment in advance for the completion of any repair, maintenance or replacement of the Paving Areas, Tenant shall make such advance payment to Landlord within ten (10) days following Landlord's written demand therefor. For the avoidance of doubt, attached hereto as Exhibit A is a schedule (the "Paving Schedule") setting forth anticipated repairs, maintenance and replacement of the Paving Areas to be completed during calendar years 2019-2021 (the "Immediate Paving Work").  Landlord and Tenant acknowledge and agree that to the extent the Immediate Paving Work has not yet been completed, the Immediate Paving Work shall be completed by Landlord in accordance with the Paving Schedule and amounts due for such Immediate Paving Work shall be the responsibility of Tenant in accordance with Paragraph 2 of this Amendment.  Tenant may

utilize Building Improvement Allowance amounts as set forth in Exhibit B of the Lease as payment to Landlord for work performed on such Paving Areas.

   3.  **Miscellaneous**. This Amendment shall bind and inure to the benefit of Landlord and Tenant and all of their respective successors and assigns. Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written. All capitalized terms used, but not defined herein, shall have the meaning set forth in the Lease. This Amendment, together with the Lease, sets forth the entire agreement between the parties with respect to the subject matter set forth herein and therein and may not be modified, amended, or altered, except by subsequent written agreement between the parties. In case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control. A determination that any provision of this Amendment is unenforceable or invalid shall not affect the enforceability or validity of any other provision hereof. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A facsimile or .pdf copy of this Amendment shall be deemed an original for all relevant purposes.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed as of the date first written above.

LANDLORD:

**HARVARD DIVISION, LLC,**
a Delaware limited liability company

By:     Holdings SPE Manager, LLC,
        a Delaware limited liability company,
        its Manager

_____

John A. Mase
Chief Executive Officer


TENANT:

**TRUE VALUE COMPANY, L.L.C.**
a Delaware corporation

By: _____
Name: _James_ _Harrington_
Title: _VP Supply Chain_

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed as of the date first written above.

**LANDLORD:**

**HARVARD DIVISION, LLC,**
a Delaware limited liability company

By:    Holdings SPE Manager, LLC,
        a Delaware limited liability company,
        its Manager

        John A. Mase
        Chief Executive Officer

**TENANT:**

**TRUE VALUE COMPANY, L.L.C.**
a Delaware corporation

By:
Name: James Harrington
Title: VP Supply Chain

<u>Exhibit A</u>

Paving Schedule

(attached hereto)

True Value – Immediate Paving Work

| Quantity | U/M | Description - 2019 | | |
|---|---|---|---|---|
| 14,718.00 | SF | 4.0" Asphalt Removal and Replacement W Base Compaction (Green) | | |
| 16,120.00 | SF | 4.0" Asphalt Removal and Replacement W Base Compaction (Green) | | |
| 80,183.00 | SF | 4.0" Asphalt Removal and Replacement W Base Compaction (Red) | | |
| 13,800.00 | SF | Excavate Existing Turf To A Depth Of 12.0" and Haul Spoils Offsite | | |
| | | Furnish and Install 4.0" Aggregate Base Course (Yellow) | | |
| | | Frame and Four New 8.0" Fiber-Reinforced Concrete Pad | | |
| 133,295.00 | SF | 4.0" Asphalt Removal and Replacement W Base Compaction (White) | | |
| | | | | |

| Quantity | U/M | Description - 2020 | | |
|---|---|---|---|---|
| 137,856.00 | SF | 4.0" Asphalt Removal and Replacement W Base Compaction (Blue) | | |
| 24,737.00 | SF | 4.0" Asphalt Removal and Replacement W Base Compaction (Red) | | |
| | | | | |
| | | | | |

| Quantity | U/M | Description - 2021 | | |
|---|---|---|---|---|
| 145,647.00 | SF | 2.0" Asphalt Mill and Resurface W Tack Coat (Black) | | |
| | | | | |
| | | | | |





308 s Division
Harvard

Year 2  4" Mill and pave

**308 s Division Harvard**

**Year 3, 2" Mill and pave**

Pol-10

145,647 sq ft

**<u>EXHIBIT B</u>**

**Lease Amendment**

## THIRD AMENDMENT TO
## AMENDED AND RESTATED LEASE AGREEMENT

THIS THIRD AMENDMENT TO AMENDED AND RESTATED LEASE AGREEMENT (the "**Amendment**") is executed on March __27_, 2025, and made effective as of the Effective Date (defined below) by and between **STNL II OPERATING CORP.**, a Delaware corporation, successor in interest to Harvard Division, LLC ("**Landlord**"), and **TV HARDWARE DISTRIBUTION, LLC**, an Indiana limited liability company ("**Tenant**").

## RECITALS:

A.      Landlord, as landlord, and True Value Company, L.L.C., a Delaware limited liability company ("**TVC LLC**"), as tenant, are parties to that certain Amended and Restated Lease Agreement dated February 28, 2018 (the "**Original Lease**"), as amended by that certain First Amendment to Amended and Restated Lease Agreement dated November 19, 2018 (the "**First Amendment**"), and as further amended by that certain Second Amendment to Amended and Restated Lease Agreement dated April 22, 2019 (the "**Second Amendment**" together with the Original Lease and the First Amendment hereinafter collectively referred to as the "**Lease**"), whereby Landlord leases to TVC LLC certain premises on the property commonly known as 308 South Division Street, Harvard, Illinois and as more particularly described in the Lease (the "**Premises**").

B.      On October 14, 2024, TVC LLC and its affiliates (collectively, the "**Debtors**") filed for relief (the "**Bankruptcy**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

C.      On November 10, 2024, the Debtors and Do it Best Corp., an Indiana corporation ("**DIB**") entered into an Amended and Restated Asset Purchase Agreement (the "**APA**"), pursuant which DIB and its designee(s) (the "**Purchaser**") agreed to purchase substantially all of the Debtors' assets, including those executory contracts and non-residential real property leases of the Debtors that the Purchaser designated for assumption by the Debtors and assignment to the Purchaser under Section 365 of the Bankruptcy Code.

D.      On November 13, 2024, the Bankruptcy Court entered an order authorizing the sale of substantially all of the Debtors' assets to the Purchaser pursuant to the terms of the APA and applicable provisions of the Bankruptcy Code [Doc. 411] (the "**Sale Order**").  The Sale Order and the APA contemplate that the Debtors will provide transition services to the Purchaser following the closing of the sale pursuant to a Transition Services Term Sheet attached as an exhibit to the APA (the "**TSA**"), including access to the Debtors' rights under executory contracts and non-residential real property leases not assumed and assigned as of the sale closing (the "**TSA Contracts**").

E.      The sale of substantially all of the Debtors' assets pursuant to the Sale Order closed on November 22, 2024.

F.      On December 11, 2024, the Bankruptcy Court entered an order implementing procedures for the assumption and assignment of TSA Contracts [Doc. 688] (the "**TSA Contract Procedures Order**") pursuant to which DIB was authorized to direct the Debtors to assume and assign TSA Contracts to DIB (or its affiliate designees) upon prior notice to the contract counterparties.  TSA Contracts assumed and assigned to DIB (or its affiliate designees) in compliance with the TSA Contract Procedures Order are "Transferred Assets" for all purposes under the Sale Order and the APA, subject to payment of any and all amounts necessary to cure defaults under such TSA Contract as required by Sections 365(b)(1)(a) and (b) of the Bankruptcy Code (the "**Cure Amounts**").

G.      Landlord and Tenant desire to amend the Lease to, among other things, recognize the assumption of the Lease by TVC LLC, the assignment of the Lease, as hereby amended, from TVC LLC to Tenant; waive certain cure amounts as stated herein and in the Objection of STNL II (Harvard), LLC to Notice of Proposed Assumption and Assignment of Certain Executory Contracts ("**Cure Objection**") (Doc. No. 425); and abate a portion of Tenant's Base Rent obligation, on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      **Recitals**.  The recitals set forth above are incorporated herein by this reference with the same force and effect as if fully set forth hereinafter.

2.      **Effective Date Subject to Bankruptcy**.  Notwithstanding anything in this Amendment to the contrary, the "**Effective Date**" of this Amendment shall be the date the Bankruptcy Court enters a final order, effective immediately upon entry, in which TVC LLC assumes the Lease and assigns the Lease to Tenant (the "**Court Order**"). A copy of the Court Order entered by the Bankruptcy Court will be attached hereto as <u>Exhibit A</u> upon issuance.  Notice of the proposed assumption and assignment of the Lease, as amended by this Amendment, will be served on Landlord by the Debtors in accordance with the TSA Contract Procedures Order, and Landlord will not interpose an objection to such notice.  On the Effective Date, this Amendment shall become effective, and the Lease shall be assumed by TVC LLC and assigned to Tenant, as amended by this Amendment, for all purposes under the Sale Order, the APA, and the Court Order. This Amendment shall become null and void if the Court Order is not entered by the Bankruptcy Court by April 15, 2025.

3.      **Landlord's Adjustment of Cure Amounts**.

        (a)      Landlord waives its cure amounts of $265,591.04 relating to roof improvements performed prior to the Bankruptcy and an amount no less than $22,500.00 representing Landlord's legal fees incurred in the Bankruptcy as identified in its Cure Objection.

        (b)      Tenant and Landlord hereby acknowledge and agree that Landlord has completed, to Tenant's satisfaction, the Tenant Improvements set forth in the Original Lease, including, without limitation, <u>Exhibit B</u> to the Original Lease, and that the remaining balance of the Building Improvement Allowance is zero.

4.      **Paving Areas.**  The Second Amendment is hereby deleted in its entirety and the following provision now controls:  Landlord shall maintain in good repair the parking areas, loading and unloading areas, trash areas, roadways and driveways located on the Property (collectively, the "**Paving Areas**").  Common Expenses shall include the repair, maintenance and replacement of the Paving Areas; provided, however, that Landlord shall amortize the cost of any Paving Area capital repairs or replacements over the Useful Life thereof, and only the amortized amount thereof attributable to any particular Computation Year (or portion thereof), at an interest rate of eight percent (8%), shall be includable as part of the Common Expenses for such Computation Year (or portion thereof) (it being acknowledged and agreed that the Useful Life for any capitalized Paving Area expenses shall be deemed to be ten (10) years).  Notwithstanding the foregoing, (A) Landlord agrees that it will not undertake any capitalized paving work for the Paving Area commonly known as the North Truck Lot as shown on <u>Exhibit D</u> attached hereto during the original Term of the Lease; (B) Landlord shall complete the paving replacement project for the Paving Area commonly known as the Southwest Lot as shown on <u>Exhibit E</u> attached hereto, at its sole cost and expense, without reimbursement from Tenant in any form, whether by way of Common Expenses or otherwise, which shall be completed by November 30, 2025; and (C) Landlord shall not be required to undertake any capitalized paving work, other than on the Southwest Lot, as aforesaid, during the remaining original Term of the Lease.

5.      **Assignment and Assumption of Lease as Amended**.  Upon the Effective Date, the Lease, as amended hereby, shall be assigned from TVC LLC to Tenant pursuant to a certain Assignment and Assumption of Lease, delivered pursuant to the Sale Order and the APA in the form of <u>Exhibit B</u> attached hereto (the "**Assignment**"). Pursuant to the Assignment, as of November 22, 2024 (the "**Assignment Effective Date**"), TVC LLC will sell, convey, transfer, deliver and assign to Tenant, and Tenant will purchase, accept and assume, (a) all of TVC LLC's right, title, benefits, privileges and interest, legal and equitable, in and to the Lease and (b) all responsibilities, liabilities and obligations of TVC LLC  that arise under the Lease, as hereby amended, on or after the Assignment Effective Date (the "**Assumed Lease Liabilities**").  Notwithstanding anything to the contrary in this section, Tenant's Assumed Lease Liabilities shall include (i) all accrued but unbilled Project Expenses, whether accrued prior to or after the Assignment Effective Date; and (ii) any Tenant maintenance, repair or replacement obligations under the Lease, as hereby amended, including, without limitation, pursuant to Section 11 of the Original Lease, whether the obligation arose prior to or after the Assignment Effective Date.  For the avoidance of doubt, Tenant hereby expressly assumes the Assumed Lease Liabilities in favor of Landlord, which assumption shall be unaffected by any provision set forth in the APA or the Assignment.

6. **Abatement of Base Rent**. The monthly installments of Base Rent for (a) the first two (2) full calendar months following the Effective Date of this Amendment, (b) the month of January 2026, and (c) the month of January 2027 shall be abated one hundred percent (100%) such that Base Rent shall be $0.00 for those months. Notwithstanding such abatement of Base Rent, all other sums due under the Lease, as hereby amended, including, without limitation, Additional Rent and sales tax (if applicable), shall be payable as provided in the Lease, as hereby amended. The abatement of Base Rent is conditioned upon Tenant's full and timely performance of all of its obligations under the Lease, as hereby amended. If, at any time during the Term, a default by Tenant occurs beyond applicable notice and cure period, then any abatement of Base Rent provided for in this section not already applied prior to such default shall immediately become void.

7. **Notice Address**. Tenant's notice address in Section 28 of the Original Lease is hereby deleted and the following is inserted in its place:

> **To Tenant**:    Do it Best Corp.
> 1626 Broadway, Suite 100
> Fort Wayne, Indiana 46802
> Attention: Gary Furst, General Counsel
>
> With a copy to:    Do it Best Corp.
> 1626 Broadway, Suite 100
> Fort Wayne, Indiana 46802
> Attention: Tim Miller, SVP

8. **Premises**. Tenant hereby accepts the Premises and the Building (including the suitability of the Premises for the use permitted under the Lease) on a completely "AS-IS", "WHERE-IS" basis and without relying on any representation or warranty (express or implied) of Landlord or any representative of Landlord, except for Landlord's representation and warranties set forth in this Amendment, but Tenant's maintenance, repair and replacement obligations as stated under the Lease, as hereby amended, shall not be diminished because of the condition of the Premises as of the Assignment Effective Date or the Effective Date. Landlord shall not be required to make any repairs, replacements or improvements (whether structural or otherwise) of any kind or nature in connection with, or in consideration of, this Amendment; provided, however, that the foregoing shall not diminish Landlord's obligations expressly set forth in the Lease.

9. **Guarantee**. Concurrently with the execution of this Amendment, DIB has delivered the Guaranty Agreement in the form of <u>Exhibit C</u> (the "**Guaranty of Lease**") attached hereto executed by DIB (the "**Guarantor**"). As of the Effective Date, each of the following shall constitute a breach under the Lease:

(a)    If Guarantor shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to any federal or state law or shall be adjudicated a bankrupt or become insolvent or shall make an assignment for the benefit of creditors, or if a petition proposing the adjudication Guarantor as a bankrupt or its reorganization pursuant to any federal or state bankruptcy law or any similar federal or state law shall be filed in any court and Guarantor shall consent to or acquiesce in the filing thereof or such petition shall not be discharged or denied within ninety (90) days after the filing thereof.

(b)    If a receiver, trustee or conservator of Guarantor, or of all or substantially all of the assets of Guarantor shall be appointed in any proceeding brought by Guarantor or if any such receiver, trustee or conservator shall be appointed in any proceeding brought against Guarantor and shall not be discharged within ninety (90) days after such appointment, or Guarantor shall consent to or acquiesce in such appointment.

(c)    If Tenant fails to deliver, or fails to cause Guarantor to deliver, any financial statements required to be delivered under the Guaranty of Lease, provided that Landlord shall not exercise any of its rights or remedies hereunder for such failure to timely deliver any required financial statement unless the breach continues to exist after Landlord has provided Tenant with ten (10) days' written notice.

171372949v7

10.    **Ratification of Lease as Amended**.  Tenant represents and warrants to Landlord that as of the date of this Amendment: (a) to Tenant's knowledge, Landlord is not in default in the performance of any of its obligations under the Lease and Tenant is unaware of any condition or circumstance which, with the giving of notice or the passage of time or both, would constitute a default by Landlord; (b) Landlord has completed, to Tenant's satisfaction, any and all improvements to, or serving, the Premises to be constructed by Landlord, subject to Landlord's maintenance and repair obligations set forth in the Lease; (c) Landlord has paid any and all allowances required of it under the Lease; and (d) to Tenant's knowledge, Tenant has no defenses, liens, claims, counterclaims or right to offset against Landlord or against the obligations of Tenant under the Lease.  Landlord hereby covenants, represents and warrants to Tenant that: (i) upon the issuance of the Court Order, no third party consents or approvals are required in order for it to enter into this Amendment; (ii) upon the issuance of the Court Order, the execution, delivery and full performance of this Amendment by it does not and shall not constitute a violation of any contract, agreement, mortgage, undertaking, judgment, law, decree, governmental or court or other restriction of any kind to which it is a party or by which it may be bound; (iii) it is the Landlord for the Premises and is duly organized, validly existing and in good standing under the laws of the state of its organization and has full power and authority to enter into this Amendment, to perform its obligations under this Amendment in accordance with its terms; and (iv) to Landlord's knowledge, (a) no default by Tenant exists under the Lease as modified and amended by this Amendment, and (b) there is no material deferred maintenance related to Tenant's obligations under the Lease; and (v) all Project Expenses are billed monthly and reconciled annually.

11.    **Tenant Authorization**.  Tenant represents and warrants that, subject to the Court Order, this Amendment has been duly authorized, executed and delivered by and on behalf of Tenant and constitutes the valid and binding agreement of Tenant in accordance with the terms hereof.

10.    **Signage**.  Notwithstanding anything set forth in the Lease to the contrary, Tenant may, with Landlord's prior written approval, not to be unreasonably withheld, install Do it Best corporate signage on the Premises, so long as such signage is in compliance with all applicable laws, rules, regulations and requirements now or hereafter in force.

11.    **Brokers**.  Tenant represents and warrants to Landlord that Tenant has not dealt with any real estate broker, salesperson or finder, other than Keen-Summit Capital Partners LCC ("**Tenant's Broker**"), in connection with this Amendment and Tenant agrees to indemnify and hold Landlord harmless from all damages, liability and expense (including attorneys' fees) arising from any claims or demands of any broker or brokers or finders, including Tenant's Broker, for any commission alleged to be due such broker or brokers or finders claiming through Tenant.

12.    **Miscellaneous**.  This Amendment shall bind and inure to the benefit of Landlord and Tenant and all of their respective successors and assigns.  Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written.  All capitalized terms used, but not defined herein, shall have the meaning set forth in the Lease.  This Amendment, together with the Lease, sets forth the entire agreement between the parties with respect to the subject matter set forth herein and therein and may not be modified, amended, or altered, except by subsequent written agreement between the parties.  In case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control.  A determination that any provision of this Amendment is unenforceable or invalid shall not affect the enforceability or validity of any other provision hereof.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  A facsimile or .pdf copy of this Amendment shall be deemed an original for all relevant purposes.

[NO FURTHER TEXT ON THIS PAGE]

4

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by their duly authorized representatives effective as of the Effective Date hereof.

**LANDLORD**:
**STNL II OPERATING CORP.**,
a Delaware corporation

By: _____
Name: _____Jill A. Matarese_____
Its: _____Vice President_____


**TENANT**:
**TV HARDWARE DISTRIBUTION, LLC**,
an Indiana limited liability company

By: _____
Name: Tim Miller
Its:  SVP, Logistics & Distribution

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by their duly authorized representatives effective as of the Effective Date hereof.

**LANDLORD**:
**STNL II OPERATING CORP.,**
a Delaware corporation

By: _____
Name: _____
Its: _____

**TENANT**:
**TV HARDWARE DISTRIBUTION, LLC**,
an Indiana limited liability company

By: _____
Name: Tim Miller
Its:  SVP, Logistics & Distribution

Docusign Envelope ID: 1D260A8D-8CA8-46A5-8D96-G062BB10055C

**EXHIBIT A**
**COURT ORDER**

**[to be attached]**

171372949v7

**EXHIBIT B**
**FORM OF LEASE ASSIGNMENT**

**ASSIGNMENT AND ASSUMPTION OF LEASE**

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Agreement") is made and entered into as of November 22, 2024 (the "Effective Date"), by and between **TRUE VALUE COMPANY, L.L.C.**, a Delaware limited liability company ("Assignor"), and **TV HARDWARE DISTRIBUTION, LLC**, an Indiana limited liability company ("Assignee").

**W I T N E S S E T H:**

**WHEREAS**, Assignor and **STNL II OPERATING CORP.**, a Delaware corporation, successor in interest to Harvard Division, LLC ("Landlord"), entered into that certain Amended and Restated Lease Agreement dated February 28, 2018 (the "Original Lease"), as amended by that certain First Amendment to Amended and Restated Lease Agreement dated November 19, 2018 (the "First Amendment"), and as further amended by that certain Second Amendment to Amended and Restated Lease Agreement dated April 22, 2019 (the "Second Amendment" together with the Original Lease and the First Amendment hereinafter collectively referred to as the "Lease"), whereby Landlord leases to Assignor certain premises on the property commonly known as 308 South Division Street, Harvard, Illinois and as more particularly described in the Lease; and

**WHEREAS**, an Order, dated _____, 2025, of the United States Bankruptcy Court for the District of Delaware, which case, Chapter 11 Case No. 24-12337 (KBO), for Assignor is now pending, had authorized and approved (i) assumption of the Lease, and (ii) pursuant to the terms of this Assignment, the assignment of the Lease; and

**WHEREAS**, Assignor, the other Sellers (as defined therein) party thereto, and Assignee's parent are parties to that certain Amended and Restated Asset Purchase Agreement, dated as of November 10, 2024 (the "Purchase Agreement"), providing for, among other things, the sale, conveyance, assignment, transfer and delivery by Assignor to Assignee of Assignor's right, title and interest in and to the Lease.

**WHEREAS**, as of the Effective Date, and subject to the terms of the Purchase Agreement, Assignor wishes to assign to Assignee all of its rights and obligations under the Lease and Assignee wishes to accept such assignment and assume the rights and obligations of Assignor under the Lease, in each case, as further set forth below.

**NOW, THEREFORE**, in consideration of the premises and covenants hereinafter contained, in consideration of the representations, warranties and covenants contained in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Assignment of Lease**. As of the Effective Date, Assignor hereby sells, conveys, transfers, delivers and assigns to Assignee, and Assignee hereby purchases, accepts and assumes, (a) all of Assignor's right, title, benefits, privileges and interest, legal and equitable, in and to the Lease and (b) all responsibilities, liabilities and obligations of Assignor that arise under the Lease on or after the Effective Date (the "Assumed Lease Liabilities"). Notwithstanding anything to the contrary in this section, the Assumed Lease Liabilities shall include (i) all accrued but unbilled Project Expenses, whether accrued prior to or after the Effective Date; and (ii) any Tenant maintenance, repair or replacement obligations under the Lease, including, without limitation, pursuant to Section 11 of the Original Lease, whether the obligation arose prior to or after the Effective Date.

2.    **No Amendment, Modification**. Nothing herein contained shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms and conditions set forth in the Purchase Agreement in any manner whatsoever. This Agreement does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the terms and conditions set forth in the Purchase Agreement. In the event of any conflict or other difference between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control. No waiver, modification or change of any of the provisions of this Agreement shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

3.    **Assignment**. This Agreement shall be binding upon and inure to the benefit of Assignee and Assignor

7

171372949v7

and their respective successors and permitted assigns. The sole and exclusive remedy of Assignee and Assignor with respect to a breach of this Agreement shall be as set forth in the Purchase Agreement. This Agreement shall not confer any rights or remedies upon any person other than Assignor, Assignee and their respective successors and permitted assigns.

4.      **Headings; Definitions**. The headings and captions of the several Sections of this Agreement are inserted for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. References to Sections, unless otherwise indicated, are references to Sections of this Agreement.  Terms not otherwise specifically defined herein shall have the meanings set forth in the Lease.

5.      **Governing Law; Submission to Jurisdiction; Specific Performance;  Waiver of Jury Trial; Severability, Limitation on Damages, No Recourse**. The Parties agree that Sections 10.10, 10.11, 10.13, 10.15, 10.16, 10.19, and 10.20 of the Purchase Agreement shall apply to this Agreement, *mutatis mutandis*.

6.      **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by electronic communications in portable document format (.pdf), each of which shall be deemed an original.

7.      **Acknowledgment and Agreement of Assignee**.  Notwithstanding anything set forth in this Agreement or the Purchase Agreement to the contrary, Assignee acknowledges and agrees that its assumption of the Assumed Lease Liabilities, as set forth in Section 1 of this Agreement, shall be unaffected by any other provision of this Agreement or the Purchase Agreement.

*[Signature Pages Follow]*

8

171372949v7

**IN WITNESS WHEREOF,** Assignor and Assignee have caused this Agreement to be executed by their duly authorized representatives to be effective as of the Effective Date.

ASSIGNOR:

**TRUE VALUE COMPANY, L.L.C.,**
a Delaware limited liability company

By:_____
Name:
Title:

ASSIGNEE:

**TV HARDWARE DISTRIBUTION, LLC,**
an Indiana limited liability company

By:_____
Name: Tim Miller
Title: SVP, Logistics & Distribution

**EXHIBIT C**
**FORM OF GUARANTY**

GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty"), is made and entered into by DO IT BEST CORP., an Indiana corporation ("Guarantor"), on the _____ day of _____, 2025, but effective as of the Effective Date (defined in Section 2.01), to STNL II OPERATING CORP., a Delaware corporation ("Landlord").

W I T N E S S E T H :

WHEREAS, Landlord, as lessor, and True Value Company, L.L.C. ("TVC LLC"), as lessee, are parties to that certain Amended and Restated Lease Agreement dated February 28, 2018, as amended by that certain First Amendment to Amended and Restated Lease Agreement dated November 19, 2018, and as further amended by that certain Second Amendment to Amended and Restated Lease Agreement dated April 22, 2019 (the "Original Lease"), in which Landlord leases to TV LLC certain premises in Harvard, Illinois (the "Leased Premises");

WHEREAS, on October 14, 2024, TVC LLC and its affiliates (collectively, the "Debtors") filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, on November 10, 2024, the Debtors and Guarantor entered into an Amended and Restated Asset Purchase Agreement (the "APA"), pursuant which Guarantor and its designee(s) (the "Purchaser") agreed to purchase substantially all of the Debtors' assets, including those executory contracts of the Debtors that the Purchaser designated for assumption by the Debtors and assignment to the Purchaser under Section 365 of the Bankruptcy Code.

WHEREAS, on November 13, 2024, the Bankruptcy Court entered an order authorizing the sale of substantially all of the Debtors' assets to the Purchaser pursuant to the terms of the APA and applicable provisions of the Bankruptcy Code [Doc. 411] (the "Sale Order"). The Sale Order and the APA contemplate that the Debtors will provide transition services to the Purchaser following the closing of the sale pursuant to a Transition Services Term Sheet attached as an exhibit to the APA (the "TSA"), including access to the Debtors' rights under executory contracts not assumed and assigned as of the sale closing (the "TSA Contracts").

WHEREAS, the sale of substantially all of the Debtors' assets pursuant to the Sale Order closed on November 22, 2024.

WHEREAS, on December 11, 2024, the Bankruptcy Court entered an order implementing procedures for the assumption and assignment of TSA Contracts [Doc. 688] (the "TSA Contract Procedures Order") pursuant to which Guarantor was authorized to direct the Debtors to assume and assign TSA Contracts to Guarantor or its affiliate designees upon prior notice to the contract counterparties. TSA Contracts assumed and assigned to Guarantor (or its affiliate designees) in compliance with the TSA Contract Procedures Order are "Transferred Assets" for all purposes under the Sale Order and the APA, subject to payment of any and all amounts necessary to cure defaults under such TSA Contract as required by Sections 365(b)(1)(a) and (b) of the Bankruptcy Code.

WHEREAS, Guarantor has designated TV HARDWARE DISTRIBUTION, LLC, an Indiana limited liability company ("Tenant") as its affiliate designee to take the Lease by assignment, subject to and conditioned upon Landlord and Tenant entering into a certain Third Amendment to Amended and Restated Lease Agreement with Tenant (the "Third Amendment", together with the Original Lease, and as the Original Lease may be further amended, the "Lease").

WHEREAS, all of the issued and outstanding stock of Tenant is owned by Guarantor; and

WHEREAS, the execution and delivery by Guarantor of this Guaranty is a material inducement to Landlord to not object to Tenant taking the Lease by assignment and to enter into the Third Amendment, and Guarantor expects to derive financial benefit therefrom.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged by Guarantor, and intending to be legally bound, Guarantor hereby covenants and agrees as follows:

ARTICLE I
GUARANTEE

Section 1.01    Guaranteed Obligations.    Guarantor hereby absolutely unconditionally and irrevocably guarantees to Landlord and its successors and assigns for the due, punctual and full payment, performance and observance of, and covenants with Landlord to duly, punctually and fully pay and perform the Assumed Lease Liabilities (defined in Section 2.01) (collectively, the "Guaranteed Obligations"), as and when the payment, performance or observance of such Assumed Lease Liabilities shall become due (whether by acceleration or otherwise) in accordance with the terms of the Lease, which terms are incorporated herein by reference.  The Guaranteed Obligations shall not be affected by the Tenant's voluntary or involuntary bankruptcy, assignment for the benefit of creditors reorganization or similar proceeding affecting the Tenant.  If for any reason any Guaranteed Obligations shall not be paid promptly when due, Guarantor shall, immediately upon demand, pay the same to Landlord when due under the terms of the Lease.  If for any reason Tenant shall fail to perform or observe any Guaranteed Obligations, Guarantor shall, immediately upon demand, perform and observe the same or cause the same to be performed or observed.  If, by reason of any bankruptcy, insolvency or similar laws affecting the rights of creditors, Landlord shall be prohibited from exercising any of Landlord's rights and remedies, including, but not limited to, enforcement of the terms of the Lease against the Tenant, then as to Guarantor such prohibition shall be of no force and effect, and Landlord shall have the right to make demand upon, and receive payment and/or performance from Guarantor of all Guaranteed Obligations and Guarantor's obligation in this respect shall be primary and not secondary.  Guarantor acknowledges and agrees that the Guaranteed Obligations include, without limitation, Rent and other sums accruing and/or becoming due under the Lease following the commencement by or against Tenant of any action under the United States Bankruptcy Code or other similar statute.  Guarantor shall pay all Guaranteed Obligations to Landlord at the address and in the manner set forth in the Lease or at such other address as Landlord shall notify Guarantor in writing.

Section 1.02    Guarantee Unconditional.  The obligations of Guarantor hereunder are continuing, absolute and unconditional, irrespective of any circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.  Without limiting the generality of the foregoing, the obligations of Guarantor hereunder shall remain in full force and effect without regard to, and shall not be released, discharged, abated, impaired or in any way affected by:

(a)    any amendment, modification, extension, renewal or supplement to the Lease or any termination of the Lease or any interest therein; provided, however, that Guarantor shall not be liable for any amendments, modifications, extensions, renewals, or supplements to the Lease made by any party other than Tenant or its successors or assigns;

(b)    any assumption by any party of Tenant's or any other party's obligations under, or Tenant's or any other party's assignment of any of its interest in, the Lease;

(c)    any exercise or nonexercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Guaranty or the Lease or pursuant to applicable law (even if any such right, remedy, power or privilege shall be lost thereby), including, without limitation, any so-called self-help remedies, or any waiver, consent, compromise, settlement, indulgence or other action or inaction in respect thereof;

(d)    any change in the financial condition of Tenant, the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the assets, marshalling of assets and liabilities, receivership, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting Landlord, Tenant or Guarantor or any of their

11

assets or any impairment, modification, release or limitation of liability of Landlord, Tenant or Guarantor or their respective estates in bankruptcy or of any remedy for the enforcement of such liability resulting from the operation of any present or future provision of the United States Bankruptcy Code or other similar statute or from the decision of any court;

        (e)      any extension of time for payment or performance of the Guaranteed Obligations or any part thereof;

        (f)      the genuineness, invalidity or unenforceability of all or any portion or provision of the Lease;

        (g)      any defense that may arise by reason of the failure of Landlord to file or enforce a claim against the estate of Tenant in any bankruptcy or other proceeding;

        (h)      the release or discharge of or accord and satisfaction with Tenant or any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in the Lease by operation of law or otherwise;

        (i)      the failure of Landlord to keep Guarantor advised of Tenant's financial condition, regardless of the existence of any duty to do so;

        (j)      any assignment by Landlord of all of Landlord's right, title and interest in, to and under the Lease and/or this Guaranty as collateral security for any Loan;

        (k)      any present or future law or order of any government (de jure or de facto) or of any agency thereof purporting to reduce, amend or otherwise affect the Guaranteed Obligations or any or all of the obligations, covenants or agreements of Tenant under the Lease (except by payment in full of all Guaranteed Obligations) or Guarantor under this Guaranty (except by payment in full of all Guaranteed Obligations);

        (l)      the default or failure of Guarantor fully to perform any of its obligations set forth in this Guaranty;

        (m)      any actual, purported or attempted sale, assignment or other transfer by Landlord of the Lease or the Leased Premises or any part thereof or of any of its rights, interests or obligations thereunder;

        (n)      any merger or consolidation of Tenant into or with any other entity, or any sale, lease, transfer or other disposition of any or all of Tenant's assets or any sale, transfer or other disposition of any or all of the shares of capital stock or other securities of Tenant or any affiliate of Tenant to any other person or entity; provided, however, that Guarantor shall not be liable for any amendments, modifications, extensions, renewals, or supplements to the Lease made following any such transaction if the result of such transaction is that Guarantor no longer owns any direct or indirect interest in the Lease;

        (o)      Tenant's failure to obtain, protect, preserve or enforce any rights in or to the Lease or the Leased Premises or any interest therein against any party or the invalidity or unenforceability of any such rights; or

        (p)      any other event, action, omission or circumstances which might in any manner or to any extent impose any risk to Guarantor or which might otherwise constitute a legal or equitable release or discharge of a guarantor or surety.

All of the foregoing may be given or done without notice to, or consent of, Guarantor.

No setoff, claim, reduction or diminution of any obligation, or any defense of any kind or nature which Tenant or Guarantor now has or hereafter may have against Landlord shall be available hereunder to Guarantor against Landlord.

12

Section 1.03    Disaffirmance of Lease.  Guarantor agrees that, in the event of rejection or disaffirmance of the Lease by Tenant or Tenant's trustee in bankruptcy pursuant to the United States Bankruptcy Code or any other law, Guarantor will, if Landlord so requests, assume all Assumed Lease Liabilities, to the same extent as if Guarantor had been the assignee under the Assignment (defined in Section 2.01) and there had been no rejection or disaffirmance; and Guarantor will confirm such assumption in writing at the request of Landlord on or after such rejection or disaffirmance.  Guarantor, upon such assumption, shall have all rights of Tenant under the Lease (to the extent permitted by law).

Section 1.04    No Notice or Duty to Exhaust Remedies.  Guarantor hereby waives notice of any default in the payment or non-performance of any of the Guaranteed Obligations (except as expressly required hereunder), diligence, presentment, demand, protest and all notices of any kind.  Guarantor agrees that liability under this Guaranty shall be primary and hereby waives any requirement that Landlord exhaust any right or remedy, or proceed first or at any time, against Tenant or any other guarantor of, or any security for, any of the Guaranteed Obligations.  Guarantor hereby waives notice of any acceptance of this Guaranty and all matters and rights which may be raised in avoidance of, or in defense against, any action to enforce the obligations of Guarantor hereunder.  Guarantor hereby waives any and all suretyship defenses or defenses in the nature thereof without in any manner limiting any other provision of this Guaranty.  Landlord may pursue its rights and remedies under this Guaranty and under the Lease in whatever order, or collectively, and shall be entitled to payment and performance hereunder notwithstanding any action taken by Landlord or inaction by Landlord to enforce any of its rights or remedies against any other guarantor, person, entity or property whatsoever.  This Guaranty is a guaranty of payment and performance of the Guaranteed Obligations and not merely of collection.

Landlord may pursue its rights and remedies under this Guaranty notwithstanding any other guarantor of or security for the Guaranteed Obligations or any part thereof.  Guarantor authorizes Landlord, at its sole option, without notice or demand and without affecting the liability of Guarantor under this Guaranty, to terminate the Lease, either in whole or in part, in accordance with its terms.

Each default on any of the Guaranteed Obligations shall give rise to a separate cause of action and separate suits may be brought hereunder as each cause of action arises or, at the option of Landlord any and all causes of action which arise prior to or after any suit is commenced hereunder may be included in such suit.

ARTICLE II
EFFECTIVENESS

Section 2.01    Effectiveness Subject to Bankruptcy; Assumed Lease Liabilities. Notwithstanding anything in this Guaranty to the contrary, the "Effective Date" of this Guaranty shall be the date the Bankruptcy Court enters a final order, immediately effective upon entry, in which TVC LLC has assumed and assigned the Lease to Tenant (the "Assumption and Assignment Order").  On the Effective Date, this Guaranty shall become effective, and the Lease shall be assumed by TVC LLC and assigned to Tenant for all purposes under the Sale Order and the APA pursuant to a certain Assignment and Assumption of Lease (the "Assignment").  Pursuant to the Assignment, as of November 22, 2024 (the "Assignment Effective Date"), TVC LLC will sell, convey, transfer, deliver and assign to Tenant, and Tenant will purchase, accept and assume, (a) all of TVC LLC's right, title, benefits, privileges and interest, legal and equitable, in and to the Lease and (b) all responsibilities, liabilities and obligations of TVC LLC that arise under the Lease on or after the Assignment Effective Date (the "Assumed Lease Liabilities"). Notwithstanding anything to the contrary in this section, Tenant's Assumed Lease Liabilities shall include (i) all accrued but unbilled Project Expenses accrued prior to or after the Assignment Effective Date; and (ii) any Tenant maintenance, repair or replacement obligations under the Lease, as hereby amended, including, without limitation, pursuant to Section 11 of the Original Lease, whether the obligation arose prior to or after the Assignment Effective Date.  This Guaranty shall become null and void if the Assignment and Assumption Order is not entered by the Bankruptcy Court by April 15, 2025.  This Guaranty shall also become null and void if the Third Amendment is not effective by April 15, 2025.

13

## ARTICLE III
## EVENTS OF DEFAULT

Section 3.01    Events of Default.  The occurrence of any one or more of the following shall constitute an "Event of Default" under this Guaranty:

(a)    a failure by Guarantor to make any payment of any Assumed Lease Liabilities, regardless of the reason for such failure;

(b)    Guarantor shall (A) voluntarily be adjudicated a bankrupt or insolvent, (B) seek or consent to the appointment of a receiver for itself or its assets, (C) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, (D) make a general assignment for the benefit of creditors, or (E) be unable to pay its debts as they mature;

(c)    a court shall enter an order, judgment or decree appointing, without the consent of Guarantor, a receiver or trustee for it or approving a petition filed against Guarantor which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain undischarged or unstayed sixty (60) days after it is entered; or

(d)    Guarantor shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution.


## ARTICLE IV
## MISCELLANEOUS

Section 4.01    Amendments, Waivers, Etc.  This Guaranty cannot be amended, modified, waived, changed, discharged or terminated except by an instrument in writing signed by the party against whom enforcement of such amendment, modification, waiver, change, discharge or termination is sought.

Section 4.02    No Implied Waiver; Cumulative Remedies.  No course of dealing and no delay or failure of Landlord in exercising any right, power or privilege under this Guaranty or the Lease shall affect any other or future exercise thereof or exercise of any other right, power or privilege; nor shall any single or partial exercise of any such right, power or privilege or any abandonment or discontinuance of steps to enforce such a right, power or privilege preclude any further exercise thereof or of any other right, power or privilege.  The rights and remedies of Landlord under this Guaranty are cumulative and not exclusive of any rights or remedies which Landlord would otherwise have under the Lease, at law or in equity.

Section 4.03    Notices.  All notices, requests, demands, directions and other communications (collectively "notices") under the provisions of this Guaranty shall be in writing and shall be deemed to have been given and received for all purposes when delivered in person or by Federal Express or other reliable 24-hour delivery service or five (5) business days after being deposited in the United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party or when delivery is refused.  All notices shall be sent to the applicable party addressed, if to Landlord, at Brennan Investment Group, 10275 W. Higgins Road, Suite 810, Rosemont, Illinois 60018, Attn:  Robert Vanecko, and, if to Guarantor, at 1626 Broadway, Suite 100, Fort Wayne, Indiana 46802, Attention: General Counsel and SVP of Logistics, or in accordance with the last unrevoked written direction from such party to the other party.

Section 4.04    Severability.  If any term or provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Guaranty, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

Section 4.05      Counterparts.  This Guaranty may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.

Section 4.06      Governing Law.  This Guaranty and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Illinois.

Section 4.07      Successors and Assigns; Joint and Several.  This Guaranty shall bind Guarantor and its successors and assigns, and shall inure to the benefit of Landlord and its successors and assigns.  The obligations and liabilities of each Guarantor under this Guaranty shall be joint and several.  As used in this Guaranty, the singular shall include the plural and vice-versa.

Section 4.08      Incorporation of Recitals; Definitions.  The recitals set forth on page 1 of this Guaranty are hereby specifically incorporated into the operative terms of this Guaranty as if fully set forth.  Terms not otherwise specifically defined herein shall have the meanings set forth in the Lease.

Section 4.09      Financial Statements.  Guarantor shall deliver to Landlord, within fifteen (15) days after written request from Landlord (but not more often than once per calendar year), Guarantor's annual audited financial statements for Guarantor's most recently closed fiscal year; provided, however, the foregoing shall not apply to the extent such financial statements are accessible on Guarantor's website within one hundred twenty (120) days following the most recently closed fiscal year.

[Signature Follows]

15

171372949v7

IN WITNESS WHEREOF, Guarantor has duly executed and delivered this Guaranty as of the date first above written.

**DO IT BEST CORP.**, an Indiana corporation

By:_____
Name:   Doug Roth
Title:    Vice President of Finance and CFO

**EXHIBIT D**
**NORTH TRUCK LOT**
**(in white)**



**EXHIBIT E**
**SOUTHWEST LOT**
**(in red)**

