**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C. *et al.*,** | **Case No. 24-12337 (KBO)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**CERTIFICATION OF COUNSEL SUBMITTING *PROPOSED*
ORDER APPROVING STIPULATION REGARDING
ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASE
OF NONRESIDENTIAL REAL PROPERTY WITH GRANITE (12 TRADEPORT) LLC**

1.      On October 14, 2024 (the "Petition Date"), the Debtors filed voluntary bankruptcy petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 with the United States Bankruptcy Court for the District of Delaware (the "Court").

2.      As of the Petition Date, The Debtors and Granite (12 Tradeport) LLC (the "Landlord") were (and as of the date of this Certification, remain) parties to that certain Industrial Lease dated October 19, 2018, as amended by that certain First Amendment to Industrial Lease dated February 18, 2019, that certain Second Amendment to Industrial Lease dated August 28, 2019, that certain Third Amendment to Industrial Lease dated January 31, 2020, that certain Fourth Amendment to Industrial Lease dated July 31, 2020, and that certain Fifth Amendment to Industrial Lease dated October 1, 2021 (collectively, the "Lease"), which pertains to certain real property located at 12 Tradeport Rd., Hanover Township, Pennsylvania 18706 (the "Premises"). A copy of the Lease is attached to the Stipulation (defined below) as Exhibit A.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

3.      On November 10, 2024, the Debtors and Do it Best Corp. ("DIB") entered into an Amended and Restated Asset Purchase Agreement (the "APA"), pursuant which the Buyer (defined below) agreed to purchase substantially all of the Debtors' assets, including those executory contracts and unexpired leases of the Debtors that the Buyer designated for assumption by the Debtors and assignment to the Buyer under Section 365 of the Bankruptcy Code.

4.      On November 13, 2024, the Court entered the *Order (A) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing Debtors to Enter Into and Perform Under Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts, and (D) Granting Related Relief* [Docket No. 411] ("Sale Order") approving the sale of substantially all of the Debtors' assets to the Buyer (collectively, the "Sale Transaction"), including those executory contracts and unexpired leases of the Debtors that the Buyer designated for assumption by the Debtors and assignment to the Buyer under Section 365 of the Bankruptcy Code.  The Sale Transaction closed as of November 22, 2024 (the "Closing").

5.      On December 11, 2024, the Court entered an order implementing procedures for the assumption and assignment of TSA Contracts [Docket No. 688] (the "TSA Contract Procedures Order") pursuant to which DIB was authorized to direct the Debtors to assume and assign TSA Contracts to DIB's designee, TV Hardware Distribution, LLC (the "Assignee" and together with DIB, the "Buyer")[2] upon prior notice to the contract counterparties.  TSA Contracts assumed and assigned to the Assignee in compliance with the TSA Contract Procedures Order are "Transferred Assets" for all purposes under the Sale Order and the APA, subject to performance of all outstanding non-monetary obligations and payment of any and all amounts necessary to cure

---

[2] The Debtors, the Landlord, and the Buyer are collectively referred to herein as the "Parties."

defaults under such TSA Contract as required by Sections 365(b)(1)(a) and (b) of the Bankruptcy Code (the "Cure Amounts").

6.      The Lease was listed by the Debtors among the executory contracts and unexpired leases that the Debtors might assume and assign to the Buyer in connection with the Sale Transaction in (i) their *Notice of Proposed Assumption and Assignment of Certain Executory Contracts* filed on November 6, 2024 [D.I. 339]; and (ii) their *Second Supplemental Notice of Proposed Assumption and Assignment of Certain Executory Contracts* filed on January 24, 2025 [D.I. 822].

7.      The Landlord filed its *Objection ... to Notice of Proposed Assumption and Assignment of Certain Executory Contracts* on November 18, 2024 [D.I. 502] and its *Objection ... to Second Supplemental Notice of Proposed Assumption and Assignment of Certain Executory Contracts* on February 4, 2025 [D.I. 859] (collectively, the "Landlord Objections").

8.      Since the Closing, the Debtors have provided the Buyer access to the Premises under the Amended and Restated Transition Services Agreement Term Sheet attached as an exhibit to the Sale Order (the "TSA"), such that the Lease is a TSA Contract.

9.      The Debtors, the Buyer and the Landlord (collectively, the "Parties") have engaged in good faith negotiations that have resulted in the *Stipulation Authorizing Assumption and Assignment of Certain Unexpired Leases of Nonresidential Real Property with Granite (12 Tradeport) LLC* (the "Stipulation") by and among the Parties, a copy of which is attached as Exhibit 1 to the proposed form of order attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to which the Debtors desire to assume and assign the Lease to the Assignee pursuant to Section 365 of the Bankruptcy Code and the TSA Procedures Order, subject to and conditioned upon the terms of a certain Sixth Amendment to Industrial Lease dated March 30, 2025, a copy of

which is attached as <u>Exhibit B</u> to the Stipulation (the "<u>Lease Amendment</u>") and the Landlord consents to the assumption and assignment of the Lease, subject to the terms and conditions set forth in the Stipulation and the Lease Amendment.

10.    As reflected in the Stipulation, counsel for the Parties have consented to the Court's entry of the Proposed Order.

11.    Accordingly, the Parties respectfully request that the Court enter the Proposed Order at its earliest convenience without further notice or a hearing.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 7, 2025
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR LLP**

*/s/ Carol E. Thompson*
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Kristin L. McElroy (Del. Bar No. 6871)
Timothy R. Powell (Del. Bar No. 6894)
Carol E. Thompson (Del. Bar No. 6936)
One Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: emorton@ycst.com
      kenos@ysct.com
      kmcelroy@ycst.com
      tpowell@ycst.com
      cthompson@ycst.com

- and -

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
Michelle C. Perez (admitted *pro hac vice*)
Esther Hong (admitted *pro hac vice*)
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
      twelch@glennagre.com
      mdoss@glennagre.com
      mperez@glennagre.com
      ehong@glennagre.com

*Efficiency Counsel to the Debtors and Debtors in Possession*

33055523.1

**<u>EXHIBIT A</u>**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C. *et al.*,** | **Case No. 24-12337 (KBO)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### ORDER APPROVING STIPULATION REGARDING
### ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASE
### OF NONRESIDENTIAL REAL PROPERTY WITH GRANITE (12 TRADEPORT) LLC

Upon consideration of the *Stipulation Regarding Assumption and Assignment of Certain Unexpired Leases of Nonresidential Real Property with Granite (12 Tradeport) LLC* (the "Stipulation"),[2] a copy of which is attached hereto as **Exhibit 1**, entered into by and among True Value Company, L.L.C. and certain of its above-captioned affiliates (collectively, the "Debtors"), Do it Best Corp. ("DIB") and its designee, TV Hardware Distribution, LLC (the "Assignee" and together with DIB, the "Buyer"), and Granite (12 Tradeport) LLC (the "Landlord" and together with the Debtors, the Buyer, the "Parties") and the related *Certification of Counsel Submitting Proposed Order Approving Stipulation Regarding Assumption and Assignment of Certain Unexpired Leases of Nonresidential Real Property with Granite (12 Tradeport) LLC*; and having determined that the United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction to enter this Order in accordance with 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware,

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Stipulation.

dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having determined that the agreements set forth in the Stipulation are in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

1.      The Stipulation attached to this Order as **Exhibit 1** is hereby approved in all respects.

2.      The Lease shall be deemed assumed by the Debtors, pursuant to Section 365(a) of the Bankruptcy Code, and assigned to the Assignee, pursuant to Section 365(f) of the Bankruptcy Code, subject to the Lease Amendment as contemplated in the Stipulation effective upon entry of this Order and payment by the Buyer of the Cure Claim.

3.      The Parties are authorized to take any action necessary or appropriate to implement the terms of the Stipulation and this Order without further order from this Court.

4.      This Court shall retain jurisdiction to resolve any disputes arising from or related to this Order or the Stipulation.

5.      This Order shall become effective immediately upon entry of this Order notwithstanding anything in the Federal Rules of Bankruptcy Procedure or otherwise to the contrary.

# **EXHIBIT 1**

## **Stipulation**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | **Chapter 11** |
| **TRUE VALUE COMPANY, L.L.C.** *et al.*, | **Case No. 24-12337 (KBO)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### STIPULATION REGARDING
### ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASE
### OF NONRESIDENTIAL REAL PROPERTY WITH GRANITE (12 TRADEPORT) LLC

True Value Company, L.L.C. and certain of its affiliates (collectively, the "Debtors"), Do it Best Corp. ("DIB") and its designee, TV Hardware Distribution, LLC (the "Assignee" and together with DIB, the "Buyer"), and Granite (12 Tradeport) LLC (the "Landlord" and together with the Debtors, the Buyer, the "Parties") through their undersigned counsel, hereby enter into this stipulation (this "Stipulation") as follows:

WHEREAS, on October 14, 2024 (the "Petition Date"), the Debtors filed voluntary bankruptcy petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court");

WHEREAS, as of the Petition Date, the Debtors and the Landlord were (and as of the date of this Certification, remain) parties to that certain Industrial Lease dated October 19, 2018, as amended by that certain First Amendment to Industrial Lease dated February 18, 2019, that certain Second Amendment to Industrial Lease dated August 28, 2019, that certain Third Amendment to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: True Value Company, L.L.C. (9896); TV Holdco II, L.L.C. (2272); TV TSLC, L.L.C. (7025); TV GPMC, L.L.C. (8136); True Value Retail, L.L.C. (7946); TrueValue.com Company, L.L.C. (6386); True Value Virginia, L.L.C. (9197); and Distributors Hardware, L.L.C. (8106).  The address of the Debtors' corporate headquarters is 8600 W. Bryn Mawr Ave. Chicago, IL 60631.

Industrial Lease dated January 31, 2020, that certain Fourth Amendment to Industrial Lease dated July 31, 2020, and that certain Fifth Amendment to Industrial Lease dated October 1, 2021 (collectively, the "Lease"), which pertains to certain real property located at 12 Tradeport Rd., Hanover Township, Pennsylvania 18706 (the "Premises").   A copy of the Lease is attached hereto as Exhibit A;

WHEREAS, on November 13, 2024, the Court entered the *Order (A) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing Debtors to Enter Into and Perform Under Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts, and (D) Granting Related Relief* [Docket No. 411] ("Sale Order") approving the sale of substantially all of the Debtors' assets to the Buyer (collectively, the "Sale Transaction"), including those executory contracts of the Debtors that the Buyer designated for assumption by the Debtors and assignment to the Buyer under Section 365 of the Bankruptcy Code;

WHEREAS, on December 11, 2024, the Court entered an order implementing procedures for the assumption and assignment of TSA Contracts [Docket No. 688] (the "TSA Contract Procedures Order") pursuant to which the Assignee was authorized to direct the Debtors to assume and assign TSA Contracts to the Assignee upon prior notice to the contract counterparties.  TSA Contracts assumed and assigned to the Assignee in compliance with the TSA Contract Procedures Order are "Transferred Assets" for all purposes under the Sale Order and the APA, subject to performance of all outstanding non-monetary obligations and payment of any and all amounts necessary to cure defaults under such TSA Contract as required by Sections 365(b)(1)(a) and (b) of the Bankruptcy Code (the "Cure Amounts");

WHEREAS, the Lease was listed by the Debtors among the executory contracts and unexpired leases that the Debtors might assume and assign to the Buyer in connection with the Sale Transaction in (i) their *Notice of Proposed Assumption and Assignment of Certain Executory Contracts* filed on November 6, 2024 [D.I. 339]; and (ii) their *Second Supplemental Notice of Proposed Assumption and Assignment of Certain Executory Contracts* filed on January 24, 2025 [D.I. 822];

WHEREAS, the Landlord filed its *Objection … to Notice of Proposed Assumption and Assignment of Certain Executory Contracts* on November 18, 2024 [D.I. 502] and its *Objection … to Second Supplemental Notice of Proposed Assumption and Assignment of Certain Executory Contracts* on February 4, 2025 [D.I. 859] (collectively, the "Landlord Objections");

WHEREAS, the Sale Transaction closed as of November 22, 2024 (the "Closing");

WHEREAS, since the Closing, the Debtors have provided the Buyer access to the Premises under the Amended and Restated Transition Services Agreement Term Sheet attached as an exhibit to the Sale Order (the "TSA"), such that the Lease is a TSA Contract;

WHEREAS, the Buyer and the Landlord have entered into that certain Sixth Amendment to Industrial Lease, dated March 30, 2025, a copy of which is attached hereto as Exhibit B (the "Lease Amendment"), that that provides for, among other things, the assumption of the Lease by the Debtors and the assignment of the Lease to the Assignee pursuant to the Sale Order and the TSA Contract Procedures Order, subject to the Lease Amendment, upon entry of the Order and payment by the Buyer of the Cure Amounts set forth in the Lease Amendment (which are defined in the Lease Amendment as the "Cure of Monetary Defaults") (the "Cure Claim"); and

WHEREAS, there are no Cure Amounts owing in respect of the Lease other than the Cure Claim expressly set forth in and required to be paid pursuant to the Lease Amendment; and

WHEREAS, through their undersigned counsel, the Parties have conferred and engaged in negotiations with respect to the Landlord Objections and have resolved, as provided for herein, the issues raised by such objections without the need for motion practice.

**NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING PREMISES, THE MUTUAL COVENANTS HEREIN CONTAINED, AND FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS ACKNOWLEDGED BY ALL PARTIES, THE PARTIES HERETO AGREE TO THE FOLLOWING TERMS, SUBJECT TO THE ENTRY OF AN ORDER BY THE COURT APPROVING THIS STIPULATION ("<u>ORDER</u>"):**

1.       The Recitals stated above constitute and form an integral part of this Stipulation and are incorporated by this reference as if set forth herein in full.

2.       Effective upon entry of the Order and satisfaction of Buyer's obligation to pay the Cure Claim, the Lease shall be deemed assumed by the Debtors pursuant to Section 365(a) of the Bankruptcy Code and assigned to the Assignee pursuant to Section 365(f) of the Bankruptcy Code, subject to the terms and conditions of the Lease Amendment, whereupon the Lease as amended by the Lease Amendment shall constitute an "Assigned Contract" and a "Transferred Asset" for all purposes under the Sale Order.

3.       This Stipulation  is being entered into by the Parties pursuant to, and subject to the terms and conditions, of the APA, the Sale Order and the Lease Amendment.  Notwithstanding anything to the contrary herein, in no manner shall this assignment supersede, amend, modify, alter or waive any term of the APA solely as between the Buyer and Debtors, and all rights of the parties to the APA thereunder are expressly preserved.  For the avoidance of doubt, nothing herein

shall limit, affect, or prejudice the Debtors' rights or the Buyer's rights under the terms of the Sale Order or APA.

4.      This Stipulation fully resolves the Landlord Objections and such objections are deemed fully resolved upon entry of the Order.  Upon entry of the Order, the Parties are authorized and empowered to take all actions necessary to implement the relief requested in this Stipulation and the Order.

5.      Except as expressly provided for in this Stipulation, nothing contained herein shall be an admission or waiver of the substantive or procedural rights, remedies, claims, or defenses of the Parties in the Debtors' chapter 11 cases or at law or equity, and the Parties reserve all of their respective rights, claims, and defenses under the Bankruptcy Code and other applicable law.

6.      This Stipulation shall not become effective unless and until it is approved by the Court.

7.      This Stipulation shall be binding on and inure to the benefit of the Parties hereto and their respective successors and assigns.

8.      This Stipulation shall not be modified, altered, amended, or vacated without written consent of all Parties hereto. Any such modification, alteration, amendment, or vacation in whole or in part, shall be subject to the approval of the Court.

9.      Each of the undersigned counsel represents that she or he is authorized to execute this Stipulation on behalf of her or his respective client.

10.     This Stipulation may be executed in multiple counterparts, any of which may be transmitted by facsimile or electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

11.     Upon entry of the Order, the Parties and their undersigned counsel are authorized to take all actions necessary to effectuate the relief provided by this Stipulation without further order from the Court.

12.     The terms and conditions of this Stipulation shall be immediately effective and enforceable upon entry of the Order.

13.     The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation and the Order.

*[Remainder of Page Intentionally Left Blank]*

STIPULATED and AGREED to this 7th day of April 2025.

*/s/ Scott L. Fleischer*

**BARCLAY DAMON LLP**

Kevin M. Newman, Esq. (admitted *pro hac vice*)
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202-2020
Telephone:  (315) 413-7115
E-mail:  knewman@barclaydamon.com

Scott L. Fleischer, Esq.
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone:  (212) 784-5810
E-mail:  sfleischer@barclaydamon.com

*Counsel for Granite (12 Tradeport) LLC*

*/s/ Katherine L. Hemming*

**CAMPBELL & LEVINE, LLC**

Katherine L. Hemming (No. 5496)
222 Delaware Avenue, Suite 1620
Wilmington, DE 19801
Telephone:(302) 426-1900
khemming@camlev.com

Paul J. Cordaro, Esq. (PA No. 85828)
310 Grant Street, Suite 1700
Pittsburgh, PA 15219
Telephone: (302) 426-1900
pcordaro@camlev.com

-and-

**TAFT STETTINIUS & HOLLISTER LLP**
W. Timothy Miller, Esq. (OH No. 0059952)
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Telephone:(317) 713-3500
miller@taftlaw.com

*Counsel for Do it Best Corp. and TV Hardware Distribution, LLC*

*/s/ Carol E. Thompson*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Kristin L. McElroy (Del. Bar No. 6871)
Timothy R. Powell (Del. Bar No. 6894)
Carol E. Thompson (Del. Bar No. 6936)
One Rodney Square
1000 North King Street
Wilmington, Delaware 1801
Telephone: (302) 571-6600
emorton@ycst.com
kenos@ycst.com
kmcelroy@ycst.com
tpowell@ycst.com
cthompson@ycst.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
Michelle C. Perez (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
aglenn@glennagre.com
twelch@glennagre.com
mdoss@glennagre.com
mperez@glennagre.com

*Conflict and Efficiency Counsel to Debtors and
Debtors in Possession*

# EXHIBIT A

**Lease**

## INDUSTRIAL LEASE

THIS INDUSTRIAL LEASE (this "<u>Lease</u>") is made on October 19, 2018 (the "<u>Effective Date</u>"), by and between NP Hanover Industrial I, LLC, a Missouri limited liability company ("<u>Landlord</u>"), and True Value Company, LLC, a Delaware limited liability company ("<u>Tenant</u>").

### WITNESSETH:

## 1.    PREMISES

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the premises (the "<u>Premises</u>") shown on the floor plan attached hereto as <u>Exhibit A-1</u> (the "<u>Floor Plan</u>"), which Premises will contain approximately one million twenty-four thousand eight hundred sixty (1,024,860) usable square feet and is a part of that certain to-be-constructed building commonly referred to as "Tradeport 164, Building I" and containing approximately one million four hundred thousand (1,400,000) usable square feet (the "<u>Building</u>") located on the real property described on <u>Exhibit A-2</u> attached hereto (the "<u>Land</u>"), having an address of TBD, Luzerne County, Pennsylvania. (The Land and the improvements located on the Land, including the Building, are collectively referred to as the "<u>Property</u>"). Notwithstanding the foregoing, (i) either Landlord or Tenant shall have the right, at the measuring party's cost and prior to the Commencement Date (as defined herein below), to measure the Premises, which measurement shall be performed by a licensed architect that is reasonably acceptable to the other party, using the American National Standard method for measuring area in buildings, as described in the pamphlet entitled "Industrial Buildings: Standard Methods of Measurement" (ANSI/BOMA Z65.2-2012) published by the Building Owners and Managers Association, (ii) Landlord and Tenant shall mutually and reasonably agree on such final measurement of usable square feet and indicate the same in writing (the "<u>Final Measurement</u>"), and (iii) said Final Measurement shall be used herein for all purposes related to the square footage of the Premises.

## 2.    TERM; EXTENSIONS

a.    The term of this Lease shall begin on the date (the "<u>Commencement Date</u>") that is the last to occur of: (i) August 1, 2019 (the "<u>Target Commencement Date</u>") and (ii) the date when the Improvements (as defined in Section 6 below) are Substantially Complete, and shall expire at midnight on the last day of the month which is two hundred fifty-seven (257) months after the Commencement Date; provided, that, subject to Tenant Delay and/or any Force Majeure Event, in no event will the Commencement Date occur earlier than sixty (60) days following the actual Early Access Delivery Date(as defined in Section 6 below), targeted for June 1, 2019. The initial term of this Lease and any extension of the initial term shall herein be the "<u>Lease Term</u>." "<u>Substantial Completion</u>" and "<u>Substantially Complete</u>" (or any variation thereof) shall mean the date when the Improvements are substantially completed as required by this Lease, with the exception of minor "punch list items" (as that term is commonly used in the construction industry) and either a temporary or final certificate of occupancy is issued. Landlord is obligated to have the Premises Substantially Complete by July 1, 2019 (the "<u>Substantial Completion Date</u>"). A certificate of occupancy for the Premises, issued by the appropriate governmental authority, shall be evidence of Substantial Completion. If such certificate of occupancy or the equivalent is not required and routinely issued by a governmental authority, then the execution and delivery of an AIA Document

G-704 Certificate of Substantial Completion with respect to the Improvements (the "<u>Certificate of Substantial Completion</u>") shall be evidence of Substantial Completion. Tenant's execution of the Certificate of Substantial Completion will not be required for achieving Substantial Completion. If a temporary certificate of occupancy is obtained, Landlord agrees to obtain the permanent certificate of occupancy before the expiration of the temporary certificate of occupancy, as such temporary certificate of occupancy may be extended by the applicable governmental authority, and Landlord agrees to obtain a permanent certificate of occupancy when it becomes available. Completion of minor punch list items must occur within sixty (60) days following Substantial Completion.

b.      So long as this Lease is in full force and effect and a Tenant Default (as defined in Section 19.a below) has not occurred, either at the time Tenant exercises the option provided in this Section 2.b. or at the commencement of an Extended Term, Tenant shall have the option to renew this Lease for two (2) additional periods of five (5) years each (each an "<u>Extended Term</u>"). Tenant may exercise such option to extend by giving written notice to Landlord of its intention to renew for the Extended Term (the "<u>Renewal Notice</u>") at least nine (9) months prior to the end of the initial 257-month Lease Term, or the prior Extended Term, as the case may be.  Unless otherwise agreed to by the parties, renewal for an Extended Term shall be upon the same terms and conditions as contained in this Lease except that: (i) the Base Rent payable during an Extended Term shall be as set forth in Section 2.c. below, and (ii) Landlord shall have no obligations to construct or provide any additional improvements to the Premises.

c.      Base Rent during any Extended Term shall be equal to "Fair Market Value". For the purposes of this Lease, "<u>Fair Market Value</u>" shall mean the annual amount per rentable square foot that a willing, comparable, non-equity tenant with a creditworthiness comparable to Tenant would pay, and a willing landlord of a comparable property in the marketplace would accept at "arms-length" given appropriate consideration of rental rates per rentable square foot, the type of escalation clauses (including, but without limitation, operating expenses, real estate taxes), length of lease term, size and location of premises being leased, the fact that the premises are used primarily for warehouse/distribution center space, and any other generally applicable terms and conditions of tenancy for the Premises. For the purposes of this Section 2.c., "comparable property" shall be located within the same general geographic location as the Premises. All other terms and conditions of the Lease applicable to the payment of Rent, including the payment of Additional Rent, shall apply during any Extended Term. Landlord shall, within thirty (30) days after receipt of the Renewal Notice, deliver to Tenant a written determination of the Fair Market Value, as determined by Landlord, using the criteria set forth above. Tenant shall thereafter have thirty (30) days to notify Landlord in writing of its acceptance of Landlord's determination of the Fair Market Value, or to deliver to Landlord its own determination of the Fair Market Value, in which case Landlord and Tenant shall have an additional thirty (30) days to negotiate in good faith a Fair Market Value acceptable to both Landlord and Tenant; provided, however, that in the event Landlord and Tenant are unable to agree on the Fair Market Value during such additional thirty (30) day period, Tenant's extension rights granted herein shall terminate, and Landlord shall be free to lease the Premises to any other party on any terms acceptable to Landlord, commencing upon the expiration of the initial 257-month Term or earlier termination of the Lease. If Landlord and Tenant arrive at an agreement as to the Fair Market Value as herein provided for, then Tenant agrees to execute and return to Landlord, within thirty (30) days after receipt thereof, a written extension form prepared by Landlord for attachment to this Lease.

2

3.      **RENTAL**

a.      Tenant agrees to pay, on the first day of each month, to Landlord the base rental ("<u>Base Rent</u>"), which Base Rent shall be determined by multiplying the usable square footage of the Premises, as determined by the Final Measurement, if any, by the applicable lease rates set forth in the schedule attached hereto as <u>Exhibit B</u>, and dividing the product thereof by twelve (12). <u>Exhibit B</u> sets forth the estimated monthly Base Rent; provided, that the same shall be updated upon completion of the Final Measurement, if any.

b.      In addition to the Base Rent, beginning on the Commencement Date, Tenant shall pay monthly, as Additional Rent, Tenant's Proportionate Share of Operating Expenses (as defined in Section 9.b. below) and Taxes (as defined in Section 5.a.i. below) in accordance with this Lease. "<u>Additional Rent</u>" hereunder shall refer to all amounts due to Landlord from Tenant under this Lease, except Base Rent.

c.      "<u>Tenant's Proportionate Share</u>" shall be a fraction, the numerator of which is the usable square footage of the Premises and the denominator of which is the usable square footage of the Building, including the usable square footage of the Premises. Landlord and Tenant estimate that, on the Effective Date, Tenant's Proportionate Share equals 73.20%.

d.      The Base Rent and the Additional Rent shall be referred to herein collectively as the "<u>Rent</u>". All Rent shall be paid on the first (1st) day of each month, in advance, without set-off or deduction unless otherwise provided for herein. Landlord shall not be required to provide Tenant with any demand, invoice, or notice for payment. Rent shall be sent to the following address: NP Hanover Industrial I, LLC, 4825 NW 41st Street, Ste. 500, Riverside, Missouri 64150, Attn: Nathaniel Hagedorn. Tenant shall have the option to pay Rent by electronic transfer and Landlord agrees to provide its bank information to Tenant within five (5) business days after any request by Tenant to enable Tenant to pay Rent by electronic transfer. Landlord may change the address for Rent payments by delivering written notice to Tenant.  If the Commencement Date occurs on any day other than the first (1st) day of a month, the Rent for the first partial month in which Rent is payable (per the Base Rent Schedule above) shall be prorated on a daily basis.

e.      Tenant will pay, as Additional Rent, to Landlord all Rent Tax (as defined in this Section below), if any, due in connection with this Lease or the payment of Rent hereunder, which Rent Tax will be paid by Tenant to Landlord with each payment of Rent made by Tenant to Landlord under this Lease. "<u>Rent Tax</u>" means any tax or excise on rents, all other sums and charges required to be paid by Tenant under this Lease, and any gross receipts tax, commercial activity tax transaction privilege tax or other tax, however described, which is levied or assessed by the United States of America, or the state, city, municipality, or political subdivision in which the Premises is located, against Landlord with respect to the Base Rent, Additional Rent, or other charges payable under this Lease, or as a result of Landlord's receipt of such rents or other charges accruing under this Lease.

f.      Upon request and signed Non-Disclosure Agreement (NDA) from Landlord, Tenant shall, within ten (10) days following Landlord's request, provide to Landlord a copy of Tenant's financial statements for the most recently ended fiscal year, it being agreed that  Tenant's

3

fiscal year financial statements will not be available prior to one hundred (120) days after the close of its fiscal year..

**4.      INTENTIONALLY DELETED**

**5.      REAL ESTATE TAXES**

a.      As used herein, the following terms wherever initially capitalized shall have the following meanings:

i.      "Taxes" shall mean all real estate taxes and assessments (general or special), real estate rental receipt or gross receipt taxes levied with respect to the Property, or any other amount levied against Landlord in substitution for, or in lieu of, any tax which would otherwise constitute a real estate tax or a specific tax on rentals from all or part of the Property, plus the reasonable costs, including attorneys' and appraisers' fees, of any negotiation, contests or appeal pursued by Landlord in an effort to reduce the taxes, or the assessment on which any of the foregoing taxes are based. Taxes shall specifically exclude all: (1) federal, state, and local income taxes, (2) franchise, gift, transfer, excise, capital stock, estate, succession, and inheritance taxes, and (3) penalties or interest for late payment of Taxes (unless such late payment is caused by Tenant's failure to timely pay Tenant's Proportionate Share of Taxes).

ii.      "Tax Year" shall mean each twelve (12) month period established as the real estate tax year by the taxing authorities where the Property is located.

b.      Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of all Taxes payable during each Tax Year (or part thereof) occurring during the Lease Term.  Tenant shall pay to Landlord its Proportionate Share of Taxes in equal monthly payments, in advance, beginning on the Commencement Date, based upon estimated annual Taxes (as estimated by Landlord), but subject to adjustment after the end of each Tax Year on the basis of the actual Taxes incurred. Any overpayment will be credited against future monthly obligations for Taxes or shall be refunded to Tenant, at Landlord's option. Any underpayment by Tenant shall be paid by Tenant to Landlord within thirty (30) days after Landlord delivers to Tenant a statement reconciling the amount actually collected from Tenant against Tenant's Proportionate Share of actual Taxes for the Tax Year. Landlord shall have the right to bill for Taxes after receipt of the tax bills or upon the expiration or sooner termination of this Lease.  Upon prior written notice to Landlord, Tenant shall have the right to protest all Taxes related to their ad valorem assessments, at Tenant's sole cost and expense.  Tenant's Proportionate Share of any relief received as a result of appeal from taxing jurisdictions will be transferred in full to Tenant in the form of a Base Rent credit or cash payment, or in a reduction in Tenant's Proportionate Share of Taxes, as the case may be.

c.      Tenant shall be liable for all taxes assessed against and levied upon Tenant's trade fixtures, furnishings, equipment, and all other personal property located at the Premises.

d.      Landlord represents and warrants to Tenant that, as of the Effective Date, Landlord has obtained a ten (10) year tax abatement in connection with the Premises (the "Tax Abatement"), which Tax Abatement abates the taxes with respect to any improvements upon the Property (but

not the value of the underlying land) as follows: (i) from 2020 to 2026, 100% of taxes related to improvements, (ii) in 2027, ninety percent (90%) of taxes related to improvements, (iii) in 2028, eighty percent (80%) of taxes related to improvements, and (iv) in 2029, seventy percent (70%) of taxes related to improvements.  In the event that the Tax Abatement is withdrawn or rescinded by the taxing jurisdiction as a result of the acts, errors, or omissions of Landlord, Tenant shall not be liable for any excess Taxes related to said withdraw or rescission (i.e. over the abatements set forth herein) until the end of the ten (10) year period of the existing Tax Abatement.  Landlord estimates that Taxes for 2020 (i.e. on the land value of the Property) will equal $0.06 per rentable square foot of the Premises.

6.    **COMPLETION; EARLY ACCESS**

a.    Landlord shall, at its sole cost and expense, construct the Improvements (as defined in the Work Letter) prior to the Target Commencement Date, in accordance with the Work Letter attached hereto as <u>Exhibit C</u> hereto (the "<u>Work Letter</u>").  Landlord shall, at its sole cost and expense, construct in a good and workmanlike manner, and in conformity with Applicable Laws (as defined in Section 15 below), those improvements set forth on <u>Exhibit C</u> (the "<u>Improvements</u>").

b.    Landlord shall provide delivery of the warehouse portion of the facility by June 1, 2019 ("Early Access Delivery Date") for True Value's installation and set-up purposes, provided True Value does not commence business operations therein and does not interfere with the construction process.  There shall be no charge to Tenant for the Building personnel or engineer for Tenant's move-in.  No base rent, additional rent, or utilities shall be due during the Early Occupancy/set-up period.

c.    Should Landlord be delayed, subject to Tenant Delay or any Force Majeure Event, in providing access for Tenant's fixture installation by June 1, 2019 ("Early Access Delivery Date"), Landlord will provide Tenant with one (1) day of rent abatement for each day of delay for up to sixty (60) days.

d.    If the Improvements and Premises are not Substantially Complete on the Target Commencement Date, the obligations of Tenant shall not be affected except that the Commencement Date and the expiration of the Lease Term, shall be postponed one day for each day Substantial Completion is delayed until the Premises are Substantially Complete. If the Improvements and Premises are not Substantially Completed on or prior to the Substantial Completion Date, subject to Tenant Delay and/or a Force Majeure Event, the Base Rent shall be credited by one (1) day for each day after the Substantial Completion Date that the Improvements are not Substantially Completed. If the Improvements and Premises are not Substantially Completed on or prior to the Target Commencement Date, subject to Tenant Delay and/or a Force Majeure Event, the Base Rent shall be credited by three (3) days for each day after the Target Commencement Date that the Improvements are not Substantially Completed; provided, that the previously referenced 1-for-1 Base Rent credit set forth in this Section shall cease upon the commencement of any such 3-for-1 Base Rent credits. If the Improvements and Premises are not Substantially Completed on or prior to September 30, 2019 (the "<u>Extended Completion Date</u>"), subject to Tenant Delay and/or a Force Majeure Event, Tenant shall have the right to thereafter terminate this Lease upon thirty (30) days' prior written notice to Landlord; provided, that if the

5

Improvements and Premises are Substantially Completed during said 30-day period, the termination notice shall be deemed null and void.

e.     "Tenant Delay" shall have the meaning set forth in the Work Letter.

f.     Tenant shall, beginning on the later of June 1, 2019 and the date upon which Landlord determines that the warehouse portion of the Premises is available to Tenant for the purposes of this Section 6.e. (the "Early Access Delivery Date"), and continuing until the Commencement Date, subject to any and all Applicable Laws, have the right to enter the warehouse portion of the Premises for the purposes of installing within the Premises racking, fixtures, wiring, and the intake of product necessary for Tenant to open for business on the Commencement Date. During any period which Tenant enters, occupies, or uses the Premises prior to the Commencement Date, as permitted by this Section 6.e., Tenant shall (i) comply with all obligations of Tenant under this Lease as if the Commencement Date had occurred, except that Tenant shall not be required to pay any Rent hereunder nor the cost of any utilities for the Premises during such period, and (ii) use reasonable efforts to avoid interfering with Landlord's completion of the Improvements. To the extent Tenant does interfere with Landlord's completion of the Improvements, and such interference causes a delay in the delivery of the Improvements, such delay will be a Tenant Delay hereunder. In the event that Landlord, subject to Tenant Delay and/or a Force Majeure Event, is unable to provide the early access set forth in this Section 6.e. on June 1, 2019,  the Base Rent shall be credited by one day for each day after June 1, 2019 that the Early Access Delivery Date actually occurs, but not to exceed thirty (30) days' worth of said credits.

## 7.     REPAIRS AND MAINTENANCE OF PREMISES AND ALTERATIONS

a.     Except for any repairs or replacements caused by the negligence or willful misconduct of Tenant, or Tenant's members, shareholders, officers, managers, agents, employees, contractors, invitees, subtenants, or any person on the Premises by reason of the Tenant's use or occupancy of the Premises (each a "Tenant Party"), the expense of which shall be paid by Tenant, Landlord, at its cost and expense, and not as part of Operating Expenses (except as otherwise specifically stated herein) shall keep, in good repair and condition, the following: (i) the roof (provided that maintenance and repair, but not capital costs, of the roof may be charged as Operating Expenses), (ii) foundation, (iii) structure of the Building and Premises (including exterior maintenance such as caulking and painting, however, such maintenance costs shall be reimbursed as Operating Expenses), (iv) foundation beneath the floor slab, (v) subfloors, (vi) structural components (including but not limited to interior load bearing walls and concrete tilt walls, columns, beams and joists), (vii) electrical systems located outside the Premises up to and including the transformer serving the Premises, (viii) the main sprinkler riser serving the Building (provided that routine maintenance and repair of the main sprinkler riser shall be reimbursable as an Operating Expense, and all portions of the sprinkler system serving the Premises other than the main sprinkler riser shall be the obligation of Tenant to maintain, repair, and replace pursuant to Section 7.d. below), and (ix) sewer and water main lines up to the point of entry into the Premises. Landlord shall additionally repair all latent Building defects. Landlord at its cost and expense (but subject to reimbursement as Operating Expenses) shall keep the sidewalks, parking areas, driveways and accessways, and the Common Areas (as defined in Section 9.a. below) in good repair and order.

b.      If any repairs required to be made by Landlord are not begun within thirty (30) days after receipt of written notice by Landlord from Tenant and then diligently pursued to completion, Tenant may, at Landlord's cost, make such repairs without liability to Landlord for loss or damage which may result to Landlord's property, except to the extent caused by the negligence or willful misconduct of Tenant or any Tenant Party, and at Tenant's option, (i) Landlord shall pay to Tenant upon written demand the reasonable costs of such repairs, plus ten percent (10%) of said costs as an administration fee, plus interest at the Maximum Rate (as defined in Section 40 below) accruing from the date that is thirty (30) days after receipt of such written demand until paid by Landlord, or (ii) Tenant may offset Base Rent up to the amount of the reasonable costs of such repairs, plus ten percent (10%) of said costs as an administration fee, plus interest at the Maximum Rate (as defined in Section 40 below) accruing from the date that is thirty (30) days after receipt of such written demand until paid by Landlord; provided, that in no event shall Tenant offset greater than fifty percent (50%) of Base Rent in any month.. If the Premises should become in need of repairs required to be made by Landlord hereunder, Tenant must give written notice to Landlord as soon as practicable.

c.      Tenant shall enter into a quarterly preventative maintenance/service contract with a maintenance contractor for servicing the heating, air conditioning, and ventilation (HVAC) systems and equipment within the Premises. The service contract must include all services suggested by the equipment manufacturer and must become effective, with a copy of the service contract delivered to Landlord, within thirty (30) days after the date Tenant takes possession of the Premises.

d.      Tenant, at Tenant's sole cost, shall perform maintenance, repairs, and replacements of and to all non-structural portions of the Premises, including but not limited to (i) the HVAC systems, (ii) glass, (iii) windows and doors, (iv) all plumbing and sewage systems, (v) fixtures, (vi) interior non-loadbearing walls, (vii) floors, (viii) ceilings, (ix) docks and all dock equipment, and (x) all electrical and mechanical systems, facilities, and equipment, of every kind and nature located in, upon, or about the Premises, except with respect to those obligations of Landlord specifically set forth in Section 7.a. above. If any repairs required to be made by Tenant are not made within thirty (30) days after receipt of written notice delivered to Tenant from Landlord, in addition to any other remedies under this Lease, Landlord may make such repairs without liability to Tenant for loss or damage to Tenant's equipment, fixtures, inventory or business by reason of such repairs, and Tenant shall pay to Landlord upon written demand as Additional Rent hereunder the cost of such repairs, plus interest at the Maximum Rate accruing from the date that is thirty (30) days after receipt of such written demand until paid by Tenant.  At the expiration or termination of Lease Term, Tenant shall surrender the Premises in a substantially similar condition as it existed on the Commencement Date, reasonable wear and tear and loss by fire or other casualty excepted, subject to Section 7.e. below.

e.      Tenant shall not make any installations, alterations, additions, repairs, or improvements that affect the roof, structural components, mechanical systems, or plumbing systems of the Premises or Building, or which exceed $100,000 in cost, without the prior written consent of Landlord, which consent may not be unreasonably withheld, conditioned or delayed. Upon Tenant's written request of such installation, alteration, addition, repair, or improvement, Landlord must provide written approval or denial within fifteen (15) days; failure of Landlord to provide a written response within fifteen (15) days should be considered approval.  With respect

7

to any installations, alterations, additions, repairs, improvements, and fixtures not requiring Landlord's consent, the same shall be removed by Tenant at or prior to the expiration or earlier termination of the Lease Term.  With respect to any installations, alterations, additions, repairs, improvements, and fixtures requiring Landlord's consent, unless specifically required to be removed by Landlord as part of Landlord's approval, all installations, alterations, additions, repairs, improvements, and fixtures, by whomever installed or erected (except Trade Fixtures, as defined below) shall remain upon and be surrendered with the Premises and become the property of Landlord at the expiration or termination of this Lease.  Tenant, at its own cost, and without Landlord's prior approval, may erect such shelves, racking, conveyors, bins, equipment, machinery, and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business so long as such items do not alter the basic character of the Premises, do not overload or damage the Premises, are not affixed to the structural components of the Building (including without limitation, columns, load bearing walls and bar joists, but excluding the floor slab), may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Applicable Laws. Tenant shall remove all Trade Fixtures, personal property, and equipment from the Premises prior to the expiration or earlier termination of this Lease, and Tenant shall repair all damage to the Premises caused by the removal of same.

f.      All construction work done by Tenant within the Premises shall be performed in a good and workmanlike manner and in compliance with all Applicable Laws.  Tenant shall, before commencing any alterations or accepting delivery of any materials to be used in connection with the alterations, deliver to Landlord certificates evidencing insurance coverages reasonably acceptable to Landlord.  Tenant shall not cause or permit any materialmen's, mechanics', artisans', or other liens to be filed against the Land, the Building, the Property, or the Premises, and nothing contained in this Lease shall be deemed the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer, or materialmen for the performance of any labor or the furnishing or any materials for any improvement, alterations, or repairs of or to the Premises, or any part thereof, nor as giving Tenant any right, power, or authority to contract for or permit the rendering of any services or the furnishing of any materials that would give rise to the filing of a materialmen's, mechanics' or other lien against the Land, the Building, the Property, or the Premises. If any such lien should be filed, Tenant shall cause the same to be discharged of record, or post a bond, within fifteen (15) days after Tenant's receipt of notice of the filing of the same. If Tenant fails to discharge or bond over any lien within such period, then in addition to any other right or remedy of Landlord, Landlord may discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by a deposit in court or by posting a bond.  Any amount paid by Landlord for the aforesaid purposes, or for the satisfaction of any lien caused by Tenant, and all reasonable expenses of Landlord in defending any action or in procuring the discharge of such lien, shall be deemed Additional Rent hereunder and shall be repaid by Tenant to Landlord within ten (10) days after Tenant's receipt of written demand from Landlord together with sufficient documentation evidencing the costs, plus interest at the Maximum Rate.

8.      **ACCEPTANCE OF PREMISES**

Tenant, upon completion of the Improvements, shall accept the Premises in its then "AS-IS," "WHERE-IS" condition as suited for the uses permitted under this Lease.  If requested by Landlord, Tenant shall execute a written acceptance of the Premises subject to any latent defects and punch list items.

9.      **COMMON AREAS AND OPERATING EXPENSES OF PREMISES**

a.      The term "Common Areas" is defined in this Lease as that part of the Property intended for the common use of all tenants of the Property, including parking areas, sidewalks, driveways, walks, truckways, common loading areas, and landscaped areas.  Tenant shall have non-exclusive access with all other tenants to the Common Areas 24 hours per day, 7 days per week.  Tenant agrees not to unreasonably interfere with other tenants' access and use of the Common Areas.

b.      Tenant may park in Common Areas with other tenants of Landlord, and Tenant shall have exclusive use of those parking spaces described in Exhibit C hereto. Additionally, Tenant shall have the non-exclusive right to utilize all other parking spaces located upon the Property that are not subject to the exclusive use of another tenant; provided, that Tenant agrees not to overburden the parking facilities and agrees to reasonably cooperate with Landlord and other tenants in the use of parking facilities.  Landlord has the right to determine whether parking facilities are becoming crowded and to allocate non-exclusive parking spaces among Tenant and other tenants.  Landlord is responsible for the operation, management, and maintenance of the Common Areas and Building, the manner and the expenditures thereof to be in the sole but reasonable discretion of Landlord. Tenant agrees to pay, as Additional Rent, Tenant's Proportionate Share of the reasonable costs and maintenance of the Common Areas and Building, including costs incurred for water; landscaping; lighting; painting; cleaning; policing; inspecting; maintaining, repairing, and replacing the Common Areas; and any amounts, fees, assessments, or other charges levied or assessed against the Property by any association, district, or otherwise, pursuant to any declaration, covenants, restrictions, reciprocal easement agreements, or operating agreements (collectively, the "Operating Expenses").  Tenant is responsible for providing its own trash dumpster and dumpster service.   Tenant's debris shall not overburden Tenant's trash dumpster, and Tenant shall keep the trash dumpster area in a clean condition.

c.      The following is an estimate of the initial year's operating expenses for the Premises (actual expenses may vary):

    a.  Property Taxes (year 1 not to exceed): $0.06 psf

    b.  Building Insurance: $0.06 psf

    c.  Maintenance: $0.17 psf

    d.  Assessments: None

    e.  Management Fee: 0.35% of Base Rent (or if the Building becomes a non-multitenant building, and Tenant elects to self-manage, $1,000 per month)

    f.  Total: $0.29 psf + management fee

d.      Included within the Operating Expenses, Tenant shall pay to Landlord Tenant's Proportionate Share of the costs of all insurance maintained by Landlord in connection with the Property during the Lease Term ("Premiums") for Landlord's fire and casualty insurance, commercial general liability insurance, and any other insurance carried by Landlord for the

9

Property (provided such other insurance is carried by prudent landlords of similar property within a ten-mile radius of the Property) for the calendar year.

e.       Notwithstanding anything to the contrary herein, Operating Expenses shall exclude: (1) leasing commissions, costs, disbursements, and other expenses incurred for leasing, renovating, or improving space for tenants or enforcing leases; (2) costs incurred by Landlord in discharging its obligations to complete the Improvements; (3) costs (including permit, license, and inspection fees) incurred in renovating, improving, decorating, painting, or redecorating vacant space or space for tenants; (4) costs incurred for matters which directly benefit other tenants, but which do not benefit Tenant; (5) costs incurred for alterations that are considered capital improvements and replacements under generally accepted accounting principles consistently applied; provided, that (i) the annual amortization of these costs shall be included to the extent they reduce Operating Expenses and (ii) the cost of capital improvements made in to comply with any law, rule, or regulation promulgated after the Effective Date by any governmental authority, which costs shall be amortized over the useful economic life of such improvements as determined by Landlord, in accordance with generally accepted accounting principles consistently applied and shall be included in Operating Expenses; (6) depreciation and amortization on the Building; (7) reserves of any kind; (8) costs incurred because Landlord or another tenant violated the terms of any lease; (9) interest on debt or amortization payments on mortgages or deeds of trust or any other debt for borrowed money, or rent payments under ground leases; (10) rentals and other related expenses incurred in leasing air conditioning systems or other equipment ordinarily considered to be of a capital nature, except equipment used in providing janitorial services that is not affixed to the Building; (11) items and services for which Tenant reimburses Landlord or pays third parties or that Landlord provides selectively to one or more tenants of the Building other than Tenant without reimbursement; (12) advertising and promotional expenditures (except as may be provided in any separate marketing agreement between Landlord and Tenant); (13) repairs or other work needed because of fire, windstorm, or other casualty or cause insured against by Landlord to the extent Landlord has received insurance proceeds therefor; (14) costs incurred to remedy structural defects in original construction materials or installations; (15) any costs, fines, or penalties incurred because Landlord, or any of Landlord's members, shareholders, officers, managers, agents, employees, contractors, invitees, or subtenants (each a "Landlord Party") violated any governmental rule, or arising from the negligence or willful misconduct of Landlord or a Landlord Party; (16) costs incurred to test, survey, or remedy hazardous materials located on the Property unless the materials were in or on the Property because of Tenant's (or a Tenant Party's) actions; (17) costs related to maintaining Landlord's legal existence and Landlord's general corporate overhead and administrative expenses that are unrelated to the operation, management, or maintenance of the Building; (18) management fees in excess of 0.35% of Base Rent, (19) costs incurred in connection with the sale or transfer of an interest in Landlord or the Building; and (20) other expenses that under generally accepted accounting principles, consistently applied, would not be considered normal maintenance, repair, management, or operation expenses.

f.       Beginning on the Commencement Date, Tenant shall pay to Landlord Tenant's Proportionate Share of the "Estimated Annual Common Area and Operating Expense Charge" in equal monthly payments, in advance, based upon the reasonable estimated annual cost of operation, management, and maintenance of the Property, but subject to adjustment after the end of each calendar year on the basis of the actual costs for such year. Landlord's estimate for the first year of Estimated Annual Common Area and Operating Expense Charge is $0.23 per square

foot (which amount includes approximately $0.06 per square foot related to the Premiums, but does not include management fees). Landlord may re-estimate Operating Expenses from time to time during the Lease Term.  In such event, but in no event more than twice in any 12-month period, Landlord will revise the monthly payment for Estimated Annual Common Area and Operating Expense Charge to an amount sufficient for Tenant to pay the reasonable re-estimated amount over the balance of the calendar year.  Landlord will notify Tenant at least thirty (30) days prior to the effective date of any such re-estimate.

g.    Commencing with the second Lease Year of the Lease Term, Landlord agrees to cap Tenant's annual obligation for payment of Additional Rent related to Controllable Operating Expenses (as defined herein below) at the greater of: (i) four percent (4%), and (ii) the actual Consumer Price Index -- All Urban Consumers (U.S. City Average, Midwest Region (Base 1982-84 = 100) as published by the United States Department of Labor, Bureau of Labor Statistics, on a cumulative basis, over the prior calendar year's Controllable Operating Expenses (the "Operating Expense Cap"). Notwithstanding the foregoing, for the purposes of determining the Operating Expense Cap in the second Lease Year, the Controllable Operating Expenses for the first Lease Year shall be deemed to be the greater of (i) $0.17 per usable square foot of the Premises, and (ii) the actual Controllable Operating Expenses during the first Lease Year. By way of definition, "Controllable Operating Expenses" is defined as all Operating Expenses other than the Premiums, utility costs, snow and ice removal costs, Non-Recurring Expenses (as defined herein below), and (for the purposes of clarity) Taxes. "Non-Recurring Expenses", for the purposes of this Lease, shall mean Operating Expenses that are incurred on an infrequent or non-recurring basis, such as but not limited to, exterior painting and caulking of the Building and re-surfacing/re-striping of the parking lots and driveways within the Common Areas, which Non-Recurring Expenses shall not be subject to the Operating Expense Cap, but the cost of which shall be amortized over the reasonably expected useful life of such Non Recurring Expenses. The Operating Expense Cap shall not apply during the tenth (10th) Lease Year or to the first year of any Extended Term; provided, that it shall once again apply to successive years following the tenth (10th) Lease Year and following the first year of any Extended Term, except to the extent set forth in this sentence (i.e. the Operating Expense Cap will "reset" to actual Controllable Operating Expenses in the tenth (10th) Lease Year and in the first year of any Extended Term).

h.    Landlord will furnish to Tenant a detailed statement of expenses for the Property for the prior year ("Statement") no later than April 30th of each calendar year, such Statement to be prepared in accordance with generally accepted accounting principles and to include Tenant's Proportionate Share of the Operating Expenses. The Statement will show any overpayment by Tenant or any shortage in the payments made by Tenant.  Any overpayment will be credited against subsequent monthly Operating Expense obligations or shall be refunded to Tenant, at Landlord's option.  Any underpayment shall be paid by Tenant to Landlord within thirty (30) days following Tenant's receipt of the Statement.

i.    Tenant, and its agents, and employees shall have ninety (90) days after receiving the Statement to audit Landlord's books and records concerning the Statement at a mutually convenient time at Landlord's offices. Tenant may utilize the services of an auditing firm reasonably acceptable to Landlord. Prior to commencing any audit, Tenant shall pay to Landlord the amount (if any) purportedly owed by Tenant as reflected on the Statement.  Landlord's books and records shall be kept in accord with generally accepted accounting principles consistently

applied.  Any audit by Tenant shall be for the sole purpose of verifying the Operating Expenses. Tenant shall hold any information obtained during any such inspection in confidence, except that Tenant shall be permitted to disclose such information to its attorneys and advisors, provided Tenant informs such parties of the confidential nature of such information and uses good faith and diligent efforts to cause such parties to maintain such information as confidential.  Tenant shall deliver to Landlord the conclusions of its audit within ten (10) days after the completion of the audit (but in no event more than one hundred fifty (150) days after Tenant receives the Statement). If the audit discloses that the total amount invoiced to Tenant for Operating Expenses exceeds Tenant's Proportionate Share of actual Operating Expenses, and Landlord reasonably concurs with such audit results, Landlord shall, within thirty (30) days reimburse Tenant for any overcharge. If Landlord does not agree with Tenant's audit, then Tenant may commence arbitration proceedings against Landlord within sixty (60) days after the date that Tenant delivers its audit to Landlord.  If the arbitrator determines that Tenant was overcharged, Landlord shall within thirty (30) days reimburse Tenant for any such overcharged amount, plus Tenant's costs in connection with the arbitration.  If the arbitrator determines that Tenant was undercharged, Tenant shall within thirty (30) days pay to Landlord any such undercharged amount, plus Landlord's costs in connection with the arbitration.

j.       If Tenant's audit of the books and records shows that the actual Operating Expenses were five percent (5%) or more below the amount appearing on the Statement (and such discrepancy is upheld in arbitration), then Landlord shall pay to Tenant, Tenant's reasonable costs of conducting the audit, not to exceed $3,000.00.

k.      Landlord reserves the right to stop the supply of water, sewage, electrical current, and other services, without incurring any liability to Tenant: (i) because of accidents or emergencies, (ii) for repairs, alterations, replacements, or improvements that Landlord reasonably deems necessary, (iii) when Landlord is prevented from supplying such services by strikes, lockouts, difficulty of obtaining materials, or accidents, (iv) for any cause beyond Landlord's control, or (v) as a result of any Applicable Laws that prevent Landlord from supplying such services. In the case of repairs, alterations, replacements, or improvements that are under Landlord's control, Landlord agrees to give Tenant reasonable prior notice and to use commercially reasonable efforts to minimize any unreasonable interference with Tenant's use of the Premises.  No diminution or abatement of rent or other compensation shall be claimed by Tenant because of, nor shall this Lease or any of the obligations of Tenant be affected or reduced by reason of, any interruption of any utility services, except that (x) if the interruption is caused by the negligence or willful misconduct of Landlord or a Landlord Party, (y) such interruption continues for three (3) consecutive days, and (z) the restoration of such service is within Landlord's reasonable control, then the Rent shall abate commencing on the fifth (5th) consecutive day following the beginning of the interruption until such time as the services are continued.

l.       Landlord reserves all rights respecting the Property and Premises not specifically granted to Tenant under this Lease, including the right to: (i) grant any party the exclusive right to conduct any business or render any service in the Property so long as such right does not prohibit Tenant from using the Premises for the Permitted Use (as defined in Section 11 below); (ii) install and maintain pipes, ducts, conduits, wires, and structural elements in the Premises that serve other parts or other tenants of the Property; (iii) make changes to the Common Areas, (iv) restrain unauthorized persons from using the Common Areas; (v) temporarily close any portion of the

Common Areas; and (iv) change the shape and size of the Common Areas. Landlord will not exercise the foregoing rights in a manner that unreasonably interferes with Tenant's access to, or use of, the Premises.

## 10.    UTILITIES AND SERVICES

On the Commencement Date, all utilities shall be available at the Premises and separately metered to the Premises, except with respect to water and sewer, which are not separately metered and are to be included in the Operating Expenses.  Tenant shall directly contract with the applicable utility companies for all utilities to the Premises (other than water and sewer service) and shall pay the bills therefor directly to the utility company providing such service.

## 11.    USE OF PREMISES

The Premises may be used 24 hours per day/7 days per week by Tenant for distribution, warehousing, and general office use (collectively, the "Permitted Use"), and any other lawful purpose subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned, or delayed.  Tenant shall, at its sole cost: (i) obtain all licenses and permits necessary for its particular use of the Premises, and (ii) comply with all Applicable Laws unless such compliance requires performing alterations to the Premises or the Building, in which case Tenant shall only be obligated to perform such alterations if required because of Tenant's particular use of the Premises. The Premises shall not be used for any noxious purposes, in violation of any Applicable Laws, or in any manner that creates any nuisance. If the Premiums on the Building are increased due to Tenant's use of the Premises, Tenant shall pay to Landlord the amount of the increase in the Premiums.

## 12.    ABANDONMENT OF LEASED PREMISES

Tenant agrees not to abandon the Premises during the Lease Term. Tenant may remove Tenant's property from the Premises and cease operations in the Premises at any time, but its right to cease to use the Premises shall not relieve Tenant of its obligations under this Lease.

## 13.    DAMAGE BY CASUALTY

If the Premises is totally or partially destroyed by casualty, rendering the Premises untenantable, Landlord will promptly restore and repair the Premises to substantially the same condition existing immediately prior to the casualty, at Landlord's expense, unless the Premises cannot be repaired within one hundred eighty (180) days after the date of the casualty, in which case either Landlord or Tenant may terminate this Lease upon thirty (30) days prior written notice to the other party. Rent shall proportionately abate during the time the Premises, or a part thereof, is unusable because of the casualty.  Landlord shall notify Tenant within thirty (30) days after a casualty as to whether the Premises may be repaired within one hundred eighty (180) days after the casualty. If Landlord does not complete the repair of the Premises within such one hundred eighty (180) days after the casualty, then Tenant shall have the right to terminate this Lease by delivering thirty (30) days prior written notice to Landlord, but the termination notice shall be automatically rescinded if the repairs are completed within thirty (30) days after Landlord's receipt of Tenant's notice.  If the Premises is substantially destroyed or damaged by casualty when there is less than twelve (12) months remaining in the Lease Term, Landlord or Tenant may terminate

this Lease upon thirty (30) days prior written notice to the other party, and Tenant's obligations to pay further Rent hereunder shall simultaneously terminate as of the termination date, but Rent shall proportionally abate from the date of the casualty.

## 14.    INDEMNITY AND INSURANCE

a.    Except to the extent Claims (as defined in this Section below) arise from the negligence or willful misconduct of Landlord or any Landlord Party, Tenant releases, indemnifies, protects, defends (with counsel reasonably acceptable to Landlord), and holds Landlord and all Landlord Parties harmless from and against all Claims to the extent arising from: (a) any use or occupancy of, or activities within, the Premises or Property by Tenant or any Tenant Party, (b) any default by Tenant under this Lease, (c) any negligence or willful misconduct of Tenant or any Tenant Party, (d) any accident, injury, or damage in or to the Premises, and (e) to the extent caused by Tenant or any Tenant Party, any accident, injury, or damage in, about, or to the Property.  As used in this Lease, "Claims" means all claims, actions, demands, liabilities, damages, costs, penalties, forfeitures, losses, or expenses including, without limitation, reasonable attorneys' fees and the costs of enforcing any obligation under this Lease. The indemnity provided for in this Section shall survive the expiration or termination of this Lease.

b.    Except to the extent Claims arise from the negligence or willful misconduct of Tenant or any Tenant Party, Landlord releases, indemnifies, protects, defends (with counsel reasonably acceptable to Tenant), and holds Tenant and all Tenant Parties harmless from and against all Claims to the extent arising from: (a) any negligence or willful misconduct of Landlord or a Landlord Party, (b) any default by Landlord under this Lease, and (c) to the extent caused by Landlord or any Landlord Party, any accident, injury, occurrence or damage in, about, or to the Property.

c.    Tenant shall maintain during the Lease Term the following minimum insurance coverage:

i.    commercial general liability insurance covering the Premises with a limit of not less than $2,000,000.00 per occurrence and $5,000,000.00 general aggregate, which may be provided by a combination of primary and umbrella coverage,

ii.    business auto liability insurance covering all vehicles used by Tenant with a limit of not less than $1,000,000.00 per accident,

iii.    all risk or special form property insurance with respect to Tenant's alterations, additions, improvements, and business and personal property located at the Premises at full replacement value,

iv.    statutory worker's compensation insurance,

v.    employer's liability insurance with a $1,000,000.00 minimum limit covering all of Tenant's employees, and

vi.    such other insurance as may be required by any lender holding a mortgage or deed of trust on the Premises, or as may be reasonably required by Landlord.

d.      All policies shall (i) be issued by an insurance company licensed to do business in the Commonwealth of Pennsylvania that is rated by AM Best as A-VII or better, (ii) be reasonably satisfactory to Landlord, (iii) excluding worker's compensation and employer's liability insurance, name Landlord, Landlord's property manager (if any), and Landlord's lender as additional insureds, and (iv) be non-cancellable except after thirty (30) day's prior notice to Landlord.  Tenant shall provide to Landlord both prior to Tenant's initial entry into the Premises and annually thereafter with certificates of insurance, on ACORD Form 25 or an equivalent, confirming that all policies required to be held by Tenant are in effect.

e.      If Tenant fails, neglects, or refuses to maintain the insurance required under this Lease, Landlord may procure or renew such insurance. Tenant shall reimburse Landlord for any amounts paid by Landlord within thirty (30) days after receipt of notice by Landlord.

f.      During the Lease Term, Landlord shall maintain Building Insurance - Special Form CP1030 (formerly known as "all risk") property insurance, including fire and extended coverage, sprinkler leakage, vandalism, and malicious mischief, upon the Building and the Property, in an amount not less than the full replacement cost thereof, including coverage for lost rent for no less than twelve (12) months. Landlord shall maintain commercial general liability insurance with respect to the Common Areas with a limit of not less than $2,000,000.00 per occurrence and $5,000,000.00 general aggregate, which may be provided by a combination of primary and umbrella coverage.

## 15.    APPLICABLE LAWS

Tenant agrees, at its own expense, to promptly comply with all applicable federal, state, county, and city laws, ordinances, rules, and regulations of governmental authorities, and all requirements of any legally-constituted public authority, and any private covenants, conditions, or restrictions (collectively, the "Applicable Laws") related to Tenant's occupancy, use, and alteration of the Premises.  On the Commencement Date, the Premises will comply with all Applicable Laws, including the Americans with Disabilities Act of 1990. Following the Commencement Date, Landlord, at its own expense, shall promptly cause the Building and Common Areas to comply with any Applicable Laws so long as such compliance is not made necessary because of Tenant's alterations to the Premises or Tenant's particular use of the Premises, as opposed to the Permitted Use.  Tenant, at its own expense, agrees to promptly cause the Premises to comply with any Applicable Laws, and the Building and the Common Areas to comply with any Applicable Laws if such compliance is made necessary because of Tenant's alterations to the Premises or Tenant's particular use of the Premises, as opposed to the Permitted Use.

## 16.    ENVIRONMENTAL MATTERS

a.      Compliance with Hazardous Materials Laws.  Tenant, nor any Tenant Party, shall cause or permit any Hazardous Materials (as defined in Section 16.e.i. below) to be brought upon, kept, or used in or about the Premises, Building, or Common Areas, except that Tenant shall be entitled to use and store in the Premises Hazardous Materials in the Premises in accordance with its ordinary operations so long as said use and storage are stored in appropriate containers and in appropriate areas, and in compliance with all Hazardous Materials Laws (as defined in Section

15

16.e.ii. below) and Applicable Laws. Tenant, at its sole cost, will comply with all Hazardous Materials Laws related to Tenant's use of the Property. Prior to the expiration or earlier termination of this Lease, Tenant will remove from the Premises, at Tenant's sole cost, all Hazardous Materials that Tenant or any Tenant Party causes or permits to be present in, on, or under the Property. All such documentation required to be maintained by Tenant under any Hazardous Materials Laws, will list Tenant or a Tenant Party as the responsible party and will not attribute responsibility for any Hazardous Materials to Landlord or any Landlord Party. All reporting and warning obligations required under Hazardous Materials Laws arising from Tenant's use or occupancy of the Premises or Property are Tenant's sole responsibility. Tenant will not apply for or maintain any permits, licenses, or other governmental approvals for the transportation, storage, use, or disposal of Hazardous Materials on the Property without having first having notified Landlord in writing; provided, that the foregoing shall not apply to any permits, licenses, or other governmental permits pursued by Tenant in the ordinary course of Tenant's business as a general hardware store retailer and distributor.

b.     Notice of Actions.   Tenant will notify Landlord of any of the following actions affecting Landlord or the Property immediately after Tenant becomes aware of the same: (a) any enforcement, clean-up, removal, or other governmental or regulatory action instituted, completed, or threatened under any Hazardous Materials Law; (b) any Claims made or threatened relating to any Hazardous Materials on the Property; and (c) any reports, records, letters of inquiry and responses, manifests, or other documents made by any person, including Tenant, to or from any environmental agency relating to any Hazardous Materials. Where such action would affect the interest of Landlord, Tenant will not take any remedial action in response to the presence of any Hazardous Materials in, on, or under the Property, nor enter into any settlement agreement, consent decree, or other compromise with respect to any Hazardous Materials in, on, or under the Property without first notifying Landlord of Tenant's intention to do so and affording Landlord reasonable opportunity to investigate, appear, intervene, and otherwise assert and protect Landlord's interest in the Property.

c.     Tenant's Hazardous Materials Indemnification.   Tenant releases, indemnifies, protects, defends (with counsel reasonably acceptable to Landlord), and holds Landlord and each Landlord Party harmless from and against all Claims to the extent arising, in whole or in part, directly or indirectly, from the presence, treatment, storage, transportation, disposal, release, or management of Hazardous Materials in, on, under, or from the Property (including water tables and atmosphere), but only to the extent arising from Hazardous Materials that Tenant or any Tenant Party brings onto, keeps, uses on, or permits to be brought upon, kept, or used on, the Premises or the Property. Tenant's indemnification obligations under this Section 16.c. includes, without limitation and whether foreseeable or unforeseeable: (a) the costs of any required or necessary repair, compliance, investigations, clean-up, monitoring, response, detoxification, or decontamination of the Property; (b) the costs of implementing any closure, remediation, or other required action in connection with the Hazardous Materials; (c) the value of any loss of use and any diminution in value of the Property and adjacent and nearby properties, including groundwater; and (d) reasonable consultants' fees, experts' fees, and response costs. The obligations of Tenant under this Section 16 shall survive the expiration or earlier termination of this Lease for a period of four (4) years. Tenant shall have no liability for any Hazardous Materials existing in, on, under, or from the Property that: (x) existed prior to Tenant's entry onto the Property; (y) resulted from any Hazardous Materials brought onto the Property by a party other

16

than Tenant or a Tenant Party; or (c) resulted from any Hazardous Materials which migrated to the Property.

     d.     <u>Landlord's Hazardous Materials Representations</u>.    Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, there are no current or pending violations of Hazardous Materials Laws with respect to the Property.  For purposes of this Section 16.d., "Landlord's actual knowledge" will mean the actual knowledge, without further investigation, of Landlord as of the Early Access Delivery Date. Landlord represents and warrants to Landlord's actual knowledge that.  Landlord shall be responsible for mitigating any Hazardous Materials located on the Property prior to the Early Access Delivery Date .

     e.     <u>Definitions</u>.

     i.     "<u>Hazardous Materials</u>" means any of the following, in any amount: (a) any petroleum or petroleum product, asbestos in any form, urea formaldehyde and polychlorinated biphenyls; (b) any radioactive substance; (c) any toxic, infectious, reactive, corrosive, ignitable or flammable chemical or chemical compound; and (d) any chemicals, materials or substances, whether solid, liquid or gas, defined as or included in the definitions of "hazardous substances," "hazardous wastes," "Hazardous materials," "extremely hazardous wastes," " restricted hazardous wastes," "toxic substances," "toxic pollutants," "solid waste," or words of similar import in any federal, state or local statute, law, ordinance or regulation now existing or existing on or after the Effective Date as the same may be interpreted by government offices and agencies, including, without limitation, (i) trichloroethylene, tetrachloroethylene, perchloroethylene and other chlorinated solvents, (ii) oil or any petroleum products or fractions thereof, (iii) asbestos, (iv) polychlorinated biphenyls, (v) flammable explosives, (vi) urea formaldehyde, (vii) radioactive materials and waste, and (viii) infectious waste.

     ii.     "<u>Hazardous Materials Laws</u>" means any federal, state, or local laws, ordinances, codes, statutes, regulations, administrative rules, policies and orders, and other authority, existing now or in the future, which classify, regulate, list, or define Hazardous Materials.

**17.    EMINENT DOMAIN**

     a.     If the Premises, or any substantial part thereof, is taken, if access to the Premises is taken, or if a portion of the parking area is taken such that the Property no longer conforms to zoning regulations applicable to the Property, in any permanent manner by any competent authority under the power of eminent domain, then the term of this Lease shall cease and terminate on the date when possession of the Premises, or the part thereof, passes to the condemning authority. Tenant shall have no claim against Landlord for the value of any unexpired Lease Term. If a taking reduces the total area of the Property or the total area of the Building by 50% or more, regardless of whether the Premises is affected or the taking will render the Premises unsuitable for the Permitted Use, then Landlord may terminate this Lease by notifying Tenant at least thirty (30) days prior to the date the condemning authority takes possession of the portion of the Property.  If a taking reduces the Property so as to render the Premises unsuitable for the Permitted Use, as reasonably determined by Tenant, then Tenant may terminate this Lease by notifying Landlord at

least thirty (30) days prior to the date the condemning authority takes possession of the portion of the Property. If there is a partial taking pursuant to which neither Landlord nor Tenant terminates this Lease, the Base Rent and Additional Rent due hereunder shall be equitably reduced in proportion to the part of the Premises so taken.  No money or other consideration shall be payable by Landlord to Tenant for the right of cancellation, and Tenant shall have no right to share in the condemnation award or in any judgment for damages caused by the taking.  Nothing in this Section 17.a. shall prevent an award being made to Tenant by the condemning authority for the value of Tenant's interest in the Premises; for loss of business; depreciation to, or cost of removal of, Tenant's equipment or fixtures; for moving expenses; or for Tenant's personal property and fixtures, but Tenant's award shall not decrease Landlord's award.

b.      If the Premises, or any substantial part thereof, shall be taken in any temporary manner by any competent authority under the power of eminent domain, this Lease shall remain in full force and effect, and Rent shall continue to be due hereunder during the temporary taking, except that Rent shall be equitably reduced to the extent that Landlord receives an award to offset such Rent reduction. No money or other consideration shall be payable by Landlord to Tenant for such temporary taking and Tenant shall have no right to share in the condemnation award or in any judgment for damages caused by the taking. Nothing in this paragraph shall preclude an award being made to Tenant by the condemning authority for the value of Tenant's interest in the Premises under this Lease, for loss of business or depreciation to and cost of removal of equipment or fixtures or for moving expenses or for Tenant's personal property and fixtures, but this award shall not decrease in anyway Landlord's award.  To the extent that Tenant receives such award, Landlord shall have no obligation to abate any portion of Tenant's Rent.

## 18.    ASSIGNMENT AND SUBLETTING

a.      Except as permitted in this Section 18.a. below, Tenant shall not assign this Lease or any interest hereunder, or sublet the Premises or any part thereof, or permit the use of the Premises by any party other than Tenant, without the prior written consent of Landlord to each assignment and sublease, which consent shall not be unreasonably withheld, conditioned, or delayed by Landlord.  Any approved assignment or subletting shall not release Tenant from the underlying obligation.  Landlord will have no recapture rights and Tenant will be allowed to retain any and all profits.  Tenant may assign this Lease or sublet all or any part of the Premises, without Landlord's consent, to: (i) any entity controlling Tenant, controlled by Tenant, or under common control with Tenant, (ii) to an entity into which Tenant is merged or consolidated, or (iii) to an entity to which substantially all of Tenant's assets are transferred, but any merger, consolidation, or transfer of assets must be for a legitimate business purpose and not principally for the purpose of transferring Tenant's interest in this Lease. With respect to any assignment permitted by this Section 18.a., the assignee shall become directly liable to Landlord, and either the assignee shall have a net worth equal to or greater than Tenant's net worth, or Tenant shall remain fully obligated under this Lease.

b.      If Landlord transfers (other than for collateral security purposes) its ownership interest in the Premises, the Landlord is automatically relieved of all obligations on the part of Landlord accruing under this Lease from and after the date of the transfer, provided that: (a) the transferee agrees in writing to assume such obligations, and (b) the transferor delivers or credits to the transferee any funds the transferor holds in which Tenant has an interest (such as the Security

Deposit).  Landlord's covenants and obligations under this Lease bind each successive Landlord only during and with respect to its respective period of ownership, but each transferor shall remain entitled to the benefits of Tenant's releases, indemnities, insurance, and other similar obligations under this Lease with respect to matters arising or accruing during the transferor's period of ownership.

c.       For the purposes of this Lease (i) "Landlord" shall include its heirs, representatives, assigns, and successors in title to Premises, and (ii) "Tenant" shall include its heirs and representatives, and if this Lease is assigned or subleased as permitted by this Lease, shall also include Tenant's assignees or sublessees, as to Premises covered by such assignment or sublease.

## 19.    DEFAULT; REMEDIES

a.       The occurrence of any of the following shall constitute a "Tenant Default" under this Lease:

i.       Tenant fails to pay any Rent within five (5) days following its due date and such failure continues for more than five (5) days after Tenant receives notice from Landlord demanding that Tenant cure such failure;

ii.       Tenant fails to maintain any insurance required by Tenant under this Lease and such failure continues for more than ten (10) days after Tenant receives notice from Landlord demanding that Tenant cure such failure;

iii.       Tenant fails to perform any of its obligations under this Lease other than the payment of Rent or maintenance of insurance, and such failure continues for more than thirty (30) days (or, in the case of Tenant's failure to timely deliver an estoppel certificate, for more than ten (10) days) after Tenant receives notice from Landlord demanding that Tenant cure such failure, or if such failure cannot be cured within thirty (30) days, within a period of time reasonably necessary to complete the cure so long as Tenant has commenced and is diligently pursuing the cure within the original thirty (30) day period;

iv.       Tenant makes material misrepresentations or omissions in any financial statements, correspondence, or other information provided to Landlord by Tenant in connection with any consent or approval Tenant requests from Landlord under this Lease;

v.       Tenant files a petition under any chapter of the Bankruptcy Code, or under any federal, state, or foreign bankruptcy or insolvency statute, or Tenant makes a general assignment or general arrangement for the benefit of creditors;

vi.       An involuntary petition is filed under any chapter of the Bankruptcy Code, or under any federal, state, or foreign bankruptcy or insolvency statute, or a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed, by or against Tenant and such filing not being dismissed within sixty (60) days;

vii.       An order is entered for or against Tenant for relief under any chapter of the Bankruptcy Code, or under any federal, state, or foreign bankruptcy or insolvency statute;

viii.    A "custodian" is appointed, as such term is defined in the Bankruptcy Code (or of an equivalent thereto under any federal, state, or foreign bankruptcy or insolvency statute) for Tenant, or a trustee or receiver is appointed to take possession of substantially all of Tenant's assets (or any of Tenant's assets located at the Premises) or of Tenant's interest in this Lease; or

ix.    Substantially all of Tenant's assets located at the Premises, or Tenant's interest in this Lease, are subjected to attachment, execution, or other judicial seizure.

If a court of competent jurisdiction determines that any act described in this Section 19.a. does not constitute a Tenant Default, and the court appoints a trustee to take possession of the Premises (or if Tenant remains a debtor-in-possession of the Premises), and such trustee or Tenant transfers Tenant's interest hereunder, then Landlord is entitled to receive the same amount of Rent as Landlord would be entitled to receive if such transfer had occurred pursuant to Section 18.

b.    Upon the occurrence of any Tenant Default, Landlord may, without any demand or notice (except as expressly required in this Section 19), elect any one or more of the following remedies:

i.    Landlord may terminate this Lease by giving notice of termination to Tenant, in which case this Lease shall terminate on the date specified in the notice, and possession of the Premises shall immediately return to Landlord. Landlord may immediately recover from Tenant all of Landlord's actual damages incurred by reason of the Tenant Default, including, the following: (i) to the extent permitted by Applicable Laws, the difference, discounted using the Treasury Yield (as defined in this Section below), between the value of all Base Rent, Additional Rent, and all other sums which would have been payable under this Lease by Tenant for the remainder of the Lease Term (the "Remaining Term"), and the aggregate reasonable rental value of the Premises for the Remaining Term, as reasonably determined by Landlord taking into consideration all relevant factors; plus (ii) all reasonable costs of recovering possession of the Premises and all reasonable costs incurred by Landlord due to the Tenant Default, including reasonable attorneys' fees; plus (iii) all unpaid Base Rent and Additional Rent accrued as of the date of termination, including Service Charges thereon and interest thereon at the Maximum Rate; plus (iv) all other sums of money and damages owed by Tenant to Landlord on the date of termination; plus (v) all other amounts reasonably necessary to compensate Landlord for all actual damages (but not consequential, punitive, or special damages) caused to Landlord by Tenant's Default, including reasonable attorneys' fees. Additionally, any of Tenant's property remaining in the Premises may be removed by Landlord and stored in a warehouse at Tenant's cost without Landlord being deemed guilty of trespass or becoming liable for any loss or damage to Tenant's property. If Tenant fails to pay the storage charges for Tenant's property as and when due, Landlord may deem such property abandoned and cause such property to be sold or otherwise disposed of without further obligation or any accounting to Tenant.  "Treasury Yield" shall mean the rate of return per annum of Treasury Constant Maturities as published in document H.15 by the Board of Governors of the U.S. Federal Reserve System for the day on which the termination occurs, or if the termination occurs on a day on which Treasury Constant Maturities are not published, for the prior business day. The Treasury Constant Maturity

Rate utilized shall be for the term closest to, but not exceeding, the number of months remaining in the Remaining Term. If the publishing of the rate of return of Treasury Constant Maturities is ever discontinued, then the Treasury Yield shall be based upon an index which, in Landlord's reasonable determination, most nearly corresponds to the rate of return of Treasury Constant Maturities.

      ii.      Landlord may terminate Tenant's right to possess the Premises without terminating this Lease, in which case Tenant will immediately surrender possession of the Premises to Landlord.  In such case, this Lease will continue in full force and effect (except for Tenant's right to possess the Premises), and Tenant shall continue to be obligated for and pay all Rent as and when due under this Lease. Unless Landlord specifically states that it is terminating this Lease, Landlord's termination of Tenant's right to possess the Premises shall not be deemed an election by Landlord to terminate this Lease.  If Landlord terminates Tenant's right to possess the Premises, Landlord may re-enter the Premises, remove all of Tenant's property from the Premises, and store the same in a warehouse at Tenant's cost without Landlord being deemed guilty of trespass or becoming liable for any loss or damage to Tenant's property.  If Tenant fails to pay the storage charges as and when due, Landlord may deem Tenant's property abandoned and cause such property to be sold or otherwise disposed of without further obligation or any accounting to Tenant.  Upon such re-entry, Landlord will use commercially reasonable efforts to relet all or any part of the Premises to a third-party or parties for Tenant's account. Tenant will be immediately liable to Landlord for all Re-entry Costs (as defined in this Section below) and must pay Landlord such Re-entry Costs within five (5) days after receipt of Landlord's demand to Tenant for payment of same. Landlord may relet the Premises for a period shorter or longer than the Remaining Term.  If Landlord relets all or any part of the Premises, Landlord will, on a monthly basis, credit any Net Rent (as defined in this Section below) received for the current month against Tenant's Rent obligation for the next succeeding month.  If the Net Rent received for any month exceeds Tenant's Rent obligation under this Lease for the succeeding month, Landlord will retain the surplus.  "Re-entry Costs" means all costs of any kind or nature that Landlord incurs with respect to re-entering and reletting all or any part of the Premises after a Tenant Default, including, without limitation, all costs related to: (a) maintaining or preserving the Premises; (b) recovering possession of the Premises, (c) removing persons and property from the Premises and storing such property, including court costs and reasonable attorneys' fees; (d) renovating or altering the Premises and/or (e) real estate commissions, advertising expenses, and similar expenses related to reletting the Premises. "Net Rent" means all rent Landlord receives from reletting all or any part of the Premises after deducting any unpaid Re-entry Costs and any other amounts owed by Tenant to Landlord.

      iii.      Landlord may pursue such other remedies under Applicable Laws or in equity.

      c.      A "Landlord Default" shall occur if Landlord fails to perform any of its obligations under this Lease within thirty (30) days following Landlord's receipt of notice from Tenant demanding that Landlord cure such failure, or if such failure cannot be cured within thirty (30) days, within a period reasonably necessary to complete the cure so long as Landlord has commenced and is diligently pursuing the cure within the original thirty (30) day period. Any

Landlord Default notice from Tenant to Landlord shall state the nature and extent of the asserted failure and identify the provisions of this Lease containing the obligations of Landlord that Tenant asserts Landlord has failed to perform. If Tenant receives notice of a Mortgagee's name, address, and a request for notice upon a Landlord Default, Tenant shall provide the same notice required by this Section 19.c. to such Mortgagee at the same time Tenant gives notice to Landlord.  If a Landlord Default occurs, Tenant shall have the right to: (i) sue for damages sustained by reason of the Landlord Default; (ii) perform the obligations described in Tenant's default notice, in which case Landlord shall reimburse Tenant for the reasonable costs of the performance of such obligations within thirty (30) days after Tenant's submission of an invoice therefor to Landlord, or Tenant may offset Base Rent in the amount of the reasonable costs of the performance of such obligations, but in no event shall Tenant offset Base Rent by greater than fifty percent (50%) of Base Rent in any month; and/ or (iii) pursue any remedy available to Tenant under Applicable Laws or in equity.  If Tenant elects to proceed under clause (ii) above, then such Landlord Default shall be deemed to have been cured when Tenant's costs has been reimbursed in full.

d.      No provision of this Lease shall be deemed to have been waived by either party unless such waiver is in writing and signed by the party making such waiver.  No custom or practice which may grow up between the parties in connection with the terms of this Lease shall be construed to waive or lessen either party's right to insist upon strict performance of the terms of this Lease, without a written notice thereof to the other party.

## 20.      WAIVER OF CLAIMS AND SUBROGATION

Neither Landlord nor Tenant shall be liable to the other for any loss arising out of damage to or destruction of the Premises, the Building, or the contents of any part thereof, when such loss is caused by any perils which are, or should be, insured against by the insurance policies required to be carried by Landlord and Tenant under this Lease. All such claims for all loss are hereby waived. Said waiver of liability is effective whether the damage or destruction is caused by the negligence of either Landlord, a Landlord Party, Tenant, or a Tenant Party. It is the agreement of Landlord and Tenant that the Rent under this Lease contemplates that each of Landlord and Tenant shall fully provide its own insurance protection, and that each of Landlord and Tenant shall look to its respective insurance carriers for reimbursement of any such loss and that the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party to this Lease. Neither Landlord nor Tenant shall have any interest or claim in the other's insurance policy or policies, or the proceeds thereof, unless specifically covered therein as an additional insured.  Any property insurance policy maintained by either of Landlord or Tenant must permit or include a waiver of subrogation in favor of the other party consistent with the provisions of this Section 20.

## 21.      MORTGAGE SUBORDINATION

a.      This Lease is subject and subordinate to any lien or security interest of any Mortgage, now or in the future, encumbering the Property. The term "Mortgage" as used in this Lease shall include ground leases, deeds of trust, and deeds to secure debt.  Tenant agrees that, in the event of foreclosure of any such Mortgage, or the sale of the Premises under the power contained therein, Tenant will attorn to and accept the purchaser at any such sale as Landlord for the balance of the then-remaining Lease Term.

22

b.      Tenant agrees that in the event of a Landlord Default, or any other occurrence which would give Tenant the right to terminate this Lease, to claim a partial or total eviction, Tenant shall not exercise any of the foregoing rights: (a) until it has notified in writing the holder of any Mortgage (a "Mortgagee") of such Landlord Default, (b) until a reasonable period of time, not exceeding sixty (60) days, for commencement of remedying such Landlord Default shall have elapsed following notice to the Mortgagee, and (c) Landlord or Mortgagee, with due diligence, shall not have remedied, or commenced and be continuing to remedy, such Landlord Default. Tenant agrees that it shall execute reasonable documentation presented to Tenant by Landlord, including a subordination and non-disturbance agreement for the purposes of subordinating Tenant's interests to those of any Mortgagee, wherein the Mortgagee shall agree in writing not to disturb the possession of the Premises by Tenant or the rights of Tenant under this Lease so long as Tenant is not in material default (subject to applicable notice and cure rights in favor of Tenant as contained in this Lease) in the performance of its obligations hereunder.

## 22.    SIGNAGE

Signage, including building signage, is included in the scope of work and should be installed as specified. Tenant shall have the right to install, at Tenant's sole cost, additional building-standard signage that is not specified in the scope of work, subject to Applicable Laws and Landlord's approval, which shall not be unreasonably withheld, conditioned, or delayed. Tenant agrees that no other signs, other than as approved by Landlord, shall be erected or painted which are visible outside the Premises. All signage shall be removed by Tenant at its sole cost on or prior to the expiration or earlier termination of the Lease, and Tenant shall repair all damage to the Premises or the Property resulting from its removal of such signage.

## 23.    LANDLORD'S RIGHT OF ENTRY

Landlord, or a Landlord Party, may enter the Premises at reasonable hours and upon reasonable notice to Tenant, examine the Premises and to do anything Landlord may be required to do to satisfy its obligations under this Lease or which Landlord deems necessary for the good of the Premises or the Building, except that Landlord shall be accompanied by a representative of Tenant. No notice or Tenant accompaniment shall be required in the case of emergencies.  During the last nine (9) months of this Lease, Landlord may show the Premises and display a "For Rent" sign on the Premises. Landlord shall enter the Premises at its own risk and shall use all measures reasonably necessary to minimize any interference with Tenant's use of the Premises.

## 24.    EFFECT OF TERMINATION OF LEASE

No termination of this Lease prior to the scheduled expiration of this Lease shall prevent Landlord's from collecting Rent for the period prior to termination of the Lease.

## 25.    NO ESTATE IN LAND

This Lease shall create only the relationship of landlord and tenant between the parties, and no estate in the Land or Property shall pass out of Landlord to Tenant.

## 26.    HOLDING OVER

If Tenant remains in possession of the Premises after expiration of the Lease Term, or fails to return the Premises to Landlord in the manner and condition required by this Lease, Tenant shall be a Tenant at sufferance and all of the terms and provisions of this Lease shall be applicable during the period following the Lease Term (the "Holdover Period"), except that during the Holdover Period, Landlord shall have the right to charge Rent equal to one hundred twenty five percent (125%) of the Rent payable by Tenant during the last month of the lease term in the first 60 days and one hundred fifty percent (150%) of the Rent payable by Tenant during the last month of the Lease Term thereafter. If, during the Holdover Period, Landlord delivers notice to Tenant that Landlord has leased the Premises to a third-party, and Tenant does not vacate the Premises within ninety (90) days following its receipt of said notice, Landlord shall have the right to seek consequential damages resulting from its possession of the Premises beyond said 90-day period. Tenant agrees to vacate and deliver the Premises to Landlord within thirty (30) days following Tenant's receipt of notice from Landlord to vacate Premises. Tenant's occupancy or possession of the Premises during the Holdover Period shall not extend the Lease Term.

## 27.    WAIVER

The rights and remedies of Landlord under this Lease, as well as those provided by Applicable Laws, shall be cumulative. A waiver by Landlord or Tenant of any Tenant Default or Landlord Default, respectively, shall not be construed to be a continuing waiver of such Tenant Default or Landlord Default, nor as a waiver of any subsequent Tenant Default or Landlord Default. The acceptance by Landlord of any installment of Rent after its due date shall not alter the obligation of Tenant to pay subsequent installments of Rent promptly when due. No receipt of money by Landlord from Tenant after the expiration or termination of this Lease shall reinstate the Lease or extend the Lease Term.

## 28.    NOTICES

All notices or other communications required or permitted hereunder shall be in writing and delivered via personal delivery, U.S. Mail, overnight delivery service, or electronic mail, addressed to the respective parties as follows:

| Notices to Tenant: | True Value Company, L.L.C. |
| | 8600 West Bryn Mawr Avenue |
| | Chicago, IL 60631 |
| | Attn: Abhinav Shukla |
| | Phone: 773-695-5430 |
| | Email: abhinav.shukla@truevalue.com |
| | |
| With a copy to: | True Value Company, L.L.C. |
| | 8600 West Bryn Mawr Avenue |
| | Chicago, IL 60631 |
| | Attn: General Counsel |

Notices to Landlord:            NP Hanover Industrial, LLC
4825 NW 41st Street, Ste. 500
Kansas City, Missouri 64150
Attn: Nathaniel Hagedorn
Phone:  816-888-7381
Email: nathaniel@northpointkc.com

With a copy to:            NorthPoint Development, LLC
4825 NW 41st Street, Ste. 500
Kansas City, Missouri 64150
Attn: Tim Klink
Phone:  816-895-8201
Email: tklink@northpointkc.com

Notices shall be deemed received by the recipient (i) when personally delivered, (ii) with respect to certified U.S. mail or overnight delivery service, on the date that delivery is made to the recipient, and (iii) with respect to electronic mail, when the electronic mail is sent by the sender so long as the sender provides a copy of such notice to the recipient via another delivery method permitted by this Lease within three (3) days following the electronic mail. Landlord or Tenant may update its contact information set forth above upon ten (10) days' prior written notice to the other party. Rejection or other refusal to accept any notice, or the inability to deliver notice because of a changed address for which no notice was given, shall be deemed to constitute receipt of any notice sent hereunder.

## 29.    TIME OF ESSENCE

Time is of the essence of this Lease.

## 30.    BANKRUPTCY

Neither this Lease, nor any interest herein, nor any estate hereby created, shall pass to any trustee or receiver in bankruptcy, or to any other receiver or assignee for the benefit of creditors or otherwise by operation of law during the Lease Term.

## 31.    GOVERNING LAW

This Lease shall be governed by the laws of the Commonwealth of Pennsylvania.

## 32.    ENTIRE AGREEMENT

This Lease contains the entire agreement between Landlord and Tenant, and no modifications of this Lease shall be binding upon Landlord or Tenant unless evidenced by an agreement in writing signed by each of Landlord and Tenant following the Effective Date.

## 33.    ATTORNEY'S FEES

In any action legal action between Landlord and Tenant under this Lease, the unsuccessful party shall pay all costs incurred by the prevailing party, including reasonable attorneys' fees.

## 34.     ESTOPPEL CERTIFICATES

Landlord and Tenant each agree to certify in writing the status of this Lease and the Rent payable hereunder, at any time, upon ten (10) days written notice from the other party. If Tenant has not responded to the request for said estoppel certificate within said 10-day period, Landlord shall provide an additional written notice requesting same, to which Tenant shall respond within three (3) business days following its receipt of said notice. Such estoppel certificate shall be in a form reasonably satisfactory to: (i) Landlord, (ii) Tenant, (iii) any governmental authority or public agency, (iv) a prospective purchaser of the Property, (v) a prospective, permitted assignee or sublessee of Tenant, and (vi) a prospective holder of a security instrument executed by Landlord or Tenant, as the case may be. Such estoppel certificate shall certify: (i) the Commencement Date, (ii) the expiration date of the Lease Term, including any extensions thereof, (iii) whether or not this Lease is in full force and effect, (iv) whether or not this Lease has been amended or modified, and if so, in what manner, (v) the date through which Rent has been paid, (vi) whether or not there are any known Tenant Defaults or Landlord Defaults, and if so, specifying the particulars of such default and the action required to remedy it, (vii) whether or not there are any known setoffs against, or defenses to, the enforcement of the terms and conditions of this Lease, and if so, specifying the particulars of such setoffs or defenses, and (viii) such other factual information as the requesting party reasonably requests.

## 35.     RULES AND REGULATIONS

The rules and regulations attached to this Lease as <u>Exhibit D</u> are hereby made a part of this Lease, and Tenant agrees to comply with and observe the same. Tenant's material failure to keep and observe the rules and regulations shall constitute a Tenant Default. Landlord reserves the right to make reasonable amendments, supplements, and additions to said rules and regulations. Written notice specifying amendments, supplements, and additions to the rules and regulations shall be given to Tenant and shall not be enforceable prior to thirty (30) days after Tenant's receipt of such notice. Tenant agrees to comply with and observe all rules and regulations, and all amendments, supplements, and additions thereto.

## 36.     FORCE MAJEURE

Landlord or Tenant shall be excused, without penalty, for the period of any delay in the performance of any obligations hereunder when prevented from doing so by causes beyond its control, which shall include acts of God, governmental restrictions, strikes, labor disturbances, shortages of materials or supplies and the inability to obtain reasonable substitutes, and actions or inactions of governmental authorities (but not violations of Applicable Laws) (a "<u>Force Majeure Event</u>"). In connection with any Force Majeure Event, the party claiming such Force Majeure Event must use commercially reasonable efforts to mitigate the effect of such Force Majeure Event. Nothing contained in this Section 36 shall excuse either party from paying in a timely fashion any payments due under the terms of this Lease. Additionally, failure of Landlord to obtain any governmental or quasi-governmental approvals shall not be deemed a Force Majeure Event hereunder.  Landlord must provide written notice within five (5) days of a Force Majeure Event that will delay construction to be excused without penalty.

## 37.     QUIET ENJOYMENT

Landlord warrants that it has the right to execute and to perform this Lease and to grant the tenancy of the Premises to Tenant. If no Tenant Default exists, Tenant shall peaceably and quietly have, hold, and enjoy the Premises during the Lease Term without hindrance by Landlord.

## 38.   EXCULPATION

Tenant agrees that no Landlord Party will be personally liable for any claim or judgment in connection with this Lease. In no event shall Landlord or any Landlord Party be liable to Tenant, Tenant Party, or any other person for consequential, indirect, special, or punitive damages.

## 39.   DUE AUTHORIZATION AND EXECUTION

Tenant represents and warrants that this Lease has been duly authorized, executed, and delivered by and on behalf of Tenant and constitutes the valid and binding agreement of Tenant.

## 40.   MAXIMUM RATE

If Tenant does not pay any amount required under this Lease when due, Tenant shall pay Landlord interest on the delinquent payment, calculated at the Maximum Rate from the date the payment is due through the date the payment is made. Such interest will be considered Additional Rent and will be in addition to any of Landlord's other remedies under this Lease. "Maximum Rate" means interest at a per annum rate equal to two hundred fifty (250) basis points in excess of the "prime rate" of interest then charged by UMB Bank, N.A., or if UMB Bank, N.A. is not then in existence, another comparable bank selected by Landlord. If the Maximum Rate exceeds the maximum interest rate permitted by Applicable Laws, such rate will be reduced to the highest rate allowed by Applicable Laws.

## 41.   NO ACCORD AND SATISFACTION

No statement on a payment check from Tenant or in a letter accompanying a payment check shall be binding on Landlord.  Landlord may, with or without notice to Tenant, cash such check without being bound by the conditions of any such statement. If Tenant pays any amount other than an actual amount due to Landlord, receipt of such partial payment will not constitute an accord and satisfaction. Landlord may retain any such partial payment, whether restrictively endorsed or otherwise, without prejudice to Landlord's right to collect the balance due under this Lease.  If all or any portion of any payment is dishonored for any reason, payment will not be deemed made until the entire amount due is actually collected by Landlord.  The foregoing provisions apply to the receipt or collection of any amount by any person on Landlord's behalf.

## 42.   CONFIDENTIALITY

Each party acknowledges and agrees that the terms of this Lease are confidential and constitute proprietary information.  Disclosure of the terms could adversely affect the ability of Landlord to negotiate other leases and impair Landlord's relationship with other tenants, or could benefit Tenant's competitors or impair Tenant's relationships with its vendors and suppliers. Tenant agrees that it and each Tenant Party shall not intentionally or voluntarily disclose the terms and conditions of this Lease to any newspaper, publication, any other tenant or apparent prospective tenant of the Building, or real estate agent, either directly or indirectly, without the

prior written consent of Landlord, but Tenant may disclose the terms of this Lease to prospective, permitted subtenants, assignees, attorneys, lenders, accountants, auditors, consultants, brokers and others with a valid business reason to review this Lease for a good faith business purpose. Landlord agrees that it and each Landlord Party shall not intentionally or voluntarily disclose the amounts of the Base Rent or any other aspect of the rent structure of the Lease, or any information about the nature, design, operation, methods or equipment used in the conduct of Tenant's business in the Premises. Landlord and Tenant may make disclosures if required by Applicable Laws, and to their attorneys, lenders, accountants, auditors, consultants, and others with a valid business reason to review this Lease for a good faith business purpose.

## 43.    BROKER

Tenant represents and warrants to Landlord that no agent, broker, or realtor other than Cresa Global, Inc. ("Tenant's Broker") has been involved with respect to this Lease on behalf of Tenant. Tenant, other than with respect to Tenant's Broker, indemnifies and holds Landlord harmless from any claims, liabilities, losses, costs and expenses incurred by Landlord with regard to any claim by any person or entity that it is entitled to compensation as a result of this Lease through its relationship with Tenant. Landlord represents and warrants to Tenant that no agent, broker, or realtor other than Cushman & Wakefield ("Landlord's Broker") has been involved with respect to this Lease on behalf of Landlord. Landlord, other than with respect to Landlord's Broker, indemnifies and holds Tenant harmless from any claims, liabilities, losses, costs and expenses incurred by Tenant with regard to any claim by and person or entity that it is entitled to compensation as a result of this Lease through its relationship with Landlord.  Landlord and Tenant agree that the commission hereunder due to Tenant's Broker shall be equal to $3,044,155 and shall be shared equally between Tenant and Tenant's Broker pursuant to a separate agreement. The foregoing commission shall be paid fifty percent (50%) within three (3) business days following the Effective Date and fifty percent (50%) within three (3) business days following the Commencement Date. Landlord shall pay a commission to Landlord's Broker pursuant to separate agreement.

## 44.    RIGHT OF FIRST REFUSAL

Provided there is no current Tenant Default, beyond any applicable notice and opportunity to cure periods, if at any time after the Commencement Date and prior to the expiration of the Lease Term, Landlord receives an offer from a third-party (the "Third Party Offer") to lease a portion of the Building (the "First Refusal Premises") which Third Party Offer Landlord intends to accept, then prior to accepting such Third Party Offer, Landlord shall provide notice to Tenant offering to lease all of the First Refusal Premises to Tenant, the terms of which shall be consistent with the terms and provisions of this Lease, as applied to the First Refusal Premises, except that the rent therefor shall be at a per-square-foot rate that is the lesser of: (i) the then-current Base Rent rate for the Premises, and (ii) the Fair Market Value of the First Refusal Premises.  If the proposed term for the First Refusal Premises will exceed the then-remaining Lease Term, then Tenant shall either (x) if any Extended Term remains in connection with this Lease, exercise all Extended Terms necessary such that the Lease Term will be co-terminus with the proposed term of the First Refusal Premises, or (y) if there are no Extended Terms remaining in connection with this Lease, or exercise of any remaining Extended Terms will not be adequate to cause the Lease Term to be co-terminus with the proposed term of the First Refusal Premises, then Tenant shall

agree to amend this Lease such that the Lease Term shall be co-terminus with the proposed term of the First Refusal Premises. Tenant may, within ten (10) days after Tenant's receipt of the foregoing notice, elect to lease all of the First Refusal Premises upon the terms set forth above by sending to Landlord a written notice of its irrevocable election to lease all of the First Refusal Premises upon such terms. If Landlord does not receive from Tenant a written irrevocable notice to lease all of the First Refusal Premises within such 10-day period, then Tenant shall be deemed to have elected not to exercise its right of first refusal to lease the First Refusal Premises with respect to such Third Party Offer, and Landlord may thereafter lease the First Refusal Premises to the third-party offeror upon the terms of the Third Party Offer. If Tenant shall timely notify Landlord of its election to lease all of the First Refusal Premises in accordance with this Section 44, then Tenant shall execute and deliver to Landlord an amendment to this Lease prepared by Landlord and reasonably acceptable to Tenant evidencing the leasing of the First Refusal Premises within fifteen (15) days after Landlord's delivery to Tenant of such amendment. Under no circumstances shall Tenant have the right under this Section 44 to lease less than all of the First Refusal Premises. Any termination of this Lease shall terminate Tenant's right of first refusal hereunder. If such lease to a third party offeror is not completed within ninety (90) days after Tenant's receipt of the Third Party Offer from Landlord, or if there is any change in the provisions of the Third Party Offer which would cause the economic value being paid by the proposed tenant to be less than ninety-five percent (95%) of the original Third Party Offer, then before entering into any such lease, Landlord shall follow the requirements of this Section 44.

## 45.    TEMPORARY USE OF ADJACENT SPACE

With respect to any unoccupied, unleased space within the Building that is adjacent to the Premises ("Temporary Use Space"), Tenant shall have the right, upon not less than thirty (30) days' prior written notice to Landlord, to utilize said Temporary Use Space on a month-to-month basis strictly for overflow storage. Tenant shall not erect or construct any improvements within said Temporary Use Space, and Landlord shall not have any obligation to cause any improvements to be made to any such Temporary Use Space. Use of the Temporary Use Space must be in 50,000 square foot increments. Tenant's use of the Temporary Use Space shall be subject to any all provisions of this Lease, except (i) as otherwise specifically set forth in this Section 45, and (ii) Tenant shall be required to pay Base Rent in connection with said Temporary Use Space in an amount equal to seventy-five percent (75%) of the Base Rent rate then in effect for the Premises, multiplied by the usable square footage of the Temporary Use Space. For the purposes of clarity, Landlord and Tenant agree that Tenant shall be required to pay Taxes and Operating Expenses in connection with any such Temporary Use Space during any period that Tenant is utilizing same, and during such period(s), Tenant's Proportionate Share shall be recalculated to account for said Temporary Use Space. Either party may terminate Tenant's use of any such Temporary Use Space upon not less than thirty (30) days' prior written notice to the other party.

## 46.    EXPANSION RIGHT

a.      Tenant shall have the right during the initial 257-month Lease Term to elect to cause the Premises to be expanded into any unoccupied, unleased space within the Building that is adjacent to the Premises (the "**Expansion Premises**") as further set forth in this Section 46 (the "**Expansion Option**"). Tenant may elect such Expansion Option by providing notice to Landlord of such election not less than thirty (30) days, and not more than sixty (60) days, prior to the date

29

on which Tenant desires to take possession of said Expansion Premises. Upon Tenant's taking of possession of any Expansion Premises, the same shall become a part of the Premises hereunder for all purposes of this Lease, and Tenant shall observe all provisions of this Lease in connection with the Expansion Premises, including, without limitation (i) Tenant shall pay Base Rent in connection with the Expansion Premises equivalent to the Base Rent rate then in effect for the original Premises, multiplied by the usable square footage of the Expansion Premises, and escalating as set forth in this Lease, (ii) Tenant shall pay all Additional Rent, Taxes, and Operating Expenses in connection with the Expansion Premises, and Tenant's Proportionate Share shall be adjusted accordingly. In no event shall Landlord be obligated to construct any improvements within any Expansion Premises, nor shall Landlord be obligated to provide any allowance of any kind to Tenant in connection with any Expansion Premises.

b.      In the event that Tenant, following the Commencement Date, requires additional space within the Building, and there is no Expansion Space available, Landlord will make commercially reasonable efforts to relocate an existing, adjacent tenant for the purposes of causing Expansion Space to become available to Tenant; provided, that Landlord does not guarantee that Landlord will be able to relocate any such existing, adjacent tenant, and Landlord shall not be required to cause any such relocation if said relocation would adversely affect Landlord. Notwithstanding the foregoing, Landlord may elect to construct a new building to which to relocate said adjacent tenant, which new building construction would require approximately 9 to 12 months, and if Landlord does move forward with constructing a new building for the relocation of said adjacent tenant, notwithstanding any provisions hereof to the contrary, the Base Rent for said resulting Expansion Premises would be equal to the then Fair Market Value thereof.

## 47.    CTPAT COMPLIANCE

Landlord will ensure that no other tenants within the Building negatively impact Tenant's compliance with the Customs Trade Partnership Against Terrorism program, as the same is administered by the United States Customs and Border Protection agency.

## 48.    MUNICIPAL INCENTIVES

Landlord, at no cost to Landlord, will provide reasonable assistance and cooperation to Tenant, in the pursuit of any available incentives offered by the local, county, state and federal authority programs.

## 49.    MISCELLANEOUS

a.      Separate Counterparts.  This Lease may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.  Facsimile, portable document format (PDF), or other electronic copies of signed counterparts of this Lease shall have the same effect as an original signed counterpart.

b.      Captions and Section Numbers.  The captions, section numbers, article numbers, and headings appearing in this Lease are inserted only as a matter of convenience, and in no way define, limit, construe, or describe the scope or intent of such sections or articles of this Lease.

c.    <u>Partial Invalidity</u>.   If any term, covenant, or condition of this Lease, or the application thereof to any person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Lease or the application of such term, covenant, or condition of this Lease shall be valid and enforceable to the fullest extent permitted by law.

d.    <u>No Third-Party Beneficiary</u>.   Nothing herein expressed or implied is intended or shall be construed to confer upon any person or entity, other than the parties hereto and their successors or permitted assigns, any rights or remedies under this Lease.

e.    <u>WAIVER OF JURY TRIAL</u>.   LANDLORD AND TENANT EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE AND OCCUPANCY OF THE PROPERTY.

[Signature Pages Follow.]

31

**IN WITNESS WHEREOF**, Tenant hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**TENANT:**

**True Value Company, LLC**, a Delaware limited liability company

By: _____

Name: _ABHINAV SHUKLA_____

Title: _COO_____

Confidential

clusardo@taftlaw.com

2024-10-07 14:46:37 +0000

**IN WITNESS WHEREOF**, Landlord hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**LANDLORD:**

**NP Hanover Industrial I, LLC**, a Missouri limited liability company

By: NPD Management, LLC, its Manager


By:_____
       Nathaniel Hagedorn, Manager

EXHIBIT A-1: PREMISES FLOOR PLAN



## EXHIBIT A-2: LEGAL DESCRIPTION OF THE LAND

**Lot 2**

ALL THAT CERTAIN piece or parcel of land situate in the Township of Hanover, County of Luzerne, Commonwealth of Pennsylvania bounded and described as follows:

BEGINNING at a rebar set in the required Right-of-Way Line for Limited Access being identified as 259 feet left, more or less of base line station 1038+52 of State Route 3046 as shown on a set of drawings attached to a deed in lieu of condemnation as recorded in Luzerne County Record Book 3015 Page 41618, said point also being the intersection of the northwesterly line of lands line now or formerly of UGI Corporation as recorded in Luzerne County Deed Book 1700 page 168;

THENCE along the required Right-of-Way Line for Limited Access of State Route 3046 the following five (5) courses and distances:

FIRST South 73 degrees 30 minutes 37 seconds West three hundred seventy-six and seventy hundredths (376.70) feet to a point;

THENCE North 27 degrees 44 minutes 36 seconds West fifty and thirty-five hundredths (50.35) feet to a point;

THENCE South 63 degrees 36 minutes 59 seconds West five hundred eighty-five (585.00) feet to a point;

THENCE South 27 degrees 36 minutes 24 seconds East sixty (60.00) feet to a point;

THENCE South 62 degrees 23 minutes 36 seconds West One thousand six and thirty-six hundredths (1,006.36) feet to a point being a corner of Lot 1;

THENCE along Lot 1 the following three (3) courses and distances:

FIRST North 27 degrees 36 minutes 48 seconds West one thousand three hundred ninety-nine and ninety-five hundredths (1399.95) feet to a point;

THENCE North 17 degrees 22 minutes 52 seconds East two hundred ninety-nine and fifty hundredths (299.50) feet to a point;

THENCE North 27 degrees 37 minutes 54 seconds West one thousand ninety-two and ninety-six hundredths (1092.96) feet to a rebar set in the southeasterly line of lands now or formerly of Edmond C. Wideman, III as recorded in Luzerne County Deed Book 2176 page 247;

THENCE along lands now or formerly of Edmond C. Wideman, III, the following six (6) courses and distances:

FIRST North 18 degrees 16 minutes 01 second East two hundred forty-one and seventy-seven hundredths (241.77) feet to a rebar set;

35

THENCE North 43 degrees 11 minutes 01 second East three hundred fifty-seven and eighty-eight hundredths (357.88) feet to a rebar set;

THENCE North 49 degrees 41 minutes 01 second East two hundred twenty-three and sixty-six hundredths (223.66) feet to a rebar set;

THENCE North 27 degrees 11 minutes 59 seconds West two hundred seventy-five and forty hundredths (275.40) feet to a rebar set;

THENCE North 41 degrees 54 minutes 59 seconds West two hundred seventy-sixty (276.00) feet to a rebar set;

THENCE South 64 degrees 14 minutes 01 second West six hundred ninety-one and eight hundredths (691.08) feet to a rebar set in line of lands now or formerly of MB Investments as recorded in Luzerne County deed Book 2415 page 857;

THENCE along lands now or formerly of MB Investment the following four (4) courses and distances:

FIRST North 26 degrees 30 minutes 21 seconds East two hundred ninety and sixty-three hundredths (290.63) feet to a rebar found;

THENCE North 12 degrees 52 minutes 28 seconds East seven hundred thirty and fifty-eight hundredths (730.58) feet to a rebar set;

THENCE North 49 degrees 35 minutes 42 seconds West four hundred (400.00) feet to a mag nail set;

THENCE North 38 degrees 39 minutes 08 seconds West four hundred eighteen and one hundredth (418.01) feet to a rebar found in the southerly right-of-way line for limited access of Ramp C as shown on a set of Right-of-Way drawings of Legislative Route 786 section 3R/W;

THENCE along the southerly Right-of-Way line for limited access along a curve to the right having a radius of two thousand seven hundred sixty-four and seventy-nine hundredths (2,764.79) feet, an arc length of one hundred ninety-three and sixty-six hundredths (193.66) feet, and a chord bearing and distance of North 78 degrees 14 minutes 06 seconds East one hundred ninety-three and sixty-two hundredths (193.62) feet to a point of compound curvature;

THENCE continuing along same along a curve to the right having a radius of eight hundred fifty-four and ninety-three hundredths (854.93) feet, an arc length of one hundred thirty-three and seventy hundredths (133.70) feet, and a chord bearing and distance of North 84 degrees 43 minutes 18 seconds East one hundred thirty-three and fifty-six hundredths (133.56) feet to a point in line of lands now or formerly of Eugene Scott and Dorothy Scott;

THENCE along lands now or formerly of Eugene Scott and Dorothy Scott South 39 degrees 09 minutes 21 seconds East one hundred one and fifty hundredths (101.50) feet to a point;

THENCE continuing along same North 80 degrees 23 minutes 55 seconds East one hundred twenty-five and seventy-two hundredths (125.72) feet to a point in the southwesterly limited access Right-of-Way line of State Route 0029, also known as the South Cross Valley Expressway;

THENCE along the southwesterly limited access Right-of-Way line of State Route 0029 the following twenty (20) courses and distances:

FIRST along a curve to the right having a radius of two hundred eighteen and thirty-one hundredths (218.31) feet, an arc length of twenty-three and sixty-six hundredths (23.66) feet, and a chord bearing and distance of South 44 degrees 28 minutes 04 seconds East twenty three and sixty-five hundredths (23.65) feet to a point;

THENCE South 48 degrees 38 minutes 14 seconds West forty (40.00) feet to a point;

THENCE along a curve to the right having a radius of two thousand seven hundred twenty-four and seventy-nine hundredths (2,724.79) feet, an arc length of one hundred seven and ninety-nine hundredths (107.99) feet, and a chord bearing and distance of South 40 degrees 13 minutes 38 seconds East one hundred seven and ninety-nine hundredths (107.99) feet to a point;

THENCE South 39 degrees 05 minutes 31 seconds East one hundred thirty-seven and fifty hundredths (137.50) feet to a point;

THENCE along a curve to the left having a radius of seven hundred twenty-eight and ninety-six hundredths (728.96) feet, an arc length of four hundred fifty-eight and seventy-seven hundredths (458.77) feet, and a chord bearing and distance of South 57 degrees 07 minutes 17 seconds East four hundred fifty-one and twenty-three hundredths (451.23) feet to a point;

THENCE North 14 degrees 50 minutes 57 seconds East forty (40.00) feet to a point;

THENCE along a curve to the left having a radius six hundred eighty-eight and ninety-six hundredths (688.96) feet, an arc length of eighty-one and eighty-three hundredths (81.83) feet, and a chord bearing and distance of South 78 degrees 33 minutes 12 seconds East eighty-one and seventy-eight hundredths (81.78) feet to a point;

THENCE South 81 degrees 57 minutes 22 seconds East two hundred fifty-one and fifty-two hundredths (251.52) feet to a point;

THENCE South 08 degrees 02 minutes 38 seconds West fifty (50.00) feet to a point;

THENCE along a curve to the right having a radius of two thousand seven hundred fourteen and seventy-nine hundredths (2,714.79) feet, an arc length of one hundred seven and sixty hundredths (107.60) feet and a chord bearing and distance of South 80 degrees 49 minutes 15 seconds East one hundred seven and fifty-nine hundredths (107.59) feet to a point of compound curvature;

THENCE along a curve to the right having a radius of one hundred sixty eight and thirty one hundredths (168.31) feet, an arc length of one hundred fifteen and forty-seven hundredths (115.47) feet, and a chord bearing and distance of South 60 degrees 01 minute 52 seconds East one hundred thirteen and twenty-two hundredths (113.22) feet to a point of compound curvature;

THENCE along a curve to the right having a radius of two thousand seven hundred fourteen and seventy-nine hundredths (2,714.79) feet, an arc length of one hundred twenty-two and forty-eight hundredths (122.48) feet, and a chord bearing and distance of South 39 degrees 05 minutes 04 seconds East one hundred twenty-two and forty-seven hundredths (122.47) feet to a point of reversing curvature;

THENCE along a curve to the left having a radius of three thousand fourteen and seventy-nine hundredths (3014.79) feet, an arc length of one thousand thirty and fifty-four hundredths (1030.54) feet, and a chord bearing and distance of South 47 degrees 35 minutes 04 seconds East one thousand twenty-five and fifty-three hundredths (1025.53) feet to a point of tangency;

THENCE South 59 degrees 08 minutes 16 seconds East ninety and ninety-eight hundredths (90.98) feet to a point;

THENCE North 31 degrees 49 minutes 38 seconds East twenty-eight (28.00) feet to a point;

THENCE along a curve to the left having a radius of three thousand fourteen and ninety-three hundredths (3014.93) feet, an arc length of one hundred fifty-one and seventy-four hundredths (151.74) feet, and a chord bearing and distance of South 59 degrees 36 minutes 53 seconds East one hundred fifty-one and seventy-two hundredths (151.72) feet to a point of tangency;

THENCE South 61 degrees 02 minutes 53 seconds East three hundred five and eighty-eight hundredths (305.88) feet to a point;

THENCE North 28 degrees 57 minutes 07 seconds East ten (10.00) feet to a point;

THENCE South 61 degrees 02 minutes 53 seconds East one thousand eight hundred fifty (1,850.00) feet to a point;

THENCE North 28 degrees 57 minutes 07 seconds East twenty (20.00) feet to a point;

THENCE South 61 degrees 02 minutes 53 seconds East one hundred seventy-six and thirty-seven hundredths (176.37) feet to a point in the required Right-of-Way line for limited access being identified as 73 feet right, more or less of base line station 6002+25 of Ramp SMLW as shown on the aforementioned set of drawings attached to a deed in lieu of condemnation as recorded in Luzerne County Record Book 3015 Page 41618;

THENCE along the required Right-of-Way line for limited access of Ramp SMLW the following three (3) courses and distances:

FIRST South 32 degrees 58 minutes 41 seconds West one hundred twenty-seven and thirty-nine hundredths (127.39) feet to a point;

THENCE South 49 degrees 04 minutes 06 seconds East two hundred ninety-eight and eighty-three hundredths (298.83) feet to a point;

THENCE South 67 degrees 43 minutes 46 seconds East twenty-two and eighteen hundredths (22.18) feet to a rebar set in line of lands now or formerly of UGI Corporation as recorded in Luzerne County Deed Book 1700 page 168;

THENCE along lands now or formerly of UGI Corporation South 50 degrees 30 minutes 24 seconds West one thousand six hundred ninety-two and forty hundredths (1,692.40) feet to the point of beginning;

CONTAINING 228.077 acres of land more or less;

SUBJECT TO conditions, exceptions, and reservations as they may appear as recorded in Luzerne County Deed Book 566 page 18;

ALSO SUBJECT TO reservation to Glen Alden Corporation as set forth in Luzerne County Deed Book 1586 page 92 reserving a carried interest in future rights;

ALSO SUBJECT TO rights granted to Wyoming Valley Sanitary Authority as set forth in Luzerne County Deed Book 1646 page 535;

ALSO SUBJECT TO notice of filing of Declaration of Taking by Newport Township Sewer Authority as set forth in Luzerne County Deed Book 2003 page 1137;

ALSO SUBJECT TO an easement agreement with UGI Utilities, Inc. as set forth in Record Book 3012 page 134148;

ALSO SUBJECT TO a deed of easement to the Commonwealth of Pennsylvania, Department of Transportation, as set forth in Luzerne County Record Book 3015 page 41604;

ALSO SUBJECT TO the conditions of the Post Construction Stormwater Management (PCSM) filing notice as set forth in Luzerne County Record Book 3016 page 164503;

ALSO SUBJECT TO a new stormwater easement more fully shown and described on the hereinafter referenced drawings;

ALSO SUBJECT TO a blanket access easement for access to and from the new stormwater easements;

TOGETHER WITH an access easement as reserved by Earth Conservancy through lands now or formerly UGI Corporation as recorded in Luzerne County Deed Book 1700 page 168;

ALSO TOGETHER WITH a new stormwater easement passing through Lot 1 more fully shown and described on the hereinafter referenced drawings;

ALSO TOGETHER WITH a new natural gas utility easement passing through Lot 1 benefitting Lot 2 more fully shown and described on the hereinafter referenced drawings;

ALSO TOGETHER WITH a new potable waterline easement passing through Lot 1 benefitting Lot 2 more fully shown and described on the hereinafter referenced drawings;

ALSO TOGETHER WITH a new sanitary sewer line  easement passing through Lot 1 benefitting Lot 2 more fully shown and described on the hereinafter referenced drawings;

BEING part of the same premise conveyed to Earth Conservancy, a Pennsylvania not-for-profit Corporation, by deed as recorded in Record Book 2501 Page 831 in the Luzerne County Recorder's Office;

ALSO BEING ALL of Lot 2 described as shown on a set of drawings entitled Preliminary / Final Subdivision Plan for Lot 9, Hanover, PA, dated April 23, 2018, prepared by Quad Three Group, Inc., 37 North Washington Street, Wilkes Barre, PA. 18701, intended to be recorded in the Luzerne County Recorder's Office;

ALSO BEING Assessed as parts of Luzerne County Parcel Identification Numbers:

25-J7-00A-001-000

25-J8-00A-107-000

25-J7-00C-002-000

25-J8-00A-106-000

25-J7-00A-003-000

25-J8-00A-105-000

25-J8-00A-104-000

25-J8-00A-082-000

25-J8-00A-103-000

EXHIBIT B: BASE RENT SCHEDULE

| Lease Month | Lease Rate (psf) | Est. Monthly Base Rent |
|---|---|---|
| 1-5 | $0.00 | $0.00 |
| 6-17 | $0.35 | $29,891.75 |
| 18-29 | $4.97 | $424,462.85 |
| 30-41 | $5.04 | $430,320.44 |
| 42-53 | $5.11 | $436,258.86 |
| 54-65 | $5.18 | $442,279.23 |
| 66-77 | $5.25 | $448,382.69 |
| 78-89 | $5.32 | $454,570.37 |
| 90-101 | $5.40 | $460,843.44 |
| 102-113 | $5.47 | $467,203.08 |
| 114-125 | $5.55 | $473,650.48 |
| 126-137 | $5.62 | $480,186.86 |
| 138-149 | $5.70 | $486,813.43 |
| 150-161 | $5.78 | $493,531.46 |
| 162-173 | $5.86 | $500,342.19 |
| 174-185 | $5.94 | $507,246.92 |
| 186-197 | $6.02 | $514,246.92 |
| 198-209 | $6.10 | $521,343.53 |
| 210-221 | $6.19 | $528,538.07 |
| 222-233 | $6.27 | $535,831.90 |
| 234-245 | $6.36 | $543,226.38 |
| 246-257 | $6.45 | $550,722.90 |

EXHIBIT C: WORK LETTER

1.    **DEFINITIONS AND INTERPRETATION.**

1.1    <u>General</u>.

This Work Letter sets forth how certain Improvements referenced in the Lease are to be completed, who is responsible for the completion of the Improvements, who will pay for such construction and the time schedule for the completion of such Improvements.  All provisions of the Lease shall apply to this Work Letter except to the extent clearly inconsistent with this Work Letter or otherwise inapplicable.  This Work Letter is attached to the Lease as <u>Exhibit C</u> and made a part thereof.

1.2    <u>Plans</u>.

Landlord will cause its architect to prepare and submit plans and specifications for the Landlord's Work (the "<u>Plans</u>") to Tenant. Tenant shall have ten (10) days after receipt to approve the Plans or to give comments to Landlord.  If Tenant does not provide comments within such 10-day period, Tenant will be deemed to have approved the Plans.  If Tenant makes such comments, and provided such comments are consistent with the scope of Landlord's Work set forth on Exhibit 1, Landlord shall have five (5) business days to revise the Plans and resubmit the same to Tenant. Tenant shall have three (3) business days after receipt of the resubmitted Plans to approve the Plans, which process of preparation, submittal and review shall continue until the Plans are approved. The Plans must comply with all Applicable Laws.

1.3    <u>Capitalized Terms</u>.

Capitalized terms used and not otherwise defined in this Work Letter shall have the meanings set forth in the main body of the Lease.  As used in this Work Letter, the following capitalized terms have the following meaning:

(a)    "<u>Improvements</u>" shall mean the Landlord's Work and Tenant's Work (as each are defined herein).

(b)    "<u>Landlord's Project Representative</u>" shall mean Eric Watts, or any replacement designated by Landlord in writing to Tenant pursuant to the notice provisions of the Lease.

(c)    "<u>Landlord's Work</u>" shall mean specifically the work set forth on <u>Exhibit 1</u> hereto.

(d)    "<u>Tenant Delay</u>" shall mean and refer to any actual delays in the completion of construction of the Improvements (or any other obligation of Landlord under the Lease) caused by or contributed to by Tenant, including, without limitation, (i) any request by Tenant for design or specification changes in Landlord's Work or Tenant's Work after the mutual approval of the Plans or Tenant Plans, or (ii) Tenant's material interference with construction, (iii) Tenant's failure to timely approve or give comments as to the Plans and/or Tenant Plans as required hereunder; and (iv) a Change Order (as defined below).

42

Provided that Landlord provides written notice to Tenant of any Tenant Delay within two (2) business days of the occurrence thereof, a Tenant Delay excuses Landlord's performance of any obligation related thereto for a period equal to (a) the duration of the act, occurrence or omission that constitutes the Tenant Delay, or (b) if longer, the period of delay actually caused by such Tenant Delay.

(e)    "Tenant's Project Representative" shall mean Christopher Galletto or any replacement designated by Tenant in writing to Landlord pursuant to the notice provisions of the Lease.

(f)    "Tenant's Work" is defined in Section 6.1 below.

1.4    Change Orders.

Any change to the Plans shall be subject to the prior written approval of Landlord, such approval not to be unreasonably withheld, conditioned or delayed, and implemented only by a Change Order executed by Landlord and Tenant. As used herein a "Change Order" means a written instrument prepared by Landlord setting forth Landlord's and Tenant's agreement upon all of the following: (i) the change in the Plans desired by Tenant (to the extent approved by Landlord); and (ii) the extent of any estimated delay in the achievement of Substantial Completion that will be caused by the Change Order, if any. If Tenant fails to approve, execute and deliver to Landlord a Change Order within three (3) business days following delivery of the completed Change Order by Landlord, Tenant will be deemed to have withdrawn the proposed request for the subject changes. Any and all delivery deadlines set forth in the Lease shall be extended by any delay caused by any agreed-upon Change Order. To the extent any Change Order results in an increase in costs of Landlord's Work, Tenant shall within thirty (30) days following demand from Landlord, reimburse Landlord for such excess costs resulting from such Change Order, or alternatively, the Allowance shall be reduced by the amount of said excess costs resulting from such Change Order.

2.    **SCOPE OF LANDLORD'S WORK**.    Landlord agrees to furnish or perform the Landlord's Work, at Landlord's sole cost and expense, in accordance with the Plans. Landlord shall deliver the Premises to Tenant in good condition and repair and with all building systems in good working order and in broom clean condition with all garbage, trash and debris removed.

3.    **SUBSTANTIAL COMPLETION**. Landlord shall diligently proceed with and cause the Improvements, in a good and workmanlike manner in compliance with all Applicable Laws.

4.    **PUNCH LIST**.    Within ten (10) business days following the Commencement Date, Landlord's Project Representative and Tenant's Project Representative shall perform a joint inspection of the Premises in order to prepare a "punch list" of items to be completed by Landlord in order to achieve final completion of Improvements. Landlord shall (i) complete such "punch list" items within sixty (60) days after agreement on such punch list, subject, however, to seasonal requirements for any exterior work, and to any delay in availability of necessary parts or materials (provided Landlord has exercised due diligence in ordering such parts or materials) required for completion of the punch list items, and (ii) be obligated to obtain a permanent certificate of occupancy for the Premises within a commercially reasonable time provided that any temporary

43

certificate of occupancy, or extension thereof, has not expired prior to the issuance of the permanent certificate of occupancy.  In the event of any dispute between Landlord and Tenant with respect to items to be included on the punch list, such disputes shall be resolved by the architect. If the punch list items are not completed within such sixty (60) sixty period, Tenant shall have the right, but not the obligation, to complete such punch list items, and Landlord shall reimburse Tenant for all costs and expenses incurred in performing such work, within thirty (30) days after Landlord's receipt of invoices and other documentation reasonably required by Landlord.

5.      **LIMITED WARRANTY**.  Subject to any matters resulting from Tenant's construction, installation, or operation of or upon the Premises, Landlord warrants the Improvements, including without limitation, the mechanical, electrical, plumbing, heating, ventilation, and air conditioning systems, sprinkler systems, fire suppression and life safety systems, dock doors and any other systems included as part of the Improvements, either initially or pursuant to any change orders (but excluding any such systems constructed or installed by Tenant) against defective workmanship and materials for a period of twelve (12) months after Substantial Completion. The foregoing 12-month period will not limit the period of any applicable manufacturer's warranty for any equipment if it is for a longer period than 12 months.  Landlord's sole obligation under this warranty is to repair or replace, as necessary, any defective item caused by poor workmanship or materials without cost to Tenant if Tenant notifies in writing Landlord of the defective item within such 12-month period (or within any longer period of time as may be applicable under applicable Laws in the event of any latent defects).  Landlord has no obligation to repair or replace any item after such applicable period expires (except to the extent required under the terms of the Lease). At the end of the applicable warranty period, to the extent assignable, Landlord will assign to Tenant all remaining warranties and guaranties applicable to any maintenance and repair obligations for which Tenant is responsible under this Lease. THIS EXPRESS WARRANTY IS GIVEN AS THE SOLE AND EXCLUSIVE RIGHT AND REMEDY OF TENANT FOR INCOMPLETE OR DEFECTIVE WORKMANSHIP OR MATERIALS OR OTHER DEFECTS IN THE BUILDING OR THE PREMISES IN LIEU OF ANY CONTRACT, TORT, WARRANTY OR OTHER RIGHTS OR CLAIMS, WHETHER EXPRESS OR IMPLIED, THAT MIGHT OTHERWISE BE AVAILABLE UNDER APPLICABLE LAW.   ALL OTHER WARRANTIES ARE EXPRESSLY DISCLAIMED.  Notwithstanding the foregoing limitation, such limitation shall not affect Landlord's repair, maintenance and replacement obligations set forth in the Lease nor shall such foregoing limitation affect (and shall be subject to) any of Tenant's rights or remedies pursuant to the terms of the Lease.  The warranty which is provided hereunder is limited in certain respects, and is conditioned on the following:

        5.1      Tenant will use the Improvements only in accordance with the design capacities and criteria established therefor.  Tenant acknowledges that any misuse thereof may void the warranty hereunder, and may void any manufacturers' or other warranties which may be assigned or otherwise made available to Tenant hereunder.

        5.2      Any and all work required to be performed under this Section will not in any way include, or require Landlord to perform, any routine or appropriate regular maintenance of the Improvements (other than as required in the Lease) required to be performed by Tenant during the applicable warranty period as part of Tenant's duties and obligations under this Lease.

5.3    The warranty hereunder specifically excludes damages to Tenant's products, equipment or other personal property which may be located within the Premises or elsewhere at the Property.

6.    **TENANT'S WORK & ALLOWANCE**

6.1    <u>Tenant's Work</u>.  In addition to Landlord's Work set forth on <u>Exhibit 1</u> hereto, Landlord shall additionally perform and complete the installation of any and all additional improvements to the Premises desired by Tenant that are not included in Landlord's Work ("<u>Tenant's Work</u>"). Within thirty (30) days after the Effective Date, Tenant shall provide Landlord with detailed plans and specifications for Tenant's Work (the "<u>Tenant Plans</u>").  Landlord shall either approve or give comments as to the Tenant Plans within ten (10) business days after receiving the Tenant Plans from Tenant, which approval shall not be unreasonably withheld, conditioned, or delayed.  If Landlord provides comments as to the Tenant Plans, Tenant shall have five (5) business days to resubmit revised Tenant Plans to Landlord, whereupon Landlord shall have five (5) business days to approve or provide comments, which process shall continue until such time as Landlord and Tenant agree upon final Tenant Plans.  Upon mutual approval of the Tenant Plans by each of Landlord and Tenant, Landlord shall commence construction of the Tenant's Work. Notwithstanding that Landlord shall perform, or cause to be performed, Tenant's Work, any and all costs and expenses or any kind or nature related to the design, construction, and/or installation of Tenant's Work (collectively, the "<u>Tenant Costs</u>") shall be the responsibility of, and shall be paid by, Tenant, subject only to the Allowance, as defined in Section 6.2 below. In no event shall Landlord be subject to any penalties under the Lease in connection with Landlord's failure to complete Tenant's Work within any specific timeframe; provided, that Landlord will use good faith efforts to complete Tenant's Work on or prior to the Commencement Date.

6.2    <u>Allowance</u>.

Landlord shall provide Tenant with a tenant improvement allowance in the amount of $6,967,000.00 (the "<u>Allowance</u>"), which Allowance shall be credited towards the Tenant Costs. To the extent that the Tenant Costs exceed the Allowance, Tenant shall be responsible for paying to Landlord any such excess amounts within thirty (30) days following demand for same from Landlord. In the event that the Tenant Costs are less than the Allowance, Landlord shall pay any such remaining Allowance to Tenant within five (5) business days following the Commencement Date.

7.    **INSURANCE REQUIREMENTS**.  In addition to the insurance requirements set forth in the Lease, the following shall apply:

7.1    Builders' Risk Insurance.  During the course of Landlord's Work and Tenant's Work, or any alteration performed by Tenant permitted under the terms of the Lease (an "<u>Alteration</u>"), Landlord, as to Landlord's Work and Tenant's Work (which shall be a Tenant Cost), and Tenant, as to any Alteration, shall purchase and maintain, at its own expense, or require its general contractor to purchase and maintain, property insurance upon the entire work to be completed to the Premises (a "<u>Builder's Risk Policy</u>") for the full insurable value thereof (excluding footers, foundations, and other subsurface improvements and also excluding paved areas, sidewalks, curbs,

aprons, mass grading and other site work), all on a replacement cost basis. The insurance required under this paragraph shall cover the interests of Landlord, Tenant, the general contractor and all other contractors, subcontractors and lower tier subcontractors in connection with the applicable work, and shall insure against any loss occasioned by fire, windstorm, tornado, rain, water, flood, earthquake, theft, vandalism, malicious mischief, sprinkler leakage, smoke, aircraft, vehicle and lightning and other such other perils as are covered under a broad form of "extended coverage" or "all-risk" endorsement.

7.2     Workers Compensation Insurance. Landlord and Tenant, each in respect of work it may perform or cause to be performed at the Premises, shall require the general contractor and all other contractors and/or subcontractors engaged to perform such work at the Premises to be obligated to carry workers' compensation insurance in amounts not less than the amount required by applicable law covering all persons employed by that party in connection with the applicable work and with respect to whom death, bodily injury, or sickness insurance claims could be asserted against Landlord or Tenant.

8.     **TENANT INCENTIVES**. Landlord agrees, at no cost to Landlord, to reasonably cooperate with Tenant in connection with Tenant's pursuit of any State and/or Federal incentives.

9.     **ACCESS ROAD**. Landlord agrees that it shall use good faith efforts to cause the main access road entering the Tradeport 164 industrial park, which access road is located to the south of the Building, to be named Denny Bratkovich Way, or a similar derivation thereof.

10.     **ZONING/ENTITLEMENTS**.  Landlord warrants that the property is zoned for the proposed use with all necessary entitlements in place.

11.     **DISPUTE RESOLUTION**.  The parties (through their Project Representatives) shall make good faith efforts to resolve any dispute which may arise under this Work Letter in an expedient manner.  In the event, however, that any dispute arises, either party may notify the other party of its intent to invoke the dispute resolution procedure herein set forth by delivering written notice to the other party.  In such event, if the parties' respective Project Representatives are unable to reach agreement on the subject dispute within five (5) days after delivery of such notice, then each party shall, within five (5) days thereafter, designate a representative of its management to meet at a mutually agreed location to resolve the dispute. All disputes to be resolved pursuant to this Section that are not resolved within ten (10) days by agreement between the designated management representatives may be submitted to the Landlord's architect for resolution if either party so elects, by delivering written notice to the other party within five (5) days after the expiration of such ten (10) day period.

WORK LETTER – EXHIBIT 1

LANDLORD'S WORK

# Build to Suit Advisory Group
# Base Industrial Specifications



**4/9/2018**
**UPDATED:  6/6/2018**
**Final Version: 9/25/2018**

---

**PLEASE NOTE THE FOLLOWING ADJUSTMENTS TO THE SPECIFICATION.  IF THIS CONFLICTS WITH INFORMATION IN THE SPEC, THIS INFORMATION SHALL OVERRIDE THE PRIOR DATA:**

1. Building size is +/- 1,400,000 SF. Client Premises is +/- 1,024,860 SF.
2. We have formally landed on a 40' clear requirement starting at the second column bay.
3. column spacing of 58'X50', where the 58' space is in parallel to the docks and the 50' spacing is from the inside edge of the speed bay and across the depth of the building.  Same speed bay depth.
4. There will be no structural building mezzanine required.  Any mezzanines will be part of the MHE solution.
5. Building depth is 570'.
6. A CAD file will be available shortly that can be provided to the Developer.
7. Current program for the office space calls for a total of 20K feet of single story space.
8. The Food Grade component (50 degrees) of the project is currently programmed for 33,154 feet of space with 15 foot clear height inside.
9. The two truckers lounges are both programmed at 178 square feet
10. Each flammables area "boom room" is programmed at 11,376 square feet, fully enclosed. Aerosol storage 7,742 square feet to be fully enclosed on 3 sides, and chain-link separation on the remaining end. See attached plan for more details.

**GENERAL GUIDELINES**

A. Developer/Contractor/Landlord shall be referred to as **LANDLORD** within these documents.
B. Landlord must submit construction Progress Schedules, Product Data, Samples, Manufacturer's Instructions and Certificates as required by Tenant.
C. All finishes installed are to be installed as per the Manufacturer's written recommendations.
D. Landlord shall provide for continuous operation of all building utilities including safety,

security,  fire alarm and fire suppression systems during construction activities.

E.  Site and building construction shall comply with all ADA requirements and meet all local, state, and  federal codes having authority.

F.  Landlord is required to provide final Architectural/Engineering Construction Documents as needed  to obtain all necessary permits and approvals.

G.  All costs for permits and application fees by Landlord.

H.  Landlord must provide final cleanup, As-Built Drawings, Operations, Warranties and Maintenance  Data to the Tenant at project completion.

I.  Landlord shall provide dated weekly digital photos showing general progress of the work.

J.  Landlord shall verify that site field conditions comply with the drawings prior to commencing work  and report any discrepancies to the tenant or tenant's representative.

K.  Provide 10% attic stock of all office area finish materials.

L.  Provide shared construction trailer to allow for locked office space for Tenant's Project Manager.


## GENERAL CONDITIONS

A.  Provide a full-time on-site superintendent to coordinate the work of all trades including tenant  vendors, monitor safety and quality and insure the job site is maintained in a neat and orderly  fashion.

B.  Mobilization of all equipment and material on and off the site.

C.  Progressive  clean-up to maintain the site in a neat and orderly fashion free of all excess construction debris.

D.  Final clean-up upon completion of the work.

E.  Temporary facilities and utilities including but not limited to:

   • Electric.
   • Water.
   • Field office (on-site trailer/prefab building).
   • Telephone and job site communications.
   • Sanitary facilities.
   • Soil erosion and sedimentation control.

F.  Provide an independent testing laboratory to perform testing as required.

G.  Provide Builders Risk Insurance required during construction.

H.  Provide one (1) year labor and material warranty from the date of substantial completion of the  project.

I.  As-built drawings to be provided in AutoCAD at the completion of the job.

J.  All on-site utilities to be run underground including - electricity, water, sewer, gas, telephone, internet, and data.

K.  Provide an auxiliary diesel generator for the facility sized to accommodate 50% of the lighting load, 100% of Demarc / MDF room and associated computer room(s) air conditioning load, and 100% Life Safety.  Provide pricing alternate to include Office Equipment and warehouse

machinery for backup generator.  Provide Pricing alternate for manual switch gear and connections for external skid generator.

L.  Provide above ground 10,000USGAL Diesel Tank with Fueling system.  Fueling system must be card or code activated.

M.  Exterior Monument signs at entrances, 3 flagpoles, Tenant signage on 1 corner of building, and misc wayfinding signage to be included. **See Exhibit A for typical signage requirement**

## BUILDING DESIGN AND ENGINEERING

A.  Employ and pay for services of Architects and Engineers registered to practice in the state in which  the project is located for design, construction document and construction administration services  for the project.

B.  Prepare floor plans, elevations, sections, and details of the building.

C.  Prepare foundation plans and details, roof and floor framing plans and complete structural design.

D.  Coordinate and design support steel for mechanical equipment, piping, and systems.

E.  Obtain and pay for local approvals, permits and inspection fees and utility connection fees.

F.  Provide  and coordinate construction, mechanical, electrical and sprinkler designs with input, review, and approval comments from Tenant's Insurance carrier.

G.  Prepare tilt up or precast panel designs.

H.  Building Construction to be dock high construction so the warehouse floor slab  i s  48-inches above grade.  Dock wells are not acceptable.

I.  Structural design criteria:

- In accordance with local code requirements for dead load, live load, seismic and  wind load (accordance with FM data sheets 1-28 & 1-29 for wind loads).
- Wet sprinkler load: Minimum 1.0 psf.
- Collateral load: Minimum 3.0 psf. (Additional dead loads hung from roofing systems inside the building)
- Final Roof specifications to be reviewed and confirmed by an engineer

J.  Structural design to include allowance for point loads imposed by packaged roof top units required  for future tenant improvement of finished office areas.

K.  The building clear height shall be minimum 40'0" to any obstruction at the second column bay.

L.  Overall building footprint is approximately 1.4MM SF.

M.  Avoid using any plastic materials in construction as these may require additional fire protection.  Use only non-combustible materials whenever possible.

N.  Use materials/equipment that are FM Approved. If FM Approved product is not  available, then use  product listed by Underwriters Laboratories Inc. (UL, ULC)/any other recognized testing laboratory.

O.  New construction should not commence in areas subject to flooding. If this is unavoidable, then  design should incorporate flood containment walls, barriers, elevated machinery and

equipment, or other flood loss control features. (References: FM Data Sheet 1-40).

## SITEWORK AND PAVING

A. Provide soil erosion and sedimentation control as required by local authorities.

B. Earthwork:
 1. Strip, stockpile and replace topsoil as necessary.
 2. Bulk cut and fill.
 3. Provide testing for earthwork in accordance with quality assurance and testing requirements and per codes.
 4. Provide site preparations per existing site conditions as required for construction (i.e., lime stabilization, etc.).

C. Storm Water Management:
 1. Provide complete storm water management system. Work includes but is not limited to: Pipe, connections, leader pipe, inlets, manholes, backflow preventers, and end walls/headwalls.    Review and approval of system to be from Factory Mutual / Local Authority
 2. Areas immediately surrounding the structure will be continually and effectively drained, and designed in such a way as to slow runoff and minimize erosion – i.e., swales, natural vegetation, etc.
 3. Comply with all applicable codes and regulations relating to soil contamination and protection of Wetlands and comply with all local and regional codes regarding erosion control, site retention, and water quality.
 4. Upon completion of excavation, and prior to commencement of concrete work, developer to retain the services of a registered soil engineer to inspect excavation to ensure suitable soil conditions have been obtained and that specifications, local codes, and ordinances have been satisfied.

D. Sanitary Sewer System:
 1. Provide complete site sanitary sewer system.
 2. Include necessary sewer connection fees, inspections, and testing.

E. Domestic Water Service:
 1. Provide minimum 3" domestic water supply to the building in accordance with codes including vaults, metering, valve backflow prevention devices, etc.
 2. Include tap fees, capacity charges, inspection, sterilization, and testing.

F. Site Fire Suppression Water Service:
 1. Provide site fire suppression water service per codes including vaults, metering, valves, backflow prevention devices, fire department connection, hydrants etc. Service installation to be reviewed and approved by Tenant's Insurance Carrier engineer.
 2. Include tap fees, capacity charges, inspection, sterilization, and testing.

G. Paving:

1. Provide paving designed as appropriate for anticipated loads.  Asphalt can be used for roadways and car parking.  Concrete trailer parking dolly strips are required.  At the loading docks, provide a continuous concrete apron sized as appropriate for the anticipated loads.
2. Landlord to provide site preparation as required for sound construction (i.e., lime stabilization, soil cement base, etc.).
3. Provide a 60' concrete dock apron with 8" thick unreinforced concrete .
4. Provide asphalt paved parking lot with 300 car parking spaces including additional handicap  spaces as required by codes. Provide  additional parking if required by code.
5. Provide 300 trailer storage spots including 10' wide dolly strips consisting of 8" thick unreinforced concrete and wheel stops as recommended by developer.
6. Provide pavement marking and parking signage for handicap parking spaces.
7. Provide testing for paving work in accordance with attached quality assurance and testing requirements.
8. Provide drive two (2) drive in ramps to be installed with continuously poured concrete curbing (6"H x 6" W) and galvanized steel railing assemblies as required by code on curbs on both sides.

H. Site Concrete:

1. Provide per project engineer specifications.  Concrete to be designed for heavy duty truck traffic and storage usage.
2. Provide 10' concrete dolly pad area at Trailer storage.  Concrete to  be 8" thick unreinforced concrete.
3. Provide testing for site concrete work in accordance with quality assurance and testing requirements.
4. Perimeter Curb or wheel stops to prevent trailers from impacting fencing.

I. Landscaping/ Fencing:

1. Provide landscaping to meet requirements of local authorities.
2. Permanently seed all disturbed lawn areas and areas to receive topsoil.
3. Provide a 10 ft high, 9-gauge chain link fence around the property with barbed wire (if allowed by local municipality).  Provide other type of fencing if required to meet codes/ zoning.    Fencing to have two (2)  motorized gates.  All fencing, gates, guard houses and access controls to be DHS Customs Trade Partnership Against Terrorism (C-TPAT) certified.

J. Site Ingress and Egress:

1. Site must meet the minimum physical security requirements as defined by the C-TPAT.
2. The Guard Command Center (CC, size and construction materials TBD) is expected to have plumbing, climate controls, and will likely have a video monitoring station (CCTV) from which Guards (provided by 3rd party) will monitor the entire site.  In addition, they will have a Yard Management System used to assign trucks to docks.  Further, the CC facility will operate 24X7.
3. Commercial Trucks will queue on premises and we expect to have no more than 5 commercial trucks in queue at any one time.  Number of inbound lanes to be determined

with Tenant and/or their representative.  The site must provide sufficient, off-public-street queuing for commercial vehicles.

4. Automobile traffic will also access the site through the same CC but will be segregated to automobile lanes where access will be provided by badge or other secured means (i.e., Toll Tags, etc.)

5. Cross traffic between commercial truck and automobiles must be kept to a minimum.

6. If possible, we would prefer no points on the site where pedestrian traffic crosses the commercial truck lane.

7. Site truck traffic shall be counter-clockwise, and a one-way traffic pattern is preferred.

8. Tenant would like to see two (2) Trucker's Lounges:

   a. Lounge for Ryder Fleet Drivers to include lockers, power stations, bathroom and, perhaps coffee maker or vending machines.

   b. Commercial lounge with similar amenities to the above (no access into the building itself) located directly adjacent to the Dispatch Operation inside the building.

9. Metal detectors are expected at every employee entry and exit point.

**BASE BUILDING CONCRETE**

A. Provide conventional concrete footings for columns and foundation walls.

B. Provide a 7" 4,000 psi concrete floor slab with #3 rebar at 18" o.c. at MHE required locations, assumed to be 15% of overall floor slab area. All other floor slab to be 7" 4,000 psi unreinforced concrete.

C. Provide minimum 12" select fill base at building slab-on-grade.  Provide vapor barrier under slab at office locations.

D. Provide Diamond Hard floor hardener/sealer at interior slab-on-grade and caulk joints with Euco-  700.

E. Provide acid resistant epoxy flooring at the battery charging area.

F. Saw cut control joints at maximum joint spacing of 15'-0" on center.

G. Construction joints shall be dowelled in accordance with ACI recommendations.

H. Seal floor slab isolation joints with elastomeric sealant.

I. Finish: Hard steel trowel.  Tolerance: Overall – FF60 FL45.  Local minimum FF40 FL 30 Final floor specification to be determined in conjunction with Tenant's materials handling equipment engineer

J. Provide testing for concrete work in accordance with quality assurance and testing requirements

Concrete Wall Panels:  Provide load-bearing, reinforced, insulated (if applicable) tilt up or pre-cast concrete wall panels  with accent reveals at the building perimeter.  Wall panels shall extend from the foundation to the  roof and, where necessary by building design, above the roof to create parapet walls.

A.   Wall panel design shall be acceptable to Owner.

B. Patch all exposed lifting hooks and brace inserts.

C. Caulk panel-to-panel joints inside and out with elastomeric sealant.

D. Provide reveal strips per Landlord standard specifications.

E. Wall panel finishes:

- Interior: White Painted Walls, interior columns white with safety yellow to 10'0" AFF. Interior Bollards Safety Yellow.

- Exterior: Filled and prepared for receipt of field applied painted finish; field color plus minimum two accent colors as selected by Owner.

F. Provide testing for site cast concrete work in accordance with quality assurance and testing requirements.

**MASONRY**

A. Provide as necessary for pump room, etc.

B. Provide enclosed, 15,354SF hazmat storage room with 2 hour rated cinderblock wall, reinforced to contain catastrophic explosion in the event of fire. Located on an exterior wall along the perimeter of the building within the building footprint.

C. Compressor & Electrical rooms shall be CMU wall enclosure to 10' AFF, Then GYP to deck

**STEEL**

A. Provide 58' column bays parallel to the dock doors and 50' column bays perpendicular to dock doors with 60' staging bays.  Column bearing shall be minimum 8" below finish floor elevation.

B. Provide a conventionally framed structural steel building.  All columns to be Standard tube steel. Finish: Factory primed, light gray or white.

C. Metal roof deck: Factory primed, white.

D. Provide movement resisting frames for lateral building reinforcement by use of "K" bracing. "K" bracing to be coordinated with racking vendor and located in flue spaces.

E. Steel frame shall be designed and reinforced to support roof-mounted equipment & snow loads.

F. Provide concrete filled steel pipe bollards for protection of exterior stairs, trash dumpster enclosures, hydrants, ramps, and electrical transformers.

G. Provide concrete filled steel pipe bollards at the drive-in doors, interior electrical panels transformers, switchgear, fire suppression risers, and domestic water services.

H. Provide "zee guards" at dock-high overhead doors.

I. Provide testing for bolted and welded connections.

J. All dock platforms to have shelters.

**CARPENTRY**

A. Provide roof blocking as required at the building perimeter.

B. Provide flashing per the Factory Mutual data sheet 1-49.

## MOISTURE PROTECTION

Roofing:

A. Provide a 45 mil TPO (Thermoplastic Polyolefin) membrane roofing system according to manufacturer's specifications and per   local codes and other applicable standards. Roof system to be in accordance with FM guidelines.

B. Provide PIMA standards polyisocyanurate roof insulation.  Provide a minimum of R-20 roof insulation or greater if required by code.

C. Two (2) year labor and material warranty on all workmanship.

D. Provide a twenty (20) year total system weathertightness and twenty (20) year membrane material NDL  warranties.

E. Provide traffic walkway from roof hatch to all rooftop units/ equipment.

F. Provide one (1) roof scuttle with ladder and locked cage.

G. If required by local authorities, provide screening for all roof mounted mechanical equipment.

H. Provide inspection for roofing work in accordance with quality assurance and testing requirements.

## CAULKING

A. Caulk interior and exterior concrete wall panel joints.

B. Caulk door and window openings.

C. Caulk exterior wall penetrations as required to prevent entry of air, moisture, or pests (insects, rodents, birds, etc.).

## DOORS AND WINDOWS

A. Provide 3' X 7' hollow metal doors and frames with commercial grade hardware at the building  perimeter as required for emergency egress and in accordance with local code and ADA  requirements.  Provide non-ferrous metal hinges at exterior doors.

B. Overhead sectional doors: Steel insulated with head, jamb, and seal weather stripping, one (1)  minimum 8" X 24" vision lite, foot plates, lift handles, 3" tracks and heavy-duty, high frequency  torsion springs and slide-bolt locks.  Locate door vision lites to correspond with location of  door  controls and slide-bolt locks.

C. Provide (100) 9' X 10' manually operated, vertical lift sectional overhead truck dock doors. Include fall protection at every door.

D. Provide one (1) door with insect screen on dock door nearest/inside to food storage.

E. Provide two (2) 9' X 10' manually operated, vertical lift trash removal door with electric for trash  compactor.

F. Provide two (2) 14' X 16' electrically operated grade level doors.  Provide entrapment protection and lock relay to disengage power to motor operator when slide-bolt lock is engaged.   When acceptable to Owner, slide-bolt lock and lock relay may be deleted at electrically operated  grade level doors.  Locations to be determined by Tenant.

G. Provide two ( 2 ) tenant entrance(s) equipped with thermally broken aluminum storefront framing  and aluminum entrance doors.

54

H.  Provide aluminum storefront at two (2) entrances equipped with 1" tinted, Low-E, insulating glass.    Provide ten-year warranty for insulation glass.

I.  Aluminum entrance door hardware:

    a.  Manufacturer's standard in conformance with local code and ADA requirements.

    b.  Finish: clear or color anodized aluminum as selected by Tenant.

J.  Interior doors shall be solid core stain grade flush, birch wood doors, in prefinished, 3'-0" W x 7'- 0"H Timely (or equal) hollow metal frames in office areas.  Fire rated doors and frames shall be provided where required by code.

K.  Hardware for doors shall include the following:

    1.  Floor stops at all doors.

    2.  Locks at all offices and tel/data rooms.

    3.  Coat hook on the interior of each office door.

    4.  All doors between office areas to warehouse and restrooms to have door closers.

    5.  All exterior building shell doors to have hardware as required by code.

    6.  Stainless Steel kick plates on both sides of office to warehouse doors up 36" H.

L.  Provide separate keying for Office and Warehouse spaces on a common master key system.  Provide two (2) sets of keys for each lock to tenant.

M.  Doors from Office into Warehouse to be hollow metal doors and frames with 10" x 10" vision panels (with safety glass) and be a 3'-0" W x 8'-0" H.  Doors and frames to be fire rated as required  by code.

N.  Clearstory glass windows to be provided near the building's roofline to allow natural sunlight into the distribution center.

**FINISHES**

Painting:

A.  Paint the exterior face of concrete wall panels; field color plus minimum two accent colors. Colors  to be per Landlord standard color scheme. Final elevations to be approved by Tenant.

B.  Paint hollow metal doors and frames.

C.  Paint exposed metal stairs, railings, and similar miscellaneous metal items.

D.  Paint exterior conduit, piping, meters, transformers, and similar exterior items that will remain  exposed in the completed work.

E.  Paint metal bollards OSHA yellow.

F.  Paint interior columns OSHA yellow to 12 feet AFF.

G.  Paint columns with fire extinguishers and hose reels red.

H.  Paint interior sprinkler risers/system, hose drops and inspector test drain piping red.

I.  One primer coat and one latex eggshell finish coat of paint applied separately to cover all walls,  doors, and columns.

J.  Two coats of latex eggshell enamel coat of paint over primer on all walls in toilet rooms.

K.  Two coats of semi-gloss enamel coat of paint over primer on all metal door frames.

L.  Landlord to provide samples for Tenant selection of colors and finishes for Office area.

M.  Landlord to provide level surface to ¼" in 10 feet.

N. Vinyl Composition Tile where indicated by Tenant on final plans.  Pattern and color selected by Tenant.    Landlord to submit samples for Tenant selection and approval.

O. Carpet Tile to be installed where indicated by tenant.    Carpet tile to be minimum 26-ounce face weight, Nylon construction, cut & loop (mostly loop) pile carpeting, unless noted otherwise.    Landlord to submit samples for Tenant selection and approval.

P. 4" Vinyl Cove Base throughout office area unless noted otherwise.

Q. Flash patch floor as required to accept flooring materials.

R. Painted concrete flooring where indicated by Tenant.

S. Patch / repair any large divots, cracking, etc. in concrete floor throughout tenant space as  required by manufacturer's recommendations and for floor coverings.

T. Provide and install transition strips between all dissimilar flooring materials and/or finishes.

U. Landlord to provide samples for Tenant selection of colors and finishes for office area.

V. All finishes not shown to be approved by Tenant.

**SPECIALTIES**

A. Provide portable fire extinguishers and identification signage as required by Code.
Fire  Extinguishers to be manufactured by Kidde or Badger brands.

B. Provide three (3) flagpoles and lights.    Final location to be determined by Tenant and approved by local municipality as applicable.

C. Provide for one (1) compressed air drop for every two (2) dock door locations with heavy duty reels.

D. Provide and install ¾" x 4' x 8' fire rated plywood backboards as required in Tel/Data closets  unless noted otherwise.  Bottom of backboards to be hung 3' AFF and be 8' in length.  Paint  backboards to match adjacent walls.

E. Provide and install standard accessories in toilet rooms as required (soap dispensers, paper towel  dispensers, toilet tissue dispenser, mirrors, napkin dispensers [women's room only] and trash  receptacles).  All accessories to be ADA compliant.

F. Provide and install motorized projection screen in Training Room.  Provide blocking in wall and /or  ceiling as required.

G. Fire cut off rooms are required to separate hazardous allocations inside the Warehouse from storage areas.

H. In office areas, all interior walls shall have R-13 or greater insulation.  All office perimeter walls shall have R-16 or greater insulation.

I. Provide for a 10,000 SF maintenance area inside the main distribution center (this in addition to the standalone 4000 square foot trailer maintenance building also to be located within the fenced premises).  This area is to be partitioned with chain-link fencing to 10'0" AFF.

**DOCK EQUIPMENT**

A. Provide the following dock equipment as manufactured by Rite Hite or equal.  Provide the following  equipment at each truck dock door:
   1. At fifty (50) doors provide 7' X 8' Hydraulic dock leveler, 40,000-pound capacity

equipped with pit seals, full range toe guards, and a minimum 16-inch lip extension. Also provide pinch guards/ protection for the dock levelers. At fifty (50) doors provide 7' X 8' manual mechanical dock leveler, 40,000-pound capacity equipped with pit seals, full range toe guards, and a minimum 20% lip extension.  Also provide pinch guards/ protection for the dock levelers. Provide allowance for Ten (10) hydraulic to be installed at locations of Tenant preference.

2.  Dock seals, dock lights & fans.

3.  Dock bumpers: #1215P.zee

4.  Hydraulic dock locks with automatic lighting communication system.  Dock locks need to be compatible with trucks equipped with lift gates.

B.  Provide pricing for mechanical dock locks and levelers.

C.  Insect screen at one (1) dock door nearest/inside food storage area.

D.  Fall protection included at every dock door.

E.  Snow Scraper Model 110 (base) or equivalent to be included for clearing trailers.


**PLUMBING**

A.  Provide interior domestic water, natural gas, and sanitary sewer systems.

B.  Provide one (1) minimum 4" below slab sanitary sewer equipped with welded sanitary cleanouts  suitable for forklift traffic spaced at code mandated intervals.    Locate in first structural bay parallel  to the dock wall.  Extend line the entire length of the building, one line down the center, width of  the building and to each of the building corners to accommodate future tenant improvements.

C.  Provide natural gas piping to supply all gas-fired equipment.  Include shut-off valve, dirt leg and  union at each connection.

D.  Provide pump room equipped with floor drain.  Provide oil/water separator at the pump room floor  drain, if required by local authorities.

E.  Provide hose bib, eyewash station, acid neutralizing basin and curbed area with a drain with all  necessary cleanout requirements for a floor scrubber dump.

F.  Provide floor drain at location of domestic water meter(s).

G.  Provide exterior frost proof hose bib at the four (4) building corners and at each grade level door.  Provide shut-off valve ahead of each wall hydrant.

H.  Domestic water lines cannot run over any communication & electrical rooms in the facility.

I.  Provide standard style sink with hot and cold water in break room and coffee areas with filter  system.

J.  Provide and install water line with shut-off valve and floor drain for ice maker.  Verify exact  location with Tenant.

K.  Provide and install plumbing and fixtures for Men's and Women's ADA compliant Toilet Rooms.  Provide multi-fixture toilet rooms as shown on plans or more as required by code.

L.  Toilet rooms to have hot water provided at sinks, under sink instant hot water heater is  acceptable.

M. Provide and install ADA compliant water fountains at restrooms and where required by code.

N. Provide water hook-ups and shut off valves for coffee makers in Break Room and coffee areas. Coffee maker shut off valves to be accessible from the top of the counter(s).

O. Provide and install a compressed air loop throughout building per compressor manufacturer's recommendations. Provide compressed air to every other dock door.

    1. Compressor shall be rotary screw design with variable speed drive

    2. Electronic demand drain (purges the condensate with no loss of air pressure)

    3. High efficiency "cycling" air dryer (on all the time, regardless of demand)

    4. High efficiency air receiver

    5. 5+ year warranty

    6. Compressor room to be sound attenuated and located on exterior wall. Floor drain required in compressor room

P. Battery wash / acid pit / scrubber dump requirements as needed TBD engineer

Q. Floor drains to be installed in maintenance area (see Specialties Item J.)

## FIRE PROTECTION

A. Use equipment that are FM Approved, or listed by Underwriters Laboratories Inc. (UL, ULC)/any other recognized testing laboratory if FM Approved is not available.

B. For warehousing, provide ESFR automatic sprinkler system or other FM Approved storage sprinkler design in accordance with Factory Mutual data sheets 2-0, 2-8N, 8-9 and NFPA 13 and other applicable standards for Group A plastic commodities.

C. Provide UL/FM approved packaged diesel-driven fire pump system with jockey pump, controller, fittings, and accessories to boost water supply pressure if required.

D. Provide interior hose stations or hose valves as required by local authorities.

E. Provide a fire protection underground loop water main to supply the sprinkler systems and hydrants. Generally, hydrants should be spaced approximately 300 ft apart or where necessary.

F. Provide a fire alarm system as required by local, state, or federal codes to receive Certificate of Occupancy for the project.

G. Refer to Specialties section for fire extinguisher requirements.

H. The sprinkler/hydrant system should be supplied by a diesel operated fire sprinkler pump or alternatively an electric motor driven fire sprinkler pump in accordance to the FM Global DS 3-7 connected to a sufficient rated back-up power supply (e. g. emergency diesel generator).

## HEATING VENTILATION AND AIR CONDITIONING

A. All HVAC equipment to meet ASHRAE Advanced Energy Design Guides for Climate Zone depending on Geographic Area.

B. Provide roof-mounted, gas-fired make-up-air units sized to maintain 55° F at 0° F outside air temperature throughout the warehouse. Provide automatic temperature controls to modulate outside air volume and to permit winter and summer operation of make-up-air units.

C. Provide sidewall mounted exhaust fans and exterior fixed wall louvers equipped with bird and insect screens and motorized dampers interlocked with exhaust fans, sized to provide minimum of one (1) air changes per hour with no open overhead doors.

D. Provide heat and ventilation for pump room as required for operation of diesel fire pump and to protect fire suppression equipment and piping located within pump room from freezing. Provide combustion and/or make-up air for diesel fire pump as required.

E. Provide smoke detection to automatically shut down air handling systems with an operating capacity greater than 2,000 cfm or as required by local code if CFM requirement is lower.

F. Provide necessary ventilation per OSHA requirements at the battery charging area.

G. Air handling system to be designed and installed per Factory Mutual data sheet 2-0.

H. Tenant office space shall be separately zoned.

I. HVAC system to be balanced and landlord to provide air balancing report (by an independent vendor).

J. Provide one (1) VAV/ VVT zone per 1,500sf of office area.

K. Diffusers on interior office zones will be 24" by 24", square ceiling diffusers, designed for VAV application. Provide (1) diffuser per 250 sf.

L. Office area should be cooled between 300-325 square feet per ton, depending on regional climate and proposed space conditions.

M. Return air system in spaces with hung acoustical ceiling shall be ducted return.

N. Training and Conference rooms to be zoned as indicated on drawings. Provide variable speed exhaust fan in training/conference rooms. There should be one exhaust fan per 250 square feet of conference /training room.

O. Provide and install ductless split system in Tel/Data closets with adequate supply. Provide and install an alarm to signal over/under temperature.

P. Fire dampers as required by Code.

Q. Toilet rooms to be provided with exhaust fans.

R. Temperature control system shall have programmable night/weekend set back thermostat.

S. HVLS fans in speed bays in both shipping and receiving. 10 included

T. Refrigerated spaces shall have dedicated HVAC system capable of maintaining at least 37 degrees F.

ELECTRICAL

A. Electrical service: All work in accordance with the National Electrical Code and Factory Mutual data sheet 5-7:

1. Provide sufficient power for a building size of the designed size.
2. Provide all electrical distribution equipment.
3. Provide power wiring to all miscellaneous equipment, fire pump, mechanical equipment, motorized dampers, motor operated overhead doors, etc.
4. Provide and install all required power for wrapping machines. Verify quantity of machines, power requirements and exact locations.
5. Provide (150) electric drops for battery chargers.
6. Provide 2" conduit from building to each light pole with pull strings for security cameras.
7. Do not locate battery charging stations within the rack storage area. Install the equipment in accordance with the National Electric Code or local equivalent.
8. Single-phase duplex outlets at one hundred (100) columns.
9. 220v power required in maintenance area. (see Specialties Item J.)

B. Interior Lighting:
1. Lighting in the Warehouse to be suspended fixtures with step dimming. Provide energy efficient LED fixtures that provides the specified 30-foot candles at 36" AFF. Locations to be coordinated with Tenant and with their warehouse storage layout. Warehouse lighting to have motion sensors. Based on 10'6" aisles and 50% racked.
2. Emergency lights and exit signs shall be the self-contained LED type with battery pack.
3. Office lighting to be LED. Office to be designed for 1 fixture per 65 sf.
4. Lighting in conference rooms to be LED. Provide dimmer switches.
5. Provide a night light circuit throughout the entire facility.
6. Occupancy sensors on all fixtures in the facility.

C. Exterior Lighting:
1. Exterior lighting to follow Landlord standard spec of 1.0 FC average over all paved surfaces in the truck courts and access drives, 2.0 FC average light levels over all paved surfaces in the employee parking areas, 0.5 FC min at building perimeter and 0.5 FC min at all paved surfaces.
2. Provide wall mounted pack lights, LED 30' on center.
3. Exterior lighting control: Provide common photocell, programmable time clock, lighting contactors and manual override.
4. Provide roof wayfinding lighting at roof mounted equipment.

D. Wiring devices:
1. Provide 120-volt duplex outlet at each truck dock.
2. Provide 120-volt duplex outlet at one hundred (100) columns throughout the warehouse space.
3. Provide 120-volt, WP GFI outlets at rooftop equipment as required by local code.
4. Provide 120-volt, WP GFI outlet at tenant entrance and each grade level door.
5. Provide 120-volt WP GFI outlet at fifty (50) positions on 36" AFF goose neck stands along building. Off building locations (50) to be grouped together.

E. Telecommunications:

1. Provide two (2) 4" dia. conduits per Tenant (for a total of 4) as necessary with pull wires from  telephone company service to building service entrance location(s).  Provide four (4) conduits with  at least two (2) building demarcation locations.

2. Provide conduits for geographically diverse, redundant feeds for continuity in case of power failure, cuts, or network error/outage.

3. Provide allowance for Tenant's voice and data cable infrastructure. $100,000 allowance included.

F. Fire Alarm System:

1. Use equipment that is FM Approved, or listed by Underwriters Laboratories Inc. (UL, ULC)/any  other recognized testing laboratory if FM Approved is not available.

2. Provide a centrally monitored fire alarm with manual and automatic initiating devices and  audible/visual signaling devices as required by code, NFPA 472, and ADA guidelines.

3. Reference Factory Mutual data sheet 5-40.

G. Systems:

1. Tenant shall provide telephone, data, and security systems.

2. Coordinate installation of required dedicated telephone lines for fire alarm system digital  communicator with Owner's representative.

H. Miscellaneous:

1. Provide one (1) guard shack with electricity and HVAC, and one (1) unisex bathroom. Two (2)  associates will be in guard shack 24 hours a day so size accordingly.

2. Provide a 10' high C-TPAT compliant fence around the entire facility with two (2) automatic gates  at each entrance.

I. Power and tel/data connections to furniture systems to originate from typical/standard duplex  back box at 12" AFF.

J. Provide three (3) circuits minimum for each workstation feed.

K. In Tel/Data room(s) provide dedicated quadraplex receptacles for Tenant's telecom infrastructure.

L. Provide dedicated receptacle for copiers in copy areas.

M. In breakroom provide duplex receptacles for coffee makers and vending machines.  In addition,  microwaves and refrigerators require dedicated duplex receptacles.  Additional outlets above  counter to be GFI and 44" AFF.

N. Convenience outlets shall be provided in all corridors and at perimeter walls of open office areas.

O. Provide motion detectors for lighting throughout office areas (unless noted otherwise on final drawings) if required  by Code.  Motion detectors to be equipped with override switches.

P. Provide and install power as required for shrink wrappers in warehouse.  Verify requirements and  location(s) with Tenant.

Q.  Lighting: all light levels per code unless otherwise indicated.  At a minimum:

1.  Office area shall be energy efficient 2 foot by 4-foot recessed LED prismatic fixtures with acrylic lens, 3 lamps.  Light fixtures should be spaced at one (1) per 65 square feet.
2.  Emergency lights and exit signs shall be the self-contained LED type with battery  pack.
3.  Provide a night light circuit throughout tenant space.
4.  Provide supplemental recessed compact fluorescent lighting on a dimmer switch in  Conference and Training room(s).  Switching to be in two bays, front and back.

R.  Life Safety system (i.e. fire alarm, smoke detectors, egress signs, etc.) to be provided as required  by local authorities to receive a Certificate of Occupancy for the project.
S.  120volt power to exterior 12,000-gallon fuel tank.
T.  120volt power to maintenance area, locations TBD.
U.  Power required at tenant entrances for metal detectors / access controls.
V.  Landlord to confirm and coordinate all specific power requirements with Tenant.

## WOOD AND PLASTICS

A.  Provide all wood blocking, nailers and furring required for mounting white boards, bulletin boards,  projector screens, toilet accessories, fixtures, millwork, floor stops, and furniture systems where  required by the scope of work.
B.  Code shall as require fire treatment of wood.
C.  Stool caps at all interior window sills to be plastic laminate.

## PARTITIONS

A.  All partitions to extend 4" above finished ceiling (unless noted otherwise), 5/8" gypsum board on  both sides of 3-5/8" metal studs (25-gauge min.) 16" on center.  Gypsum board to be taped,  beaded and ready to receive paint.
B.  If required, provide extension cap at window mullions to match adjacent finishes.
C.  Columns in Office to be finished with gypsum board on all sides.  Gypsum board to be taped,  beaded and ready to receive paint or wall covering.
D.  Existing inside face of exterior walls within the Office to be finished with 5/8" gypsum board on one side of 1 ½" metal studs, 16" on center.  Provide rigid insulation in 1 ½" walls.  Gypsum board  to be taped, beaded and ready to receive paint or wall covering.
E.  Provide and install 3 1/2" sound attenuation insulation in walls and 6" sound attenuation insulation  at ceilings throughout all finished areas.
F.  Demising partitions between Office spaces and Warehouse to be built to roof deck with sound  attenuation insulation and constructed to meet code requirements.
G.  WR Board (Green Board) to be provided on wet wall only of Toilet Rooms and Break Room.
H.  Sound caulking at base and side walls at Offices, Conference rooms, Training room and  Restrooms.

I.  Provide and install FRP (fiberglass reinforced panel) at the slop sink area and in Men's and Women's Rooms in warehouse, Shipping Area, Driver's Entrance, and employee locker room areas.

---

**CEILING**

A.  Office area(s):
    a.  standard 9 feet AFF.
    b.  lay in grid with 2 feet by 4 feet acoustical square edge tile.

---

**MILLWORK**

A.  Provide and install plastic laminate kitchen style cabinets (base and wall) in Break room and Coffee  areas with post-formed plastic laminate countertop and 4" H backsplash.  Countertop to have cut out for sink; bottom of upper cabinets to be 24" above top of counter.
B.  Landlord to provide millwork finish samples as required for Tenant selections.

---

**TELEPHONE/DATA/SECURITY**

1.  **NOTE: Cabling and termination of Tel/Data system to be completed by Tenant vendor**
A.  Supply and install the following at each wall mounted voice/data:
    1. 1" conduit and pull string extended from back box to a 90 degree sweep above finished  ceiling.
    2. 2" x 4" x 2 1/8" deep square metal back box mounted at 12" AFF.
    3. Single gang box cover with 5/8" wall flange.
B.  Anticipate a single Main Equipment Room (MER) and then IDF racks or cabinets throughout the warehouse.
C.  The MER requires a fire resistant door and a fire rated 4'X8' flame retardant particle board mounted on one wall. This door should also have a badge reader for access.
D.  A generator (size TBD) shall provide backup power to the MER which will also have a UPS system to condition power and provide intermediate support while the generator cycles on after a power outage.  Backup power is not needed at the IDF locations.
E.  Provide back box and conduit for telephone outlet at 54" AFF at Break Room.
F. Landlord to provide coordination for local Telephone Company installation requirements.
G.  Provide (dedicated) two (2) 4" minimum conduits for main telephone cable (telephone lines and T-1)  from building demarcation to each Tenant backer board in Tel/Data closets (Patch panel by  others).  Landlord to confirm specific sizes of conduit with tenant requirements before work  commences.
H.   Landlord should plan on allowing service providers access to the site from two (2) diverse pathways (i.e., one on plan north and one on plan south).
I.  Distance from the building tel/data demarcation point to Tenant Tel/Data closet should not exceed  325 linear feet.
J. Data drops included in Maintenance area, Pack stations, Time clocks, and conveyors.

K.   Data included at exterior above ground fuel tank.

L.  Tenant entrances will have metal detectors / access controls.  Data required.

M.   **See Exhibit B2 for typical Security Camera requirement**

**MATERIAL HANDLING EQUIPMENT**

A.   TBD by Tenant's engineer

| MHE Final Design | St. Onge | TBD |
|---|---|---|

# Exhibit A

## Typical Signage layout / Requirement:



# Exhibit A2 Cont.



## Exhibit B2

## Typical Security Camera layout / Requirement:



# Exhibit B2 Cont.



**Cameras covering all secured entry / exit to Tenant office space. Reception Areas from two angles.**

## EXHIBIT D: BUILDING RULES AND REGULATIONS

1.  No awning or other projection may be attached to the outside walls of the Premises or Property.  No curtains, blinds, shades, or screens visible from the exterior of the Premises may be attached to or hung in, or used in connection with any window or door of the Premises without the prior written consent of Landlord.  Such curtains, blinds, shades, screens, or other fixtures must be of a quality, type, design, and color, and attached in a manner, approved by Landlord in writing.

2.  No sign, lettering, picture, notice, or advertisement which is visible from the exterior of the Premises or Property may be installed on or in the Premises without Landlord's prior written consent, and then only in such manner, character, and style as Landlord may have approved in writing.

3.  Tenant will not obstruct sidewalks, driveways, parking areas, or any other Common Areas.

4.  Tenant will not create or allow obnoxious or harmful fumes, odors, smoke, or other discharges which may be unreasonably offensive to the other occupants of the Property or neighboring properties, or otherwise create any unlawful nuisance.

5.  The Premises may not be used for cooking (as opposed to heating of food), lodging, sleeping, or for any immoral or illegal purpose.

6.  Tenant will not make excessive noises or vibrations or operate any electrical or mechanical devices or other equipment that emit excessive sound or other waves or disturbances or which may be offensive to the other occupants of the Property, or that may unreasonably interfere with the operation of any device, equipment, computer, video, radio, television broadcasting, or reception from or within the Property.

7.  Tenant assumes full responsibility for protecting its space from theft, robbery, and pilferage, which includes keeping valuable items locked up, doors locked, and other means of entry to the Premises closed and secured after business hours and at other times the Premises is not in use.

8.  Unless expressly permitted by Landlord, no additional locks or similar devices may be attached to any door or window, except for a security system.  Upon termination of this Lease or of Tenant's possession, Tenant will surrender all keys to the Premises and will explain to Landlord all combination locks on safes, cabinets and vaults, and the code for the security system.

9.  If Tenant installs satellite dishes, antennae, or similar equipment, Tenant will first obtain Landlord's written approval which shall not be unreasonably withheld, conditioned, or delayed, and comply with Landlord's reasonable instructions in their installation.

10. The water and wash closets, drinking fountains and other plumbing fixtures will not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags, coffee grounds, or other substances will be thrown therein.

11.     Tenant will not overload any utilities serving the Premises.

12.     Tenant will not locate or store any equipment, materials, supplies, or other property outside of the Premises except as may be permitted by any Applicable Laws and specifically provided for in the Lease.  Tenant may stage trailers used in the ordinary course of Tenant's business.  Trucks and trailers are to be limited to designated parking areas.

13.     All loading, unloading, receiving, or delivery of goods, supplies, furniture or other items will be made only through entryways provided for such purposes.  No deliveries may be made which unreasonably impede or interfere with other tenants or the operation of the Property.

14.     Canvassing, soliciting, and peddling in or about the Property is prohibited, and Tenant will cooperate to prevent the same.

15.     Tenant will store all its trash and garbage in proper receptacles or other facilities for such purpose located in the areas designated by Landlord.  All dumpsters or compactors must be fully enclosed, including any trash chutes, hoppers, or apparatuses.

16.     Tenant will comply with all safety, fire protection, and evacuation procedures and regulations established by Landlord or any governmental agency.

17.     Tenant will not park or permit parking in any areas designated by Landlord for parking by visitors to the Property or for the exclusive use of other tenants or other occupants of the Property.

18.     Parking is prohibited (a) in areas not striped for parking; (b) in aisles; (c) where "no parking" signs are posted; (d) on ramps; (e) in cross-hatched areas; (f) in loading areas; and (g) in other areas as may be designated by Landlord.  Truck and trailer parking will be limited to designated areas.

19.     All responsibility for damage, loss, or theft to vehicles and the contents thereof is assumed by the person parking their vehicle.

20.     Tenant will be responsible for the observance of these rules by each Tenant Party.

21.     Landlord may waive any one or more of these rules for the benefit of Tenant or any other tenant, but no waiver by Landlord will be construed as a continuing waiver of such rule(s), nor prevent Landlord from thereafter enforcing any such rule(s) against Tenant or any other tenants.  Such enforcement shall not be done in an arbitrary manner.

22.     In the event of any conflict between these rules and any express term or provision set forth in the Lease, the express term or provision of the Lease is controlling.  Tenant shall not be required to comply with any rules which reduce Tenant's rights as set forth in the Lease or increase its obligations or liabilities as set forth in the Lease.

23.     Materials for floor striping must be approved by Landlord.  Floor striping must be removed prior to the expiration or termination of the Lease Term.  Sandblasting is prohibited.

## FIRST AMENDMENT TO INDUSTRIAL LEASE

THIS FIRST AMENDMENT TO INDUSTRIAL LEASE (this "**Amendment**") is entered into this __18th__ day of February, 2019 (the "**Effective Date**"), by and between NP Hanover Industrial I, LLC, a Missouri limited liability company ("**Landlord**"), and True Value Company, LLC, a Delaware limited liability company ("**Tenant**").

## RECITALS

WHEREAS, Landlord and Tenant entered into that certain Industrial Lease, dated October 19, 2018 (the "**Lease**"), pursuant to which Landlord agreed to lease to Tenant that certain premises located in the building known as "Tradeport 164, Building I", located in Luzerne County, Pennsylvania, as more specifically described in the Lease (the "**Premises**");

WHEREAS, Tenant and Landlord desire to amend the Lease for the purposes set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the covenants and obligations contained in this Amendment and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between Landlord and Tenant as follows:

1.     Capitalized terms used herein but not defined shall have the meaning given to such terms in the Lease.

2.     Landlord and Tenant hereby agree that Section 2.a. of the Lease shall be deleted in its entirety and replaced with the following:

"a.     The term of this Lease shall begin on the date (the "Commencement Date") that is the last to occur of: (i) September 1, 2019 (the "Target Commencement Date") and (ii) the date when the Improvements (as defined in Section 6 below) are Substantially Complete, and shall expire at midnight on the last day of the month which is two hundred fifty-seven (257) months after the Commencement Date; provided, that, subject to Tenant Delay and/or any Force Majeure Event, in no event will the Commencement Date occur earlier than sixty (60) days following the actual Early Access Delivery Date (as defined in Section 6 below), targeted for June 1, 2019. The initial term of this Lease and any extension of the initial term shall herein be the "Lease Term." "Substantial Completion" and "Substantially Complete" (or any variation thereof) shall mean the date when the Improvements are substantially completed as required by this Lease, with the exception of minor "punch list items" (as that term is commonly used in the construction industry) and either a temporary or final certificate of occupancy is issued. Landlord is obligated to have the Premises Substantially Complete by August 1, 2019 (the "Substantial Completion Date"). A certificate of occupancy for the Premises, issued by the appropriate governmental authority, shall be evidence of Substantial Completion. If such certificate of occupancy or the equivalent is not required and routinely issued by a governmental authority, then the execution and delivery of an AIA Document G-

1

704 Certificate of Substantial Completion with respect to the Improvements (the "Certificate of Substantial Completion") shall be evidence of Substantial Completion. Tenant's execution of the Certificate of Substantial Completion will not be required for achieving Substantial Completion. If a temporary certificate of occupancy is obtained, Landlord agrees to obtain the permanent certificate of occupancy before the expiration of the temporary certificate of occupancy, as such temporary certificate of occupancy may be extended by the applicable governmental authority, and Landlord agrees to obtain a permanent certificate of occupancy when it becomes available. Completion of minor punch list items must occur within sixty (60) days following Substantial Completion."

3.      Landlord and Tenant hereby agree that Section 6.b. of the Lease shall be deleted in its entirety and replaced with the following:

"b.      Landlord shall provide delivery of the warehouse portion of the facility by the Early Access Delivery Date for True Value's installation and set-up purposes, provided True Value does not commence business operations therein and does not interfere with the construction process. There shall be no charge to Tenant for the Building personnel or engineer for Tenant's move-in. No base rent, additional rent, or utilities shall be due during the Early Occupancy/set-up period."

4.      Landlord and Tenant hereby agree that Section 6.c. of the Lease shall be deleted in its entirety.

5.      Landlord and Tenant hereby agree that Section 6.d. of the Lease shall be deleted in its entirety and replaced with the following:

"d.      If the Improvements and Premises are not Substantially Complete on the Target Commencement Date, the obligations of Tenant shall not be affected except that the Commencement Date and the expiration of the Lease Term, shall be postponed one day for each day Substantial Completion is delayed until the Premises are Substantially Complete. If the Improvements and Premises are not Substantially Completed on or prior to the Substantial Completion Date, subject to Tenant Delay and/or a Force Majeure Event, the Base Rent shall be credited by one (1) day for each day after the Substantial Completion Date that the Improvements are not Substantially Completed. If the Improvements and Premises are not Substantially Completed on or prior to the Target Commencement Date, subject to Tenant Delay and/or a Force Majeure Event, the Base Rent shall be credited by three (3) days for each day after the Target Commencement Date that the Improvements are not Substantially Completed; provided, that the previously referenced 1-for-1 Base Rent credit set forth in this Section shall cease upon the commencement of any such 3-for-1 Base Rent credits. If the Improvements and Premises are not Substantially Completed on or prior to October 31, 2019 (the "Extended Completion Date"), subject to Tenant Delay and/or a Force Majeure Event, Tenant shall have the right to thereafter terminate this Lease upon thirty (30) days' prior written notice to Landlord; provided, that if the Improvements and Premises are Substantially Completed during said 30-day period, the termination

2

notice shall be deemed null and void."

6.      Landlord and Tenant hereby agree that Section 6.f. of the Lease shall be deleted in its entirety and replaced with the following:

"f.      Tenant shall, beginning on the later of June 1, 2019 and the date upon which Landlord determines that the warehouse portion of the Premises is available to Tenant for the purposes of this Section 6.f. (the "Early Access Delivery Date"), and continuing until the Commencement Date, subject to any and all Applicable Laws, have the right to enter the warehouse portion of the Premises for the purposes of installing within the Premises racking, fixtures, wiring, and the intake of product necessary for Tenant to open for business on the Commencement Date. During any period which Tenant enters, occupies, or uses the Premises prior to the Commencement Date, as permitted by this Section 6.f., Tenant shall (i) comply with all obligations of Tenant under this Lease as if the Commencement Date had occurred, except that Tenant shall not be required to pay any Rent hereunder nor the cost of any utilities for the Premises during such period, and (ii) use reasonable efforts to avoid interfering with Landlord's completion of the Improvements. To the extent Tenant does interfere with Landlord's completion of the Improvements, and such interference causes a delay in the delivery of the Improvements, such delay will be a Tenant Delay hereunder. In the event that Landlord, subject to Tenant Delay and/or a Force Majeure Event, is unable to provide the early access set forth in this Section 6.f. by July 1, 2019,  the Base Rent shall be credited by one day for each day after July 1, 2019 that the Early Access Delivery Date actually occurs, but not to exceed sixty (60) days' worth of said credits."

7.      Amendment Controls; Ratification and Affirmation. In the event that the terms of this Amendment and the Lease are held to be inconsistent, the terms of this Amendment shall control. The parties each agree and warrant that, in all other respects, the Lease is unmodified, in full force and effect, and each party hereby ratifies and affirms the Lease and any terms contained therein not otherwise modified by this Amendment.

8.      Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original but all of which, taken together, shall constitute one and the same instrument. Each party may rely upon facsimile or electronic mail counterparts of this Amendment signed by the other party with the same effect as if such party had received an original counterpart signed by such other party.

[Remainder of Page Intentionally Blank]

3

**IN WITNESS WHEREOF**, Tenant hereby executes this Lease as of the Effective Date set forth on the first page hereof.

TENANT:

**True Value Company, LLC**, a Delaware limited liability company

By: _____

Name: ___ ABHINAV   SHUKLA ___

Title: _____ COD _____

**IN WITNESS WHEREOF**, Landlord hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**LANDLORD:**

**NP Hanover Industrial I, LLC**, a Missouri limited liability company

By: NPD Management, LLC, its Manager

By:_____
    Nathaniel Hagedorn, Manager

## SECOND AMENDMENT TO INDUSTRIAL LEASE

THIS SECOND AMENDMENT TO INDUSTRIAL LEASE (this "**Amendment**") is entered into this  28th  day of August, 2019 (the "**Effective Date**"), by and between NP Hanover Industrial I, LLC, a Missouri limited liability company ("**Landlord**"), and True Value Company, LLC, a Delaware limited liability company ("**Tenant**").

RECITALS

WHEREAS, Landlord and Tenant entered into that certain Industrial Lease, dated October 19, 2018, as the same was amended pursuant to that certain First Amendment to Industrial Lease, dated February 18, 2019 (as amended, the "**Lease**"), pursuant to which Landlord agreed to lease to Tenant that certain premises located in the building known as "Tradeport 164, Building I", located in Luzerne County, Pennsylvania, as more specifically described in the Lease (the "**Premises**");

WHEREAS, Tenant and Landlord desire to amend the Lease for the purposes set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the covenants and obligations contained in this Amendment and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between Landlord and Tenant as follows:

1.     Capitalized terms used herein but not defined shall have the meaning given to such terms in the Lease.

2.     Landlord and Tenant hereby agree that Section 2.a. of the Lease shall be deleted in its entirety and replaced with the following:

"a.     The term of this Lease shall begin on the date (the "Commencement Date") that is the last to occur of: (i) October 1, 2019 (the "Target Commencement Date") and (ii) the date when the Improvements (as defined in Section 6 below) are Substantially Complete, and shall expire at midnight on the last day of the month which is two hundred fifty-seven (257) months after the Commencement Date; provided, that, subject to Tenant Delay and/or any Force Majeure Event, in no event will the Commencement Date occur earlier than sixty (60) days following the actual Early Access Delivery Date (as defined in Section 6 below). The initial term of this Lease and any extension of the initial term shall herein be the "Lease Term." "Substantial Completion" and "Substantially Complete" (or any variation thereof) shall mean the date when the Improvements are substantially completed as required by this Lease, with the exception of minor "punch list items" (as that term is commonly used in the construction industry) and either a temporary or final certificate of occupancy is issued. Landlord is obligated to have the Premises Substantially Complete by September 1, 2019 (the "Substantial Completion Date"). A certificate of occupancy for the Premises, issued by the appropriate governmental authority, shall be evidence of Substantial Completion. If such certificate of occupancy or the equivalent is not required and routinely issued by a governmental

1

authority, then the execution and delivery of an AIA Document G-704 Certificate of Substantial Completion with respect to the Improvements (the "Certificate of Substantial Completion") shall be evidence of Substantial Completion. Tenant's execution of the Certificate of Substantial Completion will not be required for achieving Substantial Completion. If a temporary certificate of occupancy is obtained, Landlord agrees to obtain the permanent certificate of occupancy before the expiration of the temporary certificate of occupancy, as such temporary certificate of occupancy may be extended by the applicable governmental authority, and Landlord agrees to obtain a permanent certificate of occupancy when it becomes available. Completion of minor punch list items must occur within sixty (60) days following Substantial Completion."

3.     Landlord and Tenant hereby agree that Section 6.d. of the Lease shall be deleted in its entirety and replaced with the following:

"d.     If the Improvements and Premises are not Substantially Complete on the Target Commencement Date, the obligations of Tenant shall not be affected except that the Commencement Date and the expiration of the Lease Term, shall be postponed one day for each day Substantial Completion is delayed until the Premises are Substantially Complete. If the Improvements and Premises are not Substantially Completed on or prior to the Substantial Completion Date, subject to Tenant Delay and/or a Force Majeure Event, the Base Rent shall be credited by one (1) day for each day after the Substantial Completion Date that the Improvements are not Substantially Completed. If the Improvements and Premises are not Substantially Completed on or prior to the Target Commencement Date, subject to Tenant Delay and/or a Force Majeure Event, the Base Rent shall be credited by three (3) days for each day after the Target Commencement Date that the Improvements are not Substantially Completed; provided, that the previously referenced 1-for-1 Base Rent credit set forth in this Section shall cease upon the commencement of any such 3-for-1 Base Rent credits. If the Improvements and Premises are not Substantially Completed on or prior to November 30, 2019 (the "Extended Completion Date"), subject to Tenant Delay and/or a Force Majeure Event, Tenant shall have the right to thereafter terminate this Lease upon thirty (30) days' prior written notice to Landlord; provided, that if the Improvements and Premises are Substantially Completed during said 30-day period, the termination notice shall be deemed null and void."

4.     Landlord and Tenant hereby agree that Section 6.f. of the Lease shall be deleted in its entirety and replaced with the following:

"f.     Tenant shall, beginning on the later of August 1, 2019 and the date upon which Landlord determines that the warehouse portion of the Premises is available to Tenant for the purposes of this Section 6.f. (the "Early Access Delivery Date"), and continuing until the Commencement Date, subject to any and all Applicable Laws, have the right to enter the warehouse portion of the Premises for the purposes of installing within the Premises racking, fixtures, wiring, and the intake of product necessary for Tenant to open for business on the Commencement Date. During any

2

period which Tenant enters, occupies, or uses the Premises prior to the Commencement Date, as permitted by this Section 6.f., Tenant shall (i) comply with all obligations of Tenant under this Lease as if the Commencement Date had occurred, except that Tenant shall not be required to pay any Rent hereunder nor the cost of any utilities for the Premises during such period, and (ii) use reasonable efforts to avoid interfering with Landlord's completion of the Improvements. To the extent Tenant does interfere with Landlord's completion of the Improvements, and such interference causes a delay in the delivery of the Improvements, such delay will be a Tenant Delay hereunder. In the event that Landlord, subject to Tenant Delay and/or a Force Majeure Event, is unable to provide the early access set forth in this Section 6.f. by August 1, 2019,  the Base Rent shall be credited by one day for each day after August 1, 2019 that the Early Access Delivery Date actually occurs, but not to exceed sixty (60) days' worth of said credits."

5.    _Amendment Controls; Ratification and Affirmation_. In the event that the terms of this Amendment and the Lease are held to be inconsistent, the terms of this Amendment shall control. The parties each agree and warrant that, in all other respects, the Lease is unmodified, in full force and effect, and each party hereby ratifies and affirms the Lease and any terms contained therein not otherwise modified by this Amendment.

6.    _Counterparts._ This Amendment may be executed in counterparts, each of which shall be deemed an original but all of which, taken together, shall constitute one and the same instrument. Each party may rely upon facsimile or electronic mail counterparts of this Amendment signed by the other party with the same effect as if such party had received an original counterpart signed by such other party.

[Remainder of Page Intentionally Blank]

3

**IN WITNESS WHEREOF**, Tenant hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**TENANT:**

**True Value Company, LLC**, a Delaware limited liability company

By: _____

Name: _Lyndsi Lee_____

Title: _VP Supply Chain_____

**IN WITNESS WHEREOF**, Landlord hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**LANDLORD:**

**NP Hanover Industrial I, LLC**, a Missouri limited liability company

By: NPD Management, LLC, its Manager


By:_____
      Nathaniel Hagedorn, Manager

5

## THIRD AMENDMENT TO INDUSTRIAL LEASE

THIS THIRD AMENDMENT TO INDUSTRIAL LEASE (this "**Amendment**") is entered into this <u>31</u> day of January, 2020 (the "**Effective Date**"), by and between NP Hanover Industrial I, LLC, a Missouri limited liability company ("**Landlord**"), and True Value Company, LLC, a Delaware limited liability company ("**Tenant**").

## RECITALS

WHEREAS, Landlord and Tenant entered into that certain Industrial Lease, dated October 19, 2018, as the same was amended pursuant to that certain First Amendment to Industrial Lease, dated February 18, 2019, and as the same was amended pursuant to that certain Second Amendment to Industrial Lease, dated August 28, 2019 (as amended, the "**Lease**"), pursuant to which Landlord agreed to lease to Tenant that certain premises located in the building known as "Tradeport 164, Building I", located at 12 Tradeport Road, Hanover Township, Pennsylvania 18706, as more specifically described in the Lease (the "**Premises**");

WHEREAS, Tenant and Landlord desire to amend the Lease for the purposes set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the covenants and obligations contained in this Amendment and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between Landlord and Tenant as follows:

1.      Capitalized terms used herein but not defined shall have the meaning given to such terms in the Lease.

2.      Landlord and Tenant hereby agree that the first sentence of Section 1 of the Lease shall be deleted in its entirety and replaced with the following:

"Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the premises (the "Premises") shown on the floor plan attached hereto as <u>Exhibit A-1</u> (the "<u>Floor Plan</u>"), which Premises contains one million twenty-eight thousand two hundred eighty (1,028,280) usable square feet and is a part of that certain building commonly referred to as "Tradeport 164, Building I" and containing one million three hundred ninety-one thousand two hundred twenty-eight (1,391,228) usable square feet (the "<u>Building</u>") located on the real property described on <u>Exhibit A-2</u> attached hereto (the "<u>Land</u>"), having an address of 12 Tradeport Road, Hanover Township, Pennsylvania 18706."

3.      Landlord and Tenant hereby agree that Exhibit A-1 of the Lease shall be deleted in its entirety and replaced with <u>Exhibit A-1</u> hereto.

4.      Landlord and Tenant hereby agree that Exhibit B of the Lease shall be deleted in its entirety and replaced with <u>Exhibit B</u> hereto.

1

5. Landlord and Tenant hereby agree that the last sentence of Section 3.c. of the Lease shall be deleted in its entirety and replaced with the following:

"Landlord and Tenant agree that Tenant's Proportionate Share equals 73.91%.

6. **Amendment Controls; Ratification and Affirmation**. In the event that the terms of this Amendment and the Lease are held to be inconsistent, the terms of this Amendment shall control. The parties each agree and warrant that, in all other respects, the Lease is unmodified, in full force and effect, and each party hereby ratifies and affirms the Lease and any terms contained therein not otherwise modified by this Amendment.

7. **Counterparts.** This Amendment may be executed in counterparts, each of which shall be deemed an original but all of which, taken together, shall constitute one and the same instrument. Each party may rely upon facsimile or electronic mail counterparts of this Amendment signed by the other party with the same effect as if such party had received an original counterpart signed by such other party.

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, Tenant hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**TENANT:**

**True Value Company, LLC**, a Delaware limited liability company

By: _James Harrington_

Name: James Harrington

Title: VP Supply Chain

**IN WITNESS WHEREOF**, Landlord hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**LANDLORD:**

**NP Hanover Industrial I, LLC**, a Missouri limited liability company

By: NPD Management, LLC, its Manager

By: _____

Nathaniel Hagedorn, Manager

# EXHIBIT A-1: PREMISES FLOOR PLAN



EXHIBIT B: BASE RENT SCHEDULE

| Lease Month | Lease Rate (psf) | Est. Monthly Base Rent |
|---|---|---|
| 1-5 | $0.00 | $0.00 |
| 6-17 | $0.35 | $29,991.50 |
| 18-29 | $4.97 | $425,879.30 |
| 30-41 | $5.04 | $431,877.60 |
| 42-53 | $5.11 | $437,875.90 |
| 54-65 | $5.18 | $443,874.20 |
| 66-77 | $5.25 | $449,872.50 |
| 78-89 | $5.32 | $455,870.80 |
| 90-101 | $5.40 | $462,726.00 |
| 102-113 | $5.47 | $468,724.30 |
| 114-125 | $5.55 | $475,579.50 |
| 126-137 | $5.62 | $481,577.80 |
| 138-149 | $5.70 | $488,433.00 |
| 150-161 | $5.78 | $495,288.20 |
| 162-173 | $5.86 | $502,143.40 |
| 174-185 | $5.94 | $508,998.60 |
| 186-197 | $6.02 | $515,853.80 |
| 198-209 | $6.10 | $522,709.00 |
| 210-221 | $6.19 | $530,421.10 |
| 222-233 | $6.27 | $537,276.30 |
| 234-245 | $6.36 | $544,988.40 |
| 246-257 | $6.45 | $552,700.50 |

## FOURTH AMENDMENT TO INDUSTRIAL LEASE

THIS FOURTH AMENDMENT TO INDUSTRIAL LEASE (this "**Amendment**") is entered into this 31st day of July, 2020 (the "**Effective Date**"), by and between NP Hanover Industrial I, LLC, a Missouri limited liability company ("**Landlord**"), and True Value Company, LLC, a Delaware limited liability company ("**Tenant**").

## RECITALS

WHEREAS, Landlord and Tenant entered into that certain Industrial Lease, dated October 19, 2018, as the same was amended pursuant to that certain First Amendment to Industrial Lease, dated February 18, 2019, as the same was amended pursuant to that certain Second Amendment to Industrial Lease, dated August 28, 2019, and as the same was amended pursuant to that certain Third Amendment to Industrial Lease, dated January 31, 2020 (as amended, the "**Lease**"), pursuant to which Landlord agreed to lease to Tenant that certain premises located in the building known as "Tradeport 164, Building I", located at 12 Tradeport Road, Hanover Township, Pennsylvania 18706, as more specifically described in the Lease (the "**Premises**");

WHEREAS, Tenant and Landlord desire to amend the Lease for the purposes set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the covenants and obligations contained in this Amendment and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between Landlord and Tenant as follows:

1.     Capitalized terms used herein but not defined shall have the meaning given to such terms in the Lease.

2.     Landlord and Tenant hereby agree that, as of July 1, 2021 (the "**Expansion Premises Commencement Date**"), the Premises shall be expanded to include the entirety of the Building, comprising one million three hundred ninety one thousand two hundred twenty-eight (1,391,228) rentable square feet. For the purposes of this amendment, the portion of the Premises so expanded hereby shall be referred to herein as the "**Expansion Premises**". Upon the Expansion Premises Commencement Date, the Expansion Premises shall become a part of the Premises for all purposes set forth in the Lease, except as otherwise specifically set forth herein.

3.     Landlord shall have no obligation to make any improvements, or provide any allowance in connection with, the Expansion Premises, except that Landlord shall, prior to the Expansion Premises Commencement Date, create a pass-through in the now-existing demising wall between the original Premises and the Expansion Premises.

4.     Landlord and Tenant hereby agree that Exhibit A-1 of the Lease shall be deleted in its entirety and replaced with <u>Exhibit A-1</u> hereto, which exhibit graphically depicts the original Premises and the Expansion Premises.

5.     Landlord and Tenant hereby agree that Exhibit B of the Lease shall be deleted in

its entirety and replaced with <u>Exhibit B</u> hereto.

6.      Landlord and Tenant hereby agree that, as of the Expansion Premises Commencement Date,  Tenant's Proportionate Share shall equal 100.00%.

7.      Landlord and Tenant each hereby agree that no broker commission or fee shall be due to any broker or agent in connection with this Amendment or the Expansion Premises.

8.      In the event that the terms of this Amendment and the Lease are held to be inconsistent, the terms of this Amendment shall control. The parties each agree and warrant that, in all other respects, the Lease is unmodified, in full force and effect, and each party hereby ratifies and affirms the Lease and any terms contained therein not otherwise modified by this Amendment.

9.      This Amendment may be executed in counterparts, each of which shall be deemed an original but all of which, taken together, shall constitute one and the same instrument. Each party may rely upon facsimile or electronic mail counterparts of this Amendment signed by the other party with the same effect as if such party had received an original counterpart signed by such other party.

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, Tenant hereby executes this Lease as of the Effective Date set forth on the first page hereof.

**TENANT:**

**True Value Company, LLC**, a Delaware limited liability company

By:_____

Name:_____Lyndsi Lee_____

Title:___Sr. Vice President, Supply Chain_____

     **IN WITNESS WHEREOF**, Landlord hereby executes this Lease as of the Effective Date set forth on the first page hereof.

                    **LANDLORD:**

                    **NP Hanover Industrial I, LLC**, a Missouri limited liability company

                    By: NPD Management, LLC, its Manager

                    By:_____
                           Nathaniel Hagedorn, Manager

## EXHIBIT A-1: PREMISES FLOOR PLAN



EXHIBIT B: BASE RENT SCHEDULE

| Lease Month | Lease Rate (psf) | Est. Monthly Base Rent |
|---|---|---|
| 1-5 | $0.00 | $0.00 |
| 6-17 | $0.35 | $29,991.50 |
| 18-21 | $4.97 | $425,879.30 |
| 22*-29 | $4.99 | $578,518.98 |
| 30-41 | $5.06 | $586,634.47 |
| 42-53 | $5.13 | $594,749.97 |
| 54-65 | $5.20 | $602,865.47 |
| 66-77 | $5.27 | $610,980.96 |
| 78-89 | $5.34 | $619,096.46 |
| 90-101 | $5.42 | $628,371.31 |
| 102-113 | $5.49 | $636,486.81 |
| 114-125 | $5.57 | $645,761.66 |
| 126-137 | $5.64 | $653,877.16 |
| 138-149 | $5.72 | $663,152.01 |
| 150-161 | $5.80 | $672,426.87 |
| 162-173 | $5.88 | $681,701.72 |
| 174-185 | $5.96 | $690,976.57 |
| 186-197 | $6.04 | $700,251.43 |
| 198-209 | $6.12 | $709,526.28 |
| 210-221 | $6.21 | $719,960.49 |
| 222-233 | $6.29 | $729,235.34 |
| 234-245 | $6.38 | $739,669.55 |
| 246-257 | $6.47 | $750,103.76 |

* Date (July 1, 2021) when Expansion Premises becomes part of the Premises.

## FIFTH AMENDMENT TO INDUSTRIAL LEASE

THIS FIFTH AMENDMENT TO INDUSTRIAL LEASE (this "**Amendment**") is made effective as of the 1st day of October, 2021 ("**Effective Date**") by and between GRANITE (12 TRADEPORT) LLC, a Delaware limited liability company (the "**Landlord**") and TRUE VALUE COMPANY, LLC, a Delaware limited liability company (the "**Tenant**").

### RECITALS

A.    WHEREAS, Landlord and Tenant entered into that certain Industrial Lease dated October 19, 2018, as the same was amended pursuant to the First Amendment to Industrial Lease dated February 18, 2019, the Second Amendment to Industrial Lease dated August 28, 2019, the Third Amendment to Industrial Lease dated January 31, 2020 and the Fourth Amendment to Industrial Lease dated July 31, 2020 (as amended, the "**Lease**"), pursuant to which the Landlord leased to the Tenant that certain premises containing approximately 1,391,228 square feet at the building municipally known as 12 Tradeport Road, Hanover Township, Pennsylvania, and as previously referred to as Tradeport 164, Building I as more specifically described in the Lease (the "**Premises**");

B.    AND WHEREAS, the Lease provides that the Landlord shall be responsible for the maintenance and repair of the Common Areas and the Tenant shall reimburse the Landlord for its proportionate share of the costs in connection therewith;

C.    AND WHEREAS, as of the Expansion Premises Commencement Date (as defined in the Lease), the Tenant is the sole occupant of the Building;

D.    AND WHEREAS, the Tenant has expressed its desire to self-manage the Premises and the Landlord and Tenant wish to amend the Lease with respect to the responsibility for certain maintenance and repairs upon the terms and conditions set forth herein.

### AGREEMENT

NOW THEREFORE, in consideration of Ten Dollars ($10.00), the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto agree as follows:

1.    <u>Confirmation</u>: The parties hereby acknowledge, confirm, and agree that the foregoing recitals are true in substance and in fact and are incorporated as an integral part of this Agreement.

2.    <u>Tenant's Election to Self-Manage</u>: The Landlord and Tenant acknowledge and agree that commencing on the Effective Date the Tenant shall, subject to the terms set out herein, self-manage the Property for the remainder of the of the Term, as may be renewed or extended. Accordingly, as of the Effective Date the following provisions of the Lease are hereby amended as follows:

(a) <u>Real Estate Taxes</u>: The following language is added to the end of Section 5(b):

1

"During any period of time which the Tenant self-manages the Property, the Tenant shall pay Taxes on or before the date such Taxes are due to the applicable taxing authority, such payments to be made at the Landlord's option either to the Landlord or directly to the applicable taxing authority (provided that the Landlord shall, at its option: (1) provide the Tenant with a copy of the applicable Tax bill; or (2) require that the Tenant arrange to have the applicable Tax bill delivered directly to the Tenant for payment, in which case the Tenant shall provide the Landlord with written proof of such arrangement). The Tenant shall deliver to the Landlord forthwith upon the Tenant's receiving the same copies of all assessment notices, tax bills, receipts and other documents received by Tenant relating to Taxes. The Tenant shall also forthwith provide the Landlord with proof of payment in connection with any Taxes paid by the Tenant directly to the applicable taxing authority."

<u>Landlord Maintenance and Repair</u>:  Section 7.a. is hereby deleted in its entirety and replaced with the following:

Except for any repairs or replacements caused by the negligence or willful misconduct of Tenant, or Tenant's members, shareholders, officers, managers, agents, employees, contractors, invitees, subtenants, or any person on the Premises by reason of the Tenant's use or occupancy of the Premises (each a "Tenant Party"), the expense of which shall be paid by Tenant, Landlord, at its cost and expense, and not as part of Operating Expenses (except as otherwise specifically stated herein) shall keep, in good repair and condition, the following: (i) the roof (to the extent capital replacements are required, otherwise maintenance and repair of the roof shall be completed by the Tenant at its sole cost pursuant to Section 7.d.), (ii) foundation, (iii) structure of the Building and Premises (excluding exterior maintenance such as routine caulking and painting which shall be the Tenant's responsibility at its sole cost pursuant to Section 7.d. For clarity, Landlord will remain responsible for caulking resulting from structural defects in the Premises), (iv) foundation beneath the floor slab, (v) subfloors, (vi) structural components (including but not limited to interior load bearing walls and concrete tilt walls, columns, beams and joists), (vii) electrical systems located outside the Premises up to and including the transformer serving the Premises, (viii) the main sprinkler riser serving the Building (provided that routine maintenance of the main sprinkler riser and maintenance, repair and replacement of all portions of the sprinkler system serving the Premises shall be the Tenant's responsibility at its sole cost pursuant to Section 7.d.), and (ix) sewer and water main lines up to the point of entry into the Premises.

(b)  <u>Tenant's Maintenance and Repair</u>:  The first sentence of Section 7.d. is hereby deleted in its entirety and replaced with the following:

Tenant, at Tenant's sole cost, shall perform maintenance, repairs and replacements of and to all non-structural portions of the Premises, including but not limited to: (i) the roof (excluding capital replacements which will be the responsibility of the Landlord pursuant to Section 7.a.), (ii) the HVAC systems, (iii) glass, (iv) windows and doors, (v) all plumbing and sewage systems, (vi) fixtures, (vii) interior non-loadbearing walls, (viii) exterior maintenance (including painting and caulking of the Building, provided Tenant shall obtain the prior approval of the Landlord prior to re-painting the Building); (ix) floors, (x) ceilings, (xi) docks and all dock equipment, (xii) main sprinkler riser (provided that capital replacements of the main sprinkler riser will be the responsibility of the Landlord pursuant to Section 7.a.) and all portions of the sprinkler system serving the Premises, (xiii) the Common Areas, and (xiv) all electrical and mechanical systems, facilities, and equipment of every kind and nature located in, upon, or about the Premises, except with respect to those obligations of Landlord specifically set forth in Section 7.a. above.

DocuSign Envelope ID: C7C539A9-0F3A-4036-A537-AE42A0FA797A

(c) <u>Inspection Reports</u>: During any period when the Tenant self-manages the Premises, the Tenant shall provide to the Landlord at least once per each twelve (12) month calendar period during the Lease Term, an inspection report from a reputable consultant or contractor which details the condition and any required maintenance and repairs in respect of the life-safety systems serving the Leased Premises and sets out any maintenance, repairs and replacements required to be performed with respect to the life-safety systems (the "<u>Tenant Report</u>").

During any period when the Tenant self-manages the Premises, the Landlord shall, at the Tenant's sole cost, engage reputable consultant(s) or contractor(s) to complete annual inspections of the building and the roof (together, the "<u>Landlord Reports</u>") and shall provide copies of said reports to the Tenant together with invoice(s) for the Landlord's costs for the Landlord Reports. The Tenant hereby covenants to pay any such invoice as Additional Rent within thirty (30) days of receipt. The Tenant acknowledges and agrees that it shall provide the Landlord and its contractor(s)/consultant(s) access to the Premises on reasonable advance written notice in order to undertake the Landlord Reports and any required inspections.

The Tenant covenants and agrees to thereafter perform such items as are set out in the Tenant Report and the Landlord Reports in accordance with the timelines set out therefor in the reports.

(d) <u>Common Area Maintenance and Repair</u>:  Except to the extent the responsibility of the Landlord pursuant to Section 7.a., the Tenant shall be responsible for the maintenance, repair and replacement of the Common Areas at its sole cost and expense. Accordingly, Section 9.b. of the Lease is deleted in its entirety and replaced with the following:

Tenant shall be responsible for the operation, management, and maintenance of the Common Areas and the Building, in good order, condition and repair as would a prudent owner of similar properties and Tenant shall be responsible for the costs incurred for the Common Areas and the Building, including costs incurred for water; landscaping; lighting; painting; cleaning; providing security; inspecting; maintaining, repairing and replacing the Common Areas (including re-surfacing/re-striping of the parking lots and driveways); and any amounts, fees, assessments or other charges levied or assessed against the Property by any association, district or otherwise, pursuant to any declaration, covenants, conditions, restrictions, reciprocal easement agreements, or operating agreements (collectively, "<u>Operating Expenses</u>"). Such Operating Expenses shall be paid for by the Tenant on or before the date such amounts are due to the applicable authority, such payments to be made at the Landlord's option either to the Landlord or directly to the applicable authority (provided that the Landlord shall, at its option: (1) provide the Tenant with a copy of the applicable bill; or (2) require that the Tenant arrange to have the applicable bill delivered directly to the Tenant for payment, in which case the Tenant shall provide the Landlord with written proof of such arrangement). Tenant is responsible for providing its own trash dumpster and dumpster service. Tenant's debris shall not overburden Tenant's trash dumpster, and Tenant shall keep the trash dumpster area in a clean condition.

The Tenant acknowledges that the Property is subject to the terms of that certain Reciprocal Easement Declaration and Agreement dated December 22, 2020 recorded on January 5, 2021 in the Recorder of Deeds Office of Luzerne County, Pennsylvania as Instrument Number 202100506, as may be amended (the "**REA**"). Notwithstanding anything to the contrary herein, the parties acknowledge and agree that the Landlord shall continue to be responsible for the maintenance and repair obligations of the Lot 2 Owner (as defined in the REA) as set out in the REA. Any costs, charges or expenses incurred by Landlord in connection with its obligations under the REA as the Lot 2 Owner shall form part of Operating Expenses and be payable by the Tenant as Additional Rent.

(e) <u>Service Contracts</u>:    Landlord and Tenant acknowledge that the service contracts as more particularly described in Schedule "A" attached hereto (collectively, the "<u>Service Contracts</u>") are currently in force with respect to the Property.  Tenant hereby confirms to Landlord that it wishes to assume all of the Service Contracts (the "<u>Assumed Contracts</u>") as of the Effective Date for the remaining term of said Service Contracts and will pay all fees due and payable pursuant to the Service Contracts directly to the applicable service provider.

(f) <u>Management Fee</u>:  The Landlord and Tenant agree that as of the Effective Date the Management Fee payable by Tenant pursuant to Section 9.c. shall be $1,000 per month payable to the Landlord monthly as Additional Rent.

(g) <u>Insurance</u>:  As of November 1, 2021 Section 9.d. is deleted in its entirety and replaced with the following:

Included within the Operating Expenses, Tenant shall pay to Landlord as Additional Rent Tenant's Proportionate Share of the costs of all insurance maintained by Landlord in connection with the Property during the Lease Term ("Premiums"), including commercial general liability insurance, and any other insurance carried by Landlord for the  Property (provided such other insurance is carried by prudent landlords of similar property within a ten-mile radius of the Property) for the calendar year.

(h) Section 9.e.(5)(i) is amended by inserting the "would" after "they".

(i) Section 9.g. of the Lease is hereby deleted in its entirety.

(j) The Landlord and Tenant acknowledge that if the Tenant is in habitual or material default of the Tenant's maintenance, repair or replacement obligations as set out in the Lease, as herein amended or if the Tenant has vacated the Premises, in each such case, the Landlord may, at its option, in addition to any other remedies under this Lease and at the Tenant's expense (which expense shall be included in Additional Rent and be subject to a administration fee of 10%), assume all or part of the Tenant's maintenance, repair or replacement obligations under Section 7.a.

(k) <u>Utilities</u>:  Section 10 of the Lease is hereby amended to add the following at the end: "During any period when the Tenant self-manages the Premises, the Tenant shall arrange to have all utilities serving the Common Area (other than water and sewer service, if applicable, which shall remain in the Landlord's name but shall be paid for by the Tenant as Additional Rent) put into the Tenant's name and shall promptly pay all charges accruing during the Lease Term directly to the utility company providing such service.  Within fifteen (15) days of receipt of written request from Landlord, Tenant at its sole cost and expense, shall deliver to Landlord copies of utility supply contracts and data regarding the water used and energy consumed (including electricity and natural gas) in the operation of the Premises for purposes of regulatory compliance, benchmarking, energy and water management, building environmental performance labeling and other related purposes. Notwithstanding the foregoing, Tenant shall not enter into any arrangement with any independent utility supplier which would bind the Premises or Landlord without Landlord's prior written consent, nor shall it extend beyond the Lease Term."

(l) The following language is added to the end of Section 13: For clarity, with respect to any insurance which the Tenant maintains as described under Section 14, and to the extent the insurance proceeds are paid to the Tenant and relate to items which the Landlord is responsible to repair or replace

under this Section 13, then the Tenant shall promptly make the proceeds available to the Landlord. Notwithstanding anything to the contrary set forth herein, the Landlord shall only be required to restore or repair the Premises to the extent the Landlord receives insurance proceeds from the insurance required to be carried by the Tenant on the Premises; however, if the amount of the insurance proceeds actually received by the Landlord with respect to the Premises is not sufficient to fully repair or restore the Premises due to the Tenant's failure to maintain insurance required to be maintained hereunder, then the Tenant shall be required to pay to the Landlord, in advance, the difference between the amount of said insurance proceeds actually received by the Landlord with respect to the Premises and the cost to fully repair or restore the Leased Premises, as the case may be.

(m) Commencing on November 1, 2021 the following language is added to the end of Section 14.c. as (vii): Building Insurance - Special Form CP1030 (formerly known as "all risk") property insurance, including fire and extended coverage, sprinkler leakage, vandalism, and malicious mischief, upon the Building and the Property, in an amount not less than the full replacement cost thereof (as determined by the Landlord acting reasonably), including coverage for lost rent for no less than twelve (12) months (the "All Risks Insurance"). Tenant shall name Landlord and Landlord's lender (if any) as loss payee. Notwithstanding anything herein to the contrary, the Landlord shall continue to maintain the All Risks Insurance between the Effective Date and October 31, 2021 and the Tenant shall pay its Proportionate Share of costs related thereto.

(n) Section 14.f. is amended by deleting the first sentence.

3. <u>Rights to Adjacent Space Deleted</u>: Sections 44, 45, 46 and 47 of the Lease are hereby deleted in their entirety.

4. <u>As-is, Where-is Condition</u>: The Tenant hereby acknowledges that it accepts the Premises "as-is, where-is" condition without any representation or warranty of any kind made by the Landlord in favor of the Tenant.

5. <u>Landlord's Address for Notice</u>: The Landlord's address for notice is hereby deleted and replaced with the following:

>Granite (12 Tradeport) LLC
>c/o Granite REIT
>77 King Street West, Suite 4010
>Toronto, Ontario M5K 1H1 Canada
>Attention: General Counsel

>with a copy to:

>Granite (12 Tradeport) LLC
>c/o Granite REIT
>3102 Oak Lawn Avenue, Suite 540
>Dallas, Texas 75219 U.S.A.
>Attention: Asset Management

6. <u>Authority</u>: Tenant represents and warrants to Landlord that the Tenant has been and is qualified to do business in the State in which the Premises is located, that Tenant has the full right and authority to enter

into this Agreement, and that all persons signing on behalf of Tenant were authorized to do so by appropriate actions.

7.  <u>Severability</u>:  If any clause or provision in this Agreement is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby.  It is also the intention of the parties to this Agreement that in lieu of each clause or provision of this Agreement that is illegal, invalid or unenforceable, there be added, as a part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

8.  <u>Definitions</u>:  Unless otherwise stated, all capitalized terms used in this Agreement shall have the same meanings ascribed to them in the Lease.

9.  <u>Miscellaneous</u>:  To the extent the provisions of this Agreement are inconsistent with the Lease, the terms of this Agreement shall control.  Except as expressly amended or modified herein, all other terms, covenants and conditions of the Lease shall remain in full force and effect and this Agreement shall be binding upon the parties hereto and their respective successors and assigns. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania .

10. <u>Counterparts/Execution</u>:  This Agreement may be executed in a number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, respectively.  Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment. Any party delivering an executed counterpart of this Agreement electronically also shall deliver a manually executed counterpart of this Agreement, but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**PLEASE SEE FOLLOWING PAGE FOR SIGNATURES**

**IN WITNESS WHEREOF,** the Landlord and the Tenant have executed this Agreement as of the date first above written:

Landlord:

**GRANITE (12 TRADEPORT) LLC,**
**a Delaware limited liability company**

By: _____
Name:  Lorne Kumer
Title:   Vice President

By: _____
Name:  Jon Sorg
Title:   Vice President

Tenant:

**TRUE VALUE COMPANY, LLC,**
**a Delaware limited liability company**

By: _____
Name:  DARIO SKUCIE
Title:

By: _____
Name:
Title:

DocuSign Envelope ID: C7C529A9-0F3A-4036-AF07-AE42A0FA797A

**EXHIBIT A**

**SERVICE CONTRACTS**

| Vendor Name | Contract Term | Service |
|---|---|---|
| East Coast Facilities | 04/01/21 – 11/30/21 | Lawncare |
| SA Comunale | 01/01/21 – 12/31/21 | Fire Protection Inspections |
| Bova Property Maintenance | 01/01/21 – 12/31/21 | Property Inspections |
| Kistler O'brien | 05/13/21 – 05/12/22 | Fire Alarm Inspections & Monitoring |
| Kistler O'brien | December 2021 | Semi-Annual Duct Detector Cleaning |

8

**EXHIBIT B**

**Lease Amendment**

## SIXTH AMENDMENT TO INDUSTRIAL LEASE

THIS SIXTH AMENDMENT TO INDUSTRIAL LEASE (this "Amendment") is made and entered into as of March 30.00 2025, and made effective as of the Effective Date (defined below) by and between GRANITE (12 TRADEPORT) LLC, a Delaware limited liability company ("Landlord"), and TV HARDWARE DISTRIBUTION, LLC, an Indiana limited liability company ("Tenant").

W I T N E S S E T H :

**WHEREAS**, Landlord and True Value Company, L.L.C., a Delaware limited liability company ("TVC LLC"), are parties to that certain Industrial Lease dated October 19, 2018, as amended by the First Amendment to Industrial Lease dated February 18, 2019, Second Amendment to Industrial Lease dated August 28, 2019, Third Amendment to Industrial Lease dated January 31, 2020, Fourth Amendment to Industrial Lease dated July 31, 2020 and Fifth Amendment to Industrial Lease dated October 1, 2021 (the "Original Lease", and, as amended by this Amendment, the "Lease"), which pertains to that certain real property located at 12 Tradeport Rd., Hanover Township, Pennsylvania 18706, and as more particularly described in the Lease, the "Leased Premises");

**WHEREAS**, on October 14, 2024, TVC LLC and its affiliates (collectively, the "Debtors") filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

**WHEREAS**, on November 10, 2024, the Debtors and Do it Best Corp., an Indiana corporation ("DIB") entered into an Amended and Restated Asset Purchase Agreement (the "APA"), pursuant which DIB and its designee(s) (the "Purchaser") agreed to purchase substantially all of the Debtors' assets, including those executory contracts of the Debtors that the Purchaser designated for assumption by the Debtors and assignment to the Purchaser under Section 365 of the Bankruptcy Code.

**WHEREAS**, on November 13, 2024, the Bankruptcy Court entered an order authorizing the sale of substantially all of the Debtors' assets to the Purchaser pursuant to the terms of the APA and applicable provisions of the Bankruptcy Code [Doc. 411] (the "Sale Order"). The Sale Order and the APA contemplate that the Debtors will provide transition services to the Purchaser following the closing of the sale pursuant to a Transition Services Term Sheet attached as an exhibit to the APA (the "TSA"), including access to the Debtors' rights under executory contracts not assumed and assigned as of the sale closing (the "TSA Contracts").

**WHEREAS**, Tenant has confirmed that the sale of substantially all of the Debtors' assets pursuant to the Sale Order closed on November 22, 2024, and DIB designated Tenant as the Purchaser to take title to the Debtor's assets including the right to designate executory contracts for assumption and assignment to Tenant.

**WHEREAS**, on December 11, 2024, the Bankruptcy Court entered an order implementing procedures for the assumption and assignment of TSA Contracts [Doc. 688] (the

"TSA Contract Procedures Order") pursuant to which Tenant was authorized to direct the Debtors to assume and assign TSA Contracts to Tenant upon prior notice to the contract counterparties. TSA Contracts assumed and assigned to Tenant in compliance with the TSA Contract Procedures Order are "Transferred Assets" for all purposes under the Sale Order and the APA, subject to performance of all outstanding non-monetary obligations and payment of any and all amounts necessary to cure defaults under such TSA Contract as required by Sections 365(b)(1)(a) and (b) of the Bankruptcy Code (the "Cure Amount").

       **WHEREAS**, Landlord acknowledges and agrees that, as of February 27, 2025, the Cure Amount owing in respect of the Lease is $80,180.68 (the "February 27 Cure Amount"), and Landlord desires that Tenant cause the Debtors to assume the Lease, and assign it to Tenant, subject to and conditioned on the amendment of the Lease pursuant to this Amendment and payment to Landlord of the Cure Amount owing in respect of the Lease.

       **WHEREAS**, the Lease is a TSA Contract that Tenant has requested that the Debtors assume and assign to Tenant, pursuant to the TSA Procedures Order, subject to and conditioned upon this Amendment being effective upon such assumption and assignment.

       **WHEREAS**, Landlord and Tenant have agreed to modify the terms of the Lease pursuant to the terms set forth herein.

       **NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Landlord and Tenant agree and covenant as follows:

1.     Incorporation of Recitals. Capitalized Terms. The background recitals set forth above are incorporated herein by this reference with the same force and effect as if fully set forth hereinafter. All capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Original Lease.

2.     Effective Date Subject to Bankruptcy; Assignment of Lease. Notwithstanding anything in this Amendment to the contrary, the "Effective Date" of this Amendment shall be the date that is the later of (i) the date the Bankruptcy Court enters an order approving TVC LLC's assumption and assignment of the Lease (the "Assumption and Assignment Order"); and (ii) the date on which Tenant performs the Cure of Monetary Defaults (as defined below). Tenant will provide Landlord with a draft copy of the Assumption and Assignment Order for its review and approval, such approval not to be unreasonably withheld, conditioned or delayed. Notice of the proposed assumption and assignment of the Lease, as amended by this Amendment, will be served on Landlord by the Debtors in accordance with the TSA Contract Procedures Order. Provided that Landlord approved of the draft copy of the Assumption and Assignment Order and the Assumption and Assignment Order is in the same form as previously approved, Landlord will not interpose an objection to entry. On the Effective Date, this Amendment shall become effective, and the Lease shall be assumed by TVC LLC and assigned to Tenant for all purposes under the Sale Order and the APA

pursuant to a certain Assignment and Assumption of Lease in the form of Schedule 1-B attached hereto (the "Assignment"). A copy of the Assignment will be provided by Tenant to Landlord promptly following execution. Pursuant to the Assignment and subject to the terms of the APA and the Assumption and Assignment Order, TVC LLC will sell, convey, transfer, deliver and assign to Tenant, and Tenant will purchase, accept and assume, (a) all of TVC LLC's right, title, benefits, privileges and interest, legal and equitable, in and to the Lease and (b) all responsibilities, liabilities and obligations of TVC LLC that arise under the Lease on or after the Effective Date; notwithstanding anything to the contrary, Tenant shall be responsible for all obligations under the Lease, subject to the terms of the Amendment and Assumption and Assignment Order, that first become due and payable after the Effective Date (the "**Assumed Lease Obligations**"); provided, however, for the avoidance of doubt, the Assumed Lease Obligations expressly exclude indemnification obligations and environmental condition obligations under the Lease that relate to events occurring prior to the Effective Date. This Amendment shall become null and void if the Effective Date has not occurred by May 12, 2025. A copy of the Assumption and Assignment Order entered by the Bankruptcy Court will be attached hereto as Schedule 1-A upon issuance.

3.  Rent.  "Exhibit B" to the Lease (Base Rent Schedule) shall be deleted in full and replaced with "Exhibit B" set forth as Schedule 2 attached hereto. For clarity, prior to obtaining the Assumption and Assignment Order, Tenant shall be obligated to pay Base Rent in accordance with the provisions of the Original Lease. In the event of an overpayment of Base Rent by Tenant when compared to the Base Rent owed pursuant to Schedule 2 attached hereto, Landlord shall refund any such overpayment within thirty (30) days following receipt of the Assumption and Assignment Order, provided that Tenant is not in default of its obligations under the Lease beyond any applicable cure period.

4.  Signage.  Notwithstanding anything set forth in the Original Lease to the contrary, Tenant may install Do it Best corporate signage on the Leased Premises, subject to consent of Landlord, not to be unreasonably withheld, conditioned or delayed, so long as such signage is in compliance with all Applicable Laws and the Original Lease.

5.  Cure Amount. Landlord confirms that the February 27 Cure Amount includes legal fees incurred to date in connection with the Debtor's application for relief under the Bankruptcy Code, the assignment and assumption of the Original Lease, and this Amendment (the "Legal Fees"). Tenant hereby agrees to reimburse Landlord, within 15 days following receipt of an invoice, for all additional Legal Fees incurred by Landlord in connection with the matters set forth herein (the "Additional Legal Fees"); provided, however, that such amount for Additional Legal Fees shall not exceed $15,000 (the "Cap"). The "Cure of Monetary Defaults" includes Tenant's payment of the February 27 Cure Amount, any other outstanding Lease obligations first coming due and payable between February 27 through and including the Effective Date, and the Additional Legal Fees subject to the Cap.

3

6.      <u>Tenant Repairs</u>. Tenant agrees to, no later than 120 days after the Effective Date, (i) perform, at Tenant's sole cost and expense, those maintenance and repair items listed on Schedule 3 (collectively the "<u>Tenant Repairs</u>"), (ii) obtain all required permits with respect to such work, and (iii) perform the Tenant Repairs in compliance with all Applicable Laws and the Original Lease.

7.      <u>Guaranty</u>.  The effectiveness of this Amendment is conditioned on Landlord's receipt of that certain Guaranty attached hereto as Schedule 4 executed by Do it Best Corp., an Indiana corporation ("<u>Guarantor</u>"), whereby Guarantor shall guarantee the Assumed Liabilities.

8.      <u>Notices</u>.  Tenant's notice address under the Lease shall be changed to:

> Do it Best Corp.
> 1626 Broadway, Suite 100
> Fort Wayne, Indiana 46802
> Attention: General Counsel, Gary Furst

WITH A COPY TO:

> Do it Best Corp.
> 1626 Broadway, Suite 100
> Fort Wayne, Indiana 46802
> Attention: SVP of Logistics, Tim Miller

9.      <u>Miscellaneous</u>.

(a)      Except as modified and amended by the Assumption and Assignment Order and this Amendment, all of the conditions, covenants and terms of the Lease hereby are confirmed and ratified and shall continue to be and remain in full force and effect. Landlord and Tenant hereby agree that (i) this Amendment is incorporated into and made a part of the Lease, and (ii) any and all references to the Lease hereinafter shall include this Amendment.

(b)      This Amendment and the Lease together contain the entire understanding between the parties hereto and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof or thereof.  Any guarantees, promises, representations or warranties not herein or therein contained and hereinafter made shall have no force and effect unless in writing and executed by the party or parties making such guarantees, promises, representations or warranties.

(c)      Neither this Amendment nor the Lease nor any portion or provisions hereof or thereof may be amended, cancelled, changed, discharged, modified, supplemented, terminated or waived orally or by any course of dealing, or in any manner other than by an

4

agreement in writing, signed by Landlord and Tenant or their respective heirs, permitted assigns, representatives or successors. Execution copies of this Amendment may be delivered by facsimile or email, and the parties hereto agree to accept and be bound by facsimile signatures or scanned signatures transmitted via email hereto, which signatures shall be considered as original signatures with the transmitted Amendment having the binding effect as an original signature on an original document.

(d)     This Amendment may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one (1) and the same instrument.

(e)     If and to the extent any of the provisions of this Amendment conflict with or otherwise are inconsistent with any of the provisions of the Lease, whether or not such inconsistency is noted expressly in this Amendment, the provisions of this Amendment shall prevail.

(f)     Tenant hereby covenants, represents and warrants to Landlord that: (i) upon the issuance of the Assumption and Assignment Order, no third party consents or approvals are required in order for it to enter into this Amendment; (ii) upon the issuance of the Assumption and Assignment Order, the execution, delivery and full performance of this Amendment by it does not and shall not constitute a violation of any contract, agreement, mortgage, undertaking, judgment, law, decree, governmental or court or other restriction of any kind to which it is a party or by which it may be bound; (iii) it is duly organized, validly existing and in good standing under the laws of the state of its organization and has full power and authority to enter into this Amendment, to perform its obligations under this Amendment in accordance with its terms; and (iv) to the knowledge of Tenant, no default by Landlord exists under the Lease as modified and amended by this Amendment. Landlord hereby covenants, represents and warrants to Tenant that: (i) upon the issuance of the Assumption and Assignment Order, no third party consents or approvals are required in order for it to enter into this Amendment; (ii) upon the issuance of the Assumption and Assignment Order, the execution, delivery and full performance of this Amendment by it does not and shall not constitute a violation of any contract, agreement, mortgage, undertaking, judgment, law, decree, governmental or court or other restriction of any kind to which it is a party or by which it may be bound; (iii) it owns the Leased Premises in fee simple and is duly organized, validly existing and in good standing under the laws of the state of its organization and has full power and authority to enter into this Amendment, to perform its obligations under this Amendment in accordance with its terms; and (iv) except for the Cure Amounts set forth in this Amendment, to the knowledge of Landlord, no default by Tenant exists under the Lease as modified and amended by this Amendment.

[remainder of page intentionally left blank; signatures appear on the following page]

IN WITNESS WHEREOF, the parties hereby have caused this Amendment to be duly executed as of the day and year first above written.

LANDLORD:

**GRANITE (12 TRADEPORT) LLC**,
a Delaware limited liability company,

By: _____
Name: Lorne Kumer
Title: Vice President

By: _____
Name: Lawrence Clarfield
Title: Secretary

TENANT:

**TV HARDWARE DISTRIBUTION, LLC**,
an Indiana limited liability company

By: _____
Name: Tim Miller
Title: SVP, Logistics & Distribution

## SCHEDULE 1-A

<u>ASSIGNMENT AND ASSUMPTION ORDER</u>

<u>[To be attached following receipt.]</u>

**SCHEDULE 1-B**

FORM OF LEASE ASSIGNMENT

**ASSIGNMENT AND ASSUMPTION OF LEASE**

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "<u>Agreement</u>") is made and entered into as of November 23, 2024 (the "<u>Effective Date</u>"), by and between **TRUE VALUE COMPANY, L.L.C.**, a Delaware limited liability company ("<u>Assignor</u>"), and **TV HARDWARE DISTRIBUTION, LLC**, an Indiana limited liability company ("<u>Assignee</u>").

**W I T N E S S E T H:**

      **WHEREAS**, Assignor and **GRANITE (12 TRADEPORT) LLC**, a Delaware limited liability company, are parties to that certain Industrial Lease dated October 19, 2018, as amended by the First Amendment to Industrial Lease dated February 18, 2019, Second Amendment to Industrial Lease dated August 28, 2019, Third Amendment to Industrial Lease dated January 31, 2020, Fourth Amendment to Industrial Lease dated July 31, 2020 and Fifth Amendment to Industrial Lease dated October 1, 2021 (the "<u>Lease</u>"), which pertains to that certain real property located at 12 Tradeport Rd., Hanover Township, Pennsylvania 18706.

      **WHEREAS**, an Order, dated _____, 2025, of the United States Bankruptcy Court for the District of Delaware, which case, Chapter 11 Case No. 24-12337 (KBO), for Assignor is now pending, had authorized and approved (i) assumption of the Lease, and (ii) pursuant to the terms of this Assignment, the assignment of the Lease; and

      **WHEREAS**, Assignor, the other Sellers (as defined therein) party thereto, and Assignee's parent are parties to that certain Amended and Restated Asset Purchase Agreement, dated as of November 10, 2024 (the "<u>Purchase Agreement</u>"), providing for, among other things, the sale, conveyance, assignment, transfer and delivery by Assignor to Assignee of Assignor's right, title and interest in and to the Lease.

      **WHEREAS**, as of the Effective Date, and subject to the terms of the Purchase Agreement, Assignor wishes to assign to Assignee all of its rights and obligations under the Lease and Assignee wishes to accept such assignment and assume the rights and obligations of Assignor under the Lease, in each case, as further set forth below.

      **NOW, THEREFORE**, in consideration of the premises and covenants hereinafter contained, in consideration of the representations, warranties and covenants contained in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

      1.     **Assignment of Lease**. As of the Effective Date, Assignor hereby sells, conveys, transfers, delivers and assigns to Assignee, and Assignee hereby purchases, accepts and assumes, (a) all

1

of Assignor's right, title, benefits, privileges and interest, legal and equitable, in and to the Lease and (b) all responsibilities, liabilities and obligations of Assignor that arise under the Lease on or after the Effective Date.

2. **No Amendment, Modification**. Nothing herein contained shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms and conditions set forth in the Purchase Agreement in any manner whatsoever. This Agreement does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the terms and conditions set forth in the Purchase Agreement. In the event of any conflict or other difference between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control. No waiver, modification or change of any of the provisions of this Agreement shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

3. **Assignment**. This Agreement shall be binding upon and inure to the benefit of Assignee and Assignor and their respective successors and permitted assigns. The sole and exclusive remedy of Assignee and Assignor with respect to a breach of this Agreement shall be as set forth in the Purchase Agreement. This Agreement shall not confer any rights or remedies upon any person other than Assignor, Assignee and their respective successors and permitted assigns.

4. **Headings**. The headings and captions of the several Sections of this Agreement are inserted for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. References to Sections, unless otherwise indicated, are references to Sections of this Agreement.

5. **Governing Law; Submission to Jurisdiction; Specific Performance;  Waiver of Jury Trial; Severability, Limitation on Damages, No Recourse**. The Parties agree that Sections 10.10, 10.11, 10.13, 10.15, 10.16, 10.19, and 10.20 of the Purchase Agreement shall apply to this Agreement, *mutatis mutandis*.

6. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by electronic communications in portable document format (.pdf), each of which shall be deemed an original.

*[Signature Pages Follow]*

2

30735282.1

171301467v7

**IN WITNESS WHEREOF,** Assignor and Assignee have caused this Agreement to be executed by their duly authorized representatives to be effective as of the Effective Date.

ASSIGNOR:

**TRUE VALUE COMPANY, L.L.C.,**
a Delaware limited liability company

By:_____
Name:
Title:




ASSIGNEE:

**TV HARDWARE DISTRIBUTION, LLC**,
an Indiana limited liability company

By:_____
Name: Tim Miller
Title: SVP, Logistics & Distribution

**SCHEDULE 2**

<u>EXHIBIT B: BASE RENT SCHEDULE</u>

| <u>From</u> | <u>To</u> | <u>Rent PSF</u> | <u>Annual</u> | <u>Monthly</u> |
|---|---|---|---|---|
| 3/1/2025 | 2/28/2026 | $5.09 | $7,075,159.56 | $589,596.63 |
| 3/1/2026 | 2/28/2027 | $5.09 | $7,075,159.56 | $589,596.63 |
| 3/1/2027 | 2/29/2028 | $5.42 | $7,540,455.76 | $628,371.31 |
| 3/1/2028 | 2/28/2029 | $5.50 | $7,649,792.37 | $637,482.70 |
| 3/1/2029 | 2/28/2030 | $5.58 | $7,760,714.36 | $646,726.20 |
| 3/1/2030 | 2/28/2031 | $5.66 | $7,873,244.72 | $656,103.73 |
| 3/1/2031 | 2/29/2032 | $5.74 | $7,987,406.76 | $665,617.23 |
| 3/1/2032 | 2/28/2033 | $5.82 | $8,103,224.16 | $675,268.68 |
| 3/1/2033 | 2/28/2034 | $5.91 | $8,220,720.91 | $685,060.08 |
| 3/1/2034 | 2/28/2035 | $5.99 | $8,339,921.37 | $694,993.45 |
| 3/1/2035 | 2/29/2036 | $6.08 | $8,460,850.23 | $705,070.85 |
| 3/1/2036 | 2/28/2037 | $6.17 | $8,583,532.55 | $715,294.38 |
| 3/1/2037 | 2/28/2038 | $6.26 | $8,707,993.78 | $725,666.15 |
| 3/1/2038 | 2/28/2039 | $6.35 | $8,834,259.69 | $736,188.31 |
| 3/1/2039 | 2/29/2040 | $6.44 | $8,962,356.45 | $746,863.04 |
| 3/1/2040 | 2/28/2041 | $6.54 | $9,092,310.62 | $757,692.55 |

Docusign Envelope ID: 6CE3E5A1-13DA-44F7-AA29-356F5AE3DF987

## SCHEDULE 3

<u>TENANT REPAIRS</u>

1.      Correct storm drain subsidence

2.      Replace building mounted lights

3.      Correct damaged water shut off access pipe and ensure fire and life systems are all in good working order

4.      Exterior wall damage repairs in multiple locations

5.      Concrete repairs at water access shut offs and interior slab

6.      Asphalt repairs in parking lot where trailers were being parked and at main employee entrance

7.      Engage landscape contractor to address deficiencies

Docusign Envelope ID: 6CE3E5A1-13DA-44F7-AA29-35BFAE3DF987

## SCHEDULE 4

<u>FORM OF GUARANTY</u>

See attached.